UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

_____

NICHOLAS MARTIN,

                                        Plaintiff,

                                                                    9:16-cv-00717
                                                                    (TJM/TWD)

v.

R. OEY, et al.,

                                        Defendants.

_____

APPEARANCES:                              OF COUNSEL:

NICHOLAS MARTIN
00-A-0008
Plaintiff *pro se*
Shawangunk Correctional Facility
P.O. Box 700
Wallkill, New York 12589

HON. ERIC T. SCHNEIDERMAN                 SHANNAN C. KRASNOKUTSKI, ESQ.
Attorney General of the State of New York Assistant Attorney General
Counsel for Defendants
The Capitol
Albany, New York 12224

**THÉRÈSE WILEY DANCKS**, United States Magistrate Judge

## ORDER AND REPORT-RECOMMENDATION

This *pro se* civil rights action, commenced pursuant to 42 U.S.C § 1983, has been

referred for Report and Recommendation by the Honorable Thomas J. McAvoy, Senior United

States District Judge, pursuant to 28 U.S.C. § 636(b) and Local Rule 72.3(c).  Plaintiff Nicholas

Martin, an inmate in the custody of the New York State Department of Corrections and

Community Supervision ("DOCCS"), alleges he was disciplined by Defendants Rebecca Oey,

Donald Venettozzi, and Anthony Annucci in violation of his due process rights under the Fourteenth Amendment to the United States Constitution. (*See generally* Dkt. No. 8.) The matter is now before the Court on Defendants' motion to dismiss for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6). (Dkt. No. 17.) Plaintiff opposes the motion. (Dkt. No. 20.) For the reasons that follow, the Court recommends that Defendants' Rule 12(b)(6) motion be granted.

## I.    RELEVANT BACKGROUND

### A.    January 23, 2015, Incident

On January 23, 2015, Plaintiff was transferred to Upstate Correctional Facility ("Upstate"). (Dkt. No. 8-4 at 2.[1]) During an interview with non-party Sergeant Wyckoff, Plaintiff refused to double bunk and stated, "if you put me in a cell with a bunky I will murder him, I won't stop beating him until I kill the mother fucker." *Id*. at 53 (unaltered text). Plaintiff was then escorted to the facility hospital and placed on suicide watch for three days. *Id*. at 2. On January 26, 2015, Plaintiff was transferred to Clinton Correctional Facility's Satellite Unit for suicide watch. *Id*. On February 2, 2016, Plaintiff was transferred back to Upstate. *Id*. On February 3, 2015, Plaintiff was served a copy of the January 23, 2015, inmate misbehavior report, in which Sergeant Wyckoff charged Plaintiff with violating DOCCS rules 102.10 (threats) and 109.15 (refusal to double bunk). *Id*.

### B.    February 6, 2015, Tier III Disciplinary Hearing

On February 6, 2015, Oey conducted Plaintiff's Tier III disciplinary hearing stemming from the January 23, 2015, incident. *Id*. at 2. At the hearing, Plaintiff pleaded guilty to making

---

[1] Plaintiff's amended complaint consists of eight handwritten pages and fifty-seven pages of attached exhibits. (*See* Dkt. No. 8.) Page references to documents identified by docket number are to the page assigned by the Court's electronic filing system.

threats and refusing to double bunk. *Id*. at 19. Oey sentenced Plaintiff to 60 days in the Special

Housing Unit ("SHU") (with 30 days suspended), along with loss of other privileges. *Id*. at 57.

Plaintiff's 30 day SHU sentence ran consecutive to a 10 month sentence Plaintiff was serving

from a previous disciplinary infraction. (Dkt. No. 8 at 4; *see also* Dkt. No. 8-4 at 57.)

On administrative appeal, Plaintiff argued that the disposition should be reversed and

expunged because Oey failed to obtain testimony from an Office of Mental Health ("OMH")

clinician pursuant to DOCCS Directive 4932. (Dkt. No. 8-4 at 2-5.[2]) On April 2, 2015,

Venettozzi upheld Oey's February 6, 2015, disciplinary disposition. *Id*. at 5.

### C.    Article 78 Proceeding

Following his unsuccessful administrative challenge, Plaintiff commenced a proceeding

in New York State Court, pursuant to Article 78 of the New York Civil Practice Law and Rules,

challenging the disciplinary determination. *Id*. at 7-23. In relevant part, Plaintiff argued:

> 9.) At no time prior to or during the Superintendent's hearing was
> the Petitioner afforded the following minimal due process rights:
>
> > a.) OMH testimony regarding Petitioner's mental condition
> > or intellectual capacity at the time of the incident and at the
> > time of the hearing.

*Id*. at 19. Specifically, Plaintiff claimed that because the hearing officer failed to interview and

record the OMH clinician's testimony in accordance DOCCS Directive 4932, 7 N.Y.C.R.R. §

254.6, his "constitutional rights to due process were violated." *Id*. at 20. Pursuant to this

section, "[w]hen an inmate's mental state or intellectual capacity is at issue, a hearing officer

shall consider evidence regarding the inmate's mental condition or intellectual capacity at the

---

[2] Plaintiff also challenged the timeliness of February 6, 2015, disciplinary hearing. (Dkt. No. 8-4 at 2-5.)

time of the incident and at the time of the hearing in accordance with this section."  7 N.Y.C.R.R. § 254.6(b).

By Decision and Judgment dated October 29, 2015, the state court vacated Plaintiff's February 6, 2015, disciplinary hearing and remitted the matter for a new hearing.  (Dkt. No. 8-4 at 33.)  Specifically, the state court analyzed § 254.6(b)(1)(ix), which indicates that "an inmate's mental state shall be at issue when . . . it appears to the hearing officer, based on the inmate's testimony, demeanor, the circumstances of the alleged offense or any other reason, that the inmate may have been mentally impaired at the time of the incident or may be mentally impaired at the time of the hearing."  7 N.Y.C.R.R. § 256.6(b)(1)(ix).  Accordingly, the state court held that in certain circumstances where "information known to DOCCS staff should have prompted a finding that the inmate may have been mentally impaired," the "catch-all" provision of this subsection should be applied to require a hearing officer to consider evidence of the inmate's mental state.  (Dkt. No. 8-4 at 32.)

As such, in light of the fact that Plaintiff claimed he was placed on suicide watch after the January 23, 2015, incident and was transferred to a mental health facility for approximately one week before being transferred back to Upstate on February 2, 2015, the state court found that the procedures set forth in §§ 254.6(c)-(g) should have been implemented at the hearing.  *Id*. Plaintiff's February 6, 2015, disciplinary determination was therefore reversed and returned to DOCCS for a rehearing.  *Id*. at 33.  In so holding, the state court expressly stated "there has been no determination that the results of the Tier III Superintendent's Hearing of February 6, 2015[,] were not supported by substantial evidence and . . . there has been no determination that one of petitioner's fundamental due process rights, as enunciated in *Wolff v. McDonnell*, 418 U.S. 539 [1974], has been violated[.]"  *Id*.  However, because DOCCS failed to timely hold the rehearing,

the January 23, 2015, incident was expunged from Plaintiff's institutional record.  (Dkt. No. 8-4 at 40, 45.)

### D.    Procedural History

Plaintiff commenced this action on June 20, 2016, by filing a complaint, together with an application to proceed *in forma pauperis* ("IFP").  (Dkt. Nos. 1 and 2.)  By Decision and Order dated July 22, 2016, Plaintiff's IFP application was granted, but following review of the complaint pursuant to 28 U.S.C. §§ 1915(e)(2)(B) and 1915A(b), the Court found that the complaint was subject to dismissal for failure to state a claim upon which relief may be granted. (Dkt. No. 5.)  Specifically, the Court found that Plaintiff failed to allege facts to plausibly suggest that he was denied any of the Fourteenth Amendment due process procedural protections to which he was entitled under *Wolff v. McDonnell*, 418 U.S. 539 1974.  *Id*.  In light of his *pro se* status, Plaintiff was afforded an opportunity to submit an amended complaint.  *Id*.  Plaintiff's amended complaint, restating and clarifying his Fourteenth Amendment due process claim against Defendants, survived the Court's *sua sponte* review.  (Dkt. No. 11.)

In his amended complaint, Plaintiff alleges that on February 6, 2015, Oey denied him due process when she "intentionally found" Plaintiff guilty "without obtaining testimony from an OMH clinician to consider [his] mental condition" in violation of 7 N.Y.C.R.R. § 254.6.  (Dkt. No. 8 at 4.)  As a result, Plaintiff was sentenced to serve 60 days in the Special Housing Unit ("SHU"), with 30 days of the sentence suspended, to run consecutive to his 10 month SHU term for unrelated matters without due process.  *Id*.  According to Plaintiff, "[w]hen prison officials initiate an emergency referral for mental health services for an inmate and disciplinary proceedings arise from an incident occurring while the referral is being executed, the inmates [sic] mental condition is an obvious concern" and therefore Oey should have considered

Plaintiff's mental state in assessing his guilt or innocence during the February 6, 2015, disciplinary hearing. *Id*. at 4. Plaintiff claims that "[p]rison regulations specifying conditions under which [an] inmate could be confined to SHU created a liberty interest . . . protected by [the] due process clause." *Id*. at 3.

Plaintiff claims that Venettozzi and Annucci learned through the administrative appeal and Article 78 proceeding that Plaintiff's constitutional rights were violated during the February 6, 2015, disciplinary hearing, and yet they failed to correct the violations and allowed the ongoing violations to continue. *Id*. at 4-5.

Defendants now move to dismiss Plaintiff's amended complaint pursuant to Rule 12(b)(6) for failure to state a claim. (Dkt. No. 17.) Plaintiff has opposed Defendants' motion. (Dkt. No. 19.) Defendants have filed a reply. (Dkt. No. 20.) With permission from the Court (Dkt. Nos. 20 and 21), Plaintiff has filed a sur-reply. (Dkt. No. 23.)

### E.    The Parties' Briefings on Defendants' Motion to Dismiss

Defendants make two major arguments in support of their motion to dismiss. (*See generally* Dkt. No. 17-1.[3]) First, Defendants contend that Plaintiff has failed to state any claim for a violation of his due process rights because, at best, he alleges no more than a procedural violation of New York State regulatory law. *Id*. at 8-10. Second, Defendants argue that Plaintiff "cannot allege deprivation of any liberty interest, since Plaintiff served no time in the [SHU] as a result of the disciplinary determination at issue." *Id*. at 5, 10-12.

In his opposition, Plaintiff responds that his due process claim is "not based upon the hearing officer's failure to conduct a mental assessment" but rather is "based on the sole fact that

---

[3] For the reasons explained in Section III.B., the Court has also considered Defendants' alternative arguments and finds them to be without merit.

the hearing officer did not call an OMH clinician as a witness in regards to [his] mental capacity, thus violating a standard in [*Wolff*]."  (Dkt. No. 19 at 6-7.)  Plaintiff stresses that the "fundamental due process guarantees outlined in [*Wolff*] are applicable to the procedures set forth in 7 N.Y.C.R.R. [§] 254.6 as it affords inmates an opportunity for witnesses to be called." *Id*. at 7.  As to Defendants' second argument, Plaintiff declares that he did in fact serve the full duration of the 30 day SHU sentence at issue.  *Id*. at 9.  Specifically, Plaintiff explains that he was confined in the SHU from December 11, 2014, to November 6, 2015, 30 days of which resulted from the February 6, 2015, disciplinary determination at issue.  *Id*. at 10.

In their reply, Defendants argue, *inter alia*, that the hearing disposition in this case, attached as Exhibit K to Plaintiff's amended complaint (Dkt. No. 8-4 at 57), indicates that Plaintiff's SHU penalty in this matter was deferred and scheduled to begin on December 11, 2015, and end on January 9, 2016.  (Dkt. No. 20 at 7-8.)  Therefore, Defendants argue that Plaintiff did not actually serve any time in the SHU as a result of the February 6, 2015, disciplinary hearing.  *Id*.  Defendants note that Plaintiff has not alleged that he remained in the SHU after December 11, 2015, the date he was scheduled to commence the SHU penalty associated with the February 6, 2015, disciplinary determination, nor do Plaintiff's disciplinary records attached as Exhibit H to Plaintiff's amended complaint (Dkt. No. 8-4 at 49-51), reflect that Plaintiff's SHU confinement continued after that date.  *Id*.

In his sur-reply, Plaintiff first argues that *Wolff* affords inmates the opportunity for witnesses to be called, regardless of whom that witness may be.  (Dkt. No. 23 at 5.)  Second, Plaintiff explains that although the February 6, 2015, hearing disposition sheet indicates that his 30 day SHU sentence was scheduled to begin on December 11, 2015, because his original SHU sentence stemming from a December 11, 2014, incident was reduced from 12 months SHU

confinement to 6 months SHU confinement, Plaintiff served the 30 days at issue immediately

thereafter, from June 9, 2015, to July 9, 2015. (Dkt. No. 23 at 8-9.) Plaintiff then served an

additional 30 days in the SHU stemming from a February 11, 2015, disciplinary hearing,

followed by an additional 90 days in the SHU arising from a February 17, 2005, disciplinary

hearing. *Id*. In total, Plaintiff claims that he served 330 consecutive days in the SHU, from

December 11, 2014, to November 6, 2015. *Id*. Lastly, Plaintiff explains that the 30 day SHU

confinement resulting from the February 6, 2015, disciplinary hearing is not reflected on the

computer generated disciplinary record because the January 23, 2015, incident was expunged

from his institutional records on November 24, 2015, *after* he served the 30 days in the SHU at

issue. *Id*.

## II.    LEGAL STANDARD

A defendant may move to dismiss a complaint under Federal Rule of Civil Procedure

12(b)(6) on the ground that the complaint fails to state a claim upon which relief can be granted.

In order to state a claim upon which relief can be granted, a complaint must contain, *inter alia*,

"a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R.

Civ. P. 8(a)(2). The requirement that a plaintiff "show" that he or she is entitled to relief means

that a complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to

relief that is *plausible* on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (emphasis added)

(quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "Determining whether a

complaint states a plausible claim for relief . . . requires the . . . court to draw on its judicial

experience and common sense. . . . [W]here the well-pleaded facts do not permit the court to

infer more than the mere possibility of misconduct, the complaint has alleged—but it has not

shown—that the pleader is entitled to relief." *Id*. at 679 (internal citation and punctuation omitted).

"In reviewing a complaint for dismissal under Rule 12(b)(6), the court must accept the material facts alleged in the complaint as true and construe all reasonable inferences in the plaintiff's favor." *Hernandez v. Coughlin*, 18 F.3d 133, 136 (2d Cir. 1994) (citation omitted). However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 555). In considering a Rule 12(b)(6) motion, "the court considers the complaint, the answer, any written documents attached to them, and any matter of which the court can take judicial notice for the factual background of the case." *L-7 Designs, Inc. v. Old Navy, LLC*, 647 F.3d 419, 422 (2d Cir. 2011) (citation and internal quotation marks omitted); *see also Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 47 (2d Cir. 1991) (A court may consider "any written instrument attached [to the complaint] as an exhibit or any statements or documents incorporated in it by reference.").

Where a party is proceeding *pro se*, the court is obliged to "read [the *pro se* party's] supporting papers liberally, and . . . interpret them to raise the strongest arguments that they suggest." *See Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994) (citations omitted); *see also Harris v. Mills*, 572 F.3d 66, 72 (2d Cir. 2009) (courts remain obligated to construe *pro se* complaints liberally even after *Twombly*). "[T]he mandate to read the papers of *pro se* litigants generously makes it appropriate to consider a plaintiff's papers in opposition to a defendant's motion to dismiss as effectively amending the allegations of the plaintiff's complaint, to the extent that those factual allegations are consistent with the allegations of the plaintiff's

9

complaint." *Robles v. Bleau*, No. 9:07-CV-0464, 2008 WL 4693153, at *6 and n.41 (N.D.N.Y.

Oct. 22, 2008)[4] (collecting cases); *Donhauser v. Goord*, 314 F. Supp. 2d 119, 121 (N.D.N.Y.

2004) ("where a *pro se* plaintiff is faced with a motion to dismiss, it is appropriate for the court

to consider materials outside of the complaint to the extent they 'are consistent with the

allegations in the complaint.'"), *vacated in part on other grounds*, 317 F. Supp. 2d 160

(N.D.N.Y. 2004); *see also Gill v. Mooney*, 824 F.2d 192, 195 (2d Cir. 1987) (in reviewing

district court's dismissal of *pro se* plaintiff's claim, Second Circuit considered plaintiff's

affidavit submitted in opposition to motion to dismiss).

## III.    ANALYSIS

### A.    Fourteenth Amendment Due Process

The Fourteenth Amendment to the United States Constitution provides that "[n]o State

shall . . . deprive any person of life, liberty, or property, without due process of law."  U.S.

Const. amend. XIV, § 1.  "A liberty interest may arise from the Constitution itself, . . . or it may

arise from an expectation or interest created by state laws or polices."  *Wilkinson v. Austin*, 545

U.S. 209, 221 (2005) (citation omitted).  "Although prison inmates necessarily have their liberty

severely curtailed while incarcerated, they are nevertheless entitled to certain procedural

protections when disciplinary actions subject them to further liberty deprivations such as loss of

good-time credit or special confinement that imposes an atypical hardship."  *Sira v. Morton*, 380

F.3d 57, 69 (2d Cir. 2004) (citations omitted).

To state a procedural due process claim under § 1983, a plaintiff must show that he (1)

possessed an actual liberty interest, and (2) was deprived of that interest without being afforded

---

[4] The Court will provide Plaintiff with copies of all unpublished decisions cited herein in
accordance with the Second Circuit's decision in *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2009)
(per curiam).

sufficient process. *See Ortiz v. McBride*, 380 F.3d 649, 654 (2d Cir. 2004); *Tellier v. Fields*, 280 F.3d 69, 79-80 (2d Cir. 2000); *Hynes v. Squillace*, 143 F.3d 653, 658 (2d Cir. 1998).

      1.   <u>Liberty Interest</u>

To state a claim for procedural due process, there must first be a liberty interest which requires protection. *Lewis v. Murphy*, No. 9:12-CV-00268 (NAM/CFH), 2014 WL 3729362, at *7 (N.D.N.Y. July 25, 2014) (citing *Valmonte v. Bane*, 18 F.3d 992, 998 (2d Cir. 1994)). An inmate retains a protected liberty interest in remaining free from segregated confinement if the prisoner can satisfy the standard set forth in *Sandin v. Conner*, 515 U.S. 472, 483-84 (1995). Therefore, a plaintiff must show that (1) the state actually created a protected liberty interest in being free from segregation, and (2) the segregation would impose an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin*, 515 U.S. at 783-84; *Tellier*, 280 F.3d at 79-80; *Hynes*, 143 F.3d at 658.

As to the first factor, "[t]he prevailing view in this Circuit is that, by its regulatory scheme, the State of New York has created a liberty interest in remaining free from disciplinary confinement, thus satisfying the first *Sandin* factor." *Liao v. Malik*, No. 9:13-CV-1497 (GTS/DEP), 2016 WL 1128245, at *4 (N.D.N.Y. Feb. 26, 2016) (collecting cases). As to the second factor, the plaintiff bears the "burden of proving that the conditions of his confinement constituted an atypical, significant hardship in relation to the ordinary incidents of prison life in order to recover damages" under § 1983. *Vasquez v. Coughlin*, 2 F. Supp. 2d 255, 260 (N.D.N.Y. 1998).

The Second Circuit has instructed that in determining whether an inmate's SHU confinement has imposed an atypical and significant hardship, a court must consider, among other things, both the duration and conditions of confinement. *J.S. v. T'Kach*, 714 F.3d 99, 106

(2d Cir. 2013).  Thus, while not dispositive, the duration of a disciplinary confinement is a

significant factor in determining atypicality.  *Colon v. Howard*, 215 F.3d 227, 231 (2d Cir. 2000)

(citations omitted).

The Second Circuit has declined to provide a bright-line rule as to what duration of

punitive confinement implicates a prisoner's constitutional rights; however, general guidelines

have been defined.  *See Palmer v. Richards*, 364 F.3d 60, 64 (2d Cir. 2004).  Confinement for

101 days or fewer under typical punitive segregation conditions "generally do[es] not constitute

'atypical' conditions of confinement."  *Bunting v. Nagy*, 452 F. Supp. 2d 447, 456 (S.D.N.Y.

2006) (quoting *Sealev v. Giltner*, 197 F.3d 578, 589 (2d Cir. 1999)).  By contrast, 305 days or

more of segregated confinement has been deemed an atypical and significant hardship.  *See*

*Colon*, 215 F.3d at 231-32.  "A period of confinement between 101 and 305 days is considered to

be an 'intermediate duration' and could implicate a liberty interest should a detailed record of the

conditions of confinement indicate that it was an atypical and significant hardship."  *Bunting*,

452 F. Supp. 2d at 456 (citing *Sealey*, 197 F.3d at 589); *see also Palmer*, 364 F.3d at 64-65.

In this case, Plaintiff claims he was confined in the SHU for 30 days as punishment for

the January 23, 2015, incident.  (Dkt. No. 8 at 4.)  Courts have consistently held that SHU or

keeplock confinement under ordinary conditions for 30 days does not rise to a level sufficient to

establish a due process claim.  *See Smart v. Goord*, 441 F. Supp. 2d 631, 640 (S.D.N.Y. 2006)

("[T]he decisions in the Second Circuit are unanimous that keeplock . . . of 30 days or less in

New York prisons is not 'atypical or significant hardship' under *Sandin*." (internal quotation

omitted)); *Ochoa v. DeSimone*, No. 9:06-CV-119 (DNH/RFT), 2008 WL 4517806, at *4

(N.D.N.Y. Sept. 30, 2008) (ruling that 30 days SHU and keeplock are insufficient to create

liberty interest); *Escalera v. Charwand*, No. 9:04-CV-0983 (FJS/DEP), 2008 WL 699273, at *8
(N.D.N.Y. Mar. 12, 2008) (ruling that 30 days keeplock are insufficient to create liberty interest).

However, the Second Circuit has suggested that "separate SHU sentences 'should be
aggregated for purposes of the *Sandin* inquiry' when they constitute a sustained period of
confinement." *Giano v. Selsky*, 238 F.3d 223, 226 (2d Cir. 2001) (quoting *Sims v. Artuz*, 230
F.3d 14, 22-23 (2d Cir. 2000)); *see also Sealey*, 197 F.3d at 589 (requiring district court to
aggregate sanctions that caused inmate to serve consecutive time in segregation); *see also
Reynoso v. Selsky*, 292 F. App'x 120, 122 (2d Cir. 2008) ("Overlapping disciplinary penalties
may, under some circumstances, have to be aggregated for purposes of determining whether a
liberty interest was violated."); *see, e.g.*, *Koehl v. Bernstein*, No. 10 Civ. (SHS)(GWG), 2011
WL 2436817, at *7 (S.D.N.Y. June 17, 2011) (aggregating the 90 day SHU and 30 day keeplock
confinement).

Here, Plaintiff claims that he was confined in the SHU from December 11, 2014, to
November 6, 2015, 30 days of which resulted from the February 6, 2015, disciplinary
determination.  (Dkt. No. 19 at 9.)  Defendants do not address Plaintiff's claim that his 30 day
SHU sentence should be considered in the aggregate.  Rather, Defendants argue that Plaintiff did
not serve any time in the SHU as a result of the February 6, 2015, disciplinary determination.
(Dkt. No. 17-1 at 12; Dkt. No. 20. at 7-8.)

Drawing all reasonable inferences in Plaintiff's favor as the Court must on Defendants'
motion to dismiss, the Court finds Plaintiff has plausibly alleged that he was confined for 330
consecutive days in the SHU, from December 11, 2014, through November 6, 2015, 30 days of
which resulted from the challenged disciplinary determination.  Because Plaintiff's combined
SHU confinement exceeds 305 days, which has been deemed an atypical and significant

hardship, for purposes of this motion, the Court finds that Plaintiff has plausibly alleged a liberty interest. *See Colon*, 215 F.3d at 231-32; *see e.g.*, *Bunting*, 452 F. Supp. 2d at 457 (aggregating the inmate's sentences imposed in May 1998, August 1998, and November 1998 (all from unrelated incidents), which resulted in 365 days of consecutive keeplock confinement).

        2.    Due Process

To state a claim under § 1983, a plaintiff must also allege that the conduct deprived him of a right guaranteed under the United States Constitution. *Snider v. Dylag*, 188 F.3d 51, 53 (2d Cir. 1999) (citing *Dwares v. City of New York*, 985 F.2d 94, 98 (2d Cir. 1993)). The constitutionally mandated due process requirements include (1) written notice of the charges to the inmate; (2) the opportunity to appear at a disciplinary hearing and a reasonable opportunity to present witnesses and evidence in support of his defense, subject to a prison facility's legitimate safety and penological concerns; (3) a written statement by the hearing officer explaining his decision and the reasons for the action being taken; and (4) in some circumstances, the right to assistance in preparing a defense. *Wolff v. McDonald*, 418 U.S. 539, 564-70 (1974); *see also Luna v. Pico*, 356 F.3d 481, 487 (2d Cir. 2004). The hearing officer's findings must be supported by "some" "reliable evidence." *Id.* (citing, *inter alia*, *Superintendent v. Hill*, 472 U.S. 445, 455 (1985)).

Thus, whether prison regulations were followed precisely is not a basis to conclude that any constitutional rights have been violated. *See Pollnow v. Glennon*, 757 F.2d 496, 501 (2d Cir. 1985). An alleged violation of prison directives or regulations does not give rise to a federal claim, because "[f]ederal constitutional standards rather than state law define the requirements of procedural due process." *Russell v. Coughlin*, 910 F.2d 75, 78 n.1 (2d Cir. 1990) (citations omitted); *see also Hyman v. Holder*, No. 96 Civ. 7748(RCC), 2001 WL 262665, at *6 (S.D.N.Y.

Mar. 15, 2001). Thus, "regardless of state procedural guarantees, the *only* process due an inmate is that minimal process guaranteed by the Constitution, as outlined in *Wolff* . . . ." *Shakur v. Selsky*, 391 F.3d 106, 119 (2d Cir. 2004).

Therefore, to the extent Plaintiff claims that Oey conducted Plaintiff's February 6, 2015, disciplinary hearing in violation of DOCCS rules and regulations (Dkt. No. 8 at 4-5), Plaintiff has failed to state a Fourteenth Amendment due process claim, and the Court recommends dismissing this claim with prejudice. In fact, as Defendants correctly note, courts have specifically held that the procedures set forth in 7 N.Y.C.R.R. § 254.6 regarding assessment of an inmate's mental state is not part of the fundamental due process guarantees outlined in *Wolff*. *See, e.g., Davis v. Fischer*, No. 09-CV-6084 CJS, 2012 WL 177400, at *7 (W.D.N.Y. Jan. 20, 2012) (finding that hearing officer's failure to conduct a mental health evaluation as required by state regulation, specifically 7 N.Y.C.R.R. § 254.6, "does not establish a federal due process violation"); *Gibson v. Travis*, No. 14 CV 8764 (VB), 2016 WL 796865, at *5 (S.D.N.Y. Feb. 25, 2016) (same).

Plaintiff, apparently conceding as much, explains that his:

> due process claims are not based upon the hearing officer's failure to conduct a mental health assessment; Plaintiff's complaint is based on the sole fact that the hearing officer did not call an OMH clinician *as a witness* in regards to [his] mental capacity, thus violating a standard in [*Wolff*] . . . accordingly, fundamental due process guarantees outlined in [*Wolff*], are applicable to the procedures set forth in 7 N.Y.C.R.R. [§] 254.6, *as it affords inmates an opportunity for witnesses to be called*.

(Dkt. No. 19 at 6-7) (emphasis added). To be sure, an accused prisoner has the right to a hearing where he is given a reasonable opportunity to call witnesses and present documentary evidence. *Sira*, 380 F.3d at 69; *Wolff*, 418 U.S. at 566. Although due process includes a right to call witnesses, this right is not unfettered. *Alicea v. Howell*, 387 F. Supp. 2d 227, 234 (W.D.N.Y.

15

2005) (citing *Ponte v. Real*, 471 U.S. 491, 495 (1985)).  Indeed, this right may be limited for security reasons, to keep a hearing within reasonable limits, or on the basis of irrelevance or lack of necessity.  *Id.* (citations omitted).

In this case, even liberally construed, nowhere has Plaintiff claimed that he requested a mental health clinician as a witness.  In fact, the current record is silent as to whether Plaintiff requested *any* witness during the February 6, 2015, disciplinary hearing.[5]  As such, the Court finds Plaintiff has failed to plausibly allege that he was denied a reasonable opportunity to call witnesses.  Moreover, having thoroughly examined the record, Plaintiff does not allege that Oey denied him any of the procedural protections to which he was entitled under *Wolff* during the February 6, 2015, disciplinary determination.  Therefore, the Court recommends that Plaintiff's Fourteenth Amendment due process claim against Oey be dismissed for failure to state a claim.

3.    Supervisory Claims

Turning to Plaintiff's supervisory claims, Plaintiff alleges that after Venettozzi and Annucci learned of the violations committed by Oey during the February 6, 2015, disciplinary hearing, they "failed to remedy the wrong," and "allowed the ongoing violation to continue." (Dkt. No. 8 at 4-5.)  Plaintiff also alleges, albeit in conclusory fashion, that Annucci was "grossly negligent in managing subordinates who caused the unlawful condition."  *Id.* at 5.

Here, because Plaintiff has failed to state a Fourteenth Amendment due process claim arising from the February 6, 2015, disciplinary hearing conducted by Oey, it logically follows that Plaintiff cannot maintain an action for supervisory liability against Venettozzi and Annucci. *See Alston v. Bendheim*, 672 F. Supp. 2d 378, 388 (S.D.N.Y. 2009) ("The failure to state a claim

---

[5]  The Court notes that the state court in Plaintiff's Article 78 proceeding indicated that Plaintiff did not "request that the Hearing Officer *interview* an OMH representative."  (Dkt. No. 8-4 at 31 (emphasis added).)

for an underlying constitutional violation forecloses supervisory liability."); *see also Phelan v. Durniak*, No. 9:10-CV-666 (FJS/RFT), 2014 WL 4759937, at * 11 n.8 (N.D.N.Y. Sept. 24, 2014). Therefore, the Court recommends dismissing Plaintiff's Fourteenth Amendment due process supervisory liability claims against Venettozzi and Annucci for failure to state a claim.

For all of the foregoing reasons, the Court recommends granting Defendants' motion for failure to state a claim.

## B.    Defendants' Alternative Arguments

Inasmuch as the Court is recommending dismissal for failure to state a claim, the Court need not reach Defendants' alternative arguments. In any event, the Court has considered Defendants' alternative arguments in support of their motion and finds them to be without merit.

### 1.    Adequate State Remedy

In their moving brief, Defendants argue that "[t]o the extent Plaintiff may base his due process claims on an alleged random, arbitrary act by a state employee, Plaintiff's due process claim also fails because he had an adequate post-deprivation remedy in state court." (Dkt. No. 17-1 at 10.)

When reviewing alleged procedural due process violations, the Supreme Court has distinguished between (a) claims based on random, unauthorized acts by state employees and (b) claims based on established state procedures. *See Parratt v. Taylor*, 451 U.S. 527, 541 (1981), *overruled on other grounds by Daniels v. Williams*, 474 U.S. 327 (1986); *Hudson v. Palmer*, 468 U.S. 517, 532 (1984). However, "[w]here an official with final authority over decisions regarding punitive segregation failed to meet the requirements of due process, the resulting 'deprivation of [the prisoner's] liberty was neither random nor unauthorized.'" *Green v. NYC Dep't of Corr.*, No. 98 CIV. 825 (JGK), 1999 WL 219911, at *5 (S.D.N.Y. Apr. 15, 1999)

(quoting *Patterson v. Coughlin*, 761 F.2d 886, 892 (2d Cir. 1985) (holding that where prisoner was given a deficient hearing, the deprivation of liberty was foreseeable and authorized)). "Thus, 'a post-deprivation hearing, by way of an Article 78 proceeding . . . is inadequate, by definition, to meet the requirements of due process.'" *Id.* (quoting *Patterson*, 761 F.2d at 892.[6])

As such, courts routinely reject the argument, which Defendants assert here (Dkt. No. 17-1 at 10), that a plaintiff suffered no due process violation because he availed himself of available post-deprivation remedies by filing an Article 78 proceeding, which ultimately resulted in the expungement of the disciplinary determination at issue. *See, e.g.*, *Bogle v. Murphy*, No. 98-CV-6473 CJS, 2003 WL 22384792, at *5 (W.D.N.Y. Sept. 9, 2003) ("The Court rejects defendants' argument that the state court Article 78 reversal cured any possible due process violation resulting from the disciplinary hearing.") (collecting cases). The Court recommends doing the same.

2.    Collateral Estoppel

In his opposition, Plaintiff responds to Defendants' adequate state remedy argument. (Dkt. No. 19 at 17.) Specifically, Plaintiff argues that he should not be barred from litigating his Fourteenth Amendment due process claim because he "did not actually litigate the constitutional issues now before this Court" in the Article 78 proceeding. *Id.* In their reply brief, Defendants

---

[6] In *Patterson*, the inmate-plaintiff alleged that his due process rights were violated when he was not allowed to call witnesses at his disciplinary hearing. *Patterson*, 761 F.2d at 892. The government opposed on the ground that inmate's claim was based upon random and unauthorized acts by states officers, and that the inmate had obtained a meaningful post-deprivation relief in a subsequent Article 78 proceeding. *Id.* The Second Circuit rejected the government's argument and determined that the denial of the inmate's due process right to call witnesses gave rise to a claim based upon established state procedures, and that therefore the Article 78 proceeding could not foreclose relief under § 1983. *Id.* at 792.

argue dismissal would also be appropriate on the separate ground of collateral estoppel.  (Dkt. No. 20 at 6-7.)  The Court disagrees with Defendants.

In the Article 78 proceeding, the state court noted that "the only argument advanced . . . [was] that the presiding hearing officer failed to interview a representative of the Office of Mental Health . . . ."  (Dkt. No. 8-4 at 30.)  However, as set forth above, the state court expressly stated that "there has been no determination that one of [Plaintiff's] fundamental due process rights, as enunciated in *Wolff v. McDonnell*, 418 U.S. 539, has been violated . . . ."  *Id*.  Under New York law, collateral estoppel or issue preclusion bars relitigation of an issue when (1) the issues in both proceedings are identical, (2) the issue in the prior proceeding was "actually litigated and actually decided," (3) the party against whom preclusion is sought had a full and fair opportunity for litigation in the prior proceeding; and (4) the previously litigated issues were necessary to support a valid and final judgment on the merits.  *Ali v. Mukasey*, 529 F.3d 478, 489 (2d Cir. 2008) (citations omitted).  In this case, because Plaintiff's Fourteenth Amendment due process claims "were not actually litigated and actually decided" in Plaintiff's Article 78 proceeding, the Court also recommends rejecting Defendants' seemingly frivolous alternative ground for dismissal.

However, the Court need not reach the alternative arguments since dismissal is recommended as noted above in Section III.A.

## C.    Leave to Replead

Ordinarily, a *pro se* plaintiff whose claims are found to be insufficient to withstand scrutiny under Rule 12(b)(6) should be granted leave to replead at least once to afford him or her the opportunity to cure any perceived deficiencies and assert a proper claim.  *Branum v. Clark*, 927 F.2d 698, 704-05 (2d Cir. 1991); *see also* Fed. R. Civ. P. 15(a) (leave to replead shall "be

freely given when justice so requires"). However, if an amendment would be futile, a court may deny leave to amend. *See Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000).

Here, in deference to Plaintiff's *pro se* status, the Court recommends that Plaintiff be permitted one more opportunity to replead his Fourteenth Amendment due process claim consistent with the above recommendations.

**WHEREFORE**, it is hereby

**RECOMMENDED** that Defendants' motion to dismiss (Dkt. No. 17) be **GRANTED**, and that Plaintiff's amended complaint be **DISMISSED** with leave to amend;

**ORDERED** that the Clerk provide Plaintiff with a copy of this Order and Report-Recommendation, along with copies of the unpublished decisions cited herein in accordance with *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) (per curiam).

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen days within which to file written objections to the foregoing report.[7] Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15 (2d Cir. 1989) (per curiam)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72, 6(a).

Dated: July 19, 2017
        Syracuse, New York

Thérèse Wiley Dancks
United States Magistrate Judge

---

[7] If you are proceeding *pro se* and are served with this Order and Report-Recommendation by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date the Order and Report-Recommendation was mailed to you to serve and file objections. Fed. R. Civ. P. 6(d). If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday. Fed. R. Civ. P. 6(a)(1)(C).

2008 WL 4693153

2008 WL 4693153
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Raymond ROBLES, Plaintiff,
v.
K. BLEAU, Correctional Officer, Riverview C.F.;
Peacock, Correctional Sergeant, Riverview C.F.;
R. Varkiar, Senior Counsel, Riverview C.F.; and
New York State Dep't of Corr. Servs., Defendants.

No. 9:07-CV-0464.
|
Oct. 22, 2008.

**Attorneys and Law Firms**

Raymond Robles, Cape Vincent, NY, pro se.

Hon. Andrew M. Cuomo, Attorney General for the State
of New York, David L. Cochran, Esq., of Counsel, New
York, NY, for Defendants.

**DECISION & ORDER**

THOMAS J. McAVOY, Senior District Judge.

**\*1** This *pro se* civil rights action, brought pursuant to
42 U.S.C. § 1983, was referred to the Hon. George H.
Lowe, United States Magistrate Judge, for a Report-
Recommendation pursuant to 28 U.S.C. § 636(b) and
Local Rule 72.3(c).

The Report-Recommendation dated September 12, 2008
recommended that Defendants motion to dismiss be
granted in part and denied in part. Specifically,
Judge Lowe recommended that Plaintiff's Fourteenth
Amendment procedural due process claim against
Defendant Varkiar regarding his disciplinary hearing
be dismissed if, within thirty (30) days from the
filing of this Final Order, Plaintiff does not file
an Amended Complaint that successfully states a
Fourteenth Amendment procedural due process claim.
It was recommended that Plaintiff's remaining claims be
dismissed with prejudice.

Plaintiff filed objections to the Report-Recommendation,
essentially raising the same arguments presented to the
Magistrate Judge.

When objections to a magistrate judge's Report-
Recommendation are lodged, the Court makes a *"de
novo* determination of those portions of the report or
specified proposed findings or recommendations to which
objection is made." *See* 28 U.S.C. § 636(b)(1). After such a
review, the Court may "accept, reject, or modify, in whole
or in part, the findings or recommendations made by
the magistrate judge. The judge may also receive further
evidence or recommit the matter to the magistrate judge
with instructions." *Id.*

Having reviewed the record *de novo* and having considered
the issues raised in the Plaintiff's objections, this Court
has determined to accept and adopt the recommendation
of Magistrate Judge Lowe for the reasons stated in the
Report-Recommendation.

It is therefore

**ORDERED** that Defendants motion to dismiss be
**GRANTED** in part and **DENIED** in part.

**IT IS SO ORDERED.**

*REPORT-RECOMMENDATION*

GEORGE H. LOWE, United States Magistrate Judge.

This *pro se* prisoner civil rights action, commenced
pursuant to 42 U.S.C. § 1983, has been referred to me
by the Honorable Thomas J. McAvoy, Senior United
States District Judge, for Report and Recommendation
with regard to any dispositive motions filed, pursuant to
28 U.S.C. § 636(b) and Local Rule 72.3(c). Generally,
in his Complaint, Raymond Robles ("Plaintiff") alleges
that three employees of the New York State Department
of Correctional Services ("DOCS"), as well as DOCS
itself, violated his rights under the Eighth and Fourteenth
Amendments when they (1) required him to submit to
a random urinalysis test when they knew he was taking
a medication that would prevent him from providing a
urine sample, and (2) charged, convicted, and punished
him with eighty-seven days in a Special Housing Unit for
refusing to provide a urine sample. (*See generally* Dkt. No.
1 [Plf.'s Compl.].) Currently pending before the Court is

2008 WL 4693153

Defendants' motion to dismiss for failure to state a claim pursuant to Fed.R.Civ.P. 12(b)(6). (Dkt. No. 16.) For the reasons that follow, I recommend that Defendants' motion be granted in part and denied in part.

## I. BACKGROUND

### A. Summary of Plaintiff's Complaint

**\*2** As Defendants correctly observe in their Memorandum of Law, Plaintiff's Complaint-which describes the events giving rise to his claims in two brief paragraphs without identifying any role played by Defendants in those events-is hardly a model of *fair notice* under Fed.R.Civ.P. 8(a)(2). (Dkt. No. 1, ¶¶ 6-7 [Plf.'s Compl.].) However, as explained below in Part II of this Report-Recommendation, the mandate to read the papers of *pro se* civil rights litigants generously makes it appropriate to consider a plaintiff's papers in opposition to a defendant's motion to dismiss as effectively amending the allegations of the plaintiff's complaint, to the extent that those factual assertions are consistent with the allegations of the plaintiff's complaint. [1] Here, I find that the factual allegations contained in Plaintiff's Response Affidavit are consistent with the factual allegations of his Complaint. As a result, in construing Plaintiff's Complaint, I will consider his Response Affidavit as effectively amending the factual allegations of his Complaint. Thus construed, Plaintiff's Complaint alleges as follows:

1. On November 6, 2006, at about 7:28 a.m., Plaintiff was directed to report to the drug testing center at Riverview C.F.; [2]

2. Upon arriving at the drug testing center, Plaintiff was informed by Correctional Officer K. Bleau ("Defendant Bleau") that he had been randomly selected to submit to urinalysis drug testing; [3]

3. Defendant Bleau asked Plaintiff if he would provide a urine sample, and Plaintiff responded yes; [4]

4. Defendant Bleau then asked Plaintiff if he was taking any medications, and Plaintiff explained that (1) yes, he was taking Flomax and Omeprazole due to a prostate condition and a stomach problem, and (2) "d[ue] to the medication [s]" and the fact that he had used the bathroom

at approximately 7:10 a.m. that morning, he would need more water in order to urinate; [5]

5. As Plaintiff was explaining these facts to Defendant Bleau, Defendant Bleau became upset and walked away from Plaintiff; [6]

6. When he returned, Defendant Bleau then informed Plaintiff that, pursuant to DOCS Directive 4937, Plaintiff had three hours provide a urine sample or he would be considered to be refusing to provide the urine sample; [7]

7. Defendant Bleau then gave Plaintiff a cup of water at approximately 7:30 a.m., and a second cup of water at approximately 9:30 a.m., but did not give him a third cup of water at approximately 8:30 a.m., as required by Part D.4. of DOCS Directive 4937; [8]

8. At approximately 10:30 a.m., Plaintiff was still unable to provide a urine sample; [9]

9. At that time, Defendant Bleau notified Correctional Sergeant Peacock ("Defendant Peacock") that Plaintiff was refusing a direct order to provide a urine sample; [10]

10. When Plaintiff tried to explain to Defendant Peacock that his medical condition prevented him from providing the urine sample, Defendant Peacock responded, "Shut up and put [your] hands behind [your] back"; [11]

**\*3** 11. Both Defendants Bleau and Peacock failed to investigate or inquire as to why Plaintiff had been prescribed Flomax and Omeprazole, or what the potential side effects of those drugs were, although that information was readily obtainable from medical staff at Riverview C.F.; [12]

12. Instead, Defendants Bleau and/or Peacock escorted Plaintiff to the Riverview C.F. Special Housing Unit ("S.H.U."); [13]

13. On November 7, 2006, at about 8:55 a.m., while Plaintiff was in S.H.U., he was served with a copy of a misbehavior report authored by Defendant Bleau, charging him with (1) failing to comply with the urinalysis testing procedure, and (2) refusing a direct order to provide a urine sample; [14]

WESTLAW  © 2017 Thomson Reuters. No claim to original U.S. Government Works.

2008 WL 4693153

14. On November 10, 2006, Senior Correctional Counselor R. Varkiar conducted Plaintiff's disciplinary hearing on the misbehavior report; [15]

15. At the hearing, when Plaintiff entered a plea of "Not guilty, with an explanation," Defendant Varkiar gave Plaintiff "an opportunity to explain [him] self"; [16]

16. Plaintiff explained that he had a medical condition that prevented him from providing a urine sample, that he had attempted to inform Defendant Bleau of this medical condition (but Defendant Bleau walked away from Plaintiff), and that he had attempted to inform Defendant Peacock of this medical condition (but Defendant Peacock told Plaintiff to "[s]hut up"); [17]

17. Defendant Varkiar then made a telephone call; when he was done with the call, he told Plaintiff that (1) he had called the medical unit at Riverview C.F. to ask whether or not the medication that Plaintiff was taking would prevent him from urinating, and (2) someone in the medical unit had responded that no, the medication should not prevent Plaintiff from urinating; [18]

18. Plaintiff then attempted to explain to Defendant Varkiar *why* he was taking one of the medications, specifically, to remedy a prostate problem that itself interfered with his ability to urinate; [19]

19. However, Defendant Varkiar failed to call back the person in the medical unit at Riverview C.F. and request that he or she again answer the question he had posed before, taking into account Plaintiff's prostate condition as shown by his medical records; [20]

20. As a result, Defendant Varkiar found Plaintiff guilty of both disciplinary charges, and sentenced him to ninety (90) days in S.H.U ., with a corresponding loss of privileges; [21]

21. At the conclusion of the hearing, Plaintiff received a written copy of the hearing disposition, which stated that the evidence relied on included (1) the statements in the written misbehavior report of Defendant Bleau (which Defendant Varkiar stated were credible), and (2) Plaintiff's

own hearing testimony (which Defendant Varkiar stated was not credible); [22]

22. On November 27, 2006, Plaintiff appealed his conviction to DOCS Director of Special Housing, Donald Selsky, who reversed the conviction on January 19, 2007; [23] and

**\*4** 23. On February 1, 2007, Plaintiff was finally released from S.H.U., after spending eighty-seven (87) days there. [24]

It should be noted that, in addition to asserting constitutional claims against Defendants Bleau, Peacock, and Varkiar in their individual or personal capacities, Plaintiff's Complaint asserts a constitutional claim also against DOCS itself. It should also be noted that, as relief for Defendants' actions, Plaintiff requests money damages but no injunctive relief. [25]

### B. Summary of Grounds in Support of Defendants' Motion

Generally, Defendants' motion to dismiss for failure to state a claim is premised on two grounds: (1) Plaintiff's claim against DOCS is barred by the Eleventh Amendment; and (2) the allegations of Plaintiff's Complaint are too lacking in detail to give Defendants *fair notice* under Fed.R.Civ.P. 8(a)(2). (Dkt. No. 16, Part 2, at 2-5 [Defs.' Memo. of Law].)

## II. LEGAL STANDARD GOVERNING MOTIONS TO DISMISS FOR FAILURE TO STATE A CLAIM

Under Fed.R.Civ.P. 12(b)(6), a defendant may move to dismiss a complaint for "failure to state a claim upon which relief can be granted." Fed.R.Civ.P. 12(b)(6). It has long been understood that a defendant may base such a motion on either or both of two grounds: (1) a challenge to the "sufficiency of the pleading" under Fed.R.Civ.P. 8(a) (2);[26] or (2) a challenge to the legal cognizability of the claim. [27]

Rule 8(a)(2) requires that a pleading contain "a short and plain statement of the claim *showing* that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2) [emphasis added]. By requiring this "showing," Fed.R.Civ.P. 8(a)(2) requires that the pleading contain a short and plain statement that

2008 WL 4693153

"give[s] the defendant *fair notice* of what the plaintiff's claim is and the grounds upon which it rests." [28] The main purpose of this rule is to "facilitate a proper decision on the merits." [29] A complaint that fails to comply with this rule "presents far too heavy a burden in terms of defendants' duty to shape a comprehensive defense and provides no meaningful basis for the Court to assess the sufficiency of [plaintiff's] claims." [30]

The Supreme Court has long characterized this pleading requirement under Fed.R.Civ.P. 8(a)(2) as "simplified" and "liberal," and has repeatedly rejected judicially established pleading requirements that exceed this liberal requirement. [31] However, it is well established that even this liberal notice pleading standard "has its limits." [32] As a result, several Supreme Court decisions, and Second Circuit decisions, exist holding that a pleading has failed to meet this liberal notice pleading standard. [33]

Most notably, in the recent decision of *Bell Atlantic Corporation v. Twombly,* the Supreme Court, in reversing an appellate decision holding that a complaint had stated an actionable antitrust claim under 15 U.S.C. § 1, "retire[d]" the famous statement by the Court in *Conley v. Gibson,* 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957), that "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." 550 U.S. 544, ---- - ----, 127 S.Ct. 1955, 1968-69, 167 L.Ed.2d 929 (2007). [34] Rather than turning on the *conceivability* of an actionable claim, the Court clarified, the Fed.R.Civ.P. 8 "fair notice" standard turns on the *plausibility* of an actionable claim. *Id.* at 1965-74.

**\*5** More specifically, the Court reasoned that, by requiring that a pleading "show[ ] that the pleader is entitled to relief," Fed.R.Civ.P. 8(a)(2) requires that the pleading give the defendant "fair notice" of (1) the nature of the claim and (2) the "grounds" on which the claim rests. *Id.* at 1965, n. 3 [citation omitted]. While this does not mean that a pleading need "set out in detail the facts upon which [the claim is based]," it does mean that the pleading contain at least "some factual allegation[s]." *Id.* [citations omitted]. More specifically, the "[f]actual allegations must be enough to raise a right to relief above the speculative level [to a plausible level]" assuming, of

course, that all the allegations in the complaint are true. *Id.* at 1965 [citations omitted]. What this means, on a practical level, is that there must be "plausible grounds to infer [actionable conduct]," or, in other words, "enough fact to raise a reasonable expectation that discovery will reveal evidence of [actionable conduct]." *Id.*

As have other Circuits, the Second Circuit has repeatedly recognized that the clarified plausibility standard that was articulated by the Supreme Court in *Twombly* governs *all* claims, not merely antitrust claims brought under 15 U.S.C. § 1 (as were the claims in *Twombly* ). [35] The Second Circuit has also recognized that this *plausibility* standard governs claims brought even by *pro se* litigants (although the plausibility of those claims is be assessed generously, in light of the special solicitude normally afforded *pro se* litigants). [36]

It should be emphasized that Fed.R.Civ.P. 8's plausibly standard, explained in *Twombly,* was in no way retracted or diminished by the Supreme Court's decision (two weeks later) in *Erickson v. Pardus,* in which the Court stated, "Specific facts are not necessary" to successfully state a claim under Fed.R.Civ.P. 8(a)(2). *Erickson v. Pardus,* 551 U.S. 89, ----, 127 S.Ct. 2197, 2200, 167 L.Ed.2d 1081 (2007) [citation omitted]. That statement was merely an abbreviation of the often-repeated point of law-first offered in *Conley* and repeated in *Twombly*-that a pleading need not "set out in detail the facts upon which [the claim is based]" in order to successfully state a claim. *Twombly,* 127 S.Ct. 1965, n. 3 (citing *Conley v. Gibson,* 355 U.S. 41, 47 [1957] ). That statement in no way meant that all pleadings may achieve the requirement of giving a defendant "fair notice" of the nature of the nature of the claim and the "grounds" on which the claim rests without ever having to allege any facts whatsoever. [37] There must still be enough fact alleged to raise a right to relief above the speculative level to a plausible level, so that the defendant may know what the claims are and the grounds on which they rest (in order to shape a defense).

Having said all of that, it should also be emphasized that, "[i]n reviewing a complaint for dismissal under Fed.R.Civ.P. 12(b)(6), the court must accept the material facts alleged in the complaint as true and construe all reasonable inferences in the plaintiff's favor." [38] "This standard is applied with even greater force where the plaintiff alleges civil rights violations or where the

**Robles v. Bleau, Not Reported in F.Supp.2d (2008)**

2008 WL 4693153

complaint is submitted *pro se.*"[39] In other words, as stated above, while all pleadings are to be construed liberally under Fed.R.Civ.P. 8(e), *pro se* civil rights pleadings are to be construed with an *extra* degree of liberality .[40]

**\*6** For example, the mandate to read the papers of *pro se* litigants generously makes it appropriate to consider a plaintiff's papers in opposition to a defendant's motion to dismiss as effectively amending the allegations of the plaintiff's complaint, to the extent that those factual assertions are consistent with the allegations of the plaintiff's complaint.[41] Moreover, "courts must construe *pro se* pleadings broadly, and interpret them to raise the strongest arguments that they suggest."[42] Furthermore, when addressing a *pro se* complaint, generally a district court "should not dismiss without granting leave to amend at least once when a liberal reading of the complaint gives any indication that a valid claim might be stated."[43] Of course, an opportunity to amend is not required where "the problem with [plaintiff's] causes of action is substantive" such that "[b]etter pleading will not cure it."[44] In addition, granting a *pro se* plaintiff an opportunity to amend is not required where the plaintiff has already been given a chance to amend his pleading.[45]

However, while this special leniency may somewhat loosen the procedural rules governing the form of pleadings (as the Second Circuit very recently observed),[46] it does not completely relieve a *pro se* plaintiff of the duty to satisfy the pleading standards set forth in Fed.R.Civ.P. 8, 10 and 12.[47] Rather, as both the Supreme Court and Second Circuit have repeatedly recognized, the requirements set forth in Fed.R.Civ.P. 8, 10 and 12 are procedural rules that even *pro se* civil rights plaintiffs must follow.[48] Stated more plainly, when a plaintiff is proceeding *pro se,* "all normal rules of pleading are not absolutely suspended."[49]

### III. ANALYSIS

#### A. Whether Plaintiff's Claim Against DOCS is Barred by the Eleventh Amendment

For the reasons offered by Defendants in their Memorandum of Law, I agree with them that Plaintiff's constitutional claims against Defendant DOCS are barred by the Eleventh Amendment to the United States

Constitution. (Dkt. No. 16, Part 2, at 2-3 [Defs.' Mem. of Law].) In the interest of brevity, I will not repeat the well-established points of law that they correctly cite in support of their argument. Instead, I will only add three points that Defendants do *not* make in their succinct argument: (1) where it has been successfully demonstrated that a defendant is entitled to sovereign immunity under the Eleventh Amendment, the federal court lacks subject matter jurisdiction over the case (or claim), and "the case [or claim] *must* be stricken from the docket";[50] (2) Plaintiff's civil rights claims against Defendant DOCS (an entity) are barred also by the express language of 42 U.S.C. § 1983, which confers liability upon only any *"person* who ... subjects, or causes to be subjected, any citizen of the United States ... to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws .... "[51]; and (3) because the defect with this claim is substantive rather than merely formal, better pleading will not cure it, and thus it should be dismissed with prejudice.[52]

**\*7** For all of these reasons, I recommend that the Court dismiss with prejudice Plaintiff's claims against Defendant DOCS.

It should be noted that, in addition to barring Plaintiff's constitutional claims against Defendant DOCS, the Eleventh Amendment would also bar any claim by Plaintiff against Defendants Bleau, Peacock and Varkiar in their official capacities.[53] However, because I do not even liberally construe Plaintiff's Complaint (and Response Affidavit) as asserting such claims, no need exists to recommend the dismissal of those claims. (*See generally* Dkt. No 1, 17.)

#### B. Whether the Allegations of Plaintiff's Complaint Are Too Lacking in Detail to Give Defendants *Fair Notice* under Fed.R.Civ.P. 8(a)(2)

For the reasons offered by Defendants in their Memorandum of Law, I agree with them that Plaintiff's Complaint-when considered alone-is too lacking in detail to give Defendants the fair notice that is required under Fed.R.Civ.P. 8(a)(2). (Dkt. No. 16, Part 2, at 3-5 [Defs.' Mem. of Law].) However, as explained above in Part II of this Report-Recommendation, the mandate to read the papers of *pro se* civil rights litigants generously makes it appropriate to consider a plaintiff's papers in opposition to a defendant's motion to dismiss as effectively amending

the allegations of the plaintiff's complaint, to the extent that those factual assertions are consistent with the allegations of the plaintiff's complaint. [54] Here, when construing Plaintiff's Complaint together with his Response Affidavit, I find that Plaintiff's allegations *are* detailed enough to give Defendants the fair notice that is required under Fed.R.Civ.P. 8(a)(2). *See, supra,* Part I.A. of this Report-Recommendation.

However, this does not end the Court's analysis of Plaintiff's Complaint because, even where a defendant has not advanced a certain argument on a motion to dismiss in a *pro se* prisoner civil rights case, a district court may (and, indeed, has a duty to) *sua sponte* address whether the pleading in such a case has successfully stated a claim upon which relief may be granted. [55] Here, Plaintiff's Complaint is plagued by several defects (some substantive and some formal) [56] that simply cannot be overlooked.

### C. Whether Plaintiff Has Stated an Actionable Claim Against Defendants Bleau, Peacock and Varkiar Arising Out of Plaintiff's Being Required to Provide a Urine Sample Given Their Knowledge of His Medications and/or Medical Condition

Among Plaintiff's claims is a claim that "[i]t is neither lawful nor [ ] reasonable to expect an Inmate to perform a bodily function on command when you know or should know that his medical condition and prescribed treatment plan indicate that when he urinates[,] and when he [can] not[,] can be beyond his control." (Dkt. No. 17, at 5 [Plf.'s Response Affid.].) I liberally construe this claim as one of harassment or perhaps inadequate-prison-conditions under the Eighth Amendment. (To the extent that this allegation is also used to support a procedural due process claim under the Fourteenth Amendment, I address that claim below in Parts III.D. and III.E. of this Report-Recommendation.)

**\*8** The problem with Plaintiff's Eighth Amendment claim is that the rather detailed facts alleged by him in support of that claim do not suggest in any way that any of the three individual Defendants were acting with the sort of mental state that is required for them to incur liability under the Eighth Amendment, namely, *deliberate indifference.* Deliberate indifference is a state of mind akin to *criminal recklessness,* which involves *knowing* of and disregarding an excessive risk to inmate health or safety. [57] Here, Plaintiff himself alleges that the

three individual Defendants did not in fact *understand* that he could not urinate due to his prostate condition. Indeed, as he was trying to explain his medical condition to Defendants, (1) Defendant Bleau became angry and "walked away" from Plaintiff, (2) Defendant Peacock told Plaintiff to "[s]hut up," and (3) Defendant Varkiar failed to call back the person in the medical unit of Riverview C.F. and ask him or her to report (to Varkiar) the impact of Plaintiff's prostate condition on his ability to urinate. *See, supra,* Part I.A. of this Report-Recommendation. [58]

At its heart, Plaintiff's Eighth Amendment claim alleges that the three individual Defendants *should have known* that he could not urinate during the time in question due to his enlarged prostate, but that they did not know that fact because they *failed to investigate* the nature and effects of his prostate condition. In other words, his Eighth Amendment claim is one of *negligence.* Such a claim is simply not actionable under the Eighth Amendment (or any constitutional provision). As is often observed, "[D]eliberate indifference describes a state of mind more blameworthy than negligence." [59] Finally, because the defect with this detailed claim is substantive rather than merely formal, I find that better pleading will not cure it. [60]

For all of these reasons, I recommend that the Court dismiss with prejudice Plaintiff's Eighth Amendment claim.

### D. Whether Plaintiff Has Stated an Actionable Claim Against Defendants Bleau and Peacock Arising Out of His Receipt of an Erroneous or False Misbehavior Report

It is well established that "a prison inmate has no general constitutional right to be free from being falsely accused in a misbehavior report." *Boddie v. Schnieder,* 105 F.3d 857, 862 (2d Cir.1997) (citing *Freeman v. Rideout,* 808 F.2d 949, 951 [2d Cir.1986] ). [61] Rather, the only way that false accusations contained in a misbehavior report can rise to the level of a constitutional violation is when there is "more, such as retaliation against the prisoner for exercising a constitutional right." *Boddie,* 105 F.3d at 862; *accord, Murray v. Pataki,* 03-CV-1263, 2007 U.S. Dist. LEXIS 26959, at \*26, 2007 WL 965345 (N.D.N.Y. March 5, 2007) (Treece, M.J.) [citations omitted].

2008 WL 4693153

Here, Plaintiff alleges no actionable conduct regarding his being issued the misbehavior report in question, such as retaliation against him for exercising a constitutional right. *See, supra,* Part I.A. of this Report-Recommendation. Moreover, because the defect with this detailed claim is substantive rather than merely formal, I find that better pleading will not cure it. [62]

**\*9** For these reasons, I recommend that the Court dismiss with prejudice Plaintiff's Fourteenth Amendment false-misbehavior-report claim.

### E. Whether Plaintiff Has Stated an Actionable Claim Against Defendant Varkiar Arising Out of Plaintiff's Erroneous or Unjustified Disciplinary Conviction

"[Courts] examine procedural due process questions in two steps: the first asks whether there exists a liberty or property interest which has been interfered with by the State ...; the second examines whether the procedures attendant upon that deprivation were constitutionally sufficient .... " *Kentucky Dept. of Corr. v. Thompson,* 490 U.S. 454, 460, 109 S.Ct. 1904, 104 L.Ed.2d 506 (1989). With regard to the first question, in 1995, the Supreme Court held in *Sandin v. Connor* that liberty interests protected by the Fourteenth Amendment's Due Process Clause will not arise from the use of mandatory language of a particular state law or regulation, but "will generally be limited to freedom from restraint which ... imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin v. Connor,* 515 U.S. 472, 483-484, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995).

Here, Plaintiff alleges that the disciplinary hearing conducted by Defendant Varkiar resulted in a sentence of eighty-seven (87) days in the Riverview C.F. S.H.U. with a corresponding loss of privileges. *See, supra,* Part I.A. of this Report-Recommendation. Numerous district courts in this Circuit have issued well-reasoned decisions finding no atypical and significant hardship experienced by inmates who served sentences in S.H.U. of far more than the eighty-seven (87) days alleged here-even where the conditions of confinement in the S.H.U. were, to varying degrees, more restrictive than those in the prison's general population. [63] As a result, I find that Plaintiff has not alleged facts plausibly suggesting that he possessed, during the disciplinary hearing, a liberty interest that was protected by the Fourteenth Amendment.

However, such a finding leads only to a recommendation that this claim be dismissed *without* prejudice. This is because it is conceivable to me that Plaintiff's Complaint and Response Affidavit-which are silent with regard to the conditions of confinement he experienced in the Riverview C.F. S.H.U.-may be amended so as to allege facts plausibly suggesting that those conditions were so restrictive as to impose on Plaintiff an *atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life* (thus conferring on him a protected liberty interest under the Fourteenth Amendment).

I should also point out that, even assuming (for the sake of argument) that Plaintiff possessed a protected liberty interest with regard to his disciplinary hearing, I find that he has alleged facts plausibly suggesting that he was, in fact, given all the process that he was due under the circumstances. Specifically, Plaintiff alleges that he was given the following: (1) timely notice of the misbehavior report: (2) an "opportunity to explain [him]self" at his disciplinary hearing; (3) a written disciplinary hearing disposition; (4) a disciplinary hearing disposition that was based on at least some evidence (e.g., his own hearing testimony, which Defendant Varkiar found to be not credible); and (5) an opportunity to appeal the disciplinary hearing disposition (which he did so successfully). *See, supra,* Part I.A. of this Report-Recommendation.

**\*10** Of course, the defect that Plaintiff alleges occurred at his disciplinary hearing was Defendant Varkiar's failure to use the telephone to call back the person in the medical unit at Riverview C .F. and request that he or she again answer the question of whether Plaintiff was physically unable to urinate, taking into account his prostate condition as shown by his medical records. *Id.* Generally, it is not the duty of an impartial hearing officer to conduct an investigation of the merit of the disciplinary charges against an inmate; rather, the duty of a hearing officer is merely to review the evidence presented to him at the disciplinary hearing, and in *certain circumstances* identify defense witnesses for the inmate. [64] Here, I find that Plaintiff has alleged no circumstances conferring on Defendant Varkiar a duty to call back the medical unit at Riverview C.F. For example, I find that Plaintiff's Complaint and Response Affidavit are devoid of any allegation that, at his disciplinary hearing, he requested and was denied an adjournment of the hearing so that, with the help of a legal assistant, he could obtain his

medical records and call as a witness a member of the medical unit, in order that he himself could introduce testimony that his prostate condition prevented him from urinating during the time in question. *See, supra,* Part I.A. of this Report-Recommendation. However, again, such a finding leads only to a recommendation that this claim be dismissed *without* prejudice, because it is conceivable to me that Plaintiff's Complaint and Response Affidavit may be amended to allege facts plausibly suggesting that, at his disciplinary hearing, he made, and was denied, such a request.

For these reasons, I recommend that the Court dismiss Plaintiff's Fourteenth Amendment procedural due process claim regarding his disciplinary hearing if, within thirty (30) days from the date of the Court's final Order on this Report-Recommendation, Plaintiff does not file an Amended Complaint that successfully states a Fourteenth Amendment procedural due process claim regarding his disciplinary hearing.

Finally, two points bear mentioning. First, to the extent that Plaintiff is attempting to allege that his procedural due process rights were violated at his disciplinary hearing also because Defendant Bleau violated Part D.4. of DOCS Directive 4937 by giving Plaintiff only two cups of water during the three-hour period in question, that allegation is not actionable under the circumstances. Section 1983 provides, in pertinent part, "Every person who ... subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by *the Constitution and laws,* shall be liable to the party injured ...." 42 U.S.C. § 1983 [emphasis added]. The term "the Constitution and laws" refers to the United States Constitution and *federal* laws. [65] A violation of a state law or regulation, *in and of itself,* does not give rise to liability under 42 U.S.C. § 1983. [66] Furthermore, the violation of a DOCS Directive, alone, is not even a violation of New York State law or regulation; [67] this is because a DOCS Directive is "merely a system the [DOCS] Commissioner has established to assist him in exercising his discretion," which he retains, despite any violation of that Directive. [68]

**\*11** Second, in making the above recommendation (that Plaintiff be required to file an Amended Complaint that successfully states a Fourteenth Amendment procedural

due process claim regarding his disciplinary hearing, upon penalty of dismissal), I am in no way "issuing specific instructions [to Plaintiff] mandating the content and format of the putative amended complaint"-instructions that the Second Circuit recently found erroneous in the case of *Sealed Plaintiff v. Sealed Defendant # 1,* No. 06-1590, 2008 WL 3294864, at \*6 (2d Cir. Aug.12, 2008). Rather, I am merely reporting my finding that Plaintiff's current Fourteenth Amendment procedural due process claim regarding his disciplinary hearing fails to state a claim upon which relief might be granted, as pleaded.

**ACCORDINGLY,** it is

**RECOMMENDED** that Defendants' motion to dismiss for failure to state a claim (Dkt. No. 16) be *GRANTED* in **part** and *DENIED* **in part** in the following respects:

(1) Plaintiff's Fourteenth Amendment procedural due process claim against Defendant Varkiar regarding his disciplinary hearing be *DISMISSED* if, within thirty (30) days from the date of the Court's final Order on this Report-Recommendation, Plaintiff does not file an Amended Complaint that successfully states a Fourteenth Amendment procedural due process claim regarding his disciplinary hearing; and

(2) The other claims asserted in Plaintiff's Complaint (as effectively amended by his Response Affidavit) be *DISMISSED* **with prejudice,** and without condition.

**ANY OBJECTIONS to this Report-Recommendation must be filed with the Clerk of this Court within TEN (10) WORKING DAYS, PLUS THREE (3) CALENDAR DAYS from the date of this Report-Recommendation (unless the third calendar day is a legal holiday, in which case add a fourth calendar day).** *See* 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72(b); N.D.N.Y. L.R. 72.1(c); Fed.R.Civ.P. 6(a)(2), (d).

**BE ADVISED that the District Court, on** *de novo* **review, will ordinarily refuse to consider arguments, case law and/ or evidentiary material that could have been, but was not, presented to the Magistrate Judge in the first instance.** [69]

**BE ALSO ADVISED that the failure to file timely objections to this Report-Recommendation will PRECLUDE LATER APPELLATE REVIEW of any Order of judgment that will be entered.** *Roldan v. Racette,*

984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Sec'y of H.H.S.,* 892 F.2d 15 [2d Cir.1989] ).

30    *Gonzales v. Wing,* 167 F.R.D. 352, 355 (N.D.N.Y.1996) (McAvoy, J.), *aff'd,* 113 F.3d 1229 (2d Cir.1997) (unpublished table opinion), *accord, Hudson v. Artuz,* 95-CV-4768, 1998 WL 832708, at *2 (S.D.N.Y. Nov.30, 1998), *Flores v. Bessereau,* 98-CV-0293, 1998 WL 315087, at *1 (N.D.N.Y. June 8, 1998) (Pooler, J .). Consistent with the Second Circuit's application of § 0.23 of the Rules of the U.S. Court of Appeals for the Second Circuit, I cite this unpublished table opinion, not as precedential authority, but merely to show the case's subsequent history. *See, e.g., Photopaint Technol., LLC v. Smartlens Corp.,* 335 F.3d 152, 156 (2d Cir.2003) (citing, for similar purpose, unpublished table opinion of *Gronager v. Gilmore Sec. & Co.,* 104 F.3d 355 [2d Cir.1996] ).

1    *See, infra,* note 41 of this Report-Recommendation (citing cases).

2    (Dkt. No. 17, at 4 [Plf.'s Response Affid.].)

3    (Dkt. No. 1, ¶ 6 [Plf.'s Compl.]; Dkt. No. 17, at 4 [Plf.'s Response Affid.].)

4    (Dkt. No. 17, at 4 [Plf.'s Response Affid.]; Dkt. No. 17, at 8 [Ex. 1 to Plf.'s Response Affid., attaching completed form entitled, "Request for Urinalysis Test"].)

5    (Dkt. No. 1, ¶ 6 [Plf.'s Compl.]; Dkt. No. 17, at 4 [Plf.'s Response Affid.]; Dkt. No. 17, at 8 [Ex. 1 to Plf.'s Response Affid., attaching completed form entitled, "Request for Urinalysis Test"]; Dkt. No. 17, at 14 [Ex. 7 to Plf.'s Response Affid., attaching Plaintiff's letter of appeal, dated November 27, 2006].)

6    (Dkt. No. 1, ¶ 6 [Plf.'s Compl.]; Dkt. No. 17, at 14 [Ex. 7 to Plf.'s Response Affid., attaching Plaintiff's letter of appeal, dated November 27, 2006].)

7    (Dkt. No. 1, ¶ 6 [Plf.'s Compl.]; Dkt. No. 17, at 4 [Plf.'s Response Affid.]; Dkt. No. 17, at 10 [Ex. 3 to Plf.'s Response Affid ., attaching page from DOCS Directive 4937].)

8    (Dkt. No. 1, ¶ 7 [Plf.'s Compl.]; Dkt. No. 17, at 4, 5 [Plf.'s Response Affid.]; Dkt. No. 17, at 10 [Ex. 3 to Plf.'s Response Affid., attaching page from DOCS Directive 4937].)

9    (Dkt. No. 1, ¶¶ 6-7 [Plf.'s Compl.]; Dkt. No. 17, at 4 [Plf .'s Response Affid.]; Dkt. No. 17, at 11 [Ex. 4 to Plf.'s Response Affid., attaching Inmate Misbehavior Report].)

10    (Dkt. No. 17, at 11 [Ex. 4 to Plf.'s Response Affid., attaching Inmate Misbehavior Report].)

11    (Dkt. No. 17, at 5 [Plf.'s Response Affid.].)

12    (Dkt. No. 1, ¶ 7 [Plf.'s Compl.]; Dkt. No. 17, at 4, 5 [Plf.'s Response Affid.]; Dkt. No. 17, at 9 [Ex. 2 to Plf.'s Response Affid., attaching page of his Ambulatory Health Record].)

13    (Dkt. No. 1, ¶ 6 [Plf.'s Compl.]; Dkt. No. 17, at 5 [Plf.'s Response Affid.].)

14    (Dkt. No. 1, ¶ 6 [Plf.'s Compl.]; Dkt. No. 17, at 3 [Plf.'s Response Affid.]; Dkt. No. 17, at 11 [Ex. 4 to Plf.'s Response Affid ., attaching Inmate Misbehavior Report].)

15    (Dkt. No. 17, at 3 [Plf.'s Response Affid.]; Dkt. No. 17, at 12-13 [Ex. 5 to Plf.'s Response Affid., attaching Superintendent Hearing Disposition].)

16    (Dkt. No. 17, at 3 [Plf.'s Response Affid.]; Dkt. No. 17, at 12-13 [Ex. 5 to Plf.'s Response Affid., attaching Superintendent Hearing Disposition].)

17    (*Id.*)

18    (Dkt. No. 17, at 3 [Plf.'s Response Affid.]; Dkt. No. 17, at 12-13 [Ex. 5 to Plf.'s Response Affid., attaching Superintendent Hearing Disposition]; Dkt. No. 17, at 15 [Ex. 7 to Plf.'s Response Affid., attaching Plaintiff's letter of appeal, dated November 27, 2006].)

19    (Dkt. No. 17, at 2-3 [Plf.'s Response Affid.]; Dkt. No. 17, at 14-15 [Ex. 7 to Plf.'s Response Affid., attaching Plaintiff's letter of appeal, dated November 27, 2006]; Dkt. No. 17, at 17 [Ex. 6 to Plf.'s Response Affid., attaching page of information about Flomax.)

20    (Dkt. No. 1, ¶ 7 [Plf.'s Compl.]; Dkt. No. 17, at 3 [Plf.'s Response Affid.]; Dkt. No. 17, at 17 [Ex. 6 to Plf.'s Response Affid ., attaching page of information about Flomax.)

21    (Dkt. No. 1, ¶ 6 [Plf.'s Compl.]; Dkt. No. 17, at 3 [Plf.'s Response Affid.]; Dkt. No. 17, at 12-13 [Ex. 5 to Plf.'s Response Affid., attaching Superintendent Hearing Disposition].)

2008 WL 4693153

22    (Dkt. No. 17, at 12-13 [Ex. 5 to Plf.'s Response Affid., attaching Superintendent Hearing Disposition]; Dkt. No. 17, at 3 [Plf.'s Response Affid.].)

23    (Dkt. No. 1, ¶ 6 [Plf.'s Compl.]; Dkt. No. 17, at 3-4 [Plf.'s Response Affid.]; Dkt. No. 17, at 15 [Ex. 7 to Plf.'s Response Affid., attaching Plaintiff's letter of appeal, dated November 27, 2006]; Dkt. No. 17, at 16 [Ex. 8 to Plf.'s Response Affid., attaching Donald Selsky's Review of Superintendent's Hearing, issued on January 19, 2007].)

24    (Dkt. No. 1, ¶ 6 [Plf.'s Compl.]; Dkt. No. 17, at 2 [Plf.'s Response Affid.].)

25    (Dkt. No. 1, ¶ 6 [Plf.'s Compl.].)

26    *See* 5C Wright & Miller, *Federal Practice and Procedure* § 1363 at 112 (3d ed. 2004) ("A motion to dismiss for failure to state a claim for relief under Rule 12(b)(6) goes to the sufficiency of the pleading under Rule 8(a)(2).") [citations omitted]; *Princeton Indus., Inc. v. Rem,* 39 B.R. 140, 143 (Bankr.S.D.N.Y.1984) ("The motion under F.R.Civ.P. 12(b)(6) tests the formal legal sufficiency of the complaint as to whether the plaintiff has conformed to F.R.Civ.P. 8(a)(2) which calls for a 'short and plain statement' that the pleader is entitled to relief."); *Bush v. Masiello,* 55 F.R.D. 72, 74 (S.D.N.Y.1972) ("This motion under Fed.R.Civ.P. 12(b)(6) tests the formal legal sufficiency of the complaint, determining whether the complaint has conformed to Fed.R.Civ.P. 8(a)(2) which calls for a 'short and plain statement that the pleader is entitled to relief.' ").

27    *See Swierkiewicz v. Sorema N.A.,* 534 U.S. 506, 514, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002) ("These allegations give respondent fair notice of what petitioner's claims are and the grounds upon which they rest.... In addition, they state claims upon which relief could be granted under Title VII and the ADEA."); *Wynder v. McMahon,* 360 F.3d 73, 80 (2d Cir.2004) ("There is a critical distinction between the notice requirements of Rule 8(a) and the requirement, under Rule 12(b)(6), that a plaintiff state a claim upon which relief can be granted."); *Phelps v. Kapnolas,* 308 F.3d 180, 187 (2d Cir.2002) ("Of course, none of this is to say that a court should hesitate to dismiss a complaint when the plaintiff's allegation ... fails as a matter of law.") [citation omitted]; *Kittay v. Kornstein,* 230 F.3d 531, 541 (2d Cir.2000) (distinguishing between a failure to meet Rule 12[b][6]'s requirement of stating a cognizable claim and Rule 8[a]'s requirement of

disclosing sufficient information to put defendant on fair notice); *In re Methyl Tertiary Butyl Ether Prods. Liab. Litig.,* 379 F.Supp.2d 348, 370 (S.D.N.Y.2005) ( "Although Rule 8 does not require plaintiffs to plead a theory of causation, it does not protect a legally insufficient claim [under Rule 12(b)(6) ].") [citation omitted]; *Util. Metal Research & Generac Power Sys.,* 02-CV-6205, 2004 U.S. Dist. LEXIS 23314, at *4-5, 2004 WL 2613993 (E.D.N.Y. Nov. 18, 2004) (distinguishing between the legal sufficiency of the cause of action under Rule 12[b][6] and the sufficiency of the complaint under Rule 8[a] ); *accord, Straker v. Metro Trans. Auth.,* 331 F.Supp.2d 91, 101-102 (E.D.N.Y.2004); *Tangorre v. Mako's, Inc.,* 01-CV-4430, 2002 U.S. Dist. LEXIS 1658, at *6-7, 2002 WL 313156 (S.D.N.Y. Jan. 30, 2002) (identifying two sorts of arguments made on a Rule 12[b] [6] motion-one aimed at the sufficiency of the pleadings under Rule 8 [a], and the other aimed at the legal sufficiency of the claims).

28    *Dura Pharmaceuticals, Inc. v. Broudo,* 544 U.S. 336, 125 S.Ct. 1627, 1634, 161 L.Ed.2d 577 (2005) (holding that the complaint failed to meet this test) [citation omitted; emphasis added]; *see also Swierkiewicz,* 534 U.S. at 512 [citation omitted]; *Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit,* 507 U.S. 163, 168, 113 S.Ct. 1160, 122 L.Ed.2d 517 (1993) [citation omitted].

29    *Swierkiewicz,* 534 U.S. at 514 (quoting *Conley,* 355 U.S. at 48); *see also Simmons v. Abruzzo,* 49 F.3d 83, 86 (2d Cir.1995) ("Fair notice is that which will enable the adverse party to answer and prepare for trial, allow the application of res judicata, and identify the nature of the case so it may be assigned the proper form of trial.") [citation omitted]; *Salahuddin v. Cuomo,* 861 F.2d 40, 42 (2d Cir.1988) ("[T]he principle function of pleadings under the Federal Rules is to give the adverse party fair notice of the claim asserted so as to enable him to answer and prepare for trial.") [citations omitted].

31    *See, e.g., Swierkiewicz,* 534 U.S. at 513-514 (noting that "Rule 8(a)(2)'s simplified pleading standard applies to all civil actions, with limited exceptions [including averments of fraud or mistake].").

32    2 *Moore's Federal Practice* § 12.34[1][b] at 12-61 (3d ed.2003).

33    *See, e.g., Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, ---- - ----, 127 S.Ct. 1955, 1964-1974, 167 L.Ed.2d 929 (2007) (pleading did not meet Rule 8[a][2]'s liberal requirement), *accord, Dura Pharmaceuticals,*

2008 WL 4693153

125 S.Ct. at 1634-1635, *Christopher v. Harbury,* 536 U.S. 403, 416-422, 122 S.Ct. 2179, 153 L.Ed.2d 413 (2002), *Freedom Holdings, Inc. v. Spitzer,* 357 F.3d 205, 234-235 (2d Cir.2004), *Gmurzynska v. Hutton,* 355 F.3d 206, 208-209 (2d Cir.2004). Several unpublished decisions exist from the Second Circuit affirming the Rule 8(a)(2) dismissal of a complaint after *Swierkiewicz. See, e.g., Salvador v. Adirondack Park Agency of the State of N.Y.,* No. 01-7539, 2002 WL 741835, at *5 (2d Cir. Apr.26, 2002) (affirming pre-*Swierkiewicz* decision from Northern District of New York interpreting Rule 8[a][2] ). Although these decisions are not themselves precedential authority, *see* Rules of the U.S. Court of Appeals for the Second Circuit, § 0.23, they appear to acknowledge the continued precedential effect, after *Swierkiewicz,* of certain cases from within the Second Circuit interpreting Rule 8(a)(2). *See Khan v. Ashcroft,* 352 F.3d 521, 525 (2d Cir.2003) (relying on summary affirmances because "they clearly acknowledge the continued precedential effect" of *Domond v. INS,* 244 F.3d 81 [2d Cir.2001], after that case was "implicitly overruled by the Supreme Court" in *INS v. St. Cyr,* 533 U.S. 289 [2001] ).

34   The Court in *Twombly* further explained: "The phrase is best forgotten as an incomplete, negative gloss on an accepted pleading standard: once a claim has been adequately stated, it may be supported by showing any set of facts consistent with the allegations in the complaint.... *Conley,* then, described the breadth of opportunity to prove what an adequate complaint claims, not the minimum standard of adequate pleading to govern a complaint's survival." *Twombly,* 127 S.Ct. at 1969.

35   *See, e.g., Ruotolo v. City of New York,* 514 F.3d 184, 188 (2d Cir.2008) (in civil rights action, stating that "To survive a motion to dismiss, a complaint must plead 'enough facts to state a claim up relief that is plausible on its face.' ") [citation omitted]; *Goldstein v. Pataki,* 07-CV-2537, 2008 U.S.App. LEXIS 2241, at *14, 2008 WL 269100 (2d Cir. Feb. 1, 2008) (in civil rights action, stating that "*Twombly* requires ... that the complaint's '[f]actual allegations be enough to raise a right to relief above the speculative level ....' ") [internal citation omitted]; *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.,* 493 F.3d 87, 98, n. 2 (2d Cir.2007) ("We have declined to read Twombly's flexible 'plausibility standard' as relating only to antitrust cases.") [citation omitted]; *Iqbal v. Hasty,* 490 F.3d 143, 157-58 (2d Cir.2007) (in prisoner civil rights action, stating, "[W]e believe the [Supreme] Court [in *Bell Atlantic Corp. v. Twombly* ] is ...

requiring a flexible 'plausibility standard,' which obliges a pleader to amplify a claim with some factual allegations in those contexts where such amplification is needed to render the claim *plausible.*" ) [emphasis in original].

36   *See, e.g., Jacobs v. Mostow,* 281 F. App'x 85, 87 (2d Cir. March 27, 2008) (in pro se action, stating, "To survive a motion to dismiss, a complaint must plead 'enough facts to state a claim up relief that is plausible on its face.' ") [citation omitted] (summary order, cited in accordance with Local Rule 32.1[c] [1] ); *Boykin v. KeyCorp.,* 521 F.3d 202, 215-16 (2d Cir.2008) (finding that borrower's *pro se* complaint sufficiently presented a "*plausible* claim of disparate treatment," under Fair Housing Act, to give lenders fair notice of her discrimination claim based on lenders' denial of her home equity loan application) [emphasis added].

37   For example, in *Erickson,* a district court had dismissed a *pro se* prisoner's civil rights complaint because, although the complaint was otherwise factually specific as to how the prisoner's hepatis C medication had been wrongfully terminated by prison officials for a period of approximately 18 months, the complaint (according to the district court) failed to allege facts plausibly suggesting that the termination caused the prisoner "substantial harm." 127 S.Ct. at 2199. The Supreme Court vacated and remanded the case because (1) under Fed.R.Civ.P. 8 and *Twombly,* all that is required is a "a short and plain statement of the claim" sufficient to "give the defendant fair notice" of the claim and "the grounds upon which it rests," and (2) the plaintiff had alleged that the termination of his hepatis C medication for 18 months was "endangering [his] life" and that he was "still in need of treatment for [the] disease." *Id.* at 2200. While *Erickson* does not elaborate much further on its rationale, a careful reading of the decision (and the dissent by Justice Thomas) reveals a point that is perhaps so obvious that it did not need mentioning in the short decision: a claim of deliberate indifference to a serious medical need under the Eighth Amendment involves two elements, i.e., the existence of a sufficiently serious medical need possessed by the plaintiff, and the existence of a deliberately indifferent mental state possessed by prison officials with regard to that sufficiently serious medical need. The *Erickson* decision had to do with only the first element, not the second element. *Id.* at 2199-2200. In particular, the decision was merely recognizing that an allegation by a plaintiff that, during the relevant time period, he suffered from

2008 WL 4693153

hepatis C is, in and of itself, a factual allegation plausibly suggesting that he possessed a sufficiently serious medical need; the plaintiff need not *also* allege that he suffered an independent and "substantial injury" as a result of the termination of his hepatis C medication. *Id.* This point of law is hardly a novel one. For example, numerous decisions, from district courts within the Second Circuit alone, have found that suffering from hepatitis C constitutes having a serious medical need for purposes of the Eighth Amendment. *See, e .g., Rose v. Alves,* 01-CV-0648, 2004 WL 2026481, at *6 (W.D.N.Y. Sept.9, 2004); *Verley v. Goord,* 02-CV-1182, 2004 WL 526740, at *10 n. 11 (S.D.N.Y. Jan.23, 2004); *Johnson v. Wright,* 234 F.Supp.2d 352, 360 (S.D.N.Y.2002); *McKenna v. Wright,* 01-CV-6571, 2002 WL 338375, at *6 (S.D.N.Y. March 4, 2002); *Carbonell v. Goord,* 99-CV-3208, 2000 WL 760751, at *9 (S.D.N.Y. June 13, 2000).

38   *Hernandez v. Coughlin,* 18 F.3d 133, 136 (2d Cir.1994) (affirming grant of motion to dismiss) [citation omitted]; *Sheppard v. Beerman,* 18 F.3d 147, 150 (2d Cir.1994).

39   *Hernandez,* 18 F.3d at 136 [citation omitted]; *Deravin v. Kerik,* 335 F.3d 195, 200 (2d Cir.2003) [citations omitted]; *Vital v. Interfaith Med. Ctr.,* 168 F.3d 615, 619 (2d Cir.1999) [citation omitted].

40   *Estelle v. Gamble,* 429 U.S. 97, 106, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976) ("[A] *pro se* complaint ... must be held to less stringent standards than formal pleadings drafted by lawyers ....") [internal quotation marks and citation omitted]; *McEachin v. McGinnis,* 357 F.3d 197, 200 (2d Cir.2004) ("[W]hen the plaintiff proceeds pro se, ... a court is obliged to construe his pleadings liberally, particularly when they allege civil rights violations.") [citation omitted].

41   "Generally, a court may not look outside the pleadings when reviewing a Rule 12(b)(6) motion to dismiss. However, the mandate to read the papers of *pro se* litigants generously makes it appropriate to consider plaintiff's additional materials, such as his opposition memorandum." *Gadson v. Goord,* 96-CV-7544, 1997 WL 714878, at *1, n. 2 (S.D.N.Y. Nov.17, 1997) (citing, *inter alia, Gil v. Mooney,* 824 F.2d 192, 195 [2d Cir.1987] [considering plaintiff's response affidavit on motion to dismiss] ). Stated another way, "in cases where a pro se plaintiff is faced with a motion to dismiss, it is appropriate for the court to consider materials outside the complaint to the extent they 'are consistent with the allegations in the complaint.' " *Donhauser v. Goord,* 314 F.Supp.2d 119, 212 (N.D.N.Y.2004) (considering factual allegations contained in plaintiff's opposition papers) [citations omitted], *vacated in part on other grounds,* 317 F.Supp.2d 160 (N.D.N.Y.2004). This authority is premised, not only on case law, but on Rule 15 of the Federal Rules of Civil Procedure, which permits a plaintiff, as a matter of right, to amend his complaint once at any time before the service of a responsive pleading-which a motion to dismiss is not. *See Washington v. James,* 782 F.2d 1134, 1138-39 (2d Cir.1986) (considering subsequent affidavit as amending *pro se* complaint, on motion to dismiss) [citations omitted].

42   *Cruz v. Gomez,* 202 F.3d 593, 597 (2d Cir.2000) (finding that plaintiff's conclusory allegations of a due process violation were insufficient) [internal quotation and citation omitted].

43   *Cuoco v. Moritsugu,* 222 F.3d 99, 112 (2d Cir.2000) [internal quotation and citation omitted]; *see also* Fed.R.Civ.P. 15(a) (leave to amend "shall be freely given when justice so requires").

44   *Cuoco,* 222 F.3d at 112 (finding that repleading would be futile) [citation omitted]; *see also Cortec Indus., Inc. v. Sum Holding L.P.,* 949 F.2d 42, 48 (2d Cir.1991) ("Of course, where a plaintiff is unable to allege any fact sufficient to support its claim, a complaint should be dismissed with prejudice.") (affirming, in part, dismissal of claim with prejudice) [citation omitted].

45   *Muniz v. Goord,* 04-CV-0479, 2007 WL 2027912, at *2, n. 14 (N.D.Y.Y. July 11, 2007) (McAvoy, J., adopting report-recommendation of Lowe, M.J.); *Richards v. Goord,* 04-CV-1433, 2007 WL 201109, at *5, n. 34 (N.D.N.Y. Jan.23, 2007) (Kahn, J., adopting report-recommendation of Lowe, M.J.); *Ariola v. Onondaga County Sheriff's Dept.,* 04-CV-1262, 2007 WL 119453, at *2, n. 13 (N.D.N.Y. Jan.10, 2007) (Hurd, J., adopting report-recommendation of Lowe, M.J.); *Collins v. Fed. Bur. of Prisons,* 05-CV-0904, 2007 WL 37404, at *4, n. 30 (N.D.N.Y. Jan.4, 2007) (Kahn, J., adopting report-recommendation of Lowe, M.J.); *Goros v. Cent. Office Review Comm.,* 03-CV-0407, 2006 WL 2794415, at *5, n. 18 (N.D.N.Y. Sept., 26, 2006) (Sharpe, J., adopting report-recommendation of Lowe, M.J.); *Williams v. Weaver,* 03-CV-0912, 2006 WL 2799417, at *4, n .16 (N.D.N.Y. Sept. 26, 2006) (Kahn, J., adopting report-recommendation of Lowe, M.J.).

46   *See Sealed Plaintiff v. Sealed Defendant # 1,* No. 06-1590, 2008 WL 3294864, at *5 (2d Cir. Aug.12,

2008) ("[The obligation to construe the pleadings of *pro se* litigants liberally] entails, at the very least, a permissive application of the rules governing the form of pleadings.") [internal quotation marks and citation omitted]; *Traguth v. Zuck,* 710 F.2d 90, 95 (2d Cir.1983) ("[R]easonable allowances to protect *pro se* litigants from inadvertent forfeiture of important rights because of their lack of legal training ... should not be impaired by harsh application of technical rules.") [citation omitted].

47    *See Prezzi v. Schelter,* 469 F.2d 691, 692 (2d Cir.1972) (extra liberal pleading standard set forth in *Haines v. Kerner,* 404 U.S. 519 [1972], did not save *pro se* complaint from dismissal for failing to comply with Fed.R.Civ.P. 8] ); *accord, Shoemaker v. State of Cal.,* 101 F.3d 108 (2d Cir.1996) (citing *Prezzi v. Schelter,* 469 F.2d 691) [unpublished disposition cited only to acknowledge the continued precedential effect of *Prezzi v. Schelter,* 469 F.2d 691, within the Second Circuit]; *accord, Praseuth v. Werbe,* 99 F.3d 402 (2d Cir.1995).

48    *See McNeil v. U.S.,* 508 U.S. 106, 113, 113 S.Ct. 1980, 124 L.Ed.2d 21 (1993) ("While we have insisted that the pleadings prepared by prisoners who do not have access to counsel be liberally construed ... we have never suggested that procedural rules in ordinary civil litigation should be interpreted so as to excuse mistakes by those who proceed without counsel."); *Faretta v. California,* 422 U.S. 806, 834, n. 46, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975) ("The right of self-representation is not a license ... not to comply with relevant rules of procedural and substantive law."); *Triestman v. Fed. Bureau of Prisons,* 470 F.3d 471, 477 (2d Cir.2006) (*pro se* status "does not exempt a party from compliance with relevant rules of procedural and substantive law") [citation omitted]; *Traguth v. Zuck,* 710 F.2d 90, 95 (2d Cir.1983) (*pro se* status "does not exempt a party from compliance with relevant rules of procedural and substantive law") [citation omitted]; *cf. Phillips v. Girdich,* 408 F.3d 124, 128, 130 (2d Cir.2005) (acknowledging that *pro se* plaintiff's complaint could be dismissed for failing to comply with Rules 8 and 10 if his mistakes either "undermine the purpose of notice pleading [ ]or prejudice the adverse party").

49    *Stinson v. Sheriff's Dep't of Sullivan Cty.,* 499 F.Supp. 259, 262 & n. 9 (S.D.N.Y.1980); *accord, Standley v. Dennison,* 05-CV-1033, 2007 WL 2406909, at *6, n. 27 (N.D.N.Y. Aug.21, 2007) (Sharpe, J., adopting report-recommendation of Lowe, M.J.); *Muniz v. Goord,* 04-CV-0479, 2007 WL 2027912, at

*2 (N.D.Y.Y. July 11, 2007) (McAvoy, J., adopting report-recommendation of Lowe, M.J.); *DiProjetto v. Morris Protective Serv.,* 489 F.Supp.2d 305, 307 (W.D.N.Y.2007); *Cosby v. City of White Plains,* 04-CV-5829, 2007 WL 853203, at *3 (S.D.N.Y. Feb.9, 2007); *Lopez v. Wright,* 05-CV-1568, 2007 WL 388919, at *3, n. 11 (N.D.N.Y. Jan.31, 2007) (Mordue, C.J., adopting report-recommendation of Lowe, M.J.); *Richards v. Goord,* 04-CV-1433, 2007 WL 201109, at *5 (N.D.N.Y. Jan.23, 2007) (Kahn, J., adopting report-recommendation of Lowe, M.J.); *Ariola v. Onondaga County Sheriff's Dept.,* 04-CV-1262, 2007 WL 119453, at *2, n. 13 (N.D.N.Y. Jan.10, 2007) (Hurd, J., adopting report-recommendation of Lowe, M.J.); *Collins v. Fed. Bur. of Prisons,* 05-CV-0904, 2007 WL 37404, at *4 (N.D.N.Y. Jan.4, 2007) (Kahn, J., adopting report-recommendation of Lowe, M.J.).

50    *McGinty v. State of New York,* 251 F.3d 84, 100 (2d Cir.2001) [citation omitted]; *see also* Fed.R.Civ.P. 12(h)(3).

51    42 U.S.C. § 1983 [emphasis added].

52    *See, supra,* note 44 of this Report-Recommendation.

53    *See Ying Jing Gan v. City of New York,* 996 F.2d 522, 529 (2d Cir.1993) ("The immunity to which a state's official may be entitled in a § 1983 action depends initially on the capacity in which he is sued. To the extent that a state official is sued for damages in his official capacity, such a suit is deemed to be a suit against the state, and the official is entitled to invoke the Eleventh Amendment immunity belonging to the state."); *Severino v. Negron,* 996 F.2d 1439, 1441 (2d Cir.1993) ( "[I]t is clear that the Eleventh Amendment does not permit suit [under Section 1983] for money damages against state officials in their official capacities."); *Farid v. Smith,* 850 F.2d 917, 921 (2d Cir.1988) ("The eleventh amendment bars recovery against an employee who is sued in his official capacity, but does not protect him from personal liability if he is sued in his 'individual' or 'personal' capacity."); *see also Will v. Michigan Dept. of State Police,* 491 U.S. 58, 71, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989) ("Obviously, state officials literally are persons. But a suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office.... As such, it is no different from a suit against the State itself.... We hold that neither a State nor its officials acting in their official capacities are 'persons' under § 1983."); *Kentucky v. Graham,* 473 U.S. 159, 165-66,

2008 WL 4693153

105 S.Ct. 3099, 87 L.Ed.2d 114 (1985) ("As long as the government entity receives notice and an opportunity to respond, an official-capacity suit is, in all respects other than name, to be treated as a suit against the entity. It is not a suit against the official personally, for the real party in interest is the entity."); *see also Holloway v. Selsky,* 05-CV-0501, 2007 WL 433375, at *4 (N.D.N.Y. Feb.6, 2007) (Sharpe, J.) [citing cases].

54    *See, infra,* note 41 of this Report-Recommendation (citing cases).

55    The authority to conduct this *sua sponte* analysis is derived from two sources: (1) 28 U.S.C. § 1915(e)(2)(B)(ii), which provides that "the court shall dismiss [a] case [brought by a prisoner proceeding *in forma pauperis* ] at any time if the court determines that ... the action ... is frivolous or malicious[,] ... fails to state a claim on which relief may be granted[,] ... or ... seeks monetary relief against a defendant who is immune from such relief"; and (2) 28 U.S.C. § 1915A(b), which provides that, "[o]n review, the court shall ... dismiss the [prisoner's] complaint, or any portion of the complaint, if the complaint ... is frivolous, malicious, or fails to state a claim upon which relief may be granted ...."

56    As explained above in Part II of this Report-Recommendation, a dismissal for failure to state a claim may be based not only on a successful challenge to the "sufficiency of the pleading" under Fed.R.Civ.P. 8(a)(2), but also on a successful challenge to the legal cognizability of the claims asserted in the pleading. *See, supra,* notes 26 and 27 of this Report-Recommendation.

57    *Farmer v. Brennan,* 511 U.S. 825, 827, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994) ("[S]ubjective recklessness as used in the criminal law is a familiar and workable standard that is consistent with the Cruel and Unusual Punishments Clause as interpreted in our cases, and we adopt it as the test for "deliberate indifference" under the Eighth Amendment."); *Hemmings v. Gorczyk,* 134 F.3d 104, 108 (2d Cir.1998) ("The required state of mind [for a deliberate indifference claim under the Eighth Amendment], equivalent to criminal recklessness, is that the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists; and he must also draw the inference.") [internal quotation marks and citations omitted]; *Hathaway v. Coughlin,* 99 F.3d 550, 553 (2d Cir.1996) ("The subjective element

requires a state of mind that is the equivalent of criminal recklessness ....") [citation omitted]; *accord, Koehl v. Greene,* 06-CV-0478, 2007 WL 2846905, at *17, n. 98 (N.D.N.Y. Sept.26, 2007) (Kahn, J.); *Richards v. Goord,* 04-CV-1433, 2007 WL 201109, at *15, n. 124 (N.D.N.Y. Jan.23, 2007) (Kahn, J.); *Salaam v. Adams,* 03-CV-0517, 2006 WL 2827687, at *10, n. 59 (N.D.N.Y. Sept.29, 2006) (Kahn, J.).

58    In addition, it is worth noting that Plaintiff's explanation to Defendant Bleau consisted of a statement that Plaintiff could not urinate because of his prostate *medication,* not because of his prostate *condition. See, supra,* Part I.A. of this Report-Recommendation. As a result, Defendant Bleau would not have become *aware* of the reason for Plaintiff's inability to urinate (which Plaintiff now alleges was his prostate *condition,* not his prostate *medication* ), even if Defendant Bleau had remained in Plaintiff's presence and listened to his explanation.

59    *Farmer v. Brennan,* 511 U.S. 825, 835, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994) ("[D]eliberate indifference [for purposes of an Eighth Amendment claim] describes a state of mind more blameworthy than negligence."); *Estelle v. Gamble,* 429 U.S. 97, 106, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976) ("[A] complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment. Medical malpractice does not become a constitutional violation merely because the victim is a prisoner."); *Murphy v. Grabo,* 94-CV-1684, 1998 WL 166840, at *4 (N.D.N.Y. Apr.9, 1998) (Pooler, J .) ("Deliberate indifference, whether evidenced by [prison] medical staff or by [prison] officials who allegedly disregard the instructions of [prison] medical staff, requires more than negligence.... Disagreement with prescribed treatment does not rise to the level of a constitutional claim.... Additionally, negligence by physicians, even amounting to malpractice, does not become a constitutional violation merely because the plaintiff is an inmate.... Thus, claims of malpractice or disagreement with treatment are not actionable under section 1983.") [citations omitted].").

60    *See, supra,* note 44 of this Report-Recommendation.

61    *Accord, Lugo v. Van Orden,* 07-CV-0879, 2008 U.S. Dist. LEXIS 56707, at *7, 2008 WL 2884925 (N.D.N.Y. July 23, 2008) (McAvoy, J.); *Darvie v. Countryman,* 08-CV-0715, 2008 U.S. Dist. LEXIS 60931, 2008 WL 3286250 (N.D.N.Y. Aug. 7, 2008)

2008 WL 4693153

(Sharpe, J.), *adopting* 2008 U.S. Dist. LEXIS 52797, at *18, n. 5, 2008 WL 2725071 (N.D.N.Y. July 10, 2008) (Lowe, M.J.); *Anderson v. Banks,* 06-CV-0625, 2008 U.S. Dist. LEXIS 60896, at *16-17, 2008 WL 3285917 (N.D.N.Y. May 19, 2008) (Homer, M.J.), *adopted by* 2008 U.S. Dist. LEXIS 60932, 2008 WL 3285917 (N.D.N.Y. Aug. 6, 2008) (Sharpe, J.); *Stewartson v. Almstead,* 04-CV-1097, 2008 U.S. Dist. LEXIS 22178, at *7, 2008 WL 783367 (N.D.N.Y. March 20, 2008) (McAvoy, J.); *McEachin v. Goord,* 06-CV-1192, 2008 U.S. Dist. LEXIS 27479, at *12, 2008 WL 1788440 (N.D.N.Y. Feb. 8, 2008) (Treece, M.J.), *adopted by* 2008 U.S. Dist. LEXIS 31879, 2008 WL 1788440 (N.D.N.Y. Apr. 17, 2008) (Hurd, J.); *Murray v. Pataki,* 03-CV-1263, 2007 U.S. Dist. LEXIS 26959, at *27, 2007 WL 965345 (N.D.N.Y. March 5, 2007) (Treece, M.J.), *adopted by* 2007 U.S. Dist. LEXIS 23065, 2007 WL 956941 (N.D.N.Y. March 29, 2007) (Kahn, J.); *Madera v. Goord,* 103 F.Supp.2d 536, 542 (N.D.N.Y.2000) (Kahn, J., adopting Report-Recommendation by Di Bianco, M.J.).

62 *See, supra,* note 44 of this Report-Recommendation.

63 *See, e.g., Spence v. Senkowski,* 91-CV-0955, 1998 WL 214719, at *3 (N.D.N.Y. Apr.17, 1998) (McCurn, J.) (180 days that plaintiff spent in S.H.U., where he was subjected to numerous conditions of confinement that were more restrictive than those in general population, did not constitute atypical and significant hardship in relation to ordinary incidents of prison life); *accord, Husbands v. McClellan,* 990 F.Supp. 214, 217-19 (W.D.N.Y.1998) (180 days in S.H.U. under numerous conditions of confinement that were more restrictive than those in general population); *Warren v. Irvin,* 985 F.Supp. 350, 353-56 (W.D.N.Y.1997) (161 days in S.H.U. under numerous conditions of confinement that were more restrictive than those in general population); *Ruiz v. Selsky,* 96-CV-2003, 1997 WL 137448, at *4-6 (S.D.N.Y.1997) (192 days in S.H.U. under numerous conditions of confinement that were more restrictive than those in general population); *Horne v. Coughlin,* 949 F.Supp. 112, 116-17 (N.D.N.Y.1996) (Smith, M.J.) (180 days in S.H.U. under numerous conditions of confinement that were more restrictive than those in general population); *Nogueras v. Coughlin,* 94-CV-4094, 1996 WL 487951, at *4-5 (S.D.N.Y. Aug.27, 1996) (210 days in S.H.U. under numerous conditions of confinement that were more restrictive than those in general population); *Carter v. Carriero,* 905 F.Supp. 99, 103-04 (W.D.N.Y.1995) (270 days in S.H.U.

under numerous conditions of confinement that were more restrictive than those in general population).

64 *Jackson v. Onondaga County,* 05-CV-1393, 2008 U.S. Dist. LEXIS 64930, at *40 & n. 46, 549 F. Supp. 2d 204 (N.D.N.Y. Jan. 8, 2008) (Lowe, M.J.) [citations omitted], *adopted on* de novo *review by* 05-CV-1393, 2008 U.S. Dist. LEXIS 22175, 2008 WL 782655 (N.D.N.Y. March 20, 2008) (McAvoy, J.); *see also Martin v. Mitchell,* 92-CV-0716, 1995 U.S. Dist. LEXIS 19006, at *10-12, 1995 WL 760651 (N.D.N.Y. Nov. 24, 1995) (McAvoy, C.J.) (rejecting plaintiff's assertion that prison disciplinary hearing officer "had a duty to investigate the identity of [a correction officer identified by the plaintiff merely as] 'Budd' and call him to testify"); *Hampton v. McGinnis,* 89-CV-6344, 1992 U.S. Dist. LEXIS 15696, at *6, 1992 WL 309553 (S.D.N.Y. Oct. 15, 1992) ("[I]t was not [the disciplinary hearing officer's] duty to investigate [the prisoner's assault] claim, and plaintiff was not precluded from offering his own evidence on that subject."); *cf. Kingsley v. Bureau of Prisons,* 937 F.2d 26, 31 (2d Cir.1991) (under circumstances, a hearing officer did have a duty to identify the name of the plaintiff's desired witness because [1] the plaintiff had an "especially compelling" need for the witness, [2] the witness's identity was "readily available" to the hearing officer, [3] the plaintiff had arrived at the prison only five days earlier, [4] fulfilling the request would not have delayed the imposition of "swift discipline," and [5] "no other institutional objective was implicated").

65 *See Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 150, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970) ("The terms of § 1983 make plain two elements that are necessary for recovery. First, the plaintiff must prove that the defendant has deprived him of a right secured by the 'Constitution and laws' *of the United States."* ) (emphasis added); *Patterson v. Coughlin,* 761 F.2d 886, 890 (2d Cir.1985) ("Recovery under 42 U.S.C. § 1983 ... is premised upon a showing, first, that the defendant has denied the plaintiff a constitutional or *federal* statutory right ....") (citation omitted; emphasis added); *Fluent v. Salamanca Indian Lease Auth.,* 847 F.Supp. 1046, 1056 (W.D.N.Y.1994) ("The initial inquiry in a § 1983 action is whether the Plaintiff has been deprived of a right 'secured by the Constitution and laws' *of the United States."* ) [emphasis added].

66 *See Doe v. Conn. Dept. of Child & Youth Servs.,* 911 F.2d 868, 869 (2d Cir.1990) ("[A] violation of state law neither gives [plaintiff] a § 1983 claim nor deprives

defendants of the defense of qualified immunity to a proper § 1983 claim."); *Patterson,* 761 F.2d at 891 ("[A] state employee's failure to conform to state law does not in itself violate the Constitution and is not alone actionable under § 1983 ....") (citation omitted); *Murray v. Michael,* 03-CV-1434, 2005 WL 2204985, at * 10 (N.D.N.Y. Sept.7, 2005) (DiBianco, M.J.) ("[A]ny violations of state regulations governing the procedures for disciplinary hearings ... do not rise to the level of constitutional violations.") (citation omitted); *Rivera v. Wohlrab,* 232 F.Supp.2d 117, 123 (S.D.N.Y.2002) ("[V]iolations of state law procedural requirements do not alone constitute a deprivation of due process since '[f]ederal constitutional standards rather than state law define the requirements of procedural due process.' ") (citing *Russell v. Coughlin,* 910 F.2d 75, 78 n. 1 [2d Cir.1990] ).

67     *See Rivera v. Wohlrab,* 232 F.Supp.2d 117, 123 (S.D.N.Y.2002) (citation omitted); *Lopez v. Reynolds,* 998 F.Supp. 252, 259 (W.D.N.Y.1997).

68     *See Farinaro v. Coughlin,* 642 F.Supp. 276, 280 (S.D.N.Y.1986).

69     *See, e.g., Paddington Partners v. Bouchard,* 34 F.3d 1132, 1137-38 (2d Cir.1994) ("In objecting to a magistrate's report before the district court, a party has no right to present further testimony when it offers no justification for not offering the testimony at the hearing before the magistrate.") [internal quotation marks and citations omitted]; *Pan Am. World Airways, Inc. v. Int'l Bhd. of Teamsters,* 894 F.2d 36, 40 n. 3 (2d Cir.1990) (district court did not abuse its discretion in denying plaintiff's request to present additional testimony where plaintiff "offered

no justification for not offering the testimony at the hearing before the magistrate"); *Alexander v. Evans,* 88-CV-5309, 1993 WL 427409, at * 18 n. 8 (S.D.N.Y. Sept.30, 1993) (declining to consider affidavit of expert witness that was not before magistrate) [citation omitted]; s*ee also Murr v. U.S.,* 200 F.3d 895, 902, n. 1 (6th Cir.2000) ("Petitioner's failure to raise this claim before the magistrate constitutes waiver."); *Marshall v. Chater,* 75 F.3d 1421, 1426 (10th Cir.1996) ("Issues raised for the first time in objections to the magistrate judge's recommendations are deemed waived.") [citations omitted]; *Cupit v. Whitley,* 28 F.3d 532, 535 (5th Cir.1994) ("By waiting until after the magistrate judge had issued its findings and recommendations [to raise its procedural default argument] ... Respondent has waived procedural default ... objection [ ].") [citations omitted]; *Greenhow v. Sec'y of Health & Human Servs.,* 863 F.2d 633, 638-39 (9th Cir.1988) ("[A]llowing parties to litigate fully their case before the magistrate and, if unsuccessful, to change their strategy and present a different theory to the district court would frustrate the purpose of the Magistrates Act."), *overruled on other grounds by U.S. v. Hardesty,* 977 F.2d 1347 (9th Cir.1992); *Patterson-Leitch Co. Inc. v. Mass. Mun. Wholesale Elec. Co.,* 840 F.2d 985, 990-91 (1st Cir.1988) ("[A]n unsuccessful party is not entitled as of right to de novo review by the judge of an argument never seasonably raised before the magistrate.") [citation omitted].

### All Citations

Not Reported in F.Supp.2d, 2008 WL 4693153

---

2014 WL 3729362

2014 WL 3729362
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Marc LEWIS, Plaintiff,

v.

MURPHY, Captain, Coxsackie Correctional
Facility; J. Lewis, Corrections Counselor,
Coxsackie Correctional Facility; Matthews, Deputy
Superintendent for Administration, Coxsackie
Correctional Facility; Christopher Miller, Deputy
Superintendent for Security, Coxsackie Correctional
Facility; Eric G. Gutwein, Commissioner
Hearing Officer, N.Y.S., D.O.C.C.S., Defendants.

No. 9:12–CV–00268 (NAM/CFH).
|
Signed July 24, 2014.
|
Filed July 25, 2014.

**Attorneys and Law Firms**

Marc Lewis, Attica, NY, pro se.

Hon. Eric T. Schneiderman, Attorney General for
the State of New York, Joshua E. McMahon, Esq.,
Assistant Attorney General, of Counsel, Albany, NY, for
Defendants.

### ORDER

NORMAN A. MORDUE, Senior District Judge.

 **\*1** The above matter comes to me following a Report–
Recommendation by Magistrate Judge Christian F.
Hummel, duly filed on the 27th day of June 2014.
Following fourteen (14) days from the service thereof, the
Clerk has sent me the file, including any and all objections
filed by the parties herein.

After careful review of all of the papers herein, including
the Magistrate Judge's Report–Recommendation, and no
objections submitted thereto, it is

ORDERED that:

1. The Report–Recommendation is hereby adopted in its
entirety.

2. The defendants' motion for summary judgment (Dkt.
No. 46) is granted and the Clerk shall enter judgment
accordingly.

3. The Clerk of the Court shall serve a copy of this Order
upon all parties and the Magistrate Judge assigned to this
case.

**IT IS SO ORDERED.**

**REPORT–RECOMMENDATION AND ORDER** [1]

[1]     This matter was referred to the undersigned for report
and recommendation pursuant to 28 U.S.C. § 636(b)
and N.D.N.Y.L.R. 72.3(c).

CHRISTIAN F. HUMMEL, United States Magistrate
Judge.

Plaintiff *pro se* Marc Lewis ("Lewis"), an inmate currently
in the custody of the New York State Department of
Correctional and Community Supervision ("DOCCS"),
brings this action pursuant to 42 U.S.C. § 1983 alleging
that defendants, five DOCCS employees, violated his
rights under the Fourteenth Amendment. Compl. (Dkt.
No. 1). Presently pending is defendants' motion for
summary judgment pursuant to Fed.R.Civ.P. 56. Dkt.
No. 46. Lewis opposes and defendants replied. Dkt. Nos.
57, 61. For the following reasons, it is recommended that
defendants' motion be granted.

### I. Background

The specific facts of the case are set forth in the
Report–Recommendation and Order filed February
28, 2012, familiarity with which is assumed. *See*
Dkt. No. 39 (Report–Recommendation); Dkt. No. 43
(Memorandum–Decision and Order). The facts are
related herein in the light most favorable to Lewis as the
non-moving party. At all relevant times, Lewis was an
inmate at Coxsackie Correctional Facility ("Coxsackie").

### A. November 5, 2011 Letter

On November 5, 2011, Lewis was watching television when non-party Correctional Officer Whit ("Whit") changed the channel on the television that Lewis was watching. Dkt. No. 46–9 at 2. Lewis wrote a letter to non-party Superintendent Martuscello ("Martuscello") complaining about the incident and stated that Whit harassed and intimidated him. Compl. ¶ 1. Lewis indicated that he would "blow the whistle on a lot of other wrong doings in this facility if need be." Dkt. No. 46–9 at 4. Lewis further indicated that he feared correctional officers would retaliate against him because he filed this complaint. *Id.* at 3. Lewis sent a copy of this letter to non-party Commissioner Fisher. Lewis Dep. # 1 (Dkt. No. 46–6) at 43:8–14. On November 7, 2011, Lewis was taken from his cell and told by non-party Sergeant Martin that he was being placed under keeplock [2] status for threats Lewis made against someone in the administration building. *Id.* at 27:14–22. At that time, Lewis had yet to receive a copy of the misbehavior report. *Id.* at 28:11–15. Based on the content of the November 5, 2011 letter, Lewis was charged with making threats and attempting to bribe and extort personnel. Dkt. No. 46–9 at 1.

[2]     "Keeplock" is a form of disciplinary confinement where an inmate is confined in his cell for the duration of the disciplinary sanction. *Gittens v. Lefevre,* 891 F.2d 38, 39 (2d Cir.1989) (citing N.Y. COMP.CODES R. & REGS. tit. 7, § 251–1.6 (2012)).

### B. Tier III Disciplinary Hearing

**\*2** On November 10, 2011, Lewis was escorted by non-party Correctional Officer Stevenson ("Stevenson") to attend his disciplinary hearing before defendant Captain Murphy ("Murphy"). Lewis Dep. # 1 at 34:8–12, 35:12–13. Murphy started the recording, explained the hearing process, and took Lewis's plea. *Id.* at 35:17–22. Lewis advised Murphy that he had not been served with a copy of the misbehavior report and had not yet been provided inmate assistance. Compl. ¶ 4; Murphy Decl. (Dkt. No. 46–22) ¶ 8. Murphy attested that he immediately stopped the hearing and directed Stevenson to provide Lewis with a copy of the misbehavior report and to arrange for the plaintiff to receive inmate assistance. Murphy Decl. ¶¶ 8, 11. Lewis also objected to Murphy being the officer who

reviewed the misbehavior report and authorized Lewis to be placed in keeplock pending a disciplinary hearing, and the hearing officer. *Id.* ¶ 9. According to DOCCS Directive 4932, 251–2.2(f) Murphy could not serve as both the reviewing and hearing officer on the same misbehavior report. Dkt. No. 46–12 at 4. Lewis was then brought back to his cell to review the misbehavior report and receive inmate assistance. Compl. ¶ 5.

#### 1. Inmate Assistance

Defendant Corrections Counselor Jackie Lewis ("Counselor Lewis") was assigned as Lewis's employee assistant. Lewis Decl. (Dkt. No. 46–14) ¶ 4. On November 10, 2011, Counselor Lewis arrived at Lewis's cell to help prepare a defense for his hearing. *Id.* ¶ 7. During the meeting, Lewis requested that Martuscello and Fischer be called as witnesses and asked for the name of the review officer who authorized his keeplock confinement. *Id.* ¶ 8; Lewis Dep. # 1 at 40:8–16. Counselor Lewis indicated that Murphy was the reviewing officer and took note of the witnesses whom Lewis wanted to question. Lewis Dep. # 1 at 40:15–17; Dkt. No. 46–15. Lewis also stated that he requested an explanation of the charges but Counselor Lewis said she was not going to do that because she was trying to go home. Compl. ¶¶ 7–8. Since Counselor Lewis did not meet Lewis's standards for assistance, Lewis did not sign the inmate assistance form and Counselor Lewis left the cell at that time. *Id.* ¶ 8. Counselor Lewis maintains that Lewis never asked her for definitions or an explanation of the charges. Lewis Decl. ¶ 9.

#### 2. Hearing Extension

On November 10, 2011, a request for an extension of the Tier III disciplinary hearing was filed because Lewis was going to be in court from November 14, 2011 to November 18, 2011 and no staff was available to conduct the hearing before that time. Dkt. No. 46–17; Compl. ¶ 10. The request indicated that defendant Commissioner's Hearing Officer Gutwein ("Gutwein") was the hearing officer and that the hearing had not commenced. Dkt. No. 46–17. Lewis contends that defendant Deputy Superintendent for Administration Matthews ("Matthews") had filed the request. Compl. ¶ 10. Lewis believes that the request contained false information because Murphy began the hearing on November 10, 2011 and Lewis was only in

court from November 14, 2011 to November 16, 2011. *Id.* Matthews attested that Lewis is mistaken about who wrote the report. Matthews Decl. (Dkt. No. 46–16) ¶¶ 8–10. Matthews explained that although the request indicates "Matthew" as the contact person, extension requests are filed by clerical staff in Coxsackie's Discipline Office; thus the reference to "Matthew" refers to someone in that office, and not Matthews. *Id.*

 **\*3** Later on November 10, 2011, Lewis wrote a letter to Martuscello explaining his November 5, 2011 letter and objecting to Murphy being the hearing officer. Dkt. No. 46–19. Martuscello directed defendant Deputy Superintendent Miller ("Miller") to respond to the letter. Miller Decl. (Dkt. No. 46–18) ¶ 7. By letter dated November 15, 2011, Miller informed Lewis that Gutwein was assigned as the hearing officer. *Id.;* Dkt. No. 46–20.

### 3. Hearing on November 21, 2011

On November 17, 2011, a second request to extend the date of the disciplinary hearing to November 21, 2011 was filed because no hearing officer was available to conduct the hearing before that time. Dkt. No. 46–13. On November 21, 2011, Gutwein conducted the disciplinary hearing for Lewis. Hr'g Tr. (Dkt. No. 46–10) at 2. [3] Lewis pleaded not guilty to the charges against him. *Id.* at 3. Lewis objected to: (1) Murphy commencing a disciplinary hearing concerning the same misbehavior report on November 10, 2011; (2) Murphy being both the reviewing and hearing officer; (3) Gutwein commencing the hearing more than seven days after placement in keeplock; and (4) Counselor Lewis providing inadequate assistance because she did not fulfill his requests. *Id.* at 4.

[3]     The page numbers following "Hr'g Tr." refer to the pagination of the header numbers generated by CM/ECF, not the individual transcripts.

Lewis requested that Counselor Lewis, Murphy, Stevenson, Fischer, Martin, and Martuscello be called as witnesses. Hr'g Tr. at 8. Lewis also requested that the November 5, 2011 letter be produced as evidence. *Id.* Gutwein noted for the record that the November 5, 2011, letter was placed in the hearing packet and denied Lewis's request to have the log books produced as evidence. *Id.* at 8, 19. Gutwein denied Lewis's request to call Murphy, Stevenson, and Counselor Lewis as witnesses on relevance

grounds as Lewis wanted them to testify to the defects of the disciplinary hearing. Gutwein Decl. (Dkt. No. 46–8) ¶ 28; Hr'g Tr. at 19, 20. Since Gutwein called Martin to testify to the misbehavior report, Gutwein declined to call Martuscello and Fischer as witnesses for their testimonies would have been duplicative. Hr'g Tr. at 8, 19, 20.

Gutwein produced Martin and asked him questions concerning the grounds for authoring the misbehavior report. Hr'g Tr. at 9. Martin explained that Lewis's November 5, 2011 letter contained statements threatening actions if certain demands were not met and Lewis would "blow the whistle if need be." *Id.* Lewis was afforded an opportunity to direct questions at Martin through Gutwein. *Id.* Gutwein denied Lewis's request to have the definitions of bribery, extortion, and threats because the definitions would be irrelevant to the incident in the report. *Id .* at 19.

Gutwein then made a written disposition and found Lewis guilty of the charges based on: (1) the misbehavior report, which stated that Lewis would retaliate if his demands were not met; (2) review of the November 5, 2011 letter stating that Lewis will retaliate by "blowing the whistle on the wrong doings by staff"; (3) Martin's testimony stating that the letters contained an ultimatum; (4) Lewis's Testimony stating that the hearing was commenced previously in an improper and untimely manner; and (5) Lewis's disciplinary history. Hr'g Tr. at 20. Gutwein sentenced Lewis to seven months in the Special Housing Unit ("SHU"), [4] along with seven months without packages, commissary privileges, phone privileges, and loss of good time credits. *Id.* Gutwein's determination and sentence was made to impress upon Lewis that it is a serious violation to threaten employees, which would not be tolerated at the correctional facility and that Lewis should modify his behavior in the future. Gutwein Decl. ¶ 12.

[4]     SHUs exist in all maximum and certain medium security facilities. The units "consist of single-occupancy cells grouped so as to provide separation from the general population ...." N .Y. COMP.CODES R. & REGS. tit 7, § 300.2(b). Inmates are confined in a SHU as discipline, pending resolution of misconduct charges, for administrative or security reasons, or in other circumstances as required. *Id.* at pt. 301.

Case 9:16-cv-00717-TJM-TWD    Document 28    Filed 07/19/17    Page 40 of 138

### C. SHU conditions

**\*4** On November 30, 2011, Lewis received a letter indicating that he had been unsatisfactorily discharged from the Aggression Replacement Training ("ART") Program because he was going to be in SHU for seven months. Compl. ¶ 39. Nevertheless, Lewis was able to complete this program after his release from SHU. Lewis Dep. # 1 (Dkt. No. 46–6) at 69:7–14.

Since Lewis had his telephone privileges taken away, he was unable to call his sister who was in need of a kidney transplant. Lewis Dep. # 2 (Dkt. No. 46–7) at 12:6–11. Lewis also stated he was in the process of filing paperwork to donate a kidney to his sister but being in SHU prevented him from finishing it. *Id.* at 12:3–5, 13:2–3. By the time Lewis was released from SHU, his sister had received a transplant. *Id.* at 13:4–7.

Lewis was also unable to interact with other inmates by attending group activities such as congregational prayer or group chow during his time in SHU. Compl. ¶ 46. Lewis contends that he was "restrained from practicing the prerequisite [rituals] associated with performing his [religious] prayers" while in SHU because the cells were unsanitary, he had to share a cell, the correctional officers gave him showers whenever they wanted, and he was not given a shower three times a week. Dkt. No. 57 at 15–16. Lewis claims he was prevented from practicing Islam because Muslims must be "in a state of purification in order to pray" and Islamic law states that men must not expose their body from the navel to the knee. Therefore he was restrained from doing "wudu," a ritual where one must wash their whole body in preparation for prayer. *Id.* at 16.

### D. Appeal of the Hearing Disposition

Lewis filed an appeal of the hearing disposition. Compl. ¶ 34. Miller reviewed the appeal and found "the hearing to be without procedural error and the resulting sanctions appropriate." Dkt. No. 46–21. Lewis appealed to non-party Albert Prack, the director of the Special Housing/Inmate disciplinary program, who reversed the guilty determination on the ground that "the evidence used fails to provide enough information to support the charges."

Dkt. No. 57 at 49. Therefore, after sixty-nine days, Lewis was released from the SHU. Compl. ¶ 45.

### II. Discussion

Lewis contends that (1) all defendants deprived him of his Fourteenth Amendment rights by denying him procedural due process in connection with the disciplinary hearings at issue and (2) defendants Miller, Matthews, Murphy, and Gutwein conspired against him to cover up Murphy's improper commencement of the hearing.

Defendants seek summary judgment dismissing the complaint in its entirety. Defs.' Mem. of Law (Dkt. No. 46–2) at 3. Defendants specifically move for summary judgment on the grounds that: (1) Lewis failed to establish a due process claim; (2) Lewis failed to establish an actionable conspiracy claim; and (3) defendants are entitled to qualified immunity. *Id.* Additionally, Matthews moves for summary judgment for lack of personal involvement. *Id.*

### A. Legal Standard

**\*5** A motion for summary judgment may be granted if there is no genuine issue as to any material fact if supported by affidavits or other suitable evidence and the moving party is entitled to judgment as a matter of law. The moving party has the burden to show the absence of disputed material facts by informing the court of portions of pleadings, depositions, and affidavits which support the motion. FED. R. CIV. P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). Facts are material if they may affect the outcome of the case as determined by substantive law. *Anderson v. Liberty Lobby,* 477 U.S. 242, 248 (1986). All ambiguities are resolved and all reasonable inferences are drawn in favor of the non-moving party. *Skubel v. Fuoroli,* 113 F.3d 330, 334 (2d Cir.1997).

The party opposing the motion must set forth facts showing that there is a genuine issue for trial. The non-moving party must do more than merely show that there is some doubt or speculation as to the true nature of the facts. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986). It must be apparent that no rational finder of fact could find in favor of the non-moving party for a court to grant a motion for summary

judgment. *Gallo v. Prudential Residential Servs.,* 22 F.3d 1219, 1223–24 (2d Cir.1994); *Graham v. Lewinski,* 848 F.2d 342, 344 (2d Cir.1988).

When, as here, a party seeks judgment against a *pro se* litigant, a court must afford the non-movant special solicitude. *See Triestman v. Fed. Bureau of Prisons,* 470 F.3d 471, 477 (2d Cir.2006). As the Second Circuit has stated,

> [t]here are many cases in which we have said that a *pro se* litigant is entitled to "special solicitude," ... that a *pro se* litigant's submissions must be construed "liberally,"... and that such submissions must be read to raise the strongest arguments that they "suggest,".... At the same time, our cases have also indicated that we cannot read into *pro se* submissions claims that are not "consistent" with the *pro se* litigant's allegations, ... or arguments that the submissions themselves do not "suggest," ... that we should not "excuse frivolous or vexatious filings by *pro se* litigants," ... and that *pro se* status "does not exempt a party from compliance with relevant rules of procedural and substantive law...."

*Id.* (citations and footnote omitted); *see also Sealed Plaintiff v. Sealed Defendant # 1,* 537 F.3d 185, 191–92 (2d Cir.2008) ("On occasions too numerous to count, we have reminded district courts that 'when [a] plaintiff proceeds *pro se,* ... a court is obliged to construe his pleadings liberally.' " (citations omitted)). However, the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion; the requirement is that there be no genuine issue of material fact. *Anderson,* 477 U.S. at 247–48.

### B. Personal Involvement

**\*6** "[P]ersonal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (quoting *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 (2d Cir.1991)). Thus, supervisory officials may not be held liable merely because they held a position of authority. *Id.; Black v. Coughlin,* 76 F.3d 72, 74 (2d Cir.1996). However, supervisory personnel may be considered "personally involved" if:

(1) [T]he defendant participated directly in the alleged constitutional violation;

(2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong;

(3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom;

(4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts; or

(5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

*Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995) (citing *Williams v. Smith,* 781 F.2d 319, 323–24 (2d Cir.1986)). [5] Assertions of personal involvement that are merely speculative are insufficient to establish a triable issue of fact. *See e.g., Brown v. Artus,* 647 F.Supp.2d 190, 200 (N.D.N.Y.2009).

[5]  Various courts in the Second Circuit have postulated how, if at all, the *Iqbal* decision affected the five *Colon* factors which were traditionally used to determine personal involvement. *Pearce v. Estate of Longo,* 766 F.Supp.2d 367, 376 (N.D.N.Y.2011), *rev'd in part on other grounds sub nom., Pearce v. Labella,* 473 F. App'x 16 (2d Cir.2012) (recognizing that several district courts in the Second Circuit have debated *Iqbal*'s impact on the five *Colon* factors); *Kleehammer v. Monroe Cnty.,* 743 F.Supp.2d 175 (W.D.N.Y.2010) (holding that "[o]nly the first and part of the third *Colon* categories pass *Iqbal*'s muster ...."); *D'Olimpio v. Crisafi,* 718 F.Supp.2d 340, 347 (S.D.N.Y.2010) (disagreeing that *Iqbal* eliminated *Colon* 's personal involvement standard).

Lewis has failed to establish the personal involvement of defendant Matthews in allegedly depriving him of his Fourteenth Amendment due process rights by filing a Tier III hearing extension request. Lewis contends that Matthews filed a Tier III hearing extension form that falsely indicated Gutwein as the hearing officer, the hearing had not yet commenced, and the dates for which Lewis would be out of the facility for an unrelated trial. Compl. ¶ 10. Matthews attested that the notation "Contact: Matthew" on the extension request did not refer to him. Rather, the extension requests are submitted by members of Coxsackie's Discipline Office; hence, it can be inferred that the notation refers to a clerical staff member in the Discipline Office. Therefore, Matthews

did not participate directly in the alleged constitutional violation. Matthews Decl. (Dkt. No. 46–16) ¶ 10; Dkt. No. 46–17. Furthermore, Matthews attested that he was not even aware of Lewis's disciplinary hearing or the extension request until after the lawsuit was filed. Matthews Decl. (Dkt. No. 46–16) ¶ 11. Accordingly, Matthews could not have failed to remedy any wrong after he was informed of the violation through a report or appeal, since he was never informed of any violation.

In addition, Matthews did not exhibit deliberate indifference to Lewis's rights by failing to act on information indicating that unconstitutional acts were occurring because Matthews had no information indicating that any wrong was occurring. Matthews also attested that he had no supervisory role over Coxsackie's inmate disciplinary program; consequently, Matthews could not have created or allowed the continuation of a policy or custom under which unconstitutional practices occurred. Matthews Decl. ¶ 2. Lastly, since Matthews held no supervisory authority over the inmate disciplinary program, he could not have been grossly negligent in supervising subordinates who committed the allegedly wrongful acts. *Id.* Lewis points to no evidence in the record to substantiate his assertions that Matthews created the extension request. Moreover, Lewis testified in his deposition and indicated in his response papers that he voluntarily withdraws his claims against Matthews. Lewis Dep. # 2 (Dkt. No. 46–7) at 28; Resp. (Dkt. No. 57) at 9. It is fair to conclude that a rational finder of fact would determine that these assertions are merely speculative and therefore, Lewis cannot establish the personal involvement of Matthews in the alleged unconstitutional actions.

**\*7** Accordingly, defendants' motion on this ground should be granted.

### C. Fourteenth Amendment

The Due Process Clause of the Fourteenth Amendment states that "[n]o State shall ... deprive any person of life, liberty, or property without due process of law." U.S. CONST. amend. XIV § 1. It is important to emphasize that due process "does not protect against all deprivations of liberty. It protects only against deprivations of liberty accomplished without due process of the law." *Baker v. McCollan,* 443 U.S. 137, 145 (1979) (internal quotation

and citations omitted). "A liberty interest may arise from the Constitution itself, ... or it may arise from an expectation or interest created by state laws or policies." *Wilkinson v. Austin,* 545 U.S. 209, 221 (2005) (citations omitted). An inmate retains a protected liberty interest in remaining free from segregated confinement if the prisoner can satisfy the standard set forth in *Sandin v. Conner,* 515 U.S. 472, 483–84 (1995).

### 1. Liberty Interest

To state a claim for procedural due process, there must first be a liberty interest which requires protection. *See generally Valmonte v. Bane,* 18 F.3d 992, 998 (2d Cir.1994) ("[Procedural] due process questions [are analyzed] in two steps: the first asks whether there exists a liberty or property interest which has been interfered with by the State; the second examines whether the procedures attendant upon that deprivation were constitutionally sufficient.") (citing *Kentucky Dep't of Corr. v. Thompson,* 490 U.S. 454, 460 (1989)). The Second Circuit has articulated a two-part test whereby the length of time a prisoner was placed in segregation as well as "the conditions of the prisoner's segregated confinement relative to the conditions of the general prison population" are to be considered. *Vasquez v. Coughlin,* 2 F.Supp.2d 255, 259 (N.D.N.Y.1998). This standard requires a prisoner to establish that the confinement or condition was atypical and significant in relation to ordinary prison life. *See Jenkins v. Haubert,* 179 F.3d 19, 28 (2d Cir.1999); *Frazier v. Coughlin,* 81 F.3d 313, 317 (2d Cir.1996).

While not a dispositive factor, the duration of a disciplinary confinement is a significant factor in determining atypicality. *Colon v. Howard,* 215 F.3d 227, 231 (2d Cir.2000) (citations omitted). The Second Circuit has not established "a bright line rule that a certain period of SHU confinement automatically fails to implicate due process rights." *Palmer v. Richards,* 364 F.3d 60, 64 (2d Cir.2004) (citations omitted). Instead, the Second Circuit has provided guidelines that "[w]here the plaintiff was confined for an intermediate duration—between 101 and 305 days—development of a detailed record of the conditions of confinement relative to ordinary prison conditions is required." *Id.* at 64–65 (citing *Colon,* 215 F.3d at 232). In the absence of a dispute about the conditions of confinement, summary judgment may

be issued "as a matter of law." *Id.* at 65 (citations omitted). Conversely, where an inmate is confined under normal SHU conditions for a duration in excess of an intermediate disposition, the length of the confinement itself is sufficient to establish atypicality. *Id.* (citing *Colon,* 215 F.3d at 231–32). Also, "[i]n the absence of a detailed factual record, cases in this Circuit typically affirm dismissal of due process claims where the period of time spent in SHU was short—e.g. 30 days—and there was no indication [of] ... unusual conditions." *Harvey v. Harder,* No. 09–CV–154 (TJM/ATB), 2012 WL 4093792, at *6 (N.D.N.Y. July 31, 2012) (citing *inter alia Palmer,* 364 F.3d at 65–66). [6]

[6] All unpublished opinions cited to by the Court in this Report–Recommendation are, unless otherwise noted, attached to this Recommendation.

**\*8** Defendants contend that Lewis has failed to demonstrate that he suffered from atypical and significant confinement and therefore cannot establish a protected liberty interest. The Court considers factors such as the length of time the prisoner was placed in segregation as well as "the conditions of the prisoner's segregated confinement relative to the conditions of the general prison population" to determine whether the prisoner can establish a liberty interest in remaining free from segregated confinement. *Palmer,* 364 F.3d at 64–65. The length of time in which Lewis spent in confinement was sixty-nine days, which is less than an intermediate amount of time. As such, the length of time itself cannot determine that the confinement was atypical and significant. Therefore, the Court determines if the confinement is atypical and significant by looking at the conditions of the segregated confinement compared to ordinary prison conditions.

Lewis contends that his confinement was atypical and significant because he was deprived of: (1) communications with the outside world; (2) an opportunity to possibly donate a kidney to his sister; (3) religious practices due to the unsanitary conditions of his confinement; (4) participation in the ART program; and (5) interaction with other inmates during activities like group chow and congressional prayer. [7] Dkt. No. 57 at 12–14. In New York, under "normal SHU conditions" an inmate is:

[7] Lewis may be attempting to raise First Amendment claims based on the denial of attendance to congregated services and sanitary conditions of his SHU cell. However, these claims were not specifically pled in the original complaint. Moreover, Lewis made no attempt to amend his complaint to include these claims. Therefore, the Court addresses these issues as arguments for establishing a liberty interest for purposes of a Fourteenth Amendment claim.

placed in a solitary confinement cell, kept in his cell for twenty-three hours a day, permitted to exercise in the prison yard for one hour a day, limited to two showers a week, and denied various privileges available to general population prisoners, such as the opportunity to work and obtain out-of-cell schooling. Visitors were permitted but the frequency and duration was less than in general population. The number of books allowed in the cell was also limited.

*Colon,* 215 F.3d at 230; *see also* N.Y. COMP.CODES R. & REGS. tit. 7, §§ 304.1–.14, 305.1–.6 (setting forth minimum conditions of SHU confinement). Lewis's confinement was of a similar kind, with twenty-three hours a day of isolation, an hour of recreation, and denial of telephone and commissary privileges. Such a claim falls short of establishing a liberty interest as Lewis fails to allege any particular condition or further deprivation outside of those generally applicable to the incidents of prison life in SHU confinement. *Vasquez,* 2 F.Supp.2d at 259; *Frazier,* 81 F.3d at 317 (explaining that while prisoners in SHU may be deprived of "certain privileges that prisoners in the general population enjoy," there exists no liberty interest in remaining a part of the general prison population); *see also Alvarado v. Halle Hous. Assoc.,* 152 F.Supp.2d 355, 355 (S.D.N.Y.2001) (finding restrictions such as loss of phone privileges, one hour of exercise a day, and three showers per week, fail to meet *Sandin* requirements). **\*9** Lewis's inability to communicate with the outside world through phone or post for the purpose of transplanting his kidney to his sister or otherwise is not considered atypical because loss of telephone privileges is an aspect of SHU confinement in New York and courts have held that this would not violate an inmate's constitutional rights. *See Long v. Crowley,* No. 09–CV–456(F), 2012 WL 1202181, at *11 (W.D.N.Y. March 22, 2012) (sixty days in keeplock with loss of telephone and commissary privileges is not a protected liberty interest); *Borsock v. Early,* No. 03–CV–395 (GLS/RFT), 2007 WL 2454196, at *9 (N.D.N.Y. Aug. 22, 2007) (GLS/RFT)

(finding that a ninety-day confinement in SHU with a ninety-day loss of packages, commissary and telephone privileges is insufficient to raise a liberty interest).

Lewis has failed to show that his unsatisfactory discharge from his ART programming due to his placement in SHU posed an atypical and significant hardship. Compl. ¶ 46; *Thompson v. LaClair,* No. 08–CV–37 (FJS/DEP), 2009 WL 2762164, at *8 (N.D.N.Y. Jan. 30, 2009) (plaintiff's inability to participate in ASAT, ART, and MAWP programs not atypical and significant hardship); *Deutsch v. U.S.,* 943 F.Supp. 276, 280 (W.D.N.Y.1996) (holding that prisoners do not have a protected liberty interest in rehabilitative programs). Moreover, Lewis was able to complete this program after his release from SHU. Lewis Dep. # 1 at 69:7–14.

Lewis's claim that his exclusion from group activities posed an atypical and significant hardship is also unfounded because SHU confinement usually segregates the inmate from the rest of the prison and therefore, the inmate would be unable to participate in group activities. *Sealey v. Coughlin,* 997 F.Supp. 316, 321 (N.D.N.Y.1998) ("plaintiff's administrative segregation in SHU was not an atypical and significant hardship"); *Edmonson v. Coughlin,* 21 F.Supp.2d 242, 249, 250 (W.D.N.Y.1998) (plaintiff's inability to participate in congregate activities such as group counseling, and religious services during his eight months of administrative segregation is not a protected liberty interest).

Lastly, in his opposition papers to the instant motion, Lewis claims that the unsanitary conditions of his cell posed an atypical and significant hardship. Lewis contends that he was "restrained from practicing the prerequisite [rituals] associated with performing his prayers" while in SHU because the cells were unsanitary, he had to share a cell, the correctional officers gave him showers at their choosing, and he was not given a shower three times a week. Dkt. No. 57 at 15–16. Lewis contends that his cell always accumulated dirt and dust, was cleaned once a week with a dirty sponge without any germicidal cleaning agents, and the water used was "black from prior use of 20 or more cells." *Id.*

Courts have found that the denial of a clean cell and personal hygiene items, as well as double-celling in SHU, do not constitute an atypical and significant hardship. *See Davidson v. Murray,* 371 F.Supp.2d 361, 364, 369 (W.D.N.Y.2005) (concluding that the denial of hygiene items and cleaning materials is not an atypical and significant hardship); *McNatt v. Unit Manager Parker,* No. 99–CV–1397 (AHN), 2000 WL 307000, at *4, *8 (D.Conn. Jan. 18, 2000) (finding stained, smelly mattresses, unclean cell, no cleaning supplies for toiletries for six days, no shower shoes, and dirty showers during SHU confinement do not constitute a constitutional violation of due process); *Bolton v. Goord,* 922 F.Supp. 604, 630 (S.D.N.Y.1998) (finding double-celling of inmates is not considered an atypical and substantial hardship). Nevertheless, a finder of fact may conclude that Lewis's cell conditions in conjunction with the denial of three showers a week to constitute an atypical and significant hardship that amount to a protected liberty interest. *See, e.g., Welch v. Bartlett,* 196 F.3d 389, 393 (2d Cir.1999) (stating that allegations of "inadequate amounts of toilet paper, soap and cleaning materials, a filthy mattress, and infrequent changes of clothes" may be a constitutional violation). Drawing every inference in Lewis's favor, these conditions were present during the entirety of Lewis's SHU confinement. Moreover, defendants do not specifically address these allegations with argument or evidence. Therefore the Court will proceed as though Lewis has established a protected liberty interest.

### 2. Procedural Due Process

**\*10** Defendants argue that Lewis was afforded ample due process. While inmates are not given "the full panoply of [due process] rights," they are still afforded procedural due process. *Wolff v. McDonnell,* 418 U.S. 539, 556 (1974). A prisoner is "entitled to advance written notice of the charges against him; a hearing affording him a reasonable opportunity to call witnesses and present documentary evidence; a fair and impartial hearing officer; and a written statement of the disposition including the evidence relied upon and the reasons for the disciplinary actions taken." *Sira v. Morton,* 380 F.3d 57, 69 (2d Cir.2004) (citations omitted).

### a. Written Notice

In this case, Lewis received proper written notice. An inmate must be provided advance written notice of the charges against him at least twenty-four hours before the

2014 WL 3729362

disciplinary hearing commences. *Wolff, 418 U.S. at 563–64*. Notice must be written "in order to inform [the inmate] of the charges and to enable him to marshal the facts and prepare a defense." *Id. at 564*. When Lewis was brought to the hearing before Murphy on November 10, 2011, Lewis had not yet received written notice of the charges. Murphy attested that once Lewis stated he did not receive a copy of the misbehavior report or inmate assistance, Murphy stopped the hearing immediately. Murphy attested that no testimony was taken, he did not review any documentary evidence other than the misbehavior report, and did not discuss the statements in the misbehavior report with Lewis. Murphy Decl. ¶ 16. Lewis was then provided a copy of the misbehavior report and inmate assistance on the same day. On November 21, 2011, Gutwein took over Lewis's Tier III disciplinary hearing. Even assuming Murphy had commenced the hearing, the ultimate penalty imposed on Lewis was by Gutwein based on the evidence presented on November 21, 2011. Lewis received a copy of the misbehavior report on November 10, 2011, well in advance of the November 21, 2011 hearing date. As such, Lewis received advanced written notice of the charges against him.

Accordingly, defendants' motion on this ground should be granted.

### b. Opportunity to Call Witnesses and Present Documentary Evidence

Lewis contends that he was deprived of an opportunity to call all his requested witnesses and present some documentary evidence. However, "[i]t is well settled that an official may refuse to call witnesses as long as the refusal is justifiable [such as] ... on the basis of irrelevance or lack of necessity." *Scott v. Kelly, 962 F.2d 145, 146–47 (2d Cir.1992)*. With respect to documentary evidence, Lewis requested the admission of the logbooks as evidence to show that he had already been taken for a disciplinary hearing regarding the same misbehavior report. Hr'g Tr. at 19. Gutwein correctly denied this request because they were irrelevant to the charges in the misbehavior report and would not have aided in Lewis's defense to such charges. Gutwein Decl. ¶¶ 33–34. As for the November 5, 2011 letter, Gutwein allowed for a copy of it to be placed in the hearing packet as evidence. Hr'g Tr. at 8.

**\*11** As for witnesses, Gutwein permitted Martin to testify at Lewis's disciplinary hearing but denied the request for Murphy, Stevenson, and J. Lewis on relevance grounds because their testimonies would have concerned the alleged defects in the disciplinary hearing rather than the charges giving rise to the hearing. Gutwein Decl. ¶ 28. Furthermore, since Martin was to testify to the content of the November 5, 2011 letter, Gutwein denied testimonies from Martuscello and Fischer on the grounds that they would be unnecessary and duplicative. *Id.* ¶ 32.

Lewis was provided with an opportunity to question Martin through Gutwein. "While inmates do have the right to question witnesses at their disciplinary hearings, that right is not unlimited and its contours are under the discretion of prison officials." *Rivera v. Wohlrab, 232 F.Supp.2d 117, 125 (S.D.N.Y.2002)*. Thus, Gutwein retained the authority to administer the questioning in a manner he saw fit. Gutwein did not permit Lewis to ask every question, but Gutwein offered reasoning for the denial of certain questions that Lewis wanted to ask. Hr'g Tr. at 9–18. A review of the hearing transcript shows that Lewis was permitted to question Martin rather extensively until Lewis was finished. *Id.* As such, Lewis was provided an opportunity to call witnesses and present documentary evidence. *Sira, 380 F.3d at 69*.

Accordingly, defendants' motion on this ground should be granted.

### c. Fair and Impartial Hearing Officer

Lewis contends that Gutwein was not an impartial hearing officer because Gutwein had not allowed Lewis to call his requested witnesses and denied him the standard and legal definitions of bribery, extortion, and threats. Prisoners have a constitutional right to a fair and impartial hearing officer. *See, e.g., Sira v. Morton, 380 F.3d 57, 69 (2d Cir.2004)*. However, "[t]he degree of impartiality required of prison officials does not rise to the level of that required of judges ... [as i]t is well recognized that prison disciplinary hearing officers are not held to the same standard of neutrality as adjudicators in other contexts." *Allen v. Cuomo, 100 F.3d 253, 259 (2d Cir.1996)* (citations omitted). The Supreme Court held "that the requirements of due process are satisfied if some evidence supports the decision by the [hearing officer] .." and the Second Circuit has held that the test is whether there was " 'reliable

evidence' of the inmate's guilt." *Luna v. Pico,* 356 F.3d 481, 487–88 (2d Cir.2004); *see also Superintendent, Mass. Corr. Inst. v. Hill,* 472 U.S. 445, 455 (1985).

As discussed *supra,* "[i]t is well settled that an official may refuse to call witnesses as long as the refusal is justifiable [such as] ... on the basis of irrelevance or lack of necessity." *Scott v. Kelly,* 962 F.2d 145, 146–47 (2d Cir.1992). Therefore, Gutwein was within his discretion to deny the calling of certain witnesses and the admission of certain evidence.

**\*12** Even though Lewis's guilty determination was reversed, it is not clear evidence that Gutwein was not a fair and impartial hearing officer. The determination was reversed on the grounds that there was insufficient evidence to support the charges, not on any procedural defects. Dkt. No. 57 at 49. The record shows no indication that Gutwein was biased and failed to serve a fair and impartial hearing officer. It is unclear to the Court how the denial of the requested definitions served as evidence of bias on Gutwein's part. Rather, it is clear from the hearing transcript that Gutwein allowed Lewis to state all of his objections for the record and question Martin as much as he needed to. *See generally* Hr'g Tr.

Gutwein had reliable evidence of Lewis's guilt, which is presented in his statement of the evidence relied upon. Gutwein relied on the statements in the November 5, 2011 letter that stated Lewis would 'blow the whistle' on wrongdoings in the facility and Martin's testimony regarding the ultimatums made by Lewis. Hr'g Tr. at 20–21. Lewis had admitted to writing the November 5, 2011 letter. *Id.* at 6. Gutwein's determination was made to impress upon Lewis that it is a serious violation to threaten employees, which would not be tolerated at the correctional facility and that he should modify his behavior in the future. Lewis points to no evidence in the record to show that Gutwein came to his determination improperly. As such, despite Lewis's contentions of bias, the record is clear that there is no question of material fact regarding the process that Lewis was provided.

Accordingly, defendants' motion on this ground should be granted.

#### d. Written Statement of Disposition

It is undisputed that Lewis received a written statement of the hearing disposition. On November 21, 2011, Lewis was present when Gutwein rendered his decision on the misbehavior report. Hr'g Tr. at 20–21. The record indicates that Lewis received a written statement of the evidence relied upon and the reasons for the disciplinary action. *Id.;* Dkt. No. 46–11 at 9. Thus, Lewis was provided with a written statement of the Tier III disciplinary hearing disposition. *Sira,* 380 F.3d at 69.

Accordingly, defendants' motion on this ground should be granted.

#### e. Inmate Assistance

"An inmate's right to assistance with his disciplinary hearing is limited." *Neree v. O'Hara,* No. 09–CV–802 (MAD/ATB), 2011 WL 3841551, at \*13 (N.D.N.Y. July 20, 2011) (*Silva v. Casey,* 992 F.2d 20, 22 (2d Cir.1993)). This Circuit has held that an assistant is constitutionally necessary when the plaintiff is confined in SHU and unable to marshal evidence and present a defense. *Id.* (citation omitted). In such a case, the assistant need only perform what the plaintiff would have done but need not go beyond the inmate's instructions. *Lewis v. Johnson,* No. 08–CV–482 (TJM/ATB), 2010 WL 3785771, at \*10 (N.D.N.Y. Aug. 5.2010) (citing *Silva,* 992 F.2d at 22). Furthermore, "any violations of this qualified right are reviewed for 'harmless error.' " *Clyde v. Schoellkopf,* 714 F.Supp.2d 432, 437 (W.D.N.Y.2010) (citing *Pilgrim v. Luther,* 571 F.3d 201, 206 (2d Cir.2009)). Lewis was confined in SHU from November 7, 2011, onward and thus was entitled to an inmate assistant. Dkt. No. 46–12 at 5; N.Y. COMP.CODES R. & REGS. tit. 7 § 251–4.1(a)(4).

**\*13** Lewis alleges that he was deprived of adequate inmate assistance. Lewis first met with his inmate assistant, Counselor Lewis, on November 10, 2011. According to Lewis, Counselor Lewis refused to give him definitions of the charges against him and interview potential witnesses. Counselor Lewis denies that she was asked to give explanations of the charges and notes that the alleged request is not indicated on the assistant form. Lewis Decl. ¶ 9; Dkt. No. 46–17. Gutwein had also denied Lewis's request for the definitions of threats, bribery, and extortion during the hearing on relevance grounds.

Taking Lewis's version of events as true, even if Counselor Lewis failed to provide such definitions of the charges, Lewis does not demonstrate that he was somehow prejudiced as a result of this error, and does not show that he was unable to present a defense or that the outcome of the hearing would have been different had Counselor Lewis provided such definitions. *Clark v. Dannheim, 590 F.Supp.2d 426, 429–31 (W.D.N.Y.2008)* ("To establish a procedural due process claim in connection with a prison disciplinary hearing, an inmate must show that he was prejudiced by the alleged procedural errors, in the sense that the errors affected the outcome of the hearing." (citation omitted)).

Furthermore, Lewis was able to present a defense and pose questions to Martin that evinced an understanding of the charges. *See generally* Hr'g Tr. at 5–18. For example, Lewis asked Martin whether the November 5, 2011 letter contained any threats of harm, which suggests that Lewis had some understanding of what constitutes "threat." *Id.* at 9. Lewis then asked "did I—anything of value to or from—Martuscello, yourself or anyone," which shows that Lewis understood the nature of the extortion charge. *Id.* at 10. Lastly, Lewis asked "did I give or attempt to give—money, gifts,—or anything worth—value ... to ... Superintendent Martuscello and—or—administrator ...." This demonstrates that Lewis had an understanding of what bribery meant. *Id.* at 11.

Lewis also alleged that Counselor Lewis failed to interview Martuscello or Fischer but does not show how this would have changed the outcome of the hearing or how this failure prejudiced him as a result. Therefore, any shortcomings in the assistance rendered by Counselor Lewis was harmless error and does not rise to the level of a due process violation. *Hernandez v. Selsky, 572 F.Supp.2d 446, 455 (S.D.N.Y.2008)* (plaintiff failed to show how outcome of hearing would have been different had employee assistant interviewed witnesses, and thus any alleged inadequate assistance was harmless error not warranting denial of summary judgment). Additionally, even though Gutwein failed to provide an explanation of the charges, Lewis was not prejudiced as a result because Gutwein described in his hearing disposition the evidence he relied upon to determine that Lewis was guilty. An explanation of these charges to Lewis would not have changed the evidence which Gutwein had relied upon. As such, Lewis's due process claim based on inadequate inmate assistance must fail.

**\*14** Accordingly, defendants' motion for on this ground should be granted.

### f. Timeliness

Lewis contends that the Tier III disciplinary hearing concerning the November 7, 2011 misbehavior report was not commenced in a timely manner because his hearing did not begin until November 21, 2011. Where an inmate is confined pending a disciplinary hearing, the hearing must commence within seven days of his initial confinement and conclude within fourteen days of the writing of the misbehavior report. N.Y. COMP.CODES R. & REGS. tit. 7 § 251–5.1(a)(b);[8] Dkt. No. 46–12 at 5–6. The Commissioner of Correctional Services or his designee must authorize any delay beyond those time limits. N.Y. COMP.CODES R. & REGS. tit. 7 § 251–5.1(a)(b); Dkt. No. 46–12 at 5–6.

[8]    Section 251–5.1, states that

(a) Where an inmate is confined pending a disciplinary hearing or superintendent's hearing, the hearing must be commenced as soon as is reasonably practicable following the inmate's initial confinement pending said disciplinary hearing or superintendent's hearing, but, in no event may it be commenced beyond seven days of said confinement without authorization of the commissioner or his designee.

(b) The disciplinary hearing or superintendent's hearing must be completed within 14 days following the writing of the misbehavior report unless otherwise authorized by the commissioner or his designee. Where a delay is authorized, the record of the hearing should reflect the reasons for any delay or adjournment, and an inmate should ordinarily be made aware of these reasons unless to do so would jeopardize institutional safety or correctional goals.

(c) Violation hearings must be completed within seven days of the writing of the misbehavior report.

N.Y. COMP.CODES R. & REGS. tit. 7 § 251–5.1.

Lewis's Tier III hearing was timely commenced. Although Lewis's hearing was initially required to commence by November 14, 2011, an extension was granted until November 18, 2011 because Lewis was scheduled to be out of the facility from November 14, 2011 through November

18, 2011, and no staff was available to conduct the hearing before that time period. Gutwein Decl. ¶ 21; Dkt. No. 46–13. A second request was made on November 17, 2011 because no hearing officer was available to conduct plaintiff's hearing until November 21, 2011. Gutwein Decl. ¶ 22; Dkt. No. 46–13. DOCCS Central Office Special Housing Unit granted the facility permission to commence Lewis's hearing by November 21, 2011 and the hearing commenced on that date. Dkt. No. 46–13. Therefore, the hearing was commenced in a timely manner in accordance with the pertinent New York regulations.

Accordingly, defendants' motion on this ground should be granted.

### D. Conspiracy

Lewis claims that defendants Murphy, Miller, and Gutwein conspired to deny him procedural due process. To establish a claim under Section 1985(3), a plaintiff must allege that (1) an agreement existed between two or more state actors to act in concert to inflict an unconstitutional injury on plaintiff, and (2) an overt act was committed in furtherance of that goal. *Ciambriello v. Cnty. of Nassau,* 292 F.3d 307, 324–25 (2d Cir.2002). Conclusory, vague, and general allegations are insufficient to support a conspiracy claim. *Ciambriello,* 292 F.3d at 325. Therefore, the plaintiff must provide some details of the time, place, and the alleged affects of the conspiracy, which would include facts to demonstrate that there was an agreement between the defendants to achieve some unlawful goal. *Warren v. Fischl,* 33 F.Supp.2d 171, 177 (E.D.N.Y.1999) (citations omitted).

In this case, defendants all deny conspiring to cover up the hearing that was allegedly commenced by Murphy. Lewis Dep. # 2 at 1–8; Gutwein Decl. ¶ 39; Miller Decl. ¶ 17; Matthews Decl. ¶ 12; Murphy Decl. ¶ 11. Lewis points to no evidence in the record to show that there was an agreement between the defendants to deprive him of his constitutional rights. Lewis alleges that the defendants conspired to cover up Murphy's attempt to start the Tier III disciplinary hearing because Murphy could not have served as the hearing officer. Murphy stated that he stopped the hearing once he realized that Lewis had not received a copy of the misbehavior report. Lewis was provided a copy and the hearing commenced on November 21, 2011 with Gutwein as the hearing officer.

Therefore, there was no wrongdoing on Murphy's part for the defendants to cover up.

**\*15** Lewis alleges that there must have been an agreement to conspire against him because of the alleged discrepancies and false statements in the extension requests, Miller's letter ruling on the appeal, and other prison forms. These allegations are conclusory and do not provide any evidence that the defendants made an actual agreement to deprive Lewis of his constitutional rights. Furthermore, as discussed *supra,* there was no deprivation of Lewis's constitutional rights and therefore there can be no valid conspiracy claim.

Moreover, Lewis's conspiracy claim fails on the grounds that it is barred by the intra-corporate conspiracy doctrine. The doctrine states that "officers, agents and employees of a single corporate entity are legally incapable of conspiring together." *Nassau Cnty. Employee "L" v. Cnty. of Nassau,* 345 F.Supp.2d 293, 304 (E.D.N.Y.2004) (internal citations and quotation marks omitted). The doctrine applies when officers and officials are working in the scope of their official duties. *Id.* Although the doctrine began in cases involving corporations, the doctrine has been extended where there are allegations of conspiracy between a public entity and its employees. *Id.; see also Everson v. New York City Transit Auth.,* 216 F.Supp.2d 71, 76 (E.D.N.Y.2002) (collecting cases). This doctrine would therefore exclude conspiracy claims against employees of DOCCS working within the scope of their employment. *Hartline v. Gallo,* 546 F.3d 95, 99, n. 3 (2d Cir.2008) (citations omitted); *Little v. City of New York,* 487 F.Supp. 426, 441–42 (S.D.N.Y.2007) (citations omitted). There is an exception to the doctrine when the individuals of the conspiracy are "pursuing personal interests that are separate and apart from the entity." *Nassau Cnty. Employee "L",* 345 F.Supp.2d at 304. Furthermore, personal bias is not considered a personal interest and is not within the exception to the intra-corporate conspiracy doctrine. *Everson,* 216 F.Supp.2d at 76 (citations omitted).

In this case, Lewis's allegations of conspiracy are against defendants who were all employees of DOCCS, which is one public entity, who were acting within the scope of their employment when they filed extension requests and other prison forms. Therefore, they are legally incapable of conspiring against each other. Lewis makes no allegation that the defendants were pursuing personal interest apart

from their official duties. As such, Lewis's conspiracy claim fails as a matter of law.

Accordingly, defendants' motion on this ground should be granted.

### E. Qualified Immunity

Defendants contend that even if Lewis's § 1983 Fourteenth Amendment and conspiracy claims are substantiated, they are nevertheless entitled to qualified immunity. Qualified immunity generally protects governmental officials from civil liability "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982); *Aiken v. Nixon,* 236 F.Supp.2d 211, 229–30 (N.D.N.Y.2002) (McAvoy, J.), *aff'd,* 80 F. App'x 146 (2d Cir.2003). However, even if the constitutional privileges "are so clearly defined that a reasonable public official would know that his actions might violate those rights, qualified ... immunity might still be available ... if it was objectively reasonable for the public official to believe that his acts did not violate those rights." *Kaminsky v. Rosenblum,* 929 F.2d 922, 925 (2d Cir.1991); *Magnotti v. Kuntz,* 918 F.2d 364, 367 (2d Cir.1990) (internal citations omitted)). A court must first determine whether, if plaintiff's allegations are accepted as true, there would be a constitutional violation. *Saucier v. Katz,* 533 U.S. 194, 201 (2001). Only if there is a constitutional violation does a court proceed to determine whether the constitutional rights were clearly established at the time of the alleged violation. *Aiken,* 236 F.Supp.2d at 230.

*16 Here, the second prong of the inquiry need not be addressed with respect to Lewis's Fourteenth Amendment and conspiracy claims against the defendants because, as discussed *supra,* it has not been shown that defendants violated Lewis's Fourteenth Amendment rights or conspired against Lewis to violate his Fourteenth Amendment rights.

Accordingly, defendants' motion on this ground should be granted.

### III. Conclusion

For the reasons stated above, it is hereby **RECOMMENDED** that defendants' motion for summary judgment (Dkt. No. 46) is **GRANTED.**

Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court "within fourteen (14) days after being served with a copy of the ... recommendation." N.Y.N.D.L.R. 72 .1(c) (citing 28 U.S.C. § 636(b)(1)(B)-(C)). **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993); *Small v. Sec'y of HHS,* 892 F.2d 15 (2d Cir.1989); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a), 6(e).

Dated: June 27, 2014.

**All Citations**

Not Reported in F.Supp.3d, 2014 WL 3729362

2016 WL 1128245
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Shihsiang Liao, a/k/a Shih-
Siang Shawn Liao, Plaintiff,
v.
Faisal Malik,[1] Defendant.

Civil Action No. 9:13-CV-1497 (GTS/DEP)
|
Signed 02/26/2016

[1]    The remaining defendant in this action is identified
in plaintiff's complaint as S. Malik. *Dkt. No. 1 at
3.* It is clear from his motion papers, however, that
defendant's first name is 'Faisal.' See, e.g., *Dkt. No.
41-2 at 1.* The clerk of the court is respectfully directed
to adjust the court's records accordingly.

**Attorneys and Law Firms**

FOR PLAINTIFF: SHIHSIANG LIAO, Pro se, P.O.
Box 472, Wassaic, NY 12592.

FOR DEFENDANT: HON. ERIC T.
SCHNEIDERMAN, New York State Attorney General,
The Capitol, KEITH J. STARLIN, ESQ., Assistant
Attorney General, Albany, NY 12224.

*REPORT AND RECOMMENDATION*

DAVID E. PEEBLES, U.S. MAGISTRATE JUDGE

**\*1**  This is a civil rights action brought by *pro se* plaintiff
Shihsiang Liao, a former New York State prison inmate
who has also identified himself as Shih–Siang Shawn
Liao, against four employees of the New York State
Department of Corrections and Community Supervision
("DOCCS"), including its former commissioner and
current acting commissioner, pursuant to 42 U.S.C. §
1983. While his complaint contains additional claims, the
sole remaining cause of action in this case is asserted
against defendant Faisal Malik based on allegations that
he denied plaintiff due process while assisting him in
preparing for a disciplinary hearing by failing to interview
and obtain witnesses identified by plaintiff.

Currently pending before the court is a motion brought
by the defendant Malik requesting the entry of summary
judgment dismissing plaintiff's remaining claim. For the
reasons set forth below, I recommend that defendant's
motion, which plaintiff has not opposed, be granted.

I. *BACKGROUND*[2]

[2]    In light of the procedural posture of this case, the
following recitation is derived from the record now
before the court, with all inferences and ambiguities
resolved in plaintiff's favor. *Terry v. Ashcroft,* 336
F.3d 128, 137 (2d Cir. 2003).

Prior to his release from prison in or about September
2014, *Dkt. No. 25,* plaintiff was an inmate held in
the custody of the DOCCS.[3] *See generallyDkt. No. 1.*
At the times relevant to his remaining claim, plaintiff
was confined initially in the Ogdensburg Correctional
Facility ("Ogdensburg"), located in Ogdensburg, New
York, and later the Gouverneur Correctional Facility
("Gouverneur"), located in Gouverneur, New York. *Id.*;
*Dkt. No. 41–6 at 19.*

[3]    It appears that following his release from prison in
New York, plaintiff served time in two correctional
facilities in Ohio. Dkt. Nos. 25, 30; *see alsoDkt. No.
41–6 at 129.*

On November 19, 2010, plaintiff was issued a series
of misbehavior reports accusing him of violating prison
rules arising from conduct occurring while housed in
Ogdensburg. *Dkt. No. 1 at 4,* 21–24; *Dkt. No. 41–7.* The
charges set forth in those misbehavior reports accused
the plaintiff of (1) soliciting goods or services without
consent from the superintendent or his designee; (2)
the unauthorized exchange of personal items without
authorization; (3) possession of contraband; (4) taking
state property; (5) providing incomplete, misleading, and/
or false statements or information; (6) impersonation; and
(7) providing legal assistance to another inmate without
prior approval from the superintendent or his designee.
*Dkt. No. 1 at 21–24; Dkt. No. 41–7.* Those charges were
based upon a search of plaintiff's cell, conducted on
November 19, 2010, and the resulting confiscation of
several prohibited items. *Dkt. No. 1 at 4,* 21–24; *Dkt. No.
41–7;see alsoDkt. No. 41–6 at 17–19.*

Following the issuance of the misbehavior reports, plaintiff was transferred to a special housing unit ("SHU") in Gouverneur to await a Tier III disciplinary hearing concerning the pending charges. [4] *Dkt. No. 41–6 at 16,* 19. In preparation for the Tier III hearing, defendant Faisal Malik, who at the time was a vocational instructor at the facility, was assigned to assist plaintiff. *Dkt. No. 1 at 7; Dkt. No. 41–2 at 1,* 6–7. After receiving the assignment, defendant Malik met with plaintiff on November 22, 2010. *Dkt. No. 41–2 at 7; Dkt. No. 41–6 at 28.* While the parties generally disagree as to what occurred after their meeting on November 22, 2010, both plaintiff and defendant appear to agree that plaintiff provided defendant with several names of individuals who he wished to have testify on his behalf at the upcoming disciplinary hearing. *Dkt. No. 1 at 7; Dkt. No. 41–2 at 7; Dkt. No. 41–6 at 21.* One of the individuals was identified by plaintiff as Ronlad Gantt, an inmate in Ogdensburg. *Dkt. No. 41–2 at 7.* Another potential witness was Tom Lawrence, the facility law librarian at Ogdensburg. *Id.; see alsoDkt. No. 41–6 at 32.* The other witnesses plaintiff identified to defendant Malik during their meeting were (1) May Liao, plaintiff's sister, who lived in Seattle, Washington; (2) Scot Liao, plaintiff's father, who lived in Taiwan; (3) Ronald Abraham, an administrative law judge who lived in Brooklyn, New York; (4) Imam Settles, the Imam assigned to Ogdensburg; and (5) an unnamed plaintiff indicated worked as a volunteer for an organization called Chan Meditation. *Dkt. No. 1 at 26; Dkt. No. 41–2 at 7; Dkt. No. 41–3.* Plaintiff expected that defendant Malik would contact each of the individuals and ensure that they would be available to testify at the hearing by way of personal appearance, telephone, or written affidavit. *Dkt. No. 41–6 at 40–41.*

---

[4]     The DOCCS conducts three types of inmate disciplinary hearings. *See* 7 N.Y.C.R.R. § 270.3; *see also Hynes v. Squillace,* 143 F.3d 653, 655 n.1 (2d Cir. 1998). Tier I hearings address the least serious infractions and can result in minor punishments such as the loss of recreation privileges. *Hynes,* 143 F.3d 655 n.1. Tier II hearings involve more serious infractions, and can result in penalties which include confinement for a period of time in the SHU. *Id.* Tier III hearings address the most serious violations and can result in unlimited SHU confinement and the loss of "good time" credits. *Id.*

**\*2** A Tier III hearing was conducted by Hearing Officer Randy Abar, beginning on November 30, 2010, to address

the charges lodged in the misbehavior reports dated November 19, 2010. *Dkt. No. 41–8.* On December 2, 2010, at the close of the hearing, plaintiff was found guilty on all counts, with the exception of the charge of unlawful soliciting. *Dkt. No. 41–8 at 28.* Based upon that finding, Hearing Officer Abar imposed a penalty that included six months of disciplinary SHU confinement, with a corresponding six-month loss of recreation, packages, commissary, and telephone privileges, and additionally recommended that plaintiff forfeit three months of good time credits. *Id.* The hearing officer's determination was administratively reversed on May 9, 2012, based upon a review by Corey Bedard, the DOCCS's Acting Director of Special Housing/Inmate Disciplinary Program. *Dkt. No. 1 at 38.*

## II. *PROCEDURAL HISTORY*

Plaintiff commenced this action on or about December 5, 2013. *Dkt. No. 1.* As defendants, plaintiff's complaint names K. Trimm, a corrections sergeant; Faisal Malik, a civilian employee; Ann Charlebois, the former DOCCS Acting Superintendent; Brian Fischer, the former DOCCS Commissioner; and Anthony J. Annucci, the Acting DOCCS Commissioner, and sets forth several causes of action against those individuals. *See generally id.* Upon initial review of plaintiff's complaint and accompanying application for leave to proceed *in forma pauperis* ("IFP"), pursuant to 28 U.S.C. §§ 1915(e) and 1915A, Chief District Judge Glenn T. Suddaby issued a decision and order on June 4, 2014, granting plaintiff's IFP application and dismissing all claims with the exception of plaintiff's procedural due process cause of action against defendant Malik. *Dkt. No. 11.*

On July 9, 2015, following the close of discovery, defendant Malik moved for summary judgment, requesting dismissal of plaintiff's remaining claim against him on a variety of grounds. *Dkt. No. 41.* That motion, to which plaintiff has failed to respond, is now ripe for determination and has been referred to me for the issuance of a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and Northern District of New York Local Rule 72.3(c). *See* Fed.R.Civ.P. 72(b).

## III. *DISCUSSION*

A. *Plaintiff's Failure to Oppose Defendant's Motion*

Before turning to the merits of defendant's motion, a threshold issue to be addressed is the legal significance of plaintiff's failure to oppose defendant's motion, and specifically whether that failure should be construed as a consent to the dismissal of his complaint.

Pursuant to Local Rule 7.1(b)(3), by failing to oppose defendant's motion, plaintiff has effectively consented to the granting of the relief sought. That rule provides as follows:

> Where a properly filed motion is unopposed and the Court determines that the moving party has met its burden to demonstrate entitlement to the relief requested therein, the non-moving party's failure to file or serve any papers as this Rule requires shall be deemed as consent to the granting or denial of the motion, as the case may be, unless good cause is shown.

N.D.N.Y. L.R. 7.1(b)(3); *see also Jackson v. Fed. Express, 766 F.3d 189, 194 (2d Cir. 2014)* (holding that the district courts may enter summary judgment in favor of the moving party where the non-moving party fails to respond in opposition, but not without first "ensur[ing] that each statement of material fact is support by record evidence sufficient to satisfy the movant's burden of production" and "determin[ing] whether the legal theory of the motion is sound").

In this case, plaintiff has not responded to defendant's motion. The motion was properly filed by defendant Malik, and defendant, through his motion, has met his burden of demonstrating entitlement to the relief requested. With respect to the question of whether defendant has met his burden, I note that the "burden of persuasion is lightened such that, in order to succeed, his motion need only be 'facially meritorious.' " *See Rodriguez v. Goord,* No. 04–CV–0358, 2007 WL 4246443, at *1 (N.D.N.Y. Nov. 27, 2007) (Scullin, J., *adopting report and recommendation by* Lowe, M.J.) (finding that whether a movant has satisfied its burden to demonstrate entitlement to a dismissal under Local Rule 7.1(b)(3) "is a more limited endeavor than a review of a contested motion to dismiss" (citing cases)). [5]

[5]    Copies of all unreported decisions cited in this document have been appended for the convenience of the *pro se* plaintiff.

**\*3** Because defendant has accurately cited both proper legal authority and evidence in the record supporting the grounds on which his motion is based, and plaintiff has failed to respond in opposition to the motion to dismiss, I find that defendant's motion is facially meritorious. *Jackson,* 766 F.3d at 194. Accordingly, I recommend that the court grant defendant's motion on this basis.

It should also be noted that there are additional consequences flowing from plaintiff's failure to file an opposition to defendant's Local Rule 7.1(a)(3) Statement of Material Facts. Local Rule 7.1 provides, in relevant part, that *"[t]he Court shall deem admitted any properly supported facts set forth in the Statement of Material Facts that the opposing party does not specifically controvert."* N.D.N.Y. L.R. 7.1(a)(3) (emphasis in original). Courts in this district have routinely enforced this rule in cases where a non-movant has failed to properly respond. *See, e.g., Elgamil v. Syracuse Univ.,* No. 99–CV–0611, 2000 WL 1264122, at *1 (N.D.N.Y. Aug. 22, 2010)* (McCurn, J.) (listing cases). Undeniably, *pro se* litigants are entitled to some measure of forbearance when defending against summary judgment motions. *Jemzura v. Public Serv. Comm'n,* 961 F.Supp. 406, 415 (N.D.N.Y.1997) (McAvoy, J.). The deference owed to *pro se* litigants, however, does not extend to relieving them of the ramifications associated with the failure to comply with the court's local rules. *Robinson v. Delgado,* No. 96–CV–0169, 1998 WL 278264, at *2 (N.D.N.Y. May 22, 1998)* (Pooler, J., *adopting report and recommendation by* Hurd, M.J.). Stated differently, "a pro se litigant is not relieved of his duty to meet the requirements necessary to defeat a motion for summary judgment." *Latouche v. Tompkins,* No. 09–CV–0308, 2011 WL 1103045, at *1 (N.D.N.Y. Mar. 23, 2011)* (Mordue, J.).

Here, because plaintiff was warned of the consequences of failing to properly respond to defendant's Local Rule 7.1 Statement, *Dkt. No. 41 at 3,* and he has failed to do so, I recommend that the court deem the facts contained in defendant's Local Rule 7.1(a)(3) Statement as having been admitted to the extent they are supported by accurate record citations. *See, e.g., Latouche,* 2011 WL 1103045, at *1; see also Champion v. Artuz,* 76 F.3d 483, 486 (2d Cir. 1996). As to any facts not contained in defendant's Local Rule 7.1(a)(3) Statement, in light of the procedural

posture of this case, the court is "required to resolve all ambiguities and draw all permissible factual inferences" in favor of plaintiff. *Terry,* 336 F.3d at 137.

### B. *Summary Judgment Standard*

Summary judgment motions are governed by Rule 56 of the Federal Rules of Civil Procedure. Under that provision, the entry of summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247 (1986); *Sec. Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.,* 391 F.3d 77, 82–83 (2d Cir. 2004). A fact is "material" for purposes of this inquiry if it "might affect the outcome of the suit under the governing law." *Anderson,* 477 U.S. at 248; *see also Jeffreys v. City of N.Y.,* 426 F.3d 549, 553 (2d Cir. 2005). A material fact is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248.

**\*4** A party moving for summary judgment bears an initial burden of demonstrating that there is no genuine dispute of material fact to be decided with respect to any essential element of the claim in issue; the failure to meet this burden warrants denial of the motion. *Anderson,* 477 U.S. at 250 n.4; *Sec. Ins. Co.,* 391 F.3d at 83. In the event the initial burden is met, the opposing party must show, through affidavits or otherwise, that there is a material dispute of fact for trial. Fed.R.Civ.P. 56(e); *Celotex,* 477 U.S. at 324; *Anderson,* 477 U.S. at 250.

When deciding a summary judgment motion, a court must resolve any ambiguities, and draw all inferences, in a light most favorable to the non-moving party. *Anderson,* 477 U.S. at 255; *Jeffreys,* 426 F.3d at 553; *Wright v. Coughlin,* 132 F.3d 133, 137–38 (2d Cir. 1998). The entry of summary judgment is justified only in the event of a finding that no reasonable trier of fact could rule in favor of the non-moving party. *Bldg. Trades Employers' Educ. Ass'n v. McGowan,* 311 F.3d 501, 507–08 (2d Cir. 2002); *see also Anderson,* 477 U.S. at 250 (finding summary judgment appropriate only when "there can be but one reasonable conclusion as to the verdict").

### C. *Analysis of Plaintiff's Procedural Due Process Claim*

In his remaining claim, plaintiff contends that defendant Malik deprived him of procedural due process as guaranteed under the Fourteenth Amendment while assisting him in preparing for his Tier III disciplinary hearing. *Dkt. No. 1 at 7–8.* To prevail on a section 1983 due process claim arising out of a disciplinary hearing, a plaintiff must show that he both (1) possessed an actual liberty interest and (2) was deprived of that interest without being afforded sufficient process. *Tellier v. Fields,* 280 F.3d 69, 79–80 (2d Cir. 2000); *Hynes v. Squillace,* 143 F.3d 653, 658 (2d Cir. 1998); *Bedoya v. Coughlin,* 91 F.3d 349, 351–52 (2d Cir. 1996).

As to the first element, in *Sandin v. Conner,* 515 U.S. 472 (1995), the Supreme Court determined that, to establish a liberty interest in the context of a prison disciplinary proceeding resulting in removal of an inmate from the general prison population, a plaintiff must demonstrate that (1) the state actually created a protected liberty interest in being free from segregation and (2) the segregation would impose an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin,* 515 U.S. at 483–84; *Tellier,* 280 F.3d at 79–80; *Hynes,* 143 F.3d at 658. The prevailing view in this circuit is that, by its regulatory scheme, the State of New York has created a liberty interest in remaining free from disciplinary confinement, thus satisfying the first *Sandin* factor. *See, e.g., LaBounty v. Coombe,* No. 95–CV–2617, 2001 WL 1658245, at *6 (S.D.N.Y. Dec. 26, 2001); *Alvarez v. Coughlin,* No. 94–CV–0985, 2001 WL 118598, at *6 (N.D.N.Y. Feb. 6, 2001) (Kahn, J.). Accordingly, I must next examine whether the allegations related to the conditions of plaintiff's SHU confinement rise to the level of an atypical and significant hardship under *Sandin.*

Atypicality in a *Sandin* inquiry is normally a question of law.[6] *Colon v. Howard,* 215 F.3d 227, 230–31 (2d Cir. 2000); *Sealey v. Giltner,* 197 F.3d 578, 585 (2d Cir. 1999). "[W]hether the conditions of a segregation amount to an 'atypical and significant hardship' turns on the duration of the segregation and a comparison with the conditions in the general population and in other categories of segregation." *Arce v. Walker,* 139 F.3d 329, 336 (2d Cir. 1998) (citing *Brooks v. DiFasi,* 112 F.3d 46, 48–49 (2d Cir. 1997)). In cases involving shorter periods of segregated confinement where the plaintiff has not alleged any unusual conditions, however, a court may not need to

undergo a detailed analysis of these considerations. *Arce, 139 F.3d at 336*; *Hynes, 143 F.3d at 658.*

6    In cases where there is factual dispute concerning the conditions or duration of confinement, however, it may nonetheless be appropriate to submit those disputes to a jury for resolution. *Colon v. Howard, 215 F.3d 227, 230–31 (2d Cir. 2000)*; *Sealey v. Giltner, 197 F.3d 578, 585 (2d Cir. 1999).*

**\*5** As to the duration of the disciplinary segregation, restrictive confinement of less than 101 days, on its own, does not generally rise to the level of an atypical and significant hardship. *Davis, 576 F.3d at 133.* Accordingly, when the duration of restrictive confinement is less than 101 days, proof of "conditions more onerous than usual" is required. *Davis, 576 F.3d at 133* (citing *Colon, 215 F.3d at 232–33 n.5*). The court must examine "the [actual] conditions of [the plaintiff's] confinement 'in comparison to the hardships endured by prisoners in general population, as well as prisoners in administrative and protective confinement, assuming such confinements are imposed in the ordinary course of prison administration.' " *Davis, 576 F.3d at 134* (quoting *Welch v. Bartlett, 196 F.3d 389, 392–93 (2d Cir. 1999)*). On the other hand, the Second Circuit has found that disciplinary segregation under ordinary conditions of more than 305 days rises to the level of atypicality. *See Colon, 215 F.3d at 231* ("Confinement in normal SHU conditions for 305 days is in our judgment a sufficient departure from the ordinary incidents of prison life to require procedural due process protections under *Sandin*.").

In this instance, although Hearing Officer Abar sentenced plaintiff to six months of disciplinary SHU confinement, plaintiff testified at his deposition that he served approximately five months, or 150 days, in the SHU, having been released early for good behavior. *Dkt. No. 41–6 at 118.* Because this period of disciplinary confinement falls between 101 and 305 days, in order to determine whether plaintiff suffered an atypical hardship, and therefore has been deprived a liberty interest, the court is required "to articulate specific findings of the conditions of the imposed confinement relative to the ordinary prison conditions[.]" *Reynoso v. Selsky, 292 F. App'x 120, 123 (2d Cir. 2008).* While plaintiff's testimony from his deposition suggests that the conditions of his SHU confinement were not extraordinary in any way, [7] defendant has not provided the court any evidence with respect to the conditions of ordinary prison life in support

of his motion. Because the court is without this evidence, it cannot undertake the type of specific fact-finding required to determine, on summary judgment, whether plaintiff suffered an atypical and significant hardship during his confinement. *See Reynoso, 292 F. App'x at 123* (reversing the district court where it had neglected "to articulate findings as to why the 150–day total sentence was not 'atypical and significant' " and commenting that "[s]uch a determination is anything but simple, and cannot be resolved summarily"). For this reason, I have assumed, for purposes of this report, that plaintiff was deprived of a liberty interest by way of his five-month SHU confinement and have proceeded to analyze whether defendant Malik provided plaintiff with constitutionally adequate assistance prior to his disciplinary hearing.

7    Plaintiff testified that, while confined in the SHU, he (1) requested legal materials from the law library daily and that they were delivered to him approximately four days later; (2) was permitted to choose non-legal books to read once per week when a corrections officer would do rounds with a cart of books; (3) was permitted to shower three times per week; (4) was provided access to the outdoors for a period of recreation time one hour per day; (5) ate three meals per day; and (6) was allowed to write, send, and receive mail and otherwise correspond with corrections staff by way of "interview slips." *Dkt. No. 41–6 at 119–26.*

The procedural safeguards to which a prison inmate is entitled before being deprived of a constitutionally cognizable liberty interest are well established under *Wolff v. McDonnell, 418 U.S. 539 (1974).* In its decision in *Wolff,* the Court held that the constitutionally mandated due process requirements include (1) written notice of the charges to the inmate; (2) the opportunity to appear at a disciplinary hearing and a reasonable opportunity to present witnesses and evidence in support of his defense, subject to a prison facility's legitimate safety and penological concerns; (3) a written statement by the hearing officer explaining his decision and the reasons for the action being taken; and (4) in some circumstances, the right to assistance in preparing a defense. *Wolff, 418 U.S. at 564–69*; *see also Luna v. Pico, 356 F.3d 481, 487 (2d Cir. 2004).* To pass muster under the Fourteenth Amendment, it is also required that a hearing officer's disciplinary determination garners the support of at least "some evidence." *Superintendent, Mass. Corr. Inst., Walpole v. Hill, 472 U.S. 445, 455 (1985)*; *Luna, 356 F.3d at 487–88.*

**\*6** Plaintiff's only contention against defendant Malik is centered upon the duty under *Wolff* to provide assistance in preparing a defense. As the Second Circuit has noted, "[p]rison authorities have a constitutional obligation to provide assistance to an inmate in marshaling evidence and presenting a defense when he is faced with disciplinary charges." *Eng v. Coughlin,* 858 F.2d 889, 897 (2d Cir. 1988). That requirement is particularly acute when an inmate faces obstacles in defending himself, including "being confined full-time to SHU[.]" *Eng,* 858 F.2d at 897. Although the Second Circuit in *Eng* specifically declined to define the extent of an assistant's obligations in helping an inmate to prepare for a disciplinary hearing, it offered the following observation:

> Although this is not the occasion to define the assigned assistant's precise role and the contours of the assistant's obligations, such help certainly should include gathering evidence, obtaining documents and relevant tapes, and interviewing witnesses. At a minimum, an assistant should perform the investigatory tasks which the inmate, were he able, could perform for himself.

*Id.* at 898; accord, *Samuels v. Selsky*, 166 F. App'x 552, 556 (2d Cir. 2006).[8]

[8]    The constitutional requirement to provide an assistant to an inmate to aid in preparing for a disciplinary hearing is echoed in New York by regulation. 7 N.Y.C.R.R. §§ 251–4.1, 251–4.2; *see also Brooks v. Prack,* 77 F.Supp.3d 301, 315 (W.D.N.Y.2014); *Fernandez v. Callens,* No. 06–CV–0506, 2010 WL 4320362, at \*9 (W.D.N.Y. Oct. 29, 2010).

The scope of the assistance that must be provided to an accused inmate, as contemplated under *Wolff* and *Eng,* is not unlimited, and clearly does not require the assignment of counsel or of the functional equivalent of a private investigator. *See Samuels,* 166 F. App'x at 556 ("The required assistance does not equate to legal counsel."); *Fernandez,* 2010 WL 4320362, at \*9 ("The Supreme Court has held that a prisoner's right to assistance as a matter of federal constitutional law is more limited, determining that the institutional concerns implicated in

prison administration would not be furthered by entitling inmates to legal counsel in the form of a retained or assigned attorney."); *Gates v. Selsky,* No. 02–CV–0496, 2005 WL 2136914, at \*6 (W.D.N.Y. Sept. 2, 2005) (citing cases). The assigned assistant is required only to perform those functions that the plaintiff would have, had he not been hampered through SHU confinement, and need not go beyond the inmate's instructions. *See Silva v. Casey,* 992 F.2d 20, 22 (2d Cir. 1993) ("[A]n assistant must be assigned to the inmate to act as his *surrogate* – to do what the inmate would have done were he able." (emphasis in original)); *accord, Samuels,* 166 F. App'x at 556; *see also Lewis v. Murphy,* No. 12–CV–0268, 2014 WL 3729362, at \*12 (N.D.N.Y. July 24, 2014) (Mordue, J., *adopting report and recommendation by* Hummel, M.J.). Significantly, any claim of deprivation of assistance is reviewed for harmless error. *Pilgrim v. Luther,* 571 F.3d 201, 206 (2d Cir. 2009).

In support of his motion, defendant Malik, a vocational instructor who is periodically assigned to assist inmates in connection with disciplinary hearings and has received DOCCS training for serving in that role, has submitted a declaration detailing his efforts to assist plaintiff in mounting a defense to the charges against him. *See generally Dkt. No. 41–2.* According to that declaration, after being assigned to the matter, defendant Milak met with plaintiff on November 22, 2010, to discuss the charges against him. *Dkt. No. 41–2 at 6–7.* After reviewing the charges and insuring that plaintiff understood them, defendant Malik inquired as to what assistance plaintiff desired. *Id.* at 7. Liao identified several witnesses who he contemplated calling as witnesses at the hearing, including inmate Gantt; Ogdensburg Law Librarian Tom Lawrence; May Liao, plaintiff's sister; Scot Liao, plaintiff's father; Ronald Abraham, an administrative law judge; Imam Settles assigned to Ogdensburg; and an unidentified individual who plaintiff referred to as a volunteer at Chan Meditation. *Id.; see also Dkt. No. 41–3.* Plaintiff told defendant Malik that he would like all of those individuals to testify at the upcoming hearing, either in person or by phone, notwithstanding that plaintiff's sister lived in the State of Washington, plaintiff's father was located in Taiwan, and Ronald Abraham resided in Brooklyn. *Dkt. No. 41–2 at 7.* Uncertain of the extent of his obligation with regard to plaintiff's requested witnesses, defendant Malik contacted the prison disciplinary office and learned that inmate Gantt had been released on November 17, 2010. *Id.* at 8; *see also Dkt. No. 41–4.* Defendant was informed by the disciplinary

officer on duty that employee assistants are not required to track down non-inmate potential witnesses outside of the facility or to arrange for or schedule the testimony of non-inmates who are "outside the correctional facility." *Dkt. No. 41–2 at 8.*

**\*7** Immediately following his discussion with the disciplinary office, defendant Malik reports that he returned to plaintiff's cell and informed him of Gantt's release from Ogdensburg, and advised plaintiff that he would have to provide contact information for the other desired witnesses who were not inmates and/or working in a DOCCS facility. *Dkt. No. 41–2 at 9.* Defendant Malik informed plaintiff "that he would then have to tell the hearing officer that he wanted them to testify, that the hearing officer would then decide if they could testify, and that if he/she decided to allow them to testify, their testimony would then be scheduled and arranged." *Id.* According to defendant, plaintiff responded by providing defendant Malik the phone number for his sister, and defendant wrote that number down on the assistant form. *Id.*; *Dkt. No. 41–3.* Plaintiff also told defendant that he would obtain the contact information for the other witnesses, aside from Tom Lawrence, from his sister. *Dkt. No. 41–2 at 9–10.* Plaintiff "did not tell [defendant Malik] that he needed assistance with anything else," and defendant then asked plaintiff to sign and date the assistant form, and plaintiff complied. *Id.* at 10. Defendant Malik did not hear anything further from plaintiff in connection with his assignment as plaintiff's assistant. *Id.* at 10.

Although plaintiff's version of the interaction with defendant Malik on November 22, 2010, differs to some degree, the factual disputes are not material. Plaintiff contends that defendant Malik forced plaintiff to sign the assistant form at the end of their meeting, which plaintiff alleges lasted only fifteen minutes, by threatening plaintiff with an additional misbehavior report for failing to comply with a direct order. *Dkt. No. 1 at 7–8; Dkt. No. 41–6 at 23.* Additionally, plaintiff alleges that he did not see or speak with defendant Malik again after their first meeting. *Dkt. No. 41–6 at 29.* Defendant Malik disputes these allegations by plaintiff. *Dkt. No. 41–2 at 9–11.*

Even assuming plaintiff's allegations are true – that he was forced to sign the assistant form and did not see or hear from defendant Malik again after their first meeting – there is no record evidence that supports plaintiff's claims

that defendant Malik did nothing to assist him. In fact, on the first day of the disciplinary hearing, plaintiff was under the impression that defendant Malik was contacting witnesses for him. *Dkt. No. 41–6 at* 58. While defendant Malik has offered a detailed account of his efforts to provide plaintiff assistance, Dkt. No. 41–2, plaintiff has failed to adduce any evidence, nor is there any in the record, that suggests defendant Malik provided plaintiff with constitutionally inadequate assistance. It is clear from plaintiff's deposition testimony that he expected defendant Malik to undertake the role of plaintiff's advocate by contacting his requested witnesses, explaining plaintiff's circumstances, and arranging for them to testify in person, by phone, or by way of a prepared affidavit. Dkt. No. 41–6 at 34–36, 38–41. Additionally, plaintiff expected defendant Malik to arrange a settlement of the misbehavior report between him and facility security to avoid the need for a disciplinary hearing. *Id.* at 84.

Plainly, plaintiff's expectations for his assigned assistant were unreasonable and exceeded the constitutional requirements under *Wolff* and *Eng.* Both the Supreme Court and courts in this circuit have unequivocally held that the constitution does not require inmate assistants to serve as legal counsel or investigator for prisoners. *Wolff,* 418 U.S. at 570; *Samuels,* 166 F. App'x at 556; *Gates,* 2005 WL 2136914, at *6. Setting aside plaintiff's unsupported allegations that defendant Malik did not assist him in any way, the uncontroverted record evidence in this case reflects that defendant met with plaintiff ahead of the hearing, explained to him the charges, asked for a list of potential witnesses, clarified his role as plaintiff's assistant with the disciplinary office, and informed plaintiff that he would be responsible for gathering the contact information for the witnesses that were not employed at Ogdensburg and then requesting them as witnesses during the hearing. *See Dkt. No. 41–2.* This conduct satisfies the due process to which plaintiff was entitled. In any event, even assuming defendant Malik's assistance fell short, any error was harmless in light of Hearing Officer Abar's rejection of plaintiff's requests to call the potential witnesses plaintiff alleges defendant Malik should have contacted prior to the hearing. [9] *Dkt. No. 41–6 at 99; Dkt. No. 41–8 at 2,* 3, 4, 16, 26. Based upon the foregoing, I recommend defendant Malik's motion be granted. [10]

[9]     At the hearing, plaintiff did not request to call Imam Settles or the individual referred to by plaintiff as a

volunteer at for Chan Meditation as witnesses. *See generally Dkt. No. 41–8.*

[10]

In light of my recommendation that defendant's motion be granted on the merits, I have not addressed the additional arguments set forth in his motion. With respect to whether plaintiff exhausted the available administrative remedies prior to filing this action, however, it is worth noting that there is no dispute that plaintiff failed to file a grievance through the DOCCS's inmate grievance program regarding the alleged inadequate assistance he received from defendant Malik. *Dkt. No. 41–6 at 104.* Plaintiff's vague and unsupported allegations that he did not file a grievance because he "was afraid of retaliation" is not sufficient to excuse that failure. *See, e.g., Baines v. McGinnis,* 766 F.Supp.2d 502, 504 (W.D.N.Y.2011) (citing *McCloud v. Tureglio,* No. 07–CV–0650, 2008 WL 1772305, at *11 (N.D.N.Y. Apr. 15, 2008) (Mordue, J., *adopting report and recommendation by* Lowe, M.J.)). While it is true that an appeal from a disciplinary hearing that raises the precise procedural infirmities asserted in a section 1983 action may be sufficient to exhaust administrative remedies, *LaBounty v. Johnson,* 253 F.Supp.2d 496, 502 n. 5 (W.D.N.Y.2013), there is no record evidence reflecting whether plaintiff raised his claim regarding defendant Malik in his appeal of Hearing Officer Abar's determination that was ultimately reversed. It seems unlikely that plaintiff would have included this ground as a basis for his appeal in light of his insistence that he did not file a grievance through the facility because of a fear of retaliation and that, by naming a particular person in a grievance or complaint, he would be targeted by corrections officers. See *Dkt. No. 41–6 at 138–40,* 156–57, 162. Accordingly, while I do not recommend dismissal of defendant's complaint on this basis, and do not intend to render any findings on this issue, it does appear likely that plaintiff's complaint is procedurally

barred based on his failure to exhaust the available administrative remedies prior to filing suit.

## IV. *SUMMARY AND RECOMMENDATION*

**\*8** Defendant has moved for summary judgment dismissing the sole remaining claim in this action, relating to plaintiff's allegation that he was denied procedural due process as a result of defendant's failure to render proper assistance to him in preparing for a disciplinary hearing. Because plaintiff has failed to oppose defendant's motion, and I find that it is facially meritorious, I recommend that it be granted on this basis. Moreover, the record before the court, including a declaration from defendant Malik detailing his efforts on plaintiff's behalf, demonstrates both that there are no genuine disputes of material fact for trial and that no reasonable factfinder could conclude that defendant deprived plaintiff of procedural due process. Accordingly, it is hereby respectfully

RECOMMENDED that defendant's motion for summary judgment *(Dkt. No. 41)* be GRANTED and that plaintiff's remaining claim in this action be DISMISSED.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections must be filed with the clerk of the court within FOURTEEN days of service of this report. FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(d), 72; *Roldan v. Racette,* 984 F.2d 85 (2d Cir. 1993).

### All Citations

Slip Copy, 2016 WL 1128245

---

2008 WL 4517806
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Kirk OCHOA, Plaintiff,

v.

Carol DeSIMONE, Inmate Records Coordinator;
D.S.A. Badger; Lt. Santos, Defendants.

Civ. No. 9:06-CV-119 (DNH/RFT).
|
Sept. 30, 2008.

**Attorneys and Law Firms**

Kirk Ochoa, Bronx, NY, pro se.

Andrew M. Cuomo, Attorney General for the State of
New York, Senta B. Suida, Esq., Assistant Attorney
General, of Counsel, Syracuse, NY, for Defendants.

*DECISION and ORDER*

DAVID N. HURD, District Judge.

**\*6** Plaintiff, Kirk Ochoa, brought this civil rights
action pursuant to 42 U.S.C. § 1983. By Report-
Recommendation dated September 10, 2008, the
Honorable Randolph F. Treece, United States Magistrate
Judge, recommended that the defendants' motion for
summary judgment (Dkt. No. 32) be granted; that
plaintiff's retaliation claim be dismissed pursuant to
28 U.S.C. § 1915(e)(2)(B)(ii); and that the plaintiff's
complaint be dismissed. Objections to the Report-
Recommendation have not been filed.

Based upon a careful review of the entire file and
the recommendations of Magistrate Judge Treece, the
Report-Recommendation is accepted and adopted in all
respects. *See* 28 U.S.C. 636(b)(1).

Accordingly, it is

ORDERED that

1. Defendants' motion for summary judgment (Docket
No. 32) is GRANTED;

2. Plaintiff's retaliation claim is DISMISSED; and

3. Plaintiff's complaint is DISMISSED.

The Clerk is directed to enter judgment accordingly and
close the file.

IT IS SO ORDERED.

RANDOLPH F. TREECE, United States Magistrate
Judge.

*REPORT-RECOMMENDATION and ORDER*

**\*1** On January 30, 2006, *pro se* Plaintiff Kirk Ochoa
filed this civil rights lawsuit, pursuant to 42 U.S.C.
§ 1983, alleging that (1) Defendant Carol DeSimone
retaliated against him for filing lawsuits and grievances;
(2) Defendant Badger violated his due process rights
by denying him a legal assistant and the right to call
witnesses during a disciplinary hearing; and (3) Defendant
Santos violated his rights by ruling against him in a
separate disciplinary hearing. Dkt. No. 1, Compl. at ¶ 7.
Defendants have filed a Motion for Summary Judgment
to which Plaintiff has not responded. Dkt. No. 32, Defs.'
Mot. for Summ. J. The original deadline for Plaintiff's
response to the Defendants' Motion was February 25,
2008. *See id.* After Plaintiff failed to meet that deadline,
on April 4, 2008, this Court issued the following Order:

> Plaintiff shall file and serve any opposition to
> Defendants' Motion for Summary Judgment on or
> before May 19, 2008; *Plaintiff is warned that failure
> to oppose Defendants' Motion will result in this Court
> accepting the facts set forth by Defendants as true. See*
> N.D.N.Y.L.R. 7.1(a)(3) ("*Any facts set forth in the
> Statement of Material Facts shall be deemed admitted
> unless specifically controverted by the opposing party.*"
> (emphasis in original)). *Plaintiff is further warned that
> failure to respond may, if appropriate, result in the
> granting of Defendants' Motion, in which [case] there
> will be no trial. See* N.D.N.Y.L.R. 7.1(b)(3) ("Where
> a properly filed motion is unopposed and the Court
> determines that the moving party has met its burden to
> demonstrate entitlement to the relief requested therein,
> the non-moving party's failure to file or serve any papers
> as required by this Rule shall be deemed as consent to

2008 WL 4517806

the granting or denial of the motion, as the case may be, unless good cause is shown.").

Dkt. No. 33, Order dated Apr. 11, 2008 (emphasis in original).

Because Plaintiff has failed to respond to the Defendants' Motion, we will accept the facts set forth by Defendants as true.

## I. FACTS

At the time of the events alleged in the Complaint, Plaintiff was in the New York State Department of Correctional Services' (DOCS) custody at the Oneida Correctional Facility. Defs.' Mot. for Summ. J., Ex. 3, Statement Pursuant to Rule 7.1 (hereinafter "Defs.' 7.1 Statement"), at ¶ 3. Plaintiff was subsequently released from DOCS custody on September 6, 2007. *Id.* at ¶ 2. The material facts giving rise to Plaintiff's claims are as follows.

On October 26, 2005, Defendant Carol DeSimone filed a Misbehavior Report (hereinafter "October Report") against Plaintiff accusing him of harassment. *Id.,* Ex. B, Misbehavior Rep., dated Oct. 26, 2005. Defendant Deputy Superintendent for Administration John Badger presided as Hearing Officer over the ensuing Disciplinary Hearing, which was held on November 8, 2005. *Id.,* Ex. C, Disciplinary Hr'g Tr., dated Nov. 8, 2005. At the conclusion of the Hearing, Plaintiff was found guilty and sentenced to thirty (30) days in the Special Housing Unit ("SHU") and one month recommended loss of good time. *Id.* at p. 7. Plaintiff appealed Badger's determination and it was reversed on January 13, 2006. *Id.,* Ex. D, Order Reversing Hr'g Decision, dated Jan. 13, 2006.

**\*2** On December 2, 2005, Plaintiff was issued another Misbehavior Report (hereinafter "December Report") for refusal to obey a direct order. *Id.,* Ex. E, Misbehavior Rep., dated Dec. 2, 2005. Defendant Lieutenant Lance Santos presided over Plaintiff's Disciplinary Hearing at the conclusion of which Plaintiff was found guilty and sentenced to thirty (30) days keeplock. *Id.,* Exs. F, Disciplinary Hr'g Tr., dated Dec. 7, 2005 & G, Inmate Disciplinary Hist. Plaintiff did not appeal that decision. *Id.* at ¶ 11.

## II. DISCUSSION

### A. Summary Judgment Standard

Pursuant to FED. R. CIV. P. 56(c), summary judgment is appropriate only where "there is no genuine issue as to any material fact and ... the moving party is entitled to judgment as a matter of law." The moving party bears the burden to demonstrate through "pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any," that there is no genuine issue of material fact. *F.D.I.C. v. Giammettei,* 34 F.3d 51, 54 (2d Cir.1994) (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). "When a party has moved for summary judgment on the basis of asserted facts supported as required by [Federal Rule of Civil Procedure 56(e)] and has, in accordance with local court rules, served a concise statement of the material facts as to which it contends there exist no genuine issues to be tried, those facts will be deemed admitted unless properly controverted by the nonmoving party." *Glazer v. Formica Corp.,* 964 F.2d 149, 154 (2d Cir.1992).

To defeat a motion for summary judgment, the non-movant must "set forth specific facts showing that there is a genuine issue for trial," and cannot rest on "mere allegations or denials" of the facts submitted by the movant. FED. R. CIV. P. 56(e); *see also Scott v. Coughlin,* 344 F.3d 282, 287 (2d Cir.2003) ("Conclusory allegations or denials are ordinarily not sufficient to defeat a motion for summary judgment when the moving party has set out a documentary case."); *Rexnord Holdings, Inc. v. Bidermann,* 21 F.3d 522, 525-26 (2d Cir.1994). To that end, sworn statements are "more than mere conclusory allegations subject to disregard ... they are specific and detailed allegations of fact, made under penalty of perjury, and should be treated as evidence in deciding a summary judgment motion" and the credibility of such statements is better left to a trier of fact. *Scott v. Coughlin,* 344 F.3d at 289 (citing *Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir.1995) and *Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983)).

When considering a motion for summary judgment, the court must resolve all ambiguities and draw all reasonable inferences in favor of the non-movant. *Nora Beverages, Inc. v. Perrier Group of Am., Inc.,* 164 F.3d 736, 742 (2d Cir.1998). "[T]he trial court's task at the summary

WESTLAW   © 2017 Thomson Reuters. No claim to original U.S. Government Works.

judgment motion stage of the litigation is carefully limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them. Its duty, in short, is confined at this point to issue-finding; it does not extend to issue-resolution." *Gallo v. Prudential Residential Servs., Ltd. P'ship,* 22 F.3d 1219, 1224 (2d Cir.1994). Furthermore, where a party is proceeding *pro se,* the court must "read [his or her] supporting papers liberally, and ... interpret them to raise the strongest arguments that they suggest." *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994), *accord, Soto v. Walker,* 44 F.3d 169, 173 (2d Cir.1995). Nonetheless, mere conclusory allegations, unsupported by the record, are insufficient to defeat a motion for summary judgment. *See Carey v. Crescenzi,* 923 F.2d 18, 21 (2d Cir.1991).

**B. Due Process Claims**

**\*3** Plaintiff asserts that Defendant Badger violated his due process rights by denying him a legal assistant and the right to call witnesses during a disciplinary hearing related to the October Report, and that Defendant Santos violated his rights by ruling against him in a disciplinary hearing related to the December Report. [1] Badger sentenced Plaintiff to thirty (30) days in SHU with a recommended one month loss of good time and Santos sentenced him to thirty (30) days keeplock. Defs.' 7.1 Statement at ¶¶ 6 & 10.

[1]  The basis for Plaintiff's claim against Defendant Santos is not entirely clear. His Complaint states: "Defendant Lt. Santos Hearing Decision informing Plaintiff that these rules apply while not in DOCS custody is a violation of due process of [law][.] DOCS own rule book clearly states that rules only apply in DOCS custody not out side [sic] custody." Compl. at ¶ 7. Because Plaintiff's claim is unclear, we liberally construe it as a due process claim.

In order to state a procedural due process claim pursuant to the Fourteenth Amendment, an inmate must first establish that he enjoys a protected liberty interest. *Arce v. Walker,* 139 F.3d 329, 333 (2d Cir.1998) (citing *Kentucky Dep't of Corr. v. Thompson,* 490 U.S. 454, 460, 109 S.Ct. 1904, 104 L.Ed.2d 506 (1989)). Such interests are derived from the Fourteenth Amendment Due Process Clause itself or from state statute or regulations. *Id.*

The Supreme Court has narrowly circumscribed the scope of liberty interests emanating from the Due Process Clause to protect "no more than the 'most basic liberty interests in prisoners.' " *Id.* (quoting *Hewitt v. Helms,* 459 U.S. 460, 467, 103 S.Ct. 864, 74 L.Ed.2d 675 (1983)). Furthermore, "changes in the conditions of confinement having a substantial adverse impact on the prisoner are not alone sufficient to invoke the protections of the Due Process Clause '[a]s long as the conditions or degree of confinement to which the prisoner is subjected is within the sentence imposed upon him.' " *Vitek v. Jones,* 445 U.S. 480, 493, 100 S.Ct. 1254, 63 L.Ed.2d 552 (1980) (quoting *Montanye v. Haymes,* 427 U.S. 236, 242, 96 S.Ct. 2543, 49 L.Ed.2d 466 (1976)).

However, when a prisoner is subjected to conditions that are "unexpected," *Sandin v. Conner,* 515 U.S. 472, 484, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995), and "qualitatively different from the punishment characteristically suffered by a person convicted of crime," the Due Process Clause itself confers a liberty interest. *Vitek v. Jones,* 445 U.S. at 493 (holding an involuntary transfer to a state mental hospital implicated a liberty interest protected by the Due Process Clause); *see also Washington v. Harper,* 494 U.S. 210, 110 S.Ct. 1028, 108 L.Ed.2d 178 (1990) (finding the Due Process Clause provides a liberty interest in being protected from the involuntary administration of psychotropic drugs).

In the case at bar, Plaintiff's disciplinary confinement in SHU and keeplock does not constitute an "unexpected" change in condition, nor did those conditions exceed the sentence imposed upon him. *See Dawes v. Dibiase,* 1997 WL 376043, at \*4 (N.D.N.Y. July 3, 1997) (citing *Washington v. Harper & Vitek v. Jones* for the proposition that the Due Process Clause will apply by its own force only for deprivations much more severe than solitary confinement for a year). Therefore, Plaintiff does not have a liberty interest in remaining free from SHU confinement emanating from the Due Process Clause itself.

State statutes and regulations may also confer liberty interests to prisoners. *Arce v. Walker,* 139 F.3d at 334 (citing *Kentucky Dep't of Corr. v. Thompson,* 490 U.S. at 460). The Supreme Court held in *Sandin v. Conner* that state created liberty interests shall be limited to those deprivations which subject a prisoner to "atypical and significant hardship ... in relation to the ordinary incidents of prison life." *Sandin v. Conner,* 515 U.S. at 484. Thus,

a prisoner asserting a denial of due process as a result of segregated confinement or loss of privileges must (1) make a threshold showing that an atypical and significant hardship was imposed upon him, and (2) establish that the "state has granted its inmates, by regulation or by statute, a protected liberty interest in remaining free from that confinement or restraint." *Frazier v. Coughlin,* 81 F.3d 313, 317 (2d Cir.1996).

**\*4** While the Second Circuit has cautioned that "there is no bright-line rule regarding the length or type of sanction" that meets the *Sandin* standard, *Jenkins v. Haubert,* 179 F.3d 19, 28 (2d Cir.1999), it has made clear that confinement in SHU for a period of one year constitutes atypical and significant restraint on inmates, deserving due process protections, *Sims v. Artuz,* 230 F.3d 14, 23 (2d Cir.2000) (stating that confinement in SHU exceeding 305 days was atypical); *Colon v. Howard,* 215 F.3d 227, 231 (2d Cir.2000) (finding 305 days of SHU confinement atypical).

In this case, neither of Plaintiff's thirty (30) day stints in SHU and keeplock, without more, [2] constitute an atypical and significant hardship, and therefore Plaintiff has not asserted that he has a liberty interest at stake. *See Sealey v. Giltner,* 197 F.3d 578, 590 (2d Cir.1999) (101 days in normal SHU conditions did not constitute an atypical and significant hardship); *see also Sandin v. Conner,* 515 U.S. at 486; *Thompson v. LaClair,* 2008 WL 191212, at \*3 (N.D.N.Y. Jan.22, 2008) (30 days in SHU does not constitute an atypical and significant hardship).

[2]     The Second Circuit has held open the possibility that a period of restricted confinement of less than 101 days could create a liberty interest if the record were to reflect atypical and significant conditions of confinement. *See Colon v. Howard,* 215 F.3d at 232 n. 5. In this case, Plaintiff has adduced no allegations regarding the conditions of his confinement beyond the loss of privileges that normally accompany disciplinary confinement.

Therefore, these claims should be **dismissed** as a matter of law. [3]

[3]     With respect to Plaintiff's due process claim against Santos, Plaintiff failed to appeal Santos's decision and therefore that claim should be dismissed for failure to exhaust administrative remedies as well. *See* Defs.' 7.1 Statement at ¶ 10; 42 U.S.C. § 1997(e)(a)

("No action shall be brought with respect to prison conditions under [section 1983], or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.")

### C. Retaliation Claim

Plaintiff asserts that Defendant DeSimone issued the October Misbehavior Report against him in retaliation for his filing "court actions and grievances against [Oneida Correctional Facility] and its staff." Compl. at ¶ 5. The Defendants failed to address this claim in their Motion for Summary Judgment. *See* Dkt. No. 32, Pl.'s Mem. of Law. However, notwithstanding that omission, under 28 U.S.C. § 1915(e)(2)(B)(ii), this Court has the power to review Plaintiff's Complaint for failure to state a claim *at any time. See, e.g., Zimmerman v. Burge,* 2008 WL 850677, at \*7 (N.D.N.Y. Mar.28, 2008) (noting that "even where a defendant has not requested dismissal based on a failure of the plaintiff to state a claim upon which relief may be granted, a district court may, *sua sponte,* address whether a pro se prisoner has failed to state a claim[.]") (citing 28 U.S.C. § 1915(e)(2)(B)(ii)). We find that, even accepting all Plaintiff's factual allegations as true, he has not stated a valid claim § 1983 retaliation claim.

The Second Circuit has stated that courts must approach prisoner retaliation claims "with skepticism and particular care," since "virtually any adverse action taken against a prisoner by a prison official-even those otherwise not rising to the level of a constitutional violation-can be characterized as a constitutionally proscribed retaliatory act." *Dawes v. Walker,* 239 F.3d 489, 491 (2d Cir.), *overruled on other grounds by Swierkiewicz v. Sorema N. A.,* 534 U.S. 506, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002) (citing *Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983) & *Franco v. Kelly,* 854 F.2d 584, 590 (2d Cir.1988)).

In order to prevail on a retaliation claim, a plaintiff bears the burden to prove, "first, that he engaged in constitutionally protected conduct and, second, that the conduct was a substantial or motivating factor for the adverse actions taken by prison officials." *Bennett v. Goord,* 343 F.3d 133, 137 (2d Cir.2003) (citations omitted). Thus, there must be a "causal connection between the protected speech and the adverse action." *Gill v. Pidlypchak,* 389 F.3d 379, 380 (2d Cir.2004) (citation omitted).

Case 9:16-cv-00717-TJM-TWD   Document 28   Filed 07/19/17   Page 62 of 138
Ochoa v. DeSimone, Not Reported in F.Supp.2d (2008)
2008 WL 4517806

**\*5** A plaintiff may meet the burden of proving an inappropriate retaliatory motive by presenting circumstantial evidence of a retaliatory motive, such as temporal proximity, thus obviating the need for direct evidence. *Bennett v. Goord,* 343 F.3d at 138-39 (holding that plaintiff met his burden in proving retaliatory motive by presenting circumstantial evidence relating to, *inter alia,* the temporal proximity of allegedly false misbehavior reports and the subsequent reversal of the disciplinary charges on appeal as unfounded). Other factors that can infer an improper or retaliatory motive include the inmate's prior good disciplinary record, vindication at a hearing on the matter, and statements by the defendant regarding his motive for disciplining plaintiff. *McEachin v. Selsky,* 2005 WL 2128851, at \*5 (N.D.N.Y. Aug.30, 2005) (citing *Colon v. Coughlin,* 58 F.3d 865, 872-73 (2d Cir.1995)).

Moreover, "in the prison context [the Second Circuit has] previously defined 'adverse action' *objectively,* as retaliatory conduct 'that would deter a similarly situated individual of ordinary firmness from exercising ... constitutional rights.' " *Gill v. Pidlypchak,* 389 F.3d at 381 (quoting *Davis v. Goord,* 320 F.3d 346, 353 (2d Cir.2003) (emphasis in original). This objective test will apply even though a particular plaintiff was not himself deterred. *Id.* If the plaintiff can carry that burden, the defendants will still be entitled to summary judgment if they can show, by a preponderance of the evidence, that they would have taken the same action in the absence of the prisoner's First Amendment activity. *Davidson v. Chestnut,* 193 F.3d 144, 148-49 (2d Cir.1999); *see Hynes v. Squillace,* 143 F.3d 653, 657 (2d Cir.1998); *Lowrance v. Achtyl,* 20 F.3d 529, 535 (2d Cir.1994).

In asserting his retaliation claim, Plaintiff generally states that he filed grievances and lawsuits which formed the basis for Defendant DeSimone's retaliatory Misbehavior Report. The Supreme Court has noted that the right to petition government for redress of grievances is "among the most precious of the liberties safeguarded by the Bill of Rights." *See United Mine Workers of Am., Dist. 12 v. Illinois State Bar Ass'n,* 389 U.S. 217, 222, 88 S.Ct. 353, 19 L.Ed.2d 426 (1967). The Second Circuit has held that within the prison context, "inmates must be 'permit[ted] free and uninhibited access ... to both *administrative and judicial* forums for the purpose of seeking redress of grievances against state officers.' " *Franco v. Kelly,* 854

F.2d at 589 (quoting *Haymes v. Montanye,* 547 F.2d 188, 191 (2d Cir.1976)) (emphasis and alterations in original).

Fatal to Plaintiff's retaliation claim, however, is his failure to specify what lawsuits or grievances he filed, against whom, and where such were filed. Plaintiff does not indicate that Defendant DeSimone was even aware of any lawsuit or grievance which he may have filed. Therefore, Plaintiff has failed to allege a causal connection between his filing of grievances and lawsuits and DeSimone's filing of the Misbehavior Report. "[A] complaint which alleges retaliation in wholly conclusory terms may safely be dismissed on the pleadings alone." *Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983).

Therefore, it is recommended that this claim be **dismissed.**

### III. CONCLUSION

For the reasons stated herein, it is hereby

**RECOMMENDED,** that Defendants' Motion for Summary Judgment (Dkt. No. 32) be **granted;** and it is further

**RECOMMENDED,** that Plaintiff's retaliation claim be **dismissed** pursuant to 28 U.S.C. § 1915(e)(2)(B)(ii); and it is further

**RECOMMENDED;** that in light of the above recommendations, Plaintiff's Complaint (Dkt. No. 1) be **dismissed;** and it is further

**ORDERED,** that the Clerk of the Court serve a copy of this Report-Recommendation and Order upon the parties to this action.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have ten (10) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. *FAILURE TO OBJECT TO THIS REPORT WITHIN TEN (10) DAYS WILL PRECLUDE APPELLATE REVIEW. Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Sec'y of Health and Human Servs.,* 892 F.2d 15 (2d Cir.1989)); *see also* 28 U.S.C. § 636(b) (1); FED. R. CIV. P. 72, 6(a), & 6(e).

2008 WL 4517806

**All Citations**

Not Reported in F.Supp.2d, 2008 WL 4517806

---

**End of Document**                                       © 2017 Thomson Reuters. No claim to original U.S. Government Works.

2008 WL 699273

2008 WL 699273
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

William ESCALARA, Plaintiff,
v.
T. CHARWAND, C.O., et al., Defendants.

No. 9:04-CV-0983 (FJS/DEP).
|
March 12, 2008.

**Attorneys and Law Firms**

William Escalara, pro se.

Hon. Andrew M. Cuomo, Attorney General of the State
of New York, Bruce J. Boivin, Esq., Christopher Hall,
Esq., Assistant Attorney General, of Counsel, Albany,
NY, for Defendants.

### ORDER

FREDERICK J. SCULLIN, JR., Senior District Judge.

 *1  Presently before the Court is Magistrate Judge David
E. Peebles February 19, 2008 Report-Recommendation
in which he recommends that defendants' motion for
summary judgment dismissing plaintiff's complaint be
granted and that plaintiff's complaint be dismissed in
all respects, without prejudice as to defendants West,
C. Lambard, Baldwin, and J. Roch, but otherwise
with prejudice. The Court having reviewed the Report-
Recommendation and the entire file in this matter, and no
objections to said Report-Recommendation having been
filed, the Court

**ORDERS** that the Report-Recommendation of
Magistrate Judge David E. Peebles filed February 19,
2008, is for the reasons stated therein, **ACCEPTED** in its
entirety and the Court further

**ORDERS** that defendants' motion for summary judgment
dismissing plaintiff's complaint is **GRANTED,** and that
plaintiff's complaint is dismissed in all respects, without
prejudice as to defendants West, C. Lambard, Baldwin,

and J. Roch, but otherwise with prejudice, and the Court
further

**ORDERS** that the Clerk of the Court is to enter judgment
in favor of Defendants and close this case.

**IT IS SO ORDERED.**

### REPORT AND RECOMMENDATION

DAVID E. PEEBLES, United States Magistrate Judge.

Plaintiff William Escalera, a New York State prison
inmate who is proceeding *pro se* and *in forma pauperis,*
has commenced this proceeding pursuant to 42 U.S.C.
§ 1983, alleging deprivation of his civil rights. In an
amended complaint which is both difficult to follow
and couched in vague and conclusory terms, plaintiff
appears to assert claims of First Amendment free speech
and procedural due process deprivations arising from
the issuance of misbehavior reports concerning his
conduct as a prison inmate, implicating matters which
include his verbal communications with fellow inmates,
determined by prison officials to violate policies regarding
such interaction, and the disciplinary proceedings which
followed. [1]

[1]     Plaintiff's complaint also purports to assert an equal
        protection denial cause of action, although the
        particulars of that claim are not well-defined.

Currently pending before the court is a motion filed
by those defendants who to date have appeared in the
action, seeking the entry of summary judgment dismissing
plaintiff's claims as lacking in merit. Having carefully
reviewed the record in the light of defendants' motion,
without the benefit of any opposing submissions by
the plaintiff, I conclude no reasonable factfinder could
determine that plaintiff's constitutional rights have been
abridged, and therefore recommend that defendants'
motion be granted.

### I. *BACKGROUND*

Plaintiff is a prison inmate who has been entrusted
to the custody of the New York State Department
of Correctional Services (the "DOCS"). *See generally,*
Amended Complaint (Dkt. No. 12); *see also* Defendants'
Exhibits (Dkt. No. 59-4) Exh. A (Transcript of Plaintiff's

2008 WL 699273

Deposition, held on May 23, 2006) at 11. At the times relevant to his claims plaintiff was designated to the Clinton Correctional Facility ("Clinton"), categorized by the DOCS as a maximum security prison. Defendants' Exhibits (Dkt. No. 59-4) Exh. A at 10-11. At Clinton, plaintiff worked as a maintenance recycling porter and was permitted to sleep in a cubicle located within a dormitory in the Clinton Annex under conditions more akin to those existing in a medium security prison. *Id.* at 9-10.

**\*2** Between the time of his transfer into Clinton in May of 2004, *see* Defendants' Exhibits (Dkt. No. 59-4) Exh. A at 11, and the end of 2004 the plaintiff, who as a prison inmate has amassed a lengthy disciplinary record, was the recipient of several misbehavior reports accusing him of violating various prison disciplinary rules. Defendants' Exhibits (Dkt. No. 59-5) Exh. D. The particulars of those misbehavior reports can be summarized as follows:

| *Date of Incident* | *Violations Alleged* |
| --- | --- |
| 6/14/04 | Creating a disturbance (Rule 104.13) and violation of refusal to obey a direct order (Rule 106.10) |
| 6/24/04 | Property in an unauthorized location (Rule 113.22) |
| 6/26/04 | Refusal to obey a hearing disposition (Rule 181.10) |
| 6/26/04 | Interference with prison officials (Rule 107.10), creating a disturbance (Rule 104.13), making a threat (Rule 102.10) and a messhall violation (Rule 124.16) |
| 8/11/04 | Creating a disturbance (Rule 104.13) and interference with prison officials (Rule 107.10) |
| 9/23/04 | Loss/damage to property (Rule 116.10), Creating a disturbance (Rule 104.13), refusal to obey an order (Rule 106.10) and interference with prison officials (Rule 107.10) |
| 10/27/04 | Creating a disturbance (Rule 104.13) |
| 12/15/04 | Interference with prison officials (Rule 107.10), refusal to obey a direct order (Rule 106.10), delay in count (Rule 112.20) and count violation (Rule 112.21) |
| 12/26/04 | Movement violation (Rule 109.12) |

*Id.* Tier II disciplinary hearings were conducted at various times in connection with a majority of those reports, in each instance resulting in a finding of guilt on one or more of the charged violations and the imposition of sanctions which generally included loss of recreation, package, commissary and/or telephone privileges of varying durations and, in some instances,

2008 WL 699273

keeplock confinement extending up to thirty days on one occasion.[2] *Id.* Plaintiff appealed each of the adverse hearing determinations and resulting disciplinary penalties to the facility superintendent, defendant Artus, who on each occasion affirmed the hearing officer's decision. Amended Complaint (Dkt. No. 12) at 4; *see also* Defendants' Exhibits (Dkt. No. 59-4) Exh. A at 50.

[2]   The DOCS conducts three types of inmate disciplinary hearings. Tier I hearings address the least serious infractions, and can result in minor punishments such as the loss of recreation privileges. Tier II hearings involve more serious infractions, and can result in penalties which include confinement for a period of time in the Special Housing Unit (SHU). Tier III hearings concern the most serious violations, and could result in unlimited SHU confinement and the loss of "good time" credits. *See Hynes v. Squillace,* 143 F.3d 653, 655 (2d Cir.), *cert. denied,* 525 U.S. 907, 119 S.Ct. 246 (1998).

At one point plaintiff attempted to speak with his prison counselor, defendant Joswick, regarding the frequency with which misbehavior reports were being administered to him by prison officials. Amended Complaint (Dkt. No. 12) at 4; Defendants' Exhibits (Dkt. No. 59-4) Exh. A at 59-60. In apparent response to Escalara's persistence, defendant Joswick advised that he was not plaintiff's "pen pal" and threatened disciplinary action if plaintiff continued in his efforts to communicate with him. Amended Complaint (Dkt. No. 12) at 2; Defendants' Exhibits (Dkt. No. 59-4) Exh. A at 60. The situation between the two was alleviated, however, when plaintiff was assigned a new counselor to replace defendant Joswick, therefore making it unnecessary for prison officials to take the threatened disciplinary measures. Defendants' Exhibits (Dkt. No. 59-4) Exh. A at 61.

## II. *BACKGROUND*

**\*3** Plaintiff commenced this action on August 19, 2004 and, at the direction of the court based upon perceived deficiencies in plaintiff's initial pleading, *see* Dkt. No. 6, submitted an amended complaint on December 27, 2004, the filing of which was authorized by the court following a review of the new pleading. Dkt. Nos. 12, 14. Named as defendants in plaintiff's amended complaint are Clinton Superintendent Artus; Mr. Douglas, a dietician at the facility; Mr. Joswick, plaintiff's former corrections counselor; Corrections Lieutenants Baldwin and Armitage; and Corrections Officers T. Charland,

West, W. Brown, R. Caron, C. Lambard, L. Favro, and J. Roch.[3] In his complaint, plaintiff claims violation of his rights of free speech and association, deprivation of procedural due process, and the denial of equal protection, and seeks recovery of compensatory and punitive damages. Dkt. No. 12.

[3]   The clerk is directed to amend the docket to reflect the correct spelling of the last names of defendants Charland and Armitage.

On August 23, 2005 an answer was filed by the New York State Attorney General, acting on behalf of various of the defendants named by the plaintiff, including Thomas Charland, Jeffrey Joswick, Dale Artus, William Brown, and Randy Caron. Dkt. No. 31. In that answer defendants have generally denied plaintiff's allegations, additionally asserting various affirmative defenses. *See id.* A second answer was subsequently filed, also by the New York State Attorney General, on behalf of defendant Michael Douglas mirroring the earlier filed answer. Dkt. No. 52. To date, defendants Corrections Captain West, Corrections Lieutenant Baldwin, C. Lambard, and J. Roch have neither been served nor otherwise appeared in the action.

On January 30, 2007, following the close of discovery, the defendants who thus far have appeared in the action moved seeking the entry of summary judgment dismissing plaintiff's complaint in its entirety, as a matter of law. Dkt. No. 59. In their motion, defendants assert that the evidence in the record fails to support plaintiff's claimed constitutional deprivations. *Id.* Despite inclusion within defendants' motion of language properly advising Escalara of the significance of the motion and the potential consequences of any failure on his part to properly respond as required, *see* Dkt. No. 59, plaintiff has not filed any papers in opposition to the pending motion, which is now ripe for determination and has been referred to me for the issuance of a report and recommendation, pursuant to 28 U.S.C. § 636(b)(1)(B) and Northern District of New York Local Rule 72.3(c). *See also* Fed.R.Civ.P. 72(b).

## III. *DISCUSSION*

### A. *Status of Unserved Defendants*
Despite the filing on December 27, 2004 of plaintiff's amended complaint and the clerk's issuance on March 28, 2005 of summonses, four of the named defendants,

2008 WL 699273

including Captain West, Corrections Officer C. Lambard, Lieutenant Baldwin, and Corrections Officer J. Roch, have neither been served nor otherwise appeared in the action. [4]

[4] The summonses issued to Captain West and C. Lambard were returned in July of 2005, unexecuted. Dkt. Nos. 20, 21. The record is unclear as to the status of efforts to serve the remaining two defendants, Corrections Lieutenant Baldwin and Corrections Officer J. Roch.

Rule 4(m) of the Federal Rules of Civil Procedure authorizes dismissal of a plaintiff's claims against a defendant where a summons and complaint is not served upon that party within 120 days after filing of the complaint, absent a showing of good cause. [5] Fed.R.Civ.P. 4(m); *Shuster v. Nassau Cty.,* No. 96 Civ. 3635, 1999 WL 9847, at *1 (S.D.N.Y. Jan. 11, 1999) (Rule 4(m) authorizes dismissal where no service within 120 days after filing of the complaint); *Romand v. Zimmerman,* 881 F.Supp. 806, 809 (N.D.N.Y.1995) (McAvoy, C.J.) (120-day period for service of a summons and complaint by a plaintiff under Fed.R.Civ.P. 4(m) applies to *pro se* plaintiffs as well as those represented by counsel). Inasmuch as the four missing defendants have not been served or otherwise appeared in the action within the appropriate time period, this court has never acquired jurisdiction over them, and the complaint should be dismissed as against those defendants, without prejudice. *See, e.g., Michelson v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 709 F.Supp. 1279, 1282 (S.D.N.Y.1989) (citing *Mississippi Publishing Corp. v. Murphree,* 326 U.S. 438, 444-45, 66 S.Ct. 242, 245-46 (1946)) (court lacks jurisdiction until defendants properly served with summons and complaint).

[5] That period is further restricted by the local rules of this court, which require that service be effected within sixty days. *See* Northern District of New York Local Rule § 4.1(b).

### B. *Plaintiff's Failure to Oppose Defendants' Motion*

**\*4** Before turning to the merits of plaintiff's claims, a threshold issue to be addressed is the legal significance, if any, of his failure to oppose defendants' summary judgment motion, and specifically whether that failure automatically entitles defendants to dismissal of plaintiff's complaint, based upon their motion.

This court's rules provide that

> [w]here a properly filed motion is unopposed and the Court determines that the moving party has met its burden to demonstrate entitlement to the relief requested therein, the non-moving party's failure to file or serve any papers as required by this Rule shall be deemed as consent to the granting or denial of the motion, as the case may be, unless good cause is shown.

N.D.N.Y.L.R. 7.1(b)(3). While *pro se* plaintiffs are entitled to special latitude when defending against summary judgment motions, *see Jemzura v. Public Serv. Comm'n,* 961 F.Supp. 406, 415 (N.D.N .Y.1997) (McAvoy, C.J.)), the failure of such a plaintiff to oppose a summary judgment motion does not preclude the court from deciding the motion. *Robinson v. Delgado,* No. 96-CV-169, 1998 WL 278264, at *2 (N.D.N.Y. May 22, 1998) (Pooler, J. & Hurd, M.J.); *Cotto v. Senkowski,* No. 95-CV-1733, 1997 WL 665551, at *1 (N.D.N.Y. Oct. 23, 1997) (Pooler, J. & Hurd, M.J.); *Wilmer v. Torian,* 980 F.Supp. 106, 106-07 (N.D.N.Y.1997) (Pooler, J. & Hurd, M.J.). As can be seen by the face of Local Rule 7.1(b)(3), however, before summary judgment can be granted under such circumstances the court must review the motion to determine whether it is facially meritorious. *See Allen v. Comprehensive Analytical Group, Inc.,* 140 F.Supp.2d 229, 231-32 (N.D.N.Y.2000) (Scullin, C.J.); *Leach v. Dufrain,* 103 F.Supp.2d 542, 545-46 (N.D.N.Y.2000) (Kahn, J.).

While a plaintiff's failure to properly oppose a defendant's motion does not assure that the motion, however lacking in merit, will be granted, that failure is not without consequences. By opting not to submit papers in opposition to their motion, plaintiff has left the facts set forth in defendants' Local Rule 7.1(a)(3) Statement unchallenged. Courts in this district have routinely invoked Local Rule 7.1(a)(3) and its predecessor, Local Rule 7.1(f), deeming facts set forth in a statement of material facts not in dispute to have been admitted based upon an opposing party's failure to properly respond to that statement. [6] *See, e.g., Elgamil v. Syracuse Univ.,* No. 99-CV-611, 2000 WL 1264122, at *1 (N.D.N.Y. Aug. 22, 2000) (McCurn, S.J.) (listing cases); *see also Monahan v. New York City Dep't of Corrs.,* 214 F.3d 275, 292 (2d

2008 WL 699273

Cir.2000) (discussing district courts' discretion to adopt local rules like 7.1(a)(3)). I recommend that the court follow this well-established practice and, notwithstanding plaintiff's *pro se* status, accept defendants' assertion of facts as set forth in their Local Rule 7.1(a)(3) Statement as uncontroverted, in light of plaintiff's failure to respond to that statement, when reviewing defendants' motion for facial sufficiency.

6       According to Local Rule 7.1(a)(3), "any facts set forth in the Statement of Material Facts shall be deemed admitted unless specifically controverted by the opposing party." *See* N.D.N.Y.L.R. 7.1(a)(3).

C. *Summary Judgment Standard*

**\*5**  Summary judgment is governed by Rule 56 of the Federal Rules of Civil Procedure. Under that provision, summary judgment is warranted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits ... show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *see Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 2509-10 (1986); *Security Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.,* 391 F.3d 77, 82-83 (2d Cir.2004). A fact is "material", for purposes of this inquiry, if it "might affect the outcome of the suit under the governing law." *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510; *see also Jeffreys v. City of New York,* 426 F.3d 549, 553 (2d Cir.2005) (citing *Anderson* ). A material fact is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510. Though *pro se* plaintiffs are entitled to special latitude when defending against summary judgment motions, they must establish more than mere "metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1356 (1986); *but see Vital v. Interfaith Med. Ctr.,* 168 F.3d 615, 620-21 (2d Cir.1999) (noting obligation of court to consider whether *pro se* plaintiff understood nature of summary judgment process).

When summary judgment is sought, the moving party bears an initial burden of demonstrating that there is no genuine dispute of material fact to be decided with respect to any essential element of the claim in issue; the failure to

meet this burden warrants denial of the motion. *Anderson,* 477 U.S. at 250 n. 4, 106 S.Ct. at 2511 n. 4; *Security Ins.,* 391 F.3d at 83. In the event this initial burden is met, the opposing party must show, through affidavits or otherwise, that there is a material issue of fact for trial. Fed.R.Civ.P. 56(e); *Celotex,* 477 U.S. at 324, 106 S.Ct. at 2553; *Anderson,* 477 U.S. at 250, 106 S.Ct. at 2511.

When deciding a summary judgment motion, a court must resolve any ambiguities, and draw all inferences from the facts, in a light most favorable to the nonmoving party. *Jeffreys,* 426 F.3d at 553; *Wright v. Coughlin,* 132 F.3d 133, 137-38 (2d Cir.1998). Summary judgment is inappropriate where "review of the record reveals sufficient evidence for a rational trier of fact to find in the [non-movant's] favor." *Treglia v. Town of Manlius,* 313 F.3d 713, 719 (2d Cir.2002) (citation omitted); *see also Anderson,* 477 U.S. at 250, 106 S.Ct. at 2511 (summary judgment is appropriate only when "there can be but one reasonable conclusion as to the verdict").

D. *Plaintiff's First Amendment Claim*

**\*6**  The essence of plaintiff's First Amendment claim appears to be that when engaged in the behavior giving rise to the issuance to him of misbehavior reports, including laughing at corrections officers and talking loudly across a cell block to fellow inmates, in violation of well known and understood directives prohibiting such actions, his conduct was protected under the First Amendment and, accordingly, when disciplined for those actions his constitutional rights were abridged. Defendants assert that the record fails to support a First Amendment deprivation, as a matter of law.

The First Amendment to the United States Constitution provides, in relevant part, that "Congress shall make no law ... abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble ...." U.S. Const. amend. I. The protections afforded by the First Amendment, like many other constitutional guarantees, are not necessarily forfeited by a person upon his or her entry into prison; many rights conferred by the Constitution, however, are by definition extinguished, or in some cases give way to legitimate, counterveiling penological concerns, upon incarceration. *Shakur v. Selsky,* 391 F.3d 106, 113 (2d Cir.2004). As the Supreme Court has noted, "[t]he fact of confinement and the needs of the penal institution impose limitations on constitutional rights, including those derived from the

2008 WL 699273

First Amendment, which are implicit in incarceration."
*Jones v. North Carolina Prisoners' Labor Union, Inc.,* 433 U.S. 119, 125, 97 S.Ct. 2532, 2537-38 (1977).

While the point of demarcation is not always readily discernable, it is clear that prison inmates enjoy some measure of First Amendment protection, yet forfeit those free speech rights which are incompatible with legitimate penological considerations. See *Pell v. Procunier,* 417 U.S. 812, 822, 94 S.Ct. 2800, 2804 (1974). As the Supreme Court has observed,

> [a] prison inmate retains those First Amendment rights that are not inconsistent with his [or her] status as a prisoner or with the legitimate penological objectives of the corrections system. Thus, challenges to prison restrictions that are asserted to inhibit First Amendment interests must be analyzed in terms of the legitimate policies and goals of the corrections system, to whose custody and care the prisoner has been committed in accordance with due process of law.

*Id.*

Thus, for example, prison officials may not deter the right of a prison inmate to voice complaints regarding prison conditions through established processes by taking adverse actions which are intended, or which have the affect, of chilling or abridging such rights. See *Gill v. Pidlypchak,* 389 F.3d 379, 380 (2d Cir.2004). Conversely, and at the other end of the spectrum, prison officials are empowered to control the use of threatening and abusive language by inmates. *Jermosen v. Coughlin,* 878 F.Supp. 444, 450-51 (N.D.N.Y.1995) (McAvoy, C.J.). The right of officials to control inmate speech and other behavior through the imposition of measures reasonably calculated to preserve the safety and security of a prison facility, its employees and inmates, is well established, even though such measures may impinge upon an inmate's ability to speak freely or to associate with others. See *Auleta v.. LaFrance,* 233 F.Supp.2d 396, 399 (N.D.N.Y.2002) (Kahn, D.J.) (noting that restrictions on inmate communication are constitutional if reasonably related to legitimate penological interests) (citing *Turner v. Safley,* 482 U.S. 78, 89, 107 S.Ct. 2254, 2261 (1987)).

**\*7** In this instance plaintiff does not allege, nor does the record disclose, that plaintiff was engaged in protected activity when disciplined for violating prison rules. Typical of plaintiff's claims, by contrast, is the contention that he was issued a misbehavior report by Corrections Officer Charland for talking loudly within the prison dormitory, despite his awareness that the officer was known to be particularly strict, and that he prohibited such potentially disruptive communications. *See* Defendants' Exhibits (Dkt. No. 59-4) Exh. A at 10-11.

Clearly, policies of the type implicated by defendant Charland's response to plaintiff's actions are reasonably related to legitimate penological concerns, and thus do not give rise to the constitutional claims for deprivation of the First Amendment right of free speech or association. *Cf. Percy v. Jabe,* 823 F.Supp. 445, 448 (E.D.Mich.1993) (noting that prison officials should be afforded wide latitude in imposing visitation restrictions at prison in light of, *inter alia,* perceived threats to security and order at the institution). It would be novel indeed for prison inmates to assert a First Amendment right to speak freely and communicate with other inmates and prison officials, without restriction based upon legitimate penological concerns. Plaintiff has cited no case authority, nor is the court aware of any, which stands for such a broad proposition and supports an open-ended, unlimited right of prison inmates to speak freely within the prison setting, however disruptive the conduct might be.

Because plaintiff has failed to allege and prove that he was engaged in constitutionally protected activity when disciplined by prison officials, and finding that defendants' actions in disciplining him were reasonably related to legitimate penological concerns, I recommend a finding that his First Amendment claims are deficient as a matter of law.

### E. *Plaintiff's Procedural Due Process Claims*

Intertwined with his First Amendment cause of action is plaintiff's claim that during the course of issuance of misbehavior reports and the ensuing disciplinary proceedings, his procedural due process rights were abridged. To successfully state a claim under 42 U.S.C. § 1983 for denial of due process arising out of a disciplinary hearing, a plaintiff must show that he or she both (1) possessed an actual liberty interest, and (2) was deprived of that interest without being afforded sufficient process.

2008 WL 699273

*See Tellier v.. Fields,* 260 F.3d 69, 79-80 (2d Cir.2000) (citations omitted); *Hynes v. Squillace,* 143 F.3d 653, 658 (2d Cir.), *cert. denied,* 525 U.S. 907, 119 S.Ct. 246 (1998); *Bedoya v. Coughlin,* 91 F.3d 349, 351-52 (2d Cir.1996). In their motion the defendants, while not conceding any lack of sufficient due process, assert that plaintiff cannot establish the deprivation of a constitutionally cognizable liberty interest. [7]

[7]    The procedural safeguards to which a prison inmate is entitled before being deprived of a constitutionally cognizable liberty interest are well-established, the contours of the requisite protections having been articulated in *Wolff v. McDonnell,* 418 U .S. 539, 564-67, 94 S.Ct. 2963, 2978-80 (1974). Under *Wolff,* the constitutionally mandated due process requirements, include 1) written notice of the charges; 2) the opportunity to appear at a disciplinary hearing and present witnesses and evidence, subject to legitimate safety and penological concerns; 3) a written statement by the hearing officer explaining his or her decision and the reasons for the action being taken; and 4) in some circumstances, the right to assistance in preparing a defense. *Wolff,* 418 U.S. at 564-67, 94 S.Ct. at 2978-80; *see also Eng v. Coughlin,* 858 F .2d 889, 897-98 (2d Cir.1988). Plaintiff's complaint does not elaborate on his claim that defendants failed to observe these guaranteed safeguards in connection with his various disciplinary proceedings.

In *Sandin v. Conner,* 515 U.S. 472, 115 S.Ct. 2293 (1995), the United States Supreme Court determined that to establish a liberty interest, a plaintiff must sufficiently demonstrate that (1) the State actually created a protected liberty interest in being free from segregation; and that (2) the segregation would impose an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Id.* at 483-84, 115 S.Ct. at 2300; *Tellier,* 280 F.3d at 80; *Hynes,* 143 F.3d at 658. Since the prevailing view is that by its regulatory scheme New York State has created a liberty interest in remaining free from disciplinary confinement, thus satisfying the first *Sandin* factor, *see, e.g., LaBounty v. Coombe,* No. 95 CIV 2617, 2001 WL 1658245, at *6 (S.D.N.Y. Dec. 26, 2001); *Alvarez v. Coughlin,* No. 94-CV-985, 2001 WL 118598, at *6 (N.D.N.Y. Feb. 6, 2001) (Kahn, J.), I must find that the conditions of plaintiff's disciplinary confinement as alleged do not rise to the level of an atypical and significant hardship under *Sandin* in order to recommend that defendants' motion be granted.

**\*8** Atypicality in a *Sandin* inquiry is normally a question of law . [8] *Colon v. Howard,* 215 F.3d 227, 230-31 (2d Cir.2000); *Sealey v. Giltner,* 197 F.3d 578, 585 (2d Cir.1999). When determining whether a plaintiff possesses a liberty interest, district courts must examine the specific circumstances of confinement, including analysis of both the length and conditions of confinement. *See Sealey,* 197 F.3d at 586; *Arce v. Walker,* 139 F.3d 329, 335-36 (2d Cir.1998); *Brooks v. DiFasi,* 112 F.3d 46, 48-49 (2d Cir.1997). In cases involving shorter periods of segregated confinement where the plaintiff has not alleged any unusual conditions, however, a detailed explanation of this analysis is not necessary. [9] *Hynes,* 143 F.3d at 658; *Arce,* 139 F.3d at 336.

[8]    In cases where there is factual dispute concerning the conditions or duration of confinement, however, it may nonetheless be appropriate to submit those disputes to a jury for resolution. *Colon v. Howard,* 215 F.3d 227, 230-31 (2d Cir.2000); *Sealey v. Giltner,* 197 F.3d 578, 585 (2d Cir.1999).

[9]    While not the only factor to be considered, the duration of a disciplinary keeplock confinement remains significant under *Sandin. Colon,* 215 F.3d at 231. Specifically, while under certain circumstances confinement of less than 101 days could be shown to meet the atypicality standard under *Sandin, see id.* at 232 n. 5, the Second Circuit generally takes the position that SHU confinement under ordinary conditions of more than 305 days rises to the level of atypicality, whereas normal SHU confinement of 101 days or less does not. *Id.* at 231-32 (305 days of SHU confinement constitutes an atypical and sufficient departure). In fact, in *Colon v. Howard* a Second Circuit panel split markedly on whether or not adoption of a 180-day "bright line" test for examining SHU confinement would be appropriate and helpful in resolving these types of cases. *See id.* at 232-34 (Newman, C.J.), 235-37 (Walker, C.J. and Sack, C.J., concurring in part).

Most of the disciplinary charges against the plaintiff in 2004, virtually all lodged as Tier II level violations, resulted in only modest disciplinary sanctions by constitutional standards. On one occasion plaintiff was sentenced to keeplock confinement for a period of thirty days, receiving shorter keeplock confinements of ten or fifteen days or even more modest restrictions on certain other occasions. [10] Plaintiff's keeplock confinement

stemming from the August 11, 2004 and September 23, 2004 misbehavior reports were served in his dormitory cubicle, and plaintiff was permitted to talk with other inmates and to maintain his prison employment during that period. Defendants' Exhibits (Dkt. No. 59-4) Exh. A at 11-12, 18-19, 31-32. Similarly, the keeplock confinement sentences imposed as a result of the June 26, 2004 misbehavior reports were also served by the plaintiff within his dormitory cubicle, while maintaining his prison employment. *Id.* at 37, 46.

10     Keeplock is a form of confinement restricting an inmate to his or her cell, separating the inmate from others, and depriving him or her of participation in normal prison activities. *Gittens v. LeFevre,* 891 F.2d 38, 39 (2d Cir.1989); *Warburton v. Goord,* 14 F.Supp.2d 289, 293 (W.D.N.Y.1998) (citing *Gittens*); *Tinsley v. Greene,* No. 95-CV-1765, 1997 WL 160124, at *2 n. 2 (N.D.N.Y. Mar. 31, 1997) (Pooler, D.J. & Homer, M.J.) (citing, *inter alia, Green v. Bauvi,* 46 F.3d 189, 192 (2d Cir.1995)). Inmate conditions while keeplocked are substantially the same as in the general population. *Lee v. Coughlin,* 26 F.Supp.2d 615, 628 (S.D.N.Y.1998). An inmate is confined to his or her general population cell for twenty-three hours a day, with one hour for exercise. *Id.* Inmates can leave their cells for showers, visits, medical exams and counseling. *Id.* Inmates can have cell study, books and periodicals. *Id.* The main difference between keeplock and the general population is that keeplocked inmates do not leave their cell for out-of-cell programs, and are usually allowed less time out of their cells on the weekends. *Id.*

Conspicuously absent from either plaintiff's amended complaint or the record now before the court is any evidence establishing that the defendants deprived Escalera of any constitutionally significant liberty interest by their actions. This marked deficiency warrants summary dismissal of plaintiff's due process claims, as a matter of law, without the need to examine the sufficiency of the protections afforded to him in connection with those misbehavior reports.

### F. *Equal Protection*

Plaintiff's amended complaint also asserts a claim for denial of equal protection. Though this is far from clear, plaintiff's equal protection claim appears to be limited to defendant Joswick, his former prison counselor.

Defendants also seek dismissal of this claim as lacking in merit.

The Equal Protection Clause directs state actors to treat similarly situated people alike. *See City of Cleburne, Texas v. Cleburne Living Ctr.,* 473 U.S. 432, 439, 105 S.Ct. 3249, 3254 (1985). To prove a violation of the Equal Protection Clause, a plaintiff must demonstrate that he or she was treated differently than others similarly situated as a result of intentional or purposeful discrimination directed at an identifiable or suspect class. *See Giano v. Senkowski,* 54 F.3d 1050, 1057 (2d Cir.1995) (citing, *inter alia, McCleskey v. Kemp,* 481 U.S. 279, 292, 107 S.Ct. 1756, 1767 (1987)). The plaintiff must also show that the disparity in treatment "cannot survive the appropriate level of scrutiny which, in the prison setting, means that he must demonstrate that his treatment was not reasonably related to [any] legitimate penological interests." *Phillips v. Girdich,* 408 F.3d 124, 129 (2d Cir.2005) (quoting *Shaw v. Murphy,* 532 U.S. 223, 225, 121 S.Ct. 1475 (2001) (internal quotation marks omitted)).

**\*9** Nothing either contained within plaintiff's amended complaint, or otherwise disclosed in the record, reflects any disparity in treatment by defendant Joswick, a corrections counselor, of the plaintiff and other inmates based upon plaintiff's inclusion in an identifiable or suspect class, nor does the record suggest that if such disparate treatment occurred, it was motivated by some other invidious, prohibited discrimination. Under these circumstances plaintiff's equal protection claim fails, as a matter of law, and is subject to dismissal. *See, e.g., Pena v. Racore,* No. 95-CV-5307, 2001 WL 262986, at *4 (E.D.N.Y. Mar. 14, 2001) (rejecting plaintiff's equal protection claim where he alleged only a difference in treatment and failed to suggest that defendants' actions demonstrated intentional and arbitrary discrimination).

### IV. *SUMMARY AND RECOMMENDATION*

Plaintiff's amended complaint, drafted in exceedingly conclusory terms and bereft of factual allegations, alleges deprivation of his right to free speech under the First Amendment, his right to procedural due process, and his right to equal protection of the law. Having carefully reviewed the record now before the court I am unable to discern any triable, genuinely disputed issue of material fact, and conclude that no reasonable factfinder could determine, based upon the record, that plaintiff's

2008 WL 699273

constitutionally rights have been abridged. Accordingly, it is hereby

RECOMMENDED that defendants' motion for summary judgment dismissing plaintiff's complaint (Dkt. No. 59) be GRANTED, and that plaintiff's complaint be dismissed in all respects, without prejudice as to defendants West, C. Lambard, Baldwin, and J. Roch, but otherwise with prejudice.

NOTICE: pursuant to 28 U.S.C. § 636(b)(1), the parties have ten (10) days within which to file written objections to the foregoing report-recommendation. Any objections shall be filed with the clerk of the court. FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(e), 72; *Roldan v. Racette, 984 F.2d 85 (2d Cir.1993)*.

It is further ORDERED that the clerk of the court serve a copy of this report and recommendation upon the parties in accordance with this court's local rules.

**All Citations**

Not Reported in F.Supp.2d, 2008 WL 699273

---

**End of Document**                    © 2017 Thomson Reuters. No claim to original U.S. Government Works.

Case 9:16-cv-00717-TJM-TWD    Document 28    Filed 07/19/17    Page 73 of 138
Koehl v. Bernstein, Not Reported in F.Supp.2d (2011)
2011 WL 2436817

2011 WL 2436817
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Edward KOEHL,

v.

Dr. Fredrick BERNSTEIN, et al., Defendants.

No. 10 Civ. 3808(SHS)(GWG).
|
June 17, 2011.

*REPORT AND RECOMMENDATION*

GABRIEL W. GORENSTEIN, United States Magistrate Judge.

**\*1** Plaintiff Edward Koehl, proceeding *pro se,* brings this action pursuant to 42 U.S.C. § 1983, alleging that various defendants, including employees of the New York State Department of Correctional Services ("DOCS") and the New York State Division of Parole ("DOP"), violated his constitutional rights during his incarceration at DOCS' Green Haven Correctional Facility ("Green Haven"). Defendants have now moved to dismiss the complaint pursuant to Fed R. Civ. P. 12(b)(6). For the reasons stated below, the motion to dismiss should be granted in part and denied in part.

I. *BACKGROUND*

A. *Facts Alleged by Koehl*

For purposes of deciding the defendants' motion to dismiss, the Court assumes the allegations in plaintiff's complaint are true and draws all reasonable inferences from those facts in favor of the plaintiff. *See, e.g., Global Network Commc'ns, Inc. v. City of New York,* 458 F.3d 150, 154 (2d Cir.2006). In light of Koehl's *pro se* status, the Court in some instances has considered factual allegations contained in his memorandum submitted in opposition to the defendants' motion where they amplify claims made in the complaint. *See, e.g., Woods v. Goord,* 2002 WL 731691, at *1 n. 2 (S.D.N.Y. Apr. 23, 2002) (considering *pro se* prisoner's factual allegations in briefs as supplementing the complaint); *Burgess v. Goord,* 1999 WL 33458, at * 1 n. 1 (S.D.N.Y. Jan. 26, 1999) ("In general, 'a court may not

look outside the pleadings when reviewing a Rule 12(b)(6) motion to dismiss. However, the mandate to read the papers of pro se litigants generously makes it appropriate to consider plaintiff's additional materials, such as his opposition memorandum.' ") (quoting *Gadson v. Goord,* 1997 WL 714878, at *1 n. 2 (S.D.N.Y. Nov. 17, 1997)) (additional citations omitted).

In October 2008, Koehl was transferred to Green Haven. *See* Amended Complaint, filed July 16, 2010 (Docket # 6) at 10 ¶ 1 ("Am.Compl."). At Green Haven, defendant Robert E. Ercole, who was a warden in the facility at the time, "callously and deliberately assigned [him] to a double bunk cell, top bunk, third floor." *Id.* at 10 ¶ 2. Koehl "was forced to carry [his] property to the third floor, [which] aggravated [his] previously complained of conditions." *Id.* As a result of this incident, Koehl spent three days in the hospital. *Id.* Upon release from the hospital, Koehl was again placed into a double bunk, and his "bunk mates (2 out of 3), were chain smokers, who smoked all day and night in the cell." *Id.* at 10 ¶ 3. Koehl filed grievances about the bunk problems, but Ercole falsified records, stating that Koehl had signed a waiver agreeing to double bunk in order to be transferred to Green Haven. *Id.* Koehl spent 60 days in a double bunk, during which time his counselor demanded that he sign a waiver agreeing to remain in the double bunk and, when Koehl refused, defendant Deputy Superintendent Richard Cunningham signed an order in retaliation requesting that Koehl be transferred to a facility seven hours away from his family. *Id.* at 1, 10 ¶ 3.

**\*2** Defendant Dr. Weinstein conducted an electromyography ("EMG") of Koehl in October or November 2008 as a result of Koehl's complaints to his assigned facility doctor, Dr. J. Fein, regarding "extreme pain, numbness and weakness in [his] arms, hands, legs, neck and back." *Id.* at 10 ¶ 4. Dr. Weinstein informed Koehl that "nothing [wa]s wrong with [him]," at which point Koehl called Dr. Weinstein "a liar" and produced a previous EMG, conducted on March 18, 2008, which showed results different from the October or November EMG. *Id.* Dr. Weinstein agreed to conduct an MRI after Koehl stated that he was going to have his family file a complaint with the DOCS Central Office. *Id.* Between June 2007 and October 2008, Koehl repeatedly complained of extreme pain and weakness, but defendants DOCS Commissioner Brian Fischer and DOCS Chief Medical Officer Dr. Lester Wright, *id.* at 2 ¶¶ 14–15,

denied him "proper testing," including a MRI of the spine, a CT scan, and neuro imaging, "[c]ontrary to numerous recommendations via the Clinton [Correctional Facility] medical staff and outside providers," *id.* at 10–11 ¶ 4.

Defendant Dr. Fredrick Bernstein, the facility Medical Director, deliberately scheduled Koehl's MRI for December 30, 2008, a date on which Bernstein knew Koehl's family would be visiting from Staten Island. *Id.* at 1, 11 ¶ 5. Dr. Bernstein "orchestrated this conflict so [that] he [could] later state that [Koehl had] refused treatment." *Id.* On February 9, 2009, Koehl was administered an MRI which indicated he suffered from "degenerative disk disease." *Id.* at 11 ¶ 6. Neurosurgeons at Albany Medical Center ("the neurosurgeons") informed him that if he had "seen them several years" before, when he had "first complained of the symptoms, [his] prognosis would be much better." *Id.* The neurosurgeons told Koehl that surgery could only stop the condition from worsening and would not cure the disease. *Id.* On July 6, 2009, Koehl had surgery, *id.,* and several weeks later he met with Dr. Fein who scheduled Koehl for another appointment with the neurosurgeons, *id.* at 11 ¶ 7. In September 2009, the neurosurgeons "ordered steroids, xrays," "an EMG, and a new neck brace" for Koehl. *Id.* at 11 ¶ 7. The new brace "kept popping off" which "exacerbated Koehl's condition," and Dr. Bernstein "deliberately refused to order a new neck brace until" January 2010, after Koehl had filed a grievance, and "callously changed the type of xrays" that were ordered. *Id.* at 11 ¶ 7. In November 2009, Dr. Weinstein conducted an EMG and reported "that nothing was wrong." *Id.* However, Dr. Weinstein's "report and conclusions were knowingly false." *Id.* In a subsequent appointment with the neurosurgeons, Koehl was informed that his condition had "progressed for the worse," and the neurosurgeons ordered an MRI and CT scan to be conducted. *Id.* In order to save costs, Dr. Bernstein, Dr. Wright, and Fischer "callously and deliberately ignored the orders of the neurosurgeons and canceled the MRI." *Id.* at 11–12 ¶ 7. The CT scan, which was performed on December 10, 2009, "proved inconclusive" because it was conducted while Koehl was "still and facing front." *Id.* at 12 ¶ 7. On January 19, 2010, X-rays were taken at Putnam Hospital which indicated that some of Koehl's vertebrae had not fused and that the rods, clamps, and screws had come loose, pinching his spinal cord. *Id.* at 12 ¶ 8. On February 11, 2010, Koehl was again seen by the neurosurgeons. *Id.* Koehl informed these

doctors that Dr. "Bernstein, [Dr.] Wright and Fischer [had] callously changed and/or ignored their orders." *Id.*

**\*3** Since he arrived at Green Haven, Koehl's "chronic and life threatening lung diseases have grown progressively worse" because he is "constantly ... exposed to unconstitutional levels of second hand tobacco smoke." *Id.* at 12 ¶ 10. Koehl complained to Dr. Fein, Dr. Bernstein, Cunningham, Ercole, and William Lee, Ercole's successor at Green Haven, *id.* at 1, who stated "that since prisoners are prohibited from smoking indoors, there are no [environmental tobacco smoke] problems in the housing blocks," *id.* at 12 ¶ 10. The low number of misbehavior reports issued at Green Haven for smoking in unauthorized areas demonstrates these defendants' callous and deliberate refusal to enforce the indoor smoking ban. *Id.* at 13 ¶ 10. Koehl has also repeatedly been denied access to his assigned pulmonary specialist and has been "denied proper testing and access to a qualified specialist." *Id.* at 13 ¶ 11. When he was allowed a pulmonary function analysis on February 27, 2009, it "showed a significant drop in [his] lung capacity." *Id.*

Koehl wears dentures. *Id.* at 13 ¶ 12. Because he has "no bottom ridge line, denture adhesive is a medical necessity." *Id.* Fischer and Dr. Wright will not provide Koehl with denture adhesive or with an implant and he is only able to obtain the adhesive by purchasing it in the facility commissary. *Id.*

Additionally, Fischer, Ercole, and Lee have denied Koehl appropriate clothing to wear during his daily period of outdoor recreation. *Id.* at 14 ¶ 13. In order for Koehl to obtain "life saving" clothing items he would have to pay for them. *Id.* Thus, he "cannot go outside for recreation without endangering [his] life." *Id.*

Cunningham, Ercole, and Lee have subjected Koehl to cruel and unusual punishment by ignoring medical orders and forcing him to "pack up all [of his] property and carry it from cell to cell." *Id.* at 10 ¶ 2; *id.* at 14 ¶ 14(a). On December 11, 2008, Koehl was moved from a double bunk cell to a single cell, *id.* at 14 ¶ 14(a); on December 24, 2008, he was moved from the first floor to the second floor, *id.* at 14 ¶ 14(a)(i); on April 16, 2009, he was moved to a cell on the third floor that contained "lead paint rust dust," *id.* at 14 ¶ 14(a)(ii); and between April 24, 2009 and February 2, 2010, he was moved to four different cells, *id.* at 14 ¶¶ 14(a)(iii)-(vi).

Cunningham and DOP employees Lester Edwards, Andrea Evans, Francis Herman, and Terrence X. Tracy "conspired to sabotage [Koehl's] application for Commutation of Sentence ... in retaliation for ... redress of grievances, reversals of false misbehavior reports, and civil awards alleging abuse." *Id.* at 1, 2 ¶¶ 6–8; *id.* at 15 ¶ 14(b). When Koehl asked Cunningham why the legal mail he sent was always returned, Cunningham told him that because of all of Koehl's "past complaints and winning law suits against DOCS employees," Cunningham would "do whatever he [could] to stop [Koehl's] mail from leaving the facility." *Id.* While more than ten letters were sent in with the application from both Koehl's family and his DOCS spiritual advisor, the DOP only received one of these letters. *Id.* Tracy told Koehl that the DOP had "no record of ... receiving any letters." *Id.* In October 2009, Koehl submitted a FOIL request which confirmed that each letter had been received and sent to the DOP for processing. *Id.* Koehl's family subsequently submitted letters to the Governor and Evans, complaining about the non-receipt of the letters, but the Governor did not respond and Edwards, answering for Evans, "purposely refused to address the actual wording in the submitted complaints." *Id.* at 15–16 ¶ 14(b). On January 16, 2010, the DOP notified Koehl that his application for a commutation of sentence had been denied. *Id.* at 16 ¶ 14(b).

**\*4** Defendants Fischer, I. Russo, Andrew Harvey, and Joseph Brennan "conspired to issue [Koehl] a tier III misbehavior report in retaliation for redressing [his] grievances and so [he] could be transferred out of the jail to preclude [him] from substantiating [his] claims in a pending matter." *Id.* at 2 ¶¶ 9–11; *id.* at 16 ¶ 14(c). Russo issued this report, which stated that on October 9, 2006, Koehl had harassed Brennan. *Id.* at 16 ¶ 14(c). Koehl was denied the ability to view, obtain, or comment on any of the evidence presented to the committee reviewing the report and was found guilty of the allegations on March 7, 2007. *Id.* Koehl was assessed a sentence of 90 days in "the Box (SHU)" and his appeal was denied in June 2007. *Id.* at 17 ¶ 14(c).

At about the same time, defendants R. Hilliar and D. Sawyer "callously and deliberately advance[d] knowingly false and unsubstantiated charges via a tier II misbehavior report in retaliation for redressing grievances." *Id.* at 2 ¶¶ 12–13; *id.* at 17 ¶ 14(c). The report, issued by Hilliar,

alleged that Koehl had harassed her. *Id.* Koehl "was not allowed access to any of [his] property and exculpatory evidence." *Id.* at 17 ¶ 14(c). On March 8, 2007, Sawyer conducted a hearing and Koehl was found guilty of the allegations in the tier II report. He was assessed a "30 days keep-locked" penalty and "30 days loss of phones, package[s] and commissary to run consecutive in SHU with the" 90–day sentence, "totaling 120 days in SHU." *Id.* His appeal was denied on March 22, 2007, and on July 7, 2007, the "guilty verdict was reversed and ordered expunged from [his] records." *Id.*

### B. *Procedural History*
The original complaint in this action was filed on May 10, 2010, *see* Complaint, filed May 10, 2010 (Docket # 2) ("Compl."), and an amended complaint was filed on July 16, 2010, *see* Am. Compl. On November 1, 2010, defendants filed the instant motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6). *See* Notice of Motion to Dismiss, filed Nov. 1, 2010 (Docket # 25); Memorandum of Law in Support of Defendants' Motion to Dismiss the Complaint, filed Nov. 1, 2010 (Docket # 26) ("Def.Mem."); Declaration of Counsel, filed Nov. 1, 2010 (Docket # 27); Notice to Pro Se Litigant Who Opposes a Rule 12 Motion Supported by Matters Outside the Pleadings, filed Nov. 1, 2010 (Docket # 28). Koehl filed a memorandum in opposition to this motion, *see* Plaintiff's Verified Memorandum of Law in Opposition to Defendants' Motion to Dismiss the Complaint Pursuant to F.R.C.P. Rule 12(b)(6) or (c), filed Dec. 29, 2010 (Docket # 46) ("Pl.Mem."); and defendants filed a reply brief, *see* Reply Memorandum of Law in Further Support of Defendants' Motion to Dismiss the Complaint, filed Jan. 26, 2011 (Docket # 50) ("Def.Reply").

## II. *LAW GOVERNING MOTIONS TO DISMISS*
A party may move for judgment pursuant to Federal Rule of Civil Procedure 12(b)(6) where the opposing party has "fail[ed] to state a claim upon which relief can be granted." Fed.R.Civ.P. 12(b) (6). Separately, Federal Rule of Civil Procedure 8(a)(2) requires that a pleading contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2). Under this rule, a complaint "must simply 'give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests.' " *Kassner v. 2nd Ave. Delicatessen Inc.,* 496 F.3d 229, 237 (2d Cir.2007) (quoting *Swierkiewicz v. Sorema N. A.,* 534 U.S. 506, 512 (2002)).

**\*5** Nonetheless, the Supreme Court has held that "a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do. Factual allegations must be enough to raise a right to relief above the speculative level ...." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555 (2007) (citations, internal quotation marks, and brackets omitted); *see also id.* at 557 (pleading must "possess enough heft to show that the pleader is entitled to relief") (internal quotation marks and brackets omitted). "Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." *Ashcroft v. Iqbal,* 129 S.Ct. 1937, 1949 (2009) (citation and internal quotation marks omitted); *accord Port Dock & Stone Corp. v. Oldcastle Ne., Inc.,* 507 F.3d 117, 121 (2d Cir.2007) ("a complaint must allege facts that are not merely consistent with the conclusion that the defendant violated the law, but which actively and plausibly suggest that conclusion") (citations omitted).

In the case of *pro se* plaintiffs, "[a] document filed *pro se* is to be liberally construed, and a *pro se* complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers." *Erickson v. Pardus,* 551 U.S. 89, 94 (2007) (citations and internal quotation marks omitted); *accord In re Sims,* 534 F.3d 117, 133 (2d Cir.2008); *McPherson v. Coombe,* 174 F.3d 276, 280 (2d Cir.1999) (a *pro se* party's pleadings should be construed liberally and interpreted "to raise the strongest arguments that they suggest") (quoting *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994)).

## III. *DISCUSSION*

Koehl's amended complaint does not clearly identify the claims it purports to assert. In moving to dismiss the amended complaint in its entirety, the defendants have categorized the claims in the amended complaint and have made arguments seeking dismissal with respect to each. In his opposition papers, Koehl has not argued that any claims exist beyond those identified in the defendant's moving papers. Nor does the Court discern any such claims. Accordingly, we address each of the claims as identified in the defendants' moving papers.

### A. *Eleventh Amendment*

Defendants have moved to dismiss Koehl's claims against the State of New York and the individual defendants in their official capacities based on the Eleventh Amendment. The Eleventh Amendment bars lawsuits by a citizen of a state against that state or its agencies, absent the state's consent or a statutory waiver of immunity. *See Pennhurst State Sch. & Hosp. v. Halderman,* 465 U.S. 89, 99–100 (1984). It is well settled that Congress did not intend to abrogate state sovereign immunity when it enacted 42 U.S.C. § 1983. *See Quern v. Jordan,* 440 U.S. 332, 343–44 (1979). Koehl's complaint does not state whether he seeks damages against the individual defendants in their official or individual capacities. To the extent it seeks damages against any of the defendants in their official capacities, however, it would be barred by the Eleventh Amendment. *See, e.g., Ford v. Reynolds,* 316 F.3d 351, 354 (2d Cir.2003) ("The Eleventh Amendment bars the award of money damages against state officials in their official capacities."); *Eng v. Coughlin,* 858 F.2d 889, 894 (2d Cir.1988) ("Eleventh Amendment immunity protects state officials sued for damages in their official capacity."). Accordingly, all claims against the State of New York for damages must be dismissed as well as any claims for damages against other defendants brought in their official capacities.

**\*6** We now consider Koehl's claims insofar as they are brought against defendants in their individual capacities.

### B. *Fourteenth Amendment Due Process Claims*
Koehl alleges certain claims regarding discipline that was meted out to him. Koehl asserts that Harvey "callously and deliberately denied [him] all due process rights ... by refusing to allow [him] ... to view, obtain or comment on any of the" evidence used to find him "guilty" of the allegations outlined in the tier III misbehavior report. *See* Am. Compl. at 16 ¶ 14(c). Koehl further asserts that "instead of finding [him] guilty of the allegedly harassing passage stated in the misbehavior report, he [was] ... found guilty of an uncharged passage that appeared in the provided letter." *Id.* at 17 ¶ 14(c). He was sentenced to 90 days in the SHU and denied leave to appeal. *Id.*

Separately, Koehl alleges that Hilliar filed a false tier II misbehavior report against him and that he was wrongly convicted of the charge listed in that report. *Id.* He states that he "was not allowed access to any of [his] property and exculpatory evidence" and that the hearing officer informed him that he would be found guilty "no matter

WESTLAW  © 2017 Thomson Reuters. No claim to original U.S. Government Works.    4

what." *Id.* Koehl was found guilty and assessed a "30 days keep-locked" penalty and "30 days loss of phones, package[s] and commissary." *Id.* Koehl alleges that he commenced an Article 78 proceeding and that a judge of the New York State Supreme Court reversed the guilty verdict. *Id.* In his memorandum of law, Koehl asserts that after the tier II disposition, he was transferred to "Upstate CF," at which point he was informed that the 90 day SHU assessment and the 30 day keep-lock assessment were to "be added together" and that Koehl was to spend the entire 120 period in the SHU. Pl. Mem. at 24.

Koehl also contends that he endured a number of hardships in the SHU during this time, including the loss of three toenails and denial of his yarmulke and prayer book. *Id.* at 24–25. Defendants argue that Koehl fails to establish a deprivation of a Fourteenth Amendment right to due process in the context of these prison disciplinary hearings as "he must establish that the confinement imposed on him created an atypical and significant hardship relative to ordinary incidents of prison life." Def. Mem. at 9 (citing *Sandin v. Conner,* 515 U.S. 472, 484 (1995)).

### 1. *Law Governing Disciplinary Proceedings*
A party asserting a due process claim " 'must establish (1) that he possessed a liberty interest and (2) that the defendant(s) deprived him of that interest as a result of insufficient process.' " *Ortiz v. McBride,* 380 F.3d 649, 654 (2d Cir.2004) (quoting *Giano v. Selsky,* 238 F.3d 223, 225 (2d Cir.2001)). Prisoners subject to disciplinary proceedings can show a liberty interest only if "disciplinary punishment 'imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life.' " *Hanrahan v. Doling,* 331 F.3d 93, 97 (2d Cir.2003) (per curiam) (quoting *Sandin,* 515 U.S. at 484); *accord Davis v. Barrett,* 576 F.3d 129, 133 (2d Cir.2009). "Factors relevant to determining whether the plaintiff endured an 'atypical and significant hardship' include 'the extent to which the conditions of the disciplinary segregation differ from other routine prison conditions' and 'the duration of the disciplinary segregation imposed compared to discretionary confinement.' " *Palmer v. Richards,* 364 F.3d 60, 64 (2d Cir.2004) (citing *Wright v. Coughlin,* 132 F.3d 133, 136 (2d Cir.1998)); *accord Davis,* 576 F.3d at 133.

**\*7** In *Sealey v. Giltner,* 197 F.3d 578 (2d Cir.1999), the Second Circuit suggested that consecutive sentences resulting from separate hearings adjudicating different misbehavior reports should be aggregated for the purpose of determining whether the confinement constitutes atypicality. *See id.* at 587–88. *Sealey* aggregated the 18 and 83–day periods the plaintiff was kept in the SHU on the ground that "[w]herever the point is beyond which confinement in harsh conditions constitutes atypicality, a prison official must not be permitted to extend such confinement beyond that point without according procedural due process." *Id.* at 587. It noted that "if conditions were of sufficient harshness that confinement for 365 days constituted atypicality, an official who held a hearing for a prisoner already confined in such conditions for 364 days would normally be required to accord procedural due process before continuing the confinement beyond an aggregate interval of 365 days." *Id.* at 587 n. 7; *see also Sims v. Artuz,* 230 F.3d 14, 23 (2d Cir.2000) (noting that it was "possible that some or all of [plaintiff's sentences] should be aggregated for purposes of the *Sandin* inquiry") (citation omitted). Other cases have similarly aggregated sentences based on separate violations. *See, e.g., Bunting v. Nagy,* 452 F.Supp.2d 447, 457 (S.D.N.Y.2006); *Charles v. Maleh,* 2006 WL 581206, at \*12 (D.Conn. Mar. 8, 2006). Thus, for purposes of this motion we will aggregate Koehl's sentences and treat the time spent in the SHU as 120 days.

"The Second Circuit has not established a bright-line rule as to how lengthy a term of disciplinary confinement (i.e., either 'keeplock' or SHU confinement) will be considered atypical and significant." *Bunting,* 452 F.Supp.2d at 455. Nevertheless, the Second Circuit has established "guidelines for use by district courts in determining whether a prisoner's liberty interest was infringed." *Palmer,* 364 F.3d at 64. Among these guidelines is that for confinements of "an intermediate duration—between 101 and 305 days—'development of a detailed record' of the conditions of the confinement relative to ordinary prison conditions is required." *Id.* at 65 (citations omitted)

As noted, Koehl has alleged that he spent 120 days in the SHU, thus placing him within the guideline governing intermediate durations of confinement. For such a duration of confinement, the fact-finding required by the Second Circuit to determine whether this intermediate sentence constitutes an atypical and significant hardship cannot occur on a motion to dismiss. *Gonzalez–Cifuentes v.. Torres,* 2007 WL 499620, at \*3 (N.D.N.Y. Feb. 13, 2007); *accord Thomas v. Calero,* 2011 WL 1532058,

at *8 (S.D.N.Y. Mar. 17, 2011) (finding that while plaintiff had "not alleged that the conditions of his confinement differed from normal SHU circumstances," his "confinement in SHU for 291 days [wa]s sufficient, for pleading purposes, to implicate a liberty interest") (291–day confinement); *Smart v. Goord,* 441 F.Supp.2d 631, 641 (S.D.N.Y.2006) ( "[Plaintiff] has not alleged that the conditions of her confinement were more severe than normal SHU conditions .... However, such detailed factual allegations are not necessary to withstand a motion to dismiss.") (70–day confinement); *Harris v. McGinnis,* 2004 WL 2187137, at *4 (S.D.N.Y. Sept. 30, 2004) (denying motion to dismiss even though "[t]he Complaint makes no representation as to the parameters of 'normal' conditions of confinement, and it is thus impossible to determine on the face of the Complaint that the keeplock conditions to which Plaintiff was subjected were not atypical within the meaning of *Sandin"* ) (151–days in keeplock). Even if it could be said that a prisoner has some obligation to describe his conditions of confinement in order to make out a due process claim, here Koehl alleges that his confinement was in fact "atypical" and constituted a "significant hardship" because he was not allowed to attend his grandmother's funeral and was not allowed to communicate with his family. Am. Compl. at 17 ¶ 14(c). Accordingly, his pleading cannot be dismissed for failure to describe in detail the conditions of his confinement.

### 2. *Statute of Limitations*

**\*8** In New York, pursuant to New York Civil Practice Law and Rules § 214(5), a three year statute of limitations governs a section 1983 action. *Okure v. Owens,* 816 F.2d 45, 49 (2d Cir.1987), *aff'd,* 488 U.S. 235 (1989); *see Harris v. City of New York,* 186 F.3d 243 (2d Cir.1999). Defendants argue that any claim against Fischer, Russo, Harvey and Brennan based on the tier III report should be dismissed because the allegedly retaliatory report was issued in October 2006, outside the three year statute of limitations for section 1983 actions. *See* Def. Mem. at 14. In fact, although the incident on which the report was based occurred on October 9, 2006, the complaint alleges that the misbehavior report was not issued until February 21, 2007, and that Koehl was found guilty of the charges in this report on March 7, 2007. *See* Am. Compl. at 16 ¶ 14(c). It would thus appear that the hearing took place on March 7, 2007, and the resulting sentence was issued on that date. Koehl's original complaint in this action is dated March 3 and March 5, 2010. *See* Compl. at 18, 20. Under the rule that the complaint in a *pro se*

prisoner case is deemed filed on the date it is delivered to prison officials for mailing, *see Dory v. Ryan,* 999 F.2d 679, 682 (2d. Cir.1993), any claim would had to have accrued by March 5, 2007, at the latest. Accordingly, the question arises whether the limitations period arose when the allegedly false report was issued—in which case the complaint would be untimely—or when Koehl was found guilty of the charges.

While the analysis will be different to the extent a claim of retaliation is made—an issue we discuss in section III.C below—we conclude that because the due process claim arises out of the punishment that was meted out on the hearing date, any due process claim began to accrue on that date, and not on the date the misbehavior report was issued. Accordingly, we reject defendants' argument that Koehl's due process claim is untimely.

### 3. *Personal Involvement*

Defendants do not argue that Koehl's due process claim should be dismissed because he received sufficient process at the administrative hearings, and thus we do not address this prong of the due process analysis. Instead, their remaining defense is that the claims against Fischer, Russo, Brennan, and Hilliar should be dismissed because the complaint does not allege that they were personally involved in the due process violation. *See* Def. Mem. at 10. [1]

[1]     Defendants have not moved to dismiss the due process claims against Harvey and Sawyer on the ground of lack of personal involvement. *See* Def. Mem. at 10; Am. Compl. at 16–17 ¶ 14(c).

"It is well settled in this Circuit that personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Farrell v. Burke,* 449 F.3d 470, 484 (2d Cir.2006) (internal quotation marks and citation omitted). In addition, personal liability under section 1983 cannot be imposed upon a state official based on a theory of *respondeat superior. See, e.g., Hernandez v. Keane,* 341 F.3d 137, 144 (2d Cir.2003) ("supervisor liability in a § 1983 action depends on a showing of some personal responsibility, and cannot rest on *respondeat superior"* ) (citation omitted), *cert. denied,* 543 U.S. 1093 (2005); *accord Black v. Coughlin,* 76 F.3d 72, 74 (2d Cir.1996). According to the Second Circuit, personal involvement can be shown by

**\*9** evidence that: (1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference ... by failing to act on information indicating that unconstitutional acts were occurring

*Back v. Hastings on Hudson Union Free Sch. Dist.,* 365 F.3d 107, 127 (2d Cir.2004) (quoting *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995)). More recently, the Supreme Court held in *Ashcroft v. Iqbal,* 129 S.Ct. 1937 (2009), that "[b]ecause vicarious liability is inapplicable to ... [section] 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Id. at* 1948. The Supreme Court explicitly rejected the argument that, "a supervisor's mere knowledge of his subordinate's discriminatory purpose amounts to the supervisor's violating the Constitution." *Id. at* 1949. Thus, "[a]bsent vicarious liability, each Government official, his or her title notwithstanding, is only liable for his or her own misconduct." *Id. Iqbal* has caused some courts to question whether all five of the personal involvement categories survive that decision. *See generally D'Olimpio v. Crisafi,* 718 F.Supp.2d 340, 347 (S.D.N.Y.2010) (citing cases and concluding that the five categories were not necessarily preempted by *Iqbal* ).

With regard to the tier III report, Koehl alleges that Russo, Brennan, and Fischer "conspired to issue [him this report] ... in retaliation for redressing [his] grievances and so [he] could be transferred out of the jail." Am. Compl. at 16 ¶ 14(c). He states that Russo authored the report, which was contrary to the record, and that he refused to allow Koehl to view, obtain, or comment on any of the evidence that was used to find him guilty of the charges. *Id.* He states that this report stemmed from

an alleged grievance letter he sent to Brennan, which was "deemed harassment," and that Brennan swore and signed a complaint demanding Koehl be charged for the alleged letter. *Id.* In his memorandum in opposition, Koehl states that he appealed the hearing officer's decision with regard to this report to Fischer, and that Fischer stated that the entire file was classified. *See* Pl. Mem. at 23. Fischer affirmed the sentence on April 27, 2007. *See id.*

The complaint's allegations against Russo are sufficient to show personal involvement as Koehl has alleged that Russo directly participated in the alleged violation. Specifically, Koehl asserts that Russo denied him his due process rights by refusing to allow him to view, obtain, or comment on the evidence used to find Koehl guilty of the charge in the tier III report. *See* Am. Compl. at 16 ¶ 14(c).

**\*10** On the other hand, the allegations against Brennan are not sufficient to show personal involvement. Brennan, who is "Chairperson, Committee on Professional Standards, Third Judicial Department," apparently received a letter that was traced to Koehl through handwriting analysis and other means—a letter that Koehl denies he wrote. *Id.* The complaint alleges Brennan demanded that Koehl be charged for writing this letter and that he was so charged. But there is no claim that Brennan had any involvement in the adjudication of the report. Thus, there are no facts sufficient to support a finding that Brennan was personally involved in violating Koehl's due process rights. *See Williams v. Smith,* 781 F.2d 319, 324 (2d Cir.1986) ("The filing of a false report does not, of itself, implicate the guard who filed it in constitutional violations which occur at a subsequent disciplinary hearing.") (citing *Sommer v. Dixon,* 709 F.2d 173, 174–75 (2d Cir.), *cert. denied,* 464 U.S. 857 (1983)); *Anderson v. Banks,* 2008 WL 3285917, at *2 (N.D.N.Y. Aug. 7, 2008) (writing of false misbehavior reports is "not sufficient to state a due process claim"); *Muhammad v. Pico,* 2003 WL 21792158, at *16 (S.D.N.Y. Aug. 5, 2003) (filing of an allegedly false report did not personally involve the sergeant who filed it in the due process violations alleged because " 'but for causation' ... is not the standard for Section 1983 liability") (citations omitted); *see generally Boddie v. Schnieder,* 105 F.3d 857, 862 (2d Cir.1997) ("prison inmate has no general constitutional right to be free from being falsely accused in a misbehavior report") (citing *Freeman v.. Rideout,* 808 F.2d 949, 951 (2d Cir.1986)).

As to Fischer, once the hearing on the tier III report was over and the decision was issued, the due process violation was completed. The only opportunity that Fischer had to rectify this violation was through the appeal process itself. To be sure, one of the methods recognized by the Second Circuit to show personal involvement is that the defendant, "after being informed of the violation through [an appeal], failed to remedy the wrong." *Colon,* 58 F.3d at 873. But this category does not apply to Fischer because—as has been held in a related context—"affirming the administrative denial of a prison inmate's grievance by a high-level official is insufficient to establish personal involvement under section 1983." *Manley v. Mazzuca,* 2007 WL 162476, at *10 (S.D.N.Y. Jan. 19, 2007) (citing, *inter alia, Foreman v. Goord,* 2004 WL 1886928, at *7 (S.D.N.Y. Aug. 23, 2004) ("The fact that [the prison superintendent] affirmed the denial of plaintiff's grievances is insufficient to establish personal involvement.")). As was noted in *Thompson v. New York,* 2001 WL 636432 (S.D.N.Y. Mar. 15, 2001), "[w]ere it otherwise, virtually every prison inmate who sues for constitutional torts by prison guards could name the Superintendent as a defendant since the plaintiff must pursue his prison remedies and invariably the plaintiff's grievance will have been passed upon by the Superintendent." *Id.* at *7 (citations omitted). "The reference in case law to an official who fails to remedy a violation logically applies only to ongoing, and therefore correctable, constitutional violations—not to a specific event that is later subject to formal review by designated officials once the constitutional violation has already concluded." *See Odom v. Calero,* 2008 WL 2735868, at *7 (S.D.N.Y. July 10, 2008) (internal quotation marks omitted); *Harnett v. Barr,* 538 F.Supp.2d 511, 524 (N.D.N.Y.2008) ("If the official is confronted with a violation that has already occurred and is not ongoing, then the official will not be found personally responsible for failing to 'remedy' a violation."). Accordingly, the mere allegation that Fischer failed to grant Koehl's appeal is insufficient to show that he was "personally involved" in committing the alleged due process violation.

**\*11** Koehl alleges that defendant Hilliar issued him an allegedly false tier II report stating that he had harassed her. *See* Am. Compl. at 17 ¶ 14(c). However, for the same reasons already stated with respect to Koehl's allegations against Brennan, such allegations are not enough to show personal involvement by Hilliar. *See Williams,* 781 F.2d at 324; *Anderson,* 2008 WL 3285917, at *2.

## C. *Retaliation Claims*

It is well established that the First Amendment protects prisoners from retaliation for engaging in protected speech, which includes submitting grievances regarding prison conditions. *See Graham v. Henderson,* 89 F.3d 75, 80 (2d Cir.1996); *Jones v. Coughlin,* 45 F.3d 677, 679–80 (2d Cir.1995); *Franco v. Kelly,* 854 F.2d 584, 589 (2d Cir.1988). To establish a *prima facie* case of retaliation, an inmate must show: (1) that his speech or conduct was constitutionally protected; (2) that the defendant took adverse action against the plaintiff; and (3) that a causal connection exists between the protected speech and the adverse action. *Scott v. Coughlin,* 344 F.3d 282, 287 (2d Cir.2003) (citing *Morales v. Mackalm,* 278 F.3d 126, 131 (2d Cir.2002)). However, "[o]nly retaliatory conduct that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights constitutes an adverse action for a claim of retaliation." *Davis v. Goord,* 320 F.3d 346, 353 (2d Cir.2003) (internal quotation marks and citations omitted); *accord Rivera v. Goord,* 253 F.Supp.2d 735, 749 (S.D.N.Y.2003). "In making this determination, the court's inquiry must be tailored to the different circumstances in which retaliation claims arise, bearing in mind that prisoners may be required to tolerate more than average citizens before a retaliatory action taken against them is considered adverse." *Davis,* 320 F.3d at 353 (internal punctuation and citation omitted). Because of the ease with which claims of retaliation can be invoked, the Second Circuit has directed courts to examine such claims "with skepticism and particular care." *Colon,* 58 F.3d at 872 (citation omitted); *see Dawes v. Walker,* 239 F.3d 489, 491 (2d Cir.2001) ("[V]irtually any adverse action taken against a prisoner by a prison official—even those otherwise not rising to the level of a constitutional violation—can be characterized as a constitutionally proscribed retaliatory act.") (citations omitted).

### 1. *Facility Transfer*

Here, Koehl asserts that defendant Cunningham retaliated against him for filing grievances by transferring him to the "5 Points" facility. *See* Am. Compl. at 10 ¶ 3. Defendants argue that Koehl's claim should be dismissed because: (1) Koehl "has no liberty interest in a particular location," Def. Mem. at 11; Def. Reply at 6; (2) "the facility transfer claim is moot because plaintiff was not transferred out of Green Haven by the time he filed the

complaint," Def. Mem. at 11; Def. Reply at 6; and (3) "the complaint does not explain why the transfers were retaliatory," Def. Mem. at 12; Def. Reply at 6. [2]

[2]    Defendants also cite to the section of their brief discussing Koehl's Eighth Amendment claim in support of their argument that Koehl has not stated a retaliation claim. *See* Def. Mem. at 12 (citing arguments set forth in Point IVa). As this claim is analyzed under a different legal standard than the retaliation claim, and as defendants have not explained their citation to this section, we do not consider this citation to constitute an additional argument in support of dismissal of Koehl's retaliation claim.

**\*12** Defendants' first argument must fail because, although prisoners have no liberty interest in remaining at a particular facility, prison officials may not transfer inmates in retaliation for exercising their constitutional rights. *Davis v. Kelly,* 160 F.3d 917, 920 (2d Cir.1998) ("[a] prisoner has no liberty interest in remaining at a particular correctional facility, but prison authorities may not transfer an inmate in retaliation for the exercise of constitutionally protected rights") (citations omitted). Because it is well established that the filing of grievances is constitutionally protected activity, prison officials may not transfer inmates in retaliation for such activity. *See Morales,* 278 F.3d at 131. The Court would normally accept defendants' second and third arguments, but inasmuch as Koehl alleges that he was transferred to the "5 Points" facility on June 10, 2010, *see* Pl. Mem. at 20, and that the allegedly retaliatory action taken by defendants was the result of Koehl's filing of "grievances and complaints," Pl. Mem. at 19, we will deem these allegations to amend his complaint. *See Woods,* 2002 WL 731691, at \*1 n. 2. [3]

[3]    Defendants also argue in a footnote that Koehl's allegations against Cunningham with regard to this claim are "speculative." *See* Def. Mem. at 12 n. 3. Koehl specifically alleges, however, that he filed complaints in writing with Cunningham about his cell conditions and that Cunningham subsequently signed the retaliatory request that Koehl be transferred to "5 Points" Correctional Facility. *See* Am. Compl. at 10 ¶ 3; Pl. Mem. at 19.

   2. *Executive Clemency Application*

Defendants argue that Koehl has failed to state a claim for retaliation with regard to the sabotage of his executive clemency application by Cunningham, Edwards, Evans, Herman, and Tracy. *See* Def. Mem. at 12–13. Koehl alleges that these defendants sabotaged his application in retaliation for the "redress of grievances, reversals of false misbehavior reports, and civil awards alleging abuse." Am. Compl. at 15–16 ¶ 14(b). In addition to grievances, the filing of civil lawsuits comprises constitutionally protected activity. *See Espinal v. Goord,* 554 F.3d 216, 227 (2d Cir.2009) (holding plaintiff's earlier federal lawsuit was a protected activity) (citation omitted). Thus, Koehl has sufficiently alleged that his speech or conduct was constitutionally protected.

In the prison context, the adverse action element of a retaliation claim is satisfied if the plaintiff alleges facts sufficient to demonstrate that the retaliatory conduct by defendants "would deter a similarly situated individual of ordinary firmness from exercising ... constitutional rights." *Gill v. Pidlypchak,* 389 F.3d 379, 381 (2d Cir.2004) (internal quotation marks and citations omitted). A reasonable jury could find that a deliberate effort by a prison official to sabotage an application for clemency fits within this category.

With respect to the personal involvement of the defendants in this activity, we agree with defendants that Koehl does not allege adverse action on the part of Evans, Edwards, Herman, and Tracy. *See* Def. Mem. at 13. The only allegations Koehl makes regarding Evans and Edwards are that these defendants responded to his questions about the DOP's receipt of letters sent as part of the executive clemency application. *See* Am. Compl. at 15 ¶ 14(b); Pl. Mem. at 25–28. Herman is only mentioned as part of Koehl's discussion of the Department's review of applications for executive clemency. *See* Pl. Mem. at 25–26. No specific allegations are made against him. With respect to Tracy, Koehl states in the complaint that, "[o]n appeal, Defendant Tracy, callously and deliberately falsified official records to continue the conspiracy." Am. Compl. at 15 ¶ 14(b). The problem with this allegation is that it is far too vague and conclusory to identify Tracy's involvement in the scheme.

**\*13** As for Cunningham, defendants argue that Koehl "does not allege a single actual adverse measure by Cunningham." Def. Mem. at 13. Koehl, however, alleges that Cunningham informed him that "because

2011 WL 2436817

of [his] past complaints and winning law suits against DOCS employees," he would "submit an unfavorable recommendation to the Division of Parole regarding [Koehl's] pending application for Commutation of Sentence," that he would "do whatever he [could] to stop [Koehl's] mail from leaving the facility," and that he would "call in every favor ... to sabotage [the] application." Am. Compl. at 15 ¶ 14(b). This is sufficient to show Cunningham's personal involvement. It is also sufficient to show a causal connection between the protected speech and the adverse action since Koehl alleges that Cunningham specifically stated that he was taking the adverse action because of Koehl's protected activities.

### 3. Misbehavior Reports

As was true for the due process claims, defendants argue that the retaliation claims against Fischer, Russo, Harvey, and Brennan—based on the tier III misbehavior report—should be dismissed on statute of limitations grounds. Def. Mem. at 14. As noted in section III.B.2 above, this argument raises the question of whether the claim accrued when the allegedly false report was issued—in which case the complaint would be untimely—or when Koehl was found guilty of the charges alleged.

We believe the answer to this question lies in the specific claim made against a defendant. To the extent a defendant's retaliatory act is the issuance of a false misbehavior report itself, the claim is untimely. See, e.g., Davidson v. Pearson, 2007 WL 952047, at *2 (W.D.N.Y. Mar. 28, 2007) ("[p]laintiff's claims initially accrued on December 27, 1998, the date the alleged false misbehavior report was issued"). To the extent a claim against a defendant is that he took some retaliatory action at the hearing on March 7, 2007, the claim would be timely.

Thus, we examine each potential defendant separately. Fischer's role is not alleged at all in the description of this incident, Am. Compl. at 16–17 ¶ 14(c), and thus the claim must be dismissed as to him. With respect to Brennan, as noted in section III.B.3 above, there is no allegation regarding his involvement in the adjudication of the report and thus no claim can survive as to him. The allegations against Russo are somewhat unclear, but it appears that Koehl is alleging that Russo denied him documents both before and after the hearing date, Am. Compl. at 16–17 ¶ 14(c), and thus we will assume that some of his conduct may fall within the limitations period. Harvey is alleged

to be the hearing officer, and thus any claim against him would be timely.

Turning to the merits, the allegations are sufficient to show Russo and Harvey's personal involvement in that both are alleged to have personally committed acts of retaliation. They are also sufficient to allege a causal connection between their actions and Koehl's protected activities. See Am. Compl. at 16 ¶ 14(c) (defendants actions were done "in retaliation for redressing [Koehl's] grievances and so [Koehl] could be transferred out of the jail to preclude [him] from substantiating [his] claims in a pending matter"). Accordingly, the retaliation claim against Russo and Harvey survives.

**\*14** With respect to the claim regarding the tier II report, this claim is not time-barred but must be dismissed as against defendant Sawyer because there are no facts alleged that he had any personal involvement in the issuance of this misbehavior report, let alone that his involvement in the matter arose because of his desire to retaliate. As discussed above, "personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." Farrell, 449 F.3d at 484 (internal quotation marks and citation omitted). Here, Koehl alleges that Sawyer was the hearing officer in the adjudication of the tier II report, see Am. Compl. at 17 ¶ 14(c); Pl. Mem. at 24. While Koehl alleges that he was wrongly denied access to certain evidence during the tier II hearing, he does not allege any facts reflecting that Sawyer was aware that the misbehavior report had been allegedly issued in retaliation for the filing of grievances. Thus, the allegations against Sawyer with regard to the tier II misbehavior report must be dismissed.

With respect to Hilliar, defendants make no argument that she should be dismissed from this claim. See Def. Mem. at 14. And the complaint contains sufficient allegations reflecting that her involvement in the issuance of the report arose from her desire to retaliate against Koehl's appeal of grievances. See Am. Compl. ¶ 14(c) at 17.

### D. Eighth Amendment Claims

The Supreme Court has held that "the Constitution 'does not mandate comfortable prisons,' but neither does it permit inhumane ones." Farmer v. Brennan, 511 U.S. 825, 832 (1994) (quoting Rhodes v. Chapman, 452 U.S. 337, 349 (1981)). The Eighth Amendment imposes an obligation

2011 WL 2436817

on prison officials to provide "humane conditions of confinement," including "adequate food, clothing, shelter, and medical care." *Farmer,* 511 U.S. at 832. To establish a violation of the Eighth Amendment on the basis of inhumane prison conditions, a plaintiff must show that the deprivation is sufficiently serious as to result in a denial of " 'the minimal civilized measure of life's necessities,' " *Wilson v. Seiter,* 501 U.S. 294, 298 (1991) (quoting *Rhodes,* 452 U.S. at 347), and that the prison officials acted with "a sufficiently culpable state of mind," *Hathaway v. Coughlin,* 99 F.3d 550, 553 (2d Cir.1996) (citation omitted). In the context of conditions of confinement, the requisite mental state is "deliberate indifference ." *Wilson,* 501 U.S. at 302–03.

1. *Exposure to Environmental Tobacco Smoke*
Defendants have moved to dismiss Koehl's claim that his exposure to environmental tobacco smoke ("ETS"), including the 60 days he spent in a double bunk cell with inmates who smoked, constituted cruel and unusual punishment. Defendants argue "that DOCS' practice of double-cell housing does not violate the Eighth Amendment," *see* Def. Mem. at 15 (citing *Jones v. Goord,* 435 F.Supp.2d 221, 257 (S.D.N.Y.2006)), and that DOCS not only has an indoor smoking ban, but that DOCS personnel were actively enforcing this ban, *see* Def. Reply at 5.

**\*15** In *Rhodes v. Chapman,* 452 U.S. 337 (1981), the Supreme Court held that "double celling" is generally permissible under the Eighth and Fourteenth Amendments. *Id.* at 347–48, 352. Nevertheless, when combined with other adverse conditions, double bunking may constitute cruel and unusual punishment. *See Bolton v.. Goord,* 992 F.Supp. 604, 626 (S.D.N.Y.1998). Thus,"[e]xposure to secondhand smoke can give rise to an Eighth Amendment violation." *Jones v. Goord,* 435 F.Supp.2d at 249 (citation omitted). Of course, "[a]s with all claims relating to conditions of confinement, an Eighth Amendment claim based on exposure to secondhand smoke must show that the exposure created an 'unreasonable risk of serious damage' to inmates' future health, and that prison officials were deliberately indifferent to that risk." *Id.* (citing *Helling v. McKinney,* 509 U.S. 25, 35 (1993)).

We will address the 60 days Koehl spent in a double cell in October through December 2008 separately from Koehl's general claim that his exposure to ETS at Green

Haven constituted a violation of the Eighth Amendment. Koehl alleges that in October 2008, Ercole assigned him to a double bunk cell in which two out of three of his cell mates "were chain smokers, who smoked all day and night in the cell." *See* Am. Compl. at 10 ¶ 3. With regard to this 60 day assignment, Koehl has alleged facts from which it could be inferred that his exposure to secondhand smoke created an unreasonable risk of serious danger to his health and that defendant Ercole was deliberately indifferent to this risk. Koehl alleges that following his transfer to Green Haven he has had difficulty breathing, his lung disease has progressively worsened, his "heart valves [have] started leaking," and his "fingernails have turned yellow." Pl. Mem. at 8–9, 12, 15. Thus, Koehl has satisfied the objective prong of the Eighth Amendment analysis.

Liberally reading the complaint, Koehl also alleges that he complained about both the conditions in the cell and the impact of these conditions on his lung disease to Ercole and Cunningham in person and in writing and that they refused to enforce the smoking ban and ignored his complaints. *See* Am. Compl. at 10 ¶ 3; *id.* at 12–13 ¶ 10. Koehl alleges that it was defendant Ercole who assigned him to this cell and that Ercole "deliberately and repeatedly falsified records" and ordered Koehl's counselor to demand that Koehl sign a waiver so that he would remain in the double bunk cell. *Id.* at 10 ¶ 3. Thus, Koehl's allegations are sufficient to allow the conclusion that Ercole was aware of the risk Koehl faced and that he deliberately disregarded this risk. *See Farmer,* 511 U.S. at 847 (deliberate indifference exists where an official "knows that inmates face a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it"); *Weaver v. Clarke,* 45 F.3d 1253, 1256 (8th Cir.1995) (finding deliberate indifference alleged where the complaint portrayed the prison officials as "consistently unwilling to enforce the smoking ban in [plaintiff's] room and repeatedly unresponsive to any of [plaintiff's] requests and protests"). [4] Accordingly, Koehl has stated a claim that his 60 day assignment by Ercole to double bunk in a cell with "chain smokers" constituted cruel and unusual punishment.

[4]    Defendants argue that Koehl's complaint "acknowledges that DOCS has prohibited indoor smoking, and, in fact, was actively enforcing it." Def. Mem. at 21 (citation omitted). While Koehl does acknowledge that there is an indoor smoking ban, *see*

Am. Compl. at 13 ¶ 10, he also alleges that his cell mates "smoked all day and night in the cell," *id.* at 10 ¶ 3, in contravention of the ban, and that Ercole was aware of this noncompliance, *id.* There are no allegations in the complaint that the ban was "actively enforc[e]d" during this particular time period. *See* footnote 5 below and accompanying text.

**\*16** As to defendant Cunningham, Koehl has not alleged that he was personally involved in the alleged deprivation of his Eighth Amendment rights with regard to this 60 day cell assignment. Here, Koehl alleges that it was Ercole who assigned him to this cell, and that Cunningham merely disregarded his complaints, Am. Compl. at 10 ¶ 3, and refused to allow an investigative report into Koehl's medical concerns with regard to his cell assignments, *see* Pl. Mem. at 19. Because "it is well-established that an allegation that an official ignored a prisoner's letter of protest and request for an investigation of allegations made therein is insufficient to hold that official liable for the alleged violations," *Greenwaldt v. Coughlin,* 1995 WL 232736, at \*4 (S.D.N.Y. Apr. 19, 1995), Koehl has failed to allege that Cunningham had any personal involvement in his exposure to ETS.

In addition, Koehl does not state an Eighth Amendment claim with regard to his general allegation that defendants Fischer, Ercole, Lee, Cunningham, and Dr. Bernstein refused to enforce the New York ban on smoking in prisons. *See* Am. Compl. at 13 ¶ 10. Koehl has failed to allege facts from which it could be inferred that defendants Fischer, Lee, Cunningham, and Bernstein were at any time deliberately indifferent to the risk created by Koehl's alleged exposure to secondhand smoke, or that Ercole was deliberately indifferent other than with regard to the 60 days Koehl spent in a double bunk cell with "chain smokers" in October through December 2008. While Koehl makes the broad allegation that Fischer, Ercole, Lee, Cunningham, and Bernstein "callously and deliberately refused to enforce the state's indoor smoking ban," *id.,* this statement is conclusory and unsupported by any allegations regarding either the objective harm to Koehl (outside of the 60 days he spent with the "chain smokers") or these defendants' subjective knowledge of the harm it was causing to Koehl. The complaint's reference to Bernstein's refusal to administer a "cotinine level test," and Ercole, Lee, and Cunningham's failure to install carbon monoxide detectors, Am. Compl. at 12 ¶ 10, does not show deliberate indifference to Koehl's health.

Notably, "[w]hether a prison has a non-smoking policy bears heavily on the question of deliberate indifference," *Enigwe v. Zenk,* 2007 WL 2713849, at \*6 (E.D.N.Y. Sept. 14, 2007) (citing *Helling,* 509 U.S. at 36), and "imperfect enforcement of the policy alone may not support a finding of deliberate indifference," *Enigwe,* 2007 WL 2713849, at \*6 (citing *Scott v. District of Columbia,* 139 F.3d 940, 942–43, 944 (D.C.Cir.1998) (dismissing claims where inmates alleged smoking in housing units but failed to present any evidence in support of claims)). As noted in the exhibits provided by Koehl, attached to his memorandum in opposition, Green Haven policy prohibits smoking in all buildings, and permits it only in restricted outdoor areas. *See* Green Haven Correctional Facility Complaint Investigation, dated May 28, 2009 (annexed as Ex. 23 to Verified Exhibits (annexed to Pl. Mem.) ("Verified Exs.")) ("May 2009 Compl. Invest.") at 1–2. Additionally, these exhibits demonstrate that Green Haven personnel, including defendants Cunningham and Lee, personally investigated Koehl's complaints regarding indoor smoking. *See id.* at 1; Emails from Lee and Devine, dated Mar. 2010 (annexed as Ex. 24 to Verified Exs.) ("Lee Emails") at 2–3. For example, Cunningham was present at the investigation of Koehl's May 6, 2009 complaint and he issued a memo to all Green Haven staff on June 10, 2009, regarding the facility's smoking policy. *See* May 2009 Compl. Invest. at 1; Lee Emails at 2. When Lee became aware of Koehl's complaints and the subsequent report, he issued memos to both staff and inmates regarding the smoking ban and he "directed that security supervisors ensure that staff are enforcing the prohibition." Lee Emails at 2. [5] Thus, while Koehl alleges that the non-smoking policy was not enforced and that defendants were deliberately indifferent to smoking by prisoners, the exhibits provided by Koehl show that at least some efforts were taken to enforce the ban. [6]

---

[5]     We note that these exhibits do not affect our finding that Ercole's assignment of Koehl to a double bunk cell with "chain smokers" in October through December 2008 constituted a violation of the Eighth Amendment, as these exhibits involve action taken only in 2009 and 2010 and do not involve enforcement of the smoking ban by defendant Ercole.

[6]     As defendants note, Def. Reply at 6 n. 1, Koehl references his treatment and conditions at DOCS' Auburn Correctional Facility for the first time in his opposition brief. *See* Pl. Mem. at 14, 16, 17, 20. As Koehl was not transferred to the Auburn facility until

after he filed the complaint in this action, we do not consider statements in Koehl's memoranda of law regarding the conditions at the Auburn facility.

### 2. Cell Transfers and Assignments

**\*17** Koehl claims that the conditions he endured while he was being transferred between cells constituted cruel and unusual punishment because he was forced to carry his belongings from cell to cell which "aggravated [his] previously complained of [medical] conditions." Am. Compl. at 10 ¶ 2; *id.* at 14 ¶ 14. He alleges that his assignment to non-first floor cells, double bunk cells, and a cell which contained "air-borne, lead paint rust dust" constituted a violation of the Eighth Amendment. *Id.*

However, other than Koehl's allegations regarding the 60 days he spent in a double bunk cell with smokers, discussed above, Koehl fails to allege facts from which it could be inferred that his specific cell assignments or physical transfer between cells constituted a violation of the Eighth Amendment. Koehl alleges that when he first arrived at Green Haven—before Ercole assigned him to spend 60 days in a double bunk cell with "chain smokers"—Ercole assigned him to a double bunk cell on the third floor of the facility. *See* Am. Compl. at 10 ¶ 2. Beyond the conclusory allegation that Ercole "callously and deliberately assigned" him to this cell, *id.,* Koehl alleges no facts from which it could be inferred that Ercole was deliberately indifferent to the risk this assignment allegedly caused Koehl. Koehl does not allege that he made Ercole aware of his medical conditions or that Ercole otherwise knew about them. *See Farmer,* 511 U.S. at 847 (deliberate indifference exists where an official "knows that inmates face a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it"). Thus, Koehl alleges no facts from which it could be inferred that Ercole knew that Koehl faced a substantial risk of serious harm with regard to this cell assignment.

Other than the cell assignments discussed in paragraphs 2 and 3 of the complaint, Koehl does not allege facts from which it could be inferred that defendant Ercole was personally involved in his cell assignments or transfers. Nor does Koehl allege that defendants Cunningham or Lee were personally involved in his assignments and transfers. He merely states that Cunningham, Ercole, and Lee "physically harmed [him] and deliberately ignored medical orders." Am. Compl. ¶ 14(a). This broad statement cannot, however, support a deliberate indifference claim and Koehl does not allege any facts supporting the inference that these defendants were involved in the cell assignments and transfers discussed in paragraph 14 of the amended complaint. *See Iqbal,* 129 S.Ct. at 1949 (federal pleading standard requires "more than an unadorned, the-defendant-unlawfully-harmed-me accusation," and a pleading fails if it "offers labels and conclusions" or "tenders naked assertion[s] devoid of further factual enhancement") (internal quotation marks and citations omitted); *Joseph v. Fischer,* 2009 WL 3805590, at \*2 (W.D.N.Y. Nov. 6, 2009) ("conclusory allegations that defendants ha[d] 'personal knowledge' of the events complained of" was insufficient to allege personal involvement). Thus, Koehl's Eighth Amendment claim regarding cell assignments and transfers cannot be sustained on this ground.

**\*18** Koehl's claim that he was under threat of transfer if he did not agree to double bunking, *see* Am. Compl. at 10 ¶ 3, should be dismissed because threats alone do not deprive a plaintiff of any constitutional rights. *See Lamar v. Steele,* 698 F.2d 1286, 1286 (5th Cir.) (per curiam), *cert. denied,* 464 U.S. 821 (1983); *see also Gaut v. Sunn,* 810 F.2d 923, 925 (9th Cir.1987) (threats to deter prisoner from "pursuing legal redress" insufficient to state a claim under § 1983 unless the prisoner was actually deprived access to the court) (internal quotation marks omitted); *Grant v. Fernandez,* 1997 WL 118257, at \*2 (N.D.Cal. Mar. 5, 1997) ("[O]nly harassment and threats coupled with conduct implicating the Eighth Amendment's proscription against cruel and unusual punishment ... may present a claim under § 1983.") (citation omitted).

### 3. Weather Appropriate Clothing

Koehl claims that Fischer, Ercole, and Lee denied him appropriate clothing for outside recreation in violation of the Eighth Amendment. *See* Am. Compl. at 14 ¶ 13. Koehl alleges that "most of the winter [he] cannot go outside for recreation without endangering [his] life." *Id.* Prison officials "may be held liable ... for failure to provide adequate clothing, if (1) the inadequacy is 'sufficiently serious' *and* (2) the official's failure is the result of his 'sufficiently culpable state of mind'—i.e., his 'deliberate indifference' to the inmate's health." *Shaffer v. Coombe,* 1995 WL 495067, at \*1 (W.D.N.Y. Aug. 10, 1995) (quoting *Farmer,* 511 U.S. at 833). "Deliberate indifference to an inmate's health equates to 'recklessly

disregarding' a risk to such, and the recklessness *vel non* of the official is judged subjectively." *Shaffer,* 1995 WL 495067, at *1 (quoting *Farmer,* 511 U.S. at 835, 839). We note that this is not a case where Koehl alleges he was confined to a cold cell without the minimal clothing necessary to keep warm. *See, e.g., Corselli v. Coughlin,* 842 F.2d 23, 27 (2d Cir.1988) (claim allowed where prisoner had been deliberately exposed to bitter cold in his cell block for three months).

First, this claim cannot survive in light of the fact that Koehl had a mechanism to stay warm in winter by staying indoors; any time he chose to spend outdoors in the cold was not prolonged, and no substantial harm has been alleged. *See, e.g., Tafari v. McCarthy,* 714 F.Supp.2d 317, 358 (N.D.N.Y.2010) (no Eighth Amendment violation where prisoner was "on many occasions" exposed to "below zero weather for an hour at a time during recreation period") (internal quotation marks and citation omitted); *Davis v.. Buffardi,* 2005 WL 1174088, at *2 (N.D.N.Y. May 4, 2005) (denying claim under Fourteenth Amendment where pretrial detainees failed to submit any evidence that "the temperature in [the prison] was so cold that Plaintiffs experienced substantial harm"); *Brown v. McElroy,* 160 F.Supp.2d 699, 706 (S.D.N.Y.2001) (where prisoner alleged his cell was "extremely cold" and guard would not allow him to enter the hallway for warmth even when prisoner complained about being sick from the low temperatures, claim was dismissed because allegations were "not sufficiently serious" and prisoner could "get warm with some blankets").

**\*19** In addition, the claim fails because Koehl makes only a conclusory allegation that Fischer, Ercole, and Lee "created and enforced unconstitutional customs and policies that ... continually denied [him] adequate clothing for the weather." Pl. Mem. at 28. While personal involvement of a supervisor may be established by showing that he created a policy or custom under which the violation occurred, *Back,* 365 F.3d at 127 (citing *Colon,* 58 F.3d at 873), conclusory allegations that a defendant was involved in the creation and enforcement of unconstitutional policies cannot sustain a claim of personal involvement. *See, e.g ., Green v. Wright,* 2010 WL 3474973, at *2 (W.D.N.Y. Sept. 1, 2010) ("Here, the Court is concerned about the conclusory nature of plaintiff's assertion that defendant was personally involved in his treatment.... Without at least some kind of factual assertion about an unconstitutional policy, not

even the liberal standards for assessing *pro se* pleadings can save plaintiff's claim in its current form."); *Joseph v. Fischer,* 2009 WL 3805590, at *2 (W.D .N.Y. Nov. 6, 2009) ("conclusory allegations that defendants ha[d] 'personal knowledge' of the events complained of" was insufficient to allege personal involvement); *Davis v. City of New York,* 2000 WL 1877045, at *9 (S.D.N.Y. Dec. 27, 2000) (merely asserting that "[defendant] was actively involved in" an incident is conclusory and insufficient to establish defendant's personal involvement in the allegedly unconstitutional custom or policy) (internal quotation marks and citations omitted); *Funches v. Reish,* 1998 WL 695904, at *4–5 (S.D.N.Y. Oct. 5, 1998) (dismissing deliberate indifference to medical care claim against warden of prison facility based upon conclusory allegation that warden created "custom" of denying medical care); *Reid v. Artuz,* 984 F.Supp. 191, 195 (S.D.N.Y.1997) (dismissing an asthmatic prisoner's section 1983 claim against a supervisory official when the plaintiff "fail[ed] to allege, let alone establish, any factual basis upon which a fact finder could reasonably conclude personal involvement by the supervisory official ... [—] that [defendant] created or continued a policy or custom which allowed the violation to occur"); *Shaffer,* 1995 WL 495067, at *1 (to satisfy the "deliberate indifference" prong of the Eighth Amendment analysis, "there must be allegations that at least suggest that the defendants were aware of the harm the plaintiff alleges") (citing *Farmer,* 511 U.S. 841). Here, Koehl has failed to allege with the requisite specificity that these supervisory defendants had any personal involvement in the alleged constitutional deprivations. Other than the conclusory statement of their involvement in the unconstitutional policy, Koehl makes no further allegations against them with regard to this claim. Thus, absent from the complaint are any facts suggesting that these defendants knew of, let alone approved, any alleged misconduct with regard to Koehl's clothing. *See Iqbal,* 129 S.Ct. at 1949 (federal pleading standard requires "more than an unadorned, the-defendant-unlawfully-harmed-me accusation," and a pleading fails if it "offers labels and conclusions" or "tenders naked assertion[s] devoid of further factual enhancement") (internal quotation marks and citations omitted). Accordingly, this claim should be dismissed.

### 4. *Medical Treatment*

**\*20** To establish a violation of the Eighth Amendment arising out of inadequate medical treatment, a prisoner is required to prove "deliberate indifference to [his] serious

medical needs." *Estelle v. Gamble,* 429 U.S. 97, 106 (1976). The deliberate indifference standard consists of both a subjective prong and an objective prong. *See Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994), *cert. denied,* 513 U.S. 1154 (1995). Under the subjective component, the prisoner must show that the defendant officials acted with a "sufficiently culpable state of mind" in depriving the prisoner of adequate medical treatment. *Hathaway v. Coughlin,* 99 F.3d 550, 553 (2d Cir.1996). The "subjective element of deliberate indifference 'entails something more than mere negligence ... [but] something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result.' " *Id.* (quoting *Farmer,* 511 U.S. at 835) (alterations in original); *see also Hernandez v. Keane,* 341 F.3d 137, 144 (2d Cir.2003) (likening the necessary state of mind to "the equivalent of criminal recklessness") (internal quotation marks and citation omitted); *cert. denied,* 543 U.S. 1093 (2005); *Hemmings v. Gorczyk,* 134 F.3d 104, 108 (2d Cir.1998) (per curiam) (same). In order to be found "sufficiently culpable," the official must "know[ ] of and disregard[ ] an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer,* 511 U.S. at 834, 837 (internal quotation marks and citation omitted); *accord Caiozzo v. Koreman,* 581 F.3d 63, 72 (2d Cir.2009). As already noted, "negligence, even if it constitutes medical malpractice, does not, without more, engender a constitutional claim." *Chance v. Armstrong,* 143 F.3d 698, 703 (2d Cir.1998).

Under the objective prong, the alleged medical need must be "sufficiently serious." *Hathaway,* 37 F.3d at 66 (internal quotation marks and citations omitted). A "sufficiently serious" medical need is "a condition of urgency, one that may produce death, degeneration, or extreme pain." *Id.* (internal quotation marks and citation omitted). "Factors that have been considered include '[t]he existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain.' " *Chance,* 143 F.3d at 702 (citations omitted) (alteration in original).

### a. *Dental Care*
With respect to Koehl's claim that he has been denied denture adhesive or an implant, *see* Am. Compl. at 13–14

¶ 12, defendants argue that the claim should be dismissed because the fact that a prisoner may prefer a different course of medical treatment does not give rise to an Eighth Amendment violation, *see* Def. Mem. at 18–19 (citing *Chance,* 143 F.3d at 703; *Dean v. Coughlin,* 804 F.2d 207, 215 (2d Cir.1986)).

**\*21** In order to state a claim for deliberate indifference under the Eighth Amendment, Koehl "must allege facts indicating that a substantial risk of serious harm would arise from the denial of the requested dental care ... and that the defendants perceived this risk and chose not to provide the requested treatment." *Partee v.. Grood,* 2007 WL 2164529, at \*5 (S.D.N.Y. July 25, 2007), *aff'd,* 335 F. App'x 85 (2d Cir.2009). "[I]nsufficient dental treatment may rise to the level of a Constitutional violation if it leads to extreme pain, deterioration of the teeth, and an inability to eat properly." *Id.* at \*5 (citing *Chance,* 143 F.3d at 703). However, "[s]o long as the treatment given is adequate, the fact that a prisoner might prefer a different treatment does not give rise to an Eighth Amendment violation." *Chance,* 143 F.3d at 703 (citing *Dean,* 804 F.2d at 215).

Assuming *arguendo* that Koehl has alleged facts indicating that a substantial risk of harm arose from his lack of dental care, he has failed to allege that either Fischer or Wright were personally involved in the deprivation of treatment. *See* Am. Compl. at 12–13 ¶ 12; Def. Reply at 2–3. Koehl merely alleges that he was denied dental care pursuant to "Fischer and Wright's policies and customs," Am. Compl. at 13 ¶ 12. Koehl does not, however, allege what these policies are. Nor are there allegations from which it could be inferred that either Fischer or Wright knew of, let alone were involved in, the failure to provide him with dental adhesives or implants. As already noted, conclusory allegations that a defendant was involved in the creation and enforcement of unconstitutional policies cannot sustain a claim of personal involvement. *See Joseph,* 2009 WL 3805590, at \*2 ("Plaintiff's complaint contains many conclusory allegations and, therefore, it is not possible to determine if there is personal involvement for each defendant.... Plaintiff needs to describe the events in sufficient detail to allow for a determination of defendants' personal involvement in the alleged incidents.").

### b. *Cervical Spine and Back Injuries*
With respect to Koehl's claim regarding the medical treatment he received for his back, defendants argue that

Koehl has failed to allege the subjective component of a deliberate indifference claim. *See* Def. Mem. at 19.

Turning first to the conduct of Dr. Weinstein, Koehl has not alleged facts giving rise to the inference that Dr. Weinstein acted with a "sufficiently culpable state of mind." Koehl alleges that in late 2008, Weinstein conducted an EMG, which Koehl believed contradicted the results of a previous EMG. *See* Am. Compl. at 10 ¶ 4. After Koehl called Dr. Weinstein "a liar," Dr. Weinstein agreed to order an MRI. *Id.* Koehl also alleges that in late 2009, Dr. Weinstein conducted another EMG "and stated that nothing was wrong." *See id.* at 11 ¶ 7. Koehl states that "[l]ater testing revealed that [Dr.] Weinstein's report and conclusions were knowingly false." *Id.* Apart from the conclusory allegation that Dr. Weinstein's conclusions were "knowingly" false, these allegations do not support the claim that Dr. Weinstein was deliberately indifferent to Koehl's medical problems. Instead, they constitute allegations that Dr. Weinstein did not give Koehl's condition proper treatment—allegations that are insufficient to show a constitutional violation. *See Perkins v. Kansas Dep't of Corr.,* 165 F.3d 803, 811 (10th Cir.1999) ("a prisoner who merely disagrees with a diagnosis or a prescribed course of treatment does not state a constitutional violation"); *Troy v. Kuhlmann,* 1999 WL 825622, at *6 (S.D.N.Y. Oct. 15, 1999) ("[A] prisoner's disagreement with the diagnostic techniques or forms of treatment employed by medical personnel does not itself give rise to an Eighth Amendment claim.") (citation omitted).

**\*22** With regard to Fischer and Drs. Wright and Bernstein, however, Koehl has alleged facts creating the inference that these defendants acted with a "sufficiently culpable state of mind," thus satisfying the subjective prong of the deliberate indifference analysis. While defendants argue that Koehl's medical care was "attentive" and that Koehl's claims against Fischer and Drs. Wright and Bernstein regarding his denial of proper diagnostic testing "lack [ ] merit in light of the extensive testing plaintiff received," Def. Mem. at 20, Koehl specifically alleges that, "as a cost saving measure," Fischer and Drs. Wright and Bernstein "callously and deliberately ignored the orders of the neurosurgeons" by canceling Koehl's MRI, changing the type of x-rays ordered, and refusing to order Koehl a new neck brace, Am. Compl. at 11–12 ¶¶ 7, 8. He states that despite his complaints of "extreme pain and weakness in [his] arms,

hands, legs, neck and back," Fischer and Dr. Wright repeatedly denied Koehl proper testing for his medical condition. *Id.* at 10–11 ¶ 4. Koehl also alleges that Dr. Bernstein deliberately scheduled Koehl's MRI on the date when Koehl's parents were visiting so that he could later claim that Koehl had refused treatment. *See id.* at 11 ¶ 5. The Second Circuit has held that the "allegation of ulterior motives, if proven true, would show that the defendants had a culpable state of mind and that their choice of treatment was intentionally wrong and did not derive from sound medical judgment." *Chance,* 143 F.3d at 704. Because Koehl has alleged ulterior motives, including monetary incentives, on the part of Fischer and Drs. Wright and Bernstein, he has alleged facts that create the inference that these defendants had a sufficiently culpable state of mind.

Defendants argue that because Fischer is not a doctor and was not involved in Koehl's medical treatment, that he was entitled to rely on the treatment of medical staff. *See* Def. Reply at 4–5 (citing *Cuoco v. Moritsugu,* 222 F.3d 99, 111 (2d Cir.2000)). This argument fails, however, because Koehl does not merely allege that Fischer deferred to the treatment articulated by Koehl's doctors. Instead, he alleges that Fischer directly interfered with Koehl's treatment "as a cost saving measure." Am. Compl. at 11–12 ¶¶ 7, 8.

Defendants also argue that the claims against Dr. Bernstein should be dismissed because they are, "at most, negligence claims." Def. Mem. at 20. While it is true that "negligence, even if it constitutes medical malpractice, does not, without more, engender a constitutional claim," *Chance,* 143 F.3d at 703 (citing *Estelle,* 429 U.S. at 105–06), "[i]n certain instances, a physician may be deliberately indifferent if he or she consciously chooses 'an easier and less efficacious' treatment plan," *Chance,* 143 F.3d at 703 (citing *Waldrop v. Evans,* 871 F.2d 1030, 1035 (11th Cir.1989) ("choice of an easier but less efficacious course of treatment can constitute deliberate indifference"); *Williams v. Vincent,* 508 F.2d 541, 544 (2d Cir.1974)). Here, Koehl claims Dr. Bernstein ignored the orders of his doctors not on the basis of his own medical view, but because of monetary incentives, and that he deliberately interfered with Koehl's treatment in order to make it appear as though Koehl had refused treatment. Accordingly, Koehl has alleged that Dr. Bernstein was more than merely negligent.

### c. Lung Disease

**\*23** Koehl alleges that his "chronic and life threatening lung diseases have grown progressively worse" because of his exposure to ETS and that defendants have denied him proper medical treatment for his worsening condition. *See* Am. Compl. at 12–13 ¶¶ 10–11. Specifically, Koehl states that Dr. Bernstein refused to administer a "cotinine level test," that "Ercole, Lee and Cunningham denied the installation of detectors," *id.* at 12 ¶ 10, and that Fischer and Drs. Bernstein and Wright denied him access to a pulmonary specialist, *id.* at 13 ¶ 11. He states that he complained both verbally and in writing to Dr. Fein, Dr. Bernstein, Cunningham, Ercole, and Lee regarding his medical problems, but that his complaints were "ignored and/or brushed under the rug." *Id.* at 12 ¶ 10.

These allegations are insufficient because the complaint does not allege facts satisfying the subjective prong of the deliberate indifference analysis. Koehl has not alleged facts showing that these defendants consciously disregarded a risk of serious harm. Nor does Koehl state that defendants had an ulterior motive for their actions. *See* Am. Compl. at 12–13 ¶¶ 10–11. While Koehl alleges that he should have been allowed to see a pulmonary specialist, *id.* at 13 ¶ 11, he also alleges that he was given multiple CT scans and a pulmonary function analysis, *id.* And in the exhibits attached to Koehl's opposition memorandum, he includes a letter from Dr. Hosannah, a cardiothoracic surgeon at Albany Medical Center, stating that on January 29, 2008, Koehl "underwent a successful bronchoscopy and mediastinoscopy." Letter from Dr. Hosannah to Dr. Weissman, dated Apr. 9, 2008 (annexed as Ex. 15 to Verified Exs.). Thus, while Koehl alleges he was "denied proper testing," Am. Compl. at 13 ¶ 11, the complaint and attached papers cannot plausibly be read to suggest that Koehl was not examined, treated, or administered medically-indicated tests for his lung disease—situations that case law has found to constitute deliberate indifference. *See, e.g., Abraham v. DiGuglielmo,* 2010 WL 2136600, at \*9 (E.D.Pa. May 25, 2010) (doctor's "decision to prescribe antibiotics without examining plaintiff or administering tests to confirm the diagnosis" was found to constitute deliberate indifference); *see also Verley v. Goord,* 2004 WL 526740, at \* 13 (S.D.N.Y. Jan. 23, 2004) ("Because, in his Complaint, [plaintiff] alleged no facts indicating that [the doctor] purposely failed to treat his medical condition or that the diagnosis was contrary to accepted medical standards, [plaintiff's] allegations of a failure to diagnose and treat his back

ailment, as stated in the Complaint, are insufficient to state a claim."). The mere allegation that Koehl had a painful lung disease that was not alleviated by treatment does not by itself reflect that the defendants acted with deliberate indifference, inasmuch as "there exist many medical conditions that do not respond to treatment." *Bryant v. Wright,* 2010 WL 3629443, at \*9 (S.D.N.Y. Aug. 31, 2010), *adopted by* 2010 WL 3629426 (S.D.N.Y. Sept. 15, 2010).

### E. Qualified Immunity

**\*24** The doctrine of qualified immunity precludes civil liability where prison officials performing discretionary functions "did not violate clearly established law," or where "it was objectively reasonable for the defendant[s] to believe that [their] action[s] did not violate such law." *Anderson v. Recore,* 317 F.3d 194, 197 (2d Cir.2003) (internal quotation marks and citation omitted); *accord Ford v. McGinnis,* 352 F.3d 582, 596 (2d Cir.2003) (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982)); *see also Hope v. Pelzer,* 536 U.S. 730, 739 (2002) (qualified immunity ensures that defendants have "fair notice" that their conduct is unlawful before being exposed to liability and that "[f]or a constitutional right to be clearly established, its contours 'must be sufficiently clear that a reasonable official would understand that what he is doing violates that right' ") (quoting *Anderson v.. Creighton,* 483 U.S. 635, 640 (1987)) (additional citations omitted). A qualified immunity defense may be asserted as part of a motion under Fed.R.Civ.P. 12(b)(6) if it is based on facts appearing on the face of the complaint, though defendants asserting the defense at this stage face a "formidable hurdle." *McKenna v. Wright,* 386 F.3d 432, 434 (2d Cir.2004).

While defendants' memorandum of law contains a brief section asserting that the doctrine of qualified immunity shields defendants from liability, they argue the applicability of the qualified immunity defense only in the vaguest and most general terms. *See* Def. Mem. at 21–23. Significantly, they do not discuss any of the substantive constitutional rights raised, do not provide any explanation as to what specific right was not "clearly established," and do not discuss why defendants would have been reasonable in believing that their alleged conduct was constitutional for any of Koehl's specific claims. Accordingly, there is no basis on which to conclude that the defendants against which Koehl has sufficiently

alleged constitutional claims are entitled to qualified immunity.

## IV. *CONCLUSION*

For the foregoing reasons, defendants' motion to dismiss (Docket # 25) should be granted in part and denied in part. Specifically, the following claims should be dismissed: (1) all claims against the State of New York for damages and against the defendants brought in their official capacities; (2) Fourteenth Amendment Due Process claims against Brennan, Fischer, and Hilliar based on disciplinary proceedings; (3) First Amendment retaliation claims (a) against Evans, Edwards, Herman, and Tracy with regard to Koehl's executive clemency application, and (b) against Fischer and Brennan with regard to the tier III misbehavior report and against Sawyer with regard to the tier II misbehavior report; (4) Eighth Amendment claims (a) against Cunningham for his involvement in Koehl's 60 day assignment to a cell with "chain smokers," (b) against Fischer, Ercole, Lee, Cunningham, and Dr. Bernstein for their failure to enforce the New York ban on smoking in prisons, (c) against Ercole, Cunningham, and Lee with regard to Koehl's cell assignments and transfers generally, (d) against Fischer, Ercole, and Lee for their failure to provide Koehl with weather appropriate clothing, (e) against Fischer and Wright for their failure to provide Koehl with dental care, (f) against Dr. Weinstein for his failure to treat Koehl's cervical spine and back injuries, and (g) against Dr. Bernstein, Dr. Fein, Dr. Wright, Ercole, Lee, Cunningham, and Fischer for their failure to treat Koehl's lung disease.

**\*25**  Thus, the following claims remain: (1) Fourteenth Amendment Due Process claims against Harvey, Sawyer, and Russo based on disciplinary proceedings; (2) First Amendment retaliation claims (a) against Cunningham with regard to Koehl's facility transfer, (b) against Cunningham with regard to Koehl's executive clemency application, and (c) against Russo and Harvey with regard to Koehl's tier III misbehavior report and against Hilliar with regard to the tier II misbehavior report; (3) Eighth Amendment claims (a) against Ercole for his involvement in Koehl's 60 day assignment to a cell with "chain smokers," and (b) against Fischer, Dr. Wright, and Dr. Bernstein for their failure to treat Koehl's cervical spine and back injuries

### *PROCEDURE FOR FILING OBJECTIONS TO THIS REPORT AND RECOMMENDATION*

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties have fourteen (14) days including weekends and holidays from service of this Report and Recommendation to serve and file any objections. *See also* Fed.R.Civ.P. 6(a), (b), (d). Such objections (and any responses to objections) shall be filed with the Clerk of the Court, with copies sent to the Hon. Sidney H. Stein, and to the undersigned, at 500 Pearl Street, New York, New York 10007. Any request for an extension of time to file objections must be directed to Judge Stein. If a party fails to file timely objections, that party will not be permitted to raise any objections to this Report and Recommendation on appeal. *See Thomas v. Arn,* 474 U.S. 140 (1985); *Wagner & Wagner, LLP v. Atkinson, Haskins, Nellis, Brittingham, Gladd & Carwile, P.C.,* 596 F.3d 84, 92 (2d Cir.2010).

**All Citations**

Not Reported in F.Supp.2d, 2011 WL 2436817

---

**End of Document**                    © 2017 Thomson Reuters. No claim to original U.S. Government Works.

2001 WL 262665
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

William HYMAN, Plaintiff,
v.
C. HOLDER, et al., Defendants.

No. 96 Civ. 7748(RCC).
|
March 15, 2001.

Opinion and Order

CASEY, J.

**\*1** Plaintiff William Hyman ("Hyman"), an inmate
at the Sing–Sing Correctional Facility, brings this
action against Correction Officer Christopher Holder,
Correction Officer J. McCarthy, Lieutenant Robert
Patterson, Lieutenant Thomas Lucas, First Deputy
Superintendent Charles Greiner and Superintendent
John P. Keane (collectively, "defendants"), alleging that
defendants conspired to violate his civil rights by filing
a false inmate misbehavior report against him and by failing
to conduct an adequate hearing before imposing certain
disciplinary sanctions. Defendants now seek summary
judgment on the grounds that no genuine issue of material
fact is in dispute and that defendants are entitled to
judgment in their favor as a matter of law. For the reasons
set forth below, defendants' motion is granted.

I. BACKGROUND

On December 9, 1995, Hyman heard the sounds of
a disturbance coming from the Southgate section of
the Sing–Sing Correctional Facility. Hyman proceeded
to that area where certain officers were engaged in a
confrontation with a prisoner, inmate Delacruz. Roughly
40 other prisoners were in the vicinity and had begun
shouting at the officers.

Hyman observed Officer Holder force inmate Delacruz
to the ground. According to Hyman, Delacruz began
thrashing on the floor in what Hyman assumed was an
epileptic seizure. A principal dispute between the parties
concerns Hyman's response to Officer Holder's actions.
Hyman claims that he then raised his voice in order to
alert the officers of his concern for Delacruz's presumed
medical condition. In contrast, defendants contend that
Hyman shouted obscenities and other loud and boisterous
remarks, inciting other inmates to do the same.

The officers transported Delacruz to the Emergency
Room. After Delacruz was removed, the prisoners moved
on to their assigned activities. Hyman continued to follow
his daily routine until the next morning, when Hyman
was advised that he was in keeplock status and would
be fed in his cell. That afternoon, Hyman received an
inmate misbehavior report prepared by Officers Holder
and McCarthy, which charged him with violations of
Institutional Rules 104.10 (Rioting), 104.13 (Creating a
Disturbance) and 102.10 (Threats). The reviewing officer,
Lieutenant Patterson, designated the subsequent hearing
as "Tier III," the most serious in the New York prison
system.

Hyman met with his assigned assistant, Ms. Ibrahim,
on December 11, 1995, in order to prepare his defense.
Hyman again met with Ms. Ibrahim on the day of the
hearing, December 15, 1995. During the proceeding before
Lieutenant Lucas, Hyman pled guilty to the charge of
creating a disturbance. Hyman withdrew his request to
call witnesses and did not proffer any witness testimony.
Hyman was found guilty of rioting and threats and was
sentenced to 270 days in keeplock, loss of 9 months good-
time credits and loss of phone, commissary and package
privileges.

Hyman wrote to Superintendent Keane by letter dated
December 22, 1995, to request a discretionary review
of the disciplinary hearing. The letter was forwarded to
First Deputy Superintendent Greiner, who affirmed the
underlying determination on January 8, 1996. Hyman
appealed defendant Greiner's decision to the Director of
Special Housing Donald Selsky. Selsky reduced Hyman's
loss of good-time credits to 6 months and the keeplock
sentence to 150 days, and dismissed the charge of rioting.

**\*2** Hyman brings the instant suit pursuant to 42
U.S.C. § 1983, 1985(3), 1986 and 1988 on the basis
that defendants conspired to violate his civil rights by
filing a false inmate misbehavior report and conducting
a procedurally improper hearing.[1] In addition, Hyman
alleges that his equal protection rights were violated

WESTLAW  © 2017 Thomson Reuters. No claim to original U.S. Government Works.    1

because he alone was singled out for discipline and that his confinement to segregated housing was contrary to the Eight Amendment. Finally, Hyman contends that defendants violated a number of prison regulations and directives.

<sup></sup>

1   The Complaint also refers to 18 U.S.C. §§ 241–42. However, those criminal statutes do not provide a private right of action. *See Robinson v. Overseas Military Sales Corp.,* 21 F.3d 502, 511 (2d Cir.1994).

Defendants make the following arguments in support of summary judgment: (1) Hyman's due process claims are barred under *Edwards v. Balisok,* 520 U.S. 641 (1997); (2) the allegations as to the inmate misbehavior report fail to state a constitutional claim because the Tier III hearing comported with due process; (3) Hyman has not established a viable equal protection violation on the basis of selective enforcement; (4) there is no evidence of conspiracy; (5) the Eighth Amendment claim is not cognizable; (6) the Court lacks jurisdiction over any allegations of state law violations; (7) defendant Keane was not personally involved with any alleged constitutional deprivations; and (8) defendants are entitled to qualified immunity. These arguments are addressed below.


## II. DISCUSSION

Summary judgment is appropriate only where no genuine issues of material fact remain for trial, and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247 (1986). The moving party bears the initial burden of proof on such a motion. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). Facts, and all inferences therefrom, must be viewed in a light most favorable to the non-movant. *Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986); *American Cas. Co. v. Nordic Leasing, Inc.,* 42 F.3d 725, 728 (2d Cir.1994). If the moving party meets its burden, then the non-movant must set forth specific facts showing that there is a genuine issue for trial. *Anderson,* 477 U.S. at 250. Mere "metaphysical doubt" is inadequate; sufficient evidence must exist upon which a reasonable jury could return a verdict for the non-movant. *Matsushita,* 475 U.S. at 587. A grant of summary judgment is appropriate when no rational jury could find in favor of the non-moving party because there is no genuine issue of material fact based on

the evidence in the record or the substantive law. *Gallo v. Prudential Residential Services, Ltd.,* 22 F.3d 1219, 1224 (2d Cir.1994).


### A. *Edwards v. Balisok*

Defendants first argue that Hyman's due process claims are not cognizable under § 1983 because the sanctions imposed on Hyman include the loss of good-time credits. *See Edwards v. Balisok,* 520 U.S. 641 (1997). In *Edwards,* which involved similar penalties to those here, the petitioner alleged that his prison disciplinary hearing, which led to the revocation of his good-time credits as well as a term of segregated confinement, violated his Fourteenth Amendment rights. Although the petitioner did not request restoration of the credits and framed his case solely as a challenge to the prison's procedures, the Supreme Court nevertheless determined that the § 1983 suit was barred. The Court held that the petitioner's case implicitly presented a challenge to the length of his sentence, and as such was not cognizable until the prison's determination was overturned administratively or judicially by the state courts, or through federal habeas review. *See also Heck v. Humphrey,* 512 U.S. 477 (1994); *Preiser v. Rodriguez,* 411 U.S. 475 (1973).

**\*3** Hyman argues that *Edwards* is inapplicable and that his suit should be allowed to proceed because his loss of good-time credits does not in and of itself affect his term of imprisonment. Although Hyman does not cite any case law, Hyman appears to rely on *Jenkins v. Haubert,* 179 F.3d 19, 27 (2d Cir.1999), in which the Second Circuit held that *Edwards* does not bar suits that do not affect the overall length of confinement. Hyman argues that the length of his confinement is not affected by the prison sanctions because under New York regulations the hearing disposition is merely tentative until a final decision is made by the Time Allowance Committee. *See* 7 N.Y.C.C.R. § 260.4. Hyman notes that the Committee may restore all or part of the lost allowance. *See* 7 N .Y.C.C.R. § 261.3. However, the possibility that the credits may be restored does not alter the Superintendent's decision. As another court in this District noted in rejecting the same argument:

> None of the cases evaluating § 1983 claims attacking a disciplinary decision involving a loss of good-time credits suggests that the fact or length of confinement is not

implicated unless the inmate has already been considered for parole or conditional release. If Plaintiff were correct, if the deprivation of good-time does not implicate the fact or length of a prisoner's confinement unless and until the time allowance committee actually implements the superintendent's decision, a prisoner could not attack the deprivation in a state court CPLR article 78 proceeding or via habeas, which the law clearly allows him to do.... Although the prisoner has available to him ways by which he may recoup time lost, potentially cancelling out the effect of part or all of the deprivation, whether he will earn all of the lost time back is what is speculative. Unless and until he does, the deprivation of good-time most certainly does affect the length of the prisoner's sentence.

*Gomez v. Kaplan,* No. 94 Civ. 3292, 2000 WL 1458804, at *7 n. 7 (S.D.N.Y. Sept. 29, 2000). Therefore, because any ruling by this Court in Hyman's favor on his procedural claims would invalidate his sentence under *Edwards,* Hyman's due process claims are not cognizable until the prison's determination is overturned through administrative channels or through habeas corpus review. [2]

[2]    Hyman also appears to suggest that the length of his confinement was unaffected because he was held past his earliest release date of May 19, 1999. However, Hyman does not indicate whether the Parole Board thereby affirmed the loss of the good-time credits or whether the issue of good-time credits may be reviewed again in the future with respect to another release date. In either event, Hyman's loss of good time credits affects the overall length of his confinement.

B. *Due Process*

Even if *Edwards* was not dispositive, Hyman's due process claims nonetheless must be dismissed as a matter of law. First, as a preliminary matter, Hyman's allegation that defendants conspired to file a false inmate misbehavior

report does not in and of itself state a constitutional claim. The Constitution requires only that prison officials conduct a proper hearing before sanctioning an inmate based upon such a report. *See Greaves v. State of New York,* 958 F.Supp. 142, 144 (S.D.N.Y.1997) ("In other words, the failure to conduct an adequate disciplinary hearing may give rise to a Section 1983 action, but the mere filing of a false misbehavior report does not."); *see also Freeman v. Rideout,* 808 F.2d 949, 951 (2d Cir.1986), *cert. denied,* 485 U.S. 982 (1988) ("a prison inmate has no constitutionally guaranteed immunity from being falsely or wrongly accused of conduct which may result in the deprivation of a protected liberty interest").

*4    Similarly, Hyman's assertion that a prison disciplinary determination must be supported by substantial evidence also does not comport with the case law. In *Superintendent v. Hill,* 472 U.S. 445, 453 (1985), the Supreme Court made clear that due process is satisfied if "some" evidence supports the prison's determination. In spite of "meager" evidence, including the lack of any direct evidence identifying the violator, the Supreme Court nonetheless found that the record in *Hill* was not "so devoid of evidence that the findings of the disciplinary board were without support or otherwise arbitrary." *Id.* at 457. Here, it is undisputed that Hyman raised his voice either during or directly following a violent situation. Moreover, Hyman pled guilty to the charge of creating a disturbance. Therefore, there is sufficient evidence to support the determination at Hyman's disciplinary hearing.

Furthermore, Hyman has presented no other facts which would suggest that his Tier III hearing was in any way contrary to due process. Hyman suggests that his rights were violated because (1) the hearing was held less than 24 hours after he met with his assistant; (2) he was not provided with a to-from memorandum or an unusual incident report, as allegedly required by New York regulations; and (3) he was not permitted to call witnesses at the hearing.

In *Wolff v. Macdonnell,* 418 U.S. 539, 563 (1974), the Supreme Court elucidated the requirements of due process with respect to prison hearings, holding that an inmate is entitled to no less than 24 hours "advance written notice of the claimed violation and a written statement of the fact finders as to the evidence relied upon and the reasons for the disciplinary actions taken." However,

Case 9:16-cv-00717-TJM-TWD    Document 28    Filed 07/19/17    Page 94 of 138
Hyman v. Holder, Not Reported in F.Supp.2d (2001)
2001 WL 262665

*Wolff* does not require that the inmate meet with his assistant 24 hours in advance of the proceeding as well; indeed, *Wolff* necessarily presumes that assistance will be provided during the 24 hour period. Furthermore, the undisputed evidence indicates that Hyman met with Ms. Ibrahim on December 11, 1995, approximately 4 days prior to the hearing. The fact that Hyman met with her again on the day of the hearing does not vitiate the prior meeting, and indeed suggests that Hyman was provided with ample assistance.

Hyman next points out that defendants did not provide him with a to-from memorandum or an unusual incident report, which Hyman contends is required under New York regulations. First, even if New York law does indeed require that an unusual incident report be filed in Hyman's situation, [3] the failure to do so does not give rise to a constitutional violation. In a similar case from this district also involving the failure to provide an unusual incident report, the court granted summary judgment to defendants, holding that:

[3]    Defendants contend that the incident at issue here did not rise to the level of an unusual incident because no force was used by or against Hyman, and no disruption of normal facility operations resulted. *See* Holder Reply Aff. ¶ 5.

Although DOCS Directives 4933 and 4004 do require that special SHU logs and unusual incident reports should have been filed following the January 7, 1990 incidents, the failure of defendants to make such reports is a violation of a state directive, not a violation of a federal constitutional right.

**\*5** *Woods v. Robertson,* No. 90 Civ. 1672(JFK), 1990 WL 115717, at \*4 (S.D.N.Y. Aug. 6, 1990); *see also infra* Section F.

Second, Hyman was not provided with a copy of the to-from memorandum because defendant Lucas believed that no such document had been issued, as to-from memoranda generally accompany only unusual incident reports, not inmate misbehavior reports. *See* Lucas Aff. ¶ 7. Hyman proffers no evidence that Lucas knowingly withheld the memorandum. The negligent failure to turn over materials cannot support a § 1983 claim. *See Daniels v. Williams,* 474 U.S. 327 (1986). Moreover, as the to-from memorandum was identical to the inmate misbehavior report, Hyman was not deprived of any relevant information prior to his hearing.

Finally, Hyman's claim that he was denied the right to call witnesses is wholly unsupported by the record. It is undisputed that Hyman withdrew his request to proffer witness testimony at the hearing. Indeed, defendant Lucas specifically asked Hyman if he would like to call witnesses, and Hyman declined. Lucas Aff. ¶ 7.

C. *Equal Protection*

Hyman also fails to state a viable claim for selective enforcement in violation of the Equal Protection Clause of the Fourteenth Amendment. In order to prevail, Hyman must show that (1) he was selectively treated as compared with others similarly situated, and (2) his selective treatment was prompted by an impermissible consideration, such as membership in a suspect class, intent to inhibit or punish the exercise of a constitutional right or malicious or bad faith intent to injure. *Birmingham v. Ogden,* 70 F.Supp.2d 353, 371 (S.D.N.Y.1999).

Hyman claims that he was singled out for discipline because he exercised his First Amendment right to report a medical emergency. However, it is undisputed that Hyman expressed his opinion by yelling during or immediately after a violent situation. Hyman acknowledges that he created a disturbance to get the officer's attention. Hyman Aff. ¶ 4. Such behavior is not constitutionally protected activity. *See Butler v. Westchester Cty.,* 94 Civ. 8216, 2000 WL 335539, at \*7 (S.D.N.Y. Mar. 30, 2000) ("[t]here is no constitutional right to behave problematically"). Although no other prisoners were subject to disciplinary proceedings, Officer Holder has sworn that he charged Hyman because Hyman was the loudest, most threatening and most repetitive. Holder Reply Aff. ¶ 3. Moreover, Holder denies the allegation that he issued the report in order to retaliate against Hyman for calling attention to another inmate's illness. *Id.* Hyman points to no evidence beyond mere speculation which would cast doubt upon defendant Holder's stated motive.

D. *Conspiracy*

Similarly, Hyman's conspiracy allegations also are unsupported. Hyman claims that defendants conspired to assist Officers Holder and McCarthy in the filing of the inmate misbehavior report, for the purpose of covering up the assault on Delacruz. It is well settled that plaintiff must proffer more than mere conclusory allegations in

order to support a civil rights conspiracy complaint. *See Salahaddin v. Cuomo,* 861 F.2d 40, 43 (2d Cir.1988). Plaintiff must put forth facts demonstrating an agreement among two or more persons. *See Whitfield v. Forest Elec. Corp.,* 772 F.Supp. 1350, 1353 (S.D.N.Y.1991). Hyman claims that each defendant took actions that resulted in Hyman's keeplock sentence. However, Hyman points only to tasks that defendants are required to perform under state law, such as defendant Patterson's review of the report, defendant Lucas' hearing determination and defendant Greiner's appellate review after receiving the file from defendant Keane. These actions cannot constitute a "meeting of the minds;" otherwise, prison officials would be liable for conspiracy each time they performed their assigned duties.

E. *Eighth Amendment*

**6** Hyman claims that his confinement to a special housing unit constitutes cruel and unusual punishment. To prevail on an Eight Amendment claim, Holder must show that the conditions of his confinement involved "unquestioned and serious deprivations of human needs" and that prison officials imposed those conditions with deliberate indifference. *Jackson v. New York Dep't of Correctional Servs.,* 994 F.Supp. 219, 223 (S.D.N.Y.1998). Hyman does not point to any specific way in which his human needs went unmet. The Second Circuit has held that the conditions of special housing units do not per se violate the Eight Amendment. *See Anderson v. Coughlin,* 757 F.2d 33 (2d Cir.1985). Thus summary judgment is warranted on this claim as well.

F. *State Law Violations*

To the extent that Hyman claims defendants failed to follow prison regulations, such as directives concerning the implementation of disturbance control plans or the failure to include the specific roles of other prisoners in the inmate misbehavior report, these state law violations are not cognizable under § 1983. Section 1983 imposes liability for violations of rights protected by the Constitution and laws of the United States, not for violations arising solely out of state or common-law principles. *Fluent v.*

*Salamanca Indian Lease Auth.,* 847 F.Supp. 1046, 1056 (W.D.N.Y.1994); *see also Doe v. Connecticut Dept. of Child & Youth Servs.,* 911 F.2d 868, 869 (2d Cir.1990) ( "[A] violation of state law neither gives [plaintiff] a § 1983 claim nor deprives defendants of the defense of qualified immunity to a proper § 1983 claim.") (citations omitted). Because Hyman fails to allege the violation of any underlying federal law, his state law claims must be dismissed.

G. *Defendant Keane*

Hyman seeks to impose liability on defendant Keane on the grounds that Keane was notified of Hyman's appeal by letter and failed to remedy the alleged wrong. Courts consistently have held that mere receipt of a letter does not render the supervisor personally liable. *See Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995); *Richardson v. Coughlin,* No. 93–CV–6254, 2000 WL 815117, at *4–5 (W.D.N.Y. June 19, 2000). Nor can Hyman assert a viable claim based upon mere conclusory allegations that defendant Keane failed to supervise defendant Greiner. Hyman has provided no evidence which shows that Keane's supervision was grossly negligent as required in this Circuit. *See Williams v. Smith,* 781 F.2d 319, 323–24 (2d Cir.1986).

H. *Qualified Immunity*

Because Hyman fails to establish any constitutional violations on the merits, this Court need not address defendants' qualified immunity claims.

III. CONCLUSION

For the foregoing reasons, defendants' motion for summary judgment is granted. The Clerk of the Court is directed to close this case.

All Citations

Not Reported in F.Supp.2d, 2001 WL 262665

---

WESTLAW    © 2017 Thomson Reuters. No claim to original U.S. Government Works.

2012 WL 177400
Only the Westlaw citation is currently available.
United States District Court,
W.D. New York.

Bernard G. DAVIS, Plaintiff

v.

Brian FISCHER, et al., Defendants.

No. 09–CV–6084 CJS.
|
Jan. 20, 2012.

**Attorneys and Law Firms**

Bernard G. Davis, New York, NY, pro se.

Toni E. Logue, New York State Attorney General, Mineola, NY, for Defendants.

DECISION AND ORDER

CHARLES J. SIRAGUSA, District Judge.

**\*1** This is an action pursuant to 42 U.S.C. § 1983, in which Plaintiff, a former prison inmate in the custody of the New York State Department of Corrections and Community Supervision ("DOCCS"), alleges that Defendants, all employees of DOCCS, violated his federal constitutional rights. Now pending before the Court are two motions: 1) Plaintiff's motion for summary judgment (Docket No. [# 32] ); and 2) Defendants' cross-motion for summary judgment [# 34]. For the reasons that follow, Plaintiff's application is denied, Defendants' application is granted, and this action is dismissed.

BACKGROUND

Unless otherwise noted, the following are the undisputed facts of this case. [1] This action involves incidents at Elmira Correctional Facility ("Elmira") and Five Points Correctional Facility ("Five Points"). On December 24, 2007, at Elmira, Corrections Lieutenant Schonstheimer ("Schonstheimer") requested that Plaintiff be given a urine screen, because he suspected that Plaintiff had used illegal drugs. Such suspicion purportedly arose from information provided by a confidential informant.

Lieutenant Shaw ("Shaw") placed Plaintiff in the Special Housing Unit ("SHU") to await drug testing and possible disciplinary action. Later that same day, December 24, 2007, Corrections Officer L. Yost ("Yost") completed a report, indicating that he had taken a urine sample from Plaintiff. Corrections Officer M. Taylor ("Taylor") allegedly tested Plaintiff's urine sample twice, and both times the results were positive for marijuana use. Consequently, Taylor issued a misbehavior report, charging Plaintiff with "use of a controlled substance." However, Plaintiff maintains that he is innocent, and that he never gave a urine sample to Yost.

[1]    The facts set forth herein are taken from several sources: Plaintiff's Complaint [# 1]; a document he filed in response to Defendants' answers [# 15]; and a document he filed in anticipation of a settlement conference [# 18], and the parties' summary judgment motions.

While in SHU, Plaintiff made an apparent suicide attempt, and was then placed in the Mental Health Unit ("MHU") on suicide watch. Plaintiff was later transferred to the Central New York Psychiatric Center ("CNYPC") for evaluation and treatment. Because of such transfer to CNYPC, Plaintiff's Tier III disciplinary hearing was postponed, until he returned to Elmira on or about February 6, 2008. Subsequently, S. Cronin ("Cronin"), Deputy Superintendent for Programs at Elmira, conducted a disciplinary hearing. The hearing commenced on February 14, 2008 and ended on February 27, 2008. Taylor testified at the hearing by telephone. Yost also testified, and Plaintiff asked him various questions concerning the procedures for collecting urine samples. Plaintiff objected to Yost's testimony, and argued that Yost had not followed the proper procedures. Nevertheless, Cronin found Plaintiff guilty, and imposed a sentence that included twelve months in SHU and loss of privileges. Cronin indicated that he relied on Taylor's written report and Taylor's testimony at the hearing in determining Plaintiff's guilt. Cronin indicated that he was imposing a lengthy SHU sentence because Plaintiff had several prior drug-related misbehavior reports.

**\*2** Plaintiff appealed the conviction at the facility level, and Superintendent Bradt ("Bradt") affirmed the conviction. See, [# 34–7]. On March 6, 2008, Plaintiff filed an appeal with Norman Bezio ("Bezio"), DOCCS Director of Special Housing/Inmate Discipline. See, [# 34–7] at pp. 14–18. On or about April 15, 2008, Bezio

2012 WL 177400

reversed the conviction, because Cronin had not followed the mental health procedures set forth in 7 NYCRR § 254.6(b). [2] See, Docket No. [# 15] at p. 15.

[2]   7 NYCRR § 254.6(b) states, in pertinent part, that "[w]hen an inmate's mental state or intellectual capacity is at issue, a hearing officer shall consider evidence regarding the inmate's mental condition or intellectual capacity at the time of the incident and at the time of the hearing in accordance with this section." Plaintiff's mental state was "at issue," because he had been sent to CNYPC for evaluation following his apparent suicide attempt, which delayed the hearing. See, 7 NYCRR § 254.6(b)(1) (viii). Bezio reversed the conviction and ordered a new hearing, because Cronin did not evaluate Plaintiff's mental condition. However, there is no indication that Plaintiff's mental condition actually was a factor in his alleged drug use or in his ability to participate in the hearing.

On May 5, 2008, a re-hearing was conducted by Deputy Superintendent Hopkins ("Hopkins"). By this time, Taylor had retired and was not available to testify at the hearing. Moreover, certain documentation concerning the calibration of the urinalysis equipment had been lost. Nevertheless, on May 7, 2008, Hopkins found Plaintiff guilty, and imposed a sentence that again included twelve months in the SHU. In that regard, Hopkins relied primarily on Taylor's misbehavior report as proof of Plaintiff's guilt. Hopkins also relied on testimony by Corrections Officer Nowaczyk ("Nowaczyk"), who testified concerning the training that he had personally provided to Taylor in drug testing procedures. Nowaczyk also examined Taylor's written reports concerning Plaintiff's urinalysis, and indicated that they appeared to have been properly completed.

The Court has reviewed the transcript [3] of the hearing conducted by Hopkins. The transcript indicates that Hopkins addressed all of Plaintiff's requests for additional documentation, and adjourned the hearing several times to do so. The only documents that Plaintiff was not given were ones that no longer existed. Hopkins reviewed Taylor's misbehavior report and the other documentation supporting the misbehavior report. Hopkins attempted to contact Taylor, who was retired from employment with DOCCS, to testify, but was unable to do so. Hopkins also attempted to obtain documentation concerning calibration of the drug testing equipment, but was likewise

unable to do so. However, as noted above, Hopkins took testimony from Nowaczyk. In addition to testifying concerning Taylor's training and paperwork, Nowaczyk indicated that, although there was no documentation concerning the calibration of the drug testing equipment, such equipment was electronically self-calibrated each day, and would not operate if there was any type of malfunction. Hopkins also obtained testimony from the Office of Mental Health concerning Plaintiff's mental status. At the close of the hearing, Plaintiff objected that Hopkins had not called Yost as a witness, but Hopkins reminded Plaintiff that he had never requested to have Yost testify. Hopkins found Plaintiff guilty and imposed a sentence primarily consisting of twelve months in SHU. In regard to the sentence, Hopkins noted that the subject charge was Plaintiff's twelfth drug related charge. Overall, it appears that Hopkins took great care to ensure that Plaintiff's procedural due process rights were protected.

[3]   See, Docket No. [# 41].

**\*3** Plaintiff appealed, and on October 2, 2008, Bezio affirmed Hopkins' ruling. Plaintiff requested reconsideration, and also filed an Article 78 proceeding in New York State Supreme Court, Chemung County. On October 30, 2008, Bezio administratively reversed Plaintiff's conviction and expunged Plaintiff's record. In his decision, Bezio stated: "The hearing record fails to indicate that relevant documents (drug testing forms) were provided to the inmate as required." Presumably, Bezio was referring to the calibration records which had been discarded.

Prior to having his second conviction reversed, Plaintiff was transferred to Five Points to serve his SHU sentence. On or about September 24, 2008, Plaintiff covered his cell window and feedup hatch with paper, which prevented staff from seeing into his cell. Staff directed Plaintiff to remove the paper, but he refused. Corrections Sergeant Jastrzab ("Jastrzab") directed a cell extraction team to enter Plaintiff's cell. Corrections Officer Shultz ("Shultz") entered Plaintiff's cell first, with a plexiglass shield, and Plaintiff moved aggressively toward Shultz and punched the shield. As a result, several officers entered the cell, subdued Plaintiff and placed him in handcuffs and leg shackles, and carried him to an observation cell. During the cell extraction, Shultz put handcuffs on Plaintiff. According to Jastrzab, Plaintiff never complained that his handcuffs were too tight. Jastrzab Aff. [# 34–7] at ¶ 3. Plaintiff now contends,

2012 WL 177400

however, that the handcuffs were too tight, and caused him to lose feeling in his hand and/or thumb. Plaintiff also contends that he experienced pain in his ankle/achilles tendon, where a corrections officer hit him with a baton. On this point, it is undisputed that Corrections Officer McIntyre ("McIntyre"), who is not a party to this action, hit Plaintiff in the ankle with a baton during the cell extraction.

On September 24, 2008, Jastrzab issued Plaintiff a misbehavior report, charging him with violations including refusing a direct order, assault on staff, and creating a disturbance. Jastrzab also placed Plaintiff on suicide watch. Plaintiff contends that Jastrzab improperly kept him in an observation cell for four days without having Plaintiff examined by the Mental Health Unit. On November 12, 2008, Hearing Officer Rasmus ("Rasmus") conducted a disciplinary hearing. The Court has reviewed the transcript of the hearing. *See,* Docket No. [# 41].[4] The transcript indicates that Plaintiff pleaded guilty to blocking his cell window, but otherwise refused to enter a plea to the remaining charges. Plaintiff admitted that he placed paper over his cell window because he was upset "about the Law Library." Docket No. [# 41], Ex. C at p. 8. Plaintiff indicated that he has "anger issues," and that he was very angry about the Law Library and lost his ability to reason during the incident. *Id.* at p. 29. Plaintiff indicated that he did not remember what happened after his cell door was opened, because he had post-traumatic stress disorder ("PTSD"). *Id.* ("[W]hen the door opened, I can't remember anything else that happened from that door, from that time."); see also, *id.* at p. 32 (Plaintiff stated that he "blacked out" and did not know what happened for the next two hours); *id.* at 58 ("I don't remember anything."). Nevertheless, Plaintiff indicated that officers handcuffed him, and someone hit him on the achilles tendon with a baton. However, Plaintiff stated that he could not remember which officers were in his cell. *Id.* at 9. Jastrzab testified at the hearing that when officers opened Plaintiff's cell door, Plaintiff struck the plexiglass shield that one of the officers was carrying several times, whereupon the officers restrained Plaintiff. *Id.* at p. 44. Schultz testified that he entered Plaintiff's cell carrying a plexiglass shield, and that Plaintiff struck the shield, whereupon the officers placed Plaintiff on his bed, and applied handcuffs and leg restraints. *Id.* at pp. 53–54.

[4]     On December 22, 2011, the Court issued an Order [# 40] directing Defendants' counsel to file the

transcripts from the subject prison disciplinary hearings. On December 28, 2011, Defendants filed hearing transcripts [# 41]. The Court had intended to receive the transcripts of the hearings conducted by Cronin and Hopkins. However, Defendants filed the transcript from the hearing conducted by Hopkins, and the transcript of disciplinary hearing conducted on November 12, 2008, at Five Points, by Hearing Officer Rasmus ("Rasmus"), concerning the incident in which Plaintiff was removed from his cell. Plaintiff is not asserting a procedural due process claim against Rasmus, and Rasmus is not a party to this action. Nevertheless, the transcript sheds light on the excessive force claim.

**\*4** On February 20, 2009, Plaintiff commenced this action against Bezio, Bradt, Shaw, Cronin, Yosh, Taylor, Hopkins, Jastrzab, and Schultz. Plaintiff also sued Brian Fischer ("Fischer"), Commissioner of DOCCS. Following a period of pre-trial discovery, on June 25, 2010, Plaintiff filed the subject motion for summary judgment [# 32]. Plaintiff maintains that he is entitled to summary judgment against Cronin and Hopkins for violating his procedural due process rights during the disciplinary hearings which they conducted .[5] Plaintiff He further contends that Bradt and Fischer were aware of the due process violations from his appeals, and failed to remedy those violations. *Id.* at ¶ 31. Plaintiff also indicates that he was subjected to excessive force that was not justified by legitimate penological interests. *Id.* at ¶ 32.

[5]     As discussed further below, Plaintiff states, for example, that his procedural due process rights were violated because he was not informed of the evidence that the hearing officers relied upon. *See, id.* at ¶ 28 ("I was denied the right to know the evidence relied on by the hearing guard." [sic] ).

On August 23, 2010, Defendants filed the subject cross-motion for summary judgment [# 34].[6] Defendants contend that they are entitled to summary judgment for the following reasons: 1) Shaw, Yost, and Taylor are not liable under § 1983, because issuing a false misbehavior is not a constitutional violation; 2) any claim pertaining to the hearing conducted by Cronin is moot, because Plaintiff's conviction was overturned, and because the failure to follow a state administrative rule, concerning mental health evaluation, does not establish a due process violation; 3) Cronin, Hopkins, Bradt, and Bezio did not violate Plaintiff's due process rights, because his convictions were supported by some evidence; 4) Fischer

2012 WL 177400

was not personally involved in the hearings or appeals; and 5) Schultz and Jastrzab used reasonable force in removing Plaintiff from his cell.

6    Defendants provided the *pro se* Plaintiff with the *Irby* notice required by Local Rule of Civil Procedure 56.2. *See,* Docket No. [# 34–2].

On December 7, 2011, the Court issued an Order [# 39], directing Plaintiff to show cause on or before January 3, 2012, why this action should not be dismissed for failure to prosecute or for failure to provide the Court with his current address. On January 5, 2012, Plaintiff filed a document indicating that his papers are lost. The Court will decide the fully-briefed summary judgment motions on the merits, pursuant to *Styles v. Goord,* No. 10–3129–pr, 431 Fed.Appx. 31, 2011 WL 2473508 (2d Cir. Jun.23, 2011) ("[T]he district court failed to consider ruling on the pending, fully-submitted summary judgment motion as an alternative to dismissing under Rule 41(b). As this Court has emphasized, resolutions on summary judgment are generally to be preferred to dismissals under Rule 41(b).") (citing *LeSane v. Hall's Sec. Analyst, Inc.,* 239 F.3d 206, 210–211 (2d Cir.2001), internal quotation marks omitted). 7

7    On January 5, 2012, after this Decision and Order was in draft form, Plaintiff filed a response to the Court's Order and a request for appointment of counsel. *See,* Docket No. [# 43]. Plaintiff's request for appointment of counsel is denied for the same reasons that the Court denied his earlier motion for appointment of counsel. See, Decision and Order [# 38]. Otherwise, Plaintiff's submission asks the Court not to dismiss his action for failure to prosecute. As noted above, the Court is not going to dismiss the action for failure to prosecute, and instead is dismissing the action on the merits, based on the summary judgment motions.

## DISCUSSION

Summary judgment may not be granted unless "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FRCP 56(a). A party seeking summary judgment bears the burden of establishing that no genuine issue of material fact exists. *See, Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). "[T]he movant must make a prima facie showing that the standard for obtaining summary judgment has

been satisfied." 11 MOORE'S FEDERAL PRACTICE, § 56.11[1][a] (Matthew Bender 3d ed.).

**\*5**  The underlying facts contained in affidavits, attached exhibits, and depositions, must be viewed in the light most favorable to the non-moving party. *U.S. v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962). Summary judgment is appropriate only where, "after drawing all reasonable inferences in favor of the party against whom summary judgment is sought, no reasonable trier of fact could find in favor of the non-moving party." *Leon v. Murphy,* 988 F.2d 303, 308 (2d Cir.1993). Moreover, since Plaintiff is proceeding *pro se,* the Court is required to construe his submissions liberally, "to raise the strongest arguments that they suggest." *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994).

Plaintiff is suing pursuant to 42 U.S.C. § 1983, and the legal principles generally applicable to such claims are well settled:

> In order to establish individual liability under § 1983, a plaintiff must show (a) that the defendant is a "person" acting "under the color of state law," and (b) that the defendant caused the plaintiff to be deprived of a federal right. See, *e.g., Monroe v. Pape,* 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961). Additionally, "[i]n this Circuit personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir.1977).

* * *

An individual cannot be held liable for damages under § 1983 "merely because he held a high position of authority," but can be held liable if he was personally involved in the alleged deprivation. *See Black v. Coughlin,* 76 F.3d 72, 74 (2d Cir.1996). Personal involvement can be shown by: evidence that: (1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference ... by failing to act on

2012 WL 177400

information indicating that unconstitutional acts were occurring. *See Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995).

*Back v. Hastings On Hudson Union Free Sch. Dist.,* 365 F.3d 107, 122, 127 (2d Cir.2004); *see also, Platt v. Incorporated Village of Southampton,* 391 Fed.Appx. 62, 2010 WL 3393738 at *3 (2d Cir. Aug.30, 2010) ("A supervisory official may be personally liable if he or she has actual or constructive notice of unconstitutional practices and demonstrates gross negligence or deliberate indifference by failing to act. Supervisory liability may be imposed where an official demonstrates gross negligence or deliberate indifference to constitutional rights by failing to act on information indicating that unconstitutional practices are taking place. We cannot say, however, that an allegation that a supervisory official ignored a letter protesting past unconstitutional conduct is, without more, sufficient to state a claim that the official was 'personally involved' in the unconstitutional conduct.") (citations and internal quotation marks omitted). [8] It is well settled that "mere linkage in the prison chain of command is insufficient to implicate ... a prison superintendent in a § 1983 claim." *Richardson v. Goord,* 347 F.3d 431, 435 (2d Cir.2003).

[8]    Following the Supreme Court's decision in *Ashcroft v. Iqbal,* 556 U.S. 662, 129 S.Ct. 1937, 1948, 173 L.Ed.2d 868 (2009), there is some disagreement among district courts in this Circuit as to whether all of the foregoing *"Colon factors" still apply. See, e.g., Dilworth v. Goldberg,* 2011 WL 3501869 at *17 (2d Cir. Jul. 28, 2011)("*Iqbal* has caused some courts to question whether all five of the personal involvement categories survive that decision.") (collecting cases). It is unclear whether *Iqbal* overrules or limits *Colon, therefore, in the absence of contrary direction from the Second Circuit, the Court will continue to apply those factors. See, Platt v. Incorporated Village of Southampton,* 391 Fed.Appx. 62, citing *Back v. Hastings on Hudson Union Free Sch. Dist.,* which sets forth all five of the *Colon* bases for imposing supervisory liability.

*No Personal Involvement By Fischer*

**\*6** Defendants maintain that Fischer was not personally involved in any alleged constitutional violation. Having reviewed the entire record, the Court does not see any basis to impose § 1983 liability against Fischer. Most notably, there is no indication that Fischer was personally

involved in Plaintiff's appeals from his disciplinary convictions. Instead, those appeals were handled by Bezio. Accordingly, Fischer is entitled to summary judgment.

*Pre–Hearing Placement in SHU*

Plaintiff contends that Shaw placed him in SHU, based on suspected drug use. In that regard, Plaintiff was identified as being suspected of having used drugs by Lt. Schonstheimer, who is not a party to this action. According to Plaintiff, he was in SHU for only one day, before he attempted suicide because he believed that he was being set up for a false behavior report. Following Plaintiff's alleged suicide attempt, he was sent to CNYPC for mental health observation. These facts do not establish a constitutional violation against Shaw. *See, Jackson v. Goord,* No. 06–CV–6172 CJS, 2011 WL 4829850 at *14 (W.D.N.Y. Oct.12, 2011) (Fifteen-day pre-hearing confinement in SHU did not impose an atypical and significant hardship on the inmate). Accordingly, Shaw is entitled to summary judgment.

*Misbehavior Report*

Plaintiff maintains that Yost and Taylor conspired to file a false misbehavior report against him. [9] In support of that claim, Plaintiff contends that he never gave a urine sample to Yost. Plaintiff does not allege that Yost or Taylor had a particular motive, such as a desire to retaliate against him. Accordingly, Yost and Taylor are entitled to summary judgment, since it is well settled that the mere filing of a false misbehavior report does not rise to the level of a constitutional violation. *See, Boddie v. Schnieder,* 105 F.3d 857, 862 (2d Cir.1997) ("[A] prison inmate has no general constitutional right to be free from being falsely accused in a misbehavior report.") (citation omitted).

[9]    Plaintiff alleges that Yost falsely claimed to have taken a urine sample, but he does not expressly contend that Taylor was aware of Yost's actions. Therefore, even assuming that Yost did lie about taking Plaintiff's urine, it is possible that he gave another urine sample to Taylor, without Taylor's knowledge, which tested positive for drug use. However, the Court will liberally construe Plaintiff's papers as indicating that Yost and Taylor acted together.

*Due Process at Disciplinary Hearings*

It is clear that where prison inmates have a liberty interest in avoiding disciplinary confinement [10], they are entitled to procedural due process protections: "Inmates are entitled to advance written notice of the charges; a fair and impartial hearing officer; a reasonable opportunity to call witnesses and present documentary evidence; and a written statement of the disposition, including supporting facts and reasons for the action taken." *Luna v. Pico,* 356 F.3d 481, 487 (2d Cir.2004) (citation omitted). To comport with due process, a disciplinary ruling must be supported by "some evidence." *Id.* at 487–488 (citation omitted). "Ascertaining whether this standard is satisfied does not require examination of the entire record, independent assessment of the credibility of witnesses, or weighing of the evidence. Instead, the relevant question is whether there is *any evidence* in the record that could support the conclusion reached by the disciplinary board." *Id.* at 488 (emphasis added, citation omitted). The Second Circuit interprets this statement to require " 'reliable evidence' of the inmate's guilt." *Id.*

[10]  "A prisoner's liberty interest is implicated when an institution's disciplinary decision results in an 'atypical and significant hardship ... in relation to the ordinary incidents of prison life.' " *Luna v. Pico,* 356 F.3d 481, 487 n. 3 (2d Cir.2004) (*quoting Sandin v. Conner,* 515 U.S. 472, 484, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995)).

**\*7** Inmates who are confined to SHU pending a disciplinary hearing also have a "limited" constitutional right to assistance in preparing a defense:

[In *Eng v. Coughlin,* 858 F.2d 889, 891–92 (2d Cir.1988) ] we warned: '[F]or inmates disabled by confinement in SHU, or transferred to another facility, the right to substantive assistance is an obligation imposed by the Due Process Clause of the Fourteenth Amendment. Further, the assistance must be provided in good faith and in the best interests of the inmate.' We therefore held that in the future "an assigned assistant who does nothing to assist a disabled prisoner ... has failed to accord the prisoner his limited constitutional due process right of assistance."

*Ayers v. Ryan,* 152 F.3d 77, 81 (2d Cir.1998) (*quoting Eng v. Coughlin,* 858 F.2d 889, 891–92 (2d Cir.1988)). The assistant's obligations "include gathering evidence, obtaining documents and relevant tapes, and interviewing witnesses. At a minimum, an assistant should perform the investigatory tasks which the inmate, were he able, could perform for himself." *Eng v. Coughlin,* 858 F.2d at 898.

An inmate's procedural due process rights also include the right to an impartial hearing officer. "This standard is satisfied by a hearing officer who does not prejudge the evidence and who cannot say how he would assess evidence he has not yet seen. However, hearing officers are not held to the same standard of neutrality as adjudicators in other contexts." *Murray v. Jacobs,* No. 04–CV–6231–CJS, 2011 WL 4074531 at \*7 (W.D.N.Y. Sep.13, 2011) (citations and internal quotation marks omitted).

Here, liberally construing the *pro se* Plaintiff's procedural due process claims, he maintains that at his hearings before Cronin and Hopkins he was prevented from proving his defense, which was that he was innocent of the charge because he never gave a urine sample to Yost. Plaintiff also contends that there was insufficient evidence that the drug testing equipment was functioning properly. [11] Plaintiff further suggests that the hearing officers were biased, and that their decisions were not supported by sufficient evidence. See, [# 18] at 7. Plaintiff also contends that his due process rights were violated because Cronin did not conduct a mental health evaluation, as required by state regulation. [12] He further states that he was not given a copy of the misbehavior report prior to the hearing, even though he admits that he signed for having received such a copy, and he obviously was aware of the charge against him prior to the hearing. He also complains that he was denied the right to call witnesses, but does not explain who he was prevented from calling. And finally, he contends that he was denied two documents—the "tech lab log book" and a copy of the "EST check-list" or "CTS checklist," and that he objected to this at the hearing. See, [# 34–7] at 17.

[11]  *See, e.g.,* Complaint [# 1] at 12 ("Plaintiff was harmed by the herein defendants from preventing Plaintiff from properly presenting evidence in his defense."); *see also,* Response to Defendants' Answers [# 15] at 2 (Indicating that Plaintiff's due process rights were violated when he was denied exculpatory documentation concerning the drug test at the hearing); *id.* at 2–3 (Indicating that he was denied due process when Taylor failed to testify at the second hearing); *Id.* at 3–4 (Indicating that he was "deprived [of] the full panoply of procedural safeguards that prisoners

2012 WL 177400

must be constitutional entitled [sic] at a disciplinary proceeding, defendant Hopkins abridgement of vindictive [Plaintiff probably meant "vindicating"] testimony, during the hearing precluded the absolute fact of reliability, when he provided in place of defendant Taylor['s] testimony prison guard Nowalchek['s] testimony."); see also, Pl. Memo of Law [# 15] at 11 ("Defendant Hopkins violated plaintiff['s] right to call witnesses to testify in his behalf."); *id.* at 12 (Referring to Cronin's and Hopkins' "egregious curtailment of plaintiff['s] right to present documentary evidence."); *id.* at 15, 17 (Indicating that he was denied documentation showing whether the drug testing equipment was working properly at the time of the alleged test).

12    *See, id.* at 15 ("The disciplinary hearing[s] conducted on April 16, 2008 and May 5, 2008 was illegal in that the proceeding was invalid and resulting punishment unconstitutional because he was denied at the first hearing by defendant [Cronin] a mental health assessment pursuant to 7 NYRCC 254.6 and at the rehearing held by defendant Hopkins was denied the right to call the testing officer as a witness."); *see also,* Memo in Support of Settlement [# 18] at 1. (Indicating that Cronin erred by failing to contact a "mental health clinician" as required by state regulation).

Viewing the entire record in the light most-favorable to Plaintiff, the Court finds that Plaintiff cannot sustain a procedural due process claim against either Cronin or Hopkins. Plaintiff was provided with the documents that he requested insofar as they existed, and he was permitted to call the witnesses he wanted, to the extent that they had relevant information. Plaintiff has not provided any evidence that Cronin or Hopkins was biased. Moreover, the dispositions by Cronin and Hopkins were supported by some evidence. Plaintiff was notified of the charges against him, was provided assistance in preparing for the hearings, and was given a written explanation of the dispositions. To the extent that Cronin may have failed to follow the mental health procedures set forth in 7 NYCRR § 254.6(b) by not inquiring into Plaintiff's mental health history, such failure does not establish a federal due process violation, though it did result in the reversal of his conviction and result in a new hearing. *See, Martinez v. Minogue,* No. 9:06–CV–546, 2008 WL 4241746 at *6 (N.D.N.Y. Sep.11, 2008) ("It is well-established ... that a violation of state law or regulation in and of itself will not establish a constitutional violation or support a civil rights claim under 42 U.S.C. § 1983.") (citations

omitted); *Bolden v. Alston,* 810 F.2d 353, 358 (2d Cir.1987) ( "State procedural requirements do not establish federal constitutional rights."), *cert. den.* 484 U.S. 896, 108 S.Ct. 229, 98 L.Ed.2d 188 (1987). As for Bradt, he is similarly not liable, since there was no underlying constitutional violation. Accordingly, Cronin, Hopkins, and Bradt are entitled to summary judgment.

*Use of Force to Remove Plaintiff From His Cell*

**\*8** The legal principles concerning an excessive force claim in the prison context are well settled:

Analysis of a claim for use of excessive force begins with "identif[ication of] the specific constitutional right allegedly infringed by the challenged application of force." *Graham v. Connor,* 490 U.S. 386, 394, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989); *see generally Baker v. McCollan,* 443 U.S. 137, 140, 99 S.Ct. 2689, 61 L.Ed.2d 433 (1979) (the first step in analysis of any claim brought under § 1983 is to identify the precise constitutional right allegedly violated). In the context of a claim by a prisoner that he was subjected to excessive force by prison employees, the source of the ban against such force is the Eighth Amendment's ban on cruel and unusual punishments. The validity of the prisoner's claim must "be judged by reference to th[is] specific constitutional standard ..., rather than to some generalized 'excessive force' standard." *Graham v. Connor,* 490 U.S. at 394, 109 S.Ct. 1865, 104 L.Ed.2d 443; *see, e.g., Whitley v. Albers,* 475 U.S. 312, 318–26, 106 S.Ct. 1078, 89 L.Ed.2d 251 (1986) (claim of excessive force to subdue convicted prisoner is to be analyzed under an Eighth Amendment standard).

A claim of cruel and unusual punishment in violation of the Eighth Amendment has two components-one subjective, focusing on the defendant's motive for his conduct, and the other objective, focusing on the conduct's effect. *See, e.g., Hudson v. McMillian,* 503 U.S. 1, 7–8, 112 S.Ct. 995, 117 L.Ed.2d 156 (1992); *Blyden v. Mancusi,* 186 F.3d 252, 262 (2d Cir.1999). The subjective component of the claim requires a showing that the defendant "had the necessary level of culpability, shown by actions characterized by 'wantonness' " in light of the particular circumstances surrounding the challenged conduct. *Id.* at 262 (*quoting Wilson v. Seiter,* 501 U.S. 294, 299, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991)); *see, e.g., Sims v. Artuz,* 230 F.3d 14, 21 (2d Cir.2000); *Davidson v. Flynn,* 32 F.3d 27, 30

& n. 2 (2d Cir.1994). When prison officials are accused of using excessive force, the "wantonness" issue turns on "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Hudson,* 503 U.S. at 7, 112 S.Ct. 995, 117 L.Ed.2d 156; *see also Blyden v. Mancusi,* 186 F.3d at 262–63.

The objective component of a claim of cruel and unusual punishment focuses on the harm done, in light of "contemporary standards of decency." *Hudson,* 503 U.S. at 8, 112 S.Ct. 995, 117 L.Ed.2d 156 (internal quotation marks omitted). In assessing this component, the court must ask whether the "alleged wrongdoing was objectively 'harmful enough' to establish a constitutional violation." *Id.* (*quoting Wilson,* 501 U.S. at 298, 111 S.Ct. 2321, 115 L.Ed.2d 271). But when prison officials use force to cause harm maliciously and sadistically, "contemporary standards of decency always are violated.... This is true whether or not significant injury is evident." *Hudson,* 503 U.S. at 9, 112 S.Ct. 995, 117 L.Ed.2d 156.

**\*9**  Accordingly, where a prisoner's allegations and evidentiary proffers could reasonably, if credited, allow a rational factfinder to find that corrections officers used force maliciously and sadistically, our Court has reversed summary dismissals of Eighth Amendment claims of excessive force even where the plaintiff's evidence of injury was slight and the proof of excessive force was weak. *See, e.g., Scott v. Coughlin,* 344 F.3d 282, 291 (2d Cir.2003) (reversing summary dismissal of prisoner's complaint, though suggesting that prisoner's evidence of an Eighth Amendment violation was "thin" as to his claim that a corrections officer struck him in the head, neck, shoulder, wrist, abdomen, and groin, where the "medical records after the ... incident with [that officer] indicated only a slight injury"); *Griffin v. Crippen,* 193 F.3d 89, 91 (2d Cir.1999) (vacating district court's sua sponte dismissal of prisoner's complaint, though characterizing his "excessive force claim [a]s weak and his evidence [as] extremely thin" where prisoner alleged that he was hit by prison guards "after he was handcuffed" but "the only injuries he suffered were a bruised shin and swelling over his left knee").

Nonetheless, the Eighth Amendment's prohibition against cruel and unusual punishment does not extend to "*de minimis* uses of physical force, provided that the use of force is not of a sort repugnant to the conscience

of mankind." *Hudson,* 503 U.S. at 10, 112 S.Ct. 995, 117 L.Ed.2d 156 (internal quotation marks omitted). " 'Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights.' " *Id.* at 9, 503 U.S. 1, 112 S.Ct. 995, 117 L.Ed.2d 156 (quoting *Johnson v. Glick,* 481 F.2d 1028, 1033 (2d Cir.1973)).

*Wright v. Goord,* 554 F.3d 255, 268–69 (2d Cir.2009).

Here, Shultz and Jastrzab contend that they are entitled to summary judgment on Plaintiff's excessive force claim, because they merely used minimal force to subdue him and remove him from his cell, after he blocked the openings to his cell, refused to remove the coverings when asked, and then attacked Schultz as he entered the cell. [13] As noted earlier, Plaintiff testified at his prison disciplinary hearing that he had no recollection of what happened after officers entered his cell, and that he could no identify any of the officers. Nevertheless, he contends that officers should not have handcuffed him behind his back, because there was some type of notice in his cell advising staff not to handcuff him behind his back. *See,* Memo in Support of Summary Judgment [# 32] at 19. Specifically, he states that a notice indicating that he should not be handcuffed behind his back was "on his wall." See, Pl. Memo in Support of Summary Judgment at 19. Plaintiff claims that as a result of being handcuffed, he lost feeling in his left hand. *Id.*

13    In support of the summary judgment motion, Defendants submitted a videotape, which the Court has viewed, showing the hallway outside Plaintiff's cell. The camera does not show the interior of the cell. The film shows ten corrections officers in their ordinary uniforms (not riot gear) assemble outside of a cell. Seven of the officers then enter the cell, while three remain outside the cell. Approximately 2.5 minutes later, the officers exit the cell, carrying an inmate horizontally, who is handcuffed behind his back and facing downward.

The malicious or sadistic application of handcuffs may constitute an Eight Amendment violation. On this point,

**\*10**  [a]lthough handcuffs must be reasonably tight to be effective, overly tight handcuffing can constitute excessive force. In evaluating the reasonableness of handcuffing, a Court is to consider evidence that: 1) the handcuffs were unreasonably tight; 2) the defendants

ignored the plaintiff s pleas that the handcuffs were too tight; and 3) the degree of injury to the wrists.

\* \* \*

There is a consensus among courts in this circuit that tight handcuffing does not constitute excessive force unless it causes some injury beyond temporary discomfort.

*Lynch ex rel. Lynch v. City of Mount Vernon,* 567 F.Supp.2d 459, 468–469 (S.D.N.Y.2008) (citations and internal quotation marks omitted).

In this case, Plaintiff apparently maintains that Schultz should have known about his unspecified preexisting medical condition, since there was some type of notice on Plaintiff's cell wall, indicating that he should not be handcuffed behind his back. However, there is no indication that Schultz was actually aware of such notice, or that he had any other reason to know that handcuffing Plaintiff might cause him harm. *See, e.g., Wright v. Goord,* 554 F.3d at 270 (Finding no evidence that corrections officer acted sadistically or maliciously by pushing Plaintiff on the site of a surgical scar, since there was no evidence that the officer "knew or had reason to know that [the inmate's] abdomen was unusually tender.") There is also no indication that Schultz applied the handcuffs maliciously or sadistically, and it is undisputed that Plaintiff did not complain that the handcuffs were too tight. Additionally, it is undisputed that the officers applied force for a legitimate reason, in that Plaintiff had essentially blockaded himself in his cell, refused to respond to inquiries, and attacked Schultz when he entered the cell. The only remaining aspect of Plaintiff's excessive force claim is that he was struck on the ankle with a baton, but McIntyre, the officer who hit Plaintiff with the baton, is not a party to this action. Accordingly, Schultz and Jastrzab are entitled to summary judgment on the excessive force claim.

*Placement on Suicide Watch*
Plaintiff's last claim is that Jastrzab violated his federal constitutional rights by placing him in an observation cell for four days, following the cell extraction. Plaintiff states: "I was taken to the observation unit and was forced to remain there for four days under suicide watch and

constant 24 hour observation without being seen by any MHU staff." Memo in Support of Summary Judgment [# 32] at 19. Plaintiff, though, does not contend that he was suffering from any condition that required him to be seen by MHU . [14] Nor does he otherwise complain about the conditions of confinement in the observation cell. His allegations do not establish a constitutional violation. *See, Gonzales v. Carpenter,* No. 9:08–CV–629 (LEK/ATB), 2011 WL 768990 at \*9–12 (N.D.N.Y. Jan.3, 2011) ("[T]he short-term confinement of plaintiff in a prison mental health clinic for observation did not implicate a liberty interest triggering due process protection. Nothing involving plaintiff's stay at the OMH satellite unit subjected him to cruel and unusual punishment under the Eighth Amendment."), report and recommendation adopted by 2011 WL 767546 (N.D.N.Y. Feb.25, 2011). Accordingly, Jastrzab is entitled to summary judgment on this claim.

[14]    To the contrary, Plaintiff maintains that he was forcibly taken from his usual cell and moved to the observation cell for no reason at all. *See,* [# 18] at 9. Accordingly, there is no indication that Jastrzab was deliberately indifferent to any serious medical need of Plaintiff's.

## CONCLUSION

**\*11** Plaintiff's motion for summary judgment [# 32] is denied, Defendants' cross-motion for summary judgment [# 34] is granted, and this action is dismissed with prejudice. The Court certifies, pursuant to 28 U.S.C. § 1915(a), that any appeal from this Order would not be taken in good faith and leave to appeal to the Court of Appeals as a poor person is denied. *Coppedge v. United States,* 369 U.S. 438, 82 S.Ct. 917, 8 L.Ed.2d 21 (1962). Further requests to proceed on appeal *in forma pauperis* should be directed on motion to the United States Court of Appeals for the Second Circuit in accordance with Rule 24 of the Federal Rules of Appellate Procedure.

SO ORDERED.

## All Citations

Not Reported in F.Supp.2d, 2012 WL 177400

© 2017 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW   © 2017 Thomson Reuters. No claim to original U.S. Government Works.

2016 WL 796865
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Dana Gibson, Plaintiff,
v.
D. Travis, S. Sassi, R. Ulysse, K. Mitchell, J.
Wiand, D. Cook, A. Gamble, C. Strauss, A.
Perez, Albert Prack, Nancy J. Heywood, J.
Cavaleri, J. O'bryan, J. Gonzalez, Defendants.

14 CV 8764 (VB)
|
Signed February 24, 2016
|
Filed 02/25/2016

**OPINION AND ORDER**

**\*1**  Briccetti, J.

In this Section 1983 action, plaintiff Dana Gibson, proceeding pro se and in forma pauperis, brings civil rights claims against defendants Travis, Sassi, Mitchell, Ulysse, Wiand, Cook, Gamble, Strauss, and Perez, current or former employees of the New York State Department of Corrections and Community Supervision ("DOCCS"), for alleged violations of her Eighth Amendment right to be free from the excessive use of force. Plaintiff further alleges defendants O'Bryan, Cavaleri, Gonzalez, Prack, and Heywood, also current or former DOCCS employees, violated her Fourteenth Amendment right to procedural due process in connection with disciplinary proceedings that took place at the Downstate Correctional Facility ("Downstate") on May 23 and May 29, 2014.

Now pending is defendants' Rule 12(b)(6) motion to dismiss all of the due process claims and the excessive force claim against defendant Perez. (Doc. #37). Defendants have not moved to dismiss the excessive force claim against the other defendants.

For the reasons set forth below, the motion is GRANTED as to defendants Perez, Prack, and Heywood, and DENIED as to defendants O'Bryan, Cavaleri, and Gonzalez.

The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331.

**BACKGROUND**

I. Factual Allegations
In deciding the pending motion, the Court accepts as true all well-pleaded factual allegations in the complaint and draws all reasonable inferences in plaintiff's favor.

A. May 19, 2014, Assaults and Administrative Complaint
Plaintiff was a general population inmate at Downstate when, on May 19, 2014, she was allegedly assaulted on two separate occasions, first by defendants Sergeant S. Sassi and Officers Travis, Mitchell, and Ulysse, then by Sergeant Wiand and Officers Cook and Gamble. After the assaults, she was taken to the infirmary, but Nurse Strauss allegedly refused to examine, treat or document plaintiff's injuries. When plaintiff refused to sign the injury accident report, she claims she was assaulted again. Plaintiff was then transferred to Downstate's Special Housing Unit ("SHU"), where she remained during the relevant period in the complaint.

On May 20, 2014, plaintiff filed a letter of complaint with Superintendent Perez, advising her of the assaults and the refusal to treat or document her reported injuries. Superintendent Perez responded to plaintiff's complaints in a memorandum dated June 6, 2014, but allegedly did not take any action to remedy the wrong.

B. May 23 and May 29, 2014, Disciplinary Hearings
Plaintiff was the subject of three Inmate Misbehavior Reports ("IMR"s) signed by Officers Sassi, Travis, and Wiand, issued on May 19, 2014, alleging plaintiff violated multiple DOCCS rules. Plaintiff was assigned a pre-hearing employee assistant, Officer Gonzalez. Sometime before the hearing, plaintiff says she requested certain documents from Gonzalez, namely, Parts A-E of the Use of Force Report, the preliminary and final unusual incident report ("U.I. Report"), and all of the "To-And-From" Memoranda regarding the alleged incident of misconduct. Gonzalez allegedly refused to provide plaintiff with the requested documents and told plaintiff

WESTLAW   © 2017 Thomson Reuters. No claim to original U.S. Government Works.    1

2016 WL 796865

she could get the documents from the hearing officer during the hearing.

**\*2** On May 23, 2014, plaintiff appeared at two separate hearings related to the IMRs. The first hearing was held before defendant Deputy Superintendent of Administration ("DSA") O'Bryan to address the IMRs signed by Officers Sassi and Travis; the second was held before defendant Captain Cavaleri to address the IMR signed by Sergeant Wiand. At each of the hearings, plaintiff was formally charged with the DOCCS rule violations. Plaintiff alleges some of the charging documents in the Cavaleri hearing contained a misspelling of Wiand's name. Plaintiff pleaded not guilty to the charges at both hearings, and she objected to the hearings based on a lack of pre-hearing employee assistance. Plaintiff alleges she had to proceed with both hearings, but at some point they were both adjourned.

The hearings were each reconvened on May 29, 2014. According to the complaint, at the first reconvened hearing, plaintiff was provided with one of the documents she requested, namely Officer Mitchell's To-And-From Memorandum, but was not given the Use of Force Report, the U.I. Report, or Ulysses's, Sassi's or Travis's To-And-From Memoranda. Moreover, plaintiff alleges she was not given any time to review the document she was given: "moments" after she was given the document, O'Bryan found plaintiff guilty of all of the alleged rule violations. (Pl.'s Opp. at 9). Plaintiff claims O'Bryan relied on at least two documents not provided to plaintiff, namely, the Sassi and Travis To-And-From Memoranda. O'Bryan imposed penalties on plaintiff in the form of six months in SHU confinement, loss of packages, phones, and commissary, and four months' loss of good time credit.

At some point before the second reconvened hearing, plaintiff was allegedly provided with "some" of the documents requested in connection with the Wiand IMR. (Compl. ¶ 28). At the second hearing, Cavaleri found plaintiff guilty of all the alleged rule violations reported in the Wiand IMR. Plaintiff claims Cavaleri relied only upon a written report "of a 'sergeant'" and supporting documentation. (Id.). He imposed penalties of six months in SHU confinement, loss of packages, phones, and commissary, and twelve months' loss of recreation.

C. Administrative Appeals

On or about May 29, 2014, plaintiff filed administrative appeals of the guilty dispositions against her. In the appeal of the first guilty disposition, plaintiff argued (i) Gonzalez deprived her of sufficient pre-hearing employee assistance; (ii) O'Bryan deprived her of the right to present documentary evidence; and (iii) O'Bryan deprived her of a fair and impartial hearing and hearing officer as the disposition was not based on substantial evidence. In the appeal of the second guilty disposition, plaintiff argued (i) Gonzalez deprived her of sufficient pre-hearing employee assistance; (ii) she was deprived of notice of alleged rule violations; and (iii) she was deprived of a fair and impartial hearing and hearing officer as the disposition was not based on substantial evidence.

On or about June 9, 2014, plaintiff filed an addendum to her appeals to add allegations that O'Bryan and Cavaleri failed to conduct a formal mental health and intellectual capacity assessment on plaintiff, which plaintiff alleges should have been done because she had "consumed prescribed medication known to alter one's mental, emotional and mood state (i.e. 'Accolate' – AKA – 'Zafirlukast')." (Compl. ¶¶ 23, 29). Also on or about June 9, 2014, plaintiff sent letters of complaint to defendant Heywood requesting that she intervene based upon O'Bryan and Cavaleri's failures to conduct a mental health and intellectual capacity assessment of plaintiff. Heywood allegedly did not take any action on plaintiff's request.

On or around August 1, 2014, according to the complaint, defendant Prack "proactively participated in reviewing plaintiff's administrative appeal[s] and appeal addendum[s]" and affirmed the hearing dispositions without providing any explanation. (Compl. ¶¶ 24, 30).

## DISCUSSION

### I. Legal Standards

### A. Rule 12(b)(6)

**\*3** In deciding a motion to dismiss pursuant to Rule 12(b)(6), the Court evaluates the sufficiency of the complaint under the "two-pronged approach" outlined by the Supreme Court in Ashcroft v. Iqbal, 556 U.S. 662, 679 (2009). First, plaintiff's legal conclusions and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements," are

not entitled to the assumption of truth and are thus not sufficient to withstand a motion to dismiss. Id. at 678. Second, "[w]hen there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." Id. at 679.

To survive a Rule 12(b)(6) motion, the allegations in the complaint must meet a standard of "plausibility." Ashcroft v. Iqbal, 556 U.S. at 678; Bell Atl. Corp. v. Twombly, 550 U.S. 544, 564 (2007). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. at 678. "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." Id.

The Court must liberally construe submissions of pro se litigants, and interpret them "to raise the strongest arguments that they suggest." Triestman v. Fed. Bureau of Prisons, 470 F.3d 471, 474 (2d Cir. 2006) (per curiam) (internal quotation marks and citation omitted). Applying the pleading rules permissively is particularly appropriate when, as here, a pro se plaintiff alleges civil rights violations. See Sealed Plaintiff v. Sealed Defendant, 537 F.3d 185, 191 (2d Cir. 2008). "Even in a pro se case, however ... threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Chavis v. Chappius, 618 F.3d 162, 170 (2d Cir. 2010) (internal quotation marks and citation omitted). Nor may the Court "invent factual allegations" plaintiff has not pleaded. Id.

   B. Section 1983
"To state a claim under § 1983, a plaintiff must allege (1) the deprivation of a right secured by the Constitution or laws of the United States (2) which has taken place under color of state law." Rodriguez v. Weprin, 116 F.3d 62, 65 (2d Cir. 1997). In addition, plaintiff must allege defendants' personal involvement in the claimed violation of his rights. Provost v. City of Newburgh, 262 F.3d 146, 154 (2d Cir. 2001). In other words, a plaintiff bringing a Section 1983 claim "must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." Ashcroft v. Iqbal, 556 U.S. at 676.

II. Excessive Force Claim Against Perez
Even construing the complaint in the light most favorable to plaintiff, the Court finds plaintiff has failed to state a plausible claim that Superintendent Perez was personally involved in the alleged conduct giving rise to plaintiff's excessive force claim. Plaintiff does not allege Perez was involved in the assaults or in the decision not to medically examine, document or photograph plaintiff's injuries. Rather, plaintiff contends she filed a letter of complaint with Perez on the day after the assaults took place, in which she advised Perez about the assaults and the alleged refusal to take action on plaintiff's injuries. By that time, the alleged excessive force violation had "concluded." Bridgewater v. Taylor, 832 F.Supp.2d 337, 348-49 (S.D.N.Y. 2011) ("[T]he Eighth Amendment constitutional violation allegedly committed by [defendant corrections officer] had concluded by the time [the superintendent] was called upon to review it."); see also Jamison v. Fischer, 2012 WL 4767173, at *4 (S.D.N.Y. 2012) (Defendant could not be held liable "because the alleged constitutional violation had ceased.").[1] Moreover, it is not apparent from plaintiff's complaint that Perez could have corrected the alleged wrong. Id.

[1]    Plaintiff will be provided with copies of all unpublished opinions cited in this decision. See Lebron v. Sanders, 557 F.3d 76, 79 (2d Cir. 2009).

*4 In short, plaintiff has failed plausibly to allege an excessive force violation by defendant Perez.

III. Procedural Due Process Claims
"[T]o comport with procedural due process, an inmate charged with a violation in a disciplinary hearing must be given: (1) advance written notice of the disciplinary charges; (2) an opportunity, when consistent with institutional safety and correctional goals, to call witnesses and present documentary evidence in his defense; and (3) a written statement by the factfinder of the evidence relied on and the reasons for the disciplinary action." Williams v. Menifee, 331 Fed. Appx. 59, 60 (2d Cir. 2009) (quoting Superintendent, Mass. Corr. Inst., Walpole v. Hill, 472 U.S. 445, 454 (1985)).

   A. Pre-Hearing Assistance, Fair and Impartial Hearing, and Notice

Defendants Gonzalez, Cavaleri, and O'Bryan do not dispute they were personally involved in the disciplinary hearings giving rise to plaintiff's due process claims. Instead, they argue the complaint does not sufficiently allege a due process violation against them.

The Court disagrees.

### 1. Officer Gonzalez

Defendants are correct that an inmate's right to assistance in disciplinary hearings is "limited." Silva v. Casey, 992 F.2d 20, 22 (2d Cir. 1993). However, it is well established that prison inmates confined in SHU have a due process right to "substantive assistance" in disciplinary hearings. Eng v. Coughlin, 858 F.2d 889, 898 (2d Cir. 1988) ("We think that for inmates disabled by confinement in SHU ... the right to substantive assistance is an obligation imposed by the Due Process Clause of the Fourteenth Amendment.") (citing Wolff v. McDonnell, 418 U.S. 539, 556-72 (1974)). The assistance provided "certainly should include gathering evidence, obtaining documents and relevant tapes, and interviewing witnesses. At a minimum, an assistant should perform the investigatory tasks which the inmate, were he able, could perform for himself." Id. at 898.

Although it is a close call, the Court finds plaintiff has adequately pleaded Officer Gonzalez did not meet well-established obligations. In particular, Gonzalez allegedly refused to provide any of the documents plaintiff requested before the disciplinary hearings, and plaintiff only received some, but not all, of the documents at the hearings.

### 2. DSA O'Bryan and Captain Cavaleri

Defendants are also correct that "some evidence" is all that is needed to make a finding of guilt in an inmate disciplinary hearing. (Defs.' Mot. to Dismiss at 7). However, the "some evidence" standard still requires more than what was allegedly relied upon here. See e.g. Luna v. Pico, 356 F.3d 481, 489 (2d Cir. 2004) (finding the "some evidence" standard was not met when defendants relied on a "misbehavior report, [a] letter from [the victim], and the testimony" of another inmate).

According to the complaint, DSA O'Bryan relied only on the IMRs and memoranda submitted by Officers Travis and Sassi. O'Bryan did not rely on the To-and-From memoranda, which plaintiff alleges contradict the evidence relied upon. Similarly, Captain Cavaleri allegedly relied only on a "written report of a sergeant and supporting documentation." (Pl.'s Opp. at 14).

**\*5** Accepting plaintiff's allegations as true for the purpose of this decision, the Court finds plaintiff has alleged sufficient facts to support a claim that the dispositions of guilt in the disciplinary proceedings were not based on "some evidence."

However, the Court agrees with defendants that the misspelling of Sergeant Wiand's name on certain documents did not amount to a violation of plaintiff's due process right to notice of the charges against her. Sira v. Morton, 380 F.3d 57, 72 (2d Cir. 2004) (due process requires only notice with "sufficient factual specificity to permit a reasonable person to understand what conduct is at issue."). Nevertheless, for the reasons discussed above, plaintiff has stated a due process claim based on the other arguments of insufficient pre-hearing assistance and failure to provide a fair and impartial hearing.

### B. Failure to Provide a Mental Health Assessment

Defendants argue there is no due process right to a mental health assessment and therefore plaintiff has failed to state a claim on this basis against Heywood, Cavaleri or O'Bryan. The Court agrees.

As stated above, plaintiff's right to procedural due process guarantees her advance written notice of the charges against her, an opportunity to call witnesses and present documentary evidence in her defense, and a written statement of reasons for the disciplinary action and evidence relied upon. (Part III supra). Due process does not guarantee a mental health assessment. Davis v. Fischer, 2012 WL 177400, \*7 (W.D.N.Y. 2012) (finding the failure to conduct a mental health evaluation required by state regulation, "does not establish a federal due process violation").

Defendant Heywood is accordingly dismissed from the case because this is the only allegation made against her. As there was no adequately pleaded constitutional violation, there is no need to consider whether Heywood is entitled to qualified immunity. See e.g. Deanda v. Hicks,

2015 WL 5730345, at *18 (S.D.N.Y. 2015) ("Because the Court finds that there was no unreasonable search and seizure ... and, accordingly, no underlying constitutional violation, it is not necessary to further address whether [defendant] is entitled to qualified immunity.").

C. Gonzalez, Cavaleri, and O'Bryan are Not Entitled to Qualified Immunity

Defendants argue Gonzalez, Cavaleri, and O'Bryan are entitled to qualified immunity on plaintiff's procedural due process claims. The Court disagrees.

Qualified immunity insulates government officials from liability in suits against them in their individual capacity when their actions do not "violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). To determine whether particular conduct violated a clearly established right, the Court looks "to Supreme Court and Second Circuit precedent existing at the time of the alleged violation." Okin v. Vill. of Cornwall–On–Hudson Police Dep't, 577 F.3d 415, 433 (2d Cir. 2009). The relevant inquiry "is whether it would be clear to a reasonable [government official] that his conduct was unlawful in the situation he confronted." Id. (quotations omitted); see also Anderson v. Creighton, 483 U.S. 635, 640 (1987).

*6 With respect to the allegations against Officer Gonzalez, it is well established that prison inmates confined in SHU have a constitutional right to substantive pre-hearing assistance. See supra Part III.A.1. Likewise, with respect to the allegations against DSA O'Bryan and Captain Cavaleri, the requirement that disciplinary decisions be supported by "some evidence" is well-established. See supra Part III.A.2. The Court therefore finds plaintiff plausibly alleges Gonzalez, Cavaleri, and O'Bryan violated clearly established constitutional rights of which a reasonable person in their situation would have known. Accordingly, dismissing plaintiff's claims against them at this stage of the case based on qualified immunity is inappropriate.

D. Prack is Entitled to Qualified Immunity

Judges in this District disagree over whether supervisory liability can be found in a Section 1983 case when an individual is alleged to have affirmed an unconstitutional disciplinary decision. See Delgado v. Bezio, 2011 WL

1842294, at *9 (S.D.N.Y. 2011) ("[I]t cannot be said that the Iqbal holding precludes liability where, as is alleged here, the supervisory personnel affirmed a decision that they knew to have been imposed in violation of Plaintiff's due process rights, thus continuing the deprivation of liberty without due process of law."). But see Jamison v. Fischer, 2012 WL 4767173, at *4 (S.D.N.Y. 2012) (defendant who upheld a decision on appeal "cannot be held liable under this theory because the alleged constitutional violation had ceased by the time that [defendant] was called upon to review Plaintiff's appeal. ... Put simply, [defendant] could not have corrected the alleged denial of Plaintiff's ability to call witnesses at the hearing because—by definition—the hearing ended before [defendant] became involved through Plaintiff's appeal.").

In Jamison, the Second Circuit had an opportunity to weigh in on appeal, but did not think it necessary. Jamison v. Fischer, 617 Fed. Appx. 25, 28 n.1 (2d Cir. 2015) ("[W]e need not address whether the district court correctly dismissed the complaint ... for lack of personal involvement."). As a result, the question is not settled in this Circuit.

Because it is not "clearly established ... whether it would be clear to a reasonable [government official] that his conduct was unlawful in the situation he confronted," Okin v. Vill. of Cornwall–On–Hudson Police Dep't, 577 F.3d at 433, defendant Prack is entitled to qualified immunity on plaintiff's procedural due process claim.

CONCLUSION

The motion to dismiss is GRANTED as to plaintiff's excessive force claim against defendant Perez and as to plaintiff's procedural due process claims against defendants Prack and Heywood.

The motion to dismiss is DENIED as to plaintiff's procedural due process claims against defendants Gonzalez, O'Bryan, and Cavaleri.

By separate order, the Court will schedule an initial conference for the purpose of setting a discovery plan and scheduling order.

**Gibson v. Travis, Slip Copy (2016)**

2016 WL 796865

The Clerk is instructed to terminate the motion (Doc. #37), and to terminate defendants A. Perez, Albert Prack, and Nancy J. Heywood.

SO ORDERED:

**All Citations**

Slip Copy, 2016 WL 796865

---

**End of Document**                    © 2017 Thomson Reuters. No claim to original U.S. Government Works.

2014 WL 4759937

2014 WL 4759937
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Kenneth J. PHELAN, Plaintiff,

v.

M. DURNIAK, Correctional Officer, Auburn
Correctional Facility; Wise, Sergeant, Auburn
Correctional Facility; H. Graham, Superintendent,
Auburn Correctional Facility; Haggett, Warden,
Mt. McGregor Correctional Facility; Brian Fischer,
Commissioner, Nys Docs; and Aubin, Correction
Officer, Auburn Correctional Facility, Defendants.

No. 9:10–CV–666 (FJS/RFT).
|
Signed Sept. 24, 2014.

**Attorneys and Law Firms**

Kenneth J. Phelan, Marcy NY, pro se.

Office of the New York, Stat Attorney General, C. Harris
Dague, AAG, of Counsel, Albany, NY, for Defendants.

Hon. Eric T. Schneiderman, Attorney General of
the State of New York, Brian J. O'Donnell, Esq.,
Assistant Attorney General, of Counsel, Albany, NY, for
Defendants.

**ORDER**

SCULLIN, Senior District Judge.

**\*1** Plaintiff brought this action pursuant to 42 U.S.C. §
1983, alleging that Defendants (1) sexually and verbally
harassed him because he is an Irish–American with
red hair; (2) violated his due process rights by placing
him on shower restriction without notice or a hearing;
(3) kept him confined in constitutionally insufficient
conditions; and (4) retaliated against him for declining
sexual advances and filing grievances. *See generally*
Dkt. No. 16, Amended Complaint. Defendants filed a
motion for summary judgment, *see* Dkt. No. 58, which
Plaintiff opposed, *see* Dkt. No. 65. On September 25,
2013, Magistrate Judge Treece issued a well-reasoned and
comprehensive Report–Recommendation and Order, in

which he recommended that this Court grant Defendants'
motion and dismiss this action in its entirety. *See
generally* Dkt. No. 70. Plaintiff filed objections to these
recommendations. *See generally* Dkt. No. 74.

When a party makes specific objections to portions of a
magistrate judge's report and recommendation, the court
conducts a *de novo* review of those recommendations. *See
Trombley v. Oneill,* No. 8:11–CV–0569, 2011 WL 5881781,
*2 (N.D.N.Y. Nov. 23, 2011) (citing Fed.R.Civ.P. 72(b)
(2); 28 U.S.C. § 636(b)(1)(C)). Where a party makes
only conclusory or general objections, however, the court
reviews the report and recommendation for "clear error"
only. *See Salmini v. Astrue,* No. 3:06–CV–458, 2009
WL 1794741, *1 (N.D.N.Y. June 23, 2009) (quotation
omitted). After conducting the appropriate review, a
district court may decide to accept, reject or modify those
recommendations. *See Linares v. Mahunik,* No. 9:05–CV–
625, 2009 WL 3165660, *10 (N.D.N.Y. Sept. 29, 2009)
(quoting 28 U.S.C. § 636(b)(1)(C)).

In light of Plaintiff's filing of objections, as well as his *pro
se* status, the Court has conducted a *de novo* review of
Magistrate Judge Treece's Report–Recommendation and
Order. Having completed that review, the Court hereby

**ORDERS** that Magistrate Judge Treece's September
25, 2013 Report–Recommendation and Order is
**ACCEPTED in its entirety** for the reasons stated therein;
and the Court further

**ORDERS** that Defendants' motion for summary
judgment is **GRANTED** and this action is **DISMISSED**
in its entirety; and the Court further

**ORDERS** that Plaintiff's motion for appointment of
counsel, *see* Dkt. No. 76, which the Court received for
filing on September 3, 2014, is **DENIED as moot;** and the
Court further

**ORDERS** that the Clerk of the Court shall enter judgment
in favor of Defendants and close this case; and the Court
further

**ORDERS** that the Clerk of the Court shall serve a copy
of this Order on the parties in accordance with the Local
Rules.

**IT IS SO ORDERED.**

Phelan v. Durniak, Not Reported in F.Supp.3d (2014)

2014 WL 4759937

*REPORT–RECOMMENDATION and ORDER*

RANDOLPH F. TREECE, United States Magistrate Judge.

*Pro se* Plaintiff Kenneth J. Phelan brings this Amended Complaint, pursuant to 42 U.S.C. § 1983, alleging that Defendants (1) sexually and verbally harassed him because he is an IrishAmerican with red hair; (2) violated his due process rights by placing him on shower restriction without notice or a hearing; (3) kept him confined in constitutionally insufficient conditions; and (4) retaliated against him for declining sexual advances and filing grievances. *See generally* Dkt. No. 16, Am. Compl. Defendants move for Summary Judgment. Dkt. No. 58. Plaintiff opposes the Motion. Dkt. No. 65. For the reasons that follow, we recommend that Defendants' Motion be **GRANTED** in all material respects, and that this action be **DISMISSED** in its entirety.

## I. STANDARD OF REVIEW

*2 Pursuant to FED. R. CIV. P. 56(a), summary judgment is appropriate only where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The moving party bears the burden to demonstrate through "pleadings, depositions, answers to interrogatories, and admissions on file, together with [ ] affidavits, if any," that there is no genuine issue of material fact. *F.D.I. C. v. Giammettei,* 34 F.3d 51, 54 (2d Cir.1994) (quoting *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986)). "When a party has moved for summary judgment on the basis of asserted facts supported as required by [Federal Rule of Civil Procedure 56(e) ] and has, in accordance with local court rules, served a concise statement of the material facts as to which it contends there exist no genuine issues to be tried, those facts will be deemed admitted unless properly controverted by the nonmoving party." *Glazer v. Formica Corp.,* 964 F.2d 149, 154 (2d Cir.1992).

To defeat a motion for summary judgment, the non-movant must set out specific facts showing that there is a genuine issue for trial, and cannot rest merely on allegations or denials of the facts submitted by the movant. FED. R. CIV. P. 56(c); *see also Scott v. Coughlin,* 344 F.3d 282, 287 (2d Cir.2003) ( "Conclusory allegations or denials are ordinarily not sufficient to defeat a motion for summary judgment when the moving party has set out a documentary case."); *Rexnord Holdings, Inc. v. Bidermann,* 21 F.3d 522, 525–26 (2d Cir.1994). To that end, sworn statements are "more than mere conclusory allegations subject to disregard ... they are specific and detailed allegations of fact, made under penalty of perjury, and should be treated as evidence in deciding a summary judgment motion" and the credibility of such statements is better left to a trier of fact. *Scott v. Coughlin,* 344 F.3d at 289 (citing *Flaherty v. Coughlin,* 713 F.3d 10, 13 (2d Cir.1983) and *Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir.1995)).

When considering a motion for summary judgment, the court must resolve all ambiguities and draw all reasonable inferences in favor of the non-movant. *Nora Beverages, Inc. v. Perrier Group of Am., Inc.,* 164 F.3d 736, 742 (2d Cir.1998). "[T]he trial court's task at the summary judgment motion stage of the litigation is carefully limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them. Its duty, in short, is confined at this point to issue-finding; it does not extend to issue-resolution." *Gallo v. Prudential Residential Servs., Ltd. P'ship,* 22 F.3d 1219, 1224 (2d Cir.1994). Furthermore, where a party is proceeding *pro se,* the court must "read [his or her] supporting papers liberally, and ... interpret them to raise the strongest arguments that they suggest." *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994), *accord, Soto v. Walker,* 44 F.3d 169, 173 (2d Cir.1995). Nonetheless, mere conclusory allegations, unsupported by the record, are insufficient to defeat a motion for summary judgment. *See Carey v. Crescenzi,* 923 F.2d 18, 21 (2d Cir.1991).

## II. DISCUSSION

### A. Summary of Facts

*3 Except where noted, the following facts are uncontroverted.

From March 17, 2008 to April 24, 2009, Plaintiff was an inmate at Mt. McGregor Correctional Facility ("MMCF"). *See* Dkt. No. 58–6, William Haggett Aff., dated Aug. 9, 2012, at ¶ 4; Dkt. No. 58–7, Sally Reams Aff., dated Aug. 14, 2012, at ¶ 5. In the early Summer of 2010, Plaintiff was incarcerated at Auburn Correctional

Facility ("ACF") where he was confined to the Special Housing Unit ("SHU") for approximately four to five months. *See* Dkt. No. 58–9, Kenneth J. Phelan Dep., dated Dec. 21, 2011, at pp. 3–4 & 13–14.[1] The showers at both ACF and MMCF lack "separate adjustable hot and cold water valves." Am. Compl. at ¶ 9; *see also* Dkt. No. 58–4, Harold Graham Aff., dated Aug. 17, 2012, at ¶ 24. Plaintiff's cell at ACF lacked running hot water, Dkt. No. 65–1, Kenneth J. Phelan Aff., dated Jan. 19, 2013, at ¶ 2, however, Plaintiff was permitted to request hot water in his cell, Phelan Dep. at p 18. Also, inmates at ACF "are only allowed 5 minutes to shower, shave, shampo[o their] hair[,] cut [their] toe and finger nails, dry off, and get dressed." Am. Compl. at ¶ 9.

[1]  The precise dates of Plaintiff's incarceration in ACF's SHU are unclear.

Under MMCF's "late nights" policy, inmates at the facility are permitted to stay up until 2:00 a.m. and watch TV in the television room with the doors closed, or to listen to radios in their cells with headphones on Friday and Saturday and sometimes on Sunday if Monday is a holiday. *Id.* at ¶ 13; *see also* Haggett Aff. at ¶ 7. ACF does not have "late nights," instead a "quiet bell" is rung every night at 10:30 p.m. in general population; whereas, inmates in the Special Housing Unit ("SHU") are expected to remain in their cells and keep quiet all day. Graham Aff. at ¶¶ 3–4.

On May 12, 2010, Defendant Wise, a Sergeant at ACF, placed Plaintiff on shower restriction. Graham Aff. at ¶ 30; *see also* Dkt. No. 65–1, Pl.'s 7.1 Statement of Material Fact Pursuant to Rule 7.1(a)(3) (hereinafter "Pl.'s 7.1 Statement"), at p. 11,[2] Deprivation Order, dated May 11, 2010 (hereinafter "May 11 Depriv. Order"). According to Plaintiff, this restriction lasted for "at least seven days." Phelan Aff. at ¶¶ 11–12. However, Defendants maintain that the Deprivation Order "covered the period May 12, 2010 through May 15, 2010." Graham Aff. at ¶ 30.

[2]  Plaintiff's 7.1 Statement includes various Exhibits; however, Plaintiff has not marked these Exhibits for identification, and the entire submission lacks page numbers. *See generally* Pl.'s 7.1 Statement. Therefore, when referring to the Exhibits attached to Plaintiff's 7.1 Statement, we will use the page numbers automatically assigned by the Court's Electronic Case Management system.

On May 23, 2010, Defendant Aubin supervised Plaintiff while he showered. Am. Compl. at ¶ 15; Graham Aff. at ¶¶ 5, 7, 11, 19, & Ex. 3, Surveillance Video, dated May 23, 2010. Surveillance footage from May 23 reveals that Plaintiff refused several direct orders from Defendant Aubin who was requesting that he turn over his razor, nail clippers, soap, and shampoo. *Id.* at ¶¶ 17, 19, 21, 32, & Ex. 3, Surveillance Video. On May 26, Plaintiff filed a grievance regarding the shower incident. *Id.* at ¶¶ 26–29 & Ex. 4, at Entry, dated May 26, 2010; *see also* Dkt. No. 58–10, at p. 00014, Grievance, dated May 26, 2010 (hereinafter "May 26 Grievance").

**\*4**  On May 30, Defendant Aubin denied Plaintiff a shower. Compl. at ¶ 15b. On June 3, 2010, Defendant Wise put Plaintiff on shower restriction once again for failing to follow shower procedures on May 23. Graham Aff. at ¶¶ 31 & 32; Pl.'s 7.1 Statement at p. 12, Deprivation Order, dated June 3, 2010 (hereinafter "June 3 Depriv. Order"). Plaintiff alleges that the deprivation lasted "at least seven days," Phelan Aff. at ¶¶ 10 & 12, whereas, Defendants contend that the Deprivation Order "covered the period of June 4, 2010 through June 6, 2010," Graham Aff. at ¶ 31.[3]

[3]  Plaintiff also alleged that on multiple occasions while confined at ACF, Defendants Aubin and Durniak made comments of a sexual nature to him. *See, e.g.,* Am. Compl. at ¶¶ 10 & 12. However, these comments have been omitted from the summary of facts because, as explained *infra,* these allegations were already determined to be insufficient as a matter of law for purposes of § 1983 by the Honorable Frederick J. Scullin, Senior United States District Judge. *See infra* Part II. C.

### B. Exhaustion

The Prison Litigation Reform Act ("PLRA") provides, in pertinent part, that "no action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). The Supreme Court has held that "the PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v.*

WESTLAW   © 2017 Thomson Reuters. No claim to original U.S. Government Works.

*Nussle,* 534 U.S. 516, 532 (2002) (citations omitted). Exhaustion is similarly required even if the prisoner asserts futility as an excuse. *See Booth v. Churner,* 532 U.S. 731, 741 n. 6 (2001) (refusing to "read futility or other exceptions into statutory exhaustion requirements where Congress has provided otherwise.") (cited in *Marvin v. Goord,* 255 F.3d 40, 43 (2d Cir.2001)). Accordingly, the exhaustion requirements apply even where the grievance process does not permit an award of money damages and the prisoner seeks only money damages, provided the grievance tribunal has the authority to take some responsive action. *See Thomas v. Wright,* 2002 WL 31309190, at *5 (N.D.N.Y. Oct. 11, 2002) (citing *Booth v. Churner,* 531 U.S. 731 (2001)).

In New York State, the administrative remedies consist of a three-step review process. First, a grievance is submitted to the Inmate Grievance Resolution Committee ("IGRC"), a committee comprised of both inmates and facility employees.[4] N.Y. COMP.CODES R. & REGS. tit. 7, § 701.5(b). The IGRC reviews and investigates the formal complaints and then issues a written determination. *Id.* Second, if the IGRC decision is appealed, the superintendent of the facility reviews the IGRC's determination and issues a decision. *Id.* at § 701.5(c). Finally, if the superintendent's decision is appealed, the Cental Office Review Committee ("CORC") makes the final administrative determination. *Id.* at § 701.5(d). Only upon exhaustion of these three levels of review may a prisoner seek relief pursuant to § 1983 in federal court. *Bridgeforth v. Bartlett,* 686 F.Supp.2d 238, 239 (W.D.N.Y.2010) (citing, *inter alia, Porter v. Nussle,* 534 U.S. 516, 524 (2002)); *see also Neal v. Goord,* 267 F.3d 116, 121 (2d Cir.2001), *overruled on other grounds by Porter v. Nussle,* 534 U.S. 516).

[4]   The IGRC is a five-member body consisting of two voting inmates, two voting staff members, and a nonvoting chair (who may be an inmate, staff member, or volunteer). N.Y. COMP.CODES R. & REGS tit.7, § 701.4.

**\*5** The Second Circuit has provided a three part test to determine whether a particular claim has been exhausted. Courts should consider the following: (1) "whether administrative remedies were in fact available to the prisoner"; (2) "whether the defendants may have forfeited the affirmative defense of non-exhaustion by failing to raise or preserve it, or whether the defendants' own actions inhibiting the inmate's exhaustion of remedies

may estop one or more of the defendants from raising the plaintiff's failure to exhaust as a defense"; and (3) "[i]f the court finds that administrative remedies were available to the plaintiff, and that the defendants are not estopped and have not forfeited their non-exhaustion defense, but that the plaintiff nevertheless did not exhaust available remedies, the court should consider whether special circumstances have been plausibly alleged that justify the prisoner's failure to comply with administrative procedural requirements." *Macias v. Zenk,* 495 F.3d 37, 41 (2d Cir.2007) (citing *Hemphill v. New York,* 380 F.3d 680 (2d Cir.2004)).

*1. Exhaustion of MMCF Related Claims*

With regard to Plaintiff's MMCF-related claims, Defendants point out that Plaintiff did not file a single grievance while he was at MMCF and, therefore, did not exhaust his claims that the "late nights" policy at MMCF was an unconstitutional regulation or that it created unconstitutional conditions of confinement. Dkt. No. 58–12, Defs.' Mem. of Law at p. 8. However, according to Plaintiff he was told that no grievance program existed at MMCF and was also threatened not to pursue grievances while at MMCF. Phelan Dep. at pp. 8–9; Dkt. No. 65, Pl.'s Opp'n, at pp 2–3.[5] A threat is sufficiently serious to render the grievance procedure unavailable where "a similarly situated individual of ordinary firmness' [would] have deemed them [un]available." *Hemphill v. New York,* 380 F.3d at 688.

[5]   Plaintiff's Memorandum of Law in Opposition to Defendants' Motion is unnumbered. Therefore, we refer to the page numbers automatically assigned by the Court's Electronic Case Management system.

Here, Plaintiff has alleged that when he attempted to file a grievance at MMCF, he was told that "[w]e don't allow inmates to file grievances. If you got a problem we'll just beat the shit out of you. You really got a problem?" Pl.'s Opp'n at p. 2. About twenty minutes later, three MMCF corrections officers ("Cos") tore up the property in his lockers, asked Plaintiff if he would like to fight, and told hm that he "better think twice about filing a grievance because, 'we have ways of dealing with assholes like you.' " *Id.* at p. 3. These COs then filed two false misbehavior reports against him. *Id.* It is plausible that an individual of ordinary firmness would feel that the

2014 WL 4759937

grievance process at MMCF was unavailable to him under these circumstances. The fact that Plaintiff did not file a single grievance while at MMCF may bolster his claim that he believed the process was unavailable to him.

Moreover, even if we were to accept that the grievance process at MMCF was available to Plaintiff, a question of fact remains as to whether Defendants' actions should estop them from raising the affirmative defense of exhaustion. See *Amador v. Andrews,* 655 F.3d 89, 103 (2d Cir.2011) ("Prior cases have held that verbal and physical threats of retaliation, physical assault, denial of grievance forms or writing implements, and transfers" can estop defendants from raising the affirmative defense of exhaustion) (citations omitted); *see also Ruggiero v. Cnty. of Orange,* 467 F .3d 170, 178 (2d Cir.2006) (citing cases for the proposition that estoppel is appropriate in cases where "defendants took affirmative action to prevent [prisoners] from availing [themselves] of grievance procedures"). Therefore, we recommend that Defendants' Motion be **DENIED** as to claims that Plaintiff's MMCF related claims were unexhausted.

**\*6** Nonetheless, as explained *infra,* Plaintiff's claims of constitutional violations at MMCF do not survive Defendants' Motion for Summary Judgment.

### 2. Exhaustion of ACF Related Claims

Defendants concede that Plaintiff has exhausted his claims that (1) the showers in ACF's SHU lacked independent hot and cold water controls, (2) ACF's five-minute shower policy is unconstitutional, and (3) that he was sexually harassed by Defendant Aubin on May 23, 2010. Defs.' Mem. of Law at p. 8. With regard to Plaintiff's remaining claims, we begin by noting that it is uncontroverted that ACF had a grievance procedure and that Plaintiff had availed himself of that procedure on several occasions. *See* Graham Aff. at ¶¶ 26–29 & Ex. 4, at Entry, dated May 26, 2010; Phelan Dep. at p. 9. Nonetheless, Plaintiff avers that officials at ACF harassed, threatened, and deprived him of showers in an effort to deter him from filing grievances and, in retaliation for the grievances he did file, caused him to either drop his grievances or not pursue them at all. *See, e.g.,* Am. Compl. at ¶¶ 15–15b; Phelan Aff at ¶¶ 7–11; Phelan Dep. pp. 26–27; *see also infra* Part II.H. Defendants have not produced any evidence to controvert Plaintiff's allegations that he was threatened and retaliated

against. Thus, much as above, it remains a question of fact as to whether or not Defendants should be estopped from raising the affirmative defense of exhaustion with regard to Plaintiff's ACF related claims. Therefore, we recommend that Defendants' Motion be **DENIED** as to their claim that Plaintiff's ACF related claims were not exhausted.

However, as explained *infra,* all of Plaintiff's claims fail for other reasons.

### C. Verbal and Sexual Harassment

In his Original Complaint, submitted on May 31, 2010, Plaintiff alleged that he was sexually and verbally harassed by Defendants Aubin and Durniak, and verbally harassed by Defendant Wise. Dkt. No. 1, Compl. On October 27, 2010, the Honorable Frederick J. Scullin, Jr., Senior United States District Judge, *sua sponte* dismissed these claims. Dkt. No. 13, Mem.-Dec. and Order, dated Oct. 27, 2010, at pp. 4–8.

With respect to Plaintiff's allegations that he was sexually harassed by Defendants Durniak and Aubin, Judge Scullin noted that "[a]s against each Defendant, Plaintiff has complained about a single isolated instance of improper verbal sexual harassment, with no allegation of contact or that Plaintiff was physically harmed. The conduct alleged, while clearly distasteful is not 'severe enough to be objectively, sufficiently serious.' " *Id.* at p. 7 (quoting *Boddie v. Schnieder,* 105 F.3d 857, 861 (2d. Cir.1997)). With regard to Plaintiff's allegation that he was verbally harassed by Defendant Wise, Judge Scullin also noted that as a matter of law "allegations of verbal harassment are insufficient to support a § 1983 claim." *Id.* at p. 8 (citing, *inter alia, Johnson v. Eggersdorf,* 8 F . App'x 140, 143 (2d Cir.2001)).

**\*7** On November 19, 2010, Plaintiff filed an Amended Complaint. [6] On March 29, 2011, Judge Scullin ordered that the Amended Complaint be accepted for filing and supersede the Original Complaint; however, "the Court expresse [d] no opinion as to whether Plaintiff's claims [could] withstand a properly filed motion to dismiss or for summary judgment." Dkt. No. 18, Order, dated Mar. 28, 2011, at p. 2. Plaintiff's Amended Complaint is nearly identical to his Original Complaint with the exception of some minor technical changes and the addition of one new

paragraph. *Compare* Original Compl. *with* Am. Compl.; *see also* Dkt. No. 58–12, Defs.' Mem. of Law, at pp. 2–3.

6    Ordinarily, under the prison mailbox rule, inmate pleadings are considered filed on the date that they are signed and delivered to prison authorities for filing with the district court. *See Walker v. Jastremski,* 430 F.3d 560, 562 (2d Cir.2005). However, the signature page of Plaintiff's Amended Complaint is a photocopy of the signature page from his Original Complaint, and retains the May 31, 2010 date of the Original Complaint. Am. Compl. We are unable to determine which date the Amended Complaint was actually signed and delivered to prison authorities, and yet this date is irrelevant to our analysis; we will use November 19, 2010, the date on which it was marked as filed by the Court's Electronic Case Management system. *Id.*

Plaintiff's Amended Complaint fails to add any additional details regarding the alleged sexual and verbal harassment that occurred at either ACF or MMCF that would push Plaintiff's claim from "distasteful" to sufficiently serious for purposes of the Eighth Amendment. *See* Am. Compl. at ¶ 15c. Moreover, even if we were to consider the additional allegations that Plaintiff includes in his Affidavit in Opposition to Defendants' Motion, such as his claim that Defendant Aubin offered to give him an extra tray in exchange for anal sex, Plaintiff's claim would still fail. *See* Phelan Aff. at ¶ 5. Plaintiff has failed to allege a single instance of sexual harassment that involves either contact or physical harm. Indeed, in his Deposition, Plaintiff admits that there was never any physical "sexual" contact between himself and any of the Defendants. Phelan Dep. at pp. 27–28. Therefore, Plaintiff's allegations amount to nothing more than inactionable verbal harassment. *Johnson v. Eggersdorf,* 8 F. App'x at 143.

Accordingly, we recommend that Defendants' Motion be **GRANTED** as to Plaintiff's verbal and sexual harassment claims against Defendants Durniak, Aubin, and Wise.

### D. Equal Protection

The equal protection clause of the Fourteenth Amendment requires the government to treat all similarly-situated people alike. *See City of Cleburne v. Cleburne Living Ctr.,* 473 U.S. 432, 439 (1989). To state a claim for a violation of the equal protection clause, a plaintiff

must show that he was intentionally treated differently from others similarly situated as a result of intentional or "purposeful discrimination ... directed at an identifiable or suspect class...." *Giano v. Senkowski,* 54 F.3d 1050, 1057 (2d Cir.1995) (internal citations omitted).

In his Original Complaint, Plaintiff claimed that "Defendant Aubin violated [his] equal protection right by watching and sexually harassing [him] in [the] shower[.]" Original Compl. at Eighth Cause of Action. Upon initial review, Judge Scullin dismissed this claim, noting that:

Although the court must construe the factual allegations in a complaint in the light most favorable to the plaintiff, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *[Ashcroft v.] Iqbal,* [566 U.S. 662, 678 (2009) ]. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* (citation omitted). Moreover, " 'complaints relying on the civil rights statutes are insufficient unless they contain some specific allegations of fact indicating a deprivation of rights, instead of a litany of general conclusions that shock but have no meaning.' " *Hunt v. Budd,* 895 F.Supp. 35, 38 (N.D.N.Y.1995) (quoting *Barr v. Abrams,* 810 F.2d 358, 363 (2d Cir.1987)); *Pourzandvakil v. Humphry,* 1995 WL 316935, at *7 (N.D.N.Y. May 22, 1995) (quotation omitted).

**\*8**  Dkt. No. 13, Mem.-Dec. and Order.

Plaintiff's Amended Complaint mirrors his Original Complaint in nearly every respect, with only one exception, the addition of paragraph 15c, which states:

This is the Amended portion of this complaint, since the court has, I believe, dismissed in error, my claim of equal protection against defendants Durniak and Aubin because I did not add one simple sentence. Of course these defendants treated me differently from other similarly-situated inmates. These defendants don't go around sexually harassing everyone. These defendants treated me differently from other similarly-situated inmates by sexually

harassing only me because of my identifiable class of Irish–American with red hair. This violates my equal protection right.

Am. Compl. at ¶ 15c.

Plaintiff's intimation that the sole deficiency in his original equal protection claim was the omission of a single sentence clearly evinces Plaintiff's misunderstanding of both Judge Scullin's ruling and the pleading requirements of a civil complaint. Plaintiff's attempt to remedy his first conclusory pleading by adding a single bald face conclusory allegation—that Plaintiff was discriminated against because of his ethnicity and hair color—is unavailing. Standing alone, without the addition of some other factual allegation(s) from which it could plausibly be inferred that such discriminatory animus actually existed, such an allegation does not nudge Plaintiff's claim from the merely possible to the plausible let alone raise a genuine issue of material fact sufficient to survive a properly supported motion for summary judgment. *See Carey v. Crescenzi,* 923 F.2d 18, 21 (1991). Therefore, because Plaintiff's Amended Complaint does not state a cause of action for a violation of the equal protection clause we recommend that Defendants' Motion be **GRANTED** as to Plaintiff's equal protection claim against Defendants Aubin and Durniak.

### E. Conditions of Confinement

Plaintiff alleges that (1) noise levels at ACF and MMCF caused him to lose sleep, Am. Compl. at ¶ 13 & Fifth Cause of Action; (2) the showers in ACF's and MMCF's SHU lacked independent hot and cold water controls and, therefore, the temperature of the water was always too hot or too cold, *id.* at ¶¶ 9, 11, & Second Cause of Action, Phelan Aff. at ¶ 3; (3) his cell lacked running hot water, Pl.'s Opp'n at pp 7–8; (4) at ACF he was provided only five minutes to shower, shave, clip his toe and finger nails, and dry off, Am. Compl. at ¶ 9 & Third Cause of Action; (5) while at ACF Defendants Wise and Durniak took his shower privileges away on May 11 and June 3, 2012, each for a period of approximately one week, leaving him unable to care for his personal hygiene, *id.* at ¶ 12 & First Cause of Action; Phelan Aff. at ¶¶ 10–12; and (6) Defendant Aubin denied him a shower on May 30, 2010, Am Compl at ¶ 15b. Construed liberally, these allegations can be interpreted as raising a conditions

of confinement claim pursuant to the cruel and unusual punishment clause of the Eighth Amendment. [7]

[7]    Plaintiff's claim that the deprivation of his shower privileges without prior notice or a hearing violated his due process rights is discussed separately, *see infra* Part II.F, as are Plaintiff's claims that the five-minute time limit on showers, the inability to control the shower temperature, and the "late nights" policies are unconstitutional, *see infra* Part II.G.

**\*9** In order to state a valid conditions of confinement claim under the Eighth Amendment, a plaintiff must allege that (1) the conditions were so serious that they constituted a denial of the "minimal civilized measure of life's necessities," and (2) the prison officials acted with "deliberate indifference." *Wilson v.. Seiter,* 501 U.S. 294, 297–99 (1991) (citation omitted) (cited in *Branham v. Meachum,* 77 F.3d 626, 630–31 (2d Cir.1996)).

In *Phelps v. Kapnolas,* 308 F.3d 180 (2d Cir.2002), the Second Circuit set out in detail the requirements that a plaintiff must prove in order to make out a claim that the conditions of his confinement violated the Eighth Amendment:

Under the Eighth Amendment, States must not deprive prisoners of their "basic human needs—*e.g.,* food, clothing, shelter, medical care, and reasonable safety." *Helling* [*v. McKinney* ], 509 U.S. 25, 32 [1993] (citation and internal quotation marks omitted). Nor may prison officials expose prisoners to conditions that "pose an unreasonable risk of serious damage to [their] future health." *Id.* at 35. Ultimately, to establish the objective element of an Eighth Amendment claim, a prisoner must prove that the conditions of his confinement violate contemporary standards of decency. *Id.* at 35–36; *Rhodes* [*v. Chapman* ], 452 U.S. 337[,] 347 [ (2002) ].

Concerning the "subjective" requirement, the Supreme Court has explained that "a prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer* [*v. Brennan* ], 511 U.S. [825,] 837 [ (1994) ].

*Phelps v. Kapnolas,* 308 F.3d at 185–86.

Additionally, "[e]ven if no single condition of confinement would be unconstitutional in itself, exposure to the cumulative effect of prison conditions may subject inmates to cruel and unusual punishment." *Rhodes v. Chapman,* 452 U.S. at 363 (internal quotation marks and citation omitted). In this regard, "conditions of confinement may be aggregated to rise to the level of a constitutional violation, but 'only when they have a mutually enforcing effect that produces the deprivation of a single, identifiable human need such as food, warmth, or exercise.' " *Walker v. Schult,* 717 F.3d 119, 125 (2d Cir.2013) (quoting *Wilson v. Seiter,* 501 U.S. 294, 304 (1991)). Here, Plaintiff complains of deprivations affecting two categories of human need: (1) the need for sleep, and (2) the need to maintain personal hygiene. As explained below, however, even when considered in the aggregate, the conditions of which Plaintiff complains are not objectively sufficiently serious for purposes of the Eighth Amendment.

### 1. Conditions Affecting Sleep

**\*10** It has been noted that "sleep is critical to human existence, and conditions that prevent sleep have been held to violate the Eighth Amendment." *Walker v. Schult,* 717 F.3d at 126 (citing cases).

Here, Plaintiff claims that he suffered sleep loss while at ACF because "the inmates are extremely noisy, yelling and shouting all day and night." *Compare* Pl.'s 7.1 Statement at ¶ 16 *with* Defs.' 7.1 Statement at ¶ 16. Plaintiff further alleges that Defendant Graham is responsible for these conditions. Am. Compl. at ¶ 13. Yet, Plaintiff fails to proffer any other factual allegations with regard to how long this condition persisted, how often Plaintiff was unable to sleep, and most importantly, how, if at all, the noise effected his overall health or safety. Contrariwise, Defendants have submitted uncontroverted evidence that at ACF a "quiet bell" is rung every night at 10:30 p.m. in general population after which inmates are required to remain quiet until the following morning; and inmates in ACF's SHU are expected to remain in their cells and be quiet all day. Graham Aff. at ¶¶ 3 & 4. Plaintiff's vague, conclusory, and unsupported allegations do not raise a triable issue of fact regarding the issue of whether the noise level at ACF was objectively sufficiently serious for

purposes of a conditions of confinement claim. *See Carey v. Crescenzi,* 923 F.2d 18, 21 (2d Cir.1991).

Plaintiff has also failed to link Defendant Graham to the alleged noisy condition. Indeed, Plaintiff fails to allege that Defendant Graham was even aware of the noise level at ACF or Plaintiff's inability to sleep. As a result, Plaintiff cannot establish that Defendant Graham was deliberately indifferent toward the alleged risk to Plaintiff's health posed by the noisy conditions at ACF. *Phelps v. Kapnolas,* 308 F.3d at 185–86.

Plaintiff also claims that he was unable to sleep while at MMCF because of the "late nights" policy which permitted inmates to watch TV or listen to their radios loudly until two in the morning on weekends and holidays. Am. Compl. at ¶ 13. Plaintiff further alleges that as a result he only got four hours of sleep on these nights and suffered migraines, *id.,* and "sometimes [he] would not be allowed to eat breakfast because [he] did not get up early enough [,]" Phelan Aff. at ¶ 20. Plaintiff does not remember whether he received treatment for his migraines while at MMCF, but acknowledges that he suffered from migraines since the age of nineteen. Phelan Dep. at pp. 24–25. Even accepting these allegations as true, Plaintiff has failed to identify an objectively serious risk to his health or safety. Essentially, Plaintiff complains that the noise from the television on Friday and Saturday nights made it difficult for him to fall asleep before 2:00 a.m. on those days. However, aside from his conclusory allegation that this noise aggravated his pre-existing migraine condition, it did not affect his health or safety in any appreciable way. Therefore, Plaintiff has failed to establish the first element of a conditions of confinement claim. *See Phillips v. Roy,* 2011 WL 3847265, at \*15 (N.D.N.Y. Aug. 29, 2011) (holding that plaintiff's allegations that constant noise from a broken pipe "interrupted his sleep[,] fail[ed] to meet the objective element of an Eighth Amendment inquiry [because] [a]lthough undoubtedly annoying, such conditions do not evince a serious risk of harm"). Moreover, as explained below, Plaintiff has failed to establish the subjective element of this claim as well.

**\*11** Plaintiff alleges that MMCF's Warden, Defendant Haggett, is responsible for his sleep loss. Am. Compl. at ¶ 13 & Fifth Cause of Action. Yet, by his own admission, Plaintiff "has never seen Defend[ant] Haggett in [his] dorm after 11 pm on late nights so [Defendant Haggett] has no clue how noisy it is then." Phelan Aff. at ¶ 17.

Nor does Plaintiff allege that Defendant Haggett was put on notice of the noise issue at MMCF or Plaintiff's migraines or sleeping problems via some other means. As a result, Plaintiff cannot establish that Defendant Haggett was deliberately indifferent toward the alleged risk to Plaintiff's health and safety posed by the noisy cell conditions. *Phelps v. Kapnolas,* 308 F.3d at 185–86.

Accordingly, we recommend that Defendants' Motion be **GRANTED** with regard to Plaintiff's claims that MMCF's Warden, Defendant Haggett, and ACF's Superintendent, Defendant Graham, maintained constitutionally inadequate conditions at their facilities which affected his ability to sleep. [8]

[8]    Plaintiff did not specifically allege that Defendant Fischer was responsible for the noisy conditions at MMCF and ACF. *See* Am. Compl. at Fifth Cause of Action. Yet, elsewhere in his Amended Complaint Plaintiff specifically names Defendant Fischer along with Defendants Graham and/or Haggett for constitutional violations that allegedly occurred at their respective facilities. *See, e.g.,* Am. Compl. at Second, Third, and Ninth Causes of Action. However, even if we were to liberally construe Plaintiff's Amended Complaint as intending to allege that Defendant Fischer was responsible, in his supervisory capacity, for the noisy conditions at ACF and MMCF, such a claim would fail because, as explained above, Plaintiff failed to sufficiently allege a conditions of confinement claim with regard to the noise levels at either facility, and therefore, cannot maintain an action for supervisory liability against Defendant Fischer. *Alston v. Bendheim,* 672 F.Supp.2d 378, 388 (S.D.N.Y.2009) ("The failure to state a claim for an underlying constitutional violation forecloses supervisory liability."); *see also Arredondo v. Cnty. of Nassau,* 2012 WL 910077, at *7 n. 8 (E.D.N.Y. Mar. 16, 2012) (citing *Alston v. Bendheim* ).

### 2. Conditions Affecting Personal Hygiene

It is clear that inmates have a constitutional right to sanitary living conditions and the necessary materials to maintain adequate personal hygiene. *See Walker v. Schult,* 717 F.3d at 127 (citing cases for the proposition that "the failure to provide prisoners with toiletries and other hygienic materials may rise to the level of a constitutional violation").

Plaintiff claims that he was unable to wash, shave, or clip his nails because Defendants Wise and Durniak separately issued a Deprivation Order denying him shower privileges for a week in May and a week in June, respectively, and that he was unable to wash himself in his cell because the cells at ACF do not have hot running water. *See* Am. Compl. at ¶ 12 & First Cause of Action; Phelan Aff. at ¶¶ 10–12; Pl.'s Opp'n at pp. 7–8. Plaintiff has also alleged that Defendant Aubin denied him a shower on May 30, 2010. Am. Compl. at ¶ 15b. These deprivations, even when considered together, are not objectively sufficiently serious for purposes of an Eighth Amendment conditions of confinement claim.

To begin with, Plaintiff's allegation that the shower Deprivation Orders each lasted for "at least seven days[,]" Phelan Aff. at ¶¶ 10–12, is not borne out by the record. Rather, it is clear that the May 11 Deprivation Order issued by Defendant Wise lasted for four days between May 12 and May 15, and the June 13 Deprivation Order issued by Defendant Durniak lasted for three days between June 4 and June 6. *See* Graham Aff. at ¶ 31; May 11 & June 3 Depriv. Orders (containing hand written notations confirming the dates provided by Defendant Graham). Even in the aggregate, Plaintiff's total eight-day loss of shower privileges—four days between May 12 and May 15, one day on May 30, and three days in June—simply does not constitute an objectively serious deprivation for purposes of the Eighth Amendment. Indeed, even if Plaintiff had been deprived for a total of two one week periods, and for one day on another occasion as he claims, such a deprivation would still be insufficient to satisfy the objective element of a conditions of confinement claim. *See Dillon v. City of New York,* 2013 WL 3776167, at *2 (S.D.N.Y. July 18, 2013) (citing cases); *see also Johnson v. Colvin,* 2013 WL 775357, at *4 (W.D.N.Y. Feb. 28, 2013) (citing cases for the proposition that "[s]everal district courts within the Second Circuit, ... have held that temporary deprivations of showers for periods of approximately two weeks, ... do not satisfy the objective component of a claim of cruel and unusual punishment"); *Phillips v. Roy,* 2011 WL 3847265, at *14 (N.D.N.Y. Aug. 29, 2011) (citing, *inter alia, Trammell v. Keane,* 338 F.3d 155, 165 (2d Cir.2003), for the same proposition); *see also Gardner v. Mental Health Unit of Sullivan Corr. Facility,* 2009 WL 1834382, at *2 (S.D.N.Y. June 17, 2009) (citing cases for the proposition that "denying a prisoner the opportunity

Phelan v. Durniak, Not Reported in F.Supp.3d (2014)

2014 WL 4759937

to shower for seven days and withholding toiletries, while uncomfortable, does not endanger an inmate's health and safety"); *Cf. Beckford v. Portuondo,* 151 F.Supp.2d 204, 211 (N.D.N.Y.2001) (finding that a week-long shower deprivation presented a sufficiently serious deprivation, but only because defendants were aware that plaintiff suffered from a medical condition that required he take extra precautions when it came to personal hygiene to avoid medical complications).

**\*12** Indeed, even when taking into consideration Plaintiff's allegation that he lacked running hot water in his cell during these periods, such claims still do not transcend the objective threshold established by the Second Circuit. *See Phelps v. Kapnolas,* 308 F .3d at 185–86. Particularly here, where Plaintiff had access to hot water in his cell by request. *See* Phelan Dep. at p 18; *see also Beckford v. Portuondo,* 151 F.Supp.2d at 210–11 (finding no deprivation, where officers denied inmate a shower followed by the suspension of in-cell water privileges for six days, in light of the fact that the inmate was able to request hot water in his cell).

Likewise, even considering the aforementioned deprivations together with the lack of running hot water in Plaintiff's cell, the fact that Plaintiff was unable to control the water temperature of the shower, and that he had only five minutes to shower, shave, clip his toe and finger nails, dry off, and get dressed, Plaintiff fails to surmount the objective threshold of a conditions of confinement claim. Plaintiff does not allege that the water in the showers was so cold or so hot as to be dangerous, or that the inability to control the temperature made it impossible for him to shower. Nor does Plaintiff show that he is unable to maintain his personal hygiene, or that he was denied the necessary tools, or that his inability to perfectly maintain his hygiene has adversely affected his overall health. Likewise, the lack of running hot water in Plaintiff's cell, while inconvenient, does not represent the denial of a basic human need or present a danger to Plaintiff's health or safety; particularly in light of the fact that Plaintiff was able to, and in fact did, request that hot water be delivered to his cell. Phelan Aff. at p. 18; *see also Beckford v. Portuondo,* 151 F.Supp.2d at 211 ("Now where has it been held that prisoners are entitled to complete or unfettered access to water or showers.").

Accordingly, we recommend that Defendants' Motion be **GRANTED** as to Plaintiff's conditions of confinement

claims against Defendants Durniak, Wise, and Aubin. Moreover, having found no indication that these conditions violated his Eighth Amendment rights, we also recommend that Defendants' Motion be **GRANTED** as to Plaintiff's claims that Defendant Graham, ACF's Superintendent, and Defendant Fischer, the Commissioner of the New York State Department of Corrections and Community Supervision ("DOCCS"), were responsible for these personal hygiene related conditions in their supervisory capacities. *See* Am. Compl. at Second, Third, & Ninth Causes of Action.

### F. Due Process

To state a due process claim under *§ 1983,* an inmate must first establish that he enjoys a protected liberty interest. *Arce v. Walker,* 139 F.3d 329, 333 (2d Cir.1998) (citing *Kentucky Dep't of Corr. v. Thompson,* 490 U.S. 454, 460 (1989)). Inmates' liberty interests are typically derived from two sources: (1) the Due Process Clause of the Fourteenth Amendment; and (2) state statute or regulations. *Id.*

#### 1. Liberties created under the Due Process Clause

**\*13** With regard to liberty interests arising directly under the Due Process Clause, the Supreme Court has "narrowly circumscribed its scope to protect no more than the 'most basic liberty interests in prisoners.' " *Arce v. Walker,* 139 F.3d at 333 (quoting *Hewitt v. Helms,* 459 U.S. 460, 467 (1983)). The Due Process clause does not protect against "every change in the conditions of confinement having a substantial adverse impact" on inmates if those changes are "within the normal limits or range of custody which the conviction has authorized the state to impose." *Sandin v. Conner,* 515 U.S. 472, 478 (1995). Instead, the Due Process Clause protects against restraints or conditions of confinement that "exceed[ ] the sentence in ... an unexpected manner." *Id.* at 484 (quoted in *Arce v. Walker,* 139 F.3d at 333).

#### 2. Liberties created by the State

State statutes and regulations may also confer liberty interests on prisoners. *Arce v. Walker,* 139 F.3d at 334 (citing *Kentucky Dep't of Corr.,* 490 U.S. at 460).

2014 WL 4759937

Prior to the Supreme Court's decision in *Sandin v. Connor,* 515 U.S. 472 (1995), the struggle to define the contours of state created liberty interests rested with the district courts, who would engage in the arduous task of scrutinizing state statutes and administrative regulations to determine whether the state had "gone beyond issuing mere procedural guidelines and had used 'language of an unmistakenly mandatory character' such that the incursion on liberty would not occur 'absent specified substantive predicates.' " *Lee v. Coughlin,* 26 F.Supp.2d 615, 629 (S.D.N.Y.1998) (quoting *Hewitt v. Helms,* 459 U.S. at 471–72); *see also Welch v. Bartlett,* 196 F.3d 389, 392 (2d Cir.1999). Such methodology, according to the *Sandin* Court, produced two undesirable effects:

> First, it create[d] disincentives for States to codify prison management procedures in the interest of uniform treatment.... Second, the *Hewitt* approach [ ] led to the involvement of federal courts in the day to day management of prisons, often squandering judicial resources with little offsetting benefit to anyone.

*Sandin,* 515 U.S. at 482.

Recognizing the fallacy of such methodology, the Supreme Court held that states may still create liberty interests for inmates in remaining free from solitary confinement, thereby requiring some process precede the segregated confinement; however, such liberty interests shall be limited solely to those deprivations which subject a prisoner to "atypical and significant hardship ... in relation to the ordinary incidents of prison life." *Sandin,* 515 U.S. at 483–84; *see also Giano v. Selsky,* 238 F.3d 223, 225 (2d Cir.2001) (citing *Sandin,* 515 U.S. at 484); *Welch v. Bartlett,* 196 F.3d at 392. Thus, a prisoner asserting that he was denied due process in connection with segregated confinement or a loss of privileges must make a threshold showing that the deprivation of which he complains imposed such an atypical and significant hardship.

**\*14** After *Sandin,* to assert a state created liberty interest, an inmate must establish that his confinement or restraint (1) created an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life," *Sandin,* 515 U.S. at 484, and (2) that the "state has granted its inmates, by regulation or by statute, a

protected liberty interest in remaining free from that confinement or restraint," *Frazier v. Coughlin,* 81 F.3d 313, 317 (2d Cir.1996).

Here, Plaintiff argues that the Deprivation Orders issued by Defendants Durniak and Wise on May 11 and June 3 2010, rescinding his shower privileges, violated his due process because he was not provided with adequate notice or a hearing. Am. Compl. at Second Cause of Action. Under New York State Regulations, SHU inmates must be given a minimum of two showers per week. *See* N.Y. COMP.CODES R. & REGS. tit. 7 § 304.5(a). However, absent proof that a deprivation would result in an atypical and significant hardship, "a mandatory obligation of prison officials for the prisoner's benefit is insufficient in itself to create a due process right enforceable by an action under § 1983 [.]" *Welch v. Bartlett,* 196 F.3d at 392. Here, Plaintiff has failed to establish that he suffered an atypical or significant deprivation.

As established above, Defendants deprived Plaintiff of his showers for a period of three days in May and a period of four days in June. *See supra* at Part II.D(2). Simply stated, the loss of shower privileges for two separate periods of three and four days respectively is neither atypical nor significant. *See, e.g., Baskerville v. Blot,* 224 F.Supp.2d 723, 727 & 736 (S.D.N.Y.2002) (citing *Arce v. Walker,* 139 F.3d at 337 for the proposition that fifteen days of shower deprivation "while undesirable did not deprive [the inmate] of his right to due process under the Fourteenth Amendment").

Therefore, we recommend that Defendants' Motion be **GRANTED** as to Plaintiff's due process claims against Defendants Wise and Durniak.

### G. Shower & Late Night Policies

Plaintiff alleges that the five-minute shower policy maintained by ACF, the policy prohibiting inmates from controlling the temperature of the water in the showers maintained at ACF and MMCF, as well as MMCF's late nights policy are unconstitutional prison regulations.

The Supreme Court has held that when a prison policy violates a prisoner's constitutional rights, courts should employ a reasonableness test, as opposed to a stricter standard, which would normally be applied

in constitutional deprivation cases. *O'Lone v.. Estate of Shabazz,* 482 U.S. 342, 349 (1987); *see also Turner v. Safley,* 482 U.S. 78, 89 (1987). Therefore, a prison regulation that impinges upon an inmate's constitutional rights may be valid, despite such encroachment, if it is reasonably related to legitimate penological interests. *Turner v. Safley,* 482 U.S. at 89; *Farid v. Smith,* 850 F.2d 917, 925 (2d Cir.1988). However, "a court need only examine penological objectives *if* a constitutional right is implicated." *Kelsey v. Cnty. of Schoharie,* 567 F.3d 54, 69 (2d Cir.2009) (Sotomayor, J. dissenting) (citing *Turner v. Safley,* 482 U.S. at 89) (emphasis in original).

**\*15** Here, Plaintiff has failed to establish that any of the policies at issue violated his constitutional rights. Therefore, we need not analyze these claims any further. Accordingly, we recommend that these claims be **DISMISSED.**

### H. Retaliation

Plaintiff alleges that (1) on May 23, 2010, Defendant Aubin told Plaintiff that if he filed a grievance against him he would make his life a "living hell" and that "this [was his] SHU and [Phelan] don't get nothing [sic] without [him,]" Am. Compl. at ¶ 15; (2) on May 30, 2010, Defendant Aubin refused to allow Plaintiff to shower in retaliation for having rejected his sexual advances, Phelan Aff. at ¶ 9; (3) on May 27, 2010, Defendant Wise made various verbal threats to Plaintiff in order to force Plaintiff to drop the grievance he filed on May 26; *id.* at ¶ 10, *see also* May 26 Grievance; and (4) on June 3, 2010, Defendant Wise "carried out" his threats by placing Plaintiff on shower deprivation for a period of one week in retaliation for the May 26 grievance, *id.* at ¶ 10; Am. Compl. at ¶ 15a; *see also* Graham Aff. at ¶¶ 26–29 & Ex. 4, at Entry Dated May 26, 2010; *see also* May 26 Grievance.

The Second Circuit has made it clear that an inmate has a substantive due process right not to be subjected to retaliation for the exercise of a constitutional right, such as petitioning the government for redress of grievances. *Jones v. Coughlin,* 45 F.3d 677, 679–80 (2d Cir.1995); *Franco v. Kelly,* 854 F.2d 584, 589–90 (2d Cir.1988). Claims of retaliation, like those asserted by Plaintiff, find their roots in the First Amendment. Central to such claims is the notion that in a prison setting, corrections officials may not take actions that would have a chilling effect upon

an inmate's exercise of First Amendment rights. *Gill v. Pidlypchak,* 389 F.3d 379, 381–83 (2d Cir.2004).

Because of the relative ease with which claims of retaliation can be invoked, courts should examine such claims "with skepticism and particular care." *Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir.1995) (citation omitted); *Dawes v. Walker,* 239 F.3d 489, 491 (2d Cir.2001), *overruled on other grounds, Swierkiewicz v. Sorema N.A .,* 534 U.S. 506 (2002) ("[V]irtually any adverse action taken against a prisoner by a prison official—even those otherwise not rising to the level of a constitutional violation—can be characterized as a constitutionally proscribed retaliatory act." (citation omitted)); *see also Graham v. Henderson,* 89 F.3d 75, 79 (2d Cir.1996).

To state a First Amendment claim for retaliation, an inmate must demonstrate (1) he or she was engaged in constitutionally protected activity, (2) the defendant took adverse action against the plaintiff, and (3) there was a causal connection between the protected activity and the adverse action in that the alleged conduct was substantially motivated by the protected activity. *Gill v. Pidlypchak,* 389 F.3d at 380 (citing *Dawes v. Walker,* 239 F.3d at 492); *see also Morales v. Mackalm,* 278 F.3d 126, 131 (2d Cir.2002).

**\*16** The plaintiff bears the initial burden in showing that the defendant's actions were improperly motivated. To satisfy the second prong, a prisoner must present evidence inferring that a defendant acted with an improper motive. Such evidence includes: (1) temporal proximity between the protected activity and the alleged retaliatory act; (2) plaintiff's prior good disciplinary record; (3) plaintiff's vindication at his disciplinary hearing; and (4) defendants' statements regarding their motive for the discipline. *See Colon v. Coughlin,* 58 F.3d at 872–73. A plaintiff may meet this burden by presenting circumstantial evidence of a retaliatory motive, thus obviating the need for direct evidence. *Bennett v. Goord,* 343 F.3d 133, 139 (2d Cir.2003) (holding that plaintiff met his burden in proving retaliatory motive by presenting circumstantial evidence relating to, *inter alia,* the temporal proximity of allegedly false misbehavior reports and the subsequent reversal of the disciplinary charges on appeal as unfounded). "Only retaliatory conduct that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights constitutes an adverse action for a

claim of retaliation." *Davis v. Goord,* 320 F.3d 346, 353 (2d Cir.2003) (citing *Dawes v. Walker,* 239 F.3d at 493). Otherwise, the retaliatory act is "*de minimis* and therefore outside the ambit of constitutional protection." *Dawes v. Walker,* 239 F.3d at 493. Furthermore, in satisfying the causal connection requirement, also known as temporal proximity, the allegations must be "sufficient to support the inference that the speech played a substantial part in the adverse action." *Id.* at 492 (internal quotation marks and citations omitted) (cited in *Davis,* 320 F.3d at 353).

### 1. Defendant Aubin

Plaintiff's claims that Defendant Aubin verbally threatened him not to file a grievance on one occasion, and denied him a shower in retaliation for filing a grievance on another occasion, are insufficient as a matter of law. It is well established that "verbal threats, ... are patently insufficient to establish adverse action and support a plausible retaliation claim." *Johnson v. Brown,* 2010 WL 6243352, at * 7 (N.D.N.Y. Sept. 3, 2010) (citing cases). Likewise, the loss of a single shower is too *de minimis* in that it would not deter a similarly situated individual of ordinary firmness from exercising their constitutional rights. *See Beckles v. Bennett,* 2008 WL 821827, at *25 (S.D.N.Y. Mar. 26, 2008) (citing cases for the proposition that the denial of a single shower does not constitute an adverse action for purposes of a retaliation claim); *see also Suarez v. Kremer,* 2008 WL 4239214, at *8 (W.D.N.Y. Sept. 11, 2008) (citing cases for the same conclusion).

Therefore, we recommend that Plaintiff's retaliation claims against Defendant Aubin be DISMISSED.

### 2. Defendant Wise

As with claims alleged against Defendant Aubin, Plaintiff's claim that Defendant Wise verbally threatened him on May 27, 2010, is insufficient as a matter of law for purposes of a retaliation claim. *Johnson v. Brown,* 2010 WL 6243352, at * 7.

**\*17** Secondly, Plaintiff's allegation that Defendant Wise revoked his shower privileges for a week on June 3 because Plaintiff filed a grievance on May 26 is also insufficient. If we accept the allegations as true, Plaintiff may have established a *prima facie* retaliation claim. It is

unquestionable that filing a grievance is a constitutionally protected exercise. *Jones v. Coughlin,* 45 F.3d at 679–80. And, it is plausible that a similarly situated prisoner of ordinary firmness would be deterred from exercising such a right if faced with the revocation of shower privileges for an entire week. Moreover, the temporal proximity of the revocation to the filing of the grievance, here just seven days, certainly weighs in favor of Plaintiff's claim.

However, in situations where the defendant's actions are the result of both retaliatory and legitimate reasons, the burden shifts to the defendants to show that they would have taken the same action absent the retaliatory motive. *Graham v. Henderson,* 89 F.3d 75, 79 (2d Cir.1996) (citing, *inter alia, Mount Healthy Sch. Dist. v. Doyle,* 429 U.S. 274, 287 (1977)); *Lowrance v. Achtyl,* 20 F.3d 529, 535 (2d Cir.1994) (cited in *Carpio v. Walker,* 1997 WL 642543, at *6 (N.D.N.Y. Oct. 15,1997)). Defendants can meet that burden with regard to a particular punishment by demonstrating that plaintiff committed the most serious of the prohibited conduct charged in the misbehavior report. *Gayle v. Gonyea,* 313 F.3d 677, 684 (2d Cir.2002) (citing *Hynes v. Squillace,* 143 F.3d 653, 657 (2d Cir.1998)).

Here, proof submitted by Defendants clearly establishes that Defendants had a nonretaliatory justification for issuing the June 3 Deprivation Order. The Record reveals that the June 3, 2010 Deprivation Order was issued due to Plaintiff's "[f]ailure to comply with Special Housing Unit shower procedures." June 3 Depriv. Order; *see also* Graham Aff. at ¶¶ 31 & 32. Additionally, Defendants submitted surveillance footage and accompanying audio which confirms that on May 23, 2010, Plaintiff ignored several direct orders from Defendant Aubin to turn over his razor, nail clippers, shampoo, and soap. *See* Graham Aff. at ¶¶ 5, 7, 10–11, 17, 19, 21, 32, & Ex. 3, Surveillance Video. Moreover, prison regulations allow shower privileges to be revoked "when it is determined that a threat to the safety or security of staff, inmates, or State property exists." *See* N.Y. COMP.CODES R. & REGS. tit. 7 §§ 304.5(f) & 305.2(a). Thus, because it is clear that Plaintiff refused a direct order to return state property (here, a razor, soap, and nail clippers), Defendant Wise was well within his rights to revoke Plaintiff's shower privileges, and therefore, Defendants have clearly established a non-retaliatory justification for issuing the June 3 Deprivation Order. Plaintiff, on the other hand, does not offer any evidence to controvert

WESTLAW   © 2017 Thomson Reuters. No claim to original U.S. Government Works.

Defendants' evidence, showing that he refused to comply with Defendant Aubin's orders on May 23.

**\*18** Therefore, we recommend that Plaintiff's retaliation claim against Defendant Wise be **DISMISSED.**

### I. Failure to Train

Plaintiff alleges that Defendant Fischer, the Commissioner of DOCCS, violated his constitutional rights "by failing to inform staff of[,] and train them on [,] policies designed to avoid constitutional deprivations." Am. Compl. at Sixth Cause of Action.

It is well established that "the doctrine of respondeat superior cannot be used to establish liability [of a supervisory official] under § 1983. *Blyden v. Mancusi,* 186 F.3d 252, 264 (2d Cir.1999). Rather, liability under § 1983 turns on a defendant's personal involvement in the alleged constitutional deprivations. *Williams v. Smith,* 781 F.2d 319, 323 (2d Cir.1986); *see Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994). The personal involvement of supervisory officials has been found where there was

> (1) actual direct participation in the constitutional violation, (2) failure to remedy a wrong after being informed through a report or appeal, (3) creation of a policy or custom that sanctioned conduct amounting to a constitutional violation, or allowing such a policy or custom to continue, (4) grossly negligent supervision of subordinates who committed a violation, or (5) failure to act on information indicating that unconstitutional acts were occurring.

*Hernandez v. Keane,* 341 F.3d 137, 145 (2d Cir.2003) (citing *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995)).

Here, Plaintiff cannot establish that any constitutional violations resulted from Defendant Fischer's failure to properly train his subordinates. Therefore, we recommend that Defendants' Motion be **GRANTED** as to Plaintiff's failure to train claim against Defendant Fischer.

### III. CONCLUSION

For the reasons stated herein, it is hereby

**RECOMMENDED,** that Defendants' Motion for Summary Judgment (Dkt. No. 58) be **DENIED** as to exhaustion and **GRANTED** in all other respects and this action be **DISMISSED;** and it is further

**ORDERED,** that the Clerk of the Court serve a copy of this Report–Recommendation and Order upon the parties to this action.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen (14) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. ***FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN (14) DAYS WILL PRECLUDE APPELLATE REVIEW.*** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Sec'y of Health and Human Servs .,* 892 F.2d 15 (2d Cir.1989)); *see also* 28 U.S.C. § 636(b) (1); FED. R. CIV. P. 72 & 6(a).

Filed Sept. 25, 2013.

**All Citations**

Not Reported in F.Supp.3d, 2014 WL 4759937

---

End of Document          © 2017 Thomson Reuters. No claim to original U.S. Government Works.

1999 WL 219911
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Shawn GREEN, Plaintiff,
v.
NEW YORK CITY DEPARTMENT OF
CORRECTION, Michael Jacobson,
Disciplinary Hearing Officer, Defendants.

No. 98 CIV 825(JGK).
|
April 15, 1999.

OPINION AND ORDER

KOELTL, District J.

**\*1** The pro se plaintiff filed this action pursuant to 42
U.S.C. § 1983 alleging violations of his right to due process
at prison disciplinary hearings. Pending now are a motion
by defendants Michael Jacobson and the New York City
Department of Correction (the "DOC") to dismiss the
complaint against them and a motion by the plaintiff to
file a Second Amended Complaint.

I.

On a motion to dismiss, the allegations in the complaint
are accepted as true. See Cohen v. Koenig, 25 F.3d 1168,
1172–73 (2d Cir.1994). In deciding a motion to dismiss,
all reasonable inferences must be drawn in the plaintiff's
favor. See Gant v. Wallingford Bd. Of Educ., 69 F.3d 669,
673 (2d Cir.1995); Cosmas v. Hasset, 886 F.2d 8, 11 (2d
Cir.1989). The court's function on a motion to dismiss is
"not to weigh the evidence that might be presented at trial
but merely to determine whether the complaint itself is
legally sufficient." Goldman v. Belden, 754 F.2d 1059, 1067
(2d Cir.1985). Therefore, the defendant's motion should
only be granted if it appears that the plaintiff can prove no
set of facts in support of his claim that would entitle him
to relief. See Conley v. Gibson, 355 U.S. 41, 45–46 (1957);
Valmonte v. Bane, 18 F.3d 992, 998 (2d Cir.1994); see also
Goldman, 754 F.2d at 1065.

Where a pro se litigant is involved, the same standards for
dismissal apply. However, a "court should give the pro
se litigant special latitude in responding to a motion to
dismiss." Gaston v. Gavin, 97 Civ. 1645, 1998 WL 7217, at
\*1 (S.D.N.Y. Jan. 8, 1998); Adams v. Galletta, 966 F.Supp.
210, 211 (S.D.N.Y.1997); Andujar v. McClellan, 95 Civ.
3059, 1996 WL 601522 at \*1 (S.D.N.Y. Oct. 21, 1996)
(citation omitted).

The parties in this case have submitted evidentiary
materials outside the pleadings. Ordinarily, pursuant to
Federal Rule of Civil Procedure 12(b), a court may
consider such materials "in its discretion and upon notice
to all parties ...." See Sellers v. M.C. Floor Crafters, Inc.,
842 F.2d 639, 642 (2d Cir.1988). If it does so, however, it
must treat the motion to dismiss as a motion for summary
judgment. See id. Where a pro se litigant is concerned,
however, the Court of Appeals for the Second Circuit has
held that summary judgment is not appropriate unless
the pro se party has been given express notice by the
court or by the opposing party of the consequences of
failing to respond to a motion for summary judgment,
or unless the pro se litigant's papers establish that the
pro se litigant understood the nature and consequences of
summary judgment. See Vital v. Interfaith Med. Ctr., No.
98–7730, 1999 WL 76804 at \*4–6 (2d Cir. Feb. 19, 1999);
Graham v. Lewinski, 848 F.2d 342, 344 (2d Cir.1988);
Sellers, 842 F.2d at 642.

In this case, the plaintiff has not received notice from
either the Court or the defendants that the submission
of evidence outside the pleadings could result in the
conversion of a motion to dismiss into a summary
judgment motion. Moreover, the plaintiff's papers do not
show that he otherwise understood that he was required to
present counter-affidavits or other documentary evidence
as to every genuine issue of material fact that he wished
to preserve for trial. His 4–page letter in opposition to
the motion to dismiss focused on issues of law and did
not attempt to dispute the defendants' factual allegations.
(See Pl.'s Letter dated Nov. 2, 1998). Therefore, except for
official reports providing background information not at
issue in this case, the affidavits and other documentary
evidence attached to the parties' briefs will not be
considered in resolving the pending motion to dismiss.

**\*2** The defendants' motion to dismiss will be construed
as directed to the Second Amended Complaint to the

extent relevant to determine whether the Second Amended Complaint is futile.

## II.

For the purposes of the defendants' motion to dismiss, the following allegations are accepted as true. The plaintiff, Shawn Green, was incarcerated initially at the James A. Thomas Center ("J .A.T.C.") and then at the George R. Vierno Center ("G.R.V.C.") on Rikers Island at the time of the events giving rise to this action. Defendant Michael Jacobson was the Commissioner of the New York City Department of Correction at all times relevant to this action. Defendant "Disciplinary Hearing Officer," later identified as Captain Juan Quinones, was in charge of the disciplinary hearings which gave rise to this action. (*See* Letter from J. Machelle Sweeting dated Dec. 28, 1998). Defendant DOC was the employer of the individual defendants, who are sued in their personal and official capacities. Although the complaint names these three defendants, the docket sheet shows that the complaint has only been served on defendant Jacobson.

On October 31, 1996, a Notice of Infraction was served on the plaintiff charging him with assault on the prison staff, disrespect for staff, and refusing to be locked in his cell. (*See* Notice of Infraction to Inmate dated Oct. 31, 1996, attached as Ex. A to Declaration of J. Machelle Sweeting dated Jan. 15, 1999 ("Sweeting Decl.")). A disciplinary hearing was commenced on November 7, 1996 at the G.R.V.C. regarding this infraction. (*See* Disciplinary Hearing Checklist dated Nov. 7, 1996 attached as Ex. B to Sweeting Decl.; Sweeting Decl. ¶ 9). That hearing was adjourned twice. (*See id.* ¶¶ 10–12). On December 11, 1996, the disciplinary hearing concluded with the plaintiff being found guilty of the charges against him. The plaintiff was sentenced to 90 days in punitive segregation. (*See* Notice to Inmate of Disciplinary Proceeding Disposition dated Dec. 11, 1996 attached as Ex. C to Sweeting Decl.).

On December 9, 1996, another disciplinary notice was issued against the plaintiff, charging him with assault on staff, physically resisting staff, and verbal abuse to staff. (*See* Notice of Infraction to Inmate dated Dec. 9, 1996 attached as Ex. D to Sweeting Decl.). The notice was served on the plaintiff on December 11, 1996. (*See id.*). On December 12, 1996, a disciplinary hearing was held on this notice, at which time the plaintiff

was found guilty of all charges and sentenced to 100 days in punitive segregation. (*See* Disciplinary Hearing Checklist dated Dec. 12, 1996 and Notice to Inmate of Disciplinary Proceeding Disposition, attached as Exs. E and F, respectively, to Sweeting Decl.).

The plaintiff alleges in his proposed Second Amended Complaint that he challenged the disciplinary hearings by filing an Article 78 proceeding in state court. He alleges that he attempted to file an appeal to the First Department of the Appellate Division, but the Clerk of the New York State Supreme Court, Bronx County, rejected and/ or refused to file his notice of appeal. Moreover, that Clerk failed to provide the plaintiff with the index number for the Article 78 proceeding.

**\*3** The plaintiff has filed this action seeking compensatory and punitive damages against the defendants. In addition, the plaintiff seeks an injunction directing the City of New York (the "City") to establish an appeal system for disciplinary proceedings. He also requests injunctive relief ordering the New York State Supreme Court, Bronx County, to establish "an index number and acknowledgment system" for applications for Article 78 proceedings filed by prisoners.

## III.

### (A)

The DOC correctly points out, and the plaintiff concedes in his motion to amend the complaint, that the DOC is not a suable entity pursuant to section 396 of the New York City Charter. Section 396 requires that "all actions and proceedings for the recovery of penalties ... be brought in the name of the City of New York, and not that of any agency, except where otherwise provided by law." N.Y.C. Charter, ch. 16, § 396; *see also Richardson v. C.O. Castro,* No. 97 CV 3772, 1998 WL 205414 at *6 (E.D.N.Y. Apr. 24, 1998); (holding that the DOC is not a suable entity); *Byas v. New York City Dep't of Correction,* 173 F.R.D. 385, 387 (S.D.N.Y.1997) (same). Accordingly, the complaint against the DOC is withdrawn and the defendants' motion to dismiss the DOC is denied as moot.

(B)

Defendant Michael Jacobson moves to dismiss the section 1983 claim against him in his personal capacity on the ground that the plaintiff has failed to allege that the defendant was personally involved in the alleged constitutional violations.

Section 1983 provides a cause of action against any person who under color of state law, deprives another of his federal rights, privileges or immunities. *See* 42 U.S.C. § 1983. The plaintiff alleges violations of his rights under the Due Process Clause of the Fourteenth Amendment to the United States Constitution. "It is well settled in this Circuit that 'personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.' " *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (quoting *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 (2d Cir.1991)); *see also Champion v. Artuz,* 76 F.3d 483, 486–87 (2d Cir.1996) (affirming dismissal of claims against correction officials who were not alleged to have been involved in wrongdoing); *Andujar,* 1996 WL 601522 at *1. Personal involvement for purposes of a section 1983 action means "direct participation, or failure to remedy the alleged wrong after learning of it, or creation of a policy or custom under which unconstitutional practices occurred, or gross negligence in managing subordinates." *Black v. Coughlin,* 76 F.3d 72, 74 (2d Cir.1996); *see also Wright,* 21 F.3d at 501; *Williams v. Smith,* 781 F.2d 319, 323–24 (2d Cir.1986); *Andujar,* 1996 WL 601522 at *1. A complaint is fatally defective on its face if it fails to allege that the defendant was directly and personally responsible for the purported unlawful conduct. *See Rosa R. v. Connelly,* 889 F.2d 435, 437 (2d Cir.1989), cert. denied, 496 U.S. 941 (1990); *Alfaro Motors, Inc. v. Ward,* 814 F.2d 883, 886 (2d Cir.1987); *see also Adams,* 966 F.Supp. at 212; *Chelewsky v. Sielaff,* Nos. 91 Civ. 3076, 91 Civ. 3777, 1993 WL 473746 at *5 (S.D.N.Y. Jan. 10, 1994) (dismissing section 1983 claim against DOC commissioner because he was not personally involved in plaintiff's disciplinary hearing).

**\*4** In this case, neither the original complaint nor either of the two amended complaints contains any allegation that defendant Jacobson was personally involved in any of the events giving rise to this action. The plaintiff has failed to allege that defendant Jacobson was involved in issuing the infraction notices or in the disciplinary

hearings. Nor has the plaintiff asserted that defendant Jacobson interfered with the plaintiff's attempts to seek judicial review. Therefore, defendant Jacobson's motion to dismiss the complaint against him in his personal capacity is granted.

(C)

Defendant Jacobson also moves to dismiss the complaint against him in his official capacity for failure to state a claim under section 1983. The defendant argues that the plaintiff has failed to allege a municipal policy, custom, or practice that caused his alleged constitutional injury. A suit against a governmental officer in his official capacity is equivalent to a suit against the entity of which the officer is an agent. *See DeCarlo v. Fry,* 141 F.3d 56, 61 (2d Cir.1998); *McMillan v. Monroe County, Alabama,* 520 U .S. 781, 785 n2 (1997); *Kentucky v. Graham,* 473 U.S. 159, 165 (1985). Thus, the suit against defendant Jacobson in his official capacity is equivalent to a suit against the City of New York. *See Grosso v. Town of Clarkstown,* No. 94 Civ. 7722, 1998 WL 566814 at *11 (S.D.N.Y. Sept. 3, 1998). The plaintiff also seeks to substitute New York City as a defendant in his Second Amended Complaint.

However, the City is correct that it can only be held liable if the alleged violation of due process was pursuant to a municipal custom or policy. *See Monell v. New York City Dep't of Social Serv .,* 436 U.S. 658, 694 (1978); *Grosso,* 1998 WL 566814 at *10. While the plaintiff need not demonstrate that the municipal defendants had an explicitly stated rule or regulation, a single incident alleged in a complaint, especially if it involved only actions below the policy-making level, does not by itself suffice to show a municipal policy. *DeCarlo,* 141 F.3d at 61 (quotation omitted); *Grosso,* 1998 WL 566814 at *10. In this case, even in the Second Amended Complaint, the plaintiff has failed to allege that any of the purported violations were pursuant to a municipal custom or policy. Therefore, the complaint against Michael Jacobson in his official capacity is denied without prejudice and the motion to add the City of New York as a defendant is denied without prejudice. [1]

(D)

The plaintiff has not expressly moved to amend the complaint to substitute Captain Juan Quinones for the defendant "Disciplinary Hearing Officer." However, the defendants have construed the motion to amend as including an application to make that substitution and do not oppose such a substitution. However, the defendants argue that the proposed amendment would be futile. They contend that the plaintiff has failed to allege a violation of procedural due process in his prior disciplinary hearings. Moreover, the defendants argue that an Article 78 postdeprivation hearing is sufficient to provide due process. [2]

**\*5** In *Patterson v. Coughlin,* 761 F.2d 886 (2d Cir.1985), cert. denied, 474 U.S. 1100 (1986), the Court of Appeals held that a fair and adequate prior hearing is required before a prisoner may be sanctioned with punitive segregation. *Id.* at 893. The mere promulgation of regulations which, if followed, would satisfy the requirements of due process is not enough. *Id.* at 891. Where an official with final authority over decisions regarding punitive segregation failed to meet the requirements of due process, the resulting "deprivation of [the prisoner's] liberty was neither 'random' nor 'unauthorized.' " *Id.* at 892. Thus, "a postdeprivation hearing, by way of an Article 78 proceeding ... is inadequate, by definition, to meet the requirements of due process." *Id.; Walker v. Bates,* 23 F.3d 652, 657 (2d Cir.1994), cert. denied, 515 U.S. 1157 (1995) (same); *see also Hellenic American Neighborhood Action Comm. v. City of New York,* 101 F.3d 877, 880 (2d Cir.1996) (distinguishing between the due process requirements for deprivation of property and liberty by random acts and by established state policy), cert. dismissed, 118 S.Ct. 15 (1997).

The plaintiff in this case has sufficiently alleged that he did not receive a fair and adequate hearing prior to his punitive segregation. In *Wolff v. McDonnell,* 418 U.S. 539 (1974), the Supreme Court set out the minimum requirements of procedural due process that must be satisfied in prison disciplinary hearings. First, written notice of the charges must be given to the disciplinary-action defendant at least 24 hours before the hearing. *McDonnell,* 418 U.S. at 564. Second, the fact-finder must prepare a written statement describing the evidence relied on and giving the reasons for the disciplinary action. *Id.* Third, prisoners facing disciplinary proceedings ordinarily should be allowed to call witnesses and present

documentary evidence. *Id.* at 566; *Walker,* 23 F.3d at 656 (holding that the summary denial of an inmate's right to call witnesses who would give exculpatory testimony constitutes, "without more, a compensable due process violation"). However, this last right is not absolute and may be subordinated to the need to maintain prison security or correctional goals. *McDonnell,* 418 U.S. at 566.

Here, the plaintiff has alleged various defects in the disciplinary hearings. He contends, among other things, that: (1) he was not given information 24 hours prior to his disciplinary hearing; (2) he was denied access to witnesses and evidentiary documents, including the injury report for the officer the plaintiff was charged with assaulting and an unidentified G.R.V.C. memorandum dated November 1, 1996; (3) he was denied assistance in preparing his defense; and (4) he was not informed of the evidence available to the factfinder. (*See* Second Am. Compl. § IV; Pl.'s Letter dated Feb. 5, 1999 at 1).

These allegations are sufficient to state a claim that the plaintiff's rights under *McDonnell* were violated. *See also Patterson,* 761 F.2d at 892 (holding that the prisoner who was punitively segregated as result of a disciplinary hearing in which he was denied the opportunity to present witnesses had been denied a meaningful predeprivation hearing). Moreover, the alleged procedural defects allegedly involved Captain Quinones and it cannot be said on this motion to dismiss that Captain Quinones lacked final authority over the decision to segregate the plaintiff for punitive reasons. Therefore, the plaintiff has also made out a colorable section 1983 claim against Juan Quinones.

**\*6** The defendants argue that even if the section 1983 claim against defendant Quinones is viable, defendant Quinones would be entitled to qualified immunity. "The purpose of the qualified immunity doctrine is to balance the need to protect the rights of citizens through damage remedies, with the opposing need to protect officials who are required to exercise their discretion and the related public interest in encouraging the vigorous exercise of official authority." *Danahy v. Buscaglia,* 134 F.3d 1185, 1189 (2d Cir.1998) (quoting *Butz v. Economou,* 438 U.S. 478, 506 (1978)); *see also Malsh v. Austin,* 901 F.Supp. 757, 764 (S.D.N.Y.1995). This defense therefore enables costly but insubstantial lawsuits against government officials to be quickly terminated, *see Harlow v. Fitzgerald,* 457 U.S. 800, 808 (1982), and also guards against the risk

that "fear of personal monetary liability and harassing litigation will unduly inhibit officials in the discharge of their duties." *Anderson v. Creighton,* 483 U.S. 635, 638 (1987); *see also Estate of Rosenblum v. City of New York,* 975 F.Supp. 206, 215 (E.D.N.Y.1997). "[G]overnment officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow,* 457 U.S. at 818; *see Crawford–El v. Britton,* 118 S.Ct. 1584, 1592 (1998). "A right is clearly established when the contours of the right are sufficiently clear that a reasonable official would understand that what he is doing violates that right. The unlawfulness must be apparent." *McEvoy v.. Spencer,* 124 F.3d 92, 96 (2d Cir.1997) (quoting *Anderson,* 483 U.S. at 640).

To determine whether a particular right was clearly established at the time of the alleged offense, courts should look to: (1) whether the right in question was defined with "reasonable specificity"; (2) whether the decisional law of the Supreme Court and the applicable circuit court support the existence of the right in question; and (3) whether under preexisting law a reasonable defendant official would have understood that his or her acts were unlawful. *Jermosen v. Smith,* 945 F.2d 547, 550 (2d Cir.1991). The use of an "objective reasonableness" standard permits qualified immunity claims to be decided as a matter of law. *Danahy,* 134 F.3d at 1190; *Carter v. Lussier,* 955 F.2d 841, 844 (2d Cir.1992); Malsh, 901 F.Supp. at 764; *see also Fry v. McCall,* No. 95 Civ.1915, 1998 WL 770563 at *3 (S.D.N.Y. Nov. 4, 1998).

Whether defendant Quinones is entitled to qualified immunity cannot be decided on this motion to amend. There were certain clearly established constitutional requirements for due process in a prison disciplinary hearing and it cannot be determined on the papers before the Court whether any of those rights were violated and whether the hearing officer was responsible for any alleged violations, although there are allegations of such violations. For example, it cannot be determined given the limited record whether the plaintiff was timely served with the infraction notices and if not, who was responsible for the delay. Similarly, the record is unclear as to whether the plaintiff's alleged request for exculpatory witnesses was transmitted to those witnesses and if not, whether there was a legitimate reason for refusing to do so.

*7 Therefore, to the extent the plaintiff has made a motion to amend the complaint to substitute defendant Quinones for the "Disciplinary Hearing Officer," the motion is granted.

(E)

The defendants also move to dismiss the due process claim on the ground that it is barred by *Edwards v. Balisok,* 520 U.S. 641 (1997). In *Balisok,* a prisoner brought a section 1983 action to challenge the constitutionality of the procedures used to deprive him of good-time credits. Balisok alleged that the prison official concealed exculpatory witness statements and refused to ask specified questions of requested witnesses, thus impeding his right to mount his defense at his disciplinary hearing. *See id.* at 644. The Supreme Court found that his claim was not cognizable under section 1983 because the procedural defect complained of, if established, would necessarily imply the invalidity of the punishment imposed as a result of the challenged proceedings. *See id.* at 646–47. The defendants in this case argue that *Balisok* compels the dismissal of the plaintiff's claim because if the plaintiff's constitutional attack on the disciplinary hearing is successful, it would necessarily invalidate the plaintiff's sentence of 190 days in punitive segregation. The defendants' reliance on *Balisok* is misplaced.

As Judge Kaplan explained in *Jackson v. Johnson,* 15 F.Supp.2d 341 (S.D.N.Y.1998), *Balisok* must be viewed in the context of Supreme Court decisions distinguishing between a section 1983 claim and a habeas corpus petition. In *Preiser v. Rodriguez,* 411 U.S. 475 (1973), the Supreme Court held that a claim "attacking the very duration of [the prisoner's] physical confinement itself" due to the loss of good time credits lay "within the core of habeas corpus." *Id.* at 487–88. Thus, a prisoner may not assert a section 1983 claim challenging "the fact or duration of confinement based ... upon the alleged unconstitutionality of state administrative action." *Id.* at 489.

In *Heck v. Humphrey,* 512 U.S. 477 (1994), the Supreme Court considered a prisoner's section 1983 claim for damages which alleged that prosecutors and police officers had engaged in misconduct in investigating and prosecuting his case. The Court again explained that to recognize such a claim would "expand opportunities for collateral attack" and might risk "the creation of two

conflicting resolutions arising out of the same or identical transaction[s]." *Id.* at 484–85. Thus, the Supreme Court held that such a complaint must be dismissed unless the conviction or sentence had already been invalidated. *Id.*

In contrast to *Preiser, Heck,* and *Balisok,* the disciplinary proceeding attacked in this case did not result in punishment that affected the "fact or duration of" the plaintiff's incarceration. *Preiser,* 411 U.S. at 498. Rather, the disciplinary segregation is alleged to have affected only the conditions of the plaintiff's confinement and section 1983 remains a proper remedy for a prisoner who is making a constitutional challenge to the conditions of his prison life. *See id.; see also McDonnell,* 418 U.S. at 554 (noting that damages claims could be pressed under section 1983 along with suits challenging the conditions of confinement) (citing *Preiser,* 411 U.S. at 498–99); *Jackson,* 15 F.Supp.2d at 349.

**\*8** Therefore, the defendants' motion to dismiss for failure to state a cognizable due process claim is denied.

### (F)

The defendants move pursuant to 42 U.S.C. § 1997e(e) to dismiss the plaintiff's claim for mental or emotional injury because the plaintiff has alleged no physical injury. Section 1997e(e) provides that "[n]o Federal civil action may be brought by a prisoner confined in a jail, prison, or other correctional facility, for mental or emotional injury suffered while in custody without a prior showing of physical injury." 42 U.S.C. § 1997e(e).

It is unclear from either the original complaint or the two amended complaints whether the plaintiff seeks to assert a claim based on mental or emotional distress. This provision would not bar a claim which does not seek such relief. *See Amaker v. Haponik,* No. 98 Civ. 2663, 1999 WL 76798 at \*6 (S.D.N.Y. Feb. 17, 1999). The defendants' motion to dismiss is therefore denied without prejudice to renewal.

### (G)

The defendants move to dismiss as moot the plaintiff's request for injunctive relief because the plaintiff is no longer in the custody of the DOC. However, it is premature to determine what the scope of injunctive relief would be prior to a determination of liability. The defendants' motion to dismiss the request for injunctive relief is therefore denied without prejudice to renewal.

### (H)

The plaintiff moves to amend his complaint to add the Clerk of the New York State Supreme Court, Bronx County, as an additional defendant. The plaintiff alleges that the Clerk "deprive[d] plaintiff of his access to court and right to appeal [New York State] Supreme Court decision regarding ... disciplinary proceedings." (*See* Second Am. Compl. § IV). According to the plaintiff, the Clerk rejected or failed to file his notice of appeal to the Appellate Division of the New York State Supreme Court. Moreover, the Clerk purportedly refused to provide to the plaintiff the index number of an Article 78 proceeding to facilitate the filing of an appeal.

The defendants have not opposed this amendment. Therefore, the plaintiff's motion to amend the complaint to add the Clerk of the Bronx County Court as an additional defendant is granted. If the plaintiff intends to pursue this claim he should serve the summons and Second Amended Complaint on the defendant Clerk. The Clerk is, of course, free to file any appropriate motion with respect to the Second Amended Complaint, including any motions based on immunity.

### (I)

The plaintiff also appears to move to amend the complaint to assert an additional basis for jurisdiction under New York General Municipal Law § 50–j. [3] (*See* Second Am. Compl. § IV). Section 50–j (3) provides that:

> Any claim for damages arising out of any act done or the failure to perform any act within the scope of the employment and in the discharge of the duties of any member of the department shall be brought and maintained in the supreme court as a claim against the city.

**\*9** N.Y. Gen. Mun. Law § 50–j (McKinney 1999). However, subsection 9 expressly provides that "[t]he provisions of this section shall not apply to the city of New York." N.Y. Gen. Mun. Law § 50–j(9); *see also Muhammad v. McMickens,* No. 86 Civ. 7376, 1988 WL 7789 at \*2 n2 (S.D.N.Y. Jan. 25, 1988) (section 50–j(9) "by its own terms does not apply to the City of New York."). It is not clear how section 50–j is relevant or necessary to this action, which asserts a section 1983 cause of action.

Therefore, the plaintiff's motion to amend the complaint to assert jurisdiction under N.Y. Gen. Mun. Law § 50–j is denied.

CONCLUSION

For the reasons explained above, the defendants' motion to dismiss the complaint against defendant Michael Jacobson in his personal and official capacities is granted. The complaint against the New York City Department of Correction is withdrawn and the defendants' motion to dismiss the Complaint against the New York City Department of Correction is denied as moot. The plaintiff's motion to file a Second Amended Complaint is granted for the purposes of asserting a claim against

defendant Juan Quinones and the Clerk of the Court, New York State Supreme Court, Bronx County. The plaintiff's motion to add New York City as a defendant is denied without prejudice to renewal.

SO ORDERED.

1    While the plaintiff also contends that there is no appeal process, on its face, the complaint alleges that an Article 78 process does exist but that he was thwarted in pursuing it. Thus, there is a review process and this allegation would not form a basis for alleging an unconstitutional municipal policy or practice.

2    The defendants make these arguments on behalf of defendant Quinones while reserving his right to raise the defense of insufficient service of process. *See* Fed.R.Civ.P. 12(b)(5).

3    The New York General Municipal Law contains two sections 50–j. The first relates to civil actions against police officers and is not at issue in this case. The second section 50–j, which is referred to here, concerns civil actions against correction employees. N.Y. Gen. Mun. Law § 50–j (McKinney 1999).

**All Citations**

Not Reported in F.Supp.2d, 1999 WL 219911

WESTLAW    © 2017 Thomson Reuters. No claim to original U.S. Government Works.                    7

2003 WL 22384792
Only the Westlaw citation is currently available.
United States District Court,
W.D. New York.

Gary E. BOGLE, a/k/a Gary Polite, Plaintiff,
v.
Robert J. MURPHY and
Richard T. Cerio, Defendants.

No. 98-CV-6473 CJS.
|
Sept. 9, 2003.

Inmate brought § 1983 action against employees of New York State Department of Correctional Services (DOCS), alleging that his exclusion from his disciplinary hearing was violation of due process. Defendants moved for summary judgment. The District Court, Siragusa, J., held that: (1) inmate's year-long confinement constituted deprivation of protected interest, but (2) due process did not require that inmate be physically present at testimony.

Motion granted.

West Headnotes (2)

**[1]    Constitutional Law**
👉 Discipline and Classification

**Prisons**
👉 Punitive, Disciplinary, or Administrative Confinement

**Prisons**
👉 Presence or Attendance

Regardless of whether time inmate served as result of his prison disciplinary hearing in which he was found guilty was credited to time he owed for two separate violations, inmate's year-long confinement resulting from hearing was sufficient to rise to level of atypical and significant hardship on him in relation to ordinary incidents of prison life, as required to satisfy the deprivation of protected interest prong of his claim of denial of due process pursuant to § 1983 against state prison employees, arising from his ejection

from hearing. U.S.C.A. Const.Amend. 14; ; 42 U.S.C.A. § 1983.

5 Cases that cite this headnote

**[2]    Constitutional Law**
👉 Discipline and Classification

**Prisons**
👉 Presence or Attendance

Even though inmate had right under New York regulation to be present at prison disciplinary hearing, inmate's ejection during his disciplinary hearing did not constitute due process violation, as required to support § 1983 claim against state prison employees, arising from his ejection from hearing; even though due process requirement provided inmate limited right to call witnesses and present documentary evidence in his defense, it did not provide right to be physically present at testimony. U.S.C.A. Const.Amend. 14; 42 U.S.C.A. § 1983; N.Y.Comp. Codes R. & Regs. title 7, § 254.6.

16 Cases that cite this headnote

**Attorneys and Law Firms**

Gary E. Bogle, a/k/a Gary Polite, Southport Correctional Facility, Pine City, NY, for plaintiff, pro se.

Kelly A. McCarthy, Assistant Attorney General, Office of the New York State Attorney General, Rochester, NY, for defendants.

DECISION AND ORDER

SIRAGUSA, J.

*INTRODUCTION*

**\*1** This is an action pursuant to 42 U.S.C. § 1983, brought by *pro se* plaintiff, a prison inmate. Plaintiff Gary E. Bogle [1] ("plaintiff") claims that his exclusion from his disciplinary hearing was a violation of due process. Now before the Court is defendants' motion [37-1] for summary

2003 WL 22384792

judgment. For the following reasons, defendant's motion is granted.

1    Plaintiff Gary Bogle was housed in the Auburn Correctional Facility under the name of Gary Polite.

## PROCEDURAL HISTORY

At all relevant times, plaintiff was an inmate at Southport Correctional Facility ("Southport") and defendants were employees of the New York State Department of Correctional Services ("DOCS") at Southport.

Plaintiff filed a civil rights complaint with this Court on November 6, 1998, claiming that defendants Robert J. Murphy ("Murphy") and Southport Senior Corrections Counselor Richard T. Cerio ("Cerio") violated his constitutional due process right to be present during his disciplinary hearing. The Court, in a decision and order filed on January 26, 1999, granted plaintiff's request to proceed *in forma pauperis,* but dismissed the complaint pursuant to 28 U.S.C. § 1951(e)(2)(B), since plaintiff never claimed that the hearing was invalidated. [2] In a subsequent decision and order, filed on May 24, 1999, the Court granted plaintiff's motion for reconsideration, and then reopened the case on the ground that his disciplinary hearing conviction was reversed and expunged from his record, which was information plaintiff had neglected to include in his original complaint. Both defendants submitted their answers on July 6, 1999, asserting three separate affirmative defenses: (1) that the complaint failed to state a claim upon which relief could be granted; (2) that defendants acted under a reasonable belief and in good faith that their actions were proper and legal and; (3) that the alleged actions were within their discretionary authority.

2    An inmate has a viable cause of action under § 1983 only if relief from the underlying conviction is obtained. *See Burnell v. Coughlin,* 975 F.Supp. 473, 475-79 (W.D.N.Y.1997).

On February 15, 2000, defendants filed a motion for summary judgment supported by a memorandum and two affidavits from each defendant. On October 18, 2000, defendants submitted an amended motion for summary judgment, an affidavit by defendants' attorney, an amended memorandum, an amended affidavit by defendant Richard T. Cerio, and an amended statement

of facts. In the amended memorandum, defendants move for summary judgment on three separate grounds:

(1) plaintiff never served any extra SHU time as a result of the eventually reversed May 1997 hearing and therefore, he had no liberty interest that was affected by the alleged due process violation; (2) defendants are entitled to qualified immunity as to their imposition (Cerio) and affirmance (Murphy) of the one year/365 day SHU term imposed on plaintiff as a result of his May 1997 disciplinary hearing because at the time, it was not clearly established under *Sandin* that such a penalty imposed an atypical and significant hardship requiring due process protection; and (3) defendants are entitled to qualified immunity as to plaintiff's right to be present at his entire disciplinary hearing because his right to be present under the circumstances was not clearly established at the time of the hearing.

**\*2**   Am. Mem. at 2.

## FACTUAL BACKGROUND

On May 8, 1997, plaintiff received an Inmate Misbehavior Report charging him with three violations based on an unknown third person's mailing of a contraband package to him. The three charges were pursuant to DOCS' Standards of Inmate Misbehavior Institutional Rules of Conduct: Rule 114.10 (Inmate shall not solicit others to smuggle items into the facility) (7 NYCRR 270.2[B] [15][i] ); Rule 113.10 (Inmate shall not possess/exchange a weapon) (7 NYCRR 270.2[B][14][i] ); and Rule 113.12 (Inmate shall not possess/exchange narcotics) (7 NYCRR 270.2[B][14][ii] ). On May 21, 1997, Cerio commenced a Tier III [3] disciplinary hearing for the above charges. Plaintiff pled not guilty to all three charges.

2003 WL 22384792

3    A Tier III disciplinary hearing is a Superintendent's
     hearing that is reserved for the most serious
     disciplinary violations.

During the hearing, Cerio tried to determine whether the
contraband package was mailed from plaintiff's home
town. Plaintiff assumed that Cerio knew, from a review of
plaintiff's records, where plaintiff lived and asked Cerio:
"Excuse me but what [do] you mean you don't know
where I'm from?" *Polite v. Goord,* No. 6759-97, slip op.
(N.Y.App.Div. Aug. 7, 1998). Cerio took offense to this
question, believing that it was an insinuation by plaintiff
that Cerio, intending an unfair hearing, had already read
plaintiff's file. Cerio decided that plaintiff's insinuation
was improper and intolerable behavior. In response, Cerio
excluded plaintiff from the proceeding and completed
the remainder of the hearing in plaintiff's absence. Cerio
found plaintiff guilty on all three charges and sentenced
him to 365 days of confinement in the Special Housing
Unit ("SHU") and one year loss of good time credit.

Plaintiff appealed to DOCS Commissioner Glenn Goord
("Goord") alleging that Cerio violated his constitutional
due process right to be present at the hearing by excluding
him. On July 25, 1997, Murphy, Goord's designee,
affirmed the hearing result. Plaintiff then served his one
year of SHU confinement time.

Before serving the SHU sentence from the May 1997
hearing ("Term II"), plaintiff was sentenced for two
additional and separate disciplinary infractions ("Term
III" and "Term IV"), which were to be served
consecutively.[4] Defendants claim that they credited his
time for Term II, to Term III and Term IV.

4    Terms II, III, and IV are used by defendants to
     identify the three separate SHU sentences mentioned
     above. Defendants use this terminology without any
     further explanation.

On September 11, 1998, plaintiff brought an Article 78
("Article 78") proceeding pursuant to the New York Civil
Procedure Law and Rules against Goord in New York
State Supreme Court, Third Judicial District. That court
granted plaintiff's petition on the ground that plaintiff was
improperly excluded from his hearing. *Polite v. Goord,* No.
6759-97, slip op. (N.Y.App.Div. Aug. 7, 1998). As a result,
the May 1997 Tier III disciplinary hearing determination
was annulled and plaintiff's record, with reference to the
disciplinary infractions at issue, was expunged.

*LEGAL STANDARDS*

A. Summary Judgment Standard
The standard for granting summary judgment is
well established. Summary judgment may not be
granted unless "the pleadings, depositions, answers to
interrogatories, and admissions on file, together with the
affidavits, if any, show that there is no genuine issue
as to any material fact and that the moving party is
entitled to a judgment as a matter of law." FED. R. CIV.
P. 56(c). A party seeking summary judgment bears the
burden of establishing that no genuine issue of material
fact exists. *See Adickes v. S.H. Kress & Co.,* 398 U.S. 144,
157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). "[T]he movant
must make a *prima facie* showing that the standard
for obtaining summary judgment has been satisfied."
11 MOORE'S FEDERAL PRACTICE, § 56 .11[1][a]
(Matthew Bender 3d ed.). That is, the burden is on the
moving party to demonstrate that the evidence creates no
genuine issue of material fact. *See Amaker v. Foley,* 274
F.3d 677 (2d Cir.2001); *Chipollini v. Spencer Gifts, Inc.,*
814 F.2d 893 (3d Cir.1987) (*en banc* ). Where the non-
moving party will bear the burden of proof at trial, the
party moving for summary judgment may meet its burden
by showing the evidentiary materials of record, if reduced
to admissible evidence, would be insufficient to carry the
non-movant's burden of proof at trial. *Celotex Corp. v.
Catrett,* 477 U.S. 317, 322-23, 106 S.Ct. 2548, 91 L.Ed.2d
265 (1986).

**\*3** Once that burden has been met, the burden then
shifts to the non-moving party to demonstrate that, as
to a material fact, a genuine issue exists. FED. R. CIV.
P. 56(e); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242,
250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). "A fact is
'material' only if the fact has some affect on the outcome
of the suit." *Catanzaro v. Weiden,* 140 F.3d 91, 93 (2d
Cir.1998)(*citing Anderson v. Liberty Lobby, Inc.,* 477 U.S.
at 248). A dispute regarding a material fact is genuine "if
the evidence is such that a reasonable jury could return
a verdict for the nonmoving party." *Anderson v. Liberty
Lobby,* 477 U.S. at 248. In determining whether a genuine
issue exists as to a material fact, the court must view
underlying facts contained in affidavits, attached exhibits,
and depositions in the light most favorable to the non-
moving party. *U.S. v. Diebold, Inc.,* 369 U.S. 654, 655, 82
S.Ct. 993, 8 L.Ed.2d 176 (1962). Moreover, the court must

2003 WL 22384792

draw all reasonable inferences and resolve all ambiguities in favor of the non-moving party. *Leon v. Murphy,* 988 F.2d 303, 308 (2d Cir.1993). However, a summary judgment motion will not be defeated on the basis of conjecture or surmise or merely upon a " 'metaphysical doubt' concerning the facts ." *Bryant v. Maffucci,* 923 F.2d 979, 982 (2d Cir.1991) (citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)); *Knight v. United States Fire Ins. Co.,* 804 F.2d 9 (2d Cir.1986). Rather, evidentiary proof in admissible form is required. FED. R. CIV. P. 56(e). Furthermore, the party opposing summary judgment "may not create an issue of fact by submitting an affidavit in opposition to a summary judgment motion that, by omission or addition, contradicts the affiant's previous deposition testimony." *Hayes v. New York City, Dep't of Corr.,* 84 F.3d 614, 619 (2d Cir.1996) (citations omitted).

A court should read a *pro se* litigant's papers liberally, interpreting them "to raise the strongest arguments that they suggest." *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994). However, when alleging a violation of a civil rights statute, even a *pro se* litigant must make "specific allegations of fact indicating a deprivation of rights, instead of a litany of general conclusions that shock but have no meaning." *Barr v. Adams,* 810 F.2d 358, 363 (2d Cir.1987).

B. Deprivation of a Protected Interest
To pursue a due process claim under 42 U.S.C. § 1983, a plaintiff must show that he "enjoyed a protected interest, and defendant's deprivation of that interest occurred without due process of law." *Taylor v. Rodriguez,* 238 F.3d 188, 191 (2d Cir.2001) (citing *Tellier v. Fields,* 230 F.3d 502, 511 (2d Cir.2000)). A prisoner asserting that he was denied due process in connection with prison disciplinary hearings that resulted in segregative confinement or a loss of privileges, must make a threshold showing that the deprivation of which he complains imposed an "atypical and significant hardship on [him] in relation to the ordinary incidents of prison life." *Sandin v. Conner,* 515 U.S. 472, 484, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995). "After *Sandin,* in order to determine whether a prisoner has a liberty interest in avoiding disciplinary confinement, a court must examine the specific circumstances of the punishment." *Brooks v. DiFasi,* 112 F.3d 46, 49 (2d Cir.1997).

**\*4** In determining atypicality, duration of the confinement is an important consideration. *Colon v. Howard,* 215 F.3d 227, 231 (2d Cir.2000) (citing *Sealey v. Giltner,* 197 F.3d 578. 586 (2d Cir.1999)) ("Both the conditions and their duration must be considered, since especially harsh conditions endured for a brief interval and somewhat harsh conditions endured for a prolonged interval might both be atypical") (citation omitted); *see also Welch v. Bartlett,* 196 F.3d 389, 392-93 (2d Cir.1999). Confinement that lasts 101 to 305 days requires a detailed factual inquiry into duration, in relation to "periods of comparable deprivation typically endured by other prisoners in the ordinary course of prison administration," *Welch,* 196 F.3d at 394, or "evidence of the psychological effects of prolonged confinement in isolation and the precise frequency of SHU confinements of varying durations." *Colon,* 215 F.3d at 232. Despite the Second Circuit's hesitancy to establish any bright line test in determining atypicality, it has held that confinement in normal SHU conditions for 305 days is sufficient to satisfy the *Sandin* standard. *Id.* at 231 ("There are no precise calipers to measure the severity of SHU hardship, but we believe that wherever the durational line is ultimately drawn, 305 days satisfies the standard").

C. Violation of Due Process
In addition to showing a deprivation of a protected interest that meets the *Sandin* standard, plaintiff must also show that this deprivation occurred without due process of law. *See Taylor,* 238 F.3d at 191 (citing *Tellier,* 230 F.3d at 511).

States can "provid[e] inmates with a procedural safeguard in disciplinary hearings that is *not* required by the U.S. Constitution ... and where that safeguard is not required by the United States Constitution's Due Process Clause, its denial cannot constitute a violation of that clause." *Dawes v. Leonardo,* 885 F.Supp. 375, 377-78 (citing *Patterson v. Coughlin,* 761 F.2d 886, 892 (2d Cir.1985)). For example, under New York State regulations, an inmate has the right to "be present at the hearing unless he refuses to attend, or is excluded for reason of institutional safety or correctional goals." N.Y.Comp.Codes R. & Regs. tit. 7, § 254.6. Although a plaintiff may bring a successful Article 78 proceeding pursuant to this New York regulation, a claim under state law does not necessarily provide a viable due process claim under § 1983. *See Dawes,* 885 F.Supp. 375, 377-78. Therefore, the Court must determine whether an inmate's protection

from an allegedly unwarranted exclusion from his hearing under New York regulations, is also a constitutional right requiring due process.

In *Wolff v. McDonnell,* 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935, (1974), the Supreme Court established certain minimum requirements for procedural due process in an inmate's disciplinary hearing: "(1) that the inmate be given written notice of the charges against him no less than 24 hours in advance of the hearing; (2) that the factfinder at the hearing provide a written statement setting forth 'the evidence relied on and reasons for the disciplinary action;' and (3) that the inmate be allowed to call witnesses and present documentary evidence in his defense, as long as doing so is not 'unduly hazardous to institutional safety or correctional goals." ' *Sims v. Artuz,* No. 96-0216, 2003 WL 1746263, at *11 (S.D.N.Y. March 31, 2003) (quoting *Wolff,* 418 U.S. at 564, 566), *rev'd in part by* 230 F.3d 14 (2d Cir.2000).

## ANALYSIS

### A. Deprivation of Protected Interest

 **\*5** The Court rejects defendants' contention that plaintiff suffered no loss of a liberty interest. Defendants argue that plaintiff's time served in SHU (Term II) was credited to time he owed for two separate violations (Term III and Term IV). Defendants assert that as a result of the credits, plaintiff essentially never served any time for his Term II sentence. In support of their argument, defendants cite to *Young v. Hoffman,* 970 F.2d 1154 (2d Cir.1992). However, *Young* is distinguishable from this case, since the plaintiff in *Young* never served any of his sentence. *Id.* at 1155. Furthermore, there is nothing in *Young* that allows time served for one violation to be credited to another, completely separate violation.

Defendants also argue that, following *Russell v. Scully,* 15 F.3d 219 (2d Cir.1994), plaintiff did not suffer any loss of a protected interest because he would not have been released from SHU confinement even if the Term II sentence had not been given. The Court rejects this argument as well. In *Russell,* the Second Circuit determined that the plaintiff was not deprived of any protected liberty interest, since the plaintiff's confinement was not punitive in nature, but rather, characterized as administrative under a New York regulatory scheme, which allowed confinement pending an appeal. *Id.* at 221-22 (citing *Hewitt v. Helms,* 459

U.S. 460, 467, 103 S.Ct. 864, 74 L.Ed.2d 675 (1983)). In the case at bar, however, plaintiff's confinement was not administrative, but rather, punitive in nature. Furthermore, in light of *Sandin, Russell's* reliance on *Hewitt* is no longer well founded. In *Sandin,* the Supreme Court criticized "the search for a negative implication from mandatory language in prisoner regulations" and concluded that "[t]he time has come to return to the due process principles we believe were correctly established and applied in *Wolff* and *Meachum." Sandin,* 515 U.S. at 483; *Wolff,* 418 U.S. at 564, 566; *Meachum v. Fano,* 427 U.S. 215, 96 S.Ct. 2532, 49 L.Ed.2d 451 (1976). Instead of looking to the language of administrative regulations, the Court must determine whether a plaintiff has shown that the alleged deprivation imposed an "atypical and significant hardship on [him] in relation to the ordinary incidents of prison life." *Sandin,* 515 U.S. at 484.

 **[1]**  Applying the legal standard above, the Court finds that plaintiff's deprivation meets the *Sandin* criterion. *See Sandin,* 515 U.S. at 484. Plaintiff was confined in SHU for 365 days, which surpasses the 305 days of SHU confinement found to meet *Sandin's* requirement in *Colon.* Therefore, his year-long confinement is sufficient to rise to the level of an "atypical and significant hardship on [him] in relation to the ordinary incidents of prison life." *Id.*

### B. Violation of Due Process

 **[2]**  The Court rejects defendants' argument that the state court Article 78 reversal cured any possible due process violation resulting from the disciplinary hearing. *Polite v. Goord,* No. 6759-97, slip op. (N.Y.App.Div. Aug. 7, 1998). In support of their argument, defendants rely on *Young v. Hoffman,* 970 F.2d 1154, 1156 (2d Cir.1992), in which the Second Circuit stated that "[t]he administrative reversal constituted part of the due process protection he received, and it cured any procedural defect that may have occurred." *Id.* at 1156. However, after *Young,* the Second Circuit held in *Patterson,* 761 F.2d at 893, that any hearing subsequent to the deprivation, such as an Article 78 proceeding, is not enough to meet the due process requirements. "Once a cause of action for a constitutional violation accrues, nothing that the state does subsequently can cut off the § 1983 action." *Walker v. Bates,* 23 F.3d 652, 657 (2d Cir.1994) (quoting *Patterson,* 761 F.2d at 893). Therefore, even though the New York State Supreme Court's decision annulled the original May 1997 hearing result, the subsequent reversal would not necessarily rectify the due process violation. See

*Walker,* 23 F.3d at 657; *see also Patterson,* 761 F.2d at 893. Nonetheless, the Court finds that plaintiff did not have a due process right to be physically present at his disciplinary hearing. In making this finding, the Court relies on *Wolff* and *Francis v. Coughlin,* 891 F.2d 43 (2d Cir.1989).

**\*6** While *Wolff,* as discussed above, establishes minimum due process requirements for prison inmates, it does not specifically provide an inmate with a due process right to be physically present at his disciplinary hearing. *See Francis,* 891 F.2d at 43. Subsequent to *Wolff,* the Second Circuit in *Francis v. Coughlin, supra,* specifically held that an inmate's right to be present at his hearing could not be implied from any of *Wolff's* due process requirements. *Id.* at 48; *but cf. Freeman v. Rideout,* 308 F.2d 949 (2d Cir.1986).[5] *Francis* interpreted *Wolff's* third due process requirement as only providing the limited right to *call* witnesses and present documentary evidence in his defense, while the right to be physically *present* at testimony was a "separate question." *Id.* Moreover, *Francis* held that prison inmates did not have a constitutional right to be present during any kind of witness testimony, whether exculpatory or incriminatory. *Id.; see also Bolden v. Alston,* 810 F.2d 353, 358 (2d Cir.1987); *Young v. Kihl,* No. 89-1580E, 1990 WL 33183, at \*2 (W.D.N.Y. March 20, 1990). Although the Second Circuit later held in *Sims v. Artuz,* 230 F.3d 14, 27 (2d Cir.2000) that the denial of an inmate's right to call witnesses, present evidence, and comment on the charges against him during a disciplinary hearing were facially valid due process claims, it did not rule on the issue of whether an inmate has a constitutional right to be physically present at his hearing. *Id.*

[5]    In its 1986 *Freeman* decision, the Second Circuit paraphrased *Wolff's* third due process requirement as an inmate's right to "the opportunity *to appear* at the hearing, to call witnesses, and to present rebuttal evidence." *Id.* at 953 (emphasis added). *Francis,* decided three years later, explicitly rejected the implication in *Freeman.*

Therefore, this Court is constrained to follow *Francis'* interpretation of *Wolff,* which was subsequent to *Freeman.* Following *Wolff, Francis,* and *Bolden,* the Court holds that since *Wolff* does not positively grant an inmate the right to be present at his hearing, such a due process right cannot be implied. Furthermore, in the absence of a due process right, there can be no due process violation.

The Court's conclusion that an inmate does not have a due process right to be physically present at his disciplinary hearing is consistent with the well-established policy that since a prison operation is an "extraordinarily difficult undertaking," prison administrators should be allowed the necessary discretion without "being subject to unduly crippling constitutional impediments." *Wolff,* 418 U.S. at 566-67. In carrying out this policy, the courts must strike a balance between an inmate's rights and the correctional facility's interests. See *Freeman,* 808 F.2d at 954 ("[I]t is the responsibility of the court to balance the concern to safeguard the rights of individual inmates with the legitimate needs and aims of the penal institution"); *see also Superintendent, Mass. Correctional Inst. v. Hill,* 472 U.S. 445, 105 S.Ct. 2768, 86 L.Ed.2d 356 (1985); *Ponte v. Real,* 471 U.S. 491, 105 S.Ct. 2192, 85 L.Ed.2d 553 (1985). Providing an inmate a limited right to call witnesses and present evidence in his defense, but not a guarantee to be physically present at his disciplinary hearing, strikes this balance. An inmate is allowed to prepare and present his defense, while correctional facilities are provided the necessary protection and safety from confrontation arising during disciplinary hearings. See *Wolff,* 418 U.S. at 562.

**\*7** Therefore, although New York regulation section 254.6 explicitly provides inmates a right to be present at their disciplinary proceedings, it does not create a constitutional due process right. Since, under *Wolff,* inmates are not afforded a constitutional due process right to be present at their hearings, plaintiff's ejection during his disciplinary hearing was not a due process violation. In the absence of a due process violation, plaintiff fails to meet the second prong of his § 1983 claim. See *Taylor,* 238 F.3d at 191.

*CONCLUSION*

For all of the foregoing reasons, defendant's motion [37-1] for summary judgment is granted.

So ordered.

**All Citations**

Not Reported in F.Supp.2d, 2003 WL 22384792

**Bogle v. Murphy, Not Reported in F.Supp.2d (2003)**

2003 WL 22384792

---

**End of Document**                    © 2017 Thomson Reuters. No claim to original U.S. Government Works.

---