UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

_____

NICHOLAS MARTIN,

                                        Plaintiff,

                                                                    9:16-cv-00717
v.                                                                  (TJM/TWD)

R. OEY, et al.,

                                        Defendants.

_____

APPEARANCES:                          OF COUNSEL:

NICHOLAS MARTIN
Plaintiff, *pro se*
00-A-0008
Shawangunk Correctional Facility
P.O. Box 700
Wallkill, NY 12589

HON. ERIC T. SCHNEIDERMAN            SHANNAN C. KRASNOKUTSKI, ESQ.
Attorney General of the State of New York    Assistant Attorney General
Counsel for Defendants
The Capitol
Albany, NY 12224

**THÉRÈSE WILEY DANCKS**, United States Magistrate Judge

## ORDER AND REPORT-RECOMMENDATION

## I.    INTRODUCTION

        Plaintiff Nicholas Martin, an inmate in the custody of the New York State Department of

Corrections and Supervision ("DOCCS"), commenced this action by submitting a *pro se* civil

rights complaint pursuant to 42 U.S.C § 1983, together with an application to proceed *in forma*

*pauperis* ("IFP Application"). (Dkt. Nos. 1, 2.) Construed liberally, Plaintiff alleged he was

disciplined by Defendants Oey, Venettozzi, and Annucci in violation of his right to due process

under the Fourteenth Amendment to the United States Constitution.  (Dkt. No. 1.)  By Decision and Order filed July 22, 2016, Plaintiff's IFP Application was granted, but the initial complaint was dismissed without prejudice and with leave to amend pursuant to 28 U.S.C. §§ 1915(e)(2)(B) and 1915A for failure to state a claim a claim on which relief may be granted. (Dkt. No. 5.)  Plaintiff's amended complaint (Dkt. No. 8), which restated and clarified the Fourteenth Amendment due process claim against Oey, Venettozzi, and Annucci, survived the District Court's *sua sponte* review.  (Dkt. No. 11.)

On November 18, 2016, Defendants moved pursuant to Federal Rule of Civil Procedure 12(b)(6) to dismiss the amended complaint in its entirety for failure to state a claim upon which relief may be granted.  (Dkt. No. 17.)  Plaintiff opposed the motion.  (Dkt. No. 19.)  By Decision and Ordered filed September 20, 2017, Plaintiff's amended complaint was dismissed in its entirety without prejudice and with leave to file a second amended complaint.  (Dkt. No. 31.)

Plaintiff's second amended complaint is before the Court for initial review.  (Dkt. No. 34.)  Construed liberally, Plaintiff restates the Fourteenth Amendment due process claim against Oey, Venettozzi, and Annucci, and raises Eighth Amendment claims against Defendants Corrections Officer ("C.O.") Wyckoff,[1] C.O. Wentzel, and Lieutenant Mitchell.  *Id.*

For the reasons below, the Court recommends dismissal of Plaintiff's Fourteenth Amendment due process claim against Oey, Venettozzi, and Annucci with prejudice because Plaintiff does not allege he was denied any of the procedural protections to which he was entitled under *Wolff v. McDonnell*, 418 U.S. 539 (1974).  As to Plaintiff's newly asserted claims against Wyckoff, Wentzel, and Mitchell, mindful of the Second Circuit's instruction that a *pro se* plaintiff's pleadings must be liberally construed, *Sealed Plaintiff v. Sealed Defendant*, 537 F.3d

---

[1]  Plaintiff also refers to this Defendant as "Wykoff."  The Court will use "Wyckoff" herein.

185, 191 (2d Cir. 2008), the Court recommends that Wyckoff be directed to respond to Plaintiff's Eighth Amendment excessive force claim but that all other claims be *sua sponte* dismissed pursuant to 28 U.S.C. §§ 1915(e)(2)(B) and 1915A.

## II.    STANDARD OF REVIEW

Even when a plaintiff meets the financial criteria for *in forma pauperis*, 28 U.S.C. § 1915(e) directs that when a person proceeds *in forma pauperis*, "the court shall dismiss the case at any time if the court determines that . . . the action . . . (i) is frivolous or malicious; (ii) fails to state a claim on which relief may be granted; or (iii) seeks monetary relief against a defendant who is immune from such relief."  28 U.S.C. § 1915(e)(2)(B)(i)-(iii).

In determining whether an action is frivolous, the court must look to see whether the complaint lacks an arguable basis either in law or in fact.  *Neitzke v. Williams*, 490 U.S. 319, 325 (1989).  "An action is frivolous when either: (1) the factual contentions are clearly baseless such as when the claims are the product of delusion or fantasy; or (2) the claim is based on an indisputably meritless legal theory."  *Livingston v. Adirondack Beverage Co.*, 141 F.3d 434, 437 (2d Cir. 1998) (citations and internal quotation marks omitted).  Although extreme caution should be exercised in ordering *sua sponte* dismissal of a *pro se* complaint before the adverse party has been served and the parties have had an opportunity to respond, *Anderson v. Coughlin*, 700 F.2d 37, 41 (2d Cir. 1983), the court still has a responsibility to determine that a claim is not frivolous before permitting a plaintiff to proceed.  *See, e.g.*, *Thomas v. Scully*, 943 F.2d 259, 260 (2d Cir. 1991) (per curiam) (holding that a district court has the power to dismiss a complaint *sua sponte* if the complaint is frivolous).

To survive dismissal for failure to state a claim, a complaint must plead enough facts to state a claim that is "plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570

(2007).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted).  While Rule 8(a) of the Federal Rules of Civil Procedure, which sets forth the general rules of pleading, "does not require detailed factual allegations, . . . it demands more than an unadorned, the-defendant-harmed-me accusation."  *Id*. (internal quotation marks and citation omitted).  In determining whether a complaint states a claim upon which relief may be granted, "the court must accept the material facts alleged in the complaint as true and construe all reasonable inferences in the plaintiff's favor."  *Hernandez v. Coughlin*, 18 F.3d 133, 136 (2d Cir. 1994) (citation omitted).  "[T]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions."  *Iqbal*, 556 U.S. at 678.  "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  *Id*.

## III.    SUMMARY OF THE SECOND AMENDED COMPLAINT

Plaintiff alleges numerous claims arising out of his confinement at Upstate Correctional Facility ("Upstate") and Clinton Correctional Facility ("Clinton").  (Dkt. No. 34.  )  Plaintiff was transferred to Upstate on January 23, 2015.  *Id*. at ¶ 19.  During his initial interview with a sergeant, Plaintiff requested that he not be placed in a double bunk because of a prior incident. *Id*.  The sergeant agreed and Plaintiff was assigned to Housing Unit-B, C1-19T.  *Id*.

Approximately thirty minutes later, Wyckoff walked to Plaintiff's cell, looked in, and yelled, "you are trying to kill yourself, huh?  You are trying to commit suicide."  *Id*. at ¶ 20. Wyckoff then "pulled the pin or activated the alarm on his radio."  *Id*. at ¶ 21.  A sergeant and several officers responded to the alarm.  *Id*.  Plaintiff was handcuffed and slammed into the sink. *Id*.  Plaintiff was kicked and fell to the floor.  *Id*.  Wyckoff and the responding officers proceeded

to kick, beat, and strike Plaintiff on his head, face, arms, legs, ankles, and back. *Id*. at ¶¶ 21, 41. Subsequently, the sergeant, who was standing by, yelled, "that is enough, get him the fuck up and the hell out of here." *Id*. at ¶ 21. Plaintiff was "pulled up from the floor by way of the handcuffs to his feet," and escorted to a medical holding cell. *Id*. at ¶ 22. At some point, Plaintiff lost consciousness and fell to the floor. *Id*.

After the incident, Plaintiff was transported to the infirmary. *Id*. at ¶ 22. Plaintiff fell off of the stretcher. *Id*. at ¶ 22. At the infirmary, the attending nurse "found nothing wrong" with Plaintiff. *Id*. at ¶ 24. Plaintiff was not physically examined and X-rays were not taken. *Id*.

Thereafter, Plaintiff was escorted to an observation room in the Mental Health Unit ("MHU") for "one-on-one watch." *Id*. at ¶ 25. Plaintiff's clothes were removed and he was provided a smock and paper slippers. *Id*. On January 24, 2015, Plaintiff showed a nurse "the cuts and impression of the handcuffs on both wrists" and complained about his bruises and swollen limbs. *Id*. at ¶ 27. Although the nurse asked Plaintiff if he wanted Ibuprofen for his pain and A&D Ointment for his cuts, Plaintiff was not physically examined by anyone in the "Medical Department." *Id*.

On January 26, 2015, Plaintiff was interviewed by an [Office of Mental Health] physician or attending MHU staff. *Id*. at ¶ 28. Without any tests or examinations, it was determined that Plaintiff would remain in the MHU "to cover-up or hid (sic) the wounds and injuries that Plaintiff had sustained from the physical beating and mayhem." *Id*. The next day, Plaintiff was transferred to Clinton's MHU. *Id*. at ¶ 29. Plaintiff was provided a smock and paper slippers. *Id*.

Plaintiff's MHU cells consisted of a mat bolted to the floor, which was covered with a blanket. *Id*. The lights were extremely bright and hot, and on twenty-four hours a day. *Id*. His

food at Clinton was never hot, mixed together, and served on a styroform tray without utensils. *Id*. Due to the conditions of the MHU cells at Upstate and Clinton, Plaintiff suffered from sleep deprivation. *Id*. at ¶ 26. Plaintiff remained in these "barbaric conditions" twenty-four hours a day until February 2, 2015, when Plaintiff was transferred back to Upstate. *Id*. at ¶ 31. Upon his arrival at Upstate, Plaintiff was interviewed, "cleared," and assigned to Housing Unit-B, C1-19T. *Id*.

On February 3, 2015, Wentzel personally served Plaintiff a "sham, false, and fictious (sic)" inmate misbehavior report relating to the January 23, 2015, incident that was authored by Wyckoff and reviewed by Mitchell. *Id*. The false misbehavior report charged Plaintiff with violating Rules 102.10 (threats) and 109.15 (refusing to double bunk). *Id*. at ¶¶ 32-34. Mitchell also "made the determination" that the false misbehavior report "should be adjudicated under the provision of 7 NYCRR Part 254 *et seq.*, as amended." *Id*. at ¶ 33.[2] Oey was designated to conduct the Superintendent's hearing. *Id*. at ¶¶ 35-36.

On February 6, 2015, Oey conducted Plaintiff's Tier III disciplinary hearing. *Id*. During the hearing, Oey did not use, or even attempt to use, the codified provision of 7 NYCRR Part 254 Section 254.6(c) to (g), as amended." *Id*.[3] "When Oey was asked about it, she was from the outset outright arrogant (sic), haughty, belligerent (sic), hostile, bias, aggressive and bigotry (sic)." *Id*. at ¶ 36. Oey found Plaintiff "guilty as charged" and sentenced Plaintiff to 60 days in the special housing unit ("SHU"), and 30 days without packages, commissary, and telephone privileges. *Id*. at ¶ 37.

---

[2] Section 254 sets forth the procedures to be implemented in a Superintendent's hearing. 7 N.Y.C.R.R. § 254.

[3] Section 254.6(c) to (g) sets forth the procedures regarding assessment of an inmate's mental state in a Superintendent's hearing. 7 N.Y.C.R.R. § 254.6(c) to (g).

IV.    ANALYSIS

Plaintiff seeks relief for violation of his constitutional rights pursuant to 42 U.S.C. § 1983, which "provides a cause of action for 'the deprivation of any rights, privileges, or immunities secured by the Constitution and laws' of the United States." *Wilder v. Virginia Hosp. Ass'n*, 496 U.S. 498, 508 (1990) (quoting 42 U.S.C. § 1983); *see also Myers v. Wollowitz*, No. 95-CV-0272 (TJM/RWS), 1995 WL 236245, at *2 (N.D.N.Y. Apr. 10, 1995[4]) (stating that "[§ 1983] is the vehicle by which individuals may seek redress for alleged violations of their constitutional rights.").

"Section 1983 itself creates no substantive rights, [but] . . . only a procedure for redress for the deprivation of rights established elsewhere." *Sykes v. James*, 13 F.3d 515, 519 (2d Cir. 1993) (citation omitted). The personal involvement of a defendant is a prerequisite for the assessment of liability in a § 1983 action, *McKinnon v. Patterson*, 568 F.2d 930, 934 (2d Cir. 1977), and the doctrine of *respondeat superior* is inapplicable to these claims. *Polk Cty v. Dodson*, 454 U.S. 312, 325 (1981); *Johnson v. Glick*, 481 F.2d 1028, 1033 (2d Cir. 1973). Thus, a plaintiff must demonstrate "a tangible connection between the acts of the defendant and the injuries suffered." *Bass v. Jackson*, 790 F.2d 260, 263 (2d Cir. 1986).

Liberally construing the second amended complaint, Plaintiff alleges he was issued a false misbehavior report, subjected to excessive force, subjected to inhumane conditions of confinement, denied medical care, and denied procedural due process.

---

[4]  The Court will provide Plaintiff with copies of all unpublished decisions cited herein in accordance with the Second Circuit's decision in *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) (per curium).

### A.  False Misbehavior Report

It is well settled that "a prison inmate has no general constitutional right to be free from being falsely accused in a misbehavior report." *Boddie v. Schnieder*, 105 F.3d 857, 862 (2d Cir. 1997) (citing *Freeman v. Rideout*, 808 F.2d 949, 951 (2d Cir. 1986), *cert. denied*, 485 U.S. 982 (1988)); *accord Pittman v. Forte*, No. 9:01-CV-0100 (LEK/GLS), 2002 WL 31309183, at *5 (N.D.N.Y. July 11, 2002); *see also Santana v. Olson*, No. 07-CV-0098A (DGL), 2007 WL 2712992, at *2 (W.D.N.Y. Sept. 13, 2007) ("[T]he filing of a false behavior report by a correctional officer does not state a claim for relief.").  Further, "[t]he filing of a false report does not, of itself, implicate the guard who filed it in constitutional violations which occur at a subsequent disciplinary hearing." *Williams v. Smith*, 781 F.2d 319, 324 (2d Cir. 1986) (rejecting the prisoner's "but for" argument as to guard who prepared the misbehavior report but was not involved the disciplinary hearing) (citation omitted).

Therefore, to the extent Plaintiff claims Wyckoff issued a false misbehavior report, and Mitchell, Wentzel, and Oey, "aided and abetted" Wyckoff by reviewing the report, serving the report, and being designated as the hearing officer, respectively, the Court recommends dismissing this claim with prejudice pursuant to 28 U.S.C. §§ 1915e(2)(B)(ii) and 1915A(b)(1) for failure to state a claim.

### B.  Eighth Amendment Claims

The Eighth Amendment protects prisoners from "cruel and unusual punishment" at the hands of prison officials.  *Wilson v. Seiter*, 501 U.S. 294, 296-97 (1991); *Estelle v. Gamble*, 429 U.S. 97, 104 (1976).  Prison officials must "ensure that inmates receive adequate food, clothing, shelter, and medical care, and must 'take reasonable measures to guarantee the safety of the

inmates.'" *Farmer v. Brennan*, 511 U.S. 825, 832 (1994) (quoting *Hudson v. Palmer*, 468 U.S. 517, 526-27 (1984)).

        1.    <u>Excessive Force and Failure to Intervene</u>

The Eighth Amendment prohibition against cruel and unusual punishment encompasses the use of excessive force against an inmate, who must prove two components: (1) subjectively, that the defendant acted wantonly and in bad faith, and (2) objectively, that the defendant's actions violated "contemporary standards of decency." *Blyden v. Mancusi*, 186 F.3d 252, 262-63 (2d Cir. 1999) (internal quotation marks omitted) (citing *Hudson v. McMillian*, 503 U.S. 1, 8 (1992)).

The key inquiry into a claim of excessive force is "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Hudson*, 503 U.S. at 7 (citing *Whitley v. Albers*, 475 U.S. 312, 321-22 (1986)); *see also Wilkins v. Gaddy*, 559 U.S. 34, 37 (2010) (per curiam) ("[t]he Supreme Court has emphasized that the nature of the force applied is the core judicial inquiry in excessive force cases—not whether a certain quantum of injury was sustained.").

A prison official who is present while an assault upon an inmate occurs may bear responsibility for any resulting constitutional deprivation, even if he did not directly participate. *See, e.g.*, *Tafari v. McCarthy*, 714 F. Supp. 2d 317, 342 (N.D.N.Y. 2010); *Cicio v. Graham*, No. 9:08-CV-534 (NAM/DEP), 2010 WL 980272, at *13 (N.D.N.Y. Mar. 15, 2010). To establish liability under a failure to intervene theory, a plaintiff must prove the use of excessive force by someone other than the individual and that the defendant under consideration: (1) possessed actual knowledge of the use by another of excessive force; (2) had a realistic opportunity to intervene and prevent the harm from occurring; and (3) nonetheless disregarded that risk by

intentionally refusing or failing to take reasonable measures to end the use of excessive force. *Curley v. Vill. of Suffern*, 268 F.3d 65, 72 (2d Cir. 2001).

Mindful of the Second Circuit's instruction that a *pro se* plaintiff's pleadings must be liberally construed, *Sealed Plaintiff v. Sealed Defendant*, 537 F.3d 185, 191 (2d Cir. 2008), Plaintiff claims Wyckoff and nine officers subjected him to excessive force on January 23, 2015, while a sergeant was present and failed to intervene.  (Dkt. No. 34 at ¶¶ 40-41.)  Therefore, the Court recommends that Wyckoff be directed to respond to Plaintiff's Eighth Amendment claim for excessive force.[5]  The Court expresses no opinion as to whether this claim can withstand a properly filed dispositive motion.

## 2.     Conditions of Confinement

The Eighth Amendment imposes on jail officials the duty to "provide humane conditions of confinement" for prisoners.  *Farmer*, 511 U.S. at 832.  To demonstrate that the conditions of his confinement constitute cruel and unusual punishment a plaintiff must show that (1) he was incarcerated under conditions which posed a substantial risk of serious harm, and (2) prison officials acted with deliberate indifference to his health or safety.  *Id.* at 834; *Hathaway v. Coughlin*, 37 F.3d 63, 66 (2d Cir. 1994).  "Only those deprivations denying the minimal civilized measure of life's necessities are sufficiently grave to form the basis of an Eighth Amendment violation."  *Wilson*, 501 U.S. at 298-99.

---

[5]  If this Report-Recommendation is adopted by the District Court, the Clerk is directed to amend the docket to add Doe Corrections Officer 1-9 and Sergeant Doe as Defendants.  Plaintiff is advised to take reasonable steps through discovery to ascertain the name of the Doe Defendants. If Plaintiff fails to ascertain their identity so as to permit the timely amendment of the second amended complaint and service of process on these individuals, the Court will recommend dismissal of the second amended complaint as against them.

"Sleep is critical to human existence, and conditions that prevent sleep have been held to violate the Eighth Amendment." *Walker v. Schult*, 717 F.3d 119, 126 (2d Cir. 2013) (citing, *inter alia*, *Tafari v. McCarthy*, 714 F. Supp. 2d 317, 367 (N.D.N.Y. 2010) ("Courts have previously recognized that sleep constitutes a basic human need and conditions [including constant illumination] that prevent sleep violate an inmate's constitutional rights.")). "Requiring inmates to live in constant illumination can . . . under certain circumstances, rise to the level of an Eighth Amendment violation." *Jones v. Rock*, No. 9:12-CV-447 (NAM/TWD), 2013 WL 4804500, *10 (N.D.N.Y. Sept. 6, 2013) (citing, *inter alia*, *Keenan v. Hall*, 83 F.3d 1083, 1090-91 (9th Cir. 1996) (an allegation that large fluorescent lights directly in front of and behind an inmate's cell that shown into his cell twenty-four hours a day, causing him grave sleeping problems and other mental and psychological problems stated a claim of cruel and unusual punishment that could withstand a motion for summary judgment)).

"The decisions evaluating Eighth Amendment claims based on continuous lighting in the prison setting are very 'fact driven,' turning on the degree of illumination, the duration of the inmate's exposure, the extent of harm it causes, and the penological justification for the lighting." *Jones v. Smith*, No. 9:09-cv-1058 (GLS/ATB), 2015 WL 5750136, at *14 (N.D.N.Y. Sept. 30, 2015) (collecting cases).

The Eighth Amendment also requires that prisoners be provided with "nutritionally adequate food that is prepared and served under conditions which do not present an immediate danger to the health and well being of the inmates who consume it." *Robles v. Couglin*, 725 F.2d 12, 15 (2d Cir. 1983); *Brown v. Eagen*, No. 9:08-CV-0009 (TJM/DRH), 2009 WL 815724, *10 (N.D.N.Y. Mar. 26, 2009); *Midalgo v. Bass*, No. 9:03-CV-1128 (NAM/RFT), 2006 WL 2795332, *11 (N.D.N.Y. Sept. 26, 2006). "The provision of cold food, is not, by itself, a

violation of the Eighth Amendment as long as it is nutritionally adequate and is prepared and served under conditions which do not present an immediate danger to the health and well being of the inmates who consume it."  *Waring v. Meachum*, 175 F. Supp. 2d 230, 239 (D. Conn. 2001) (internal quotation marks and citation omitted); *see also Phelan v. Hersh*, No. 9:10-CV-0011 (GLS/RFT), 2011 WL 6031940, at *12 (N.D.N.Y. Sept. 13, 2011) ("There is no constitutional right to have a hot meal every day, but only that inmates be provided nutritionally adequate food prepared under safe conditions."), *report and recommendation adopted by*, 2011 WL 6031071 (N.D.N.Y. Dec. 5, 2011); *Brooks v. NYC DOC Comm'r*, No. 14-CV-6283 (RRM/CLP), 2016 WL 4530456, at *4-5 (E.D.N.Y. Aug. 29, 2016) (*sua sponte* dismissing cause of action based on the failure to provide hot meals where there was no allegation that the inmate did not receive nutritionally adequate meals) (collecting cases).

Upon review, and even assuming Plaintiff has alleged facts sufficient to plausibly suggest that the conditions of his MHU confinement posed a substantial risk of serious harm to his health and safety, the second amended complaint does not allege any facts which even suggest that any Defendant was aware of the conditions, including constant illumination, let alone that they acted with deliberate indifference to or refused to take steps to address this situation.  *See, e.g.*, *Gomez v. Sepiol*, No. 11-CV-1017SR, 2014 WL 1575872, at *9 (W.D.N.Y. Apr. 11, 2014); *see also Toliver v. Dep't of Corrs.*, No. 10 Civ. 6298 (LAP/JCF), 2012 WL 4510635, at *9 (S.D.N.Y. Apr. 10, 2012) (dismissing the deliberate indifference claim for failure to plead facts identifying a responsible official who acted with a sufficiently culpable state of mind).

Here, Plaintiff has not sufficiently alleged that any Defendant acted with a deliberate state of mind.  *See Gaston v. Coughlin*, 249 F.3d 156, 157 (2d Cir. 2001).  Therefore, it is

recommended that Plaintiff's condition of confinement claim be dismissed without prejudice for failure to state a claim pursuant to 28 U.S.C. §§ 1915(e)(2)(B)(ii) and 1915A(b)(1).

3.    Medical Care

There are two elements to a claim that officials violated a plaintiff's right to receive adequate medical care: "the plaintiff must show that she or he had a serious medical condition and that it was met with deliberate indifference." *Caiozzo v. Koreman*, 581 F.3d 63, 72 (2d Cir. 2009) (citation and punctuation omitted).

"The objective 'medical need' element measures the severity of the alleged deprivation, while the subjective 'deliberate indifference' element ensures that the defendant prison official acted with a sufficiently culpable state of mind." *Smith v. Carpenter*, 316 F.3d 178, 183-84 (2d Cir. 2003). "An official acts with the requisite deliberate indifference when that official 'knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.'" *Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir. 1998) (quoting *Farmer*, 511 U.S. at 837).

"[D]isagreements over medications, diagnostic techniques (e.g., the need for X-rays), forms of treatment, or the need for specialists or the timing of their intervention are not adequate grounds for a section 1983 claim." *Sonds v. St. Barnabas Hosp. Corr. Health Servs.*, 151 F. Supp. 2d 303, 312 (S.D.N.Y. 2001); *see also Mendoza v. McGinnis*, No. 9:05-CV-1124 (TJM/DEP), 2008 WL 4239760, at *11 (N.D.N.Y. Sept. 11, 2008) ("Determinations made by medical providers within their discretion are given a 'presumption of correctness' when it concerns the care and safety of patients."). Rather, the plaintiff must allege conduct that is "repugnant to the conscience of mankind" or "incompatible with the evolving standards of

13

decency that mark the progress of a maturing society." *Ross v. Kelly*, 784 F. Supp. 35, 44 (W.D.N.Y. 1992) (quoting *Estelle*, 429 U.S. at 102, 105-06).

In the second amended complaint, Plaintiff alleges he sustained cuts, bruises, and swollen limbs as a result of the "severe physical beating he had received" on January 23, 2015. (Dkt. No. 34 at ¶¶ 22-24.) At some point, Plaintiff lost consciousness. *Id.* at ¶ 24. Generally, such injuries do not amount to a condition of urgency that may produce death, degeneration or extreme pain. *See, e.g.*, *Benitez v. Straley*, No. 01-CV-0181 (RCC/RLE), 2006 WL 5400078, at *3, 4, 12 (S.D.N.Y. Feb. 16, 2006) (cut on the plaintiff's lips and head, and "severe cuts" to his wrists-none of which required stitches-did not constitute a medical condition that was sufficiently serious for purposes of Eighth Amendment, even if the allegations were assumed to be true); *Hickey v. City of New York*, 01-CV-6506 (GEL), 2004 WL 2724079, at *16 (S.D.N.Y. Nov. 29, 2004) (cuts and bruises do not constitute sufficiently serious medical needs); *Decayette v. Goord*, 06-CV-0783 (TJM), 2009 WL 1606753, at *1 (N.D.N.Y. June 8, 2009) (injures limited to cuts, bruises, and swelling do not constitute sufficiently serious medical need); *Rodriguez v. Mercado*, 00-CV-8588, 2002 WL 1997885, at *3, 8 (S.D.N.Y. Aug. 28, 2002) (bruises to inmate's head, back and wrists, accompanied by back pain and migraines but no loss of consciousness, did not constitute a medical condition that was sufficiently serious for purposes of Eighth Amendment); *Sonds*, 151 F. Supp. 2d at 311 ("cut finger, even where skin is 'ripped off,' . . . does not, as a matter of law, qualify as an injury severe enough to justify civil rights relief").

Even assuming Plaintiff's cuts, bruises, and swelling, along with loss of consciousness, constitute a serious medical need for purposes of an Eighth Amendment claim, Plaintiff has failed to allege any facts establishing which medical personnel were responsible or personally involved in the alleged unconstitutional medical care. As discussed above, "personal

involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Wright*, 21 F.3d at 501 (quoting *Moffitt*, 950 F.2d at 885); *see also Gaston*, 249 F.3d at 157.

Upon review, the facts alleged in the second amended complaint do not plausibly suggest that the unidentified nurse acted with deliberate indifference, was reckless in his treatment, or provided him with medical treatment that was "inadequate" in a constitutional sense. Although Plaintiff takes issue that he was not examined by the medical department and diagnostic examinations were not ordered, Plaintiff states that on January 24, 2015, the day after the incident, the nurse asked Plaintiff if he wanted Ibuprofen for his pain and A&D Ointment for his cuts. *Id*. at ¶ 27. "So long as the treatment given is adequate, the fact that a prisoner might prefer a different treatment does not give rise to an Eighth Amendment violation." *Chance*, 143 F.3d at 703.[6] At best, Plaintiff's allegations suggest a disagreement over treatment, which does not give rise to a constitutional claim. *Id*.

Therefore, the Court recommends dismissing Plaintiff's Eighth Amendment medical indifference claim without prejudice pursuant to 28 U.S.C. § 1915(e)(2)(B)(ii) and 28 U.S.C. § 1915A(b)(1).

### C.    Fourteenth Amendment Due Process Claim

To successfully state a claim under § 1983 for denial of due process, a plaintiff must show both the existence of a protected liberty or property interest, and that he or she was deprived of that interest without being afforded sufficient process. *See Ortiz v. McBride*, 380

---

[6] The word "adequate" reflects the reality that "[p]rison officials are not obligated to provide inmates with whatever care the inmates desire. Rather, prison officials fulfill their obligations under the Eighth Amendment when the care provided is 'reasonable.'" *Jones v. Westchester Cty. Dep't of Corrs.*, 557 F. Supp. 2d 408, 413 (S.D.N.Y. 2008).

F.3d 649, 654 (2d Cir. 2004); *Tellier v. Fields*, 280 F.3d 69, 79-80 (2d Cir. 2000); *Hynes v. Squillace*, 143 F.3d 653, 658 (2d Cir. 1998); *Bedoya v. Coughlin*, 91 F.3d 349, 351-52 (2d Cir. 1996). Due process generally requires that the state afford individuals "some kind of hearing" prior to depriving them of a liberty or property interest. *DiBlasio v. Novello*, 344 F.3d 292, 302 (2d Cir. 2003).

An inmate's protected liberty interest is implicated where the punishment at issue imposes an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin v. Conner*, 515 U.S. 472, 484 (1995). The duration of the challenged confinement, while not determinative, is a significant factor under *Sandin*. The Second Circuit generally takes the position that confinement in a SHU, without unusual conditions, for a period of 101 days will not constitute an atypical hardship, while confinement for a period of more than 305 days has been held to be atypical even if under "normal condition." *Ortiz*, 380 F.3d at 654; *Colon v. Howard*, 215 F.3d 227, 231 (2d Cir. 2000) (citing *Sealey v. Giltner*, 197 F.3d 578, 589-90 (2d Cir. 1999)).

"The due process protections afforded inmates facing disciplinary hearings that affect a liberty or property interest include advance written notice of the charges, a fair and impartial hearing officer, a hearing that affords the inmate the opportunity to call witnesses and present documentary evidence, and a written statement of the evidence upon which the hearing officer relied in making his determination." *Sira v. Morton*, 380 F.3d 57, 69 (2d Cir. 2004) (citing, *inter alia*, *Wolff v. McDonnell*, 418 U.S. 539, 563- 67 (1974)). In addition, the hearing officer's findings must be supported by "some" "reliable evidence." *Id*. (citing, *inter alia*, *Superintendent v. Hill*, 472 U.S. 445, 455 (1985)).

In the second amended complaint, Plaintiff alleges Oey sentenced him to serve 60 days in the SHU.  (Dkt. 34 at ¶ 37.)  As set forth above, the Second Circuit generally takes the position that normal confinement in a segregated housing unit of 101 days or less does not constitute an "atypical and significant hardship" under *Sandin*.  *Colon*, 215 F.3d at 231.  In this case, however, Plaintiff argues for the aggregation of his various SHU sentences, amounting to 330 days of consecutive SHU confinement.  (Dkt. No. 34 at ¶ 57.)

"Overlapping disciplinary penalties may, under some circumstances, have to be aggregated for purposes of determining whether a liberty interest was violated."  *Reynoso v. Selsky*, 292 F. App'x 120, 122 (2d Cir. 2008) (summary order); *see, e.g.*, *Giano v. Selsky*, 238 F.3d 223, 226 (2d Cir. 2001) (aggregating sentences where the inmate's segregation at one facility was "simply a continuation of his segregation at" the facility from which he had been transferred, and a "review of the record indicate[d] that the two periods of confinement were based on the same administrative rationale").  However, the Court need not determine whether Plaintiff's 60-day SHU sentence should be considered in the aggregate to his other segregated confinement.  Even if it was determined that Plaintiff's SHU confinement, aggregated or not, deprived him of a liberty interest because it imposed an "atypical and significant hardship" on him, Plaintiff has failed to allege that his liberty was denied without due process.  Meeting the *Sandin* threshold would only establish that a liberty interest was involved, not that Plaintiff's liberty interest was denied without due process.  Here, as more fully discussed below, Plaintiff alleges no facts to plausibly suggest Oey denied him due process at the February 6, 2015, disciplinary hearing.  Therefore, regardless of the length of Plaintiff's SHU confinement, the Court finds Plaintiff has failed to state a Fourteenth Amendment due process claim.

As set forth above, to state a claim under § 1983, a plaintiff must allege that the conduct deprived him or her of a right guaranteed under the Constitution of the United States. *Snider v. Dylag*, 188 F.3d 51, 53 (2d Cir. 1999) (citing *Dwares v. City of New York*, 985 F.2d 94, 98 (2d Cir. 1993)). In the second amended complaint, Plaintiff claims Oey conducted Plaintiff's February 6, 2015, disciplinary hearing in violation of DOCCS rules and regulations. (Dkt. No. 34 at ¶ 36.) Further, when Oey "was asked about it, she was from the outset outright arrogant (sic), haughty, beligerent (sic), hostile, bias, aggressive and bigotry (sic)." These allegations do not state a plausible Fourteenth Amendment due process claim.

First, as this Court explained in the July 19, 2017, Report-Recommendation (Dkt. No. 28), whether prison regulations were followed precisely is not a basis to conclude that any constitutional rights have been violated. *See Pollnow v. Glennon*, 757 F.2d 496, 501 (2d Cir. 1985). An alleged violation of prison directives or regulations does not give rise to a federal claim, because "[f]ederal constitutional standards rather than state law define the requirements of procedural due process." *Russell v. Coughlin*, 910 F.2d 75, 78 n.1 (2d Cir. 1990) (citations omitted); *see also Hyman v. Holder*, No. 96 Civ. 7748, 2001 WL 262665, at *6 (S.D.N.Y. Mar. 15, 2001). Thus, "regardless of state procedural guarantees, the only process due an inmate is that minimal process guaranteed by the Constitution, as outlined in *Wolff* . . . ." *Shakur v. Selsky*, 391 F.3d 106, 119 (2d Cir. 2004).

Second, although an inmate does have the right to an impartial hearing officer, the degree of impartiality required of prison hearing officers does not rise to the level required of judges generally. *Francis v. Coughlin*, 891 F.2d 43, 46 (2d Cir. 1989) (citations omitted). Further, because prison officials serving as hearing officers "enjoy a rebuttable presumption that they are unbiased," Plaintiff's conclusory allegation of "bias," without more, fails to state a due process

18

claim. *Rodriguez v. Selsky*, No. 9:07-CV-0432 (LEK/DEP), 2011 WL 1086001, at *11
(N.D.N.Y. Jan. 25, 2011) (citation omitted). Indeed, "[a]n inmate's own subjective belief that
the hearing officer was biased is insufficient to create a genuine issue of material fact." *Johnson
v. Fernandez*, No. 9:09 CV-626 (FJS/ATB), 2011 WL 7629513, at *11 (N.D.N.Y. Mar. 12,
2011) (citing *Francis v. Coughlin*, 891 F.2d 43, 46 (2d Cir. 1989)). Additionally, "disagreement
with rulings made by a hearing officer does not constitute bias." *Johnson v. Doling*, No. 9:05-
CV-376 (TJM/RFT), 2007 WL 3046701, at *10 (N.D.N.Y. Oct. 17, 2007) (citing *Dumpson v.
Rourke*, No. CIVA96CV621 (RSP/GJD), 1997 WL 610652, at *6 (N.D.N.Y. Sept. 26, 1997)
(stating "[t]he fact that the hearing officer did not decide in the plaintiff's favor does not make
him biased in the constitutional sense")).

Because Plaintiff fails to allege that Oey denied him any of the procedural protections to
which he was entitled under *Wolff*, the Court finds Plaintiff has failed to state a Fourteenth
Amendment due process claim.

As to Plaintiff's allegations against Annucci and Venettozzi, Plaintiff claims they "knew
or should have known" that Plaintiff's due process rights were violated at the hearing and yet
they refused and failed to correct Oey's "wrongdoing" on appeal. *Id*. at ¶ 53. Here, because the
Court finds Oey did not violate Plaintiff's constitutional rights, there was no "misconduct" for
Annucci and Venettozzi to "correct" on appeal. *See, e.g.*, *Toole v. Connell*, No. 9:04-CV-0724
(LEK/DEP), 2008 WL 4186334, at *1, 7 (N.D.N.Y. Sep. 10, 2008) (supervisory defendant
cannot be liable for failing to investigate or correct conduct that has already been found to be not
actionable under § 1983); *Linares v. Mahunik,* No. 9:05-CV-0625 (RFT/GLS), 2006 WL
2595200, at *11 (N.D.N.Y. Sept. 11, 2006) (finding the plaintiff could not "sustain a supervisory

liability claim as there was no wrong for [supervisor-defendant] to remedy since there [was] no constitutional violation").

Lastly, Plaintiff claims Annucci and Venettozzi violated his due process rights because they "failed and refused to follow-up and comply with the Judicial mandate to insure (sic) that [Plaintiff's] rehearing was in fact timely[.]" *Id*. at ¶ 55.  The Court construes this claim as an alleged violation of the so-called "fourteen-day rule" set forth in 7 N.Y.C.R.R. § 251-5.1. However, as discussed above, this allegation, without more, is not sufficient to state a federal constitutional claim.  *See Shakur*, 391 F.3d at 119 ("regardless of state procedural guarantees, the *only* process due an inmate is that minimal process guaranteed by the Constitution, as outlined in *Wolff* . . . ."); *see, e.g.*, *Bolanos v. Coughlin*, No. 91 CIV. 5330, 1993 WL 762112, at *14 (S.D.N.Y. Oct. 15, 1993) (stating that an inmate does not have a federally created right to have his disciplinary hearing commenced within a certain time); *see also Barnes v. Henderson*, 628 F. Supp. 2d 407, 413 (W.D.N.Y. 2009) (collecting cases) (stating that the failure to provide a speedy hearing under the state regulation is not enough to establish a federal due process violation).

In the second amended complaint, Plaintiff alleges that his rehearing was not timely commenced but does not allege that the delay was unreasonable or that the delay resulted in a constitutional violation.  Further, documents attached to the second amended complaint indicate Venettozzi "cancelled the rehearing and the matter [was] completely expunged from [Plaintiff's] records" because "the facility failed to timely conduct the ordered rehearing."  (Dkt. No. 34-1 at 18.)

Based on the forgoing, the Court recommends that Plaintiff's Fourteenth Amendment due process claim against Oey, Annucci, and Venettozzi be dismissed pursuant to 28 U.S.C. §§

1915(e)(2)(B)(ii) and 1915A(b)(1) for failure to state a claim. Because Plaintiff has already been afforded two opportunities to amend this claim, and the allegations in the second amended complaint, liberally construed, give no indication that a valid Fourteenth Amendment due process claim might be stated if Plaintiff were provided another opportunity to amend, *see Gomez*, 171 F.3d at 795, the Court recommends that the dismissal against Oey, Venettozzi, and Annucci be with prejudice.

      **WHEREFORE**, it is hereby

      **RECOMMENDED** that Plaintiff's second amended complaint (Dkt. No. 34) be accepted for filing as the operative pleading in this action; and it is further

      **RECOMMENDED** that Defendant Wyckoff be directed to respond to Plaintiff's Eighth Amendment excessive force claim; and it is further

      **RECOMMENDED** that the following claims be **DISMISSED with prejudice**: Plaintiff's Fourteenth Amendment due process claim against Defendants Oey, Venettozzi, and Annucci, and Plaintiff's claim based on the false misbehavior report against Defendants Wyckoff, Mitchell, Wentzel, and Oey; and it is further

      **RECOMMENDED** that the following claims be **DISMISSED without prejudice**: Plaintiff's Eighth Amendment conditions of confinement and medical indifference claims; and it is further

      **ORDERED** that if the District Court adopts this Report-Recommendation the Clerk is directed to amend the docket to add Doe Corrections Officer 1-9 and Sergeant Doe as Defendants; and it is further

**ORDERED** that the Clerk provide Plaintiff with a copy of this Order and Report-Recommendation, along with copies of the unpublished decisions cited herein in accordance with *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) (per curiam).

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen days within which to file written objections to the foregoing report.[7]  Such objections shall be filed with the Clerk of the Court.  **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.**  *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15 (2d Cir. 1989) (per curiam)); 28 U.S.C. § 636(b)(1) (Supp. 2013); Fed. R. Civ. P. 72, 6(a).

Dated: November 27, 2017
       Syracuse, New York

Thérèse Wiley Dancks
United States Magistrate Judge

---

[7]  If you are proceeding *pro se* and are served with this Order and Report-Recommendation by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date the Order and Report-Recommendation was mailed to you to serve and file objections.  Fed. R. Civ. P. 6(d).  If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday.  Fed. R. Civ. P. 6(a)(1)(C).

Myers v. Wollowitz, Not Reported in F.Supp. (1995)

1995 WL 236245

1995 WL 236245
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

James N. MYERS, Jr., Plaintiff,

v.

Heather WOLLOWITZ, Attorney, Defendant.

No. 95–CV–0272 (TJM) (RWS).
|
April 10, 1995.

**Attorneys and Law Firms**

James N. Myers, Jr., Troy, NY, pro se.

*DECISION AND ORDER*

McAVOY, Chief Judge.

*I. Background*

**\*1** Presently before this Court is the above-captioned plaintiff's application to proceed in forma pauperis and civil rights complaint. Plaintiff has not paid the partial filing fee required to maintain this action.

For the reasons stated below, plaintiff's complaint is dismissed pursuant to 28 U.S.C. § 1915(d) and Local Rule 5.4(a) of the General Rules of this Court as without arguable basis in law.

In his *pro se* complaint, plaintiff seems to claim that plaintiff was represented by defendant Wollowitz, a public defender for the County of Rensselaer, in a County Court proceeding. Plaintiff alleges that after a criminal proceeding in that Court, plaintiff was "sentenced to a illegal sentence." *Id.* at 2. Plaintiff contends that due to the ineffective assistance of his counsel, defendant Wollowitz, his constitutional rights were violated. For a more complete statement of plaintiff's claims, reference is made to the entire complaint filed herein.

*II. Discussion*

Consideration of whether a *pro se* plaintiff should be permitted to proceed in forma pauperis is a two-step process. First, the court must determine whether the plaintiff's economic status warrants waiver of fees and costs under 28 U.S.C. § 1915(a). If the plaintiff qualifies by economic status, the court must then consider whether the cause of action stated in the complaint is frivolous or malicious. *Moreman v. Douglas,* 848 F.Supp. 332, 333 (N.D.N.Y.1994) (Scullin, J.); *Potnick v. Eastern State Hosp.,* 701 F.2d 243, 244 (2d Cir.1983) (per curiam).

In the present case, upon review of the plaintiff's inmate account statements, the Court has determined that plaintiff's financial status qualifies him to file or "commence" this action in forma pauperis. 28 U.S.C. § 1915(a). Turning to the second inquiry, a court may "dismiss the proceeding under 28 U.S.C. § 1915(d) if the court thereafter determines that ... the action is frivolous or malicious." *Moreman,* 848 F.Supp. at 333 (citation omitted).

In determining whether an action is frivolous, the court must look to see whether the complaint lacks an arguable basis either in law or in fact. *Neitzke v. Williams,* 490 U.S. 319, 325 (1989). Although the court has the duty to show liberality towards *pro se* litigants, *Nance v. Kelly,* 912 F.2d 605, 606 (2d Cir.1990) (per curiam), and extreme caution should be exercised in ordering sua sponte dismissal of a *pro se* complaint before the adverse party has been served and the parties have had an opportunity to respond, *Anderson v. Coughlin,* 700 F.2d 37, 41 (2d Cir.1983), there is a responsibility on the court to determine that a claim is not frivolous before permitting a plaintiff to proceed with an action in forma pauperis. Dismissal of frivolous actions pursuant to 28 U.S.C. § 1915(d) is appropriate to prevent abuses of the process of the court, *Harkins v. Eldredge,* 505 F.2d 802, 804 (8th Cir.1974), as well as to discourage the waste of judicial resources. *Neitzke,* 490 U.S. at 327. *See generally Moreman,* 848 F.Supp. at 334.

**\*2** 42 U.S.C. § 1983 is the vehicle by which individuals may seek redress for alleged violations of their constitutional rights. *See, e.g., Von Ritter v. Heald,* 91–CV–612, 1994 WL 688306, *3, 1994 U.S.Dist. LEXIS 17698, *8–9 (N.D.N.Y. Nov. 14, 1994) (McAvoy, C.J.). A party may not be held liable under this section unless it can be established that the defendant has acted under the color of state law. *See, e.g., Rounseville v. Zahl,* 13 F.3rd 625, 628 (2d Cir.1994) (noting state action requirement under § 1983); *Wise v. Battistoni,* 92–Civ–4288, 1992 WL 380914, *1, 1992 U.S.Dist. LEXIS 18864, *2–3 (S.D.N.Y. Dec. 10, 1992) (same) (citations omitted).

1995 WL 236245

In the present case, the sole defendant named by plaintiff is the Rensselaer County public defender who apparently represented plaintiff in the criminal proceeding discussed in his complaint. *See* Complaint at 2. However, "[i]t is well settled that an attorney's representation of a party to a court proceeding does not satisfy the Section 1983 requirement that the defendant is alleged to have acted under color of state law...." *Wise,* 1992 WL 380914 at *1, 1992 U.S.Dist. LEXIS 18864 at *2–3; *see also D'Ottavio v. Depetris,* 91–Civ–6133, 1991 WL 206278, *1, 1991 U.S.Dist. LEXIS 13526, *1–2 (S.D.N.Y. Sept. 26, 1991).

Since the plaintiff has not alleged any state action with respect to the Section 1983 claim presently before the Court, plaintiff's complaint, as presented to this Court, cannot be supported by any arguable basis in law and must therefore be dismissed pursuant to 28 U.S.C. § 1915(d). *Neitzke,* 490 U.S. at 328.

Accordingly, it is hereby

ORDERED, that leave to proceed or prosecute this action in forma pauperis is denied, and it is further

ORDERED, that this action is dismissed pursuant to 28 U.S.C. § 1915(d) and Local Rule 5.4(a) of the General Rules of this Court as lacking any arguable basis in law, and it is further

ORDERED, that the Clerk serve a copy of this Order on the plaintiff by regular mail.

I further certify that any appeal from this matter would not be taken in good faith pursuant to 28 U.S.C. § 1915(a).

IT IS SO ORDERED.

**All Citations**

Not Reported in F.Supp., 1995 WL 236245

---

**End of Document**

© 2017 Thomson Reuters. No claim to original U.S. Government Works.

2002 WL 31309183
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Derrick PITTMAN, Plaintiff,

v.

Anthony FORTE, Prisoner Doctor; Z. Hoefling,
Corrections Officer; Officer Erickson,

Corrections Officer; K. Decker [1], Captain;
E. McDonald, Corrections Officer; and S.
Miller, Corrections Officer, Defendants.

[1]     Service must be made upon a defendant within 120
        days of filing the complaint or any claims against
        that defendant will be dismissed. Fed.R.Civ.P.
        4(m). In this case, defendants Decker, McDonald
        and Miller have not been served and since this
        court lacks jurisdiction over them, dismissal is
        recommended.

No. CIV.9:01CV0100LEKGLS.
|
July 11, 2002.

State prisoner brought § 1983 action against prison
officials alleging Eighth Amendment and Due Process
Clause claims. Officials moved to dismiss. The
District Court, Sharpe, United States Magistrate Judge,
recommended that: (1) prisoner could not bring §1983
action raising due process challenge to misbehavior
report or validity of hearing, and (2) officials were
not deliberately indifferent to prisoner's serious medical
condition within meaning of Eighth Amendment.

Report and recommendation issued.

West Headnotes (3)

[1]     **Civil Rights**
        👉 Discipline and classification;grievances
        Prison disciplinary hearing resulting in loss of
        good time credits was not invalidated through
        appeal or other process, and, thus, prisoner
        could not bring §1983 action raising due
        process challenge to validity of hearing which

affected overall length of his confinement.
U.S.C.A. Const.Amend. 14, 42 U.S.C.A.
§1983.

1 Cases that cite this headnote

[2]     **Prisons**
        👉 Particular Conditions and Treatments
        **Sentencing and Punishment**
        👉 Medical care and treatment
        State prisoner who alleged he required
        assistance through cane, crutches, or
        wheelchair to walk due to extreme pain in
        his leg and foot did not show that prison
        officials withheld walking aid for sole purpose
        of causing prisoner pain, and, thus, officials
        were not deliberately indifferent to serious
        medical condition within meaning of Eighth
        Amendment due to any delay in provision of
        such aid. U.S.C.A. Const.Amend. 8.

Cases that cite this headnote

[3]     **Civil Rights**
        👉 Discipline and classification;grievances
        Prison disciplinary hearing resulting in loss of
        good time credits was not invalidated through
        appeal or other process, and, thus, state
        prisoner could not bring §1983 action raising
        due process challenge to prisoner misbehavior
        report leading to hearing which affected
        overall length of his confinement. U.S.C.A.
        Const.Amend. 14, 42 U.S.C.A. §1983.

18 Cases that cite this headnote

**Attorneys and Law Firms**

Derrick Pittman, Plaintiff, Pro Se, Auburn Correctional
Facility, Auburn, for the Plaintiff.

Hon. Eliot Spitzer, Attorney General State of New
York, Albany, Steven H. Schwartz, Esq., Asst. Attorney
General, for the Defendants.

2002 WL 31309183

## REPORT–RECOMMENDATION

SHARPE, Magistrate J.

## I. INTRODUCTION

**\*1** This matter was referred to the undersigned for a Report–Recommendation by the Hon. Lawrence E. Kahn, United States District Judge, pursuant to 28 U.S.C. § 636(b)(1)(B) and Local Rule 72.3(c). Pending is a motion to dismiss filed on May 9, 2001, by defendants [2] Dr. Anthony Forte ("Forte") and Z. Hoefling ("Hoefling") in lieu of an answer (Dkt. No. 12). Plaintiff, *pro se,* Derrick Pittman ("Pittman") responded the motion (Dkt. No. 18). Pittman brings this action under 42 U.S.C. § 1983 claiming that the defendants violated his civil rights under the First, Eighth and Fourteenth Amendments. [3] After reviewing Pittman's claims and for the reasons set forth below, the defendants' motion to dismiss should be granted.

[2]   Defendant Erickson does not join in this motion to dismiss.

[3]   The claim of excessive force against defendants Miller, McDonald and Erickson will not be addressed since Erickson, who was the only one served, has not joined the current motion to dismiss.

## II. Facts

On March 25, 1998, Corrections Officer Miller confiscated two tapes and a pair of headphones that belonged to Pittman, claiming that they were unauthorized. After Pittman's cell search, he claimed that he was assaulted by Officers Miller, McDonald and Erickson. Thereafter, he was transported in a wheelchair to the Special Housing Unit ("SHU") since he was having difficulty walking. When he arrived at the SHU, Hoefling conducted a body search. As he watched, Hoefling withdrew a dark colored object from his pocket and wrapped it in a pair of underwear that did not belong to him. Thereafter, Hoefling reported that he had found a razor blade in a pair of Pittman's underwear.

On March 31, 1998, a disciplinary hearing was conducted for the altercation in Pittman's cell, and the weapon incident in the SHU. However, Pittman was unable to attend the hearing since his request for a wheelchair, crutches, or a cane was denied, and he was unable to walk to the hearing. Forte testified during the hearing that in his opinion, Pittman did not need a walking aid to walk the limited distance to the hearing. Subsequently, the hearing was conducted in his absence. He was sentenced to sixty months in the SHU, sixty months loss of packages, and twelve months loss of good time credits.

## III. DISCUSSION

A. *Legal Standard*

In deciding a Rule 12(c) motion for judgment on the pleadings, the court applies the same standard as is used in deciding a motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6). *See* Sheppard v. Beerman, 18 F.3d 147, 150 (2d Cir.1994). Federal Rules of Civil Procedure 12(b)(6) provides that a cause of action shall be dismissed if a complaint fails "to state a claim upon which relief can be granted." In other words, the court should dismiss the complaint pursuant to Rule 12(b)(6), if it appears beyond doubt that the plaintiff can prove no set of facts in support of the complaint which would entitle him to relief. *See* Conley v. Gibson, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957); *Harris v. City of New York,* 186 F.3d 243, 247 (2d Cir.1999); *S.E.C. v. U.S. Environmental, Inc.,* 155 F.3d 107, 110 (2d Cir.1998). "The task of the court in ruling on a Rule 12(b)(6) motion 'is merely to assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof." ' *Cooper v. Parsky,* 140 F.3d 433, 440 (2d Cir.1998) (*quoting* Ryder Energy Distribution Corp. v. Merrill Lynch Commodities Inc., 748 F.2d 774, 779 (2d Cir.1984)). Therefore, in analyzing a motion to dismiss, the facts alleged by a plaintiff are assumed to be true and must be liberally construed in the light most favorable to him. *See e.g.,* Easton v. Sundram, 947 F.2d 1011, 1014–15 (2d Cir.1991). With this generous standard in mind, the court turns to the sufficiency of Pittman's claims.

B. *Denial of Adequate Medical Care and Due Process Violation*

**\*2** Pittman is suing defendant Forte for deliberate indifference to his serious medical needs, and for aiding in the denial of his right to attend his disciplinary hearing. Both claims fail for the following reasons.

2002 WL 31309183

1. *Due Process Claim*

The Supreme Court has determined that an inmate, who implicates the invalidity of his conviction or sentence in a § 1983 action, must first demonstrate that his sentence or conviction has been reversed or invalidated by another tribunal, or called into question by the issuance of a federal habeas corpus petition. *Heck v. Humphrey,* 512 U.S. 477, 486–487, 114 S.Ct. 2364, 2372, 129 L.Ed.2d 383 (1994). The Court has applied this reasoning to a § 1983 action in which the plaintiff challenges the loss of his good time credits in an administrative hearing. *Edwards v. Balisok,* 520 U.S. 641, 643–644, 117 S.Ct. 1584, 1586–1587, 137 L.Ed.2d 906 (1997). The Court held that a claim for damages under § 1983 brought by a state prisoner whose allegations necessarily challenge the validity of the procedures used to deprive him of good time credits is not actionable under § 1983, unless the decision in question has previously been invalidated. *See Edwards,* 520 U.S. at 648, 117 S.Ct. at 1589.

The Supreme Court's decision in *Edwards* engendered great confusion regarding the applicability of the *Heck* rule to intra-prison administrative actions. *See Jenkins v. Haubert,* 179 F.3d 19, 25 (2d Cir.1999). The source of that confusion was whether *Heck* barred challenges to disciplinary decisions that do not affect the overall length of an inmate's confinement. *Id.* at 26. The Second Circuit resolved this question in *Jenkins* when it held that *Heck* does not apply to such cases. *Id.* at 27. However, despite the Circuit's recent interpretation in this area of law, it is clear that the *Heck* rule, through *Edwards,* still applies to cases where a prisoner challenges the procedures used in a disciplinary hearing that results in the loss of good time credits.

[1] In this case, Pittman alleges that he was improperly issued a misbehavior report, then prohibited from attending his disciplinary hearing, which resulted in sixty months of SHU confinement and loss of good time credits. The defendants contend that this cause of action must be dismissed because it is barred by *Edwards.* The defendants maintain that Pittman has not demonstrated that the determination imposing a penalty has been overturned. Since his penalty included the loss of good time credits, his claim is not cognizable under § 1983.

This court finds that *Edwards* clearly applies to this claim because Pittman challenges the validity of a disciplinary hearing which affected the overall length of his confinement. Although Pittman does not specifically attack the loss of his good time credits, his claim, if successful, would require the invalidation of his disciplinary hearing. Since there is no indication that the disciplinary hearing has been invalidated either administratively or by a state court proceeding, *Edwards* does apply here. Accordingly, this court recommends that Pittman's due process claim against defendant Forte should be dismissed.

2. *Eighth Amendment Claim*

**\*3** Pittman also contends that the defendants were deliberately indifferent to his serious medical needs. The Eighth Amendment does not mandate comfortable prisons, yet it does not tolerate inhumane prisons either, and the conditions of an inmate's confinement are subject to examination under the Eighth Amendment. *Farmer v. Brennan,* 511 U.S. 825, 832, 114 S.Ct. 1970, 1975, 128 L.Ed.2d 811 (1994). Nevertheless, deprivations suffered by inmates as a result of their incarceration only become reprehensible to the Eighth Amendment when they deny the minimal civilized measure of life's necessities. *Wilson v. Seiter,* 501 U.S. 294, 298, 111 S.Ct. 2321, 2324, 115 L.Ed.2d 271 (1991) (*quoting Rhodes v. Chapman,* 452 U.S. 337, 347, 101 S.Ct. 2392, 2399, 69 L.Ed.2d 59 (1981)).

Moreover, the Eighth Amendment embodies "broad and idealistic concepts of dignity, civilized standards, humanity, and decency ..." against which penal measures must be evaluated. *See Estelle,* 429 U.S. at 102, 97 S.Ct. at 290. Repugnant to the Amendment are punishments hostile to the standards of decency that " 'mark the progress of a maturing society." ' *Id.* (*quoting Trop v. Dulles,* 356 U.S. 86, 101, 78 S.Ct. 590, 598, 2 L.Ed.2d 630 (1958). Also repugnant to the Amendment, are punishments that involve " 'unnecessary and wanton inflictions of pain." ' *Id.* at 103, 97 S.Ct. at 290 (*quoting Gregg v. Georgia,* 428 U.S. 153, 173, 96 S.Ct. 2909, 2925, 49 L.Ed.2d 859 (1976)).

In light of these elementary principles, a state has a constitutional obligation to provide inmates adequate medical care. *See West v. Atkins,* 487 U.S. 42, 54, 108 S.Ct. 2250, 2258, 101 L.Ed.2d 40 (1988). By virtue of their incarceration, inmates are utterly dependant upon prison authorities to treat their medical ills and are wholly powerless to help themselves if the state languishes in its obligation. *See Estelle,* 429 U.S. at 103, 97 S.Ct.

at 290. The essence of an improper medical treatment claim lies in proof of "deliberate indifference to serious medical needs." *Id.* at 104, 97 S.Ct. at 291. Simply put, "in order to allege deliberate indifference, plaintiff must assert facts establishing that either his access to physicians for necessary medical care was unreasonably delayed or denied, or that prescribed medical treatment was withheld by a defendant for the sole purpose of causing plaintiff unnecessary pain." *Nunez v. Horn,* 72 F.Supp.2d 24, 28 (N.D.N.Y.1999).

The standard of deliberate indifference includes both subjective and objective components. The objective component requires the alleged deprivation to be sufficiently serious, while the subjective component requires the defendant to act with a sufficiently culpable state of mind. *See Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998). A prison official acts with deliberate indifference when he " 'knows of and disregards an excessive risk to inmate health or safety.' " *Id.* (*quoting Farmer,* 511 U.S. at 837, 114 S.Ct. at 1979). However, " 'the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.' " *Id.* However, an Eighth Amendment claim may be dismissed if there is no evidence that a defendant acted with deliberate indifference to a serious medical need. An inmate does not have a right to the treatment of his choice. *See Murphy v. Grabo,* 1998 WL 166840, at *4 (N.D.N.Y. April 9, 1998) (*citation omitted* ). Also, mere disagreement with the prescribed course of treatment does not always rise to the level of a constitutional claim. *See Chance,* 143 F.3d at 703. Moreover, prison officials have broad discretion to determine the nature and character of medical treatment which is provided to inmates. *See Murphy,* 1998 WL 166840, at *4 (*citation omitted* ).

**\*4** While there is no exact definition of a "serious medical condition" in this circuit, the Second Circuit has indicated what injuries and medical conditions are serious enough to implicate the Eighth Amendment. *See Chance,* 143 F.3d at 702–703. In *Chance,* the Second Circuit held that an inmate complaining of a dental condition stated a serious medical need by showing that he suffered from great pain for six months. The inmate was also unable to chew food and lost several teeth. The Circuit also recognized that dental conditions, along with medical conditions, can vary in severity and may not all be severe. *Id.* at 702. The court acknowledged that while some injuries are not serious

enough to violate a constitutional right, other very similar injuries can violate a constitutional right under different factual circumstances. *Id.*

The Second Circuit provided some of the factors to be considered when determining if a serious medical condition exists. *Id.* at 702–703. Factors that the court mentioned were " '[t]he existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain' " are highly relevant. *Id.* at 702–703 (*citation omitted* ).

**[2]** In this case, Pittman claims that he "needed the assistance of a wheelchair, crutches or a walking cane to be transported to his hearing, due to the extreme pain he was suffering to his left leg and foot" (Compl.¶ 16). He alleges that Forte's failure to authorize a walking aid constituted deliberate indifference to his serious medical needs. Pittman claims that this action by Forte clearly established a substantive due process violation.

The defendants contend that Pittman has failed to state a cause of action against Forte for deliberate indifference to a serious medical need. They argue that Pittman was not suffering from a serious medical need. Furthermore, they argue that even assuming that Pittman was suffering extreme pain to his leg and foot, they maintain that, at best, Forte's actions may have constituted negligence, but not deliberate indifference.

As previously noted, in order to allege deliberate indifference, Pittman must assert facts establishing that either: (1) his access to a physician for necessary medical care was unreasonably delayed or denied; or (2) that prescribed medical treatment was withheld by a defendant for the sole purpose of causing plaintiff unnecessary pain. Pittman has failed to establish facts which, even if true, provide a basis for the relief sought. The fact that two weeks after the hearing Pittman was issued a wheelchair is insufficient to show that he needed it prior to that time. There is nothing in the record to show that Forte denied him a walking aid in order to cause unnecessary pain. Accordingly, this court recommends that Pittman's Eighth Amendment claim against Forte should be dismissed.

*C. False Misbehavior Report*

2002 WL 31309183

**\*5** The Second Circuit has held that "a prison inmate has no general constitutional right to be free from being falsely accused in a misbehavior report." *Boddie v. Schnieder,* 105 F.3d 857, 862 (2d Cir.1997); *see Freeman v. Rideout,* 808 F.2d 949, 951 (2d Cir.1986). "As long as prison officials grant the inmate a hearing and an opportunity to be heard, 'the filing of unfounded charges d[oes] not give rise to a *per se* constitutional violation actionable under § 1983.' " *Franco v. Kelly,* 854 F.2d 584, 587 (2d Cir.1988). There must be more such as retaliation against the prisoner for exercising a constitutional right. *See Franco,* 854 F.2d at 588–590.

**[3]**    In this case, Pittman alleges that Hoefling filed a misbehavior report against him in response to the assault of his fellow officers by Pittman. Specifically, Pittman claims that after Hoefling completed a body search, he asked Hoefling about being issued a toothbrush, washcloth and additional clothing for the SHU. Pittman claims that Hoefling replied by stating that he should not "worry about any additional SHU items ... because [he] was going to have plenty of time in the SHU to get the stuff once [Hoefling] and his brother officers (who Hoefling claimed plaintiff assaulted) got through with [him]" (Compl.¶¶ 11–12). Subsequent to this exchange, Hoefling turned his attention away from Pittman and while stepping out of the view of the surveillance camera stationed just outside the exit, Pittman watched Hoefling retrieve a dark colored object from his pocket and wrap the object in a pair of SHU underwear nearby, that did not belong to him. Thereafter, Hoefling claimed that he found a razor blade concealed in a pair of underwear that he falsely reported belonged to Pittman. On the other hand, the defendants maintain that Hoefling must be dismissed from the suit because Pittman's claim regarding denial of due process is barred by *Edwards.*

Pittman alleges that Hoefling planted the razor blade in response to the assault that occurred between Pittman and his fellow officers. This court finds that Pittman has no cause of action against Hoefling for allegedly filing a false misbehavior report because despite not attending the hearing, Pittman was provided a hearing. Additionally, Pittman's due process claim is also barred by *Edwards* since nothing in the record shows that his conviction was invalidated. Accordingly, this court recommends that the false misbehavior report claim against Hoefling should be dismissed.

WHEREFORE, for the foregoing reasons, it is hereby

RECOMMENDED, that the motion to dismiss be GRANTED in all respects in favor of defendants Forte and Hoefling. However, this court makes no recommendation as to defendant Erickson as he has not filed a motion; and it is further

ORDERED, that the Clerk of the Court serve a copy of this Report–Recommendation upon the parties by regular mail.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court within TEN days. FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW. *Roldan v. Racette,* 984 F.2d 85 (2d Cir.1993); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a), 6(e).

**All Citations**

Not Reported in F.Supp.2d, 2002 WL 31309183

---

**End of Document** © 2017 Thomson Reuters. No claim to original U.S. Government Works.

2007 WL 2712992
Only the Westlaw citation is currently available.
United States District Court,
W.D. New York.

Osvaldo SANTANA, Plaintiff,

v.

M. OLSON, Correction Officer, Martin
Kearney, Captain, and Anthony
Zon, Superintendent, Defendants.

No. 07-CV-0098A.
|
Sept. 13, 2007.

**Attorneys and Law Firms**

Osvaldo Santana, Alden, NY, pro se.

DECISION AND ORDER

DAVID G. LARIMER, United States District Judge.

*INTRODUCTION*

**\*1** Plaintiff, Osvaldo Santana, an inmate of the Wende
Correctional Facility, has filed this *pro se* action seeking
relief under 42 U.S.C. § 1983 (Docket No. 1) and has
both requested permission to proceed *in forma pauperis*
and filed a signed Authorization (Docket Nos. 2 and
4). Plaintiff claims that on January 11, 2006, defendant
M. Olson, a correctional officer, stated in a written
misbehavior report that while pat frisking plaintiff before
a "[s]ergeant's interview" he found a razor blade.[1] He
also claims that defendant Martin Kearney, the Tier
III Superintendent's Hearing Officer, violated plaintiff's
rights to due process when he made repeated requests
to extend the Hearing, failed to allow plaintiff to call
inmate witnesses, and that the inmate witnesses he did call
were questioned outside the presence of plaintiff without
plaintiff being provided an opportunity to listen to the
witnesses' testimony. On February 15, 2006, Kearney
affirmed the charges set forth in the misbehavior report
and sentenced plaintiff to some unspecified period of time
in SHU.

[1]     Plaintiff was immediately taken to the Special
        Housing Unit where it appears he remained until the
        reversal of his Superintendent's Hearing on April 24,
        2006.

On April 24, 2006, Donald Selsky, Director of Special
Housing/Inmate Disciplinary Program, reversed the
Superintendent's Hearing.

Plaintiff also alleges that defendant Anthony Zon, the
former Superintendent at Wende, violated plaintiff's
rights to due process when plaintiff was placed in the
Special Housing Unit and that Zon failed to "ensure
that his direct subordinates [*i.e.,* Kearney] carried out his
policies."

For the reasons discussed below, plaintiff's request to
proceed as a poor person is granted, his claims against
Olson and Zon are dismissed pursuant to 28 U.S.C.
§§ 1915(e)(2)(B) and 1915A, and service by the U.S.
Marshals is ordered with respect to the remaining
procedural due process claim against Kearney.[2]

[2]     "In the absence of a detailed factual record," the
        Court of Appeals has "affirmed dismissal of dud
        process claims only in cases where the period of time
        spent in SHU was exceedingly short-less than the 30
        days that the *Sandin [v. Conner,* 515 U.S. 472, 484,
        115 S.Ct. 2293, 132 L.Ed.2d 418 (1995) ] plaintiff
        spent in SHU-and there was no indication that the
        plaintiff: endured unusual SHU conditions." *Palmer
        v. Richarson,* 364 F.3d 60, 65-66 (2d Cir.2004).

*DISCUSSION*

Because plaintiff has met the statutory requirements of 28
U.S.C. § 1915(a) and filed an Authorization with respect
to this action, plaintiff is granted permission to proceed *in
forma pauperis.*

Section 1915(e) (2)(B) of 28 U.S.C. provides that the Court
shall dismiss a case in which *in forma pauperis* status has
been granted if the Court determines that the action (i) is
frivolous or malicious; (ii) fails to state a claim upon which
relief may be granted; or (iii) seeks monetary relief against
a defendant who is immune from such relief. In addition,
28 U.S.C. § 1915A(a) requires the Court to conduct
an initial screening of "a complaint in a civil action in
which a prisoner seeks redress from a governmental entity

or officer or employee of a governmental entity," *id.*, regardless of whether or not the inmate has sought *in forma pauperis* status under 28 U.S.C. § 1915. Sections 1915 and 1915A "provide an efficient means by which a court can screen for and dismiss legally insufficient claims." *Abbas v. Dixon,* 480 F.3d 636, 639 (2d Cir.2007) (citing *Shakur v. Selsky,* 391 F.3d 106, 112 (2d Cir.2004)). "Section 1915 governs proceedings *in forma pauperis,* while § 1915A applies to all civil complaints brought by prisoners against governmental officials or entities regardless of whether the prisoner has paid a filing fee." *Shakur,* 391 F.3d at 112.

**\*2** Further, in evaluating the complaint, the Court must accept as true all of the factual allegations and must draw all inferences in plaintiff's favor. *See Larkin v. Savage,* 318 F.3d 138, 139 (2d Cir.2003) (per curiam); *King v. Simpson,* 189 F.3d 284, 287 (2d Cir.1999). "To survive dismissal, the plaintiff must provide the grounds upon which his claim rests through factual allegations sufficient 'to raise a right to relief above the speculative level.' " *ATSI Communications, Inc. v. Shaar Fund, Ltd.,* 493 F.3d 87, 2007 WL 1989336, \*5 (2d Cir. July 11, 2007) (quoting *Bell Atl. Corp. v. Twombly,* --- U.S. ----, ----, 127 S.Ct. 1955, 1965, 167 L.Ed.2d 929 (2007).

"The settled rule is that a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *McEachin v. McGuinnis,* 357 F.3d 197, 200 (2d Cir.2004) (citations and internal quotation marks omitted) (applying both §§ 1915 and 1915A). "This rule applies with particular force where the plaintiff alleges civil rights violations or where the complaint is submitted *pro se.*" *Chance v. Armstrong,* 143 F.3d 698, 701 (2d Cir.1998).

Based on its evaluation of the complaint, the Court finds that plaintiff's claims against Olson and Zon must be dismissed pursuant to 28 U.S.C. §§ 1915(e)(2)(B)(ii) and 1915A(b) because they fail to state a claim upon which relief may be granted.

### 1. *Claims Against Olson*

Plaintiff alleges that defendant Olson submitted a misbehavior report in which he charged plaintiff with violations of various prison rules. This report led to the Superintendent's Hearing and alleged due process

violations. While the complaint does not specifically allege that the misbehavior report was false, that is the only way the Court can logically construe the allegations against Olson. As such, the claims against Olson must be dismissed because the filing of a false behavior report by a correctional officer does not state a claim for relief. *Freeman v. Rideout,* 808 F.2d 949, 951 (2d Cir.1986) ("The prison inmate has no constitutionally guaranteed immunity from being falsely or wrongly accused of conduct which may result in the deprivation of a protected liberty interest"), *cert. denied,* 485 U.S. 982, 108 S.Ct. 1273, 99 L.Ed.2d 484 (1988)); *Husbands v. McClellan,* 957 F.Supp. 403 (W.D.N.Y.1997). The only constitutional violation that could occur in this situation is if plaintiff were not provided adequate due process in any proceeding which is based upon the misbehavior report. In that case, the claim is not based on me truth or falsity of the misbehavior report but instead on the conduct of the hearing itself.

### 2. *Claims Against Zon*

Plaintiff claims that Zon should liable for the alleged due process violations that arose from the Superintendent's Hearing conducted by Kearney but the allegations against Zon make clear that plaintiff seeks to hold him liable only in his supervisory role as the former superintendent at Wende. This is insufficient to state a claim against Zon under 42 U.S.C. § 1983. It is axiomatic that proof of an individual defendant's personal involvement in the alleged wrong is a prerequisite to liability on a claim for damages under §§ 1983. *See, e.g., Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994). A claim which fails to demonstrate a defendant's personal involvement in the alleged constitutional deprivation is subject to *sua sponte* dismissal. *Sealey v. Giltner,* 116 F.3d 47, 51 (2d Cir.1997). The complaint alleges nothing that would establish that Zon was personally involved in the alleged due process violations alleged and, accordingly, the claims against him must be dismissed.

### *CONCLUSION*

**\*3** Because plaintiff has met the statutory requirements of 28 U.S.C. § 1915(a) and filed an Authorization with respect to the filing fee, his request to proceed *in forma pauperis* is hereby granted. For the reasons discussed above, plaintiff's claims against defendants Olson and

2007 WL 2712992

Zon are dismissed with prejudice pursuant to 28 U.S.C. §§ 1915(e)(2)(B)(ii) and 1915A, and the U.S. Marshal is directed to serve the summons and complaint on Martin Kearney regarding the remaining due process claim.

### *ORDER*

IT HEREBY IS ORDERED, that plaintiffs request to proceed *in forma pauperis* is granted;

FURTHER, that the claims against defendants Olson and Zon are dismissed with prejudice;

FURTHER, that the Clerk of the Court is directed to terminate defendants Olson and Zon as parties to this action;

FURTHER, that the Clerk of the Court is directed to file plaintiffs papers, and to cause the United States Marshal to serve copies of the Summons, Complaint, and this Order upon; Martin Kearney, Captain, without plaintiff's payment therefor, unpaid fees to be recoverable if this action terminates by monetary award in plaintiff's favor;

FURTHER, that pursuant to 42 U.S.C. § 1997e(g)(2), the defendants are directed to respond to the complaint.

IT IS SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2007 WL 2712992

---

**End of Document**                    © 2017 Thomson Reuters. No claim to original U.S. Government Works.

2010 WL 980272
Only the Westlaw citation is currently available.

**This decision was reviewed by West editorial staff and not assigned editorial enhancements.**

United States District Court,
N.D. New York.

Terry CICIO, Plaintiff,
v.
GRAHAM; Peter M. Sigona; Richard D. Ruston, III;
Phil J. Manna; A. Vega; and Ryerson, Defendants.

No. 9:08-CV-534 (NAM/DEP).
|
March 15, 2010.

**Attorneys and Law Firms**

Terry Cicio, Malone, NY, pro se.

Hon. Andrew M. Cuomo, Office of the Attorney General, State of New York, Adrienne J. Kerwin, Esq., of Counsel, Albany, NY, for Defendants.

**MEMORANDUM-DECISION AND ORDER**

HON. NORMAN A. MORDUE, Chief Judge.

**\*1** Plaintiff, an inmate in the custody of the New York State Department of Correctional Services ("DOCS"), brought this action for declaratory and monetary relief under 42 U.S.C. § 1983, claiming excessive use of force, failure to intervene, and denial of adequate medical care stemming from a disturbance involving 17 or more inmates occurring in a "holding pen" or "cage" at Auburn Correctional Facility ("ACF") on March 7, 2006. Plaintiff moved for summary judgment (Dkt. No. 35) and defendants cross-moved for summary judgment (Dkt. No. 38). Upon referral of the motions pursuant to 28 U.S.C. § 636(b)(1)(B) and Local Rule 72.3(c), United States Magistrate Judge David E. Peebles issued a Report and Recommendation (Dkt. No. 41) recommending that this Court deny plaintiff's motion, grant defendants' motion, and dismiss the action.

Plaintiff has submitted an objection (Dkt. No. 42). Plaintiff states that the Court should have reviewed the transcripts from his disciplinary hearing, because the testimony of defendants Peter M. Sigona and Richard D. Ruston, III at that hearing "contradicts the reports that [Magistrate Judge Peebles] relied on in making [his] decision." Plaintiff gives no specifics and thus appears to be interposing a general objection directed to the issues of excessive force and failure to intervene. His objection does not refer to the issue of medical indifference.

Pursuant to 28 U.S.C. § 636(b)(1)(C), this Court reviews *de novo* those parts of a report and recommendation to which a party specifically objects. Where, as here, a party interposes only general objections to a report and recommendation, the Court reviews for clear error or manifest injustice. *See Davis v. Chapple,* 2010 WL 145298, \*2 (N.D.N.Y. Jan.8, 2010), *Brown v. Peters,* 1997 WL 599355,\*2-\* 3 (N.D.N.Y.), *aff'd without op.,* 175 F.3d 1007 (2d Cir.1999). Failure to object to any portion of a report and recommendation waives further judicial review of the matters therein. *See Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993).

The Court accepts and adopts Magistrate Judge Peebles' Report and Recommendation. In view of plaintiff's objection, which, as noted, appears to be directed to the evidence on the issues of excessive force and failure to intervene, the Court briefly revisits these issues. Although plaintiff interposes only a general objection on these issues, in light of his *pro se* status and the nature of the objection, the Court conducts a *de novo* review. Plaintiff requests the Court to obtain the transcript of the disciplinary hearing and contends that the testimony given by Sigona and Ruston at that hearing contradicts the reports relied on by Magistrate Judge Peebles; however, as explained below, the award of summary judgment to defendants is based on plaintiff's own evidence.

The record evidence pertinent to the excessive force and failure to intervene claims is briefly summarized as follows. In a declaration supporting the motion for summary judgment, Sigona, a sergeant at ACF, states:

**\*2** On March 7, 2006, I was supervising the hospital depot area at Auburn. While waiting with a group of inmates in the holding pen in the hospital depot, inmate Baer became disruptive and began threatening staff. Baer ignored several orders by me to cease his behavior. I then entered the holding pen with Officers Manna and Ruston with the intention of removing inmate Baer.

All of the inmates in the pen were ordered to one side of the pen, while Baer remained on the other. Inmate Green refused to move, so I guided him to the side directed.

While I was guiding inmate Green, plaintiff Cicio then lunged at Officer Manna, striking him with a closed fist and knocking him to the ground. I immediately went to Officer Manna's aid and assisted with gaining control of Cicio by taking control of Cicio's right side. Officer Manna and I then escorted a struggling Cicio out of the pen, after which Cicio and Officer Manna fell to the floor. Once Cicio stopped struggling, he was removed from the area and taken to medical for examination.

The declaration from defendant Philip J. Manna, a corrections officer at ACF, is consistent with Sigona's declaration.

Plaintiff's complaint states that defendant Sigona pushed plaintiff into defendant Manna "who then grabbed plaintiff by the hair and began to pull plaintiff towards [the] holding pen door at which point plaintiff was thrown to the floor and kneed in [the] nose." The complaint further states that, after plaintiff was brought to his feet and escorted out of the immediate area, defendant Manna "once again grabbed plaintiff by his hair and pushed plaintiff's face into [the] wall." According to plaintiff, Sigona and Ruston "stood and watched the incident" and did not "intervene[ ] to stop the assault."

Plaintiff testified in his deposition that there were 17 or 18 inmates in the holding pen awaiting transport; that there were no corrections officers in the pen but there were some in the vicinity; that another inmate George Baer started "cursing up a storm" at a corrections officer; and that the sergeant told Baer to "cut it out," to which Baer responded, "No." The sergeant then said, "Take him out of there," ordered Baer to come up front, and ordered everyone else to the back of the pen. Instead of coming up front, Baer "sat down in the middle of the cage." Plaintiff stated that everyone else went to the back of the pen except plaintiff and inmate Green; according to plaintiff, they could not go back because "there was no more room." As plaintiff describes it:

There wasn't any more room. And he [Green] was standing directly in front of Inmate Baer. So they started taking Green out of the holding pen, and

that's where everything just a whole jumble of things happened. I ended up getting mixed up in that, because one of officers tried to barge in there and push me into the sergeant, and then I got into a use of force behind it. So a whole lot of events that took place after one move.

**\*3** \* \* \*

Once they started pulling [Green] out [of the pen], other officers barged into the cage. I don't know if done purposely or not, but I was pushed into the sergeant, and from there I was given an assault charge and taken down.

\* \* \*

... [Baer] was sitting there [in the middle of the pen] when Green was being taken out. After I was pushed to the sergeant, I don't know what happened.

Plaintiff's deposition testimony continued:

Q. Was Green eventually taken out?

A. Yes.

Q. Okay. Now, was he still in the cage when you got pushed into the sergeant?

A. I am not sure.

Q. It was all happening at the same time?

A. Yes.

Q. Did you see any officers go to Baer to get him up and out?

A. Not specifically, because by this time it was just chaos in the cage. I was on the floor somewhere. I don't know where.

Q. How many officers were taking out Green?

A. When I first seen, I only saw one before everything just-

Q. When the sergeant said, "Take him of there," meaning Baer, how many officers entered the pen?

A. At the time, there was about five or six.

Q. They entered at the time just to remove Baer because of the goings on?

WESTLAW    © 2017 Thomson Reuters. No claim to original U.S. Government Works.

A. Yes.

Q. Was one of them the sergeant?

A. Yes. There was a sergeant in there.

Q. So the sergeant and/or three or four officers?

A. Quite a few, yes. Something like that.

Q. Okay. So they enter. Then Green is told to move. He doesn't. Somebody, was it one of those officers that entered that tried to remove Green?

A. The first officer that enters, the one that ... talked to him at first trying to remove him. I don't know which officer that was.

Q. Okay. But no additional officers to deal with Green, it was somebody in there from Baer?

A. Right. Once Green, once they saw an officer pulling Green out of the cage, that's when more officers entered the cage.

Q. So I think, and when I try to recap what you just said, I am not trying to put words in your mouth, but tell me if I am doing it wrong. I am trying to make sure I get it right. You said five or six officers came in to deal with Baer; is that right?

A. Something close to, right.

Q. How many more entered once Green became an issue?

A. I have no idea, because by that time I was into the sergeant and on the floor.

Q. Okay. All right. So somebody, as they are rushing in, whether intentional or not, you don't know, pushed you into the sergeant?

A. Right.

Q. Then what happened?

A. From there, I was taken down. I got kneed in the nose.

Q. Do you know who took you to the floor?

A. I am only going by the reports.

Q. Okay.

A. I don't know specifically. Only in the reports that they wrote do I know any names.

Q. Okay.

A. But other than that, at the time of the incident, I didn't know anything.

Q. Okay. At what point in time did you-at some point in time did you see the report?

 *4  A. I saw the reports after I got my misbehavior report, and I got my assistance, and I asked for the use of force report, and the unusual incident report, and everything else.

Q. Okay. Now, once you were taken to the floor, then what happened? Take me through it totally.

A, Once I was taken to the floor, another CO kneed me in the nose. I don't know who.

Q. You don't think it was the same person that took you to the floor? A. I doubt it.

Q. All right. Okay.

A. And once I was lifted, I was pulled [from] the cage by my hair. At the time I had a lot of hair. I was pulled out [of] the cage by my hair, and then I hit the floor again.

Q. Okay. Now when you hit the floor again, were you taken to the floor? Do you know how that happened, the second hitting of the floor?

A. I am not sure.

Q. Okay.

A. I am not sure.

Q. You ended up on the floor?

A. I just ended up on the floor with a couple C.O.s on top of me. I don't know if they fell, if I fell. I have no idea.

Q. There were other officers on the floor with you?

A. Right.

Plaintiff explained that he was then removed from the scene, taken upstairs to "their SHU" and given a ticket. He was placed in a different holding pen where a nurse came to see him within 15 or 20 minutes. According to plaintiff, he told the nurse that his nose hurt, he had pains in his right wrist, which was swollen, and some of his hair "had got pulled out in back." He was not bleeding. He requested and was denied pain medication, although at some later time he was given ibuprofen. He had headaches "off and on" for two or three weeks and his wrist was swollen for a few days, although it did not limit any of his activities.

When the disputed facts are viewed most favorably to plaintiff and considered in combination with the undisputed facts, the record shows the following: a group of 17 or 18 inmates was confined in the pen; one inmate, Baer, became disruptive and refused to comply with Sergeant Sigona's direction to stop; five or six corrections officers entered the pen to remove Baer; the other inmates were directed to move to the back of the pen; there was not room for Green and plaintiff to do so; Green was told to move but did not do so; and corrections officers began removing Green. The evidence further shows that at that point "just a whole jumble of things happened"; more corrections officers entered the pen; as they were entering, one of them-intentionally or not-pushed plaintiff into Sergeant Sigona; it was "chaos" in the pen; a corrections officer took plaintiff to the floor; and plaintiff then "got kneed in the nose," probably by a different corrections officer. Plaintiff was then pulled out of the pen. In his complaint he states that Officer Manna again grabbed him by the hair and pushed his face into the wall, whereas in his deposition, plaintiff stated that he was pulled out of the pen by his hair and "ended up on the floor again" with a couple of corrections officers on top of him, and added: "I don't know if they fell, if I fell." He was then removed and taken to SHU, where a nurse examined him within 20 minutes.

**\*5** The Court agrees with Magistrate Judge Peebles that defendants are entitled to summary judgment dismissing plaintiff's claims of excessive force. It is undisputed that the force used on plaintiff on March 7, 2006 occurred in the context of a disturbance involving 17 or 18 inmates in a holding pen. In plaintiff's own word, it was "chaos." Indeed, plaintiff states that when he was pushed into Sergeant Sindona it may have been unintentional, and that, when he went to the floor a second time, it may have been because he and/or the corrections officers fell. In view of this evidence and the minimal nature of plaintiff's injuries, no rational trier of fact could conclude that plaintiff was subjected to force that was malicious or sadistic for the purpose of causing plaintiff harm and not in a good faith effort to maintain discipline. *See Wright v. Goord,* 554 F.3d 255, 268-69 (2d Cir.2009). For the same reason, there is no basis for a claim of failure to intervene. Moreover, no rational trier of fact could find that plaintiff suffered a serious medical need. As to the other issues raised, the Court agrees with the Report and Recommendation. Accordingly, the Court hold that plaintiff has failed to establish that he is entitled to summary judgment; defendants have demonstrated their entitlement to summary judgment; and plaintiff has failed to show the existence of a material question of fact.

In addition to his objection to the Report and Recommendation (Dkt. No. 42), plaintiff has filed what appears to be an appeal from the Report and Recommendation (Dkt. No. 43). Because Magistrate Judge Peebles did not issue any order which could be the subject of the appeal, the appeal is denied. In the event that plaintiff wishes to appeal from this Memorandum-Decision and Order, he should follow the procedure set forth in the Civil Appeals Packet, which will be provided to him with this decision.

It is therefore

ORDERED that United States Magistrate Judge David E. Peebles's Report and Recommendation (Dkt. No. 41) is accepted and adopted; and it is further

ORDERED that the appeal (Dkt. No. 43) from the Report and Recommendation is denied; and it is further

ORDERED that plaintiff's motion for summary judgment (Dkt. No. 35) is denied; and it is further

ORDERED that defendants' cross motion for summary judgment (Dkt. No. 38) is granted and the complaint dismissed on the merits; and it is further

ORDERED that the Clerk is directed to provide plaintiff with a Civil Appeals Packet.

IT IS SO ORDERED.

2010 WL 980272

*REPORT AND RECOMMENDATION*

**DAVID E. PEEBLES**, United States Magistrate Judge.

Plaintiff Terry Cicio, a New York State prison inmate who is proceeding *pro se* and *in forma pauperis,* has commenced this action pursuant to 42 U.S.C. § 1983, claiming deprivation of his civil rights. In his complaint plaintiff asserts that he was assaulted by one of the defendants while two others stood by and failed to intervene, and that following the assault medical personnel at the prison facility where the incident took place failed to provide requested medical treatment for his resulting injuries. Plaintiff's complaint seeks both declaratory and monetary relief.

**\*6** Currently pending before the court are cross-motions for summary judgment. Plaintiff initiated the motion process, moving for summary judgment and claiming that the evidence in the record supports a finding in his favor on the issue of liability and that no reasonable factfinder could conclude otherwise. Defendants have responded by both opposing plaintiff's motion and seeking summary judgment dismissing plaintiff's complaint. In their motion defendants assert that based upon the record now before the court no reasonable factfinder could find in plaintiff's favor on any of his claims and that, in any event, they are deserving of qualified immunity from suit under the circumstances presented.

Having carefully reviewed the record considered in light of the arguments of the parties, for the reasons that follow I recommend that defendants' motion be granted and that plaintiff's motion be denied.

**I. BACKGROUND**
The facts forming the basis for plaintiff's claims are not particularly complex, although the parties have given conflicting accounts of the relevant events, particularly with regard to the circumstances surrounding the use of force by prison officials of force against Cicio.

Plaintiff is a prison inmate entrusted to the care and custody of the New York State Department of Correctional Services ("DOCS"); at the times relevant to his complaint, Cicio was housed at the Auburn Correctional Facility ("Auburn"), located in Auburn, New York. *See generally* Complaint (Dkt. No. 1). On

March 7, 2006, while plaintiff was among a group of between sixteen and eighteen inmates confined in the Auburn hospital depot awaiting transfer out a disruption occurred involving a fellow prisoner. Complaint (Dkt. No. 1) Statement of Facts ¶ 1; Sigona Decl. (Dkt. No. 38-8) ¶ 3; Manna Decl. (Dkt. No. 38-9) ¶ 3; *see also* Kerwin Aff. (Dkt. No. 38-3) Exh. K (transcript of plaintiff's deposition, conducted on May 15, 2009 and hereinafter cited as "Plaintiff's Dep. Tr." at pp. 8-10). Defendants Sigona, Manna and Ruston, all three of whom are employed as corrections workers at the facility, responded to the incident, entering the cell and ordering all of the inmates to retreat to the back. Complaint (Dkt. No. 1) Statement of Facts ¶ 2, Manna Decl. (Dkt. No. 38-9) ¶ 3; Sigona Decl. (Dkt. No. 38-8) ¶ 3. While those corrections officers attempted to remove the dissident inmate from the cell plaintiff Cicio became involved. It is at this point that the parties' versions of the relevant events significantly diverge.

Plaintiff contends that during the ensuing events he was pushed into defendant Manna, who then grabbed him by the hair and began to pull him toward the cell door, resulting in Cicio being thrown to the floor and kneed in the nose. Complaint (Dkt. No. 1) Statement of Facts ¶ 4; Cicio Decl. (Dkt. No. 40-2) ¶ 4. Plaintiff maintains that after regaining his footing he was again grabbed by the hair and pushed face first into the wall. Complaint (Dkt. No. 1) Statement of Facts ¶ 5. Plaintiff asserts that while this was occurring defendants Sigona and Ruston stood by and watched without coming to his assistance. *Id.*

**\*7** Defendants offer a markedly different version of the relevant events. According to the defendants, while they were attempting to extricate the disruptive inmate from the holding cell Manna issued a direct order to the plaintiff to move to the back of the cage. Plaintiff's Exh. D (Dkt. No. 35-2) Disregarding the order, plaintiff blocked Corrections Officer Manna's path, lunged at him and struck him with a closed fist knocking him to the floor. *Id.; see also,* Manna Decl. (Dkt. No. 38-9) ¶ 4; Sigona Decl. (Dkt. No. 38-8) ¶ 5. Cicio then began yelling to the other inmates in the cage, encouraging them to join in, exclaiming, "let's get them." Plaintiff's Exh. D (Dkt. No. 35-2). At that point, defendants Manna and Sigona attempted to subdue Cicio, who continued to struggle and resist, resulting in Cicio and Officer Manna falling to the floor. Manna Decl. (Dkt. No. 38-9) ¶¶ 4-5; Sigona Decl. (Dkt. No. 38-8) ¶ 5.

As a result of the incident a misbehavior report was subsequently issued by Corrections Officer Manna charging Cicio with disciplinary infractions, including 1) assault on staff; 2) prison takeover; 3) engaging in violent conduct; 4) inciting inmates; 5) disobeying a direct order; 6) physically interfering with an employee; and 7) impeding inmate movement. Mann Decl. (Dkt. No. 38-9) ¶ 7. Following a Tier III disciplinary hearing commenced on March 13, 2006, plaintiff was found guilty of five of the six violations including, *inter alia,* assault on staff. Kerwin Aff. (Dkt. No. 38-3) Exh. I. As a result of that determination plaintiff received a series of sanctions which, after being modified on appeal, included twelve months of confinement in a facility special housing unit ("SHU") with a corresponding loss of packages, commissary, and telephone privileges, and an additional recommendation that plaintiff forfeit twelve months of good time credits. *Id.*

Following the incident plaintiff was immediately removed from the area and taken to be examined by facility medical personnel. Manna Decl. (Dkt. No. 38-9) ¶ 6. Plaintiff was examined by defendant A. Vega, a registered nurse, within fifteen to twenty minutes after the incident. Cicio Decl. (Dkt. No. 40-2) ¶ 5; Plaintiff's Dep. Tr. at p. 22. During that examination Nurse Vega observed a reddened area on the bridge of plaintiff's nose and noted his reports of minor pain in the nose and head areas. Plaintiff's Dep. Tr. at pp. 25-26; *see also* Kerwin Aff. (Dkt. No. 38-3) Exhs. B and H. Plaintiff was not treated for his injuries nor was he scheduled to see a doctor. Complaint (Dkt. No. 1) Statement of Facts ¶ 8.

Plaintiff claims that following the incident he submitted sick call slips on March 8, 9, 13 and 19, 2006, requesting medical intervention to address his injuries. Complaint (Dkt. No. 1) Statement of Facts ¶¶ 9, 11-12 and 15. Plaintiff contends, however, that those sick call slips were not processed by defendant Ryerson, the nurse administrator at Auburn. *Id.* ¶ 22. Defendant Ryerson denies that allegation and counters that based upon her review of all sick call slips received during the time period involved, there is no record of plaintiff having requested sick call at any time between March 8 and March 20, 2006. Ryerson Decl. (Dkt. No. 38-10) ¶ 4.

**\*8** As is the case with regard to plaintiff's substantive allegations, the parties disagree over the procedural steps taken by the plaintiff to seek internal review of the relevant events. Plaintiff contends that following the incident he filed two separate grievances, filing the first on March 14, 2006, and both related to the failure of prison officials to permit him to attend sick call. Complaint (Dkt. No. 1) Statement of Facts ¶¶ 14, 16. Plaintiff does not assert in his complaint that he filed a grievance regarding the alleged use of force and failure of prison officials to intervene on his behalf, although in an affirmation in opposition to defendants' summary judgment motion Cicio succinctly states "[p]laintiff filed grievances on both incidents, only one was responded to." *See* Cicio Aff. (Dkt. No. 39) ¶ 3. Plaintiff's motion submission also includes a handwritten memorandum, dated March 14, 2006 and addressed to the facility inmate grievance review committee ("IGRC"), citing the events including the alleged assault by prison officials. *See* Plaintiff's Exhs. (Dkt. No. 35-3) p. 24 of 27.

According to the defendants, the sole grievance filed by plaintiff regarding the incident was submitted on March 24, 2006 and was denied by the facility IGRC on April 3, 2006 after plaintiff was transferred out of Auburn. Graham Decl. (Dkt. No. 38-7) ¶ 6. That denial was subsequently affirmed by defendant Graham, the Superintendent at Auburn, on April 3, 2006. While plaintiff claims to have appealed that determination on June 12, 2006, presumably to the DOCS Central Office Review Committee ("CORC"), the record contains no further indication of whether that appeal was in fact taken, and if so, the result. *See* Complaint (Dkt. No. 1) Statement of Facts ¶ 18. According to prison officials at Auburn, their research of relevant records at the facility failed to disclose additional documents regarding plaintiff's exhaustion of remedies and, significantly, to show that plaintiff appealed to Superintendent Graham from the disposition of his claimed use of force grievance. *See* Graham Decl. (Dkt. No. 38-7) ¶ 4.

## II. *PROCEDURAL HISTORY*

Plaintiff commenced this action on April 28, 2008.[1] As defendants, plaintiff's complaint names Auburn Superintendent Harold D. Graham; Corrections Sergeant Peter M. Sigona; Corrections Officers Richard D. Ruston and Phil J. Manna; Registered Nurse A. Vega; and Nurse Administrator Ryerson. The complaint alleges varying claims against those defendants including for the alleged use of excessive force and failure to protect the plaintiff from the use of force as well as indifference to his medical

needs arising from the incident. [2] *See generally* Complaint (Dkt. No. 1).

[1]    This action was filed in the Western District of New York but was subsequently transferred here by order issued on May 2, 2008 by Chief District Judge Richard J. Arcara. Dkt. Nos. 1, 3.

[2]    In his motion submission, plaintiff also claims to have asserted a cause of action for violation of procedural due process, based upon the defendants' alleged failure to process and investigate his grievances. Plaintiff's Memorandum (Dkt. No. 35-3) at p. 2. Such a claim, if indeed present in this action, is nonetheless subject to dismissal, since it is well established that a prison inmate has no cognizable constitutional right of access to the grievance process or to have grievances which have been filed investigated. *Avent v. Doe,* No. 9:05-CV-1311, 2008 WL 877176, at *8 (N.D.N.Y. Mar.31, 2008) (Scullin, S.J. & DiBianco, M.J.) (citing *Torres v. Mazzuca,* 246 F.Supp.2d 334, 342 (S.D.N.Y.2003)).

Issue was initially joined in the action by defendant Manna through his filing of an answer on September 25, 2008. Dkt. No. 23. Following the denial of their pre-answer motion seeking dismissal of plaintiff's claims against them on a variety of bases, *see* Dkt. Nos. 29, 32, an answer was filed on behalf of the remaining defendants on February 25, 2009. Dkt. No. 30.

**\*9** On July 15, 2009, following pretrial discovery, plaintiff filed a motion for summary judgment in his favor. Dkt. No. 35. While plaintiff's motion appears to focus on the defendants' use of force, it purports to seek summary judgment on all of his claims. *See id* . On September 28, 2009, defendants responded in opposition to plaintiff's motion and in support of a cross-motion requesting judgment dismissing all of plaintiff's claims against them as a matter of law. Dkt. No. 38. In their motion, defendants argue that 1) plaintiff's deliberate medical indifference claim is legally deficient based both upon his inability to establish the existence of a serious medical need and the lack of evidence of indifference on the part of defendants Vega or Ryerson, the two medical personnel against whom the claim appears to have been lodged; 2) plaintiff's claim surrounding the alleged use of a excessive force and failure to intervene lacks merit; 3) plaintiff's claims against Superintendent Graham are subject to dismissal based upon his lack of personal involvement in the constitutional deprivations alleged;

and 4) in any event defendants are entitled to qualified immunity from suit. Plaintiff has since responded in opposition to defendants' motion and in further support of his initial summary judgment motion. Dkt. Nos. 38, 39, 40.

The parties' cross-motions, which are now fully briefed and ripe for determination, have been referred to me for the issuance of a report and recommendation, pursuant to 28 U.S.C. § 636(b)(1)(B) and Northern District of New York Local Rule 72.3(c). *See also* Fed.R.Civ.P. 72(b).

## III. *DISCUSSION*

### A. *Summary Judgment Standard*
Summary judgment motions are governed by Rule 56 of the Federal Rules of Civil Procedure. Under that provision, summary judgment is warranted when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *see Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 2509-10, 91 L.Ed.2d 202 (1986); *Security Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.,* 391 F.3d 77, 82-83 (2d Cir.2004). A fact is "material", for purposes of this inquiry, if it "might affect the outcome of the suit under the governing law." *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510; *see also Jeffreys v. City of New York,* 426 F.3d 549, 553 (2d Cir.2005) (citing *Anderson)*. A material fact is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510.

A party moving for summary judgment bears an initial burden of demonstrating that there is no genuine dispute of material fact to be decided with respect to any essential element of the claim in issue; the failure to meet this burden warrants denial of the motion. *Anderson,* 477 U.S. at 250 n. 4, 106 S.Ct. at 2511 n. 4; *Security Ins.,* 391 F.3d at 83. In the event this initial burden is met, the opposing party must show, through affidavits or otherwise, that there is a material issue of fact for trial. Fed.R.Civ.P. 56(e); *Celotex,* 477 U.S. at 324, 106 S.Ct. at 2553; *Anderson,* 477 U.S. at 250, 106 S.Ct. at 2511. Though *pro se* plaintiffs are entitled to special latitude when defending against summary judgment motions, they must establish more

2010 WL 980272

than mere "metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986); *but see Vital v. Interfaith Med. Ctr.,* 168 F.3d 615, 620-21 (2d Cir.1999) (noting obligation of court to consider whether *pro se* plaintiff understood nature of summary judgment process).

**\*10** When deciding a summary judgment motion, a court must resolve any ambiguities and draw all inferences from the facts in a light most favorable to the nonmoving party. *Jeffreys,* 426 F.3d at 553; *Wright v. Coughlin,* 132 F.3d 133, 137-38 (2d Cir.1998). The entry of summary judgment is warranted only in the event of a finding that no reasonable trier of fact could rule in favor of the non-moving party. *See Building Trades Employers' Educ. Ass'n v. McGowan,* 311 F.3d 501, 507-08 (2d Cir.2002) (citation omitted); *see also Anderson,* 477 U.S. at 250, 106 S.Ct. at 2511 (summary judgment is appropriate only when "there can be but one reasonable conclusion as to the verdict").

In a case such as this, where parties have interposed cross-motions for summary judgment, each motion must be independently assessed, using this standard as a backdrop. *See Light Sources, Inc. v. Cosmedico Light, Inc.,* 360 F.Supp.2d 432, 434 (D.Conn.2005).

### B. *Excessive Force/ Failure To Intervene*

At the heart of plaintiff's complaint is his claim that on March 7, 2006 he was subjected to an unprovoked attack by defendant Manna and that defendants Sigona and Ruston watched and failed to take any measures to end the assault and that, as a result, he suffered physical injuries. Plaintiff claims that the record supports his excessive force and failure to intervene claims as a matter of law. Defendants counter by arguing that no reasonable factfinder could conclude, based upon the record now before the court, that plaintiff's constitutional rights were violated, even assuming the truth of his version of the relevant events.

#### 1. *Excessive Force*

Plaintiff's excessive force claim must be analyzed under the Eighth Amendment, which proscribes punishments that involve the "unnecessary and wanton infliction of pain" and are incompatible with "the evolving standards of decency that mark the progress of a maturing society." *Estelle v. Gamble,* 429 U.S. 97, 102, 104, 97 S.Ct. 285, 290, 291, 50 L.Ed.2d 251 (1976); *see also Whitley v. Albers,* 475 U.S. 312, 319, 106 S.Ct. 1076, 1084 (1986) (citing, *inter alia, Estelle* ). While the Eighth Amendment does not mandate comfortable prisons, neither does it tolerate inhumane treatment of those in confinement; thus, the conditions of an inmate's confinement are subject to Eighth Amendment scrutiny. *Farmer v. Brennan,* 511 U.S. 825, 832, 114 S.Ct. 1970, 1976, 128 L.Ed.2d 811 (1994) (citing *Rhodes v. Chapman,* 452 U.S. 337, 349, 101 S.Ct. 2392, 2400, 69 L.Ed.2d 59 (1981)).

A plaintiff's constitutional right against cruel and unusual punishment is violated by an "unnecessary and wanton infliction of pain." *Whitley,* 475 U.S. at 319, 106 S.Ct. at 1084 (citations and quotations omitted); *Griffen v. Crippen,* 193 F.3d 89, 91 (2d Cir.1999). The lynchpin inquiry in deciding claims of excessive force against prison officials is "whether force was applied in a good-faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm." *Hudson v. McMillian,* 503 U.S. 1, 6-7, 112 S.Ct. 995, 998-999, 117 L.Ed.2d 156 (1992) (applying *Whitley* to all excessive force claims); *Whitley,* 475 U.S. at 320-21, 106 S.Ct. at 1085 (quoting *Johnson v. Glick,* 481 F.2d 1028, 1033 (2d Cir.) (Friendly, J.), *cert. denied sub nom ., John v. Johnson,* 414 U.S. 1033, 94 S.Ct. 462, 38 L.Ed.2d 324 (1973)).

**\*11** Analysis of claims of cruel and unusual punishment requires both objective examination of the conduct's effect and a subjective inquiry into the defendant's motive for his or her conduct. *Wright v. Goord,* 554 F.3d 255, 268 (2d Cir.2009) (citing *Hudson,* 503 U.S. at 7-8, 112 S.Ct. at 999 and *Blyden v. Mancusi,* 186 F.3d 252, 262 (2d Cir.1999)). As was recently emphasized by the United States Supreme Court in *Wilkins v. Gaddy,* however, after *Hudson* the "core judicial inquiry" is focused not upon the extent of the injury sustained, but instead whether the nature of the force applied was nontrivial. --- U.S. - - - -, --- S.Ct. ----, --- L.Ed.2d - - - -, 2010 WL 596513, at \*3 (Feb. 22, 2010) (per curiam). Accordingly, when considering the subjective element of the governing Eighth Amendment test a court must be mindful that the absence of serious injury, though relevant, does not necessarily negate a finding of wantonness since, as the Supreme Court has noted,

> [w]hen prison officials maliciously and sadistically use force to cause harm, contemporary standards of decency always are violated.... This

2010 WL 980272

is true whether or not significant injury is evident. Otherwise, the Eighth Amendment would permit any physical punishment, no matter how diabolic or inhuman, inflicting less than some arbitrary quantity of injury.

*Hudson,* 503 U.S. at 9, 112 S.Ct. at 1000 (citations omitted); *Velasquez v. O'Keefe,* 899 F.Supp. 972, 973 (N.D.N.Y.1995) (McAvoy, C.J.) (quoting *Hudson,* 503 U.S. at 9, 112 S.Ct. at 1000); *see Romaine v. Rewson,* 140 F.Supp.2d 204, 211 (N.D.N.Y.2001) (Kahn, J.). Even a de *minimis* use of physical force can constitute cruel and unusual punishment if it is "repugnant to the conscience of mankind." *Hudson,* 503 U.S. at 9-10, 112 S.Ct. 1000 (citations omitted).

With its focus on the harm done, the objective prong of the inquiry is contextual and relies upon "contemporary standards of decency." *Wright,* 554 F.3d at 268 (quoting *Hudson,* 503 U.S. at 8, 112 S.Ct. at 1000) (internal quotations omitted)). When addressing this component of an excessive force claim under the Eighth Amendment calculus, the court can consider the extent of the injury suffered by the inmate plaintiff. While the absence of significant injury is certainly relevant, it is not dispositive. *Hudson,* 503 U.S. at 7, 112 S.Ct. at 999. The extent of an inmate's injury is but one of the factors to be considered in determining a prison official's use of force was "unnecessary and wanton"; courts should also consider the need for force, whether the force was proportionate to the need, the threat reasonably perceived by the officials, and what, if anything, the officials did to limit their use of force. *Whitley,* 475 U.S. at 321, 106 S.Ct. at 1085 (citing *Johnson,* 481 F.2d at 1033). "But when prison officials use force to cause harm maliciously and sadistically, 'contemporary standards of decency are always violated.... This is true whether or not significant injury is evident.' " *Wright,* 554 F.3d at 268-69 (quoting *Hudson,* 503 U.S. at 9, 112 S Ct. at 1000). That is not to say, however, that "every malevolent touch by a prison guard gives rise to a federal cause of action." *Griffen,* 193 F.3d at 91 (citing *Romano v. Howarth,* 998 F.2d 101, 105 (2d Cir.1993)); *see also Johnson,* 481 F.2d at 1033 ("Not every push or shove, even if it later may seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights").

**\*12** Addressing the objective prong of the Eighth Amendment analysis, the fact that Cicio suffered minor though discernable injuries from the use of force distinguishes this case from others in which the lack of injury has justified summary judgment dismissing excessive force claims under the Eighth Amendment. *See, e.g., Boddie v. Schnieder,* 105 F.3d 857, 862 (2d Cir.1997) (the fact that the plaintiff, who claims he was "bumped, grabbed, elbowed, and pushed" by the defendants did not rise to a level of constitutional significance since plaintiff did "not maintain that he experienced any pain or injury as a result of the physical contact"); *Cunningham v. Rodriguez,* No. 01 Civ. 1123, 2002 WL 31654960, at *5 (S.D.N.Y. Nov. 22, 2002).[3] Under the circumstances now presented it would be inappropriate to find, as a matter of law, that objectively plaintiff's injuries were not sufficiently serious to rise to a constitutionally cognizable level.

[3]    Copies of all unreported decisions cited in this document have been appended for the convenience of the *pro se* plaintiff. [Editor's Note: Appended decisions deleted for Westlaw purposes.]

Turning to the subjective element, the record is devoid of any evidence from which a reasonable factfinder could conclude that this element of plaintiff's excessive force claim against Manna has been met. Rather than representing an unprovoked use of force, by plaintiff's own version, the use of force against the plaintiff occurred during a period of turmoil when one or more disruptive inmates in a group of between sixteen and eighteen combined in a single holding cell became unruly and were being urged to lash out against corrections officers. Plaintiff alleges in his complaint and states in a sworn declaration that he was pushed into a corrections officer by Sergeant Sigona, pulled out of the holding pen by his hair, and thrown to the floor and kneed in the nose. During his deposition, however, plaintiff testified that five or six corrections officers rushed into the holding pen directing him to move to the back, which he could not do because there was no room. Plaintiff's Dep. Tr. at pp. 16 and 51. From there, plaintiff is not exactly sure what happened; he does not know whether he was pushed intentionally, only that "[he] was taken down ... [and] ... kneed in the nose." *Id.* at p. 16. Additionally, at the time of the incident, plaintiff did not know who the officers involved were, who "took him down", or who kneed him in the nose, and could not say whether there were also

officers on the floor with him.[4] *Id.* at pp. 16-17, 52. Plaintiff further testified that after he fell to the floor, he was lifted and pulled out of the cage by his hair, and then he hit the floor again. *Id.* at p. 18. Again, plaintiff admittedly does not know how he ended up on the floor a second time, or whether he fell or the corrections officers fell on him, although he recalls that he was on the floor with a couple of corrections officers on top of him. *Id.*

[4]    Plaintiff later learned the names of the officers he identified in his complaint when he received a copy of the misbehavior report that was issued to him as a result of the incident. Plaintiff's Dep. Tr. at p. 17.

Under the circumstances presented, even accepting as true plaintiff's version of the events, when considering the four factors informing the subjective analysis no reasonable factfinder could conclude that the force applied was malicious or sadistic for the purpose of causing plaintiff harm and not in a good faith effort to maintain discipline. Moreover, considering the extent of the force applied and the relatively minor injuries suffered even by plaintiff's account, coupled with the lack of evidence of malicious motives on the part of the corrections officers involved, I recommend a finding that the use of force was truly *de minimis* and did not abridge plaintiff's Eighth Amendment rights.[5]

[5]    By plaintiff's own account, the injures suffered as a result of the incident were minor. *See* Plaintiff's Dep. Tr. at pp. 21-26.

### 2. *Failure to Intervene*

**\*13** A corrections worker who, though not participating, if present when an assault upon an inmate occurs may nonetheless bear responsibility for any resulting constitutional deprivation. *See Anderson v. Branen,* 17 F.3d 552, 557 (2d Cir.1994). It is well-established that a law enforcement official has an affirmative duty to intervene on behalf of an individual whose constitutional rights are being violated in his or her presence by other officers. *See Mowry v. Noone,* No. 02-CV-6257 Fe, 2004 WL 2202645, at \*4 (W.D.N.Y. Sept.30, 2004); *see also Curley v. Village of Suffern,* 268 F.3d 65, 72 (2d Cir.2001) ("Failure to intercede results in [section 1983] liability where an officer observes excessive force being used or has reason to know that it will be.") (citations omitted). In order to establish liability on the part of a defendant under this theory, a plaintiff must prove the use of excessive force by someone other than the individual and that the defendant under consideration 1) possessed actual knowledge of the use by another corrections officer of excessive force; 2) had a realistic opportunity to intervene and prevent the harm from occurring; and 3) nonetheless disregarded that risk by intentionally refusing or failing to take reasonable measures to end the use of excessive force. *See Curley,* 268 F.3d at 72; *see also Espada v. Schneider,* 522 F.Supp.2d 544, 555 (S.D.N.Y.2007). Mere inattention or inadvertence, it should be noted, does not rise to a level of deliberate indifference sufficient to support liability for failure to intervene. *See, e.g., Schultz v. Amick,* 955 F.Supp. 1087, 1096 (N.D.Iowa 1997) (noting that "liability in a § 1983 'excessive force' action cannot be founded on mere negligence") (citing, *inter alia, Daniels v. Williams,* 474 U.S. 327, 335-36, 106 S.Ct. 662, 667, 88 L.Ed.2d 662 (1986)).

Based upon my finding that plaintiff's Eighth Amendment rights were not violated through the actions of defendant Manna, there can be no cognizable claim for liability on the part of defendants Sigona and Ruston for failure to intervene and protect plaintiff from the constitutional violation. *See Curley,* 268 F.3d at 72. I therefore recommend that plaintiff's claims against those defendants be dismissed as well.

### C. *Medical Indifference*

The second component of plaintiff's complaint alleges that defendants Vega and Ryerson failed to provide him with needed medical treatment. Plaintiff's claim against Nurse Vega apparently stems from her failure, upon examining Cicio immediately following the March 7, 2006 incident, to arrange for him to see a doctor or to prescribe pain medication. The allegations against defendant Nurse Administrator Ryerson result from her alleged failure to process sick call slips submitted on several occasions following the incident by plaintiff. While plaintiff's summary judgment motion does not speak directly to this claim, he apparently seeks summary judgment on the issue of liability on this claim as well. For their part, defendants urge dismissal of plaintiff's medical indifference claims as a matter of law due to his failure to assert the existence of a serious medical need and additionally for lack of any evidence to satisfy the subjective element of the controlling test.

**\*14** Claims that prison officials have intentionally disregarded an inmate's medical needs are encompassed

within the Eighth Amendment's prohibition of cruel and unusual punishment. *Estelle,* 429 U.S. at 104, 97 S.Ct. at 291 (1976). The Eighth Amendment's prohibition of cruel and unusual punishment proscribes punishments that involve the "unnecessary and wanton infliction of pain" and are incompatible with "the evolving standards of decency that mark the progress of a maturing society." *Id.; see also Whitley,* 475 U.S. at 319, 106 S.Ct. at 1084 (citing, *inter alia, Estelle* ). While the Eighth Amendment does not mandate comfortable prisons, neither does it tolerate inhumane treatment of those in confinement; thus the conditions of an inmate's confinement are subject to Eighth Amendment scrutiny. *Farmer v. Brennan,* 511 U.S. 825, 832, 114 S.Ct. 1970, 1976, 128 L.Ed.2d 811 (1994) (citing *Rhodes v. Chapman,* 452 U.S. 337, 349, 101 S.Ct. 2392, 2400, 69 L.Ed.2d 59 (1981)).

A claim alleging that prison conditions violate the Eighth Amendment must satisfy both an objective and subjective requirement-the conditions must be "sufficiently serious" from an objective point of view, and the plaintiff must demonstrate that prison officials acted subjectively with "deliberate indifference". *See Leach v. Dufrain,* 103 F.Supp.2d 542, 546 (N.D.N.Y.2000) (Kahn, J.) (citing *Wilson v. Seiter,* 501 U.S. 294, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991)); *Waldo v. Goord,* No. 97-CV-1385, 1998 WL 713809, at *2 (N.D.N.Y. Oct. 1, 1998) (Kahn, J. and Homer, M.J.); *see also, generally, Wilson,* 501 U.S. 294, 111 S.Ct. 2321, 115 L.Ed.2d 271. Deliberate indifference exists if an official "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer,* 511 U.S. at 837, 114 S.Ct. at 1978; *Leach,* 103 F.Supp.2d at 546 (citing *Farmer );* *Waldo,* 1998 WL 713809, at *2 (same).

### 1. *Serious Medical Need*

In order to state a medical indifference claim under the Eighth Amendment, a plaintiff must allege a deprivation involving a medical need which is, in objective terms, " 'sufficiently serious' ". *Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994) (quoting *Wilson,* 501 U.S. at 298, 111 S.Ct. at 2324), *cert. denied sub nom., Foote v. Hathaway,* 513 U.S. 1154, 115 S.Ct. 1108, 130 L.Ed.2d 1074 (1995). A medical need is serious for constitutional purposes if it presents " 'a condition of urgency' that may result in 'degeneration' or 'extreme pain'." *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998) (citations omitted). A

serious medical need can also exist where " 'failure to treat a prisoner's condition could result in further significant injury or the unnecessary and wanton infliction of pain' "; since medical conditions vary in severity, a decision to leave a condition untreated may or may not be unconstitutional, depending on the facts. *Harrison v. Barkley,* 219 F.3d 132, 136-37 (2d Cir.2000) (quoting, *inter alia, Chance,* 143 F.3d at 702). Relevant factors informing this determination include whether the plaintiff suffers from an injury that a " 'reasonable doctor or patient would find important and worthy of comment or treatment' ", a condition that " 'significantly affects' " a prisoner's daily activities, or " 'the existence of chronic and substantial pain.' " *Chance,* 143 F.3d at 701 (citation omitted); *Lafave v. Clinton County,* No. CIV. 9:00CV774, 2002 WL 31309244, at *3 (N.D.N.Y. Apr.3, 2002) (Sharpe, M.J.) (citation omitted).

**\*15** The record in this case fails to establish that plaintiff experienced a serious medical need of constitutional proportions as a result of the incident complained of. Plaintiff alleges that during the incident he suffered from a swollen and painful wrist as well as head pain. Complaint (Dkt. No. 1) Statement of Facts ¶ 6; *see also* Plaintiff's Dep. Tr. at pp. 21-22, 24-26. The record, including plaintiff's submission in support of his summary judgment motion and later opposition to defendants' motion, fails to provide further elaboration and contains no evidence of any extreme pain or degeneration. Instead, the record discloses only injuries of a transitory nature which are insufficient to establish existence of a serious medical need of constitutional proportions. *Ford v. Phillips,* No. 05 Civ. 6646(NRB), 2007 WL 946703, at *12 (S.D.N.Y. Mar.27, 2007) (finding that minor bruising, slight bleeding, and abrasions are no injuries that may produce death, degeneration or extreme pain and that no reasonable juror could find otherwise).

### 2. *Deliberate Indifference*

In addition to establishing the existence of a serious medical need, to prevail on an Eighth Amendment claim a plaintiff must also establish indifference to that condition on the part of one or more of the defendants. *Estelle,* 429 U.S. at 104, 97 S.Ct. at 291. Deliberate indifference, in a constitutional sense, exists if an official "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he [or she] must also draw the inference."

2010 WL 980272

*Farmer,* 511 U.S. at 837, 114 S.Ct. at 1979; *Leach,* 103 F.Supp.2d at 546 (citing *Farmer,* 511 U.S. at 837, 114 S.Ct. at 1979); *Waldo,* 1998 WL 713809, at *2 (same).

It should be noted that the Eighth Amendment does not afford prisoners a right to medical treatment of their choosing; the question of which diagnostic techniques and treatments should be administered to address an inmate's medical condition is a "classic example of a matter for medical judgment", and, accordingly, prison medical personnel are vested with broad discretion to determine what method of care and treatment to provide to their patients. *Estelle,* 429 U.S. at 107, 97 S.Ct. at 293; *Chance,* 143 F.3d at 703 (citation omitted); *Rosales v. Coughlin,* 10 F.Supp.2d 261, 264 (W.D.N.Y.1998) (citation omitted).

The record now before the court fails to substantiate plaintiff's claims of deliberate indifference. Even if plaintiff could establish the existence of a serious medical need, the record does not provide a basis for a reasonable factfinder to conclude that either defendant Vega or defendant Ryerson was deliberately indifferent to such a need. Plaintiff's claim against Nurse Vega is that on one occasion she failed to provide pain medication or to refer the plaintiff to a physician as a result of his injuries. Such an allegation of a single instance of delayed or denied medical care does not establish constitutional claim of medical deliberate indifference. *See Smith v. Carpenter,* 316 F.3d 178, 186 (2d Cir.2003).

*16 Turning to the allegations against defendant Ryerson, those stem from an alleged failure to process sick call slips on four or five occasions following the March 7, 2006 incident. Even assuming the existence of a serious medical condition prompting the need for medical care and defendant Ryerson's failure to process sick call slips over a brief period of time, these facts alone do not suffice to establish a deliberate indifference claim as against defendant Ryerson since there is no evidence suggesting that the minimal delay caused any significant adverse effect to plaintiff's health. *See Bumpus v. Canfield,* 495 F.Supp.2d 316, 324 (W.D.N.Y.2007). Accordingly, I recommend dismissal of plaintiff's deliberate indifference claim against defendant Ryerson on this alternative basis.

### D. *Personal Involvement*
In their motion defendants assert that even if plaintiff could establish a cognizable excessive force or deliberate indifference claim, his cause of action against defendant Graham, the superintendent at Auburn, is legally insufficient based upon his lack of personal involvement in any conduct forming the basis for those claims.

Personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under section 1983. *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (citing *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 (2d Cir.1991)) and *McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir.1977), *cert. denied,* 434 U.S. 1087, 98 S.Ct. 1282, 55 L.Ed.2d 792 (1978)). In order to prevail on a section 1983 cause of action against an individual a plaintiff must show some tangible connection between the constitutional violation alleged and that particular defendant. *See Bass v. Jackson,* 790 F.2d 260, 263 (2d Cir.1986).

Importantly, a supervisor like Superintendent Graham cannot be liable for damages under section 1983 solely by virtue of being a supervisor; there is no *respondeat superior* liability under section 1983. *Richardson v. Goord,* 347 F.3d 431, 435 (2d Cir.2003); *Wright,* 21 F.3d at 501. Vague and conclusory allegations that a supervisor has failed to train or properly monitor the actions of subordinate employees will not suffice to establish the requisite personal involvement and support a finding of liability. *Pettus v. Morgenthau,* 554 F.3d 293, 300 (2d Cir.2009) ("To the extent that [a] complaint attempts to assert a failure-to-supervise claim ... [that claim is insufficient where] it lacks any hint that [the supervisor] acted with deliberate indifference to the possibility that his subordinates would violate [plaintiff's] constitutional rights."). Culpability on the part of a supervisory official for a civil rights violation can, however, be established in one of several ways, including when that individual 1) has directly participated in the challenged conduct; 2) after learning of the violation through a report or appeal, has failed to remedy the wrong; 3) created or allowed to continue a policy or custom under which unconstitutional practices occurred; 4) was grossly negligent in managing the subordinates who caused the unlawful event; or 5) failed to act on information indicating that unconstitutional acts were occurring. *Iqbal v. Hasty,* 490 F.3d 143, 152-53 (2d Cir.2007), *rev'd on other grounds, sub nom., Ashcroft v. Iqbal,* ---U.S. ----, 129 S.Ct. 2931 (2009); *see also Richardson,* 347 F.3d at 435; *Wright,* 21 F.3d at 501; *Williams v. Smith,* 781 F.2d 319, 323-24 (2d Cir.1986).

**\*17** In my earlier report and recommendation, addressing a pre-answer dismissal motion filed by certain of the defendants including Superintendent Graham, I recommended against dismissing plaintiff's claim against defendant Graham, finding that the proof at trial could potentially establish that defendant Graham learned, through the appeal of plaintiff's grievance denial, that he was deprived of medical care at a point when he had an opportunity to cure that alleged constitutional deficiency. *See* Report and Recommendation dated February 10, 2009 (Dkt. No. 29) at pp. 17-21. The more fully developed record now before the court, however, firmly establishes that this is not the case. There is no indication that defendant Graham was aware of plaintiff's circumstances prior to plaintiff's appeal on April 12, 2006 of the IGRC's grievance denial. *See* Graham Decl. (Dkt. No. 38-7) ¶ 6. By that point, plaintiff had been transferred out of Auburn, and thus even if defendant Graham was placed on notice of a constitutional deprivation in the form of denial of adequate medical treatment, he was no longer in a position to cure that deficiency. *Id.* Accordingly, because the record fails to disclose any basis on which defendant Graham could be held liable for the constitutional violations alleged, there is an independent, alternate basis for dismissing plaintiff's claims against him.

## IV. SUMMARY AND RECOMMENDATION

The record in this case discloses no basis on which a reasonable factfinder could conclude that plaintiff's constitutional right to be free from cruel and unusual punishment was violated by defendant Manna during the course of the March 7, 2006 incident and defendants Sigona and Ruston failed to intervene to prevent such a violation. The record similarly discloses no basis on which a reasonable factfinder could conclude that plaintiff suffered injuries of constitutional significance as a result of that incident or that the defendants were subjectively indifferent to the medical needs presented by those injuries. Finally, the record discloses no basis on which a reasonable factfinder could assign liability on the part of defendant Graham, as superintendent of the Auburn Correctional Facility. Accordingly, it is hereby respectfully

RECOMMENDED that defendants' motion for summary judgment (Dkt. No. 38) be GRANTED and that plaintiff's complaint be dismissed in its entirety, and that based upon that determination plaintiff's summary judgment motion (Dkt. No. 35) be DENIED.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections must be filed with the clerk of the court within FOURTEEN days of service of this report. FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(d), 72; *Roldan v. Racette, 984 F.2d 85 (2d Cir.1993)*.

It is hereby ORDERED that the clerk of the court serve a copy of this report and recommendation upon the parties in accordance with this court's local rules.

**All Citations**

Not Reported in F.Supp.2d, 2010 WL 980272

---

Case 9:16-cv-00717-TJM-TWD    Document 35    Filed 11/28/17    Page 46 of 310

2013 WL 4804500
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Eugene JONES, Plaintiff,

v.

ROCK, Superintendent, Upstate Correctional
Facility; J. Marienelli, MHU Counselor, Upstate
Correctional Facility; John Doe # 3, Mental Health
Doctor, Upstate Correctional Facility; Michael
Hogan, Mental Health Commissioner; J. Healy,
C.O., Upstate Correctional Facility; John Doe #
2, C.O., Upstate Correctional Facility; John Doe
# 3, C.O., Upstate Correctional Facility; Laveen,
C.O., Upstate Correctional Facility; Dwyer, C.O.,
Upstate Correctional Facility; John Doe # 4,
Lt., Upstate Correctional Facility; S. Santamore,
Sgt., Upstate Correctional Facility; Burgess, C.O.,
Upstate Correctional Facility; John Doe # 5, C.O.,
Upstate Correctional Facility; John Doe # 6, C.O.,
Upstate Correctional Facility; Jerry Miller, Dental
Doctor, Upstate Correctional Facility, Defendants.

No. 9:12–cv–0447 (NAM/TWD).
|
Sept. 6, 2013.

**Attorneys and Law Firms**

Eugene Jones, Elmira, NY, pro se.

Hon. Eric T. Schneiderman, Attorney General of the State
of New York, Colleen Galligan, Esq, Assistant Attorney
General, of Counsel, Albany, NY, for Defendant.

### ORDER

NORMAN A. MORDUE, Senior District Judge.

**\*1** The above matter comes to me following a Report–
Recommendation by Magistrate Judge Therese Wiley
Dancks, duly filed on the 14th day of August 2013.
Following fourteen (14) days from the service thereof, the
Clerk has sent me the file, including any and all objections
filed by the parties herein.

After careful review of all of the papers herein, including
the Magistrate Judge's ReportRecommendation, and no
objections submitted thereto, it is

ORDERED that:

1. The Report–Recommendation is hereby adopted in its
entirety.

2. The Clerk of the Court shall serve a copy of this Order
upon all parties and the Magistrate Judge assigned to this
case.

**IT IS SO ORDERED.**

### REPORT–RECOMMENDATION AND ORDER

THÉRÈSE WILEY DANCKS, United States Magistrate
Judge.

This *pro se* prisoner civil rights action, commenced
pursuant to 42 U.S.C. § 1983, has been referred to me for
Report and Recommendation by the Honorable Norman
A. Mordue, United States District Judge, pursuant to 28
U.S.C. § 636(b) and N.D.N.Y. L.R. 72.3(c).

Plaintiff Eugene Jones claims that from September, 2009,
through November, 2010, while he was confined at
Upstate Correctional Facility ("Upstate"), Defendants,
in violation of his rights under the Eighth Amendment
to the Constitution, denied him proper and adequate
care for his serious mental health, and dental needs;
used excessive force against him; sexually harassed
and assaulted him; and subjected him to unlawful
conditions of confinement. (*See generally* Dkt. No.
1.) Defendants Rock, Superintendent at Upstate; J.
Marienelli ("Marienelli"), Mental Health Unit ("MHU")
Counselor at Upstate; T. Kemp ("Kemp"), MHU Unit
Chief at Upstate; Michael Hogan ("Hogan"), New
York State Commissioner of Mental Health; J. Healy
("Healy"), C.O. at Upstate; Lavigne, incorrectly sued
as Laveen, C.O. at Upstate; Dwyer, C.O. at Upstate;
S. Santamore ("Santamore"), Sgt. at Upstate; Burgess,
C.O. at Upstate; and Jerry Miller ("Miller"), Dentist at
Upstate, filed an Answer to Plaintiff's Complaint (Dkt.
No. 20) and now move for judgment dismissing Plaintiff's
Complaint on the pleadings pursuant to Rule 12(c) of

the Federal Rules of Civil Procedure. [1] (Dkt. No. 23.) Plaintiff has opposed the motion. (Dkt. No. 27.)

[1]
Plaintiff has also named John Does # 1–6 as Defendants. (Dkt. No. 1.) It appears from the Docket maintained by the Clerk's Office that none of the Doe Defendants have yet been identified or served, and they are not parties to the motion now before me.

For the reasons that follow, I recommend that Defendants' motion be granted in part and denied in part.

## I. BACKGROUND [2]

[2]
The background facts set forth herein are taken from the allegations in Plaintiff's Complaint, which I have, as I am required to do, accepted as true for purposes of this motion, (see *Chambers v. Time Warner, Inc.,* 282 F.3d 147, 152 (2d Cir.2002)), as well as other submissions that may properly be considered by the Court on a Rule 12(c) motion involving a *pro se* plaintiff.

### A. Plaintiff's Alleged Lack of Proper and Adequate Mental Health Treatment at Upstate

Upstate is a maximum security prison in which seventy-five percent of the inmates are housed in a Special Housing Unit. (Dkt. No 1 at ¶ 14.) According to Plaintiff, nearly half of the eleven buildings house single cell inmates, who are housed in single cells because of assaultive behavior, homosexual activity, or mental illness. Plaintiff was confined in a single cell in ABlock in 11–Building where mentally ill inmates were housed together without any treatment. *Id.* at ¶¶ 15, 26.

**\*2** Shortly after Plaintiff was moved into the single cell, he was interviewed by Defendant Marienelli, his MHU Counselor. *Id.* at ¶ 15. Plaintiff explained to Marienelli that he had a long history of mental illness and treatment both before and during his incarceration. *Id.* at ¶ 16. Despite Plaintiff's long history of treatment for mental illness, when he was seen by a mental health doctor approximately a week later, Plaintiff was told that all inmates on the same medication as that being taken by Plaintiff were being removed from the medication. *Id.* at ¶ 17. Plaintiff requested that he be given the same type of medication for his mood disorder and other mental health problems, and the doctor said, "you'll be alright," and did not prescribe any other medication or mental health treatment. *Id.* at ¶ 18. Thereafter, despite his

protest, Plaintiff received no mental health medication or treatment during the remainder of his time at Upstate. *Id.* at ¶¶ 15, 19.

Plaintiff wrote letters complaining about his lack of treatment to Defendant Kemp, MHU Unit Chief at Upstate, on January 13, 2010, March 22, 2010, June 17, 2010, August 30, 2010, and October 14, 2010 . [3] *Id.* at ¶ 20; Dkt. No. 27–1 at 9–13. Kemp never responded to Plaintiff. *Id.* However, after nearly every one of Plaintiff's complaint letters to Kemp, Marienelli would appear at Plaintiff's cell door and warn him against writing the complaints and going over Marienelli's head. *Id.* Plaintiff also wrote letters of complaint to State Mental Health Commissioner Hogan, on May 3, 2010, September 21, 2010, and November 8, 2010. *Id.* at ¶ 21; Dkt. No. 27–1 at 5–8. Hogan did not respond. (Dkt. No 1 at ¶ 21.)

[3]
Plaintiff stated in his Complaint that copies of the letters to Kemp were included as Exhibit A–1. (Dkt. No. 1 at ¶ 20.) However, neither the letters, nor any of the other exhibits identified in the Complaint were filed with the Complaint. On August 15, 2012, I issued a Text Order denying Defendants' letter motion requesting an order compelling Plaintiff to file the exhibits identified in his Complaint. (Dkt. No. 19.) Plaintiff has filed copies of his letters to Defendant Kemp, along with copies of a number of other documents originally identified as exhibits to his Complaint, in opposition to Defendants' motion. (Dkt. No. 27–1 at 9–13.)

On August 30, 2010, Plaintiff used a piece of metal to cut his arms. *Id.* at ¶ 22. When he showed his arms to Marienelli, Marienelli responded, "they don't look that bad." *Id.* Marienelli told Plaintiff that he would not take him out of his cell for those little things and to just run some water on them, and he would be fine. *Id.* Plaintiff then began screaming for help, and Marienelli walked away. *Id.*

In the early morning of October 21, 2010, Plaintiff made a rope from his sheets and hanged himself in the shower. *Id.* at ¶ 23. Defendant Healy, a Corrections Officer at Upstate, and two other corrections officers entered Plaintiff's cell and cut him down. The three then began beating Plaintiff with their hands and feet. Plaintiff begged them to stop. *Id.;* Dkt. No. 27–1 at 15. Healy and the other two officers made Plaintiff promise not to hang himself again and left his cell. (Dkt. No. 1 at ¶ 23.) Healy warned

Plaintiff stated that if he tried writing up the incident he would really wish he were dead. *Id.* Later in the day, Plaintiff cut his wrist and showed Healy, who again did not obtain help for Plaintiff from the mental health or medical staffs. *Id.* at ¶ 24; Dkt. 27–1 at 15.

### B. Conditions of Plaintiff's Confinement

**\*3** The mentally ill inmates with whom Plaintiff was housed in Building 11 constantly screamed; beat on metal toilets, beds, desks, and showers; flooded the cells; and threw liquids and feces. *Id.* at ¶ 26. There was also an unpleasant smell because many of the inmates smeared themselves with feces and did not take showers. *Id.* In addition, the regular procedure at Upstate was to have one light or another on twenty-four hours a day. *Id.* at ¶ 25.

On March 10, 2010, Plaintiff made a written complaint to Defendant Rock, Superintendent at Upstate, concerning the conditions under which he was forced to live. He received no response from Rock. *Id.* at ¶ 27. On October 1, 2010, Plaintiff filed a grievance concerning the housing of inmates in constant illumination. *Id.* at ¶ 28; Dkt. No. 27–1 at 17. The grievance was denied by the Inmate Grievance Review Committee ("IGRC") based upon a prior Central Office Review Committee ("CORC") determination in which CORC upheld the discretion of the facility administrator to make top level decisions regarding night lights being turned on for the safety, security, and good order of their facilities. (Dkt. No. 27–1 at 18.) Plaintiff's grievance was denied on appeal by the Acting Superintendent, who found that "[t]he night lights are used to ensure clear visibility into the cell, this is of vital importance to the safety and security of both staff and inmates." *Id.* at 19. CORC unanimously denied Plaintiff's grievance for the reasons given by the Acting Superintendent and also noted that the night lights installed produced "a minimum amount of light given the low wattage bulb used to ensure the safety and security of [the] population, without unduly interfering with the populations's sleep." *Id.* at 20.

### C. Alleged Sexual Harassment and Assault

#### 1. *May 4, 2010*

In April of 2010, an Alcohol and Substance Abuse Treatment ("ASAT") program was started at Upstate. (Dkt. No. 1 at ¶ 29.) Defendant Corrections Officers Lavigne and Dwyer were the escort officers responsible for

taking inmates assigned to the ASAT program from their cells, frisking them, and escorting them to the program. *Id.* On May 4, 2010, Plaintiff was handcuffed and led out of his cell by Lavigne and Dwyer for a pat-frisk. *Id.* at ¶ 30. Dwyer held Plaintiff's hands above his head and against the wall by the handcuffs, while Lavigne did the patfrisk. *Id.* According to Plaintiff, Lavigne pulled Plaintiff's pants up as high as they would go causing Plaintiff to wince in pain. *Id.* at ¶ 31. Lavigne allegedly screamed at Plaintiff, "don't move or we will take you down," and shoved his fingers between Plaintiff's buttocks with such force that one of his fingers, along with Plaintiff's pants and underwear, invaded Plaintiff's anus. *Id.* Plaintiff has alleged that when he screamed, Dwyer laughed and said, "oh, you're still a virgin, don't worry about it, we'll take care of that." *Id.* at ¶ 32. Lavigne then groped Plaintiff's genitals and squeezed them until Plaintiff cried out in pain. *Id.* at ¶ 33. Lavigne became verbally abusive, screaming in Plaintiff's face and smelling strongly of alcohol, and yelling at Plaintiff the entire way to the ASAT program. *Id.*

**\*4** Plaintiff filed a grievance concerning the alleged actions of both Lavigne and Dwyer. *Id.* at ¶ 34.; Dkt. No. 27–1 at 22. The grievance was not nearly as explicit concerning Lavigne and Dwyer's alleged actions as Plaintiff's Complaint. Plaintiff offered no additional information when interviewed in connection with the grievance, and the officer named in the grievance denied sexually harassing Plaintiff during the pat-frisk or acting unprofessionally in any way. (Dkt. No. 27–1 at 23.) Finding no evidence to support Plaintiff's claim, the Acting Superintendent denied Plaintiff's grievance as unsubstantiated, as did CORC. *Id.* at 24.

#### 2. *September 14, 2010*

According to Plaintiff, while he was standing in the shower, naked and wet, on September 14, 2010, Defendant Santamore, a Corrections Sergeant at Upstate, was standing at Plaintiff's cell door looking into the cell at the shower. (Dkt. No. 1 at ¶¶ 37–38.) Plaintiff screamed that he was done with his shower but naked, and Santamore ordered plaintiff to "drop the sheet," which, according to Plaintiff, would have meant exposing his naked body in violation of the Department of Correction and Community Supervision ("DOCCS") standard of inmate behavior and rule 101.20 regarding sex offenders intentionally exposing their private parts. *Id.* at ¶ 38. Plaintiff also informed Santamore that taking the sheet

down would put Plaintiff in violation of DOCCS standard
of inmate behavior rules 118.22, unhygenic acts; 118.30
maintain cleanliness and orderliness of living quarters;
and 118.33, intentionally causing a flood in living
quarters. *Id.* at ¶ 39. Santamore allegedly responded, "you
can either take the sheet down and let me see in there and
let me see that dick or I take the sheet and you get a ticket."
*Id.* at ¶ 40. Plaintiff screamed for help from Defendant
Lieutenant John Doe # 4, who was in the area, but the
Lieutenant instead yelled at Plaintiff to take the sheet
down. *Id*. at ¶ 42. Santamore then allegedly looked up and
down at Plaintiff's naked body, smirked and walked away,
saying "I'll see you later." *Id.*

Santamore filed a misbehavior report against Plaintiff in
connection with the incident, in which he stated that after
twice being given a direct order to take down the sheet
covering the shower, Plaintiff complied saying, "I think
you are gay and want to watch us take showers," and
yelling out to the gallery, "They won't think it is funny
when we set it off tomorrow morning." (Dkt. Nos. 1 at ¶
44; 27–1 at 25.) According to Plaintiff, after a review of
the videotape of the incident at the disciplinary hearing on
the misbehavior report, which supported Plaintiff's side of
the incident, the misbehavior report was dismissed. (Dkt.
Nos. 1 at ¶¶ 45–46; 27–11 at 29.)

Plaintiff filed a grievance concerning the incident. (Dkt.
No. 27–1 at 26–27.) The grievance was denied by the
IGRC based upon a prior CORC ruling that a curtain or
private screen would not be provided for obvious security
reasons. *Id.* at 28. CORC denied Plaintiff's appeal. *Id.* at
29.

### D. Plaintiff's Alleged Lack of Proper and Adequate Dental Care

**\*5** On August 29, 2010, while eating breakfast, one of
Plaintiff's teeth cracked and lost its filling, which left
Plaintiff in pain and unable to eat on one side of his
mouth. (Dkt. No. 1 at ¶ 48.) Plaintiff thereafter submitted
a number of sick call slips to the dental department
requesting assistance and sent letters to Dentist Defendant
Miller asking for help on September 6th and 14th, 2010.
*Id.* at ¶ 29; Dkt. No. 27–1 at 31–32.)

When Plaintiff went to a dental appointment on
September 29, 2010, he learned that the appointment was
for a cleaning, not to treat his cracked tooth and lost
filling. (Dkt. No. 1 at ¶ 50. Plaintiff showed his cracked

tooth and two impacted wisdom teeth to the hygienist and
saw her write in his file. *Id.* at ¶ 51. The September 29,
2010, entry in Plaintiff's dental treatment record reads in
part, "Pl claims he lost filling in lower molar and wisdom
teeth are bothering him. Plaintiff claims he's in pain & feels
like theres not enough room in mouth." (Dkt. No. 27–1
at 45.) The entry notes a referral to an oral surgeon for
extraction of teeth # 17 and # 32. *Id.*

On October 5, 2010, Plaintiff filed a grievance
complaining of the Dental Department's failure to provide
treatment for his lost filling. (Dkt. No. 1 at ¶ 52; 27–1
at 33.) Despite the entry in Plaintiff's dental treatment
record showing that he had informed the hygienist of
the missing filling during his September 29th cleaning,
the IGRC response was that Plaintiff had not mentioned
the missing filling when he went in for a cleaning that
day. (Dkt. No. 27–1 at 34.) The IGRC also noted that
filing a grievance was not the proper way to get an
appointment and recommended that Plaintiff write to the
Dental Department. *Id.*

On Plaintiff's appeal, the Acting Superintendent wrote
on October 20, 2010 that: "According to Dr. Miller and
investigation of dental records and dental staff interviews,
treatment has been provided consistent with Dental
Department Policy. Inmate Jones was seen on 11/16/09,
1/28/10 and 2/1/10. The inmate's remaining dental work
is elective (not requiring immediate attention) and he has
been scheduled for it. Grievance denied." *Id.* at 35.

On November 3, 2010, Plaintiff was taken from his cell
for an ASAT treatment and a dental call out by two
corrections officers. (Dkt. No. 1 at ¶ 55.) Plaintiff told
Defendant Dwyer that he wanted to refuse the ASAT call
out because he was really in pain and needed to see the
dental staff. *Id.* Dwyer is alleged to have told Plaintiff
that he made the rules and the rules were that if Plaintiff
refused one call out, he refused both. *Id.* at ¶ 56. Once
ASAT was over, Plaintiff watched a number of inmates
enter dental before him, and when Defendant John Doe #
4 attempted to take Plaintiff to see dental, Dwyer waived
Defendant Doe away and stated Plaintiff would see the
dentist last if he saw him at all. *Id.* at ¶ 57.

When Plaintiff asked Dwyer why he was doing that to
Plaintiff, Dwyer, Defendant Burgess, and two Defendant
John Doe correctional officers began screaming at
Plaintiff and making threats to his person. *Id.* Defendant

2013 WL 4804500

Santamore refused to intervene. *Id.* at ¶ 58. According to Plaintiff, Burgess retrieved a dental refusal slip and demanded that Plaintiff sign the slip and go back to his cell, telling Plaintiff that he would be visiting the facility hospital if he refused. *Id.* at ¶ 59. Plaintiff wrote on the refusal slip, "I've been waiting & staff refuse to let me see dental staff. I can see a number of inmates going in but correctional staff refuse to let me see dental staff." (Dkt. No. 23–2 at 5.)

**\*6** Plaintiff filed a grievance regarding the November 3, 2010 incident the following day. (Dkt. No. 27–1 at 37–38.) Defendant Rock denied Plaintiff's grievance on appeal based upon the staff members' contradiction of Plaintiff's allegations and Santamore's statement that Plaintiff had been yelling that he was going to see the dentist and saw the dentist later in the day. *Id.* at 39. Plaintiff denies seeing a dentist later in the day on November 3, 2010, and the dental records for that date indicate only that "pt refused per c.o." (Dkt. No. 27–1 at 45.) CORC upheld the denial of Plaintiff's grievance. *Id.* at 40.

Plaintiff was transported to Clinton Correctional Facility on November 14, 2010. (Dkt. Nos. 1 at ¶ 63.) He received a temporary filling, which stopped his pain, approximately a week later. *Id.; see also* Dkt. No. 23–2 at 3.

## II. PROCEDURAL HISTORY

Plaintiff filed his Complaint in this lawsuit, along with a motion for leave to proceed *in forma pauperis,* on March 13, 2012. (Dkt.Nos.1, 2.) I subsequently issued an Order granting Plaintiff's application to proceed *in forma pauperis* and requiring a response to Plaintiff's Complaint. (Dkt. No. 4.) I also directed Plaintiff to take reasonable steps through discovery to learn the names of the "John Doe" Defendants. *Id.* The named Defendants were served in June of 2012 and filed their Answer to the Complaint on August 20, 2012. (Dkt.Nos.7–16, 20.) A Mandatory Pretrial Discovery Order was entered on August 27, 2012. (Dkt. No. 21.) The named Defendants thereafter filed the Rule 12(c) motion for judgment on the pleadings now before me, (Dkt. No. 23), and Plaintiff filed papers in opposition. (Dkt. No. 27.)

## III. LEGAL STANDARD GOVERNING MOTIONS TO DISMISS ON THE PLEADINGS

After the pleadings are closed, a motion to dismiss for failure to state a claim is properly brought as a motion for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure. *Maggette v. Dalsheim,* 709 F.2d 800, 801 (2d Cir.1983). "The standard for addressing a Rule 12(c) motion for judgment on the pleadings is the same as for a Rule 12(b)(6) motion to dismiss for failure to state a claim." *Cleveland v. Caplaw Enterprises,* 448 F.3d 518, 521 (2d Cir.2006). Therefore, Plaintiff's Complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face' " to avoid dismissal. *Ashcroft v. Iqbal,* 556 U.S. 662, 663, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)).

"Determining whether a complaint states a plausible claim for relief ... requires the ... court to draw on its judicial experience and common sense .... [W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged— but has not shown—that the pleader is entitled to relief." *Iqbal,* 556 U.S. at 679 (internal citation and punctuation omitted). Plausibility requires "enough facts to raise a reasonable expectation that discovery will reveal evidence of [the alleged misconduct]." *Twombly,* 550 U.S. at 556. A complaint may be dismissed pursuant to Rule 12(b)(6), and thus pursuant to Rule 12(c), only where it appears that there are not "enough facts to state a claim that is plausible on its face." *Id.* at 570. While Rule 8(a) of the Federal Rule of Civil Procedure, which sets forth the general rules of pleading, "does not require detailed factual allegations, ... it demands more than an unadorned, the-defendant-harmed-me-accusation." *Iqbal,* 556 U.S. at 678 (citation and internal quotation marks omitted). A complaint which "tenders 'naked assertion [s]' devoid of 'further factual enhancement' " does not suffice. *Id.* (citation omitted).

**\*7** "The court must accept the material facts alleged in the complaint as true and construe all reasonable inferences in the plaintiff's favor." *Hernandez v. Coughlin,* 18 F.3d 133, 136 (2d Cir.1994) (citation omitted). However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal,* 556 U.S. at 678.

Where a party is proceeding *pro se,* the court is obliged to "read [the *pro se* party's] supporting papers liberally,

2013 WL 4804500

and ... interpret them to raise the strongest arguments that they suggest." *See Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994); *see also Harris v. Mills,* 572 F.3d 66, 72 (2d Cir.2009) (courts remain obligated to construe *pro se* complaints liberally even after *Twombly* ). This principle merits particular weight when a civil rights violation is claimed. *See McEachin v. McGuinnis,* 357 F.3d 197, 200 (2d Cir.2004).

In considering a Rule 12(c) motion, "the court considers the complaint, the answer, any written documents attached to them, and any matter of which the court can take judicial notice for the factual background of the case." *L–7 Designs, Inc. v. Old Navy, LLC,* 647 F.3d 419, 422 (2d Cir.2011) (citation and internal quotation marks omitted); *see also Cortec Indus., Inc. v. Sum Holding, L.P.,* 994 F.2d 42, 47 (2d Cir.1991) (A court may also consider "any written instrument attached [to the complaint] as an exhibit or documents incorporated in it by reference."). "Even where a document is not incorporated by reference, the court may nevertheless consider it where the complaint relies heavily upon its terms and effect, which renders the document integral to the complaint." *Chambers v. Time Warner, Inc.,* 282 F.3d 147, 153 (2d Cir.2002) (citation and internal quotation marks omitted). Furthermore, "[i]n cases where a *pro se* plaintiff is faced with a motion to dismiss, it is appropriate for the court to consider materials outside the complaint to the extent they are consistent with the allegations in the complaint." *See, e.g., Donhauser v. Goord,* 314 F.Supp.2d 119, 121 (N.D.N.Y.2004) (considering factual allegations in plaintiff's opposition papers) (citations and internal quotations marks omitted), *vacated and amended in part on other grounds,* 317 F.Supp.2d 160 (N.D.N.Y.2004).

Where a *pro se* complaint fails to state a cause of action, the court generally "should not dismiss without granting leave to amend at least once when a liberal reading of the complaint gives any indication that a valid claim might be stated." *Cuoco v. Moritsugu,* 222 F.3d 99, 112 (2d Cir.2000) (citation and internal quotation marks omitted). An opportunity to amend is not required where "the problem with [the plaintiff's] causes of action is substantive" such that "better pleading will not cure it." *Cuoco,* 222 F.3d at 112 (citation omitted).

## IV. ANALYSIS

## A. Plaintiff's Official Capacity Claims For Money Damages Against Defendants

**\*8** Plaintiff has asserted official capacity claims for money damages under 42 U.S.C. § 1983 against all of the Defendants. (Dkt. No. 1 at ¶ 8.) The moving Defendants seek dismissal of those official capacity claims on Eleventh Amendment grounds.[4] (Dkt. No. 23–4 at 3–4.) The Eleventh Amendment protects states against suits brought in federal court. *Alabama v. Pugh,* 438 U.S. 781, 782, 98 S.Ct. 3057, 57 L.Ed.2d 1114 (1978). The immunity granted the states under the Eleventh Amendment extends beyond the states themselves to state agents and instrumentalities that are effectively arms of the state (*Woods v. Rondout Valley Cent. School Dist. Bd. of Educ.,* 466 F.3d 232, 236 (2d Cir.2006)), and bars all money damages claims against state officials acting in their official capacities, including the Defendants herein. *Kentucky v. Graham,* 473 U.S. 159, 167–68, 105 S.Ct. 3099, 87 L.Ed.2d 114 (1985); *see also Davis v. New York,* 316 F.3d 93, 101 (2d Cir.2002) (an inmate plaintiff's claims for damages against all individual DOCCS employees sued in their official capacities are considered claims against New York and are thus barred by the state's Eleventh Amendment immunity). Therefore, I recommend that Plaintiff's claims for money damages against all of the Defendants, including the Doe Defendants, in their official capacities, be dismissed on Eleventh Amendment grounds without leave to amend.

4  Although only the moving Defendants seek dismissal of Plaintiff's official capacity claims for money damages, the District Court is empowered to dismiss those official capacity claims *sua sponte* as against Defendants John Doe # 1–6 as well. *See Atlantic Healthcare Benefits Trust v. Googins,* 2 F.3d 1, 4 (2d Cir.1993) (Eleventh Amendment may be raised *sua sponte* because it affects the court's subject matter jurisdiction); *see also Saxon v. Attica Medical Dept.,* 468 F.Supp.2d 480, 484 (W.D.N.Y.2007) (recognizing that 28 U.S.C. § 1915A directs district courts *sua sponte* to dismiss prisoner claims barred by the Eleventh Amendment).

## B. Plaintiff's Eighth Amendment Conditions of Confinement Claim

Plaintiff claims the conditions of his confinement, namely, the constant noise caused by the mentally ill prisoners, foul odors from the throwing and smearing of feces by those prisoners, and continuous illumination in the area

in which he was housed, constituted cruel and unusual punishment in violation of his Eighth Amendment rights. (Dkt. No. 1 at ¶¶ 25–28, 74.) In his October 1, 2010, grievance complaining of the constant illumination, Plaintiff stated that it was impossible to get a full restful sleep, and that having a light on at all times was torture and caused fatigue, frustration, and depression. (Dkt. No. 27–1 at 17.)

The Eighth Amendment prohibits the infliction of "cruel and unusual punishments." U.S. Const. amend. VIII. The prohibition extends to prison conditions. *Horne v. Coughlin,* 155 F.3d 26, 31 (2d Cir.1998). "The Constitution does not mandate comfortable prisons ... but neither does it permit inhumane ones, and it is now settled that the treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment." *Farmer v. Brennan,* 511 U.S. 825, 832, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994) (citations and internal quotation marks omitted).

To state a claim under the Eighth Amendment based upon conditions of confinement, an inmate must allege that: "(1) objectively, the deprivation the inmate suffered was sufficiently serious that he was denied the minimal civilized measures of life's necessities, and (2) subjectively, the defendant official acted with a sufficiently culpable state of mind ..., such as deliberate indifference to inmate health or safety." *Walker v. Schult,* 717 F.3d 119, 125 (2d Cir.2013) (citations and internal quotation marks omitted).

**\*9** To establish the objective element, an inmate must show "that the conditions, either alone or in combination, pose an unreasonable risk of serious damage to his health." *Id.* Prison officials violate the Eighth Amendment when they "deprive an inmate of his 'basic human needs' such as food, clothing, medical care, and safe and sanitary living conditions." *Id.* (quoting *Phelps v. Kapnolas,* 308 F.3d 180, 185 (2d Cir.2002) (per curiam)). There is no "static test" for determining whether a deprivation is serious enough to violate an inmate's Eighth Amendment rights. *Id* . (citing *Jabbar v. Fischer,* 683 F.3d 54, 57 (2d Cir.2012)). "The conditions themselves must be evaluated in light of contemporary standards of decency." *Jabbar,* 683 F.3d at 57 (citation and internal quotation marks omitted). "[C]onditions of confinement may be aggregated to rise to the level of a constitutional violation,

but 'only when they have a mutually enforcing effect that produces the deprivation of a single, identifiable, human need such as food, warmth, or exercise.' " *Walker,* 717 F.3d at 125 (quoting *Wilson v. Seiter,* 501 U.S. 294, 304, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991)).

To constitute deliberate indifference under the subjective element, "[t]he prison official must know of, and disregard, an excessive risk to inmate health or safety. *Jabbar,* 683 F.3d at 57; *see also Trammel v. Keane,* 338 F.3d 155, 162–63 (2d Cir.2003) (the state of mind for the subjective element in cases involving prison conditions is "deliberate indifference to inmate health or safety."). Mere negligence is not enough. *Farmer,* 511 U.S. at 835.

### 1. *Objective Element*

Plaintiff claims that the constant illumination made it impossible for him to get a full restful sleep, was torture, and caused fatigue, frustration, and depression. (Dkt. No. 27–1 at 17.) Although Plaintiff's Complaint does not allege specific harm resulting from the constant noise, he has included as an exhibit to his Complaint, his September 21, 2010 letter to Defendant Hogan, in which he complained that the excessive noise of the other inmates kept him from sleeping. (Dkt. No. 27–1 at 7.) In addition, the Affidavit of another inmate describes the screaming, banging, and crying of mentally ill inmates throughout the night as making it impossible to rest until overwhelmed by exhaustion. (Dkt. No. 27–1 at ¶ 5.) Even then, according to the inmate, one was quickly jolted out of sleep by the noises. *Id.*

"[S]leep is critical to human existence, and conditions that prevent sleep have been held to violate the Eighth Amendment." *Walker,* 717 F.3d at 126 (citing *Tafari v. McCarthy,* 714 F.Supp.2d 317, 367 (N.D.N.Y.2010)) ("Courts have previously recognized that sleep constitutes a basic human need and conditions that prevent sleep violate an inmate's constitutional rights."). Furthermore, "public conceptions of decency inherent in the Eighth Amendment," have been found to "require that [inmates] be housed in an environment that, if not quiet, is at least reasonably free of excess noise." *Keenan v. Hall,* 83 F.3d 1083, 1090 (9th Cir.1996), *amended on other grounds on denial of reh 'g,* 135 F.3d 1318 (9th Cir.1998) (quoting *Toussaint v. McCarthy,* 597 F.Supp. 1388, 1397, 1410 (N.D.Cal.1984), *aff'd in part, rev'd in part on other grounds,* 801 F.2d 1110 (9th Cir.1986)); *see also Hamilton v. Conway,* No. 03–CV–527S, 2008 WL

234216, at *12–13, 2008 U.S. Dist. LEXIS 6064, at *37–38 (W.D.N.Y. Jan.28, 2008) (allegations of excessive noise and inmates throwing feces in SHU may support an Eighth Amendment claim).

**\*10** Requiring inmates to live in constant illumination can also, under certain circumstances, rise to the level of an Eighth Amendment violation. *See Keenan,* 83 F.3d at 1090–91 (an allegation that large fluorescent lights directly in front of and behind an inmate's cell that shown into his cell twenty-four hours a day, causing him grave sleeping problems and other mental and psychological problems stated a claim of cruel and unusual punishment). "Whether constant security lighting in prison cells violates the Eighth Amendment is fact-specific and often depends upon the brightness of the light at issue." *Jose v. Thomas,* No. CV 11–0486–PHX–GMS (SPL), 2012 WL 2091527, at *6, 2012 U.S. Dist. LEXIS 80199, at *16–17 (D.Ariz. June 11, 2012); *see, e.g., Vasqeuz v. Frank,* 290 F. App'x 927, 929 (7th Cir.2008) (twenty-four hour lighting with one 9–watt fluorescent bulb not an extreme deprivation). Exposure to low wattage night time security lighting has been found permissible based on legitimate penological interests such as security concerns. *See Chavarria v. Stacks,* 102 F. App'x 433, 436–37 (5th Cir.2004) (policy of constant illumination related to legitimate security concerns); *O'Donnell v. Thomas,* 826 F.2d 788, 790 (8th Cir.1987) (same); *see also Jones v. Beaver County Jail,* No. Civ. A 11–0816, 2013 WL 409439, at *10, 2013 U.S. Dist. LEXIS 13702, at *27–28 (W.D.Pa. Feb.1, 2013) (collecting cases).

Although the likelihood that Plaintiff could ultimately prevail on his conditions of confinement claim as alleged seems questionable at best, [5] the conditions alleged by Plaintiff, i.e, excessive noise and constant illumination which prevented him from sleeping, taken as true and considered in their totality, arguably satisfy the objective element of the claim for pleading purposes.

[5]    The IGRC response denying Plaintiff's illumination grievance, submitted by Plaintiff in opposition to Defendants' motion, indicates that the night lights used in the SHU where Plaintiff was housed were low wattage and were used to "ensure the safety and security of its population with out unduly interfering with the population's sleep." (Dkt. No. 27–1 at 18.) *See Chavarria,* 102 F. App'x at 436–37.

### 2. *Subjective Element*

However, neither the allegations in Plaintiff's Complaint, nor his submissions in opposition to Defendant's motion, satisfy the subjective element of his conditions of confinement claim—that a defendant acted with a "sufficiently culpable state of mind ..., such as deliberate indifference to inmate health or safety." *Walker,* 717 F.3d at 125. The only defendant tied to Plaintiff's conditions of confinement claim by the allegations in his Complaint is Defendant Rock. (Dkt. No. 1 at ¶ 27.) Plaintiff claims to have sent a letter to Rock complaining about the conditions under which he and other inmates were living. *Id.* According to Plaintiff, Rock did not respond. The law is clear that "personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir.1977). "Because vicarious liability is inapplicable to ... § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Iqbal,* 556 U.S. at 676. ("Government officials may not be held liable for the unconstitutional conduct of their subordinates under a theory of *respondeat superior."* ). "Holding a position in a hierarchical chain of command, without more, is insufficient to support a showing of personal involvement." *Groves v. Davis,* No. 9:11–CV–1317 (GTS/RFT), 2012 WL 651919, at *6, 2012 U.S. Dist. LEXIS 25367, at *22–23 (N.D.N.Y. Feb.28, 2012) (citing *McKinnon,* 568 F.2d at 934); *see also Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (noting that a defendant may not be held liable in a § 1983 action merely because he or she held a high position of authority). Therefore, "a plaintiff must ... allege a tangible connection between the acts of a defendant and the injuries suffered." *Bass v. Jackson,* 790 F.2d 260, 263 (2d Cir.1986).

**\*11** The Second Circuit has held that personal involvement by a supervisor necessary to state a claim under § 1983 may be found where: "(1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that

unconstitutional acts were occurring." *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995). [6]

[6]    The Supreme Court's decision in *Iqbal,* 556 U.S. 662, 129 S.Ct. 1937, 173 L.Ed.2d 868 has arguably nullified some of the categories set forth in *Colon. See Sash v. United States,* 674 F.Supp.2d 531, 543–44 (S.D.N.Y.2009) (collecting cases). However, the Second Circuit has yet to issue a decision addressing *Iqbal*'s effect on the *Colon* categories, and I will assume for purposes of this motion that *Colon* remains good law.

Although the Court of Appeals has expressly held that a supervisor can be held liable under § 1983 for a failure to remedy a wrong after being informed through a report or appeal, *Colon, id.,* courts in this district have repeatedly held that supervisory liability cannot be established by an official's failure to respond to grievance letters or requests for investigations from prisoners. *See, e.g., Johnson v. Wright,* 234 F.Supp.2d 352, 363 (S.D.N.Y.2002) (noting that a number of courts have held that "[i]t is well-established that an allegation that an official ignored a prisoner's letter of protest and request for an investigation of allegations made therein is insufficient to hold that official liable for the alleged violations.") (citation and internal quotation marks omitted); *Walker v. Pataro,* No. 99 Civ. 4607(GBD)(AJP), 2002 WL 664040, at *12, 2002 U.S. Dist. LEXIS 7067, at *43 (S.D.N.Y. Apr. 23, 2002) ("[I]f mere receipt of a letter or similar complaint were enough, without more, to constitute personal involvement, it would result in liability merely for being a supervisor, which is contrary to the black-letter law that § 1983 does not impose *respondeat superior* liability."); *Rivera v. Goord,* 119 F.Supp.2d 327, 344 (S.D.N.Y.2000) (allegations that inmate wrote to prison officials and was ignored are insufficient to hold those officials liable under § 1983).

Plaintiff has conceded that Rock did not respond to his complaint letter, and the Complaint and Plaintiff's opposition to Defendant's motion contain no facts that make a plausible showing of personal involvement by Rock with respect to Plaintiff's conditions of confinement claim. Therefore, I recommend that Plaintiff's conditions of confinement claim against Rock be dismissed, and that in light of Plaintiff's *pro se* status, he be granted leave to amend.

## C. Deliberate Indifference to Plaintiff's Serious Mental Health Needs and Use of Excessive Force in Violation of the Eighth Amendment

A few months after he was taken off his medication, Plaintiff began writing complaint letters to Defendant Kemp, MHU Unit Chief. [7] (Dkt. No. 27–1 at 9–12.) In his January 13, 2010 letter, Plaintiff wrote:

[7]    Plaintiff also wrote three complaint letters to Hogan. In his May 3, 2010 letter, Plaintiff told Hogan that his medication had been stopped, and he felt like he was slipping back into mental illness. (Dkt. No. 27–1 at 8.) Plaintiff wrote "I keep hearing people talking & I can't tell if its in my head or not." *Id.*

**\*12** I'm writing you because I was taken of my meds when I first got to this jail and I really tried to manage but I'm having a lot of symptoms of mental illness now and I can't keep living like this. I talked to or tried to talk to Marienelli but he thinks it's a game or something, could you please change my therapist to some one that will treat me according to my issues and not treat this like a joke.

(Dkt. No. 27–1 at 10.)

On March 22, 2010, Plaintiff sent another letter to Kemp:

How is it that I write you complaining about this guy Marienelli and a couple of weeks later he show up at my cell bragging that you gave him my letter of complaint? Please don't give this man the letters I write to you. He's coming around threatening me. He says he's going to get me more time here.

Why can't you help me see a doctor, I talked to Marienelli about seeing a doctor and he laughed in my face. Instead of helping that guy in his efforts to liven up his day at my expense, why not allow me to see a doctor so I could get some meds that can stop these voices.

(Dkt. No. 27–1 at 9.)

In his June 17, 2000 letter, Plaintiff told Kemp that he had written to Hogan to inform him that "Kemp and Marienelli refuse to treat mentally ill inmates, won't put in refurls (sic) for [them] to see a mental health doctor." (Dkt. No. 27–1 at 13.) Plaintiff sent a third letter to Kemp on August 30, 2010, the same day he cut his arms with a piece of metal. *Id.* at ¶ 22. In his August 30th letter, Plaintiff wrote:

I'm writing because I attempted suicide today. I cut my arms open and showed it to Marienelli on his rounds and he laughed at it. I need help now. At least send someone for me to talk to (not Marienelli!) I'm telling you I'm trying to deal with this but I don't know how much longer I can hold on. Next time I try this suicide thing, I'm not going to cut up. I'm going to hang myself! No mistakes next time!

(Dkt. No. 27–1 at 11.) In his October 14, 2010 letter to Kemp, Plaintiff threatened to sue Kemp for violating the law by not treating inmates for mental illness, and wrote "I hope to god I make it out of this place, and live to do it. I don't know how the world could look at a person like me as the scum of the earth but see you as a 'good guy.' I would never treat people the way you do." (Dkt. No. 27–1 at 12.) A week after his October 14th letter to Kemp, Plaintiff attempted to hang himself in the shower. (Dkt. No. 1 at ¶ 23.)

Assuming the facts alleged by Plaintiff to be true, as I must for this motion, while Kemp did not respond directly to any of Plaintiff's letters, he did give copies of the letters to Marienelli. He continued to do so even after Plaintiff informed him that Marienelli had threatened to get Plaintiff more time in the block where he was being housed if he kept going over Marienelli's head to Kemp, and had specifically asked Kemp to stop giving them to Marienelli because of the threat. (Dkt. Nos. 1 at 20; 27 at 12; *see also* Dkt. No. 27–1 at 9.)

**\*13** Claims that prison officials have intentionally disregarded an inmate's serious medical needs fall under the Eighth Amendment umbrella of protection from the imposition of cruel and unusual punishments. *Farmer,* 511 U.S. at 832. Prison officials must ensure, among other things, that inmates receive adequate medical care. *Id.* (citing *Hudson v. Palmer,* 468 U.S. 517, 526–27, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984)). The requirement extends to adequate mental health care. *See Langley v. Coughlin,* 888 F.2d 252, 254 (2d Cir.1989) ("We think it plain that from the legal standpoint psychiatric or mental health care is an integral part of medical care. It thus falls within the requirement of *Estelle v. Gamble,* [429 U.S. 97, 104 (1976) ], that it must be provided to prisoners."); *Guarneri*

*v. Hazzard,* No. 9:06–CV–985 (NAM/DRH), 2010 WL 1064330, at 16, 2010 U .S. Dist. LEXIS 26966, at *52 (N.D.N.Y. Mar.22, 2010) (the denial of mental health care may constitute a violation of the Eighth Amendment).

As with conditions of confinement claims, a claim that prison officials have intentionally disregarded an inmate's serious medical needs has both objective and subjective elements. *See Caiozzo v. Koreman,* 581 F.3d 63, 72 (2d Cir.2009) (citation and punctuation omitted). "The plaintiff must show that she or he had a serious medical condition and that it was met with deliberate indifference." *Id.* at 72. "The objective 'medical need' element measures the severity of the alleged deprivation, while the subjective 'deliberate indifference' element ensures that the defendant prison official acted with a sufficiently culpable state of mind." *Smith v. Carpenter,* 316 F.3d 178, 183–84 (2d Cir.2003) (citation omitted).

Analyzing the objective element of an Eighth Amendment medical care claim requires two inquiries. "The first inquiry is whether the prisoner was actually deprived of adequate medical care." *Salahuddin v. Goord,* 467 F.3d 263, 279 (2d Cir.2006). The word "adequate" reflects the reality that "[p]rison officials are not obligated to provide inmates with whatever care the inmates desire. Rather, prison officials fulfill their obligations under the Eighth Amendment when the care provided is 'reasonable.' " *Jones v. Westchester County Dept. of Corrections Medical Dept.,* 557 F.Supp.2d 408, 413 (S.D.N.Y.2008) (quoting *Salahuddin,* 467 F.3d at 820).

The second inquiry is "whether the inadequacy in medical care is sufficiently serious. This inquiry requires the court to examine how the offending conduct is inadequate and what harm, if any, the inadequacy has caused or will likely cause the prisoner." *Salahuddin,* 467 F.3d at 280. The focus of the second inquiry depends on whether the prisoner claims to have been completely deprived of treatment or whether he claims to have received treatment that was inadequate. *Id.* If "the unreasonable medical care is a failure to provide any treatment for an inmate's medical condition, courts examine whether the inmate's medical condition is sufficiently serious." *Id.*

**\*14** A "serious medical condition" is "a condition of urgency, one that may produce death, degeneration, or extreme pain." *Nance v. Kelly,* 912 F.2d 605, 607 (2d Cir.1990) (Pratt, J. dissenting) (citations omitted), *accord*

*Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994); *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998). Relevant factors to consider when determining whether an alleged medical or mental health condition is sufficiently serious include, but are not limited to: (1) the existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; (2) the presence of a medical condition that significantly affects an individual's daily activities; and (3) the existence of chronic and substantial pain. *Chance,* 143 F.3d at 702–03.

Under the subjective element, medical mistreatment rises to the level of deliberate indifference only when it "involves culpable recklessness, i.e., an act or a failure to act ... that evinces 'a conscious disregard of a substantial risk of serious harm.' " *Id.* at 703 (quoting *Hathaway v. Coughlin,* 99 F.3d 550, 553 (2d Cir.1996)). "Deliberate indifference requires more than negligence but less than conduct undertaken for the very purpose of causing harm." *Hathaway,* 37 F.3d at 66. To establish deliberate indifference, an inmate must prove that (1) a prison medical care provider was aware of facts from which the inference could be drawn that the inmate had a serious medical need; and (2) the medical care provider actually drew that inference. *Farmer,* 511 U.S. at 837; *Chance,* 143 F.3d at 702. The inmate then must establish that the provider consciously and intentionally disregarded or ignored that serious medical need. *Farmer,* 511 U .S. at 835. An "inadvertent failure to provide adequate medical care" does not constitute "deliberate indifference." *Estelle,* 429 U.S. at 105–06. Moreover, "a complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim ... under the Eighth Amendment." *Id.* at 106. Stated another way, "medical malpractice does not become a constitutional violation merely because the victim is a prisoner." *Id.; see also Smith,* 316 F.3d at 184 ("Because the Eighth Amendment is not a vehicle for bringing medical malpractice claims, nor a substitute for state tort law, not every lapse in prison medical care will rise to the level of a constitutional violation."). However, malpractice that amounts to culpable recklessness constitutes deliberate indifference. Accordingly, "a physician may be deliberately indifferent if he or she consciously chooses an easier and less efficacious treatment plan." *Chance,* 143 F.3d at 703 (quoting *Hathaway,* 99 F.3d at 553).

1. *Marienelli*

After Plaintiff's medication was stopped in September of 2009, he received no medication or treatment for his long term mental health problems while at Upstate. (Dkt. No. 1 at ¶¶ 15, 19.) It can be inferred from Plaintiff's March 22, 2010 letter to Kemp that Marienelli had an element of control over whether Plaintiff was allowed to see a doctor for his mental illness, and that Marienelli had refused Plaintiff's requests. (Dkt. No. 27–1 at 9.)

**\*15** Where a plaintiff has received no treatment, the court examines whether the inmate's medical condition is sufficiently serious. *See Salahuddin,* 467 F.3d at 280. "Mental illness can constitute a serious medical need." *Hale v. Rao,* 768 F.Supp.2d 367, 378 (N.D.N.Y.2011). Moreover, "[a] propensity to attempt suicide or harm oneself is undoubtedly a serious medical condition, as are the health effects that flow[ ] from ... mental illness such as lacerations from cutting and hanging." *Barnes v. Ross,* No. 12 Civ 1916(PKC), 2013 WL 646551, at *4, 2013 U.S. Dist. LEXIS 24103, at *11 (W.D.N.Y. Feb. 21, 2013); *see also Loadholt v. Lape,* No. 9:09–CV–0658 (LEK/RFT), 2011 WL 1135934, at *3, 2011 U.S. Dist. LEXIS 31368, at *9–10 (N.D.N.Y. Mar.3, 2011) ("This Court, in accord with multiple decisions in this Circuit, recognizes that allegations of mental illness, especially when accompanied by suicidal ideation, state a plausible claim that Plaintiff's mental health needs were sufficiently serious."); *Allah v. Kemp,* No. 9:08–CV–1008 (NAM/GHL), 2010 WL 1036802, at *6, n. 9, 2010 U.S. Dist. LEXIS 25781, at *19, n. 9 (N.D.N.Y. Feb.25, 2010) (failure to provide plaintiff with a mental health evaluation, notwithstanding his attempted suicide three days earlier, was enough to meet "sufficiently serious" standard).

Although Plaintiff's Complaint is far from specific as to the nature of his mental health problems, his allegations of mood disorder and other mental problems and long history of medication and treatment, considered with Plaintiff's allegations that he: (1) was taking medication for his mental health problems when he arrived at Upstate; (2) was housed in an area designated for mentally ill inmates; (3) was assigned a mental health counselor; and (4) attempted suicide on two occasions, by cutting and hanging, while at Upstate, state a plausible claim that Plaintiff had serious mental health problems that went untreated. [8]

[8]      In addition, in his letters to Defendant Hogan, Plaintiff wrote of fear of slipping back into mental

illness without his medication and hearing people talking and not being able to tell if the voices were in his head or not. (Dkt. No. 27–1 at 8.)

Further, the allegations in Plaintiff's Complaint and the claims in Plaintiff's letters to Defendant Kemp, accepted as true for this motion, are sufficient to make a plausible showing of deliberate indifference on Marienelli's part. As Plaintiff's mental health counselor, Marienelli was aware of his mental health problems and that he had been taken off his medication. (Dkt. No. 1 at ¶¶ 16–19.) According to Plaintiff, Marienelli laughed in his face when Plaintiff talked to him about seeing a doctor for his mental illness. (Dkt. No. 27–1 at 9.) When Plaintiff cut his arms, in what he described as a suicide attempt in his August 30, 2010 letter to Kemp, Marienelli laughed, told Plaintiff to run some water on the cuts, and walked away without arranging for any mental health intervention. (Dkt. Nos. 1 at ¶ 22; 27–1 at 11.) Less than two months after that cutting incident, Plaintiff attempted to hang himself. (Dkt. No. 1 at ¶ 23.)

Based upon the forgoing, I recommend that Marienelli's Rule 12(c) motion for judgment on the pleadings be denied.

### 2. *Kemp*

**\*16** Plaintiff has also asserted an Eighth Amendment medical indifference claim against Defendant Kemp based upon his failure to take steps to ensure that Plaintiff received needed medication and treatment for his mental health problems. I have already concluded that Plaintiff has made a facially plausible showing that he received no medication or treatment for his mental health problems while at Upstate, and that his mental problems constituted a serious medical need for purposes of satisfying the objective element of his medical indifference claim.

Moreover, I find that under the circumstances alleged, Plaintiff has an adequate showing of deliberate indifference by Kemp. Plaintiff wrote four letters to Kemp. In each of those letters, Plaintiff complained about Marienelli including: (1) Marienelli treating Plaintiff's attempts to talk to him about his mental health issues as a game or a joke; (2) Marienelli threatening Plaintiff about his letters to Kemp and laughing in Plaintiff's face when he asked to see a doctor; and (3) Marienelli laughing when Plaintiff cut his arms in a suicide attempt. (Dkt. No. 27–1 at 9–11.) In his second letter, Plaintiff specifically implored

Kemp not to give copies of his letters to Marienelli because of his threats. *Id.* at 9.

According to Plaintiff, Kemp's sole response to his letters was to continue to give copies to Marienelli—the subject of Plaintiff's complaints. (Dkt. No. 1 at ¶ 20.) The failure of a supervisory official to investigate or respond to a complaint letter from an inmate is alone insufficient to establish the personal involvement necessary for liability on a § 1983 claim. *Johnson,* 234 F.Supp.2d at 363; *Risch v. Hulihan,* No. 9:09–CV–330, 2010 WL 5463339, at \*4, 2010 U.S. Dist. LEXIS 137094, at \*12–13 (N.D.N.Y. Dec.29, 2010) (writing letters to the MHU Unit Chief at Mid–State and Commissioner Hogan was insufficient to establish personal involvement). While mere receipt of a letter from an inmate is insufficient to establish individual liability ... "[p]ersonal involvement will be found ... where a supervisory official receives and acts on a prisoner's grievance or otherwise reviews and responds to a prisoner's complaint." *Boddie v. Morgenthau,* 342 F.Supp.2d 193, 203 (S.D.N.Y.2004) (quoting *Johnson,* 234 F.Supp.2d at 363).

"Where a supervisor's involvement in a prisoner's complaint is limited to forwarding of correspondence to appropriate staff, the supervisor has insufficient personal involvement to sustain a § 1983 cause of action." *Liner v. Goord,* 310 F.Supp.2d 550, 555 (W.D.N.Y.2004); *see also Woods v. Goord,* No. 01 Civ. 3255(SAS), 2002 WL 731691, at \*7, 2002 U.S. Dist. LEXIS 7157, at \*25 (S.D.N.Y. April 23, 2002) (referring a letter requesting medical assistance to a lower ranking supervisor does not constitute personal involvement). Therefore, if giving copies of Plaintiff's letters to Marienelli were viewed as merely the routine forwarding of inmate correspondence to the appropriate staff member for handling, I would be compelled to conclude that Plaintiff has not alleged facts sufficient to show Kemp's personal involvement in his medical indifference claim. However, in this case, Kemp responded to Plaintiff's letters by giving copies to the individual whom Plaintiff claimed was not only denying him mental health care, but threatening him for writing letters. Moreover, assuming the facts alleged by Plaintiff to be true, Kemp took no steps to ensure that Marienelli did not follow through on his threats, and that Plaintiff received needed mental health treatment. Under the circumstances of this case, I find that while Plaintiff's claim against Kemp may not survive a summary judgment motion, for purposes of this motion, he has adequately

alleged not only Kemp's personal involvement, but his deliberate indifference to Plaintiff's serious mental health needs. Therefore, I recommend that Kemp's motion for judgment on the pleadings be denied.

### 3. *Hogan*

**\*17** Plaintiff has acknowledged that Hogan never responded to his letters and has failed to make any showing of personal involvement by Hogan in his claim that he was denied adequate mental health care. Therefore, I recommend that Hogan's motion for judgment dismissing Plaintiff's claim against him be dismissed, and that in light of Plaintiff's *pro se* status, he be granted leave to amend.

### 4. *Healy*

Plaintiff claims that Defendant Healy, a Corrections Officer at Upstate, and two other corrections officers beat Plaintiff with their hands and feet after discovering he had hanged himself in the shower and cutting him down. (Dkt. Nos. 1 at ¶ 23; 27–1 at 15.) After beating Plaintiff, Healy and the other officers made Plaintiff promise he wouldn't hang himself again, Healy then warned Plaintiff that if he wrote up the incident they would be back and he would really wish he were dead, and left. (Dkt. No. 1 at ¶ 23.) Later in the day, Plaintiff cut his wrist and showed it to Healy, who did nothing to seek mental health or medical care for Plaintiff. *Id.* at ¶ 4. Plaintiff has asserted Eighth Amendment claims for medical indifference and excessive force against Healy.

#### a. *Plaintiff's Medical Indifference Claim*

Plaintiff has made a plausible showing that he had a serious mental condition. I find that Plaintiff has also made an adequate showing that Healy acted with deliberate indifference. "Non-medical personnel may engage in deliberate indifference if they intentionally deny or delay access to medical care." *Jean v. Barber,* No. 9:09–CV–430 (MAD/GHL), 2011 WL 2975218, at *5, 2011 U . S. Dist. LEXIS 79499, at *13 (N.D.N.Y. Jul.21, 2011). It can reasonably be inferred from Plaintiff's Complaint that finding Plaintiff hanging in the shower placed Healy on notice that he could be a suicide risk, particularly since Plaintiff was being housed in an area designated for mentally ill inmates. Healy's alleged actions in beating and threatening Plaintiff, rather than seeing to it that Plaintiff's apparent suicidal ideation was addressed through the Upstate mental health system, suggests an intentional disregard of that risk. Therefore, I recommend that Defendant Healy's motion for judgment on the pleadings on Plaintiff's Eighth Amendment medical indifference claim against him be denied.

#### b. *Excessive Force Claim*

The Eighth Amendment prohibition on cruel and unusual punishments precludes the "unnecessary and wanton infliction of pain," *Gregg v. Georgia,* 428 U.S. 153, 173, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976), and protects inmates against the use of excessive force. *Hudson v. McMillian,* 503 U.S. 1, 9–10, 112 S.Ct. 995, 117 L.Ed.2d 156 (1992). As with Plaintiff's other Eighth Amendment claims, in order to bring an excessive force claim, a plaintiff must establish both objective and subjective elements. *Blyden v. Mancusi,* 186 F.3d 252, 262 (2d Cir.1999).

"The objective element is 'responsive to contemporary standards of decency' and requires a showing that 'the injury actually inflicted is sufficiently serious to warrant Eighth Amendment protection.' " *Brooks v. Brennan,* No. 9:12–CV–0624 (NAM/CFH), 2013 WL 3716399 at *7, 2013 U.S. Dist. LEXIS 98942, at *22 (N.D.N.Y. Jul.12, 2013) (quoting *Hudson,* 503 U.S. at 9) (internal citations omitted). " 'The malicious use of force to cause harm constitute[s] [an] Eighth Amendment violation *per se'* regardless of the seriousness of the injuries." *Id.* (quoting *Blyden,* 186 F.3d at 263) (citing *Hudson,* 503 U.S. at 9). That is so because "[w]hen prison officials maliciously and sadistically use force to cause harm, contemporary standards of decency always are violated." *Id.*

**\*18** The subjective element requires a plaintiff to demonstrate the "necessary level of culpability, shown by actions characterized by wantonness in light of the circumstances surrounding the challenged conduct." *Sims v. Artuz,* 230 F.3d 14, 21 (2d Cir.2000). Whether actions are characterized by wantonness "turns on 'whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm.' " *Id .* (quoting *Hudson,* 503 U.S. at 7). The Second Circuit has set forth several factors to be considered in determining whether a defendant acted maliciously or wantonly, including "the extent of the injury and the mental state of the defendant, as well as the need for the application of force; the correlation between that need and the amount of force used; the threat reasonably perceived by the defendants; and any efforts made by the defendant

to temper the severity of a forceful response." *Scott v. Coughlin,* 344 F.3d 282, 291 (2d Cir.2003) (citation and internal quotation marks omitted).

Plaintiff does not claim that he sustained any physical injuries as a result of the beating allegedly inflicted by Healy and the two other corrections officers. However, assuming the truth of Plaintiff's allegations regarding the beating, I find that beating Plaintiff immediately after his apparent attempt to commit suicide by hanging constitutes a malicious use of force, and that Plaintiff has stated a *per se* claim for excessive force regardless of the lack of factual allegations concerning injuries. I also find that for pleading purposes, Plaintiff has satisfied the subjective element of an excessive force claim. There are no allegations in the Complaint suggesting that any amount of force was needed against Plaintiff after Healy cut him down, and there is no suggestion that Plaintiff presented any threat to the safety of Healy or the other officers at the time the beating was allegedly inflicted. The allegations in Plaintiff's Complaint instead support the inference that Healy was acting maliciously and sadistically in beating Plaintiff.

I therefore recommend that Healy's motion for judgment on the pleadings dismissing Plaintiff's Eighth Amendment excessive force claim also be denied.

### D. Plaintiff's Sexual Harassment and Abuse Claims Against Defendants Lavigne, Dwyer, and Santamore

#### 1. *Lavigne and Dwyer*

Sexual abuse of a prisoner by a corrections officer may, under some circumstances, violate the prisoner's Eighth Amendment right to be free from cruel and unusual punishments. *Boddie v. Schnieder,* 105 F.3d 857, 861 (2d Cir.1997). It may violate contemporary standards of decency and "can cause severe physical and psychological harm." *Id.* For those reasons, "severe or repetitive sexual abuse of an inmate by a prison officer can be objectively serious enough to constitute an Eighth Amendment violation" where "no legitimate law enforcement or penological purpose can be inferred from the defendant's alleged conduct." *Id.* (citation and internal quotation marks omitted).

**\*19** The Second Circuit and district courts require "allegations of very extreme and severe conduct with no imaginable penological purpose before finding an

inmate has stated an Eighth Amendment sexual abuse claim." *McCarroll v. Matteau,* No. 9:09–CV–0355 (NAM/GHL), 2010 WL 2346327, at \*4, 2010 U.S. Dist. LEXIS 56574, at \*11 (N.D.N.Y. May 17, 2010). *See, e.g., Caldwell v. Crossett,* No. 9:09–CV–576 (LEK/RFT), 2010 WL 2346337, 2010 U.S. Dist. LEXIS 56573 (N.D.N.Y. May 24, 2010) (claim that corrections officer grabbed plaintiff's testicles during a pat-frisk causing serious pain around his groin area failed to allege a violation of the Eighth Amendment based upon claims of sexual abuse or excessive force); *Excell v. Fischer,* No. 9:08–CV–945 (DNH/RFT), 2009 WL 3111711, 2009 U.S. Dist. LEXIS 88506 (N.D.N.Y. Sept.24, 2009) (allegations that guard grabbed and squeezed prisoner's penis during pat-frisk insufficient to state an Eighth Amendment claim); *Morrison v. Cortright,* 397 F.Supp.2d 424 (W.D.N.Y.2005) (allegation that corrections officer shone light up inmate's anus, ran his middle finger between inmate's buttocks, causing inmate to urinate on himself, and rubbing his penis against inmate's buttocks during strip search did not implicate Eighth Amendment); *Montero v. Crusie,* 153 F.Supp.2d 368, 375 (S.D.N.Y.2001) (failure to state an Eighth Amendment claim where plaintiff failed to allege injury as a result of guard's squeezing his genitalia on several occasions during pat-frisking).

Plaintiff has alleged a single incident of sexual abuse by Lavigne during a pat-frisk. According to Plaintiff, while Dwyer was holding up Plaintiff's hands, Lavigne "pulled plaintiffs pants up as high as they would go causing him to winch (sic) in pain .... [;] shoved his fingers between plaintiffs buttock with such force that one of his fingers along plaintiffs pants, and underwear, ultimately invading plaintiff's anus .... [; and] groped plaintiff genitals and squeezed them until plaintiff cried out in pain." (Dkt. No. 1 at ¶¶ 31, 33.) Plaintiff has not alleged that he sustained any physical injury as a result.

While by no means condoning the acts alleged in Plaintiff's Complaint, Plaintiff has alleged only a single instance of alleged sexual abuse by Lavigne, the actions were not extreme or severe when measured against the case law cited herein, and Plaintiff has alleged no physical injury. Additionally, Lavigne was performing a pat-frisk, which has a penological purpose. Therefore, I find that Plaintiff has not stated a plausible claim against him for sexual abuse or assault in violation of the Eighth Amendment. [9]

9

Furthermore, I find that Plaintiff has not stated a plausible claim for excessive force as against Lavigne with respect to the pat-frisk. "[N]ot every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers violates a prisoner's constitutional rights," *Boddie,* 105 F.3d at 862 (citation omitted), and "not even every malevolent touch by a prison guard gives rise to a federal cause of action." *Id.* at 862. (citation and internal quotation marks omitted). *See, e.g., Rodriguez v. Peguero,* No. 9:09–CV–1005 (TJM/ATB), 2011 WL 754123, at *5, 2011 U.S. Dist. LEXIS 18096, at *15–16 (Jan. 27, 2011) (allegations that defendant handcuffed plaintiff and slammed him against a wall hurting his chest and twisting his arm in an upward motion causing injury to his shoulder, chest and ear failed to meet the objective standard for stating an excessive force claim); *Tavares v. City of New York,* No. 08 Civ. 3782(PAE)(JCF), 2011 WL 5877550, at *6, 2011 U.S. Dist. LEXIS 137381, at *3 (S.D.N.Y Oct. 17, 2011) (defendant granted summary judgment because force used was *de minimis* and did not rise to the level of a constitutional violation where plaintiff claimed defendant threw him against the wall, kicked him harshly on both ankles, and compressed his chest against the wall so that he thought he was going to pass out); *James v. Phillips,* No. 05 Civ. 1539(PKC) (KNF), 2008 WL 1700125, *4–5, 2008 U.S. Dist. LEXIS 30615, at *12 (S.D.N.Y. Apr. 9, 2008) (finding *de minimis* use of force where prison guard had shoved inmate into a door resulting in swelling of his chin).

Plaintiff has alleged that Dwyer's threat of sexual assault ("oh, you're still a virgin, don't worry about it, we'll take care of that") left him in a constant state of fear and depression. (Dkt. No. 1 at ¶¶ 31, 36.) However, there are no allegations in the Complaint that Dwyer sexually abused Plaintiff[10], and the law is clear that "although indefensible and unprofessional, verbal threats or abuse are not sufficient to state a constitutional violation cognizable under § 1983." *Harris v. Lord,* 957 F.Supp. 471, 475 (S.D.N.Y.1997).

10

Inasmuch as I have concluded that Plaintiff has not stated a claim for sexual abuse in violation of the Eighth Amendment against Lavigne, Plaintiff has no viable Eighth Amendment claim against Dwyer either for sexual abuse because he was holding Plaintiff's hands during the pat-frisk or his failure to intervene.

**\*20** Given the foregoing, I recommend that Defendants Lavigne and Dwyer's motion for judgment on the

pleadings dismissing Plaintiff's claims against them relating to the alleged sexual abuse in violation of the Eighth Amendment be granted, but that Plaintiff be given leave to file an amended complaint.

### 2. *Santamore*

Plaintiff claims that Defendant Santamore sexually harassed him by ordering him to take down a sheet he had put up while he was taking a shower. At the time Santamore directed Plaintiff to take down the sheet, Plaintiff was naked and allegedly believed that exposing his naked body would be a violation of DOCCS standards of behavior. (Dkt. No. 1 at ¶¶ 37–39.) Santamore threatened Plaintiff with a misbehavior report if he did not comply with the directive. When Plaintiff complied, Santamore allegedly "looked at plaintiff's naked body up and down, smirked and walked away saying 'I'll see you later.' " *Id.* at ¶ 42. Santamore thereafter filed a misbehavior report, which was dismissed after review of a videotape of the incident.[11] *Id.* at ¶¶ 44–46.

11

Plaintiff has no constitutional protection against the filing of a false misbehavior report, unless, for instance, it was filed in retaliation for the exercise of a protected First Amendment right. *See Boddie,* 105 F.3d at 862.

"[T]o date, in this Circuit there has been 'no case in which a plaintiff ha[s] established an actionable claim of sexual harassment under *Boddie* without having physical contact with the alleged perpetrator[.]' " *Vaughn v. Strickland,* Nos. 12 Civ. 2696(JPO), 12 Civ. 3335(JPO), 12 Civ. 2995(JPO), 12 Civ. 3333(JPO), 2013 WL 3481413, at *4, 2013 U.S. Dist. LEXIS 97122, at * 12 (S.D.N.Y. Jul. 11, 2013) (citation and internal quotation marks omitted). Plaintiff has not alleged physical conduct by Santamore and has not alleged facts setting forth a facially plausible claim of sexual harassment under *Boddie.* I therefore recommend that Plaintiff's claim for sexual harassment against Santamore be dismissed. Even though it appears virtually certain that Plaintiff will be unable to allege facts stating a plausible claim against Santamore in connection with the shower incident, given Plaintiff's *pro se* status, I recommend that the dismissal be with leave to amend.

### E. Eighth Amendment Claim for Indifference to Plaintiff's Serious Dental Needs by Defendants Dwyer, Burgess, and Miller

1. *Plaintiff's Unsuccessful Attempts to Obtain Dental Treatment*

Plaintiff cracked a molar and lost the filling in the tooth on August 29, 2010. (Dkt. Nos. 1 at ¶ 48; 27–1 at 45.) Plaintiff, who was in pain and unable to eat from one side of his mouth as a result of the lost filling, began submitting dental sick call slips every evening. (Dkt. Nos. 1 at ¶ 48; 27–1 at 31.) However, as of September 6, 2010, when Plaintiff wrote to Defendant Miller, the Dentist at Upstate, asking that him be called out for treatment as soon as possible, Plaintiff had heard nothing in response to the sick call slips. (Dkt. No. 27–1 at 31.)

In his September 6th letter, Plaintiff told Miller that "since the filling came out I've been in such great pain I can't eat correctly I think I'm losing weight.... I need your help Sir." *Id.* Plaintiff continued to submit dental slips with no reply. *Id.* at 32. On September 14, 2010, Plaintiff wrote a second letter to Miller, who had not responded to the initial letter. *Id* . at 32. In his September 14th letter, Plaintiff informed Miller that he had been submitting dental call slips with no response and wrote "Sir, I need help! I don't know what else to do. This pain is driving me crazy. I can't eat, or sleep right. If there is something I can do to insure that I'm called out sooner, please tell me & I will do it. What ever it takes." *Id.*

**\*21** On September 29, 2010, Plaintiff was called out for a dental appointment. He asked the dental hygienist if the appointment was to treat the cracked tooth and missing filling and was told it was only for a cleaning. (Dkt. No. 1 at ¶ 50.) Plaintiff showed his tooth to the hygienist, who made a notation about it on Plaintiff's dental treatment record. *Id.;* (Dkt. No. 27–1 at 45.)

Plaintiff filed a grievance complaining of the lack of treatment for the lost filling on October 5, 2010. (Dkt. No. 27–1 at 33.) The grievance stated: "For over a month I've been writing request to Dental because my filling came out and I need emergency treatment, but the Dental Dept will not call me out. I've been in pain if they aren't going to call me, treat me for the pain until they see me." *Id.* The IGRC response stated that when Plaintiff was seen on September 29, 2010, for a cleaning, he didn't mention the missing filling. That is contrary to Plaintiff's dental treatment record. *Id.* at 34. The IGRC also noted that, contrary to the information in Plaintiff's letters to Miller, the Dental Department had no call out slips from Plaintiff. *Id.* The IGRC stated that writing to the IGRC was not the

proper procedure and recommended that Plaintiff write to the Dental Department, which Plaintiff had already done twice with no response. *Id.*

The Acting Superintendent, in denying the grievance on appeal on October 20, 1010, wrote that "[a]ccording to Dr. Miller and investigation of dental records and dental staff interviews, treatment has been provided consistent with Dental Department Policy ." (Dkt. No. 27–1 at 35.) He indicated that Plaintiff had been seen on 11/16/09, 11/23/09, 1/28/10 and 2/1/10, long before he lost the filling, and that all remaining work was "elective (not requiring immediate attention) and had been scheduled." *Id.*

2. *Plaintiff's November 3, 2010 Dental Call Out*

On November 3, 2010, Defendant Dwyer took Plaintiff to a dental call out after a scheduled ASAT. (Dkt. No. 1 at ¶ 55.) Dwyer had refused to allow Plaintiff to skip the ASAT to go to the dentist when Plaintiff told him that he was "really in pain and needed to see dental staff." *Id.* Plaintiff saw a number of inmates enter dental before him. *Id.* at ¶ 57. When a corrections officer attempted to take Plaintiff to see dental, Dwyer waived him away and said that Plaintiff would see the dentist last if he saw him at all. *Id.* Dwyer and Defendant Burgess began screaming at Plaintiff, and Burgess retrieved a dental refusal slip and threatened Plaintiff with "a visit to the facility Hospital" if he did not sign it. *Id.* at ¶¶ 58–59. Defendant Santamore, who was nearby, refused to intervene. *Id.* at ¶ 58. Plaintiff signed the refusal slip under coercion and was taken back to his cell. *Id.* at ¶¶ 60–61. Plaintiff wrote his reason for refusal as "I've been waiting & staff refuse to let me see dental staff. I can see a number of inmates going in but correctional staff refuse to let me see dental staff." (Dkt. No. 23–2 at 5.) A notation made in Plaintiff's dental treatment record for November 3, 2010 states "pt. refused per c.o." (Dkt. No. 27–1 at 45.)

**\*22** Plaintiff was transferred to Clinton on or about November 14, 2010 and received a temporary filling shortly thereafter. *Id.* at ¶ 63.

3. *Plaintiff's Serious Dental Condition*

In order to state an Eighth Amendment claim for deliberate indifference to his serious dental condition, Plaintiff must, as with his claim for indifference to his serious mental health needs, show that he had a serious dental condition and that it was met with deliberate

indifference. *See Harrison v. Barkley,* 219 F.3d 132, 136 (2d Cir.2000); *Chance,* 143 F.3d at 702. A serious medical, or in this case dental condition, exists where "the failure to treat a prisoner's condition could result in further significant injury or the 'unnecessary and wanton infliction of pain.' " *Chance,* 143 F.3d at 702 (citing *Gutierrez v. Peters,* 111 F.3d 1364, 1373 (7th Cir.1997). Specifically, "[a] cognizable claim regarding inadequate dental care ... can be based on various factors, such as the pain suffered by the plaintiff ... the deterioration of the teeth due to a lack of treatment ... or the inability to engage in normal activities."[12] *Chance,* 143 F.3d at 703 (citations omitted). "[B]ecause a tooth cavity will degenerate with increasingly serious implications if neglected over sufficient time, it presents a 'serious medical need' within the meaning of our case law." *Harrison,* 219 F.3d at 137.

[12]    "When the basis for a prisoner's Eighth Amendment claim is a temporary delay or interruption in the provision of otherwise adequate medical treatment, it is appropriate to focus on the challenged delay or interruption in treatment rather than the prisoner's underlying medical condition alone in analyzing whether the alleged deprivation is, in objective terms, sufficiently serious, to support an Eighth Amendment claim." *Smith,* 316 F.3d at 185 (quoting *Chance,* 143 F.3d at 702).

Logic suggests that a tooth with a lost filling, if neglected over time, would not be any less likely than a cavity first to degenerate with increasingly serious implications or any less a serious dental need. *See Hoover v. Hardman,* No. 9:99–CV–1855, 2005 WL 1949890, at *8, 2005 U.S. Dist. LEXIS 42974, at *23–24 (N.D.N.Y. Aug.15, 2005) (finding an issue of fact as to whether a lost filling was a serious medical need). Moreover, Plaintiff claims that he suffered from extreme pain and an inability to eat or sleep properly as a result of the lost filling. *See Hauschulz v. Bourbon Cty. Board of Commissioners,* Civil Action No. 04–3475–KHV, 2006 WL 1675907, at *7, 2006 U.S. Dist. LEXIS 39511, at *21 (D.Kan. June 14, 2006) (The law does not require that an inmate's tooth be abscessed or infected before a lost filling can be considered a serious medical condition. Pain can be considered substantial harm resulting from delay). Therefore, even though a temporary filling was ultimately put in the tooth, and there are no allegations in the Complaint indicating further problems with the molar as a result of the delay, I find that Plaintiff has made a plausible showing that he suffered

from a serious dental condition for purposes of this Eighth Amendment claim.

#### 4. *Miller*

In order to establish an Eighth Amendment claim arising out of inadequate medical care against Defendant Miller, Plaintiff must prove that Miller showed "deliberate indifference" to his serious medical needs. *See Chance,* 143 F.3d at 702. Plaintiff must show that Miller "knew of and disregarded [his] serious medical needs." *Id.* at 703. Denying or delaying access to dental care may constitute deliberate indifference. *Harrison,* 219 F.3d at 138.

**\*23**  Plaintiff has alleged facts, assumed to be true for this motion, showing that he sent two letters to Miller informing him of the lost filling, the great pain he was suffering, and his inability to eat or sleep properly. Miller did not respond to Plaintiff's requests for emergency treatment for the lost filling. When Miller was consulted as a part of the investigation into Plaintiff's grievance complaining of the lack of treatment, he responded that treatment had been provided consistent with Dental Department policy when, according to Plaintiff and his dental treatment records, no treatment whatsoever had been provided.[13] (Dkt. No. 27–1 at 44–46.)

[13]    Miller cannot be faulted for Plaintiff missing his dental call out on November 3, 2010. However, by then, it had been nearly two months since Plaintiff first wrote to Miller informing him of the severe pain and problems with eating and sleeping that he was experiencing.

Discovery in this matter may reveal that Miller's failure to treat Plaintiff and to provide accurate information in response to the grievance investigation were inadvertent failures or negligence on his part rather than deliberate indifference. *See Estelle,* 429 U.S. at 105–06. However, for purposes of this Rule 12(c) motion, I find that Plaintiff has made a plausible showing of deliberate indifference on Miller's part and recommend that his motion for judgment on the pleadings be denied. *See Washington v. Farooki,* No. 9:11–CV–1137, 2013 WL 3328240, at *1, 7, 2013 U.S. Dist. LEXIS 93712, at *18–19 (N.D.N.Y. Jul 2, 2013) (letters from plaintiff to defendant dentist complaining of severe pain and the need for dental treatment, in conjunction with defendant's silence, found to create factual issue as to whether defendant intentionally delayed plaintiff's care).

### 5. *Dwyer, Burgess, and Santamore*

"[W]hen an inmate alleges that non-medical subordinate prison personnel were deliberately indifferent to his serious medical needs, he must demonstrate that they 'intentionally delayed access to medical care when the inmate was in extreme pain and has made his medical problem known to the attendant prison personnel.' " *Hoover,* 2005 WL 1949890, at *4 (quoting *Baumann v. Walsh,* 36 F.Supp.2d 508, 512 (N.D.N.Y.1999)).

Assuming the truth of Plaintiff's allegations, Defendant Dwyer was aware that Plaintiff was in extreme pain and needed dental care and nonetheless interfered with his access to dental care on November 3, 2010 by waiving away a corrections officer who tried to take Plaintiff in to see the dental provider and stating that Plaintiff would see the dentist last if he saw him at all.[14] *Id.* at ¶ 57. (Dkt. No. 1 at ¶¶ 55, 57.) Furthermore, it can be inferred from the allegations in Plaintiff's Complaint that Dwyer was present when Burgess coerced Plaintiff into signing the dental refusal slip with threats of bodily harm and even if not a participant, Dwyer did not attempt to intervene. *Id.* at ¶ 59. Therefore, I conclude that Plaintiff made a plausible showing of deliberate indifference on Dwyer's part and recommend that Dwyer's motion for judgment on the pleadings on Plaintiff's Eighth Amendment medical indifference claim be denied. *See Hoover,* 2005 WL 1949890, at *9 (where court found a question of fact with regard to defendant corrections officer's deliberate indifference where he instructed a nurse to see plaintiff for his dental problem and a week later instructed the same nurse not to provide plaintiff with medication).

[14]    Plaintiff does not allege that he described his pain to Dwyer as "extreme." However, "really in pain," the language used by Plaintiff in his Complaint, can be construed as "extreme pain." (Dkt. No. 1 at ¶ 55.)

**\*24** Plaintiff does not claim that he told Burgess or Defendant Santamore, who is alleged to have refused to intervene and correct the situation when Dwyer and Burgess interfered with Plaintiff seeing the dental provider, that he was in extreme pain and needed dental work. I find that Plaintiff has thus failed to make a facially plausible showing of deliberate indifference to his serious dental needs by either Burgess or Santamore. Therefore, I recommend that their motion for judgment on the pleadings dismissing Plaintiff's dental indifference

claim be granted, but that Plaintiff be granted leave to amend.

### F. Qualified Immunity

Defendants have raised qualified immunity as a basis for granting them judgment on the pleadings. (Dkt. No. 23–4 at 16–18.) "A federal official is entitled to qualified immunity from suit for money damages unless the plaintiff shows that the official violated a statutory or constitutional right, and that the right was 'clearly established' at the time of the challenged conduct." *Walker,* 717 F.3d at 125 (citing *Ashcroft v. al-Kidd,* ––– U.S. ––––, 131 S.Ct. 2074, 2080, 179 L.Ed.2d 1149 (2011)) (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982)). "A Government official's conduct violates clearly established law when, at the time of the challenged conduct, the contours of a right are sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *al-Kidd,* 131 S.Ct at 2083 (citations and internal quotation marks omitted). The Supreme Court "[does] not require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate." *Id.* If a defendant's conduct "did not violate a clearly established constitutional right, or if it was objectively reasonable for the [official] to believe that his conduct did not violate such a right, then the [official] is protected by qualified immunity." *Doninger v. Niehoff,* 642 F.3d 334, 345 (2d Cir.2011) (citation omitted).

Qualified immunity is an affirmative defense on which defendant officials have the burden of proof. *Sudler v. City of New York,* 689 F.3d 159, 174 (2d Cir.2012). "[A] defendant presenting an immunity defense on a Rule 12(b)(6) motion [or a Rule 12(c) motion in this case] instead of a motion for summary judgment must accept the more stringent standard applicable to this procedural road." *Walker,* 717 F.3d at 126 (quoting *McKenna v. Wright,* 386 F.3d 432, 436 (2d Cir.2004)). Included in that standard is that the facts supporting the defense appear on the face of Plaintiff's Complaint. *McKenna, id.*

While recognizing that qualified immunity should be decided as early as possible in the litigation, *see Saucier v. Katz,* 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001), *abrogated on other grounds by Pearson v. Callahan,* 555 U.S. 223, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009), the Second Circuit has taken the position that qualified immunity "is often best decided on a motion

for summary judgment when the details of the alleged deprivations are more fully developed." *Walker,* 717 F.3d at 130 (citing *Castro v. United States,* 34 F.3d 106, 112 (2d Cir.1994) ("Although a defense of qualified immunity should ordinarily be decided at the earliest possible stage in litigation, and it is a defense that often can and should be decided on a motion for summary judgment, some limited and carefully tailored discovery may be needed before summary judgment will be appropriate.")

**\*25** In this case, I have concluded that Plaintiff has asserted plausible claims for violation of his Eighth Amendment right to receive adequate medical care against Defendants Marienelli, Kemp, and Healy (mental health care), and Miller and Dwyer (dental care), and for excessive force against Defendant Healy, and recommended that Defendants' motion for judgment on the pleadings be denied as to those claims. If the district court adopts those recommendations, further facts will be required to decide the question of qualified immunity with regard to those defendants. Therefore, as in *Walker,* I find that it would be "inappropriate to conclude as a matter of law at the pleadings stage of the litigation that defendants did not violate [Plaintiff's] clearly established constitutional rights," 717 F.3d at 130, and recommend that Defendants Marienelli, Kemp, Healy, Miller, and Dwyer's motion for judgment on the pleadings on qualified immunity grounds be denied. [15]

[15]     Because I have recommended that Plaintiff's Complaint be dismissed as against Defendants Rock, Hogan, Lavigne, Burgess, and Santamore, I do not find it necessary to address their motion for qualified immunity.

**ACCORDINGLY,** it is hereby

**RECOMMENDED,** that Defendants' Rule 12(c) motion for judgment on the pleadings dismissing Plaintiff's Complaint (Dkt. No. 23) be ***GRANTED IN PART AND DENIED IN PART.*** Specifically, I recommend that Defendants' motion be ***GRANTED*** as follows:

1. Dismissal on Eleventh Amendment grounds of all claims seeking money damages against all of the Defendants, including John Doe # 1–6, in their official capacities, without leave to amend;

2. Dismissal of Count # 1 for deliberate indifference to Plaintiff's serious medical (mental health) needs in violation of the Eighth Amendment against Defendant Hogan, with leave to amend; and

3. Dismissal of Count # 3 for conditions of confinement in violation of the Eighth Amendment against Defendant Rock, with leave to amend;

4. Dismissal of Count # 4 for sexual harassment, assault/ excessive force in violation of the Eighth Amendment against Defendants Lavigne, Dwyer, and Santamore, with leave to amend;

5. Dismissal of Count # 5 for deliberate indifference to Plaintiff's serious medical (dental) needs in violation of the Eighth Amendment against Defendants Burgess and Santamore, with leave to amend; and it is further

**RECOMMENDED** that Defendants' motion be ***DENIED*** as to the following: (1) Count # 1 for deliberate indifference to Plaintiff's serious medical (mental health) needs against Defendants Marienelli, and Kemp; (2) Count # 2 for deliberate indifference to Plaintiff's serious medical (mental health) needs and for excessive force against Defendant Healy; (3) Count # 5 for deliberate indifference to Plaintiff's serious medical (dental) needs against Defendants Miller and Dwyer; and (4) Defendants Marienelli, Kemp, Healy, Miller, and Dwyer's request for dismissal on qualified immunity grounds; and it is hereby

**ORDERED** that the Clerk provide Plaintiff with copies of the unpublished decisions cited herein.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. ***FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.*** *Roldan v. Racette,* 984 F.2d 85 (2d Cir.1993) (citing *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir.1989)); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a), 6(e).

**All Citations**

Not Reported in F.Supp.2d, 2013 WL 4804500

WESTLAW    © 2017 Thomson Reuters. No claim to original U.S. Government Works.

**End of Document**

© 2017 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag - Negative Treatment

Distinguished by Sanchez v. Graham, N.D.N.Y., September 12, 2016

2015 WL 5750136
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Michael JONES, Plaintiff,
v.
Joseph SMITH et al., Defendants.

No. 9:09–cv–1058 (GLS/ATB).
|
Signed Sept. 30, 2015.

**Attorneys and Law Firms**

Michael Jones, Ossining, NY, pro se.

Hon. Eric T. Schneiderman, New York State Attorney General, Cathy Y. Sheehan, Assistant Attorney General, of Counsel, Albany, NY, for the Defendants.

*MEMORANDUM–DECISION AND ORDER*

GARY L. SHARPE, District Judge.

### I. *Introduction*

**\*1** Plaintiff *pro se* Michael Jones alleges violations of the First, Eighth, and Fourteenth Amendments of the United States Constitution pursuant to 42 U.S.C. § 1983 against numerous employees of New York State Department of Corrections and Community Supervision (DOCCS) at Shawangunk Correctional Facility and Eastern Correctional Facility in their official and individual capacities. (Compl., Dkt. No. 1.) Jones also alleges a violation of the Religious Land Use and Institutionalized Persons Act (RLUIPA).[1] (*Id.* at 5.) Pending before the court are Jones' objections to the R & R and an appeal from the denial of his motion to amend.[2] (Dkt. No. 135.) For the reasons that follow, the R & R is adopted in its entirety and the denial of Jones' motion to amend his complaint is affirmed.

[1]    See 42 U.S.C. §§ 2000cc–2000cc–5.

[2]    Although Jones does not identify his arguments directed to the denial of his motion as an appeal of a non-dispositive order, (Dkt. No. 134 at 2–3), or fully comply with the Local Rules, *see* N.D.N.Y. L.R. 72.1(b), because Jones proceeds *pro se* the court liberally construes these arguments as an appeal subject to review under Rule 72(a) of the Federal Rules of Civil Procedure.

### II. *Background*

While incarcerated at Schawagunk, Jones converted to Judaism. (Dkt. No. 131, Attach. 3 at 87.) Since Jones' conversion, he allegedly received cold kosher meals three times per day, seven days per week. (*Id.,* Attach. 2 at 29; Compl. ¶ 7–m.) Jones alleged he had high blood pressure, (Compl.¶ 7–e), and, in 2009, requested low sodium kosher meals, (Dkt. No. 131, Attach. 2 at 28.). Jones also requested two hot meals per day. (*Id.*) Jones' requests were denied. (*Id.* at 29–30.) As a result, Jones allegedly changed his diet to non-kosher, low sodium meals. (Compl.¶ 7–l.)

On May 13, 2009, Jones was transferred to Eastern and escorted into his assigned double cell. (Defs.' Statement of Material Facts (SMF) ¶ 3, Dkt. No. 124, Attach. 2.) Jones allegedly informed the escorting officer that his assignment to a double cell and top bunk would exacerbate injury to his back and knees. (Compl.¶ 8–j.) In response, escorting officers allegedly issued a disciplinary ticket and escorted Jones to the special housing unit (SHU). (*Id.* ¶ 8–k.)

Jones' allegations arise from conduct during his incarceration at Shawangunk and Eastern between 2006 and 2009. (Compl. at 6–22.) After the close of discovery, defendants moved for partial summary judgment. (Dkt.Nos.124, 125.) Jones opposed and cross-moved to amend his complaint to join three parties. (Dkt. No. 131.)

In an Order and Report–Recommendation (R & R) filed May 20, 2015, Magistrate Judge Andrew T. Baxter recommended to grant defendants' partial motion for summary judgment and to dismiss Jones' First Amendment and RLUIPA causes of action *sua sponte.* (Dkt. No. 134 at 2.) Judge Baxter also denied Jones' motion to amend his complaint. (*Id.* at 49–50.)

## III. *Standard of Review*

### A. *Objections to the R & R*

Before entering final judgment, this court routinely reviews all report and recommendation orders in cases it has referred to a magistrate judge. If a party has objected to specific elements of the magistrate judge's findings and recommendations, this court reviews those findings and recommendations *de novo. See Almonte v. N.Y. State Div. of Parole,* No. Civ. 904 CV 484, 2006 WL 149049, at *3, *5 (N.D.N.Y. Jan. 18, 2006). In those cases where no party has filed an objection, or only a vague or general objection has been filed, this court reviews the findings and recommendations of the magistrate judge for clear error. *See id.*

### B. *Appeal of a Magistrate Order*

**\*2** When reviewing an appeal from a pretrial non-dispositive motion decided by a magistrate judge, the court will affirm the order unless it is clearly erroneous or contrary to law. 28 U.S.C. § 636(b)(1)(A); Fed.R.Civ.P. 72(a). Courts have generally held that motions to amend a complaint are non-dispositive. *See Rubin v. Valicenti Advisory Servs., Inc.,* 471 F.Supp.2d 329, 333 (W.D.N.Y.2007). Under a clearly erroneous standard, a district court can reverse a magistrate judge's order only if the court " 'is left with the definite and firm conviction that a mistake has been committed.' " *Gualandi v. Adams,* 385 F.3d 236, 240 (2d Cir.2004) (quoting *United States v. U.S. Gypsum Co.,* 333 U.S. 364, 395 (1948)). Under a contrary to law standard, a district court can reverse a magistrate judge's order only if the order fails to apply the relevant law. *See Olais–Castro v. United States,* 416 F.2d 1155, 1158 n. 8 (9th Cir.1969) ("The term 'contrary to law' means contrary to any existing law." (citing *Callahan v. United States,* 285 U.S. 515, 517 (1932)). "[M]agistrate judges are afforded broad discretion in resolving non-dispositive disputes and reversal is appropriate only if their discretion is abused." *Am. Stock Exch., LLC v. Mopex, Inc.,* 215 F.R.D. 87, 90 (S.D.N.Y.2002).

## IV. *Discussion*

### A. *Objections to the R & R*

Jones objects to Judge Baxter's failure to address his claim that the denial of his request for hot, low sodium kosher meals violates the Eighth Amendment. (Dkt. No. 135 at 3.) Judge Baxter generically addressed Jones' claim in a footnote and concluded that Jones did not allege any of the necessary elements to state a violation of the Eighth Amendment. (Dkt. No. 134 at 39 n. 15.) Construing Jones' argument liberally, the court treats his objection as invoking *de novo* review. Ultimately, while the court recognizes that the procedural posture is summary judgment, it agrees with Judge Baxter that the complaint is devoid of factual allegations to support an Eighth Amendment violation.

To establish an Eighth Amendment claim involving prison conditions, a plaintiff must demonstrate that: (1) the alleged deprivation is sufficiently serious and (2) prison officials acted with deliberate indifference to the inmate's health and safety. *See Farmer v. Brennan,* 511 U.S. 825, 834 (1994). The Eighth Amendment requires prisons to provide "nutritionally adequate food that is prepared and served under conditions which do not present an immediate danger to the health and well being of the inmates who consume it," and "under certain circumstances a substantial deprivation of food may well be recognized as being of constitutional dimension." *Robles v. Coughlin,* 725 F.2d 12, 15 (2d Cir.1983) (internal quotation marks and citations omitted). Here, however, Jones fails to sufficiently allege he was deprived of any meals or that his food was contaminated. *See Curtis v. Fischer,* No. 9:12–CV–1140, 2014 WL 5769410, at *7 (N.D.N.Y. Aug. 11, 2014) (prisoner failed to state a claim under the Eighth Amendment when denied kosher low sodium, high fiber diet but offered a non-kosher medically prescribed alternative), *report and recommendation rejected on other grounds* 2014 WL 5769656 (N.D.N.Y. Nov. 5, 2014); *Phelan v. Hersh,* No. 9:10–CV–0011, 2011 WL 6031940, at *12 (N.D.N.Y. Sept. 13, 2011) ("There is no constitutional right to have a hot meal every day, but only that inmates be provided nutritionally adequate food prepared under safe conditions." (citation omitted)), *report and recommendation adopted,* 2011 WL 6031071 (N.D.N.Y. Dec. 5, 2011); *cf. Robles,* 725 F.2d at 16 (holding that inmates' allegations that corrections officers contaminated inmate meals with glass, human waste, and rocks were sufficient to state an Eighth Amendment claim). Accordingly, the court agrees with Judge Baxter that Jones' claim must fail.

**\*3** Jones' remaining objections are general, triggering clear error review. Upon reviewing the R & R for clear error and finding none, the court adopts it in its entirety.

## B. *Appeal*

As noted above, the court construes Jones' arguments directed to the denial of his motion to amend his complaint as an appeal of a non-dispositive order. *See* Fed.R.Civ.P. 72(a). Jones contends that he should be permitted to amend his complaint to add additional parties because defendants: (1) did not contest that a proposed party violated his constitutional rights and (2) did not oppose joinder. (Dkt. No. 135 at 3.) Jones proposed to join Robert Schattinger and Elizabeth Culkin, who allegedly created DOCCS' dietary menu, and "Sgt. Todd" to replace defendant "Jane Doe," who allegedly ordered Jones to SHU in May 2009 and took his knee braces. (Dkt. No. 131, Attach. 1 at 16–17.)

Judge Baxter held the proposed amendment would be futile because it would not survive summary judgment. (Dkt. No. 134 at 49.) Judge Baxter reasoned that Jones did not allege the personal involvement of Schattinger and Culkin and, assuming personal involvement, Jones' First Amendment claim against them arising from the denial of hot, low sodium kosher meals would fail. (*Id.*) Additionally, Judge Baxter held that the addition of Sgt. Todd would be futile because Jones had no cognizable Eighth Amendment claim against him. (*Id.*)

Because a scheduling order had been entered, the standard to evaluate leave to amend the pleadings is Rule 16(b) of the Federal Rules of Civil Procedure rather than Rule 15(a). *Grochowski v. Phoenix Constr.*, 318 F.3d 80, 86 (2d Cir.2003) ("Where a scheduling order has been entered, the lenient standard under Rule 15(a), which provides leave to amend shall be freely given, must be balanced against the requirement under Rule 16(b) that the Court's scheduling order shall not be modified except upon a showing of good cause.") (internal quotation marks and citations omitted)); *see also Parker v. Columbia Pictures Indus.*, 204 F.3d 326, 339–40 (2d Cir.2000). Rule 16(b)(4) of the Federal Rules of Civil Procedure provides that a scheduling order "may be modified only for good cause and with the judge's consent." Fed R. Civ P. 16(b)(4). "To satisfy the good cause standard the party must show that, despite its having exercised diligence, the applicable deadline could not have been reasonably met." *Enzymotec Ltd. v. NBTY, Inc.*, 754 F.Supp.2d 527, 536

(E.D.N.Y.2010) (internal quotation marks and citations omitted).

Here, Jones fails to demonstrate good cause. He did not seek leave to amend his complaint until his opposition to defendants' summary judgment motion, (Dkt. No. 131, Attach. 1 at 16–17), long after the deadline to file dispositive motions, (Dkt. No. 121). [3] Jones never sought permission to extend the time to amend his pleadings. Although Jones learned of Sgt. Todd's identity during discovery, (Dkt. No. 131, Attach. 3 at 15), he failed to seek leave to amend at that point. With respect to the other proposed parties, Jones fails to demonstrate that he diligently identified them. Although Judge Baxter should have employed the Rule 16 standard, this error is harmless because the court would have denied leave to amend under either Rule 16 or Rule 15. *See Bailey v. Christian Broad. Network*, 483 F. App'x 808, 810 (4th Cir.2012) (holding that the magistrate's legal error was harmless because the proper standard would have rendered the same result). Accordingly, the denial of Jones' motion to amend his complaint is affirmed.

[3]     The scheduling order did not have a deadline to amend the pleadings but it was necessarily before the deadline to file dispositive motions. (Dkt. No. 39, 121.)

## V. *Conclusion*

**\*4 WHEREFORE,** for the foregoing reasons, it is hereby

**ORDERED** that Magistrate Judge Andrew T. Baxter's May 20, 2015 Order and Report–Recommendation (Dkt. No. 134) is **ADOPTED** in its entirety; and it is further

**ORDERED** that defendants' motion for partial summary judgment (Dkt. No. 124.) is **GRANTED** on the grounds raised therein and Jones' following claims are dismissed:

1. All claims for injunctive relief dismissed as moot;

2. All claims against defendants in their official capacities dismissed with prejudice;

3. All claims against defendant Fischer dismissed due to lack of personal involvement;

4. Eighth Amendment claims against defendants Smith, Griffin, Khramova, Schoonmaker, Gusman, and Brown;

5. Retaliation claim against defendant Maly, but only to the extent that it was predicated on an allegation of verbal harassment, dismissed with prejudice;

6. Due process and right to privacy claims against defendant Pingotti; and it is further

**ORDERED** that all RLUIPA and First Amendment Religion claims against defendants Rapp and Horowitz are **DISMISSED** *sua sponte,* with prejudice; and it is further

**ORDERED** that Judge Baxter's denial of Jones' motion to amend is **AFFIRMED.**

**IT IS SO ORDERED.**

### ORDER and REPORT–RECOMMENDATION

ANDREW T. BAXTER, United States Magistrate Judge.

Presently before the court is the defendants' motion for partial summary judgment pursuant to Fed.R.Civ.P. 56. (Dkt. No. 124, 125). This matter was referred for Report and Recommendation on October 16, 2014 by Chief U.S. District Judge Gary L. Sharpe, pursuant to 28 U.S.C. § 636(b) and Local Rules N.D.N.Y (L.R.) 72.3(c).

In his civil rights complaint, plaintiff alleged that defendants violated his rights to proper medical care, religious freedom, equal protection, due process, privacy, and his right to be free from cruel and unusual punishment. (Dkt. No. 1). The allegations stem from his imprisonment, by the New York State Department of Corrections and Community Supervision ("DOCCS"), at the Shawangunk Correctional Facility ("Shawangunk") and the Eastern Correctional Facility ("Eastern"). Plaintiff is still incarcerated, but is no longer in the custody of DOCCS. [1]

---

[1]     Plaintiff notified the court, by letter dated August 8, 2014 (Dkt. No. 122), that he now is confined at the George Motchan Detention Center, a facility of the New York City Department of Corrections.

*See* http://www.nyc.gov/html/doc/html/about/locate-facilities.shtml

Following the completion of discovery, defendants filed a partial motion for summary judgment on October 15, 2014 (Dkt.Nos.124, 125). Plaintiff has opposed the motion for summary judgment; he has also moved to amend his complaint to add three additional parties. (Dkt. No. 131). Defendants did not reply in further support of their motion or respond to the motion to amend.

For the reasons set forth below, this court recommends that defendants' motion for partial summary judgment be granted on the grounds raised therein, and also recommends that the District Court dismiss plaintiff's First Amendment/RLUIPA cause of action *sua sponte* pursuant to 28 U.S.C. § 1915(e)(2)(B). Furthermore, this court denies plaintiff's motion to amend his complaint by adding additional parties.

**\*5** Since the present motion only sought summary judgment in regards to certain causes of action and certain defendants, this court's recommendation does not resolve all issues in this litigation. Specifically, the following claims survive, solely against defendants in their individual capacities: claims for monetary damages against Dr. Maryann Genovese, Catherine Wells, and Pedro Diaz for medical indifference; a claim against Dr. Genovese for invasion of privacy in plaintiff's First Cause of Action; and claims against Earnell Boddison, Joseph Smith, John Maly, Lt. Gardner, Lt. Palen, Sgt. Kimbler, and C.O. Brooks for alleged retaliation for prior grievances in plaintiff's Third Cause of Action.

### *BACKGROUND*

**I. Facts and Procedural History**

**A. Factual Overview** [2]

[2]     Given the breadth of the claims and the number of defendants, the court will detail the relevant facts of each claim below, as necessary to address defendants' motion for summary judgment.

Plaintiff alleges a number of constitutional violations which occurred while he was an inmate at Shawangunk and Eastern, including: deliberate medical indifference, stemming from an alleged failure to accommodate plaintiff's back pain following surgery; retaliatory treatment, including transfer from Shawangunk to

2015 WL 5750136

Eastern, in response to plaintiff's history of litigation and grievances at Shawangunk and other DOCCS facilities; and cruel and unusual punishment arising from the nighttime illumination of plaintiff's cell while confined to the Eastern Special Housing Unit ("SHU"). (Compl.¶ 6–b). Plaintiff also makes due process claims concerning a disciplinary hearing at Eastern, and a religious liberty claim arising from the limited Kosher menu available at both facilities. *Id.*

In addition to the defendants directly involved in the incidents alleged in the complaint, plaintiff also makes a broad claim against Brian Fischer, the DOCCS Commissioner during the relevant time period.[3] Plaintiff alleges that defendant Fischer failed to adequately train and establish appropriate policies for the DOCCS employees under his supervision. (Compl.¶ 10–c).

[3]    Defendant Fischer is no longer the Commissioner of DOCCS. The current Acting Commissioner of DOCCS is Anthony J. Annucci. http:// www.doccs.ny.gov/

All defendants were sued in their individual and official capacities. (Compl.¶ 10–b). In addition to monetary damages on each claim, plaintiff also seeks the following injunctive relief: provision of a low sodium Kosher menu; delivery of two hot Kosher meals per day; provision of a special mattress and a chair in his cell to relieve plaintiff's back pain; return of knee braces confiscated while he was in SHU; and exclusion from any future housing in double-bunk cells to accommodate his back problems. (Compl.¶ 13).

### B. Procedural History

The original complaint in this action was filed on September 16, 2009. On May 16, 2011, defendants, who are all officials or employees of DOCCS, filed a motion to dismiss plaintiff's civil rights action based upon their allegation that plaintiff had "three strikes" pursuant to 28 U.S.C. § 1915(g), and therefore, should not be entitled to proceed *in forma pauperis.* (Dkt. No. 75). Plaintiff responded (Dkt. No. 78) and defendants filed a reply. (Dkt. No. 79). On December 6, 2011, this court recommended that defendants' motion to dismiss be granted, unless a filing fee was paid by plaintiff. (Dkt. No. 83). This recommendation was adopted by the District Court on January 23, 2012. (Dkt. No. 85). On January 25, 2012, plaintiff appealed to the United States Court

of Appeals for the Second Circuit (Dkt. No. 86), which reversed the decision of the District Court on July 12, 2013. (Dkt.90).

**\*6** Now, upon completion of discovery, all defendants move for summary judgment regarding plaintiff's claims for monetary relief against the defendants in their "official capacities," and against all injunctive relief, due to plaintiff's subsequent transfer to a different prison. Certain defendants also move for summary judgment as to all or some of the claims against them in their individual capacities.

### C. Deficiencies in Plaintiff's Opposition Papers

As required under L.R. 7.1, defendants have filed a Statement of Material Facts. (Dkt. No. 124.) Although plaintiff has responded to the Statement of Material Facts filed by Defendants (Dkt. No. 131), he has failed to do so in the manner required under L.R. 7.1(a)(3). Under this rule, the opposing party's response to the movant's statement of material facts "shall mirror the movant's Statement of Material Facts by admitting and/or denying each of the movant's assertions in matching numbered paragraphs. Each denial shall set forth a specific citation to the record where the factual issue arises." Although plaintiff has admitted or denied many of the defendants' assertions and has submitted two volumes of exhibits in support of his response, his Response to the Statement of Material Facts is inconsistent with L.R. 7.1.

Where, as in this case, a party has failed to respond to the movant's statement of material facts in the manner required under L.R. 7.1(a)(3), the local rule provides that facts in the movant's statement will be accepted as true (1) to the extent they are supported by evidence in the record, and (2) the nonmovant, if proceeding pro se, has been specifically advised of the possible consequences of failing to respond to the motion. *See Champion v. Artuz,* 76 F.3d 483, 486 (2d Cir.1996). However, the Second Circuit, acknowledging a court's broad discretion to determine whether to overlook a failure to comply with local rules, has held that "while a court is not required to consider what the parties fail to point out in their [local rule statements of material facts], it may in its discretion opt to conduct an assiduous review of the entire record even where one of the parties has failed to file such a statement." *Holtz v. Rockefeller & Co., Inc.,* 258 F.3d 62, 73 (2d Cir.2001) (citation and internal quotation marks omitted). In deference to plaintiff's pro se status and

his attempt, albeit inadequate, to respond to defendants' statement of material facts, the court has opted to review the entire summary judgment record.

### DISCUSSION

### I. Summary Judgment–Applicable Law

Summary judgment is appropriate where there exists no genuine issue of material fact and, based on the undisputed facts, the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56; *Salahuddin v. Goord,* 467 F.3d 263, 272–73 (2d Cir.2006). "Only disputes over ["material"] facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby,* 477 U.S. 242, 248 (1986). It must be apparent that no rational finder of fact could find in favor of the non-moving party for a court to grant a motion for summary judgment. *Gallo v. Prudential Residential Servs.,* 22 F.3d 1219, 1224 (2d Cir.1994).

**\*7** The moving party has the burden to show the absence of disputed material facts by informing the court of portions of pleadings, depositions, and affidavits which support the motion. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). If the moving party satisfies its burden, the nonmoving party must move forward with specific facts showing that there is a genuine issue for trial. *Salahuddin v. Goord,* 467 F.3d at 273. In that context, the non-moving party must do more than "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986). However, in determining whether there is a genuine issue of material fact, a court must resolve all ambiguities, and draw all inferences, against the movant. *See United States v. Diebold, Inc .,* 369 U.S. 654, 655 (1962); *Salahuddin v. Goord,* 467 F.3d at 272.

"[I]n a pro se case, the court must view the submissions by a more lenient standard than that accorded to "formal pleadings drafted by lawyers." *Govan v. Campbell,* 289 F.Supp.2d 289, 295 (N.D.N.Y.2007) (citing, *inter alia, Burgos v. Hopkins,* 14 F .3d 787, 790 (2d Cir.1994) (a court is to read a pro se party's "supporting papers liberally, and ... interpret them to raise the strongest arguments that they suggest")). "However, a pro se party's 'bald assertion,' completely unsupported by evidence, is not sufficient to overcome a motion for summary judgment."

*Lee v. Coughlin,* 902 F.Supp. 424, 429 (S.D.N.Y.1995) (citing *Carey v. Crescenzi,* 923 F.2d 18, 21 (2d Cir.1991)).

### II. Mootness/Injunctive Relief

#### A. Legal Standards

A case is moot, and the court has no jurisdiction when the "parties lack a legally cognizable interest in the outcome." *Powell v. McCormack,* 395 U.S. 486, 496 (1969). Federal courts are without power to decide questions that cannot affect the rights of the parties in the case before the court. *See Swaby v. Ashcroft,* 357 F.3d 156, 159–160 (2d Cir.2004) (petitioner's injury must be traceable to respondent and likely to be redressed by a favorable judicial decision). The plaintiff must have a "personal stake" in the litigation. *Fox v. Board of Trustees of the State University of New York,* 42 F.3d 135, 140 (2d Cir.1994).

The Second Circuit has held that an inmate's request for prospective injunctive relief against correctional staff or conditions of confinement at a particular correctional institution becomes moot when the inmate is discharged or transferred to a different correctional institution. *See, e.g., Day v. Chaplin,* 354 F. App'x 472, 473 (2d Cir.2009) (citing *Mawhinney v. Henderson,* 542 F.2d 1, 2 (2d Cir.1976)); *Prins v. Coughlin,* 76 F.3d 504, 506 (2d Cir.1996) (citations omitted). There is an exception to the mootness doctrine for challenged actions that are "capable of repetition, yet evading review." *See Murphy v. Hunt,* 455 U.S. 478, 482 (1982). This exception will be applied—provided the action is not a class-action lawsuit-if "(1) the challenged action was in its duration too short to be fully litigated prior to its cessation or expiration, and (2) there [i]s a reasonable expectation that the same complaining party would be subjected to the same action again." *Id.* (quoting *Weinstein v. Bradford,* 423 U.S. 147, 149 (1975)); *Muhammad v. City of New York Dep't of Corr.,* 126 F.3d 119, 123 (2d Cir.1997). Transfer of an inmate does not moot monetary damage claims. *See Young v. Coughlin,* 866 F.2d 567, 568 n. 1 (2d Cir.1989).

#### B. Analysis–All Defendants

**\*8** Plaintiff was transferred from Eastern to Clinton Correctional Facility ("Clinton") on or about July 2009 [4]. (Dkt. No. 131, Pl.'s Resp. to Def.'s Stmt. of Mat. Fact at 17, ¶ 70). In this proceeding, commenced September 11, 2009, plaintiff seeks injunctive relief consisting of the

following: (1) a low sodium Kosher diet; (2) two hot Kosher meals per day; (3) a special mattress to relieve his back pain; (4) a chair for his cell; (5) knee braces; (6) and (7) exclusion from double bunk cells. (Compl.¶ 13).

[4]   Plaintiff has been transferred at least once more, and is currently housed in Sing Sing Correctional Facility. (Dkt. No. 124–5, Sheehan Aff. Ex. A).

Plaintiff does not allege that any of the alleged violations continued after he was transferred, and states that some of the disputes have been resolved. For example, plaintiff challenges the confiscation of his knee braces while in the Eastern SHU, and notes that he was allowed to wear knee braces after being transferred to the Clinton SHU. (Pl.'s Resp. to Def.'s Stmt. of Mat. Fact at 17, ¶ 70). None of the other claims rise to the level of "disputes which are capable of repetition and evading review," particularly now that plaintiff is no longer in DOCCS custody. [5] Therefore, the court will recommend granting summary judgment on all plaintiff's claims for injunctive relief.

[5]   Plaintiff's religious freedom claims are those with the greatest potential for repetition, but plaintiff does not assert that the alleged violations are ongoing. Moreover, for the reasons discussed below plaintiff has failed to state a claim for which relief can be granted on either First Amendment or RLUIPA grounds.

## III. Eleventh Amendment–Official Capacity Monetary Damage Claims

### A. Legal Standards

The state itself cannot be sued under section 1983. *Komlosi v. New York State OMRDD,* 64 F.3d 810, 815 (2d Cir.1995) (citing *Will v. Michigan Department of Police,* 491 U.S. 58, 71 (1989)). This is true whether the court is considering Eleventh Amendment immunity or a statutory interpretation of section 1983. *Id.* at 815 n. 3. An action against state officers in their official capacities is tantamount to an action against the state. *Yorktown Medical Laboratory, Inc. v. Perales,* 948 F.2d 84, 87 & n. 1 (2d Cir.1991) (citations omitted).

### B. Analysis–All Defendants

Plaintiff states that he is suing defendants in their individual and official capacities. (Compl.¶ 10–b). In this motion, defendants correctly argue that to the extent that

plaintiff is attempting to sue them for damages in their official capacities or to the extent that his complaint can be interpreted as raising such official capacity claims, he is barred by the Eleventh Amendment from doing so. (Dkt. No. 124–8, Def.'s Mem. of Law at 14–15). Accordingly, this court recommends that defendants' motion for summary judgment be granted insofar as all monetary claims raised by plaintiff against the defendants in their official capacity be dismissed with prejudice. Monetary claims against defendants in their individual capacities will survive, to the extent that summary judgment or dismissal is not recommended on other grounds.

## IV. Personal Involvement/Respondeat Superior

### A. Legal Standards

Personal involvement is a prerequisite to the assessment of damages in a section 1983 case, and *respondeat superior* is an inappropriate theory of liability for any constitutional claim. *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994); *Richardson v. Goord,* 347 F.3d 431, 435 (2d Cir.2003). "The personal involvement of a supervisory defendant may be shown by evidence that: (1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring." *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995) (citing, *inter alia, Williams v. Smith,* 781 F.2d 319, 323–24 (2d Cir.1986)). [6]

[6]   Many courts in this Circuit have discussed whether all of the personal involvement factors, set forth in *Colon,* are still viable after *Ashcroft v. Iqbal,* 556 U.S. 662, 676 (2009). *See, e.g., Conklin v. County of Suffolk,* 859 F.Supp.2d 415, 439 (E.D.N.Y.2012) (discussing cases). However, the court in *Conklin* ultimately determined that it was unclear whether *Colon* had been overruled or limited, and continued to apply the factors outlined in *Colon. Id.* In making this determination, the court in *Conklin* stated that "it remains the case that 'there is no controversy

that allegations that do not satisfy any of the *Colon* prongs are insufficient to state a claim against a defendant-supervisor.' " *Id.* (quoting *Aguilar v. Immigration Customs Enforcement Div. of the U.S. Dep't of Homeland Sec.,* 811 F.Supp.2d 803, 815 (S.D.N.Y.2011)). *See also Young v. Choinski,* 15 F.Supp.3d 172, No. 3:10–CV–606, 2014 WL 962237, at *10–12 (D.Conn. Mar. 13, 2014) ("Although *Iqbal* does arguably cast doubt on the viability of certain categories of supervisory liability, where the Second Circuit has not revisited the criteria for supervisory liability, this Court will continue to recognize and apply the *Colon* factors.").

### B. Analysis–Fischer

**\*9** Plaintiff alleges that defendant Fischer failed to adequately train DOCCS staff and establish policies that would prevent the constitutional violations alleged in the complaint. Defendants argue that plaintiff has failed to allege sufficient personal involvement of defendant Fischer. Defendant Fischer was the Commissioner of DOCCS at the time that the complaint was filed. Defendant Fischer delegated the day-to-day operations of the various correctional facilities to his staff. (Dkt. No. 124–6, Sheehan Aff., Ex. B, Fischer's Resp. to Inter.). Fischer's office was in Albany, not in any of the individual DOCCS facilities. (*Id.*) Fischer has denied any knowledge related to any of plaintiff's claims. (*Id.*). Without more, plaintiff has failed to establish that defendant Fischer was even aware of any of plaintiff's concerns or any lapses in policy. Plaintiff's conclusory allegations are not adequate to establish Fischer's personal involvement. Accordingly, the court recommends that summary judgment be granted to defendant Fischer as to all causes of action.

### V. Eighth Amendment Claims

#### A. Legal Standards

The Eighth Amendment protects prisoners from "cruel and unusual punishment" in the form of "unnecessary and wanton infliction of pain" at the hands of prison officials. *Wilson v. Seiter,* 501 U.S. 294, 297 (1991); *Estelle v. Gamble,* 429 U.S. 97, 104 (1976). The constitutional prohibition against cruel and unusual punishment includes the right to be free from conditions of confinement that impose an excessive risk to an inmate's health or safety. *Farmer v. Brennan,* 511 U.S. 825, 837 (1994); *Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994). To establish an Eighth Amendment claim based on unsafe or medically inappropriate living conditions, a

plaintiff must establish that (1) he was incarcerated under conditions which posed a substantial risk of serious harm, and (2) prison officials acted with deliberate indifference to his health or safety. *See Farmer,* 511 U.S. at 834.

"The deliberate indifference standard embodies both an objective and a subjective prong." *Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994). Under the objective standard, a plaintiff must allege a deprivation "sufficiently serious" to constitute a constitutional violation. *Hathaway,* 37 F.3d at 66 (quoting *Wilson v. Seiter,* 501 U.S. at 298). "Because society does not expect or intend prison conditions to be comfortable, only extreme deprivations are sufficient to sustain a 'conditions-of-confinement' claim." *Blyden v. Mancusi,* 186 F.3d 252, 263 (2d Cir.1999) (citing *Hudson v. McMillan,* 503 U.S. 1, 9 (1992) (only those deprivations denying "the minimal civilized measures of life's necessities" are sufficiently serious to form the basis of an Eighth Amendment violation) (internal quotations and citations omitted).

The subjective element of the Eighth Amendment analysis focuses on whether the defendant official acted with "a sufficiently culpable state of mind." *Salahuddin v. Goord,* 467 F.3d 263, 280 (2d Cir.2006) (citing *Wilson v. Seiter,* 501 U.S. at 300). "Deliberate indifference" requires more than negligence, but less than conduct undertaken for the very purpose of causing harm. *Farmer,* 511 U.S. at 835. In order for a prison official to act with deliberate indifference, he must know of and disregard an excessive risk to an inmate's health or safety. *Hathaway,* 37 F.3d at 66. The official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference. *Id.*

**\*10** In regards to prison medical care, a plaintiff's disagreement with prescribed treatment does not rise to the level of a constitutional claim. *Sonds v. St. Barnabas Hosp. Correctional Health Services,* 151 F.Supp.2d 303, 311 (S.D.N.Y.2001). Prison officials have broad discretion in determining the nature and character of medical treatment afforded to inmates. *Id.* (citations omitted). An inmate does not have the right to treatment of his choice. *Dean v. Coughlin,* 804 F.2d 207, 215 (2d Cir.1986). The fact that plaintiff might have preferred an alternative treatment or believes that he did not get the medical attention he desired does not rise to the level of a constitutional violation. *Id.*

It is well established that disagreements over medications, diagnostic techniques, forms of treatment, the need for specialists, and the timing of their intervention implicate medical judgments and not the Eighth Amendment. *Sonds,* 151 F.Supp.2d at 312 (citing *Estelle,* 429 U.S. at 107). Even if those medical judgments amount to negligence or malpractice, malpractice does not become a constitutional violation simply because the plaintiff is an inmate. *Id. See also Daniels v. Williams,* 474 U.S. 327, 332 (1986) (negligence not actionable under Section 1983). Thus, any claims of malpractice, or disagreement with treatment are not actionable under Section 1983.

### B. Deliberate Medical Indifference

#### 1. Shawangunk

#### a. Relevant Facts

Plaintiff claims that upon his return to Shawangunk after back surgery, Dr. Maryann Genovese, M.D. confiscated a special back brace provided by plaintiff's back surgeon and denied plaintiff's requests for its return. (Compl.¶ 6–e). Plaintiff also requested that if defendant Genovese could not provide his back brace, that she prescribe a chair for his cell and/or a special mattress with greater back support than the standard prison issue mattress. (Compl.¶¶ 6–f, 6–h). Genovese denied all these requests, and plaintiff's grievances were unsuccessful. (Compl.¶¶ 6t–6y). In connection with this dispute with Dr. Genovese, plaintiff claims to have spoken with Shawangunk Superintendent Joseph Smith, requesting the return of his back brace, and/or the addition of a special mattress or a chair to his cell. (Compl.¶ 6–j). According to plaintiff, Smith stated that the issue "should be addressed with the medical department." (*Id.*). Smith also allegedly stated that "he had nothing to do with the medical department and a special mattress, chair and back brace was not a security issue" but that "he would look into the problem." (*Id.*). In plaintiff's response to the Statement of Material Facts, he also notes that Smith denied his grievance at Shawangunk requesting the special mattress, although this allegation does not appear in his complaint. (Dkt. No 131, Pl.'s Resp. to Def.'s Stmt. of Mat. Fact p. 8, ¶ 19; Dkt. No. 131–3, Pl.'s Ex. O).

Plaintiff claims that his back pain became so extreme that he could not get a full night's sleep, and woke up with stiffness and numbness. (Compl.¶ 6–q). On August 21, 2007, plaintiff filed a grievance requesting that he be provided with a special mattress and chair for his cell. (Dkt. No. 131, Pl.'s Exhibit O). The grievance was denied, and plaintiff exhausted his administrative remedies. Plaintiff filed this complaint, claiming that the actions of Genovese and Smith constituted deliberate medical indifference and cruel and unusual punishment under the Eighth Amendment. Plaintiff also named Catherine Wells, a Shawangunk administrative nurse and Pedro Diaz, a Regional Health Service Administrator based in Albany, New York, as defendants for their involvement during the administrative grievance process. (Dkt. No. 131, Pl.'s Ex. O and R).

#### b. Analysis–Defendant Smith

**\*11** Only defendant Smith moves for summary judgment as to the medical indifference claim arising from the refusal to allow plaintiff a back brace, special mattress, or chair while in Shawangunk. Defendant Smith alleges that he was informed of plaintiff's back problems, but deferred to the medical department. (Def.'s Mem. of Law at 10). Beyond mere speculation, plaintiff does not allege that defendant Smith had any authority to override the medical determinations of Dr. Genovese. *See Cuoco v. Moritsugu,* 222 F.3d 99, 111 (2d Cir.2000) (the failure of non-doctors at a prison to intercede in the medical treatment of an inmate is not unreasonable, because they lack the authority to intervene in medical decisions). Moreover, Smith's alleged statement that he would "look into it" is not by itself, a demonstration of personal involvement. *See Garrido v. Coughlin,* 716 F.Supp. 98, 100 (S.D .N.Y.1989); *Parks v. Smith,* No. 08–CV–586, 2011 WL 4055415, at \*14 (N.D.N.Y. Mar. 29, 2011) (Rep't–Rec.), *adopted,* 2011 WL 4055414 (N.D.N.Y. Sept. 12, 2011). The fact that Smith issued an unfavorable grievance report on this claim, which plaintiff raised for the first time in opposition to this motion, does not change the outcome. Smith's denial of plaintiff's grievance expressly relied on the medical determination of Dr. Genovese and does not give rise to a constitutional claim. (Dkt. No. 131–3, Pl's Ex. O). *See Brock v. Wright,* 315 F.3d 158, 164 (2d Cir.2003) (prison superintendent with no medical training who deferred completely to a prison doctor in ruling on a grievance regarding medical care, while perhaps negligent, was not "deliberately indifferent"). Therefore, the court recommends that defendant Smith's motion for summary judgment on the medical indifference claim in plaintiff's First Cause of Action be granted.

## 2. Eastern

### a. Relevant Facts

On May 13, 2009, plaintiff was transferred to Eastern. (Compl.¶ 8–j). Defendant Steven Schoonmaker, a Correctional Officer, escorted plaintiff along with several other prisoners to their respective cells. (*Id.*). When Schoonmaker directed plaintiff to the top bunk of a double-bunk cell, plaintiff told him that "he could not be placed in a double-bunk cell, especially on the top bunk because of his back injury and bad knees." (*Id.*). Defendant Schoonmaker repeated the order to go into the assigned cell, and plaintiff "stated that he would not go into the cell because of his back injuries and bad knees, and to do so would put his health in jeopardy." (Compl.¶ 8–k), Plaintiff was ticketed for misbehavior and escorted to SHU. (*Id.*).

Plaintiff alleges that the order to enter the double-bunk cell, and the assignment to a top bunk, constituted cruel and unusual punishment. (Compl.¶ 8–k). Plaintiff also alleges that the assignment was precipitated by the deliberate medical indifference of Defendants Thomas Griffin and Olga Khramova of Shawangunk, who completed the screening forms allowing plaintiff to be placed into a double-bunk cell. (Compl.¶ 8–I). Plaintiff contends that this contradicted a 2001 Shawangunk medical evaluation form which indicated that plaintiff's medical history required assignment to a bottom bunk bed. (Compl. ¶ 9–e; Dkt. No. 131–3, Pl.'s Ex. D).

**\*12** On June 2, 2009, plaintiff went to his scheduled medical appointment with defendant Dr. Mikhail Gusman, where plaintiff requested a medical permit to exempt him from placement in a double-bunk cell. (Compl.¶ 9–j). After a physical examination, defendant Gusman would only issue a permit to limit plaintiff to a bottom bunk. (Compl.¶ 9–I). Plaintiff also requested a special mattress to accommodate his back pain, and the return of his knee braces, which had been confiscated during his placement in SHU. (Compl.¶ 9–m). Defendant Gusman refused both requests, but advised that plaintiff's knee braces would be returned once he was released from SHU. (*Id.*).

Plaintiff alleges that defendant Gusman's actions constitute deliberate medical indifference, in violation of the Eighth Amendment. Defendant Gusman has moved for summary judgment, arguing that plaintiff's request to

be exempted from a double cell is unconnected to his back problems, that plaintiff's knee braces were confiscated for security reasons while plaintiff was in SHU, and that plaintiff's allegations amount to non-actionable disagreements about medical care. (Def.'s Mem. of Law at 10–11).

### b. Analysis–Griffin, Khramova, and Schoonmaker

Plaintiff alleges that defendants Griffin and Khramova completed screening sheets which allowed plaintiff to be assigned to a top bunk, despite the attendant difficulties associated with his back problem. (Compl.¶ 8–I). At times, plaintiff's complaint also alleges that the mere assignment to a double bunk cell violated his constitutional rights. (Dkt. No 131, Pl.'s Resp. to Def.'s Stmt. of Mat. Fact p. 16, ¶ 62). Based on the evidence before the court, it appears that plaintiff's condition was sufficiently serious to warrant assignment to a bottom bunk in 2001 (prior to back surgery) at Shawangunk and after his July 2009 medical evaluation at Eastern. (Dkt. No. 131–2, Pl.'s Ex. 1–X; Dkt. No. 131–3, Pl.'s Ex. D). Thus, reading the facts presented by the plaintiff in the most favorable light, the court will assume for purposes of this motion that the potential aggravation of plaintiff's back problems constituted a "sufficiently serious" medical impairment.

However, the Court finds no record evidence from which a rational trier of fact could conclude that defendants Griffin, Khramova, and Schoonmaker's failure to assign plaintiff a bottom bunk was, at worst, anything more than carelessness or negligence. *See Felix Torres v. Graham,* 687 F.Supp.2d 38, 53 (N.D.N.Y.2009). Negligently failing to assign an inmate to a lower bunk does not satisfy the subjective element of the legal standard governing claims of deliberate indifference to a serious medical need under the Eighth Amendment. *See Goodson v. Willard Drug Treatment Campus,* 615 F.Supp.2d 100, 102 (W.D.N.Y.2009) ("[E]ven if there were sufficient evidence upon which a factfinder could reasonably conclude that defendants were negligent in assigning plaintiff to a top bunk (and I do not believe that there is), that too would be insufficient."); *Faison v. Janicki,* No. 03–CV–647, 2007 WL 529310, at *2–3 (W.D.N.Y. Feb. 14, 2007) ("[E]ven assuming that Dr. Barranos's rescission of plaintiff's bottom-bunk permit amounted to a serious deprivation of his constitutional rights-which is doubtful-there is no evidence that Dr. Barranos acted with a culpable state of mind [where the plaintiff admitted in his deposition that the basis of his claim against Dr. Barranos was

'medical negligence]."); *Connors v. Heywright,* No. 02–CV–9988, 2003 WL 21087886, at *3 (S.D.N.Y. May 12, 2003) (dismissing prisoner's claim that defendants were "negligent to [his] medical needs" in that they, inter alia, placed him in a top bunk despite the fact that he had a "mandatory lower bunk slip").

**\*13** Plaintiff points to the inconsistency between the 2001 Shawangunk screening sheet, which limited plaintiff to a bottom bunk, and the 2009 screening sheet, which did not, as proof that Griffin ignored or failed to review plaintiff's medical history when completing the form. (Compl.¶ 8–I). However, plaintiff makes no showing that Griffin knew and disregarded an excessive risk to plaintiff's safety. As to Khramova, plaintiff likewise concludes, without proof, that she must have ignored his medical history before completing her form. (*Id.*). Plaintiff offers nothing to support his notion, and mere speculation is insufficient to overcome a summary judgment motion. *Bennett v. Goord,* No. 06–3818–pr, 2008 WL 5083122, at *2 (2d Cir. Dec. 2, 2008) (citing *inter alia McPherson v. N.Y. City Dep't of Educ.,* 457 F.3d 211, 215 (2d Cir.2006) (speculation alone is insufficient to defeat a motion for summary judgment)). As to Schoonmaker, plaintiff offers no proof that Schoonmaker had any indication of plaintiff's medical history or did anything more than escort plaintiff to his assigned cell.

Even taking the facts in the light most favorable to the plaintiff, the actions of the moving defendants do not support a constitutional claim. Accordingly, the court recommends that defendants Griffin, Khramova, and Schoonmaker's motion for summary judgment on plaintiff's Third Cause of Action be granted.

#### c. Analysis–Defendant Gusman

Defendant Gusman evaluated plaintiff after his transfer to Eastern, and considered plaintiff's requests to be excluded from double bunk cells, to be issued a special mattress due to his back pain, and to be allowed to wear knee braces while being held in SHU. (Compl.¶ 9–k–9–m). Defendant Gusman denied each of these requests, but did restrict plaintiff to a bottom bunk, consistent with his previous celling situation at Eastern. (Compl.¶ 9–i). The exhibits show that Dr. Gusman provided significant medical treatment while plaintiff was in SHU, including knee x-rays. (Dkt. No. 131–3, Pl.'s Ex. B). Plaintiff's allegations against Gusman amount to nothing more than a dispute over what further medical treatment was

appropriate. The fact that plaintiff was ultimately allowed to wear his knee braces after being transferred to a different facility has no bearing on the legitimacy of Gusman's treatment. *Gillespie v. New York State Dept. of Correctional Services,* No. 9:08–CV–1339 (TJM/ATB), 2010 WL 1006634, at *6, (N.D .N.Y. Feb. 22, 2010) (citing cases) (Rep't–Rec.), *adopted,* 2010 WL 1006643 (N.D.N.Y. Mar 19, 2010) ("The mere fact that [DOCCS] physicians in other facilities may have previously provided plaintiff with some of the treatments and accommodations he demanded at [Clinton] does not render the medical decisions of [N.P. Lashway] 'deliberate indifference.'"). Even if those medical judgments rose to negligence or malpractice, malpractice does not become a constitutional violation simply because the plaintiff is an inmate. *Sonds,* 151 F.Supp.2d at 312. Moreover, plaintiff's own exhibits do not show an existing permit for knee braces for the May to June 2009 time period at issue [7]. Therefore, the court recommends that defendant Gusman be granted summary judgment as to plaintiff's Fourth Cause of Action.

[7] Plaintiff has included with his response to this summary judgment motion "medical equipment passes" for "neoprene knee sleeves" for the periods July 23, 2003 to July 23, 2004; December 21, 2004 to March 21, 2005; June 3, 2006 to January 3, 2007; January 29, 2007 to July 29, 2007; August 29, 2007 to March 1, 2008; February 29, 2008 to August 29, 2008; and August 21, 2008 to February 21, 2009. (Dkt. No. 131–2, Pl.'s Ex. 1V through 1Y.

#### C. Conditions of Confinement (Eastern)—SHU Lighting

##### 1. Relevant Facts

**\*14** While in SHU, plaintiff alleges that his cell had a night light which "was directly overhead and was so bright that it was impossible to sleep the entire time he was in Eastern SHU." (Compl.¶ 9–a). During his confinement in SHU, plaintiff spoke with defendants William Brown and Thomas Griffin, who were making rounds, and complained "that the night light was to [sic] bright and that he could not sleep ..." and that "the light was so bright that he could read a book, and he had not had a full night's sleep since he [had] been [in] SHU." (Compl.¶ 9–f). In response to Brown's suggestion that plaintiff should put something over his eyes, plaintiff said that "he had tried that but every time he turn[ed] over it would come off and he would wake up." (*Id.*).

Plaintiff's June 5, 2009 grievance, in which he requested that the night light be turned off at night so that he could sleep, was denied, and his appeal was unsuccessful. (Dkt. No. 131–2, Pl.'s Ex. 1U). In this action, Plaintiff alleged that the sleep deprivation caused by the night light in the Eastern SHU constituted cruel and unusual punishment, and named Brown and Griffin as defendants.

### 2. Analysis—Brown and Griffin

"[S]leep is critical to human existence, and conditions that prevent sleep have been held to violate the Eighth Amendment." *Walker v. Schult,* 717 F.3d 119, 126 (2d Cir.2013) (citing, *inter alia, Tafari v. McCarthy,* 714 F.Supp.2d 317, 367 (N.D.N.Y.2010)) ("Courts have previously recognized that sleep constitutes a basic human need and conditions that prevent sleep violate an inmate's constitutional rights."). "Requiring inmates to live in constant illumination can ..., under certain circumstances, rise to the level of an Eighth Amendment violation." *Jones v. Rock,* No. 9:12–CV–447 (NAM/TWD), 2013 WL 4804500, *10 (N.D.N.Y. Sept. 6, 2013) (citing, *inter alia, Keenan v. Hall,* 83 F.3d 1083, 1090–91 (9th Cir.1996) (an allegation that large fluorescent lights directly in front of and behind an inmate's cell that shown into his cell twenty-four hours a day, causing him grave sleeping problems and other mental and psychological problems stated a claim of cruel and unusual punishment that could withstand a motion for summary judgment). *See also Holmes v. Grant,* No. 03–CV–3426, 2006 WL 851753, at *3, 11–12 (S.D.N.Y. Mar. 31, 2006) (denying motion to dismiss plaintiff's claim that 24–hour illumination of the SHU during his 35 days of confinement caused fatigue, loss of appetite, migraine headaches, and other physical and mental problems because, as alleged, it would sustain both the objective and the subjective prongs of an Eighth Amendment analysis) (collecting cases).

The decisions evaluating Eighth Amendment claims based on continuous lighting in the prison setting are very "fact-driven," turning on the degree of illumination, the duration of the inmate's exposure, the extent of harm it causes, and the penological justification for the lighting. [8] *Booker v. Maly,* No. 9:12–CV–246 (NAM/ATB), 2014 WL 1289579, at *18 (N.D.N.Y. Mar. 31, 2014) (citing, *inter alia, McGee v. Gold,* No. 1:04–CV–335, 2010 WL 5300805, at *5 (D.Vt. Aug. 3, 2010) (Rep't–Rec.), *adopted, sub nom. McGee v. Pallito,* 2010 WL 5389996 (D.Vt. Dec. 20, 2010), *vacated and remanded on other grounds sub*

*nom. Kimber v. Tallon,* 556 F. App'x 27 (2d Cir.2014); *Chappell v. Mandeville,* 706 F.3d 1052, 1058–59 (9th Cir.2013) (comparing cases). Taking these factors into consideration, and resolving all ambiguities and drawing all reasonable inferences in favor of the plaintiff, the court recommends granting defendant's motion for summary judgment on plaintiff's cause of action for cruel and unusual punishment related to the illumination of the SHU.

[8]   The Ninth Circuit has noted:

The precise role of legitimate penological interests is not entirely clear in the context of an Eighth Amendment challenge to conditions of confinement. The Supreme Court has written that the test of *Turner v. Safley,* 482 U.S. 78 ... (1987), which requires only a reasonable relationship to a legitimate penological interest to justify prison regulations, does not apply to Eighth Amendment claims. *Johnson v. California,* 543 U.S. 499, 511 ... (2005) ("[W]e have not used *Turner* to evaluate Eighth Amendment claims of cruel and unusual punishment in prison....) ... The existence of a legitimate penological justification has, however, been used in considering whether adverse treatment is sufficiently gratuitous to constitute punishment for Eighth Amendment purposes. *See Rhodes v. Chapman,* 452 U.S. 337, 346 ... (1981) ("Among 'unnecessary and wanton' inflictions of pain are those that are 'totally without penological justification.' ")

*Grenning v. Miller–Stout,* 739 F.3d 1235, 1240 (9th Cir.2014) (some citations omitted). Other courts which have considered penological justification in the context of claims involving continuous prison lighting have related it to the subjective prong of the Eighth Amendment analysis. *See, e.g., Chavarria v. Stacks,* 102 F. App'x 433, 436 (5th Cir.2004) (plaintiff cannot establish the subjective element of an Eighth Amendment violation because he cannot show that his deprivation is unnecessary and wanton, given the security-related justification for the lighting policy in the administrative segregation area).

**\*15** Defendant has offered evidence that the night light currently used in the Eastern SHU is 13 watts, but the declarant, the current Deputy Superintendent for Security at Eastern; did not offer any objective evidence that the light in plaintiff's cell in 2009 was actually 13 watts. (Dkt. No. 124–3, Wilkins Decl. ¶

6). However, even if brighter than 13 watts, constant illumination of the SHU cell does not necessarily violate the Eighth Amendment. See *Vasquez v. Frank,* 290 F. App'x 927, 929 (7th Cir.2008) (24–hour lighting involving a single, 9–watt fluorescent bulb does not constitute an "extreme deprivation."); *McBride v. Frank,* No. 05C1058, 2009 WL 2591618, at *5 (E.D.Wis.Aug.21, 2009) (constant illumination from a 9–watt fluorescent bulb does not objectively deny "the minimal civilized measure of life's necessities."); *Wills v. Terhune,* 404 F.Supp.2d 1226, 1230–31 (E.D.Cal.2005) (holding that 24–hour illumination by 13–watt bulb was not objectively unconstitutional); *Pawelski v. Cooke,* No. 90–C–949– C, 1991 WL 403181, at *4 (W.D.Wis. July 18, 1991) ("Having a single 40 watt light bulb on 24 hours a day for security purposes amounts to no more than an inconvenience to the segregation inmates."), *aff'd,* 972 F.2d 352 (7th Cir.1992) (table). Plaintiff disputes defendants' description of the night light but states only that it was bright enough to "read a book." (Complaint 9–f). Plaintiff also admits that he could cover his eyes and fall asleep, but would wake up when he would turn over and the cover would come off. (*Id.*). Cf. *Quick v. Graham,* No. 9:12–CV–1717, 2014 WL 4627108 (N.D.N.Y.2014) (denying summary judgment motion where plaintiff claimed that cell lights were never dimmed at night); *Keenan,* 83 F.3d 1083, 1090–91 (lighting from "large fluorescent lights" was unconstitutional where plaintiff alleged that he "had no way of telling night or day").

Plaintiff was in the Eastern SHU for 48 days. (Wilkins Decl. ¶ 2). The relatively short duration that plaintiff was exposed to the uncomfortable illumination does not, on its face, compel summary judgment in favor of defendants. See *Holmes v. Grant,* No. 03–CV–3426, 2006 WL851753 (S.D.N.Y.2006) (where plaintiff alleged specific health problems resulting from twenty-four hour lighting during 35 day stay in SHU, he had adequately stated a constitutional claim). However,"[i]n order to succeed on a claim of illegal illumination, plaintiff must produce evidence that the constant illumination had harmful effects on his health beyond mere discomfort." *Vasquez v. Frank,* No. 05–C–528–C, 2007 WL 3254702, at *5 (W.D.Wis. Nov. 2, 2007); *see also Quick,* 2014 WL 4627108 at *8 (denying defendants' motion for summary judgment where plaintiff alleged that he suffered migraine headaches and delusions as a result of sleep deprivation); *Holmes,* 2006 WL851753 at *11 (denying motion to dismiss where plaintiff alleged that sleep deprivation caused fatigue, loss of appetite, migraine headaches, and other physical and mental problems). Plaintiff does not allege any health effects resulting from the alleged sleep deprivation that would rise to the severity necessary to trigger Eighth Amendment concerns. Instead, plaintiff only claims that he was unable to get a full night's sleep. (Compl. ¶ 9–f; Dkt. No. 131–2, Pl.'s Ex. 1U).

**\*16** Finally, defendants argue that the night lights serve a legitimate penological function. Both plaintiff and defendant agree that the SHU cell doors are solid doors with a small window measuring approximately either 8 inches by 10 inches, or 8 inches by 16 inches, and a "feed-up hatch" that is closed unless a meal is being served. (Wilkins Decl. ¶ 21; Pl.'s Resp. to Def.'s Stmt. of Mat. Fact at 3, ¶ 6). Given the limited visibility, defendants argue that the night lights provide the necessary illumination to allow security staff to see into the cell in order to protect both correctional facility staff and inmates from physical harm. (Wilkins Decl. ¶ 8). It is well-recognized that the ability to maintain the safety of inmates and the officers is a legitimate penological interest. *Booker v. Maly,* 2014 WL 1289579 at *19. Indeed, plaintiff does not challenge the security purpose of the light in his pleadings. [9]

[9]    In plaintiff's grievance, plaintiff argued that the security goals could be adequately met by equipping security guards with flashlights, but did not press that claim in this proceeding.

After consideration of the intensity of the nighttime lighting, the limited exposure of plaintiff during his stay in SHU, the lack of any identifiable health or other deleterious impacts from the illumination, and the legitimate penological interest in being able to monitor SHU inmates 24 hours a day, the court recommends granting defendants' motion for summary judgment as to the Eighth Amendment claim in the Fourth Cause of Action related to the SHU night light.

## V. Due Process/Right to Privacy (Eastern)

### A. Procedural Due Process

### 1. Relevant Facts

Plaintiff was ticketed for three violations arising from the refusal to enter the assigned cell: refusal to obey a direct order; interference with an employee; and failure to follow

facility regulations and staff directions. (Dkt. No. 124–7, Sheehan Aff., Ex. C, Disciplinary Hearing Certified Transcript at 4–5). Plaintiff's disciplinary hearing before defendant Captain Louis Pingotti of Eastern was held on May 16, 2009, May 19, 2009, and May 29, 2009. (Compl.¶¶ 9–b, 9–d, 9–g). The hearing was adjourned several times to allow for obtaining evidence and identifying potential witnesses. (Dkt. No. 124–7, Sheehan Aff., Ex. C, Disciplinary Hearing Certified Transcript). Plaintiff pled not guilty to the three charges. (Id. at 5). On the first day of the hearing, May 16, plaintiff raised an issue regarding the availability of his medical records, and the hearing was adjourned. (Id. at 9).

On May 19, 2009, the hearing re-opened and defendant Pingotti provided plaintiff with three documents related to his back condition. (Id. at 11–14). Each document was read into the record: a May 11, 2009 double cell information sheet completed by defendant Thomas Griffin; a May 13, 2009 screening of physical assessment form for placement in a double cell completed by defendant Olga Khramova; and a December 6, 2001 screening physical assessment and placement for a double cell form from Shawangunk. (Id.). Plaintiff had requested the first two documents. Pingotti requested the third document on his own, noting that he "wanted to make sure what your last facility said in case there was a contradiction." (Id. at 11). During the course of the hearing, plaintiff testified regarding his 2006 back surgery, 2008 physical therapy, and his physical therapist's exercise recommendations. (Dkt. No. 124–7, Sheehan Aff., Ex. C, Disciplinary Hearing Certified Transcript at 5, 14–22, 24–7).

**\*17** Following another adjournment, on May 29, 2009, plaintiff was allowed to call the doctor then on duty at Eastern, Dr. Bhavsar, as a witness. (Id. at 27–31). Dr. Bhavsar reviewed the various screening sheets and concluded that plaintiff should be assigned to a bottom bunk, but that double-bunking was appropriate. (Id. at 30). Dr. Bhavsar also stated that the screening sheets available upon plaintiff's transfer to Eastern did not indicate that a bottom bunk was required. (Id.). Dr. Bhavsar also scheduled plaintiff for a medical review. (Id. at 29).

Defendant Pingotti denied plaintiff's request to call his physical therapist as a witness. Pingotti explained the rationale for his decision-that the physical therapist had

no direct knowledge of the incident that led to the disciplinary hearing, and there was no dispute that the inmate had been given a list of exercises. (Id. at 23). Plaintiff also did not know the physical therapist's name. (Id. at 26).

Defendant Pingotti denied plaintiff's request that the disciplinary hearing be adjourned until plaintiff had received a medical checkup, and issued his decision on May 29, 2009. (Dkt. No. 124–7, Sheehan Aff., Ex. C, Disciplinary Hearing Certified Transcript at 35). Plaintiff was found guilty on all three charges, based upon defendant Schoonmaker's report and the evidence presented at the hearing. (Id.). The disposition of the hearing was confinement in SHU, loss of commissary, packages and phones for a period of three months, with a start date of March 13, 2009 [10] . (Id.).

[10]     Plaintiff stayed in the Eastern SHU until June 29, 2009, when he was transferred to Clinton. (Wilkins Decl. ¶ 2, Plaintiff's Ex. 1Y).

Plaintiff contends that defendant's Pingotti's handling of the disciplinary hearing, including his refusal to call all the requested witnesses, indicated bias and violated his right to due process. (Compl.¶ 9–i). Plaintiff also argues that defendant Pingotti's request for plaintiff's double cell information sheet from Shawangunk violated his right to privacy in his medical records. (Compl.¶ 9–d). In the present motion for summary judgment, defendant Pingotti argues that plaintiff received due process, and that the weight of the evidence supports his conclusion. (Def.'s Mem. of Law at 4–7). Defendant Pingotti also argues that plaintiff did not raise any objection to the retrieval of plaintiff's Double Cell Information Sheet from Shawangunk, and that the document was obtained solely to investigate plaintiff's claim that he could not be double-bunked because of his back problems. (Id. at 6).

### 2. Procedural Due Process–Legal Standards

In order to begin a due process analysis, the court first determines whether plaintiff had a protected liberty interest in remaining free from the confinement that he challenges and then determines whether the defendants deprived plaintiff of that liberty interest without due process. *Giano v. Selsky,* 238 F.3d 223, 225 (2d Cir.2001); *Bedoya v. Coughlin,* 91 F.3d 349, 351 (2d Cir.1996). In *Sandin v. Conner,* the Supreme Court held that although states may still create liberty interests protected by due

process, "these interests will be generally limited to freedom from restraint which, while not exceeding the sentence in such an unexpected manner as to give rise to protection by the Due Process Clause of its own force ..., nonetheless imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin v. Conner,* 515 U.S. 472, 483–84 (1995).

**\*18** The Second Circuit has explicitly avoided a bright line rule that a certain period of confinement in a segregated housing unit automatically gives rise to due process protection. *See Sims v. Artuz,* 230 F.3d 14, 23 (2d Cir.2000); *Colon v. Howard,* 215 F.3d 227, 234 (2d Cir.2000). Instead, cases in this circuit have created guidelines for use by district courts in determining whether a prisoner's liberty interest was infringed. *Palmer v. Richards,* 364 F.3d 60, 64–66 (2d Cir.2004). A confinement longer than an intermediate one, and under "normal SHU conditions" is "a sufficient departure from the ordinary incidents of prison life to require procedural due process protections under *Sandin.*" *Colon v. Howard,* 215 F.3d at 231 (finding that a prisoner's liberty interest was infringed by 305–day confinement). Shorter confinements under normal SHU conditions may not implicate a prisoner's liberty interest.

"SHU confinements of fewer than 101 days could constitute atypical and significant hardships if the conditions were more severe than the normal SHU conditions ... or a more fully developed record showed that even relatively brief confinements under normal SHU conditions were, in fact, atypical." *Palmer v. Richards,* 364 F.3d at 65 (citations omitted). In the absence of a detailed factual record, cases in this Circuit typically affirm dismissal of due process claims where the period of time spent in SHU was short–*e.g.,* 30 days–and there was no indication that the plaintiff endured unusual SHU conditions. *Id.* at 65–66 (collecting cases).

The due process protections afforded inmates facing disciplinary hearings that affect a liberty interest include advance written notice of the charges, a fair and impartial hearing officer, a hearing that affords the inmate the opportunity to call witnesses and present documentary evidence, and a written statement of the evidence upon which the hearing officer relied in making his determination. *Sira v. Morton,* 380 F.3d 57, 69 (2d Cir.2004) (citing, inter alia, *Wolff v. McDonnell,* 418 U.S. 539, 563–67 (1974)). The hearing officer's findings must

be supported by "some reliable evidence." *Id.* (citing, inter alia, *Superintendent v. Hill,* 472 U.S. 445, 455 (1985)).

### 3. Procedural Due Process–Analysis

Plaintiff was found guilty of three misbehavior charges in this case, and the penalty was three months in SHU, with loss of commissary, package and phone privileges. (Complaint ¶ 9–I). Plaintiff only served 48 days in the Eastern SHU before being transferred to Clinton. (Wilkins Decl. ¶ 2). At Eastern, plaintiff's only concerns about the condition of his confinement were the night light that kept him from getting a full night's sleep, and a restriction on wearing his knee braces due to security concerns. (Compl. ¶¶ 9–f, 9–m; Pl.'s Resp. to Def.'s Stmt. of Mat. Fact at 3, ¶ 6). The remainder of the penalty was served in Clinton SHU, and plaintiff has raised no concerns about conditions there. In fact, plaintiff has compared it favorably to Eastern SHU, noting that he was allowed to wear his knee braces in Clinton's SHU. (Pl.'s Resp. to Def.'s Stmt. of Mat. Fact at 17, ¶ 70).

**\*19** The ninety day period in SHU, and the 48 days spent under the disfavored conditions at Eastern, fall within the "short range" of disciplinary confinement. *See Tafari v. McCarthy,* 714 F.Supp.2d 317, 375 (N.D.N.Y.2010) (finding 30, 60, and 90 day SHU sentences within the short range of disciplinary sentences). Therefore, plaintiff's confinement in SHU implicates a liberty interest only if "the conditions were more severe than the normal SHU conditions." [11] *Palmer,* 364 F.3d at 64. "Factors relevant to determining whether the plaintiff endured an 'atypical and significant hardship' include 'the extent to which the conditions of the disciplinary segregation differ from other routine prison conditions' and 'the duration of the disciplinary segregation imposed compared to discretionary confinement.' " *Id.* (quoting *Wright v. Coughlin,* 132 F.3d 133, 136 (2d Cir.1998)). Plaintiff alleges that the SHU night light kept him from getting a full night's sleep, and that he was denied use of knee braces while in SHU. The court doubts that the constant illumination and the confiscation of knee braces, which applied to all inmates in the Eastern SHU, would qualify as "atypical and significant hardships" that, over a period of relatively limited confinement, would implicate a liberty interest. (*See* Wilkins Decl. Ex. A and B (policy documents noting that inmate property may be confiscated upon entry to SHU)). But even assuming that plaintiff's confinement in the Eastern SHU implicated

a liberty interest, he received adequate due process in connection with the disciplinary hearing.

11    "Normal" SHU conditions include being kept in solitary confinement for 23 hours per day, provided one hour of exercise in the prison yard per day, and permitted two showers per week. *Ortiz v. McBride,* 380 F.3d 649, 655 (2d Cir.2004).

A review of the record shows that plaintiff was afforded notice of the charges, a hearing, and the opportunity to present witnesses. Plaintiff also received a written reason for the disposition at the close of the hearing. (Dkt. No. 124–7, Sheehan Aff., Ex. C, Disciplinary Hearing Certified Transcript).

An inmate is entitled to a decision-maker who does not "prejudge the evidence and who cannot say ... how he would assess evidence he has not seen yet." *Allen v. Cuomo,* 100 F.3d 253, 259 (2d Cir.1996) (citing *inter alia Patterson v. Coughlin,* 905 F.2d 564, 570 (2d Cir.1990)); *Tellier v. Scott,* 94 Civ. 3459, 2004 WL 224499, at *8 (S.D.N.Y. Feb. 5, 2004) (citations omitted). However, prison hearing officers 'are not held to the same standard of neutrality as adjudicators in other contexts.' *Id.* (citing *inter alia Russell v. Selsky,* 35 F.3d 55, 60 (2d Cir.1994)).

The evidence presented demonstrates that the hearing officer was not biased and that plaintiff otherwise received adequate process. During the course of the hearing, defendant Pingotti adjourned the proceeding several times to allow plaintiff an opportunity to review documents or identify witnesses. (Dkt. No. 124–7, Sheehan Aff., Ex. C, Disciplinary Hearing Certified Transcript). A medical doctor was allowed to testify as to defendant's back condition, even after plaintiff had admitted to refusing to enter the assigned cell. (*Id.* at 27–31). The hearing office excluded one witness-an unidentified physical therapist who could allegedly testify as to the potential difficulty for plaintiff to perform back exercises in a double bunk cell-but defendant Pingotti did consider a chart depicting those exercises, and plaintiff's related testimony. (*Id* . at 14–18).

**\*20** Although due process includes a right to call witnesses, this right is not unfettered. *Alicea v. Howell,* 387 F.Supp.2d 227, 234 (W.D.N.Y.2005) (citing *Ponte v. Real,* 471 U.S. 491, 495 (1985)). A hearing officer does not violate due process by excluding irrelevant or unnecessary evidence or testimony. *Kawalinski v. Morse,* 201 F.3d 103, 109 (2d Cir.1999) (citing *Kingsley v. Bureau of Prisons,*

937 F.2d 26, 30 (2d Cir.1991)); *Chavis v. vonHagn,* No. 02–CV–119, 2009 WL 236060, at *62 (W.D.N.Y. Jan. 30, 2009) (citing *Kawalinski, supra* ). For constitutional due process purposes (assuming that a liberty interest existed), all that is required is "some" or "a modicum" of evidence supporting the disciplinary determination. *Superintendent v. Hill,* 472 U.S. 445, 455 (1985) (some evidence standard). Plaintiff in this case simply disagrees with defendant Pingotti's findings, which are supported by the evidence. Therefore, defendant Pingotti's motion for summary judgment as to plaintiff's allegations of a deprivation of due process in his Fourth Cause of Action should be granted, even assuming that plaintiff had demonstrated a liberty interest.

**B. Right to Privacy**

**1. Legal Standards**

In the United States Constitution, there exists a right to privacy, protecting an individual's interest in avoiding the disclosure of personal matters. *Doe v. City of New York,* 15 F.3d 264, 267 (2d Cir.1994) (citing *Whalen v. Roe,* 429 U.S. 589, 599 (1977)). This right is protected by the Due Process Clause. *O'Connor v. Pierson,* 426 F.3d 187, 201 (2d Cir.2005) (citing *Whalen,* 429 U.S. at 598–600). The right to privacy has also been "characterized as a right to 'confidentiality,' which 'includes the right to protection regarding information about the state of one's health.' " *Matson v. Bd. of Ed. of City School Dist. of New York,* 631 F.3d 57, 64 (2d Cir.2011) (quoting inter alia *Doe,* 15 F.3d at 267).

With respect to the "disclosure" of medical information, an inmate's privacy right varies with the inmate's condition, with a greater interest in preventing the disclosure of highly sensitive conditions. *Id.* (citations omitted). Prison officials may impinge upon the inmate's privacy right only to the extent that their actions are not "reasonably related to legitimate penological interests." *Powell v. Schriver,* 175 F.3d 107, 112 (2d Cir.1999). Where the sensitive information is spread gratuitously through "humor or gossip," it is more likely that the inmate's right to privacy will have been violated. *Rodriguez v. Ames,* 287 F.Supp.2d 213, 220 (citing *Powell,* 175 F.3d at 112).

**2. Right to Privacy–Analysis** [12]

12    In his First Cause of Action, plaintiff alleges that, while at Shawangunk, defendant Genovese

unlawfully released plaintiff's medical records in violation of New York State regulations. Plaintiff does not identify the nature of the records allegedly released, and defendants do not address the issue in the present motion for summary judgment. Therefore, the court will not address this issue in this motion.

Defendant Pingotti has moved for summary judgment on the alleged breach of privacy at the disciplinary hearing. (Dkt. No. 124–8, Def.'s Mem. of Law at 5). Even reading the complaint in the light most favorable to the plaintiff, there was a legitimate penological purpose for obtaining the screening sheet, as plaintiff's primary argument during the disciplinary hearing was that his medical condition prohibited assignment to a double-bunk cell. In fulfilling his duties, defendant Pingotti sought the best available source of the information. Moreover, plaintiff's back and knee problems, to the extent that they were "disclosed" during the hearing, are not the sort of impairment which "carr[ies] with it the sort of opprobrium that confers upon those who suffer from it a constitutional right of privacy as to that medical condition." *See Matson v. Bd. of Education of the City School Dist. of New York,* 631 F.3d 57, 61 (2d Cir.2010) (finding that disclosure of fibromyalgia would not expose a person to discrimination or intolerance). Accordingly, the court recommends that defendant Pingotti's motion for summary judgment be granted as to the Fourth Cause of Action.

## VI. Retaliation/Verbal Harassment (Shawangunk)

### A. Relevant Facts

**\*21** Plaintiff alleges that numerous personnel at Shawangunk retaliated against him for filing various grievances at the facility, as well as for receiving a settlement payment in connection with prior litigation against officials at Attica Correctional Facility. (Compl.¶ 8–a). Plaintiff claims that each time that he filed a grievance, his cell was searched immediately afterwards [13]. (Dkt. No 131, Pl.'s Resp. to Def.'s Stmt. of Mat. Fact p. 13, ¶¶ 46, 48). Plaintiff also claims that his wife was denied entrance to Shawangunk on a visiting day, and that he was transferred to another facility as retaliation for his past grievances and receipt of the settlement payment. (Compl.¶ 8–b). Plaintiff alleges that Correctional Councilor Earl Boddison, Superintendent Joseph Smith, Superintendent John Maly, Lt. Gardner, Lt. Palen, Sgt. Kimbler and C.O. Brooks participated in

these retaliatory actions. (Compl. ¶ 8–e,8–f,8–h). The only alleged retaliation addressed in this summary judgment motion is defendant Maly's response to plaintiff's question regarding the transfer. Maly allegedly "smiled and said, 'have a nice day Mr. Jones.'" (Compl. ¶ 8–h). Defendant John Maly has moved for summary judgment solely in regards to this exchange. ((Dkt. No. 124–8, Def.'s Mem. of Law at 12–13).

[13]     Plaintiff states that his "cell was destroyed" in a cell search on or about April 16, 2009, but does not identify any personal property that was removed or destroyed. (Compl.¶ 8–e).

### B. Legal Standards

It is well established in the Second Circuit that verbal abuse, whether threatening, vulgar, or racial in nature, does not, by itself, rise to the level of a constitutional violation. *See, e.g ., Purcell v. Coughlin* 790 F.2d 263, 265 (2d Cir.1986); *Webster v. Holmes,* 694 F.Supp.2d 163, (N.D.N.Y.2010) (collecting cases); *Ramirez v. Holmes,* 921 F.Supp. 204, 210 (S.D.N.Y.1996).

### C. Analysis

Plaintiff has interpreted Maly's response "have a nice day Mr. Jones," as proof of a retaliatory motive for his transfer. In this motion, defendant Maly ignores the other allegations of retaliation in the complaint and narrowly argues that his response to plaintiff is not actionable in a federal civil rights action. To the extent that plaintiff is suing over the comment alone, the court agrees that even if the remark could be interpreted as harassment, it does not give rise to a constitutional claim. Therefore, defendant Maly should be granted summary judgment solely as it relates to any allegation of verbal harassment.

Defendant Maly must still remain part of this litigation, as plaintiff's Third Cause of Action alleges that Maly was personally involved in other retaliatory conduct, including the denial of plaintiff's visitation privileges. (Compl.¶ 8–e). Because defendant Maly did not address these allegations in his motion for summary judgment, [14] he is not entitled to summary judgment with respect to plaintiff's further claims of retaliation. *See Salahuddin,* 467 F.3d at 278.

[14]     As noted above, none of the defendants identified in the retaliation claim (Earnel Boddison, Joseph Smith, Lt. Palen, Sgt. Kimbler, C.O. Brooks, Lt. Gardner,

and John Maly) moved for summary judgment, except for the Maly verbal harassment issue addressed herein.

## VI. Religious Liberty (Shawangunk and Eastern) [15]

[15]     Although the heading for plaintiff's second Cause of Action also references cruel and unusual punishment, and the equal protection clause, his pleadings with regard to the Kosher menu do not allege any of the elements necessary for an Eighth Amendment or Fourteenth Amendment claim.

### A. Relevant Facts

Plaintiff converted to Judaism on or about January 2004, while in prison. (Dkt. 131–1, Pl.'s Ex. T). Plaintiff alleges that since his conversion, he "received a high sodium cold Kosher Diet three times a day, seven days a week for the past five years." (Compl.¶ 7–m). Plaintiff also alleges that he has a history of high blood pressure, and so he sought a low-sodium Kosher alternative diet. (Compl.¶¶ 7–e, 7–f).

**\*22**  Plaintiff alleges that he asked Rabbi Horowitz, a Shawangunk prison chaplain, for assistance in receiving "at least two hot meals per day and to change the Kosher Menu ..." (Compl.¶ 7–c). Plaintiff claims that Rabbi Horowitz refused to assist him. (Compl.¶ 7–i). [16]

[16]     Plaintiff also alleges that Rabbi Horowitz was skeptical of his conversion and refused to provide him with information concerning the Jewish religion. However, the record demonstrates that Rabbi Horowitz signed plaintiff's change of religious designation form and plaintiff's form accepting the Kosher diet requirements. (Dkt. 131–3, Pl.'s Ex. T).

Plaintiff submitted a request to John Rapp, Shawangunk Food Administrator, seeking a low sodium Kosher diet which included at least two hot meals per day. (Compl.7–i) This request was denied. (Dkt. No. 131–2, Pl.'s Ex. 1–I). During the grievance process, Rapp advised that the Kosher menu is established by DOCCS Central Food Service, and that hot meals were only provided on Jewish holidays, with the exception of the Green Haven Correctional Facility. (Id.). Plaintiff exhausted his administrative appeals, which were unsuccessful.

### B. Legal Standards

#### 1. Religious Land Use and Institutionalized Persons Act ("RLUIPA")

RLUIPA provides that:

No government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution ... even if the burden results from a rule of general applicability, unless the government demonstrates that imposition of the burden on that person—

(A) is in furtherance of a compelling governmental interest; and

(B) is the least restrictive means of furthering that compelling governmental interest.

42 U.S.C. § 2000cc–1(a). Under RLUIPA, the plaintiff bears the burden of showing that his religious exercise has been burdened and that the burden is substantial. [17] Marria v. Broaddus, 200 F.Supp.2d 280, 297 (S.D.N.Y.2002) (citing 42 U.S.C. § 2000cc–2(b)). The burden then shifts to the government to show that the burden furthers a compelling governmental interest **and** that it is the **least restrictive** means of achieving that interest. Id. The act defines "religious exercise" to include "any exercise of religion, whether or not compelled by, or central to, a system of religious belief." 42 U.S.C. § 2000cc–5(7)(A).

[17]     RLUIPA uses the term "substantial burden" in the language of the statute, removing any ambiguity with respect to the extent of the burden required to establish a statutory claim.

A "substantial burden" is one that places "substantial pressure on an adherent to modify his behavior and to violate his beliefs." Singh v. Goord, 520 F.Supp.2d 487, 498 (S.D.N.Y.2007) (citing, inter alia, Jolly v. Coughlin, 76 F.3d 468, 477 (2d Cir.1996)). Inconvenience alone is insufficient to establish a substantial burden. Id. (citing Westchester Day School v. Village of Mamaroneck, 379 F.Supp.2d 550, 557 (S.D.N.Y.2005)). Furthermore, the substantial burden test presupposes that some inconveniences may be so minor that they do not amount to a violation. See McEachin v. McGuinnis, 357 F.3d 197, 203 n. 6 (2d Cir.2004) (discussing in a footnote the applicability of the "time-honored maxim 'de minimis non curat lex' " ). However, the court should not attempt to engage in resolving disputes as to whether a particular

practice is "central" or "mandatory" to a particular religion in determining whether a burden was substantial. *See Ford v. McGinnis,* 352 F.3d 582, 593–94 (2d Cir.2003) (discussing First Amendment protections).

**2. First Amendment**

**\*23**  Inmates have the right under the First and Fourteenth Amendments to freely exercise a chosen religion. *Ford v. McGinnis,* 352 F.3d 582, 588 (2d Cir.2003) (citing *Pell v. Procunier,* 417 U.S. 817, 822 (1974)). However this right is not limitless, and may be subject to restrictions relating to legitimate penological concerns. *Benjamin v. Coughlin,* 905 F.2d 571, 574 (2d Cir.1990). The analysis of a free exercise claim is governed by the framework set forth in *O'Lone v. Estate of Shabazz,* 482 U.S. 342 (1987) and *Turner v. Safely,* 482 U.S. 78, 84 (1987). This framework is one of reasonableness and is less restrictive than the standard ordinarily applied to the alleged infringements of fundamental constitutional rights. *Ford,* 352 F.3d at 588.

In *O'Lone,* the Supreme Court held that a regulation that burdens a protected right withstands a constitutional challenge if that regulation is reasonably related to legitimate penological interests. 482 U.S. at 349 (quoting *Turner,* 482 U.S. at 89). An individualized decision to deny an inmate the ability to engage in a religious exercise is analyzed under the same standard. *Salahuddin v. Goord,* 467 F.3d 263, 274 n. 4 (2d Cir.2006) (citations omitted). In *Farid v. Smith,* 850 F.2d 917, 926 (2d Cir.1988), the Second Circuit held that to assess a free exercise claim, the court must determine "(1) whether the practice asserted is religious in the person's scheme of beliefs and whether the belief is sincerely held; (2) whether the challenged practice of prison officials infringes upon the religious belief; and (3) whether the challenged practice of the prison officials furthers some legitimate penological interest."

The Second Circuit has recently examined the standard for analyzing a First Amendment religion claim. *Holland v. Goord,* No. 13–2694, 2014 WL 3360615, at \*47 (2d Cir. July 10, 2014). In *Holland,* the court discussed the degree of burden required for a First Amendment claim. *Id.* The court noted that it has not been decided in this Circuit whether, to state a claim under the First Amendment, the inmate must show at the onset that the disputed conduct "substantially burdens his sincerely held religious beliefs ." *Id.* (citing *Salahuddin, supra* at 274–75; *Ford, supra* at 592 (where the court assumed without

deciding that the substantial burden test applies)). The court in *Holland* did not decide the issue, rather the court assumed the continued validity of the substantial burden test and analyzed the case accordingly. [18] *Id.* This court will follow the analysis in *Holland* and proceed to consider the First Amendment analysis, assuming that the substantial burden test is still valid. [19]

[18]  This finding was supported by the fact that the court's "precedent squarely dictat[ed] that Holland's religious exercise was unconstitutionally burdened," a point that the defendants in that case did not challenge on appeal. *Holland,* 2014 WL 3360615 at \*4.

[19]  The definition of "substantial burden" is discussed above.

Once a substantial burden is found, the court must examine whether the challenged action has a legitimate, rational connection to the governmental objective; whether prisoners have alternative means of exercising the burdened right; the impact on guards, inmates, and prison resources of accommodating that right; and the existence of alternative means of facilitating the exercise of that right that have only a *de minimis* adverse effect on the valid penological interests. *See King v. Bennett,* No. 02–CV–349, 2007 WL 1017102, at \*4 (W.D.N.Y. March 30, 2007) (citing *Salahuddin,* 467 F.3d at 274). Finally, once prison officials state a legitimate penological interest to justify their actions, the burden shifts to plaintiffs to show that the defendants' concerns are "irrational." *Ford,* 352 F.3d at 595.

**C. Analysis**

**\*24**  Defendants did not move for summary judgment as to plaintiff's First Amendment or RLUIPA claims. However, the court recommends dismissing plaintiff's religious liberty causes of action for failure to state a claim pursuant to 28 U.S.C. § 1915(e)(2)(B) (ii). This section provides that the court may dismiss an *in forma pauperis* action *sua sponte* at any time if the court determines that, *inter alia,* the action fails to state a claim on which relief can be granted.

**1. RLUIPA**

As noted above, plaintiff was transferred from both Shawangunk and Eastern and has not been in DOCCS custody since August 2014. Hence, injunctive relief against

DOCCS is no longer possible and any claim for injunctive relief should be dismissed as moot. [20] In addition, since only injunctive relief is available under RLUIPA, money damages are not available against the defendants, either in their individual or official capacities. *Loccenitt v. City of New York,* No. 12 Civ. 948, 2013 WL 1091313, at *6 (S.D.N.Y. March 15, 2013) (citing *Pugh v. Goord,* 571 F.Supp.2d 477, 506–507 (S.D.N.Y.2008) (citing cases)). Thus, the court recommends *sua sponte* dismissal of plaintiff's RLUIPA claim. [21]

[20]    In *Blalock v. Jacobsen,* No. 13–CV–8332, 2014 WL 5324326, at *3 & n. 2 (S.D.N.Y. Oct. 20, 2014), the court discussed the possibility that RLUIPA claims for injunctive relief might not be moot upon an inmate's transfer if the "Commissioner's" policy continued to burden and adversely affect the plaintiff's rights, under the theory that the violation is capable of repetition, yet evades review. *Id.* (citing *Pugh v. Goord,* 571 F.Supp.2d 477, 507 (S.D.N.Y.2008)). Here, plaintiff does not allege that the RLUIPA violations are ongoing since his transfer.

[21]    Even if injunctive relief were still available on the RLUIPA claim, dismissal would still be warranted as plaintiff fails to state a claim on which relief may be granted. Recent decisions in this district, discussed *infra,* rejected RLUIPA claims identical to plaintiff's, where otherwise valid religious menus do not meet a prisoner's dietary wants or medical needs. *See Williams v. Fisher,* No. 9:11–CV–379 (NAM/TWD), 2015 WL 1137644 (N.D.N.Y. Mar. 10, 2015) (finding compelling state interest in limiting menu options and not providing vegetarian Kosher meals); *Hamilton v. Smith,* No. 9:06–CV–805 (GTS/DRH), 2009 WL 3199520 (N.D.N.Y. June 30, 2009) (finding that financial burden of creating low sodium Kosher menu was a compelling state interest warranting summary judgment in favor of DOCCs on RLUIPA claim); *Smith v. Perlman,* No. 09:11 CV–20 (MAD/CFH), 2014 WL 7333229 (N.D.N.Y. Dec. 18, 2014) (granting DOCCS summary judgment on Muslim inmate's RLUIPA claim seeking therapeutic diet which included halal meat); *see also Prins v. Coughlin,* 76 F.3d 504, 507 (2d Cir.1996) (finding that inmate had no claim under the Religious Freedom Restoration Act arising from inability to obtain hot Kosher meals after prison transfer).

**2. First Amendment**

While plaintiff may no longer obtain injunctive relief (either under RLUIPA or the First Amendment), based upon his transfers from Shawangunk and Eastern, further analysis is required with respect to a First Amendment claim for monetary damages against defendants in their individual capacities.

The necessary analysis for this case is identical to that performed in *Williams v. Fisher,* 2015 WL 1137644 and *Hamilton v. Smith,* 2009 WL 3199520. First, the record evidence establishes that named defendants Rapp and Rabbi Horowitz do not have any personal involvement in creating or altering the Kosher menu served at DOCCS facilities. (Pl.'s Resp. to Def.'s Stmt. of Mat. Fact p. 10, ¶¶ 31, 33; Dkt. No. 131–3, Pl.'s Ex. V, W, X, and Z). The action against Rapp and Horowitz could be dismissed on this basis alone. *Williams,* 2015 WL 1137644, at *22–3.

However, even assuming that any defendant had personal involvement, plaintiff's First Amendment claim is futile, given the clear nexus between limiting the variety of menus and the economic and efficiency concerns of the state-wide prison system. *Williams,* 2015 WL 1137644, at *28–9; *Hamilton,* 2015 WL 3199520, at *56. Plaintiff does not allege that he cannot receive a Kosher meal, only that he cannot receive a Kosher meal that meets his preferences. Even if the plaintiff were given every benefit of the doubt by the court in considering the *Turner* and *O'Lone* factors, the legitimate penological concerns of maintaining order and meeting budgetary demands justifies the burden, if any, imposed on plaintiff's First Amendment rights. *Williams,* 2015 WL 1137644, at *24–29; *Hamilton,* 2015 WL 3199520, at *6. To hold otherwise, and allow plaintiff an individualized meal option outside the established DOCCS-wide menus could have a "significant ripple effect" on fellow inmates, and "open the door to the creation of various specialized menus for other inmates with different therapeutic and religious needs." *Hamilton,* 2015 WL 3199520, at *6. Therefore, the court recommends *sua sponte* dismissal of plaintiff's Second Cause of Action.

**VII. Motion to Amend**

**A. Applicable Law**

**\*25** Pursuant to Fed.R.Civ.P. 15(a), a court should grant leave to amend a pleading "freely ... when justice so requires." Fed.R.Civ.P. 15(a)(2); *Foman v. Davis,* 371 U.S. 178, 182 (1962). The Second Circuit has stated that, "[a] *pro se* plaintiff who brings a civil rights action

2015 WL 5750136

should be 'fairly freely' afforded an opportunity to amend his complaint, even if he makes the request after the court has entered judgment dismissing his original complaint." *Satchell v. Dilworth,* 745 F.2d 781, 785 (2d Cir.1984) (citing *Bradley v. Coughlin,* 671 F.2d 686, 690 (2d Cir.1982)). The Second Circuit has articulated the similarly liberal standards by which a court may allow a party to supplement a pleading with allegations regarding transactions, occurrences, or events that have transpired since the date of the original pleading:

> Fed.R.Civ.P. 15(d) permits a party to move to serve a supplemental pleading and the district court may grant such a motion, in the exercise of its discretion, upon reasonable notice and upon such terms as may be just.... [L]eave to file a supplemental pleading should be freely permitted when the supplemental facts connect it to the original pleading.

*Quaratino v. Tiffany & Co.,* 71 F.3d 58, 66 (2d Cir.1995) (citations omitted).

Although Rule 15 generally governs the amendment or supplementation of complaints, where the proposed amendment seeks to add new parties, Fed.R.Civ.P. 21 governs. *Rush v. Artuz,* No. 00 Civ. 3436, 2001 WL 1313465, at *5 (S.D.N.Y. Oct. 26, 2001). Rule 21 states that "the court may at any time, on just terms, add or drop a party." Fed.R.Civ.P. 21. "In deciding whether to allow joinder, the Court is guided by 'the same standard of liberality afforded to motions to amend pleadings under Rule 15.' " *Rush v. Artuz,* 2001 WL 1313465, at *5 (citations omitted). *Accord, Javier H. v. Garcia Botello,* 239 F.R.D. 342, 346 (W.D.N.Y.2006).

A motion to amend, supplement, or join parties should not be denied unless there has been undue delay, bad faith, undue prejudice to the opposing party, or the amendment is futile. *Milanese v. Rust Oleum Corp.,* 244 F.3d 104, 110 (2d Cir.2001). A motion to amend may also be denied when the movant knew or should have known of the facts upon which the amendment is based when the original pleading was filed. *Berman v. Parco,* 986 F.Supp. 195, 217 (S.D . N.Y.1997). This is particularly true when the movant offers no excuse for the delay.

Generally, an amendment is futile if the pleading fails to state a claim or would otherwise be subject to dismissal. *U. M.G. Recordings, Inc. v. Lindor,* No. CV–05–1095, 2006 WL 3335048, at*2 (E.D.N.Y. Nov. 9, 2006) (citing *S.S. Silberblatt, Inc. v. East Harlem Pilot Block,* 608 F.2d 28, 42 (2d Cir.1979)). "In addressing the proposed futility of an amendment, the proper inquiry is comparable to that required upon a motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6)." *Aetna Cas. and Sur. Co. v. Aniero Concrete Co., Inc.,* 404 F.3d 566, 604 (2d Cir.2005) (citation omitted). The court must accept the asserted facts as true and construe them in the light most favorable to the amending party. *Stetz v. Reeher Enterprises, Inc.,* 70 F.Supp.2d 119, 121 (N.D .N.Y.1999). When proposed amendments raise colorable claims, especially where they are based upon disputed facts, they should be allowed, and a comprehensive legal analysis deferred to subsequent motions to dismiss or for summary judgment. *See, e.g., Alexander Interactive, Inc. v. Adorama, Inc.,* No. 12 Civ. 6608, 2014 WL 113728, at *4 (S.D.N.Y. Jan. 13, 2014); *Gallagher v. Town of Fairfield,* 3:10CV1270, 2012 WL 370070, at *3 (D.Conn. Feb. 2, 2012); *S.S. Silberblatt,* 608 F.2d at 42–43; *WIXT Television, Inc. v. Meredith Corp.,* 506 F.Supp. 1003, 1010 (N.D.N.Y.1980). In the limited circumstances when a summary judgment motion is opposed with a cross-motion to amend a pleading, the futility of the proposed amendment is judged by whether it would survive a motion for summary judgment. *Milanese v. Rust Oleum Corp.,* 244 F.3d at 110.

### B. Analysis

**\*26** In his opposition to the motion for summary judgment, plaintiff requests that, if defendants' motion is not denied in its entirety, that he be allowed to amend his complaint to identify "Sgt. Todd" as the "Jane Doe" who ordered plaintiff to SHU and confiscated his knee braces. Plaintiff also seeks to add Robert Schattinger and Elizabeth Culkin, alleging that these individuals "are in charge of establishing the dietary menu" for DOCCS. (Pl.'s Mem. of Law at 16–7; Pl.'s Resp. to Def.'s Stmt. of Mat. Fact at 14, ¶ 54). Defense counsel did not file any response to plaintiff to address the motion to amend or offer any declarations from the new prospective defendants. Hence, the court must rely primarily on plaintiff's allegations in addressing whether his amended claims are futile, based on the standards of Fed.R.Civ.P. 12(b)(6).

WESTLAW   © 2017 Thomson Reuters. No claim to original U.S. Government Works.

Plaintiff fails to elaborate how Mr. Schattinger or Ms. Culkin are personally involved in this matter, beyond the bare allegation that these individuals establish the DOCCS menu. However, even assuming such personal involvement, the court concludes that plaintiff's claims against Mr. Schattinger and Ms. Culkin would be futile, for the reasons set forth in the *Williams* and *Hamilton* analysis in Section VI(C) of this report and recommendation. Similarly, the proposed claims against "Sgt. Todd [22]" would be futile for the same reasons set forth in Section V(A)(4) of this report and recommendation regarding defendants Schoonmaker and Gusman. Applying the summary judgment standard as required, the court thus orders that plaintiff's motion to amend be denied.

[22]    Plaintiff offers no facts in support of his conclusion that Sgt. Todd confiscated plaintiff's knee braces and ordered him to SHU. In their motion papers, defendants identify "Lt. Mark" as the individual who ordered plaintiff to SHU. Both Sgt. Todd and Lt. Mark are listed in the Eastern SHU log book, submitted as plaintiff's Exhibit C.

**WHEREFORE,** based on the findings above, it is

**RECOMMENDED,** that defendants' motion for partial summary judgment (Dkt. No. 124, 125) be **GRANTED** on the grounds raised therein, and the following of plaintiff's claims dismissed:

1.  All claims for injunctive relief, to be dismissed as moot;

2.  All claims against defendants in their official capacities, to be dismissed with prejudice;

3.  All claims against defendant Fischer to be dismissed, due to lack of evidence of any personal involvement;

4.  Eighth Amendment claims, against defendants Smith, Griffin, Khramova, Schoonmaker, Gusman, and Brown only;

5.  Retaliation claim against defendant Maly, but only to the extent that it was predicated on an allegation of verbal harassment, to be dismissed with prejudice;

6.  Due process and right to privacy claims against defendant Pingotti; [23] and it is further

[23]    As noted above (at p. 2 and notes 12 and 14), the defendants' summary judgment motion did not address the following individual capacity claims for monetary damages, which survive: (1) claims against Dr. Maryann Genovese, Catherine Wells, and Pedro Diaz for medical indifference; (2) a claim against Dr. Genovese in her individual capacity for invasion of privacy; and (3) retaliation claims against Earnell Boddison, Joseph Smith, John Maly (involving conduct other than verbal harassment), Lt. Gardner, Lt. Palen, Sgt. Kimbler, and C.O. Brooks.

**RECOMMENDED** that all RLUIPA and First Amendment Religion claims (against defendants John Rapp and Rabbi A. Horowitz), be **DISMISSED** *sua sponte,* and with prejudice; [24] and it is further

[24]    If this court's recommendations are approved, defendants Fischer, Smith, Griffin, Khramova, Schoonmaker, Gusman, Brown, Pingotti, Rapp, and Horowitz may be terminated from this action, based on the dismissal of all claims against them.

**ORDERED,** that plaintiff's motion to amend (Dkt. No. 131) is **DENIED.**

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have fourteen (14) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Sec. of Health & Human Servs.,* 892 F.2d 15 (2d Cir.1989)); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(e), 72.

**\*27** Filed May 20, 2015.

**All Citations**

Not Reported in F.Supp.3d, 2015 WL 5750136

---

WESTLAW   © 2017 Thomson Reuters. No claim to original U.S. Government Works.

2009 WL 815724
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Frank BROWN, Plaintiff,
v.
Thomas G. EAGEN, et al., Defendants.

No. 9:08–CV–0009 (TJM/DRH).
|
March 26, 2009.

West KeySummary

**1**   **Civil Rights**

👉  Prisons and Jails;Probation and Parole

An inmate's § 1983 claims of deliberate
indifference to his serious medical needs
were so fantastic or incredible that they
were dismissed as factually frivolous. The
inmate alleged that prison officials gave him
a "medical resource drink" that contained
blood and feces, intentionally infected him
with Hepatitis A and H. Pylori and denied
testing and treatment. The inmate also alleged
that the prison officials were working with
Spanish inmates to contaminate his food
tray with blood, urine, semen, and chemicals.
Further, the inmate failed to allege a tangible
connection between the acts of any of the
prison officials and any injuries he suffered. 42
U.S.C.A. § 1983.

Cases that cite this headnote

**Attorneys and Law Firms**

Frank Brown, pro se.

Hon. Andrew M. Cuomo, New York State Attorney
General, Richard Lombardo, Esq., Assistant Attorney
General, of Counsel, for Represented Defendants.

**MEMORANDUM–DECISION and ORDER**

THOMAS J. McAVOY, Senior District Judge.

**I. Introduction**

 *1  Plaintiff Frank Brown commenced this action *pro se*
pursuant to 42 U.S.C. § 1983 ("Section 1983") alleging
that Defendants violated his rights under the United
States Constitution. Dkt. No. 1 (Comp.). Plaintiff seeks
substantial monetary relief.

Reading Plaintiff's Complaint liberally, Plaintiff claims
that Defendants conspired and retaliated against him
for filing grievances; denied him access to the courts
by interfering with his legal mail; were deliberately
indifferent to his serious medical needs; failed to protect
him from known harm; subjected him to excessive force;
conspired against Plaintiff; and denied him due process,
all in violation of his rights under the First, Fifth,
Eighth, and Fourteenth Amendments to the United States
Constitution.

Presently before the Court is Defendants' Motion to
Dismiss the Complaint pursuant to FED. R. CIV. P.
12(b)(1) and (6). Dkt. No. 50. Plaintiff has responded in
opposition to the Motion. Dkt. No. 65. For the following
reasons, Defendants' Motion to Dismiss is granted.

**II. Standard of Review**

A motion to dismiss pursuant to Rule 12(b)(6) may not be
granted so long as plaintiff's complaint includes "enough
facts to state a claim to relief that is plausible on its
face." *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544,550
U.S. 544, 127 S.Ct. 1955, 1974, 167 L.Ed.2d 929 (2007); [1]
*cf. Iqbal v. Hasty,* 490 F.3d 143, 157–58 (2d Cir.2007)
(recognizing that the Supreme Court "is not requiring
a universal standard of heightened fact pleading, but is
instead requiring a flexible 'plausibility standard,' which
obliges a pleader to amplify a claim with some factual
allegations in those contexts where such amplification is
needed to render the claim *plausible."* ). The pleading of
specific facts is not required; rather a complaint need only
give the defendant "fair notice of what the ... claim is
and the grounds upon which it rests." *Erickson v. Pardus,*
551 U.S. 89, 127 S.Ct. 2197, 2200, 167 L.Ed.2d 1081
(2007). The court must accept the material facts alleged
in the complaint as true. *Cooper v. Pate,* 378 U.S. 546, 84

S.Ct. 1733, 12 L.Ed.2d 1030 (1964) (per curiam)); *Burke v. Gregory,* 356 F.Supp.2d 179, 182 (N.D.N.Y.2005). In determining whether a complaint states a cause of action, great liberality is afforded to pro se litigants. *Platsky v. Central Intelligence Agency,* 953 F.2d 26, 28 (2d Cir.1991) (citation omitted).

[1]   The Supreme Court, in *Bell Atlantic Corp.,* rejected the standard of review previously applied-namely, that "it appears beyond a doubt that plaintiff can prove no set of facts in support of his claim that would entitle him to relief"—and replaced the "no set of facts" language with the requirement that a plaintiff plead sufficient facts "to state a claim for relief that is plausible on its face." *Id.* at 1974.

For purposes of a Rule 12(b)(6) motion, the "complaint" includes any written instrument attached to the complaint and any statements or documents incorporated into it by reference. *Chambers v. Time Warner, Inc.,* 282 F.3d 147, 153 (2d Cir.2002); *Gant v. Wallingford Bd. of Educ.,* 69 F.3d 669, 674 (2d Cir.1995) (citations omitted). "Even where a document is not incorporated by reference, the court may nevertheless consider it where the complaint 'relies heavily upon its terms and effect,' which renders the document 'integral' to the complaint." *Chambers,* 282 F.3d at 153 (citation omitted). The Court may also consider "matters of which judicial notice may be taken." *Kowalyshyn v. Sobieski,* 3:07–CV–687, 2008 WL 1924973, at *1 (D.Conn. Apr.30, 2008).

### III. Facts
**\*2**  The facts are related as alleged by Plaintiff in his complaint. Dkt. No. 1 (Comp.).

#### A. First Cause of Action
On November 4, 2004, Defendants Burge and Bellnier failed to protect Plaintiff when they did "nothing to stop" Spanish inmates from contaminating Plaintiff's food tray "by putting ketchup that was sealed and called LA–BINE–YA, which is sealed ketchup with blood inside" and by "paying black porters with drugs and money to let them violate [Plaintiff's] food trays with sperm and blood and chemicals." Comp. at 11. Plaintiff's mail was constantly tampered with at Auburn Correctional Facility by the spanish inmates and, as a result, his grievances and complaints, including a letter to the FBI which included a sample of the ketchup, were never delivered. Comp. at 11–12. Plaintiff's mail was tampered with "to prevent

[Plaintiff] from contacting anyone [to] let them know that all the murders of [his] whole family was done by spanish inmates at Great Meadow from Oct, 2006, until Nov, 2007." Comp. at 12. Defendants Burge and Bellnier are "responsible for massive corruption at Auburn from 9/17/2004 until 3/8/2005, so they are responsible for all corrupt acts committed" against Plaintiff. Comp. at 13, 33.

#### B. Second Cause of Action
On December 29, 2004, spanish officers gave out Plaintiff's personal information to "their spanish people." Comp. at 13. The sharing of Plaintiff's personal information began in 1999 when he was at Southport, and since then "all spanish inmates have been able to get all information at will." Comp. at 13. John Burge, Glenn Goord, and Lucien J. LeClaire were made aware of all of these "criminal acts by many spanish inmates and officers" but did nothing to protect Plaintiff's federal rights. Comp. at 13, 33–34.

#### C. Third Cause of Action
On January 1, 2005 Defendants Nurse Smith [2] and Sergeant Nipper retaliated against Plaintiff because of the many grievances Plaintiff had filed against "medical and officers." Comp. at 13–14. Nurse Smith and Sergeant Nipper gave Plaintiff "an infected medical resource drink with feces and blood inside of it." Comp. at 14. Nurse Smith was very nervous when she came to Plaintiff's cell on that day "[b]ecause some one put her up to this ... [and it] was done in retaliation for the many grievances and complaints" that Plaintiff was writing. Comp. at 14, 34.

[2]   Nurse Smith has not been served and has not appeared in this action.

#### D. Fourth Cause of Action
Nurse Smith and Sergeant Nipper gave Plaintiff an "infected medical resource drink with feces and blood inside of it." Comp. at 14. Defendants were deliberately indifferent to Plaintiff's serious medical needs and to his safety in violation of the Eighth Amendment. Comp. at 14, 35.

#### E. Fifth Cause of Action
On January 6, 2005, Defendant Burge was involved in a "massive conspiracy" with Southport Superintendent Michael McGinnis, who is **not a defendant** in this action,

to keep Plaintiff "on mental health level one" and medicated so as to prevent Plaintiff from pursuing his legal actions in Federal Court and exposing the massive conspiracy. Comp. at 15. Burge and McGinnis knew each other because they had previously worked together at Southport. Comp. at 15. Plaintiff was put on mental health level one and transferred to Auburn "to be silenced at all costs." Comp. at 15. Plaintiff has "no mental health problems or issues at all." Comp. at 15. Burge's actions violated Plaintiff's right to due process in violation of the Fourteenth Amendment. Comp. at 35.

### F. Sixth Cause of Action

**\*3** On January 12, 2005, Defendants Robinson, Laux, Wright, LeClaire, Goord, Burge, Bellnier, Meyers, Nurse Smith, Officer Smith, and Sergeant Nipper violated Plaintiff's "constitutional rights to be free from infections."[3] Comp. at 15. Plaintiff was infected with the hepatitis A virus and then denied medical treatment. Comp. at 16. All of the staff prevented Plaintiff from being tested for hepatitis to prevent the ongoing conspiracy from being exposed. Comp. at 16. Plaintiff advised "all staff at Central Office" of this problem but they did nothing at all. Comp. at 16. Defendants were deliberately indifferent to Plaintiff's serious medical needs and to his safety in violation of the Eighth Amendment. Comp. at 36.

[3]     Defendants Robinson and Correctional Officer Smith have not been served and have not appeared in this action.

### G. Seventh Cause of Action

On January 18, 2005, Defendants Eagan, Bellamy, and Burge denied Plaintiff "access to the open tank cells." Comp. at 16. All Defendants are to blame for this discrimination because they "all had the opportunity to correct this policy that discriminated against [Plaintiff]." Comp. at 16. Defendants' actions were retaliatory in violation of Plaintiff's First Amendment rights. Comp. at 37.

### H. Eighth Cause of Action

On January 23, 2005, Defendants Meyers and Toomey denied Plaintiff his right to "medical help" by destroying a paper instructing Plaintiff not to eat any food in preparation for a blood test. Comp. at 17. LeClaire, Goord, Eagen, and Bellamy "are all responsible also

because they did nothing and knew of all crimes being done to [Plaintiff] many times." Comp. at 17. Defendant Wright is also responsible because it was "his duty to stop crimes against [Plaintiff] for massive infections." Comp. at 17. Defendants were deliberately indifferent to Plaintiff's serious medical needs and safety in violation of the Eighth Amendment. Comp. 38.

### I. Ninth Cause of Action

On January 26, 2006, Defendant Nurse Vega, who is spanish, destroyed the test results from Plaintiff's stool sample to cover up the conspiracy by spanish inmates and corrupt officers. Comp. at 18. Defendant was deliberately indifferent to Plaintiff's serious medical needs in violation of the Eighth Amendment. Comp. at 38.

### J. Tenth Cause of Action

On January 27, 2005, in retaliation for Plaintiff's filing grievances, Defendant Rizzo gave Plaintiff tuna fish with "sperm in it." Comp. at 18–19. Plaintiff wrote many grievances against Defendant Rizzo. Comp. at 19. Defendant retaliated against Plaintiff in violation of his First Amendment rights. Comp. at 39.

### K. Eleventh Cause of Action

On January 30, 2005, Defendant Meyers denied Plaintiff access to the courts "by destroying [Plaintiff's] free legal postage mail," including his Article 78 motions. Comp. at 19–20. Defendant Meyers also destroyed many of Plaintiff's grievances. Comp. at 20. Meyers is the officer "who almost always picks up the mail." Comp. at 20. Defendant Meyers denied Plaintiff access to the Courts in violation of his First Amendment rights. Comp. at 39.

### L. Thirteenth Cause of Action[4]

[4]     Plaintiff's Complaint does not include a Twelfth Cause of Action. *See* Comp. at 39–40.

**\*4** On February 1, 2005, Defendants Rizzo, Correctional Officer Smith, Portney, Nurse Smith, Sergeant Nipper, and D. Meyers infected Plaintiff with "a life time virus called Hepatitis A" because Plaintiff filed many grievances against them and other correctional staff. Comp. at 21. Defendants subjected Plaintiff to cruel and unusual punishment and were deliberately indifferent to his serious medical needs in violation of the Eighth Amendment. Comp. at 40.

### M. Fourteenth Cause of Action

On February 2, 2005, Plaintiff was infected with H. Pylori from the drinking water. Comp. at 21. Defendant Burge, "being the chief person at Auburn in 2004 and 2005 is responsible for [Plaintiff's] well-being." Comp. at 22. Defendant Laux refused to have Plaintiff's blood tested. Comp. at 22. Both Defendants Burge and Laux knew that Plaintiff was "bleeding inside from the drinking water" but did nothing. Comp. at 22. Defendants were deliberately indifferent to his serious medical needs in violation of the Eighth Amendment. Comp. at 40–41.

### N. Fifteenth Cause of Action

On February 10, 2005, Defendants Eagen, Bellamy, and Burge denied Plaintiff the right to petition the government without retaliation or reprisals "because the grievance program is not fair and effective." Comp. at 22. Plaintiff has been "infected in every prison ... most likely by chemicals, sperm, blood by officers, sergeants, medical staff and spanish inmate agents. [He] has been given three (3) life time viruses of Hepatitis A, Herpes and H pyloria. Plus massive infections in [his] stomach, throat and head for only using the grievance programs." Comp. at 23. "The whole corrupt Great Meadow murdered [Plaintiff's] whole family for only using the grievance program." Comp. at 24. Plaintiff was denied due process under the Fourteenth Amendment. Comp. at 42.

### O. Sixteenth Cause of Action

On February 23, 2005, Defendants Burge, Bellnier, Nurse Smith, Officer Smith, Portney, Rizzo, Putman, Toomey, LeClaire, Wright, Eagen, Bellany, Laux, Robinson, Vega, Nipper, Meyers, and Goord all conspired with each other to infect Plaintiff with chemicals and to retaliate against him. Comp. at 25. Goord, Wright, LeClaire, Eagen, and Bellamy were all from the Central Office and therefore "in a position to stop all crimes being committed against [Plaintiff] but did nothing." Comp. at 25. Plaintiff claims that no white prisoners would be treated like this, only black prisoners, because there is "class-based discriminatory animus behind this massive conspiracy." Comp. at 25. Plaintiff states that

> [t]his massive conspiracy is from prison to prison with massive criminal acts of food tampering, mail tampering, property destruction, assaults, conspiracy to murder, attempted murders, massive infections, retaliation and murders of [Plaintiff's] whole family also. This is the biggest conspiracy in the history of United States. Plus using mental health to help [them] cover-up massive federal crimes.

**\*5** Comp. at 26. Plaintiff claims that Defendants conspired against him in violation of 42 U.S.C. § 1985(3).

### P. Seventeenth and Eighteenth Causes of Action

On February 27, 2005, Defendants Portney and Correctional Officer Smith assaulted Plaintiff "by putting the black strap on [him] at sick call because nurse Androsko told the officers" to get Plaintiff out of there. Comp. at 27. When Plaintiff returned to his cell, Plaintiff put his hands out of the food slot and "all officers which [he] didn't put on this lawsuit because [he] is extremely indigent ... pulled [Plaintiff's] hands and arms very hard trying to break them and [Plaintiff's] wrists also plus [his] back was in extreme pain." Comp. at 27–28. Plaintiff alleges that he was subjected to excessive force in violation of the Eighth Amendment. Comp. at 44–46.

### Q. Nineteenth Cause of Action

On February 28, 2005, Defendant Putnam told Plaintiff that he will remember Plaintiff till the day Plaintiff died and then threatened to give Plaintiff food and water infected with feces, urine, and sperm. Comp. at 28–29. Putnam's actions were in retaliation for Plaintiff filing grievances in violation of the First Amendment. Comp. at 29, 47.

### R. Twentieth Cause of Action

On February 28, 2005, Officer Toomey tampered with Plaintiff's food tray by pouring some sort of liquid all over everything. Comp. at 29–30. Toomey planned this with Defendant Putnam. Comp. at 30. Plaintiff alleges that Defendants actions were retaliatory in violation of the First Amendment. Comp. at 48–49.

### S. Twenty-first Cause of Action

On March 1, 2005, Defendant Rizzo contaminated Plaintiff's water with chemicals "that put pain in [Plaintiff's] side." Comp. at 30. Many times Defendant Officer Smith put feces and sperm in Plaintiff's hot water. Comp. at 31.

**T. Twenty-second Cause of Action**
Plaintiff was in the Auburn Special Housing Unit (SHU) from October 30, 2004 until March 7, 2005 under conditions that were an "atypical and significant hardship [and] a deprivation of a liberty interest." Comp. at 31. During this period of SHU incarceration, he was infected with two or maybe three "life time viruses." [5] Comp. at 31. Plaintiff alleges that he "was entitled to be free from all infections, crimes against [him] in SHU at Auburn." Comp. at 50. Plaintiff claims that he was deprived of due process. Comp. at 50.

[5]     Plaintiff was placed in SHU after he "stabbed spanish inmate Rodriguez on October 30, 2005. Comp. at 32. Plaintiff says that he stabbed Rodriguez because Defendants had failed to stop the "corruption and breaches of security" that Plaintiff had been subjected to. Comp. at 32.

**IV. Defendants' motion to dismiss**
Defendants argue that Plaintiff's Complaint should be dismissed because: (1) the Complaint fails to state a claim pursuant to 42 U.S .C. § 1983; (2) Defendants are entitled to qualified immunity; and (3) the First, Second, Third and Fourth causes of action are barred by the applicable statute of limitations. Dkt. No. 50.

**V. Discussion**

**A. Statute of limitations**
The applicable statute of limitations for Section 1983 actions arising in New York requires claims to be brought within three years. *Pinaud v. County of Suffolk,* 52 F.3d 1139, 1156 (2d Cir.1995) (citing *Owens v. Okure,* 488 U.S. 235, 250–51, 109 S.Ct. 573, 582, 102 L.Ed.2d 594 (1989); *Eagleston v. Guido,* 41 F.3d 865, 871 (2d Cir.1994)).

**\*6** Defendants assert that Plaintiff's action was filed with the Court on January 4, 2008, and that therefore Plaintiff's first, second, third, and fourth causes of action should be dismissed as time-barred. Dkt. No. 50–2, Memorandum of Law at 26. However, because Plaintiff is an inmate, his

pleading is deemed "filed" when it is delivered to prison officials. *Dory v. Ryan,* 999 F.2d 679, 682 (2d Cir.1993); *Pritchard v. Kelly,* 9:98–CV–0349, 2000 WL 33743378, at *2 n. 2 (N.D.N.Y. Oct.3, 2000) (Sharpe, M.J.). The date the plaintiff signed the complaint is presumed to be the date the plaintiff gave the complaint to prison officials to be mailed. *Mingues v. Nelson,* 96–CV–5397, 2004 WL 324898, at *3 (S.D.N.Y. Feb.20, 2004). In this case, Plaintiff signed his Complaint on December 25, 2007. Comp. at 52. Accordingly Plaintiff may not prevail on any claims asserted in his Complaint which occurred prior to December 25, 2004.

Plaintiff's first cause of action asserts allegations against Defendants Burge and Bellnier concerning wrongdoing that occurred on November 4, 2004, **but also alleges** that Burge and Bellnier were "responsible for massive corruption at Auburn from September 11, 2004 continuing **until March 8, 2005.** Comp. at 11–13. The alleged wrongdoing in Plaintiff's second, third, and fourth causes of action occurred, if at all, on December 29, 2004 and January 4, 2008. Accepting Plaintiff's allegations as true, the Court cannot conclude at this juncture that the allegations set forth in the first through fourth causes of action are time-barred. [6] Defendants' Motion to Dismiss portions of Plaintiff's Complaint as untimely is denied **without prejudice.**

[6]     The sufficiency of Plaintiff's allegations will be discussed below.

**B. Personal Involvement**
To state a viable claim under Section 1983, a plaintiff must allege that the defendant, while acting under color of state law, deprived him of a right, privilege or immunity secured by the Constitution or by the laws of the United States. *See* 42 U.S.C. § 1983. The personal involvement of a defendant is a prerequisite for the assessment of damages in a Section 1983 action, *McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir.1977), and the doctrine of respondeat superior is inapplicable to Section 1983 claims. *Polk County v. Dodson,* 454 U.S. 312, 325, 102 S.Ct. 445, 453, 70 L.Ed.2d 509 (1981); *Johnson v. Glick,* 481 F.2d 1028, 1033 (2d Cir.1973). "Further, a Section 1983 plaintiff must 'allege a tangible connection between the acts of the defendant and the injuries suffered.' " *Austin v. Pappas,* No. 04–CV7263, 2008 WL 857528, at *2 (S.D.N.Y. Mar.31, 2008) (citing *Bass v. Jackson,* 790 F.2d 260, 263 (2d Cir.1986) (other citation omitted). Any complaint that fails to allege

personal involvement is "fatally defective on its face." *Alfaro Motors, Inc. v. Ward,* 814 F.2d 883, 886 (2d Cir.1987) (internal quotations and citations omitted).

A defendant is "personally involved" if he or she "directly participated in the infraction." *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (citations omitted). Also, a defendant in a supervisory capacity may be "personally involved" within the meaning of Section 1983 if the state actor (1) failed to remedy the wrong after learning of the violation through a report or appeal; (2) created or continued a custom or policy under which unconstitutional practices ensued; or (3) was grossly negligent in managing subordinates who caused the unlawful condition or event. *Id.*

**\*7** Plaintiff has named supervisory personnel as Defendants and attempts to hold them liable for alleged violations of his rights by Department of Corrections employees. Plaintiff alleges, among other things, that Burge and Bellnier failed to stop "breaches of security" including spanish inmates from giving Plaintiff ketchup contaminated with blood (Comp. at 11–12); Burge, Goord, and LeClaire did nothing to stop "the spanish population" from tampering with Plaintiff's food and mail and disseminating Plaintiff's personal information (Comp. at 13); Burge was involved in a "massive conspiracy" to keep Plaintiff on mental health status and medicated (Comp. at 15); Wright, LeClaire, Goord, Burge, and Bellnier and "all staff at Central Office were made aware of all infections and did nothing at all" (Comp. at 15–16); LeClaire, Goord, Eagan, Bellamy, and Wright are responsible for Plaintiff's injuries because "they did nothing and knew of all crimes being done to [Plaintiff]" and did not stop the crimes or the "massive infections" (Comp. at 17). Plaintiff's vague allegations that he let the supervisory Defendants and all Central Office staff know about the conspiracy and crimes against him is insufficient to provide the type of notice that would have required these Defendants to act. Moreover, none of these Defendants can be held personally liable merely because they were in a high position of authority. *See Ayers v. Coughlin,* 780 F.2d 205, 210 (2d Cir.1985) ("[P]laintiff's claim for monetary damages against [the Commissioner] requires a showing of more than linkage in the prison chain of command.").

The Court has reviewed the Complaint in its entirety and afforded it great liberality but is unable to find any allegations to suggest that any of the supervisory Defendants—Burge, Goord, LeClaire, Bellnier, Wright, Eagan, or Bellamy—were personally involved or directly participated in any violation of Plaintiff's civil or constitutional rights. *See Johnson,* 481 F.2d at 1034 (when monetary damages are sought under Section 1983, the general doctrine of respondeat superior does not suffice and a showing of personal responsibility is required). Defendants Burge, Goord, LeClaire, Bellnier, Wright, Eagan, and Bellamy are **dismissed without prejudice**. [7]

[7]     As discussed below, even if Plaintiff could sufficiently allege personal involvement by these Defendants, Plaintiff has failed to state any claim which would entitle him to relief under Section 1983.

### C. Failure to State a Claim

A court may dismiss an *in forma pauperis* complaint if it determines that the complaint is frivolous. *Neitzke v. Williams,* 490 U.S. 319, 325, 109 S.Ct. 1827, 1833, 104 L.Ed.2d 338 (1989). "An action is frivolous when either: (1) the factual contentions are clearly baseless, such as when allegations are the product of delusion or fantasy; or (2) the claim is based on an indisputably meritless legal theory." *Livingston v. Adirondack Beverage Co.,* 141 F.3d 434, 437 (2d Cir.1998) (internal quotations omitted) (citing *Nance v. Kelly,* 912 F.2d 605, 606 (2d Cir.1990) (per curiam) (quoting *Neitzke,* 490 U.S. at 327, 109 S.Ct. at 1833)).

**\*8** A complaint is factually frivolous if the facts alleged are clearly baseless, a category that includes allegations that are fanciful, fantastic, and delusional. *Denton v. Hernandez,* 504 U.S. 25, 32–33, 112 S.Ct. 1728, 1733, 118 L.Ed.2d 340 (1992) (citing *Neitzke,* 490 U .S. at 325–28, 109 S.Ct. at 1833). "[A] finding of factual frivolousness is appropriate when the facts alleged rise to the level of the irrational or the wholly incredible, whether or not there are judicially noticeable facts available to contradict them." *Denton,* 504 U.S. at 33, 112 S.Ct. at 1733. A complaint is based on an "indisputably meritless" legal theory when either the claim lacks an arguable basis in law, *Benitez v. Wolff,* 907 F.2d 1293, 1295 (2d Cir.1990) (per curiam), or a dispositive defense clearly exists on the face of the complaint. *See Pino v. Ryan,* 49 F.3d 51, 53 (2d Cir.1995). Although the Court must accept the truth of Plaintiff's allegations on a motion to dismiss, the federal *in forma pauperis* statute grants the Court "the unusual power to pierce the veil of the complaint's

WESTLAW    © 2017 Thomson Reuters. No claim to original U.S. Government Works.

2009 WL 815724

factual allegations and dismiss those claims whose factual allegations are clearly baseless." *Neitzke,* 490 U.S. at 327, 109 S.Ct. at 1833.

Moreover, the law in this Circuit clearly provides that "complaints relying on the civil rights statutes are insufficient unless they contain some specific allegations of fact indicating a deprivation of rights, instead of a litany of general conclusions that shock but have no meaning." *Hunt v. Budd,* 895 F.Supp. 35, 38 (N.D.N.Y.1995) (McAvoy, C.J.) (citing *Barr v. Abrams,* 810 F.2d 358, 363 (2d Cir.1987) (other citations omitted)); *Pourzandvakil v. Humphry,* 94–CV–1594, 1995 WL 316935, at *7 (N.D.N.Y. May 22, 1995) (Pooler, J.) (citation omitted).

**1. Eighth Amendment**
The Eighth Amendment prohibits cruel and unusual punishment which encompasses punishments that involve the "unnecessary and wanton infliction of pain" and are incompatible with "the evolving standards of decency that mark the progress of a maturing society." *Estelle v. Gamble,* 429 U.S. 97, 102, 104, 97 S.Ct. 285, 290–91, 50 L.Ed.2d 251 (1976) (citations and quotations omitted). While the Eighth Amendment does not mandate comfortable prisons, neither does it tolerate inhumane treatment of those in confinement; thus the conditions of an inmate's confinement are subject to Eighth Amendment scrutiny. *Farmer v. Brennan,* 511 U.S. 825, 832, 114 S.Ct. 1970, 1976, 128 L.Ed.2d 811 (1994) (citing *Rhodes v. Chapman,* 452 U.S. 337, 349, 101 S.Ct. 2392, 2400, 69 L.Ed.2d 59 (1981)).

A claim alleging that prison conditions violate the Eighth Amendment must satisfy both an objective and subjective requirement—the conditions must be "sufficiently serious" from an objective point of view, and the plaintiff must demonstrate that prison officials acted subjectively with "deliberate indifference." *See Leach v. Dufrain,* 103 F.Supp.2d 542, 546 (N.D.N.Y.2000) (Kahn, J.) (quoting *Wilson v. Seiter,* 501 U.S. 294, 297–98, 111 S.Ct. 2321, 2323–24, 115 L.Ed.2d 271 (1991)); *Waldo v. Goord,* No. 97–CV–1385, 1998 WL 713809, at *2 (N.D.N.Y. Oct. 1, 1998) (Kahn, J. and Homer, M.J.). Deliberate indifference exists if an official "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer,* 511 U.S. at 837, 114 S.Ct. at 1979.

*9 Plaintiff alleges multiple violations of his Eighth Amendment rights. Plaintiff claims that Defendants were deliberately indifferent to his health and safety because they purposely infected him with and then denied him treatment for three "life-time" viruses, served him contaminated food, and subjected him to excessive force.

**a. Medical claims**
Generally, to prevail on a claim of inadequate medical care under the Eighth Amendment, a plaintiff must show two things: (1) that the plaintiff had a *sufficiently serious* medical need; and (2) that the defendant was *deliberately indifferent* to that serious medical need. *Estelle,* 429 U.S. at 104, 97 S.Ct. at 290–91. Mere disagreement with prison officials about what constitutes appropriate medical care does not state a cognizable claim under the Eighth Amendment. *Ross v. Kelly,* 784 F.Supp. 35, 44 (W.D.N.Y.1992). Prison officials have broad discretion in determining the nature and the character of medical treatment afforded to inmates. *Id.* (citations omitted). An inmate does not have the right to treatment of his choice. *Id.* at 45 (citing *Dean v. Coughlin,* 804 F.2d 207, 215 (2d Cir.1986); *Jackson v. Fair,* 846 F.2d 811, 817–18 (1st Cir.1988)). "Further, a delay in treatment does not violate the constitution unless it involves an act or failure to act that evinces 'a conscious disregard of a substantial risk of serious harm.' " *Thomas v. Nassau County Correctional Center,* 288 F.Supp.2d 333, 339 (E.D.N.Y.2003) (citation omitted). "The Second Circuit has 'reserved such a classification for cases in which, for example, officials deliberately delayed care as a form of punishment, ignored a life threatening and fast-degenerating condition for three days, or delayed major surgery for over two years.' " *Thomas,* 288 F.Supp.2d at 339 (citing *Espinal v. Coughlin,* 98 Civ. 2579, 2002 WL 10450, at *3 (S.D.N.Y. Jan.3, 2002)). Even if a prisoner is able to establish delay, in order to establish deliberate indifference, he must also show that his condition became worse or deteriorated as a result of the delay. *Thomas,* 288 F.Supp.2d at 339.

Plaintiff alleges that Defendants were deliberately indifferent to his serious medical needs when they gave him a "medical resource drink" containing blood and feces (fourth cause of action); intentionally infected him with Hepatitis A and then denied testing and medical treatment for the disease (sixth and thirteenth causes of action); infected him with H. Pylori (fourteenth cause of action); and served Plaintiff water intentionally contaminated with

2009 WL 815724

chemicals (twenty-first cause of action). Plaintiff also alleges that the supervisory Defendants allowed spanish inmates and corrupt correctional officers to contaminate his food tray with blood, semen, urine, and chemicals. These allegations are so fantastic or incredible as to be factually frivolous. Moreover, with respect to the sixth, thirteenth, and fourteenth causes of action, Plaintiff has failed to allege a tangible connection between the acts of any of the Defendants named in those causes of action and the injuries suffered by Plaintiff. Accordingly, Plaintiff's fourth, sixth, thirteenth, fourteenth, and twenty-first causes of action are dismissed **without prejudice.**

**\*10** Plaintiff also alleges that he was unable to have his blood tested on January 23, 2005 because Defendants Meyers and Toomey destroyed the paper instructing Plaintiff to fast before the test (eighth cause of action). Finally, Plaintiff alleges that on January 26, 2005, Defendant Vega destroyed the results from Plaintiff's stool sample to cover up the conspiracy by spanish inmates and officers (ninth cause of action). Plaintiff does not, however allege that any of these actions resulted in a delay in treatment which was life-threatening or that Plaintiff was ultimately denied medical treatment because of these acts. *See, e.g. Amaker v. Coombe,* No. 96 Civ. 1622, 2002 WL 523388, at \*8 (S.D.N.Y. Mar. 29, 2002) ("delay in treatment does not automatically indicate a violation of a prisoner's Eighth Amendment rights, 'unless the delay reflects deliberate indifference to a serious risk of health or safety, to a life-threatening or fast-degenerating condition or to some other condition of extreme pain that might be alleviated through reasonably prompt treatment.' "). Moreover, Plaintiff's claims against Defendants Meyers, Toomey, and Vega when read in their entirety are, as all of Plaintiff's claims in this Complaint, factually frivolous. Plaintiff alleges that the actions of these Defendants were part of the massive conspiracy to deliberately infect Plaintiff with viruses and then deny him proof that he had such viruses or treatment for the viruses. Plaintiff's eighth and ninth causes of action are also **dismissed without prejudice.**

### b. Food contamination

In the context of Eighth Amendment protections, prisoners are to be provided with "nutritionally adequate food that is prepared and served under conditions which do not present an immediate danger to the health and well being of the inmates who consume it." *Robles v. Coughlin,* 725 F.2d 12, 15 (2d Cir.1983) (citation

omitted); *see also Lunney v. Brureton,* No. 04 Civ. 2438, 2005 WL 121720, at \*6 (S.D.N.Y. Jan.21, 2005). Consequently, "[d]epriving an inmate of food or serving him contaminated food may constitute a violation of the Eighth Amendment." *Moncrieffe v. Witbeck,* No. 97–CV–253, 2000 WL 949457, at \*6 (N.D.N.Y. June 29, 2000) (citing *Robles v. Coughlin,* 725 F.2d at 15). However, as with most of his medical claims, Plaintiff's allegations that his food was contaminated with blood (sealed in packaged ketchup); feces; urine; semen; and chemicals are so conclusory and fantastic as to rise to the level of factually frivolous. Accordingly, these allegations are dismissed **without prejudice.**

### c. Excessive force

While the Eighth Amendment protects a prisoner against the excessive use of force, it "excludes from constitutional recognition *de minimis* uses of physical force, provided that the use of force is not of a sort repugnant to the conscience of mankind ." *Branham v. Meachum,* 77 F.3d 626, 630 (2d Cir.1996) (quoting *Hudson v. McMillian,* 503 U.S. 1, 9–10, 112 S.Ct. 995, 117 L.Ed.2d 156 (1992) (other quotations omitted)). A truly *de minimis* use of force will rarely suffice to state a constitutional claim. *Hudson,* 503 U.S. at 9–10, 112 S.Ct. at 1000 ("[Not] every malevolent touch by a prison guard gives rise to a federal cause of action."); *Johnson,* 481 F.2d at 1033 ("Not every push or shove, even if it later may seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights").

**\*11** Plaintiff alleges that Defendants Portnoy and Correctional Officer Smith "put the black strap" on Plaintiff's hands when transporting him from sick call to his cell. Comp. at 27. The restraining of Plaintiff's hands with a black strap on one occasion during transport from sick call to his cell is a *diminimis* use of force at best and does not allege conduct which is "repugnant to the conscience of mankind." Plaintiff's excessive force claims against Portnoy and Correctional Officer Smith are **dismissed without prejudice.** [8]

[8] To the extent that Plaintiff claims to have suffered emotional and mental harm for the alleged use of force by Defendants Portnoy and Smith, Plaintiff fails to state a claim upon which relief may be granted. *See* 42 U.S.C. § 1997e(e) (No Federal civil action may be brought by a prisoner confined in a jail,

2009 WL 815724

prison or other correctional facility, for mental or emotional injury suffered while in custody without a prior showing of physical injury).

Plaintiff also alleges that once back at his cell, he held his hands out through the food slot to have the black strap removed and "all officers which [Plaintiff] didn't name in this law suit started pulling his hands and arms really hard trying to break them and [his] wrists also." Comp. at 27–28. Since Plaintiff has not named any of the officers responsible for this incident, this claim is also dismissed **without prejudice.**

Defendants' Motion to Dismiss Plaintiff's excessive force claims is granted and those claims (seventeenth and eighteenth causes of action) are dismissed **without prejudice.**

### 2. Retaliation

When adverse action is taken by prison officials against an inmate, motivated by the inmate's exercise of a right protected under the Constitution, including the free speech provisions of the First Amendment, a cognizable retaliation claim under § 1983 lies. *See Franco v. Kelly,* 854 F.2d 584, 588–90 (2d Cir.1988). Courts must approach claims of retaliation " ' with skepticism and particular care' because 'virtually any adverse action taken against a prisoner by a prison official—even those otherwise not rising to the level of a constitutional violation— can be characterized as a constitutionally proscribed retaliatory.' " *Davis v. Goord,* 320 F.3d 346, 352 (2d Cir.2003) (quoting *Dawes v. Walker,* 239 F.3d 489, 491 (2d Cir.2001), overruled on other grounds by *Swierkiewicz v. Sorema N.A.,* 534 U.S. 506, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002)).

In order to survive a motion to dismiss a complaint, a plaintiff asserting a First Amendment retaliation claim must advance "non-conclusory" allegations establishing:

> (1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected speech [or conduct] and the adverse action.

*Davis,* 320 F.3d at 352 (quoting *Dawes,* 239 F.3d at 492). "[A] complaint which alleges retaliation in wholly

conclusory terms may safely be dismissed on the pleadings alone." *Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983).

Plaintiff alleges that he was retaliated against for filing grievances and complaints (third, seventh, tenth, nineteenth, and twentieth causes of action). Since the filing of prison grievances is a constitutionally protected activity, Plaintiff meets the first prong of the retaliation test. *See Graham v. Henderson,* 89 F.3d 75, 80 (2d Cir.1996); *Franco,* 854 F.2d at 590.

**\*12** Plaintiff has not proffered non-conclusory allegations showing a causal connection between any of the alleged retaliatory conduct with any of Plaintiff's grievances. More importantly, the retaliatory conduct alleged—which includes intentionally infecting Plaintiff with viruses; contaminating his food with blood, urine, semen, and chemicals; and murdering his whole family —are so outrageous and unbelievable as be factually frivolous. Plaintiff's retaliation claims are **dismissed without prejudice** in their entirety.

### 3. Denial of access to the courts

Inmates have a First Amendment right to "petition the Government for a redress of grievances." This right, which is more informally referred to as a "right of access to the courts," requires States "to give prisoners a reasonably adequate opportunity to present claimed violations of fundamental constitutional rights." *Bounds v. Smith,* 430 U.S. 817, 828, 97 S.Ct. 1491, 52 L.Ed.2d 72 (1977), modified on other grounds, *Lewis v. Casey,* 518 U.S. 343, 350, 116 S.Ct. 2174, 135 L.Ed.2d 606 (1996); see also *Bourdon v. Loughren,* 386 F.3d 88, 92 (2d Cir.2004) (citations omitted). "However, this right is not 'an abstract, freestanding right to a law library or legal assistance' and cannot ground a Section 1983 claim without a showing of 'actual injury.' " *Collins v. Goord,* 438 F.Supp.2d 399, 415 (S.D.N.Y.2006) (quoting *Lewis,* 518 U.S. at 351). As a result, to state a claim for denial of access to the courts, a plaintiff must assert non-conclusory allegations demonstrating both (1) that the defendant acted deliberately and maliciously, and (2) that the plaintiff suffered an actual injury. *Lewis,* 518 U.S. at 353; *Renelique v. Duncan,* 03–CV1256, 2007 WL 1110913, at *9 (N.D.N.Y. Apr.12, 2007) (Strom, J.) (same) (citing *Howard v. Leonardo,* 845 F.Supp. 943, 946 (N.D.N.Y.1994)).

Plaintiff alleges that Defendant Meyers denied Plaintiff access to the courts by destroying Plaintiffs' free legal postage mail, including Plaintiff's Article 78 motions (eleventh cause of action). Comp. at 19–20. Plaintiff does not allege any actual injury as a result of Defendant's alleged conduct. Plaintiff fails to state a claim for denial of access to the Courts, and therefore his eleventh cause of action is dismissed **without prejudice.** *See Lewis,* 518 U.S. at 351, 116 S.Ct. at 2180 (to state a constitutional claim for denial of access to the courts, a plaintiff must make a showing that he has suffered, or will imminently suffer, actual harm; that is, that he was "hindered [in] his efforts to pursue a legal claim"); *accord Morello v. James,* 810 F.2d 344, 347 (2d Cir.1987).

### 4. Conspiracy claims under Sections 1983 and 1985

To survive a motion to dismiss, a conspiracy claim under § 42 U.S.C.1983 must allege that: (1) an agreement existed between two or more state actors to act in concert to inflict an unconstitutional injury on plaintiff and (2) an overt act was committed in furtherance of that goal. *Ciambriello v. County of Nassau,* 292 F.3d 307, 324–25 (2d Cir.2002); *see also Concepcion v. City of New York,* No. 05 Civ. 8501, 2008 WL 2020363, at *5 (affirming the continued viability of the *Ciambriello* standards when analyzing a conspiracy claim *vis a vis* a motion to dismiss). [9] Vague and conclusory allegations that defendants have engaged in a conspiracy must be dismissed. *Ciambriello,* 292 F.3d at 325; *see also Sommer v. Dixon,* 709 F.2d 173, 175 (2d Cir.1983) ("A complaint containing only conclusory, vague, or general allegations of conspiracy to deprive a person of constitutional rights cannot withstand a motion to dismiss."); *Brown v. City of Oneonta,* 106 F.3d 1125, 1133 (2d Cir.1997) (complaints containing only conclusory, vague or general allegations of a conspiracy to deprive a person of constitutional rights do not state a claim for relief). Moreover, a Section 1983 conspiracy claim must not only allege a conspiracy, but also the "actual deprivation of constitutional rights." *Romer v. Morgenthau,* 119 F.Supp.2d 346, 363–64 (S.D.N.Y.2000) (citing *Malsh v. Austin,* 901 F.Supp. 757, 765 (S.D.N.Y.1995). "Thus, if a plaintiff cannot sufficiently allege a violation of his rights, it follows that he cannot sustain a claim of conspiracy to violate those rights." *See id.*

[9] The *Concepcion* Court stated that "in accord with Supreme Court precedent as well as the overwhelming weight of authority in this Circuit, this Court applies the *Ciambrello* standard in evaluating the sufficiency of the conspiracy claim ... under the Rule 12(b)(6) standard. In this regard ... the Court notes that it does not construe the decision in *Ciambrello* as imposing a 'heightened pleading requirement [ ]' for civil rights conspiracy claims ... nor a requirement that plaintiff must plead 'specific facts' to support his claim.... Rather, it reads *Ciambrello* as informing this Court's understanding of the type of factual allegations that are minimally sufficient to state a 'plausible' conspiracy claim under § 1983." *Concepcion,* 2008 WL 2020363, at * 5.

**\*13** Plaintiff alleges in conclusory fashion that all of the Defendants were involved in a massive conspiracy against Plaintiff. Plaintiff does not assert any facts giving rise to a conspiracy, but instead makes vague and shocking statements about a massive conspiracy involving Defendants, spanish inmates, and corrupt officers. Plaintiff has not alleged, except in conclusory fashion, that any meeting of the minds occurred between any of the Defendants. The Complaint does not contain any allegations to support a "plausible" conspiracy claim involving any of the Defendants. "[A]lthough a plaintiff does not need to provide detailed factual allegations, the allegations in the complaint must be 'enough to raise a right to relief above the speculative level.' " *Flores v. Levy,* No. 07–CV–3753, 2008 WL 4394681, at *9 (E.D.N.Y. Sep. 23, 2008) (citing *Bell Atlantic Corp.,* 127 S.Ct. at 1965).

Plaintiff also asserts conspiracy claims under 42 U.S.C. § 1985(3). To state a claim under 42 U.S.C.1985(3) a plaintiff must allege:

> " '(1) a conspiracy; (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of equal protection of the laws, or of equal privileges and immunities under the laws; (3) an act in furtherance of the conspiracy; (4) whereby a person is either injured in his person or property or deprived of any right of the citizens of the United States.' " *Fox v. City of New York,* No. 03 Civ. 2268, 2004 WL 856299, at *9 (S.D.N.Y. Apr. 20, 2004) (quoting *Mian [v. Donaldson, Lufkin & Jenrette Sec. Corp.],* 7 F.3d [1085,] 1087–88 [ (2d Cir.1993) ] ).

*Mione v. McGrath,* 435 F.Supp.2d 266, 271–72 (S.D.N.Y.2006). Under § 1985(3), the language requiring intent to deprive of equal protection of the laws "means that there must be some racial, or perhaps otherwise class-based, invidiously discriminatory animus behind the conspirator's action." *Segreto v. Kirschner,* 977 F.Supp. 553, 565 (D.Conn.1997) (quoting *Griffin v. Breckenridge,* 403 U.S. 88, 102, 91 S.Ct. 1790, 1798, 29 L.Ed.2d 338 (1971)).

However, "[a]s the Second Circuit has noted repeatedly, conspiracy claims are to be viewed with skepticism and must be supported by more than mere conclusory allegations." *Webb,* 340 F.3d at 110 ("In order to maintain an action under Section 1985, a plaintiff must provide some factual basis supporting a meeting of the minds, such that defendants entered into an agreement, express or tacit, to achieve the unlawful end.") (internal quotation marks omitted). Plaintiff's conclusory allegations of a conspiracy against him fail to provide any factual basis to plausibly support a meeting of the minds between the Defendants or that Defendants entered into an agreement to violate Plaintiff's rights.

Finally, even if Plaintiff's allegations of conspiracy were found to be more than merely conclusory, Plaintiff's conspiracy claims are barred by the "intra-corpo rate conspiracy" doctrine, also sometimes referred to as the intraenterprise conspiracy doctrine. The "intracorporate conspiracy" doctrine provides that a corporation or public entity "generally cannot conspire with its employees or agents as all are considered a single entity." *Everson v. New York City Transit Auth.,* 216 F.Supp.2d 71, 76 (E.D.N.Y.2002) (citation omitted); *see also Orafan v. Goord,* 411 F.Supp.2d 153, 165 (N.D.N.Y.2006) (holding that the conspiracy claim failed because the alleged co-conspirators were all DOCS officials and employees acting within the scope of their employment) (internal citations and quotations omitted), vacated and remanded on other grounds by *Orafan v. Rashid,* 249 Fed. Appx. 217, 2007 WL 2875968 (2d Cir.2007). An exception exists if the individuals are motivated by personal interests, separate and apart from the entity. *Orafan,* 411 F.Supp.2d at 165. To allege facts plausibly suggesting that defendants were pursuing personal interests, more is required than merely alleging defendants were motivated by personal bias. *See Peters v. City of New York,* 04–CV–9333, 2005 WL 387141, at *3 (S.D.N.Y. Feb.16, 2005) ("[P]ersonal bias is not the sort of individual interest that takes a

defendant out of the intraenterprise conspiracy doctrine") (internal quotation marks and citation omitted); *accord, Johnson v. City of New York,* 01–CV–1860, 2004 WL 502929, at *5 (E.D.N.Y. Jan.12, 2004).

**\*14** In this case, all of the Defendants were DOCS employees during the period set forth in the Complaint and all were acting within the scope of their employment. Therefore, the intra-corporate conspiracy doctrine applies. Additionally, Plaintiff has not alleged facts to plausibly suggest that the exception to the intra-corporate conspiracy doctrine applies.

For all of the foregoing reasons, Plaintiff's conspiracy claims (the fifth and sixteenth causes of action) are **dismissed** in their entirety **without prejudice.**

### 5. Due process

To state a claim for violation of procedural due process, Plaintiff must allege first that he had a protected liberty interest and, second, if he had such an interest, that he was deprived of that interest without being afforded due process of law. *Sealey v. Giltner,* 116 F.3d 47, 51 (2d Cir.1997); *see generally Wolff v. McDonnell,* 418 U.S. 539, 557, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974).

Plaintiff alleges that Defendant Burge violated Plaintiff right to due process because he was involved in "massive conspiracy" to keep Plaintiff on mental health status and medicated in order to silence Plaintiff (fifth cause of action). Comp. at 15. This claim is dismissed as conclusory and for failure to state any sort of claim for denial of due process.

Plaintiff also alleges that Defendants Eagen, Bellamy, and Burge denied Plaintiff due process by having in place a "grievance program [that is] not fair and effective." (fifteenth cause of action). Comp. at 22–23. Inmates do not have a constitutional right to have grievances processed or to ensure that grievances are processed properly. *See e.g. Torres v. Mazzuca,* 246 F.Supp.2d 334, 342 (S.D.N.Y.2003) (prison grievance procedures do not confer any constitutionally protected right on an inmate). A violation of the inmate grievance procedures does ***not*** give rise to a claim under Section 1983. *Cancel v. Goord,* No. 100 Civ.2042, 2001 WL 303713, at *3 (S.D.N.Y. Mar. 29, 2001). Thus, Plaintiff's claims regarding the unfairness of the grievance process are dismissed.

Finally, Plaintiff alleges that he was subjected to an "atypical and significant hardship" during his SHU incarceration at Auburn in violation of his due process rights (twenty-second cause of action). Comp. at 31. Plaintiff has not however alleged that he received insufficient process prior to being confined in SHU nor does he indicate what Defendants, if any, were personally involved in the alleged denial of due process. Plaintiff fails to allege a plausible claim for denial of due process.

### 6. Qualified Immunity

Defendants raise the affirmative defense of qualified immunity. Dkt. No. 50–2, Memorandum of Law at 24–25. "Qualified immunity is an affirmative defense that shields government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.' " *Stephenson v. Doe,* 332 F.3d 68, 76 (2d Cir.2003) (quoting *McCardle v. Haddad,* 131 F.3d 43, 50 (2d Cir.1997) (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982)).

**\*15** In determining whether qualified immunity applies, the court may first consider whether "the facts alleged show the [defendant's] conduct violated a constitutional right." *Saucier v. Katz,* 533 U.S. 194, 201, 121 S.Ct. 2151, 2156, 150 L.Ed.2d 272 (2001), modified by *Pearson v. Callahan,* ––––U.S. ––––, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009) (holding that although "the sequence set forth [in *Saucier* ] is often appropriate, it should no longer be regarded as mandatory"). If the plaintiff establishes that the violation of a constitutional right occurred, the court can examine "whether the right was clearly established ... in light of the specific context of the case, not as a broad general proposition." *Saucier,* 533 U.S. 194 at 201, 121 S.Ct. 2151, 150 L.Ed.2d 272. "If no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity." *Saucier,* 533 U.S. at 201, 121 S.Ct. at 2156. Because Plaintiff has not sufficiently alleged that any of the Defendants have violated his constitutional rights, "there is no necessity for further inquiries concerning qualified immunity."

## VI. Conclusion

Plaintiff's recounting of the facts is conclusory at best and wholly fantastic. Plaintiff claims that he is the target of a "massive conspiracy" to infect him with three "life-time" viruses; contaminate his food; and destroy his mail. Plaintiff claims that spanish inmates have been putting "LA–BINE–YA" on Plaintiff's food tray, which he describes as "sealed ketchup with blood inside." Plaintiff also claims that spanish officers are giving out Plaintiff's personal information; Plaintiff is being kept at "mental health level one" and medicated to prevent him from litigating his actions in the courts; he has been deliberately infected with Hepatitis A, H. pylori, and herpes; and his food has been contaminated with feces, sperm, blood, urine, and chemicals. Additionally, Plaintiff alleges that as part of this conspiracy, his whole family has been murdered. Plaintiff claims that "[t]his is the biggest conspiracy in the history of the United States." Comp. at 26.

Even reading Plaintiff's Complaint in the most generous manner, the Court finds Plaintiff's allegations as a whole to be unbelievable. Moreover, Plaintiff's history of mental illness, as documented in the psychiatric evaluations attached as exhibits to Plaintiff's Complaint (*see* Comp., Exhibits at 8–15), further supports a finding that his allegations are the product of delusion. The Court finds that the Complaint is factually frivolous under the standards delineated in *Denton, Neitzke,* and *Livingston* (*see* Section V.C., *supra* ) and therefore dismisses the Complaint in its entirety.[10]

[10]  Since the Complaint has been found to be factually frivolous, it "is exactly the sort of case that the PLRA now requires that a district court dismiss 'before docketing, if feasible' ... [since a]llowing these frivolous suits to proceed would subject the prospective defendants to the type of inconvenience and expense that concerned the Supreme Court in *Neitzke....."Jones v. City of New York,* Nos. Civ.A. 99–8281 and Civ.A. CV–00–370, 2000 WL 516889, at \*3 (E.D.N.Y. Mar.15, 2000). Moreover, because the problem with Plaintiff's complaint is substantive, such that a better pleading will not cure it, leave to re-plead is denied as futile. *See Cuoco v. Moritsugu,* 222 F.3d 99, 112 (2d Cir.2000).

WHEREFORE, based on the findings above, it is hereby

ORDERED, that Defendants' Motion to Dismiss (Dkt. No. 50) is **GRANTED** and Plaintiff's claims and

2009 WL 815724

all Defendants are **dismissed in their entirety without prejudice;** [11] and it is further

[11]    While Defendants Correctional Officer Smith, W. Robinson, and Nurse Smith have not been served or appeared, because all of Plaintiff's claims have been dismissed in their entirety, this action is dismissed as to the unserved Defendants as well.

**\*16** ORDERED that the Clerk shall serve a copy of this Memorandum–Decision and Order upon the parties in accordance with the Local Rules.

**All Citations**

Not Reported in F.Supp.2d, 2009 WL 815724

---

End of Document

© 2017 Thomson Reuters. No claim to original U.S. Government Works.

© 2017 Thomson Reuters. No claim to original U.S. Government Works.

Case 9:16-cv-00717-TJM-TWD    Document 35    Filed 11/28/17    Page 101 of 310
Midalgo v. Bass, Not Reported in F.Supp.2d (2006)
2006 WL 2795332

2006 WL 2795332
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Gabriel MIDALGO, Plaintiff,

v.

Sgt. BASS, Spinner, C.O. Streeter, John

Doe,[1] Head Medical Staff, C.O. Bennet,[2]

Sgt. Trimm, C.O. Bouyea, Defendants.

[1]    Defendant John Doe has not been identified and
therefore has not been served with the Amended
Complaint or otherwise appeared in this action. *See*
Dkt No 12.

[2]    Plaintiff mistakenly spells Defendant Bennett's
name as "Bennet." *See* Dkt. No. 23, Answer at n. 1.
The Court will refer to this Defendant by the proper
spelling.

No. 9:03-CV-1128 (NAM/RFT).
|
Sept. 26, 2006.

**Attorneys and Law Firms**

Gabriel Midalgo, Plaintiff, Pro Se.

Eliot Spitzer, Attorney General for the State of New
York, Senta B. Siuda, Esq., Assistant Attorney General,
Syracuse, NY, Attorney for Defendants.

**MEMORANDUM-DECISION AND ORDER**

NORMAN A. MORDUE, Chief U.S. District Judge.

 **\*1** Presently before this Court is defendants' motion
(Dkt. No. 105) for summary judgment dismissing the
complaint in this civil rights action pursuant to 42 U.S.C. §
1983. In his amended complaint (Dkt. No. 8), plaintiff, an
inmate in the custody of the New York State Department
of Correctional Services ("DOCS"), alleges deliberate
indifference towards his health and safety in violation of
the Eighth Amendment, interference with mail and access
to the law library in violation of the First Amendment,
inadequate visitation, and harassment.

Defendants' motion was referred to United States
Magistrate Judge Randolph F. Treece for a Report
and Recommendation pursuant to 28 U.S.C. § 636(b)
(1)(B) and Local Rule 72.3(c). In a thorough Report
and Recommendation (Dkt. No. 110), Magistrate Judge
Treece recommends that the Court grant the motion
for summary judgment. Plaintiff objects (Dkt. No. 112). After
the Court extended time for plaintiff to file additional
objections to the Report-Recommendation (Dkt. No.
113), plaintiff filed a second objection (Dkt. No. 114).

Pursuant to 28 U.S.C. § 636(b)(1)(C), this Court conducts
a *de novo* review of those parts of a magistrate judge's
Report and Recommendation to which a party specifically
objects. Where only general objections are filed, the Court
reviews for clear error. *See Brown v. Peters,* 1997 WL
599355,*2-* 3 (N.D.N.Y.), *aff'd without op.,* 175 F.3d 1007
(2d Cir.1999). Failure to object to any portion of a Report
and Recommendation waives further judicial review of the
matters therein. *See Roldan v. Racette,* 984 F.2d 85, 89 (2d
Cir.1993).

Plaintiff's objections include a variety of allegations. A
number of them revisit issues which are the subject of
the Report and Recommendation. They do not, however,
demonstrate the existence of material questions of fact
which warrant denial of summary judgment. Other
allegations concern events allegedly occurring subsequent
to the filing of the amended complaint herein; these are
not properly the subject of this action. Upon thorough *de
novo* review, the Court accepts and adopts the Report and
Recommendation.

It is therefore

ORDERED that the Report and Recommendation (Dkt.
No. 110) is accepted and adopted in its entirety; and it is
further

ORDERED that defendants' motion for summary
judgment (Dkt. No. 105) is granted and the action is
dismissed.

IT IS SO ORDERED.

RANDOLPH F. TREECE, Magistrate Judge.

2006 WL 2795332

### *REPORT-RECOMMENDATION and ORDER*

Pro se Plaintiff Gabriel Midalgo brings a civil action pursuant to 42 U.S.C. § 1983, alleging deliberate indifference towards his health and safety in violation of the Eighth Amendment, interference with mail and access to the law library in violation of the First Amendment, inadequate visitation, and harassment. Dkt. No. 8, Am. Compl. at ¶¶ 42-54. Defendants Bass, Sergeant at the Upstate Correctional Facility ("Upstate"), Correction Officer ("C.O.") Spinner, C.O. Streeter, C.O. Bennett, Trimm, Sergeant at Upstate, and C.O. Bouyea, bring this Motion for Summary Judgment. Dkt. No. 105. Plaintiff opposes the Motion. Dkt. No. 106. For the reasons to follow, it is recommended that the Motion for Summary Judgment be **granted.**

### I. FACTS [3]

[3]    Plaintiff's response to the Motion for Summary Judgment fails to comport with the requirements of the Local Rules for the Northern District of New York. Plaintiff only submitted a Memorandum of Law and some Exhibits but did not provide a Statement of Material Facts as required. *See* N.D.N.Y.L.R. 7.1(a). Normally, if no Statement of Material Facts are filed, Defendants' Statement of Material Facts are deemed admitted. N.D.N.Y.L.R. 7.1(a)(3). This Court, nonetheless, will proceed to decide this Motion with the aid of Defendants' Statement of Material Facts with accompanying Exhibits and Plaintiff's Verified Amended Complaint with Exhibits. Although no exhibits were attached to the Amended Complaint on the Docket Report, attachments were available with the Original Complaint and will hereby be incorporated into the Amended Complaint. *See* Dkt. Nos. 1 & 8.

 **\*2**  During the period of time of the alleged incidents, Plaintiff was incarcerated at the Upstate Correctional Facility. Dkt. No. 105, Defs.' 7.1 Statement at ¶ 3. In December 2002, an inmate was placed in Plaintiff's cell who Plaintiff alleges "was a paid informant." Am. Compl. at ¶ 16. Plaintiff further alleges that a wiretap was also placed in his cell during that time. *Id.* On February 4, 2003, Plaintiff wrote letters to the mail clerk and warden regarding his misplaced or delayed newspaper and magazine subscriptions and was told that they were

handed out by correction officers. *Id.* at ¶ 23, Ex. C, Lt. to Warden, dated Feb. 4, 2003; Lt. to Mail Clerk, dated Feb. 4, 2003; Lt. from Nason to Midalgo, dated Feb. 10, 2003. Plaintiff believed his subscriptions had been misplaced or delayed since January 2003. *Id.* at ¶ 22. Plaintiff's complaints about his subscriptions were forwarded to the Deputy Superintendent of Programs. *Id.* at ¶ 23, Ex. C, Lt. from Girdich to Midalgo, dated Feb. 5, 2003. Several months later, Plaintiff alleged he still had not received his magazines and newspapers and thus canceled his subscriptions. *Id.* at ¶ 24, Ex. C, Lts. to F.H.M. & Maxim, dated Apr. 21, 2003. Then, on April 20, 2003, Plaintiff's family arrived for a visit but were delayed for several hours in seeing him. *Id.* at ¶ 25. Plaintiff also claims that on April 24, 2003, and from June to September 2003, he received rotten fruits and vegetables and spoiled milk at meal time on several occasions. [4] *Id.* at ¶¶ 26 & 28. On April 26, 2003, Plaintiff wrote a complaint where he grieved that an officer took an excessive amount of time to hand his legal mail, he received rotten food, there was a delay in visitation with his family, magazine and newspapers were intercepted and either destroyed or misplaced, his cell was wiretapped, and the outgoing and incoming mail was being read. *Id.,* Ex. A, Grievance, dated Apr. 26, 2003. Since Plaintiff received no response, he submitted a letter seeking an appeal to the Superintendent. [5] *Id.,* Grievance Lt., dated May 27, 2003.

[4]    Plaintiff does not provide any specific dates as to when he received rotten or spoiled food.

[5]    It is unknown to this Court whether a response from the Superintendent was received.

On June 21, 2003, Plaintiff filed a grievance concerning "continuous harassment" regarding Plaintiff's legal mail as well as complaints made about his food and recreation. Defs.' 7.1 Statement, Ex. A, Grievance, dated June 21, 2003, & Case History & Record, UST 16208-03. C.O. Streeter provided a memo based on Plaintiff's grievance stating that he did not provide Plaintiff with spoiled food and that the meal "is inspected and packed in the mess" and then it is inspected once again by him prior to going into Plaintiff's cell. *Id.,* Ex. A, Streeter Lt. to Sgt. King, dated July 20, 2003. Correction Officers Spinner and Trimm also submitted memos regarding the grievance and noted they did not refuse recreation time and the grievance may have been a result of a misbehavior report filed against Plaintiff. *Id.,* Ex. A, Spinner Lt. to Sgt. King, dated July 23, 2003, & Trimm Lt. to Sgt. King, dated July 29,

2003. Sergeant King then submitted a memo to Captain Bezio stating that after he spoke to Plaintiff, and after interviewing several corrections officers on the matter, he could find no evidence to support the allegations. *Id.,* Ex. A, Sgt. King Lt. to Captain Bezio, dated Aug. 1, 2003. Based on the above investigation, the Inmate Grievance Resolution Committee ("IGRC") recommended that the grievance complaint pass through to the Superintendent. *Id.,* Ex. A, Case History & Record on Grievance dated June 21, 2003. Thereafter, the Superintendent found that the complaint had been investigated and that there was "no evidence to support [the] complaint[.]" *Id.,* Ex. A, Superintendent's Appeal, dated Aug. 6, 2003. Plaintiff then appealed to the Central Office Review Committee ("CORC"). The CORC made several findings which included that the Superintendent's determination be upheld based on the same reasoning provided by the Superintendent and that there was no substantiation to the claim that Plaintiff was harassed nor was there sufficient evidence to conclude there was harassment and that performance of the employees' duties should not be construed as harassment.[6] *Id.,* Ex. A, CORC Appeal, dated Oct. 1, 2003.

[6]   The CORC also stated that no grievances were received by the IGRC in April or May 2003, as Plaintiff has alleged he filed grievances during those months. Defs.' 7.1 Statement, Ex. A, CORC Appeal, dated Oct. 1, 2003; Am. Compl., Ex. A; *see also supra* p. 3.

**\*3** On June 27, 2003, a Fight Investigation Form was prepared by Sergeant Bass. Am. Compl., Ex. "Exhaustion of my Administrative Remedies ... [with fight investigation] ...," Fight Investigation Form, dated June 27, 2003. The form had a notation stating that Midalgo purportedly was defending himself in a fight he had with his cellmate because they had been in rival gangs. *Id.* The Sergeant's assessment was that it was a real fight and they were in rival gangs. *Id.* After the fight, Midalgo and his cellmate were placed in different cells. *Id.*

On July 1, 2003, Plaintiff sent Captain Bezio a letter stating that a known enemy had been placed in his cell and that his cell had been searched and that no contraband slip was received by Plaintiff.[7] Defs.' 7.1 Statement, Ex. A, Pl.'s Lt., dated July 1, 2003. Captain Bezio responded stating that an investigation had been completed as to the issues Plaintiff had raised. *Id.,* Ex. A, DOCS Lt. from Captain Bezio, dated July 14, 2003. In Captain Bezio's

letter, he noted that Sergeant Trimm interviewed Plaintiff about the missing materials but that Plaintiff did not provide any information. *Id.* Furthermore, the facility records were reviewed and it was found that there were no documented enemies of Plaintiff at the facility. *Id.*

[7]   It is unclear to this Court as to which cellmate Plaintiff referred to as a known enemy in the grievance.

On July 10, 2003, Plaintiff filed a grievance regarding bunking with an alleged known enemy, harassment, and other complaints. *Id .,* Ex. A, Grievance, dated July 10, 2003. C.O. Spinner submitted a memo to Sergeant Trimm stating that no legal material was removed from the cell and only items which were of excess were removed and logged, for which Plaintiff received a copy. *Id.,* Ex. A, Spinner Lt. to Sgt. Trimm, dated July 6, 2003. The Cell Search or Inspection Notice listed the items that were removed. *Id.,* Ex. A, Cell Search or Inspection Notice, dated June 27, 2003. Similarly, Sergeant Trimm sent a memo to Captain Bezio on July 6, 2003, stating that he had interviewed Plaintiff and that Plaintiff could provide no information as to the law books removed or any legal work that was missing. *Id.,* Ex. A, Sgt. Trimm Lt. to Captain Bezio, dated July 6, 2003. In addition, Trimm stated that Midalgo was not in a cell with a known enemy. *Id.* The IGRC recommended that the grievance complaint filed pass through to the Superintendent. *Id.,* Ex. A, Case History & Record for Grievance dated July 10, 2003. The Superintendent found that after an investigation, there was no evidence to show that Plaintiff was placed in a cell with a known enemy and that inmates are bunked together based on "[a]n assessment of compatibility" and that there was no evidence to support any of the other complaints. *Id.,* Ex. A, Superintendent's Appeal, dated July 15, 2003. Plaintiff appealed to the CORC, which found the complaint to be without merit.[8] *Id.,* Ex. A, CORC Appeal, dated Aug. 20, 2003.

[8]   Once again, the CORC noted that IGRC had not received grievances on April 26 or June 21, 2003, as Plaintiff has alleged he filed grievances on those dates. Am. Compl. at ¶ 27; Defs.' 7.1 Statement, Ex. A, CORC Appeal, dated Aug. 20, 2003.

On July 17, 2003, Plaintiff wrote to food services stating he was receiving spoiled food. Am. Compl., Ex. "Exhaustion of my Administrative Remedies Some Material Lost ...," Food Services Lt., dated July 17, 2003. On August 5, 2003, in a letter from Captain Racette to Plaintiff, Captain

2006 WL 2795332

Racette stated that after conducting an investigation "a check with the messhall indicates that the trays were received in the proper condition" and that no other inmate had any problems with the trays. *Id.,* Ex. "Exhaustion of my Administrative Remedies Some Material Lost ...," Mem. from Captain Racette, dated Aug. 5, 2003.

**\*4** On July 28, 2003, Plaintiff received a letter stating two books he was requesting from the law library were not required to be provided by the facility's law library and that the other book he sought should be available and if it was missing, then a replacement would be ordered. *Id.,* Ex. D, Lt. from Litzenberger, dated July 28, 2003. On August 3, 2003, Plaintiff wrote a letter to Jean Botta stating that the library staff was refusing to provide him with a law book and that he had been told that two books were not available at the facility. [9] *Id.,* Ex. D, Lt. to Botta, dated Aug. 3, 2003. Then, on August 4, 2003, Plaintiff submitted a letter to "D.S.G. Kiebert" stating he was receiving the wrong books and cases from the law library. [10] *Id.,* Ex. C, Lts., dated Aug. 4, 2003. He also noted that he did not receive a law book that was supposed to be available. *Id.* On August 5, 2003, Midalgo received a memo from Captain Racette stating that his complaints were investigated and that when Plaintiff was interviewed, he did not provide any further information, which resulted in a finding that the staff acted properly. *Id.,* Ex. "Exhaustion of my Administrative Remedies Some Material Lost ...," Mem. from Captain Racette, dated Aug. 5, 2003. On August 19, 2003, Plaintiff received a letter from the Law Library Supervisor, C.O. Bennett, stating one book requested was available but since it was in looseleaf and because Plaintiff was in SHU, he could request a photocopy of the materials. *Id.,* Ex. D., Lt. from Bennett, dated Aug. 19, 2003.

[9]    Jean Botta is not named as Defendant in this action.

[10]    "D.S.G. Kiebert" is also not named as a Defendant in this action.

## II. DISCUSSION

### A. Summary Judgment Standard

Pursuant to FED. R. CIV. P. 56(c), summary judgment is appropriate only where "there is no genuine issue as to any material fact and ... the moving party is entitled

to judgment as a matter of law." The moving party bears the burden to demonstrate through "pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any," that there is no genuine issue of material fact. *F.D.I. C. v. Giammettei,* 34 F.3d 51, 54 (2d Cir.1994) (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986)). "When a party has moved for summary judgment on the basis of asserted facts supported as required by [Federal Rule of Civil Procedure 56(e) ] and has, in accordance with local court rules, served a concise statement of the material facts as to which it contends there exist no genuine issues to be tried, those facts will be deemed admitted unless properly controverted by the nonmoving party." *Glazer v. Formica Corp.,* 964 F.2d 149, 154 (2d Cir.1992).

To defeat a motion for summary judgment, the nonmoving party must "set forth specific facts showing that there is a genuine issue for trial," and cannot rest on "mere allegations or denials" of the facts submitted by the moving party. FED. R. CIV. P. 56(e); *see also Scott v. Coughlin,* 344 F.3d 282, 287 (2d Cir.2003) ("Conclusory allegations or denials are ordinarily not sufficient to defeat a motion for summary judgment when the moving party has set out a documentary case."); *Rexnord Holdings, Inc. v. Bidermann,* 21 F.3d 522, 525-26 (2d Cir.1994). To that end, sworn statements are "more than mere conclusory allegations subject to disregard ... they are specific and detailed allegations of fact, made under penalty of perjury, and should be treated as evidence in deciding a summary judgment motion" and the credibility of such statements is better left to a trier of fact. *Scott v. Coughlin,* 344 F.3d at 289 (citing *Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir.1995) and *Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983)).

**\*5** When considering a motion for summary judgment, the court must resolve all ambiguities and draw all reasonable inferences in favor of the nonmoving party. *Nora Beverages, Inc. v. Perrier Group of Am., Inc.,* 164 F.3d 736, 742 (2d Cir.1998). "[T]he trial court's task at the summary judgment motion stage of the litigation is carefully limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them. Its duty, in short, is confined at this point to issue-finding; it does not extend to issue-resolution." *Gallo v. Prudential Residential Servs., Ltd. P'ship,* 22 F.3d 1219, 1224 (2d Cir.1994).

**B. Eleventh Amendment**

Plaintiff brings suit against Defendants Bass, Spinner, Streeter, Bennett, Trimm, and Bouyea in both their individual and official capacities. *See* Am. Compl. Plaintiff seeks injunctive relief as well as compensatory damages against these individuals in their individual and official capacities. *Id.* at Wherefore Clause.

The Eleventh Amendment states "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. CONST. amend. XI. The Eleventh Amendment bars a suit against the state in federal court unless the state consents to being sued or Congress legislatively overrides a state's immunity. *Huang v. Johnson,* 251 F.3d 65, 69 (2d Cir.2000). The state's immunity extends to state officials "act[ing] on behalf of the state" when the state is the "real, substantial party in interest." *Id.* at 69-70 (citing *Puerto Rico Aqueduct & Sewer Auth. v. Metcalf & Eddie, Inc.,* 506 U.S. 139, 142-47 (1993) & quoting *Pennhurst State School and Hosp. v. Halderman,* 465 U.S. 89, 101-02 (1984)). Moreover, the Eleventh Amendment will bar recovery for money damages in a suit "against state officials in their official capacities." *Ford v. Reynolds,* 316 F.3d 351, 354 (2d Cir.2003).

Therefore, the Defendants cannot be sued in their official capacities in a claim for money damages. However, Midalgo may seek damages from them in their individual capacities. Furthermore, Plaintiff may sue the Defendants for injunctive relief in both their individual and official capacities because "official-capacity actions for prospective relief are not treated as actions against the State." *Cruz v. Gomez,* 202 F.3d 593, 595 n. 2 (2d Cir.2000) (quoting *Will v. Michigan Dep't of State Police,* 491 U .S. 58, 71 n. 10 (1989)).

**C. Exhaustion of Remedies**

Defendants claim that Plaintiff has failed to exhaust his administrative remedies as to the following claims: 1) medical care;[11] 2) mail tampering; 3) law library issues; and 4) family visitation. Dkt. No. 105, Defs.' Mem. of Law at p. 4.

11    As to Plaintiff's medical care claim, Plaintiff may have grieved his medical care issues. *See* Am. Compl., Ex. "Exhaustion of my Administrative Remedies Some Material Lost ...," Grievance, dated Aug. 13, 2003. However, since the Eighth Amendment medical indifference claim is against the John Doe Defendant who was never identified nor appeared in this action, the issue will not be addressed further.

The Prisoner Litigation Reform Act of 1995 ("PLRA"), 42 U.S.C. § 1997(e)(a), states that "[n]o action shall be brought with respect to prison conditions under [section 1983], or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." This exhaustion requirement "applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle,* 534 U.S. 516, 532 (2002); *see also Ziemba v. Wezner,* 366 F.3d 161, 163 (2d Cir.2004).

**\*6** The New York State Department of Corrections has created a three-step process to exhaust all administrative remedies available to inmates. *See Abney v. McGinnis,* 380 F.3d 663, 668 (2d Cir.2004). First, the inmate must file a grievance complaint with the Grievance Clerk within fourteen (14) days of the incident. N.Y. COMP.CODES R. & REGS. tit. 7, § 701.7(a)(1). The complaint is then submitted to the IGRC to review the grievance. N.Y. COMP.CODES R. & REGS. tit. 7, § 701.7(a)(2)-(5). Second, the inmate may appeal the IGRC decision to the Superintendent. *See* N.Y. COMP.CODES R. & REGS. tit. 7, § 701.7(b). Third, if the inmate appeals the Superintendent's determination, the CORC is to make a final administrative determination. N.Y. COMP.CODES R. & REGS. tit. 7, § 701.7(c). Upon the completion of all three steps, an inmate may "seek relief pursuant to 42 U.S.C. § 1983." *Colon v. Harvey,* 344 F.Supp.2d 896, 897 (W.D.N.Y.2004) (citing *Neal v. Goord* 267 F.3d 116, 122 (2d Cir.2001) & *Santos v. Hauck,* 242 F.Supp.2d 257, 259 (W.D.N.Y.2003)). Moreover, "[e]ven if a prisoner receives no reply to a grievance or appeal, he is not excused from completing the appeals process. The rules provide that matters not decided within the prescribed time limits must be appealed to the next level of review." *Walters v. Carpenter,* 2004 WL 1403301, at \*3 (S.D.N.Y. June 22, 2004) (citing N.Y. COMP. CODES R. & REGS. tit. 7, §

Case 9:16-cv-00717-TJM-TWD    Document 35    Filed 11/28/17    Page 106 of 310
Midalgo v. Bass, Not Reported in F.Supp.2d (2006)
2006 WL 2795332

701.8 [12] & *Mendoza v. Goord,* 2002 WL 31654855, at *2 (S.D.N.Y. Nov. 21, 2002)).

[12]    N.Y. COMP.CODES R. & REGS. tit. 7, § 701.8 states: "[t]ime limit extensions may be requested at any level of review, but such extensions may be granted only with the written consent of the grievant. Absent such extension, matters not decided within the time limits may be appealed to the next step."

The Second Circuit has suggested a three-step inquiry when the inmate opposes a defendant's assertion that the inmate did not exhaust his remedies.

Depending on the inmate's explanation for the alleged failure to exhaust, the court must ask whether administrative remedies were in fact "available" to the prisoner. *Abney v. McGinnis,* 380 F.3d 663, 667-68 (2d. Cir.2004). The court should also inquire as to whether the defendants may have forfeited the affirmative defense of non-exhaustion by failing to raise or preserve it, *Johnson v. Testman,* 380 F.3d 691, 695 (2d Cir.2004), or whether the defendants' own actions inhibiting the inmate's exhaustion of remedies may estop one or more of the defendants from raising the plaintiff's failure to exhaust as a defense, *Ziemba v. Wezner,* 366 F.3d 161, 163 (2d Cir.2004). If the court finds that administrative remedies were available to the plaintiff, and that the defendants are not estopped and have not forfeited their non-exhaustion defense, but that the plaintiff nevertheless did not exhaust available remedies, the court should consider whether "special circumstances" have been plausibly alleged that justify "the prisoner's failure to comply with administrative procedural requirements." *Giano v. Goord,* 380 F.3d at 675 (citing *Berry v. Kerik,* 366 F.3d 85, 88 (2d Cir.2003); *Rodriguez* order).

*Hemphill v. New York,* 380 F.3d 680, 686 (2d Cir.2004); *see also Braham v. Clancy,* 425 F.3d 177, 181-82 (2d Cir.2005).

**\*7** Since failure to exhaust is an affirmative defense and defendants may be estopped from asserting the defense as "special circumstances may excuse a prisoner's failure to exhaust," the specific circumstances of each case must be examined. *Giano v. Goord,* 380 F.3d 670, 675 (2d Cir.2004) (citations omitted). Some special circumstances include, but are not limited to, occasions when prison officials "inhibit an inmate's ability to utilize administrative grievance procedures," if the prisoner received a favorable

disposition from his grievance but the time to appeal had expired and no relief was forthcoming, and all appeals were undertaken but prison officials did not respond within the required time period. *Id.* at 677. The effect of a plaintiff's justification as to why there was no exhaustion "is that, even though the administrative remedies are no longer available for reasons of timing or other procedural restrictions, such restrictions cannot serve to keep the plaintiff's suit from proceeding." *Id.* at 676. Additionally, "exhausted claims filed alongside unexhausted ones may proceed even though the unexhausted claims must be dismissed." *Id.* at 675.

Here, the Amended Complaint was filed on October 24, 2003. Dkt. No. 8. Any grievances filed subsequent to that date are untimely and irrelevant to the current action. [13] Therefore, only grievances filed prior to the date the Amended Complaint was filed will be considered.

[13]    As Exhibits to their 7.1 Statement, Defendants include grievances filed by Plaintiff on April 27, 2004, and May 20, 2004, which clearly were submitted after the filing of the Amended Complaint.

Plaintiff's June 21st complaint grieved the issues of harassment, food, and recreation. *See* Defs.' 7.1 Statement, Ex. A, Grievance, dated June 21, 2003. Plaintiff's other complaint in July addressed the issues of a known enemy in his cell, harassment, and a cell search where items were taken. *Id.,* Ex. A., Grievance, dated July 10, 2003. Both of these grievances were appealed to the Superintendent and CORC, thus, they are exhausted.

As to Plaintiff's claims regarding the law library, outgoing/incoming mail, and visitation, Defendants assert such were not fully exhausted. Plaintiff states that he did exhaust all his remedies as shown by the Exhibits to his Amended Complaint. Dkt. No. 106, Pl.'s Mem. of Law at Point Two. Plaintiff claims that Defendant Spinner destroyed legal documents that showed he attempted to exhaust. *Id.* Midalgo also alleges that he "filed and appealed at least ten grievances" and that "more than half were ignored or intercepted" by Defendant Streeter. *Id.*

Plaintiff did provide a copy of his grievance on the law library, outgoing/incoming mail, and visitation issues, which was dated April 26, 2003; however, the CORC stated they never received any grievances from April 2003. Am. Compl., Ex. A, Grievance, dated Apr. 26, 2003; Defs.' 7.1 Statement, Ex. A, CORC Appeal, dated Oct.

1, 2003. Plaintiff also submitted a letter stating that since he received no response that he sought an appeal to the Superintendent. Am. Compl., Ex. A, Grievance Lt., dated May 27, 2003. No other appeals were instituted on that grievance. Nonetheless, even if the CORC stated they did not receive the grievance, Plaintiff attempted to fulfill the exhaustion requirement by seeking an appeal to the next level as required when he received no response. *See Walters v. Carpenter,* 2004 WL 1403301, at *3; N.Y. COMP.CODES R. & REGS . tit. 7, § 701.8.

**\*8** Since Defendants put forth the affirmative defense of failure to exhaust, this Court will make the three-step inquiry set forth by the Second Circuit. With the first inquiry, depending on the prisoner's explanation, the Court must decide whether the remedies were "available." " 'Available' means more than the mere presence of a grievance system but also that the system is functionally available to the prisoner." *Shaheen v. Hollins,* 2005 WL 2179400, at *3 (N.D.N.Y. Sept. 7, 2005) (citing *Hemphill v.. New York,* 380 F.3d at 686-87 ("[I]n some circumstances, the behavior of the defendants may render administrative remedies unavailable.")); *see also Abbas v. Senkowski,* 2005 WL 2179426, at *6 (S.D.N.Y. Sept. 9, 2005). The "proper test for determining whether ordinary grievance procedures were 'available' [is] whether 'a similarly situated individual of ordinary firmness [would] have deemed them available.' " *McCullough v. Burroughs,* 2005 WL 3164248, at *3 (E.D.N.Y. Nov. 29, 2005) (quoting *Hemphill v. New York,* 380 F.3d at 688). In addition, "threats or other intimidation by prison officials may well deter a prisoner of 'ordinary firmness' from filing an internal grievance, but not from appealing directly to individuals in positions of greater authority within the prison system, or to external structures of authority such as state or federal courts." *McCullough,* 2005 WL 3164248, at *3 (quoting *Hemphill v. New York,* 380 F.3d at 688). Here, administrative remedies were available as a similarly situated inmate of ordinary firmness could deem the remedies available and because Plaintiff stated he did actually file the grievances, copies of which were provided to the Court.

As remedies were "available," it must be determined if the Defendants' own actions estop them from raising the failure to exhaust affirmative defense. The Second Circuit has held that "prison officials' threats or other inhibiting conduct may estop defendants from asserting the affirmative defense of non-exhaustion." *Hemphill*

*v. New York,* 380 F.3d at 688. Also, in making a determination based on the second inquiry, "[t]o establish equitable estoppel, the party claiming estoppel must show: (1) a misrepresentation by the opposing party; (2) reasonable reliance on that misrepresentation; and (3) detriment." *McCullough,* 2005 WL 3164248, at *4 (quoting *Lewis v. Washington,* 300 F.3d 829, 834 (7th Cir.2002)). In addition, "[w]hen asserting equitable estoppel against the government, one must also prove affirmative misconduct." *McCullough,* 2005 WL 3164248, at *4 (quoting *Lewis v. Washington,* 300 F.3d at 834). In this case, Plaintiff claims that Defendant Spinner destroyed legal documents showing he attempted to exhaust his administrative remedies and that "more than half [of the grievances] were ignored or intercepted" by Defendant Streeter. Pl.'s Mem. of Law at Point Two. Plaintiff's claim raises a matter of credibility but, for the purposes of this Motion, drawing all inferences in favor of Plaintiff, since Plaintiff set forth allegations of affirmative misconduct that could be considered "inhibiting," Defendants shall be deemed estopped from asserting the affirmative defense of failure to exhaust. Since we are considering Defendants actions as inhibiting, again for the purposes of this Motion, the claims will be deemed exhausted.

### D. Eighth Amendment Claims

**\*9** Plaintiff alleges that Defendants Bass and Trimm were deliberately indifferent to his health and safety when they placed incompatible cellmates or known enemies in Plaintiff's cell. Am. Compl. at ¶ 42. Plaintiff also contends that Defendants Bouyea, Spinner, and Streeter served him spoiled food which caused him psychological harm. *Id.* at ¶ 54.

The Eighth Amendment to the U.S. Constitution prohibits cruel and unusual punishment. Prohibited punishment includes that which "involve[s] the unnecessary and wanton infliction of pain." *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998) (quoting *Gregg v. Georgia,* 428 U.S. 153, 173 (1976)). To state a claim under § 1983, the inmate "must allege actions or omissions sufficient to demonstrate deliberate indifference; mere negligence will not suffice." *Hayes v. New York City Dep't of Corr.,* 84 F.3d 614, 620 (2d Cir.1996).

2006 WL 2795332

The Supreme Court has delineated a two-part test for deliberate indifference. First, the "depravation alleged must be, objectively, sufficiently serious," and "the inmate must show that he is incarcerated under conditions posing a substantial risk of serious harm." *Farmer v. Brennan,* 511 U.S. 825, 834 (1994) (internal quotation marks and citations omitted). Second, the prison official must "know[ ] of and disregard[ ] an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* at 837; *see also Hayes v. New York City Dep't of Corr.,* 84 F.3d at 620.

The Eighth Amendment also imposes on prison officials "a duty ... to protect prisoners from violence at the hands of other prisoners." *Farmer v. Brennan,* 511 U.S. at 833 (citation omitted). Nonetheless, prison officials may not be constitutionally liable for every injury an inmate suffers at the hands of other inmates. *Id.* at 834. A plaintiff may recovery for injuries received while in custody "if the injury resulted from the defendant prison official's purposeful subjection of the prisoner to a 'substantial risk of serious harm' or from the official's deliberate indifference to that risk." *Fischl v. Armitage,* 128 F.3d 50, 55 (2d Cir.1997) (quoting *Farmer v. Brennan,* 511 U.S. at 834). The Second Circuit has stated that "[t]he failure of custodial officers to employ reasonable measures to protect an inmate from violence by other prison residents has been considered cruel and unusual punishment." *Ayers v. Coughlin,* 780 F.2d 205, 209 (2d Cir.1985) (citing *United States v. Bailey,* 444 U.S. 394, 423 (1980)). However, "[a]n isolated omission to act by the state prison guard does not support a claim under section 1983 absent circumstances indicating an evil intent, or recklessness, or at least deliberate indifference to the consequences of his conduct for those under his control and dependent upon him." *Id.* (quoting *Williams v. Vincent,* 508 F.2d 541, 546 (2d Cir.1974)). Instead, "reckless disregard of plaintiff['s] right to be free from attacks by other inmates may be shown by the existence of a pervasive risk of harm to inmates from other prisoners and a failure by prison officials to reasonably respond to that risk." *Knowles v. New York City Dep't of Corr.,* 904 F.Supp. 217, 221-22 (S.D.N.Y .1995) (citing *Rucco v. Howard,* 1993 WL 299296, at *4 (S.D.N.Y. Aug. 4, 1993) & *Martin v. White,* 742 F.2d 469, 474 (8th Cir.1984)) (internal quotation marks omitted) (alteration in original). Furthermore, "an inmate must inform a correctional official of the basis for his belief that another inmate represents a substantial threat to his safety before the correctional official can be charged with deliberate indifference." *Sims v. Bowen,* 1998 WL 146409, at *3 (N.D.N.Y. Mar. 23, 1998). Moreover, there is no constitutional right to the cellmate of a prisoner's choice even if a prisoner is not getting along with his cellmate. *Harris v. Greer,* 750 F.2d 617, 618 (7th Cir.1984).

**\*10** Here, Plaintiff claims a known enemy was placed in his cell. Midalgo states that he filed a grievance expressing his fear that he would be placed with a "known or made for hire enemy" and that on June 27, 2003, he was bunked with a known enemy and a fight broke out where Plaintiff suffered injuries to his face, eye, knees, and tricep. Am. Compl. at ¶¶ 27 & 31. However, Captain Bezio stated in a letter to Midalgo that "there [was] no evidence to indicate that [he] was placed in a cell with a known enemy. A review of facility records reveal[ed] that there [were] no documented enemies of [his] at [the] facility" and that if an inmate should be considered an enemy, Midalgo should contact the assigned Correction Counselor. Defs.' 7.1 Statement, Ex. A, DOCS Lt. from Captain Bezio, dated July 14, 2003. Defendant Trimm also conducted an investigation into the grievance and found that there was no evidence that there was a known enemy placed in Midalgo's cell. *Id.,* Ex. A, Sgt. Trimm Lt. to Captain Bezio, dated July 6, 2003. Even the Superintendent stated that inmates were bunked based on compatibility. *Id.,* Ex. A, Superintendent's Appeal, dated July 15, 2003.

When questioned about how Plaintiff knew there was a known enemy placed in his cell, Plaintiff stated that his "circumstantial evidence clearly proves that [he] was placed in the cell with a known enemy. The timing, the dates, [his] grievances, [his] appeals, the coincidences, everything[.]" Dkt. No. 105, Ex. A., Pl.'s Dep. at p. 63, lines 5-8. He also stated he told his correction counselor he was in danger from "all gang members" but then stated that he did not tell his counselor anything of such nature since "there was no counselor for [him] to speak to" until after the incident occurred. *Id.* at pp. 63, lines 12-14, 64, lines 17-20, & 65, lines 17-23. Plaintiff further stated that the fights he had with his cellmate occurred because his cellmate made "homosexual advances" on him. *Id.* at p. 16, line 14. After that cellmate, Plaintiff had approximately twenty (20) more cellmates because "things weren't working out" and he was fighting with them as well over alleged homosexual advances. *Id.* at pp. 25, lines

11-14 & 30, lines 21-24, & 31, lines 1-11. Plaintiff stated he had "plenty of fights" with other cellmates. *Id.* at p. 31, lines 16-24.

Midalgo has failed to meet the Eighth Amendment standard of deliberate indifference. First, Midalgo must show that he was incarcerated under conditions that posed a substantial risk of serious harm. Plaintiff has stated he fought with many of his cellmates and was injured, especially with his first cellmate whom "Sergeant Bass thought was a rival gang member." Am. Compl., Ex. "Exhaustion of my Administrative Remedies ... [with fight investigation] ...," Fight Investigation Form, dated June. 27, 2003. However, Plaintiff has not shown that the injuries he received were based on the purposeful subjection of Midalgo to a substantial risk of serious harm or by deliberate indifference to the risk. Plaintiff's claims were investigated and found to be without merit as there were no known enemies in the facility. Furthermore, after Plaintiff's fight with his cellmate, they were separated and placed in different cells. *Id.* Moreover, Plaintiff, over time, had numerous cellmates because they were not compatible. Prison officials took appropriate measures to protect Midalgo after the fights by removing the other inmate from the cell. Therefore, Plaintiff has failed to prove that any depravation alleged was serious and that he was incarcerated under conditions that posed a substantial risk of harm.

**\*11** Even if Plaintiff could satisfy the first prong, Plaintiff clearly fails on the second prong. Midalgo has not shown that the Defendants knew of and disregarded an excessive risk to his health or safety. This is evidenced by the fact that he had nearly twenty other cellmates. He was not forced to bunk with another cellmate for an extended period of time. Even with his first cellmate, he only bunked with him for a month or so. Pl.'s Dep. at pp. 16, lines 12-24, & 17, lines 1-3. Investigations were conducted into the matter and no evidence was found to support Plaintiff's claim that there was a known enemy placed in his cell. Plaintiff also admitted that many of his fights were because he thought other inmates were making homosexual advances towards him. *Id.* at pp. 30, lines 21-24, & 31, lines 1-11. Although there is a duty to protect placed on prison officials, the injuries were not a result of indifference on the part of the officials. Furthermore, Plaintiff did not inform the correction officials of his belief until a fight ensued. *Id.* at p. 65, lines 22-23. Plaintiff seemingly would prefer to choose his own cellmate,

however inmates do not possess such a right, and the Superintendent noted that cellmates were chosen based on compatibility.

Plaintiff also claims that Defendants Spinner, Streeter, and Bouyea brought him spoiled or rotten food on several occasions and that from June to September 2003, Defendants Spinner and Streeter served Midalgo "moldy cheese, bread, spoiled milk and rotten fruits ." *Id.* at p. 14, lines 3-6; Am. Compl. at ¶ 28.

The Eighth Amendment places a duty upon prison officials to ensure that prisoners receive adequate food. *Farmer v. Brennan,* 511 U.S. at 832. In that context, prisoners are to be provided with "nutritionally adequate food that is prepared and served under conditions which do not present an immediate danger to the health and well being of the inmates who consume it." *Robles v. Coughlin,* 725 F.2d 12, 15 (2d Cir.1983) (citation omitted); *see also Lunney v. Brureton,* 2005 WL 121720, at \*6 (S.D.N.Y. Jan. 21, 2005).

Here, C.O. Streeter stated that he did not provide Plaintiff with spoiled food and that meals are inspected and placed on the trays at the messhall and then are further inspected once again by him prior to Plaintiff receiving the food. Defs.' 7.1 Statement, Ex. A, Streeter Lt. to Sgt. King, dated July 20, 2003. The Superintendent found no evidence to support Plaintiff's claim on this issue. *Id.,* Ex. A, Superintendent's Appeal, dated Aug. 6, 2003. Plaintiff admits that the officers do not prepare food trays and that they merely inspect them before they get to Plaintiff. Pl.'s Dep. at pp. 36, lines 19-24, & 37, lines 1-5. Midalgo also stated that while in the normal population, all the meals are sealed but in SHU some items are not sealed, however some do remain sealed such as cheese and meat. *Id.* at p. 38, lines 2-14. Plaintiff further stated that he received expired milk from the correction officers and that Defendants Spinner and Streeter provided spoiled food during breakfast and lunch from June to September 2003. *Id.* at pp. 41, lines 23-24, 42, lines 1-13, 50, lines 16-24, & 51, lines 1-12. On October 10, 2003, Plaintiff received a memo from the Food Services Administrator stating that his kosher meal was prepared in accordance with the guidelines set by the Department of Correctional Services. Pl.'s Mem. of Law, Ex., Inter-Departmental Memo from Haug to Midalgo, dated Oct. 10, 2003. The memo also states that items such as milk and bread are prepackaged and the trays are checked

2006 WL 2795332

and wrapped with cellophane before they are delivered to the inmates. *Id.* The Superintendent further stated that after an investigation was conducted with the Food Service Administrator, since the food is prepackaged, contact between an officer and the trays are limited. Pl.'s Mem. of Law, Ex. Superintendent's Appeal, dated Oct. 28, 2003. Midalgo states, however, that he had to beg other prisoners to sell him food so that he "wouldn't starve or get sick" and that as a result he received psychological harm which include "anxiety, nightmares about being poisoned, delusions and dizziness." *Id.* at p. 50; Am. Compl. at ¶ 54.

*12 Prison officials are required to provide nutritionally adequate meals that are served under conditions which do not present an immediate danger to the health and well being of an inmate. Here, Plaintiff received kosher meals for several years because the food was more healthy than regular food received by the inmates. Pl.'s Dep. at pp. 38, lines 15-24, & 39, lines 1-18. Upstate provided the kosher meals since Plaintiff made the request. *Id.* at p. 39, lines 1-18. Furthermore, Midalgo only stated he received psychological harm from the alleged incident. There was no immediate danger to his health or well being. Plaintiff did not starve nor was he denied meals. He also does not state he had weight loss or anything of the sort which would put his health in immediate danger. He stated that he purchased food from other inmates. Moreover, investigations were conducted into Plaintiff's spoiled and rotten food claims and the claims were found to be unsupported by any evidence as most items were prepackaged and wrapped in cellophane. Moreover, Plaintiff admits that the Defendants he seeks to hold liable had no control over the contents on his foodtrays.

Therefore, it is recommended that the Motion for Summary Judgment on Plaintiff's Eighth Amendment claims be **granted.**

### E. First Amendment Claims

Plaintiff claims that Sergeant Trimm and "her C.O.s" were misplacing or destroying his magazine and newspaper subscriptions and that his outgoing mail/legal mail was read by Defendant Bouyea in order to "play mind games with [Plaintiff]." Am. Compl. at ¶¶ 22 & 46. Plaintiff further alleges that Defendant Bennett purposefully gave him the wrong books and cases and lost legal documents which resulted in frustrating Plaintiff's lawsuit and an

inability to file a 440 motion pursuant to New York State's Criminal Procedure Law. *Id.* at ¶ 48.

"Interference with legal mail implicates a prison inmate's rights to access to the courts and free speech as guaranteed by the First and Fourteenth Amendments to the U.S. Constitution." *Davis v. Goord,* 320 F.3d 346, 351 (2d Cir.2003). In order to state a claim for lack of access to the courts by interference with legal mail, "an inmate must allege that a defendant's deliberate and malicious interference actually impeded his access to the court or prejudiced an existing action." *Cancel v. Goord,* 2001 WL 303713, at *4 (S.D.N.Y. Mar. 29, 2001) (citing *Lewis v. Casey,* 518 U.S. 343, 349 (1996)). However, "[a] delay in being able to work on one's legal action or communicate with the courts does not rise to the level of a constitutional violation." *Cancel v. Goord,* 2001 WL 303713, at *5 (citing *Jermosen v. Coughlin,* 877 F.Supp. 864, 871 (S.D.N.Y.1995) & *Jones v. Smith,* 784 F.2d 149, 151-52 (2d Cir.1986)). But, if an adverse judgment to an "otherwise meritorious" motion resulted from defendants' delay, then a § 1983 claim is stated. *Id.*

A prisoner maintains the right to the flow of incoming and outgoing mail as protected by the First Amendment. *Davis v. Goord,* 320 F.3d at 351 (citing, *inter alia, Heimerle v. Attorney General,* 753 F.2d 10, 12-13 (2d Cir.1985)). Any "[r]estrictions on prisoners' mail are justified only if they 'further [ ] one or more of the substantial governmental interests of security, order, and rehabilitation ... [and] must be no greater than is necessary or essential to the protection of the particular governmental interest involved.' " *Id.* (quoting *Washington v. James,* 782 F.2d 1134, 1139 (2d Cir.1986)) (alterations in original). Therefore, "in balancing the competing interests implicated in restrictions on prison mail, courts have consistently afforded greater protection to legal mail than to non-legal mail, as well as greater protection to outgoing mail than to incoming mail." *Id.* (citing, *inter alia, Thornburgh v. Abbott,* 490 U.S. 401, 413 (1989)). Although an inmate has the right to be there when his legal mail is opened, an isolated event of tampering will be insufficient to allege a constitutional violation unless the inmate can show "that prison officials 'regularly and unjustifiably interfered with the incoming legal mail.' " *Id.* (quoting *Cancel v. Goord,* 2001 WL 303713, at *6); *see also Wolff v. McDonnell,* 418 U.S. 539, 574-76 (1974); *Morgan v. Montanye,* 516 F.2d 1367, 1371 (2d Cir.1975);

Case 9:16-cv-00717-TJM-TWD   Document 35   Filed 11/28/17   Page 111 of 310
Midalgo v. Bass, Not Reported in F.Supp.2d (2006)
2006 WL 2795332

*Gill v. Riddick,* 2005 WL 755745, at *15 (N.D.N.Y. Mar. 31, 2005).

**\*13** With regard to non-legal incoming mail, a prison's "regulations or practices affecting a prisoner's receipt of non-legal mail must 'be reasonably related to legitimate penological interests[.]'" *Cancel v. Goord,* 2001 WL 303713, at *6 (quoting *Thornburg v. Abbott,* 490 U.S. 401, 409 (1989)). "[P]rison security is a sufficiently important governmental interest to justify limitations on a prisoner's [F]irst [A]mendment rights." *Id.* (quoting *Gaines v. Lane,* 790 F.2d 1299, 1304 (7th Cir.1986)). In order to state a claim for interference with incoming non-legal mail, the inmate will have to show a pattern and practice of interference without the legitimate penological interest. *Id.*

With regard to Plaintiff's legal mail being read, Plaintiff states that C.O. Bouyea "mumble[d] something similar to what [Plaintiff] wrote in [his] legal mail under his breath." Am. Compl. at ¶ 26. Bouyea purportedly repeated "something verbatim to a letter" Midalgo had written to a legal organization and that there were similar occurrences on several occasions. Pl.'s Dep. at pp. 39, lines 19-24, & 40, lines1-6. Plaintiff claims that Bouyea whispered so that only Plaintiff could hear the statements. *Id.* at p. 40, lines 19-23. When Plaintiff was asked about the statement made in his Amended Complaint that "outgoing mail/ legal mail was being read due to a fabricated penological interest" Midalgo stated that he believed his mail was read because he "agitated [the facility's] security interest and that ... gave them a reason to read [his] mail and things [he] was writing in [his] mail." *Id.* at p. 83, lines 3-8. Another reason Plaintiff believed the mail was read was because the inmates who became his cellmates "would try to start a whole situation based on letters" that Plaintiff had written. *Id.* at p. 83, lines 9-12. Plaintiff had submitted a grievance about his legal mail and it was found to have no merit and that there was no evidence to support his complaint. Defs.' 7.1 Statement, Ex. A, Sgt. King Lt. to Captain Bezio, dated Aug. 1, 2003; Ex. A, Superintendent's Appeal, dated Aug. 6, 2003.

Here, Plaintiff has failed to show that there was interference with his legal mail. Plaintiff has not alleged any deliberate and malicious interference that actually impeded his access to the courts nor prejudiced an existing action. Plaintiff also provides no proof that his mail was read except that he states Defendant Bouyea was mumbling under his breath something similar to what had

been written in Plaintiff's letters. Moreover, Midalgo has not shown that Bouyea opened and read his mail on a regular and unjustifiable basis.

Plaintiff further states he was not receiving his magazine and newspaper subscriptions and that Defendant Trimm "was aware that her C.O.s were purposefully misplacing [his] magazines and newspaper subscription" or providing them to other inmates. Am. Compl. at ¶ 22; Pl.'s Dep. at p. 34. Midalgo says he knew some of his magazines that were in the "rec room" were his because he saw his name on the label. Pl.'s Dep. at p. 34, lines 2-4. He also stated he wrote to the mail clerk to inquire about his mail, the mail clerk told him that magazines were given to the correction officers to be handed out, that they were not delivered to him. *Id.* at p. 34, lines 8-12. Then when Plaintiff spoke to Sergeant Trimm about the situation, she gave him "a devious smile and wrote something out on a pad and said she would look into it and she never did." *Id.* at p. 34, lines 16-19.

**\*14** In regards to the non-legal mail, Plaintiff does have a right to incoming, non-legal mail, although to a lesser extent than legal, outgoing mail. *See Davis v. Goord,* 320 F.3d at 351. Plaintiff would have to show a pattern and practice of interference without a penological interest or purpose. Midalgo makes the general claim that he did not receive his subscriptions for several months. In a letter to the Warden, Plaintiff provides the names of five different magazines which were not delivered to him. Plaintiff only submitted two letters to the Court that were sent to two different magazine companies stating he needed to cancel his subscriptions due to his failure to receive the magazines. Am. Compl., Ex. C, Lt. to Warden, dated Feb. 4, 2003; Lts. to F.H.M. & Maxim, dated Apr. 21, 2003. Midalgo also states he received one issue for each subscription. Lts. to F.H.M. & Maxim, dated Apr. 21, 2003. Plaintiff states he received one issue of Maxim after it had gone through the procedure of media review. Pl.'s Dep. at p. 34, lines 20-24, & 35, lines 4-12. Despite the letters, Plaintiff has not shown that there was a pattern and practice in not receiving his subscriptions. Plaintiff has not stated with any specificity which magazines he did not receive and, more importantly, for what time periods he did not receive them. *See* Am. Compl. at ¶¶ 22-24; Pl.'s Mem. of Law at Point Five. Plaintiff merely makes a generalization that from January 2003 until he cancelled his subscriptions, his magazines and newspapers were misplaced and that several months had

2006 WL 2795332

passed without receiving any subscriptions. Am. Compl. at ¶¶ 23 -24. More to his detriment, Plaintiff does not state which officers misplaced or destroyed his magazines nor does he show that there was a practice of this by the Defendants. [14] Therefore, Plaintiff has failed to state a claim on his non-legal, incoming mail.

[14]     The Court also notes that the Defendants fail to address whether or not there was a penological interest in the regulations or practices that may have affected Midalgo's receipt of non-legal mail. *See* Defs.' Mem. of Law.

In addition, "personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (quoting *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 (2d Cir.1991)). Even if the Court were to draw all inferences in favor of Plaintiff that a pattern and practice has been established, Plaintiff has failed to allege the personal involvement of Defendant Trimm or any other Defendant. Furthermore, to the extent Plaintiff states that Defendant Trimm would be liable in a supervisory capacity, Plaintiff has failed to show what supervisory position Defendant Trimm holds as to the corrections officers who may have misplaced or destroyed his magazines.

Plaintiff further makes the claim that he received the wrong books and cases from the law library or that he never received the books requested. *Id.* at ¶ 48. Midalgo also alleges that his legal documents were lost and he was unable to file court documents as a result. *Id.*

Under the First Amendment, "prisoners have a constitutional right of access to the courts." *Bounds v. Smith,* 430 U.S. 817, 821 (1977); *Bourdon v. Loughren,* 386 F.3d 88, 92 (2d Cir.2004). This right "requires prison authorities to assist inmates in the preparation and filing of meaningful legal papers by providing prisoners with adequate law libraries or adequate assistance from persons trained in the law." *Bounds v. Smith,* 430 U.S. at 828; *Bourdon v. Loughren,* 386 F.3d at 92 (quoting *Bounds*). However, there is no "abstract, freestanding right to a law library or legal assistance, [and] an inmate cannot establish relevant actual injury simply by establishing that his prison's law library or legal assistance program is subpar in some theoretical sense." *Lewis v. Casey,* 518 U.S. at 351. The Supreme Court held that in order to fulfill the actual injury requirement, derived

from the constitutional doctrine of standing, on a law library claim where there is a lack of access to the courts, the inmate must be pursuing direct appeals from the conviction for which he or she was incarcerated, a *habeas corpus* petition, or a civil rights claim pursuant to § 1983 "to vindicate basic constitutional rights." *Lewis v. Casey,* 518 U.S. at 354.

**\*15** As to Plaintiff's law library claim, in regards to some of the books Midalgo sought, he received a letter stating that the law library was not required to carry two of the books he requested and that the other book should have been available and if it was missing, then a replacement would be ordered. Am. Compl., Ex. F, Lt. from Litzenberger, dated July 28, 2003. Then Plaintiff wrote two letters noting that the library staff was refusing to provide him with a law book, that he had been told that two books were not available at the facility, and that he was receiving the wrong books and cases from the law library. *Id.,* Exs. D, Lt. to Botta, dated Aug. 3, 2003 & Ex. C, Lt., dated Aug. 4, 2003. However, Plaintiff received a memo noting that an investigation had been completed and that the staff had acted properly. *Id.,* Ex. "Exhaustion of my Administrative Remedies Some Material Lost ...," Mem. from Captain Racette, dated Aug. 5, 2003. Midalgo also received a letter from C.O. Bennett whereby Plaintiff was told that one book he had requested was available but that because Plaintiff was in SHU and since the book was looseleaf, he could request a photocopy of the materials. *Id.,* Ex. D., Lt. from Bennett, dated Aug. 19, 2003. However, Plaintiff claims that the book was not in looseleaf and that Defendant Bennett had lied and then stated the book was missing after Plaintiff claimed that all he received was the index. Pl.'s Dep. at pp. 78, lines 14-24, & 79, lines 1-3. Plaintiff alleges that every book he requested from the law library was missing and that one book that he did receive had a section ripped out that Plaintiff needed. *Id.* at p. 85, lines 1-18. However, Plaintiff states that he would not say it was Defendant Bennett's fault but that it is his duty to oversee the law library. *Id.* at p. 86, lines 18-24.

Additionally, Plaintiff states that he was trying to find out how to copyright some of his poetry. *Id.* at p. 74, lines 22-23. Midalgo further acknowledges he was trying to file a N.Y. CRIM. PROC. LAW 440 motion because he claims he was wrongfully convicted and that he is still unable to file the motion because he received the wrong books and cases. *Id.* at pp. 74, line 24, & 75, lines 1-20.

Plaintiff claims that he sent legal documents, which were exhibits Plaintiff wanted to attach to his 440 motion, to the law library to be copied, but that they were never returned even though the request was made. *Id.* at pp. 79, lines 16-24, & 80, lines 1-8. As a result, Plaintiff claims that this was another reason why he was unable to file the motion. *Id.* at p. 80, lines 1-5. Midalgo stated that he did not file the 440 motion prior to arriving at Upstate because he had been studying the process and procedures. *Id.* at p. 81, lines 18-21. Plaintiff alleges that if not Defendant Bennett, then either Defendants Streeter or Spinner lost his copies because "[t]hey colluded together" and conspired against Plaintiff. *Id.* at pp. 87, lines 10-24, & 88, lines 1-4. Midalgo avers that his claim could be proven by "circumstantial evidence," which would include his grievances and hearings. *Id.* at p. 88, lines 7-17.

**\*16** Here, Plaintiff does have a constitutional right to the access of the courts and, in turn, the right to an adequate law library or assistance from those trained in the law when preparing and filing legal documents. Plaintiff does not state a claim as to the availability of books he sought for the purposes of his copyright lawsuit. *See Lewis v. Casey,* 518 U.S. at 354. Plaintiff does state a claim in regards to the missing books and copies of exhibits to his 440 motion as he seeks to challenge his conviction, which would provide standing as it would be a direct appeal from the conviction for which he was incarcerated. *See id.*

However, the Second Circuit has held that "personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (quoting *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 (2d Cir.1991)). In this case, as only Plaintiff's law library claim as to his 440 motion could proceed, Plaintiff has failed to allege any personal involvement on the part of any of the Defendants. Plaintiff states that Defendant Bennett was not at fault for the missing books. That statement belies the notion that there was any personal involvement. In addition, Plaintiff fails to state a claim for supervisory liability against Defendant Bennett for the missing books as Plaintiff does not state which Defendants Bennett was supervising. Furthermore, as to the missing copies of exhibits for the 440 motion, Plaintiff merely claims that Defendants Bennett, Streeter, and Spinner were involved because he believes there was a conspiracy. That allegation does not constitute personal involvement.

Therefore, it is recommended that the Motion for Summary Judgment be **granted** on the First Amendment claims.

### F. Inadequate Visitation

Plaintiff alleges that Defendant Trimm delayed his visit with his mother for several hours causing him emotional distress. Am. Compl. at ¶ 50.

"Although inmates do not relinquish their constitutional rights when imprisoned, implicit with incarceration is the fact that confinement imposes a limitation on privileges and rights." *Henry v. Coughlin,* 940 F.Supp. 639, 642 (S.D.N.Y.1996) (citing, *inter alia, Sandin v. Conner,* 515 U.S. 472, 485 (1995)). Restrictions that are placed upon an inmate's constitutional rights "may be upheld as long as they are 'reasonably related to legitimate penological interests.' " *Hernandez v. McGinnis,* 272 F.Supp.2d 223, 226 (W.D.N.Y.2003) (quoting *Turner v. Safley,* 482 U.S. 78, 89 (1987)). However, family visitations for inmates only constitute a privilege and not a right. *See Block v. Rutherford,* 468 U.S. 576, 589 (1984); *Jones v. North Carolina Prisoners' Labor Union, Inc.,* 433 U.S. 119, 125-26 (1977) (holding that one of the more obvious constitutional rights curtailed by confinement is the right to freely associate with those outside the penal institution); *see also Lynott v. Henderson,* 610 F.2d 340, 342 (5th Cir.1980) (stating that "[c]onvicted prisoners have no absolute constitutional right to visitation"); *Oxendine v. Williams,* 509 F.2d 1405, 1407 (4th Cir.1975) (holding that a "[prisoner] has no constitutional right to physical contact with his family"); *Hernandez v. McGinnis,* 272 F.Supp.2d at 227.

**\*17** Here, Plaintiff does not claim that he was denied visitation nor has he stated that visitation was delayed at any other time than the one time alleged. He merely states that a visit with his mother and brother was delayed by a few hours. Am. Compl. at ¶ 25. As there is no constitutional right to visitation and because of the fact that Plaintiff did actually receive visitation that same day, Plaintiff has failed to state a claim.

Therefore, it is recommended that the Motion for Summary Judgment be **granted** as to the visitation claim.

### G. Harassment

Plaintiff claims that Defendants Trimm and Bass harassed him by placing a wiretap in his cell as well as confidential informants and/or hired help in order to cause him physical and psychological harm. [15] Am. Compl. at ¶ 52.

[15]   Although Plaintiff does not specify what aspect of the Constitution was violated, though Plaintiff does insert a short sentence saying Defendants were deliberately indifferent, this Court will analyze the wiretap claim pursuant to the Fourth Amendment. *See* Am. Compl. at ¶ 52.

In terms of the wiretap, the claim would turn on whether a plaintiff had a legitimate expectation of privacy with respect to his conversations. To assess the expectation, "the person asserting a privacy interest must demonstrate a subjective expectation of privacy." *George v. Carusone,* 849 F.Supp. 159, 165 (D.Conn.1994) (citing *California v. Greenwood,* 486 U.S. 35, 39 (1988)) (further citations omitted). Then "that person's subjective expectation must be one that society accepts as reasonable." *Id.* (citing *California v. Greenwood,* 486 U.S. at 39) (further citations omitted). The Second Circuit has held that "a convict has no expectation of privacy in his prison cell" because "society is not prepared to recognize as legitimate any subjective expectation of privacy that a [prisoner] might have in his prison cell[.]" *Willis v. Artuz,* 301 F.3d 65, 66, & 69 (2d Cir.2002) (citing *Hudson v. Palmer,* 468 U.S. 517, 526 (1984)).

Here, besides alleging that a wiretap was placed in his cell, Plaintiff does not provide a shred of evidence that there was actually a wiretap placed within his cell. Plaintiff sets forth certain circumstances, which to him seem like too much of a coincidence that a wiretap had to have been placed in his cell. Pl.'s Mem. of Law at Point Eight. Plaintiff merely states that he **thought** there was a wiretap because his cellmate attempted to talk about illegal activity and that his neighbor was trying to get Midalgo to bring back drugs. Pl.'s Dep. at p. 15, lines 13-17. He also stated the lights would flicker and that some of the officers would talk about the same things Midalgo and his cellmate had discussed. *Id.* at p. 15, lines 18-24. Even though Plaintiff does not have an expectation of privacy in his cell, Plaintiff fails to allege any facts that are not general or conclusory to state any claim in regards to the alleged wiretap.

With regard to his claim of a confidential informant or hired help being placed in his cell to harass him, Plaintiff states that he believes his cellmate was a confidential informant because Officer Bouyea, Officer Streeter, and others gave the cellmate extra food trays, magazines, and books. Pl.'s Dep. at pp. 17, lines 4-12 & 29, lines 4-10. Other than supposition, Plaintiff has not provided any proof or evidence that his cellmate was a confidential informant. Midalgo's claims are merely conclusory and unsupported by any facts. Furthermore, the Superintendent stated that inmates are placed together based on compatibility. Defs.' 7.1 Statement, Ex. A, Superintendent's Appeal, dated July 15, 2003. Plaintiff has not stated any type of claim available and moreover, Plaintiff would not have any choice in who was placed within his cell as inmates do not a have a constitutional right to the cellmate of their choice. *Harris v. Greer,* 750 F.2d 617, 618 (7th Cir.1984).

**\*18** Therefore, it is recommended that the Motion for Summary Judgment be **granted** on his claim.

### H. John Doe Defendant

As noted previously, Defendant John Doe has not been identified or appeared in this action. *See* Dkt No 12. FED.R.CIV.P. 4(m) states that "[i]f service of the summons and complaint is not made upon a defendant within 120 days after the filing of the complaint, then the court, upon motion or on its own initiative after notice to the plaintiff, shall dismiss the action without prejudice as to that defendant or direct that service be effected within a specified time[.]" Furthermore, pursuant to the Local Rules for the Northern District of New York, "service of process [is required] upon all defendants within sixty (60) days of the filing of the complaint." N.D.N.Y.L.R. 4.1. Plaintiff's time for service on John Doe has expired, per both the Local Rules and the Federal Rules, as the date of the filing of the Amended Complaint was October 24, 2003. *See* Dkt. No. 8. Since Plaintiff has failed to properly identify this Defendant, such claims should be dismissed.

### III. CONCLUSION

For the reasons stated herein, it is hereby

2006 WL 2795332

**RECOMMENDED,** that the Motion for Summary Judgment (Dkt. No. 105) be **GRANTED;** and it is further

**RECOMMENDED,** that all claims against the John Doe Defendant be **DISMISSED** due to Plaintiff's failure to timely identify and serve such Defendant; and it is further

**ORDERED,** that the Clerk of the Court serve a copy of this Report-Recommendation and Order upon the parties to this action.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have ten (10) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. ***FAILURE TO OBJECT TO THIS REPORT WITHIN TEN (10) DAYS WILL PRECLUDE APPELLATE REVIEW.*** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Sec'y of Health and Human Servs.,* 892 F.2d 15 (2d Cir.1989)); *see also* 28 U.S.C. § 636(b)(1); FED.R.CIV.P. 72, 6(a), & 6(e).

**All Citations**

Not Reported in F.Supp.2d, 2006 WL 2795332

**End of Document**                © 2017 Thomson Reuters. No claim to original U.S. Government Works.

2011 WL 6031940
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Kenneth J. PHELAN, Plaintiff,

v.

HERSH, C.O., Mt. McGregor Corr. Facility; M. Scott,
C.O., Mt. McGregor Corr. Facility; Pam Ramond,
Civilian Library Clerk, Mt. McGregor Corr. Facility;
Goodman, Lieutenant, Mt. McGregor Corr. Facility;
Fletcher, Civilian Employee, Mt. McGregor Corr.
Facility; J. Micheals, Sergeant, Mt. McGregor
Corr. Facility; Cambell, Sergeant, Mt. McGregor
Corr. Facility; W. Haggett, Superintendent,
Mt. McGregor Corr. Facility; Gregory Kadien,
Superintendent, Gowanda Corr. Facility; P.Millson,
Mental Health Director, Gowanda Corr. Facility;
Brian Fischer, Commissioner of Department of
Corr.; James Morgan, Associate Director of the
Office of Mental Health; R. Regan, Corr. Officer,
Gowanda Corr. Facility; Acosta–Ortiz, Corr.
Officer, Gowanda Corr. Facility; B. Pawelczak,
Civilian Hearing Officer, Gowanda Corr. Facility;
Stachewiez, Lieutenant, Gowanda Corr. Facility;
Thompson, Deputy Superintendent, Collins Corr.
Facility; R. Thomas, Corr. Officer, Mt. McGregor
Corr. Facility, a/k/a "Fat Boy", Defendants.

Civ. No. 9:10–CV–0011 (GLS/RFT).
|
Sept. 13, 2011.

**Attorneys and Law Firms**

Kenneth J. Phelan, Comstock, NY, pro se.

Hon. Eric T. Schneiderman, New York State Attorney
General, Department of Law, The Capitol, Adrienne J.
Kerwin, Esq., Assistant Attorney General, of Counsel,
Albany, NY, for Defendants.

ORDER

RANDOLPH F. TREECE, United States Magistrate
Judge.

*1 Kenneth J. Phelan, a New York state prison inmate
proceeding *pro se* and *in forma pauperis,* commenced this
action pursuant to 42 U.S.C. § 1983, alleging, *inter alia,*
in forty-three causes of action, that Defendants retaliated
against him for filing grievances, denied him due process
of the law, denied him adequate mental health treatment
in deliberate indifference to his medical needs, subjected
him to cruel and unusual punishment, and generally
harassed and discriminated against him on account of his
disability. Dkt. No. 1, Compl. Defendants now move for
dismissal of the Complaint pursuant to Federal Rule of
Civil Procedure 12(b)(6). Dkt. No. 55. Plaintiff opposes
the Motion. Dkt. No. 60. For the reasons that follow, we
recommend that Defendants' Motion be **granted** in part
and **denied** in part.

I. BACKGROUND

A. Facts

The following facts are derived from the Complaint,
which, in accordance with the standard of review on a
motion to dismiss, must be taken as true. *See infra* Part
II.A.

On or about March 25, 2009, Plaintiff, while housed at
Mt. McGregor Correctional Facility, requested mental
health treatment from "sick call," where a nurse told
him he would be notified when treatment becomes
available. Compl. at ¶ 6. On April 2, 2009, Plaintiff
asked Defendant Hersh if he could go to the "grievance
building" to file an administrative grievance complaining
about the lack of mental health treatment, to which
Hersh replied that he could. *Id.* at ¶ 7. At the grievance
building, Defendant Scott "immediately started yelling
at [Plaintiff] and demanded to know why [he] wanted to
file [a grievance]." *Id.* Scott called Plaintiff a "fucking
retard" and that "[w]e don't allow fucking inmates to file
grievances. If you got a problem we'll just beat the shit out
of you. You really got a problem?" *Id.* Plaintiff feared for
his life, and responded "no, ma['a]m" and returned to his
housing unit without filing a grievance. *Id.* at ¶ 8. Twenty
minutes after returning, Defendant Thomas, Defendant
Hersh, and an unidentified Correctional Officer searched
Plaintiff's cell, throwing his "neatly folded and ironed
laundry ... on the floor shaking them out." *Id.* at ¶ 9.
Defendant Thomas also read Plaintiff's legal mail and
"stomped on his legal papers and mail," while Hersh

WESTLAW   © 2017 Thomson Reuters. No claim to original U.S. Government Works.   1

2011 WL 6031940

told him they "don't allowed retards to file grievances" and threatened to fight him. *Id.* Thomas told Plaintiff that "[t]his is how we deal with grievances here retard." *Id.* Plaintiff received two disciplinary "write ups" from the incident, alleging, among other things, that Plaintiff refused direct orders and had gang material in his locker. *Id.* at ¶¶ 10–11.

On or about April 7, 2009, Plaintiff requested mental health treatment from Correctional Officer Collins, who is not a named Defendant in this action and who arranged for "a nurse at medical" to speak with Plaintiff. *Id.* at ¶ 12. The nurse told Plaintiff that someone from mental health would be coming in a few days and asked if Plaintiff wanted to go to the infirmary until mental health assistance arrived, to which Plaintiff said no, because "that won't solve anything." *Id.*

**\*2** On April 14, 2009, Plaintiff went to the law library, where the clerk, Defendant Raymond, told Plaintiff, "[o]h, you are that retard the C/Os told me about.... I can do whatever I want to you retard.... Get the hell out of my library retard." *Id.* at ¶ 13. Plaintiff received a disciplinary ticket for this incident. *Id.* When he returned to his housing, Plaintiff was confronted by Defendants Cambell and Micheals, who yelled at Plaintiff, saying "[y]ou are a fucking retard and a scumbag, you know that[?] ... Stop l[y]ing about a disability and take your fucking medicine like a man;" they then asked Plaintiff for his "side of the story" regarding the incident in the library. *Id.* at ¶ 15. Apparently not satisfied with Plaintiff's synopsis, Defendant Micheals "came up beside [Plaintiff] and hit[ ] [Plaintiff] in the head several times, aggravating [his] Tra[u]matic Brain Injury." *Id.*

In April 2009, three disciplinary hearings for Plaintiff commenced. Two of the hearings, which started on April 9 and April 17, addressed disciplinary tickets Plaintiff received from Defendant Thomas and Defendant Ramond, respectively, and were presided over by Defendant Fletcher. *Id.* at ¶¶ 16 & 19. The other disciplinary hearing, presided over by Defendant Goodman, regarded a ticket from Defendant Scott and commenced on April 14. *Id.* at ¶ 17. Both Defendants Fletcher and Goodman stayed their hearings to undertake mental health assessments after Plaintiff told the hearing officers he had a mental disability. *Id.* at ¶¶ 16–17. Plaintiff claims that the proceedings restarted with no mental health assessment ever being undertaken. *Id.* at

¶¶ 18–21. Plaintiff complains that in Defendant Fletcher's disciplinary hearings, Fletcher interviewed witnesses outside Plaintiff's presence and investigated witnesses suitability for the hearing without Plaintiff's involvement, which "was b[ia]sed." *Id.* at ¶¶ 19 & 21.

Pursuant to the disciplinary ticket issued by Defendant Thomas, Plaintiff plead not guilty "to the gangs charge" and guilty to the other charges, wherefore Defendant Fletcher found Plaintiff guilty of all charges and sentenced him three months in a Special Housing Unit ("SHU"), three months loss of packages, commissary, and phone privileges, and a five-dollar surcharge. *Id.* at ¶ 18. Defendant Fletcher also sentenced Plaintiff to the same punishment with regard to the disciplinary ticket from Defendant Ramond. *Id.* at ¶ 21. [1] Defendant Goodman sentenced Plaintiff to thirty days "keepblock, suspended 30 days and deferred for 90 days," a five-dollar surcharge, and took away Plaintiff's yard, packages, commissary, and phone privileges for thirty days. *Id.* at ¶ 20. Plaintiff appealed the disciplinary hearing determinations from Defendants Thomas's and Ramond's tickets; all convictions were affirmed except "the gang charge," which was reversed on May 26, 2009 "by the Commissioner." *Id.* at ¶¶ 22–23.

[1] It is unclear by Plaintiff's Complaint whether these two sentences were to run concurrently or consecutively.

**\*3** On or about May 14, 2009, Plaintiff was transferred to Downstate Correctional Facility for an overnight stay. *Id.* at ¶ 24. Plaintiff was "sha [c]kled and cuffed to waist chains for about 4 hours, even though [he has] a mental illness." *Id.* The next day, Plaintiff was strip-searched and handcuffed and restrained again in order to be transferred to Lakeview Shock Correctional Facility, which was "about a 12 hour drive;" the drive made Plaintiff's shoulder muscles "very sore." *Id.* Plaintiff was not given a hot meal that day, but "was only given another dry boloney sandwich." *Id.* Plaintiff does not attribute these acts to any specific Defendants. Around July 19, 2009, Plaintiff was transferred to Gowanda Correctional Facility. *Id.* at ¶ 25.

On or about July 21, 2009, Plaintiff had a medical doctor appointment with Dr. Bangsil, [2] who was concerned with Plaintiff's history of suicide attempts and put in a referral for Plaintiff "to see someone in mental health." *Id.* at ¶

26. However, Plaintiff did not see someone from mental health until September 8, 2009; in the interim, he placed upwards of seven requests to "see M.H." *Id.* at ¶¶ 27–34 & 37. He also received a disciplinary ticket from Defendant Regan for smoking—even though Plaintiff is a non-smoker and allergic to cigarette smoke—and Regan told him that, "I heard about you retard, you want treatment, I will throw you in the SHU." *Id.* at ¶¶ 35–36. When Plaintiff saw Defendant Millson, a psychologist from mental health who reviewed Plaintiff's medical history, Millson denied Plaintiff's specific request to see a psychiatrist. *Id.* at ¶¶ 32, 34, & 37.

[2]    Dr. Bangsil is not a named Defendant in this action.

On September 15, 2009, Plaintiff's hearing for the smoking disciplinary ticket commenced, presided over by Lieutenant Kolpack,[3] where Plaintiff again "was not allowed to see a psychiatrist." *Id.* at ¶ 38. On September 14, Plaintiff had a doctor appointment with Dr. Bangsil and Nurse Amborlosi,[4] who both called the Plaintiff "retard" and told him to "get out of here," to which Plaintiff responded he would "see them in court." *Id.* at ¶ 39. Plaintiff was then written up on September 16 by Defendant Acosta–Ortiz, who called Plaintiff "pea brain," "retard," and "scumbag." *Id.* at ¶ 40. Plaintiff's disciplinary hearing for this ticket occurred on September 21, where hearing officer Defendant Pawelczak "force[d] Plaintiff to enter a plea" even though "[Plaintiff has] M.H. issues and can't proceed;" at the hearing Plaintiff claimed that Defendant Millson's evaluation of Plaintiff's mental health should be disregarded because he "is not competent to evaluate Plaintiff's M.H. condition because he is not a psychiatrist." *Id.* at ¶ 41. Plaintiff had another disciplinary hearing before Defendant Stachewiez, who Plaintiff claimed did not interview employee witnesses on the record. *Id.* at ¶ 43. Plaintiff was found guilty at all the above-mentioned hearings and lost all appeals, at least some of which were denied by Defendants Kadien and Fischer. *Id.* at ¶¶ 38 & 41–43.

[3]    Lieutenant Kolpack is not a named Defendant in this action.

[4]    Nurse Amborlosi is not a named Defendant in this action.

**\*4**  Plaintiff characterizes himself as someone suffering from Traumatic Brain Injury, who is slow to process information and has outbursts of temper and impulsive

behavior. *Id.* at ¶ 46. He outlines his claims against the multiple Defendants in forty-three various causes of action. *See id.* at ¶ 47 [hereinafter "Causes of Action"]. He is currently housed at Collins Correctional Facility. *Id.* at ¶ 2.

### B. Procedural History

Plaintiff filed his civil rights Complaint on January 5, 2010, along with a Motion to Proceed *In Forma Pauperis* ("IFP"). Dkt. Nos. 1 & 2. On January 20, 2010, the Honorable Gary L. Sharpe, United States District Judge, reviewed those filings and granted Plaintiff permission to proceed with this mater IFP. Dkt. No. 5. However, citing various inadequacies with Plaintiff's pleading, Judge Sharpe dismissed Defendants R. Regan and Pam Ramond from this action, dismissed all of Plaintiff's claims of "harassment," and denied Plaintiff's motion for injunctive relief. *See generally id.*

On February 2, 2010, Plaintiff filed a Motion for Reconsideration of Judge Sharpe's Decision and Order. Dkt. 10. In an almost identical filing on the same day, Plaintiff also brought a Notice of Appeal to the Second Circuit Court of Appeals from the January Order. Dkt. 11. In a Decision and Order issued on July 20, 2010,[5] Judge Sharpe re-instated Defendants Pam Ramond and R. Regan and denied Plaintiff's request to be appointed counsel. Dkt. No. 22. Finally, pursuant to Plaintiff's representations that he wished to "waive [his] challenge to loss of good time," *see* Dkt. No. 23, Judge Sharpe dismissed all claims set forth in the Complaint relating to the loss of good time credits in disciplinary hearings, as well as directed the Clerk of the Court to strike Plaintiff's submitted Amended Complaint as duplicative. Dkt. No. 27.[6]

[5]    "[I]f a notice of appeal is filed after a motion for reconsideration, the district court retains jurisdiction over the motion for reconsideration." *Rich v. Associated Brands, Inc.,* 2009 WL 236055, at *1 (W.D.N.Y. Jan.30, 2009) (citing *Basciano v. Lindsay,* 2008 WL 1700442, at *1 (E.D.N.Y. April 9, 2008)).

[6]    Judge Sharpe noted that the only difference between Plaintiff's Complaint and his proposed Amended Complaint was an additional claim against Defendant Haggett related to the conditions of

2011 WL 6031940

Plaintiff's confinement. This exact same claim is asserted in another action now pending in this District. *See Phelan v. Durniak,* 9:10–cv–666 (FJS/RFT). This Court also notes that Plaintiff has filed a virtually identical complaint to this instant action in this District, with the exact same factual assertions, but bringing claims against the defendants pursuant to the Americans with Disabilities Act ("ADA"). *See Phelan v. Thomas et al.,* 9:10–cv–012 (DNH/RFT). Because of the existence of this pending action, we will not address any claims Plaintiff makes in his instant Complaint seeking relief from Defendants under the ADA. *See, e.g., Curtis v. Citibank, N.A.,* 226 F.3d 133, 138 (2d Cir.2000) ("As a part of its general power to administer its docket, a district court may stay or dismiss a suit that is duplicative of another federal court suit.").

## II. DISCUSSION

### A. Standard of Review

On a motion to dismiss, the allegations of the complaint must be accepted as true. *See Cruz v. Beto,* 405 U.S. 319, 322, 92 S.Ct. 1079, 31 L.Ed.2d 263 (1972). The trial court's function "is merely to assess the legal feasability of the complaint, not to assay the weight of the evidence which might be offered in support thereof." *Geisler v. Petrocelli,* 616 F.2d 636, 639 (2d Cir.1980). "The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974) (*overruled on other grounds by Davis v. Scherer,* 468 U.S. 183, 104 S.Ct. 3012, 82 L.Ed.2d 139 (1984)).

"Generally, in determining a 12(b)(6) motion, the court may only consider those matters alleged in the complaint, documents attached to the complaint, and matters to which the court may take judicial notice." *Spence v. Senkowski,* 1997 WL 394667, at *2 (N.D.N.Y. July 3, 1997) (citing *Kramer v. Time Warner Inc.,* 937 F.2d 767, 773 (2d Cir.1991)). Moreover, "even if not attached or incorporated by reference, a document 'upon which [the complaint] solely *relies and which is* integral to the complaint' may be considered by the court in ruling on such a motion." *Roth v. Jennings,* 489 F.3d 499, 509 (2d Cir.2007) (emphasis in original) (quoting *Cortec Indus., Inc. v. Sum Holding L.P.,* 949 F.2d 42, 47 (2d Cir.1991)).

*\*5* The court is bound to give the plaintiff the benefit of every reasonable inference to be drawn from the "well-pleaded" allegations of the complaint. *See Retail Clerks Intern. Ass'n, Local 1625, AFL–CIO v. Schermerhorn,* 373 U.S. 746, 754 n. 6, 83 S.Ct. 1461, 10 L.Ed.2d 678 (1963); *see also Arar v. Ashcroft,* 532 F.3d 157, 168 (2d Cir.2008). Nevertheless, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Ashcroft v. Iqbal,* 556 U.S. 662, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009). Therefore, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* (citation omitted).

A motion to dismiss pursuant to Rule 12(b)(6) may not be granted so long as the plaintiff's complaint includes "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007); *Ashcroft v. Iqbal,* 556 U.S. 662, 129 S.Ct. at 1960, 173 L.Ed.2d 868 (citing *Twombly* ). [7] "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal,* 556 U.S. 662, 129 S.Ct. at 1949, 173 L.Ed.2d 868. This plausibility standard "is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* Thus, in spite of the deference the court is bound to give to the plaintiff's allegations, it is not proper for the court to assume that "the [plaintiff] can prove facts [which he or she] has not alleged, or that the defendants have violated the ... laws in ways that have not been alleged." *Assoc. Gen. Contractors of California, Inc. v. California State Council of Carpenters,* 459 U.S. 519, 526, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983). The process of determining whether a plaintiff has "nudged [his] claims ... across the line from conceivable to plausible," entails a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Ashcroft v. Iqbal,* 556 U.S. 662, 129 S.Ct. at 1950–51, 173 L.Ed.2d 868.

7    By its opinion in *Bell Atl. Corp. v. Twombly* and then again in *Ashcroft v. Iqbal,* the Supreme Court abrogated the often-cited language of *Conley v. Gibson* "that a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to

Case 9:16-cv-00717-TJM-TWD   Document 35   Filed 11/28/17   Page 120 of 310
Phelan v. Hersh, Not Reported in F.Supp.2d (2011)
2011 WL 6031940

relief." *Bell Atl. Corp. v. Twombly,* 550 U.S. 561 (2007) (quoting *Conley,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)). In so doing, the Court found that *Conley* "described the breadth of opportunity to prove what an adequate complaint claims, not the minimum standard of adequate pleading to govern a complaint's survival." *Id.* at 563.

## B. Deference Given to *Pro Se* Litigants

Plaintiff herein is proceeding with this action *pro se.* "[A] pro se complaint, 'however inartfully pleaded,' must be held to 'less stringent standards than formal pleadings drafted by lawyers.' " *Estelle v. Gamble,* 429 U.S. 97, 106, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976) (citing, *inter alia, Haines v. Kerner,* 404 U.S. 519, 520–21, 92 S.Ct. 594, 30 L.Ed.2d 652) (other internal citations and quotation marks omitted). However, the Second Circuit has stated that there are circumstances where an overly litigious inmate, "who is quite familiar with the legal system and with pleading requirements," may not be afforded such special solicitude. *Davidson v. Flynn,* 32 F.3d 27, 31 (2d Cir.1994) (declining to afford an "extremely litigious inmate" the benefit of lenient treatment normally afforded *pro se* litigants and thus denying the opportunity to amend a claim where he failed to properly plead a cause of action); *see also Davidson v. Dean,* 204 F.R.D. 251, 257 (S.D.N.Y.2001) (citing *Davidson v. Flynn,* 32 F.3d at 31, and refusing to accord deference to same plaintiff); *Santiago v. C.O. Campisi Shield No. 4592,* 92 F.Supp.2d 665, 670 (S.D.N.Y.2000) (applying *Davison v. Flynn* to *pro se* plaintiff who had ten suits pending in district); *Brown v. McClellan,* 1996 WL 328209, at *1 n. 3 (W.D.N.Y. Jun.11, 1996) (stating that plaintiff's "litigious nature," notwithstanding his *pro se* status, "weighs somewhat against the leniency that is normally accorded"); *Brown v. Selsky,* 1995 WL 13263, at *8 n. 1 (W.D.N.Y. Jan.10, 1995) (denying special solicitude to *pro se* plaintiff who had seven cases pending in district).

**\*6** It is patently clear that Kenneth J. Phelan, the instant Plaintiff, is no stranger to the courts. [8] In light of Plaintiff's experience in federal court, we find that the special solicitude afforded *pro se* litigants shall not be accorded herein.

[8]   Since June 2010, Phelan has filed nineteen (19) lawsuits in this district alone:

(1) *Phelan v. Sullivan et al.,* 10–cv–724 (DNH/ATB) (currently pending)

(2) *Phelan v. Thomas et al.,* 10–cv–011 (GLS/RFT) (currently pending; the instant case herein)

(3) *Phelan v. Thomas et al.,* 10–cv–012 (DNH/RFT) (currently stayed pending appeal)

(4) *Phelan v. Eckert et al.,* 10–cv–325 (TJM/GHL) (transferred to W.D.N.Y. on Apr. 8, 2010)

(5) *Phelan v. Cambell et al.,* 10–cv–540 (NAM/RFT) (currently pending)

(6) *Phelan v. Chin et al.,* 10–cv–601 (DNH/RFT) (transferred to W.D.N.Y. on June 23, 2010)

(7) *Phelan v. Durniak et al.,* 10–cv–666 (FJS/RFT) (currently pending)

(8) *Phelan v. Wolczye et al.,* 10–cv–1061 (GTS/DEP) (currently pending)

(9) *Phelan v. Lempke,* 10–cv–1108 (GTS) (closed on Sept. 28, 2010—habeas corpus petition dismissed without prejudice to Petitioner filing an action pursuant to 42 U.S.C. § 1983)

(10) *Phelan v. Zenzen et al.,* 10–cv–1178 (LEK/DEP) (transferred to W.D.N.Y. on Dec. 17, 2010)

(11) *Phelan v. Lempke,* 10–cv–1324 (TJM) (transferred to W.D.N.Y. on Nov. 4, 2010)

(12) *Phelan v. Bezio,* 11–cv–272 (GTS/GHL) (transferred to W.D.N.Y. on Mar. 15, 2011)

(13) *Phelan v. Bezio,* 11–cv–288 (DNH) (currently pending)

(14) *Phelan v. Fischer et al.,* 11–cv–289 (TJM/ATB) (currently pending)

(15) *Phelan v. Delnegro,* 11–cv–313 (GTS/DRH) (currently pending)

(16) *Phelan v. Quinn et al.,* 11–cv–314 (DNH/DRH) (currently pending)

(17) *Phelan v. Lichva et al.,* 11–cv–315 (GLS/GHL) (currently pending)

(18) *Phelan v. Bezio,* 11–cv–416 (GLS) (currently pending)

(19) *Phelan v. Karandy et al.,* 11–cv–636 (NAM/RFT) (currently pending).

## C. First Amendment Claims

### 1. Retaliation

Plaintiff claims that Defendants Thomas, Hersh, and Scott retaliated against him for attempting to file grievances. *See* Compl. at Causes of Action 3, 4, & 5.

In order to state a valid retaliation claim, a plaintiff must allege that "(1) that the speech or conduct at

2011 WL 6031940

issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected speech and the adverse action." *Espinal v. Goord,* 558 F.3d 119, 128 (2d Cir.2009) (quoting *Gill v. Pidlypchak,* 389 F.3d 379, 380 (2d Cir.2004)). The required causal connection means, "in other words, that the protected conduct was a 'substantial or motivating factor' in the defendants' decision to take action against the plaintiff." *Tafari v. McCarthy,* 714 F.Supp.2d 317, 347 (N.D.N.Y.2010) (quoting *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 287, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977)).

Plaintiff alleges that Correctional Officers Thomas and Hersh searched Plaintiff's self and cell on April 2, 2009, seemingly in retaliation for Plaintiff attempting to file a grievance earlier that day about not getting appropriate mental health treatment. *See* Compl. at ¶¶ 8–9. Further, Plaintiff alleges the Defendants Thomas and Scott "wrote [Plaintiff] up" for various infractions relating to that cell search, such as refusing a direct order, and having "gang material"—all of which Plaintiff claims were fabricated and done in retaliation for his filing of a grievance. *Id.* at ¶¶ 10–11.

The Second Circuit has made clear that an inmate has a right not to be subjected to retaliation for the exercise of a constitutional right, such as petitioning the government for redress of grievances as guaranteed under the First and Fourteenth Amendments. *See, e.g., Graham v. Henderson,* 89 F.3d 75, 80 (2d Cir.1996) (cited in *Dorsey v. Fisher,* 2010 WL 2008966, at *12 (N.D.N.Y. May 19, 2010)); *see also Colon v. Coughlin,* 58 F.3d 865, 972 (2d Cir.1995) ("Prisoners, like non-prisoners, have a constitutional right of access to the courts and to petition the government for the redress of grievances, and prison officials may not retaliate against prisoners for the exercise of that right."). Thus, there is no question that Plaintiff's conduct, filing a grievance, is protected by the Constitution and satisfies the first prong of a retaliation claim.

Plaintiff's allegations—again, taken as true for the purposes of this Motion—also establish that the Defendants took "adverse action" sufficient to state a valid retaliation claim under section 1983. Initially, we note that while many of the District Courts in this Circuit have found that a "search of an inmate's cell, even if performed with a retaliatory motive, does not give rise to a constitutional claim for retaliation," *see,*

*e.g., Keesh v. Goord,* 2007 WL 2903682, at *8 (W.D.N.Y. Oct.1, 2007) (citing *Hudson v. Palmer,* 468 U.S. 517, 527, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984)), [9] the Second Circuit is silent on this matter. We decline to similarly draw such a hard-nosed line, and find that cell searches, if accompanied by more, can implicate a retaliation claim under section 1983. *See Shariff v. Poole,* 689 F.Supp.2d 470, 481 (W.D.N.Y.2010) ("Although a cell search is not considered to be actionable under § 1983, regardless of any retaliatory motives, there exists here a suggestive chronology of grievances, threats, and cell searches, the combination of which would likely 'chill a person of ordinary firmness from continuing to engage' in the protected activity at issue here— the filing of grievances.") (internal quotation omitted). Plaintiff states that Defendants Hersh and Thomas did more than just search his cell, but rather "tore up" his cell and locker, manipulated and damaged his legal papers, and threatened to fight Plaintiff. Finally, there was a causal connection between this cell search and the protected conduct of filing grievances. The search happened only twenty minutes after Plaintiff attempted to file a grievance, and Defendant Thomas explicitly told Plaintiff that "[t]his is how we deal with grievances here retard. Next time it will be worse." Compl. at ¶ 9. Therefore, Plaintiff's assertions are enough to state a valid retaliation claim.

9      That an inmate has no constitutionally protected right of privacy in their prison cells, and that a search of that cell cannot give rise to a retaliation claim, has been found in all four District Courts of New York. *See Bumpus v. Canfield,* 495 F.Supp.2d 316, 327 (W.D.N.Y.2007) ("It is well settled ... that plaintiff cannot base a retaliation claim ... based on a cell search."); *Battice v. Phillip,* 2006 WL 2190565, at *7 (E.D.N.Y. Aug.2, 2006) (noting that "a prisoner has no reasonable expectation of privacy in his or her prison cell; therefore, a search of an inmate's cell, even for retaliatory reasons, therefore does not implicate a constitutional right"); *Gadson v. Goord,* 1997 WL 714878, at *7 (S.D.N.Y. Nov.17, 1997) (holding that "searches of cells implicate no protected constitutional rights, even if the search is arbitrary or retaliatory in nature"); *Payne v. Axelrod,* 871 F.Supp. 1551, 1556 (N.D.N.Y.1995) ("*Hudson v. Palmer* [ ] permits even arbitrary cell searches in prison."). The cases cited herein that find these types of retaliation claims untenable collect their support in the case law noting that an inmate has no expectation of

privacy in his cell, and therefore a cell search by itself is not actionable under the Fourth Amendment. Here, however, Plaintiff's claims and underlying facts allege more than a mere cell search under the Fourth Amendment, but rather state a claim of retaliation for exercising other protected constitutional rights.

**\*7** Furthermore, Plaintiff claims that he was unjustly written up by Defendants Thomas and Scott, in connection with the cell search. Plaintiff states that Defendants Thomas issued a report against Plaintiff for having gang material, harassment, and for "violating messhall proce[ ]dures," and that Defendant Scott issued one for "harassment, refusing a direct order, and [for being] out of place." Compl. at ¶¶ 10–11.

While a "prison inmate has no general constitutional right to be free from being falsely accused in a misbehavior report," *see Boddie v. Schnieder,* 105 F.3d 857, 862 (2d Cir.1997), a misbehavior report issued in retaliation to the exercise of a constitutional right constitutes an "adverse action." *See Reid v. Bezio,* 2011 WL 1577761, at \*4 (N.D.N.Y. Mar.30, 2011) ("[T]here is little doubt that a misbehavior report would constitute an adverse action.") (internal quotations omitted); *Lewis v. Blazejewski,* 2007 WL 542117, at \*5 (W.D.N.Y. Feb.16, 2007) ("An allegation that a prison official filed false disciplinary charges in retaliation for the exercise of a constitutionally protected right, such as the filing of a grievance, states a claim under § 1983.") (quoting *Gayle v. Gonyea,* 313 F.3d 677 (2d Cir.2002)). This Court is keenly aware that "retaliation claims by prisoners are 'prone to abuse' since prisoners can claim retaliation for every decision they dislike." *Williams v. Hupkowicz,* 2004 WL 1197354, at \*3 (W.D.N.Y. June 1, 2004) (citing *Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir.1995) ("Because we recognize both the near inevitability of decisions and actions by prison officials to which prisoners will take exception and the ease with which claims of retaliation may be fabricated, we examine prisoner's claims of retaliation with skepticism and particular care.")). However, these purportedly fabricated misbehavior reports clearly were in the same chain of events as the cell search, and thus, taking Plaintiff's claims as true, are likewise causally connected to Plaintiff's attempt to file a grievance. [10]

[10]    Implicit through the Plaintiff's narrative, though not always stated, is that the alleged retaliation was a result of his attempt to file grievances. *See* Compl. at ¶ 9. This is supported in his statements in his

Causes of Action section. *See id.* at ¶ 47 ("Causes of Action" 4) ("Defendants C/O Thomas and C/O Scott retaliated against Plaintiff for trying to file a grievance ..."). Accordingly, we interpreted Plaintiff's constitutionally protected speech or conduct to be his attempt to file grievances. Plaintiff makes numerous claims, however, scattered variously throughout his forty-one-page Complaint, that Defendants violated his rights because of his disability. It is thus no surprise to see him also claim that the misbehavior reports were issued in retaliation "against [his] disability." *See id.* at ¶ 11; *see also id.* at Causes of Action 4 & 5. However, having a mental handicap or disability clearly is not protected "speech or conduct." When possible, this Court interprets any claims of such to be claims of retaliation against Plaintiff's attempt to file a grievance.

Accordingly, Plaintiff's allegations relating to Defendants Thomas and Hersh's cell search and his allegations that he received false misbehavior reports from Defendants Thomas and Scott, all in retaliation to his attempt to file a grievance, states a claim sufficient to survive Defendants' Motion to Dismiss. [11]

[11]    Plaintiff also seems to indicate something akin to a retaliation claim regarding Defendant Regan, who gave Plaintiff "a write up (ticket) for smoking, even though Plaintiff is a non-smoker and allergic to cigarette smoke." Compl. at ¶¶ 35 & 36. However, Plaintiff's Complaint alleges, if anything, that this misbehavior report was premised on harassing Plaintiff because of his mental handicap alone. These allegations of harassment and discrimination based on Plaintiff's disability are examined later in this Court's Report and Recommendation, *see infra* Part III.F, but, again, adverse action for having a mental disability alone does not state a valid First Amendment retaliation claim. *See supra* Note 11.

### 2. Access to the Courts

Phelan asserts that Defendant Ramond prevented him from using the law library on April 14, 2009, that Defendant Thomas damaged his legal work during a cell search, and that Defendant Thompson prevented him from making copies on October 15 and December 18, both in 2009. Compl. at ¶¶ 9, 13, & 47. We interpret these facts to allege a violation of his right to access the courts.

The Supreme Court has held that the constitutional right of access to courts entitles plaintiffs to "adequate law libraries or adequate assistance from persons trained in the law." *Bounds v. Smith,* 430 U.S. 817, 828, 97 S.Ct. 1491, 52 L.Ed.2d 72 (1977). To establish a *Bounds* violation, a plaintiff must show "actual injury," as "*Bounds* did not create an abstract, freestanding right to a law library or legal assistance." *Lewis v. Casey,* 518 U.S. 343, 349 & 351, 116 S.Ct. 2174, 135 L.Ed.2d 606 (1996). Thus, to establish a claim of inadequate access to the courts under *Bounds,* a plaintiff must show " 'that the alleged shortcomings in the library or legal assistance program hindered his efforts to pursue a legal claim'—for example, by demonstrating that he has been unable to file a complaint or has had a complaint dismissed for failure to observe a technicality." *Benjamin v. Fraser,* 264 F.3d 175, 184 (2d Cir.2001) (citing *Lewis v. Casey,* 518 U.S. at 351).

**\*8** Plaintiff fails to allege any prejudice or injury from Defendants' actions, and we find none in what has been presented to the Court. Without a demonstration that a "nonfrivolous legal claim had been frustrated or was being impeded," there is no basis to conclude Plaintiff's First Amendment right of access to the courts has been violated. *Lewis v. Casey,* 518 U.S. at 353. We recommend that this claim be **dismissed.**

### D. Due Process Claims

Plaintiff asserts in no fewer than eleven different claims that his Due Process rights were violated due to various deficiencies in his administrative disciplinary hearings and appeals thereto. Specifically, Plaintiff claims that the officers presiding over his disciplinary proceedings did not properly account for his mental disabilities; either interviewed witnesses outside Plaintiff's presence or did not interview them; and that his due process rights were violated because other Defendants denied his appeal. Compl. at ¶¶ 16–23 & Causes of Action 11, 12, 16, 21, 22, 31, 32, 33, 34, 38 & 39. We address these due process claims in turn.

As an initial matter, in order to state a due process claim under § 1983, an inmate must first establish that he enjoys a protected liberty interest. *Arce v. Walker,* 139 F.3d 329, 333 (2d Cir.1998) (citing *Kentucky Dep't of Corr. v. Thompson,* 490 U.S. 454, 460, 109 S.Ct. 1904, 104 L.Ed.2d 506 (1989)). Plaintiff brings his due process

claims against four separate hearing officers who presided over separate misbehavior report hearings. Plaintiff states that he received a punishment of at least three months of confinement in the SHU and three months loss of privileges, such as packages and phones, from the hearings Defendant Fletcher presided over. Compl. at ¶¶ 18 & 21. He states that he also received thirty days "keepblock, suspended 30 days and deferred for 90 days," and a loss of yard, packages, commissary, and phone privilege for thirty days from the hearing Defendant Goodman presided over. *Id.* at ¶ 20. However, Plaintiff fails to allege any liberty interest that was at stake from the hearings related to Defendants Pawelczak or Stachewiez. *See id.* at ¶¶ 42 & 43. Thus, because Plaintiff does not allege any liberty interest by which he was entitled to some measure of due process before being deprived therewith, his due process claims against Defendants Pawelczak and Stachewiez should be **dismissed.** *See Sandin v. Connor,* 515 U.S. 472, 484, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995) (noting that a prisoner is not entitled to due process protections unless the resulting restricting confinement subjected the prisoner to "atypical and significant hardship ... in relation to the ordinary incidents of prison life").

Turning back to Defendants Fletcher and Goodman, a prisoner asserting that he was denied due process in connection with segregated confinement or a loss of privileges must make a threshold showing that the deprivation of which he complains imposed the requisite atypical and significant hardship. Whether the conditions of the segregation amounted to atypical and significant hardship "turns on the duration of the segregation and a comparison with the conditions in the general population and in other categories of segregation." *Arce v. Walker,* 139 F.3d at 336 (citations omitted). However, the Second Circuit has cautioned that "there is no bright-line rule regarding the length or type of sanction" that meets the above-stated *Sandin* standard. *Jenkins v. Haubert,* 179 F.3d 19, 28 (2d Cir.1999); *see also Ayers v. Ryan,* 152 F.3d 77, 83 (2d Cir.1998) ("Whether or not a period of disciplinary confinement amounts to an atypical and significant hardship is a factintensive inquiry[.]"). The Second Circuit has suggested that confinement for a period of less than 101 days would not constitute an atypical and significant hardship. *See Colon v. Howard,* 215 F.3d 227, 231–32 (2d Cir.2000). Comparatively, the segregative sentences of 125–288 days are deemed to be "relatively long" and therefore necessitate "specific

articulation of fact findings before the district court could properly term the confinement atypical or insignificant." *Sims v. Artuz,* 230 F.3d 14, 22 (2d Cir.2000). In reviewing the duration and conditions of Phelan's special confinement as a result of the misbehavior hearings at issue, we do not find his confinement alone to be atypical and significant. In any event, we find that even if Plaintiff identified a valid liberty interest, he failed to allege facts supporting the notion that he was denied due process in his misbehavior hearings. Plaintiff states that Defendants Fletcher and Goodman each failed to adequately consider his mental disability in their respective disciplinary proceedings. Compl. at ¶¶ 16–19 & Causes of Action 11, 12, 18, & 19. While rules exist that govern the procedure hearing officers must follow when an inmate's mental health is an issue, *see* N.Y. COMP.CODES R. & REGS. tit. 7, § 254.6(b), there are no allegations in the Complaint that allege sufficient facts to state a claim that Plaintiff's constitutional rights were violated. For example, it appears from Plaintiff's Complaint that both Fletcher and Goodman stopped the proceedings to consider Plaintiff's mental health. Compl. at ¶¶ 16–17. In fact, with the same breath that Plaintiff claims his mental disability was not adequately considered in these disciplinary hearings, he claims Goodman "discriminated against Plaintiff's disability ... by unlawfully asking Plaintiff what his disability is and to describe [it] in detail." *Id.* at Causes of Action 17. Plaintiff's allegations that the disciplinary hearings were eventually continued and not excused altogether, without more, does not state a constitutional violation. Thus, Plaintiff's complaint that his disciplinary hearings proceeded despite his mental handicap fails to state a claim and should be **dismissed.**

**\*9** Plaintiff also claims his due process rights were violated by Defendant Fletcher when he failed to interview witnesses in Plaintiff's presence on the record and investigated witnesses on his own; Plaintiff further asserts that Defendant Fletcher "was biased." *Id.* at ¶¶ 19, 21 & Causes of Action 12, 16, & 21. The Supreme Court has held that due process entitles inmates to call witnesses and present documentary evidence, subject to legitimate safety and correctional goals of the institution. *Wolff v. McDonnell,* 418 U.S. 539, 566, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974); *see also McCann v. Coughlin,* 698 F.2d 112, 121–22 (2d Cir.1983). However, "it is not a violation of due process at a disciplinary hearing to take the testimony of a witness outside the presence of an inmate." *Kalwasinski v. Morse,* 201 F.3d 103, 109 (2d Cir.1999)

(internal citations omitted); *see also Silva v. Casey,* 992 F.2d 20, 22 (2d Cir.1993) (noting an inmate does not have a constitutional right of confrontation in disciplinary hearings). Additionally, "the mere involvement of a hearing officer in related investigations or proceedings does not evidence bias." *Rodriguez v. Selsky,* 2011 WL 1086001, at * 11 (N.D.N.Y. Jan.25, 2011) (citing *Vega v. Artus,* 610 F.Supp.2d 185, 200 (N.D.N.Y.2009). Defendant Fletcher's investigation into the witnesses Plaintiff wanted to call does not make him biased in his role as a hearing officer. [12] Rather, an impartial hearing officer is one who "does not prejudge the evidence and who cannot say ... how he would assess evidence he has not yet seen." *Patterson v. Coughlin,* 905 F.2d 564, 570 (2d Cir.1990). Plaintiff's unsupported and conclusory allegation of bias does not plausibly state a claim upon which relief can be granted, and thus, his due process complaints against Defendant Fletcher should be **denied.**

[12]   Though not explicit in the Complaint, to the extent Plaintiff may be complaining that Defendant Fletcher did not call witnesses Plaintiff requested be called, "a hearing officer does not violate due process by excluding irrelevant or unnecessary testimony." *Kalwasinski v. Morse,* 201 F.3d 103, 109 (2d Cir.1999).

Lastly, Plaintiff claims his due process rights were violated because his appeals of the determinations of his disciplinary hearings were denied. Compl. at ¶¶ 23 & Cause of Action 22. This conclusory statement clearly does not state a due process violation—Plaintiff sets forth no facts that the determinations of his disciplinary hearings deserved reversal, let alone that a failure to reverse the results of the hearings would constitute a due process violation. Therefore, this claim should be summarily **denied.**

Because Plaintiff states no valid due process violations upon which relief may be granted, this Court recommends that his due process claims be **dismissed** in their entirety.

### E. Eighth Amendment Claims

In his expansive and lengthy Complaint, Plaintiff alleges two distinct Eighth Amendment claims: deliberate indifference to his serious medical needs and cruel and unusual punishment. We address these allegations *seriatim.*

*1. Deliberate Indifference to Serious Medical Needs*

Plaintiff claims that he was denied mental health treatment and services, specifically naming Defendants P. Millson, James Morgan, Gregory Kadien, W. Hagget, Cambell, and J. Michaels as the culprits. Compl. at ¶¶ 7, 26–34, 37, 39, 40, 44, & 45. [13] To state an Eighth Amendment claim for denial of adequate medical care, a prisoner must demonstrate that prison officials acted with "deliberate indifference to serious medical needs." *Estelle v. Gamble,* 429 U.S. 97, 104, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). "[T]he plaintiff must allege conduct that is 'repugnant to the conscience of mankind' or 'incompatible with the evolving standards of decency that mark the progress of a maturing society.' " *Ross v. Kelly,* 784 F.Supp. 35, 44 (W.D.N.Y.), *aff'd,* 970 F.2d 896 (2d Cir.1992) (quoting *Estelle v. Gamble,* 429 U.S. at 102, 105–06).

[13]    Though discussed in multiple occasions in his forty-one-page Complaint, Plaintiff does not name Dr. Bangsil nor Nurse Amborlosi as Defendants in this action. They are named, however, in his almost identical complaint brought in this District under the ADA. *See supra* Note 3.

**\*10** The "deliberate indifference standard embodies both an objective and a subjective prong," both of which the plaintiff must establish. *Hathaway v. Coughlin* ("*Hathaway I* "), 37 F.3d 63, 66 (2d Cir.1994). Under the objective prong, the alleged medical need must be "sufficiently serious." *Id.; Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998). The Second Circuit has stated that a medical need is serious if it presents "a condition of urgency that may result in degeneration or extreme pain." *Chance v. Armstrong,* 143 F.3d at 702 (internal quotation marks and citation omitted). Among the relevant factors to consider are "[t]he existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individuals daily activities; or the existence of chronic and substantial pain." *Id.* (quoting *McGuckin v. Smith,* 974 F.2d 1050, 1059–60 (9th Cir.1992)). Under the subjective component, the plaintiff must demonstrate that the defendant acted with "a sufficiently culpable state of mind." *Hathaway I,* 37 F.3d at 66. The requisite culpable mental state is similar to that of criminal recklessness. *Wilson v. Seiter,* 501 U.S. 294, 301–03, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991).

In his Complaint, Phelan claims that he suffers from a traumatic brain injury dating back to when he was an infant, resulting in him being "slower to process information," and having "impulsive behavior." Compl. at ¶ 46(A) & (B). He also claims to suffer from attention deficit disorder and depression. *Id.* at ¶ 46(C). He states that despite his consistent requests, he did not receive adequate mental health care in prison, and as such, Plaintiff "adjusted poorly and received a lot of write ups, and spent more time in SHU th[a]n in general population." *See generally id.; see* Compl. at ¶ 46(F).

Here, Plaintiff does not provide facts by which this Court could assess the objective seriousness of his medical needs, other than injecting conclusory statements that his mental handicap, if left untreated, leads him to act out and receive misbehavior reports. Furthermore, Plaintiff does not sufficiently aver that Defendants acted with the requisite culpable state of mind. A plaintiff must demonstrate that the defendant acted with reckless disregard to a known substantial risk of harm. *Farmer v. Brennan,* 511 U.S. 825, 836, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994). This requires "something more than mere negligence ... [but] something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." *Id.* at 835; *see also Weyant v. Okst,* 101 F.3d 845, 856 (2d Cir.1996) (citing *Farmer* ). Plaintiff states that, pursuant to his requests for a mental health examination, Defendant P. Millson received Plaintiff's mental health history and met with and examined Plaintiff in person. Compl. at ¶¶ 32 & 37. In that meeting, Defendant Millson, who is a psychologist, did not grant Plaintiff permission to see a psychiatrist, saying "we don't have to let you see one." *Id.* at ¶ 37. These facts do not support a finding that this Defendant was subjectively deliberately indifferent to Plaintiff's medical needs, or that Defendant Millson bore Plaintiff any ill will at all. Mere disagreement over the prescribed course of treatment does not evidence deliberate indifference. *See Brown v. Eagen,* 2009 WL 815724, at \*9 (N.D.N.Y. Mar.26, 2009) (stating that the prison officials have broad discretion to determine the nature and character of the medical treatment afforded to inmates, as "[a]n inmate does not have the right to treatment of his choice") (citing, *inter alia, Dean v. Coughlin,* 804 F.2d 207, 215 (2d Cir.1986)). [14] Likewise, Plaintiff's allegation against Defendant Morgan—that he wrote a letter in response to Plaintiff's requests for mental health care, stating that he is denying that request—

2011 WL 6031940

without more, fails to allege the requisite culpable state of mind needed to state a claim for deliberate indifference.

14    Additionally, a showing of medical malpractice is insufficient to support an Eighth Amendment claim unless "the malpractice involves culpable recklessness, i.e., an act or a failure to act by the prison doctor that evinces 'a conscious disregard of a substantial risk of serious harm.' " *Chance v. Armstrong,* 143 F.3d at 702 (quoting *Hathaway v. Coughlin ("Hathaway II" ),* 99 F.3d 550, 553 (2d Cir.1996)); *see also Hernandez v. Keane,* 341 F.3d 137, 144 (2d Cir.2003) (citations omitted).

**\*11** Lastly, Plaintiff's conclusory statements that Defendants Gregory Kadien and W. Hagget "are responsible for and required by law to provide mental health care by a psychiatrist on a full time basis [and] failed to do this," as well as his claims that Cambell and J. Michaels yelled at him and told him to "stop l[y]ing about a disability and [to] take your fucking medicine like a man [,]" do not allege any facts by which this Court could engage in an Eighth Amendment examination or which would meet the *Iqbal* standard. *See* Compl. at ¶¶ 15 & 45. Plaintiff further does not allege personal involvement by Defendants Kadien and Hagget, who are the Superintendents at Gowanda and Mt. McGregor correctional facilities, respectively. *See Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995) (providing the test for personal involvement of a supervisory defendant); *see also Black v. Coughlin,* 76 F.3d 72, 74 (2d Cir.1996) (stating that a defendant may not be liable for damages simply by virtue of holding a supervisory position).

Therefore, Plaintiff does not allege a valid Eighth Amendment claim that the Defendants were deliberately indifferent to his serious medical needs. Rather, as stated in his Complaint, Plaintiff was seen by medical personnel at Mt. McGregor upon his request on March 25, 2009, and then again on April 7, 2009, where he was offered the option of staying in the infirmary until someone from the mental health division could check on Plaintiff, but he refused, saying "that won't solve anything, so no." *Id.* at ¶¶ 6 & 12. He also appears to have had an appointment with Doctor Bangsil and Nurse Amborlosi to discuss his medical issues, but these appointments apparently did not end well and Plaintiff told them "he would see them in court." *Id.* at ¶ 39. Considering all of the above allegations, we recommend that Plaintiff's claims of

deliberate indifference be **dismissed** for failure to state a claim.

### 2. Cruel and Unusual Punishment

The Eighth Amendment also prohibits the infliction of cruel and unusual punishment. *Robinson v. California,* 370 U.S. 660, 666–67, 82 S.Ct. 1417, 8 L.Ed.2d 758 (1962) (cited in *Tramell v. Keane,* 338 F.3d 155, 161 (2d Cir.2003)). Plaintiff appears to bring three claims under this umbrella: that the punishments he received from hearing officers concerning misbehavior reports were cruel and unusual; that he was subject to excessive physical force; and that he suffered cruel and unusual punishment resulting from his general conditions of confinement.

First, Plaintiff complains that punishments he received from disciplinary hearings, assigned from Defendants Fletcher and Goodman, violated his rights because they are cruel and unusual considering his mental illness. "Restraints on an inmate do not violate the [Eighth] [A]mendment unless they are 'totally without penological justification,' 'grossly disproportionate,' or 'involve the unnecessary and wanton infliction of pain.' " *Smith v. Coughlin,* 748 F.2d 783, 787 (2d Cir.1984) (quoting *Rhodes v. Chapman,* 452 U.S. 337, 346, 101 S.Ct. 2392, 69 L.Ed.2d 59 (1981)). Plaintiff provides no facts by which this Court could evaluate this claim. Sentencing an inmate with diminished mental capacity to special or solitary confinement does not constitute a *per se* violation of the Eighth Amendment. *See Horne v. Coughlin,* 155 F.3d 26, 31 (2d Cir.1998). Plaintiff's claim accordingly should be **denied.**

**\*12** Secondly, to determine whether an Eighth Amendment violation occurred where "prison officials stand accused of using excessive physical force in violation of the Cruel and Unusual Punishments Clause, the core judicial inquiry is ... whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Hudson v. McMillian,* 503 U.S. 1, 6–7, 112 S.Ct. 995, 117 L.Ed.2d 156 (1992) (quoted in *Davidson v. Flynn,* 32 F.3d 27, 29 (2d Cir.1994)). To validly assert an Eighth Amendment violation through the use of excessive force, an inmate must prove (1) objectively, that the defendant's actions violated "contemporary standards of decency," and (2) subjectively, that the defendant acted wantonly and in

bad faith. *Blyden v. Mancusi*, 186 F.3d 252, 262–63 (2d Cir.1999) (internal quotations and citations omitted).

Plaintiff asserts that on May 14, 2009, when he was transferred "to a S-block [in] Downstate Correction Facility," he was handcuffed and shackled for "about [four] hours, even though [he has] a mental illness." Compl. at ¶ 24. The next day, Plaintiff was "strip[ ] searched again and shackled and cuffed with waist chains again to be transfer[re]d to Lakeview Shock Correctional Facility.... This was about a [twelve] hour drive." *Id.* He alleges this made his "shoulder muscles very sore." Plaintiff seems to associate this blame to Defendant Fischer, the Commissioner of DOCCS, but this fact is not made clear in Plaintiff's Complaint. *See* Cause of Action 23. Regardless of the assured lack of personal involvement, these facts do not give rise to a claim of cruel and unusual punishment. The facts fail to state that the use of handcuffs and shackles during transport was not done "in a good-faith effort to maintain or restore discipline," but rather as a form of punishment or to constitute a wanton infliction of pain. Therefore, Plaintiff's claim that he suffered excessive force relating to his transports should be **denied.**

Plaintiff also states that Defendant Micheals struck him in the head several times while asking Plaintiff questions in connection to the disciplinary ticket he received from his incident in the library. *See* Compl. at ¶ 13 & 15. While Plaintiff does not explicitly raise an accusation of excessive force against Micheals in his forty-three causes of action, Plaintiff's statement of facts clearly indicates the Eighth Amendment. Here, though Plaintiff provides sparse details of the incident, his claim suggests that Defendants Micheals hit him maliciously, multiple times, and without the good-faith effort to maintain discipline. This is enough to validly state an excessive force claim, and, accordingly, we recommend that this claim against Defendant Micheals survive Defendants' Motion to Dismiss.

Lastly, to the extent that Plaintiff claims his conditions of confinement constituted an Eighth Amendment violation —specifically, because he did not receive a hot meal for one day, when he was being transported to another correctional facility, but instead received a "dry boloney sandwich"—this complaint does not state a cause of action. There is no constitutional right to have a hot meal every day, but only that inmates be provided nutritionally

adequate food prepared under safe conditions. *See Robles v. Coughlin*, 725 F.2d 12, 15 (2d Cir.1983) (cited in *Quintana v. McCoy*, 2006 WL 2827673, at *6 (N.D.N.Y. Sept.29, 2006)). Furthermore, Plaintiff does not allocate personal involvement by any Defendant in this matter. Thus, Plaintiff does not state a valid Eighth Amendment claim here, and his allegation of such should be **denied.**

### F. Other Claims

**\*13** Throughout Plaintiff's Complaint, he accuses the majority of the Defendants of harassing him, chiefly through name-calling, specifically "retard." *See generally* Compl. As Judge Sharpe ruled in his January Order, allegations of verbal harassment are insufficient to support a § 1983 claim. *See* Dkt. No. 5 at pp. 5–6 (citing *Johnson v. Eggersdorf*, 8 Fed. Appx. 140, 143 (2d Cir.2001) ("allegations of verbal harassment are insufficient to base a § 1983 claim if no specific injury is alleged") (citing *Purcell v. Coughlin*, 790 F.2d 263, 265 (2d Cir.1986))). In accord with that Order and the law of the case doctrine, [15] Plaintiff's claims of harassment should be **dismissed.**

[15]   The law of the case doctrine " 'posits that when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case.' " *Pescatore v. Pan Am. World Airways, Inc.,* 97 F.3d 1, 7–8 (2d Cir.1996) (quoting *Dilaura v. Power Auth.,* 982 F.2d 73, 76 (2d Cir.1992)).

Also throughout the Complaint, Plaintiff makes wholly-conclusory allegations that Defendants either discriminated against, harassed, or otherwise treated Plaintiff poorly because of Plaintiff's mental disability. While this issue of "whether disability discrimination gives rise to a section 1983 claim 'is not a settled question of law in this circuit,' " *Petrosky v. New York State Dept. of Motor Vehicles,* 72 F.Supp.2d 39, 61 (N.D.N.Y.1999) (citing *Campbell v. City Univ. Constr. Fund,* 1999 WL 435132, at *5 (S.D.N.Y. June 25, 1999)), the courts who use the Equal Protection Clause of the Fourteenth Amendment alone as the vehicle by which to seek relief note that "[t]he basic command of the Equal Protection Clause is that similarly situated persons be treated equally," *City of Cleburne, Tex. v. Cleburne Living Ctr.,* 473 U.S. 432, 439, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985). To establish an Equal Protection violation, plaintiff must show purposeful discrimination directed to an identifiable class. *Giano v. Senkowski,* 54 F.3d 1050, 1057 (2d Cir.1995)

(cited in *Greco v. County of Nassau,* 146 F.Supp.2d 232, 248 (E.D.N.Y.2001)). Plaintiff fails to alert this Court to any specific fact by which we could conclude that Plaintiff was treated differently because of his mental illness; instead, he merely repeats conclusory statements that he was "discriminated against." These statements cannot withstand the required pleading standard set out in *Iqbal,* and thus, this Court recommends that the claims Plaintiff brings pursuant to the Equal Protection Clause be **dismissed.** To the extent Plaintiff is stating a claim of disability discrimination under Title II of the ADA, we refer the reader to Plaintiff's identical complaint brought in this District pursuant to the ADA. *See supra* note 3.

Lastly, Plaintiff complains that Defendants Hersh, Scott, and Thomas did not allow Plaintiff to file a grievance. *See* Compl. at Causes of Action 2. To the extent this claim overlaps with Plaintiff's retaliation claims, we refer to our above disposition of that issue. *See supra* Part III.C.i. We pause to note that although Plaintiff "has a constitutional right to access the courts, participation in an inmate grievance process is not a constitutionally protected right." *Davis v. Buffardi,* 2005 WL 1174088, at *3 (N.D.N.Y. May 4, 2005) (internal citations omitted); *see also Rhodes v. Hoy,* 2007 WL 1343649, at *2 n. 2 (N.D.N.Y. May 5, 2007) (citing cases, including *Shell v. Brzezniak,* 365 F.Supp.2d 362, 369–70 (W.D.N.Y.2005) (holding that "inmate grievance programs created by state law are not required by the Constitution and consequently allegations that prison officials violated those procedures does [sic] not give rise to a cognizable § 1983 claim")). Notwithstanding, Plaintiff states no sufficient facts for us to find that Defendant Hersh, who allowed Plaintiff to go to the "grievance building" when Plaintiff requested, *see* Compl. at ¶ 7, or Defendant Thomas are liable for preventing Plaintiff from filing grievances; thus, this claim must be **dismissed** in its entirety for failing to state a claim. [16]

[16]  We note that a plaintiff's lack of exhaustion of administrative remedies, as prescribed by the Prison Litigation Reform Act ("PLRA"), is an affirmative defense, but one that is not raised by Defendants in this action. *See Arce v. Keane,* 2004 WL 439428, at *2–3 (S.D.N.Y. Mar.9, 2004) (describing PLRA's exhaustion requirement).

### III. CONCLUSION

**\*14** For the reasons stated herein, it is hereby

**RECOMMENDED,** that Defendants' Motion to Dismiss (Dkt No. 55) be **granted in part and denied in part** as follows:

1. To the extent asserted, retaliation claims against Defendants Hersh and Thomas, relating to their cell search on April 2, 2009, and Defendants Thomas and Scott, relating to misbehavior reports issued pursuant to that cell search, should survive Defendants' Motion and proceed to discovery;

2. To the extent asserted, Eighth Amendment excessive force claims against Defendant Micheals, relating to striking Plaintiff in the head several times, should survive Defendants' Motion and proceed to discovery;

3. All other asserted claims against Defendants be **dismissed** for failure to state a claim; and it is further

**ORDERED,** that the Clerk of the Court serve a copy of this Report–Recommendation and Order upon the parties to this action.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen (14) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. *FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN (14) DAYS WILL PRECLUDE APPELLATE REVIEW. Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Sec'y of Health and Human Servs. .,* 892 F.2d 15 (2d Cir.1989)); *see also* 28 U.S.C. § 636(b) (1); FED. R. CIV. P. 72 & 6(a).

**All Citations**

Not Reported in F.Supp.2d, 2011 WL 6031940

© 2017 Thomson Reuters. No claim to original U.S. Government Works.

© 2017 Thomson Reuters. No claim to original U.S. Government Works.

2011 WL 6031071
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Kenneth J. PHELAN, Plaintiff,
v.
HERSH et al., Defendants.

No. 9:10−cv−11 (GLS/RFT).
|
Dec. 5, 2011.

**Attorneys and Law Firms**

Kenneth J. Phelan, Romulus, NY, pro se.

Hon. Eric T. Schneiderman, New York State Attorney General, Adrienne J. Kerwin, Assistant Attorney General, of Counsel, Albany, NY, for the Defendants.

*MEMORANDUM–DECISION AND ORDER*

GARY L. SHARPE, District Judge.

### I. *Introduction*

 **\*1**  Plaintiff *pro se* Kenneth J. Phelan brings this action under 42 U.S.C. § 1983, alleging his constitutional rights were violated by defendants. (*See* Compl., Dkt. No. 1.) In a Report–Recommendation and Order (R & R) filed September 13, 2011, Magistrate Judge Randolph F. Treece recommended that defendants' motion to dismiss be granted in part and denied in part. [1] (*See generally* R & R, Dkt. No. 63.) Pending are Phelan's objections to the R & R. (*See* Dkt. No. 68.) For the reasons that follow, the R & R is adopted in its entirety.

---

[1]     The Clerk is directed to append the R & R to this decision, and familiarity therewith is presumed.

### II. *Standard of Review*

Before entering final judgment, this court routinely reviews all report and recommendation orders in cases it has referred to a magistrate judge. If a party has objected to specific elements of the magistrate judge's findings and recommendations, this court reviews those findings and recommendations *de novo*. *See* Almonte v. N.Y. State Div. of Parole, No. 04–cv–484, 2006 WL 149049, at *6– 7 (N.D.N.Y. Jan.18, 2006). In those cases where no party has filed an objection, or only a vague or general objection has been filed, this court reviews the findings and recommendations of the magistrate judge for clear error. *See id.*

### III. *Discussion*

Phelan's "objections" consist of factual statements which were either not alleged in his Complaint, or already considered by Judge Treece. (*See* Dkt. No. 68 at 1–5.) As Phelan is well aware—given the fact that he has filed nineteen lawsuits in this district alone—the sufficiency of a complaint is judged by the factual allegations contained therein. *See* McCarthy v. Dun & Bradstreet Corp., 482 F.3d 184, 191 (2d Cir.2007) (The court's review is limited to the "four corners of the complaint ...."). Thus, Phelan's attempt to cure the deficiencies in his Complaint are unavailing. More importantly though, Phelan's "objections" are insufficient to require a *de novo* review as there is no reference to a perceived error by Judge Treece. Having found no clear error in the R & R, the court accepts and adopts Judge Treece's R & R in its entirety.

### IV. *Conclusion*

**WHEREFORE,** for the foregoing reasons, it is hereby

**ORDERED** that Magistrate Judge Randolph F. Treece's September 13, 2011 Report–Recommendation and Order (Dkt. No. 63) is **ADOPTED** in its entirety; and it is further

**ORDERED** that defendants' motion to dismiss (Dkt. No. 55) is **DENIED** in part with respect to the following:

  (1) the retaliation claims against defendants Hersh and Thomas, relating to their cell search on April 2, 2009;

  (2) the retaliation claims against defendants Thomas and Scott, relating to misbehavior reports issued pursuant to the April 2, 2009 cell search; and

2011 WL 6031071

(3) the Eighth Amendment excessive force claims against defendant Micheals, relating to striking Phelan in the head several times; and it is further

**ORDERED** that defendants' motion to dismiss (Dkt. No. 55) is **GRANTED** without prejudice as to all of the other claims against defendants; and it is further

**\*2  ORDERED** that in accordance with the Mandate of the United States Court of Appeals for the Second Circuit (*see* 9:10–cv–12, Dkt. No. 25), this case is consolidated with Case No. 9:10–cv–12; and it is further

**ORDERED** that 9:10–cv–11 shall be the lead case and 9:10–cv–12 shall be the member case; and it is further

**ORDERED** that Magistrate Judge Treece shall, in accordance with the Second Circuit's Mandate, appoint counsel; and it is further

**ORDERED** that the parties shall contact Magistrate Judge Treece to schedule further proceedings; and it is further

**ORDERED** that the Clerk provide a copy of this Memorandum–Decision and Order to the parties by mail and certified mail.

**IT IS SO ORDERED.**

**All Citations**

Not Reported in F.Supp.2d, 2011 WL 6031071

---

**End of Document**                    © 2017 Thomson Reuters. No claim to original U.S. Government Works.

2016 WL 4530456
Only the Westlaw citation is currently available.
United States District Court,
E.D. New York.

Daniel Brooks; Kareem Bacchus;
and, Sharief Bodden, Plaintiffs,
v.
NYC DOC Commissioner, Joseph Ponte;
NYC Department of Corrections; Warden
Jane DOE of GRVC; and Security Deputy
Warden Jane DOE of GRVC, Defendants.

14-CV-6283 (RRM) (CLP)
|
Signed August 25, 2016
|
Filed 08/29/2016

**Attorneys and Law Firms**

Daniel Brooks, East Elmhurst, NY, pro se.

Kareem Bacchus, East Elmhurst, NY, pro se.

Sharief Bodden, East Elmhurst, NY, pro se.

Eric Brent Porter, Joshua C. Wertheimer, New York City Law Department, New York, NY, for Defendants.

## MEMORANDUM AND ORDER

ROSLYNN R. MAUSKOPF, United States District Judge

Plaintiffs Daniel Brooks ("Brooks"), Kareem Bacchus ("Bacchus"), and Sharief Bodden ("Bodden") (collectively, "plaintiffs"), who at the time of filing the complaint were pretrial detainees at the George R. Vierno Center ("GRVC") on Rikers Island, bring this *pro se* action pursuant to 42 U.S.C. § 1983, alleging that defendants violated their federal and state constitutional rights by depriving them of showers, hot meals, mail service, library access, and non-emergency medical care during three lockdowns in the six-week period preceding their filing of the complaint. (Doc. No. 1.) The Court grants plaintiffs' requests to proceed *in forma pauperis* pursuant to 28 U.S.C. § 1915. (Doc. Nos. 2–4.) The complaint is dismissed without prejudice, but plaintiffs are

granted leave to amend the complaint within thirty (30) days of the entry of this Memorandum and Order if they can do so in good faith.

## BACKGROUND

The following facts are drawn from plaintiffs' complaint, the allegations of which are assumed to be true for purposes of this decision. Plaintiffs were, at the time of filing the complaint, incarcerated at GRVC – a facility operated by the New York City Department of Correction, an agency of the City of New York. Plaintiffs were "in detainee status." (Compl. at 5.)

On September 14–15, 2014, GRVC was held under "lockdown status in which [plaintiffs] were not afforded showers, or hot meals." (*Id.* at 4.) On September 26–27, 2014, the facility was again held under lockdown and plaintiffs were "denied law library, mail service, hot showers, [and] hot meals for the course of twenty four hours." (*Id.*) Then, from October 5–9, 2014, an extended, but twice-interrupted, lockdown occurred: it began on or about October 5th (the beginning date and time are unspecified, but plaintiffs provide that the initial lockdown was for more than twenty-four hours over the period of "October 5–7, 2014"), was lifted for a period of nine hours on an unspecified date and time as well as for two hours on October 8th (from 5:00 a.m. to 7:00 a.m.), and ended at 7:00 p.m. on October 9th. The lockdown between October 5th and 9th lasted a minimum of sixty hours during which plaintiffs were deprived of showers, hot meals, mail service, and "any other services other than medication and emergency medical treatment." (*Id.*)

Plaintiffs requested an explanation for the lockdowns from GRVC employees. Bodden and Bacchus did not receive an explanation, but Brooks received two different explanations. (*Id.* at 5.) At first, an unidentified person told Brooks that the lockdown "status [wa]s being instituted as per order of the Commissioner Joseph Ponte." (*Id.*) Then defendant "Warden" told him that the lockdown was because of a "pending investigation" and that it would be resumed "if any in[c]idents took place in the facility." (*Id.*) Plaintiffs are dubious of the second explanation because no lockdown was implemented on October 11th, even after Brooks observed the "investigation unit in the main corridor headed to the even side of G.R.V.C." (*Id.*) Moreover, "the cause of the

lockdowns didn't take place in [their] housing areas so [they] should not have been punished for it." (*Id.*)

**\*2** Plaintiffs do not allege any injury arising from the lockdowns. They seek damages, "a formal apology," and a "possible policy change to keep this from happening to other inmates under the care, custody and control of the New York City Department of Corrections." (*Id.* at 6.)

### STANDARD OF REVIEW

Under 28 U.S.C. § 1915A, the Court "shall review, before docketing, if feasible or, in any event, as soon as practicable after docketing, a complaint in a civil action in which a prisoner seeks redress from a governmental entity or officer or employee of a governmental entity." 28 U.S.C. § 1915A(a). Upon review, the Court is required to "identify cognizable claims or dismiss the complaint, or any portion of the complaint, if the complaint ... (1) is frivolous, malicious, or fails to state a claim upon which relief may be granted; or (2) seeks monetary relief from a defendant who is immune from such relief." 28 U.S.C. § 1915A(b); *Liner v. Goord*, 196 F.3d 132, 134 n.1 (2d Cir. 1999) (noting that under the Prison Law Reform Act ("PLRA"), *sua sponte* dismissal of frivolous prisoner complaints is not only permitted, but mandatory); *see* 28 U.S.C. § 1915(e)(2)(B).

Of course, when a prisoner is proceeding *pro se*, the Court is required to read the complaint liberally and interpret it as raising the strongest arguments it suggests. *See Erickson v. Pardus*, 551 U.S. 89, 94 (2007); *Sealed Plaintiff v. Sealed Defendant #1*, 537 F.3d 185, 191–93 (2d Cir. 2008). However, even a *pro se* complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Although the allegations contained in the complaint are assumed to be true, this tenet is "inapplicable to legal conclusions." *Id.* The Federal Rules of Civil Procedure do not require "detailed factual allegations," but demand "more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Id.*

### DISCUSSION

#### I. Improper Defendants Under § 1983

According to the caption of their complaint, plaintiffs are proceeding pursuant to 42 U.S.C. § 1983. This statute provides, in pertinent part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for seeking redress.

42 U.S.C. § 1983. Section 1983 "is not itself a source of substantive rights, but a method for vindicating federal rights elsewhere conferred by those parts of the United States Constitution and federal statutes that it describes." *Baker v. McCollan*, 443 U.S. 137, 144 n.3 (1979).

In order to maintain a § 1983 action, a plaintiff must allege both that the conduct complained of was "committed by a person acting under color of state law" and "deprived a person of rights, privileges or immunities secured by the Constitution or laws of the United States." *Pitchell v. Callan*, 13 F.3d 545, 547 (2d Cir. 1994).

##### A. Claims against the DOC

**\*3** Plaintiffs name as a defendant the City of New York Department of Corrections ("DOC"). The DOC, which is an agency of the City of New York, does not have a legal identity separate and apart from the municipality and cannot sue or be sued. *See Lauro v. Charles*, 219 F.3d 202, 205 n.2 (2d Cir. 2000); *Bailey v. New York City Police Dep't*, 910 F. Supp. 116, 117 (E.D.N.Y. 1996) (citing New York City Charter, Chapter 17, § 396, which provides that "all actions and proceedings for the recovery of penalties for the violation of any law shall be brought in the name of the City of New York and not that of any agency); *see*

*also Hall v. City of White Plains,* 185 F. Supp. 2d 293, 303 (S.D.N.Y. 2002); *Wilson v. City of New York,* 800 F. Supp. 1098, 1101 (E.D.N.Y. 1992). Thus, the § 1983 claim against the DOC is dismissed pursuant to 28 U.S.C. §§ 1915A, 1915(e)(2)(B)(ii).

### B. Claims against Ponte

Because vicarious liability is inapplicable to § 1983 suits, a plaintiff must prove that each government-official defendant, "through the official's own individual actions, has violated the Constitution." *Iqbal,* 556 U.S. at 676–77 (rejecting the argument that "a supervisor's mere knowledge of his subordinate's discriminatory purpose amounts to the supervisor's violating the Constitution") (citations omitted). Thus, a supervisory official cannot be held liable solely on account of the acts or omissions of his or her subordinates. *See Grullon v. City of New Haven,* 720 F.3d 133, 138 (2d Cir. 2013) ("[I]n order to establish a defendant's individual liability in a suit brought under § 1983, a plaintiff must show, *inter alia,* the defendant's personal involvement in the alleged constitutional deprivation."). The complaint here does not provide any facts in support of the personal involvement, if any, of Commissioner Ponte except to state that Brooks received an unattributed explanation that the lockdown was pursuant to the "order of Commissioner Joseph Ponte." (Compl. at 5.) This is insufficient to support a cause of action against Ponte, and thus the lawsuit is dismissed against him.

Should plaintiffs file an amended complaint, they must allege the personal involvement of each defendant, including Ponte, in the alleged constitutional violations. *See Farid v. Ellen,* 593 F.3d 233, 249 (2d Cir. 2010) ("[P]ersonal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.").

## II. Conditions of Confinement

### A. Applicable Law

A convicted prisoner's claim based on the conditions of his or her confinement is analyzed under the Eighth Amendment. *See Weyant v. Okst,* 101 F.3d 845, 856 (2d Cir. 1996) (noting that the Eighth Amendment governs medical claims of convicted persons because of its prohibition of "cruel and unusual punishment"). In the case of a pretrial detainee, the same claim is analyzed under the Fourteenth Amendment's Due Process Clause. *See Caiozzo v. Koreman,* 581 F.3d 63, 69 (2d Cir. 2009) (noting that because a pretrial detainee is not being "punished," pretrial detainees in state custody are protected by the Due Process Clause of the Fourteenth Amendment. Although plaintiffs identified their cause of action as arising under the Eighth Amendment to the United States Constitution, given their apparent status at the time of filing their complaint as pretrial detainees, plaintiffs' claims challenging the conditions of their confinement are properly brought under the Due Process Clause of the Fourteenth Amendment. In any event, the constitutional inquiries under the Eighth and Fourteenth Amendments are in all relevant respects identical. *Id.* at 72.

**\*4** Under the Due Process Clause of the Fourteenth Amendment, the conditions of pretrial detention are constitutional unless they amount to punishment of the detainee. *See Bell v. Wolfish,* 441 U.S. 520, 535–37 (1979). "Because restraint is always necessary in effectuating confinement, not every uncomfortable or disabling condition and restriction can be considered punitive." *Benjamin v. Fraser,* 343 F.3d 35, 50 (2d Cir. 2003) (citation omitted), *overruled on other grounds by Caiozzo, supra.* To state a "claim based on conditions of confinement, an inmate must allege that: (1) objectively, the deprivation the inmate suffered was 'sufficiently serious that he was denied the minimal civilized measure of life's necessities,' and (2) subjectively, the defendant official acted with 'a sufficiently culpable state of mind ... such as deliberate indifference to inmate health or safety.' " *Walker v. Schult,* 717 F.3d 119, 125 (2d Cir. 2013) (quoting *Gaston v. Coughlin,* 249 F.3d 156, 164 (2d Cir. 2001)); *Trammell v. Keane,* 338 F.3d 155, 161 (2d Cir. 2002).

With respect to pleading an objective deprivation, the Second Circuit Court of Appeals has explained that "[b]ecause society does not expect or intend prison conditions to be comfortable, only extreme deprivations are sufficient to sustain a 'conditions-of-confinement claim.' " *Blyden v. Mancusi,* 186 F.3d 252, 263 (2d Cir. 1998) (citing *Hudson v. McMillian,* 503 U.S. 1, 9 (1992)). The "inmate must show that the conditions, either alone or in combination, pose an unreasonable risk of serious damage to his health." *Walker,* 717 F.3d at 125 (citing *Rhodes v. Chapman,* 452 U.S. 337, 347 (1981)). The conditions of confinement must be "evaluated in light of

2016 WL 4530456

contemporary standards of decency," *Jabbar v. Fischer*, 683 F.3d 54, 57 (2d Cir. 2012), and may be "aggregated to rise to the level of a constitutional violation, but 'only when they have a mutually enforcing effect that produces the deprivation of a single, identifiable human need such as food, warmth or exercise.' " *Walker*, 717 F.3d at 125 (quoting *Wilson v. Seiter*, 501 U.S. 294, 304 (1991)).

With respect to demonstrating a subjectively culpable state of mind, a plaintiff "must show that the acts of defendants involved more than lack of due care, but rather involved obduracy and wantonness in placing his health in danger." *LaBounty v. Coughlin*, 137 F.3d 68, 73 (2d Cir. 1998); *see Farmer v. Brennan*, 511 U.S. 811, 837 (1970) (the plaintiff must show that the defendant acted with "more than mere negligence"). "To constitute deliberate indifference, '[t]he prison official must know of and disregard an excessive risk to inmate health or safety.' " *Walker*, 717 F.3d at 125 (quoting *Jabbar*, 683 F.3d at 57).

### B. Application

Plaintiffs allege that there were lockdowns at GRVC on all or part of the following days: September 14–15 and 26–27, 2014, and October 5–9, 2014, during which they were deprived of showers and hot meals, as well as occasionally deprived of access to the law library, mail service, and nonemergency medical treatment. The Court heeds the Second Circuit's "reaffirm[ation] that each prisoner complaint alleging a constitutional violation must be carefully analyzed in light of the particular facts contained therein." *Id.* at 130. Here, the specific facts in plaintiffs' complaint have not plausibly alleged conditions – alone or in combination – that deprived them of a minimal civilized measure of life's necessities. Nor have they alleged that defendants were deliberately indifferent to an excessive risk to inmate health or safety.

### 1. Objective Prong

#### a. Temperature of Food

Plaintiffs allege that they were not given hot food during the periods of the lockdowns. There is no allegation that plaintiffs failed to receive three meals per day or that the meals they did receive were nutritionally inadequate. While prisoners are guaranteed a nutritionally adequate diet, *see Wilson v. Seiter*, 501 U.S. 294, 303 (1991), the

provision of cold food over the duration of the lockdown does not, in this context, rise to the level of a due process violation. *See Waring v. Meachum*, 175 F. Supp. 2d 230, 239–40 (D. Conn. 2001) (finding that inadequate and cold food during weeklong lockdown did not rise to level of constitutional violation); *McLeod v. Scully*, No. 81-CV-3139 (RLC), 1984 WL 692, at *2 (S.D.N.Y. July 30, 1984) (holding that provision of two meals per day during eight-day lockdown did not rise to level of Eighth Amendment violation); *see also Brown-El v. Delo*, 969 F.2d 644, 648 (8th Cir. 1992) ("claim that [plaintiff's] constitutional rights were violated when he was served cold food is frivolous"); *Hayward v. Procunier*, 629 F.2d 599, 600 (9th Cir. 1980) (determining no constitutional violation where prisoners were served sack lunches twice a day in their cells for two weeks during five-month lockdown); *Hoitt v. Vitek*, 497 F.2d 598, 601 (1st Cir. 1974) (concluding that prisoners' allegations concerning denial of hot meals failed to state cognizable claim of cruel and unusual punishment, given that prisoners were otherwise adequately fed); *Gawloski v. Dallman*, 803 F. Supp. 103, 111–12 (S.D. Ohio W.D. 1992) (holding that inmate's allegation that prison officials failed to provide hot meals "did not constitute cruel and unusual punishment absent some indication that [the inmate] received less than one meal per day or that the meals lacked nutritional value or were in some way physically harmful to [the inmate's] health").

**\*5** Based on the facts presented and the above authorities, the Court finds that plaintiffs did not suffer a sufficiently serious deprivation of their rights because there are no allegations that they did not receive nutritionally adequate meals during the lockdown. Thus, plaintiffs' cause of action based on the failure to provide hot meals fails to state a claim on which relief may be granted. *See* 28 U.S.C. §§ 1915A, 1915(e)(2)(B)(ii).

#### b. Lack of Showers

Plaintiffs allege that they were not permitted to shower during the lockdown periods. This claim also fails to rise to the level of a due process violation. The failure to provide inmates with showers during lockdowns has been upheld in cases where the lockdown itself was not subject to constitutional challenge. *See, e.g.*, *Banks v. Argo*, No. 11-CV-4222 (LAP), 2012 WL 4471585, at *4 (S.D.N.Y. Sept. 25, 2012) ("[E]ven assuming prison

officials denied Plaintiff shower access for the entire time alleged in his complaint – thirteen days –his claim still fails as a matter of law.") (citing *McCoy v. Goord*, 255 F. Supp. 2d 233, 260 (S.D.N.Y. 2003) ("[A] two-week suspension of shower privileges does not suffice as a denial of 'basic hygienic needs.' ")); *Suarez v. Kremer*, No. 03-CV-809 (RJA), 2008 WL 4239214, at *8 (W.D.N.Y. Aug. 7, 2008) (finding that temporary denial of recreation or shower rights did not rise to level of Eighth Amendment violation); *Ford v. Phillips*, No. 05-CV-6646 (NRB), 2007 WL 946703, at *4 (S.D.N.Y. Mar. 27, 2007) ("[A]s a matter of law, minor and temporary deprivations of property, showers and recreation do not violate the Eighth Amendment."); *Beckford v. Portuondo*, 151 F. Supp. 2d 204, 210 (N.D.N.Y. 2001) (holding that temporary denial of shower rights does not violate Eighth Amendment); *Waring*, 175 F. Supp. 2d at 241–42 ("[T]he prohibition of showers and failure to provide a change of clothing during the seven day lockdown period does not demonstrate that plaintiffs were deprived of a minimum civilized level of life's necessities."); *McLeod*, 1984 WL 692, at *3 (finding no violation where prison deprived inmates of showers during eight-day lockdown); *see also Rust v. Grammer*, 858 F.2d 411, 414–15 (8th Cir. 1988) (holding that cancellation of shower privileges during nine-day lockdown did not violate Eighth Amendment); *Wright v. DeBruyn*, No. 93-CV-448 (RP), 1996 WL 441879, at *1–3 (N.D. Ind. Jun. 4, 1996) (determining no violation where showers were prohibited during first three to four weeks of ten-month lockdown; after first month inmates were permitted to shower once every eight to ten days).

Under these circumstances, the Court finds that plaintiffs did not suffer a sufficiently serious deprivation of their rights because they were unable to shower during the lockdowns. Plaintiffs' claim based on the cancellation of shower privileges during the lockdowns therefore fails to state a claim on which relief may be granted. *See* 28 U.S.C. §§ 1915A, 1915(e)(2)(B)(ii).

### c. Access to Law Library

In order for plaintiffs to successfully plead a claim arising from their deprivation of access to the law library, they must allege that the restrictions about which they complain "hindered [their] efforts to pursue a legal claim – for example, by demonstrating that [they] ha[ve] been unable to file a complaint or [have] had a complaint dismissed for failure to observe a technicality." *Benjamin*, 264 F.3d at 184. Plaintiffs have made no such allegation in their complaint. Furthermore, access to legal assistance need not be unfettered, and facilities "may place reasonable restrictions on inmates' use of facility law libraries as long as those restrictions do not interfere with inmates' access to the courts." *Gamble v. City of New York ex rel. NYC Dep't of Correction*, No. 04-CV-10203 (TPG), 2009 WL 3097239, at *6 (S.D.N.Y. Sept. 25, 2009). Thus, the restrictions alleged in the complaint – as well as the fact that these restrictions are not alleged to have caused plaintiffs any injury – do not rise to the level of unconstitutional obstruction of access to courts. *See Coleman v. Bartlett*, 165 F.3d 13, 13 (2d. Cir. 1998) (finding that deprivation of access to law library, without showing of resulting harm, insufficient to state claim for relief); *Johnson v. Nassau Cnty.*, No. 13-CV-6510 (JS), 2014 WL 294250, at *6 (E.D.N.Y. Jan. 24, 2014) (holding that the plaintiff "failed to state a plausible claim for relief" regarding access to prison law library because he "made no allegations regarding an actual injury he suffered due to the allegedly inadequate law library or insufficient access to the law library"); *Simmons v. Adamy*, 987 F. Supp. 2d 302, 308 (W.D.N.Y. 2013) (dismissing the plaintiff's claim regarding denial of access to prison law library due to simultaneous scheduling with religious services, as the "plaintiff offer[ed] no evidence that he was harmed by the lack of more frequent law library access"); *Hayes v. Cnty. of Sullivan*, 853 F. Supp. 2d 400, 437 n.33 (S.D.N.Y. 2012) ("Plaintiff does not have a constitutional right to access the law library whenever he wishes and has failed to show any injury resulting from allegedly not being called to the law library every time he made a request.").

### d. Mail Service and Routine Medical Care

**\*6** Similarly, the interruption in mail service and denial of routine medical care during the lockdowns does not rise to the level of a deprivation of the minimal civilized measures of life's necessities or subject plaintiffs to unreasonable health and safety risks. Because plaintiffs have failed to show that any of them suffered from serious medical conditions and that defendants intentionally denied or delayed plaintiffs' access to medical care, their Eighth Amendment claim based on inadequate medical care must fail. *See Smith v. Fischer*, 500 Fed.Appx. 59, 61 (2d Cir. 2012) ("To succeed on an Eighth Amendment

deliberate indifference claim, a plaintiff must satisfy two requirements. He must show both that the danger posed by the indifference he alleges is 'sufficiently serious' and that the defendant has acted with 'deliberate indifference to inmate health or safety' in failing to address this danger.") (quoting *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)). Nor have plaintiffs alleged a sufficiently serious deprivation of their rights because they were sometimes deprived of mail service during the lockdown periods. *See Banks v. Argo*, No. 11-CV-4222 (LAP), 2012 WL 4471585, at *6 (S.D.N.Y. Sept. 25, 2012) (dismissing constitutional claims of incarcerated *pro se* plaintiff challenging restriction on telephone calls and mail communications that lasted up to thirteen days).

Finally, the Court concludes that plaintiffs have failed to allege that the "conditions either alone or in combination, pose an unreasonable risk of serious danger to [their] health." *Walker*, 717 F.3d at 125; *cf. Cano v. City of New York*, No. 13-CV-3341 (WFK), 2014 WL 4494169, at *7–8 (E.D.N.Y. Sept. 12, 2014) (holding that the plaintiffs' complaint, which "alleged [a] combination of overcrowded cells, exposure to insects, rodents, extreme temperatures, and unsanitary conditions (including garbage, feces, urine, and vomit), sleep deprivation, the lack of adequate food and water, the inability to clean themselves, the lack of access to usable bathroom facilities, and the lack of protection from the crimes and conduct of other inmates" sufficiently "alleged objectively serious conditions depriving them of basic human needs, including food, a habitable temperature, sleep, and the ability to relieve oneself without exposure to other human excrement, among others"); *Boadi v. City of New York*, No. 12-CV-2456 (BMC), 2012 WL 3062063, at *4 (E.D.N.Y. July 26, 2012) (finding that a complaint alleging deprivation of an incarcerated individual's ability to "eat, drink, or use the bathroom for 18 consecutive hours" is sufficient to state a claim for deliberate indifference). Based on the facts presented in the complaint and the above authorities, the Court finds that the complaint fails to allege a sufficiently serious deprivation to substantiate a Due Process Fourteenth Amendment conditions-of-confinement claim.

## 2. Subjective Prong

Nor have plaintiffs alleged facts to show that any defendant acted with deliberate indifference. That is to say, even if plaintiffs had alleged objectively serious conditions, the complaint does not allege that defendants knew of and disregarded excessive risks to plaintiffs' health or safety.

Hence, the Court finds that the conditions alleged by plaintiffs do not fall below the "minimal civilized measure of life's necessities," and that they have failed to allege that defendants knew of and disregarded an excessive risk to the detainees' health or safety. *See Trammell*, 338 F.3d at 161; *Caiozzo*, 581 F.3d at 72. The complaint thus fails to state a claim on which relief may be granted and is dismissed. [1] *See* 28 U.S.C. §§ 1915A, 1915(e)(2)(B)(ii).

[1]    Plaintiffs' claims under the New York State Constitution must also be dismissed because there is no private right of action under the New York State Constitution where an identical claim may be brought under § 1983. *Canzoneri v. Incorporated Village of Rockvile Ctr.*, 986 F. Supp. 2d 194, 206 (E.D.N.Y. 2013) ("Because all state constitutional law claims are also asserted as Section 1983 claims, all such claims are dismissed.").

## III. Requirements of the PLRA

### A. Injury

Even if plaintiffs had successfully alleged claims of unconstitutional conditions existing at the jail during the lockdown, in order to obtain monetary damages they would have to provide evidence to show that each of them suffered an injury as a result of his incarceration at that facility. *See* 42 U.S.C. § 1997e(e) ("No federal civil action may be brought by a prisoner confined in a jail, prison, or other correctional facility, for mental or emotional injuries suffered while in custody without a prior showing of physical injury."). Plaintiffs have failed to allege facts to show, or indeed even to allege, that they suffered any viable injuries as a result of the conditions of confinement complained of in the complaint.

### B. Exhaustion of Administrative Remedies

**\*7** Even if plaintiffs could allege plausible claims against any of the defendants, the allegations in the complaint indicate that plaintiffs have failed to exhaust their administrative remedies prior to commencing this action. (*See* Compl. at 3.) *See* 42 U.S.C. § 1997e(a); *Harris v. Gunsett*, No. 12-CV-3578 (PAC), 2013 WL 3816590, at *1 (S.D.N.Y. July 22, 2013) (holding that,

although inmates are not required to plead or demonstrate exhaustion in their complaints, if non-exhaustion is clear from the face of the complaint and attached documents, dismissal is warranted). Should plaintiffs file an amended complaint, they should be mindful of the steps necessary to exhaust their administrative remedies as inmates of the New York City Department of Correction, which are described in numerous judicial opinions and are publicly available on the DOC's website. *See* http://www.nyc.gov/html/doc/downloads/pdf/Directive_3376_Inmate_Grievance_Request_Program.pdf (setting forth the review process for a grievance filed by inmates of the New York City Department of Correction, which includes several layers of review and appeal); *Bolton v. City of New York*, No. 13-CV-5749 (RJS), 2014 WL 4446452, at *4 n.9 (S.D.N.Y. Sept. 9, 2014) (finding that claims for injuries arising out of a series of prison lockdowns that allegedly took place at a prison facility on Rikers Island were subject to summary judgment for failure to exhaust administrative remedies).

## IV. Leave to Amend

As currently stated, even with a liberal construction, the complaint fails to state a claim for mistreatment at the hands of DOC officials under the Due Process Clause of the Fourteenth Amendment. Nevertheless, in light of plaintiffs' *pro se* status, plaintiffs are afforded thirty (30) days to amend their complaint if they can, in good faith, set forth claims under § 1983 against defendants. *See* Fed R. Civ. P. 15(a); *Davis v. Goord*, 320 F.3d 346, 352 (2d Cir. 2003) ("Certainly the court should not dismiss without granting leave to amend at least once when a liberal reading of the [*pro se*] complaint gives any indication that a valid claim might be stated.") (quoting *Gomez v. USAA Fed. Sav. Bank*, 171 F.3d 794, 795 (2d Cir. 1999)) (quotations omitted).

Should plaintiffs file an amended complaint, they must satisfy the minimal filing requirements of Fed. R. Civ. P. 8, providing defendant(s) with notice of the claims and a short, plain statement of the relevant facts supporting their claim(s). Plaintiffs must provide facts pertinent to each claim and cannot rely on generalized allegations of misconduct. If plaintiffs elect to file an amended complaint, they should list specifically what injury they suffered, when and how it occurred, and who was responsible for it. Conclusory allegations are not sufficient. *See Iqbal*, 556 U.S. at 678. Moreover,

plaintiffs should make clear if they are challenging the constitutionality of the lockdown itself, or only its resultant conditions of confinement and lack of explanation. Plaintiffs should also be mindful of the PLRA's requirements and the information contained in this Memorandum and Order regarding the necessity of personal involvement of any defendant(s), as well as the fact that the DOC may not be sued under § 1983.

## CONCLUSION

For the foregoing reasons, plaintiffs' complaint is dismissed without prejudice for failure to state a claim on which relief may be granted. *See* 28 U.S.C. §§ 1915A(b), 1915(e)(2)(B)(ii). However, in an abundance of caution and in light of plaintiffs' *pro se* status, plaintiffs shall be afforded thirty (30) days to file an amended complaint against defendant(s) if they can do so in good faith. If plaintiffs elect to file an amended complaint, it should be captioned as an "Amended Complaint," should bear the same docket number as this Memorandum and Order, and must provide facts giving rise to their claims against defendant(s). Plaintiffs are advised that an amended complaint will completely replace the original pleading and are reminded to include all facts that would support their claim. An amended complaint shall be submitted to the Court within thirty (30) days of the entry of this Memorandum and Order. All further proceedings are stayed for thirty (30) days for plaintiffs to comply with this Memorandum and Order. If plaintiffs fail to comply within the time allowed, the Court shall enter judgment dismissing this action. Once submitted, the amended complaint will be reviewed for compliance with this Memorandum and Order, and for sufficiency under Fed. R. Civ. P. 8 and 28 U.S.C. § 1915A.

**\*8** The Court certifies pursuant to 28 U.S.C. § 1915(a)(3) that any appeal would not be taken in good faith and therefore *in forma pauperis* status is denied for the purpose of any appeal. *See Coppedge v. United States*, 369 U.S. 438, 444–45 (1962).

The Clerk of Court is directed to mail a copy of this Memorandum and Order to plaintiffs and note the mailing on the docket.

SO ORDERED.

2016 WL 4530456

**All Citations**

Slip Copy, 2016 WL 4530456

---

**End of Document**                                    © 2017 Thomson Reuters. No claim to original U.S. Government Works.

2014 WL 1575872

2014 WL 1575872
Only the Westlaw citation is currently available.
United States District Court,
W.D. New York.

Eddie GOMEZ, Olga Padilla,
Elizabeth Padilla, Plaintiffs,
v.
Stanley SEPIOL, A. Mucigrosso, A. Fusare, Atwood,
Rope, Virginia Livermore, W. Hughes, Steven
Racette, Raymond J. Coveny, Robert Prack, Patrick
Griffin, Michael Sheahan, Harry Hetrick, Marc
D. Macgrain, Scott M. Hodge, Richard T. Orioles,
Thomas Evans, Douglas Reynolds, Sabrina Von
Hagn, Elizabeth. White, John Doe 1, John Doe 2,
John Doe 3, John Doe 4, John Doe 5, John Doe 6,
John Doe 7, Angela Bartlett, Kathleen Washburn,
Jane Gray, John Doe 8, John Doe 9, John Doe 10,
John Doe 11, John Doe 12, Brian Fischer, Andrew
S. Pedalty, Karen Bellamy, Peter S. Schmitt, Steve
F. Post, Mark Deburgomaster, Steven Wenderlich,
Paul Sweeney, Harold Graham, John Doe 13, John
Doe 14, Signor, Steven J. Evertts, sued individually
and in their official capacities, Defendants.

No. 11–CV–1017SR.
|
Signed April 9, 2014.
|
Filed April 11, 2014.

**Attorneys and Law Firms**

Eddie Gomez, Alden, NY, pro se.

Olga Padilla, pro se.

Elizabeth Padilla, pro se.

**ORDER**

MICHAEL A. TELESCA, District Judge.

*INTRODUCTION*

**\*1** Plaintiffs, Eddie Gomez, currently an inmate at
the Wende Correctional facility, who was an inmate at

the Elmira and Southport Correctional Facilities at the
time of the events alleged in the complaint, and Olga
and Elizabeth Padilla, Gomez's wife and stepdaughter,
respectively, filed, pro se, a complaint under 42 U.S.C.
§ 1983 alleging a number of claims (Eight) against
a number of defendants (34), including a number of
John Does, who are or were supervisory officials and/
or employees of the New York State Department of
Corrections and Community Supervision ("DOCCS").
Plaintiffs allege, *inter alia*, that defendants violated their
constitutional rights in a myriad of ways, including but
not limited to, a conspiracy to retaliate against Gomez for
the filing of numerous grievances, complaints and other
court actions while he was at Southport, a violation of
Gomez's due process rights during disciplinary hearings
and interference with plaintiffs' mail when Gomez was at
Southport. (Docket No. 1, Complaint.)

Each plaintiff has been granted permission to proceed
*in forma pauperis* (Docket No. 8), and each has now
signed the complaint or submitted a signed signature page,
as directed by the Court. [1] (Docket Nos. 8, 10). The
complaint must now be screened pursuant to 28 U.S.C. §
§ 1915(e)(B) and 1915A. For the reasons discussed below,
several of plaintiffs' claims are dismissed with prejudice,
pursuant to 28 U.S.C. §§ 1915(e)(2)(ii) and 1915A(b). The
remaining claims will proceed to service by the United
States Marshals Service. *See id., § 1915(d);* Fed.R.Civ.P.
4(c)(3).

[1]     It appeared that the complaint and separate
        verification pages had been signed by Gomez only
        on behalf of all three plaintiffs and, therefore, the
        Court directed each plaintiff to submit a declaration
        declaring under oath that they each separately read
        and signed the complaint. (Docket No. 8.) Each
        plaintiff, as directed, submitted declarations stating
        that Gomez signed the complaint and verification
        page on Olga and Elizabeth Padilla's behalf after the
        two Padillas authorized him to do that because of the
        need to file the complaint on a timely basis. (Docket
        Nos. 9–10.) The Court, therefore, finds that plaintiffs
        have shown cause as directed by the Court. (Docket
        No. 8.) Each plaintiff is reminded however that they
        must each act on their own in this litigation and one
        cannot act on behalf of another *pro se. See Iannacone
        v. Law,* 142 F.3d 553, 558 (2d Cir.1998) Each plaintiff
        must sign each pleading and be actively involved in
        the prosecution of this litigation. Any plaintiff not

2014 WL 1575872

prepared to do that should withdraw voluntarily as a party to this action.

## DISCUSSION

Sections 1915(e)(2)(B) and 1915A(a) of 28 U.S.C. require the Court to conduct an initial screening of the complaint. In evaluating the complaint, the Court must accept as true all of the factual allegations and must draw all inferences in plaintiffs' favor. See *Larkin v. Savage,* 318 F.3d 138, 139 (2d Cir.2003) (per curiam); *King v. Simpson,* 189 F.3d 284, 287 (2d Cir.1999). While "a court is obliged to construe [pro *se* ] pleadings liberally, particularly when they allege civil rights violations," *McEachin v. McGuinnis,* 357 F.3d 197, 200 (2d Cir.2004), even pleadings submitted *pro se* must meet the notice requirements of Rule 8 of the Federal Rules of Civil Procedure. *Wynder v. McMahon,* 360 F.3d 73 (2d Cir.2004). "Specific facts are not necessary," and the plaintiffs "need only 'give the defendant fair notice of what the ... claim is and the grounds upon which it rests.' " *Erickson v. Pardus,* 551 U.S. 89, 93, 127 S.Ct. 2197, 167 L.Ed.2d 1081 (2007) (quoting *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007) (internal quotation marks and citation omitted).

A complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Twombly,* 550 U.S. at 570. A claim will be considered plausible on its face "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal,* 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (citing *Twombly,* 550 U.S. at 556). Although a pro *se* complaint must contain sufficient factual allegations to meet the plausibility standard, it is held to less stringent standards than pleadings drafted by lawyers, *see Erickson,* 551 U.S. at 94, and the court is obliged to construe plaintiffs' pleadings liberally and interpret them as raising the strongest arguments they suggest. See *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994).

**\*2** Plaintiffs bring this action pursuant to 42 U.S.C. § 1983. "To state a valid claim under 42 U.S.C. § 1983, the plaintiff must allege that the challenged conduct (1) was attributable to a person acting under color of state law, and (2) deprived the plaintiff of a right, privilege, or immunity secured by the Constitution or laws of the United States." *Whalen v. County of Fulton,* 126 F.3d

400, 405 (2d Cir.1997) (citing *Eagleston v. Guido,* 41 F.3d 865, 875–76 (2d Cir.1994)). Based on its evaluation of the complaint, the Court finds that several of plaintiffs' claims must be dismissed with prejudice, pursuant to 28 U.S.C. §§ 1915(e)(2)(B) and 1915A(b), because they fail to state a claim upon which relief may be granted. In addition, the Court finds that the remaining claims may proceed to service.

## A. PLAINTIFFS' CLAIMS [2]

[2]  In light of the procedural posture of this case, initial review pursuant to 28 U.S.C. § § 1915(e)(2)(B) and 1915A(b), the recitation of facts is drawn exclusively from plaintiff's complaint, the contents of which must be accepted as true for purposes of this review. *See Erickson,* 551 U.S. at 93–94 (citing *Bell Atlantic Corp.,* 550 U.S. at 555–56).

The complaint is 61 pages in length and includes 184 separate exhibits, comprising 327 pages. It contains 215 separate paragraphs, is brought against 34 defendants and asserts eight separate claims for relief under various amendments to the United State Constitution and state law. The claims for relief are asserted against numerous defendants, many of whom are supervisory and non-supervisory officials who are not alleged to have been personally involved in the constitutional deprivations alleged. For example, many defendants are alleged to be liable simply in their capacities as supervisory officials or members of the Central Office Review Committee ("CORC") or Inmate Grievance Review Committees ("IGRC") who were involved in reviewing grievances or appeals from the denials of grievances filed by plaintiff-e.g., former DOCCS Commissioner Fischer, Superintendent Griffin, Deputy Superintendents Bartlett and Sheahan, John Does 1–5 (CORC Members) and John Does 6–13, Von Hagn and White (IGRC Members or IGRC Supervisors at Southport)

The Court will review each of the eight claims for relief below separately, pursuant to 28 U.S.C. §§ 1915(e)(2)(B) and 1915A. [3]

[3]  The Court notes the tension between its obligations to enforce the pleading requirements of Rule 8 of the Federal Rules of Civil Procedure and "to read[ ] *pro se* complaints with special solicitude and [to] interpret[ ] them to raise the strongest [claims] that they *suggest." Shomo v. New York,*

2014 WL 1575872

374 Fed. Appx. 180, 183 (2d Cir.2010) (internal quotation marks and citation omitted). The Rule 8 "violations" in the instant complaint, however-*e.g.,* short and plain statement-are not of the type that would allow the Court to dismiss the complaint *in toto* with leave to amend to comply with Rule 8, *Shomo,* 374 Fed. Appx. at 183 (complaint is neither "unintelligible" nor a "labrynthian prolixity of unrelated and vituperative charges that defied comprehension") (quoting *Prezzi v. Schelter,* 469 F.2d 691, 692 (2d Cir.1972)). Accordingly, the Court is therefore charged with the oft-time burdensome task of reviewing each claim against each of the 34 defendants and to determine whether said claims are frivolous, malicious, fail to state a claim upon which relief can be granted, or seek relief against defendants entitled to immunity, *see* 28 U.S.C. § § 1915(e)(2)(B) and 1915A; *see also Shomo,* 374 Fed.Appx. at 183 (district court's dismissal on the basis of § 1915(e) was in error, because [it] did not review, in fact, the merits of plaintiff's claims to determine whether they were frivolous under the relevant civil rights statute ....") and, if so, whether the claims can be dismissed *sua sponte* or cured by amendment.

### 1. *First Claim: Harassment and Retaliation for Filing Grievances, Complaints and Other Actions*

The gravamen of Gomez's [4] claims is that in 2008 and 2009, prior to his transfer from Southport to Elmira on May 4, 2009, he had filed numerous grievances and administrative complaints against a number of DOCCS officials and employees at Southport, including defendants Sepiol and Livermore, and a N.Y.C.P.L.R. Article 78 proceeding against former Commissioner Fischer and a former Southport Superintendent (Napoli) relating to the occurred at Southport on June 14, 2008. [5] Gomez claims that he assumed that Fischer and Napoli would not disclose the records despite a state court order requiring them to do so and he thus served on June 17, 2010, an "amended demand" for the preservation of evidence on Napoli and Southport's then Deputy Superintendent for Security, Colvin. (Complaint, ¶ ¶ 52–55.) On July 27, 2010, more than 30 days after the time to comply with the court order had elapsed, Gomez wrote to then Attorney General Andrew Cuomo and indicated that "unless he received the records ... he intended to file a motion to compel compliance and to ask the state court to hold Fischer and Napoli in contempt...." (*Id.,* ¶ 55.) A copy of the letter was also forwarded to Fischer and Napoli.

[4] Because the vast majority of the allegations involve Gomez only, when "plaintiff" is used herein it refers to Gomez only, unless noted otherwise.

[5] This incident is the gravamen of plaintiff's other lawsuit pending in this Court, *Gomez and Padilla v. Fisher, et al.,* 11–CV–0476Sr, and involved a visit between Gomez and Olga Padilla where they were each accused of passing contraband to each other, the investigation that ensued and the suspension of Padilla's visitation privileges.

**\*3** Plaintiff then alleges, upon information and belief, that service of the demand on Fischer and Colvin "prompted" Southport officials to contact security officials at Elmira and request them to harass Gomez and search his cell on June 24, 2010 in retaliation. He also alleges that a number of other actions, if not all actions, taken at Elmira were taken in retaliation for the grievances, complaints and Article 78 proceeding he had filed previously when he was at Southport. (Complaint, ¶ ¶ 52, 78.) These alleged retaliatory actions are, for the most part, vastly different and unrelated, and include the following: the denial of a FOIL request for review of copies of all invoices and inventory records sold at the commissary from January 1, 2008 to July 10, 2010; the filing of a false misbehavior report by Correctional Officer Fusare following the June 24, 2010 cell search, which was ordered by Lt. Sepiol based on confidential information, charging plaintiff with possession of a weapon and a controlled substance; the deduction from Gomez's inmate account for the purchase of two belts that he did not receive because his purchase order and check were not mailed to the company initially; [6] the denial of an application by Gomez and his family, including Olga and Elizabeth Padilla, to participate in the Family Reunion Program, which was denied at Elmira and then forwarded to DOCCS's Central Office for a final determination where it appears to remain unresolved; the denial of Gomez's grievance-regarding the cell search and false misbehavior report-by Racette, Elmira Superintendent, based on an investigation by Correctional Officer Coveny; the finding of guilt on the weapons charge [7] by Livermore, Senior Counselor, who conducted the Superintendent's Hearing on the misbehavior report and sentenced Gomez to nine months in SHU and a loss of privileges; the affirmance of the Superintendent's Hearing by Prack, Director of Inmate Discipline and Special Housing; the denial of a grievance regarding Gomez being denied the

opportunity to attend his GED graduation and obtain a free Dictionary and Thesaurus as a reward for passing the GED Test; the move of Gomez and Olga Padilla from the contact visiting area to a non-contact visit booth during a visit at Southport by Padilla on April 4, 2011;[8] the removal of Gomez's handcuffs by Schmitt before the April 4, 2011 visit in violation of security procedures which Gomez "understood as an invitation" by Schmitt to have Gomez engage in a physical confrontation with Schmitt; the removal of Gomez and Padilla to a non-contact visit booth by Correctional Officers Orioles, Cleary, Scmitt and Pedalty during a visit on May 14, 2011; the denial of Gomez's grievance, regarding the May 14, 2011 visit, by Sheahan, Southport's Acting Superintendent, following an interview by Lt. Evans regarding the grievance which Evans ended after Gomez refused to answer a question relating to a different grievance; the requirement that Gomez submit a FOIL request and pay $177.34 for a copy of the video tape of the May 14, 2011 visit with Olga Padilla; the submission, upon request by Gomez, of a copy of Olga Padilla's visitor pass on May 14, 2011, which had Padilla's address and seat location blotted out or covered in order to conceal the original seat location where Gomez was moved from in order to be placed in a non-contact visit booth; the denial of Gomez's request that the names of the other visitors on May 14, 2011, be disclosed based on a claim of confidentiality and failure to resolve or address Gomez's appeal to DOCCS's Counsel's Office; Gomez's move from a cell on "level 2," to one on "level 3," led Correctional Officer Hodge to inform Gomez that he was not going to remain on level 3 and would go to "level 1," and the next day during a visit by Olga Padilla, Correctional Officer McGrain searched Gomez's cell and fabricated a false misbehavior report charging Gomez with violations of rules relating to the unauthorized exchange and/or possession of another inmate's disciplinary, grievance and criminal sentencing history material or documents; Gomez's grievance related to the visit and cell search was not filed by Von Hagn, Inmate Grievance Review Committee ("IGRC") Supervisor, because she claimed it was untimely, and Gomez's resubmitted grievance was not filed nor responded to by Von Hagn; and the coercion of Gomez by Hearing Officer Bartlett, Deputy Superintendent for Programs, Southport, to plead guilty to the charges set forth in the misbehavior report by telling Gomez that he would get "a lot" of time in SHU if he did not plead guilty.[9] (Complaint, ¶¶ 53–78.)

[6]    Padilla had to reorder the belts for Gomez, and eventually Gomez's initial order and check were sent to the belt company and the belts ordered initially were received at Elmira and returned but Elmira only reimbursed Gomez $19.99 initially rather than the full $39.97. Gomez's grievance regarding the reimbursement was denied but he received $13.99 more which was still less than the total amount of the $39.97 deducted from his account. (Complaint, ¶ 59.)

[7]    The possession of controlled substance charge was dismissed. (Complaint, ¶ 62.)

[8]    Gomez was transferred back to Southport on January 14, 2011. (Complaint, ¶ 206.)

[9]    Bartlett sentenced Gomez to 120 days keeplock, 60 days suspended and 30 days loss of some commissary and telephone privileges. (Complaint, ¶ 74.)

**\*4** Gomez was released from SHU at Southport on August 1, 2011 and transferred to Auburn. He claims that as a consequence of the two retaliatory misbehavior reports he was denied parole on September 20, 2011, and held for another 24 months before his next Parole Board appearance. (*Id.*, ¶¶ 76–77.) He alleges that

> As the evidence attached ... as Exhibits 1–176, and as described above, Defendants Sepiol, Muccigrosso, Fusare, Atwood, Rope, Coveny, Reynolds, Hughes, Racette, Livermore, McGrain, Hodge, Washburn, Hetrick, Sheahan, Evans, Pedalty, Orioles, Scmitt, Bartlett, Von Hagn, John Doe [s 1–5, CORC Members], Bellamy, and Prack were directly or indirectly involved in a conspiracy to retaliate against Gomez and Padilla for Gomez's exercising of his First and Fourteenth Amendment rights to petition the government for redress of grievance and for Padilla's support to Gomez, or condoned the retaliation and failed to take corrective actions upon learning of it through Gomez's grievances, complaints and appeals....

(*Id.*, ¶ 78.)

Gomez v. Sepiol, Not Reported in F.Supp.3d (2014)
Case 9:16-cv-00717-TJM-TWD    Document 35    Filed 11/28/17    Page 143 of 310
2014 WL 1575872

It is well established that prison officials may not retaliate against inmates for exercising their constitutional rights. *See, e .g., Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir.1995); *Franco v. Kelly,* 854 F.2d 584, 589 (2d Cir.1988). To state a retaliation claim under § 1983, "a plaintiff must show that: (1) his actions were protected by the Constitution or federal law; and (2) the defendant's conduct complained of was in response to that protected activity." *Friedl v. City of New York,* 210 F.3d 79, 85 (2d Cir.2000) (internal quotation and citation omitted). As to the second prong, a prisoner alleging retaliation must show that the protected conduct was "a substantial or motivating factor" behind the alleged retaliatory conduct. *See Graham v. Henderson,* 89 F.3d 75, 79 (2d Cir.1996). Evidence that can lead to an inference of improper motive includes: (1) the temporal proximity of the filing of a grievance and the alleged retaliatory act; (2) the inmate's prior good disciplinary record; (3) vindication at a hearing on the matter; and (4) statements by the defendant regarding his motive for disciplining plaintiff. *See Colon,* 58 F.3d at 872–73.

Because claims of retaliation are easily fabricated, the courts must "examine prisoners' claims of retaliation with skepticism and particular care," *Colon,* 58 F.3d at 872, requiring " 'detailed fact pleading ... to withstand a motion to dismiss.' " *Flaherty v. Courchlin,* 713 F.2d 10, 13 (2d Cir.1983) (quoting *Angola v. Civiletti,* 666 F.2d 1, 4 (2d Cir.1981)). To survive a motion to dismiss, such claims must be " 'supported by specific and detailed factual allegations,' " and not stated " 'in wholly conclusory terms.' " *Friedl,* 210 F.3d at 85–86 (quoting *Flaherty,* 713 F.2d 13); *see also Graham,* 89 F.3d at 79 (wholly conclusory claims of retaliation "can be dismissed on the pleadings alone"); *Gill v. Mooney,* 824 F.2d 192, 194 (2d Cir.1987) (same). Thus, "a complaint which alleges retaliation in wholly conclusory terms may safely be dismissed on the pleadings alone [because i]n such a case, the prisoner has no factual basis for the claim...." *Flaherty, supra.*

**\*5** Gomez's claims of retaliation are precisely the type that the Court is and must be skeptical of and must be dismissed. While there is no doubt that Gomez has pled a number of acts that he claims were taken in retaliation for grievances and complaints he had filed up to two years earlier while incarcerated at Southport, there are simply no facts that support his claims that the acts were taken in retaliation for those prior grievances and complaints.

As noted by the Court in a prior case filed by Gomez and Olga Padilla, in which they alleged similarly numerous claims of retaliation, "[t]he numerosity of plaintiffs' claims or instances of retaliation should not be mistaken for the sufficiency of such claims. Gomez essentially claims that anything that occurred ... that somehow negatively affected him or Padilla was retaliatory." *Gomez, et al. v. Fischer, et al.,* 11–CV–0476Sr (Docket No. 10, Order, at 39–40, filed March 29, 2013.)

Gomez claims that he believes ("upon information and belief"), that by serving a demand upon Andrew Cuomo, then New York Attorney General, relating to former Commissioner Fischer and former Southport Superintendent's Napoli's alleged failure to comply with an order to disclose certain records,[10] he caused Southport officials to contact Elmira officials and request them to harass Gomez by ordering a cell search. This is precisely the type of conclusory, unsupported allegation that must be looked at skeptically and fails to state a claim for relief upon which relief can be granted. There are no non-conclusory allegations that support that this cell search and the other actions alleged in the complaint were done in retaliation for plaintiff's prior grievances and complaints, and an Article 78 proceeding related to a Freedom of Information of Law request. Simply stated, Gomez has not plead facts which support claims of retaliation that are plausible on their face. *Ashcroft,* 556 U.S. at 678. Accordingly, plaintiff's First Claim alleging retaliation must be dismissed with prejudice for failure to state a claim prejudice. *See* 28 U.S.C. ¶¶ 1915(e)(2)(B)(ii) and 1915A(b); *see also Ellis v. Chao,* 336 F.3d 114, 127 (2d Cir.2003) ("[I]t is well established that leave to amend a complaint need not be granted when amendment would be futile .") (citations omitted)).

10    These records included videotapes and documents related to, in part, Padilla's visit with Gomez at Southport in June 2008. *See* n. 5, *supra.*

### 2. Denial of Due Process at Disciplinary Hearing: December 9, 2010–Januarv 4, 2011

Plaintiff alleges that defendant Livermore, the Hearing Officer assigned to the Superintendent's Hearing held in relation to the misbehavior report issued by defendant Fusare following a cell search on November 29, 2010 (Complaint, ¶¶ 61–62) denied him due process when she (1) denied Gomez the right to call witnesses and introduce relevant evidence, (2) failed to dismiss the weapons

2014 WL 1575872

possession charge as untimely, (3) allowed a witness, defendant Atwood, to testify outside Gomez's presence, (4) did not provide Gomez a copy of the photograph of the weapon prior to the Hearing, and (5) was unfair and biased. (*Id.,* ¶ 81–130.) Gomez alleges that Livermore refused to ask a number of questions of a number of witnesses that he had requested she ask, refused to call a witness (*id.,* ¶¶ 83–91), and prior to the hearing refused to provide him a photocopy of the weapon found during the search because she said it was part of the Unusual Incident Report. He claims the photocopy he was shown during the Hearing was not the same photocopy he later received pursuant to a FOIL request. (*Id.,* ¶¶ 92–93.) Gomez also claims that, inter *alia,* Livermore relied on false testimony, lied to him when she denied that others were secretly supervising the Hearing and held the Hearing despite its untimeliness. Livermore found Gomez guilty of possession of a weapon and sentenced him to nine months SHU confinement and loss of privileges. (*Id.,* ¶¶ 98–105.) The appeal was denied by Prack on March 17, 2011. (*Id.,* ¶ 106.)

 **\*6** Plaintiff claims that defendants Sepiol, Muccigrosso, Fusare, Atwood, Reynolds, Wenderlich, Racette, Prack and Fischer are all liable for the due process violations alleged because "they all were directly or indirectly involved in the events leading up to the conduct of the hearing or failed to take corrective action upon learning of the violations resulting in Gomez's confinement in SHU...." (*Id.,* ¶ 121.) Gomez alleges that: Lt. Sepiol was a principal actor causing the false misbehavior report to be issued; Correctional Officers Muccigrosso, Fusare and Atwood provided false testimony which Livermore relied on to find Gomez guilty; Wenderlich, Deputy Superintendent for Security, Racette, Superintendent, and Prack had the duty and obligation to insure that Gomez received due process and to review the determination and correct it; Correctional Officer Reynolds assigned Livermore to conduct the Hearing and thus is responsible for Livermore's violations of Gomez's rights; and Fischer, former Commissioner, who learned of the alleged violations by being served a copy of Gomez's Article 78 petition failed to correct the violations.

It is clear that filing a false misbehavior report or providing false testimony does not rise to the level of a constitutional violation and thus the claims against Sepiol, Muccigrosso, Fusare and Atwood alleging violations of Gomez's due process rights must be dismissed with

prejudice. *See Freeman v. Rideout,* 808 F.2d 949, 951 (2d Cir.1986) ("The prison inmate has no constitutionally guaranteed immunity from being falsely or wrongly accused of conduct which may result in the deprivation of a protected liberty interest"), *cert. denied,* 485 U.S. 982, 108 S.Ct. 1273, 99 L.Ed.2d 484 (1988); *Husbands v. McClellan,* 957 F.Supp. 403 (W.D.N.Y.1997). The only constitutional violation that could occur in this situation is if plaintiff were not provided adequate due process in any proceeding which is based upon the misbehavior report. In that case, the claim is not based on the truth or falsity of the misbehavior report but instead on the conduct of the hearing itself.

Plaintiff's claims against Wenderlich, Racette, and Fischer must also be dismissed because there are no allegations of their personal involvement in the alleged due process violations at the Hearing, *See Woodward v. Mullah,* 2009 WL 4730309, at \*2 (W.D.N.Y. Dec.7, 2009) ("It is the well settled law of the Second Circuit that a defendant must be personally involved in an alleged constitutional deprivation for a court to award damages under § 1983 [,]") (citing *Provost v. City of Newburgh,* 262 F.3d 146, 154 (2d Cir.2001)), but the due process claims against Livermore and Prack will proceed to service. *See id.,* at \*2–3 ((in reviewing the split of authority among district courts in Second Court regarding whether affirming a disciplinary hearing alone is sufficient to allege personal involvement under 42 U.S.C. § 1983, Magistrate Judge Jeremiah McCarthy noted that "while personal involvement cannot be founded solely on supervision, liability can be found if the official proactively participated in reviewing the administrative appeals as opposed merely to rubber-stamping the results.") (citing *Hamilton v. Smith,* 2009 WL 3199531, \*22 (N.D.N.Y.2009), report and recommendation adopted as modified, 2009 WL 3199520); *Odom v. Calero,* 2008 WL 2735868, \*7 (S.D.N.Y.2008) ( "The reference in case law to an official who 'fails to remedy' a violation logically applies only to ongoing, and therefore correctable, constitutional violations-not to a specific event that is later subject to formal review by designated officials once the constitutional violation has already concluded."). At this stage in the litigation, the Court cannot determine the extent of Prack's personal involvement in affirming the Hearing Officer's disposition.

### 3. *Denial of Due Process at Disciplinary Hearing: June 8–10, 2011*

**\*7** Plaintiff alleges that defendant Sweeney, who was assigned to be his inmate assistant for the disciplinary hearing in relation to the May 28, 2011 Misbehavior Report charging him with the unauthorized exchange and possession of another inmate's disciplinary, grievance and criminal sentencing material or documents (Complaint, ¶¶ 72) and defendant Bartlett, the Hearing Officer, denied him his right to adequate inmate assistance and due process when Sweeney refused to (1) obtain various documentary evidence, including two contraband receipts indicating that his cell had been searched previously and no contraband had been found, and (2) interview an inmate witness (*id.,* ¶¶ 131–132, 134–135). Gomez alleges that Bartlett denied him the right to: (1) a fair and impartial hearing; (2) call witnesses; and (3) introduce relevant and material evidence. (*Id.,* ¶¶ 135–137.)

Gomez alleges that Bartlett denied him the right to call witnesses (*id.,* ¶ 136) and that she coerced him to plead guilty to the charges when she stated to him during the Hearing: "Unless you make a deal with me and plea[d] guilty you are going to get a lot of time in the SHU. I already got you. You are guilty as charged. So, it is up to you. You can get out of the box [o]n August 1 st or you can stay here and do the SHU time I am going to give you." (*Id.,* ¶ 137.) Bartlett then imposed a penalty of 60 day keeplock, thereby extending Gomez's disciplinary confinement to a total of 306 days, and a 30 day loss of telephone and commissary privileges. (*Id.,* ¶ 137.) Prack affirmed Bartlett's disposition. (*Id.,* ¶ 139.) Plaintiff also alleges that he submitted a grievance detailing the statement by Bartlett at the Hearing, which was investigated by the Deputy Superintendent for Administrative Services and denied by Sheahan, Acting Superintendent, Southport. (*Id.,* ¶ 138; Exh. 78, A 171.) His appeal to CORC was denied. ((*Id.*)

Plaintiff claims that Sweeney, Bartlett, Sheahan, Prack and John Does 1–5 (CORC Members) violated his rights to due process. (*Id.,* ¶¶ 141–143.) Because Sheahan and John Does 1–5 had no personal involvement in the alleged denial of due process at the June 8–11, 2011 disciplinary hearing, the claims against them must be dismissed. *See Woodward,* 2009 WL 4730309, at \* 2 ("It is the well settled law of the Second Circuit that a defendant must be personally involved in an alleged constitutional deprivation for a court to award damages under § 1983."); *see also Rogers v. Artus,* 2013 WL 5175570,

at \*3 (W.D.N.Y., Sept.11, 2013) (Curtin, D.J.) (review of prisoner's grievance by Superintendent pursuant to DOCCS's grievance procedures is insufficient to establish the requisite personal involvement) (quoting *James v. Poole,* 2013 WL 132492 (W.D.N.Y. Jan.9, 2013); *Brooks v. Chappius,* 450 F.Supp.2d 220, 225–26 (W.D.N.Y.2006) ("[W]hile there is some authority from within this circuit that a supervisory official's denial of a grievance can suffice to show personal involvement, in general personal involvement will not be found unless "the supervisor's response is detailed and specific[.]") (citations omitted)).

**\*8** The claims against Bartlett, Sweeney and Prack, however, may proceed to service at this time. *See Sims v. Artuz,* 230 F.3d 14, 23–24 (2d Cir.2000) (aggregating separate SHU sentences for purposes of the *Sandin* inquiry when they constitute a sustained period of confinement); *Sealey v. Giltner,* 197 F.3d 578, 587–88 (2d Cir.1999) (aggregating two periods of SHU segregation). [11]

[11]    The Court at this time makes no determination whether the 60 day keeplock disposition constituted an "atypical and significant" hardship under *Sandin v. Conner,* 515 U.S. 472, 484, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995). *See also Torres v. Mazzuca,* 246 F.Supp.2d 334 (S.D.N.Y.2003) ("[I]t appears that the Second Circuit's post *Sandin* decisions are unanimous that **keeplock** confinements of sixty days or less in New York prisons are not 'atypical hardship.' ") (Emphasis in original).

### 4. *Intentional Infliction of Emotional Distress, Cruel and Unusual Punishment and Abuse of Process*

Plaintiff alleges that Sepiol, Mucigrosso, Fusare, Atwood, Livermore, Wenderlich and Hughes intentionally inflicted emotional distress upon him and subjected him to cruel and unusual punishment when they "us[ed] the legal process of issuing a misbehavior report" charging him with possession of weapon, which he claims he did not have in his cell at the time of the cell search on November 29, 2010, and "utiliz[ed] the disciplinary hearing process as a means of punishing him" in violation of his constitutional rights for exercising his rights to redress grievances. This is essentially the same claim that is raised in the First Claim (retaliation) and Second Claim (Due Process) and arises from the alleged retaliatory cell search on November 29, 2010, the misbehavior report issued following the search and the resultant disciplinary hearing conducted by Livermore. Gomez alleges that after

2014 WL 1575872

he was moved to SHU on November 29, 2010, he was depressed and attempted to take his own life by hanging himself but pulled himself "from the brink." (Complaint, ¶ 144.) He claims that he feared the defendants would file criminal charges against him and that "[a]ll hopes of keeping a clean disciplinary record, of being granted participation in [Family Reunion Program] ... and of being released on parole in September 2011 were lost." (*Id.,* ¶ 145.)

To the extent plaintiff may be alleging state law tort claims-viz ., intentional infliction of emotional distress and abuse of process-against the defendants they are barred from consideration in this Court by N.Y. Correction Law § 24(1). N.Y. Correction Law § 24(1) provides:

> No civil action shall be brought in any court of the state, except by the attorney general on behalf of the state, against any officer or employee of the department, which for purposes of this section shall include members of the state board of parole, in his or her personal capacity, for damages arising out of any act done or the failure to perform any act within the scope of the employment and in the discharge of the duties by such officer or employee.

See *Johnson v. New York State Department of Corrections,* 2013 WL 5347468, at *2 (W.D.N.Y. Sept.23, 2013) (Skretny, C.J.); *see also Baker v. Coughlin,* 77 F.3d 12, 15 (2d Cir.1996) (this section also prohibits review by a federal court exercising pendent jurisdiction).

Section 24 "shields employees of a state correctional facility from being called upon to personally answer a state law claim for damages based on activities that fall within the scope of the statute." *Ierardi v. Sisco,* 119 F.3d 183, 187 (2d Cir.1997). "Instead, any claim for damages due to a state correctional facility employee's action or inaction must be brought in New York's Court of Claims as a claim against the state." *Johnson,* 2013 WL 5347468, at 2 (citing N.Y. Correction Law, § 24(2).

**\*9** Plaintiff's reference to the Eighth Amendment in this claim, without any allegations related specifically to the conditions of his confinement during his period of time in SHU resulting from the disposition of guilt and sentence of nine months SHU and loss of privileges, is nothing more than a recasting of his due process claims set forth in his Second Claim and address above, Discussion, supra, at 14–18.) Moreover, " '[n]ormal" conditions of SHU confinement do not amount to an Eighth Amendment violation." *Hattley v. Goord,* 2006 WL 785269, at *5–6 (S.D.N.Y. March 27, 2006) (citing *Shannon v. Selsky,* 2005 WL 578943, at *6 (S.D.N.Y. Mar.10, 2005) (normal SHU confinement conditions do not violate the Eighth Amendment); *Gulley v. Roach,* 2004 WL 2331922, at *11 (W.D.N.Y. Oct.15, 2004) (inmate "merely subjected to normal SHU confinement" cannot establish an Eighth Amendment claim); *Dixon v. Goord,* 224 F.Supp.2d 739, 748 (S.D.N.Y.2002)). [12]

[12]     Plaintiff's allegations set forth in a different section of the complaint that he was deprived of cold water on a few occasions while he was in SHU, which increased the hot water pressure and made him unable to obtain cold water from his sink (Complaint, p 115–117), even if they rose to the level of an Eighth Amendment violation, *see Jolly v. Coughlin,* 76 F.3d 468, 480 (2d Cir.1996) (the conditions of confinement resulted in "unquestioned and serious deprivations of basic human needs," and defendants acted with deliberate indifference), fail to state a claim because plaintiff does not allege which correctional officers were responsible for turning off his cold water. He does not allege that any of the named defendants were personally involved in such alleged unconstitutional conditions.

Accordingly, the Fourth Claim is dismissed with prejudice to the extent it alleges state law claims and Eighth Amendment claims against the defendants named in such claim-Sepiol, Mucigrosso, Fusare, Atwood, Livermore, Wenderlich and Hughes-but to the extent it alleges a conditions of confinement claim under the Eighth Amendment it is dismissed without prejudice to the filing of an amended complaint against the officers plaintiff claims turned off his cold water and thus allegedly deprived him of his basic human needs and acted with deliberate indifference. *See Jolly v. Coughlin,* 76 F.3d 468, 480 (2d Cir.1996) ("To demonstrate that conditions of his confinement constitute cruel and unusual punishment ... [inmate] must demonstrate that conditions of confinement result 'in unquestioned and serious deprivations of basic human needs,' [and] that the defendants imposed those

conditions with 'deliberate indifference.' ") (citations omitted)).

### 5. *Denial of Access to Courts*

Plaintiff alleges that defendants Sepiol, Muccigrosso, Fusare, Atwood, Rope, Coveny and John Does 1–5 (CORC Members) denied him access to the Court when during the cell search on November 29, 2010 his legal papers relating to two separate legal proceedings were taken. (Complaint, ¶¶ 150–158.) One was an Article 78 petition challenging the denial of his FOIL request for copies of commissary records (Complaint 57–58, 157), and the second was an action under 42 U.S.C. § 1983 alleging that he was denied due process at a disciplinary hearing on December 13, 2007, when he was not allowed to call as a witness a representative of the company that manufactured the drug testing apparatus which was used to test his urine. The test was positive for marijuana despite Gomez's claim that he did not use said drug. (*Id.,* ¶¶ 153, 155–156.) Gomez claims the confiscation of these documents caused the limitation periods to expire on his actions before he could file them. (*Id.,* at ¶ 150.)

Plaintiff alleges that he had finished drafting the papers for his two lawsuits and placed them on his bed in their respective files when on November 29, 2010, Muccigrosso opened his cell gate and he saw six or seven officers running to his cell. One of the officers, he now "has reason to believe" was Rope, ordered him to put his hands on the fence and Muccigrosso then directed the officers to place Gomez in the shower. While Gomez was in the shower, Sepiol came on to the gallery and went to Gomez's cell. Gomez was later taken directly from the shower to SHU. (*Id.,* ¶¶ 15–152.) Gomez received his personal property in SHU on December 3, 2010, at which time he noticed the papers from the two lawsuits were missing, except for the first three pages of the Article 78 petition and copies of his FOIL papers and documents related to the December 13, 2007 disciplinary hearing (the basis of the § 1983 lawsuit). He claims he did not have access to all the papers until he was released from SHU in August 2011 and received his personal property at Auburn, where he was transferred. (*Id.,* ¶ 153.)

**\*10** Plaintiff filed a grievance which Racette, Elmira Superintendent, denied based on what Gomez claims was a faulty-investigation by Correctional Officer Coveny. CORC Members, John Does 1–5, affirmed the denial of the grievance. (Complaint, ¶ 154.) As noted above, *see*

Discussion, *supra,* at 19–20, a Superintendents's review of grievance pursuant to DOCCS's grievance mechanism is insufficient to establish personal involvement in the alleged constitutional violation. *Rogers,* 2013 WL 5175570, at *3 (review of prisoner's grievance by Superintendent pursuant to DOCCS's grievance procedures is insufficient to establish the requisite personal involvement) (quoting *James,* 2013 WL 132492). Moreover, the investigation of a grievance alone, is not sufficient to allege personal involvement in the underlying constitutional violation. *See* also *Jordan v. Fischer,* 773 F.Supp.2d 255, 279 (N.D.N.Y.2011) (Defendant's failure to investigate grievance does not rise to level of personal involvement nor does it state a separate constitutional claim.); *Green v. Herbert,* 677 F.Supp.2d 633, 639 (W.D.N.Y. Jan.5, 2010) (inmate's allegation that officer who was assigned to investigate his grievance conducted a biased, unfair investigation dismissed because an inmate " 'has no constitutional right to have his grievances processed or investigated in any particular manner' ") (quoting *Shell v. Brzezniak,* 365 F.Supp.2d 362, 379 (W.D.N.Y. April 21, 2005)). Accordingly, the claims against Racette, Coveny and John Does 1–5 are dismissed with prejudice. *See Ellis,* 336 F.3d at 127 ("[I]t is well established that leave to amend a complaint need not be granted when amendment would be futile.") (citations omitted)).

A correctional facility must provide an inmate with meaningful access to the courts, *Bounds v. Smith,* 430 U.S. 817, 828, 97 S.Ct. 1491, 52 L.Ed.2d 72 (1977), but the mere limitation of access to legal materials, without more, does not state a constitutional claim, as " 'the Constitution requires no more than reasonable access to the courts.' " *Jermosen v. Coughlin,* 877 F.Supp. 864, 871 (S.D.N.Y.1995) (quoting *Pickett v. Schaefer,* 503 F.Supp. 27, 28 (S.D.N.Y.1980)). In order to state a constitutional claim of a denial of access to the courts, a plaintiff must make a showing that he has suffered, or will imminently suffer, actual harm; that is, that he was "hindered [in] his efforts to pursue a legal claim." *Lewis v. Casey,* 518 U.S. 343, 351, 116 S.Ct. 2174, 135 L.Ed.2d 606 (1996). *Accord Morello v. James,* 810 F.2d 344, 347 (2d Cir.1987).

Thus, plaintiff must show that he has suffered an actual injury traceable to the challenged conduct of prison officials. A plaintiff has not shown actual injury unless he shows that a "nonfrivolous legal claim had been frustrated or was being impeded" due to the actions of prison

officials. *Lewis,* 518 U.S. at 351–52. Assuming plaintiff's allegations to be true, as the Court must, the Court finds that, at this stage in the litigation, plaintiff's denial of access to the courts claim based on the confiscation of his legal documents should proceed to service against the officers allegedly involved in the cell search and confiscation of said documents-Sepiol, Muccigrosso, Fusare, Atwood and Rope. [13] *See Richardson v. Dep't of Corr. of N.Y.S.,* 2011 U.S. Dist. LEXIS 103871, at *16–17, 2011 WL 4091491 (S.D.N.Y. Sept. 13, 2011) ("[T]he injury requirement is satisfied by only certain types of frustrated legal claims, including direct and collateral attacks on an inmate's sentence, such as petitions for federal and state habeas relief, and civil rights claims challenging confinement conditions.") (citing *Lewis,* 518 U.S. 351–52).

[13]     It may turn out that none of these defendants were the ones personally involved in the confiscation of Gomez's documents during the cell search and by allowing these claims to proceed and directing a response to them, the Court expresses no opinion as to whether plaintiff's claims can withstand a properly filed motion to dismiss or for summary judgment.

### 6. *Interference with Mail, Privacy, and Freedom of Speech and Association*

**\*11** Plaintiffs allege that numerous defendants, including mail room employees at Southport, correctional officers, IGRC Members, CORC Members and supervisory officials at Southport, deliberately interfered with Gomez's incoming and outgoing mail, some of which was from or to Olga and Elizabeth Padilla. (Complaint, ¶ 160.) On January 11, 2011, Olga Padilla forwarded Gomez a letter at Elmira, which Gomez did not receive because on January 14, 2011, he was transferred to Southport. On January 15, Padilla, after learning of the transfer, sent Gomez a letter at Southport. (*Id.,* ¶ 161.) At a visit on January 23, Padilla and Gomez learned that Gomez had not received the two letters, and Gomez sent a letter to a mail room employee at Elmira inquiring if anyone at Elmira recalled forwarding one or both letters to him at Southport. Gomez was informed that "all mail has been forwarded to S'port if we had any at ECF." (*Id.,* ¶¶ 162–163.) On February 28, Southport's mail room processed Padilla's seond letter (January 15); the first letter (January 11) was never received by Gomez. (*Id.,* ¶ 64.)

Gomez alleges, upon information and belief, that Southport's mail room staff (unnamed) turned over the

January 15 letter to security staff "after which a decision was made to give that piece of mail to Gomez so they could attempt to find out what Padilla was talking about when, in her letter ... she wrote ... 'What do you want me to do with those papers you sent me? Because you sent me those papers but you did not explain what it is that you want me to do with them. As soon as you receive this letter write me back and tell me and tell me what should I do with those papers so I would know[,]' which in turn gives rise to the inference, if not proof, that [Southport's] mail room and security staff opened and read the letter Gomez wrote to Padilla on February 28, 2011, in response to her [January 15, 2011] letter before forwarding it to Padilla." (Complaint, ¶ 165.)

On May 5, 2011, Padilla sent Gomez some bankruptcy papers at Southport for him to review and determine what information should be included in her motion to proceed *in forma pauperis* in another civil rights action filed in this court. Gomez was notified by mail room staff that the papers had been confiscated because they contained "legal info not yours." On May 11, Gomez then wrote to Washburn, Senior Mail and Supply Clerk, requesting the papers be returned. On May 10, Padilla mailed additional bankruptcy papers to Gomez and a letter, which contained Padilla's weekly pay check and a completed motion to proceed *in forma pauperis.* Gomez was again informed that the mail room (Correspondence Unit) had confiscated these mailings because it contained legal information that was not his, but did not justify why it confiscated the letter to Gomez and Padilla's paycheck. (*Id.,* ¶¶ 168–169, Exh. 104, A221.)

On May 16, 2011, Padilla forwarded Gomez a letter at Southport, the mail room confiscated it and it was never delivered to Gomez. (*Id.,* ¶ 170.) On May 31, 2011, Gomez submitted a grievance challenging the May 11, May 16 and May 17, 2011, confiscations. Defendants Post and John Doe 7, correctional officers assigned to IGRC, denied the grievance and the appeal to Sheahan, Acting Superintendent, was denied. Gomez appealed to CORC but never received a copy of a decision. (*Id.,* ¶ 171.)

**\*12** Plaintiff had requested that mail room staff forward the confiscated mail and papers to Prison Legal Services but the request was denied on the basis that "[c]ontraband is not privileged in nature-Contraband is to be returned to the party that sent it. We cannot send it to a third party. Please resubmit for processing." (*Id.,* ¶ 172.) Gomez then

requested the mail be returned to Padilla. The bankruptcy papers were returned but the letter, copy of Padilla's pay check and motion to proceed *in forma pauperis* were not and no justification for that was provided. (*Id.* ¶ 173.) Padilla informed Gomez that she sent him letters on May 23 and 25, June 1 and 13, 2011, which he never received and no justification for their apparent confiscation by the mail room was provided. (*Id.* ¶¶ 174, 176–177.) Elizabeth Padilla told Gomez in a letter that she did not receive a letter Gomez had sent her on May 25, 2011. (*Id.,* ¶ 175.)

Gomez filed a grievance related to these incidents on June 25, 2011, but defendant Von Hagn, IGRC Supervisor, refused to accept the grievance on grounds that it was untimely. Gomez grieved Von Hagn's action and defendants John Doe 6–9, correctional officers serving on the IGRC, denied the grievance and Gomez appealed to the Superintendent. When Gomez did not receive a decision on his appeal within 20 days, he appealed to CORC. Von Hagn received the appeal and she and White, an IGRC Supervisor, informed Gomez that he had returned the grievance response form with the "No Appeal Necessary" box checked and thus no further action was taken and the appeal was not forwarded to CORC. Gomez asserts that the grievance form stapled to Von Hagn and White's letter was forged by Von Hagn, White or an IRGC member. Gomez claims he did not check the No Appeal Necessary box but rather checked the box indicating that he did not agree with the IGRC's response and wished to appeal. (Complaint, ¶¶ 178–179.)

Plaintiffs name as defendants Washburn, Senior Mail Room Staff, Gray, Mail Room Staff, Bartlett, Deputy Superintendent for Programs, Sheahan, Acting Superintendent, Hetrick, Captain, Evans, Lt., Von Hagn and White, IGRC Supervisors, Post and John Does 6–9, IGRC Members, and John Does 1–5 (CORC Members), alleging an interference with their mail in violation of their First and Fourteenth Amendment rights.

An inmate has a First Amendment right to the free flow of his mail, both incoming and outgoing. *Procunier v. Martinez,* 416 U.S. 396, 94 S.Ct. 1800, 40 L.Ed.2d 224 (1974); *Davis v. Goord,* 320 F.3d 346 (2d Cir.2003); *Heimerle v. Attorney General,* 753 F.2d 10 (2d Cir.1985); *France v. Coucrhlin,* 1987 WL 10724 (S.D.N.Y.1987). In order to accommodate this right, prison regulations restricting inmate mail must be reasonably related to prison interests in security and order. *Procunier v.*

*Martinez,* 416 U.S. at 412; *Heimerle,* 753 F.2d at 12; *see also Davidson v. Scully,* 694 F.2d 50 (2d Cir.1982); *Wolfish v. Levi,* 573 F.2d 118 (2d Cir.1978), *rev'd in part on other grounds sub nom. Bell v. Wolfish,* 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979).

**\*13** "Restrictions on prisoners' mail are justified only if they 'further [ ] one or more of the substantial governmental interests of security, order, and rehabilitation ... [and] must be no greater than is necessary or essential to the protection of the particular governmental interest involved.' " *Davis,* 320 F.3d at 351 (quoting *Washington v. James,* 782 F.2d 1134, 1139 (2d Cir.1986) (internal citations and quotation marks omitted). Greater protection is afforded to legal mail than to personal or non-legal mail, and greater protection is given to outgoing mail than to incoming mail. *Davis,* 320 F.3d at 351 (citing *Thornburcrh v. Abbott,* 490 U.S. 401, 413, 109 S.Ct. 1874, 104 L.Ed.2d 459 (1989); *Washington,* 782 F.2d at 1138–39; *Davidson v. Scully,* 694 F.2d 50, 53 (2d Cir.1982).

It has been held that "as few as two incidents of mail tampering could constitute an actionable violation (1) if the incidents suggested an ongoing practice of censorship unjustified by a substantial government interest, or (2) if the tampering unjustifiably chilled the prisoner's right of access to the courts or impaired the legal representation received." *Davis,* 320 F.d at 351 (citing *Washington,* 782 F.2d at 1139). "Following *Washington,* district courts have generally required specific allegations of invidious intent or of actual harm where the incidents of tampering are few and thus the implication of an actionable violation is not obvious on its face." *Davis,* 320 F.3d at 351 (citing *Cancel v. Goord,* 2001 WL 303713 at \*6 (S.D.N.Y., Mar.29, 2001) (dismissing claim where only two incidents of tampering alleged and no other indications of a continuing practice); *John v. N.Y.C. Dep't of Corrections,* 183 F.Supp.2d 619, 629 (S.D.N.Y.2002) (requiring plaintiff to allege facts that show defendants acted with invidious intent and plaintiff was harmed by the interference); *Hudson v. Greiner,* 2000 WL 1838324, at \* 5 (S.D.N.Y.Dec.13, 2000) (same); *Johnson v. Morton,* 1996 WL 518078, at \*1 (E.D.N.Y. Aug.26, 1996) (noting that "[c]ourts have consistently applied *Morgan* [ *v. Montanye* ] to dismiss suits by inmates alleging unconstitutional opening of their legal mail without any showing of damages").

Case 9:16-cv-00717-TJM-TWD    Document 35    Filed 11/28/17    Page 150 of 310
Gomez v. Sepior, Not Reported in F.Supp.3d (2014)
2014 WL 1575872

"[I]n order for an inmate to state a claim for interference with incoming non-legal mail he must show a pattern and practice of interference that is not justified by any legitimate penological concern." *Cancel,* 2001 WL 303713, *6 (citing *Rowe v. Shake,* 196 F.3d 778, 782 (7th Cir.1999). Regulations limiting a prisoner's right to send and receive non-legal mail " 'is valid if it is reasonably related to legitimate penological interests.' " *Rodriguez v. James,* 823 F.2d 8, 12 (2d Cir.1987) (quoting *Turner v. Safley,* 482 U.S. 78, 89, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987)).

Gomez alleges more than a few incidents of mail interference, in this case confiscation of a incoming legal and non-legal mail from Olga Padilla and a couple of pieces of personal mail to and from him and both Olga and Elizabeth Padilla. With respect to the individuals allegedly involved in the alleged confiscation of mail, Washburn and Gray, mail room employees, the Court finds that the interference/confiscation of the mail may proceed against them only.

 *14  With regard to the other defendants named in this claim-Bartlett, Sheahan, Hetrick, Evans, Post, Von Hagn, Griffin, Bellamy, John Does 6–9, and John Does 1–5–, the Court finds that none of them are alleged to have been personally involved in the alleged interference with Gomez's legal mail. Sheahan is alleged to have denied Gomez's grievance appeal on June 17, 2011. As noted above, a Superintendent's review of a grievance is alone insufficient to allege personal involvement. *See, e.g.,* Rogers, 2013 WL 5175570, at *3 (review of prisoner's grievance by Superintendent pursuant to DOCCS's grievance procedures is insufficient to establish the requisite personal involvement) (quoting *James,* 2013 WL 132492). There are no allegations of Bartlett's, Hetrick's nor Evans's role other than they were supervisors and "condon[ed] the violation by failing to take corrective action...." (Complaint, at ¶ 160.) The others-Post and John Does 6–9 (IGRC Members), John Does 1–5 (CORC Members), and Von Hagn and White (IGRC Supervisors)-are alleged to either have denied the grievance in their role as IGRC Members or failed to consider (CORC Members) or process Gomez's grievances. None of these allegations allege personal involvement in the alleged constitutional interference with plaintiffs' mail. *See Parks v. Lantz,* 2012 WL 1059696, at *9 (D.Conn. March 28, 2012) (failure to respond or process grievances does not demonstrate personal involvement); *Swift v. Tweddell,* 582 F.Supp.2d 437, 445–

46 (W.D.N.Y.2008) (citing cases) ("a failure to process, investigate or respond to a prisoner's grievances does not in itself give rise to a constitutional claim."); *Jordan,* 773 F .Supp.2d at 279 (Defendant's failure to investigate grievance does not rise to level of personal involvement nor does it state a separate constitutional claim.)

Accordingly, this claim alleging a First Amendment interference with plaintiffs' mail may proceed against Washburn and Gray only, [14] but the claims against the other defendants must be dismissed pursuant to 28 U.S.C. §§ 1915(e)(2)(B) and 1915A for failure to state a claim upon which relief can be granted.

[14]    *See Thornburgh v. Abbott,* 490 U.S. 401, 407–08, 109 S.Ct. 1874, 104 L.Ed.2d 459 (1989) (acknowledging that free citizens, such as inmate family members, journalists, and attorneys have a legitimate First Amendment interest in communicating with inmates); *see also Massey v. Wheeler,* 221 F.3d 1030, 1036 (7th Cir.2000) (describing *Thornburgh's* recognition of those with First Amendment interests in access to inmates). By allowing plaintiffs' claims to go forward, the Court is expressing no opinion as to whether such a claim would survive a properly supported motion to dismiss or for summary judgment.

7. *Denial of Right to File Grievances*
This claim alleges that a number of defendants, again including both supervisory and non-supervisory correctional employees and IGRC and CORC Members, interfered with Gomez's right to file grievances when they "regularly and deliberately interfered with [his] right to petition the government for redress of government, freedom of speech, and to due process of law by refusing to file and process many of [his] grievances and their appeals." (Complaint, ¶ 182.) Gomez then proceeds to set forth a number of instances where defendants either failed to file or process grievances, denied grievances or upheld on appeal the denials of grievances. (*Id.,* ¶¶ 183–202.) For the following reasons, this claim is dismissed in its entirety with prejudice. [15]

[15]    Plaintiff filed a similar claim in his other action, *Gomez v. Fischer,* ll–CV–0476Sc, and it too was dismissed for failure to state a claim upon which relief can be granted. (*Id.,* Docket No. 10, Order, at 51–52.)

2014 WL 1575872

**\*15** Grievance procedures are the internal procedures and requirements of DOCCS, and as such, prison inmates neither have a constitutionally protected right to a grievance procedure, see, *e.g.,* *Jones v. North Carolina Prisoners Labor Union,* 433 U.S. 119, 97 S.Ct. 2532, 53 L.Ed.2d 629 (1977) (Burger, J., concurring) ("I do not suggest that the [grievance] procedures are constitutionally mandated."); *Adams v. Rice,* 40 F.3d 72, 75 (4th Cir.1994) (holding that "the Constitution creates no entitlement to grievance procedures or access to any such procedure voluntarily established by a state"), *cert. denied,* 514 U.S. 1022, 115 S.Ct. 1371, 131 L.Ed.2d 227 (1995), nor, as a general rule, is there a federal right to have them properly administered, *see* *Ramirez v. Holmes,* 921 F.Supp. 204, 208 (S.D.N.Y.1996). *See also* *Green,* 677 F.Supp.2d at 639 (inmate's allegation that officer who was assigned to investigate his grievance conducted a biased, unfair investigation dismissed because an inmate " 'has no constitutional right to have his grievances processed or investigated in any particular manner' ") (quoting *Shell v. Brzezniak,* 365 F.Supp.2d 362, 379 (W.D.N.Y. April 21, 2005)). *Shell,* 365 F.Supp.2d at 369–70 ("inmate grievance programs created by state law are not required by the Constitution and consequently allegations that prison officials violated those procedures [do] not give rise to a cognizable § 1983 claim.") (citing *Cancel,* 2001 WL 303713, at \*3).

Accordingly, this claim is dismissed in its entirety with prejudice.

8. *Eighth Amendment: Denial of Meaningful Exercise*
Plaintiff alleges that at Southport between January 14, 2011, and January 28, 2011 (14 days), and June 13, 2011 and July 12, 2011 (29 days), he was denied the right to meaningful exercise when he was placed in the exercise cage with mechanical restraints. He also claims that he had to wear the same restraints for about six hours during visits with Olga Padilla on January 22, June 25 and July 9, 2011. (Complaint, ¶¶ 205–206.) He claims that defendants Griffin, Sheahan, Hetrick, Evans, Signor, Post, Evertts, John Doe 6, Deburgomaster, John Does 1–5, and Bellamy are liable "directly, or by condoning the action[s] by failing to take corrective action upon learning of the violations and instead enforcing the practice...." (*Id.,* ¶ 205.) Plaintiff claims the restraints were painful, caused bruises on his wrists and waist, and that he had difficulty eating snacks Padilla had purchased for him from the vending machines because it was painful. (*Id.,* at ¶¶ 207–208.)

Gomez filed a grievance on January 22, 2011, which defendants Post and Evertts, acting as IGRC members, denied and, because Gomez's appeal to the Superintendent went undecided for 20 days, he appealed to CORC. When CORC did not respond, he wrote to defendants Von Hagn and White, IGRC Supervisors, requesting that his appeal be submitted to CORC. He received no response. Gomez submitted another grievance on July 4, 2011, after the second period of time when he was required to exercise in restraints, and it was denied by defendants John Doe 6 and Deburgomaster, acting as IGRC members. The appeal to defendant Hopkins, Acting Superintendent, Southport, was denied, as was his appeal to CORC by defendants John Does 1–6. [16] (*Id.,* ¶ 210–211.)

[16]    CORC's affirmance of the denial of Gomez's grievance cites to DOCCS Directive No. 4933, 7 N.Y.C.R.R. § 305.3(c)(2)(ii) & (iii), which provides generally that all Level I inmates who have not completed the post adjustment period are to be restrained during exercise and visits. (Complaint, Exh. 121, A 242.) The initial denial and affirmance of the denial both cite to Southport's Orientation Manual that note that Level I inmates will remain in cuffs and waist chains during their entire period. (*Id.,* Exh. 119–120, A240–241.) Inmates transferred to Southport are automatically placed in Level I, for at least a 30 day adjustment period. *Dumpson v. Goord,* 2011 WL 4345760, at \*1 (W.D.N.Y. Sept .15, 2011) (Siragusa, D.J.). *See also* Directive No. 4933, 7 N.Y.C.R.R. § 305.3 and 305.4 (SHU inmates are permitted one hour of outdoor exercise daily and they may be placed under a restraint order by deputy superintendent of security.)

**\*16** The Eighth Amendment prohibits the infliction of "cruel and unusual punishment" on inmates, and this prohibition includes the infliction of "unnecessary and wanton" pain. *Gregg v. Georgia,* 428 U.S. 153, 173, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976). The Second Circuit has held that prisoners possess an Eighth Amendment right to "some opportunity for exercise." *Williams v. Greifinger,* 97 F.3d 699, 704 (2d Cir.1996); *see also* *Dumpson v. McGinnis,* 348 Fed.Appx. 658, 2009 WL 3259419, at \*1 (2d Cir., 2009) (Summary Order) ("We have stated that an inmate has a right to some 'opportunity to exercise,' subject to a 'safety exception.' "). "Interference with prisoners' recreation must be quite severe in order to state an Eighth Amendment claim." *DiBlasio v. Rock,* 2011 WL 4478581,

at *18 (N.D.N.Y., Sept. 26, 2011) (citing *Branham v. Meachum,* 77 F.3d 626, 630–31 (2d Cir.1996); *see also Branham,* 77 F.3d at 630–31 (finding that keeping inmate on lockdown and "full restraint" status without outdoor exercise for a period of approximately twenty-two days does not violate the Eighth Amendment); *Gibson v. City of New York,* 1998 WL 146688, *3 (S.D.N.Y.Mar.25, 1998) (denial of recreation for eight days in a sixty-day period and the opportunity to exercise on two consecutive days found not constitutionally actionable); *Young v. Scully,* 1993 WL 88144, at *5 (S.D.N.Y. March 22, 1993) (holding that Eighth Amendment was not violated when inmate was deprived of exercise for periods lasting several days); and *Jordan v. Arnold,* 408 F.Supp. 869, 876–877 (M.D.Pa.1976) (holding that Eighth Amendment not violated when inmates confined to special housing unit were allowed two hours of exercise per week).

In both *Mitchell v. New York State Dept. of Correctional Services,* 2012 WL 6204205, at *4–5(W.D.N.Y. Dec.12, 2012) (Telesca, D.J.) and *Phelan v. Zenzen,* 2012 WL 5420423, at *5 (W.D.N.Y., Nov.6, 2012) (Siragusa, D.J.) this Court rejected similar claims. In *Mitchell,* plaintiff alleged that he was forced to remain in mechanical restraints during recreation approximately 35–40 times while placed in the Level I category over the course of a number of years. He also alleged that the restraints were "extremely tight" to the point that it caused him discomfort. Judge Telesca held that the allegations failed to state a claim of cruel and unusual punishment and a denial of meaningful exercise in violation of the Eighth Amendment. *Id.,* 2012 WL 6204205, at *5. In *Phelan,* Judge Siragusa dismissed claims alleging the denial of exercise in the prison yard for several weeks (June through September) as punishment for a disciplinary infraction. *Phelan,* 2012 WL 5420423, at *5. *See also Gomez,* et al., 11–CV–0476Sr (Docket No. 10, Order, at 40–43, filed March 29, 2013) (dismissing Gomez's claims alleging the same ones set forth herein). This Court (Arcara, D.J.) also has upheld the use of restraints to shackle inmates during exercise. *See Dabney v. McGinnis,* 2006 WL 1285625, at *5 (W.D.N.Y. May 9, 2006) (upholding use of restraint order to shackle inmate for exercise) (Report and Recommendation adopted by District Judge); *Brown v. Coughlin,* 1995 WL 643349, at *5 (W.D.N.Y., Oct.13, 1995) (Elfvin, D.J.) ("This Court also concludes as a matter of law that being required to wear mechanical restraints in the manner required and during exercise periods does not constitute the unnecessary and wanton

infliction of pain.") (citing *Whitley v. Albers,* 475 U.S. 312, 106 S.Ct. 1078, 89 L.Ed.2d 251 (1985)). Based on the foregoing, plaintiff's allegations that he was required to wear handcuffs and a waist chain during exercise and visits fail to state a claim of cruel and unusual punishment under the Eighth Amendment

### CONCLUSION

**\*17** For the reasons discussed above, the following claims are dismissed, in whole or in part as set forth herein, with prejudice pursuant to 28 U.S.C. § § 1915(e)(2)(B)(ii) and 1915A: (1) First Claim (Retaliation), in its entirety; (2) Second Claim (Due Process: Disciplinary Hearing December 9, 2010–January 4, 2011), as against defendants Sepiol, Mucigrosso, Fusare, Atwood, Reacette, Reynolds, Fischer and Wenderlich; (3) Third Claim (Due Process: Disciplinary Hearing June 8–June 10, 2011), as against Sheahan; (4) Fourth Claim (Intentional Infliction of Emotional Distress, Abuse of Process and Cruel and Unusual Punishment), in its entirety, against each of the named defendants-Sepiol, Mucigrosso, Fusare, Atwood, Rope, Livermore, Hughes and Wenderlich, but plaintiff is granted leave to amend the complaint, if he wishes, against those unnamed correctional officers/employees who he claims turned off his cold water and deprived him of drinking water in violation of the Eighth Amendment only; (5) Fifth Claim (Access to Courts), as against John Does 1–5, Racette and Coveny; (6) Sixth Claim (Mail Interference), as against Bartlett, Sheahan, Hetrick, Evans, Post, Von Hagn, White, Griffin, John Does 1–5, John Does 6–9 and Bellamy; (7) Seventh Claim (Grievance Process), in its entirety; and (8) Eighth (Denial of Exercise and Mechanical Restraints), in its entirety. The following claims will proceed to service by the United States Marshals Service at this time: (1) Second Claim (Due Process: Disciplinary Hearing December 9, 2010–January 4, 2011) against Livermore and Prack only; (2) Third Claim (Due Process: Disciplinary Hearing June 6–June 8, 2011) against Bartlett, Sweeney and Prack only; (3) Fifth Claim (Access to Courts) against Sepiol, Mucigrosso, Fusare, Rope and Atwood only; (4) Sixth Claim (Mail Interference) against Washburn and Gray only.

### ORDER

IT HEREBY IS ORDERED, that the following claims are dismissed, in whole or in part, with prejudice, pursuant to 28 U.S.C. § § 1915(e) (2)(B)(ii) and 1915A: (1) First Claim (Retaliation), in its entirety; (2) Second Claim (Due Process: Disciplinary Hearing December 9, 2010–January 4, 2011), as against defendants Sepiol, Mucigrosso, Fusare, Atwood, Reacette, Reynolds, Fischer and Wenderlich; (3) Third Claim (Due Process: Disciplinary Hearing June 8–June 10, 2011, as against Sheahan; (4) Fourth Claim (Intentional Infliction of Emotional Distress, Abuse of Process and Cruel and Unusual Punishment), in its entirety, against each of the named defendants-Sepiol, Mucigrosso, Fusare, Atwood, Rope, Livermore, Hughes and Wenderlich, but plaintiff is granted leave to amend the complaint, if he wishes, against those unnamed correctional officers/employees who he claims turned off his cold water and deprived him of drinking water in violation of the Eighth Amendment only; (5) Fifth Claim (Access to Courts), as against John Does 1–5, Racette and Coveny; (6) Sixth Claim (Mail Interference), as against Bartlett, Sheahan, Hetrick, Evans, Post, Von Hagn, White, Griffin, John Does 1–5, John Does 6–9 and Bellamy; (7) Seventh Claim (Grievance Process), in its entirety; and (8) Eighth (Denial of Exercise and Mechanical Restraints), in its entirety;

**\*18** FURTHER, that the Clerk of the Court is directed to terminate defendants W. Hughes, Steven Racette, Raymond J. Coveny, Patrick Griffin, Michael Sheahan, Harry Hetrick, Marc D. MacGrain, Scott M. Hodge, Richard T. Orioles, Thomas Evans, Douglas Reynolds, Sabrina Von Hagn, Elizabeth White, John Does 1–14, Brian Fischer, Andrew S. Peralty, Karen Bellamy, Peter S. Schmitt, Steve F. Post, Mark Deburgomaster, Steven Wenderlich, Harold Graham, Signor and Steven J. Evertts as parties to this action;

FURTHER, that the Clerk of the Court is directed to cause the United States Marshal to serve copies of the Summons, Complaint, [17] and this Order upon Virginia Livermore and Robert Prack (Second Claim: Due Process,

Disciplinary Hearing December 9, 2010–January 4, 2011); Angela Bartlett, Paul Sweeney and Prack (Third Claim: Due Process, June 6–8, 2011 Hearing); Stanley Sepiol, A. Mucigrosso, A. Fusare, Atwood and Rope (Fifth Claim: Access to Court); and Kathleen Washburn and Jane Gray (Sixth Claim: Mail Interference), without plaintiff's payment therefor, unpaid fees to be recoverable if this action terminates by monetary award in plaintiff's favor; [18]

[17] The Court notes that plaintiff's Appendix of Exhibits was manually filed only because it contains over 325 pages. The Court, at this time, will not direct that each defendant be served with a copy of the Appendix of Exhibits and that upon service of the summons and complaint on the defendants, the New York State Attorney General's Office can contact the Clerk's Office and arrange for a copy of the Appendix to be prepared, if necessary.

[18] Pursuant to a Standing Order of Court, filed September 28, 2012, a defendant will have 60 days to file and serve an answer or other responsive pleading, see Fed.R.Civ.P. 12(a)-(b), if the defendant and/or the defendant's agent has returned an Acknowledgment of Receipt of Service by Mail Form within 30 days of receipt of the summons and complaint by mail pursuant to N.Y.C.P.L.R. § 312–a.

FURTHER, the Clerk of the Court is directed to forward a copy of this Order by email to Michael Russo, Assistant Attorney General in Charge, Buffalo Regional Office <Michael.Russo@ag.ny.gov>;

FURTHER, that pursuant to 42 U.S.C. § 1997e(g)(2), the defendants are directed to respond to the complaint.

**SO ORDERED.**

**All Citations**

Not Reported in F.Supp.3d, 2014 WL 1575872

---

2012 WL 4510635
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Michel TOLIVER, Plaintiff,

v.

DEPARTMENT OF CORRECTIONS, Commissioner
of the Dept., Chief of the Dept., Warden of G.R.V.C.,
Captain of Housing Unit 7 x 3 Tour, Captain of
Housing Unit 3 x 11 Tour, Captain of Housing Unit
11 x 7 Tour, P.H.S. Corporation—Prison Health
Services, First Deputy Warden John and Jane Does
All Tours—3, D.O.C. Legal Division, Defendants.

No. 10 Civ. 6298(LAP)(JCF).
|
April 10, 2012.

*REPORT AND RECOMMENDATION*

JAMES C. FRANCIS IV, United States Magistrate
Judge.

**\*1**  TO THE HONORABLE LORETTA A. PRESKA,
CHIEF JUDGE:

Michel Toliver brings this action pursuant to 42 U.S.C.
§ 1983 ("Section 1983") against the New York City
Department of Correction ("DOC") and the DOC Legal
Division, DOC Commissioner Dora Schriro, DOC Chief
of Department Larry Davis, George R. Vierno Center
("GRVC") Supervising Warden Kathleen Mulvey, three
unnamed Housing Unit Captains, Prison Health Services
("PHS"), and First Deputy Warden John and Jane Does
All Tours. The plaintiff alleges that while he was detained
at GRVC on Rikers Island, the defendants violated his
civil rights by (1) denying him access to a typewriter; (2)
denying him adequate medical care and mental health
services; (3) denying him access to a chaplain; (4) losing
his property; and (5) denying him telephone privileges.
The plaintiff now moves to amend his complaint to add
the City of New York, GRVC Assistant Deputy Warden
Lombardi, Captain Garcia, Captain Dunbar, and Phillip
Keeplings of PHS as defendants. Defendants DOC, PHS,
Commissioner Schriro, Chief Davis, and Supervising
Warden Mulvey (the "Moving Defendants") now move
to dismiss the complaint. They also oppose the plaintiff's

motion to amend except to the extent that he is alleging
that his constitutional rights were violated in connection
with the City's alleged practice of not vouchering inmates'
property upon their entry into the punitive segregation
housing unit. For the reasons that follow, I recommend
that the plaintiff's motion to amend the complaint be
granted in part, and that the defendants' motion to dismiss
the complaint be granted.

*Background*

In his original complaint, the plaintiff claims that
he suffered the following deprivations while he was
incarcerated at GRVC: (1) lack of access to a working
typewriter; (2) inadequate medical and mental health
care services; (3) lack of access to a chaplain; (4) loss
of his property; and (5) denial of telephone privileges.
(Complaint ("Compl.") at 3; Addendum [1] to Compl.
at 2–3). Specifically, Mr. Toliver alleges that the only
law library typewriter available to the approximately 100
inmates in his housing unit was "inoperable." (Compl. at
3). He also alleges that

[1]    The plaintiff has attached a two-page addendum to
his Complaint in which he sets forth additional facts.
The addendum will be cited as "Add." followed by the
corresponding page number.

P.H.S.—Prison Health Services—staff 7–days a week
briskly walk by cells many times I was on the floor
—resulting from my back injury[.] P.H.S. staff would
quickly walk by my cell and many others' cells knowing
that many inmates need and yell out to them to stop by
the cells for meds or some adjustments made to medical
orders[,] emergency sick call[,] etc .... and we are most of
the time in 11–Building are ignored.

(Compl. at 3 (ellipses in original)). He further claims
that "P.H.S. has denied many of our serious problems
—covering up the non-work by simply putting a
'free' newspaper on our cell door." (Add. at 2). Mr.
Toliver also alleges that he was denied mental health
services, but pleads no facts to support this claim.
(Compl. at 3). The plaintiff next complains that he
was denied access to a chaplain, though his pleadings
appear to relate to the denial of chaplain services
to another inmate: "Denial of access to any chaplin
[sic] even after having requested one inmate's aunt
passed away: inmate Carrion (currently in 24 cell) was
denied a chaplin [sic]." (Compl. at 3). Additionally, Mr.

Toliver alleges that the "Department of Corrections has exhibited violations of the Constitution (Due Process)," explaining that, "upon entry in a punitive segregation housing unit[,][an] inmate's property (all of it) is taken from them and absolutely not vouchered[,] thus causing them to be missing, stolen, [or] misplaced (as my property was for several weeks). Now all my property has been stolen—I have nothing that I came into this housing unit with." (Add. at 2). Lastly, Mr. Toliver complains that "every inmate [in the punitive segregation unit] is only allowed *one* phone call a day[.] All this takes place without notice or any determination under due process[.] [I]t's just taken away from each inmate who is placed in punitive segregation ... and no notice [or] hearing is ever given ...." (Add. at 3). Upon first filing his complaint, the plaintiff demanded only injunctive relief—a transfer out of his housing unit—as a remedy for his injuries. (Compl. at 5).

**\*2** On June 7, 2011, the Moving Defendants moved to dismiss the complaint pursuant to Rules 12(b)(1) and (6) of the Federal Rules of Civil Procedure on the grounds that: (1) the action is moot because Mr. Toliver seeks only injunctive relief, which is not available as he is no longer in City custody; (2) the complaint fails to state a claim against PHS; (3) DOC is not a suable entity; and (4) the complaint fails to allege the personal involvement of any of the individually named defendants. (Memorandum of Law in Support of Defendants' Motion to Dismiss at 4–8).

On July 14, 2011, Mr. Toliver submitted a motion to amend his complaint along with a proposed amended complaint. (Amended Complaint dated July 14, 2011 ("Am.Compl.")). The amended complaint (1) adds the City of New York, Captain Garcia, Captain Dunbar, Assistant Deputy Warden Lombardi, and Phillip Keeplings of PHS as defendants;[2] (2) adds a section entitled "Explanation as to Why Defendants in this Action are Being Sued"; (4) adds claims for violations of substantive and procedural due process; (5) alleges that the defendants are responsible for deliberate indifference; and (6) indicates that Mr. Toliver now seeks damages. (Am. Compl. at 9–17). The amended complaint does not contain any additional facts concerning the plaintiff's claims.[3] (Am. Compl. at 12–17).

2    It is assumed that the plaintiff has identified Captains Garcia and Dunbar and Assistant Deputy Warden

Lombardi as the John and Jane Does named as defendants in his original complaint.

3    Though the proposed amended complaint contains a section entitled "Additional Statement of Facts," the plaintiff does not actually plead additional facts; rather, he states the law upon which his claims are based. (Am. Compl. at 13–17).

On August 5, 2011, the Moving Defendants filed a reply memorandum of law in which they argue, among other things, that the plaintiff (1) fails to state a claim against PHS or any of the individually named defendants in his complaint and proposed amended complaint; (2) fails to state a claim in connection with his allegations that he was denied access to a working typewriter or deprived of telephone privileges; and (3) cannot state a claim on behalf of other inmates. (Reply Memorandum of Law in Further Support of Defendants' Motion to Dismiss Plaintiff's Complaint and in Partial Opposition to Plaintiff's Motion to Amend the Complaint dated Aug. 5, 2011 ("Def.Reply") at 4–6). The Moving Defendants argue that the complaint should be dismissed and the motion to amend denied except to the extent that the plaintiff alleges that his constitutional rights were violated in connection with his loss of property as a result of the City's purported practice of not vouchering inmates' property upon their entry into the punitive segregation housing unit. (Def. Reply at 7).

On September 16, 2011, Mr. Toliver submitted a letter to the Court in which he acknowledged receipt of the defendants' reply memorandum and requested permission to supplement his proposed amended complaint with an additional "[e]xplanation as to why each defendant is being sued." (Plaintiff's Supplementary Amended Complaint dated Sept. 28, 2011[4] ("Supp.Am.Compl.") at 1, 4–12). In this supplement, Mr. Toliver first provides slightly more detail concerning his lost property claim against the City, stating that he "was literally stripped of all of [his] property, clothes, shoes, food, [and] lots of other personal property [that was] taken and never [ ] was vouchered for safekeeping." (Supp. Am. Compl. at 5). The plaintiff next explains that, on May 5, 2010, Captain Garcia "maliciously" transferred him to an "inoperable [sic] cell" with, among other problems, a nonfunctioning toilet flooded with feces which caused him to be sick. (Supp. Am. Compl. at 6). Mr. Toliver alleges that Captain Dunbar and Assistant Deputy Warden Lombardi are liable for their roles in the transfer because they refused his repeated requests to be moved to another cell, and

WESTLAW    © 2017 Thomson Reuters. No claim to original U.S. Government Works.

further alleges that Captain Dunbar denied his many requests to receive medical treatment. (Supp. Am. Compl. at 7–8). Mr. Toliver explains that Phillip Keeplings, a mental health clinician in the punitive segregation unit at GRVC, refused his requests for mental health care following several assaults against the plaintiff that occurred on or around May 19 and 20, 2010, including one incident in which Mr. Toliver alleges to have been sodomized by a corrections officer. (Supp. Am. Compl. at 9–10). Finally, Warden Mulvey is alleged to be "liable and responsible" because, according to the plaintiff, he notified the warden of his many grievances and she did not take corrective action. (Supp. Am. Compl. at 11–12). Specifically, he alleges that "Warden Mulvey has never once interviewed a single person [or] interviewed me one single time [concerning] the floods[,] ... the assaults [,] ... the sodomy[,] ... the stolen property[,][or] the theft of my property.... I submitted grievances and complaints to Warden Mulvey[.] She was certainly put on notice[.] She told me at one point[,] 'I got all your letters and complaints' and she kept walking by my cell without any additional assistance." (Supp. Am. Compl. at 11–12).

[4]    Mr. Toliver dates the documents September 28, 2011. However, they were received by the Court on September 16, 2011.

**\*3** On December 2, 2011, the Moving Defendants responded to Mr. Toliver's supplementary amended complaint. (Moving Defendants' Response to Supplementary Amended Complaint dated Dec. 2, 2011 ("Def.Resp.") at 1–4). They maintain that the plaintiff continues to fail to state a claim against PHS, Commissioner Schriro, Chief Davis, and Warden Mulvey, and argue that he should be denied leave to amend his complaint to add Captain Garcia, Captain Dunbar, Assistant Deputy Warden Lombardi, and Phillip Keeplings because the allegations against these defendants are duplicative of claims asserted against them by the plaintiff in other actions. (Def. Resp. at 3–4). They remain unopposed to the plaintiff's motion to amend to add the City as a defendant. (Def. Resp. at 4). I will address the plaintiff's motion to amend his complaint before deciding the defendants' motion to dismiss.

*Discussion*

    A. *Motion to Amend the Complaint*

1. *Standard for Amendment*

A motion to amend is generally governed by Rule 15(a) of the Federal Rules of Civil Procedure, which states that "[t]he court should freely give leave when justice so requires." Fed.R.Civ.P. 15(a)(2). Notwithstanding the liberality of the general rule, "it is within the sound discretion of the court whether to grant leave to amend." *John Hancock Mutual Life Insurance Co. v. Amerford International Corp.,* 22 F.3d 458, 462 (2d Cir.1994); *accord Krumme v. WestPoint Stevens Inc.,* 143 F.3d 71, 88 (2d Cir.1998). Regarding the use of this discretion, the Supreme Court has stated:

> In the absence of any apparent or declared reason-such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc.-the leave should ... be freely given.

*Foman v. Davis,* 371 U.S. 178, 182 (1962) (internal quotation marks omitted).

Where, as here, a proposed amendment adds new parties, the propriety of amendment is governed by Rule 21 of the Federal Rules of Civil Procedure. *Momentum Luggage & Leisure Bags v. Jansport, Inc.,* No. 00 Civ. 7909, 2001 WL 58000, at \*1 (S.D.N.Y. Jan. 23, 2001). That rule states that a party may be added to an action "at any time, on just terms." Fed.R.Civ.P. 21. In deciding whether to permit joinder, courts apply " 'the same standard of liberality afforded to motions to amend pleadings under Rule 15.' " *Soler v. G & U, Inc.,* 86 F.R.D. 524, 528 (S.D.N.Y.1980) (quoting *Fair Housing Development Fund Corp. v. Burke,* 55 F.R.D. 414, 419 (E.D.N .Y.1972)); *accord Smith v. P.O. Canine Dog Chas,* No. 02 Civ. 6240, 2004 WL 2202564, at \*12 n. 11 (S.D.N.Y. Sept. 28, 2004). Thus, joinder will be permitted absent undue delay, bad faith, prejudice, or futility. Joinder may be denied as futile if the proposed pleading would not withstand a motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. *Oneida Indian Nation of New York v. City of Sherill,* 337 F.3d 139, 168 (2d Cir.2003), *rev'd on other grounds,* 544 U.S. 197 (2005); *Smith v. CPC International, Inc.,* 104 F.Supp.2d 272, 274 (S.D.N.Y.2000). As when considering a motion under Rule 12(b)(6), a court

evaluating the futility of an amendment to a complaint must accept all factual allegations in the complaint as true and draw all reasonable inferences in favor of the plaintiff. *Henneberry v. Sumitomo Corp. Of America,* 532 F.Supp.2d 523, 527 (S.D.N.Y.2007).

**\*4** *Pro se* complaints are held to less stringent standards than those drafted by lawyers. *Haines v. Kerner,* 404 U.S. 519, 520–21 (1972); *Boykin v. KeyCorp,* 521 F.3d 202, 213–14 (2d Cir.2008) (citing *Erickson v. Pardus,* 551 U.S. 89, 94 (2007)). In fact, pleadings of a pro se party should be read " 'to raise the strongest arguments that they suggest.' " *Green v. United States,* 260 F.3d 78, 83 (2d Cir.2001) (quoting *Graham v. Henderson,* 89 F.3d 75, 79 (2d Cir.1996)). Even after *Bell Atlantic v. Twombly,* 550 U.S. 544 (2007), and *Ashcroft v. Iqbal,* 556 U.S. 662, 129 S.Ct. 1937 (2009), which imposed heightened pleading standards for all complaints, pro se complaints are to be liberally construed. *See Harris v. Mills,* 572 F.3d 66, 71–72 (2d Cir.2009). Dismissal of a pro se complaint is nevertheless appropriate where a plaintiff has clearly failed to meet minimum pleading requirements. *Rodriguez v. Weprin,* 116 F.3d 62, 65 (2d Cir.1997).

### 2. *Captain Garcia, Captain Dunbar, and Assistant Deputy Warden Lombardi*

The defendants argue that Mr. Toliver should be denied leave to amend his complaint to add Captains Garcia and Dunbar and Assistant Deputy Warden Lombardi as defendants because "he is attempting to sue these defendants, not in connection with any claims within the scope of this action, but for claims relating to the conditions in his cell on and after May 5, 2010, which are the subject of a separate action ... in which he also names these same individuals as defendants." (Def. Resp. at 3). Indeed, the complaint in *Toliver v. Dept. of Corrections, NYC,* No. 10 Civ. 5807 (the "5807 Action"), names Captain Garcia, Captain Dunbar, and Assistant Deputy Warden Lombardi as defendants and asserts claims based on the plaintiff's detention in the "inoperable" cell occurring on or around May 5, 2010 described in his supplemental amended complaint. (Complaint at 3, No. 10 Civ. 5807, Doc. No. 2). Thus, because the claims asserted against these defendants here are duplicative of those asserted in the 5807 Action, the plaintiff's motion to add these defendants in this action must be denied. *See Curtis v. Citibank, N.A.,* 226 F.3d 133, 138–39 (2d Cir.2000) ("As part of its general power to administer its docket, a district court may stay or dismiss a suit that

is duplicative of another federal court suit.... [P]laintiffs have no right to maintain two actions on the same subject in the same court, against the same defendant at the same time." (citing *Colorado River Water Conservation District v. United States,* 424 U.S. 800, 817 (1976) and *Zerilli v. Evening News Association,* 628 F.2d 217, 222 (D.C.Cir.1980))).

### 3. *Phillip Keeplings of PHS*

Similarly, the plaintiff's motion to amend his complaint to add Mr. Keeplings as a defendant must be denied, as he is also a named defendant in another action predicated on the same facts alleged in the plaintiff's supplemental amended complaint. (Def. Resp. at 4). *See Toliver v. P.H.S. Corp. and Mental Health–Kepplinphillips,* No. 10 Civ. 5355 (the "5355 Action"). Specifically, the 5355 Action complaint describes the alleged May 20, 2010 assault, alleges that "Mental Health was notified by myself all to no avail.... Mental Health and/or medical did nothing about this sodomy or assault," and names Mr. Keeplings as a defendant. (Complaint at 1, 3, No. 10 Civ. 5355, Doc. No. 2). Therefore, as the claims asserted against Mr. Keeplings here are duplicative of those asserted in the 5355 Action, the plaintiff's motion to add him as a defendant in this action must be denied. *See Curtis,* 226 F.3d at 138–39.

### 4. *City of New York*

**\*5** Mr. Toliver also seeks to add the City of New York as a defendant in this action, and the Moving Defendants do not oppose permitting him to do so. (Am. Compl. at 2; Def. Reply at 7). In order to prevail on a Section 1983 claim against the City of New York, the plaintiff must show that a municipal policy or custom caused the deprivation of his constitutional rights. *Monell v. Department of Social Services,* 436 U.S. 658, 690–91 (1978). An "official policy" may be implemented through a " 'policy statement, ordinance, regulation, or decision' " that is officially promulgated by a municipality's policy makers. *Anthony v. City of New York,* 339 F.3d 129, 139 (2d Cir.2003) (quoting *Monell,* 436 U.S. at 690). A "custom," for the purposes of municipal liability, must be so entrenched and well-established as to constitute a practice with the force of law. *Patterson v. County of Oneida, New York,* 375 F.3d 206, 226 (2d Cir.2004). "[A] single incident of unconstitutional conduct by a non-policymaking employee" of the City is insufficient to demonstrate a municipal policy or custom; rather, a

2012 WL 4510635

systematic pattern of conduct must be shown to establish municipal liability under Section 1983. *Warheit v. City of New York,* No. 02 Civ. 7345, 2006 WL 2381871, at *12 (S.D.N.Y. Aug. 15, 2006) (citing *Davis v. City of New York,* 228 F.Supp.2d 327, 336 (S.D.N.Y.2002)).

In his complaint, Mr. Toliver alleges that when an inmate enters punitive segregation housing, DOC takes his property without vouchering it, which caused all of Mr. Toliver's property to be stolen. (Add. at 2). These allegations are sufficient to state a claim that the City maintains a policy, custom, or practice of not vouchering inmates' property upon their entry into the punitive segregation housing unit, and that the plaintiff was deprived of his property as a result. [5]

[5]    In his supplementary amended complaint, Mr. Toliver explains that his "trial court attire" was among the items of his personal property that was lost, which resulted in his being "made to wear 100% '[o]range [p]ants' and '[o]range [s]hirt' with white letters that read: *'D.O.C.'* and *'Prisoner.' "* (Supp. Am. Compl. at 5). He further alleges that, "I was forced all the way through trial and court(s) appearances to wear D.O.C. issued *'orange'* suit prison attire ... despite my protests." (Supp. Am. Compl. at 5). Although he does not appear to be asserting a claim on the basis of these facts, such a claim would nonetheless be barred by *Heck v. Humphrey,* 512 U.S. 477 (1994), which precludes Section 1983 actions for monetary damages if success on such claims would necessarily call into question the validity of the underlying conviction and sentence. *Id.* at 487. Until a Section 1983 plaintiff has proven that his conviction or sentence has been "reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal ... or called into question by a federal court's issuance of a writ of habeas corpus," the court must dismiss the claim. *Id.* at 486–87.

Accordingly, Mr. Toliver's motion to amend his complaint is granted to the extent he seeks to add the City of New York as a defendant; consequently, for purposes of the motion to dismiss, the amended complaint supersedes the original complaint.

B. *Motion to Dismiss*

1. *Legal Standard for Dismissal*

When considering a motion to dismiss, a court must accept all factual allegations in the complaint as true and draw all reasonable inferences in favor of the plaintiff. *Erickson,* 551 U.S. at 94; *Freedom Holdings Inc. v. Spitzer,* 357 F.3d 205, 216 (2d Cir.2004). A complaint need not contain detailed factual allegations, but must contain more than mere labels and conclusions or a formulaic recitation of the elements of a cause of action. *Iqbal,* 556 U.S. at ——, 129 S.Ct. at 1949–50 (citing *Twombly,* 550 U.S. at 555). "To survive a motion to dismiss, a complaint must contain sufficient factual matter ... to 'state a claim to relief that is plausible on its face.' " *Id.* at 1949 (citing *Twombly,* 550 U.S. at 570). Where the complaint's factual allegations permit the court to infer only that it is possible, but not plausible, that misconduct occurred, the complaint fails to meet the general pleading requirements of Rule 8 of the Federal Rules of Civil Procedure. *Id.* at 1950 (citing Fed.R.Civ.P. 8(a)(2)).

2. *Section 1983*

**\*6** Section 1983 "is not itself a source of substantive rights, but a method for vindicating federal rights elsewhere conferred by those parts of the United States Constitution and federal statutes that it describes." *Baker v. McCollan,* 443 U.S. 137, 145 n. 3 (1979). Section 1983 provides as follows:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law ....

42 U.S.C. § 1983. To state a claim under Section 1983, a plaintiff must allege that "(1) the challenged conduct was attributable at least in part to a person who was acting under color of state law and (2) the conduct deprived the plaintiff of a right guaranteed under the Constitution of the United States." *Snider v. Dylag,* 188 F.3d 51, 53 (2d Cir.1999).

a. *New York City Department of Correction*

As an initial matter, DOC is not a suable entity. *See, e.g., Renelique v. Doe,* No. 99 Civ. 10425, 2003 WL 23023771, at *6 (S.D.N.Y. Dec. 29, 2003) ("[T]he overwhelming body of authority holds that DOC is not a suable entity."). Section 396 of the New York City Charter provides that "[a]ll actions and proceedings for the recovery of penalties for the violation of any law shall be brought in the name of the city of New York and not in that of any agency, except where otherwise provided by law." N.Y. City Charter § 396. As an agency within the meaning of the New York City Charter, DOC cannot be sued. *Antrobus v. Department of Corrections,* No. 07 Civ.2076, 2009 WL 773277, at *3 (S.D.N.Y. March 24, 2009) ("[P]erforce of the ... New York City Charter, DOC, an agency of the city of New York, lacks the capacity to be sued."). Thus, to the extent that Mr. Toliver asserts claims against DOC, they must be dismissed.

b. *Commissioner Schriro and Chief Davis*

Personal involvement by the defendant in any alleged constitutional violation is a prerequisite to an award of damages under Section 1983. *Hernandez v. Keane,* 341 F.3d 137, 144–45 (2d Cir.2003); *Blyden v. Mancusi,* 186 F.3d 252, 264 (2d Cir.1999). Therefore, "to state a claim for damages under Section 1983, the plaintiff must allege sufficient facts to demonstrate that defendants were personally or directly involved in the violation, that is, that there was 'personal participation by one who ha[d] knowledge of the facts that rendered the conduct illegal.' " *Harris v. Westchester County Department of Corrections,* No. 06 Civ.2011, 2008 WL 953616, at *9 (S.D.N.Y. April 3, 2008) (alteration in original) (quoting *Provost v. City of Newburgh,* 262 F.3d 146, 155 (2d Cir.2001)). "A supervisory official is not liable under section 1983 by virtue of his subordinate's actions; rather, he must be shown to have 'some personal responsibility.' " *Murray v. Koehler,* 734 F.Supp. 605, 606 (S.D.N.Y.1990) (quoting *Al–Jundi v. Estate of Rockefeller,* 885 F.2d 1060, 1065 (2d Cir.1989)).

**\*7** Mr. Toliver fails to set forth the personal involvement of either Commissioner Schriro or Chief Davis in the incidents giving rise to his claims. Aside from his bare allegation that they are "responsible for [their] deliberate indifference" (Am. Compl. at 17), the plaintiff does not otherwise mention these defendants in his complaint, proposed amended complaint, or supplemental amended complaint. Thus, he has not adequately set forth a

constitutional claim against these defendants, and his claims against them must be dismissed.

c. *Supervising Warden Kathleen Mulvey*

Mr. Toliver next alleges that Warden Mulvey violated his rights by failing to take action after he notified her of the loss of his property.[6] The defendants contend that the plaintiff "has not alleged that Warden Mulvey played any role in establishing the alleged municipal policy of not vouchering inmates' property upon entry to the punitive segregation housing unit, which he has alleged led to the loss of his property. Thus, he has failed to allege her personal involvement in any alleged constitutional violation," thereby precluding a finding of liability under Section 1983. (Def. Resp. at 4).

[6]    In his supplemental amended complaint, the plaintiff alleges that he notified Warden Mulvey of several of his grievances and complaints, and that she failed to take action on any of them. (Supp. Am. Compl. at 11–12). However, only his allegations relating to the loss of his property are considered here, as the other grievances concern incidents and defendants that are the subject of other actions. (*See* Section A(2)-(3), *supra* ).

As the defendants acknowledge, a supervisory official may be found to have personal involvement in a constitutional violation if the official "created a policy or custom under which unconstitutional practices occurred," *Back v. Hastings on Hudson Union Free School District,* 365 F.3d 107, 127 (2d Cir.2004) (quoting *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995)); however, this is merely one route to imposing supervisory liability under Section 1983. Additionally, liability may attach to a supervisor's conduct where (1) the official directly participated in the violation; (2) the official, " 'after being informed of the violation through a report or appeal, failed to remedy the wrong' "; (3) the official allowed the continuance of a policy or custom under which unconstitutional practices occurred; (4) the official " 'was grossly negligent in supervising subordinates' " who caused the unlawful condition or event; or (5) the official " 'exhibited deliberate indifference [to the plaintiff's rights] by failing to act on information indicating that unconstitutional acts were occurring.' " *Back,* 365 F.3d at 127 (quoting *Colon,* 58 F.3d at 873); *see Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994); *see also Plair v. City of New York,* 789 F.Supp.2d 459, 465 (S.D.N.Y.2011) (holding that

"the traditional [Second Circuit] categories of supervisory liability still apply" in deliberate indifference cases after *Iqbal* ); *Jackson v. Goord,* 664 F.Supp.2d 307, 324 & n. 7 (S.D.N.Y.2009) (same).

Here, Mr. Toliver alleges that he "submitted grievances and complaints to Warden Mulvey," and claims that "[s]he was certainly put on notice" of his grievances, as "[s]he told [him] at one point, 'I got all your letters and complaints.' " (Supp. Am. Compl. at 12). The plaintiff further alleges that, despite his complaints, the warden "never once interviewed a single person [or] interviewed [him] one single time [concerning] ... the stolen property ... [or] the theft of [his] property ...." (Supp. Am. Compl. at 11–12).

**\*8** That the warden ignored the plaintiff's grievances is insufficient to impose Section 1983 liability, however, as personal involvement is found only "where a supervisory official receives and acts on a prisoner's grievance or otherwise reviews and responds to a prisoner's complaint." *Johnson v. Wright,* 234 F.Supp.2d 352, 363 (S.D.N.Y.2002). Though courts in this Circuit are divided "regarding whether a supervisor who reviews and ultimately denies a grievance can be considered personally involved in the unconstitutional act underlying the grievance," *Garcia v. Watts,* No. 08 Civ. 7778, 2009 WL 2777085, at *15 (S.D.N.Y. Sept. 1, 2009) (collecting cases), the law is clear that a supervisor's mere "receipt of a letter, without personally investigating or acting on the letter or grievance, is insufficient to establish personal involvement," *Harrison v. Fischer,* No. 08–CV–1327, 2010 WL 2653629, at *4 (N.D.N.Y. June 7, 2010) (citing *Rivera v. Fischer,* 655 F.Supp.2d 235, 238 (W.D.N.Y.2009) and *Boddie v. Morgenthau,* 342 F.Supp.2d 193, 203 (S.D.N.Y.2004)); *see, e.g., Johnson,* 234 F.Supp.2d at 363 ("[I]t is well-established that an allegation that an official ignored a prisoner's letter of protest and request for an investigation of allegations made therein is insufficient to hold that official liable for the alleged violations." (internal quotation marks omitted) (collecting cases)); *Tafari v. McCarthy,* 714 F.Supp.2d 317, 359 (N.D.N.Y.2010) ("A prisoner's allegation that a supervisory official failed to respond to a grievance is insufficient to establish that the official 'failed to remedy the violation after learning of it through a report or appeal' or 'allowed the custom or policy continue after learning of it.' " (quoting *Rivera v. Goord,* 119 F.Supp.2d 327, 344–45 (S.D.N.Y.2000))). As Mr. Toliver

makes no allegation that Warden Mulvey responded to his grievances or took any other action in regard to his complaints, he does not state a claim for personal involvement under Section 1983. Thus, his claim against the warden must be dismissed.

#### d. *Prison Health Services*

Mr. Toliver also alleges that PHS violated his rights by denying him adequate medical and mental health care. "To establish an unconstitutional denial of medical care, a prisoner must prove deliberate indifference to [his] serious medical needs." *Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994) (alteration in original) (internal quotation marks omitted). The test for deliberate indifference has both objective and subjective prongs. *Id.* First, the alleged deprivation must be objectively " 'sufficiently serious.' " *Id.* (quoting *Wilson v. Seiter,* 501 U.S. 294, 298 (1991)). "This standard contemplates a [showing by the prisoner that his medical need was] a condition of urgency, one that may produce death, degeneration, or extreme pain." *Lucas v. McCoy,* No. 10 Civ. 9611, 2011 WL 6005164, at *2 (S.D.N .Y. Nov. 30, 2011) (alteration in original) (internal quotation marks omitted). Second, the prisoner must show that the charged official acted "with a sufficiently culpable state of mind," meaning that the "official kn[ew] of and disregard[ed] an excessive risk to inmate health or safety." *Hathaway,* 37 F.3d at 66 (citing *Wilson,* 501 U.S. at 298, and *Farmer v. Brennan,* 511 U.S. 825, 837 (1994)). "[T]he official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* at 66 (internal quotation marks omitted).

**\*9** Mr. Toliver alleges that PHS staff "briskly walk[ed]" by his cell daily, including on days he was lying on his cell floor resulting from a back injury, and "ignored" his requests for treatment "most of the time." [7] (Compl. at 3). First, the plaintiff has failed to allege with any particularity that his medical needs—presumably, those resulting from the unspecified injury to his back—would pose an excessive risk to his health if he were denied services. Even construing his complaint to allege that his back-related medical needs created such a "condition of urgency," however, he has failed to plead facts (a) identifying a responsible official (b) who acted with a sufficiently culpable state of mind. In other words, Mr. Toliver has failed to show that any PHS staff member

knew of his serious medical needs and intentionally disregarded them, fully aware that denying him medical services would create a "substantial risk of serious harm" to his health. Thus, the plaintiff has failed to state a claim for deliberate indifference to a serious medical need, and his claim against PHS must be dismissed accordingly.

7    In his pleadings concerning PHS, Mr. Toliver appears to assert claims on behalf of other inmates, which he cannot do. *See Iannaccone v. Law,* 142 F.3d 553, 558 (2d Cir.1998) ("[B]ecause pro se means to appear for one's self, a person may not appear on another person's behalf in the other's cause. A person must be litigating an interest personal to him."). Accordingly, only alleged violations of the plaintiff's rights are considered here.

e. *Mr. Toliver's Remaining Claims*

Finally, Mr. Toliver claims that he was denied access to a working typewriter in the law library, denied telephone privileges upon entering punitive segregation, and denied access to a chaplain. (Compl. at 3, 5). However, as the plaintiff does not plead any facts indicating that any defendant was personally involved in or responsible for any of the alleged deprivations, these claims must be dismissed.

Even if Mr. Toliver were able to establish the requisite personal involvement, however, his claims would still fail to state a cause of action. First, aside from the plaintiff's allegation that the only law library typewriter available to the approximately 100 inmates in his housing unit was "inoperable," he alleges no facts indicating that he suffered any actionable harm as a result. *See Lewis v. Casey,* 518 U.S. 343, 351, 360 n. 7 (1996) (holding that, as "[c]ourts have no power to presume and remediate harm that has not been established," an inmate must therefore show "that the alleged shortcomings in the

library ... hindered his efforts to pursue a legal claim" to establish a constitutional violation). Likewise, with respect to his claim that he was limited to one phone call per day while housed in the punitive segregation unit, Mr. Toliver has failed to allege that he was deprived of a constitutional right. *See Henry v. Davis,* No. 10 Civ. 7575, 2011 WL 3295986, at *2 (S.D.N.Y. Aug. 1, 2011) ("Phone restrictions do not impinge on a prisoner's constitutional rights where an inmate has alternate means of communicating with the outside world, and particularly with counsel.") (collecting cases). Lastly, Mr. Toliver appears to assert his denial-of-chaplain-services claim on behalf of another inmate, which is not permitted. (*See* n. 7, *supra* ). Therefore, these claims must be dismissed.

*Conclusion*

**\*10**    For the reasons stated above, I recommend that the plaintiff's motion to amend his complaint be granted to the extent he seeks to add the City of New York as a defendant and denied in all other respects, and that the defendants' motion to dismiss be granted, leaving a single claim against the City for its alleged policy of failing to voucher the property of inmates entering segregated housing. Pursuant to 28 U.S.C. § 636(b)(1) and Rules 72, 6(a), and 6(d) of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from this date to file written objections to this Report and Recommendation. Such objections shall be filed with the Clerk of Court, with extra copies delivered to the chambers of the Honorable Loretta A. Preska, Chief Judge, Room 2220, and to the chambers of the undersigned, Room 1960, 500 Pearl Street, New York, New York 10007. Failure to file timely objections will preclude appellate review.

**All Citations**

Not Reported in F.Supp.2d, 2012 WL 4510635

---

**End of Document**    © 2017 Thomson Reuters. No claim to original U.S. Government Works.

Mendoza v. McGinnis, Not Reported in F.Supp.2d (2008)

2008 WL 4239760

KeyCite Yellow Flag - Negative Treatment

Distinguished by Collier v. Harter, W.D.N.Y., April 27, 2012

2008 WL 4239760
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Eric MENDOZA, Plaintiff,

v.

M. McGINNIS, Superintendent, Southport
Correctional Facility, et al., Defendants.

Civil Action No. 9: 05-CV-1124 (TJM/DEP).
|
Sept. 11, 2008.

West KeySummary

1   **Prisons**

⚷ Particular Conditions and Treatments

**Sentencing and Punishment**

⚷ Medical Care and Treatment

Prison employees were not deliberately
indifferent to an inmate's serious medical
needs. The inmate was seen on numerous
occasions by infirmary staff. The inmate's
disagreement with a prescribed course of
treatment and the refusal of prison nurses and
nurse practitioners to honor his request to be
seen by a prison physician for his back pain
did not provide a basis to find a violation
of his rights under the Eighth Amendment.
U.S.C.A. Const.Amend. 8.

32 Cases that cite this headnote

**Attorneys and Law Firms**

Eric Mendoza, pro se.

Hon. Andrew M. Cuomo, Office of the Attorney
General, State of New York, Senta B. Siuda, Esq.,
Assistant Attorney General, of Counsel, Syracuse, NY,
for Defendants.

**DECISION & ORDER**

THOMAS J. McAVOY, Senior District Judge.

**\*1** This *pro se* action brought pursuant to 42 U.S.C. §
1983 was referred to this Court by this Court to the Hon. David E.
Peebles, United States Magistrate Judge, for a Report
and Recommendation pursuant to 28 U.S .C. § 636(b)
and Local Rule N.D.N.Y. 72.3(c). The Report and
Recommendation dated July 24, 2008 recommended that
Defendants' motion for summary judgment be granted
and the action dismissed. No objections to the Report
and Recommendation have been filed and Plaintiff's
time to do so has expired. Furthermore, after examining
the record, this Court has determined that the Report
and Recommendation is not subject to attack for plain
error or manifest injustice. Accordingly, the Court adopts
the Report and Recommendation for the reasons stated
therein.

It is therefore,

**ORDERED** that Defendants' motion for summary
judgment (dkt.# 53) is **GRANTED,** and Plaintiff's
complaint is **DISMISSED** in its entirety.

**IT IS SO ORDERED**

*REPORT AND RECOMMENDATION*

DAVID E. PEEBLES, United States Magistrate Judge.

Plaintiff Eric Mendoza, a New York State prison inmate
who is proceeding *pro se* and *in forma pauperis,* has
commenced this action pursuant to 42 U.S.C. § 1983,
claiming deprivation of his constitutional rights. In his
complaint, plaintiff alleges that the defendants were
deliberately indifferent to his serious medical needs by
refusing his repeated requests for proper treatment of back
pain, migraine headaches, ear aches, and a broken tooth,
and on one isolated occasion by giving him the wrong
medication, in violation of the Eighth Amendment to
the United States Constitution. As relief, plaintiff seeks
recovery of not less than six million dollars in damages.

Currently pending before the court is a motion
by the defendants seeking the entry of summary

judgment dismissing plaintiff's complaint. In their motion defendants assert that as a matter of law the plaintiff cannot establish that any of his health conditions was sufficiently serious to rise to a level of constitutional significance, nor does the evidence support a finding that the defendants were subjectively indifferent to any of his medical needs. Based upon a thorough review of the record now before the court, I find that while some of plaintiff's conditions could potentially be viewed as sufficiently serious to trigger the protections of the Eighth Amendment, no reasonable factfinder could conclude that the defendants were deliberately indifferent to those needs, and therefore recommend that the defendants' motion for summary judgment be granted.

## I. BACKGROUND [1]

[1]  The following recitation is gleaned from the record now before the court, with all inferences drawn and ambiguities resolved in plaintiff's favor. *Jeffreys v. City of New York,* 426 F.3d 549, 553 (2d Cir.2005); *Wright v. Coughlin,* 132 F.3d 133, 137-38 (2d Cir.1998). To the extent there is any significant controversy regarding facts material to the claims raised in plaintiff's complaint, they will be noted.

Plaintiff is a New York State prison inmate entrusted to the custody of the New York State Department of Correctional Services ("DOCS"). *See generally* Complaint (Dkt. No. 1); *see also* Defendants' Local Rule 7.1(a)(3) statement (Dkt. No. 53-3) ¶ 1. At the times relevant to his claims plaintiff was designated first to the Southport Correctional Facility ("Southport"), and later the Auburn Correctional Facility ("Auburn"), where he was transferred on November 28, 2003. Complaint (Dkt. No. 1) ¶¶ 3, 12; Felker Aff. (Dkt. No. 53-3) ¶ 38; *see also* Defendants' Motion (Dkt. No. 53-4) Exh. 1.

**\*2**  On August 2, 2003, during his confinement at Southport, Mendoza slipped and fell upon entering a shower area while handcuffed, injuring his head, shoulder and back. [2], [3]  Complaint (Dkt. No. 1) Attachment ¶ 12; Felker Aff. (Dkt. No. 53-5) ¶ 4 and Exh. A (Plaintiff's Ambulatory Health Records) 8/2/03 entry. Following the accident plaintiff was returned to his cell, and later transported to the prison infirmary where he was seen by Nurse Scobble for his injuries. Complaint (Dkt. No. 1) Attachment ¶ 12; Felker Aff. (Dkt. No. 53-5) ¶ 4. Nurse Scobble administered Tylenol and, after evaluating the plaintiff, provided him with an ice-pack for his head

injury and placed him in the facility's hospital unit for observation. Defendants' Motion (Dkt. No. 53-4) Exh. 2, 21:9-21; Felker Aff. (Dkt. No. 53-5) Exhibit A-1. After remaining in the hospital unit for approximately two and one half hours, Mendoza was returned back to his cell. [4] Felker Aff. (Dkt. No. 53-5) Exhibit A-1.

[2]  According to his medical records plaintiff's complaints regarding his back pre-date the shower accident, reaching back at least to June 2, 2003. Kooi Aff. (Dkt. No. 53-6) ¶ 5. Magnetic resonance imaging ("MRI") testing of Mendoza's back conducted on June 25, 2003 revealed the onset of degenerative disc disease. *Id.* ¶ 7 and Exh. B, pp. B-3, B-4. Plaintiff's records further reflect that Mendoza complained of a "sore back" on July 30, 2003, three days before his fall, and at that time was prescribed Ultram for the pain and placed on a list to see a physician. Felker Aff. (Dkt. No. 53-5) ¶ 5 and Exh. A, 7/30/03 and 7/31/03 Entries.

[3]  While plaintiff now claims to have suffered a broken tooth as a result of the fall, and for purposes of the pending motion that allegation must be credited, plaintiff's medical records make no reference to plaintiff's claim of suffering a broken tooth during the fall, nor do they otherwise substantiate that claim.

[4]  Plaintiff asserts that Nurse Scobble told him a doctor would come to his cell in the afternoon to talk with him, but the doctor never appeared to evaluate him. Complaint (Dkt. No. 1), Attachment ¶ 12.

Mendoza alleges that requests made by him on August 4 and 5, 2003 to be seen by a doctor were ignored. [5] Complaint (Dkt. No. 1) Attachment ¶ 12. On August 6, 2003, after voicing numerous complaints to the floor officer regarding his continuous pain, Mendoza was visited by Nurse Whendon. [6] *Id.* During that visit the plaintiff complained of experiencing strong ear pain as a result of his fall in the shower area; defendant Whendon promised to discuss the matter with a prison physician, and prescribed Ultram for plaintiff's pain. [7] *Id.*

[5]  There is no entry in the plaintiff's ambulatory health record either documenting sick-call requests or reflecting any request by Mendoza for medical services on August 4 or 5, 2003. Felker Aff. (Dkt. No. 53-5) Exhibit A1-2.

2008 WL 4239760

6    Plaintiff's health records appear to reflect that he was seen by Nurse Practitioner Northrup on that date, and that it was August 10, 2003 when he was seen by Nurse Whendon. Felter Aff. (Dkt. No. 53-5) ¶¶ 7 & 9 and Exh. A, 8/6/03 & 8/10/03 Entries.

7    While given the current procedural posture plaintiff is entitled to the benefit of all inferences and the resolution of all ambiguities in his favor, it nonetheless should be noted that a medical record entry memorializing his discussion with Nurse Ripley on August 8, 2003 reflects that while Mendoza did complain regarding his ears, he claimed not to be experiencing any pain, noting that they "just feel funny." Felter Aff. (Dkt. No. 53-5) Exh. A, 8/8/03 Entry. Plaintiff's medical records entry from the August 6, 2003 visit, which fail to make reference to complaints of ear pain, confirm that Ultram was prescribed on that date, presumably to address the complaints of back pain lodged during that visit. Id., 8/6/03 Entry.

On August 15, 2003, plaintiff again complained to corrections staff of severe pain in his head, back, shoulders, and teeth, after noticing that the lump on his head was swollen and had become discolored. Complaint (Dkt. No. 1) Attachment ¶ 12. When plaintiff asked to see a doctor, an unidentified corrections sergeant responded that because plaintiff did not appear to be experiencing an emergency situation, he would have to wait until sick-call the next day. Id. On the morning of August 16, 2003, after continuing to experience serious pain, plaintiff was seen by Nurse P. Mills, but was not permitted to see a physician.[8] Id . Noting that the Ultram which had been prescribed was not working and that plaintiff was also experiencing ear pain, Nurse Mills reported on the medical record entry from that session that plaintiff "needs ear check", discontinued Ultram, and instead prescribed Naprosyn. Felker Decl. (Dkt. No. 53-5) Exh. 1, 8/16/03 Entry.

8    While plaintiff's complaint affixes the date of that visit at August 15, 2003, and refers to the medical official who examined him on that date as Nurse Miller, it is apparent from the chronology set forth in that complaint, corroborated by an entry from August 16, 2003 in plaintiff's ambulatory health records, that the visit actually occurred on the latter date, and that the nurse's name is Mills.

A central theme of plaintiff's complaint appears to relate to prison officials' failure to honor his requests to be seen by a prison doctor. In addition to those requests previously discussed, plaintiff's complaint alleges that he requested access to a prison physician on August 15, 16, 23, and 29, 2003, as well as September 2, 4, 11, 16, 18, and 19, 2003. From the time of the accident on August 3, 2003 until his transfer out of Southport on November 24, 2003, Mendoza was not seen by a doctor. Id. Complaint (Dkt. No. 1) Attachment ¶ 12. Plaintiff's medical records also reveal, however, that between the time of his injury on August 2, 2003, and the date of his transfer out of Southport on November 28, 2003, plaintiff was seen on twenty-five different occasions by seven different registered nurses and one nurse practitioner ("NP"), and completed six physical therapy sessions. Felker Aff. (Dkt. No. 53-5) ¶¶ 4, 7-9, 11-25, 27-30, 32-37. Those records also reflect considerable efforts on the part of prison medical staff to address plaintiff's back condition, including through the use of physical therapy, pain medication, and a combination of other strategies which included a "front cuff order". Id.

*3 Plaintiff's ear condition was also addressed during many of his visits with medical personnel at Southport. On August 27, 2003 NP Northrup, upon checking plaintiff's ears, determined that they were both filled with wax and prescribed Debrox drops to address that condition. Id. ¶ 15 and Exh. A, 8/27/03 Entry. Plaintiff was seen on August 28, 2003 by Nurse Scobble, again complaining of ongoing discomfort. Id. ¶ 16. Nurse Scobble similarly observed a wax build-up in both ear canals, and again ordered that plaintiff be provided with Debrox drops to alleviate the condition. Id. and 8/28/03 Entry.

Despite several intervening visits with prison medical personnel, the next reference in plaintiff's health records to his ear condition is contained in a note of a visit on September 24, 2003 with Nurse Preiser, who wrote that plaintiff was complaining of left ear pain and stating that his left ear made a "buzzing" sound. Id. ¶ 29 and 9/24/03 Entry. After being placed on an NP call-out, plaintiff was seen by NP Northrup on that same date; based upon her examination, NP Northrup determined that plaintiff was experiencing a left eustachian tube dysfunction/allergies and prescribed Allegra D to address the condition. Id. ¶ 30 and 9/24/03 Entry. After requesting a refill of the Allegra D on October 13, 2003, plaintiff was seen by Nurse Whendon on October 27, 2003 with residual complaints of left ear pain and an inability to hear. Id. ¶¶ 31, 32 and Exh. A, 10/13/03 and 10/27/03 Entries. On that occasion, an ear check was ordered. Id.

Plaintiff again presented to medical staff at Southport on several subsequent occasions, including November 2, 2003, November 17, 2003, November 23, 2003 and November 24, 2003, complaining of on-going ear pain. *Id.* ¶¶ 33-36. Plaintiff was prescribed Tylenol following the November 23, 2003 visit, and an ear check was recommended. *Id.*

On November 24, 2003 Nurse Ripley examined plaintiff's left ear. Felker Aff. (Dkt. No. 53-5) ¶ 37 and Exh. A, 11/25/03 Entry. Determining that the ear canal was red and inflamed and discovering fluid behind the tympanic membrane, Nurse Ripley referred the plaintiff to NP Northrup and ordered a prescription for Amoxicillin. *Id.*

While his complaint is lacking in specifics on this score, plaintiff maintains that the deficiencies in his medical care continued following his transfer into Auburn on November 25, 2003. Complaint (Dkt. No. 1) Attachment ¶ 12. Plaintiff's medical records, however, reflect a similarly intensive regimen of treatment of the plaintiff by medical personnel at Auburn. Those records show that upon his entry into Auburn Mendoza was examined by Patty Hefrun, RN, who noted prior diagnoses of degenerative disc disease, disc protrusion based upon the June 25, 2003 MRI testing and a recent history of ear pain, and referred plaintiff's records to a physician for review and determination of appropriate medications. Kooi Aff. (Dkt. No. 53-6) ¶ 16 and Exh. A, 11/28/03 Entry. Thereafter, plaintiff was seen by prison medical personnel on a regular basis, and his back and ear conditions were the subject of many of those visits. *Id.* ¶¶ 17-78. Plaintiff's medical records also reveal that the last complaint registered by plaintiff concerning ear pain came on April 13, 2004, and that on May 17, 2004 he was found by a audiologist to have functional hearing. *Id.* ¶¶ 77 and Exh. B, p. B-22.

## II. *PROCEDURAL HISTORY*

**\*4** Plaintiff commenced this action on September 7, 2005, and was thereafter granted leave to proceed *in forma pauperis.*[9] Dkt. Nos. 1, 6. Plaintiff's complaint alleges defendants' deliberate indifference to his medical needs, both initially at Southport and later at Auburn. *See generally* Complaint (Dkt. No. 1). Named as the defendants in plaintiff's complaint are M. McGinnis, the Superintendent at Southport; J. Burge, the

Superintendent of Auburn; Dr. Kooi, a prison doctor at Auburn; and J. Scobble, T. Whendon, Preiser, B. Brandt, P. Miller, and P. Nelson, all of whom are alleged to be registered nurses employed by the DOCS at Southport.[10] Dkt. No. 1.

[9]    Since plaintiff's complaint asserts claims based upon occurrences at both the Southport Correctional Facility, which is situated in the Western District of New York, and at Auburn, located in this district, venue properly lies in the Northern District of New York. *See* 28 U.S.C. § 1391(b) (indicating that "[a] civil action wherein jurisdiction is not founded solely on diversity of citizenship may, except as otherwise provided by law, [may] be brought only in (1) a judicial district where any defendant resides, if all defendants reside in the same State [or] (2) a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred ...").

[10]    On March 14, 2006, in response to defendants' filing of a pre-answer motion seeking the dismissal of the plaintiff's complaint, Senior Judge Thomas J. McAvoy ordered dismissal of plaintiff's claims, without prejudice, against defendants J. Scobble, T. Whendon, Preiser and P. Miller for failure to effect timely service of process. Dkt. No. 37. Despite that ruling, defendant J. Scobble nonetheless remains a defendant since although not reflected in the court's records, she was in fact served in the action.

In April of 2007, Mendoza sought leave to file a second amended complaint, see Dkt. No. 42, attempting to join six additional defendants in the action.[11] Dkt. No. 42. Plaintiff's proposed second amended complaint also purported to rename as defendants the individuals previously dismissed from the action, including T. Whendon, Preiser and P. Miller. Plaintiff's motion to file a second amended complaint, which was opposed by the defendants, *see* Dkt. No. 44, was denied by the court on July 20, 2007. Dkt. No. 48.

[11]    An earlier effort by the plaintiff to amend his complaint without court leave was rejected. *See* Dkt. Nos. 8, 10.

On January 15, 2008, defendants M. McGinnis, J. Burge, Dr. Kooi, J. Scobble, and B. Brandt, moved seeking the entry of summary judgment dismissing plaintiff's complaint. Dkt. No. 53. In their motion, the defendants argue that the plaintiff has not properly served two defendants, cannot prove certain defendants' personal

involvement in the constitutional violations asserted, and has failed to establish that they were deliberately indifferent to any serious medical need. *Id.* That motion, which plaintiff has opposed, *see* Dkt. No. 55, is now ripe for determination and has been referred to me for the issuance of a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and Northern District of New York Local Rule 72.3(c). [12] *See also* Fed.R.Civ.P. 72(b).

[12] In his opposition to defendants' summary judgment motion, plaintiff appears to expand his claim considerably to now challenge the propriety of the DOCS practice of escorting prisoners to showers with their hands restrained behind their backs and also to implicate Corrections Officer Bennett, who accompanied him to the shower area, as having culpability in the matter. See Plaintiff's Memorandum (Dkt. No. 55-3) p. 7. This claim, however, is nowhere contained in plaintiff's complaint, nor is C.O. Bennett named as a defendant in the case. Plaintiff cannot properly now, at the summary judgment stage, interject additional legal arguments or new defendants into the action. *See McAllister v. New York City Police Dep't,* 49 F.Supp.2d 688, 697-68 (S.D.N.Y.1999) (noting that it is inappropriate to raise new claims for first time in opposition to summary judgment); *Carribean Wholesales & Serv. Corp. v. U.S. JVC Corp.,* 963 F.Supp. 1342, 1359 (S.D.N.Y.1997) (asserting that a motion for summary judgment is not the appropriate place to present new claims); *Harvey v. New York City Police Dep't,* No. 93 Civ. 7563, 1997 WL 292112, at *2 (S.D.N.Y. June 3, 1997) (same).

## III. *DISCUSSION*

### A. *Failure To Serve*

In their motion, defendants initially seek dismissal of plaintiff's claims against two unserved defendants, including a John Doe defendant identified in plaintiff's amended complaint only as a corrections sergeant at Southport, and Nurse P. Nelson. In support of their motion defendants correctly note at this procedural juncture in the case any named but unserved defendants, particularly those Doe defendants whose identities have not yet been ascertained, are entitled to dismissal, although without prejudice, in light of the fact that jurisdiction over them is lacking. *See* Fed.R.Civ.P. 4(m).

In this instance, however, defendants' motion is unnecessary. While both sergeant John Doe and Nurse P.

Nelson are specifically mentioned by those designations in plaintiff's complaint, and Nurse P. Nelson appears to be specifically identified in the body of that pleading as a "defendant.", *see* Complaint (Dkt. No. 1) Attachment ¶ 12, neither is listed as a defendant in either the caption or the two locations within the complaint where the parties are described. *See id.* § 3 and Attachment ¶¶ 3-11. Since neither Sergeant John Doe nor Nurse P. Nelson appears to have been intended by Mendoza to be named as a defendant in the case, and neither has been served with process or voluntarily intervened in the action, I recommend this portion of defendants' motion be denied as moot.

### B. *Summary Judgement Standard*

**\*5** Summary judgment is governed by Rule 56 of the Federal Rules of Civil Procedure. Under that provision, summary judgment is warranted when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *see Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 2509-10, 91 L.Ed.2d 202 (1986); *Security Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.,* 391 F.3d 77, 82-83 (2d Cir.2004). A fact is "material", for purposes of this inquiry, if it "might affect the outcome of the suit under the governing law." *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510; *see also Jeffreys v. City of New York,* 426 F.3d 549, 553 (2d Cir.2005) (citing *Anderson* ). A material fact is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510. Though *pro se* plaintiffs are entitled to special latitude when defending against summary judgment motions, they must establish more than mere "metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986); *but see Vital v. Interfaith Med. Ctr.,* 168 F.3d 615, 620-21 (2d Cir.1999) (noting obligation of court to consider whether *pro se* plaintiff understood nature of summary judgment process).

When summary judgment is sought, the moving party bears an initial burden of demonstrating that there is no genuine dispute of material fact to be decided with respect to any essential element of the claim in issue; the failure to

2008 WL 4239760

meet this burden warrants denial of the motion. *Anderson,* 477 U.S. at 250 n. 4, 106 S.Ct. at 2511 n. 4; *Security Ins.,* 391 F.3d at 83. In the event this initial burden is met, the opposing party must show, through affidavits or otherwise, that there is a material issue of fact for trial. Fed.R.Civ.P. 56(e); *Celotex,* 477 U.S. at 324, 106 S.Ct. at 2553; *Anderson,* 477 U.S. at 250, 106 S.Ct. at 2511.

When deciding a summary judgment motion, a court must resolve any ambiguities, and draw all inferences from the facts, in a light most favorable to the nonmoving party. *Jeffreys,* 426 F.3d at 553; *Wright v. Coughlin,* 132 F.3d 133, 137-38 (2d Cir.1998). Summary judgment is inappropriate where "review of the record reveals sufficient evidence for a rational trier of fact to find in the [non-movant's] favor." *Treglia v. Town of Manlius,* 313 F.3d 713, 719 (2d Cir.2002) (citation omitted); *see also Anderson,* 477 U.S. at 250, 106 S.Ct. at 2511 (summary judgment is appropriate only when "there can be but one reasonable conclusion as to the verdict").

### C. *Personal Involvement*
In their motion the defendants challenge the sufficiency of plaintiff's allegations regarding the personal involvement of Superintendents McGinnis and Burge, and as well as of Nurse Brandt, arguing that the allegations against those defendants are wholly conclusory and lack specifics connecting them to any constitutional violation alleged in his complaint.

**\*6** Personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under section 1983. *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (citing *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 (2d Cir.1991) and *McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir.1977), *cert. denied,* 434 U.S. 1087, 98 S.Ct. 1282, 55 L.Ed.2d 792 (1978)). In order to prevail on a section 1983 cause of action against an individual, a plaintiff must show some tangible connection between the constitutional violation alleged and that particular defendant. *See Bass v. Jackson,* 790 F.2d 260, 263 (2d Cir.1986).

### 1. *Nurse B. Brandt*
Plaintiff's complaint fails to elaborate upon Nurse Brandt's role in his medical care at Southport, and in particular the manner in which she was deliberately indifferent to his serious medical needs. The sole mention

of that defendant's name in the body of plaintiff's complaint is in a passage in which he alleges, in wholly conclusory fashion and without supporting details, that she and others at Southport and Auburn were deliberately indifferent to his health by failing to provide adequate medical care, and additionally that they "intentionally failed to administer proper medication and refused to fulfill any of [his] requests for proper follow up care." Complaint (Dkt. No. 1) Attachment ¶ 13.

In the face of defendants' summary judgment motion, in which they assert the insufficiency of his allegations against Nurse Brandt, Mendoza fails to offer any evidence which would implicate her personal involvement in the deliberate indifference claimed. During his deposition Mendoza was asked to describe Nurse Brandt's involvement in his treatment. Defendants' Motion (Dkt. No. 53-4) Exh. 1 at 53:22-54-2. In response, plaintiff alleged that he spoke with Nurse Brandt complaining of an ear infection on one occasion, at which time she prescribed Antavera, but on that one occasion she would not grant his request to be seen by a prison physician.[13] *Id.* This allegation is insufficient to establish Nurse Brandt's role in the medical indifference alleged. *See Schwartz v. Dennison,* 518 F.Supp.2d 560, 573 n. 11 (S.D.N.Y.2007) (Plaintiff's complaint contained no allegations from which it can be inferred that defendants created, or allowed to continue, an unconstitutional policy); *Graham v. Poole,* 476 F.Supp.2d 257, 261 (W.D.N.Y.2007) ("Plaintiff's conclusory allegation that Poole failed to provide him with adequate medical care is also insufficient to state a claim."). Accordingly, I recommend that this portion of defendants' motion be granted.

13    There is no reference in plaintiff's health records to the drug "Antavera". According to the plaintiff's ambulatory health record, his ear infection was treated with Debrox (ear drops), Amoxicillin, and Allegra D. Felker Affidavit (Dkt. No. 53-5) ¶¶ 16, 30, 37.

### 2. *Superintendents McGinnis and Burge*
Defendants also argue that plaintiff's complaint is devoid of allegations of any personal involvement, or even awareness, on the part of the superintendents at Southport and Auburn regarding the medical treatment which he was receiving at those facilities. Accordingly, defendants assert, it therefore appears that they are being sued by

plaintiff solely by virtue of their positions as facility superintendents.

**\*7** A supervisor cannot be liable for damages under section 1983 solely by virtue of being a supervisor-there is no *respondeat superior* liability under section 1983. *Richardson v. Goord,* 347 F.3d 431, 435 (2d Cir.2003); *Wright,* 21 F.3d at 501. A supervisory official can, however, be liable in one of several ways: 1) the supervisor may have directly participated in the challenged conduct; 2) the supervisor, after learning of the violation through a report or appeal, may have failed to remedy the wrong; 3) the supervisor may have created or allowed to continue a policy or custom under which unconstitutional practices occurred; 4) the supervisor may have been grossly negligent in managing the subordinates who caused the unlawful event; or 5) the supervisor may have failed to act on information indicating that unconstitutional acts were occurring. *Iqbal v. Hasty,* 490 F.3d 143, 152-53 (2d Cir.2007); *see also Richardson,* 347 F.3d at 435; *Wright,* 21 F.3d at 501; *Williams v. Smith,* 781 F.2d 319, 323-24 (2d Cir.1986). *Richardson,* 347 F.3d at 435 ("[M]ere 'linkage in the prison chain of command' is insufficient to implicate a state commissioner of corrections or a prison superintendent in a § 1983 claim.") (citations omitted); *see also, e.g., Gill v. Mooney,* 824 F.2d 192, 196 (2d Cir.1987) (dismissal appropriate where plaintiff does no more than allege that defendant was in charge of prison); *Ayers v. Coughlin,* 780 F.2d 205, 210 (2d Cir.1985) (same).

In his response to defendants' motion plaintiff asserts that his claims against Southport Superintendent McGinnis are tied to his position as having responsibility "for training and over all management of [the] facility", and his contention that accordingly, "he is liable for all deficiencies in his staffs [sic] performance of their official duties of care, custody and control." [14] Plaintiff's Memorandum (Dkt. No. 55-3) at 9. While under other circumstances liability on the part of a supervisor can be imputed based upon the acts of subordinate employees, it is well-established that there is no *respondeat superior* liability under section 1983. *See Richardson,* 347 F.3d at 435; *Wright,* 21 F.3d at 501. Similarly, it is also true that a supervisor can under certain circumstances be held accountable for their gross negligence in managing subordinates, or for knowingly tolerating the existence of a policy or custom giving rise to unconstitutional practices, plaintiff has identified no specifics to support such a claim, instead merely making

conclusory, unsupported allegations which are simply insufficient to establish liability. [15] *See Jean-Laurent v. Wilkinson,* 540 F.Supp.2d 501, 513 (S.D.N.Y.2008) (indicating that plaintiff must allege specific facts of personal involvement to survive summary judgement); *see also Iqbal v. Hasty,* 490 F.3d at 152-53; *Colon v. Coughlin,* 58 F.3d 865, 873-74 (2d Cir.1995).

[14]    Plaintiff's response does not provide any indication as to the basis for his claims against Auburn Superintendent Burge.

[15]    Indeed, in opposition to defendants' motion plaintiff has not even offered any information to indicate the extent, if any, of the supervising responsibilities of a prison superintendent, presumably with little or no medical training, upon medical staff at the prison facility overseen by him or her.

Having carefully reviewed the record in this case I find that plaintiff's claims against those two individuals are predicated exclusively upon their supervisory positions, a conclusion which is buttressed by testimony given during Mendoza's deposition. During his deposition plaintiff asserted that he was suing Southport Superintendent McGinnis not because of any specific denial in medical treatment, but instead because he was the person in charge of the facility. Defendants' Motion (Dkt. No. 53-4) Exh. 2 at 50:8-20. Similarly, plaintiff testified that he was suing Auburn Superintendent Burge because he "is in charge of [the] facility and he had to believe that everything was going straight." *Id.* at 53:22-54-2.

**\*8** In order to defeat the portion of defendants' motion for summary judgment asserting lack of personal involvement, it was incumbent upon plaintiff to present evidence to support an inference that the three defendants implicated in that motion had personal involvement in any deliberate indifference to his medical care. In light of his failure to do so, and reliance instead upon mere conclusory allegations regarding their liability, I recommend a finding that defendants Brandt, McGinnis and Burge are entitled to dismissal based upon lack of personal involvement and recommend the entry of an order granting that portion of defendants' summary judgment motion. *See Kia P. v. McIntyre,* 235 F.3d 749, 763 (2d Cir.2000) ("A plaintiff may not survive a properly asserted motion for summary judgment on the basis of conclusory allegations alone."); *D'Amico v. City of New York,* 132 F.3d 145, 149 (2d Cir.1998); *Quarles v. General Motors Corp.,* 758 F.2d 839,

840 (2d Cir.1985) ("[M]ere conjecture or speculation by the party resisting summary judgment does not provide a basis upon which to deny the motion.").

#### D. *Deliberate Medical Indifference*

The centerpiece of defendants' motion is their contention that after surveying the evidence contained in the record the court can only conclude that no reasonable factfinder could find that they were deliberately indifferent to plaintiff's serious medical needs. In their motion, defendants argue both that plaintiff has failed to prove the existence of a serious medical need of constitutional proportions, and that in any event the record belies any claim that they were deliberately indifferent to any such need.

The Eighth Amendment's prohibition of cruel and unusual punishment encompasses punishments that involve the "unnecessary and wanton infliction of pain" and are incompatible with "the evolving standards of decency that mark the progress of a maturing society." *Estelle v. Gamble,* 429 U.S. 97, 102, 104, 97 S.Ct. 285, 290, 291, 50 L.Ed.2d 251 (1976); *see also Whitley v. Albers,* 475 U.S. 312, 319, 106 S.Ct. 1076, 1084 (1986) (citing, *inter alia, Estelle* ). While the Eighth Amendment does not mandate comfortable prisons, neither does it tolerate inhumane treatment of those in confinement; thus the conditions of an inmate's confinement are subject to Eighth Amendment scrutiny. *Farmer v. Brennan,* 511 U.S. 825, 832, 114 S.Ct. 1970, 1976, 128 L.Ed.2d 811 (1994) (citing *Rhodes v. Chapman,* 452 U.S. 337, 349, 101 S.Ct. 2392, 2400, 69 L.Ed.2d 59 (1981)).

A claim alleging that prison conditions violate the Eighth Amendment must satisfy both an objective and subjective requirement-the conditions must be "sufficiently serious" from an objective point of view, and the plaintiff must demonstrate that prison officials acted subjectively with "deliberate indifference." *See Leach v. Dufrain,* 103 F.Supp.2d 542, 546 (N.D.N.Y.2000) (Kahn, J.) (citing *Wilson v. Seiter,* 501 U.S. 294, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991)); *Waldo v. Goord,* No. 97-CV-1385, 1998 WL 713809, at *2 (N.D.N.Y. Oct. 1, 1998) (Kahn, J. and Homer, M .J.); *see also, generally, Wilson,* 501 U.S. 294, 111 S.Ct. 2321, 115 L.Ed.2d 271. Deliberate indifference exists if an official "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must

also draw the inference." *Farmer,* 511 U.S. at 837, 114 S.Ct. at 1978; *Leach,* 103 F.Supp.2d at 546 (citing *Farmer* ); *Waldo,* 1998 WL 713809, at *2 (same).

**\*9** In order to state a medical indifference claim under the Eighth Amendment, a plaintiff must allege a deprivation involving a medical need which is, in objective terms, " 'sufficiently serious' ". *Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994) (citing *Wilson,* 501 U.S. at 298, 111 S.Ct. at 2324), *cert. denied sub nom., Foote v. Hathaway,* 513 U.S. 1154, 115 S.Ct. 1108, 130 L.Ed.2d 1074 (1995). A medical need is serious for constitutional purposes if it presents " 'a condition of urgency' that may result in 'degeneration' or 'extreme pain'." *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998) (citations omitted). A serious medical need can also exist where " 'failure to treat a prisoner's condition could result in further significant injury or the unnecessary and wanton infliction of pain' "; since medical conditions vary in severity, a decision to leave a condition untreated may or may not be unconstitutional, depending on the facts. *Harrison v. Barkley,* 219 F.3d 132, 136-37 (2d Cir.2000) (quoting, *inter alia, Chance* ). Relevant factors in making this determination include injury that a " 'reasonable doctor or patient would find important and worthy of comment or treatment' ", a condition that " 'significantly affects' " a prisoner's daily activities, or causes " 'chronic and substantial pain.' " *Chance,* 43 F.3d at 701 (citation omitted); *LaFave v. Clinton County,* No. CIV. 9:00CV774, 2002 WL 31309244, at *2-*3 (N.D.N.Y. Apr.3, 2002) (Sharpe, M.J.).

Deliberate indifference, in a constitutional sense, exists if an official knows of and disregards an excessive risk to inmate health or safety; the official must "both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer,* 511 U.S. at 837, 114 S.Ct. at 1979; *Leach,* 103 F.Supp.2d at 546 (citing *Farmer* ); *Waldo,* 1998 WL 713809, at *2 (same).

#### 1. *Serious Medical Need*

##### a) *Broken Tooth*

Among plaintiff's medical complaints are those surrounding defendants' alleged failure to treat a broken tooth which, although not referenced in any of the medical reports following that incident, is alleged to have occurred during the course of the shower incident on

August 2, 2003. While in the memorandum in support of their summary judgment motion defendants devote no attention to plaintiff's broken tooth, they seemingly argue that it does not constitute a serious medical need.

Under certain circumstances a dental condition can constitute a serious medical need. *See Bennett v. Erie County Holding Ctr. Med. Dep't),* No. 03-CV-6393P, 2006 WL 897817, at *6 (W.D.N.Y. Mar.31, 2006) (holding that dental infection over nine month period constituted serious medical need); *see also Harrison v. Barkley,* 219 F.3d 132, 137 (2d Cir.2000) ("[B]ecause a tooth cavity will degenerate with increasingly serious implications if neglected over sufficient time, it presents a 'serious medical need' within the meaning of our case law."). Dental conditions, like all medical conditions, can vary in severity and, if left untreated, can support an Eighth Amendment claim depending on the specific facts of the case. *See Chance,* 143 F.3d at 703 ("[A] cognizable claim regarding inadequate dental care, like one involving medical care, can be based on various factors, such as the pain suffered by the plaintiff ...."); *see also Boyd v. Knox,* 47 F.3d 966, 969 (8th Cir.1995) (three-week delay in dental treatment aggravated problem); *Fields v. Gander,* 734 F.2d 1313, 1314-15 (8th Cir.1984) ("severe pain" due to infected tooth); *cf. Dean v. Coughlin,* 623 F.Supp. 392, 404 (S.D.N.Y.1985) (holding "dental needs-for fillings, crowns, and the like-are serious medical needs as the law defines that term"). Thus, for example, a tooth cavity has been held to constitute a degenerative condition in light of the fact that, if left untreated indefinitely "it is likely to produce agony and to require more invasive and painful treatments, such as root canal therapy or extraction." *Harrison,* 219 F.3d at 137 (citation omitted).

**\*10** In this instance, by contrast, plaintiff asserts the existence of a broken tooth, and does not allege either that it has caused him to experience extreme pain or the likelihood, that if left untreated, his broken would have resulted in degeneration. Indeed, during his deposition Mendoza testified that the pain associated with his broken tooth diminished after medication was prescribed, and that when he complained to a prison nurse regarding the tooth she made an appointment with a dentist who, after determining that it could not be saved, extracted it without causing additional pain. Defendants' Motion (Dkt. No. 53-4) Exh. 1 at 59:5-60:9. Accordingly, I recommend a finding that no reasonable factfinder could conclude that plaintiff's broken tooth represents a medical condition of

constitutional significance. *See Chance,* 143 F.3d at 703 (indicating that the factors to consider in determining if dental problems raise to the level of constitutional significance are whether plaintiff suffers from severe pain, deterioration of teeth, or inability to engage in normal activities) (internal citations omitted).

### b) *Back Pain and Migraine Headaches*

While noting a conflict among the various court decisions which address the issue, defendants argue that Mendoza's back condition does not rise to a level sufficient to trigger the protections of the Eighth Amendment.[16] The question of whether chronic back pain can rise to a level of constitutional significance is dependent upon the circumstances of the particular case presented. In this instance, given plaintiff's diagnosed condition of degenerative disc disease, and resolving all ambiguities in plaintiff's favor, I conclude that a reasonable factfinder could find that the condition constitutes a serious medical need. *See Guarneri v. Hazzard,* No. 06-CV-0985, 2008 WL 552872, at * 6 (N.D.N.Y. Feb. 27, 2008) ("[s]evere back pain, especially if lasting an extended period of time, can amount to a 'serious medical need' under the Eighth Amendment.") (citing *Nelson v. Rodas,* No. 01-CV-7887, 2002 WL 31075804, at *14 (S.D.N.Y. Sept.17, 2002)); *Faraday v. Lantz,* No. 03-CV-1520, 2005 WL 3465846, at *5 (D. Conn. Dec 12, 2005) (holding that persistent complaints of "lower back pain caused by herniated, migrated discs [and] sciatica ..." leading to severe pain constitutes a serious medical need.).

16      In presenting this argument, defendants fail to address plaintiff's migraine headaches, which can also constitute a serious medical need. *Moriarity v. Neubold,* No. 02-CV-1662, 2004 WL 288807, at *2 n. 2 (D.Conn. Feb. 10, 2004) (suggesting plaintiff's migraine headaches constituted a serious medical need warranting Eighth Amendment protection since they can be "extremely painful and debilitating"); *O'Bryan v. Sedgwick County,* No. 98-3308, 2000 WL 882516, at *5 (D.Kan. June 12, 2000) (assuming plaintiff's migraine headaches, for which he was prescribed medication, was a serious medical need under the Eighth Amendment); *but see Rodriguez v. Mercato,* No. 00 Civ. 8588, 2002 WL 1997885, and *2-3, 8 (S.D.N.Y. Aug, 28, 2002) (migraines and back pain not "sufficiently serious" to implicate the Eighth Amendment)

#### c) *Ear Pain*

As is true of back pain, the cases addressing the issue of whether an ear condition, including an infection, may constitute a serious medical need for purposes of the Eighth Amendment are similarly equivocal and fact-specific. *Compare Duffield v. Jackson,* No. CIV-07-90-R, 2007 WL 4210863, at *13 (W.D.Okla. Nov.27, 2007) (assuming that the plaintiff's ear infection, and ear pain was a sufficiently serious condition under the Eighth Amendment); *Golden v. Berge,* No. 03-C-0403, 2003 WL 23221483, at *6 (W.D.Wis. Sept.25, 2003) (finding that plaintiff's allegation that he suffered severe pain in his ear as a result of an ear infection was sufficient to suggest that he had a serious medical need) *with Feazell v. Augusta County Jail,* 401 F.Supp. 405, 407 (D.Va.1975) (ear infection found not to constitute a serious medical need for constitutional purposes). Given this conflict, and resolving all ambiguities in plaintiff's favor, I am unable to conclude, as defendants argue, that plaintiff's ear pain did not constitute a serious medical need.

#### 2. *Deliberate Indifference*

**\*11** Even assuming that any of plaintiff's medical conditions arises to the level of a serious medical need, the record nonetheless is devoid of evidence from which a reasonable factfinder could conclude that defendants were indifferent to that need. A review of plaintiff's medical records from both Southport and Auburn, which are comprehensive, fail to substantiate plaintiff's claim that his complaints were ignored and medical treatment was withheld. Instead, those records reveal at times intense regimens of testing, prescription of medication, use of physical therapy, and other strategies employed by prison medical officials in an effort to address plaintiff's conditions. The records also show that during the relevant periods he was seen frequently by medical staff at Southport and Auburn. Particularly given the extent of efforts on the part of medical personnel at those facilities plaintiff's allegations, even when liberally construed, fall far short of demonstrating indifference by prison officials to his medical needs.

Plaintiff's quarrel with the medical treatment received at Southport appears to center upon his disagreement with chosen courses of treatment and the refusal of prison nurses and nurse practitioners to honor his request to be seen by a prison physician. Unfortunately for the plaintiff, mere disagreement by a prison inmate with a prescribed course of treatment does not provide a basis to find a violation of inmate's rights under the Eighth Amendment. *Estelle,* 429 U.S. at 105-06, 97 S.Ct. at 201-02; *Chance,* 143 F.3d at 703; *Ross v. Kelly,* 784 F.Supp. 35, 44 (W.D.N.Y.), *aff'd,* 970 F.2d 896 (2d Cir.), *cert. denied,* 506 U.S. 1040, 113 S.Ct. 828, 121 L.Ed.2d 698 (1992). Determinations made by medical providers within their discretion are given a "presumption of correctness" when it concerns the care and safety of patients. *Perez v. County of Westchester,* 83 F.Supp.2d 435, 440 (S.D.N.Y.2000) (citing *Kulak v. City of New York,* 88 F.3d 63, 77 (2d Cir.1996)). As for plaintiff's claims that he should have been permitted to see a doctor at his insistence, it should be noted that the Eighth Amendment, while prohibiting cruel and unusual punishment, does not guarantee a prison inmate unfettered access, at his or her insistence, to a prison physician. *See Wandell v. Koenigsmann,* No. Civ.A. 99-8652, 2000 WL 1036030, at *3 (S.D.N.Y. July 27, 2000) (indicating that as long as the medical care provided was adequate, there is no Eighth Amendment violation); *Church v. Hegstrom,* 416 F.2d 449, 450-51 (2d Cir.1969) (maintaining that medical professionals have wide discretion in treating prisoners, and section 1983 was not designed to permit the federal courts to sit as the final arbiter of the ordinary medical practices of state prisons). In this instance the record reflects that plaintiff was seen at appropriate intervals by medical personnel at Southport, and that those personnel, utilizing their discretion, determined whether it was necessary for the plaintiff to be seen by a physician. Accordingly, the record yields no evidence from which a factfinder could conclude that medical officials at Southport were deliberately indifferent to plaintiff's medical needs.

**\*12** Turning to his period of incarceration at Auburn, Mendoza asserts that while there, Dr. Kooi treated him in a "poor manner" and he was unhappy with Dr. Kooi's conservative course of treatment. Defendants' Motion (Dkt. No. 53-4) Exhibit 1, 54:3-7. Plaintiff also disagreed with the reduced level of pain medication prescribed for him by Dr. Kooi. *Id.* at 45:13-46:17. The records reveal that Dr. Kooi examined the plaintiff on eleven separate occasions over a sixteen month period, and additionally referred him to an audiologist, a neurologist, and a physical therapist, and requested repeat MRI testing of plaintiff's back. Kooi Aff. (Dkt. No. 53-6) ¶¶ 21, 24, 29, 33, 34, 39, 45, 50, 54, 56, 59, 65, 67. In addition, Dr. Kooi prescribed for the plaintiff a range of different pain and anti-inflammatory medications in order to find

Case 9:16-cv-00717-TJM-TWD    Document 35    Filed 11/28/17    Page 172 of 310

which medications provided him the most relief for his conditions, and continued to monitor his progress at regular intervals.

The question of what diagnostic techniques and treatments should be administered to an inmate is a "classic example of a matter for medical judgment"; accordingly, prison medical personnel are vested with broad discretion to determine what method of care and treatment to provide to their patients. *Estelle,* 429 U.S. at 107, 97 S.Ct. at 293; *Chance,* 143 F.3d at 703; *Rosales v. Coughlin,* 10 F.Supp.2d 261, 264 (W.D.N.Y.1998). Moreover, plaintiff's disagreement over the level of pain medication, without more, is insufficient to avoid dismissal of the plaintiff's claim; "[r]ather, to prevail on a claim involving choices between alternative course of treatment, a prisoner must show that the chosen course of treatment 'was medically unacceptable under the circumstances,' and was chosen 'in conscious disregard of an excessive risk to [the prisoner's] health.' " *Toguchi v. Chung,* 391 F.3d 1051, 1058 (9th Cir.2004) (citing and quoting *Jackson v. McIntosh,* 90 F.3d 330, 332 (9th Cir.1996)).

Based upon the foregoing, I find that no reasonable factfinder could conclude that any of the remaining defendants named in plaintiff's complaint were deliberately indifferent to plaintiff's serious medical needs.[17]

[17]    Among plaintiff's complaints is a claim that on or about October 20, 2003 he was administered medication meant for another inmate. Complaint (Dkt. No. 1) Attachment ¶ 12. Because plaintiff has not elaborated regarding the incident, either in his complaint or in his responsive motion papers, and fails to identify the nurse involved, nor does he offer any evidence to indicate that the incident was the result of an intentional act, it appears that at best the matter involves a mistake or negligence which would not suffice to support an Eighth Amendment

claim. *See Hudson v. Clark,* 319 F.Supp.2d 347, 352 (W.D.N.Y.2004); *see also Daniels v. Williams,* 474 U.S. 327, 330-31, 106 S.Ct. 662, 664-65, 88 L.Ed.2d 662 (1986) (stating that mere negligence on the part of state officials is not actionable under section 1983 and does not work a constitutional deprivation by itself).

## IV. *SUMMARY AND RECOMMENDATION*

A thorough review of the comprehensive record now before the court fails to disclose evidence from which a reasonable factfinder could conclude that defendants McGinnis, Burge, and Brandt were personally involved in the constitutional deprivations allegedly experienced by the plaintiff. Additionally, the record is lacking in evidence from which a reasonable factfinder could conclude that defendants Nurse Scobble and Dr. Kooi were deliberately indifferent to plaintiff's serious medical need. Accordingly, it is hereby

RECOMMENDED, that defendants' motion for summary judgment dismissing plaintiff's complaint (Dkt. No. 53) be GRANTED, and that plaintiff's complaint be DISMISSED in its entirety.

NOTICE: pursuant to 28 U.S.C. § 636(b)(1), the parties have ten (10) days within which to file written objections to the foregoing report-recommendation. Any objections shall be filed with the clerk of the court. FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(e), 72; *Roldan v. Racette,* 984 F.2d 85 (2d Cir.1993).

**\*13**  It is further ORDERED that the Clerk of the Court serve a copy of this report and recommendation upon the parties in accordance with this court's local rules.

**All Citations**

Not Reported in F.Supp.2d, 2008 WL 4239760

2006 WL 5400078
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Henry BENITEZ, Plaintiff,

v.

C. STRALEY, et al., Defendants.

No. 01 Civ. 0181(RCC)(RLE).
|
Feb. 16, 2006.

**Attorneys and Law Firms**

Henry Benitez, Malone, NY, pro se.

Benjamin Lee, Assistant Attorney General, New York,
NY, for Defendant.

### REPORT AND RECOMMENDATION

RONALD L. ELLIS, United States Magistrate Judge.

**\*1 To the HONORABLE RICHARD CONWAY
CASEY, U.S.D.J.:**

### I. INTRODUCTION

*Pro se* plaintiff, Henry Benitez ("Benitez"), has brought
this action pursuant to 42 U.S.C. § 1983, alleging
retaliatory acts of thirty-four defendants from the Green
Haven Correctional Facility ("Green Haven") and the
Attica Correctional Facility ("Attica"), and claiming
numerous violations of his constitutional rights. He
has apparently served twenty-six of the defendants.[1]
These defendants, on behalf of themselves and the
unserved defendants, move to dismiss the following
claims under Federal Rule of Civil Procedure ("FRCP")
12(b)(6): conspiracy, retaliation, deprivation of property
without due process, medical indifference, and violation
of procedural due process. Some of the defendants also
move to dismiss claims against them for lack of personal
involvement and on the basis of qualified immunity.
Defendants also move for change of venue. For the
reasons stated below, I recommend that defendants'
motion be **GRANTED,** in part, and **DENIED,** in part.

[1]   Defendants' Memorandum of Law indicates that
twenty-one of the defendants have been served, but
the court record shows executed service receipts for
the following twenty-six defendants: Goord, Bartlett,
Straley, Decicco, Keysler, Schmitt, Artuz, Totten,
Ward, Higley, Selsky, Gunderman, Schneider,
Conway, Corcoran, Miller, Morton, Kelly, Bea,
Sinicki, Surber, Stiles, Williams, Sparhawk, Tucker,
and Dolan.

### II. BACKGROUND

#### A. Factual Background [2]

[2]   The factual background is taken from Benitez's
Statement of Claim. For purposes of this motion, the
allegations are assumed to be true, *see Hishon v. King
& Spaulding,* 467 U.S. 69, 73 (1984), and Benitez's
allegations will be held to a less stringent standard
than a formal pleading drafted by lawyers. *McEachin
v. McGuiness,* 357 F.3d 197, 200 (2d Cir.2004); *Haines
v. Kerner,* 404 U.S. 519, 520 (1972).

Benitez, an inmate first at Green Haven and later at
Attica, alleges numerous false misbehavior reports that
led to disciplinary actions such as confinement to Special
Housing Units ("SHU"), reduction of privileges, and
transfer.

#### 1. May 28 and May 29, 1998 Incidents

On May 28, 1998, as he was taking a "bird bath" (washing
from the waist down) in his cell in H-Block, Benitez
observed Correctional Officer Straley watching him. He
stopped Straley to ask whether she announced "female
on the company" when she entered the cellblock.
Plaintiff's Statement of Claim ("Pl.Claim") ¶¶ 1-2. He
stopped Straley to ask whether she announced "female
on the company" when she entered the cellblock. *Id.* ¶ 3.
Straley told Benitez he could alert the superintendent if
he wanted to complain about a privacy right violation.
*Id.* ¶ 4. Shortly thereafter, Straley and Officer Jones
entered Benitez's cell, frisked him, and left. *Id .* ¶ 5. Two
minutes later, defendants Straley and Sparhawk entered
his cell. *Id.* ¶ 7. Sparhawk forcibly held Benitez down
while Straley asked "Where is the money?" and forced
her fingers into his rectum. *Id.* ¶¶ 8-9. The pain was so
intense that it caused him to push Sparhawk off the bed,
and both defendants ran out of his cell. *Id.* ¶¶ 9-10. Benitez
provided Correctional Officers Artuz, Schneider, Gourd,
and Bartlett with a complaint about this incident, but
believes that no action was taken to investigate.  *Id.* ¶ 14.

Straley filed a misbehavior report against Benitez that alleged lewd exposure, solicitation, threats, and harassment. *Id.* ¶ 12. In the report, she said she had received an anonymous letter that matched Benitez's handwriting, and that while she was walking in cellblock H, she saw Benitez running a mirror up and down the bars of his cell, and that he was naked from the waist down, and masturbating. *Id.* ¶ 12.

**\*2** On May 29, 1998, Benitez overheard Straley telling defendants Gunderman and Surber that he had written the anonymous letter, and that she did not want him to remain in H-block. *Id.* ¶ 13. Five minutes later, Gunderman and Surber entered the cell, ordered Benitez off his bed, and frisked him. *Id.* ¶ 15. While Benitez faced an opposite wall, Surber threw Benitez's personal property, including his walkman, onto the floor. *Id.* ¶ 16. Defendant Ward came to the cell, and asked Surber if any contraband had been found. Surber replied that he was going to take Benitez to another area to be strip-searched and confined in the SHU. *Id.* ¶ 17. After the strip search, Benitez was handcuffed, then Gunderman and Surber repeatedly punched and kicked him while Ward placed him into a chokehold. *Id.* ¶¶ 19-20. Benitez was escorted to the prison clinic for treatment of his complaints of pain in his face, body, and throat. *Id.* ¶ 21. Defendant Schmitt then took Benitez to a cell in G-Block where he was confined without a mattress or bed linen. *Id.* ¶ 22. Thereafter, Ward, Surber, and Gunderman filed two misbehavior reports against Benitez, alleging assault, harassment, and refusing direct orders. *Id.* ¶¶ 23-25.

Benitez filed a complaint regarding the incidents with Ward, Surber, and Gunderman. *Id.* ¶ 30. He told his Tier III hearing assistant, defendant Dicicco, that he needed a copy of his misbehavior report, his mirror, and his complaint, but Dicicco did nothing about it. *Id.* ¶ 32. On May 30, 1998, Benitez made another complaint alleging that Ward, Surber, and Gunderman willfully confiscated his property.[3] *Id.* ¶ 33.

[3]     Benitez's belongings were later returned but he found the items smeared with green paint and his walkman broken. Pl. Claim ¶¶ 38-39. Benitez made a complaint to Artuz, Schneider, Gourd, and Bartlett, but no investigation took place. *Id.* ¶ 40.

### 2. June 1, 1998 Disciplinary Hearing re May 28, 1998 Misbehavior Report

On June 1, 1998, defendant Correctional Officer Totten commenced a disciplinary hearing regarding Benitez's misbehavior report from May 28. Benitez informed Totten that he had not received the required twenty-four hours notice with respect to the misbehavior report, and thus was unable to adequately prepare his defense. *Id.* ¶ 35-36. He also told Totten that he was unable to enter a plea, and the hearing was adjourned. *Id.* ¶ 37. On June 4, Benitez entered a "not guilty" plea. *Id.* ¶ 41-42. On June 15, over Benitez's objections, Totten threatened to remove him from the hearing, and would not allow him to introduce certain evidence, or ask certain questions. *Id.* ¶ 44-45. On June 16, the hearing was extended to June 17. *Id.* ¶ 46. Totten affected the hearing by asking one of the witnesses leading questions. *Id.* ¶ 48. At the conclusion of the hearing, Benitez was found not guilty of solicitation, but guilty of threats, harassment, and lewd exposure, and sentenced to two years of "keep lock" confinement, loss of commissary, packages, and telephone privileges. *Id.* ¶ 49.

**\*3** On August 25, Benitez appealed the determination. The charges of lewd exposure and harassment were affirmed while the charge of prohibited threats was dismissed, and his sentence was reduced by one year. *Id.* ¶ 30-31. Totten knew that Straley had filed these charges in retaliation for Benitez's complaint regarding her infringement on his privacy right. *Id.* ¶ 51.

### 3. June 9, 1998 Disciplinary Hearing re May 29, 1998 Misbehavior Report

On June 3, 1998, Benitez requested certain evidence from Tier III hearing assistant Dolan to prepare for the hearing conference, but no evidence was provided to him. *Id.* ¶¶ 52-53. Morton did not allow Benitez to introduce relevant evidence or to ask certain questions. *Id.* ¶ 55. Benitez was found guilty of all charges; he was given six months confinement in SHU, and loss of packages, commissary, and telephone privileges. *Id.* ¶ 57. Defendant Selsky later affirmed this determination despite Benitez's claims that the hearing was not fair and impartial. *Id .* ¶ 58.

### 4. July 18, 1998 Misbehavior Report and Subsequent Disciplinary Hearing

Benitez was forced to sleep in a cell in G-Block without a mattress or bed linens from May 29, 1998, to August 8, 1998, and defendants Schmitt, Artuz, Schneider, Goord, Bartlett, Totten, Miller, Tucker, and Keysler were aware of, and approved, this conduct. *Id.* ¶ 63. On July 18,

defendant Tucker falsified a misbehavior report against Benitez in retaliation for Benitez's repeated requests for bed linens, a mattress, and hospital care. *Id.* ¶ 60. On July 24, defendant Williams disciplined Benitez at a Tier II hearing for not appearing even though Benitez was not given an opportunity to appear. *Id.*

### 5. October 21, 1998 Incident

On October 21, 1998, defendant Stiles escorted Benitez out of his cell to attend a deposition. Defendant Straley whispered something to Stiles and then entered a room with defendant Maldonado. *Id.* ¶ 65. Benitez was told to move into a holding cell, or "bull pen." *Id.* ¶ 66. Benitez asked why he had to enter the cell, and Maldonado, Straley, and Stiles struck him in the face with handcuffs, cutting his lip, and pushed him into the cell, where he cut his head. *Id.* ¶ 67. Benitez claims he was left in the holding cell for forty-five minutes without medical attention while defendants wrote up false misbehavior reports in retaliation for the misbehavior reports Benitez had filed against defendant Straley. *Id.* ¶ 67. When he was released from the holding cell, Benitez was given a wet towel by Schneider to hide the severity of his injuries. *Id.* ¶ 70. Straley fabricated a misbehavior report charging Benitez with harassment, threats, and refusing an order. *Id.* ¶ 70. Defendant Maldonado also filed a misbehavior report containing various charges. *Id.* ¶ 72. On October 22, Benitez was transferred to the Attica Correctional facility. *Id.* ¶ 73. Benitez claims he was transferred in retaliation for his numerous complaints. *Id.*

### 6. Claims Arising During Plaintiff's Attica Incarceration

**\*4** On October 29, 1998, defendant Schoellkopf commenced a Tier III hearing against Benitez based on the October 21 charges. *Id.* ¶ 75. Schoellkopf denied Benitez the opportunity to present relevant witnesses and evidence. *Id.* ¶¶ 73-82. Benitez was found guilty of all charges, and sentenced to four months of SHU confinement. *Id.* ¶ 83.

On February 12, 1999, Benitez complained that prison guard defendants Kelly, Berbary, and Corcoran were serving cold meals, turning off his cell light, and denying him his daily hour of exercise. *Id.* ¶ 86. No action was taken to investigate this complaint. [4] *Id.* On February 22, defendant Rademacker refused to give Benitez breakfast. When Benitez asked him what his name was, Rademacker

stated that Benitez would not be around long enough to find out. *Id.* ¶ 88. Five minutes later, defendant Acquard threw a bucket of water at Benitez and stated "that was [his] ticket out of here." *Id.* ¶ 89. Defendants Corcoran and Sassy escorted Benitez out of his cell, where there was a guard holding a video recorder. *Id.* at 90. Sassy removed Benitez's prescribed glasses, and Corcoran told Benitez to be quiet when he kept asking for his glasses. *Id.* ¶ 91. Then, Corcoran and Sassy forced Benitez wrists inward against the edges of his handcuffs, causing a severe cut on both wrists, and falsified reports claiming that Benitez's wrist injuries were not serious. *Id.* ¶¶ 92-94. On February 22, Benitez complained about his lost glasses and the unlawful treatment, but no action was taken.

[4]    The complaint is unclear whether it was only Benitez who received a cold meal, or whether meals were being served, and he was denied his provision.

On the same date, defendant Rademacker entered Benitez's cell and destroyed his typewriter, legal documents, law books, tapes, army jacket, and other personal items. *Id.* ¶ 98. Defendant Acquard also filed a complaint against Benitez alleging assault on staff, unhygienic acts, and refusing orders. *Id.* ¶ 99. Acquard claims in the misbehavior report Benitez threw a bucket of an unknown substance on him. *Id.*

On February 23, defendant Sinicki served Benitez with a copy of Acquard's misbehavior report and refused to read it to Benitez who could not read it without his glasses. *Id.* ¶ 100. During the February 24 hearing, Benitez could not read the complaint, and could not prepare an adequate defense. *Id.* ¶ 101. On March 4, Benitez was found guilty of the assault alleged in Acquard's report, and sentenced to five years SHU confinement without commissary, packages, and telephone privileges. *Id.* ¶ 108.

### B. Procedural Background

On August 14, 2001, defendants filed a motion to dismiss pursuant to 42 U.S.C. § 1997(e) of the Prison Litigation Reform Act ("PLRA"), claiming that Benitez had failed to exhaust all of his administrative remedies prior to seeking relief in federal court. District Judge Richard C. Casey referred this matter to the undersigned. This Court recommended that the motion to dismiss be granted in favor of defendants pursuant to FRCP 12(b)(6). *Benitez v. Straley,* 2002 WL 485692 (S.D.N.Y. Mar 27, 2002). Judge Casey adopted the Report and Recommendation

2006 WL 5400078

with modifications, holding that the dismissal was proper not under FRCP 12(b)(6), but under FRCP 12(b)(1), for failing to exhaust administrative remedies. *Benitez v. Straley,* 2002 WL 31093608 (S.D.N.Y. Sept. 18, 2002).

**\*5** Benitez filed an appeal claiming that exhaustion under the PLRA was not jurisdictional. *See Richardson v. Goord,* 347 F.3d 431, 433 (2d Cir.2003) (A prisoner's failure to exhaust grievances internally does not leave federal court without subject matter jurisdiction). The Second Circuit remanded for further consideration. *Benitez v. Straley,* 94 Fed. Appx. 854 (2d Cir.2004). Defendants have reinstated their motion to dismiss, and have requested a change of venue from the Southern District of New York to the Western District of New York.

### III. DISCUSSION

**A. Standard of Review for Motion to Dismiss**
When ruling on a 12(b)(6) motion, the Court confines its evaluation to the facts stated in the complaint. The Court "may dismiss the complaint only where it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Sykes v. James,* 13 F.3d 515, 519 (2d Cir.1993) (internal quotations and citations omitted). Furthermore, a *pro se* plaintiff's pleading must be construed liberally in a light most favorable to him "to raise the strongest argument that they suggest." *Graham v. Henderson,* 89 F.3d 75, 79 (2d Cir.1996) (*quoting Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994)). The Court will grant a motion to dismiss pursuant to 12(b)(6) if, taking the plaintiff's allegations as true, "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45-46 (1957); *see also Henderson v. Doe,* 1999 WL 378333, at \*1 (S.D.N.Y. June 10, 1999).

**B. Exhaustion**
Defendants allege that Benitez's claim must be dismissed because he failed to exhaust his administrative remedies as required by the PLRA, 42 U.S.C. § 1997e(a). The PLRA applies to civil rights claims and requires a prisoner to exhaust all administrative channels "as are available" before bringing a claim to federal court. "To be 'available' under the PLRA, a remedy must afford 'the possibility of some relief for the action complained of.' " *See Abney*

*v. McGinnis,* 380 F.3d 663, 667 (2d Cir.2004) (*quoting Booth v. Churner,* 532 U.S. 731, 738 (2001)). Further, a prisoner is not required to file numerous grievances after the promised relief is not provided. *Id.* at 668-69.

The PLRA's exhaustion requirement applies to "all inmate suits about prison life, whether involv[ing] general circumstances or particular episodes, and whether alleg[ing] excessive force or some other wrong." *Porter v. Nussle,* 534 U.S. 516, 532 (2002). Although the exhaustion requirement is not jurisdictional, *Richardson,* 347 F.3d at 433-34, a defendant may raise exhaustion as an affirmative defense. *See Johnson v. Testman,* 380 F.3d 691, 696 (2d. Cir.2004) (finding that exhaustion is an affirmative defense that must be asserted in order not to be waived). As such, the burden is on the defendant to prove that the plaintiff failed to exhaust. *See McCoy v. Goord,* 255 F.Supp.2d 233, 248 (S.D.N.Y.2003). Prison officials are in a better position to produce documents that set forth prison administrative procedures and demonstrate an inmate's non-exhaustion. *Id.*

**\*6** Defendants have proffered an affidavit from Karen Bellamy, Assistant Director of Inmate Grievance Program at New York State Department of Correctional Services and a declaration from Benjamin Lee, Assistant Attorney General. *See* Karen Bellamy Affidavit in Support, August 14, 2001 ("Bellamy Aff."); Lee Declaration in Support of Motion to Dismiss, March 28, 2005 ("Lee DecL"). Bellamy states that the claims Benitez is alleging in this suit may be grieved through the Inmate Grievance Program, but she has no records from Benitez to the Central Office Review Committee of any appeals made while he was at the Green Haven facility except for an incident where he was denied envelopes. Bellamy Aff. ¶ 5. Lee attaches a number of grievances Benitez made at Attica which include many of the same facts alleged in Benitez's complaint, including an incident in which an officer took Benitez's glasses and threw them on the floor and another in which his property was confiscated. Lee Decl., Exh. A.

When a prisoner challenges a defendant's contention that he failed to exhaust, a three-part inquiry is appropriate: (1) Were administrative remedies "available" to the prisoner? (2) Did the defendant forfeit the affirmative defense of non-exhaustion by failing to raise or preserve it, or did the defendant's actions inhibit the inmate such that the defendant should be estopped from raising the plaintiff's failure to exhaust as a defense? (3) Are there

"special circumstances" to justify the prisoner's failure to exhaust? *Hemphill v. New York,* 380 F.3d 680, 686 (2d Cir.2004). Upon a finding that administrative remedies were unavailable or that a defendant's actions inhibited an inmate from exhausting those remedies, the analysis of special circumstances is unnecessary. *See id.*

**1. Availability of Administrative Remedies**

Benitez asserted that he filed six grievances with the Inmate Grievance program in order to exhaust his administrative remedies and comply with the PLRA. *See* Benitez Affidavit in Opposition to Defendant's Motion for Relief ("Benitez Aff") ¶¶ 5-13. His explanation for his failure to further exhaust is that his grievances were resolved informally, that he was satisfied with the resolution, and subsequently, he signed the informal resolution letters. *Id.* ¶¶ 5-10.

| **Filed Complaint with Grievance Program** | **Resolved Informally** |
| --- | --- |
| May 28, 1998-1st Grievance | June 5, 1998 |
| May 29, 1998-2nd Grievance | June 8, 1998 |
| June 3, 1998-3rd Grievance | June 11, 1998 |
| July 18, 1998-4th Grievance | July 27, 1998 |
| October 21, 1998-5th Grievance | October 22, 1998 |
| February 22, 1999-6th Grievance | February 26, 1999 |

Benitez claims that these informal resolutions were not implemented and later denied, but he was notified after the deadline for timely filing of an appeal had expired. *Id.* ¶ 11. He also notes that he cannot provide copies of the letters as they were confiscated by defendants. *Id.* at 6.

**\*7** This Court's first Report and Recommendation did not consider this argument because it appeared to contradict statements in Benitez's complaint to the effect that his appeals had been "denied ." *Benitez,* 2002 WL 485692, at *3. As Judge Casey stated in his opinion and order adopting and modifying that Report and Recommendation, Benitez then submitted objections to that Report and Recommendation explaining that he did not mean his pleadings to imply that he had filed appeals which were denied, but that he had filed grievances, which were closed by signing the informal resolution letters, that those resolutions were not implemented, and that no provisions allowed for further review. *See Benitez,* 2002 WL 31093608, at *2. The Court finds this explanation sufficient, especially given the detail Benitez has provided. The fact that defendants bear the burden of proof here alleviates some of the pleading particularity requirements. *McCoy,* 255 F.Supp.2d at 248.

Defendants have not responded to Benitez's claim that no provisions allowed for further exhaustion of some of his claims. Rather than point to specific provisions to refute his statement, defendants simply note that the record does not establish that Benitez appealed the grievances for which they have provided documentation. Defendants' Reply Memorandum of Law in Further Support of Their Motion to Dismiss the Complaint and Motion for Change of Venue ("Def.Reply") at 6. However, one attachment they have submitted states that the glasses-related grievance could not be appealed, that the grievance is closed, and "satisfied the necessity of 'Exhaustion of Remedies.' " *Id.* (pages unmarked). Furthermore, while an attachment pertaining to one of Benitez's property-related grievances states that Benitez needed to file a claim with the Business Office for the loss of his property, the form also indicates that Benitez notified defendants that he needed to know the name of the officer in order to take further action. *Id.* Rather than meet the defendant's burden to establish that Benitez has not exhausted administrative remedies, this submission supports Benitez's claim that further remedies were unavailable either because there was no route of

further exhaustion, or defendants took actions which kept Benitez from pursuing additional remedies.

Where a favorable informal ruling is never implemented, or informal resolutions were obtained, exhaustion may not be required. *Abney,* 380 F.3d at 668-69; *Marvin v. Goord,* 255 F.3d 40, 43 n. 3 (2d Cir.2001). *See Thomas v. Casslebery,* 315 F.Supp.2d 301, 304 (W.D.N.Y.2004) (granting summary judgment on exhaustion issue because there was no evidence that informal complaints had resolved matters in the plaintiff's favor); *Muhammad v. Pico,* 2003 WL 21792158, *8 n. 23 (S.D.N.Y. Aug. 5, 2003) (same). Accepting Benitez's statements, it appears his grievances were resolved informally, there was no implementation of the resolution, and either he was not given notice of any grievance denials in a timely fashion or there were no provisions providing for further review, making further administrative remedies unavailable.

### 2. Estoppel

**\*8** Benitez alleges that prison officials prevented him from exhausting his administrative remedies by subjecting him to false disciplinary charges. Pl. Claim ¶¶ 11-12, 23, 60, 71-73. His personal property and legal documents were destroyed or confiscated. *Id.* ¶ 16. In retaliation for his complaints, defendants assaulted him on two occasions, and one of the beatings resulted in a six day hospital stay. *Id.* ¶¶ 19-20, 59, 67. Additionally, he contends that he was transferred to Attica in order to preclude him from pursuing his complaints. *Id.* ¶ 73.

Under these facts, defendants are estopped from asserting an exhaustion defense because their actions and the environment of retaliatory harassment attempted to inhibit Benitez from pursuing his claims. *See Ziemba v. Wezner,* 366 F.3d 161, 162-64 (2d Cir.2004) (vacating and remanding where the district court failed to consider claim that plaintiff was precluded from exhaustion of available remedies because prison officials beat him, threatened him, denied him grievance forms and writing implements, and transferred him to another correctional facility). *See also Rivera v. Pataki,* 2005 WL 407710, at *11 (S.D.N.Y. Feb. 7, 2005) (prison officials were estopped from raising failure to exhaust as an affirmative defense because they told the prisoner his grievances were untimely).

Given the finding that administrative remedies were unavailable to Benitez and that defendants are estopped from raising exhaustion because their actions inhibited

Benitez from pursuing his claims, an assessment of whether special circumstances existed is unnecessary. Benitez exhausted all possible administrative options available to him. Defendant's motion to dismiss pursuant to PLRA, 42 U.S.C. § 1997e(a) should be **DENIED.**

### C. Conspiracy Claim

Benitez claims that several of the guards from the Green Haven facility conspired to violate his civil rights by covering up unlawful behavior and falsifying misbehavior reports. *See* Pl. Claim ¶¶ 65-70 (alleging conspiracy to physically abuse Benitez in retaliation for a report made against a guard). Defendants contend that Benitez's conspiracy allegations are only conclusory and non-specific allegations, and should be dismissed. [5]

[5]    Defendants argue that plaintiff has not adequately stated a conspiracy claim under 42 U.S.C. § 1985(3), which prohibits conspiracies undertaken for the purpose of depriving a person or class of equal protection or privileges under the law. Defendant's Memorandum of Law in Support of their Motion to Dismiss the Complaint and Motion for Change of Venue ("Def.Mem.") at 15-17; *see Jews for Jesus, Inc. v. Jewish Community Relations Council of New York,* 968 F.2d 286, 290-91 (2d Cir.1992). However, Benitez has claimed conspiracy under 42 U.S.C. § 1983. Pl. Claim ¶¶ 65-70; Plaintiff's Affidavit and Memorandum of Law In Opposition to Defendants' Motion For Relief ("Pl. Aff. and Mem.") ¶ 2.

In order to allege conspiracy under § 1983, Benitez must show: "(1) an agreement between two or more state actors or between a state actor and a private entity; (2) to act in concert to inflict an unconstitutional injury; and (3) an overt act done in furtherance of that goal causing damages." *Pangburn v. Culbertson,* 200 F.3d 65, 72 (2d Cir.1999). In order to survive a motion to dismiss, Benitez must provide specific instances of misconduct and details such as time and place since mere "conclusory, vague, or general allegations that the defendants have engaged in a conspiracy to deprive the plaintiff of his constitutional rights are insufficient to state a claim." *Crespo v. New York City Police Comm'r,* 930 F.Supp. 109, 118 (S.D.N.Y.1996); *see also Dwares v. City of New York,* 985 F.2d 94, 100 (2d Cir.1993) (finding the elements of a conspiracy to assault "skinheads" by the police were sufficiently pled to defeat a motion to dismiss). However, the Second Circuit has "recognized that such 'conspiracies are by their very nature secretive operations,' and may

WESTLAW    © 2017 Thomson Reuters. No claim to original U.S. Government Works.    6

2006 WL 5400078

have to be proven by circumstantial, rather than direct, evidence." *Pangburn,* 200 F.3d at 72 (*quoting Rounseville v. Zahl,* 13 F.3d 625, 632 (2d Cir.1994)).

**\*9** Benitez asserts that Straley, Stiles, and Maldonado conspired to impose an unconstitutional injury on his person for the numerous official misconduct complaints that he had filed against Straley and Fitzpatrick. Pl. Claim ¶¶ 64-70. His primary evidence of conspiracy is his allegation that on October 21, 1998, he witnessed a conversation between defendants Straley, Stiles, and Maldonado, and thereafter experienced an assault by those defendants. *Id.* ¶ 64-68. Benitez has provided definite allegations of facts from which a conspiracy between Straley, Stiles, and Maldonado could be inferred. He has provided detailed incidents of misconduct and provided specifics as to time and place. Although he could not hear the defendants' conversation on October 21, concerted action immediately following that conversation connects the conversation to the action. The fact that Benitez's allegations are supported by circumstantial evidence, rather than direct evidence, does not diminish his claim. "[A] plaintiff usually does not have access to the facts surrounding a conspiracy claim and the conspiracies are seldom proven with direct evidence ..." *Crespo,* 930 F.Supp. at 118. The evidence proffered by Benitez sufficiently withstands a 12(b)(6) motion; therefore, defendants' motion to dismiss should be **DENIED.**

## D. Retaliation

To set forth a claim of retaliation, Benitez must demonstrate that the "(1) speech at issue was protected; (2) defendants took adverse action against [him]; and (3) that there was a causal connection between the protected speech and the adverse action." *Davis v. Goord,* 320 F.3d 346, 352 (2d Cir.2003) (citations omitted). Benitez must show a high level of factual detail that the retaliatory action would not have been taken "but for" the exercise of his legal rights. *Baker v. Zlochowon,* 741 F.Supp. 436, 439 (S.D.N.Y.1990). Moreover, retaliation claims from prisoners need to be reviewed with "caution" because "virtually any adverse action taken against a prisoner by a prison official-even those otherwise not rising to the level of a constitutional violation-can be characterized as a constitutionally proscribed retaliatory act." *Davis,* 320 F.3d at 352 (citations omitted).

Benitez alleges that he reported wrongdoings by prison officials. This qualifies as protected speech and satisfies the first element. *Id.* at 352-53. After making these reports, Benitez suffered numerous retaliatory actions by prison officials, including falsified reports, SHU confinement, and transfer. Pl. Claim ¶¶ 60 (false misbehavior reports filed in retaliation for repeated request for bed linens and a mattress), 71 (false misbehavior reports filed in retaliation for making a complaint against Straley regarding her privacy infringements), 73 (retaliatory transfer based on various complaints), 88 (complaining of cold breakfasts led to a retaliatory transfer), 99 (false misbehavior reports in retaliation for a complaint). "Retaliatory conduct that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights constitutes an adverse action for a claim of retaliation." *Davis,* 320 F.3d at 353 (citations omitted). Courts have found actions similar to those alleged by Benitez sufficient to constitute an adverse action and survive a motion to dismiss. *See, e.g., Hernandez v. Goord,* 312. F.Supp.2d 537, 544-45 (S.D.N.Y.2004) (physical attacks and threats on plaintiff's life); *Davis,* 320 F.3d at 353. ("burying" grievances, discussing grievances with another prison official, ordering a "retaliatory cell search"); *Morales v. Mackalm,* 278 F.3d 126, 132 (2d Cir.2002) (transfer to psychiatric facility), *abrogated on other grounds by Porter v. Nussle,* 534 U.S. 516 (2002).

**\*10** The third element in a retaliation claim presents unique problems in a prison context, where an alleged retaliatory action, such as a prison transfer, could also be taken for proper motives. In *Lowrance v. Achtyl,* 20 F.3d 529, 535 (2d Cir.1994), the Court assumed *arguendo* that the plaintiff had established that the officials had a retaliatory motive in bringing charges, but then affirmed the dismissal of his complaint, concluding that his admission of the misbehavior described in the charge allowed the inference that the disciplinary charges would have been brought even in the absence of improper motives. *Id.* The inmate thus has an additional burden. His "claims must *render it unlikely* that the prison official would have performed the act absent a retaliatory purpose." *Rivera v. Senkowski,* 62 F.3d 80, 86 (2d Cir.1995) (emphasis added). *See Nicholas v. Tucker,* 89 F.Supp.2d 475, 479-81 (S.D.N.Y.2000). Benitez's allegations meet the standard as articulated in these cases. Many of his allegations describe incidents that could not have any proper motive. Those allegations which involve the filing of misbehavior reports sufficiently include evidence showing a retaliatory animus to survive a motion to dismiss.

Furthermore, a closeness in timing between an official's actions and a plaintiffs protected conduct can support an inference that there is a connection between the incidents. *Baker,* 741 F.Supp. at 440. While the timing is not clear with respect to every allegation, for some incidents Benitez has indicated that the conduct and retaliation occurred on the same day or within a number of days. Pl. Claim ¶ 86-93, 96-99. These allegations link his protected activity with the adverse actions. Therefore, Benitez has sufficiently proffered facts which link his protected activity with the adverse actions he suffered, satisfying the third element in *Davis.*

Taking into account Benitez's *pro se* status, the Court finds that he has adequately set forth a claim of retaliation and has met FRCP 8(a)'s requirement of a "short and plain" statement of his claim. *See Hernandez,* 312 F.Supp.2d at 544-45; *Davis,* 320 F.3d at 352-53. He should be given an opportunity to present more facts in order to support his claim. *See Morales,* 278 F.3d at 131. Defendants' motion to dismiss the retaliation claims should be **DENIED.**

**E. Deprivation of Property Without Due Process**

Benitez alleges that on May 28, 1998, Straley confiscated documents and a mirror from his cell. Pl. Claim ¶ 9. Benitez claims that on May 29, Surber broke his walkman and his typewriter. *Id.* at 16. Benitez also alleges that Ward, Surber, and Gunderman confiscated all of his personal state-issued property and returned the property on June 2, smeared with green oil paint. In addition, Benitez claims that his walkman was smashed, and his beard trimmer, personal photographs, and legal documents were missing. *Id.* ¶¶ 38-39.

 *11 Defendants assert that Benitez has failed to state a claim of a due process property deprivation in violation of the Fifth Amendment, because "there is no constitutional right prohibiting prison officials from confiscating a prisoner's personal property. The constitutional violation arises only if they confiscate that property without due process of law." *See Jackson v. Fed. Bureau of Prisons,* 1994 WL 282086, at *2 (S.D.N.Y. June 22, 1994). Defendants also assert that mere allegations of property deprivation do not by themselves state a constitutional claim under the Due Process Clause. *Id.* When a deprivation is "random and unauthorized," and thus renders a pre-deprivation hearing impossible, due process requires a post-deprivation hearing. *See DiBlaso*

*v. Novello,* 344 F.3d 292, 302 (2d Cir.2003), **cert denied,** 541 U.S. 988 (2004).

While defendants acted under color of law in the deprivation of Benitez's property, Benitez has been afforded and has availed himself of due process. After the confiscation of his property, Benitez filed numerous inmate grievance complaints which were resolved when the Inmate Grievance Program (IGP) provided Benitez with Informal Grievance Recommendation Letters (IGRL's), which contained recommendations of relief. Benitez was satisfied with the recommended relief and informally resolved the grievances. Pl. Aff and Mem. ¶¶ 5-15. Therefore, assuming that Benitez's property was taken by defendants, Benitez was afforded an adequate post-deprivation remedy under state law to redress his loss. *See Gill v. Stella,* 845 F.Supp. 94, 101 (E.D.N.Y.1994). Since there is no due process violation when a post-deprivation remedy is available, defendants' motion to dismiss Benitez's due process claim should be **GRANTED.**

**F. Medical Indifference**

Punishments which are incompatible with "the evolving standards of decency ... or involve the unnecessary and wanton infliction of pain" are repugnant to the standards established by the Eighth Amendment, which prohibits cruel and unusual punishment. *Estelle v. Gamble,* 429 U.S. 97, 102-03 (1976). Denial of medical care may result in pain and suffering which does not serve any penological purpose. *Gregg v. Georgia,* 428 U.S. 153, 173 (1976). To establish a claim, a prisoner must show "deliberate indifference to serious medical needs. The indifference is manifested by ... prison guards in intentionally denying or delaying access to medical care." *Estelle,* 429 U.S. at 104-05. Medical indifference has both an objective and a subjective element. *Id.* Benitez must show that: (1) the alleged deprivation of care objectively was "sufficiently serious;" and (2) the defendants acted with a "sufficiently culpable state of mind." *Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994). Thus, the injury in question must reach a certain threshold of seriousness before triggering a constitutional right to treatment. *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998). To survive a motion to dismiss on a medical indifference claim, a plaintiff must set forth allegations of chronic pain or an injury that imposes a significant strain on daily activities. *Id.*

 *12  Benitez claims Healy, Maldonado, and Stiles were indifferent to his medical needs by refusing to render aid to a cut on his head. Pl. Claim ¶¶ 68-70. Benitez also claims Higley, Corcoran, and Sassy were indifferent toward his wrist injuries. *Id.* ¶¶ 93-94. Benitez has failed to demonstrate that these injuries were sufficiently serious. They are not permanent and there is no claim that they affect his daily activities. There is no indication that the alleged injuries required stitches or wrist braces. Since Benitez has failed to meet the objective standard for an Eighth Amendment claim, the defendants' motion to dismiss the claim should be **GRANTED.**

### G. Personal Involvement

Defendants assert that Benitez failed to assert personal involvement of Schneider, Goord, Artuz, Bartlett, Schmitt, and Keyser in any of the challenged actions. Personal involvement cannot be established through *respondeat superior.* *See Walker v. Pataro,* 2002 WL 664040, at *10 (S.D.N.Y. Apr. 23, 2002). In the absence of personal involvement, Benitez may also hold a supervisory official responsible through evidence that "(1) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong; (2) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a custom or policy; (3) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts; or (4) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring." *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995).

### 1. Defendants Schneider, Goord, Artuz, and Bartlett

Benitez mailed complaints to Schneider, Goord, Artuz, and Bartlett alerting them to wrongdoing by prison officials. Pl. Claim ¶¶ 14, 33, 40. He argues that these defendants were therefore aware of wrongdoing and failed to investigate the incidents. *Id .* He alleges that they either exhibited deliberate indifference to the rights of inmates by failing to act on information, or did nothing to remedy the wrong, when they had knowledge of an unconstitutional practice. Therefore, Benitez asserts that receipt of his letter and the defendants' inaction imposes liability.

The mere assertion that supervisory officials ignored an inmate's letter, however, does not make such officials culpable. *Walker,* 2002 WL 664040, at *11-13; *Bolanos v. Coughlin,* 1993 WL 762112, at *24-25 (S.D.N.Y. Oct. 15, 1993); *Candelaria v. Coughlin,* 787 F.Supp. 368, 373 (S.D.N.Y.), *affd,* 979 F.2d 845 (2d Cir.1992). Except for any general knowledge based on Benitez's alleged letter, the facts alleged do not meet the criteria in *Colon.* 58 F.3d at 873. Benitez fails to state a claim, and defendants' motion to dismiss Benitez's personal involvement claims with respect to these supervisory defendants should be **GRANTED.**

### 2. Defendants Schmitt and Keyser

 *13  Benitez alleges that Schmitt and Keyser willfully ignored his request for a mattress and linens for his cell in G-Block, and that he slept on the floor of his cell from May 29, 1998, to August 8, 1998. Pl. Claim ¶¶ 62-63. Benitez claims that these conditions exacerbated existing medical problems such as "asma-bronchitis, and ongoing extreme pain in his back, head, neck, rib cage area, arms, and legs," *id.* ¶ 63, and constitute an Eighth Amendment violation of cruel and unusual punishment. Schmitt is alleged to have been involved in creating these conditions. *Id.* ¶ 22. Benitez claims he notified Keyser of the conditions, requested a mattress and linens, and Keyser declined to assist. *Id.* ¶ 62.

As the Supreme Court has explained, "The Constitution ... does not mandate comfortable prisons ... and only those deprivations denying the minimal civilized measure of life's necessities ... are sufficiently grave to form the basis of an Eighth Amendment violation." *Wilson v. Seiter,* 501 U.S. 294, 298 (1991) (citations and internal quotations omitted). "[A]n inmate must show (1) a deprivation that is objectively, sufficiently serious that he was denied the minimal civilized measure of life's necessities, and (2) a sufficiently culpable state of mind on the part of the defendant official, such as deliberate indifference to inmate health or safety." *Moore v. Gardner,* 199 F.Supp.2d 17, 36-37 (W.D.N.Y.2002).

The Second Circuit has found that prisoners claiming detention under very cold temperatures and without bedding can make out an Eighth Amendment claim of cruel and unusual punishment. *See, e.g., Gaston v. Coughlin,* 249 F.3d 156, 166 (2d Cir.2001) (reinstating Eighth Amendment claims of frigid temperatures dismissed by district court); *Channer v. Mitchell,* 43 F.3d 786, 788 (2d Cir.1994) (denying motion to dismiss where prisoner alleged that officer had required him to spend two

nights in a holding cell without bedding). Accordingly, where prisoners have made allegations that could rise to such unconstitutional conditions, but where some facts remain unclear, courts in this Circuit have allowed their claims to continue. *See, e.g, Moore,* 199 F.Supp. at 37-38 (denying summary judgment where plaintiff alleged he was kept in a cold, drafty cell for three weeks without sheets and with only one blanket); *Beckford v. Portuondo,* 151 F.Supp.2d 204, 212-13 (N.D.N.Y.2001) (denying motion for summary judgment where plaintiff alleged he was forced to sleep on cold steel without bedding because he refused to cut a fingernail); *Maguire v. Coughlin.* 901 F.Supp. 101, 104-05 (N.D.N.Y.1995) (denying summary judgment where plaintiff alleged he was confined in a cold cell without bed linens). *Compare with Brown v. McElroy,* 160 F.Supp.2d 699, 706 (S.D.N.Y.2001) (dismissing claim of unconstitutional conditions where plaintiff alleged he was kept in an extremely cold cell without clean linens, toiletries, or clean clothing, but admitted he was able to get warm with some blankets).

**\*14** Here, Benitez alleges he had no mattress or linens at all. He also alleges that he was denied other protective clothing. Pl. Claim ¶ 22 (stating he was confined without a mattress, bed linen, or any item other than the t-shirt, jogging shirts, and shower sandals [he] was wearing). While not explicitly stating that this exposed him to cold temperatures, Benitez clearly implies that this is the case. He mentions his skimpy clothing, and asserts that the conditions aggravated his asthma-bronchitis. *Id.* ¶ 22, 63. Under these facts, Benitez has articulated an Eighth Amendment claim. At the same time, he has adequately alleged that Schmitt and Keyser were directly and personally involved in creating or maintaining the conditions at issue. Defendants' motion to dismiss the claims against Schmitt and Keyser should be **DENIED.**

Similarly, Schmitt and Keyser are not entitled to qualified immunity. Qualified immunity is established when:

> "either (a) the defendant's action did not violate clearly established law, or (b) it was objectively reasonable for the defendant to believe that his action did not violate such law." A right is clearly established if (1) the law is defined with reasonable clarity, (2) the Supreme Court or the Second Circuit has recognized the right, and (3) "a reasonable defendant [would] have understood from the existing law that [his] conduct was unlawful.

*Anderson v. Record,* 317 F.3d 194, 197 (2d Cir.2003) (*quoting Young v. County of Fulton,* 160 F.3d 899, 903 (2d Cir.1998)). The threshold question in establishing qualified immunity is assessing whether there has been a constitutional violation of plaintiffs rights. *See Saucier v. Katz,* 533 U.S. 194, 201 (2001). Thereafter, it is necessary to look at each defendant's acts to evaluate whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted; if so, then qualified immunity does not apply. *Hope v. Pelzer,* 536 U.S. 730, 752 (2002). Here, Benitez has articulated a claim of a violation of the Eighth Amendment's prohibition of cruel and unusual punishment and established the personal involvement of Schmitt and Keyser. The Second Circuit had established that this prohibition covers prison conditions such as cold temperatures and lack of a mattress four years before the facts leading to Benitez's case occurred. *Channer,* 43 F.3d at 788. A reasonable officer should have known that to deprive an inmate of a mattress and bed linens for almost three months could violate his constitutional rights.

## H. Due Process

Benitez claims various violations of his due process rights stemming from disciplinary hearings in June, July, and October of 1998, and February of 1999. The following defendants were directly involved in the hearings: Totten, Decicco, Dolan, Morton, Williams, Schoellkopf, and Sinicki; and Selsky affirmed the decisions of the hearings when Benitez appealed.

**\*15** An inmate does not have to be afforded the same procedural safeguards as in a criminal prosecution, but he must be afforded certain minimum rights to meet the due process requirement of the Fourteenth Amendment. *See Espinal v. Goord,* 180 F.Supp.2d 532, 537 (S.D.N.Y.2002) (*citing Edwards v. Balisok,* 520 U.S. 641, 647 (1997)). These rights include: (1) at least twentyfour hours written notice of the disciplinary charges; (2) the permission to call witnesses and present evidence if doing so "would not be unduly hazardous to institutional safety or correctional goals"; (3) a fair and impartial hearing officer; (4) a disciplinary conviction supported by evidence; (5) "a written statement of fact finding that support the disposition as well as the reasons for the disciplinary action taken." *Id.* at 538 (*citing Wolff v. McDonell,* 418 U.S. 539, 566 (1974)).

Benitez v. Straley, Not Reported in F.Supp.2d (2006)

2006 WL 5400078

Benitez alleges the following due process violations: 1) lack of notice of disciplinary charge; 2) refusal to allow witnesses and evidence at hearings; 3) lack of assistance at one hearing; 4) refusal to allow Benitez to attend one of the hearings; 5) undue delay; and 6) biased hearing officer. [6] Though many of the facts remain unclear, at this stage, Benitez's allegations are sufficient to state a claim in the first three areas. The rights implicated by those allegations have also been clearly established, and the defendants involved are not entitled to qualified immunity. The latter three allegations either fail to state a claim for violation of due process or remain unclear in the law, thus entitling defendants to qualified immunity as to those claims.

[6]   Benitez also alleges that there was insufficient evidence to support the decisions of the hearings. In a footnote, defendants argue that this claim fails as to the February 24, 1999 hearing. Def. Mem. at 27, n. 12. The standard for reviewing the sufficiency of evidence in prison disciplinary hearings is "extremely tolerant" and satisfied by "some evidence"; however, the evidence must be "reliable evidence." *Sira v. Morton,* 380 F.3d 57, 69 (2d Cir.2004) (*citing Luna v. Pico,* 356 F.3d 481, 488 (2d Cir.2004), and *Taylor v. Rodriguez,* 238 F.3d 188, 194 (2d Cir.2001)). Despite this standard, Benitez's allegations are sufficient to make out a claim at this stage. The defendants have not challenged his claim as to the earlier hearings. It does appear the decision resulting from the February 1999 hearing was supported by "some evidence," but it is difficult to evaluate whether this evidence is reliable because Benitez's assessment of the hearing was thwarted by both a lack of assistance and an inability to see the videotape shown by the prison officials. Pl. Claim ¶ 106.

### 1. Lack of Notice

A prisoner must have twenty-four hours written notice of charges. *Wolff,* 418 U.S. at 566. If a prisoner is not afforded sufficient time to prepare for a hearing, his constitutional rights may be violated. *Alvarez v. Coughlin,* 2001 WL 118598, at *7 (N.D.N.Y. Feb. 6, 2001) (denying summary judgment on issue of whether plaintiff's trial materials were confiscated which kept him from preparing adequate defense). Furthermore, the notice of charges against him must contain "sufficient factual specificity to permit a reasonable person to understand what conduct is at issue so that he may identify relevant evidence and present a defense." *Sira v. Morton,* 380 F.3d 57, 70-72 (2d Cir.2004) (notice found inadequate). At his June 1998

hearing, Benitez claims that although he was served with the misbehavior report, it was then confiscated and he did not have sufficient time to prepare for the hearing. Pl. Claim. ¶¶ 35, 37, 41-51. The hearing was adjourned to allow Benitez's property to be returned to him, property which apparently included the misbehavior report which had been confiscated. *Id.* ¶ 37. Benitez then alleged that the report lacked sufficient information for him to be clear on the charges. *Id.* ¶ 42.

Defendants argue that because the hearing was adjourned and the misbehavior report returned to allow Benitez time to prepare, there is no violation. Def. Mem. at 23. Defendants do not directly address the issue of whether the report was sufficiently specific but cite a case in which an inmate misbehavior report was considered adequate notice. *See Kingwood v. Coombe,* 1997 WL 323913, at *5 (S.D.N.Y. June 13, 1997). The misbehavior report in that case, however, specified the conduct the inmate had engaged in which constituted a violation. *Id.* at *1. Here, Benitez alleges the particular acts were not described. Pl. Claim ¶ 42. As it appears Benitez either did not have timely notice, and/or the notice was insufficiently detailed, he has adequately claimed a violation of due process. At the same time, the defendants involved in these allegations are not entitled to qualified immunity because an inmate's right to adequate notice of his disciplinary charges has been clearly established since 1974. *See Wolff,* 418 U.S. at 566.

### 2. Refusal to Call Witnesses and Present Evidence
**\*16**   A hearing officer may rightfully refuse to call a witness if the refusal is justified, *see Scott v. Kelly,* 962 F.2d. 145, 146-47 (2d Cir.1992), but the burden is on the prison officials to "prove the rationality of the decision to exclude witnesses." *Moye v. Selsky,* 826 F.Supp. 712, 717 (S.D.N.Y.1993). *See Fox v. Coughlin,* 893 F.2d. 475, 479 (2d Cir.1990); *Bass v. Grottoli,* 1995 WL 565979, at *5 (S.D.N.Y. Sept. 25, 1995) ("Prison officials must provide an explanation of their decision not to permit a prisoner to call a witness or present evidence-either on the record of the hearing or in a later proceeding-and such an explanation will satisfy the due process clause if it is 'logically related to preventing undue hazards to institutional safety or correctional goals.' ") (*quoting Ponte v. Real,* 471 U.S. 491, 497 (1985)). "A hearing officer may also refuse to call a witness 'on the basis of irrelevance or lack of necessity.' " *Campo v. Keane,* 913 F.Supp. 814 (1996), 821-22 (S.D.N.Y.1996) (*citing Kingsley v. Bureau of Prisons,* 937 F.2d 26, 30

(2d Cir.1991)). At hearings held in June and October of 1998, Benitez claims that he was not allowed to call certain witnesses, question them as he found relevant, or present pieces of evidence. Pl. Claim ¶¶ 46, 55-56, 78, 81-82. While defendants question the relevancy of some of the evidence that Benitez intended to use during the hearing, Def. Mem. at 25, a simple statement to this effect is insufficient to meet their burden. *See Scott v. Coughlin,* 78 F.Supp.2d 299, 316 (S.D.N.Y.2000) (finding that prison officials' unjustified refusal to call relevant witnesses constituted a violation of inmate's due process rights). Defendants have not presented any explanation for the exclusion of witnesses, certain lines of questioning, or pieces of evidence. Therefore, Benitez has adequately claimed a due process violation pertaining to his witnesses and evidence. At the same time, the cases establishing these rights clearly articulated the standards involved as early as 1990. *See Fox v. Coughlin,* 893 F.2d. at 479. Therefore, the defendants involved in these allegations are not entitled to qualified immunity.

### 3. Lack of Assistance

An inmate has a constitutional right to assistance in establishing a defense and prison officials are obligated to provide such assistance when the inmate is faced with disciplinary charges. *See Eng v. Couglin,* 858 F.2d 889, 897 (2d Cir.1988). It is not necessary for inmate assistance to rise to a level of legal counsel or advocacy. *See Silva v. Caset,* 992 F.2d 20, 22 (2d Cir.1993). Benitez claims that because his glasses had been taken away he could not read the disciplinary charges at issue in his February 1999 hearing. Pl. Claim ¶¶ 100-01. Because he could not see, he also could not choose an assistant from the list and asked Sinicki to read him three names. *Id.* Instead, Sinicki apparently reported that Benitez had refused assistance. *Id.* Benitez also alleges that he was unable to view the videotape evidence presented at trial because of his lost glasses. *Id.* ¶ 106. Benitez could not read the misbehavior report without his glasses and was denied assistance altogether. Therefore, he was unable to "marshal evidence and prepare a defense." *Eng,* 858 F.2d at 898. *See Ayers v. Ryan,* 152 F.3d 77, 80-81 (2d Cir.1998) (holding inmate's due process rights were violated where assistant failed to call witnesses the inmate requested). Benitez has made out a claim for violation of his due process rights in relation to the lack of assistance at his February 1999 hearing. At the same time, the cases establishing these rights clearly articulated the standards involved as early as 1988. *See*

*Eng,* 858 F.2d at 898. Therefore, the defendants involved in these allegations are not entitled to qualified immunity.

### 4. Refusal to Allow Benitez to Attend July 1998 Hearing

*\*17* Benitez alleges he was not given an opportunity to attend a Tier II disciplinary hearing on July 24, 1998, through which he was punished for certain acts reported in misbehavior reports. Pl. Claim ¶¶ 60-61. Benitez does not indicate what sanction he received. Defendants report that thirty days SHU confinement is the maximum penalty for a Tier II hearing, Def. Mem. at 25, which does not rise to the level of a due process violation as explicitly determined by the Supreme Court in *Sandin v. Conner,* 515 U.S. 472 (1995). Here, Benitez has not claimed a deprivation that rises to a level of a due process violation.

### 5. Delay in Completion of Hearing

New York State regulations governing inmates establish a liberty interest for Constitutional purposes, and undue delay in providing a hearing will result in a violation. *See, e.g., Soto v. Walker,* 44 F.3d 169, 172-73 (2d Cir.1995) ( "The failure to provide informal review procedures within even as short a time as seven days in connection with a transfer into administrative confinement states a due process claim."). It is unclear, however, what period of delay is prohibited. *See Horne v. Coughlin,* 155 F.3d 26, 33 (2d Cir.1998) (Cardamone, J., dissenting).

Benitez's June 1998 hearings lasted five days longer than allowed by New York State regulations. Def. Mem. at 24 (citing 7 New York Administrative Code § 251.5.1). Defendants argue this delay is *de minimis* and that Benitez is responsible for the delay because of his requests for extensions. *Id.* Benitez claims he needed extensions because of defendants' failure to provide him with a copy of his misbehavior report. Pl. Claim. ¶¶ 35, 37, 41-51.

Most cases discussing the delay issue involve questions concerning the start of hearings. *See, e.g., Jermosen v. Cahill,* 159 F.3d 1347 (2d Cir.1998) (finding no due process violation where length of confinement due to delay in initiating hearing was less than that considered in *Sandin* ); *Hynes v. Squillace,* 143 F.3d 653, 658-59 (2d Cir.1998) (inmate presented no evidence twenty-one days of keeplock confinement was atypical or significant, thus failing to meet threshold of *Sandin* ).

When courts have considered delays in the completion of hearings, they have found periods of one or two days *de minimis. Arosena v. Coughlin,* 1996 WL 607096, at *3 (W.D.N.Y. Oct. 2, 1996) (two-day delay); *Green v. Bauvi,* 46 F.3d 189, 195-96 (2d Cir.1995) (one-day delay). It was not clear whether the five day delay alleged by Benitez violated his due process rights. The defendants involved are therefore entitled to qualified immunity.

### 6. Biased Hearing Officer

"The degree of impartiality required of prison hearing officials does not rise to the level of that required of judges generally." *Francis v. Coughlin,* 891 F.2d 43, 46 (2d Cir.1989). "[D]ue process requires only that the hearing officer not be 'a hazard of arbitrary decisionmaking.' " *Espinal,* 180 F.Supp.2d at 538-39 (quoting *Wolff,* 418 U.S. at 571). Benitez claims that Totten, who oversaw his June 1998 hearings, was biased and therefore he was deprived of an impartial hearing officer. *E.g.,* Pl. Claim ¶¶ 47-48. He alleges Totten's questioning of another officer, Gunther, was done in a way "to ensure that Gunthers not testify in favor of Benitez's defense theory." *Id.* ¶ 47. Benitez has included quotes intended to demonstrate Totten's intentions, Pl. Claim ¶¶ 47-48, but the bias and the claimed resulting effect on the witness are not evident. Other actions Totten took during the hearing implicate other violations of due process, for example, refusal to allow witnesses and evidence. However, he was not involved in the incidents leading to the misbehavior reports at issue in the disciplinary hearings. *See Powell v. Ward,* 542 F.2d 101, 102-03 (2d Cir.1976) (prison official who directly participated in or witnessed acts complained of may be insufficiently impartial). Benitez has not provided enough facts to make a claim that Totten was so biased as to rise to the level of a due process violation.

### J. Change of Venue

**\*18** Venue in a case involving a federal question is proper where the majority of the events occurred, and where the defendants can be found. 28 U.S.C. § 1391(b). The majority of the events arising out of this suit took place in Green Haven. Of the thirty-four defendants, the majority are at Green Haven.[7] Green Haven is located in Dutchess County, within the Southern District of New York. Defendants contend, however, that since eleven defendants and Benitez are in Attica, and the supervisory defendants are in Albany, both located in the Western District of New York, venue is also proper in Western

District of New York. Since venue is proper in either the Southern or Western District of New York, the case should be determined based on the "convenience of the transfer" and where it will best serve the "interest of justice." *Orb Factory Ltd. v. Design Science Toys Ltd.,* 6 F.Supp.2d 203, 208 (S.D.N.Y.1998).

[7]     Green Haven defendants are: Straley, Sparhawk, Artuz, Schneider, Gunderman, Surber, Ward, Schmitt, Decicco, Totten, Miller, Dolan, Morton, Tucker, Williams, Keysler, Stiles, Maldonado, G. Schneider, and Healy. Attica defendants are Schoellkopf, Conway, Kelly, Berbary, Corcoran, Rademacker, Acquard, Sassy, Higley, Bea, Sinicki. Supervisory defendants Goord, Bartlett, and Selsky are based in Albany.

The motion to transfer venue from one federal district court where venue is proper to another is governed by 28 U.S.C. § 1404(a). The burden is on the moving party to demonstrate by a clear and convincing showing that transfer is proper and should be granted. *See Morales v. Navieras de Puerto Rico,* 713 F.Supp. 711, 712 (S.D.N.Y.1989). However, a motion for transfer of venue lies within the "broad discretion of the court" considering the "notions of convenience and fairness" evaluated through the individual facts of the case. *Cancel v. Mazzuca,* 2002 WL 1891395, at *2 (S.D.N.Y. Aug. 15, 2002) (*citins In re the Cuyahoga v. Equip. Corp.,* 980 F.2d 110, 117 (2d Cir.1992)). In deciding a motion to dismiss for improper venue, the court balances several factors, the most crucial being the convenience of the witnesses and parties, trial efficacy, and the interests of justice. *See Palace Exploration Co. v. Petroleum Dev. Co.,* 41 F.Supp.2d. 427, 437 (S.D.N.Y.1998).

As the moving party, defendants "must specifically list the evidence and witnesses on which [they] intend to rely in the transferee district, along with the general statement of the topics of each witness' testimony." *See Colour & Design v. U.S. Vinyl Mfg. Grp,* 2005 WL 1337864, at *4 (S.D.N.Y. June 3, 2005) (*citing Editorial Musical Latino Americana, S.A. v. Mar Int'l Records, Inc.,* 829 F.Supp. 62, 66-67 (S.D.N.Y.1993)). Defendants mention some of the names of the Attica defendants, but fail to assert how the Attica defendants would be inconvenienced. Merely naming defendants from the transferee district does not satisfy defendants' burden for this motion. *See id.* (refusing transfer where movant had simply stated that all the witnesses were located elsewhere). Further, defendants

2006 WL 5400078

do not provide information regarding evidence, and they do not state how the witnesses they intend to call would be burdened by this claim being litigated in the Southern District. *See Nabisco, Inc. v. Brach's Confections, Inc.,* 2000 WL 1677935, at *2 (S.D.N.Y. Nov. 8, 2000) (finding a listing of witnesses along with a statement of what their testimony will generally cover is sufficient to meet the moving party's burden); *Herbert Ltd. P'ship v. Elec. Arts,* 325 F.Supp.2d 282, 287 (S.D.N.Y.2004) (moving party is "obligated" to present a list of witnesses who would be inconvenienced by the current location in order to support motion for change in venue). Defendants have not met their burden in showing that transfer is proper and their motion to transfer venue should be **DENIED.**

## IV. CONCLUSION

**\*19** In summary, defendants' motion to dismiss pursuant to PLRA 42 U.S . C. § 1997e(a) exhaustion requirements should be **DENIED.** Defendants' motion to dismiss the conspiracy and retaliation claims should be **DENIED.** However, defendants' motion to dismiss Benitez's deprivation of property without due process claim and Eighth Amendment medical indifference claim should be **GRANTED.**

Defendants' motion to dismiss Benitez's personal involvement claims should be **GRANTED** with respect to those supervisory defendants listed herein, but **DENIED** as to defendants Schmitt and Keyser.

Defendants' motion to dismiss Benitez's procedural due process claims should be **DENIED** with respect to the claims relating to a lack of notice, refusal of witnesses and evidence, and a lack of assistance. The defendants involved are not entitled to qualified immunity on those claims. However, defendants' motion is **GRANTED** as to the due process claims of refusal to allow Benitez to attend a Tier II hearing, delay in completing a hearing, and a biased hearing officer.

Finally, defendants' motion to transfer venue should be **DENIED.**

Pursuant to Rule 72, Federal Rules of Civil Procedure, the parties shall have ten (10) days after being served with a copy of the recommended disposition to file written objections to this Report and Recommendation. Such objections shall be filed with the Clerk of the Court and served on all adversaries, with extra copies delivered to the chambers of the Honorable Richard Conway Casey, 500 Pearl Street, Room 1350, and to the chambers of the undersigned, Room 1970. Failure to file timely objections shall constitute a waiver of those objections both in the District Court and on later appeal to the United States Court of Appeals. *See Thomas v. Arn,* 474 U.S. 140, 150 (1985); *Small v. Secy'y of Health and Human Servs.,* 892 F.2d 15. 16(2d Cir.1989) (*per curiam* ); 28 U.S.C. § 636(b)(1) (West Supp.1995); Fed.R.Civ.P. 72, 6(a), 6(e).

**All Citations**

Not Reported in F.Supp.2d, 2006 WL 5400078

---

**End of Document** © 2017 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag - Negative Treatment

Disagreement Recognized by Mangino v. Incorporated Village of Patchogue, E.D.N.Y., September 30, 2011

2004 WL 2724079

Only the Westlaw citation is currently available.

United States District Court,

S.D. New York.

Walter HICKEY and Annie Hickey, Plaintiffs,

v.

THE CITY OF NEW YORK et al., Defendants.

No. 01 Civ. 6506(GEL).

|

Nov. 29, 2004.

**Attorneys and Law Firms**

Dan Cherner, Law Offices of Daniel Cherner, New York, New York, for Plaintiffs Walter and Annie Hickey.

Michael I. Verde, James Tampellini, Katten Muchin Zavis Rosenman, New York, New York, for Defendants City of New York, Howard Safir, Harold Wittig, Patrick Reilly, Barbara Ojeda, Thomas Siracusa, Andrew Amelia, John Moeser, Sean M. Reilly, Kim Andrews, John Heihs, Christoper Teiner, Peter Reese, and James Delaney.

OPINION AND ORDER

LYNCH, J.

**\*1** In this civil rights action, plaintiff Walter Hickey, who was shot when police officers responded to a domestic violence call, alleges that the police used excessive force in shooting him and in manhandling him after he shot. His mother, Annie Hickey, who was present at the time, alleges primarily that she was unlawfully arrested without probable cause by the officers on the scene. For reasons difficult to understand, plaintiffs persist in confusing the central issues arising from this incident by compounding these claims with literally dozens of causes of action against a host of defendants, many of whom had no substantial involvement in the actions that plaintiffs plausibly claim were unlawful. As a consequence, the defendants, while acknowledging that at least one of plaintiffs' claims calls for trial, move for the dismissal of

most of these claims. The motion will be granted in part and denied in part.

BACKGROUND

A party against whom a claim is asserted may move "at any time ... for a summary judgment in the party's favor as to all or any part thereof." Fed.R.Civ.P. 56(b). Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). A "genuine issue as to any material fact," in turn, is established "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). Where a "genuine issue of material fact" exists, the motion will be defeated with respect to those claims that present such genuine issues.

In determining the existence of a "genuine issue," this Court must view the evidence in the light most favorable to the nonmoving party. See United States v. Diebold, Inc., 369 U.S. 654, 655 (1962) ("On summary judgment the inferences to be drawn from the underlying facts contained in such materials must be viewed in the light most favorable to the party opposing the motion."). The parties to this case have submitted extensive, detailed materials in support of their respective positions, and exhibits to the briefing provided by each side number in the dozens. Given the extent of the factual disputes in the case, the Court will describe here the evidence presented by both sides. It does so not with a view toward making findings or evaluating the evidence, but rather to present a coherent account of such facts as are not disputed, while giving sufficient play to the many points of disagreement between the parties.

*I. Factual Background*

On February 23, 1999, Officers Christopher Teiner and John Heihs of the New York City Police Department were dispatched to the residence of plaintiffs Walter and Annie Hickey in response to the 911 call of Walter Hickey's ex-wife, Christine Brown. Brown placed at least two calls from the Hickey residence following an altercation with Walter Hickey, during which (according to Brown) Walter

Hickey repeatedly struck her in the head, temporarily causing her to lose consciousness. (Copertino DD–5, Wallace Report, Cherner Decl. Ex. N, at 1). After the second call, Brown retreated to the basement, where she heard the shots fired by Officer Teiner (and placed a further call to 911 to report those shots, which she claims she assumed were intended for her) (*id.*), but did not otherwise observe the events at the core of plaintiffs' complaint. Plaintiffs offer a competing account of the circumstances surrounding the phone calls of Brown to 911, contending that it was Brown who initially attacked Walter Hickey and that, when asked to leave the home by Annie Hickey, she fled to the kitchen, calling 911 to assert false claims against Walter Hickey. (Annie Hickey Dep., Cherner Decl. Ex. R, at 43, 46, 50—51; Walter Hickey Aff. ¶¶ 10—19.)

 **\*2** The parties also disagree about what happened once Teiner and Heihs arrived at the Hickey residence, announced their arrival, and identified themselves as police officers responding to a domestic violence call. Plaintiffs allege that, in response, Annie and Walter Hickey came to the door, and Annie Hickey, with her arm around her son, identified herself as a School Safety Officer, and invited the officers to come inside. (Annie Hickey Dep. 65—66.) Walter Hickey's cell phone was in a leather case clipped to his belt on his right-hand side, at waist-level. (Walter Hickey Aff. ¶ 23.) As Annie and Walter Hickey stepped outside, both police officers ran back from the house. One of the officers—later identified by both plaintiffs and defendants as Teiner—shouted, "He's got a gun," drew his own service weapon, and pointed it in the direction of the plaintiffs. (Annie Hickey Aff. ¶ 16.) According to the plaintiffs, Annie Hickey protested that her son was unarmed, and pled with the officers not to shoot, but Teiner nonetheless fired a shot, shattering the glass of the storm door, and causing Walter Hickey to fall backwards through the door. (Annie Hickey Dep. 65—66; Annie Hickey Aff. ¶¶ 17—18; Walter Hickey Aff. ¶ 26.) Plaintiffs allege that after this first shot, Annie Hickey again protested that they were unarmed, but the same officer fired again. This time the bullet struck Walter Hickey and caused him to fall to the ground. (Walter Hickey Aff. ¶ 26.)

Defendants counter with a strikingly different scenario. Teiner and Heihs claim that after arriving at the Hickey residence they heard "noises and pushing like banging into walls" coming "from behind the front door." (Teiner

9/8/03 Dep., Verde Aff. Ex. 5, at 137—38.) On hearing these noises, Teiner and Heihs retreated backwards, away from the front door, and down the steps, with Teiner at least reaching street level, before Walter and Annie Hickey emerged through the front door, locked in struggle. It appeared to the officers as if Annie Hickey was attempting to restrain Walter Hickey from coming toward them. (*Id.* at 138—39, 148; Heihs 9/9/03 Dep., Verde Aff. Ex. 7, at 87—88, 94—95.) According to both officers, Walter Hickey then broke out of his mother's embrace, and pulled from his waistband what appeared to the officers to be a gun, took a combat stance, and threatened to kill the officers. (Heihs 9/9/03 Dep. 95—96; Teiner 9/8/03 Dep. 163, 165.) Heihs retreated, attempted to retrieve his firearm from its holster, and sought cover (Heihs 9/9/03 Dep. 96); Teiner fired two shots in the direction of Walter Hickey, striking him once. (Teiner 9/8/03 Dep. 171, 174; Def. R. 56.1 Stmt. ¶ 8.) The officers' version of events is partially corroborated a statement given later that evening by Annie Hickey while at the station house. Although Annie Hickey now disavows the statement as made under duress, sleep deprivation, and psychological pressure, *see* below, at the time she claimed that Walter Hickey yelled that he had a gun, and pleaded with the officers to shoot him. (Annie Hickey Written Stmt., Verde Aff. Ex. 30, at 3.)

 **\*3** The parties disagree as well as to what happened after Walter Hickey was shot. According to the plaintiffs, even after Walter Hickey lay on the porch, Teiner yelled at Annie Hickey to get out of the way, or he would shoot her, too. (Annie Hickey Dep. 80.) Teiner then "handcuffed [Walter Hickey] with one hand, ... [Heihs] got him by the other arm and they dragged him and [threw] him down the steps, [and] they began to kick him." (*Id.* at 87.) Plaintiffs claim that at least one officer who arrived on the scene after the shooting also joined in the beating. (*Id.* at 95—96.) The officers who arrived on the scene after the shooting did not immediately realize that Walter Hickey had been shot (Walter Hickey Aff. ¶ 33), and it was only after considerable delay that he was placed in an ambulance, and even then the ambulance remained at the Hickey residence for some time before Walter Hickey was taken to the hospital. (*Id.* ¶¶ 33, 34, 36, 38.)

Defendants, however, adamantly deny that Walter Hickey was either dragged from the porch or beaten following the shooting, citing inter alia the following: EMT technician William Cummings stated that Walter Hickey's head

injury was inconsistent with being dragged, and that Walter Hickey had told Cummings he had been injured when he fell down the stairs (Cummings Interview, Verde Aff. Ex. 17, at 2); neither the physician's assistant who treated Walter Hickey, nor the intern on duty that evening in the emergency room observed any injuries apart from the bullet exit and entry wounds (Engel Report, Verde Aff. Ex. 19, at 1—2); and three civilian bystander witnesses all testified that they did not recall observing anyone beating Walter Hickey (Mitchell Dep., Scott–McKelvey Dep., Mayas Dep., Verde Aff. Exs. 20, 21, 22). Moreover, defendants claim that an ambulance was summoned for Walter Hickey within minutes of the shooting, and that it departed the scene for the hospital about thirty minutes later. (Def. R. 56.1 Stmt. ¶¶ 12, 15 (noting ambulance was requested at 11:09p.m., two minutes after the officers arrived at the Hickey residence, and departed for the hospital at 11:39p.m.).)

Both sides agree that at some point before Walter Hickey left for the hospital in the ambulance, Annie Hickey was transported to the 105th Precinct, where she remained until sometime between 4:00 and 5:00 a.m. Plaintiffs and defendants differ, however, about the conditions of her stay there. Plaintiffs allege that defendants Sgt. Thomas Siracusa and Officer Kim Andrews took her to the precinct against her will, without giving her adequate time to dress properly, after Siracusa informed her that she would have to make a statement about the incident. Plaintiffs further allege that she was kept in a small room at the precinct, where Detective John Moeser told her she had to complete a statement before she could leave, contact family members, or go to the hospital, even after she complained that she felt ill. (Annie Hickey Dep. 110—11, 113—17, 368.) Annie Hickey later discovered that a number of relatives, including her brother, sister, niece, and nephew, had visited the precinct looking for her, but all were denied access to her. (*See* Carlton Newton Aff.; Simmons Aff.; David Newton Aff.)

**\*4** Annie Hickey testifies that Moeser told her that "[she] had to answer questions and make a statement, and the sooner that [she] did that, then [she] could leave and that [the police] would drive [her] to the hospital." (Annie Hickey Aff. ¶ 34.) The great strain of the events of the evening allegedly exacerbated Annie Hickey's pre-existing high blood pressure condition (she had suffered a stroke in the 1980s), and Annie Hickey feared not only that her son was dying, but also that she herself might be suffering

a second stroke. (Annie Hickey Aff. ¶¶ 37—38.) Under those conditions, plaintiffs allege Annie Hickey signed a statement prepared by Moeser, after he discarded a first, truthful statement as not "good enough" (Annie Hickey Dep. 115—116), and made the tape-recorded statements now offered by defendants to impeach her present claims. Annie Hickey disavows the contents of those statements: "I signed some pieces of paper and did not know what they said or what I was signing, and all I could think about was Moeser's telling me that the sooner I finished, the sooner I could get out of there." (Annie Hickey Aff. ¶ 39.) With regard to the taped statements, she now avers that "I was even more worn out than I had been before, and I said what they wanted to hear.... Much of what is on the tape is not correct, as it was coerced and suggested." (Annie Hickey Aff. ¶ 41.)

Defendants do not dispute that the police took Annie Hickey to the 105th Precinct "to be interviewed further in regard to the incident and to preserve the statement she had made at the scene." (Def. R. 56.1 Stmt. ¶ 39.) Defendants deny, however, that Annie Hickey requested medical treatment, and claim she was provided with information about Walter Hickey's condition, and allowed access to her brother, David Newton. According to defendants, it was Annie Hickey who refused to make phone calls, not precinct personnel who denied her access to a telephone. (Def. R. 56.1 Stmt. ¶¶ 49.) Further, defendants claim Moeser merely recorded Annie Hickey's verbal statement made earlier at the Hickey residence to Sgt. Arthur Hearns, and note that Annie Hickey stated in a tape-recorded interview she had not been mistreated by the police: "I would say I'm sorry that this happened and I ... have to say the police here have been very nice.... They have tried to make my stay here, being here, comfortable and ... I have great respect for you guys." (Def. R. 56.1 Stmt. ¶ 53; Annie Hickey Taped Stmt., Verde Aff. Ex. 31, at 29.) Both parties agree that Annie Hickey left the 105th Precinct in the early hours of February 24, 2004, escorted by her brother, David Newton. (Annie Hickey Dep. 361—62; Def. R. 56.1 Stmt. ¶¶ 52, 55.)

## II. *Procedural History*
As the preceding account makes clear, the parties agree roughly on the time line of the evening's events and contacts between plaintiffs and the various defendants, but hotly dispute the character of those contacts. Out of this confusing factual record, plaintiffs find support in their complaint, originally filed on July 18, 2001, for

thirty-eight causes of action against the City of New York, the New York City Police Department ("NYPD"), eleven named City of New York/NYPD employees, as well as "Unknown John and Jane Doe(s)" police officers, and Queens County Assistant District Attorneys ("ADAs") Peter Reese and James Delaney. Plaintiffs are not always clear, however, against which defendants they assert these causes of action, often referring simply to "the defendants" in their complaint, even when the facts alleged make clear that not all defendants could be involved.

**\*5** Plaintiffs assert a number of violations of 42 U.S.C. §§ 1983 and 1985. First, plaintiffs assert four claims of excessive use of force, against Teiner and/or Heihs for shooting Walter Hickey (Fifth Cause of Action, Compl. ¶¶ 128—132), against Teiner, Heihs, and "other unknown individuals" for the alleged beating which took place following the shooting (Sixth Cause of Action, Compl. ¶¶ 133—137), and against Teiner or Heihs for injuries to Walter and Annie Hickey from the shattering of storm door glass (Seventh Cause of Action, Compl. ¶¶ 138—147). Plaintiffs also assert a claim of deliberate indifference against the defendants for failure to provide timely medical attention for Walter Hickey. (Ninth Cause of Action, Compl. ¶¶ 148—155.)

Second, plaintiffs assert a series of claims for the alleged mistreatment of Annie Hickey while in police custody after the shooting. They allege she was falsely arrested (Second Cause of Action, Compl. ¶¶ 111—116), falsely imprisoned (Fourth Cause of Action, Compl. ¶¶ 123—127), and denied medical care while in police custody due to defendants' deliberate indifference (Tenth Cause of Action, Compl. ¶¶ 156—163). In addition, the complaint avers a failure to intervene on the part of defendants to prevent those injuries (Fourteenth Cause of Action, Compl. ¶¶ 181—185).

Third, plaintiffs assert a similar series of claims on behalf of Walter Hickey for false arrest (First Cause of Action, Compl. ¶¶ 106—110), false imprisonment (Third Cause of Action, Compl. ¶¶ 117—122), malicious prosecution (Eleventh Cause of Action, Compl. ¶¶ 164—169), and abuse of process (Twelfth Cause of Action, Compl. ¶¶ 170—175) in connection with his arrest and eventual prosecution (leading to acquittal) on assault charges (Compl.¶¶ 81, 95—96), as well as a claim of failure to intervene to prevent these abuses and those complained

of in connection with his shooting (Thirteenth Cause of Action, Compl. ¶¶ 176—180). Plaintiffs also assert that the events at the core of the complaint—Walter Hickey's shooting, arrest, and prosecution, and Annie Hickey's detention—deprived Walter and Annie Hickey of their substantive due process rights in that the behavior of defendants was "shocking to the conscience" (Fifteenth Cause of Action, Compl. ¶¶ 186—190), and resulted in a number of procedural due process violations, including the failure of defendants to provide either plaintiff with Miranda warnings, and denial of Annie Hickey's access to counsel and her family members while in police custody. (Sixteenth Cause of Action, Compl. ¶¶ 191—195.)

Fourth, plaintiffs make three broader complaints in Causes of Action Seventeen through Nineteen. [1] In Cause of Action Seventeen, plaintiffs allege a *Monell* claim of a "pattern and practice of unjustified, unreasonable and illegal beatings and excessive uses of force and other violations of law, including, but not necessarily limited to false arrests, false imprisonments, abuses of process, malicious prosecutions, and procedural and substantive due process violations by police officers" employed by the NYPD, "permitted and tolerated" by the City of New York, and which made possible the abuses suffered by the plaintiffs as alleged throughout the complaint. (Compl.¶ 197, 203.) Plaintiffs further allege that the defendants conspired to deprive them of their civil rights in violation of 42 U.S.C. § 1985(2) and (3), by obstructing justice in covering up their alleged wrongful acts in this matter and depriving plaintiffs of the equal protection of the laws. (Causes of Action Eighteen and Nineteen, Compl. ¶¶ 204–224).

[1]     There are actually two Causes of Action denominated as the Nineteenth Cause of Action in plaintiffs' complaint, but they appear to be identical and will be treated here as one Cause of Action.

**\*6** In addition to these constitutional claims, plaintiffs originally asserted a number of state law claims in Causes of Action Twenty through Thirty–Eight, all but two of which (Causes of Action Twenty–Six and Twenty– Seven, false arrest and imprisonment of Annie Hickey) have been dismissed. A Stipulation and Order, agreed to by the parties and signed by United States Magistrate Judge Frank Maas, dismissed the New York City Police Department as a defendant in the case (given its status as an agency of the City of New York, and thus a non-suable entity), and dismissed the state law claims against

the City of New York and the "NYPD defendants," *"i.e.,* those individual defendants who were employees of the City of New York working for the NYPD." (Stipulation and Order of February 13, 2004). And in response to a motion to dismiss by defendants Reese and Delaney, the two Queens County ADAs, the Court dismissed plaintiffs' Eleventh, Twelfth, Twenty–Third, Twenty–Fourth, and Thirty–Fourth Causes of Action, which allege actions that were fully within the scope of prosecutorial immunity, on grounds of absolute prosecutorial immunity. *Hickey v. City of New York,* No. 01 Civ. 6506, 2002 WL 1974058, at *4 (S.D.N.Y. Aug. 26, 2002). However, Causes of Action Two, Four, Sixteen, Nineteen, Twenty–Six, and Twenty–Seven alleged actions—participation in the arrest and detention of Annie Hickey—which fell outside the scope of that immunity, and therefore survived defendants' motion to dismiss, *id.* at *3–*4, while the balance of the complaint did not allege any involvement of these defendants, *id.* at *5. As a result of these orders, Causes of Action One through Nineteen survive as to all remaining defendants, and Causes of Action Twenty–Six and Twenty–Seven survive only as to defendants Reese and Delaney.

DISCUSSION

The parties are divided by the basic factual issue of how Walter Hickey came to be shot. As the preceding narrative indicates, plaintiffs claim the shooting was provoked by little more than the appearance of Walter Hickey on his porch, with a cell phone strapped to his waist. Meanwhile, defendants claim Walter Hickey emerged from his home, threatening to shoot them, and holding what appeared to be a gun in a firing position. This divide creates a clear factual issue as to whether the police used excessive force in shooting Walter Hickey. [2] Plaintiffs, however, have brought a series of additional claims, on which defendants now move for summary judgment.

[2] Walter Hickey has made an excessive force claim for injuries caused by the shattering of the glass storm door (Cause of Action Seven, Compl. ¶¶ 138—142), over and above those injuries resulting directly from either the shooting itself or the alleged beating he received thereafter. Defendants, pointing to the description of events provided by Walter Hickey in his deposition, claim the storm door shattered due to the force of Walter Hickey's body as he fell backwards

into it, rather than as a direct result of the bullets fired by Teiner. (Walter Hickey Dep., Verde Aff. Ex. 23, at 118, 126.) Regardless, this excessive force claim is dismissed as duplicative. There is only one use of force that is relevant to these particular injuries: the shooting. If that use of force was excessive, Walter Hickey may recover for any resulting injuries, whether he was injured by the bullets themselves, by glass that shattered when it was hit by a bullet, or by glass that shattered as he fell through the door as a consequence of being shot. Which, if any, of these injuries can be established by sufficient evidence to reach the jury may await determination at trial.

I. *Walter Hickey: False Arrest, False Imprisonment, Malicious Prosecution, and Abuse of Process*

Defendants move for summary judgment on plaintiffs' First, Third, Eleventh, and Twelfth Causes of Action, alleging federal civil rights claims under 42 U.S.C. § 1983 for false arrest, false imprisonment, malicious prosecution, and abuse of process as to Walter Hickey. The Supreme Court has long recognized that both the elements and defenses of such causes of actions are to be construed with reference to state common law. *See, e.g., Wilson v. Garcia,* 471 U.S. 261, 277 (1985). Indeed, the Second Circuit has recognized explicitly that § 1983 false arrest and malicious prosecution claims are distinguished from their state law analogues only by the requirement that the tortfeasor act "under color of state law," *see Posr v. Doherty,* 944 F.2d 91, 94 (2d Cir.1991), *citing Raysor v. Port Authority of New York and New Jersey,* 768 F.2d 34, 40 (2d Cir.1985), and has held that abuse of process may ground a § 1983 claim, while looking to New York state law to define its elements. *Cook v. Sheldon,* 41 F.3d 73, 80 (2d Cir.1994). Moreover, the claims of false arrest and false imprisonment are "synonymous" under New York law. *Posr,* 944 F.2d at 96. [3] Accordingly, this Court must look to the New York state law of false arrest, malicious prosecution, and abuse of process in deciding defendants' motion on these claims.

[3] Because the torts of false arrest and false imprisonment are identical, plaintiffs' Third Cause of Action, for false imprisonment of Walter Hickey, is dismissed as duplicative.

*7 A thorough exploration of the elements of these state law torts, however, is unnecessary because the existence of probable cause offers a complete defense to all three. *See Boyd v. City of New York,* 336 F.3d 72, 75 (2d. Cir.2003) (probable cause for arrest and prosecution will

defeat false arrest and malicious prosecution claims); *Granato v. City of New York,* No. 98 Civ. 667, 1999 WL 1129611, at *7 (E.D.N.Y. Oct. 18, 1999) (probable cause an "excuse or justification" that defeats abuse of process claim); *see also Singer v. Fulton Co. Sheriff,* 63 F.3d 110, 118 (2d Cir.1995) ("There can be no federal civil rights claim for false arrest where the arresting officer had probable cause."). Therefore, the critical issue is whether a reasonable jury could find that no probable cause existed for Walter Hickey's arrest and prosecution; if not, summary judgment must be granted as to these claims. Probable cause is measured by the reasonableness of the belief that an offense has been committed by the person arrested. *See Rounseville v. Zahl,* 13 F.3d 625, 629 (2d Cir.1994) (probable cause exists where "the knowledge of facts, actual or apparent, [is] strong enough to justify a reasonable man in the belief that he has lawful grounds for prosecuting the person complained of" (internal quotes omitted)); *Golino v. City of New Haven,* 950 F.2d 864, 870 (2d Cir.1991) (probable cause exists "when the authorities have knowledge or reasonably trustworthy information sufficient to warrant a person of reasonable caution in the belief that an offense has been committed by the person to be arrested").

Although plaintiffs press their claims against a long list of officers, they focus their discussion on the deposition testimony of Hearns. (P. Mem.3—4.) Hearns —oddly enough, one of the few officers connected to the case who is *not* named as a defendant—took responsibility for the decision to place Walter Hickey formally under arrest. (Hearns Dep., Verde Aff. Ex.11, at 56.) Characterizing Hearns's deposition testimony as amounting to an admission that "he did not know what, if anything, Mr. Hickey had done wrong," plaintiffs argue that probable cause was lacking and Hearns's decision to arrest arbitrary. (P. Mem.3—4.)

Plaintiffs' argument quotes isolated portions of Hearns's testimony, and completely mischaracterizes the tenor of his actual account. Hearns stated during his deposition that he "wasn't sure" whether Walter Hickey had done anything wrong. (Hearns Dep. 56.) Of course, probable cause does not require certainty on an officer's part that a crime has been committed, only that "the authorities have knowledge or reasonably trustworthy information sufficient to warrant a person of reasonable caution in the belief that an offense has been committed by the person to be arrested." *Golino,* 950 F .2d at 870. Moreover,

Hearns testified that after arriving at the Hickey residence, but prior to his decision to arrest Walter Hickey, Annie Hickey had told him that her son had been upset by a fight with his girlfriend, and had threatened to kill his girlfriend, himself, and the police officers. (Hearns Dep. 52—53.) Given that "[o]fficers have probable cause to arrest if they receive 'information from some person—normally the putative victim or eyewitness—who it seems reasonable to believe is telling the truth," ' *Thomas v. Culbary,* 741 F.Supp. 77, 80 (S.D.N.Y.1990) (*quoting Daniels v. United States,* 393 F.2d 359, 361 (D.C.Cir.1968)), the statements of Annie Hickey to Hearns would constitute probable cause. Hearns was also told by Heihs or Teiner that they were responding to a 911 call about a domestic dispute with Walter Hickey's girlfriend, which confirmed Annie Hickey's account. (Hearns Dep. 56.) Thus, plaintiffs' claim that Hearns admitted that "he did not know what, if anything, Mr. Hickey had done wrong" and therefore lacked probable cause is completely inaccurate.

**\*8** However, plaintiffs' brief also misperceives the point at which a Fourth Amendment seizure of Walter Hickey occurred. A suspect is seized for purposes of the Fourth Amendment when he is shot in an effort to bring him under police control. *Tennessee v. Garner,* 471 U.S. 1, 7 (1985). Thus, regardless of when the officers decided to label their actions an arrest, Walter Hickey was "arrested" when Teiner shot him, and the existence of probable cause must be gauged as of that point.

There is abundant evidence from which a jury could find that the officers had probable cause to arrest Walter Hickey. Teiner and Heihs were responding to a 911 call reflecting an assault at the Hickeys' address. (N.Y.PD 911 Sprint Report, Verde Aff. Ex. 3, at 1.) The 911 operator had received a call from Brown, and knew that a female complainant had reported a "male trying to kill her." (*Id.*) Annie Hickey herself recalls that the officers announced themselves as responding to a domestic dispute. (Annie Hickey Dep. 65.) Most importantly, the officers describe Walter Hickey as bursting out of the house, with his mother trying to restrain him, making threatening gestures and remarks towards them, and pointing an object that appeared to them to be a gun. (Heihs 9/9/03 Dep. 95—96; Teiner 9/8/03 Dep. 163, 165.) If this account is accepted, there can be no doubt that Teiner and Heihs were justified in arresting Hickey. [4]

[4]    Whether they were justified in using deadly force in the attempt is a different question, which is addressed below in Part III.

This account, however, is disputed by the plaintiffs. Both Annie and Walter Hickey dispute the officers' account of what occurred on the front steps. (Annie Hickey Dep. 65—66, 78—80; Walter Hickey Aff. ¶¶ 21—28.) Because a jury could believe their testimony, on summary judgment the Court must disregard the disputed portions of the testimony, and can award summary judgment only if the officers already had probable cause based on the undisputed information in their possession at the time they arrived at the Hickey residence. This information, however, is not entirely clear on the present record. The 911 operators knew that a woman had reported that a man was trying to kill her, [5] a fact which, if known to Teiner and Heihs, might well have sufficed to give them probable cause to arrest Walter Hickey when he emerged from the house in the presence of a woman, Annie Hickey, whose intervention, even on her own account, could be taken by a reasonable officer as confirming that Walter Hickey was the man they were seeking.

[5]    The record is unclear as to whether this information was also known to the dispatcher. The record contains a "NYPD 911 Sprint Report and Incident Listing" from February 23, 1999 (Verde Aff. Ex. 3), detailing the 911 calls placed by Christine Brown, and their content. It is not clear, however, what access the dispatcher had to all or some of this information, as no explanation has been given as to how the Sprint Report is used, or what precise communications took place between the 911 operators and the dispatcher. Regardless, for the reason given below, information known only to the 911 operators or to the dispatcher may not be imputed to Teiner and Heihs.

"[W]here law enforcement authorities are collaborating in an investigation, ... the knowledge of one is presumed shared by all," *Illinois v. Andreas,* 463 U.S. 765, 772 n. 5 (1982), and the existence of probable cause is therefore determined with reference to the collective knowledge of all officers involved in the investigation. However, the knowledge of 911 operators and dispatchers may be imputed to investigating officers only where the operator or dispatcher is a police officer, or has received appropriate training to evaluate information for probable cause. *See United States v. Colon,* 250 F.3d 130, 137—38 (2001). As the Second Circuit there held, "imputing information known only to the civilian operator and

not conveyed to the dispatching and then arresting officers would extend the [collective knowledge] doctrine beyond its current jurisprudential parameters." *Id.* at 137. Although the Court went on to hold that this difficulty could be remedied by providing 911 operators (and presumably then also civilian dispatchers) with training on "the standards for evaluating the sufficiency of incoming information," *id.* at 138, nothing in the present record reflects whether the 911 operators or dispatcher in this case had such training. [6] Thus, for present purposes, the evaluation of probable cause must depend solely on the information relayed by the operators and dispatcher to the arresting officers themselves.

[6]    Indeed, as plaintiffs point out, the 911 operators and dispatcher in this case, all identified as "police communications technicians," were disciplined for "failure to obtain information from a caller" and "failure to relay pertinent information to the responding units," respectively. (Queens South Investigations Unit Final Report, Cherner Decl. Ex. G, at 3.)

**\*9** On this point, however, the record is cryptic. The garbled transcript of the dispatch to the officers in the field says only, "Central ... assaulted ... male ... female. 90—5 2 210 Place. 9 0—5 2 210 Place, 9 0 Avenue to 9 1. It's a private house. You're gonna see a female at the location in regards K. Basement ... time." (Dispatch Run Tr., Cherner Decl. Ex. H., at 1.) While a reasonable jury might interpret this as suggesting a female victim, such an interpretation is, to say the least, disputable. Neither Teiner nor Heihs, in fact, recalls whether they believed that the call reflected a male-on-female assault or vice versa. Heihs initially stated he knew the complainant was a woman, but retreated, when pressed, to the conclusion that he did not remember. (Heihs 10/14/03 Dep., Verde Aff. Ex. 8, 296—98.) Teiner, similarly, was "not positive" as to whether it was a man or woman who had placed the 911 call, did not remember whether a weapon was involved, and could say only that he understood there was "an assault in progress ." (Teiner 9/8/03 Dep. 133—35, 116.) This information would certainly give reasonable officers a reasonable basis to conclude that a crime was being committed, but not that Walter Hickey was committing it.

There are thus genuine issues of material fact as to whether Teiner and Heihs had probable cause to arrest Walter Hickey at the time that Teiner shot, and thereby seized, him.

But these questions do not support a claim against the other officers. Plaintiffs charge a number of officers in the challenged claims, many of whom had no connection to the arrest at all, or had only a formal connection to the arrest (like Officer Sean Reilly, who merely processed the arrest because Teiner and Heihs had been sent for medical treatment (Sean Reilly Dep., Verde Aff. Ex. 13, at 41—42, 44—45, 55—56)). By the time Walter Hickey was taken from the scene, in police custody, in an ambulance, the officers had discovered Brown in the basement and taken her statement, which unequivocally gave the officers probable cause to arrest Hickey. *See Thomas,* 741 F.Supp. at 80 (S.D.N.Y.1990) (*quoting Daniels v. United States,* 393 F.2d 359, 361 (D.C.Cir.1968)).

For similar reasons, plaintiffs' claims of malicious prosecution and abuse of process are blatantly without merit. By the time a complaint was filed against Walter Hickey, any ambiguity about the nature of the alleged assault had been completely resolved. By that time, both Brown and Annie Hickey had made statements alleging that Walter Hickey had assaulted Brown. While Annie Hickey has since disavowed the statements she made at the station house, she does not deny that she made them, and even if a jury concludes that she was not being truthful and made the statements solely to please the police, there is no basis for concluding that the officers and prosecutors who heard the statements did not in good faith believe that she was reporting what had actually happened. Moreover, even if these statements are disregarded, Brown's statements alone are sufficient to establish probable cause.

**\*10** Accordingly, summary judgment is denied as to Cause of Action One, insofar as it alleges that Teiner and Heihs seized Walter Hickey without probable cause in violation of the Fourth Amendment. Summary judgment is granted to all other defendants on Causes of Action One, Three, Eleven, and Twelve.

II. *Annie Hickey; False Arrest and False Imprisonment*
Defendants move for summary judgment on plaintiffs' Second and Fourth Causes of Action, alleging civil rights claims under 42 U.S.C. § 1983 for the false arrest and imprisonment of Annie Hickey. [7] A cause of action for false arrest will lie where the plaintiff shows, inter alia, "that the defendant intentionally confined him without his consent and without justification." *Weyant v. Okst,* 101 F.3d 845, 852 (2d Cir.1996) (*citing Broughton v. State,* 37 N.Y.2d 451, 456 (1975)). As stated above, probable cause would supply the requisite "justification," and serve as a complete defense to a false arrest claim.

[7]    Because the claims of false arrest and false imprisonment are identical and duplicative, plaintiffs' claim for false imprisonment of Annie Hickey will be dismissed. *See* note 3 above.

But defendants do not argue that they had probable cause to arrest Annie Hickey. Instead, they argue that she was never arrested. Defendants rely on the notion of consent, arguing that Annie Hickey voluntarily went to and stayed at the station house, and therefore has no claim of false arrest. (D.Mem.12–13.) In the absence of a formal charge, as here, a person may still be "seized" within the meaning of the Fourth Amendment, and therefore have a basis for a false arrest claim under § 1983, where " 'in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." ' *INS v. Delgado,* 466 U.S. 210, 215 (1984) (*quoting United States v. Mendenhall,* 446 U.S. 544, 554 (1980)). Thus, the critical question is whether a jury could find that a reasonable person in Annie Hickey's position would have believed that she was not free to leave.

Defendants cite to a great deal of evidence suggesting that Annie Hickey was free to leave, and that a reasonable person would have so believed. They note, inter alia, that she was never handcuffed; that she rode to the station in an unmarked police car, where she sat in the back seat, alone; and that she volunteered information about the incident to the officers en route. (*Id.* at 12, *citing* Annie Hickey Dep. 103–04; Siracusa Dep., Verde Aff. Ex. 33, at 54; Andrews Dep., Verde Aff. Ex. 34, at 41; Siracusa Mem. Book, Verde Aff. Ex. 39, at 3; Andrews Mem. Book, Verde Aff. Ex. 35, at 2.) Once at the station, defendants assert, she never tried to leave, refused to take phone calls, and was told that she would be taken to the hospital to visit her son once officers were finished taking her statement. (*Id.* at 12–13, *citing* Annie Hickey Dep. 360, 374; Siracusa Dep. 115–16, 122–23.) Moreover, defendants point to Annie Hickey's tape-recorded statement that "[the police] have been very nice. They have tried to make my stay here, being here, comfortable and I have great respect for you guys." (*Id.* at 13, *quoting* Annie Hickey Taped Stmt. 29.)

**\*11** But defendants disregard Annie Hickey's own testimony. Annie Hickey states that she told Siracusa that she did not want to go to the precinct and that she "was forced out of [her] own house against [her] will." (Annie Hickey Aff. ¶¶ 27, 29.) She also testifies that once at the station, she was placed in a small room, told she was not allowed to leave, and refused access to a telephone and visitors. (*Id.* ¶¶ 33–34.) Moreover, she now disavows both her written and oral statements that evening, claiming they were made under severe physical and emotional distress and sleep deprivation (Annie Hickey Aff. ¶¶ 35–42). At her deposition, she similarly testified that she was hustled out of her house by Siracusa, with barely time to dress (Annie Hickey Dep. 99); that she made two to three requests to leave (*id.* at 111); that she was "scared to death," and felt "nervous" and "coerced" while making her written statement at the precinct (*id.* at 114–115); that a first, truthful statement was discarded as not "good enough" by the officer taking that statement (*id.* at 115–116); and that she told that same officer anything that he wanted to hear in order to be released so as to see her son as quickly as possible (*id.* at 117).

A reasonable jury might well reject Annie Hickey's current account of the evening's events, particularly in light of her earlier contradictory out-of-court statements. But these contradictions, and the contrary testimony of the officers, simply raise credibility questions, to be resolved by the jury. If the jury accepts her version of events, it will have a sufficient basis for finding that her Fourth Amendment rights were violated. Defendants' insistence that Annie Hickey was never considered a suspect by the police (Moeser Dep., Verde Aff. Ex. 36, at 119; Reese Dep., Verde Aff. Ex. 37, at 97–98) is beside the point: The relevant inquiry for the jury is what a reasonable person in Annie Hickey's position would believe, and therefore, the state of mind of the officers is not controlling. The jury may either reject the defendants' testimony entirely, or even if it credits the testimony, it may find nonetheless that a reasonable person in Annie Hickey's position would have believed that she was under arrest.

Defendants argue in the alternative that even if Annie Hickey was held against her will, her detention was justified for purposes of investigation. (D.Mem.11, 13.) Police officers may briefly detain a person for investigatory purposes, *see Terry v. Ohio,* 392 U.S. 1 (1968), although ordinarily that power of temporary, investigative detention is justified by the underlying purpose of determining whether a suspect should ultimately be placed under formal arrest. *See, e.g., United States v. Vita,* 294 F.2d 524, 530 (2d Cir.1961). Here, defendants disclaim any purpose of holding Annie Hickey as a suspect. In any event, the extent of investigative custody is not unbounded, *Florida v. Royer,* 460 U.S. 491, 499 (1983) (*Terry* "created only limited exceptions to the general rule that seizures of the person require probable cause to arrest"); *Dunaway v. New York,* 442 U.S. 200, 212–216 (1979) (custodial interrogation of suspect, after forcible removal from neighbor's home, for period of one hour required probable cause, not just *Terry* stop standard of reasonable suspicion), and it certainly cannot extend to the circumstances alleged here, which include forcible removal to a police station for an interrogation that stretched over several hours, accompanied by a denial of requests to seek medical treatment and to visit her son at the hospital.

**\*12** Annie Hickey's false arrest claim will therefore survive summary judgment. It is a separate question, however, against whom she can press this claim. The complaint names Siracusa, Andrews, Moeser, Wittig, Reese, Delaney, and "all others involved." (Compl.¶ 113.) Her claim can only survive against those defendants who a reasonable jury can find "confined" Annie Hickey "without [her] consent and without justification," that is, those defendants who contributed to a reasonable belief that she was not free to leave.

Annie Hickey's claim unquestionably survives against Siracusa, who allegedly told her that she had no choice but to accompany him to the precinct (Annie Hickey Aff. ¶ 28), and Moeser, who allegedly told her that she had to make a statement before she could leave, and could not make phone calls or speak to family members (Annie Hickey Aff. ¶ 34; Annie Hickey Dep. 110–111). The record on summary judgment, however, does not support her claims against any of the other police defendants, or against ADAs Reese and Delaney. Although Annie Hickey claims to have been surrounded by a number of police officers and escorted to the police car to be taken to the precinct (Annie Hickey Aff. ¶ 30), she does not identify which police officers, nor does her testimony provide any basis for finding that these officers were coercing or detaining her, rather than escorting her or simply milling about. She claims Andrews initially got into the back seat of the car with her (Annie Hickey Aff. ¶ 31), which could conceivably be viewed as blocking her exit, but Andrews's

presence in the backseat was fleeting: Plaintiff's testimony is that she was driven to the station seated alone in the back of the car (Annie Hickey Dep. 103–04). Moreover, neither her affidavit nor her deposition testimony reveals any other coercive behavior on the part of any other defendant other than Moeser, once she arrived at the station. [8] Therefore, plaintiffs' Second and Fourth Causes of Action are dismissed with regard to all defendants, except Siracusa and Moeser.

[8]   Plaintiff states that after Moeser, Reese, Delaney, and Wittig completed taking her tape recorded statement, they "made [her] stay awhile longer, about 20 minutes, before they finally let [her] leave" (Annie Hickey Aff. ¶¶ 40–43), but she provides no concrete details about their actions. The conclusory statement that these individuals "made [her] stay" is insufficient to raise a genuine issue of fact about coercion.

III. *Walter and Annie Hickey: Excessive Force Claims*
Defendants move to dismiss plaintiffs' Fifth (as against defendant Heihs), Sixth, Seventh, and Eighth Causes of Action, alleging use of excessive force in violation of plaintiffs' Fourth Amendment rights. Briefly summarized, these causes of action allege excessive use of force in the shooting of Walter Hickey (Fifth Cause of Action), excessive use of force in the beating of Walter Hickey (Sixth Cause of Action), and excessive use of force in the resulting injury to Annie Hickey as a consequence of Walter Hickey's shooting (Eighth Cause of Action). [9] Civil rights claims under § 1983 for excessive use of force in connection with seizure by law enforcement officials are governed by the "objective reasonableness" standard of the Fourth Amendment. *Graham v. Connor,* 490 U.S. 386, 395, 397 (1989). Whether the use of force by police in connection with a seizure is objectively reasonable, in turn, is determined in light of "careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* at 396. Where it is established that a cognizable Fourth Amendment seizure has occurred, summary judgment will only be appropriate if, viewing the evidence in the light most favorable to plaintiffs, no jury could find that the behavior of the officers was unreasonable. *See Amnesty Am. v. Town of West Hartford,* 361 F.3d 113, 123 (2d Cir.2004).

[9]    The Seventh Cause of Action should be dismissed as duplicative. *See* note 2 above.

**\*13** Defendants move to dismiss plaintiffs' Fifth Cause of Action only as against defendant Heihs, conceding that a genuine issue of material fact exists as to whether Teiner used excessive force in shooting Walter Hickey. (D. Reply Mem. 5.) Defendants find support for their motion in the apparent agreement between the parties that it was Teiner, not Heihs, who fired at Walter Hickey, and that Heihs indeed did not discharge his weapon at all. (P.R. 56.1 Stmt. ¶ 9.) Heihs' nonparticipation in the shooting, defendants argue, render plaintiffs' claims without basis in fact. (D.Mem.14.)

Defendants are mistaken, however, as a matter of law. "[A]ll law enforcement officials have an affirmative duty to intervene to protect the constitutional rights of citizens from infringement by other law enforcement officers in their presence." *Anderson v. Branen,* 17 F.3d 552, 557 (2d Cir.1994). An officer, although he or she does not personally inflict the injury at the core of an excessive use of force claim, may still be liable under § 1983 where he or she fails to intervene to prevent the harm, in spite of a "realistic opportunity" to do so, *O'Neill v. Krzeminski,* 839 F .2d 9, 11—12 (2d Cir.1998), and "observes or has reason to know ... that excessive force is being used." *Anderson,* 17 F.3d at 557. To be sure, it may be difficult to persuade a jury that Heihs could have done anything to prevent the shooting, even if plaintiffs succeed in demonstrating that Teiner used excessive force that evening. Events appear to have transpired very quickly, and there is no evidence that Teiner communicated his intention to fire before doing so. But ultimately, whether Heihs could have or should have intervened is an issue of fact for the jury to resolve. Contrary to defendants' argument, the mere fact that Heihs never discharged his weapon does not protect him from liability, if it can be shown that he could have and should have prevented Teiner from firing at Walter Hickey. Therefore, defendants' motion to dismiss the Fifth Cause of Action as against defendant Heihs must be denied.

Defendants next move for summary judgment of plaintiffs' Sixth Cause of Action, which alleges Heihs and Teiner used excessive force in dragging Walter Hickey off the front porch, throwing him onto the ground in front of his residence, and subjecting him to a savage beating, which consisted of "kick [ing] him in the head, stomach, body and other parts of the body, including stepping on

and kicking his head, causing him to suffer a gash on his head." (Compl. ¶ 47 .) While plaintiffs' memorandum also presses this claim against Hearns, they have not sought to amend their complaint and therefore this claim will only be considered as against Heihs and Teiner. Defendants claim that plaintiffs have failed to produce any evidence in support of this version of events, and have therefore failed to satisfy their burden. (D.Mem.15.)

Here, too, plaintiffs' case may be weak, but is adequate to survive summary judgment. A "moving party is 'entitled to judgment as a matter of law' [if] the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). On a cause of action for excessive force, plaintiffs would have the burden of establishing both the use of force and resulting injury, but there is little in the record before the Court on summary judgment to support plaintiffs' version of events. Heihs denied in his deposition testimony that any such beating took place (Heihs 9/9/03 Dep. 133—34, 141—42); the three deposed witnesses, all neighbors of the Hickeys, could not recall any beating (Mitchell Dep., Scott–McKelvey Dep., Mayas Dep.); and emergency room personnel who examined Walter Hickey found no injuries consistent with having been beaten (Engel Report 1—2). Nonetheless, Walter Hickey testifies that he was dragged and beaten in the manner alleged (Walter Hickey Aff. ¶ 30—31), and Annie Hickey also testified that Teiner and Heihs kicked her son after dragging him onto the lawn (Annie Hickey Dep. 87 —88; Annie Hickey Aff. ¶ 23). If Walter and Annie Hickey are believed, then Walter Hickey has a claim for excessive force in connection with the post-shooting assault. This conflict in the testimony must be resolved by the jury. Defendants' motion for summary judgment on plaintiffs' Sixth Cause of Action must be denied.

**\*14** Finally, defendants move for summary judgment on Annie Hickey's excessive use of force claim against Heihs and Teiner, for injuries she allegedly suffered when the glass in the storm door shattered following Teiner's firing of his weapon (Eighth Cause of Action). Defendants claim that Annie Hickey cannot state a cause of action for excessive use of force, because the Fourth Amendment's protection extends only to unreasonable seizures, and Annie Hickey was not "seized" under the Fourth Amendment where she was merely the unintentional victim of a shooting directed at her son.

(D.Mem.17—18.) Plaintiffs argue that Teiner's actions were directed equally at Walter and Annie Hickey. (P. Mem.9—10.)

In order to state an excessive force claim, Annie Hickey must indeed first establish that she was "seized," such that the Fourth Amendment is at all applicable. *Medeiros v. O'Connell,* 150 F.3d 164, 167 (2d Cir.1998) ("[T]he first step [in any section 1983 claim predicated on the Fourth Amendment] is to determine whether there has been a constitutionally cognizable seizure.") Whether Annie Hickey was "seized" for purposes of this Fourth Amendment excessive force claim is a different question from whether she was later "seized" for purposes of her false arrest claim. Here, the relevant conduct is the shooting as the source of her injuries from the shattered glass of the storm door, regardless of whether the storm door shattered as a result of the force of the second bullet, as plaintiffs contend, or as a result of the force of Walter Hickey's body as he fell, as defendants contend. *See* note 2 above. While a shooting may constitute a seizure for Fourth Amendment purposes, *Tennessee v. Garner,* 471 U.S. 1, 7 (1985), it is equally clearly established that the conduct at issue must be purposeful for it to raise the possibility of a Fourth Amendment violation. *Brower v. County of Inyo,* 489 U.S. 593, 597, 599 (1989) (Fourth Amendment seizure occurs "only where there is a governmental termination of freedom of movement *through means intentionally applied,"* such that the "person [is] stopped by the very instrumentality set in motion or put in place in order to achieve that result"). In a case of first impression, the Second Circuit applied this standard to the accidental shooting of a hostage during police efforts to apprehend the hostage-taker in *Medeiros,* holding that the hostage did not have a Fourth Amendment claim because the "police did not intend to restrain [the hostage]." *Medeiros,* 150 F.3d at 169. [10]

[10]     In so holding, the Second Circuit followed the approach of the First and Fourth Circuits, which rejected similar claims because the person restrained was not the intended object of the force applied. *See Landol–Rivera v. Cosme,* 906 F.2d 791 (1st Cir.1990) (rejecting Fourth Amendment claim of hostage injured by police bullet intended for armed robber); *Rucker v. Harford County,* 946 F.2d 278 (4th Cir.1991) (rejecting Fourth Amendment claim where bystander was killed when struck by bullets intended to stop fugitive's car).

Therefore, in order for Annie Hickey to have a Fourth Amendment claim, she must show as a threshold matter that she was the intended object of the force exerted by Teiner. If a genuine issue of material fact existed as to Teiner's intent in firing those two shots, this would preclude summary judgment. Despite the loose allegations made in their memorandum of law (P. Mem.9), plaintiffs have produced no actual evidence indicating that Teiner was attempting to restrain her when he fired. Annie Hickey's proximity to Walter Hickey on the porch does not in of itself give rise to the inference that the officers intended to restrain her, rather than the man they claim was gesturing at them with an object that appeared to be a gun.

**\*15** Although Annie Hickey therefore was not "seized" by the shooting for Fourth Amendment purposes because she was not the intended object of the shooting, she is not left wholly without protection: Police misconduct outside of the context of Fourth Amendment seizures may still give rise to claims under the substantive due process protections of the Fourteenth Amendment. *See, e.g., County of Sacramento v. Lewis,* 523 U.S. 833, 844—45 (1998); *Claybrook v. Birchwell,* 199 F.3d 350, 359 (6th Cir.2000)* ("[C]onstitutional tort claims asserted by persons collaterally injured by police conduct who were not intended targets of an attempted official 'seizure' are adjudged according to substantive due process norms."); *cf. Clark v. City of Norwalk,* No. X01CV 930146667, 1998 WL 886599, at \*9—\*10 (Conn.Super.Ct. Dec. 10, 1998) (unpublished opinion) (denying summary judgment on excessive force claim under due process standard of *County of Sacramento* where material fact existed as to whether police had some intent to harm minor passengers whey they fired upon car during police pursuit). Annie Hickey's claims are more appropriately examined under a substantive due process standard, as pressed in plaintiffs' Fifteenth Cause of Action and explored below. With regard to her Fourth Amendment claim, however, in the absence of a genuine issue of material fact as to Teiner's intent to restrain Annie Hickey, defendant's motion for summary judgment is granted.

## IV. *Walter and Annie Hickey: Deliberate Indifference Claims*

Defendants move for summary judgment on plaintiffs' Ninth and Tenth Causes of Action, alleging deliberate police indifference to the medical needs of Walter and Annie Hickey while they were in custody, in violation of plaintiffs' rights under the Fifth and Eighth Amendments. Defendants assert that the Fifth and Eighth Amendments are inapplicable to Walter and Annie Hickey, because they were neither subject to federal action as required by the Fifth Amendment, nor convicted of any crimes as required by the Eighth Amendment, and in the alternative, that plaintiffs have failed to produce any evidence of deliberate indifference to substantiate their claims. (D.Mem.18—20.)

Defendants are correct that plaintiffs' claims fall outside the protection of the Fifth and Eighth Amendments. *See Betts v. Brady,* 316 U.S. 455, 462 (1942) ("Due process of law is secured against invasion by the federal Government by the Fifth Amendment and is safeguarded against State action in identical words by the Fourteenth."), *overruled on other grounds by Gideon v. Wainwright,* 372 U.S. 335 (1963); *Ingraham v. Wright,* 430 U.S. 651, 668—71 (1977) (Eighth Amendment protection against "cruel and unusual punishment" applies only in postconviction setting). However, as plaintiffs correctly observe (P. Mem.10), "deliberate indifference" claims under § 1983 may be grounded in the due process clause of the Fourteenth Amendment. It is well-established that police officers have a constitutional duty under the Fourteenth Amendment to attend to the medical needs of those held in custody: "[W]hen the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being. The rationale for this principle is simple enough: when the State by the affirmative exercise of its power so restrains an individual's liberty that it renders him unable to care for himself, and at the same time fails to provide for his basic human needs—*e.g.,* food, clothing, shelter, medical care, and reasonable safety—it transgresses the substantive limits on state action set by the ... Due Process Clause." *DeShaney v. Winnebago County Dept. of Social Services,* 489 U.S. 189, 199 (1989) (internal citation and footnote omitted); *see also City of Revere v. Mass. General Hospital,* 463 U.S. 239, 244 (1983) ("Due Process clause ... does require the responsible government or governmental agency to provide medical care to persons ... who have been injured while being apprehended by the police."). Further, as the rights of those held without any adjudication of guilt must be equal to, if not greater than, the rights of those held pursuant to a valid conviction, the Supreme Court has directed courts to look to the standards applicable under

2004 WL 2724079

the Eighth Amendment in defining the scope of the corresponding Fourteenth Amendment duty. *See County of Sacramento v. Lewis,* 523 U.S. 833, 849–50 (1998); *Madden v. City of Meriden,* 602 F.Supp. 1160, 1163—64 (D.C.Conn.1985). Therefore, plaintiffs may have a cause of action if they can make out a claim of deliberate indifference under the *Estelle v. Gamble* test, 429 U.S. 97 (1976), established in the context of Eighth Amendment liability, but subsequently recognized as applicable to substantive due process claims for deliberate indifference as well. *See County of Sacramento,* 523 U.S. at 849—50. Walter Hickey was concededly in police custody at the time these claims arose, and because there is a material factual dispute about whether Annie Hickey was in police custody we must assume arguendo that she was.

**\*16** While plaintiffs' claims are legally sufficient, however, they fail because an adequate factual basis has not been supplied to sustain claims of deliberate indifference. Under *Estelle v. Gamble,* plaintiffs must "allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs ." 429 U.S. at 106. With regard to Walter Hickey, while the gunshot wound undoubtedly incurred serious medical needs, there is no evidence of indifference, deliberate or otherwise, to those needs. While plaintiffs continue to insist otherwise (*see e.g.,* P.R. 56.1 Stmt. ¶¶ 12—16), the record is clear that the police summoned an ambulance almost immediately (within two minutes of arriving on the scene), and that the ambulance arrived on scene within six minutes, and departed for the hospital twenty-two minutes later. (N.Y.PD 911 Sprint Report 1; Ambulance Call Report, Verde Aff. Ex. 18, at 1.) With regard to Annie Hickey, there is no basis upon which a reasonable factfinder could conclude that she was suffering from any serious medical condition requiring attention. Although Annie Hickey testified that she did tell police officers at the precinct that she was "ill" and "at the point of having a stroke," and requested water to take high blood pressure medication she had brought with her from home, she also testified that she was provided with a bottle of water and that she did take her medication. (Annie Hickey Dep. 106, 108, 368—69.) The only other injuries she alleges were cuts and bruises on her arm and foot, for which she did not seek treatment until two days after the incident. (*Id.* 305.) Since no evidence has been produced of serious medical needs, there is no basis for finding that the defendants showed deliberate indifference. Therefore, defendants' motion for summary judgment will be granted as to the deliberate indifference claims of both Walter and Annie Hickey.

## V. *Walter and Annie Hickey: Failure to Intervene Claims*

Defendants move for summary judgment on plaintiffs' Thirteenth and Fourteenth Causes of Action, alleging a failure by various defendants to intervene to prevent the abuses alleged throughout the Complaint. More specifically, plaintiffs have alleged in their Thirteenth Cause of Action that defendants failed to intervene to prevent false arrest, false imprisonment, malicious prosecution, abuse of process, and excessive use of force with regard to Walter Hickey (Compl.¶ 177), and to prevent false arrest, false imprisonment, and excessive use of force with regard to Annie Hickey in their Fourteenth Cause of Action (Compl.¶¶ 182—183). In support of their motion, defendants argue that none of the defendants would have had the opportunity to intervene to prevent any of the alleged abuses (D.Mem.25—29), and therefore can not be liable.

A "failure to intervene" cause of action does not itself state a separate constitutional violation. Rather, it is a means through which to hold additional defendants accountable for the violations committed by their co-defendants, given the duty discussed above of all law enforcement officials to prevent constitutional violations: "An officer who fails to intercede is liable for the preventable harm caused by the actions of the other officers where that officer observes or has reason to know: (1) that excessive force is being used; (2) that a citizen has been unjustifiably arrested; or (3) that any constitutional violation has been committed by a law enforcement official." *Anderson v. Branen,* 17 F.3d 552, 557 (2d Cir.1994) (internal citations omitted). For liability to attach to that officer, however, "there must have been a realistic opportunity to intervene to prevent the harm from occurring," and assessment of the existence of such a "realistic opportunity" for intervention and prevention is left to the factfinder's determination. *Id.*

**\*17** Setting aside the requisite showing of "realistic opportunity" for the moment, however, it is clear that there must be colorable claims of an underlying violation first before plaintiffs may state failure to intervene causes of action against additional defendants. Here, summary judgment has already been granted on Walter and Annie Hickey's causes of action for false imprisonment as duplicative, Walter Hickey's causes of action for malicious prosecution and abuse of process, and is granted below

on Annie Hickey's excessive use of force claim as a species of substantive due process violation, *see* Part VI.A below. Therefore these cannot serve to ground failure to intervene claims. On the remaining claims (false arrest of Walter Hickey; excessive use of force in arresting Walter Hickey; false arrest of Annie Hickey), plaintiffs have failed to make out a factual basis on which a reasonable factfinder could conclude that any defendants beyond those directly responsible for the alleged violations would have had a "realistic opportunity" to prevent their occurrence. First, on Walter Hickey's false arrest and excessive use of force claims, it is uncontested that only defendants Teiner and Heihs were on the scene when Teiner fired his weapon, the Fourth Amendment "seizure" that grounds those claims. Since plaintiffs' First and Fifth Causes of Action are already pressed against both Heihs and Teiner, a "failure to intervene" claim would be duplicative here. Similarly, plaintiffs have already pressed their Sixth Cause of Action against Teiner and Heihs for the alleged beating Walter Hickey endured after being shot. Although plaintiffs summarize the evidence as showing that Hearns, Filippidis, and Baker were present when the alleged beating occurred (P. Mem.13), none of these individuals are named as defendants.

Second, we have already determined that Annie Hickey's false arrest claim is only properly pressed against defendants Siracusa and Moeser, and "failure to intervene" claims against these defendants would be duplicative. Of the remaining named defendants, plaintiffs claim that Andrews, Ojeda, Wittig, Reese, Delaney, Amelia, and Patrick Reilly could have intervened to stop the alleged violations from incurring, but point to no evidence in the record to support this characterization. (P. Mem.14.) Indeed, the record shows no contact between Annie Hickey and defendant Amelia (who merely transported another officer to the Hickey residence the next morning (Amelia Dep., Verde Aff. Ex. 26, at 36—37)), and only minimal contacts between Annie Hickey and defendants Ojeda (who, as the desk officer that evening, had some awareness that Annie Hickey was in the precinct, but did not speak to her (Ojeda Dep., Verde Aff. Ex. 27, at 39—44)), Andrews (who escorted Annie Hickey to the precinct with Siracusa, *see* above), and Patrick Reilly (who interviewed Annie Hickey after she had already returned home (Patrick Reilly Dep., Verde Aff. Ex. 25, at 130)). Plaintiffs attempt to make out a case against Ojeda by pointing to the testimony of Carlton Newton, Annie Hickey's nephew, that he and other

Hickey family members were prevented from seeing Annie Hickey by officers on duty in the station that night. (P.R. 56.1 Stmt. ¶¶ 56—57.) But in fact, Newton's Affidavit does not identify Ojeda by name (Carlton Newton Aff. ¶¶ 19—27), and in any event, does not suffice to show that Ojeda, or any other defendant, knew that Annie Hickey's detention was allegedly illegal. *See Anderson,* 17 F.3d at 557 (officer must either "observe or have reason to know" of the violation); *Universal Calvary Church v. City of New York,* No. 96 Civ. 12236, 2000 WL 1538019, at *9 n. 20 (S.D.N.Y. Oct. 17, 2000) ("Although a failure to intervene and protect claim does not require a showing of presence, it does require the officer to have observed or have reason to know of the alleged violation." (*citing Anderson,* 17 F.3d at 557)). Likewise, although defendants Wittig (Wittig Dep., Verde Aff. Ex. 24, at 93—96), Reese, and Delaney questioned Annie Hickey that evening, she appears to have cooperated fully, going so far in her oral statement as to applaud the treatment she received. (Annie Hickey Taped Stmt. 29.) Whether she now disavows that voluntariness of her detention is irrelevant; at the time, even accepting the truth of Annie Hickey's account, defendants did not have any reason to suspect that she was being detained against her will and so cannot be held liable for a failure to intervene. Annie Hickey's claim of involuntary detention is that Siracusa told her she was required to go to the station and that Moeser kept her from having contact with relatives. If she acquiesced in these alleged shows of authority without further protest, and plaintiff does not contend that she made any, officers who encountered her later cannot have known she was there in obedience to authority. Accordingly, defendants' motion for summary judgment on plaintiffs' Thirteenth and Fourteenth Causes of Action is granted.

## VI. *Walter and Annie Hickey: Due Process Claims*

### A. *Substantive Due Process*

**\*18** Defendants move for summary judgment on plaintiffs' Fifteenth Cause of Action, alleging violations of Walter and Annie Hickey's substantive due process rights by defendants' "behavior shocking to the conscience," including "(i) attempting to murder Mr. Hickey and Ms. Hickey; (ii) shooting Mr. Hickey; (iii) savagely beating and assaulting Mr. Hickey; (iv) failing to provide timely, adequate medical attention to Mr. Hickey; and (v) arresting Ms. Hickey and forcing her to the precinct to attempt to force false statements from her as part of a cover-up of the wrongful

actions of the defendants." (Comp.¶ 187–188). These claims are largely duplicative, and improperly pressed as violations of substantive due process. This Court has already considered, and dismissed on summary judgment, plaintiffs' claims with regard to defendants' alleged indifference to Walter Hickey's medical needs. *See* Part IV above. Similarly, we have already assessed plaintiffs' claims springing from the shooting, alleged beating of Walter Hickey, and alleged illegal detention of Annie Hickey under the applicable Fourth Amendment standards, and have found that all will survive this summary judgment motion. It would be a waste of resources to permit these claims under the Fourteenth Amendment, as well as improper, given the Supreme Court's direction that substantive due process analysis is not available where a more specific constitutional standard is directly applicable. *See, e.g., Graham v. Connor,* 490 U.S. 386, 394 (1989) ( "The validity of the [excessive force] claim must then be judged by reference to the specific constitutional standard which governs that right, rather than to some generalized 'excessive force' standard.").

Only Annie Hickey's claims in connection with the shooting may be properly considered under a substantive due process analysis, because, as we have already determined, there was no cognizable Fourth Amendment seizure, and no other constitutional standard is directly applicable. *See* Part III above. But even this claim is legally insufficient. A substantive due process claim is only appropriate where governmental conduct "shocks the conscience" and transgresses the "decencies of civilized conduct," *Rochin v. California,* 342 U.S. 165, 172–73 (1952); ordinarily, such conduct must be "intended to injure in some way unjustifiable by any government interest." *County of Sacramento v. Lewis,* 523 U.S. 833, 849 (1998) (*quoting Daniels v. Williams,* 474 U.S. 327, 331 (1986) ("Historically, this guarantee of due process has been applied to *deliberate* decisions of government officials to deprive a person of life, liberty, or property.")). Merely negligent conduct by government officials is not constitutionally cognizable under substantive due process, *Daniels,* 474 U.S. at 328, and "recklessness or gross negligence" has only very occasionally sufficed, *see County of Sacramento,* 523 U.S. at 849–50 (compiling cases). In *County of Sacramento,* in the context of a high-speed police chase, the Supreme Court held that recklessness or gross negligence could not give rise to a Fourteenth Amendment substantive due process claim

where "unforeseen circumstances demand an officer's instant judgment," given that permitting liability in such situations would fail to " 'convey the appropriate hesitancy to critique in hindsight decisions [balancing competing interests and] necessarily made in haste, under pressure, and frequently without the luxury of a second chance.' " *Id.* at 852–54 (*quoting Whitley v. Albers,* 47 U.S. 312, 320 (1986)); *see also Medeiros v. O'Connell,* 150 F.3d 164, 170 (2d. Cir.1998) (*citing County of Sacramento* in rejecting Fourteenth Amendment claim brought on behalf of hostage killed by police bullet intended for hostage-taker).

**\*19** Applying these precedents to the specific circumstances of this case, Teiner's conduct cannot be said to have "shocked the conscience." No evidence has been adduced that it was Teiner's intent to restrain Annie, rather than Walter Hickey, when he fired his weapon, *see* Part III above, so at most Teiner might be said to have acted recklessly in shooting at Walter Hickey, with the unintended consequence that the glass storm door might shatter and injure Annie Hickey. Even if so, there can be no question that he acted with law enforcement goals in mind, making precisely the sort of split-second decision, balancing Walter Hickey's rights with public safety, protected by the standards announced in *County of Sacramento.* Perhaps, as a decision on the merits in this case will finally resolve, he struck that balance improperly, employing excessive force in restraining Walter Hickey, but that would not suffice to find a substantive due process violation as to Annie Hickey. Defendants' motion for summary judgment on plaintiffs' Fifteenth Cause of Action is therefore granted.

### B. *Procedural Due Process*

Plaintiffs have also pressed a number of procedural due process claims in their Sixteenth Cause of Action. Plaintiffs have alleged defendants "failed to give Miranda warnings either to Mr. Hickey or Ms. Hickey; they failed to allow Ms. Hickey to leave the 105th precinct; they failed to allow her to speak to a lawyer; they failed to allow her to see her family; they failed to allow her family members to see her; and generally completely denied procedural due process to Mr. Hickey and Ms. Hickey." (Compl.¶¶ 192–193.) Plaintiffs' procedural due process claims are either duplicative or meritless and require little discussion. Three of these claims are simply duplicative—allegations that Annie Hickey was illegally detained, including denying her and her family members access to one another, are covered

2004 WL 2724079

by her false arrest claim (Cause of Action Two). The remaining claims—failure to give Miranda warnings and failure to provide Annie Hickey with access to counsel—do not state constitutionally protected rights, and cannot give rise to procedural due process claims. *See Mathews v. Eldridge,* 424 U.S. 319, 332 (1976) ("Procedural due process imposes constraints on government decisions which deprive individuals of 'liberty' or 'property' interests within the meaning of the Due Process Clause of the Fifth or Fourteenth Amendment."). It is undisputed that Annie Hickey was never under formal arrest, nor subject to custodial interrogation as a suspect, and therefore, she had no protected right to a lawyer. *Brewer v. Williams,* 430 U.S. 387, 398–399 (1977) (Sixth and Fourteenth Amendment right to counsel attaches "at or after the time that judicial proceedings have been initiated against him whether by way of formal charge, preliminary hearing, indictment, information, or arraignment") (internal quotes omitted). And although Miranda warnings are a prerequisite to the admission of statements at a criminal trial resulting from any custodial interrogation, suppression of statements given in the absence of Miranda warnings is the proper mechanism for protection against self-incrimination under the Fifth Amendment. Failure to give Miranda warnings is not an independent wrong, and cannot give rise to potential § 1983 liability. *See O'Hagan v. Soto,* 523 F.Supp. 625, 629 (S.D.N.Y.1981) ( "Nothing in the Miranda opinion even suggests the elevation of the warning itself to the level of a constitutional right.... There is no reason or support for subjecting law enforcement officials to civil liability for failure to give Miranda warnings.") Therefore, defendants' motion for summary judgment on plaintiffs' Sixteenth Cause of Action is granted.

## VII. *Monell Claim*

**\*20** Plaintiffs' Seventeenth Cause of Action alleges a "pattern and practice of unjustified, unreasonable, and illegal beatings and excessive uses of force and other violations of law, including, but not necessarily limited to, false arrests, false imprisonments, abuses of process, malicious prosecutions, and procedural and substantive due process violations by police officers," which plaintiffs claim gives rise to liability on the part of the City of New York under *Monell v. Department of Social Services,* 436 U.S. 658 (1978). (Compl.¶ 197.) Municipal liability can be established under *Monell* where the alleged unconstitutional action "implements or executes a policy statement, ordinance, regulation, or decision officially

adopted or promulgated by [the municipality's] officers," or where that action results from "governmental 'custom' even though such a custom has not received formal approval through the body's official decisionmaking channels." *Id.* at 690–91. Liability for the actions of subordinates, as alleged here, hinges on providing a link to "actions or omissions of higher ranking officials with policymaking authority." *Amnesty Am. v. Town of West Hartford,* 361 F.3d 113, 126 (2d Cir.2004).

Plaintiffs advance two such links in support of *Monell* liability: first, that defendant police officers were not given proper training or supervision, and, second, that defendant City of New York had a policy of covering up civilian shootings leading to increased incidences of such shootings. (P. Mem.18–19.) A failure to train or supervise can raise municipal liability where it "amounts to deliberate indifference" to the violations which may occur as a result. *City of Canton v. Harris,* 489 U.S. 378, 388 (1989). Plaintiffs claim training should have been provided for virtually every aspect of the conduct involved in this case, including the appropriate use of deadly force, determination of probable cause for arrest, and investigation of civilian shootings. But even assuming that all of these various situations could meet the *Walker* test, which establishes certain requirements that must be met in this Circuit before a failure to train or supervise in a particular context will raise *Monell* liability, *see Walker v. New York,* 974 F.2d 293, 297–98 (2d Cir.1992), *cert. denied,* 507 U.S. 961 (1993), plaintiffs have not provided evidence of any such failure to train.

Plaintiffs cite to a preliminary report provided by one of their expert witnesses, but this report makes no effort to evaluate the training actually provided by the NYPD. With regard to a failure to train on use of force, the expert has relied on Teiner's deposition testimony, concluding simply that "assuming [Teiner's description of his initial and ongoing firearms training] is accurate" such training would be "dramatically flawed and inconsistent with generally accepted practices on law enforcement training." (Ryan Report, Cherner Decl. Ex. LL ¶¶ 30–33.) But as defendants note (D. Reply Mem. 11), Teiner's deposition testimony is hardly dispositive on this issue. For example, the expert report cites a lack of "shoot-don't shoot" training, but Teiner was never asked explicitly whether he received "shoot-don't shoot" training. (Teiner 9/8/03 Dep., Verde Reply Aff. Ex. 45, at 57–60.) And while the post-police academy training Teiner described appears

to be primarily target practice, he was never asked to unpack his affirmative response to the question of whether he received firearm training at the police academy, which "include [d] getting training on firing [his] weapon." *Id.* at 57. "Training on firing his weapon" might or might not have included "shoot-don't shoot" training, but it is impossible to know one way or the other from this exchange. No other discovery appears to have been taken on the subject.

**\*21** Similarly, the expert's report reveals nothing about what kinds of training officers may or may not have received with respect to plaintiffs' other claims; instead, the expert merely extrapolates from his analysis of the events that such events could have been avoided if proper training had been provided. (*See, e.g.,* Ryan Report ¶ 59 ("Obviously, this failure by multiple [communications] personnel indicates a failure to train communications personnel in a recurring law enforcement task that can have a dramatic impact on the rights of citizens.".) But these conclusory allegations are insufficient on summary judgment, *see Kulak v. City of New York,* 88 F.3d 63, 71 (2d Cir.1996) ("[C]onclusory statements, conjecture, or speculation by the party resisting the motion will not defeat summary judgment."); plaintiffs have failed entirely to develop any factual record to support their failure to train or supervise claims.

Plaintiffs have also failed to develop a factual record which would support their second theory of *Monell* liability, *i.e.,* an existence of "a policy of trying to cover up officer shootings of civilians and justify the shootings." (P. Mem.18.) While plaintiffs "need not identify an express rule or regulation," and can show instead a "persistent or widespread" practice amounting to a "custom or usage with the force of law," or a "failure to investigate" such that the conduct becomes an "accepted custom or practice," *Patterson v. County of Oneida,* 375 F.3d 206, 226 (2d Cir.2004), plaintiffs cite to no evidence at all in the record in support of this theory. Nor has the Court's search of the record revealed a factual basis for this claim. At most, perhaps plaintiffs could have pointed to the conclusion of their expert that the investigations of the ADAs and the NYPD into this incident were inadequate and biased (Ryan Report ¶¶ 44–55), but failure to investigate a single incident without more does not create a genuine issue of material fact as to whether such conduct has become an "accepted custom or practice." *See, e.g., Turpin v. Mailet,* 619 F.2d 196, 202 (2d Cir.1980)

("[A]bsent more evidence of supervisory indifference, such as acquiescence in a prior pattern of conduct, a policy could not ordinarily be inferred from a single incident of illegality such as a first arrest without probable cause or with excessive use of force."). The Court cannot, as plaintiffs appear to assume, somehow take judicial notice of a number of highly-publicized episodes of alleged police abuse or brutality, assume without any evidentiary record that these episodes all involved wrongful police behavior and a failure to investigate or punish such behavior, and extrapolate from those assumptions an effect on the present episode. Defendants are entitled, therefore, to summary judgment on plaintiffs' Seventeenth Cause of Action.

### VIII. § 1985 Claims

In Causes of Action Eighteen and Nineteen, plaintiffs allege that defendants conspired to "impede, hinder, obstruct, and defeat the due course of justice in New York State" with the intent to deprive the Hickeys of the equal protection of the laws in violation of § 1985(2) and, "motivated by invidious discriminatory intent," conspired to "deprive [the Hickeys] of the equal protection of the law and of equal privileges and immunities under the laws" in violation of § 1985(3). (Compl.¶¶ 205—207, 217—219.) Defendants argue that plaintiffs have failed to produce any evidence of either conspiracy or of any invidious discriminatory animus. (D.Mem.33–35.)

**\*22** While claims under §§ 1985(2) and (3) are distinct, both require a showing of class-based invidiously discriminatory animus, at least where obstruction of justice is alleged in connection with state court proceedings. *See Kush v. Rutledge,* 460 U.S. 719, 726 (1983) (affirming Ninth Circuit analysis requiring "class-based, invidiously discriminatory animus" in connection with § 1985(2), cl. 2 (state court proceedings), but not in connection with § 1985(2), cl. 1 (federal proceedings)); *Griffin v. Breckenridge,* 403 U.S. 88, 102 (1971) (requiring "racial, or otherwise class-based, invidiously discriminatory animus" under § 1985(3)); *Zemsky v. City of New York,* 821 F.2d 148, 151 (2d Cir.1987) ("A plaintiff states a viable cause of action under § 1985 [excepting clause 1 of § 1985(2) ] only by alleging a deprivation of his rights on account of his membership in a particular class of individuals.") Plaintiffs suggest that a race-based animus can be inferred here from "historical experience" of police discrimination against racial minorities, a racial epithet directed at Walter Hickey, and abusive language directed

at Annie Hickey. (P. Mem.20.) Plaintiffs have supplied no record of this "historical experience" and the abusive language cited evinces no race-based content. (*See, e.g.,* Annie Hickey Dep. 80 ("you fucking bitch, move").) According to Annie Hickey's deposition testimony, an unidentified officer, who appeared on the scene after the shooting, did say to Officer Teiner "don't worry about it, that's the nigger you shot, don't worry about it." (Annie Hickey Dep. 96.) But such an isolated instance of a racial slur, by an unidentified officer who is not a defendant, cannot create a genuine issue of material fact as to the motivations of those defendants who are alleged to have violated plaintiffs' rights. Absent evidence of racial or other class-based invidious discriminatory animus on the part of the defendants themselves, defendants are entitled to summary judgment on plaintiffs' § 1985 claims.

### IX. *State Law Claims*

Defendants move for summary judgment on the remaining two state law claims for false arrest and false imprisonment of Annie Hickey, pressed against ADAs Reese and Delaney (Causes of Action Twenty Six and Twenty Seven). Defendants argue that these claims are time-barred under the New York statute of limitations applicable to pendant state tort actions. (D. Mem. 35, *citing* N.Y. Gen. Mun. Law § 50–i.) If § 50–i applies, these claims are clearly time-barred: Under § 50–i, actions must be commenced within "one year and ninety days after the happening of the event upon which the claim is based." The events at issue here occurred on February 23 and 24, 1999, and this action was not filed until July 18, 2001, more than two years later.

Plaintiffs argue that as ADAs, defendants Reese and Delaney are state officials, and therefore unprotected by the terms of § 50–i (P. Mem.24), which provides a statute of limitations for actions against any "officer, agent or employee" of a "city, county, town, village, fire district or school district." N.Y. Gen. Mun. Law § 50–i. Plaintiffs are mistaken, however, courts have routinely considered § 50–i applicable to district attorneys as county officials. *See, e.g., Fox v. City of New York,* No. 03 Civ. 2268, 2004 WL 856299 (S.D.N.Y. Apr. 20, 2004) (applying § 50–i to state law claims against district attorney); *Drakeford v. Brooklyn Dist. Attorney,* 700 N.Y.S.2d 1, 1 (N.Y.App.Div.1999) (same); *Drake v. City of Rochester,* 408 N.Y.S.2d 847, 851–52 (N.Y.Sup.Ct.1978) (applying § 50–i to claims against county for acts of its district attorneys). Therefore, state law claims in this case

are time-barred and defendants' motion for summary judgment on these claims is granted. [11]

[11]    In any event, as discussed in Part II above, no evidence supports the claim that Reese and Delaney were responsible for the false arrest of Annie Hickey, and so these claims would fail on the merits.

### X. *Immunity*

#### A. *Police Defendants*

**\*23** Defendants move to have the complaint dismissed in its entirety against the police defendants (Safir, Wittig, Patrick Reilly, Ojeda, Siracusa, Amelia, Moeser, Sean M. Reilly, Andrews, Heihs, and Teiner) on the basis of qualified immunity. (D.Mem.39—40.) The only claims which will survive summary judgment are Cause of Action One (false arrest of Walter Hickey) as against Teiner and Heihs, Cause of Action Two (false arrest of Annie Hickey) as against Siracusa and Moeser, and Causes of Action Five and Six (excessive use of force in arrest of Walter Hickey) as against Teiner and Heihs, and so we need only consider whether qualified immunity applies to these claims and these defendants. Defendants will be entitled to qualified immunity "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982). A two-part inquiry is required: first, whether the facts alleged show a constitutional violation, and if so, second, whether that constitutional right was clearly established at the time of the constitutional violation, such that the "law put the officer on notice that this conduct would be clearly unlawful." *See Cowan v. Breen,* 352 F.3d 756, 761 (2d Cir.2003) (quoting from and interpreting requirements of *Saucier v. Katz,* 533 U.S. 194, 201—02, 205 (2001)).

We have already determined that the facts, viewed in the light most favorable to plaintiffs, allege constitutional violations. *See* Parts I, II, III above. If proven, these would certainly be violations of clearly established constitutional rights, *i.e.,* the right to be free from false arrest, *Dunaway v. New York,* 442 U.S. 200, 206–07 (1979); *Florida v. Royer,* 460 U.S. 491, 499—500 (1983), and to be free from excessive use of force in connection with arrest, *Graham v. O'Connor,* 490 U.S. 386, 395 (1989). At the same time, as we have already examined in connection with the underlying claims, the established law clearly would have put these defendants

on notice that their conduct might have been legally justified under certain circumstances, and defendants have argued that such circumstances existed here (*i.e.,* they had probable cause to seize Walter Hickey and Annie Hickey's consent to take her to the station house; use of force was "objectively reasonable" against Walter Hickey). Plaintiffs have advanced competing versions, sufficient to survive summary judgment, and so we cannot say as a matter of law whether defendants' conduct was legally justified. The merits of the underlying claims and the qualified immunity inquires therefore merge in this case, even where qualified immunity analysis would require ordinarily that they be kept separate. *See Saucier v. Katz,* 533 U.S. at 206 (reversing Ninth Circuit decision collapsing excessive force and qualified immunity analysis, reasoning qualified immunity analysis provides additional deference for a mistake of law); *cf. Cowan,* 352 F.3d at 764 n. 7 (where genuine issues of material fact exist in excessive force cases, *Saucier* analysis "ultimately converge[s] on one question: Whether in the particular circumstances faced by the officer, a reasonable officer would believe that the force employed was lawful"). Where such factual disputes exist as to whether conduct may be legally justified, neither qualified immunity, nor a decision on the merits can be granted as a matter of summary judgment. Defendants' motion is therefore denied.

### B. *ADAs Reese and Delaney*

**\*24** Defendants also move for dismissal of the complaint against ADAs Reese and Delaney, arguing they are entitled to absolute or qualified immunity. (D.Mem.36—39.) This Court has already determined that the ADAs are not entitled to absolute immunity for those Causes of Action not within the scope of prosecutorial immunity—Causes of Action Two, Four, Sixteen, Nineteen, Twenty–Six, and Twenty–Seven—but dismissed the remainder of the complaint as against Reese and Delaney. *Hickey v. City of New York,* No. 01 Civ. 6506, 2002 WL 1974058, at \*3–\*4 (S.D.N.Y. Aug. 26, 2002). At that time, the Court reserved decision as to whether they might be entitled to qualified immunity on the surviving claims until the factual record was more fully developed. *Id.* at \*5. Only Cause of Action Two (false arrest of Annie Hickey) has not been dismissed on summary judgment, and no evidence in the record supports pressing these claims as against ADAs Reese and Delaney. *See* Part II above. Reese and Delaney are not, therefore, in need of the

protection of qualified immunity, and defendants' motion to dismiss the complaint on this basis is moot.

### XI. *Sanctions*

Finally, defendants ask this Court to award sanctions against plaintiffs under Fed.R.Civ.P. 11.[12] Defendants argue sanctions are appropriate, first, because plaintiffs have pressed claims they know to be "legally meritless and factually unsupported" in violation of Fed.R.Civ.P. 11(b) (D. Reply Mem. 13–15) and, second, because plaintiffs have violated Magistrate Judge Maas's Order in this case barring counsel from engaging in personal attacks (D. Reply Mem. 15).

[12]    Defendants initially requested sanctions be imposed under the New York State Rules of the Chief Administrator of the Courts (D.Mem.40), a state statute inapplicable to these federal proceedings. Realizing their mistake, defendants have stated the proper basis for such a request in their reply memorandum (D. Reply Mem. 13).

Defendants' first request for sanctions based on plaintiffs' allegedly frivolous pleading may not simply be tacked on to a brief on the merits of their summary judgment motion. Such a motion must be brought separately, *see* Fed.R.Civ.P. 11(c) ("A motion for sanctions under this rule shall be made separately from other motions or requests."). Defendants attempt to excuse this dereliction by claiming that Judge Maas ordered or directed them to raise this issue in their reply papers. (D. Reply Mem. 13.) But the cited correspondence between counsel and Judge Maas does no such thing; it makes no reference to directing this Court's attention to plaintiffs' alleged frivolous pleading, and, in fact, was not even entered until August 10, 2004 (Maas 8/10/04 Order, Verde Reply Aff. Ex. 50, at 1), more than a month after defendants' "Rule 11" request was first made in a memorandum of law filed on July 2, 2004. Rather than purporting to overrule or grant an exception to Rule 11's requirement of a separate sanctions motion, the cited Order addresses an entirely different sanctions issue—plaintiffs' counsel's ad hominem attacks on defense counsel in plaintiffs' opposition memorandum; it is that matter which Judge Maas directed defendants to address in their reply brief in the instant motion. (*Id.* at 1.)

But regardless of this procedural defect, sanctions will not be granted. Plaintiffs have erected a superstructure of

2004 WL 2724079

claims that are meritless, duplicative, and/or trivial around the core of plausible triable claims in this case. Plaintiffs' counsel's refusal to dismiss even the most baseless or useless of these claims demonstrates overzealousness and lack of judgment. It is not so clear, however, that all or most of the arguments advanced are frivolous, in any technical sense. As can be seen from the preceding opinion, a few of the claims on which defendants move for summary judgment have merit sufficient to defeat the motion, and several more are supported by reasonable, if ultimately meritless, arguments. Plaintiffs' most troubling practice is their insistence on naming a number of officers as defendants who have no semblance of responsibility. Counsel's imprudent insistence on pursuing these claims required considerable time and expenditure on the part of defense counsel and the Court, and offered little or no genuine value to plaintiffs. Such conduct is not to be encouraged, and is not in the best tradition of legal advocacy, which aims for the vindication of a client's genuine rights in an efficient and effective way, not for the multiplication of claims that can have little impact on the ultimate outcome of the case. But sanctions may not be predicated on the foolish advancement of valueless and unlikely claims, unless the "claims, defenses, and other legal contentions" are not "warranted by existing law or by a nonfrivolous argument for the extension, modification, or reversal of existing law or the establishment of new law," and/or the "allegations and other factual contentions" have no "evidentiary support or ... [are not] likely to have evidentiary support after a reasonable opportunity for further investigation and support." (Fed.R.Civ.P. 11(b)(2)-(3).) We cannot say that the claims presented here are so lacking in legal and factual support as to be sanctionable.

**\*25** Defendants also seek sanctions via their reply papers for violation of Judge Maas's Order regarding personal vituperation, as directed by Judge Maas in the subsequent order discussed above. Interactions between opposing counsel in this case have been marked by such a degree of incivility that Judge Maas, after examining the transcript of one deposition and other submissions made by the parties in the discovery process, found it necessary to caution both sides about their behavior. (Discovery Order of October 30, 2003.) Judge Maas singled out the use of "pejoratives" directed by plaintiffs' counsel toward defendants' counsel for special rebuke, and warned that any future use of such "pejoratives" would result in the imposition of sanctions. (*Id.* at 1.) Defendants now claim

that plaintiffs have violated this order, pointing to a single paragraph in plaintiffs' opposition papers (D. Reply Mem. 15, *citing* P. Mem. 24–25), a claim to which plaintiffs have not had an opportunity to respond.

The paragraph in question is indeed personally offensive to counsel for defendants, and serves no purpose whatever, other than to divert attention from defendants' quite plausible demand for Rule 11 sanctions. It is hard to imagine how any attorney could regard this kind of language as effective advocacy, especially when a prior history of such interpersonal offensiveness has already led a judicial officer to admonish the lawyer, and to order that such conduct be avoided. Judge Maas's August 10 Order, however, leaves open to defendants' counsel the possibility of bringing the issue back to him if it is not addressed by this Court. (Maas 8/10/04 Order 1.) This is a more appropriate way of handling the matter. First, since plaintiffs have not had an opportunity to reply, referring the matter back to Judge Maas will permit any response plaintiffs would like to make, without delaying resolution of the merits of the motion. Second, Judge Maas, having issued the Order, is in a much better position to evaluate what, if any, sanction is merited by the conduct in question, taken in the context of the behavior occasioning the Order. Judge Maas's Order, however, remains in place, and is reaffirmed by this Court. Despite this Court's preference for having this issue resolved before Judge Maas, its patience is not infinite. As the case progresses to trial, behavior of the sort admonished by Judge Maas and exemplified in plaintiffs' brief will not be tolerated.

CONCLUSION

Accordingly, defendants' motion for summary judgment is granted in part, and denied in part. Summary judgment on Causes of Action Three, Four, Seven through Nineteen, Twenty–Six, and Twenty–Seven is hereby granted as to all defendants. Summary judgment on Causes of Action One, Five and Six, pressed only against defendants Teiner and Heihs, is hereby denied. Summary judgment on Cause of Action Two is denied as against defendants Siracusa and Moeser and granted on behalf of all other defendants. Defendants' motion for sanctions is also hereby denied.

**\*26** SO ORDERED.

2004 WL 2724079

**All Citations**

Not Reported in F.Supp.2d, 2004 WL 2724079

---

**End of Document**                    © 2017 Thomson Reuters. No claim to original U.S. Government Works.

2009 WL 1606753
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

David DECAYETTE, Plaintiff,
v.
Glenn S. GOORD, et al., Defendants.

No. 9:06–CV–783.
|
June 8, 2009.

West KeySummary

**1**  **Federal Civil Procedure**

   👉 Civil Rights Cases in General

   Genuine issue of material fact as to whether
   prison official had a reasonable opportunity
   to intervene in an incident precluded summary
   judgment in favor of inmate who brought a
   § 1983 action against a prison official who
   allegedly failed to intervene while other prison
   officials where beating inmate in violation
   of his Eighth amendment right. There were
   multiple issues of fact, including whether the
   other prison officials actually beat inmate,
   and if so whether prison official observed
   the beating, and if she observed the beating,
   whether she was capable of preventing or
   mitigating it. U.S.C.A. Const.Amend 8 42
   U.S.C.A. § 1983.

   Cases that cite this headnote

**Attorneys and Law Firms**

David Decayette, Romulus, NY, pro se.

Hon. Andrew M. Cuomo, Attorney General for the
State of New York, Christina L. Roberts–Ryba, Esq., of
Counsel, New York, NY, for Defendants.

**DECISION & ORDER**

THOMAS J. McAVOY, Senior District Judge.

**\*1**  This matter brought pursuant to 42 U.S.C. § 1983
was referred to the Hon. George H. Lowe, United
States Magistrate Judge, for a Report–Recommendation
pursuant to 28 U.S.C. § 636(b) and Local Rule 72.3(c).

The Report–Recommendation dated March 31, 2009
recommended that Defendants' motion be granted in part
and denied in part. On April 21, 2009, Plaintiff filed
an objection to the Report–Recommendation. Plaintiff's
objection focused primarily on the dismissal of the
Complaint against Defendant Commissioner Goord for
lack of sufficient personal involvement. On May 19,
2009, Defendant Volpe filed an objection to the Report–
Recommendation on the grounds that the action against
her should be dismissed in its entirety.

When objections to a magistrate judge's Report–
Recommendation are lodged, the Court makes a *"de
novo"* determination of those portions of the report or
specified proposed findings or recommendations to which
objection is made." *See* 28 U.S.C. § 636(b)(1). After such a
review, the Court may "accept, reject, or modify, in whole
or in part, the findings or recommendations made by
the magistrate judge. The judge may also receive further
evidence or recommit the matter to the magistrate judge
with instructions." *Id.*

Having reviewed the record *de novo* and having
considered the issues raised in Plaintiff's and Defendant's
objections respectively, with the exception of the Eighth
Amendment claim of inadequate medical care against
Defendant Volpe, this Court has determined to accept
the recommendations of Magistrate Judge Lowe for the
reasons stated in the Report–Recommendation.

For a plaintiff to succeed on a claim of inadequate
medical care in violation of the Eighth Amendment, two
factors must be shown: (1) that the plaintiff's medical
need was sufficiently serious; and (2) that the defendant
was deliberately indifferent to that serious medical need.
*Estelle v. Gamble,* 429 U.S. 97, 104, 97 S.Ct. 285, 50
L.Ed.2d 251 (1976); *Chance v. Armstrong,* 143 F.3d
698, 702 (2d Cir.1998). A plaintiff's medical need is
deemed sufficiently serious under an Eighth Amendment
claim if, looked at objectively, it is "a condition of
urgency, one that may produce death, degeneration, or
extreme pain." *Hathaway v. Coughlin,* 37 F.3d 63, 66

(2d Cir.1996) (citations omitted). A defendant acts with deliberate indifference when she "knows of and disregards an excessive risk to inmate health or safety." *Farmer v. Brennan,* 511 U.S. 825, 837, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994). "[T]he official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and [s]he must also draw the inference." *Id.*

Plaintiff has failed to show that the alleged injuries present at the time of his interactions with Defendant Volpe were sufficiently serious to satisfy the first prong. While it is unclear from Plaintiff's testimony whether Defendant Volpe was present at the time that the alleged injuries were suffered (Dkt. No. 36–4, at 43, lines 7–23), or whether she was brought into the room shortly thereafter, this distinction is immaterial to this claim. Plaintiff admits that his visible injuries were limited to cuts, bruises and swelling. Dkt. No. 36–4, at 49, lines 12–18. Injuries of this nature are not conditions of urgency that threaten death, degeneration or extreme pain. *Hickey v. City of New York,* No. 01–Civ. 6506(GEL), 2004 WL 2724079, *16 (S.D.N.Y. Nov. 29, 2004) (holding that cuts and bruises do not constitute sufficiently serious medical needs). Moreover, during a meeting with medical personnel on August 5, 2004, which was seven days after the alleged assault, the only injury complained of by Plaintiff was back pain (Dkt. No. 36–4, at 48, 49). Plaintiff admits that his back pain was caused by a 2002 bus accident, and does not allege that it was exacerbated by the incident in question. Dkt. No. 36–4, at 15–16. Accordingly, Plaintiff has failed to demonstrate that he had a sufficiently serious medical need.

**\*2** Assuming, *arguendo,* that Plaintiff's alleged injuries were sufficiently serious, Plaintiff has provided insufficient evidence that Defendant Volpe both knew of and disregarded any such injuries. Plaintiff alleges that he currently suffers nerve damage in his groin area as a result of the alleged assault. Dkt. No. 36–4, at 9. However, the evidence provided by Plaintiff is insufficient to show that Defendant Volpe either knew of or disregarded such injury during her encounters with Plaintiff on or about July 29, 2004 and July 31, 2004.

The first interaction between Defendant Volpe and Plaintiff occurred on July 29, 2004. Dkt. No. 36–12, at 7. According to Plaintiff, Defendant Volpe was either in the room during the alleged assault, or she was brought

into the room immediately thereafter. Dkt. No. 36–4, at 43, lines 7–23. However, Plaintiff does not allege that he notified Defendant Volpe of any specific injuries, including to his groin, during this interaction. Further, the fact that Plaintiff was wearing undershorts during this interaction suggests that, even upon visual inspection, Defendant Volpe would likely have been unable to observe an injury to Plaintiff's groin. While Plaintiff does allege to have had blood visible in his underwear, he did not notice this blood until July 31, 2004 (Dkt. No. 1, at 6), approximately two days after his initial interaction with Defendant Volpe. Accordingly, there is an insufficient basis upon which to conclude that Defendant Volpe was aware of Plaintiff's alleged groin injury at the time of their initial interaction.

The second interaction between Defendant Volpe and Plaintiff occurred on or about July 31, 2004. Dkt. No. 36–4, at 43. On this date, Plaintiff alleges that he noticed blood in his underwear and notified Capt. Felix. Dkt. No. 1, at 5–6. Plaintiff was subsequently removed from his cell to be photographed and inspected. *Id.* Shortly thereafter, Defendant Volpe attended to Plaintiff and attempted to retrieve a urine sample from him. Dkt. No. 36–4, at 43. Plaintiff states that he was unable to provide a urine sample at that time, and that another nurse obtained a urine sample from him the following day. Dkt. No. 36–4, at 46, lines 5–13. Plaintiff admits that he saw medical staff on the day that he was removed from his cell to be inspected and photographed, which was the same day that Defendant Volpe attempted to retrieve his urine sample. Dkt. No. 36–4 at 46–47. Further, Plaintiff admits that he has received consistent medical care from a urologist from the time of the alleged assault to the present date. Dkt. No. 36–4, at 10. As such, there is insufficient evidence to suggest that Defendant Volpe disregarded Plaintiff's injuries once she became aware of the possibility that they may exist.

For the foregoing reasons, Plaintiff has not provided sufficient evidence upon which a fair minded trier of fact could reasonably conclude that he sustained sufficiently serious injuries, or that Defendant Volpe acted with deliberate indifference to a serious injury of which she was aware.

**\*3** It is therefore

2009 WL 1606753

**ORDERED** that summary judgment be granted dismissing all claims against Defendants Goord, Allard, Berry, Meeks, Martin, and Sugg; and it is further

**ORDERED** that summary judgment be granted dismissing the Eighth Amendment claim of inadequate medical care against Defendant Volpe; and it is further

**ORDERED** that Defendant Volpe's motion for summary judgment be denied as to the Eighth Amendment claim of failure to intervene.

The case shall proceed to trial against Defendant Volpe on Plaintiff's Eighth Amendment claim of failure to intervene, against Defendants Schewnki and Roberts on Plaintiff's Eighth Amendment claims of excessive force, and against Defendants Schewnki and Roberts on Plaintiff's First Amendment retaliation claims.

**IT IS SO ORDERED.**

*REPORT–RECOMMENDATION AND ORDER*

GEORGE H. LOWE, United States Magistrate Judge.

This *pro se* prisoner civil rights action, commenced pursuant to 42 U.S.C. § 1983, has been referred to me for Report and Recommendation by the Honorable Thomas J. McAvoy, Senior United States District Judge, pursuant to 28 U.S.C. § 636(b) and Local Rule 72.3(c). Generally, David Decayette ("Plaintiff") alleges that in July and August of 2004, while he was incarcerated at the Franklin Correctional Facility ("Franklin C.F."), ten employees of the New York State Department of Correctional Services ("DOCS") violated certain of his constitutional rights. (*See generally* Dkt. No. 1 [Plf.'s Compl.].) Currently pending before the Court is Defendants' motion for partial summary judgment [1] pursuant to Fed.R.Civ.P. 56. (Dkt. No. 36.) For the reasons that follow, I recommend that Defendants' motion be granted in part and denied in part.

[1]     The motion is made on behalf of all Defendants except Roberts and Schewnki.

## I. BACKGROUND

### A. Summary of Plaintiff's Complaint

Liberally construed, Plaintiff's Complaint alleges as follows. (Dkt. No. 1.) Plaintiff and another inmate (identified in subsequent pleadings as inmate Rashad) were transferred to Franklin C.F. on or about the same day. Certain of Rashad's personal property was missing. On or about July 13, 2004, Defendants Sgt. Berry and Corrections Officer Sugg confiscated certain of Plaintiff's personal property. These Defendants permitted Rashad, who was gang affiliated, to view Plaintiff's personal property, including personal photographs.

In his Memorandum of Law submitted in opposition to Defendants' summary judgment motion, Plaintiff alleges that although Rashad's property was not found among Plaintiff's property, Rashad nevertheless believed that Plaintiff possessed it. Rashad threatened Plaintiff, claiming that while viewing Plaintiff's personal property he had obtained information concerning Plaintiff's family and their address. Rashad warned of "serious problems" if he did not get his property back. Dkt. No. 39, at 8–9. [2]

[2]     The page numbers referred to in this Report–Recommendation are those assigned by the ECF system.

In his Complaint Plaintiff alleges that he subsequently filed a grievance concerning this matter. It appears that the grievance was in the form of a letter to Defendant Goord, then the Commissioner of DOCS. Upon the recommendation of Defendant Goord, Plaintiff was interviewed by Defendant Lt. Meeks. Defendant Berry gave Plaintiff "an ultimatum [to] re-write and sign a statement informing Comm. Goord that there was a misunderstanding." Dkt. No. 1, at 2. Plaintiff declined to do so, and he was issued a false misbehavior report.

**\*4** Without being given a formal hearing on the report Plaintiff was taken to the Special Housing Unit ("SHU"). Upon his arrival at SHU he was confronted by Defendants Sgt. Schewnki, Corrections Officer Roberts, and an unidentified Corrections Officer. They "started reminding the plaintiff about the incident with the statement that he refused to write," (Dkt. No. 1, at 4) and then they beat him. He suffered significant injuries and endured severe pain, but he was denied medical treatment.

## II. APPLICABLE LEGAL STANDARDS

### A. Legal Standard Governing Motions for Summary Judgment

Under Fed.R.Civ.P. 56, summary judgment is warranted if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). In determining whether a genuine issue of material [3] fact exists, the Court must resolve all ambiguities and draw all reasonable inferences against the moving party. [4]

[3]    A fact is "material" only if it would have some effect on the outcome of the suit. *Anderson v. Liberty Lobby,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

[4]    *Schwapp v. Town of Avon,* 118 F.3d 106, 110 (2d Cir.1997) [citation omitted]; *Thompson v. Gjivoje,* 896 F.2d 716, 720 (2d Cir.1990) [citation omitted].

However, when the moving party has met its initial burden of establishing the absence of any genuine issue of material fact, the nonmoving party must come forward with "specific facts showing that there is a genuine issue for trial." [5] The nonmoving party must do more than "rest upon the mere allegations ... of the [plaintiff's] pleading" or "simply show that there is some metaphysical doubt as to the material facts." [6] Rather, "[a] dispute regarding a material fact is *genuine* if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." [7]

[5]    Fed.R.Civ.P. 56(e) ("When a motion for summary judgment is made [by a defendant] and supported as provided in this rule, the [plaintiff] may not rest upon the mere allegations ... of the [plaintiff's] pleading, but the [plaintiff's] response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the [plaintiff] does not respond, summary judgment, if appropriate, shall be entered against the [plaintiff]."); *see also Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 585–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

[6]    *Matsushita,* 475 U.S. at 585–86; *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *see also* Fed.R.Civ.P. 56(e) ("When a motion for summary judgment is made

[by a defendant] and supported as provided in this rule, the [plaintiff] may not rest upon the mere allegations ... of the [plaintiff's] pleading ....").

[7]    *Ross v. McGinnis,* 00–CV–0275, 2004 WL 1125177, at *8 (W.D.N.Y. Mar.29, 2004) [internal quotations omitted] [emphasis added]. The undersigned will provide a copy of all electronically-available-only opinions in this Report–Recommendation to Plaintiff in light of the Second Circuit's recent decision in *Lebron v. Sanders,* 557 F.3d 76 (2d Cir.2009).

Where a plaintiff has failed to respond to a defendant's properly filed and facially meritorious memorandum of law (submitted in support of its motion for summary judgment), the plaintiff is deemed to have "consented" to the legal arguments contained in that memorandum of law under Local Rule 7.1(b)(3) of the Local Rules of Practice for this Court. [8] Stated another way, where a defendant has properly filed a memorandum of law (in support of a properly filed motion for summary judgment), and the plaintiff has failed to respond to that memorandum of law, the only remaining issue is whether the legal arguments advanced in the defendant's memorandum of law are *facially meritorious.* [9] A defendant's burden in making legal arguments that are facially meritorious has appropriately been characterized as "modest." [10]

[8]    N.D.N.Y. L.R. 7.1(b)(3) ("Where a properly filed motion is unopposed and the Court determines that the moving party has met its burden to demonstrate entitlement to the relief requested therein, the non-moving party's failure to file or serve any papers as required by this Rule shall be deemed as consent to the granting or denial of the motion, as the case may be, unless good cause be shown ."); N.D.N.Y. L.R. 7.1(a) (requiring opposition to motion for summary judgment to contain, *inter alia,* a memorandum of law); *cf.* Fed.R.Civ.P. 56(e) ("When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's *response* ... must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not *respond,* summary judgment, if appropriate, shall be entered against the adverse party.") [emphasis added]; *see, e.g., Beers v. GMC,* 97–CV–0482, 1999 U.S. Dist. LEXIS 12285, at *27–31, 1999 WL 325378 (N.D.N.Y. March 17, 1999) (McCurn, J.) (deeming plaintiff's failure, in his opposition papers, to oppose several arguments by defendants in their motion for

2009 WL 1606753

summary judgment as consent by plaintiff to the granting of summary judgment for defendants with regard to the claims that the arguments regarded, under Local Rule 7.1[b][3] ).

[9]      *Hernandez v. Nash,* 00–CV–1564, 2003 U.S. Dist. LEXIS 16258, at *7–8, 2003 WL 22143709 (N.D.N.Y. Sept. 10, 2003) (Sharpe, M.J.) (before a motion to dismiss may be granted under Local Rule 7.1[b] [3], "the court must review the motion to determine whether it is *facially meritorious*" ) [emphasis added; citations omitted] ).

[10]     *See Ciaprazi v. Goord,* 02–CV0915, 2005 WL 3531464, at *8 (N.D.N.Y. Dec.22, 2005) (Sharpe, J.; Peebles, M.J.) (characterizing defendants' threshold burden on a motion for summary judgment as "modest") (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 323–324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)).

Finally, in construing Plaintiff's claims, the Court has afforded Plaintiff's Complaint the liberal construction that all pleadings must be afforded, under Fed.R.Civ.P. 8. *See* Fed.R.Civ.P. 8(f) ("All pleadings shall be so construed as to do substantial justice."). Furthermore, the pleadings of *pro se* litigants are construed with even more liberality than is required under Fed.R.Civ.P. 8, [11] and the Court has done so here. The rationale for extending this special liberality to the pleadings of *pro se* litigants is that, generally, *pro se* litigants are unfamiliar with legal terminology and the litigation process.

[11]     *Cruz v. Gomez,* 202 F.3d 593, 597 (2d Cir.2000) ("[C]ourts must construe *pro se* pleadings broadly, and interpret them to raise the strongest arguments that they suggest.") [internal quotation marks and citation omitted].

## III. ANALYSIS

### POINT I

**The claims against Defendants Goord and Allard should be dismissed because of a lack of personal involvement.** [12]

[12]     Plaintiff failed to respond to Defendants' legal arguments on this point. *See* discussion at pages 4–5 above. Nevertheless the Court has performed an independent review of the record.

*5 " '[P]ersonal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.' " *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (quoting *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 [2d Cir.1991] ). [13] In order to prevail on a cause of action under 42 U.S.C. § 1983 against an individual, a plaintiff must show some tangible connection between the alleged unlawful conduct and the defendant. [14] If the defendant is a supervisory official, such as a DOCS Commissioner or a correctional facility superintendent, a mere "linkage" to the unlawful conduct through "the prison chain of command" (i.e., under the doctrine of *respondeat superior* ) is insufficient to show his or her personal involvement in that unlawful conduct. [15] In other words, supervisory officials may not be held liable merely because they held a position of authority. [16] Rather, supervisory personnel may be considered "personally involved" only if they (1) directly participated in the violation, (2) failed to remedy that violation after learning of it through a report or appeal, (3) created, or allowed to continue, a policy or custom under which the violation occurred, (4) had been grossly negligent in managing subordinates who caused the violation, or (5) exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that the violation was occurring. [17]

[13]     *Accord, McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir.1977), *cert. denied,* 434 U.S. 1087, 98 S.Ct. 1282, 55 L.Ed.2d 792 (1978); *Gill v. Mooney,* 824 F.2d 192, 196 (2d Cir.1987).

[14]     *Bass v. Jackson,* 790 F.2d 260, 263 (2d Cir.1986).

[15]     *Polk County v. Dodson,* 454 U.S. 312, 325, 102 S.Ct. 445, 70 L.Ed.2d 509 (1981); *Richardson v. Goord,* 347 F.3d 431, 435 (2d Cir.2003); *Wright,* 21 F.3d at 501; *Ayers v. Coughlin,* 780 F.2d 205, 210 (2d Cir.1985).

[16]     *Black v. Coughlin,* 76 F.3d 72, 74 (2d Cir.1996).

[17]     *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995) (adding fifth prong); *Wright,* 21 F.3d at 501 (adding fifth prong); *Williams v. Smith,* 781 F.2d 319, 323–324 (2d Cir.1986) (setting forth four prongs).

With respect to Defendant Goord, in 2004 he was the Commissioner of DOCS. Dkt. No. 1 at 1. Defendant Allard was the Superintendent of Franklin C.F. *Id.* In his Complaint Plaintiff alleges that he "wrote a letter"

to them, [18] advising them as to what had occurred and his concerns. *Id.,* at 2–3. In his "Statement Pursuant to Rule 7.1(a)(3)," Plaintiff alleges that Goord "ordered an investigation into the incident." Dkt. No. 39, at 3. The investigation was conducted by Defendant Meeks. Dkt. No. 1, at 2; Dkt. No. 39, at 4; Dkt. No. 36–7, at 2–3.

[18]     Beyond Plaintiff's allegation the record reflects only a letter to Defendant Goord, which was forwarded to Defendant Allard. Dkt. No. 36–7, at 5.

The foregoing does not constitute personal involvement in the alleged constitutional violations. "Defendant Goord was, during the time in question, entitled to (1) refer letters of complaint to subordinates ..., and (2) rely on those subordinates to conduct an appropriate investigation and response." *Fletcher v. Goord,* 07–CV–0707, 2008 WL 4426763, at * 17 (N.D.N.Y. Sept.25, 2008) (Sharpe, J., adopting Report–Recommendation by Lowe, M.J., on *de novo* review); *see also Cabassa v. Gummerson,* 01–CV–1039, 2008 WL 4416411, at *7 (N.D.N.Y. Sept.24, 2008) (Hurd, J., adopting Report–Recommendation by Lowe, M.J. on *de novo* review) ("[A]s the superintendent of Auburn C.F., Defendant Walker was entitled to rely on his subordinate correctional officers (including the three members of the Periodic Review Committee) to conduct an appropriate investigation of an issue at the facility, without personally involving Defendant Walker in that issue."); *Garvin v. Goord,* 212 F.Supp.2d 123, 126 (W.D.N.Y.2002) ("[W]here a commissioner's involvement in a prisoner's complaint is limited to forwarding of prisoner correspondence to appropriate staff, the commissioner has insufficient personal involvement to sustain a § 1983 cause of action."); *cf. Sealey v. Giltner,* 116 F.3d 47, 51 (2d Cir.1997) (DOCS Commissioner was not personally involved in alleged constitutional violation where he forwarded plaintiff's letter of complaint to a staff member for decision, and he responded to plaintiff's letter inquiring as to status of matter).

**\*6** Accordingly, it is recommended that summary judgment be granted in favor of Defendants Goord and Allard, dismissing the Complaint as against them.

***POINT II***

**The conduct of Defendants Berry and Sugg in the examination of Plaintiff's personal property did not amount to a constitutional violation.** [19]

[19]     Plaintiff failed to respond to Defendants' legal arguments on this point. *See* discussion at pages 4–5 above. Nevertheless the Court has performed an independent review of the record.

As indicated above, Plaintiff and another inmate ("Rashad") were transferred to Franklin C.F. on the same day. Certain of Rashad's personal property was missing. Plaintiff alleges that "Defendants Berry and Sugg elected to allow inmate Rashad to go through Plaintiff's property to look for his missing items." Dkt. No. 39, at 2. Plaintiff's objection appears to be that Berry and Sugg alone should have examined his property and taken an inventory to ascertain whether Rashad's missing property was included with his. *Id.,* at 2–3. Berry and Sugg have declared under oath that at no time did they "allow the plaintiff's property to be viewed by inmate Rashad or any other inmate." Dkt. No. 36–8, at 2; *see also* Dkt. No. 36–11, at 2–3. In addition, Plaintiff has no non-hearsay evidence to support his claim that Rashad examined his property. Dkt. No. 39, at 3. Finally, Plaintiff has not even alleged, not to mention proffered admissible evidence, that Berry and Sugg knew or should have known that Rashad subsequently would threaten Plaintiff.

In any event, even assuming *arguendo* that Plaintiff's version of the events is correct, there were no constitutional violations. With respect to the Fourth Amendment, it provides that "[t]he right of the people to be secure in their persons ... against unreasonable searches ... shall not be violated." U.S. Const. amend IV. "What is reasonable, of course, depends on all of the circumstances surrounding the search or seizure and the nature of the search or seizure itself." *Skinner v. Ry. Labor Executives' Ass'n,* 489 U.S. 602, 619, 109 S.Ct. 1402, 103 L.Ed.2d 639 (1989) (internal quotation marks and citation omitted). "Thus, the permissibility of a particular practice is judged by balancing its intrusion on the individual's Fourth Amendment interests against its promotion of legitimate governmental interests." *Skinner,* 489 U.S. at 619 (internal quotation marks and citations omitted). In so doing, "[c]ourts must consider the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it

is conducted." *Bell v. Wolfish,* 441 U.S. 520, 559, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979) (citations omitted), *accord, Covino v. Patrissi,* 967 F.2d 73, 77 (2d Cir.1992). The Fourth Amendment's proscription against unreasonable searches does not apply *at all* within the confines of a prison cell. *Hudson v. Palmer,* 468 U.S. 517, 526, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984). Therefore, Plaintiff has not stated a Fourth Amendment claim.

With respect to the Eighth Amendment, generally, to prevail on a claim of inadequate prison conditions, a plaintiff must show two things: (1) that the conditions of his confinement resulted in deprivation that was *sufficiently serious;* and (2) that the defendant acted with *deliberate indifference* to the plaintiff's health or safety. *Farmer v. Brennan,* 511 U.S. 825, 834, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994); *Davidson v. Murray,* 371 F.Supp.2d 361, 370 (W.D.N.Y.2005). "[D]eliberate indifference [for purposes of an Eighth Amendment claim] describes a state of mind more blameworthy than negligence." *Farmer,* 511 U.S. at 835. Here, again assuming *arguendo* that Plaintiff's version of the events is correct, for Defendants Berry and Sugg to have allowed Rashad to go through Plaintiff's property to look for his missing items, at a point in time when they had no reason to anticipate the alleged subsequent events, clearly was not a serious deprivation. Similarly, their conduct, at the most, was negligent, and not deliberately indifferent.

**\*7** Accordingly, it is recommended that summary judgment be granted in favor of Defendants Berry and Sugg, dismissing Plaintiff's claims based upon the examination of his personal property.

### POINT III

### Plaintiff's excessive force claims against Defendants Allard, Meeks, Berry, Sugg, and Martin should be dismissed.

In his Complaint Plaintiff alleges that the aforementioned Defendants, along with Defendants Schewnki and Roberts (and John Doe), "wantonly and with malice assaulted and battered him." Dkt. No. 1, at 7. However, in his "Statement Pursuant to Rule 7.1(a) (3)," Plaintiff stated that Defendants Roberts and Schewnki (and John Doe) "beat him"; "those were the only Defendants that beat Plaintiff." Dkt. No. 39, at 5. His deposition testimony

was consistent with these statements. Dkt. No. 36–4, at 26–33.

Defendants Schewnki and Roberts have not moved for summary judgment on Plaintiff's excessive force claims. Dkt. No. 36–13, at ii (ftn.1). Given Plaintiff's concession that only Defendants Schewnki and Roberts allegedly beat him, it is recommended that summary judgment be granted in favor of all other Defendants, dismissing as against them Plaintiff's Eighth Amendment excessive force claims.

### POINT IV

### Triable issues of fact exist as to whether Defendant Volpe was deliberately indifferent to a serious medical need.

To prevail on an Eighth Amendment claim of inadequate medical care, a plaintiff must show two things: (1) that the plaintiff had a *sufficiently serious* medical need; and (2) that the defendant was *deliberately indifferent* to that serious medical need. *Estelle v. Gamble,* 429 U.S. 97, 104, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976); *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998). To be sufficiently serious for purposes of the Constitution, a medical condition must be "a condition of urgency, one that may produce death, degeneration, or extreme pain." *Nance v. Kelly,* 912 F.2d 605, 607 (2d Cir.1990) (Pratt, J., dissenting) (citations omitted); *accord, Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1996), *cert. denied,* 513 U.S. 1154, 115 S.Ct. 1108, 130 L.Ed.2d 1074 (1995); *Chance,* 143 F.3d at 702. With respect to the second prong, "deliberate indifference describes a state of mind more blameworthy than negligence;" it is a state of mind akin to criminal recklessness. *Farmer,* 511 U.S. at 827, 835.

The argument of Defendant Volpe (a Registered Nurse) that Plaintiff's Eighth Amendment claim of insufficient medical care should be dismissed as against her opens with the contention that she "was brought into the room after [Plaintiff] was allegedly assaulted by Defendants Roberts and Schewnki." Dkt. No. 36–13, at 10. In support of this contention, Volpe cites to page 39 of the transcript of Plaintiff's deposition, at lines 22–25. It is dismaying to this Court that Volpe failed to cite to the following questions and answers that appear on the same page of the transcript:

Decayette v. Goord, Not Reported in F.Supp.2d (2009)

2009 WL 1606753

Q: Why is [Volpe] a defendant? Why do you have her listed here as a defendant?

**\*8** A: Because she was—she was—she was in the room at the time during the incident happened and she never entered into the record that she noted that—she noticed that I was bleeding.

Q: She was in the room when you're claiming that the three officers—

A: Right.

Q:—beat you?

A: Right.

Dkt. No. 36–4, at 39, lines 5–15. In his Memorandum of Law [20] Plaintiff states:

[20] In an Affidavit Plaintiff swears that "[a]ll statements made by me in my Complaint and associated documents are true." Dkt. No. 39, at 1. Fed.R.Civ.P. 56(e) provides: "When a motion for summary judgment is made [by a defendant] and supported as provided in this rule, the [plaintiff] may not rest upon the mere allegations ... of the [plaintiff's] pleading, but the [plaintiff's] response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial." Here the Court is mindful of the special leniency to be afforded to a *pro se* litigant alleging a civil rights violation.

Upon Plaintiff's arrival at the S.H.U. Defendant Roberts began to physically assault Plaintiff, and Sgt. Schewnski eventually joined in the assault as Defendant Volpe watched from the doorway.

Dkt. No. 39, at 10. In his "Statement Pursuant to Rule 7.1(a) (3)" Plaintiff states: "during and after he was being beat, he saw Defendant Volpe." Dkt. No. 39, at 5. In short, there clearly is an issue of fact as to whether Defendant Volpe observed the alleged beating. If the trier of fact concludes that she did, and accepts Plaintiff's version of the alleged beating (punching and slapping both sides of his face, punching him in the ribs, kicking him in the groin area; *see* Dkt. No. 36–4 at 32–37) and further accepts Plaintiff's version of his condition following the alleged beating ("multiple bruises, cut above my eye, and as well as blood that was shown to my underwear and stuff

like that"; Dkt. No. 36–4, at 47; *see also* Dkt. No. 1, at 3–5), a finding of an Eighth Amendment violation would not be unreasonable.

Accordingly, it is recommended that Defendant Volpe's motion for summary judgment dismissing Plaintiff's Eighth Amendment claim as against her be denied.

### POINT V

### Triable issues of fact exist as to whether Defendant Volpe is liable for failing to intervene during the alleged beating of Plaintiff.

Liberally construed, based upon the allegations referenced above in Point IV, Plaintiff has asserted a failure to intervene cause of action against Defendant Volpe.

Law enforcement officials can be held liable under § 1983 for not intervening in a situation where another officer is violating an inmate's constitutional rights. *Jean–Laurent v. Wilkinson,* 540 F.Supp.2d 501, 512 (S.D.N.Y.2008). A state actor may be held liable for failing to prevent another state actor from committing a constitutional violation if "(1) the officer had a realistic opportunity to intervene and prevent the harm; (2) a reasonable person in the officer's position would know that the victim's constitutional rights were being violated; and (3) the officer does not take reasonable steps to intervene." *Id.; see also Ricciuti v. N.Y.C. Transit Authority,* 124 F.3d 123, 129 (2d Cir.1997) ("Failure to intercede to prevent an unlawful arrest can be grounds for § 1983 liability.") Whether an officer can be held liable on a failure to intervene theory is generally a question of fact for the jury to decide. *See Anderson v. Branen,* 17 F.3d 552, 557 (2d Cir.1992) ( "Whether an officer had sufficient time to intercede or was capable of preventing the harm being caused by another officer is an issue of fact for the jury unless, considering all the evidence, a reasonable jury could not possibly conclude otherwise.").

**\*9** Here there are multiple issues of fact, including whether Defendants Schewnki and Roberts beat the Plaintiff, if so whether Defendant Volpe observed the beating, and if so whether she was capable of preventing or mitigating it. Accordingly, it is recommended that dismissal of Plaintiff's Eighth Amendment failure to intervene claim as against Defendant Volpe be denied.

Decayette v. Goord, Not Reported in F.Supp.2d (2009)

2009 WL 1606753

*POINT VI*

**Plaintiff's retaliation claims based upon allegedly false misbehavior reports should be dismissed. [21]**

[21]  Plaintiff failed to respond to Defendants' legal arguments on this point. *See* discussion at pages 4–5 above. Nevertheless the Court has performed an independent review of the record.

In order to state a cause of action for retaliation, a plaintiff must plead facts plausibly suggesting that (1) the speech or conduct at issue was protected; (2) the defendant took adverse action against the plaintiff; and (3) there was a causal connection between the protected speech and the adverse action. *Davis v. Goord,* 320 F.3d 346, 352 (2d Cir.2003) (citing *Dawes v. Walker,* 239 F.3d 489, 492 (2d Cir.2001)).

In his Complaint Plaintiff alleges that "on or about July 26, 2004, after filing a grievance the plaintiff was interviewed by Lt. Meeks, per recommendation by Comm. Glenn Goord." Dkt. No. 1, at 2. This "grievance" presumably was the letter that he wrote to Defendant Goord. *Id.* at 2–3. In his Memorandum of Law Plaintiff alleges that he "was subjected to retaliation by receiving false misbehavior reports, for exercising his first amendment right to file grievances pertaining to the search for his personal property." Dkt. No. 39, at 8. Again, the only "grievance[] pertaining to the search for his personal property" that is reflected in the record is the letter to Defendant Goord.

The Court acknowledges that Plaintiff's right to send a letter of complaint to Defendant Goord was a constitutionally protected activity. *Davis,* 320 F.3d at 352–53. However, first, the only "inmate misbehavior reports" that are reflected in the record were issued by *non-parties.* *See* Dkt. No. 36, Exhibits B and C. In addition, Plaintiff has proffered no evidence whatsoever that these non-parties were even aware of the existence of his letter to Defendant Goord. Accordingly, there is no party defendant in this action against whom Plaintiff has made a retaliation claim based upon an allegedly false inmate misbehavior report. Furthermore, there is no evidence of a causal connection between the protected conduct, *i.e.,* the letter to Defendant Goord, and the "adverse actions,"

*i.e.,* the issuance of the inmate misbehavior reports. Therefore it is recommended that summary judgment be granted dismissing Plaintiff's retaliation claims based upon allegedly false misbehavior reports.

*POINT VII*

**Triable issues of fact exist with respect to Plaintiff's retaliation claims against Defendants Schewnki and Roberts. [22]**

[22]  Plaintiff has failed to respond to Defendants' legal arguments on this point. *See* discussion at pages 4–5 above. Nevertheless the Court has performed an independent review of the record.

As noted above, Plaintiff's right to send letters of complaint to Defendant Goord was a constitutionally protected activity. *Davis,* 320 F.3d at 352–53. Also as noted above, Defendants Schewnki and Roberts are not seeking summary judgment on Plaintiff's excessive force claims. Questions of fact clearly exist as to whether they took "adverse action" against him.

**\*10**  Finally, on the "causal connection" prong of the retaliation cause of action, in his Complaint Plaintiff alleges, in paragraph "14", that prior to the commencement of the alleged beating, Defendants Schewnki and Roberts "started reminding the plaintiff about the incident with the statement that he refused to write." Dkt. No. 1, at 4. This "incident with the statement that he refused to write" presumably is the one described in paragraph "4" of the Complaint, when Defendant Berry allegedly gave Plaintiff "an ultimatum [to] re-write and sign a statement informing Comm. Goord that there was a misunderstanding." *Id.,* at 2. In short, there clearly are triable questions of fact as to whether there was a causal connection between Plaintiff's letter to Defendant Goord and the alleged beatings by Defendants Schewnki and Roberts. Accordingly, it is recommended that Plaintiff's First Amendment retaliation claims against Defendants Schewnki and Roberts proceed to trial.

*POINT VIII*

**Plaintiff's Fourteenth Amendment Due Process claims should be dismissed.** [23]

[23] Plaintiff has failed to respond to Defendants' legal arguments on this point. *See* discussion at pages 4–5 above. Nevertheless the Court has performed an independent review of the record.

In his Complaint Plaintiff alleges that he was not "afforded substantive Due Process" and that his Fourteenth Amendment right "against arbitrary and capricious conduct" [24] was violated. Dkt. No. 1, at 6 and 7. However, as the Supreme Court has repeatedly held, "if a constitutional claim is covered by a specific constitutional provision, such as the Fourth ... Amendment, the claim must be analyzed under the standard appropriate to that specific provision, not under the [more generalized notion] of substantive due process." *United States v. Lanier,* 520 U.S. 259, 272, n. 7, 117 S.Ct. 1219, 137 L.Ed.2d 432 (1997) (citing *Graham v. Connor,* 490 U.S. 386, 392–94 [1989] ). Because the Court has already analyzed Plaintiff's claims under the appropriate specific legal standards, an analysis is not required under the Fourteenth Amendment substantive due process standard.

[24] "Substantive due process protects individuals against government action that is arbitrary, ... conscience-shocking, ... or oppressive in a constitutional sense, ... but not against constitutional action that is incorrect or ill-advised." *Lowrance v. Achtyl,* 20 F.3d 529, 537 (2d Cir.1994) [internal quotations marks and citations omitted], *aff'g,* 91–CV–1196, Memorandum–Decision and Order (N.D.N.Y. Jan. 26, 1993) (DiBianco, M.J.) (granting summary judgment to defendants in inmate's civil rights action).

However, in addition to substantive due process, the Due Process Clause of the Fourteenth Amendment has a procedural component. *Zinermon v. Burch,* 494 U.S. 113, 125, 110 S.Ct. 975, 108 L.Ed.2d 100 (1990). The procedural component bars "the deprivation by state action of a constitutionally protected interest in life, liberty, or property ... *without due process of law." Id.* at 125–126 [internal quotations marks and citations omitted; emphasis in original]. In his Memorandum of Law Petitioner argues that "Defendants Sugg and Berry violated his Procedural Due Process Rights ... against unreasonable searches." Dkt. No. 39, at 8.

"[Courts] examine procedural due process questions in two steps: the first asks whether there exists a liberty or property interest which has been interfered with by the State ...; the second examines whether the procedures attendant upon that deprivation were constitutionally sufficient." *Kentucky Dept. of Corr. v. Thompson,* 490 U.S. 454, 460, 109 S.Ct. 1904, 104 L.Ed.2d 506 (1989). Here the Court already has conducted the first step analysis of the conduct of Defendants Berry and Sugg and found no deprivation of a property interest. *See* Point II above. Therefore an analysis is not required under the Fourteenth Amendment procedural due process standard.

**\*11** Accordingly, it is recommended that the Defendants' motion for summary judgment dismissing Plaintiff's Fourteenth Amendment due process claim be granted.

## *POINT IX*

**Qualified Immunity** [25]

[25] Plaintiff has failed to respond to Defendants' legal arguments on this point. *See* discussion at pages 4–5 above. Nevertheless the Court has performed an independent review of the record.

The doctrine of qualified immunity "protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.' " *Pearson v. Callahan,* ––– U.S. ––––, ––––, 129 S.Ct. 808, 815, 172 L.Ed.2d 565 (2009) (citing *Harlow v. Fitzgerald,* 457 U.S. 800, 812, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982)). A determination of this issue involves deciding whether the facts that a plaintiff has alleged, or shown, make out a violation of a constitutional right, and whether the right at issue was clearly established at the time of the defendant's alleged misconduct. *Pearson,* 129 S.Ct. at 815–16 (citing *Saucier v. Katz,* 533 U.S. 194, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001)).

A right is sufficiently clearly established if 'it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted.' " *Higazy v. Templeton,* 505 F.3d 161, 169, n. 8 (2d Cir.2007). The following three factors are considered when determining whether

2009 WL 1606753

a particular right was clearly established at the time a defendant acted:

> (1) whether the right in question was defined with 'reasonable specificity'; (2) whether the decisional law of the Supreme Court and the applicable circuit court support the existence of the right in question; and (3) whether under preexisting law a reasonable defendant official would have understood that his or her acts were unlawful.

*Jermosen v. Smith,* 945 F.2d 547, 550 (2d Cir.1991) (citations omitted), *cert. denied,* 503 U.S. 962, 112 S.Ct. 1565, 118 L.Ed.2d 211 (1992). [26] "As the third part of the test provides, even where the law is 'clearly established' and the scope of an official's permissible conduct is 'clearly defined,' the qualified immunity defense also protects an official if it was 'objectively reasonable' for him at the time of the challenged action to believe his acts were lawful." *Higazy,* 505 F.3d at 169–70 (citations omitted). [27] This "objective reasonableness" part of the test is met if "officers of reasonable competence could disagree on [the legality of defendant's actions]." *Malley v. Briggs,* 475 U.S. 335, 341, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986). As the Supreme Court has explained,

[26]    *See also Pena v. DePrisco,* 432 F.3d 98, 115 (2d Cir.2005); *Clue v. Johnson,* 179 F.3d 57, 61 (2d Cir.1999); *McEvoy v. Spencer,* 124 F.3d 92, 97 (2d Cir.1997); *Shechter v. Comptroller of City of New York,* 79 F.3d 265, 271 (2d Cir.1996); *Rodriguez v. Phillips,* 66 F.3d 470, 476 (2d Cir.1995); *Prue v. City of Syracuse,* 26 F.3d 14, 17–18 (2d Cir.1994); *Calhoun v. New York State Division of Parole,* 999 F.2d 647, 654 (2d Cir.1993).

[27]    *See also Anderson v. Creighton,* 483 U.S. 635, 639, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987) ("[W]hether an official protected by qualified immunity may be held personally liable for an allegedly unlawful official action generally turns on the 'objective reasonableness of the action.' ") [citation omitted]; *Davis v. Scherer,* 468 U.S. 183, 190, 104 S.Ct. 3012, 82 L.Ed.2d 139 (1984) ("Even defendants who violate [clearly established] constitutional rights enjoy a qualified immunity that protects them from liability for damages unless it is further demonstrated that their conduct was unreasonable under the applicable standard."); *Benitez v. Wolff,* 985 F.2d 662, 666 (2d Cir.1993) (qualified immunity protects defendants "even where the rights were clearly established, if it was objectively reasonable for defendants to believe that their acts did not violate those rights").

[T]he qualified immunity defense ... provides ample protection to all but the plainly incompetent or those who knowingly violate the law.... Defendants will not be immune if, on an objective basis, it is obvious that no reasonably competent officer would have concluded that a warrant should issue; but if officers of reasonable competence could disagree on this issue, immunity should be recognized.

*Malley,* 475 U.S. at 341. However, when "there are facts in dispute that are material to a determination of reasonableness," dismissal on the basis of a qualified immunity defense is inappropriate. *Thomas v. Roach,* 165 F.3d 137, 143 (2d Cir.1999); *Ali v. Szabo,* 81 F.Supp.2d 447, 461 (S.D.N.Y.2000) ("The Court cannot conclude as a matter of law that [the officers'] conduct was objectively reasonable since there are material issues of fact as to whether [plaintiff] was obeying the officers' order and who started the physical confrontation.").

**\*12** The Court has recommended that Defendant Volpe should not be entitled to summary judgment because triable issues of fact exist as to whether she was deliberately indifferent to a serious medical need of Plaintiff's and as to whether she is liable for failing to intervene during the alleged beating of Plaintiff. Therefore, Defendant Volpe should not be entitled to summary judgment on the defense of qualified immunity. *See Hemphill v. Schott,* 141 F.3d 412, 418 (2d Cir.1998) ("[S]ummary judgment based either on the merits or on qualified immunity requires that no disputes about material facts remain.") (citations omitted); *Deal v. Yurack,* No. 9:04–CV–0072, 2007 WL 2789615, at *14 (N.D.N.Y. Sept.24, 2007) (Kahn, J.) (adopting Report–Recommendation of Magistrate Judge David E. Peebles, finding that whether "the defendants maintained a good faith belief that their actions did not violate clearly established rights depends on the resolution of fact issues similar to those identified as precluding entry of summary judgment on the merits of plaintiff's retaliation and excessive force claims. As such ... the court is not currently positioned to determine defendant's entitlement

to qualified immunity.").[28]  Accordingly, I recommend denying summary judgment in this regard.

[28]    *See also* *Jeanty v. County of Orange,* 379 F.Supp.2d 533, 542 (S.D.N.Y.2005) ("[T]he same genuine issues of material fact that preclude summary judgment on plaintiff's excessive force claim, also preclude application of the defense of qualified immunity at the summary judgment stage."); *Dellamore v. Stenros,* 886 F.Supp. 349, 352 (S.D.N.Y.1995) (finding that material factual disputes exist on the issue of qualified immunity for the same reasons that the court denied the motion for summary judgment on the plaintiff's Eighth Amendment excessive force claim).

**ACCORDINGLY,** it is

**RECOMMENDED** that summary judgment be granted dismissing all claims against Defendants Goord, Allard, Berry, Meeks, Martin, and Sugg; and it is further

**RECOMMENDED** that Defendant Volpe's motion for summary judgment be denied; and it is further

**RECOMMENDED** that the case proceed to trial against Defendants Volpe, Schewnki and Roberts on Plaintiff's Eighth Amendment claims of excessive force and failure to intervene, against Defendants Schewnki and Roberts on Plaintiff's First Amendment retaliation claims, and against Defendant Volpe on Plaintiff's Eighth Amendment claim of inadequate medical care; and it is further

**ORDERED** that the Clerk serve copies of the electronically-available-only opinions cited on pages 4, 5, 7, and 20 of this Report–Recommendation on Plaintiff.

**ANY OBJECTIONS to this Report–Recommendation must be filed with the Clerk of this Court within TEN (10) WORKING DAYS, PLUS THREE (3) CALENDAR DAYS from the date of this Report–Recommendation (unless the third calendar day is a legal holiday, in which case add a fourth calendar day).** *See* 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72(b); N.D.N.Y. L.R. 72.1(c); Fed.R.Civ.P. 6(a)(2), (d).

**BE ADVISED that the District Court, on** *de novo* **review, will ordinarily refuse to consider arguments, case law and/or evidentiary material that could have been, but was not, presented to the Magistrate Judge in the first instance.**[29]

[29]    *See, e.g., Paddington Partners v. Bouchard,* 34 F.3d 1132, 1137–38 (2d Cir.1994) ("In objecting to a magistrate's report before the district court, a party has no right to present further testimony when it offers no justification for not offering the testimony at the hearing before the magistrate.") [internal quotation marks and citations omitted]; *Pan Am. World Airways, Inc. v. Int'l Bhd. of Teamsters,* 894 F.2d 36, 40 n. 3 (2d Cir.1990) (district court did not abuse its discretion in denying plaintiff's request to present additional testimony where plaintiff "offered no justification for not offering the testimony at the hearing before the magistrate"); *see also Murr v. U.S.,* 200 F.3d 895, 902, n. 1 (6th Cir.2000) ("Petitioner's failure to raise this claim before the magistrate constitutes waiver."); *Marshall v. Chater,* 75 F.3d 1421, 1426 (10th Cir.1996) ("Issues raised for the first time in objections to the magistrate judge's recommendations are deemed waived.") [citations omitted]; *Cupit v. Whitley,* 28 F.3d 532, 535 (5th Cir.1994) ("By waiting until after the magistrate judge had issued its findings and recommendations [to raise its procedural default argument] ... Respondent has waived procedural default ... objection[ ].") [citations omitted]; *Greenhow v. Sec'y of Health & Human Servs.,* 863 F.2d 633, 638–39 (9th Cir.1988) ("[A]llowing parties to litigate fully their case before the magistrate and, if unsuccessful, to change their strategy and present a different theory to the district court would frustrate the purpose of the Magistrates Act."), *overruled on other grounds by U.S. v. Hardesty,* 977 F.2d 1347 (9th Cir.1992); *Patterson–Leitch Co. Inc. v. Mass. Mun. Wholesale Elec. Co.,* 840 F.2d 985, 990–91 (1st Cir.1988) ("[A]n unsuccessful party is not entitled as of right to de novo review by the judge of an argument never seasonably raised before the magistrate.") [citation omitted].

**BE ALSO ADVISED that the failure to file timely objections to this Report–Recommendation will PRECLUDE LATER APPELLATE REVIEW of any Order of judgment that will be entered.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Sec'y of H.H.S.,* 892 F.2d 15 [2d Cir.1989] ).

**All Citations**

Not Reported in F.Supp.2d, 2009 WL 1606753

**Decayette v. Goord, Not Reported in F.Supp.2d (2009)**

2009 WL 1606753

---

**End of Document**

© 2017 Thomson Reuters. No claim to original U.S. Government Works.

---

2011 WL 1086001
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Nelson RODRIGUEZ, Plaintiff,
v.
Donald SELSKY, Defendant.

Civil Action No. 9:07–CV–0432 (LEK/DEP).
|
Jan. 25, 2011.

**Attorneys and Law Firms**

Nelson Rodriguez, Attica, NY, pro se.

Hon. Eric T. Schneiderman, Attorney General of the State of New York, Aaron M. Baldwin, Esq., Assistant Attorney General, of Counsel, Albany, NY, for the Defendant.

*REPORT AND RECOMMENDATION*

DAVID E. PEEBLES, United States Magistrate Judge.

 **\*1** Plaintiff Nelson Rodriguez, a New York state prison inmate, has commenced this action pursuant to 42 U.S.C. § 1983 alleging deprivation of his civil rights. In his complaint, as amended, Rodriguez alleges that prison officials at the facility in which he was confined at the relevant times issued him two fabricated misbehavior reports ("MBRs") falsely accusing him of violating prison rules and denied him procedural due process during the course of the ensuing disciplinary hearing.[1] Plaintiff attributes those actions to retaliation for his having filed a civil action against a corrections employee who was not named as a defendant in his complaint.

[1]    As originally constituted, plaintiff's complaint recited other purportedly unlawful conduct, alleging that he was subjected to ongoing harassment, retaliation, and interference with his access to the courts. As a result of a series of court interventions the claims in this action, which was commenced elsewhere but later transferred to this district, have been significantly narrowed.

The sole remaining claim in this action is asserted against defendant Donald Selsky, the former Director of Special Housing and Inmate Disciplinary Programs for the New York State Department of Correctional Services ("DOCS"), alleging deprivation of procedural due process arising out of plaintiff's disciplinary hearing and defendant Selsky's review of the resulting determination.

Currently pending before the court is defendant's motion for summary judgment dismissing plaintiff's amended complaint. In his motion, defendant argues that 1) he was not sufficiently involved in the constitutional deprivation alleged to support a finding of liability; 2) plaintiff was afforded procedural due process in connection with the disciplinary proceedings at issue, and 3) in any event he is entitled to qualified immunity from suit. For the reasons set forth below, I recommend a finding that plaintiff was not deprived of procedural due process, and that his complaint therefore be dismissed.

I. *BACKGROUND*[2]

[2]    In light of the procedural posture of the case the following recitation is derived from the record now before the court with all inferences drawn and ambiguities resolved in favor of the plaintiff. *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir.2003).

Plaintiff is a prison inmate entrusted to the custody of the DOCS; at the times relevant to his due process claim plaintiff was housed at the Shawangunk Correctional Facility ("Shawangunk"), located in Wallkill, New York. Amended Complaint (Dkt. No. 7) ¶ 3; Selsky Decl. (Dkt. No. 62–3) ¶ 15.

As a result of an incident involving another inmate occurring on December 30, 2003, plaintiff was issued two MBRs. Amended Complaint (Dkt. No. 7) ¶¶ 12–15. Selsky Decl. (Dkt. No. 62–3) ¶ 16. The first, issued on December 30, 2003 and authored by Corrections Officer Goosby, charged Rodriguez with fighting and refusal to obey a direct order. Selsky Decl. (Dkt. No. 62–3) ¶ 17 and Exh. A (Dkt. No. 62–4). The second, issued on January 2, 2004 by Corrections Lieutenant Wright, addressed the same incident and accused Rodriguez of fighting, engaging in violent conduct, and participating in a demonstration detrimental to the order of the facility. Selksy Decl. (Dkt. No. 62–3) ¶ 18 and Exh. A (Dkt. No. 62–4).

The parties differ as to when the two MBRs were served upon Rodriguez. Plaintiff and defendant appear to be in agreement that the second MBR was served upon him on

January 2, 2004. Selsky Decl. (Dkt. No. 62–3) ¶ 19 and Exh. A (Dkt. No. 62–4); Plaintiff's Local Rule 7.1(a)(3) Statement (Dkt. No. 68) ¶ 16. While defendant asserts that both MBRs were served on January 2, 2004, *see* Selsky Decl. (Dkt. No. 62–3) ¶ 19 and Exh. A (Dkt. No. 62–4), plaintiff denies that he received the December 30, 2003 MBR until the commencement of his disciplinary hearing.[3] Plaintiff's Local Rule 7.1(a)(3) Statement (Dkt. No. 68) ¶ 16.

[3]  As will be seen I have assumed, as I must at this juncture, that plaintiff's version of the facts is correct. *See* pp. 21–32, *post.*

**\*2** The two MBRs were consolidated, over plaintiff's objection, and a Tier III disciplinary hearing was conducted, beginning on January 7, 2004, to address the charges set forth within them.[4],[5] Amended Complaint (Dkt. No. 7) ¶ 15; Selsky Decl. (Dkt. No. 62–3) ¶ 21 and Exhs. A (Dkt. No. 62–4) and B (Dkt. Nos. 62–5 and 62–6). In advance of the hearing plaintiff was given the opportunity to express his preferences for an assistant, and, based upon his selection Corrections Counselor Roddy was assigned to assist him. Selsky Decl. (Dkt.62–3) ¶ 20 and Exh. A (Dkt. No. 62–4).

[4]  The DOCS conducts three types of inmate disciplinary hearings. *See* 7 N.Y.C.R.R. § 270.3. Tier I hearings address the least serious infractions and can result in minor punishments such as the loss of recreation privileges. Tier II hearings involve more serious infractions and can result in penalties which include confinement for a period of time in the Special Housing Unit ("SHU"). Tier III hearings concern the most serious violations and can result in unlimited SHU confinement and the loss of "good time" credits. *See Hynes v. Squillace,* 143 F.3d 653, 655 (2d Cir.), *cert. denied,* 525 U.S. 907, 119 S.Ct. 246 (1998).

[5]  Plaintiff's disciplinary hearing was originally scheduled to start on January 5, 2004, in order to meet the requirements of a state regulation mandating that a disciplinary hearing commence within seven days of a prisoner's confinement in a facility's SHU, 7 N.Y.C.R.R. § 251–5.1(a) (1983). Selsky Decl., Exh. B (Dkt. No. 62–5) pp. 18–19. While plaintiff assigns significance to the failure of prison officials to meeting the seven-day requirement, the record reveals that an extension was granted because plaintiff's assistant was unable to meet with him prior to January 5, 2004. *Id.* In any event, the

violation of state regulations is not cognizable under 42 U.S.C. § 1983. *Cusamano v. Sobek,* 604 F.Supp.2d 416, 482 (N.D.N.Y.2009) (Suddaby, J.) (collecting cases). Plaintiff's claim of undue delay is instead subject to constitutional standards, which require only that the hearing be held within a "reasonable time" and not within any prescribed number of days. *Russell v. Coughlin,* 910 F.2d 75, 78 n. 1 (2d Cir.1990) ("Federal constitutional standards rather than state law define the requirements of procedural due process."); *Donato v. Phillips,* No. 9:04–CV–1160, 2007 WL 168238, at \*6 (N.D.N.Y. Jan. 18, 2007) (McAvoy, J.) (hearing that started nine days after plaintiff's confinement in the SHU was reasonable).

Following its commencement on January 7, 2004, the hearing officer twice adjourned the hearing, initially to January 8, 2004, and again from January 8, 2004 to January 13, 2004, to allow the plaintiff an opportunity to prepare his defense. Selsky Decl. (Dkt. No. 62–3) and Exh. B (Dkt. No. 62–5) pp. 4–20, 20–58. During the course of the hearing plaintiff was permitted to call at least eleven witnesses to testify on his behalf, and also to introduce documentary evidence in his defense Selsky Decl. (Dkt. No. 62–3) ¶ 44 and Exh. A (Dkt. No. 62–4); Exh. B (Dkt. No. 62–5) at pp. 60–86, 94–115, 136–83, 185–209, and Exh. B (Part 2) (Dkt. No. 62–6) at pp. 2–12, 30–43, 59–71, 72–78, 76–83, 105–111, 111–117, 117–21,122–26, 128–39. Two inmate witnesses listed by the plaintiff declined to testify, and executed refusal forms stating that they did not wish to be involved in the matter. Selsky Decl. (Dkt. No. 62–3) ¶ 42 and Exh. A (Dkt. No. 62–4). The hearing officer rejected plaintiff's request that he be permitted to adduce testimony from two other witnesses, his wife and his attorney, concluding that the testimony would not be relevant to the issues involved in the hearing. Selsky Decl., Exh. B (Part 2) (Dkt. No. 62–6) pp. 98–99.

At the conclusion of hearing, plaintiff was found guilty of fighting (one count), refusing to obey a direct order, engaging in violent conduct, and participating in a demonstration, but was acquitted on the second count of fighting. Selsky Decl. (Dkt. No. 62–3) ¶ 22 and Exh. A (Dkt. No. 62–4). Based upon his findings, which were both noted in writing and stated orally at the hearing, the hearing officer imposed a penalty that included twenty-four months of disciplinary SHU confinement and a corresponding loss of package, commissary and telephone privileges. Selsky Decl. (Dkt. No. 62–3) ¶ 23; *see also* Exh. A (Dkt. No. 62–4) and Exh. B (Part 2) (Dkt. No. 62–6) pp. 156–58.

On February 11, 2004, plaintiff appealed the disciplinary determination to defendant Selsky's office. *See* Amended Complaint (Dkt. No. 7) ¶ 21; Selsky Decl. (Dkt. No. 62–3) ¶ 26 and Exh. C (Dkt. No. 62–7). Plaintiff also submitted a supplemental appeal on or about March 12, 2004. Selsky Decl. (Dkt. No. 62–3) ¶¶ 26–27, Exhs. C (Dkt. No. 62–7) and D (Dkt. No. 62–8). Defendant Selsky issued a determination on behalf of the DOCS Commissioner on April 8, 2004, modifying the results of the hearing by dismissing the charge of engaging in a demonstration and reducing the penalty imposed to twelve months of SHU confinement with a corresponding loss of privileges.[6] Selsky Decl. (Dkt. No. 62–3) ¶ 28 and Exh. E (Dkt. No. 62–9). That determination was based upon defendant Selsky's finding that the nature of the incidents giving rise to the MBRs did not warrant the full extent of the penalty imposed and that the charge of engaging in a demonstration was not substantiated. *Id.* at ¶ 28 and Exh. E (Dkt. No. 62–9). Based upon his review, however, Selsky concluded that plaintiff received all of the procedural due process mandated under the Fourteenth Amendment and that there was evidence in the record substantiating the charges for which Rodriguez was found guilty. *Id.* at ¶ 29.

[6]     Plaintiff's SHU term of disciplinary confinement and corresponding loss of privileges was further reduced to eighth months and nine days, ending on September 9, 2004, as a result of a discretionary time cut on or about July 14, 2004, occurring while plaintiff was housed at the Southport Correctional Facility. Selsky Decl. (Dkt. No. 62–3) ¶ 53.

## II. *PROCEDURAL HISTORY*

**\*3** This action was commenced on April 11, 2007 in the Southern District of New York, but was subsequently transferred to this district by order issued by Chief District Judge Kimba M. Wood on April 11, 2007.[7] Dkt. Nos. 1, 3. Plaintiff's original complaint challenged not only the MBRs issued and the disciplinary action that ensued, but also chronicled alleged continued harassment and acts of retaliation that he experienced following his transfer into the Attica Correctional Facility, naming as defendants several DOCS employees including Donald Selsky. *See* Complaint (Dkt. No. 1).

[7]     While plaintiff's complaint was not filed in the Southern District until April 11, 2007, the transfer order issued by Chief Judge Wood noted that the complaint was received in that district on February 26, 2007. *See* Dkt. No. 3, n. 1.

Upon transfer of the case to this district and the court's initial review of plaintiff's complaint and accompanying request for leave to proceed *in forma pauperis* ("IFP"), by order dated May 17, 2007, Senior District Judge Lawrence E. Kahn granted plaintiff IFP status but directed that he file an amended complaint, noting several deficiencies in the original pleading including, *inter alia,* the apparent untimeliness of certain of his claims. Dkt. No. 5. In accordance with the court's directive, plaintiff filed an amended complaint on June 26, 2007. Dkt. No. 7. Upon review of that pleading District Judge Kahn issued an order on July 19, 2007 accepting the amended complaint for filing, but dismissing plaintiff's claims against the majority of the defendants as time-barred and further directing dismissal of plaintiff's claims against a newly-added defendant, Corrections Sergeant Corcran, without prejudice to plaintiff's right to file a separate action against that defendant in the Western District of New York.[8] As a result, Donald Selsky was left as the sole remaining defendant in the action.

[8]     District Judge Kahn explained that "[s]ince the alleged wrongdoing by Defendant Corcran occurred in the Western District of New York, and Plaintiff's claims against Defendant Corcran are very recent, and thus not in jeopardy of being time-barred at this time, the Court will dismiss Defendant Corcran from the action, without prejudice to Plaintiff filing his claims against Defendant Corcran in the Western District of New York." Decision and Order (Dkt. No. 8) at p. 3.

After filing an answer generally denying plaintiff's allegations against him and asserting various affirmative defenses, *see* Dkt. No. 10, defendant Selsky moved pursuant to Rule 12(c) of the Federal Rules of Civil Procedure for judgment on the pleadings, urging dismissal of plaintiff's amended complaint on the ground that it failed to allege the requisite degree of his personal involvement in any wrongdoing to support a finding of liability. Dkt. No. 47. The motion resulted in my issuance of a report on February 25, 2010 recommending that the motion be denied. Dkt. No. 54. That recommendation was adopted by District Judge Lawrence E. Kahn by order issued on September 13, 2010. Dkt. No. 67.

On June 18, 2010, defendant again moved, this time for summary judgment dismissing plaintiff's complaint. Dkt.

2011 WL 1086001

No. 62. In his motion defendant reiterates his claim of lack of personal involvement, and additionally asserts that in any event plaintiff's due process claim lacks merit since the plaintiff was afforded all of the procedural safeguards required under the Fourteenth Amendment, and further that he is entitled to qualified immunity from suit. *Id.* Plaintiff has since responded in opposition to defendant's motion, Dkt. No. 68, and defendant has submitted a reply memorandum addressing plaintiff's arguments and further supporting his motion. Dkt. No. 74.

**\*4** Defendant's motion, which is now fully briefed and ripe for determination, has been referred to me for the issuance of a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and Northern District of New York Local Rule 72.3(c). *See also* Fed.R.Civ.P. 72(b).

## III. *DISCUSSION*

### A. *Summary Judgment Standard*

Summary judgment motions are governed by Rule 56 of the Federal Rules of Civil Procedure. Under that provision, summary judgment is warranted when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *see Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 2509–10 (1986); *Security Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.,* 391 F.3d 77, 82–83 (2d Cir.2004). A fact is "material", for purposes of this inquiry, if it "might affect the outcome of the suit under the governing law." *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510; *see also Jeffreys v. City of New York,* 426 F.3d 549, 553 (2d Cir.2005) (citing *Anderson* ). A material fact is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510.

A party moving for summary judgment bears an initial burden of demonstrating that there is no genuine dispute of material fact to be decided with respect to any essential element of the claim in issue; the failure to meet this burden warrants denial of the motion. *Anderson,* 477 U.S. at 250 n. 4, 106 S.Ct. at 2511 n. 4; *Security Ins.,* 391 F.3d at 83. In the event this initial burden is met the opposing party must show, through affidavits or otherwise, that there is a material issue of fact for trial.

Fed.R.Civ.P. 56(e); *Celotex,* 477 U.S. at 324, 106 S.Ct. at 2553; *Anderson,* 477 U.S. at 250, 106 S.Ct. at 2511. Though *pro se* plaintiffs are entitled to special latitude when defending against summary judgment motions, they must establish more than mere "metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1356 (1986); *but see Vital v. Interfaith Med. Ctr.,* 168 F.3d 615, 620–21 (2d Cir.1999) (noting obligation of court to consider whether *pro se* plaintiff understood nature of summary judgment process).

When deciding a summary judgment motion, a court must resolve any ambiguities, and draw all inferences from the facts, in a light most favorable to the nonmoving party. *Jeffreys,* 426 F.3d at 553; *Wright v. Coughlin,* 132 F.3d 133, 137–38 (2d Cir.1998). The entry of summary judgment is warranted only in the event of a finding that no reasonable trier of fact could rule in favor of the non-moving party. *See Building Trades Employers' Educ. Ass'n v. McGowan,* 311 F.3d 501, 507–08 (2d Cir.2002) (citation omitted); *see also Anderson,* 477 U.S. at 250, 106 S.Ct. at 2511 (summary judgment is appropriate only when "there can be but one reasonable conclusion as to the verdict").

### B. *Personal Involvement*

**\*5** In his motion defendant Selsky renews an argument previously made and rejected—that his limited involvement in reviewing the disciplinary determination in question based upon plaintiff's appeal of that decision is insufficient to support a finding of liability for any procedural due process violation which may have occurred in the context of that hearing. In response, plaintiff counters that the record reveals facts from which a reasonable factfinder could conclude that the defendant personally participated in the due process violation, including by conducting an inadequate review of the disciplinary hearing record.

It seems clear, particularly in light of the Supreme Court's relatively recent decision in *Ashcroft v. Iqbal,* ––– U.S. –––– 129 S.Ct. 1937, 1948–49 (2009), that to be held accountable for a constitutional deprivation under section 1983 a defendant must have had personal involvement in the conduct giving rise to the deprivation. *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (*citing Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 (2d Cir.1991) and *McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir.1977), *cert. denied,* 434 U.S. 1087, 98 S.Ct. 1282 (1978); *Scott*

*v. Fischer,* 616 F.3d 100, 110 (2d Cir.2010) ("In this Circuit personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under [section] 1983.") (quoting *McKinnon* ). In order to prevail on a section 1983 cause of action against an individual, a plaintiff must show some tangible connection between the constitutional violation alleged and that particular defendant. *See Bass v. Jackson,* 790 F.2d 260, 263 (2d Cir.1986).

As was noted in my prior report and recommendation, the question of whether defendant Selsky's review of an allegedly infirm disciplinary hearing provides grounds for establishing his personal involvement is one that has divided the courts. Some courts have found the mere allegation that Selsky has reviewed and affirmed a hearing determination that was the product of a due process deprivation is insufficient to establish liability for the underlying violation. *See, e.g., Abdur–Raheem v. Selsky,* 598 F.Supp.2d 367, 370 (W.D.N.Y.2009) ("The only allegation concerning Selsky in the case at bar is that he affirmed the disposition of plaintiff's administrative segregation hearing, pursuant to which plaintiff was confined to SHU.... That is not enough to establish Selsky's personal involvement."); *Ramsey v. Goord,* No. 05–CV–47A, 2005 WL 2000144, at *6 (W.D.N.Y. Aug. 13, 2005) ("[t]he fact that Commissioner Goord and SHU Director Selsky, as officials in the DOCS 'chain of command,' affirmed defendant Ryerson's determination on appeal is not enough to establish personal involvement of their part."); [9] *see also Odom v. Calero,* No. 06 Civ. 15527, 2008 WL 2735868, at *7 (S.D.N.Y. Jul. 10, 2008) (concluding that a due process violation is complete upon the hearing officer rendering a decision, even when the liberty interest deprivation persists, and therefore is not "ongoing" when an appeal is taken to Donald Selsky).

[9] Copies of all unreported decisions cited in this document have been appended for the convenience of the *pro se* plaintiff.

**\*6** On the other hand, other courts have found that the act of reviewing and affirming a determination on appeal can provide a sufficient basis to find the necessary personal involvement of a supervisory employee like defendant Selksy. *See, e.g., Bennett v. Fischer,* No. 9:09–CV–1236, 2010 WL 5525368 (N.D.N.Y. Aug 17, 2010) (Peebles, M.J.) (finding questions of fact regarding Commissioner Fischer's personal involvement in disciplinary precluding summary judgment), *Report and*

*Recommendation Adopted,* 2011 WL 13826 (N.D .N.Y. Jan. 4, 2011) (Scullin, S. J.); *Baez v. Harris,* No. 9:01–CV–807, 2007 WL 446015, at *2 (N.D.N.Y. Feb. 7, 2007) (Mordue, C.J.) (fact that defendant Selsky responds personally to all disciplinary appeals by inmates found sufficient to withstand summary judgment motion based on lack of personal involvement); *Cepeda v. Coughlin,* 785 F.Supp. 385, 391 (S.D.N.Y.1992) ("The Complaint alleges that '[t]he Commissioner and/or his designee entertained plaintiff[']s appeal and also affirmed.' ... [T]he allegation that supervisory personnel learned of alleged misconduct on appeal yet failed to correct it constitutes an allegation of personal participation. Assuming that this allegation is true, as this court must on a motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6) ..., Cepeda has pleaded personal involvement by Commissioner Coughlin sufficiently to withstand this motion.") (citations omitted); *Johnson v. Coombe,* 156 F.Supp.2d 273, 278 (S.D.N.Y.2001) (finding that plaintiff's complaint had sufficiently alleged personal involvement of Superintendent and Commissioner to withstand motion to dismiss because plaintiff alleged that both defendants had actual or constructive notice of the defect in the underlying hearing); *Ciaprazi v. Goord,* No. 9:02–CV–0915, Report–Recommendation, 2005 WL 3531464, at *16 (N.D.N.Y. Mar. 14, 2004) (Peebles, M.J.) (recommending that Selsky's motion for summary judgment for lack of personal involvement be denied because Selsky's review of plaintiff's disciplinary hearing appeal "sufficiently establishes his personal involvement in any alleged due process violations based upon his being positioned to discern and remedy the ongoing effects of any such violations."), *adopted,* 2005 WL 3531464, at *1– 2 (N.D.N.Y. Dec. 22, 2005) (Sharpe, J.).

In support of his argument regarding personal involvement defendant cites *Tafari v. McCarthy,* 714 F.Supp.2d 317 (N.D.N.Y. My 24, 2010), in which another magistrate judge of this court, in a report and recommendation adopted by the assigned district judge, wrote that "[t]he affirming of a disciplinary conviction does not constitute personal involvement in a constitutional violation." *Tafari,* 714 F.Supp.2d at 383. (citing *Joyner v. Greiner,* 195 F.Supp.2d 500, 506 (S.D.N.Y.2002)). I respectfully disagree with my esteemed colleague and maintain that the cases holding that Selsky's affirmance, or that of someone in his corresponding position, of a constitutionally defective disciplinary determination at a time when the inmate is still serving his or her disciplinary sentence, and the

WESTLAW   © 2017 Thomson Reuters. No claim to original U.S. Government Works.

2011 WL 1086001

violation can therefore be abated, falls within the *Colon* factors articulated in the Second Circuit for informing the supervisory liability analysis. *See Colon v. Coughlin, 58 F.3d 865, 873 (2d Cir.1995).* In any event, this case is distinguishable from *Tafari* since here plaintiff has alleged that through his own conduct in inadequately reviewing the underlying determination defendant Selsky committed a due process violation, *see* Amended Complaint (Dkt. No. 7) ¶ 21, thereby satisfying the Supreme Court's admonition that a defendant can only be held liable for his or own conduct for purposes of a civil rights violation. *Iqbal,* 129 S.Ct. at 1948.

**\*7** As I noted in my prior report, I believe that those cases concluding that a plaintiff's allegation that defendant Selsky reviewed and upheld an allegedly constitutionally-suspect disciplinary determination is enough to show his personal involvement in the alleged violation appear to be both better reasoned and more consonant with the Second Circuit's position regarding personal involvement. *See Black v. Coughlin, 76 F.3d 72, 75 (2d Cir.1996)* (criticizing a district court's denial of leave to amend to add Donald Selsky as a defendant in a due process setting and appearing to assume that Selsky's role in reviewing and affirming a disciplinary determination is sufficient to establish his personal involvement). While it may be true that the due process violations cited by Rodriguez occurred and were no longer ongoing when his appeal was taken to defendant Selsky, because it appears that the sentence imposed was still being served at the time of his review, the liberty interest deprivation allegedly effectuated without due process was therefore ongoing, and defendant Selsky was in a position to remedy the violation, at least in part, at a time when his intervention would still have been meaningful.

C. *Merits of Plaintiff's Due Process Claim*

To successfully state a claim under 42 U.S.C. § 1983 for the denial of procedural due process arising out of a disciplinary hearing, a plaintiff must show that he or she 1) possessed an actual liberty interest, and 2) was deprived of that interest without being afforded sufficient process. *See Tellier v. Fields, 280 F.3d 69, 79–80 (2d Cir.2000)* (citations omitted); *Hynes, 143 F.3d at 658; Bedoya v. Coughlin, 91 F.3d 349, 351–52 (2d Cir.1996).* Defendant concedes that plaintiff's eight months of SHU disciplinary confinement "at least arguably" impacted a protected liberty interest, *see* Defendant's Memorandum (Dkt. No. 62–14) at p. 3, and I agree. *See Colon v. Howard,*

*215 F.3d 227, 231 (2d Cir.2000)* (finding that disciplinary confinement for a period of 305 days is "a sufficient departure from the ordinary incidents of prison life to require procedurally due process protections."). Plaintiff's claim, then, boils down to whether he was provided the procedural safeguards guaranteed under the Fourteenth Amendment prior to that deprivation. [10]

[10]    It should be noted that in this case plaintiff goes beyond merely alleging defendant Selsky's failure to rectify a past due process violation. In his complaint plaintiff also alleges that defendant Selsky participated in or furthered the violation by failing to conduct an appropriate review. Amended Complaint (Dkt. No. 7) ¶ 21.

The procedural rights to which a prison inmate is entitled before being deprived of a constitutionally cognizable liberty interest are well-established, the contours of the requisite protections having been articulated in *Wolff v. McDonnell, 418 U.S. 539, 564–67, 94 S.Ct. 2963, 2978–80 (1974).* [11] Under *Wolff,* the constitutionally mandated due process requirements include 1) written notice of the charges; 2) the opportunity to appear at a disciplinary hearing and present witnesses and evidence, subject to legitimate safety and penological concerns; 3) a written statement by the hearing officer explaining his or her decision and the reasons for the action being taken; and 4) in some circumstances, the right to assistance in preparing a defense. *Wolff, 418 U.S. at 564–67, 94 S.Ct. at 2978–80; see also Eng v. Coughlin, 858 F .2d 889, 897–98 (2d Cir.1988).* In addition, to pass muster under the Fourteenth Amendment the hearing officer's disciplinary determination must garner the support of at least "some evidence". *Superintendent v. Hill, 472 U.S. 445, 105 S.Ct. 2768 (1985).*

[11]    Many of the points raised in support of plaintiff's due process claim surround the alleged failure of prison officials to meet the requirements prescribed by regulation for disciplinary hearings. It is well established, however, that a violation of a state regulation is not actionable under section 1983. *Cusamano, 604 F.Supp.2d at 482.*

1. *Notice of Charges*

**\*8** The record now before the court, when interpreted in a light most favorable to the plaintiff, suggests that while the second of the two MBRs addressed at plaintiff's disciplinary hearing was served on Rodriguez on January

2, 2004, the earlier report was not received by him until the date on which the hearing was to begin. [12] Under *Wolff,* an accused inmate is entitled to meaningful advance written notice of the charges against him; in this circuit, a minimum of twenty-four hours of advance notice is generally considered to be required. *Sira v. Morten,* 380 F.3d 57, 70 (2d Cir.2004). The purpose of the notice requirement is to place the inmate on notice of the charges faced in order to permit the preparation of an adequate defense. *Id.* (citing *Taylor v. Rodriguez,* 238 F.3d 188, 192–93 (2d Cir.2001); *see also Martin v. Mitchell,* No. 92–CV–716, 1995 WL 760651, at *2 (N.D.N.Y. Nov. 24, 1995) (McAvoy, J.) (citing *Wolff,* 418 U.S. at 564, 94 S.Ct. at 2978) (holding that the purpose of the twenty-four hour notice rule is to provide inmates with sufficient time to prepare a defense, "not to hold hearing officers to a rigid and useless requirement that they only may call an inmate into a hearing room once they are positive that the inmate received a copy of the misbehavior report at least twenty-four hours earlier").

[12]     As was previously noted, defendant disputes plaintiff's claim in this regard and asserts instead that both misbehavior reports were served on the plaintiff on January 2, 2004 by Corrections Officer Ferguson on January 2, 2004. Selsky Decl. (Dkt. No. 62–3) ¶ 19 and Exh. A.

In this instance, any failure on the part of prison officials to provide plaintiff with notice of the charges lodged against him prior to the scheduled hearing was harmless in light of the hearing officer's agreement to adjourn the hearing, initially from January 7, 2004 to January 8, 2004, and then again to January 13, 2004, in order to allow the Rodriguez to prepare his defense. The record clearly reflects that, during those intervening periods, he was afforded the opportunity to prepare a defense to both charges before any testimony was taken. *See* Plaintiff's Memorandum (Dkt. No. 68–1) at p. 5 (admitting that plaintiff was served with the first misbehavior report at the hearing prior to any testimony having been taken).

The notice requirements of *Wolff* were therefore satisfied in this case, and no reasonable factfinder could conclude otherwise.

    2. *Assistance in Preparation of a Defense*
Under *Wolff* and its progeny, a prisoner is entitled to an "employee assistant" to aid in the preparation for a disciplinary hearing when the inmate is illiterate, confined to the SHU, or unable to grasp the complexity of the issues involved. *Silva v. Casey,* 992 F.2d 20, 22 (2d Cir.1993); *see also Eng,* 858 F.2d at 897. The Supreme Court has made it clear, however, that the assistance due prisoners is limited and is not equivalent of the right of a criminally accused legal counsel. *Wolff,* 418 U.S. at 570, 94 S.Ct. at 2981. An assistant is only required to act as the inmate's *"surrogate*—to do what the inmate would have done were he able." *Silva,* 992 F.2d at 22 ("The assistant is not obliged to go beyond the specific instructions of the inmate because if he did so he would then be acting as counsel.")

**\*9** Because Rodriguez had been relegated to SHU confinement by the time of the disciplinary hearing he was entitled to and was in fact assigned an employee assistant, Ms. Roddy, to help him prepare for the hearing. Rodriguez asserts that the assistant, however, refused to provide him with requested documents and threatened to "write him up" if he requested further assistance. Plaintiff's Memorandum (Dkt. No. 68–1) at pp. 14–17. Specifically, plaintiff claims that he was refused access to documents that would have helped prove his innocence, including a list of officers involved in the incidents involved, letters written by another inmate, video footage of a different inmate being led to the SHU, all misbehavior reports concerning other inmates' involvement in the incidents, and all pertinent "To/From" memoranda produced by staff or inmates with knowledge of the relevant events. *Id.* at p. 15.

A careful review of the assistant forms and attachments in the record shows that the assigned assistant fulfilled her duty as plaintiff's surrogate. Plaintiff provided several lists of documents requested to prepare his defense. [13] Selsky Decl., Exh. A (Dkt. No. 62–4) pp. 46–49, 54–61. Ms. Roddy indicated on the assistant form that she pursued all of plaintiff's requests and provided him with at least twenty pages of documents. *Id.* at pp. 17–18. On the handwritten lists, Ms. Roddy noted which documents were provided to plaintiff and gave brief explanations as to why some of the requested documents could not be produced. It was noted, for example, that plaintiff was denied access to the handwritten notes of another inmate, several requested "To/From" forms simply did not exist, and that the video footage would be available for viewing at the hearing if deemed pertinent to the pending charges. *Id.* at pp. 46–49.

13    It is noted that plaintiff did not request that Ms. Roddy interview any inmates or other persons as potential witnesses and refused to sign the assistant form. Selsky Decl., Exh. A (Dkt. No. 62–4) p. 17.

There is no indication that any documents were withheld from plaintiff without justification or as a result of Ms. Roddy's ineffective assistance. Ms. Roddy's role as plaintiff's assistant was limited to acting as his surrogate; if he was not permitted to receive certain documents, Ms. Roddy likewise could not access them. Even assuming plaintiff's claim that Ms. Roddy was rude and hostile toward him is accurate, such conduct in and of itself does not violate his federal due process rights. *See Gates v. Selsky,* No. 02 CV 496, 2005 WL 2136914, at * 7 (W.D.N.Y. Sept. 02, 2005) (noting that the duty owed by an employee assistant is the provision of requested services in good faith and in the best interest of the inmate and to perform as instructed by the inmate). In short, there is no evidence now before the court from which a reasonable factfinder could conclude that plaintiff was denied effective assistance in preparing his defense to the pending disciplinary charges.

### 3. *Opportunity to Present Evidence*

The due process clause of the Fourteenth Amendment plainly guarantees the right of an accused inmate to present a defense to disciplinary charges. *Wolff,* 418 U.S. at 555–56, 94 S.Ct. at 2974. That right, however, is not unfettered and does not apply to the same extent as the constitutional guarantee to a criminally accused defendant of the right to present a meaningful defense. *Hernandez v. Selsky,* 572 F.Supp.2d 446, 454 (S.D.N.Y.2008) (citing *Wolff* ). Instead, in order to keep a disciplinary hearing to within reasonable limits, a hearing officer "must have the necessary discretion ... to refuse to all witnesses that may create a risk of reprisal or undermine authority" *Wolff,* 418 U.S. at 566, 94 S.Ct. at 2980.

**\*10** An inmate's request to have specific witnesses called to testify may be refused if the hearing officer reasonably finds that such witnesses' testimony would be duplicative, non-probative, or would interfere with correctional goals. *See Russell v. Selsky,* 35 F.3d 55, 58 (2d Cir.1994). "[A] hearing officer does not violate due process by excluding irrelevant or unnecessary testimony." *Kalwasinski v. Morse,* 201 F.3d 103, 109 (2d Cir.1999).

In support of his claim that he was denied the opportunity to present a meaningful defense plaintiff first points to the hearing officer's refusal to allow him to call his mother and attorney as witnesses. According to the plaintiff, both would have substantiated his claim of retaliatory motives on the part of correctional officials. Plaintiff's Memorandum (Dkt. No. 68–1) at p. 8; *see also* Selsky Decl., Exh. B (Dkt. No. 62–6) pp. 98–99. Neither witness, however, was present in the prison during any of the events giving rise to plaintiff's claims. The only testimony those individuals could have offered would not only have been hearsay, but would have come directly from Rodriguez himself, who was present to testify. Accordingly, the hearing officer properly determined that such testimony would have been irrelevant or unnecessarily redundant.

Plaintiff also challenges the hearing officer's failure to submit written questions to two fellow inmates who refused to testify at the hearing. Despite plaintiff's claim to the contrary, a hearing officer is under no affirmative duty to compel a response from an inmate who refuses to testify at a disciplinary hearing. If a witness has indicated that he or she will not testify if called, it would be futile and unnecessary to pursue his or her testimony further. *Silva,* 992 F.2d at 22; *see also Johnson v. Doling,* No. 9:05–CV–376, 2007 WL 3046701, at *7 (N.D.N.Y. Oct. 17, 2007) (McAvoy, J. and Treece, M.J.) (the failure to summon the testimony of a witness who refuses to testify does not violate due process); *Dumpson v. Rourke,* No. CIVA96CV621, 1997 WL 610652, at *5 (N.D.N.Y. Sept. 26, 1997) (Pooler, J. and DiBianco, M.J.) (a hearing officer's failure to investigate why an inmate refused to testify does not constitute a due process violation).

Here, inmates Colon and Berrios flatly refused to testify at plaintiff's disciplinary hearing, signing the appropriate refusal forms on January 14, 2004. Selsky Decl., Exh. A (Dkt. No. 62–4) pp. 110–11. Colon explained his refusal by noting that he had not witnessed the incident, and Berrios likewise claimed to have no relevant information because he was sleeping in his cell at the relevant times. *Id.* Requesting further information from these inmates would have been futile and unnecessary since they claimed not to have actually witnessed the events that led to Rodriguez's charges. It was therefore not a violation of plaintiff's due process rights for the hearing officer to refuse to inquire further into their involvement.

2011 WL 1086001

### 4. Impartial Hearing Officer

**\*11** Among the due process dictates arising under the Fourteenth Amendment is the requirement that a hearing officer assigned to address a disciplinary charge against an inmate be unbiased. *Allen v. Cuomo,* 100 F.3d 253, 259 (2d Cir.1996); *see also Davidson v. Capuano,* No. 78 Civ. 5724, 1988 WL 68189, at \*8 (S.D.N .Y. June 16, 1988) (citing *McCann v. Coughlin,* 698 F.2d 112, 122 n. 10 (2d Cir.1983)). While the reality is that most hearing officers serving in that capacity are prison officials, and a prison hearing officer's impartiality generally does not have to mirror that of judicial officers, nonetheless the result of a disciplinary hearing should not be "arbitrary and adversely predetermined." *Francis v. Coughlin,* 891 F.2d 43, 46 (2d Cir.1989). Here again, the inquiry focuses on whether plaintiff was afforded basic due process. *See Wright v. Conway,* 584 F.Supp.2d 604, 609 (W.D.N.Y.2009). Within that context, an impartial hearing officer is one who "does not prejudge the evidence and who cannot say ... how he would assess evidence he has not yet seen." *Patterson v. Coughlin,* 905 F.2d 564, 570 (2d Cir.1990).

It should be noted that a plaintiff's disagreement with a hearing officer's rulings alone does not give rise to a finding of bias. *See Johnson,* 2007 WL 3046701, at \*10 (hostile exchanges between plaintiff and the hearing officer throughout the proceeding and adverse rulings did not constitute bias where plaintiff was otherwise provided the opportunity to testify, call witnesses, and raise objections). Similarly, the mere involvement of a hearing officer in related investigations or proceedings does not evidence bias. *See Vega v. Artus,* 610 F.Supp.2d 185, 200 (N.D.N.Y.2009) (failing to find bias where the hearing officer conducted both the disciplinary proceeding and the investigation into the inmate's grievance against the involved corrections officer).

Because prison officials serving as adjudicators enjoy a rebuttable presumption that they are unbiased, *Allen,* 100 F.3d at 259, plaintiff's conclusory allegations of bias in this case are insufficient to overcome this presumption. Plaintiff claims that Hearing Officer Ewanciw was biased because he sought assistance from Lt. Wright, who authored one of the two MBRs in issue. Plaintiff's Memorandum (Dkt. No. 68–1) at pp. 18–20. However, Rodriguez fails to explain how this evidences bias against him, reflects a predetermination on the hearing officer's part, or impacted the outcome of the proceeding. The

record reflects that the hearing officer disclosed to the plaintiff that he had consulted with Lt. Wright, the "disciplinary lieutenant," for the purpose of ascertaining whether plaintiff was permitted to receive copies of redacted investigation documents. Selsky Decl., Exh. B (Dkt. No. 62–5) p. 130.

During the hearing plaintiff suggested that the hearing officer and Lt. Wright are friends outside of work. Selsky Decl., Exh. B (Dkt. No. 62–5) pp. 131–32. While the allegation denied by Hearing Officer Ewanciew, even if true this fact does not show that he was predisposed to rule against plaintiff.

**\*12** In sum, plaintiff has failed to adduce evidence from which a reasonable factfinder could conclude that the hearing officer assigned to preside over plaintiff's disciplinary hearing was biased, or had prejudged plaintiff's guilt prior to considering the evidence presented at the hearing.

### 5. Determination Supported by "Some Evidence"

In addition to repeated verbal explanations of his rulings throughout the hearing and of his ultimate findings, Hearing Officer Ewanciw provided plaintiff with a written explanation of the evidence relied upon in reaching his conclusion. Selksy Decl., Exh. A (Dkt. No. 62–4) pp. 3–4. In his written explanation, Hearing Ewanciw acknowledged that he relied in part on information from confidential witnesses. Selksy Decl., Exh. A (Dkt. No. 62–4) p. 4. The question next presented is whether these findings were supported by at least some credible evidence.

The "some evidence" standard is extremely tolerant and is satisfied if "there is any evidence in the record that supports" the disciplinary ruling. *Friedl v. City of New York,* 210 F.3d 79, 85 (2d Cir.2000). Nonetheless to pass constitute muster, the supporting evidence must be reliable. *Taylor v. Rodriguez,* 238 F.3d 188, 194 (2d Cir.2001). The Second Circuit has made clear that "the reliability of evidence is always properly assessed by reference to the totality of the circumstances and that an informant's record for reliability cannot, by itself, establish the reliability of bald conclusions or third-party hearsay." *Sira,* 380 F.3d at 82; *see also Dawkins v. Gonyea,* 646 F.Supp.2d 594, 614 (S.D.N.Y.2009) ("*Sira* clearly established that an independent assessment is necessary to satisfy the 'some evidence' standard when a disciplinary decision is based solely on confidential information.").

The hearing transcript reflects that the hearing officer did not make an independent inquiry into the reliability of the confidential inmate witnesses himself, but instead relied on Lt. Wright's independent finding of reliability. Selsky Decl., Exh. B (Dkt. No. 62–5) p. 128. Had the disciplinary decision been based solely on such confidential information, an issue of material fact might have been presented as to whether the "some evidence" standard was met. With defendant Selsky's reversal of plaintiff's conviction on the demonstration charge contained within the January 2, 2004 MBR, the remaining charges for which he was found guilty included fighting, refusing a direct order, and violent conduct. To support his finding of guilt on those counts Hearing Officer Ewanciw relied on a correctional officer's assertion that he witnessed plaintiff raise his fists, throw punches, and fail to stop fighting when instructed to do so—an account that was corroborated by another officer's investigation—as well as the results of an investigation into the incident and evidence found in plaintiff's cell tying him to the relevant events. There was therefore sufficient reliable evidence on which to base a disciplinary decision related to the charges, independent of the confidential witness statements, and no reasonable factfinder could conclude otherwise.

IV. *SUMMARY AND RECOMMENDATION*

 **\*13** Plaintiff has failed to establish the existence of a genuine issue of material fact regarding his procedural due process claim. Rodriguez received sufficient notice of the charges against him as well as adequate assistance in preparing a defense, and had ample opportunity to appear, call witnesses, and present evidence in his defense. In addition, the record fails to disclose any basis for concluding that Hearing Officer Ewanciw was biased, and the record before the court proves that he provided plaintiff with a written explanation of the reasons for his decision, which was supported by at least some reliable evidence. I therefore recommend dismissal of plaintiff's due process claim against defendant Selsky on the merits, and in light of this recommendation find it unnecessary to address defendant's claim of qualified immunity. It is therefore respectfully

RECOMMENDED, that defendant's motion for summary judgment (Dkt. No. 62) be GRANTED, and that the complaint be DISMISSED in its entirety.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections must be filed with the clerk of the court within FOURTEEN days of service of this report. FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(d), 72; *Roldan v. Racette,* 984 F.2d 85 (2d Cir.1993).

It is hereby ORDERED that the clerk of the court serve a copy of this report and recommendation upon the parties in accordance with this court's local rules.

**All Citations**

Not Reported in F.Supp.2d, 2011 WL 1086001

---

**End of Document**                    © 2017 Thomson Reuters. No claim to original U.S. Government Works.

2011 WL 7629513
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Todd JOHNSON, Plaintiff,
v.
Christopher FERNANDEZ, et al., Defendants.

No. 9:09–CV–626 (FJS/ATB).
|
March 1, 2011.

**Attorneys and Law Firms**

Todd Johnson, pro se.

Michael G McCartin, Ass't Attorney General, for Defendants.

**REPORT RECOMMENDATION**

ANDREW T. BAXTER, United States Magistrate Judge.

**\*1** This matter was referred for Report and Recommendation, pursuant to 28 U.S.C. § 636(b) and Local Rules N.D.N.Y. 72.3(c), by the Honorable Frederick J. Scullin, Jr., Senior United States District Judge. On November 4, 2010, this case was reassigned to me from Magistrate Judge David R. Homer. (Dkt. No. 48).

In this civil rights complaint (Dkt. No. 1), Plaintiff alleges that Defendants violated his rights under the First, Eighth, and Fourteenth Amendments. Plaintiff seeks $1 million in damages, as well as injunctive relief. Presently before this court is Defendants' motion for summary judgment pursuant to Fed.R.Civ.P. 56(b). (Dkt. No. 39). Plaintiff responded in opposition to the motion. (Dkt. No. 43). For the following reasons, the court recommends granting Defendants' motion, and dismissing the complaint in its entirety.

**DISCUSSION**

**I. *Facts***

**A. Excessive Force Claims Against Christopher Fernandez and Jason Yung**

Plaintiff alleges [1] that he was assaulted by Defendant Christopher Fernandez, a correctional officer, on February 9, 2008, while incarcerated at Coxsackie Correctional Facility ("Coxsackie"). (Dkt. No. 1, Compl. at 8 [2]; Dkt. No. 39–3, Pl.'s Dep. at 13). At approximately 3:00 P.M., Defendant Fernandez approached Plaintiff's cell and started screaming about people who were "loud at the gate" earlier in the week. (Compl. at 8; Pl.'s Dep. at 12). Defendant Fernandez told another correctional officer, known only as Officer Ryan, to open Plaintiff's cell. (Compl. at 8; Pl.'s Dep. at 12–13). After Officer Ryan opened the cell, Defendant Fernandez told Plaintiff to "step out" and "place [his] hands on the wall." (Compl. at 8; Pl.'s Dep. at 13) Defendant Fernandez allegedly began punching Plaintiff in the ribs once he exited his cell. (Compl. at 8; Pl.'s Dep. at 16). Although Defendant Fernandez supposedly told Plaintiff to "fight back," Plaintiff refused to do so. (Compl. at 8; Pl.'s Dep. at 16). Defendant Fernandez then began "trashing" Plaintiff's cell, as if he were searching for contraband. (Compl. at 8; Pl.'s Dep. at 13). Finding none, Defendant Fernandez ordered Plaintiff to get on his knees. (Compl. at 8; Pl.'s Dep. at 13). Defendant Fernandez then kicked Plaintiff's lower back, causing Plaintiff's neck to snap. *Id.* (Compl. at 8; Pl.'s Dep. at 13).

[1] Plaintiff was deposed on February 23, 2010 (Dkt. No. 39–3), and this court has incorporated facts that were brought out in plaintiff's deposition.

[2] All references to page numbers in the Complaint will be to the page numbers assigned by the court's electronic docketing system.

After Defendant Fernandez locked Plaintiff in his cell, Defendant Fernandez walked over to Inmate Green's cell and ordered Officer Ryan to open that cell. (Compl. at 8; Pl.'s Dep. at 25). Although Plaintiff did not see what transpired immediately after Defendant Fernandez entered Inmate Green's cell, Plaintiff claims that he later witnessed Defendant Fernandez slapping Inmate Green. (Compl. at 8; Pl.'s Dep. at 26). Defendant Fernandez then proceeded to Inmate Palmer's cell and ordered Officer Ryan to open that cell. (Compl. at 8; Pl.'s Dep. at 30). Plaintiff does not claim that he witnessed any assault on Inmate Palmer, but claims that he heard repeated sounds of a stick hitting a body and cries for help. (Compl. at 8;

Pl.'s Dep. at 35). Plaintiff also claims to have witnessed Inmate Palmer being dragged to the day room in bloody clothing. (Compl. at 8; Pl.'s Dep. at 35).

**\*2** On February 15, 2008, Plaintiff states that a correctional officer told Plaintiff that he was being called as a witness in Inmate Palmer's disciplinary hearing that arose from the February 9 incident. (Compl. at 8; Pl.'s Dep. at 59). The officer asked Plaintiff: "Do you want to get involved with that?" (Compl. at 8). After Plaintiff responded affirmatively, the officer allegedly told Plaintiff that getting involved was not a "good idea." *Id.* After that officer left, another officer approached Plaintiff and asked him the same question. *Id.* Once again, Plaintiff replied affirmatively. *Id.* The officer then told Plaintiff that he would be called after lunch. *Id.*

Plaintiff states that he wanted to bring a written statement and other documents into Inmate Palmer's hearing. (Compl. at 8; Pl.'s Dep. at 64–65). On his way to the hearing room, after retrieving those items and placing them in an envelope, Plaintiff claims that he was stopped by Defendant Sergeant Jason Yung and an unidentified correctional officer. (Compl. at 8; Pl.'s Dep. at 65). Defendant Yung then allegedly threatened Plaintiff with being "locked up" if he testified at the hearing. (Compl. at 8; Pl.'s Dep. at 64).

As Plaintiff sat in the waiting pen, Correctional Officer (C.O.) Nieves told Plaintiff that his envelope would need to be searched before he could bring it into the hearing room. (Dkt. No. 39–11, Disciplinary Hr'g at 11; Dkt. No. 39–12, Hr'g Papers at 4). Plaintiff then shouted that he would not permit the officers to search his envelope, claiming that C.O. Nieves was interfering with his ability to testify for Inmate Palmer. (Pl.'s Dep. at 65; Disciplinary Hr'g at 11–12; Hr'g Papers at 4). C.O. Nieves then issued Plaintiff a disciplinary ticket. (Hr'g Papers at 4).

Based upon this misbehavior, Defendant Yung and another officer escorted Plaintiff back to his cell to pack for confinement in the special housing unit ("SHU"). (Compl. at 8; Disciplinary Hr'g at 17). During the escort to SHU, Defendant Yung allegedly called for more officers. (Compl. at 8). Plaintiff claims that Defendant Yung and the other officers began punching and kicking Plaintiff in the face and ribs. (Compl. at 8; Pl.'s Dep. at 70–73).

Once Plaintiff arrived at SHU, Plaintiff told his mental health counselor, Mr. Tatum, that he was crying because he had been assaulted. (Compl. at 8; Pl's Dep. at 78). Mr. Tatum transferred Plaintiff to the Office of Mental Health ("OMH") infirmary. (Compl. at 8; Pl.'s Dep. at 78). Plaintiff claims that was not seen by a doctor until February 27, 2008. (Compl. at 15). He believes that the delay in treatment occurred because he told Investigator Begmann of the Inspector General's Office about the February 9 and 15 assaults. *Id.*

### B. Mail Interference Claim Against M. Bathrick

As an initial matter, the court notes that Plaintiff fails to allege which Defendant (or any other individual) deprived him of his First Amendment right to the free flow of mail. Although Defendant Bathrick is named as a defendant in the caption of the Complaint and is later identified as a clerk in the Inmate Account Unit (Compl. at 3), the Complaint fails to contain any allegations indicating how Defendant Bathrick violated the law or injured Plaintiff. Under these circumstances, the claim would ordinarily have been subject to dismissal. [3] Defendants, however, have interpreted the allegation of mail interference to refer to Defendant Bathrick. (Dkt. No. 39–14, Defs.' Mem. of Law at 15). Moreover, Plaintiff states, in his opposition to summary judgment, that Defendant Bathrick is the defendant responsible for this alleged violation of Plaintiff's First Amendment rights. (Dkt. No. 43 at 24, Pl.'s 7.1 Statement ¶ 14). Accordingly, the Court will construe the Complaint as asserting a First Amendment mail interference claim against Defendant Bathrick. *See Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994) (holding that where a party is proceeding pro se, the court must "read [his or her] supporting papers liberally, and ... interpret them to raise the strongest arguments that they suggest").

[3]    *See, e.g., Orraca v. McCreery,* No. 9:04–CV–1183, 2006 U.S. Dist. LEXIS 22941, 2006 WL 1133254, at *6 (N.D.N.Y. Apr.25, 2006) (dismissing claim against defendant where defendant named in complaint but complaint and supporting documents "fail[ed] to disclose any basis on which to conclude" that defendant was personally involved in the alleged unlawful conduct); *Dove v. Fordham Univ.,* 56 F.Supp.2d 330, 335 (S.D.N.Y.1999) ( "Where the complaint names a defendant in the caption but contains no allegations indicating how the defendant violated the law or injured the plaintiff, a motion

2011 WL 7629513

to dismiss the complaint in regard to that defendant should be granted."), *aff'd,* 210 F.3d 354 (2d Cir.2000).

**\*3** Plaintiff alleges that his First Amendment rights were violated at Coxsackie because he was denied his right to "communicate with the outside world." (Compl. at 13). Following the alleged assaults discussed above, Plaintiff claims that he was depressed and wanted to communicate with this family. *Id.* Plaintiff states, however, that he was prevented from writing to his family because he was not permitted to buy stamps when he arrived at the SHU on February 15, 2008. (Pl.'s Dep. at 102). He states that he was unable to obtain stamps until March 2008. *Id.* at 106.

### C. Due Process Claims Against Defendant Kim Gerwer

Defendant Kim Gerwer, a Coxsackie Education Supervisor, presided over Plaintiff's Tier III hearing. (Compl. at 15; Disciplinary Hr'g at 1). Plaintiff alleges that his due process rights were violated at this hearing in a number of ways. (Compl. at 15). First, he claims he was not provided with notice of the charges against him twenty-four hours before the hearing. *Id.* Second, he claims that Defendant Gerwer refused, without a legitimate reason, to call a witness that would have supported Plaintiff. *Id.* Third, Defendant Gerwer failed to collect documents that Plaintiff had requested. *Id.* Fourth, Defendant Gerwer relied upon Officer Germaine's testimony, even though the officer did not endorse the disciplinary ticket as someone with "personal knowledge" of the incident. (Pl.'s Dep. at 85–87). Finally, Plaintiff was not provided with an impartial hearing because Defendant Gerwer had stated that the officer who wrote the ticket was a "good person." *Id.* at 82.[4]

[4]    Plaintiff also appears to assert a conditions of confinement claim. (Compl. at 14). Plaintiff, however, has failed to make any allegations about how any of the named defendants are related to a possible condition of confinement claim. Accordingly, the Court will only address the claims asserted against the named defendants.

### II. *Legal Standard for Summary Judgment*

Summary judgment is appropriate where there exists no genuine issue of material fact and, based on the undisputed facts, the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56; *Salahuddin v. Goord,* 467 F.3d 263, 272–73 (2d Cir.2006). "Only disputes over ['material'] facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). It must be apparent that no rational finder of fact could find in favor of the non-moving party for a court to grant a motion for summary judgment. *Gallo v. Prudential Residential Servs.,* 22 F.3d 1219, 1224 (2d Cir.1994).

The moving party has the burden to show the absence of disputed material facts by informing the court of portions of pleadings, depositions, and affidavits which support the motion. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). If the moving party satisfies its burden, the nonmoving party must move forward with specific facts showing that there is a genuine issue for trial. *Salahuddin v. Goord,* 467 F.3d at 273. In that context, the nonmoving party must do more than "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

**\*4** In determining whether there is a genuine issue of material fact, a court must resolve all ambiguities, and draw all inferences, against the movant. *See United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962); *Salahuddin v. Goord,* 467 F.3d at 272. "[I]n a *pro se* case, the court must view the submissions by a more lenient standard than that accorded to 'formal pleadings drafted by lawyers.' " *Govan v. Campbell,* 289 F.Supp.2d 289, 295 (N.D.N.Y.2007) (citing, *inter alia, Burgos v. Hopkins,* 14 F.3d at 790 (a court is to read a *pro se* party's "supporting papers liberally, and ... interpret them to raise the strongest arguments that they suggest")). "However, a *pro se* party's 'bald assertion,' completely unsupported by evidence, is not sufficient to overcome a motion for summary judgment." *Lee v. Coughlin,* 902 F.Supp. 424, 429 (S.D.N.Y.1995) (citing *Carey v. Crescenzi,* 923 F.2d 18, 21 (2d Cir.1991)).

### III. *Eighth Amendment Excessive Force Claims*

Defendants Fernandez and Yung argue that Plaintiff has failed to properly exhaust the excessive force claims. (Defs.' Mem. of Law at 5). The Prison Litigation Reform Act's ("PLRA") exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes regardless

WESTLAW    © 2017 Thomson Reuters. No claim to original U.S. Government Works.

of the subject matter of the claim. *See, e.g., Giano v. Goord,* 380 F.3d 670, 675–76 (2d Cir.2004). In *Woodford v. Ngo,* 548 U.S. 81, 126 S.Ct. 2378, 165 L.Ed.2d 368, 765 L.Ed. 368 (2006), the Supreme Court held that the PLRA required "proper" exhaustion as a prerequisite to filing a section 1983 action in federal court. *Id.* at 92–93. "Proper" exhaustion means that the inmate must complete the administrative review process in accordance with the applicable procedural rules, including deadlines, as a prerequisite to bringing suit in federal court. *See id.* at 89–94. An inmate must appeal any denial of his grievance to the highest available administrative level. *Martinez v. Williams,* 349 F.Supp.2d 677, 682 (S.D.N.Y.2004).

However, the Second Circuit has held that certain exceptions to exhaustion apply. The proper inquiry is to determine "whether: (1) administrative remedies were in fact available to the prisoner; (2) the defendants may have forfeited the affirmative defense of non-exhaustion by failing to preserve it ... or whether the defendants' own actions inhibiting the inmate's exhaustion of remedies may estop one or more of the defendants from raising the plaintiff's failure to exhaust as a defense; and (3) special circumstances may have been plausibly alleged that justify the prisoner's failure to comply with administrative procedural requirements." *Chavis v. Goord,* 333 Fed. App'x 641, 643 (2d Cir.2009) (citing *Hemphill v. New York,* 380 F.3d 680, 686 (2d Cir.2004) (internal quotation marks omitted).

The grievance procedure in New York is a three-tiered process. The inmate must first file a grievance with the Inmate Grievance Resolution Committee ("IGRC"). N.Y. Comp.Codes R. & Regs., tit. 7 §§ 701.5(a)(1) and (b). An adverse decision of the IGRC may be appealed to the Superintendent of the facility. *Id.* § 701.5(c). Adverse decisions at the Superintendent's level may be appealed to the Central Office Review Committee (CORC). *Id.* § 701.5(d). The court also notes that the regulations governing the Inmate Grievance Program (IGP) encourage the inmate to "resolve his/her complaints through the guidance and counseling unit, the program area directly affected, or other existing channels (informal or formal) prior to submitting a grievance." *Id.* § 701.3(a).

**\*5** There is also an expedited process for the review of complaints of inmate harassment or other misconduct by corrections officers or prison employees. 7 NYCRR § 701.8. Under this procedure, the inmate may (but

is not required to) report the misconduct to the employee's supervisor. *Id.* § 701.8. The inmate then files a grievance under the normal procedures outlined above; but all grievances alleging employee misconduct are given a grievance number, and sent immediately to the Superintendent for review. *Id* . § 701.8(b). Under the regulations, the Superintendent or his designee shall determine immediately whether the allegations, if true, would state a "bona fide" case of harassment. If so, the Superintendent shall initiate an investigation of the complaint, either "in-house," by the Inspector General's Office, or by the New York State Police Bureau of Criminal Investigations. *Id.* §§ 701.8(c); 701.8(d)(1)-(d)(3). An appeal of the adverse decision of the Superintendent may be taken to the Central Office Review Committee as in the regular grievance procedure. *Id.* § 701.8(h).

Here, Defendants argue that Plaintiff did not properly exhaust his administrative remedies because he failed to grieve the excessive force claims through the state's three-tiered process in a timely and appropriate manner. (Defs.' Mem. of Law at 5.) Plaintiff claims that a grievance officer told him that the grievance office did not handle staff assaults, and that he should, instead, complain to the Inspector General. (Compl. at 1; Pl's Dep. at 52–53; Pl.'s 7 .1 Statement ¶ 1). Plaintiff then wrote to the Inspector General's Office. (Pl.'s Dep. at 36–37).

An inmate's attempt to exhaust by simply writing a letter directly to the Inspector General will not suffice to exhaust administrative remedies. *See Grey v. Spearhawk,* No. 99 CIV. 9871, 2000 U.S. Dist. LEXIS, at \*5, 2000 WL 815916 (S.D.N.Y. June 23, 2000) (holding that a complaint filed directly with the Inspector General did not excuse plaintiff from "adhering to the available administrative procedures"). It has been held that "a grievance through informal channels will satisfy the exhaustion requirement if the prisoner thereby obtained a *favorable resolution* of his grievance." *Thomas v. Cassleberry,* 315 F.Supp.2d 301, 304 (W.D.N.Y.2004) (citations omitted) (emphasis added). The exhaustion requirement will be satisfied in that situation because the inmate would not have any reason to appeal a favorable resolution. *Andrews v. Cruz,* No. 04 Civ. 566, 2010 U.S. Dist. LEXIS 28124, at \*16, 2010 WL 1141182, at \*6 (S.D.N.Y. Mar. 24, 2010) (citations omitted). Thus, Plaintiff did not exhaust administrative remedies by writing to the Inspector General's Office, even though the Inspector General

2011 WL 7629513

investigated plaintiff's allegations and found them to be unsubstantiated.

Defendants may "forfeit the affirmative defense of non-exhaustion ... [if] defendants' own actions inhibit[ed] the inmate's exhaustion of remedies .... " *Chavis v. Goord,* 333 Fed. App'x at 641 (citations omitted); *see, e.g., Jacoby v. Phelix,* No. 9:07–CV–872 (DNH/ATB), 2010 U.S. Dist. LEXIS 44222, at *26–28, 2010 WL 1839299, at *8–9 (N.D.N.Y. Mar.31, 2010) (Baxter, Mag. J.) (summary judgment denied where issues of fact remained on whether plaintiff was threatened by defendants into withdrawing his grievance), *report-recommendation adopted,* 2010 U.S. Dist. LEXIS 44201, 2010 WL 1839264 (N.D.N.Y. May 6, 2010) (Hurd, J.). Although plaintiff claims that an unidentified grievance officer told him that the grievance office did not handle staff assaults, nothing in the record indicates that Defendants Fernandez and Yung or any other DOCS employee actually inhibited Plaintiff's ability to exhaust administrative remedies. First, the IGP Supervisor at Coxsackie denied telling plaintiff that allegations of assault are not grievable. (Dkt. No. 39–7, Bellamy's 7/30/2008 Letter at 1). Further, plaintiff has acknowledged that he wrote one grievance regarding the assaults on February 25, 2008, and then wrote another grievance after March 8, 2008, when the grievance office supposedly told him that "they do not deal with assaults on inmates by staff." [5] (Dkt. No. 39–8, Pl. 6/20/2008 Letter at 4). Whatever the Grievance Supervisor said, plaintiff's own statements indicate that he was not deterred from pursuing grievance regarding the alleged assaults.

[5]    Contrary to this purported advice, DOCS regulations clearly permit an inmate to file harassment grievances. 7 NYCRR § 701.8; see also *id.* § 701.2(e) (defining "harassment grievances" as "those grievances that allege employee misconduct meant to annoy, intimidate or harm an inmate").

 **\*6** Plaintiff states that the he did mention the February 9 and February 15 incidents in a grievance that he filed on June 25, 2008. (Pl.'s Dep. at 55–56). The regulations provide, however, that an inmate must file a grievance within twenty-one days of the alleged occurrence. 7 NYCRR § 701.5(a)(1). An exception to this time limit may be granted based on "mitigating circumstances" if the extension is requested within forty-five days of the alleged occurrence. 7 NYCRR § 701.6(g)(1)(i)(a). Thus, to the extent that the June 25 grievance complained about

the February 9 and 15 assaults, it would have been time-barred. [6]

[6]    Captain J.R. Raymond also responded to a April 29, 2008, letter of complaint that Plaintiff sent to Superintendent Lape. (Compl. at 38, Ex. 8). Even if the April 29 letter could be considered a grievance complaint, it would likewise be time-barred under 7 NYCRR § 701.6(g)(1)(i)(a).

Plaintiff appealed the denial of his June 25, 2008 grievance. In the CORC's decision, dated July 30, 2008, the Committee stated that "CORC notes that there is no record of the grievant filing prior grievances addressing the allegations of assaults by staff on 2/9/08 and 2/15/08. However, it is noted that both allegations were investigated by the Office of the Inspector General and determined to be unsubstantiated." (Dkt. No. 39–6 at 1). Thus, it is clear from the CORC's response to plaintiff that there was no record of a prior grievance, complaining about these alleged assaults.

Even though the forty-five day window to file a grievance regarding the alleged assaults had already expired, IGP Director Karen Bellamy advised Plaintiff on June 30, 2008, that he could contact the IGP supervisor with his mitigating circumstances. (Dkt. No. 39–7, Bellamy's 7/30/2008 Letter at 1). There is nothing in the record, however, to indicate that Plaintiff did so. No rational fact finder could determine that Plaintiff exhausted his administrative remedies, or was deterred from doing so by the actions of the Defendants or any DOCS employee. [7] Accordingly, it is recommended that summary judgment be **granted** as to the Eighth Amendment claims.

[7]    See *Jeffreys v. City of New York,* 426 F.3d 549, 554 (2d Cir.2005) ("While it is undoubtedly the duty of district courts not to weigh the credibility of the parties at the summary judgment stage, in the rare circumstance where the plaintiff relies almost exclusively on his own testimony, much of which is contradictory and incomplete, it will be impossible for a district court to determine whether 'the jury could reasonably find for the plaintiff,' ... and thus whether there are any "genuine" issues of material fact, without making some assessment of the plaintiff's account." (citation omitted). See also *Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983) ("mere conclusory allegations or denials are insufficient to

withstand a motion for summary judgment once the moving party has set forth a documentary case").

#### IV. First Amendment Mail Interference Claim

Plaintiff alleges that his First Amendment rights were violated because he was not permitted to buy stamps when he arrived at the SHU on February 15, 2008, and was unable to buy stamps until "some time in March" 2008. (Pl.'s Dep. at 102, 106). Because he was unable to buy stamps, Plaintiff claims that he was unable to communicate with this family about the February 15 assault. (Compl. at 13). At his deposition, however, he admitted that he was able to send out at least one letter between February 15 and March 2008, in which he notified his family about the February 9 assault. (Pl.'s Dep. at 106).

Under the First Amendment, prisoners have a right to "the free flow of incoming and outgoing mail." *Johnson v. Goord,* 445 F.3d 532, 534 (2d Cir.2006) (citations omitted). A plaintiff may bring a claim under the First Amendment for interference with non-legal mail, based upon his free speech right to send or receive mail. *See Cancel v. Goord,* No. 00 CIV 2042, 2001 WL 303713, at *4 (S.D.N.Y. Mar. 29, 2001). "[A] prison official's interference with an inmate's mail may violate his First Amendment right to free speech, which includes the 'right to be free from unjustified governmental interference with communication.' " *Id.* (quotation omitted).

 *7 Although "[t]he boundary between an inmate's First Amendment right to free speech and the ability of prison officials to open or otherwise interfere with an inmate's mail is not precise[,] ... when analyzing such claims courts have consistently made distinctions between outgoing mail and incoming mail ... based on the various rights and interests at stake." *Id.* "[T]he Supreme Court has recognized that 'the implications of outgoing correspondence for prison security are of a categorically lesser magnitude than the implications of incoming materials.' " *Id.* (quotation omitted). Thus, "the penological interests for interference with outgoing mail must be more than just the general security interest which justifies most interference with incoming mail." *Id.* (citation omitted). However, when reviewing an interference with mail claim, "district courts have generally required specific allegations of invidious intent or of actual harm where the incidents of tampering are few and thus the implication of an actionable violation is not

obvious on its face." *Davis v. Goord,* 320 F.3d 346, 351–52 (2d Cir.2003); *see also John v. N.Y .C. Dep't of Corr.,* 183 F.Supp.2d 619, 629 (S.D.N.Y.2002) (requiring plaintiff to allege facts that show defendants acted with invidious intent and plaintiff was harmed by the interference); *Cancel v. Goord,* 2001 WL 303713 at *6 (dismissing claim where only two incidents of tampering alleged and no other indications of a continuing practice).

In this case, Plaintiff admits that he was able to send out at least one letter between February 15, 2008, and March 2008. (Pl.'s Dep. at 106). Moreover, any inability to send mail to his family was limited to, at most, a one month period because Plaintiff was able to buy stamps in March 2008. [8] Thus, any alleged occurrences of mail interference were few, any delay was minimal, and there is no indication that it was an ongoing practice. Plaintiff has also failed to show any harm, physical or otherwise, caused by his failure to communicate with his family, and he has failed to show that Defendant Bathrick (or anyone else) acted with invidious intent. Accordingly, the Court recommends **granting** Defendants' motion for summary judgment as to Plaintiff's First Amendment claims.

[8]     Plaintiff could not remember the exact time in March that he was able to purchase the stamps. (Pl.'s Depo. at 102).

#### V. Due Process Violations

Defendant Kim Gerwer is an Education Supervisor at Coxsackie. (Dkt. No. 39–10, Gerwer Decl. ¶ 1; Dkt. No. 39–13, Defs.' 7.1 Statement ¶ 2). She served as the hearing officer for Plaintiff's Tier III disciplinary hearing, which arose from the misbehavior report that was issued on February 15. (Gerwer Decl. ¶ 2; Defs.' 7 .1 Statement ¶ 2). Plaintiff asserts that Defendant Gerwer's conduct at the disciplinary hearing violated due process. (Compl. at 15–17).

To prevail on a procedural due process claim under section 1983, a plaintiff must show that he possessed a protected property or liberty interest, and that he was deprived of that interest without being afforded sufficient procedural safeguards. *See Tellier v. Fields,* 280 F.3d 69, 79–80 (2d Cir.2000); *Hynes v. Squillace,* 143 F.3d 653, 658 (2d Cir.1998). Due process generally requires that a state afford individuals "some kind of hearing" prior to depriving them of a liberty or property interest. *DiBlasio v. Novello,* 344 F.3d 292, 302 (2d Cir.2003).

**\*8**  In *Wolff v. McDonnell,* 418 U.S. 539, 563–64, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974), the Supreme Court held that due process requires advance notice of the charges against the inmate, and a written statement of reasons for the disposition. The inmate should also have the ability to call witnesses and present documentary evidence, subject to legitimate safety and correctional goals of the institution. *Id.* at 566. Finally, the inmate is entitled to a fair and impartial hearing officer, and the hearing disposition must be supported by "some" or "a modicum" of evidence. *Superintendent v. Hill,* 472 U.S. 445, 455, 105 S.Ct. 2768, 86 L.Ed.2d 356 (1985) (some evidence standard); *McCann v. Coughlin,* 698 F.2d 112, 121–22 (2d Cir.1983) (fair and impartial hearing officer).

### A. Liberty Interest

An inmate's protected liberty interest is implicated where the punishment at issue imposes an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin v. Conner,* 515 U.S. 472, 484, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995). The Second Circuit, however, has refused to set a bright line rule on when confinement becomes atypical. Instead, "in order to determine whether a liberty interest has been affected, district courts are required to examine the circumstances of a confinement and to identify with specificity the facts upon which [their] conclusions [are] based." *Wright v. Coughlin,* 132 F.3d 133, 137 (2d Cir.1998) (citations omitted).

Here, Plaintiff was sentenced to 180 days of SHU confinement. (Disciplinary Hr'g at 49). He also lost commissary, phone, and package privileges for 180 days. *Id.* The Second Circuit has found that SHU confinement for 180 days may impose an "atypical and significant hardship." *See Kalwasinski v. Morse,* 201 F.3d 103, 106–08 (2d Cir.1999) (per curiam). Defendants do not address this issue, and the court will assume that plaintiff had a protected liberty interest without further analysis because the court finds that plaintiff received due process in any event.

### B. Notice

Generally a prisoner must be provided with advanced written notice of the charges against him at least twenty-four hours prior to the hearing. *Wolff v. McDonnell,* 418 U.S. at 564–66; *see also Taylor v. Rodriguez,* 238 F.3d 188,

192 (2d Cir.2001); *Freeman v. Rideout,* 808 F.2d 949, 953 (2d Cir.1986).

In this case, Plaintiff argues that his due process rights were violated because he did not receive notice of the charges against him at least twenty-four hours before the hearing. (Compl. at 15; Pl.'s Dep. at 84–85). Plaintiff admitted at his disciplinary hearing that he was served with formal notice of the charges on February 20, 2008, at 9:20, but it is unclear from the hearing transcript and other documents in the record whether Plaintiff was served at 9:20 A .M. or 9:20 P.M. (Disciplinary Hr'g at 1). The disciplinary hearing commenced on February 21, 2008, at 11:30 A.M. *Id.* If Plaintiff were served at 9:20 P.M., then he would not have received exactly twenty-four hour notice. Even assuming that plaintiff's allegation about the time that the misbehavior report was served is true, his due process rights were not violated by what was ultimately a technicality that had absolutely no impact upon plaintiff's right to proper notice of the disciplinary charges.

**\*9**  The purpose of the twenty-four hour rule is to provide inmates with sufficient time to prepare to defend charges filed against them. *See Wolff v. McDonnell,* 418 U.S. at 564; *Benitez v. Wolff,* 985 F.2d 662, 665 (2d Cir.1993). A review of the hearing transcript shows that Plaintiff received sufficient notice to prepare for the hearing. Although the hearing began at 11:30 A.M. on February 20, 2008, Defendant Gerwer adjourned the hearing at 11:35 A.M., five minutes after the hearing started. (Disciplinary Hr'g at 3). Plaintiff did not have to defend himself against anything on February 20th. The hearing did not commence again until one week later, on February 27, 2008, at 1:29 P.M. *Id.* This six-day adjournment, which guaranteed that Plaintiff would have sufficient time to prepare for his defense, cured any deficiencies that may have occurred. The February 27th hearing was also adjourned at 2:05 P.M. and began again on March 6 at 3:25 P.M. *Id .* at 22. The second adjournment was necessary because Defendant Gerwer wanted secure the witnesses that Plaintiff requested. *Id.* The March 6 hearing adjourned at 3:45 P.M. so that Defendant Gerwer could secure another witness that Plaintiff requested. *Id.* at 32. The hearing reconvened on March 10 at 12:45 P.M. when that witness became available to testify. *Id.* The hearing was adjourned on at least three different occasions, ensuring that Plaintiff had sufficient time to prepare to defend the charges against him. Plaintiff has not alleged, and cannot claim, any

prejudice to him that resulted from the fact that the initial hearing may have started less than twenty-four hours after he was served with the misbehavior report, because there was no "hearing" on that day. Plaintiff had plenty of time to defend against the charges and to produce evidence and witnesses in his defense.

### C. Evidence and Witnesses

An inmate has a right to call witnesses and present evidence in his or her defense "when permitting him to do so will not be unduly hazardous to institutional safety or correctional goals." *Wolff v. McDonnell,* 418 U.S. at 566; *see also Ponte v. Real,* 471 U.S. 491, 496, 105 S.Ct. 2192, 85 L.Ed.2d 553 (1985) ("Prison officials must have the necessary discretion to keep the hearing within reasonable limits and to refuse to call witnesses that may create a risk of reprisal or undermine authority ....") (citations omitted). Moreover, a hearing officer does not violate due process by excluding irrelevant or unnecessary testimony or evidence. *See Kingsley v. Bureau of Prisons,* 937 F.2d 26, 30 (2d Cir.1991) (citing *Wolff v. McDonnell,* 418 U.S. at 566). A hearing officer may refuse to call a witness "on the basis of relevance or lack of necessity." *Kingsley v. Bureau of Prisons,* 937 F.2d at 30; *see also Scott v. Kelly,* 962 F.2d 145, 145–47 (2d Cir.1992) ("It is well settled that an official may refuse to call a witness as long as the refusal is justifiable.").

**\*10** Plaintiff alleges that his due process rights were violated because Defendant Gerwer excluded a log book from evidence. (Pl.'s Dep. at 88–89; Disciplinary Hr'g at 29–30). C.O. Nieves's signature appears on a misbehavior report dated February 15, 2008. (Dkt. No. 39–12, Disciplinary Hr'g Papers at 4). Plaintiff requested the log book because he did not believe that C.O. Nieves was assigned to the site of the incident at the time it occurred. (Pl.'s Dep. at 88; Disciplinary Hr'g at 29). C.O. Nieves testified at the disciplinary hearing that she wrote the February 15 report because Plaintiff had disobeyed her orders. (Disciplinary Hr'g at 11–12). Plaintiff questioned C.O. Nieves at the disciplinary hearing. *Id.* at 12–18. C.O. Donovan also testified that C.O. Nieves was present at the site of the incident. (Disciplinary Hr'g at 32). Plaintiff also had an opportunity to question C.O. Donovan. *Id.* at 33–34.

Thus, Defendant Gerwer had a rational basis to conclude that excluding the log book was proper because its inclusion was unnecessary as C.O. Nieves's presence at the

site of the incident was substantiated by C.O. Donovan. Plaintiff questioned both officers at the disciplinary hearing. Since C.O. Nieves was the officer claiming that plaintiff violated her orders, the log book, showing whether she was assigned to the location in question at the time of the incident, was totally irrelevant.

Defendant Gerwer also allegedly refused, without a legitimate reason, to let Plaintiff call Mr. Tatum to testify on Plaintiff's behalf. (Compl. at 15; Pl.'s Dep. at 90). Plaintiff wanted Mr. Tatum, a mental health counselor, to testify about Plaintiff's mental state after the alleged February 15th assault. (Pl.'s Dep. at 90; Disciplinary Hr'g at 25). Plaintiff admits, however, that Mr. Tatum was not present at the time of the incident that gave rise to the disciplinary hearing, and plaintiff's mental state when he was taken to SHU had nothing to do with the incident that gave rise to the disciplinary hearing. (Disciplinary Hr'g at 25). The alleged assault, even if it did occur, happened after the conduct giving rise to the misbehavior report occurred. As such, Defendant Gerwer had a proper basis to deny Mr. Tatum's testimony as his testimony would not be relevant to any issues or incidents that gave rise to the disciplinary hearing. *See, e.g., Kalwasinski v. Morse,* 201 F.3d 103, 108–109 (2d Cir.1999) (indicating that testimony on the record that no one else was present at incident gave rational basis for excluding plaintiff's witnesses as irrelevant and unnecessary). Moreover, at Plaintiff's request, Defendant Gerwer attempted to call another inmate who was present at the scene of the incident. *Id.* at 22. That inmate, however, refused to testify. *Id.* Finally, at Plaintiff's request, Defendant Gerwer called Officers Donovan and Germaine to testify. *Id.* at 32, 41, 43. Thus, Defendant Gerwer's refusal to call Mr. Tatum did not violate Plaintiff's due process rights because Mr. Tatum's testimony was irrelevant, and Defendant Gerwer called other witnesses that Plaintiff requested.

**\*11** Defendant Gerwer allegedly committed another due process violation when C.O. Germaine was permitted to testify even though he had failed to sign the misbehavior report as DOCS regulations require. (Pl.'s Dep. at 85–87). However, violations of state regulations with respect to disciplinary hearings do not, by themselves, necessarily rise to the level of constitutional violations. *See Young v. County of Fulton,* 160 F.3d 899, 902 (2d Cir.1998) (violation of state law is not the "benchmark" for determining whether a constitutional violation has occurred); *Soto v. Walker,* 44 F.3d 169, 173 (2d Cir.1995)

(state law violation does not necessarily rise to the level of a constitutional violation). [9] Plaintiff's claim that this error violated his due process rights is further undermined because Defendant Germaine testified at Plaintiff's request. (Disciplinary Hr'g at 43).

[9]  "While failure to adhere to regulations does not itself give rise to a claim under 42 U.S.C. § 1983, it may constitute evidence of a constitutional deprivation." *Samuels v. Selsky,* No. 01 Civ. 8235, 2002 U.S. Dist. LEXIS 17089, 2002 WL 31040370, at *13 n. 21 (S.D.N.Y. Sept. 12, 2002) (citing *Duckett v. Ward,* 458 F.Supp. 624, 627 (S.D.N.Y.1978)).

**D. Impartiality**

Finally, Plaintiff alleges that he was deprived of due process because Defendant Gerwer was not fair or impartial. (Compl. at 15; Pl.'s Dep. at 82, 85–87). "An inmate subject to a disciplinary proceeding is entitled to an impartial hearing officer." *Allen v. Cuomo,* 100 F.3d at 253, 259 (2d Cir.1996). An impartial hearing officer is "one who, *inter alia,* does not prejudge the evidence and who cannot say ... how he would assess the evidence he has not yet seen." *Patterson v. Coughlin,* 905 F.2d 564, 569–70 (2d Cir.1990); *Francis v. Coughlin,* 891 F.2d 43, 46 (2d Cir.1989) ("it would be improper for prison officials to decide the disposition of a case before it was heard").

It is well settled, however, "that prison disciplinary officers are not held to the same standard of neutrality as adjudicators in other contexts." *Allen v. Cuomo,* 100 F.3d at 259. "The degree of impartiality required of prison officials does not rise to the level of that required of judges generally." *Id.* An inmate's own subjective belief that the hearing officer was biased is insufficient to create a genuine issue of material fact. *Francis v. Coughlin,* 891 F.2d 43, 47 (2d Cir.1989); *Clyde v. Schoellkopf,* 714 F.Supp.2d 432, 437–38 (W.D.N.Y.2010).

Plaintiff first accuses Defendant Gerwer of saying on the record that C.O. Nieves was a "good person." (Disciplinary Hr'g at 48). Later, Plaintiff claims that Defendant Gerwer made this statement off the record. (Disciplinary Hr'g at 52). A review of the disciplinary hearing transcript shows Defendant Gerwer never made such a statement on the record. [10] But even if Defendant Gerwer made such a statement, either on the record or off the record, it is not evidence of bias. As the hearing officer, Defendant Gerwer could make

credibility determinations. *See Lewis v. Johnson,* No. 9:08–CV–482 (TJM/ATB), 2010 U.S. Dist. LEXIS 98116, at *39–40 n. 25, 2010 WL 3785771, at *11 n. 25 (N.D.N.Y. Aug.5, 2010) (Baxter, Mag. J .) ("the Second Circuit has required that a hearing examiner make an independent assessment of the credibility of certain sources of evidence at a prison disciplinary hearing"), *report-recommendation adopted,* 2010 U.S. Dist. LEXIS 98084, at *1, 2010 WL 3762016, at *1 (N.D.N.Y. Sept.20, 2010) (McAvoy, J.). Moreover, a review of the record belies Plaintiff's accusation that Defendant Gerwer had pre-determined Plaintiff's guilt. The disciplinary hearing spanned several weeks to locate witnesses and schedule a time for them to testify. Plaintiff was permitted to call witnesses to testify on his behalf, and was permitted to cross-examine the witnesses against him. (Disciplinary Hr'g at 12, 32, 41, 43). The constitutional standard for sufficiency of evidence in a prison disciplinary hearing is whether there is "some" or "a modicum" of evidence to support the hearing officer's determination. *Sira v. Morton,* 380 F.3d 57, 76 (2d Cir.2004) (citing *Superintendent v. Hill,* 472 U.S. 445, 454, 105 S.Ct. 2768, 86 L.Ed.2d 356 (1985)). In this case, there was clearly sufficient evidence supporting the hearing officer's determination. Thus, the record establishes that Defendant Gerwer was not biased and did not prejudge the evidence. Accordingly, Defendant Gerwer's summary judgment motion with respect to plaintiff's due process claim should be granted. [11]

[10]  Plaintiff, however, kept accusing defendant Gerwer of stating that fact. (Disciplinary Hr'g at 48, 50). At one point, plaintiff stated that "I object to this Hearing Officer on the grounds as she said on the record that Ms. Nieves is a good person.... so therefore I'm feeling like she feels like I'm the bad person." *Id.* at 48. Defendant Gerwer then stated that she wanted to "clarify for the record" that she was "an unbiased Tier Hearing Officer." *Id.* This court cannot find any statement on the record, made by Defendant Gerwer, that Officer Nieves was a "good person." Later during the hearing, Defendant Gerwer interrupted plaintiff and stated that "I said that 'the testimony of Ms. Nieves was believable to this Tier Hearing Officer." *Id.*

[11]  In his response to the summary judgment motion, Plaintiff asserts that Defendant Gerwer and others were engaged in a conspiracy to deprive him of his constitutional rights. (Dkt. No. 43 at 12). A civil rights conspiracy must be proven with specificity, as bare claims of illegal agreement, supported only by

allegations of conduct easily explained as individual action, is insufficient. *See Iqbal v. Hasty,* 490 F.3d 143, 177 (2d Cir.2007), *rev'd on other grounds sub nom. Ashcroft v. Iqbal,* 556 U.S. 662, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009); *see also Gyadu v. Hartford Ins. Co.,* 197 F.3d 590, 591 (2d Cir.1999). Thus, plaintiffs must "make an effort to provide some details of time and place and the alleged effects of the conspiracy ... [including] facts to demonstrate that the defendants entered into an agreement, express or tacit, to achieve the unlawful end." *Warren v. Fischl,* 33 F.Supp.2d 171, 177 (E.D.N.Y.1999) (citations omitted). Conclusory, vague, and general allegations, such as those in this Plaintiff's response, are insufficient to support a civil rights conspiracy claim. *Ciambriello v. County of Nassau,* 292 F.3d 307, 325 (2d Cir.2002); *X–Men Sec., Inc. v. Pataki,* 196 F.3d 56, 71 (2d Cir.1999). In any event, as discussed herein, Plaintiff has not asserted any viable substantive constitutional claims that would support a conspiracy claim.

## VI. *Qualified Immunity*

**\*12** Defendants argue that they are entitled to qualified immunity with respect to all of Plaintiff's claims. In determining whether qualified immunity applies, the court may first consider whether "the facts alleged show the [defendant's] conduct violated a constitutional right." *Saucier v. Katz,* 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001), *modified, Person v. Callahan,* 555 U.S. 223, 129 S.Ct. 808, 811, 172 L.Ed.2d 565 (2009) (holding that, "while the sequence set forth [in *Saucier* ] is often appropriate, it should no longer be regarded as mandatory in all cases"). "If no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity." *Saucier v. Katz,* 533 U.S. at 201. Accordingly, this Court need not address qualified immunity with respect to Plaintiff's claims because, as discussed above, he has not established those alleged violations of constitutional rights.

**WHEREFORE,** based on the findings above, it is

**RECOMMENDED,** Defendants' motion for summary judgment (Dkt. No. 39) be **GRANTED** and the complaint be **DISMISSED IN ITS ENTIRETY .**

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have fourteen (14) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Sec. of Health & Human Servs.,* 892 F.2d 15 (2d Cir.1989)); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(e), 72.

### All Citations

Not Reported in F.Supp.2d, 2011 WL 7629513

---

**End of Document** © 2017 Thomson Reuters. No claim to original U.S. Government Works.

2007 WL 3046701
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Andre JOHNSON, Plaintiff,

v.

Richard DOLING, Hearing Officer, Great Meadow
Correctional Facility; Robert Murphy, Acting
Director, Special Housing Unit, Defendants.

Civ. No. 9:05-CV-376 (TJM/RFT).

|

Oct. 17, 2007.

**Attorneys and Law Firms**

Andre Johnson, Pine City, NY, pro se.

Hon. Andrew Cuomo, Attorney General for the State
of New York, Jeffrey P. Mans, Esq., Assistant Attorney
General, of Counsel, Albany, NY, for Defendants Doling
and Murphy.

**DECISION & ORDER**

THOMAS J. McAVOY, Senior United States District
Judge.

**\*1** This *pro se* action brought pursuant to 42 U.S.C.
§ 1983 was referred to the Hon. Randolph F. Treece,
United States Magistrate Judge, for a Report and
Recommendation pursuant to 28 U.S.C. § 636(b) and
Local Rule 72.3(c). No objections to the Report-
Recommendation and Order dated September 17, 2007
have been filed. Furthermore, after examining the
record, this Court has determined that the Report-
Recommendation and Order is not subject to attack for
plain error or manifest injustice. Accordingly, the Court
adopts the Report-Recommendation and Order for the
reasons stated therein.

It is therefore,

**ORDERED** that Defendants' motion for summary
judgment (Docket No. 34) is **GRANTED** and the
complaint is **DISMISSED** as to all defendants.

**IT IS SO ORDERED.**

***REPORT-RECOMMENDATION and ORDER***

RANDOLPH F. TREECE, United States Magistrate
Judge.

*Pro se* Plaintiff Andre Johnson brings this civil action,
pursuant to 42 U.S.C. § 1983, alleging Defendants
Doling and Murphy denied him due process rights in
a Disciplinary Hearing in violation of the Fourteenth
Amendment. Dkt. No. 1, Compl., Facts at ¶¶ 1-35 &
Cause of Action at ¶¶ 36-47. Specifically, Plaintiff alleges
Defendants violated his due process rights by denying him
the right to present a defense, call witnesses, be present,
receive a written disposition and statement of the evidence
relied upon, and receive a fair and impartial hearing.
Compl. at ¶ 39. Defendants now bring a Motion for
Summary Judgment. Dkt. No. 34. Plaintiff opposes the
Motion. Dkt. No. 35. For the following reasons, it is
recommended that the Motion for Summary Judgment be
**granted.**

**I. FACTS**

During all relevant times pertaining to this action, Plaintiff
was incarcerated at Great Meadow Correctional Facility.
Dkt. No. 34, Defs' 7.1 Statement at ¶ 2. [1] Plaintiff was
served with an Inmate Misbehavior Report, dated March
17, 2002, in which he was charged with possession of a
weapon, assault, fighting, and threat of violence. *Id.* at ¶ 3.
Prior to the Disciplinary Hearing, Plaintiff was provided
an assistant of his choice with whom he met, received all
requested documents, and requested one inmate witness,
Angulo. *Id.* at ¶ 4.

[1]     When the Plaintiff has not objected to a particular
        statement of fact proffered in the Defendants' 7.1
        Statement, we will not cite to both 7.1 Statements,
        only to the Defendants'. *See* N.D.N.Y.L.R. 7.1(a)
        (3) ("*Any facts set forth in the Statement of Material
        Facts shall be deemed admitted unless specifically
        controverted by the opposing party.*") (emphasis in
        original).

Defendant Officer Doling commenced the Hearing on
March 21, 2002, advising Plaintiff of the procedure and his
rights. *Id.* at ¶ 7. Doling then read the Inmate Misbehavior

2007 WL 3046701

Report into the record and asked Plaintiff to enter a plea, to which Plaintiff entered a plea of not guilty. *Id.* at ¶¶ 7-8. During the Hearing, Plaintiff objected to the evidence tag number identified in the Misbehavior Report (# 8621), which was not the same evidence tag number on the physical weapon (# 8629). *Id.* at ¶ 9. Doling dismissed the objection, indicating that because the weapon marked # 8629 had the same physical description as the weapon in the Misbehavior Report, he believed the mixup in numbers was the result of a typographical error. Dkt. No. 34, Jeffrey P. Mans, Asst. Att'y Gen., Affirm., dated Jan. 10, 2007, Ex. A-10, Hr'g Tr. at p. 2.

**\*2** Correction Officer Young authored the Misbehavior Report which formed the basis for the charges against Plaintiff. Mans Affirm., No. 34, Ex. A-3, Inmate Misbehavior Report, dated Mar. 17, 2002. In the Report, Young stated he saw Plaintiff swing at and stab another inmate, Angulo, with a weapon about eight inches long and sharpened to a point with a piece of bed sheet wrapped around it as a handle. *Id.* Young also stated he recovered the weapon after Plaintiff threw it away as he was falling to the floor. *Id.* The Misbehavior Report does not mention any other inmate besides Plaintiff and the victim, Angulo. Plaintiff objected that the Misbehavior Report should include other inmates involved in the incident pursuant to Departmental Regulation, codified at N.Y. COMP.CODES R. & REGS. (N.Y.CRR) tit. 7, § 251-3.1(c)(4), which states that "when more than one inmate was involved in an incident, the report should, to the extent practicable under the given circumstances, indicate the specific role played by each inmate." Hr'g Tr. at pp. 3-6. Because Young had not mentioned other inmates in the Report, Doling dismissed Plaintiff's objections to the Report as irrelevant. *Id.* at pp. 3-4.

An Unusual Incident Report (UIR), dated March 17, 2002, indicates that four inmates were involved in the altercation Young observed. Mans Affirm., Ex. A-6 at pp. 1-3, Unusual Incident Rep., dated Mar. 17, 2002 (stating "[O]fficer [Y]oung observed three inmates fighting with inmate Angulo"). Plaintiff attempted to introduce the UIR into evidence in order to call into question the accuracy of the Misbehavior Report, however, Doling denied said introduction for lack of relevancy because the Misbehavior Report alone constituted the formal charge against Plaintiffs under 7 NYCRR § 254.3, and because the UIR was not written by Young. Hr'g Tr. at pp. 3-5 & 10.

At Plaintiff's request, Officer Young and Inmate Ingram testified at the Hearing. Defs.' 7.1 Statement at ¶ 11. Young testified he observed Plaintiff and two other inmates attacking Inmate Angulo, that Plaintiff attempted to stab Angulo with the shank he subsequently threw away as he slipped and fell to the floor, and that after he recovered the weapon he "screwed up" the tag number, creating the aforementioned tag number discrepancy. Hr'g Tr. at pp. 6-10.

Plaintiff then called as witnesses Inmate Angulo and the other inmates named in the UIR, Temple and Ingram. Hr'g Tr. at p. 5. Angulo refused to testify in the case, stating in his refusal form that he didn't know Plaintiff. Mans Affirm., Ex. A-9 at p. 4, Requested Inmate Refusal to Testify Form, dated Mar. 21, 2002. Defendant Doling was satisfied that Angulo's refusal was fair, reasonable and not occasioned by any wrongdoing. Hr'g Tr. at p. 13. Doling called Officer Stemp in order to request Inmate Temple to testify, but Officer Stemp indicated Temple did not want to testify. *Id.* at p. 18. Officer Stemp did not know why Temple refused, nor did he know if Temple had been threatened or promised anything if he didn't testify. *Id.* Based upon that conversation, Doling found that Temple had voluntarily refused to testify. *Id.* at p. 19.

**\*3** Plaintiff also called as a witness Sergeant (Sgt.) Brown, who investigated the incident, and Lieutenant (Lt.) Armstrong, who received an interdepartmental communication from Officer Young indicating that Young recovered a different weapon from the scene of the altercation, a four-and-a-half inch long piece of sharpened metal wrapped with plastic food covering. Hr'g Tr. at pp. 13-17; Mans Affirm., Ex. A-6 at p. 4, Ex. 5, Interdepartmental Commc'n, dated Mar. 17, 2002. Doling refused to call these officers for lack of relevancy. Hr'g Tr. at pp. 13-17. In Sgt. Brown's case, Doling deemed his testimony irrelevant because he did not witness the incident nor write the Misbehavior Report. *Id.* Lt. Armstrong's testimony was deemed irrelevant because Doling saw no inconsistencies between the Interdepartmental Communication and the Misbehavior Report. *Id.*

Doling excluded Plaintiff from the Hearing after Plaintiff allegedly exhibited threatening behavior and, in Doling's opinion, attempted to prolong the Hearing by calling

Johnson v. Doling, Not Reported in F.Supp.2d (2007)

2007 WL 3046701

irrelevant witnesses. Hr'g Tr. at pp. 19-20. Officer Doling stated:

> Upon asking Mr. Johnson to step out so I could arrange for further witnesses, Mr. Johnson became threatening and I had him removed from the hearing room because of his clear refusal to um, move this hearing along and his threatening manner. Mr. Johnson has been excluded from this hearing. I have decided to complete this hearing without him. It is clear that Mr. Johnson is making requests for witnesses who are not relevant or material to the issue has become very angry with hearing officer for refusing to uh, subject himself, the hearing officer refusal to subject himself to the_____ of the inmate and have become argumentative, threatening and otherwise uh, dangerous to the safety and security of the facility. The inmate has requested a number [of] witnesses most of whom have been dealt with by either hearing the testimony of or obtaining the refusal of the witnesses.

Hr'g Tr. at pp. 19-20.

Plaintiff denies exhibiting any threatening or obstructive behavior, and further asserts that Doling stopped the audio recorder while rudely dismissing him.[2] Pl.'s 7.1 Statement at ¶ 7. Doling continued the Hearing without Plaintiff and questioned Inmate Ingram, the final witness Plaintiff had requested prior to his removal. Hr'g Tr. at pp. 20-22. Doling found Plaintiff guilty of the charges and imposed a penalty of 730 days disciplinary confinement in the Special Housing Unit (SHU). *Id.* at p. 22. Doling made a statement of the evidence relied upon, and requested that Officer Catalfamo give copies of the Hearing Disposition along with an appeal form to Plaintiff within twenty-four hours. *Id.* at pp. 22-23. Plaintiff denies ever receiving these documents. Pl.'s 7.1 Statement at ¶ 7; Compl. at p. 2. However, Plaintiff did receive a copy of the audio tape of the Hearing and successfully requested an extension of time to appeal the disposition. Mans. Affirm., Ex. A-11,

Letter from Andre Johnson to Glenn S. Goord, dated Apr. 18, 2002 (stating "I received the hearing tape in SHU"); Mans. Aff., Ex A-13, Letter from Deputy Comm'r Lucien J. Leclaire, Jr. to Andre Johnson, dated Apr. 29, 2002 (granting Johnson's request for an extension to supplement his appeal).

2    Plaintiff asserts Doling told Officer Catafalmoto to "get this piece of shit out of here." Pl.'s 7.1 Statement at ¶ 7. There does appear to be a break in the transcript before Doling announces he has expelled Plaintiff. Hr'g Tr. at p. 19.

**\*4** Plaintiff appealed Doling's Tier III determination. Defs.' 7.1 Statement at ¶ 21. Defendant Robert Murphy, Acting Director of Special Housing and Inmate Discipline, modified the Tier III disciplinary determination by reducing the penalty imposed from 730 days to 540 days in SHU. *Id.* at ¶ 22. Subsequently, by determination dated June 23, 2002, Donald Selsky, Director of Special Housing and Inmate Discipline, administratively reversed the Tier III disciplinary determination, although Plaintiff had already served the entirety of the modified sanction. Defs.' 7.1 Statement at ¶ 26; Pl.'s 7.1 Statement at ¶ 12.

## II. DISCUSSION

### A. Summary Judgment Standard

Pursuant to FED. R. CIV. P. 56(c), summary judgment is appropriate only where "there is no genuine issue as to any material fact and ... the moving party is entitled to judgment as a matter of law." The moving party bears the burden to demonstrate through "pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any," that there is no genuine issue of material fact. *F.D.I.C. v. Giammettei,* 34 F.3d 51, 54 (2d Cir.1994) (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986)). "When a party has moved for summary judgment on the basis of asserted facts supported as required by [Federal Rule of Civil Procedure 56(e) ] and has, in accordance with local court rules, served a concise statement of the material facts as to which it contends there exist no genuine issues to be tried, those facts will be deemed admitted unless properly controverted by the nonmoving party." *Glazer v. Formica Corp.,* 964 F.2d 149, 154 (2d Cir.1992).

2007 WL 3046701

To defeat a motion for summary judgment, the non-movant must "set forth specific facts showing that there is a genuine issue for trial," and cannot rest on "mere allegations or denials" of the facts submitted by the movant. FED. R. CIV. P. 56(e); *see also Scott v. Coughlin,* 344 F.3d 282, 287 (2d Cir.2003) ("Conclusory allegations or denials are ordinarily not sufficient to defeat a motion for summary judgment when the moving party has set out a documentary case."); *Rexnord Holdings, Inc. v. Bidermann,* 21 F.3d 522, 525-26 (2d Cir.1994). To that end, sworn statements are "more than mere conclusory allegations subject to disregard ... they are specific and detailed allegations of fact, made under penalty of perjury, and should be treated as evidence in deciding a summary judgment motion" and the credibility of such statements is better left to a trier of fact. *Scott v. Coughlin,* 344 F.3d at 289 (citing *Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir.1995) and *Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983)).

When considering a motion for summary judgment, the court must resolve all ambiguities and draw all reasonable inferences in favor of the non-movant. *Nora Beverages, Inc. v. Perrier Group of Am., Inc.,* 164 F.3d 736, 742 (2d Cir.1998). "[T]he trial court's task at the summary judgment motion stage of the litigation is carefully limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them. Its duty, in short, is confined at this point to issue-finding; it does not extend to issue-resolution." *Gallo v. Prudential Residential Servs., Ltd. P'ship,* 22 F.3d 1219, 1224 (2d Cir.1994). Furthermore, where a party is proceeding *pro se,* the court must "read [his or her] supporting papers liberally, and ... interpret them to raise the strongest arguments that they suggest." *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994), *accord, Soto v. Walker,* 44 F.3d 169, 173 (2d Cir.1995). Nonetheless, mere conclusory allegations, unsupported by the record, are insufficient to defeat a motion for summary judgment. *See Carey v. Crescenzi,* 923 F.2d 18, 21 (2d Cir.1991).

## B. Due Process Claims Against Defendant Doling

**\*5** In order to state a procedural due process claim pursuant to the Fourteenth Amendment, an inmate must first establish that he enjoys a protected liberty interest. *Arce v. Walker,* 139 F.3d 329, 333 (2d Cir.1998) (citing

*Kentucky Dep't of Corr. v. Thompson,* 490 U.S. 454, 460 (1989)). Such interests are derived from the Fourteenth Amendment Due Process Clause itself or from state statute or regulations. *Id.*

The Supreme Court has narrowly circumscribed the scope of liberty interests emanating from the Due Process Clause to protect "no more than the 'most basic liberty interests in prisoners.' " *Id.* (quoting *Hewitt v. Helms,* 459 U.S. 460, 467 (1983)). Furthermore, "changes in the conditions of confinement having a substantial adverse impact on the prisoner are not alone sufficient to invoke the protections of the Due Process Clause '[a]s long as the conditions or degree of confinement to which the prisoner is subjected is within the sentence imposed upon him.' " *Vitek v. Jones,* 445 U.S. 480, 493 (1980) (quoting *Montanye v. Haymes,* 427 U.S. 236, 242 (1976)).

However, when a prisoner is subjected to conditions that are "unexpected," *Sandin v. Conner,* 515 U.S. 472, 484 (1995), and "qualitatively different from the punishment characteristically suffered by a person convicted of crime," the Due Process Clause itself confers a liberty interest. *Vitek v. Jones,* 445 U.S. at 493 (holding an involuntary transfer to a state mental hospital implicated a liberty interest protected by the Due Process Clause); *see also, Washington v. Harper,* 494 U.S. 210 (1990) (finding the Due Process Clause provides a liberty interest in being protected from the involuntary administration of psychotropic drugs).

In the case at bar, Plaintiff's disciplinary confinement in SHU does not constitute an "unexpected" change in condition, nor did those conditions exceed the sentence imposed upon him. *See Dawes v. Dibiase,* 1997 WL 376043, at \*4 (N.D.N.Y. July 3, 1997) (citing *Washington v. Harper & Vitek v. Jones* for the proposition that the Due Process Clause will apply by its own force only for deprivations much more severe than solitary confinement for a year). Therefore, Plaintiff does not have a liberty interest in remaining free from SHU confinement emanating from the Due Process Clause itself.

State statutes and regulations may also confer liberty interests to prisoners. *Arce v. Walker,* 139 F.3d at 334 (citing *Kentucky Dep't of Corr. v. Thompson,* 490 U.S. at 460). The Supreme Court held in *Sandin v. Conner* that state created liberty interests shall be limited to those deprivations which subject a prisoner to "atypical and

2007 WL 3046701

significant hardship ... in relation to the ordinary incidents of prison life." *Sandin v. Conner,* 515 U.S. at 484. Thus, a prisoner asserting a denial of due process as a result of segregated confinement or loss of privileges must (1) make a threshold showing that an atypical and significant hardship was imposed upon him, and (2) establish that the "state has granted its inmates, by regulation or by statute, a protected liberty interest in remaining free from that confinement or restraint." *Frazier v. Coughlin,* 81 F.3d 313, 317 (2d Cir.1996).

**\*6** While the Second Circuit has cautioned that "there is no bright-line rule regarding the length or type of sanction" that meets the *Sandin* standard, *Jenkins v. Haubert,* 179 F.3d 19, 28 (2d Cir.1999), it has made clear that confinement in SHU for a period of one year constitutes atypical and significant restraint on inmates, deserving due process protections, *Sims v. Artuz,* 230 F .3d 14, 23 (2d Cir.2000) (stating that confinement in SHU exceeding 305 days was atypical); *Colon v. Howard,* 215 F.3d 227, 231 (2d Cir.2000) (finding 305 days of SHU confinement atypical).

Thus, while Plaintiff cannot claim a liberty interest emanating from the Due Process Clause itself, he has by virtue of being confined in SHU for over a year passed the *Sandin* threshold for constitutional protection of a state-created liberty interest. Because New York State has created by statute or regulation a liberty interest in remaining free from segregated confinement, Plaintiff has stated a valid due process claim based on a constitutionally protected, state-created liberty interest. *Sher v. Coughlin,* 739 F.2d 77, 81 (2d. Cir.1984); *Alvarez v. Coughlin,* 2001 WL 118598, at \*6 (N.D.N.Y. Feb. 6, 2001) (holding *Sandin* does not affect the validity of prior decisions holding New York State Regulations create a protected liberty interest in remaining free from disciplinary segregation).

Having made a threshold showing of atypical and significant confinement, we must consider whether Plaintiff, prior to his confinement, was afforded the minimum requirements of due process. *Wolff v. McDonnell,* 418 U.S. 539, 556 (1974). A prisoner placed in administrative segregation must be provided (1) advanced written notice of the charges against him at least twenty-four hours prior to the hearing; (2) the opportunity to appear at the hearing, call witnesses, and present rebuttal evidence; and (3) a written statement as to the evidence

relied upon and the reasons for the disciplinary action taken. *Id.* at 564-66; *see also Freeman v. Rideout,* 808 F.2d 949, 953 (2d Cir.1986); *Taylor v. Rodriguez,* 238 F.3d 188, 192 (2d Cir.2001) (quoting *Hewitt v. Helms,* 459 U.S. 460, 476 (1983).

### 1. Notice

"Notice" should be something more than a mere formality. *Benitez v. Wolff,* 985 F.2d 662, 665 (2d Cir.1993). "The effect of the notice should be to compel 'the charging officer to be [sufficiently] specific as to the misconduct with which the inmate is charged' to inform the inmate of what he is accused of doing so that he can prepare a defense to those charges and not be made to explain away vague charges set out in a misbehavior report." *Taylor v. Rodriguez,* 238 F.3d at 192-93 (quoting *McKinnon v. Patterson,* 568 F.2d 930, 940 n.11 (2d Cir.1977)) (alteration in original).

In this case, Plaintiff was served with an Inmate Misbehavior Report, dated March 17, 2002, in which he was charged by Officer Young with possession of a weapon, assault, fighting, and threat of violence. Mans Affirm., Ex. A-3, Inmate Misbehavior Rep. Johnson acknowledged receipt of the Misbehavior Report by signing the Hearing Record Sheet and does not contest receipt of such Report. Mas Affirm. Ex. A-9 at p. 2, Hr'g Record Sheet.

**\*7** We find that Plaintiff was provided sufficient notice to fulfill the requirements of due process.

### 2. Hearing

A prisoner must be afforded the opportunity to appear at the Disciplinary Hearing, to call witnesses, and to present rebuttal evidence. *Wolff v. McDonnell,* 418 U.S. at 556. "Although the hearing requirement for placement in administrative segregation may be met by an 'informal, nonadversary' proceeding, *Hewitt [v. Helms,]* 459 U.S. at 476, it is a bedrock requirement of due process that such hearing be held 'at a meaningful time and in a meaningful manner,' *Matthews v. Eldridge,* 424 U.S. 319, 333 (1976)." *Taylor v. Rodriguez,* 238 F.3d at 193.

2007 WL 3046701

Plaintiff was provided an assistant of his choice, received all requested documents, and requested Inmates Angulo and Temple to testify as his only inmate witnesses. At the Hearing presided by Defendant Officer Doling on March 21, 2002, Plaintiff was advised of the procedure and of his rights and was read the charges against him as reflected in the Misbehavior Report. Hr'g Tr. at pp. 1-2. Plaintiff claims Doling violated his due process rights at various times during the course of the Hearing. Compl. at ¶ 39.

**a. Witnesses**

First, Plaintiff asserts he was denied the opportunity to call witnesses as part of his defense. *Id.* An inmate's right to call witnesses is not the same as a defendant in a criminal trial, but rather, is qualified by the circumstances of prison life. *Wolff v. McDonnell,* 418 U.S. at 566-67. The Supreme Court has stated that disciplinary hearing officers must have the discretion to deny witnesses, noting that valid bases for the denial of witnesses would include irrelevance, lack of necessity, and other hazards particular to each case. *Id.* (noting that the right to call witnesses must be balanced against legitimate penological interests).

Plaintiff attempted to call as witnesses Inmates Angulo (the victim) and Temple (mentioned in the Unusual Incident Report). Angulo refused to testify, stating in his signed refusal form he didn't know Plaintiff. Mans Affirm., Ex A-9 at p. 4, Requested Inmate Witness Refusal to Testify Form, dated Mar. 21, 2002. Inmate Temple, without offering any reasons, also refused to testify as recounted by Officer Stemp. Hr'g Tr. at p. 18.

A failure to summon the testimony of a witness who has refused to testify, in the absence of evidence that the refusal was linked to intimidation on the part of prison officials, does not violate due process because calling a witness who refuses to speak upon questioning would be futile. *Silva v. Casey,* 992 F.2d 20, 22 (2d Cir.1993); *see also Rossi v. Goord,* 2006 WL 2811505, at *14 (N.D.N.Y. Sept. 28, 2006). The hearing officer does not have to conduct an independent investigation before accepting an inmates-witness's refusal to testify. *Dumpson v. Rourke,* 1997 WL 610652, at *1 (N.D.N.Y. Sept. 28, 2006) (citing *Greene v. Coughlin,* 1995 WL 60020, at *14 (S.D.N.Y. Feb. 10, 1995). In this case, the record provides no evidence nor intimation that either refusal was made because of intimidation. The fact Temple did not sign a refusal form

did not even amount to a violation of any New York State Regulation, let alone a constitutional due process violation. *See,* 7 N.Y. COMP.CODES R. & REGS. tit. 7, § 253 .5. Therefore, Officer Doling's refusal to compel these witnesses' appearance does not constitute a due process violation.

**\*8** Plaintiff also attempted to call as witnesses Sgt. Brown, who investigated the incident, and Lt. Armstrong, who received an interdepartmental communication about the incident from Officer Young. Defendant Officer Doling denied calling them for lack of relevancy. Hr'g Tr. at pp. 13-17. Doling ruled that neither Lt. Armstrong nor Sgt. Brown personally witnessed the incident, and thus could not offer any relevant information. Irrelevancy is a valid grounds for the denial of a witness. *Wolff v. McDonnell,* 418 U.S. at 566-67. Although Plaintiff correctly points out that the Misbehavior Report did not include information pertaining to other inmates who were allegedly involved in the incident, possibly in contravention of the protocol laid out in Departmental Regulation § 251-3.1, such an omission does not change the charges against him nor the evidence relevant to that charge. Violation of state law alone is generally insufficient to establish a constitutional violation. *See Soto v. Walker,* 33 F.3d 169, 173 (2d Cir.1993). Additionally, the UIR, which identified other inmate participants, is congruent with Young's Misbehavior Report in that both state that Young observed Johnson stabbing and slashing Angulo with an eight inch sharpened metal shank with a cloth handle. In determining that their testimony was irrelevant, Doling's refusal to call Brown and Armstrong did not violate due process.

Plaintiff was allowed to call and question Officer Young as a witness. Hr'g Tr. at pp. 6-10. Young affirmed the charges described in his Misbehavior Report. *Id.* Doling also called Inmate Ingram and examined him after Plaintiff was removed from the Hearing .[3] *Id.* at pp. 20-22. For the reasons stated above, it is therefore recommended that summary judgment be **granted** as to this claim.

[3]    We consider Plaintiff's ejection and the continuation of the Hearing in his absence below.

**b. Ejection from Hearing**

Second, Plaintiff asserts Doling deprived him of due process when he evicted him from the Hearing and continued it in his absence. Compl. at ¶ 39. Defendants argue due process does not entail the right to be physically present at a disciplinary hearing. Dkt. No. 34-24, Defs' Mem. of Law, at p. 17 (citing *Bogle v. Murphy,* 2003 WL 22384792 (W.D.N.Y. Sept. 9, 2003) for the proposition that violations of New York State Regulations do not necessarily constitute constitutional due process violations, and *Francis v. Coughlin,* 891 F.2d 43, 48 (2d Cir.1989) for the Second Circuit's determination that "[p]rison inmates do not possess a constitutional right to be present during the testimony of witnesses during a disciplinary proceeding"). We recently recognized in *Holloway v. Selsky* the existence of conflicting Second Circuit opinions regarding whether prisoners have a right to be present at disciplinary hearings under the Due Process Clause. 2007 WL 433375, at *7 (N.D.N.Y. Feb. 6, 2007). In that case, we noted that in *Francis v. Coughlin,* 891 F.2d 43, 48 (2d Cir.1989), the Second Circuit declared nonexistent the right of an inmate to be present at a disciplinary hearing, while in two subsequent cases, the Second Circuit affirmed a limited right to be present during disciplinary hearings: in *Young v. Hofman,* 970 F.2d 1154 (2d Cir.1992), the Second Circuit stated that "[t]he Due Process Clause provides inmates with several protective procedures that they may expect at disciplinary hearings, *including the opportunity to appear at the hearing* and to call witnesses" (emphasis added) and in *Chavis v.. Zodlow,* 2005 WL 834646, at *3-4 (2d Cir.2005), it stated that prisoners have a "limited right to be present" during disciplinary hearings. In *Holloway,* we declined to address this constitutional issue because the Plaintiff failed to make the threshold showing of a constitutionally protected liberty interest under the atypical and significant standard. *Holloway v. Selsky,* 2007 WL 433375, at *7. In the case at bar, no such roadblock prevents our consideration of this constitutional issue.

**\*9** The Second Circuit has held that the limited right to call witnesses, present evidence, and comment on the charges brought are facially valid constitutional claims. *Sims v. Artuz,* 230 F.3d 14, 24 (2d Cir.2000) (citing *Wolff v. McDonnell,* 418 U.S. at 555-72). We find implicit in the Supreme Court's decision in *Wolff* the limited right to be physically present at disciplinary hearings in order to exercise the aforementioned basic due process rights. *Chavis v. Zodlow,* 2005 WL 834646 at *3-4 (stating that the Supreme Court in *Wolff v. McDonnell* "acknowledg[ed] an

inmate's limited right to be present during his disciplinary hearing"). While this right must necessarily be limited by penological interests, the *per se* denial of such right would undermine the requirement that disciplinary hearings be held "at a meaningful time and in a meaningful manner." *Matthews v. Eldridge,* 424 U.S. 319, 333 (1976); *see also Wolff v. McDonnell,* 418 U.S. at 566 (stating "we must balance the inmate's interest ... against the needs of the prison, and some amount of flexibility and accommodation is required").

However, because we recognize that neither the Supreme Court nor the Second Circuit has clearly articulated the right of prisoners to be present at disciplinary hearings, Defendants are entitled to qualified immunity. *African Trade & Info. Ctr., Inc. v. Abromaitis,* 294 F.3d 355, 359 (2d Cir.2002). Qualified immunity will shield "government officials from liability for civil damages when their conduct does not violate 'clearly established statutory or constitutional rights of which a reasonable person would have known.' " *Id.* at 359 (2d Cir.2002) (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982)); *see also Mollica v. Volker,* 229 F.3d 366, 370 (2d Cir.2000). Violation of a duty under state law does not defeat qualified immunity because there must be a clearly established *federal* right on which the claim for relief is based. *Elder v. Holloway,* 510 U.S. 510, 515-16 (1994) (citing *Davis v. Scherer,* 468 U.S. 183, 197 (1984)). In order for the constitutional right to be clearly established, three elements must be met: "1) ... [that] the right in question [be] defined with reasonable specificity; 2) [that] the decisional law of the Supreme Court and applicable circuit court support the existence of the right in question; and 3) [that] under preexisting law a reasonable defendant official would have understood that his or her acts were unlawful." *Mollica v. Volker,* 229 F.3d at 371 (internal quotation marks and citations omitted) (alterations in original).

Because neither the Supreme Court nor the Second Circuit has clearly established the right of prisoners to be present at a disciplinary hearing, qualified immunity applies and it is recommended that summary judgment on this claim be **granted.**

### c. Right to Present a Defense

Plaintiff asserts Doling denied him the opportunity to present a defense. Compl. at ¶ 39. Specifically, Plaintiff

WESTLAW  © 2017 Thomson Reuters. No claim to original U.S. Government Works.

objects to Doling's determination that the discrepancy of the numbered label on the evidence bag was due to a typographical error, to his refusal to call certain witnesses, and to the Misbehavior Report, which failed to include a description of the participation of three other inmates who were named in the UIR. Pl.'s Mem. of Law at pp. 15-20. These objections are without merit. As discussed above, Doling acted within his authority when he declined to call witnesses for lack of relevancy. *See supra* Part II.B.2.a at pp. 12-14. Further, the charges brought against Plaintiff in the Misbehavior Report are not contradicted by the UIR, and are in fact affirmed by it. *Compare* Inmate Misbehavior Report (stating Plaintiff was "swinging and stabbing inmate Angulo") *with* Unusual Incident Report (stating Plaintiff was "using a metal shank stabbing and slashing at Angulo"). Finally, Doling's determination that a typographical error was the cause of the mislabeled evidence bag, affirmed by Officer Young's testimony, was not unreasonable. Hr'g Tr. at pp. 6-9. And, as previously discussed with respect to Plaintiff's dismissal from the hearing, qualified immunity applies, and it is therefore recommended that summary judgment on this claim be **granted.**

### d. Fair and Impartial Hearing

 **\*10** Plaintiff claims he received an unfair and partial hearing before Hearing Officer Doling. Compl. at ¶ 39. An inmate subject to a disciplinary hearing is entitled to an impartial hearing officer who does not prejudge the evidence. *Allen v. Cuomo,* 100 F.3d 253, 259 (2d Cir.1996). But, it has been held that "prison disciplinary hearing officers are not held to the same standard of neutrality as adjudicators in other contexts." *Id.* at 259 (citing *Russell v. Selsky,* 35 F.3d 55, 60 (2d Cir.1994) and *Francis v. Coughlin,* 891 F.2d 43, 46 (2d Cir.1989).

The Hearing Transcript reveals a contentious proceeding characterized by frequent interruptions and heated exchanges between Plaintiff and Doling. *See generally* Hr'g Tr. Notwithstanding, until his dismissal from the proceeding, Plaintiff was provided the opportunity to testify, call and question witnesses, and raise objections on which Doling ruled and explained his reasoning to Plaintiff. *Id.* Disagreement with rulings made by a hearing officer does not constitute bias. *Cf. Dumpson v. Rourke,* 1997 WL 610652, at \*6 (N.D.N.Y. Sept. 26, 1997) (stating "[t]he fact that the hearing officer did

not decide in the plaintiff's favor does not make him biased in the constitutional sense"). We find no genuine issues of material fact concerning Doling's impartiality and therefore it is recommended that summary judgment be **granted** on this claim.

### 3. Written Statement of the Evidence Relied Upon

Plaintiff claims he did not receive a written disposition of the Disciplinary Hearing or statement of the evidence relied upon. Compl. at ¶ 39. Prisoners are entitled to a "written statement of the factfinders as to the evidence relied upon and the reasons for the disciplinary action taken." *Wolff v. McDonnell,* 418 U.S. at 563. Provision of a written disposition is a mechanism that ensures the inmate protection against "collateral consequences based on a misunderstanding of the nature of the original proceeding.... Without written records, the inmate will be at a severe disadvantage in propounding his own cause to or defending himself from others." *Id.* at 565.

After declaring Plaintiff guilty of the charges brought, Doling imposed a penalty of 730 days in SHU with attendant loss of privileges, annunciated a statement of the evidence which was relied upon, and directed Officer Catalfamo to deliver the Hearing Disposition together with an appeal form to Plaintiff within 24 hours. Hr'g Tr. at p. 22. Defendants provide an Interdepartmental Communication from Officer Catalfamo, dated March 29, 2002, wherein he asserts he delivered a copy of the disposition form to Plaintiff and also informed Plaintiff of his right to appeal the disposition within thirty days. Mans Affirm., Ex. A-9 at p. 6, Interdepartmental Commc'n, dated Mar. 29, 2002. Plaintiff asserts those documents were never delivered to him as Doling directed. Pl.'s Mem. of Law at pp. 20-21. However, Plaintiff did receive a copy of the disposition within a month after the Hearing, and was able to file an appeal on which he eventually prevailed. Mans Affirm., Ex. A, Dep. of Andre Johnson, dated Sept. 12, 2006, at pp. 47-51 (stating he received them sometime in April 2002); *see also* Mans Affirm. Exs. a-11 & A-12 (letters from Plaintiff requesting extensions of time to file an appeal and noting he received an audio tape of the Hearing along with a cassette player). Any potential constitutional violation was therefore cured because the delay in no way prejudiced Plaintiff, as evidenced by the fact that he filed an appeal and was ultimately successful,

and therefore it is recommended that summary judgement be **granted** on this claim.

### C. Due Process Claims Against Defendant Murphy

**\*11** Plaintiff claims Murphy violated his due process rights by failing to remedy the alleged constitutional violations he suffered. Compl. at ¶¶ 40-41. Plaintiff does not allege that Defendant Murphy was personally involved in any wrongdoing, and thus his theory of liability rests solely on Murphy's supervisory status. Because we find that Defendant Doling did not violate any clearly established constitutional rights, Defendant Murphy cannot be held liable on any grounds. *See supra* Part B, Due Process Claims Against Defendant Doling. It is therefore recommended that summary judgment be **granted** as to the claims against Murphy.

### III. CONCLUSION

For the reasons stated herein, it is hereby

**RECOMMENDED,** that Defendants' Motion for Summary Judgment (Dkt. No. 34) be **GRANTED** and the Complaint (Dkt. No. 1) be **DISMISSED** against all Defendants, and it is further

**ORDERED,** that the Clerk of the Court serve a copy of this Report-Recommendation and Order upon the parties to this action.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have ten (10) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. *FAILURE TO OBJECT TO THIS REPORT WITHIN TEN (10) DAYS WILL PRECLUDE APPELLATE REVIEW. Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Sec'y of Health and Human Servs .,* 892 F.2d 15 (2d Cir.1989)); *see also* 28 U.S.C. § 636(b) (1); FED. R. CIV. P. 72, 6(a), & 6(e).

**All Citations**

Not Reported in F.Supp.2d, 2007 WL 3046701

---

**End of Document**                    © 2017 Thomson Reuters. No claim to original U.S. Government Works.

Case 9:16-cv-00717-TJM-TWD    Document 35    Filed 11/28/17    Page 250 of 310

Dumpson v. Rourke, Not Reported in F.Supp. (1997)

1997 WL 610652

1997 WL 610652
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Timothy DUMPSON, Plaintiff,

v.

Captain ROURKE; Hans Walker, Superintendent,
Auburn Correctional Facility; Donald Selsky,
Director of Department of Correctional Services;
and Du Seitz, Hearing Officer Defendants.

No. CIVA96CV621 (RSP/GJD)
|
Sept. 26, 1997.

**Attorneys and Law Firms**

Timothy Dumpson, plaintiff, pro se.

Dennis C. Vacco, New York State Attorney General, New
York State Department of Law, The Capitol, Albany,
New York, Howard L. Zwickel, Assistant Attorney
General, of Counsel.

*ORDER*

POOLER, J.

**\*1** The above matter comes to me following a Report–
Recommendation by Magistrate Judge Gustave J. Di
Bianco, duly filed on the 2nd day of September, 1997.
Following ten days from the service thereof, the Clerk has
sent me the entire file, including any and all objections
filed by the parties herein.

Plaintiff Timothy Dumpson, an inmate incarcerated in the
state of New York, brought this civil rights action alleging
violations of his rights to due process of law and freedom
from cruel and unusual punishment in connection with
a Tier III disciplinary hearing held on March 18, 1994,
and the subsequent punishment imposed of one day of
keeplock and a seven day restricted diet. The magistrate
judge recommended that I dismiss Dumpson's complaint
in its entirety and deny his response filed as a cross-
motion. Dumpson has filed objections to the report-
recommendation.

I review the sections of the magistrate judge's
report-recommendation to which Dumpson has filed
specific objections *de nov.* See 28 U.S.C. § 636(b);
Fed.R.Civ.P. 72(b). I review the remainder of the report-
recommendation for clear error.

Dumpson contends primarily that his due process and
Eighth Amendment claims against defendant Seitz should
be allowed to go forward because Seitz (1) violated state
by failing to interview inmate Green, who refused to
testify at Dumpson's disciplinary hearing, to ascertain
the reasons for Green's refusal and (2) imposed a seven day
restricted diet which Dumpson was unable to eat without
becoming ill. Dumpson contends that Seitz's violation of
state law rises to the level of a due process violation and
that imposition of the restricted diet constitutes cruel and
unusual punishment.

I conclude that the magistrate judge correctly held
that the hearing officer's failure to investigate the
reasons for inmate Green's refusal to testify does not
constitute a due process violation. As noted in the report-
recommendation, when a hearing officer denies an inmate
witness, due process requires only that officials provide
some explanation either at the time of the hearing or
subsequently in court. *Russell v. Selsky,* 35 F.3d 55, 58
(2d Cir.1994) (citing *Ponte v. Real,* 471 U.S. 491, 498–
99, 105 S.Ct. 2192, 85 L.Ed.2d 553 (1985)). In this case
officials have stated that inmate Green refused to testify.
The Hearing Record Sheet signed by defendant Seitz
also notes that Green refused to testify. Dkt. No. 15,
Ex. A. Finally, a Witness Refusal Form indicating that
Green both refused to testify and refused to sign the
form is attached and signed by a corrections officer. *Id.*
Yet another corrections officer noted at the bottom of
the form that he specifically asked Green to provide a
reason for his refusal and Green refused to provide further
information. *Id.* When an inmate refuses to testify, a
hearing officer need not call the witness, *Silva v. Casey,*
992 F.2d 20, 22 (2d Cir.1993), or make an independent
investigation into the refusal to testify, *Greene v. Coughlin,*
1995 WL 60020, \*14 (S.D.N.Y.). Consequently, Seitz's
failure to investigate Green's refusal to testify does not
constitute a due process violation.

**\*2** Dumpson's Eighth Amendment claim also fails.
As the magistrate judge noted, plaintiff alleges that
he suffered because of his refusal to accept the food
offered to him on the restricted diet, not that the

diet harmed him in any way. In addition, Dumpson does not allege that the restricted diet was nutritionally inadequate and doest not controvert defendant Walker's statement that the diet includes a "nutritionally adequate loaf and cabbage." Walker Aff. at ¶¶ 4, 5. Although Dumpson alleges in his objections that he refused the food offered on the restricted diet because he knew from past experience that the food would make him sick, I do not find those allegations in the pleadings. In addition, Dumpson does not allege that he informed prison officials that the restricted die food had made him sick in the past. Dumpson failed to contest defendants' statement that Dumpson never complained about the diet. Consequently, Dumpson fails to state a claim of an Eighth Amendment violation, and his Eighth Amendment claims are dismissed.

However, the magistrate judge has recommended that I dismiss Dumpson's Eighth Amendment claim against Seitz without prejudice in light of recent developments in the Second Circuit with regard to this issue. *See Phelps v. Kapnolas,* 123 F.3d 91, 1997 WL 469904 (2d Cir.). I agree, and I dismiss Dumpson's Eighth Amendment claim against Seitz only without prejudice.

Dumpson's remaining objections are general in nature. Therefore, finding no clear error, I adopt the magistrate judge's report-recommendation with respect to the remaining issues.

After careful review of all of the papers herein, including the Magistrate Judge's Report–Recommendation, and the objections submitted thereto, it is

ORDERED, that:

1. The Report–Recommendation is hereby approved;

2. The departments' motions are granted and the action dismissed for the reasons set forth in the Magistrate Judge's Report;

3. The plaintiff's cross-motion is denied; and

3. The Clerk shall serve a copy of this Order on the parties by regular mail.

IT IS SO ORDERED.

REPORT–RECOMMENDATION

GUSTAVE J. DI BIANCO, Magistrate J.

This matter was referred to the undersigned for report and recommendation by the Honorable Rosemary S. Pooler, United States District Judge, pursuant to 28 U.S.C. § 636(b)(1)(B) and Local Rules N.D.N.Y. 72.3(c).

In the instant civil rights complaint, plaintiff alleges that he was denied due process of law in connection with a Tier III disciplinary hearing held against him, beginning on March 18, 1994, and as a result of which, he received the sanctions of one day of keeplock [1] and a seven day restricted diet. Plaintiff also alleges an Eighth Amendment violation as the result of the imposition of the diet.

[1]    Keeplock is a form of confinement which can be administrative or disciplinary, and which involves an inmate's confinement to his own cell, deprived of participation in normal prison routine, and denied contact with other inmates. *See Gittens v. LeFevre,* 891 F.2d 38, 39 (2d Cir.1989) (defining administrative keeplock).

Plaintiff seeks injunctive and monetary relief.

Presently before the court is a motion for summary judgment filed on benefit of defendants Selsky, Walker, and Seitz [2] pursuant to FED.R.CIV.P. 56 (Docket # 14). Plaintiff responded to the defendants' motion [3] (Docket # 19). Defendant Rourke [4] has filed a motion for judgment on the pleadings pursuant to FED.R.CIV .P. 12(c) (Docket # 20). On February 3, 1997, plaintiff filed his "Second Reply for Cross–Motion in Opposition for Summary Judgment" [5] (Docket # 23).

[2]    The plaintiff mistakenly referred to defendant Seitz as "Duseitz" in the complaint. It is clear, however, that Lieutenant Seitz was the Hearing officer in plaintiff's case and will be referred to by his correct name. The court would also point out that originally, the plaintiff sued Philip Coombe, Jr. in addition to the other defendants. Philip Coombe, Jr. is the present Commissioner of the Department of Correctional Services. However, the plaintiff submitted an amended complaint, in which he deleted Coombe as a defendant. Therefore, Philip Coombe,

**Dumpson v. Rourke, Not Reported in F.Supp. (1997)**
Case 9:16-cv-00717-TJM-TWD    Document 35    Filed 11/28/17    Page 252 of 310

1997 WL 610652

Jr. is no longer in this action and does not need to be included in the motion for summary judgment.

3    Plaintiff labeled his response as "Notice of Motion Reply to Opposition for Summary Judgment" (Docket # 19). The document is merely a responsible to the defendants' motion.

4    Defendant Rourke was not included in the defendants' motion for summary judgment because he had not been served at the time.

5    Plaintiff labeled his responsible as "Cross–Motion", and it was docketed as such, but the document is merely a response to the defendants' motion (Docket # 23).

**\*3** For the following reasons, the undersigned agrees with the defendants and will recommend dismissal of the amended complaint.

DISCUSSION

**1. *Summary Judgment:***

Summary judgment may be granted when the moving party carries its burden of showing the absence of a genuine issue of material fact. Fed.R.Civ.P. 56; *Thompson v. Gjivoje,* 896 F.2d 716, 720 (2d Cir.1990) (citations omitted). "Ambiguities or inferences to be drawn from the facts must be viewed in the light most favorable to the party opposing the summary judgment motion." *Id.* However, when the moving party has met its burden, the nonmoving party must doe more than "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 585–86, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *see also Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). At that point, the nonmoving party must come forward with specific facts showing that there is a genuine issue for trial. *Id.*

**2. *Judgment on the Pleadings:***

After the pleadings are closed, a motion to dismiss for failure to state a claim is properly brought as a motion for judgment on the pleadings pursuant to FED.R.CIV.P. 12(c). *Maggette v. Dalsheim,* 709 F.2d 800, 801 (2d Cir.1983) (citations omitted). *See* FED.R.CIV.P. 12(b), 12(c), and 12(h)(2). The motion for judgment on the

pleadings is then treated according to the same standard as a motion under Rule 12(b)(6). *Id.*

A court may not dismiss an action pursuant to Rule 12(b)(6) unless "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Cohen v. Koenig,* 25 F.3d 1168, 1172 (2d Cir.1994) (citing *inter alia Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)). The court must accept the material facts alleged in the complaint as true. *Id.* (citing *Cooper v. Pate,* 378 U.S. 546, 84 S.Ct. 1733, 12 L.Ed.2d 1030 (1964) (per curiam)). In determining whether a complaint states a cause of action, great liberality is afforded to *pro see* litigants. *Platsky v. Central Intelligence Agency,* 953 F.2d 26, 28 (2d Cir.1991) (citation omitted).

**3. *Facts:***

Plaintiff was given a misbehavior report on March 14, 1994 by Lieutenant Rourke, charging plaintiff with demonstration, creating a disturbance, and refusing a direct order. Defendants' Exhibit A. The misbehavior report involved an incident when Lieutenant Rourke and another officer were attempting to "talk [another inmate] out of his cell." Defendants' Exhibit A at p. 5. Defendants rourke stated in the misbehavior report that plaintiff yelled and continuously interrupted the officers as they were "making headway with the inmate", resulting in the inmate's refusal to leave the cell and the need to use chemical agents to remove the inmate. Rourke stated in the misbehavior report that he told plaintiff three times to be quiet, but plaintiff continued to interrupt. *Id.*

**\*4** The disciplinary hearing began on March 18, 1994. Plaintiff requested five witnesses. Defendants' Exhibit A at p. 4. Four of the five inmate witnesses testified, two by speakerphone in the inmate's presence, and two outside of the inmate's presence. *Id.* One inmate refused to testify. *Id. See also id.* at p. 8. An officer named Sergeant Smith the at the request of the hearing officer. *Id* . Plaintiff was ultimately found guilty of creating a disturbance and refusing a direct order. Defendants' Exhibit A at p. 1. Plaintiff was found not guilty of the demonstration charge. *Id.*

As a sanction for the violations, defendant Seitz sentenced plaintiff to one day of keeplock, to be served after plaintiff was released from the Special Housing Unit (SHU) in the year 2000. In addition, Seitz imposed a 7 day restricted

Case 9:16-cv-00717-TJM-TWD    Document 35    Filed 11/28/17    Page 253 of 310
Dumpson v. Rourke, Not Reported in F.Supp. (1997)
1997 WL 610652

diet that was to commence almost immediately. The diet disposition was imposed because the plaintiff was confined to SHU (on other sanctions) until the year 2000, and "no other disposition [could] be applied that [would] have an immediate effect." Defendants' Exhibit A at p. 2. This reasoning is set forth in the "Restricted Diet Form", which is a memorandum to the Commissioner of Correctional Services, informing the Commissioner of the imposition of the diet. *Id.*

Plaintiff appealed the decision to defendant Selsky, who reversed the hearing officer's disposition on May 17, 1994. Defendants' Exhibit C. Selsky also ordered plaintiff's records expunged. *Id.* at p. 2. The hearing officer's decision was reversed by Selsky because the "[h]earing [o]fficer failed to make the required meaningful effort to obtain the requested witness testimony ." There was no "indication that [Seitz] questioned the officer who signed [sic] witness refusal form." *Id.* at p. 2. Plaintiff was subjected to the restricted diet prior to the reversal, but he never served the keeplock sanction because that sanction was not set to commence until the year 2000.

Plaintiff alleges that he was denied due process in connection with the disciplinary hearing. He alleges that he was denied the right to be present when his witnesses testified. Plaintiff also claims that the hearing officer failed to investigate the refusal of one of plaintiff's witnesses to testify. Plaintiff alleges that he was denied his right to call inmate Cruz as a witness, and denied the right to obtain documentary evidence. Plaintiff states that the hearing officer was not impartial and alleges that defendant Rourke filed a false misbehavior report.

Plaintiff also claims Eighth Amendment violations due to the restricted diet. Plaintiff alleges that he refused to eat for the 7 day period, thus he suffered pain, weight loss, dermatitis, depression, headaches, and nightmares.

**4.** *Due Process:*
As the Second Circuit stated in *Bedoya v. Coughlin,* 91 F.3d 349, 351–52 (2d Cir.1996), in order to award damages under 42 U.S.C. section 1983 for a procedural due process violation, the court must find that the defendants acted under color of state law and deprived the plaintiff of a liberty or property interest without due process of law. Once the "color of state law" hurdle is past, the remaining inquiry is whether plaintiff had a protected liberty or property interest and whether that interest was deprived

without due process. *Id.* If the court determines that plaintiff was not deprived of any due process right, then the court need not decide whether plaintiff had a protected liberty interest.

**\*5** In the instant case, the court has reviewed all the records submitted, and finds that plaintiff was not denied constitutional due process, notwithstanding the reversal of his disciplinary hearing. Thus, the undersigned need not decide whether plaintiff had a protected liberty interest in either the keeplock confinement or the restricted diet.

In the case of prison disciplinary procedures, the Supreme Court has outlined the procedural protections necessary once a liberty interest is found to exist. *Wolff v. McDonnell,* 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974). These protections include twenty-four hour notice of the claimed violation, a written statement of the evidence relied upon by the fact finder, and the reasons for the disciplinary action taken. *Wolff,* 418 U.S. at 563–65.

Additionally, the inmate should be able to call witnesses and present documentary evidence when doing so will not be unduly hazardous to safety or correctional goals. *Id.* at 566. However, witnesses may be denied for irrelevance or lack of necessity. *Russell v. Selsky,* 35 F.3d 55, 58 (2d Cir.1994) (citations omitted). When denying the inmate witnesses, the officials are only required to provide some explanation *either at the time of the hearing or subsequently in court. Id.* (citing *Ponte v. Real,* 471 U.S. 491, 498–99, 105 S.Ct. 2192, 85 L.Ed.2d 553 (1985)).

In the instant case, plaintiff alleges that defendant Seitz did not allow some witnesses to testify in the plaintiff's presence. Plaintiff alleges that Seitz did not call inmate Cruz as a witness. However, the hearing record sheet indicates that inmate Cruz testified from Southport Correctional Facility, using a speakerphone. Defendants' Exhibit A at p. 4. The fact that Cruz was not transported to Auburn Correctional Facility to testify does not rise to the level of a constitutional violation. Another inmate also testified by telephone from Southport. An inmate has no constitutional right to have his witnesses testify in his presence. *Francis v. Coughlin,* 891 F.2d 43, 48 (2d Cir.1989) (quoting *Bolden v. Alston,* 810 F.2d 353, 358 (2d Cir.), *cert. denied,* 484 U.S. 896, 108 S.Ct. 229, 98 L.Ed.2d 188 (1987). It has also been held that testimony taken by telephone in the inmate's presence is constitutionally sufficient. *Greaves v. New York,* No. 95 Civ. 9725 WL

Case 9:16-cv-00717-TJM-TWD    Document 35    Filed 11/28/17    Page 254 of 310

Dumpson v. Rourke, Not Reported in F.Supp. (1997)

1997 WL 610652

278109, p. *3 (S.D.N.Y. May 22, 1997) (citing *Sinclair v. Coughlin,* 128 A.D.2d 883, 513 N.Y.S.2d 806, 807 (2d Dep't 1987)).

Plaintiff also claims that Seitz did not investigate inmate Green's refusal to testify on plaintiff's behalf. Green's Refusal Form is included on page 8 of Defendants' Exhibit A. Although Green apparently refused to testify, he also refused to sign the Refusal Form. *Id.* Defendant Selsky reversed the hearing disposition based upon the hearing officer's failure to investigate this refusal. The violation of state law alone, however, does not necessarily rise to the level of a constitutional violation. *See Soto v. Walker,* 44 F.3d 169, 173 (2d Cir.1995). A hearing officer has no power to force an inmate to testify, and when the inmate refuses, the hearing officer need not call the witness. *Silva v. Casey,* 992 F.2d 20, 21–22 (2d Cir.1993). It has also been held that a hearing officer need not make an independent evaluation of the basis for the refusal to testify. *Greene v. Coughlin,* No. 93 Civ. 2805, 1995 WL 60020, p. *14 (S.D.N.Y. February 10, 1995). Thus, the fact that Seitz did not interview the officer who witnessed the refusal does not rise to the level of a constitutional violation.

**\*6** The plaintiff's only complaint against defendant Selsky is that he failed to reverse the hearing disposition quickly enough to avoid the imposition of the restricted diet on plaintiff. *See* Plaintiff's Second Reply to Defendants' Summary Judgment Motion (Docket # 23 at p. 3). Plaintiff states that he filed his Notice of Appeal on March 25, 1994, and the restricted diet was commenced on March 28, 1994. Plaintiff states that Selsky did not reverse the hearing disposition until May 17, 1994. The undersigned cannot find that the less than 60 day delay between the plaintiff's appeal and the reversal rose to the level of a constitutional violation, or any violation. Certainly, given the amount of disciplinary appeals that are probably filed, it would be almost impossible for defendant Selsky to review and decide a disciplinary appeal within 3 days. Thus, the case must be dismissed against defendant Selsky based only on this allegation by plaintiff.

Plaintiff also claims that the hearing officer was not impartial. Plaintiff, however, makes only this conclusory allegation, without any basis whatsoever for the claim. The fact that the hearing officer did not decide in the plaintiff's favor does not make him biased in the constitutional sense. Conclusory allegations are

insufficient to state a claim under section 1983. *Barr v. Abrams,* 810 F.2d 358, 363 (2d Cir.1987). Thus, no due process violations occurred at or subsequent to the disciplinary hearing.

**5.** *False Misbehavior Report:*
Defendant Rourke has submitted a motion for judgment on the pleadings. The only claim against defendant Rourke is that the misbehavior report was falsified. The court would first point out that in the plaintiff's first response to the defendants' summary judgment motion, he basically agrees with the facts stated by Rourke. Defendant Rourke and another officer were attempting to extricate another inmate from his cell. The plaintiff admits that "several prisoners voiced complaints to the defendants ... about improper treatment and harassment by staff against [the other inmate]." Docket # 19 at p. 3. Plaintiff also admits that as a result of this, chemical agents had to be used against the other inmate to get him out of the cell. *Id.* at 3–4. Plaintiff may be claiming that he was not one of the inmates involved. However, it appears that the misbehavior report was not false. Whether plaintiff was guilty of the misbehavior was an issue for the disciplinary hearing. In fact, the Second Circuit has held that a false misbehavior report does not rise to the level of a constitutional violation, as long as the inmate has the opportunity at a disciplinary hearing to challenge the report. *Freeman v. Rideout,* 808 F.2d 949, 953 (2d Cir.1986), *cert. denied,* 485 U.S. 982, 108 S.Ct. 1273, 99 L.Ed.2d 484 (1988).

In the instant complaint, plaintiff alleges only that defendant Rourke filed a false misbehavior report. Thus, the case may be dismissed as to this defendant.

**6.** *Respondeat Superior:*
**\*7** It is well settled that the personal involvement of a defendant is a prerequisite for the assessment of damages in a section 1983 action, *McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir.1977), *cert. denied,* 434 U.S. 1087, 98 S.Ct. 1282, 55 L.Ed.2d 792 (1978), and that the doctrine of respondent superior is inapplicable to section 1983 claims. *Polk County v. Dodson,* 454 U.S. 312, 325, 102 S.Ct. 445, 70 L.Ed.2d 509 (1981); *Johnson v. Glick,* 481 F.2d 1028, 1033 (2d Cir.), cert. denied, 414 U.S. 1033, 94 S.Ct. 462, 38 L.Ed.2d 324 (1973).

1997 WL 610652

In *Williams v. Smith,* 781 F.2d 319, 323–24 (2d Cir.1986), the Second Circuit detailed the various ways in which a defendant can be personally involved in a constitutional deprivation. A supervisory official is said to have been personally involved if that official directly participated in the infraction. *Id.* A supervisory official is said to have been personally involved if, after learning of a violation through a report or appeal, he or she failed to remedy the wrong. *Id.* Personal involvement of a supervisory official is said to exist if he or she created a policy or custom under which unconstitutional practices occurred or allowed such a policy or custom to continue. *Id.* Finally, a supervisory official may be personally involved if he or she were grossly negligent in managing subordinates who caused the unlawful condition or event. *Id.*

In the instant case, plaintiff names the superintendent of Auburn Correctional Facility as a defendant. However, there is no indication that defendant Walker had any personal involvement with the plaintiff's case. Therefore, summary judgment may be granted in defendant Walker's favor.

### 7. *Eighth Amendment:*

Apart from any due process claims regarding the restricted diet, plaintiff seems to allege that the restricted diet violated his Eighth Amendment right to be free from cruel and unusual punishment. "The inquiry to be made [in an Eighth Amendment cruel and unusual punishment claim] is whether the prison conditions 'deprived inmates of the minimal civilized measure of life's necessities.' " *Morgan v. Ward,* 699 F.Supp. 1025, 1054 (N.D.N.Y.1988) (quoting *Rhodes v. Chapman,* 452 U.S. 337, 347, 101 S.Ct. 2392, 69 L.Ed.2d 59 (1981)). "Not all deprivations, therefore, give rise to Eighth Amendment concerns, 'instead the deprivations that trigger Eighth Amendment scrutiny are deprivations of essential human needs.' " *Morgan v. Ward,* 699 F.Supp. at 1054 (quoting *Inmates of Occoquan v. Barry,* 844 F.2d 828, 836 (D.C.Cir.1988)). The Eighth Amendment is implicated when inmates claim that they are denied essential food, medical care, or sanitation, or when the conditions are such that the threat of violence among inmates is increased. *Id.* (quoting *Rhodes v. Chapman,* 452 U.S. at 348).

In the instant case, plaintiff alleges that the imposition of the restricted diet constituted cruel and unusual punishment in violation of the Eighth Amendment. Plaintiff alleges that because the diet was improperly imposed, he refused the food and therefore, suffered a variety of ailments including pain, headaches, nightmares, and cramps. It does appear that plaintiff created some of his own problems by refusing food. He does not allege that the restricted diet was in any way nutritionally unsound. The fact that he refused the food does not create an Eighth Amendment violation. As stated above, the hearing did not violate plaintiff's due process right. The sanction of restricted diet was imposed properly, and based on plaintiff's own admissions, it was not the diet that caused him injury, it was his refusal of the food.

**\*8** The court is aware of the Second Circuit's decision in *Phelps v.. Kapnolas,* No. 96–2242, slip op. at 5744 (2d Cir. August 19, 1997), wherein the court held that it could not say that there are no facts under which the imposition of a seven day diet might constitute cruel and unusual punishment. The court then vacated a sua sponte dismissal on the diet issue and remanded for service of the complaint and for further development of the Eighth Amendment claim. The instant case is different in that it is at the summary judgment stage, plaintiff refused the food, did not make a nutritional argument, and defendnat Walker has submitted an affidavit stating that the medical department reviews inmates placed on restricted diets to make sure there is no medical problem which would prevent its imposition. Finally, defendant Walker states that the diet includes a "nutritionally adequate loaf and cabbage." Walker Affidavit at ¶ 4, 5. Finally, the defendants argue that plaintiff never complained about the diet. Plaintiff's response to the summary judgment motion does not contest any of those facts.

Thus, as the complaint stands, plaintiff cannot claim an Eighth Amendment violation relating to the restricted diet. However, based on the liberality with which *pro se* complaints are treated, and based upon *Phelps,* the undersigned will recommend dismissing plaintiff's Eighth Amendment claim without prejudice.

WHEREFORE, based on the above, it is hereby

RECOMMENDED, that defendants' motion for summary judgment (Docket # 14) be **GRANTED** as to any due process claims, and the complaint be dismissed as to defendants Walker, Selsky, and Seitz on the due process issues, and it is

Case 9:16-cv-00717-TJM-TWD    Document 35    Filed 11/28/17    Page 256 of 310

Dumpson v. Rourke, Not Reported in F.Supp. (1997)

1997 WL 610652

RECOMMENDED, that the defendants' motion for summary judgment (Docket # 14) be **GRANTED** on the Eighth Amendment claim, and the complaint be dismissed **with prejudice** as to defendants Walker and Selsky on the Eighth Amendment claim, but **without prejudice** as to defendant Seitz on the Eighth Amendment diet claim, and it is

RECOMMENDED, that defendant Rourke's motion for judgment on the pleadings (Docket # 20) be **GRANTED,** and the complaint be dismissed as against defendant Rourke in all respects, and it is further

RECOMMENDED, that plaintiff's response, filed as a cross-motion (Docket # 23), be **DENIED.**

Pursuant to 28 U.S.C. § 636(b)(1), the parties have ten days within which to file written objections to the foregoing reports. Such objections shall be filed with the Clerk of the Court. ***FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW.*** *Roldan v. Racette,* 984 F.2d 85 (2d Cir.1993) (citing *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir.1989)); 28 U.S.C. § 636(b)(1); Fed.R .Civ.P. 72, 6(a), 6(e).

**All Citations**

Not Reported in F.Supp., 1997 WL 610652

---

**End of Document** © 2017 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW  © 2017 Thomson Reuters. No claim to original U.S. Government Works.  7

Case 9:16-cv-00717-TJM-TWD    Document 35    Filed 11/28/17    Page 257 of 310

2008 WL 4186334
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Lawrence TOOLE, Plaintiff,
v.
Susan A. CONNELL, et al., Defendant.

No. 9:04-CV-0724 (LEK/DEP).
|
Sept. 10, 2008.

**Attorneys and Law Firms**

Lawrence Toole, pro se.

Hon. Andrew Cuomo, New York State Attorney General, David L. Cochran, Esq., Assistant Attorney General, of Counsel, Albany, NY, for Defendants.

## *DECISION AND ORDER*

LAWRENCE E. KAHN, District Judge.

**\*1** This matter comes before the Court following a Report-Recommendation filed on August 1, 2008, by the Honorable David E. Peebles, United States Magistrate Judge, pursuant to 28 U.S .C. § 636(b) and L.R. 72.3(c) of the Northern District of New York. Report-Rec. (Dkt. No. 62).

Within ten days, excluding weekends and holidays, after a party has been served with a copy of a Magistrate Judge's Report-Recommendation, the party "may serve and file specific, written objections to the proposed findings and recommendations," FED. R. CIV. P. 72(b), in compliance with L.R. 72.1. No objections have been raised in the allotted time with respect to Judge Peebles' Report-Recommendation. Furthermore, after examining the record, the Court has determined that the Report-Recommendation is not subject to attack for plain error or manifest injustice.

Accordingly, it is hereby

**ORDERED,** that the Report-Recommendation (Dkt. No. 62) is **APPROVED** and **ADOPTED** in its **ENTIRETY;** and it is further

**ORDERED,** that Defendant's Motion for summary judgment (Dkt. No. 53) is **GRANTED;** and it is further

**ORDERED,** that the remaining claims contained within the Plaintiff's Complaint (Dkt. No. 1) are **DISMISSED;** and it is further

**ORDERED,** that the Clerk serve a copy of this Order on all parties.

**IT IS SO ORDERED.**

## *REPORT AND RECOMMENDATION*

DAVID E. PEEBLES, United States Magistrate Judge.

Plaintiff Lawrence Toole, a New York State prison inmate who is proceeding *pro se* and *in forma pauperis,* has commenced this action pursuant to 42 U.S.C. § 1983, claiming deprivation of his civil rights. In his complaint, plaintiff alleges that 1) he was sexually harassed by Corrections Officer Prusinowski; 2) the remaining defendants failed to fulfill their responsibilities to investigate and remediate the constitutional deprivation associated with that sexual harassment, including by their failure to properly address his grievances concerning the matter; and 3) a misbehavior report was issued against him in retaliation for complaining of the sexual harassment, all in violation of his constitutional rights.

Having already succeeded in securing dismissal of plaintiff's sexual harassment claim against defendant Prusinowski, based upon a finding that the factual allegations offered in support of that cause of action, even if proven, do not rise to a level sufficient to establish an Eighth Amendment violation, defendants now move for summary judgment in their favor dismissing the balance of plaintiff's complaint as a matter of law. In their motion, defendants assert that because the underlying sexual harassment did not rise to a level of constitutional significance, there can be no corresponding liability on the part of the other defendants for failing to investigate the matter and remedy the claimed harassment. Noting that plaintiff has no constitutional right of access to the

2008 WL 4186334

internal prison grievance process, and that the record is lacking in any evidence linking the issuance of the disputed misbehavior report-authored by an individual who is not a party to the action-to plaintiff's efforts to obtain redress for Corrections Officer Prusinowski's behavior, defendants seek dismissal of plaintiff's remaining claims.

**\*2** Having carefully reviewed the record now before the court, considered in light of the arguments raised by the defendants and in plaintiff's opposition to their motion, I conclude that no reasonable factfinder could determine that plaintiff's constitutional rights were abridged based upon the acts complained of in his complaint. Accordingly, I therefore recommend that defendants' motion be granted.

I. *BACKGROUND* [1]

[1]    In light of the procedural posture of the case, the record now before the court has been interpreted in a light most favorable to the plaintiff, as a non-moving party, with all inferences drawn, and ambiguities resolved, in his favor. *See Jeffreys v. City of New York,* 426 F.3d 549, 553 (2d Cir.2005).

At the times relevant to his complaint plaintiff was a prison inmate entrusted to the custody of the New York State Department of Correctional Services ("DOCS"), and designated to the Oneida Correctional Facility ("Oneida"). *See generally* Complaint (Dkt. No. 1). On February 5, 2004, while confined within a dormitory unit at Oneida, plaintiff awoke to someone, later identified as Corrections Officer H. Prusinowski, shaking his buttocks and standing over him, smiling. [2] Complaint (Dkt. No. 1) Exh. A. Defendant Prusinowski, who according to Toole at the time was acting in a sexually provocative manner, asked the plaintiff to accompany him to the laundry room, ostensibly to engage in sexual activity. *Id.* After being asked by plaintiff to leave his cell, defendant Prusinowski stated, "you don't know what you're missing", and left the area. *Id.* In his complaint, plaintiff alleges that Officer Prusinowski had previously appeared in Toole's cube on February 3, 2004, and again on February 4, 2004, in an intoxicated condition "seeking homosexual liaison." *Id.* Following the February 5, 2004 incident plaintiff attempted to apprise the area supervisor of the situation, but was directed by defendant Prusinowski to "get the f__ __k away from the desk." *Id.*

[2]    While Corrections Officer Prusinowski was initially sued as C. Prusinowski, a subsequent application by plaintiff to amend his complaint to identify the intended defendant as H. Prusinowski was granted on March 1, 2005. Dkt. No. 10.

On February 20, 2004 plaintiff filed a grievance with the Inmate Grievance Resolution Committee ("IGRC") at Oneida, claiming that defendant Prusinowski had sexually harassed him on February 3, 4, and 5, 2004. Complaint (Dkt. No. 1) Exh. A. In addition to detailing his encounters with defendant Prusinowski, in that grievance plaintiff also complained that his attempt to report the February 5, 2004 incident to the desk sergeant had been unsuccessful, and asserted that defendant Prusinowski had arranged to have Toole transferred to a different prison dormitory unit on February 6, 2004. [3] *Id.*

[3]    That transfer was later rescinded. Complaint (Dkt. No. 1) Exh. A.

Because Toole's grievance alleged harassment by a staff member, it bypassed the IGRC stage of the normal grievance process and was forwarded directly to the superintendent's office for a determination. Debejian Decl. (Dkt. No. 53-7) ¶ 6. Toole's grievance was subsequently denied by Oneida Superintendent Connell on March 12, 2004. Complaint (Dkt. No. 1) Exh. B. As a basis for her determination, defendant Connell relied principally upon Prusinowski's denial of having engaged in any inappropriate behavior and the lack of any evidence tending to independently substantiate Toole's allegations. *Id.*

Plaintiff appealed the denial of his grievance to the Central Office Review Committee ("CORC"). Complaint (Dkt. No. 1) Exhs. B, C. By decision dated April 14, 2004, Toole's appeal was "unanimously denied with clarification." In its decision the CORC found that the sexual harassment complaint was properly investigated at the facility level, and that substantiation of plaintiff's allegations was lacking. [4] *Id.* Exh. C.

[4]    The CORC decision also noted that DOCS Directive No. 4040 precludes the taking of any action in reprisal for an inmate having resorted to the grievance process, and advised the plaintiff that he was free to "write to anyone he wishes regarding the instant grievance." Complaint (DKt. No. 1) Exh. C.

Case 9:16-cv-00717-TJM-TWD    Document 35    Filed 11/28/17    Page 259 of 310

**\*3** Plaintiff was issued an inmate misbehavior report on March 13, 2004 by Corrections Sergeant J. Allison, accusing him of lying regarding the February 5, 2004 incident in violation of prison rules .[5] *Id.* Exh. D. In that misbehavior report, Sergeant Allison alleged that as the desk supervisor to whom plaintiff allegedly tried to complain, he did not observe either any attempt on the part of plaintiff to lodge a complaint or defendant Prusinowski making the statement which the plaintiff now attributes to him, adding that Toole "was not at the desk, but in a doorway." Complaint (Dkt. No. 1) Exh. D. A disciplinary hearing was convened by Corrections Lieutenant Santos on March 19, 2004 to address the charge set forth in the March 13, 2004 misbehavior report. Deposition Transcript of Lawrence Toole (Dkt. No. 53-10) Exh. A at 19-20. Upon learning from defendant Debejian that the charge was related to a grievance filed by the plaintiff regarding Corrections Officer Prusinowski, Lt. Santos adjourned the hearing. *Id.* at 13-14; *see also* Debejian Decl. (Dkt. No. 53-7) ¶ 11. The hearing was never reconvened, and the disciplinary charge against the plaintiff arising from the incident was eventually dismissed. Deposition Transcript of Lawrence Tool (Dkt. No. 53-10) Exh. A at 12.

5      Although the misbehavior report also charged the plaintiff with harassing employees, that accusation was not pursued. Deposition Transcript of Lawrence Toole (Dkt. No. 53-10) Exh. A at 12.

II. *PROCEDURAL HISTORY*
Plaintiff commenced this action on June 23, 2004. Dkt. No. 1. Listed as defendants in plaintiff's complaint are Oneida Superintendent Susan A. Connell; IGS David DeBejian; Corrections Officer Prusinowski; and K. Bellamy, the Assistant Director of New York's Inmate Grievance Program. Although plaintiff's claims are less than artfully stated, they appear to include his assertions that 1) he was subjected to cruel and unusual punishment, in violation of the Eighth Amendment, based upon defendant Prusinowski's actions; 2) the remaining defendants are implicated in that constitutional violation based upon their awareness of the relevant events and failure to conduct a proper investigation and remediate the violation; 3) plaintiff's rights were violated based upon defendants' failure to properly process and address his inmate grievance concerning the sexual harassment allegations; and 4) the defendants unlawfully retaliated against him, in violation of his First Amendment rights,

by arranging for the issuance of a misbehavior report in retaliation for his complaint regarding the matter.

As their initial response to plaintiff's complaint, defendants Connell, Debejian and Bellamy moved to dismiss his claims for failure to satisfy the pleading requirements of Rules 8 and 10 of the Federal Rules of Civil Procedure. Dkt. No. 13. Defendant Prusinowksi filed a separate motion seeking dismissal of the sexual harassment claims against him for failure to state a legally cognizable claim that Toole's constitutional rights were violated by his conduct. Dkt. No. 18.

By order filed March 20, 2006, acting upon a report issued by me recommending that relief, District Judge Lawrence E. Kahn granted defendant Prusinowski's motion to dismiss plaintiff's sexual harassment claim against him. Dkt. No. 29. Defendants' companion motion to dismiss the complaint, however, was denied based upon the court's finding that while not a model of clarity, plaintiff's complaint sufficiently apprised the defendants of the nature of plaintiff's claims to permit a meaningful investigation of those claims and formulation of a defense. *Id.* at 2.

**\*4** Following the close of pretrial discovery, defendants have now moved seeking the entry of summary judgment dismissing the remaining portions of plaintiff's complaint. Dkt. No. 53. In their motion, defendants argue that because the court has already determined that plaintiff's allegations against defendant Prusinowski, even if true, are nonetheless insufficient to support a finding of sexual harassment, none of the remaining defendants can be held accountable for constitutional deprivations based upon that conduct. Defendants further submit that plaintiff cannot maintain a cognizable constitutional claim bottomed upon their alleged failure to properly process and address his grievance regarding the matter, and additionally assert that because none of them was involved in the issuance of the misbehavior report upon which plaintiff's retaliation claim is predicated, they bear no liability for any alleged retaliation. Plaintiff has since submitted papers in opposition to defendants' motion. Dkt. No. 59.

Defendants' motion, which is now ripe for determination, has been referred to me for the issuance of a report and recommendation, pursuant to 28 U.S.C. § 636(b)(1)(B)

2008 WL 4186334

and Northern District of New York Local Rule 72.3(c). *See also* Fed.R.Civ.P. 72(b).

### III. *DISCUSSION*

#### A. *Summary Judgment Standard*

Summary judgment is governed by Rule 56 of the Federal Rules of Civil Procedure. Under that provision, summary judgment is warranted when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *see* *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 2509-10 (1986); *Security Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.,* 391 F.3d 77, 82-83 (2d Cir.2004). A fact is "material", for purposes of this inquiry, if it "might affect the outcome of the suit under the governing law." *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510; *see also* *Jeffreys v. City of New York,* 426 F.3d 549, 553 (2d Cir.2005) (citing *Anderson* ). A material fact is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510. Though *pro se* plaintiffs are entitled to special latitude when defending against summary judgment motions, they must establish more than mere "metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1356 (1986); *but see* *Vital v. Interfaith Med. Ctr.,* 168 F.3d 615, 620-21 (2d Cir.1999) (noting obligation of court to consider whether *pro se* plaintiff understood nature of summary judgment process).

When summary judgment is sought, the moving party bears an initial burden of demonstrating that there is no genuine dispute of material fact to be decided with respect to any essential element of the claim in issue; the failure to meet this burden warrants denial of the motion. *Anderson,* 477 U.S. at 250 n. 4, 106 S.Ct. at 2511 n. 4; *Security Ins.,* 391 F.3d at 83. In the event this initial burden is met, the opposing party must show, through affidavits or otherwise, that there is a material issue of fact for trial. Fed.R.Civ.P. 56(e); *Celotex,* 477 U.S. at 324, 106 S.Ct. at 2553; *Anderson,* 477 U.S. at 250, 106 S.Ct. at 2511.

**\*5** When deciding a summary judgment motion, a court must resolve any ambiguities, and draw all inferences from

the facts, in a light most favorable to the nonmoving party. *Jeffreys,* 426 F.3d at 553; *Wright v. Coughlin,* 132 F.3d 133, 137-38 (2d Cir.1998). Thus, " 'the judge must ask ... not whether ... the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented.' " *Jeffreys,* 426 F.3d at 553 (quoting *Anderson,* 477 U.S. at 252, 106 S.Ct. at 2512). "Assessments of credibility and choices between conflicting versions of the events are matters for the jury, not for the court on summary judgment." *Rule v. Brine, Inc.,* 85 F.3d 1002, 1011 (2d Cir.1996). Summary judgment is inappropriate where "review of the record reveals sufficient evidence for a rational trier of fact to find in the [non-movant's] favor." *Treglia v. Town of Manlius,* 313 F.3d 713, 719 (2d Cir.2002) (citation omitted).

#### B. *Retaliation*

When liberally construed, plaintiff's complaint could be deemed to include a retaliation cause of action. The potential retaliation claim discerned from plaintiff's allegations stems from the issuance by Corrections Sergeant James Allison of the March 12, 2004 misbehavior report, and plaintiff's contention that it was prompted by his having complained of Corrections Officer Prusinowski's actions towards him. Defendants seek dismissal of this claim, citing the lack of evidence suggesting their involvement in the issuance of that disciplinary charge.

When adverse action is taken by prison officials against an inmate, motivated by the inmate's exercise of a right protected under the Constitution, including the free speech provisions of the First Amendment, a cognizable retaliation claim under 42 U.S.C. § 1983 lies. *See Franco v. Kelly,* 854 F.2d 584, 588-90 (2d Cir.1988). As the Second Circuit has repeatedly cautioned, however, such claims are easily incanted and inmates often attribute adverse action, including the issuance of misbehavior reports, to retaliatory animus; courts must therefore approach such claims "with skepticism and particular care." *Dawes v. Walker,* 239 F .3d 489, 491 (2d Cir.2001) (citing *Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983)), *overruled on other grounds, Swierkiewicz v. Sorema N.A.,* 534 U.S. 506 (2002); *Davis v. Goord,* 320 F.3d 346, 352 (2d Cir.2003) (same).

In order to state a *prima facie* claim under section 1983 for retaliatory conduct, a plaintiff must advance non-

conclusory allegations establishing that 1) the conduct at issue was protected; 2) the defendants took adverse action against the plaintiff; and 3) there was a causal connection between the protected activity and the adverse action-in other words, that the protected conduct was a "substantial or motivating factor" in the prison officials' decision to take action against the plaintiff. *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 287, 97 S.Ct. 568, 576 (1977); *Dillon v. Morano,* 497 F.3d 247, 251 (2d Cir.2007); *Dawes,* 239 F.3d at 492 (2d Cir.2001). If the plaintiff carries this burden, then to avoid liability the defendants must show by a preponderance of the evidence that they would have taken action against the plaintiff "even in the absence of the protected conduct." *Mount Healthy,* 429 U.S. at 287, 97 S.Ct. at 576. If taken for both proper and improper reasons, state action may be upheld if the action would have been taken based on the proper reasons alone. *Graham v. Henderson,* 89 F.3d 75, 79 (2d Cir.1996) (citations omitted).

**\*6** Analysis of retaliation claims thus requires careful consideration of the protected activity in which the inmate plaintiff has engaged, the adverse action taken against him or her, and the evidence tending to link the two. When such claims, which are exceedingly case specific, are alleged in only conclusory fashion, and are not supported by evidence establishing the requisite nexus between any protected activity and the adverse action complained of, a defendant is entitled to the entry of summary judgment dismissing plaintiff's retaliation claims. *Flaherty,* 713 F.2d at 13.

It should also be noted that personal involvement of a named defendant in any alleged constitutional deprivation is a prerequisite to an award of damages against that individual under section 1983. *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (citing *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 (2d Cir.1991) and *McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir.1977), *cert. denied,* 434 U.S. 1087, 98 S.Ct. 1282 (1978)). In order to prevail on a section 1983 cause of action against an individual, a plaintiff must show some tangible connection between the constitutional violation alleged and that particular defendant. *See Bass v. Jackson,* 790 F.2d 260, 263 (2d Cir.1986). As is true of other types of claims, this principle applies to causes of action claiming unlawful retaliation. *See Abascal v. Hilton,* No. 04-CV-1401, 2008 WL 268366, at *10 (N.D.N.Y. Jan. 30, 2008) (Kahn, D .J. and Lowe, M.J.).

In support of their motion, defendants have submitted a declaration from Corrections Sergeant Allison, the author of the misbehavior report in issue, in which he states that the decision to issue the charge was his, and his alone, and was based upon his own personal observations and determination that plaintiff had committed one or more disciplinary infractions. *See* Allison Decl. (Dkt. No. 53-4) ¶ 4. In addition, defendants Connell and Prusinowski have submitted declarations attesting to their official duties and responsibilities as DOCS employees, and expressly disavowing any involvement in the issuance of the misbehavior report by Sergeant Allison.[6] *See* Connell Decl. (Dkt. No. 53-6) ¶ 9; Prusinowski Decl. (Dkt. No. 53-9) ¶ 3. In response to these submissions, plaintiff has cited no evidence linking the issuance of that report to the remaining defendants in the action.

[6]     The record contains no evidence even remotely tending to suggest that defendants DeBejian, the IGS at Oneida, or Bellamy, the DOCS Assistant Director of the Inmate Grievance Program, were in any way involved in the issuance of the misbehavior report.

It may be that plaintiff's retaliation claim, particularly as against Oneida Superintendent Connell, is predicated upon the defendants' positions as supervisors, and his assertion that in light of their positions they should be held accountable for any retaliation committed by Corrections Sergeant Allison. It is well-established, however, that a supervisor cannot be liable for damages under section 1983 solely by virtue of being a supervisor-there is no *respondeat superior* liability under section 1983. *Richardson v. Goord,* 347 F.3d 431, 435 (2d Cir.2003); *Wright,* 21 F.3d at 501. A supervisory official can, however, be liable in one of several ways; 1) the supervisor may have directly participated in the challenged conduct; 2) the supervisor, after learning of the violation through a report or appeal, may have failed to remedy the wrong; 3) the supervisor may have created or allowed to continue a policy or custom under which unconstitutional practices occurred; 4) the supervisor may have been grossly negligent in managing the subordinates who caused the unlawful event; or 5) the supervisor may have failed to act on information indicating that unconstitutional acts were occurring. *Iqbal v. Hasty,* 490 F.3d 143, (2d Cir.2007); *see also Richardson,* 347 F.3d at 435; *Wright,* 21 F.3d at 501; *Williams v. Smith,* 781 F.2d 319, 323-24 (2d Cir.1986).

None of these circumstances apply in this instance, based upon the evidence now before the court. [7]

[7]    When liberally construed, plaintiff's complaint could be considered to contain a claim of retaliation based on his transfer from one dormitory to another upon being made aware of his intentions to pursue his sexual harassment claims. *See* Complaint (Dkt. No. 1) Exh. A. Based on the record before the court, however, no reasonable factfinder could conclude that this transfer amounted to adverse action, particularly in light of the fact that the transfer was rescinded a short time after plaintiff was moved and there being no proof in the record that plaintiff lost any privileges or suffered any negative consequences as a result of the transfer. *Contrast Walker v. Pataro,* No. 99 CIV. 4607, 2002 WL 664040, at *8 (S.D.N.Y. Apr. 23, 2002) (Peck, M.J.), *adopted,* Dkt. No. 50 (S.D.N.Y. Oct. 2, 2002) (Daniels, D.J.) (considering inmate's transfer from one housing unit to another an adverse action given that the transfer resulted in prisoner losing his prison job). Accordingly, any retaliation claim stemming from plaintiff's threatened dormitory transfer must also fail.

**\*7** Having carefully reviewed the record, I find no evidence from which a reasonable factfinder could conclude that any of the defendants were personally involved in the issuance of the misbehavior report forming the underpinnings of plaintiff's retaliation claim. I therefore recommend dismissal of that claim as a matter of law.

### C. *Failure To Investigate*
In an argument which also implicates personal involvement, at least tangentially, defendants assert that based upon the court's earlier finding that Corrections Officer Prusinowski's actions did not rise to a level of constitutional significance, any claim against the remaining defendants based upon their failure to investigate his allegations of unlawful harassment also fails to state a constitutional claim.

Undeniably, where a supervisory employee knows or reasonably should know of the existence of facts revealing a constitutional deprivation and, by virtue of his or her failure to properly investigate and remediate the matter, perpetuates or fails to prevent additional constitutional violations despite authority to do so, that defendant may face liability under section 1983. *See Colon v. Coughlin,*

58 F.3d 865, 873 (2d Cir.1995); *see also Meriwether v. Coughlin,* 879 F.2d 1037, 1048 (2d Cir.1989) (indicating that supervisory liability was proper where "an official has actual or constructive notice of unconstitutional practices" by his or her subordinates "and demonstrates gross negligence or deliberate indifference by failing to act"). This principle applies equally to claims of sexual harassment; accordingly, a supervisory prison official who fails to address and take appropriate remedial actions, upon finding the existence of actionable sexual harassment of a prison inmate, bears legal responsibility for a resulting violation of the inmate's Eighth Amendment rights. *See Doe v. Barrett,* No. 3:01-CV-519, 2006 WL 3741825, at *8-9 (D.Conn., Dec. 19, 2006); *Safadi v. Almanzar,* No. 98 Civ. 7995, 2000 WL 1738403, at *3 (S.D.N.Y. Nov. 22, 2000). The mere failure to investigate an allegation of unconstitutional activity, without more, however, does not provide a basis for finding liability under section 1983. *Wingate v. Horn,* No. 05-Civ.2001, 2007 WL 30100, at *6 (S.D.N.Y. Jan. 4, 2007) (citing cases).

In this instance, the court has already determined that Officer Prusinowski's actions, however boorish or offensive they may have been, if substantiated, did not rise to a level of constitutional significance. It logically follows, based upon that finding, that neither could the defendants now accused of failing to investigate and remediate that conduct, already found not to be actionable under section 1983, be held liable for a constitutional deprivation. *See Linares v. Mahunik,* No. 05 Civ. 625, 2006 WL 2595200, at *11 (N.D.N.Y. Sept. 11, 2006) (Sharpe, D.J. and Treece, M.J.) (holding plaintiff could not "sustain a supervisory liability claim as there was no wrong for [supervisor-defendant] to remedy since there [was] no constitutional violation"). I therefore recommend dismissal of plaintiff's failure to investigate claims against the defendants.

### D. *Failure To Process Plaintiff's Grievance*
**\*8** In a related but arguably distinct claim, plaintiff contends that his constitutional rights were violated based upon the defendants' failure to properly process and investigate his grievance regarding defendant Prusinowski's actions. This claim is asserted against defendant David Debejian, the Inmate Grievance Supervisor at Oneida; defendant Connell, the Superintendent at Oneida; and defendant Bellamy, the Assistant Director of the DOCS Inmate Grievance

Program. Defendants also seek dismissal of this claim as a matter of law.

Since New York's inmate grievance program ("IGP"), provides a vehicle to permit inmates to seek internal remedial action within the relevant prison facility before commencing legal action complaining of their conditions of confinement, *see* 7 N.Y.C.R.R. § 701 *et. seq.* (setting forth the stages of the inmate grievance resolution process); *see also Rodriguez v. Hahn,* 209 F.Supp.2d 344, 347 (S.D.N.Y.2002) (requiring New York State prison inmates to avail themselves of the DOCS IGP three step administrative process for the resolution of grievances), and allows them to satisfy their exhaustion requirement under 42 U.S.C. § 1997e, in order to bring an action such as this. *Soto v. Belcher,* 339 F.Supp.2d 592, 595 (S .D.N.Y.2004) (An inmate must first exhaust administrative remedies that are available before he may file an action in federal court). It is well-established, however, that a prison inmate has no constitutional right of access to such an internal grievance process. *Rhodes v. Hoy,* No. 05-CV-836, 2007 WL 1343649, at *6 (N.D.N.Y. May 5, 2007) (Scullin, J.) (noting that inmates have "no constitutional right of access to the established inmate grievance program"); *Davis v. Buffardi,* No. 01 CV0285, 2005 WL 1174088, at *3 (N.D.N.Y. May 4, 2005) (Magnuson, J.) ("[P]articipation in an inmate grievance process is not a constitutionally protected right.") (citations omitted). Accordingly, plaintiff's allegations to the effect that the defendants failed to afford him an adequate investigation and remedial action under section 1983 response to his grievance, provides no basis for finding liability against them. *Cancel v. Goord,* No. 00. CIV.2042, 2001 WL 303713, at *3 (S.D .N.Y. Mar. 29, 2001) (holding that "inmate grievance procedures are not required by the Constitution" and therefore failure to see to it that grievances are properly processed does not create a claim under section 1983). I therefore recommend dismissal of this remaining claim against the defendants, as a matter of law, based upon the lack of any underlying constitutional obligation on their part to afford plaintiff meaningful access to the internal grievance procedure, and to investigate and properly determine any such grievance.

## IV. *SUMMARY AND RECOMMENDATION*

Pivotal to the plaintiff's claims in this case are actions of Corrections Officer Prusinowski, characterized by him

as constituting unlawful sexual harassment, but already found by the court not to rise to a level of constitutional significance, and defendants' alleged failure to properly address and remediate those actions. In light of the court's finding that Corrections Officer Prusinowski's actions, as alleged by the plaintiff, did not constitute cruel and unusual punishment or otherwise result in a cognizable unconstitutional deprivation, and the fact that the Constitution does not guarantee him access to the internal grievance process, I recommend dismissal of plaintiff's claims.

**\*9** To the extent that plaintiff has also asserted a retaliation cause of action claiming that the issuance by Correction Sergeant Allison, who is not a party to the action, of a misbehavior report accusing Toole of misconduct was motivated by plaintiff's filing of a grievance concerning Corrections Officer Prusinowski's actions, plaintiff has offered no evidence from which a reasonable factfinder could determine that the defendants were involved in, or in any way prompted, the issuance of that misbehavior report. Plaintiff's retaliation claim is therefore also subject to dismissal as a matter of law. It is therefore hereby

RECOMMENDED that defendants' motion for summary judgment (Dkt. No. 53) be GRANTED, and that the remaining claims contained within the plaintiff's complaint be DISMISSED.

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have ten days within which to file written objections to the foregoing report. Objections shall be filed with the Clerk of the Court. FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(e), 72; *Roldan v. Racette,* 984 F.2d 85 (2d Cir.1993).

The Clerk of the Court is directed to serve a copy of this report and recommendation upon the parties in accordance with the court's local rules.

**All Citations**

Not Reported in F.Supp.2d, 2008 WL 4186334

---

**End of Document**

© 2017 Thomson Reuters. No claim to original U.S. Government Works.

---

2006 WL 2595200

2006 WL 2595200
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Jorge LINARES, Plaintiff,
v.
David MAHUNIK, John Burge, and
Kenneth McLaughlin, Defendants.

No. 9:05-CV-625 (GLS/RFT).
|
Sept. 11, 2006.

**Attorneys and Law Firms**

Jorge Linares, Malone, New York, Pro Se.

Hon. Eliot J. Spitzer, New York Attorney General,
Albany, NY, Maria Moran, Assistant Attorney General,
for Defendants.

### ORDER

GARY L. SHARPE, District Judge.

 **\*1** The above-captioned matter comes before this
court following a Report-Recommendation issued by
Magistrate Judge Randolf F. Treece on August 10, 2006.
Despite the passage of ten days, no objections have been
filed. Having reviewed the Report-Recommendation for
clear error, *see Almonte v. N.Y. State Div. of Parole, 9:04-
CV-484, 2006 WL 149049 (N.D.N.Y. Jan. 18, 2006),* and
finding none, the court adopts Judge Treece's Report-
Recommendation in its entirety.

**WHEREFORE,** it is hereby

**ORDERED,** that the Report-Recommendation filed on
August 10, 2006 is **ACCEPTED** in its entirety for the
reasons stated therein, and it is further

**ORDERED,** that defendants' motion to dismiss (Dkt. No.
22) is **GRANTED IN PART AND DENIED IN PART,**
and it is further

**ORDERED,** that defendants' motion to dismiss based
on all the claims against the defendants in their official
capacities is **GRANTED,** and it is further

**ORDERED,** that defendants' motion to dismiss based on
plaintiff's First Amendment free exercise of religion claim
is **GRANTED,** and it is further

**ORDERED,** that defendants' motion to dismiss based on
plaintiff's First Amendment access to the law library claim
is **GRANTED,** and it is further

**ORDERED,** that defendants' motion to dismiss based
on plaintiff's First Amendment retaliation claim against
Defendant Mahunik is **DENIED,** and it is further

**ORDERED,** that defendants' motion to dismiss based on
plaintiff's supervisory liability claim for retaliation against
Defendant Burge is **DENIED,** and it is further

**ORDERED,** that defendants' motion to dismiss based on
plaintiff's failure to investigate claim against Defendant
McLaughlin is **GRANTED,** and it is further

**ORDERED,** that defendants Mahunik and Burge submit
answers to the Amended Complaint within twenty (20)
days of the filing of this order, and it is further

**ORDERED,** that the Clerk of the Court provide a copy of
this Order to the parties by regular mail.

RANDOLPH F. TREECE, Magistrate Judge.

### REPORT-RECOMMENDATION and ORDER

*Pro se* Plaintiff Jorge Linares brings a civil action
pursuant to 42 U.S.C. § 1983, alleging denial of
his right to participate in a religious service, denial
of access to the law library, and retaliation, all in
violation of the First Amendment, as well as failure
to supervise and failure to investigate. Dkt. No. 9,
Am. Compl.; Dkt. No. 23, Pl.'s Mem. of Law at pp.
1-7. Defendants David Mahunik, Corrections Officer
("C.O.") at Auburn Correctional Facility ("Auburn"),
John Burge, Superintendent at Auburn, and Kenneth
McLaughlin, Director of Operations at the Inspector
General's Office, bring this Motion to Dismiss. Dkt. No.
22. Plaintiff opposes the Motion. Dkt. No. 23.[1] For the

reasons to follow, it is recommended that the Motion to Dismiss be **granted in part and denied in part.**

[1]   Although Plaintiff's Response to the Motion was untimely when submitted on February 15, 2006, because it was due on January 17, 2006, this Court, nevertheless, reviewed the Response and has accepted it for filing. *See* Dkt. Nos. 22 & 23.

# I. FACTS [2]

[2]   The Court notes that Plaintiff did not set forth each allegation in separately numbered paragraphs. *See* Am. Compl. at § II.

The following facts are derived from the Amended Complaint, which, on a motion to dismiss, must be taken as true. *See infra* Part II.A. Plaintiff arrived at the Auburn Correctional Facility on August 24, 2004. Am. Compl. at § II. During November and December 2004, Plaintiff's cell was searched numerous times and no contraband was found. *Id.* at p. 4. On January 19, 2005, [3] Plaintiff's cell was searched once again and his cell was left in disarray with his criminal case papers placed on his bed. *Id.*

[3]   Although Plaintiff provides a date of January 19, 2004, for this incident, Plaintiff did not arrive at Auburn until August of 2004 and therefore, the year 2005 will be reflected for the events described by Plaintiff subsequent to and including this incident.

*\*2   On January 21, 2005, Plaintiff was singled out for a pat frisk and was surrounded by twelve (12) officers and two (2) sergeants. *Id.* During the frisk, Plaintiff's criminal case was discussed by one of the sergeants. *Id.* Defendant Mahunik was present at the incident. *Id.* Plaintiff reported the incident to a civilian staff member who in turn relayed the information regarding the incident to the Deputy Superintendent. *Id.* Plaintiff was told that the harassment would cease and that he should not file a grievance. *Id.* at pp. 4-5. Even though no grievance was filed, Plaintiff continued to be harassed by Mahunik. *Id.* at p. 5.

On April 16, 2005, Plaintiff was attending a Catholic Choir callout when Defendant Mahunik abruptly cancelled the callout. *Id.* Then, on April 17, 2005, Plaintiff was supposed to attend a callout for the law library but was denied entry by Mahunik. *Id.* That same afternoon, Mahunik, along with Sergeant Gardner and Officer Banks, arrived at Plaintiff's cell and ordered him to

submit to a pat frisk. *Id.* During that time, Mahunik entered Plaintiff's cell and placed a weapon inside the cell. *Id.* Mahunik proceeded to announce that he had found the weapon and that he had previously been provided information by an informant that a weapon would be found in Plaintiff's cell. *Id.* Plaintiff's cell was searched once again and a body cavity search was performed on Plaintiff. *Id.* No other contraband was found. *Id.*

On April 18, 2005, a misbehavior report was filed against Plaintiff for violation of the rule against possessing weapons. *Id .* at p. 6. Plaintiff was assigned an assistant but the assistant failed to interview the requested witnesses and obtain copies of the paperwork Plaintiff requested. *Id.* Plaintiff refused to sign the form that the assistant had completed his duties. *Id.* On April 21, 2005, a Superintendent's Hearing was held in regards to the rule violation. *Id.* Plaintiff pled not guilty and explained to the hearing officer that Mahunik had placed the weapon in his cell. *Id.* Plaintiff also sought to have several witnesses testify as to the harassment by Mahunik against Plaintiff. *Id.* After six people had testified, on April 28, 2005, Plaintiff was found not guilty. *Id.* at pp. 6-7. The reasoning given by the hearing officer was that there was "prior antipathy" between Mahunik and Plaintiff "as exemplified by the canceling of Catholic Choir callout ... on 4/16/05 and denial of [Plaintiff's] entrance to the law library per callout on ... 4/17/05." *Id.* at p. 7. Additionally, the hearing officer stated that there were credibility issues with the confidential informant. *Id .*

On April 27, 2005, Mahunik returned to Plaintiff's cell and announced that he believed another knife was in the cell. *Id.* Because of the events that had occurred, Plaintiff filed two grievances, one for intentionally placing a weapon in his cell and another for threatening to place another weapon in the cell. On May 3, 2005, Plaintiff was approached by Mahunik who informed Plaintiff that he should not attend his law library callout and that he should cease filing grievances against him, otherwise there would be consequences. *Id.* at pp. 7-8. The same day, Plaintiff submitted a complaint to the Deputy Superintendent of Programs Ronald Nelson regarding Mahunik. *Id.* at p. 8. That complaint is being investigated. *Id.*

*\*3   On April 29, 2005, Superintendent Burge rendered his decision on Plaintiff's first grievance and found that there was no evidence to support the allegations and there

2006 WL 2595200

was no merit to Plaintiff's complaint. *Id.* Plaintiff received this response on May 3, 2005, and on the same day filed an appeal to the Central Office Review Committee ("CORC") attaching the decision from Plaintiff's hearing to the CORC. *Id.* Burge rendered his decision as to the second grievance on May 5, 2005, and again stated there was no evidence to support the allegations. *Id.* Plaintiff appealed the decision to the CORC on May 16, 2005. *Id.*

In addition to filing the complaint and grievances, Plaintiff filed another complaint with the Inspector General's Office. *Id.* at pp. 8-9. The first letter sent by Plaintiff was on April 21, 2005, with a follow up letter sent on May 5, 2005. *Id.* at p. 9. Defendant McLaughlin is the Director of Operations at the Inspector General's Office. *Id.* By memorandum, McLaughlin referred the complaint to Defendant Burge, thus, no independent investigation was conducted by the Inspector General's Office. [4] *Id.*

[4]    At this juncture, the results of the referral to Defendant Burge are unknown.

On May 16, 2005, Plaintiff received a response to the complaint filed with Ronald Nelson by Captain Gummerson. *Id.* The response stated that Mahunik was interviewed and denied the allegation. *Id* . Plaintiff was further told to relay any concerns to Lieutenant Easterbrock. *Id.* On May 14 and 16, 2005, Plaintiff continued to be harassed by Mahunik. *Id.*

## II. DISCUSSION

### A. Motion to Dismiss Standard

Upon a motion to dismiss pursuant to *Fed.R.Civ.P.* 12(b)(6), a court may dismiss a complaint "only if 'it appears beyond a doubt that the plaintiff can prove no set of facts' in support of his claim which would entitle him to relief.' " *Equal Employment Opportunity Comm'n v. Staten Island Sav. Bank,* 207 F.3d 144, 148 (2d Cir.2000) (quoting *Conley v. Gibson,* 355 U.S. 41, 45-46 (1957) & citing *Drake v. Delta Air Lines, Inc.,* 147 F.3d 169, 171 (2d Cir.1998)); *see also Green v. New York State Dep't of Corr. Serv. et al.,* 2003 WL 22169779, at * 1 (N.D.N.Y. Aug. 27, 2003). Furthermore, "the court must accept as true the factual allegations in the complaint, and draw all reasonable inferences in favor of the plaintiff." *Harris v. City of New York,* 186 F.3d 243, 247 (2d Cir.1999); *see also Smith*

*v. Local 819 I.B.T. Pension Plan,* 291 F.3d 236, 240 (2d Cir.2002) (citations omitted). However, the court need not credit conclusory statements unsupported by assertions of facts or legal conclusions and characterizations presented as factual allegations. *Papasan v. Allain,* 478 U.S. 265, 286 (1986). Nevertheless, "[i]n assessing the legal sufficiency of a claim [under 12(b)(6) ], the court may consider those facts alleged in the complaint, documents attached as an exhibit thereto or incorporated by reference ... and documents that are integral to plaintiff's claims, even if not explicitly incorporated by reference." *Green,* 2003 WL 22169779, at * 1 (internal quotation marks and citations omitted) (alterations in original).

**\*4** Moreover, pleadings submitted by *pro se* litigants "should be 'construed liberally,' " and a complaint "should not be dismissed unless 'it is clear that the plaintiff would not be entitled to relief under any set of facts that could be proved consistent with the allegations.' " *Phillips v. Girdich,* 408 F.3d 124, 127 (2d Cir.2005) (internal citations omitted). A "dismissal on the pleadings is *never* warranted unless the plaintiff's allegations are doomed to fail under any available legal theory." *Id.* at 128.

### B. Non-Compliance with Federal Rules of Civil Procedure

Defendants assert that Plaintiff's Amended Complaint fails to comply with *Fed.R.Civ.P.* 8 and 10. Dkt. No. 22, Defs.' Mem. of Law at pp. 2-3.

*FED.R.CIV.P.* 8(a) states in part that "[a] pleading which sets forth a claim for relief ... shall contain ... a short and plain statement of the claim showing that the pleader is entitled to relief[.]" *Fed.R.Civ.P.* 8(a)(2). This Rule also requires that "[e]ach averment of a pleading shall be simple, concise, and direct." *FED.R.CIV.P.* 8(e). Thus, "[u]nder the Rules' liberal pleading standards, a plaintiff must disclose sufficient information to permit the defendant 'to have a fair understanding of what the plaintiff is complaining about and to know whether there is a legal basis for recovery.' " *Kittay v. Kornstein,* 230 F.3d 531, 541 (2d Cir.2000) (quoting *Ricciuti v. New York City Transit Auth.,* 941 F.2d 119, 123 (2d Cir.1991)).

If a complaint fails to comply with the requirements set forth under *FED. R. CIV. P.* 8, a district court has the power, either by motion or *sua sponte,* "to dismiss the complaint or to strike such parts as are redundant

or immaterial." *Simmons v. Abruzzo,* 49 F.3d 83, 86 (2d Cir.1995) (citing *Salahuddin v. Cuomo,* 861 F.2d 40, 42 (2d Cir.1988)). Dismissal of a plaintiff's complaint should only be "reserved for those cases in which the complaint is so confused, ambiguous, vague, or otherwise unintelligible that its true substance, if any, is well disguised." *Salahuddin v. Cuomo,* 861 F.2d at 42 (citation omitted). While the mere fact that a plaintiff is proceeding *pro se* should not inhibit a court from dismissing a complaint under this Rule if warranted, *Jones v. Ocwen Fed. Bank,* 147 F.Supp.2d 219, 223-24 (S.D.N.Y.2001) (citing *Praseuth v. Werbe,* 99 F.3d 402 (2d Cir.1995)), it is generally accepted that pleadings drafted by *pro ses* are not held to the same standards as those drafted by counsel and, as a matter of policy, *pro se* pleadings are construed liberally with a "lenient eye," *Haines v. Kerner,* 404 U.S. 519, 520 (1972); *Fleming v. Untied States,* 146 F.3d 88, 90 (2d Cir.1998); *Boddie v. Schneider,* 105 F.3d 857, 860 (2d Cir.1997).

Additionally, if a court dismisses a plaintiff's complaint under this Rule, the court should generally afford plaintiff an opportunity to amend the complaint, especially "when the complaint states a claim that is on its face nonfrivolous." *Simmons v. Abruzzo,* 49 F.3d at 87. It is within the court's discretion whether to grant or deny leave to amend but the court must adhere to the standard set forth under FED.R.CIV.P. 15(a). *Salahuddin v. Cuomo,* 861 F.2d at 42. Nevertheless, a court may "dismiss a prolix complaint without leave to amend in extraordinary circumstances, such as where leave to amend has previously been given and the successive pleadings remain prolix and unintelligible[.]" *Id.* (citations omitted).

 **\*5** Furthermore, FED.R.CIV.P. 10 states in part that "[a]ll averments of claim or defense shall be made in numbered paragraphs, the contents of each of which shall be limited as far as practicable to a statement of a single set of circumstances[.] ... Each claim founded upon a separate transaction or occurrence and each defense other than denials shall be stated in a separate count or defense whenever a separation facilitates the clear presentation of the matters set forth." **Fed.R.Civ.P.** 10(b). The intent of this Rule is so that one can easily identify numbered paragraphs by which to make reference from the pleading. *Flores v. Graphtex,* 189 F.R.D. 54, 55 (N.D.N.Y.1999) (citation omitted). If the complaint does not conform to the requirements set forth within **Fed.R.Civ.P.** 10,

it "presents [a] far too ... heavy burden in terms of defendants' duty to shape a comprehensive defense and provides no meaningful basis for the Court to assess the sufficiency of a plaintiff's claims, and may properly be dismissed by the Court." *Id.* (quoting *Gonzales v. Wing* 167 F.R.D. 352, 355 (N.D.N.Y.1996)).

In this case, Plaintiff filed his Original Complaint on May 23, 2005, and amended his Complaint as of right on August 10, 2005. Dkt. Nos. 1 & 9. Instead of submitting an answer, Defendants brought this Motion to Dismiss on December 8, 2005. [5] Dkt. No. 22. Within this Motion, Defendants assert that dismissal of the Amended Complaint is warranted due to the fact that Plaintiff has failed to comply with FED.R.CIV.P. 8 & 10. Defs.' Mem. of Law at pp. 2-3.

| | |
|---|---|
| 5 | Upon the filing of the Amended Complaint, Defendants' sought an extension of time to answer. Dkt. Nos. 13, Defs.' Lt., dated Oct. 26, 2005, & 17, Defs.' Lt., dated Nov. 15, 2005. Defendants were granted an extension and were directed to file their answer by December 9, 2005, thus, the filing of the Motion to Dismiss was timely. Dkt. Nos. 14, Order, dated Oct. 27, 2005, & 18, Order, dated Nov. 16, 2005. |

Plaintiff, when submitting his Amended Complaint, utilized a form typically given to prisoners who wish to file a complaint under 42 U .S.C. § 1983. Am. Compl. Section II of the form asks plaintiffs to submit a "Statement of Claim." An explanation is provided as to what should be contained within this section:

> State here as briefly as possible the *facts* of your case. Describe how each defendant is involved. Also include the names of any other persons involved, dates and places of events. You may cite Constitutional Amendments you alleged were violated, but do not give any legal arguments or cite any cases or statutes. If you intend to allege a number of related claims, number and set forth each claim in a separate paragraph. Use as much space as you need. (Attach additional sheet if necessary).

2006 WL 2595200

*Id.* at § II (emphasis in original). Plaintiff's "Statement of Claim" consists of approximately six pages of narrative as to events of which Plaintiff complains. *Id.* Although Plaintiff includes numerous paragraphs within this Section, they are not numbered and each paragraph includes several sentences. *Id.*

Nevertheless, the events described are clear enough that the nature of Plaintiff's claims can be deciphered. *Id.* The Second Circuit has held that a plaintiff's complaint should not be dismissed unless "the complaint is so confused, ambiguous, vague, or otherwise unintelligible that its true substance, if any, is well disguised." *Salahuddin v. Cuomo,* 861 F.2d at 42. This is not the case here. Read liberally, Plaintiff's Amended Complaint alleges several causes of action. *See supra* Part I. Plaintiff's failure to number his paragraphs amounts to nothing more than a technical but harmless violation of the Federal Rules, and thus, absent any prejudice to Defendants, is an improper basis for dismissal. *Phillips v. Girdich,* 408 F.3d 124, 125 & 128 (2d Cir .2005) (holding that harmless violations of the Federal Rules of Civil Procedure pleading requirements, especially Rule 10, should be excused since such technical pleading irregularities "neither undermine the purpose of notice pleading nor prejudice the adverse party").

**\*6** Thus, it is recommended that Defendants' Motion to Dismiss be **denied** for failing to comply with the Federal Rules.

### C. Eleventh Amendment

Plaintiff brings suit against all Defendants in both their individual and official capacities. *See* Am. Compl. Plaintiff seeks monetary damages against these Defendants in their individual and official capacities. *Id.* at § III. Defendants state that the Eleventh Amendment bars suit against the Defendants for monetary damages in their official capacities. Defs.' Mem. of Law at p. 2.

The Eleventh Amendment states "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. CONST. amend. XI. The Eleventh Amendment bars a suit against the state in federal court unless the state

consents to being sued or Congress legislatively overrides a state's immunity. *Huang v. Johnson,* 251 F.3d 65, 69 (2d Cir.2000). The state's immunity extends to state officials "act[ing] on behalf of the state" when the state is the "real, substantial party in interest." *Id.* at 69-70 (citing *Puerto Rico Aqueduct & Sewer Auth. v. Metcalf & Eddie, Inc.,* 506 U.S. 139, 142-47 (1993) & quoting *Pennhurst State School and Hosp. v. Halderman,* 465 U.S. 89, 101-02 (1984)). Moreover, the Eleventh Amendment will bar recovery for money damages in a suit "against state officials in their official capacities." *Ford v. Reynolds,* 316 F.3d 351, 354 (2d Cir.2003).

Therefore, Defendants cannot be sued in their official capacities in a claim for money damages. However, Linares may seek damages from Defendants in their individual capacities.

### D. First Amendment Claims

**1. Religious Service**
Plaintiff claims that his callout to attend the Catholic Choir was cancelled by Defendant Mahunik on April 16, 2005. Am. Compl. at pp. 5 & 7; Pl.'s Mem. of Law at p. 2.

Prisoners have a constitutional right to participate in congregate religious services. *Young v. Coughlin,* 866 F.2d 567, 570 (2d Cir.1989). Although a prisoner does retain this right, it is not absolute. Thus, "a threshold question is whether the alleged state action in question substantially burdens that right." *Wagnoon v. Gatson,* 2001 WL 709276, at * 7 (S.D.N.Y. June 25, 2001) (citing *Gill v. DeFrank,* 2000 WL 897152, at *1 (S.D.N.Y. July 6, 2000); *Troy v. Kuhlman,* 1999 WL 825622, at * 15 (S.D.N.Y. Oct. 15, 1999); & *Boomer v. Irvin,* 963 F.Supp. 227, 231 (W.D.N .Y.1997)). "A substantial burden constitutes more than a mere inconvenience, but rather involves, for example, a situation where an adherent is forced to modify his behavior and violate his beliefs ." *Id.* (citing *Gill v. DeFrank,* 2000 WL 897152, at *1).

Courts in this Circuit have held, and the Second Circuit has affirmed, that "missing one religious service does not constitute a substantial burden on an inmate's right to the free exercise of his religion." *Gill v. Defrank,* 2000 WL 897152, at * 2, *aff'd* 8 Fed Appx. 35 (2d Cir. Apr. 16, 2001); *see also Wagnoon v. Gatson,* 2001 WL 709276, at * 8 (dismissing the free exercise claim on a motion to dismiss);

2006 WL 2595200

*Troy v. Kuhlmann,* 1999 WL 825622, at * 15; *Boomer v. Irvin,* 963 F.Supp. at 230-31.

**\*7** In this case, Plaintiff had a callout to attend Catholic Choir. Am. Compl. at pp. 5 & 7; Pl.'s Mem. of Law at p. 2. It is not clear whether such was an actual religious service or ancillary to a religious service, such as choir practice. In any event, even if it were to constitute a religious service, cancellation of his callout to attend the Catholic Choir occurred only one time. Thus, as this is not considered to be a substantial burden, the claim must fail.

Therefore, it is recommended that the Motion to Dismiss be **granted** on the religious service claim.

**2. Law Library Access**

Plaintiff claims that on April 17, 2005, Defendant Mahunik prevented him from attending his law library callout. Am. Compl. at pp. 5 & 7; Pl.'s Mem. of Law at p. 3.

Under the First Amendment, "prisoners have a constitutional right of access to the courts." *Bounds v. Smith,* 430 U.S. 817, 821 (1977); *Bourdon v. Loughren,* 386 F.3d 88, 92 (2d Cir.2004). This right "requires prison authorities to assist inmates in the preparation and filing of meaningful legal papers by providing prisoners with adequate law libraries or adequate assistance from persons trained in the law." *Bounds v. Smith,* 430 U.S. at 828; *Bourdon v. Loughren,* 386 F.3d at 92 (quoting *Bounds)*. However, there is no "abstract, freestanding right to a law library or legal assistance, [and] an inmate cannot establish relevant actual injury simply by establishing that his prison's law library or legal assistance program is subpar in some theoretical sense." *Lewis v. Casey,* 518 U.S. 343, 351 (1996). The Supreme Court held that in order to fulfill the actual injury requirement, derived from the constitutional doctrine of standing, on a law library claim where there is a lack of access to the courts, the inmate must be pursuing direct appeals from the conviction for which he or she was incarcerated, a *habeas corpus* petition, or a civil rights claim pursuant to § 1983 "to vindicate basic constitutional rights." *Lewis v. Casey,* 518 U.S. at 354. Thus, to prove an actual injury, a plaintiff "must show that a non-frivolous legal claim was frustrated or impeded due to the actions of prison officials." *Murray v. Michael,* 2005 WL 2204985, at *16 (N.D.N.Y. Sept. 7, 2005) (citing *Warburton v. Underwood,* 2 F.Supp.2d 306, 312 (W.D.N.Y.1998)); *see also Ramirez*

*v. Holmes,* 921 F.Supp. 204, 207 (S.D.N.Y.1996) (stating that if a plaintiff alleges he was actually denied access to the law library, the plaintiff "must allege that the deprivation proximately caused some prejudice or denial of a legal claim" (citations omitted)).

In addition, under a First Amendment challenge on a law library claim, "[a] delay in being able to work on one's legal action or communicate with the courts does not rise to the level of a constitutional violation." *Odom v. Poirier,* 2004 WL 2884409, at *8 (S.D.N.Y. Dec. 10, 2004) (quoting *Herrera v. Scully,* 815 F.Supp. 713, 725 (S.D.N.Y.1993) & citing *Jones v. Smith,* 784 F.2d 149, 151-52 (2d Cir.1986)).

**\*8** Here, Plaintiff, in his Amended Complaint, claims he was prevented from using the law library on his callout by Defendant Mahunik on one solitary occasion. However, Plaintiff has not alleged how any non-frivolous legal claims he may have been pursuing were frustrated or impeded due to the actions of Defendant Mahunik nor has he shown how he would be prejudiced in any way from not having access to the law library on that particular day. Furthermore, Plaintiff does not assert that he was in fact pursuing or intending to initiate any type of legal claim on the date Plaintiff states he was denied access to the law library. Even if there was malicious intent by Defendant Mahunik when he prevented Plaintiff from accessing the law library, Plaintiff cannot show he was prejudiced. *Ramirez v. Holmes,* 921 F.Supp. at 207 (citing *Smith v. O'Connor,* 901 F.Supp. 644, 649 (S.D.N.Y.1995) for the proposition that the complaint was dismissed "where allegations did not show how denial of access, even if done deliberately and maliciously, 'materially prejudiced a pending legal action or one that [the plaintiff] sought to file in the courts' " (alteration in original) & *Derrick v. Melendez,* 1992 WL 373474 (S.D.N.Y. Dec. 2, 1992) for a similar notion in that a complaint was dismissed even though there were allegations of a retaliatory motive because there was no "mention of prejudice from isolated incident denying plaintiff use of legal text"). Thus, Plaintiff's access to the law library claim cannot stand as he has failed to show an "actual injury." *Id.* (dismissing the complaint on a motion to dismiss where the court found that a single incident of denial of use of the prison law library did not violate constitutional rights and plaintiff had not alleged any prejudice resulting from the one incident). Moreover, this one-time denial could be viewed as a mere delay. This delay does not rise to the level of a constitutional violation.

Therefore, it is recommended that the Motion to Dismiss be **granted** as to the law library claim.

### 3. Retaliation

Plaintiff claims that he was retaliated against by Defendant Mahunik for filing two grievances. Am. Compl. at pp. 5-8; Pl.'s Mem. of Law at pp. 3-4.

The Second Circuit has stated that courts must approach prisoner retaliation claims "with skepticism and particular care," since "virtually any adverse action taken against a prisoner by a prison official-even those otherwise not rising to the level of a constitutional violation-can be characterized as a constitutionally proscribed retaliatory act." *Dawes v. Walker,* 239 F.3d 489, 491 (2d Cir.2001), *overruled on other grounds by Swierkiewicz v. Sorema N.A.,* 534 U.S. 506 (2002) (citing *Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983) & *Franco v. Kelly,* 854 F.2d 584, 590 (2d Cir.1988)).

In order to prevail on a retaliation claim, a plaintiff bears the burden to prove, "first, that he engaged in constitutionally protected conduct and, second, that the conduct was a substantial or motivating factor for the adverse actions taken by prison officials." *Bennett v. Goord,* 343 F.3d 133, 137 (2d Cir.2003) (citations omitted). There must also be a "causal connection between the protected speech and the adverse action." *Gill v. Pidlypchak,* 389 F.3d 379, 380 (2d Cir.2004) (citation omitted).

 **\*9** A plaintiff may meet the burden of proving an inappropriate retaliatory motive by presenting circumstantial evidence of a retaliatory motive, such as temporal proximity, thus obviating the need for direct evidence. *Bennett v. Goord,* 343 F.3d at 138-39 (holding that plaintiff met his burden in proving retaliatory motive by presenting circumstantial evidence relating to, *inter alia,* the temporal proximity of allegedly false misbehavior reports and the subsequent reversal of the disciplinary charges on appeal as unfounded). Other factors that can infer an improper or retaliatory motive include the inmate's prior good disciplinary record, vindication at a hearing on the matter, and statements by the defendant regarding his motive for disciplining plaintiff. *McEachin v. Selsky,* 2005 WL 2128851, at \*5 (N.D.N.Y. Aug. 30, 2005) (citing *Colon v. Coughlin,* 58 F.3d 865, 872-73 (2d Cir.1995)).

Moreover, in terms of what constitutes an adverse action, "in the prison context [the Second Circuit has] previously defined 'adverse action' *objectively,* as retaliatory conduct 'that would deter a similarly situated individual of ordinary firmness from exercising ... constitutional rights.' " *Gill v. Pidlypchak,* 389 F.3d at 381 (quoting *Davis v. Goord,* 320 F.3d 346, 353 (2d Cir.2003)) (emphasis in original). This objective test will apply even though a particular plaintiff was not himself deterred. *Id.* If the plaintiff can carry that burden, the defendants may still defeat the claim if they can show, by a preponderance of the evidence, that they would have taken the same action in the absence of the prisoner's First Amendment activity. *Davidson v. Chestnut,* 193 F.3d 144, 148-49 (2d Cir.1999); *see Hynes v. Squillace,* 143 F.3d 653, 657 (2d Cir.1998); *Lowrance v. Achtyl,* 20 F.3d 529, 535 (2d Cir.1994); *Wheeler v. Goord,* 2005 WL 2180451, at \*9 (N.D.N.Y. Aug. 29, 2005).

The Supreme Court has noted that the right to petition government for redress of grievances is "among the most precious of the liberties safeguarded by the Bill of Rights." *See United Mine Workers of Am., Dist. 12 v. Illinois State Bar Ass'n,* 389 U.S. 217, 222 (1967). In this respect, the Second Circuit has held that within the prison context, "inmates must be 'permit[ted] free and uninhibited access ... to both *administrative and judicial* forums for the purpose of seeking redress of grievances against state officers.' " *Franco v. Kelly,* 854 F.2d at 589 (quoting *Haymes v. Montanye,* 547 F.2d 188, 191 (2d Cir.1976)) (emphasis and alterations in original).

Here, Plaintiff filed his first grievance on April 17, 2005, regarding the law library callout denied to him by Defendant Mahunik. Dkt. No. 23, Linares Affirm., Ex. B, Grievance, dated Apr. 17, 2005. This grievance was reviewed by Superintendent Burge on April 29, 2005, who found that the complaint was investigated, that there was no evidence to support the claim, and that the accused staff member denied the misconduct.[6] *Id.,* Ex. B, Superintendent's Review, dated Apr. 29, 2005. Defendant Burge denied the grievance. *Id.* Plaintiff appealed to the Central Office Review Committee ("CORC"), which denied Plaintiff's grievance and upheld the Superintendent's determination based on the same reasoning. *Id.,* Ex. B, CORC Review, dated June 1, 2005. In fact, the CORC noted that the facility records indicated

that Plaintiff did not attend the law library call "because he had a visit." *Id.*

6    The results of the Inmate Grievance Resolution Committee's ("IGRC") investigation were not provided to this

**\*10** Plaintiff filed his second grievance on April 27, 2005, stating that Defendant Mahunik threatened him by claiming he found another knife in Plaintiff's cell, and asking that the verbal harassment cease. *Id.,* Ex. C., Grievance, dated Apr. 27, 2005. Plaintiff stated the threat occurred after Mahunik had testified at a hearing based upon a misbehavior report filed against Plaintiff by Mahunik. *Id.* On May 5, 2005, Superintendent Burge denied the grievance stating that the complaint was investigated, there was no evidence to support the claim, and the accused staff member denied the misconduct.[7] *Id.,* Ex. C, Superintendent's Review, dated May 5, 2005. Plaintiff appealed to the CORC and on June 22, 2005, the CORC denied Plaintiff's grievance and upheld the Superintendent's determination, once again based on the same reasoning. *Id.,* Ex. C, CORC Review, dated June 22, 2005.

7    The results of the IGRC investigation were not provided to this Court.

Since filing of grievances is constitutionally protected conduct, *Graham v. Henderson,* 89 F.3d 75, 80 (2d Cir.1996) (citing *Franco v. Kelly,* 854 F.2d at 589); *Wheeler v. Goord,* 2005 WL 2180451, at \*9, Plaintiff would next have to show the filing of the grievance was a substantial and motivating factor for any adverse action taken and that there was a causal connection. The following events occurred after the filing of both grievances which are in proximity to the filings: 1) on April 18, 2005, a misbehavior report was issued to Plaintiff for violating the Department of Correctional Services ("DOCS") rule against having a weapon, which came as a result of a cell search on the previous day conducted by Mahunik, and after a hearing, Plaintiff was found not guilty of the charge; 2) on April 27, 2005, Defendant Mahunik "stated in a threatening manner" in front of Plaintiff's cell that he believed another knife was in Plaintiff's cell; and 3) on May 3, 2005, Mahunik verbally threatened Plaintiff and told him not to attend the law library callout or write any more grievances. Pl.'s Mem. of Law at pp. 5-8; Linares Affirm., Ex. C., Grievance, dated Apr. 27, 2005.

At this juncture, it is possible that the April 17, 2005 grievance could have been a substantial or motivating factor for the adverse action taken, the issuing of a misbehavior report on April 18, and that there was a connection between the filing of the grievance against Mahunik and the misbehavior report written the next day due to the temporal proximity of filing of the grievance and the search of the cell as well as the issuance of the misbehavior report. Plaintiff was also found not guilty, another factor which could also infer an improper retaliatory motive.

Turning to the other incidents, it is also possible that the grievances filed on April 17 and 27, 2005, could be considered a substantial and motivating factor for the threats allegedly occurring on April 27, 2005, and May 3, 2005. The temporal proximity of the threats to the filing of the grievances provides some circumstantial evidence of a retaliatory intent. *See, e.g. Baskerville v. Blot,* 224 F.Supp.2d 723, 733 n. 6 (S.D.N.Y.2002). Furthermore, the threats could be viewed as adverse actions as they may deter a similarly situated inmate of ordinary firmness from exercising his constitutional rights.

**\*11** Taking the threats in conjunction with the misbehavior report issued, Plaintiff raises at least a "colorable suspicion of retaliation" entitling him to at least some discovery on the issue. *Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983) (describing three methods of pleading retaliation, each requiring separate analysis). Moreover, because of the stage of the litigation and the nature of this Motion, Defendants have not been permitted to put forth any evidence or provide an explanation that they would have taken the same action in the absence of the Linares's filing of the grievance. Consequently, Plaintiff has alleged a retaliation claim thus far.

Therefore, it is recommended that the Motion to Dismiss be **denied** as to the retaliation claims.

### E. Supervisory Liability

Plaintiff states that Superintendent Burge is liable because he denied Plaintiff's grievances regarding Defendant Mahunik's conduct and that he did not remedy the situation with Defendant Mahunik. Am. Compl. at p. 8; Pl.'s Mem. of Law at pp. 4-5.

The Second Circuit has held that "personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Hernandez v. Keane,* 341 F .3d 137, 144 (2d Cir.2003) (quoting *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994)). " 'Absent some personal involvement by [the supervisory official] in the allegedly unlawful conduct of his subordinates,' he cannot be liable under section 1983." *Hernandez v. Keane,* 341 F.3d 137, 144-45 (2d Cir.2003) (quoting *Gill v. Mooney,* 824 F.2d 192, 196 (2d Cir.1987)) (alterations in original). However, liability on the part of the supervisor may exist

> in one or more of the following ways: 1) actual direct participation in the constitutional violation, 2) failure to remedy a wrong after being informed through a report or appeal, 3) creation of a policy or custom that sanctioned conduct amounting to a constitutional violation, or allowing such a policy or custom to continue, 4) grossly negligent supervision of subordinates who committed a violation, or 5) failure to act on information indicating that unconstitutional acts were occurring.

*Id.* at 145 (citing *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995)) (further citations omitted).

Here, Plaintiff does not allege that Defendant Burge was personally involved in any of the alleged violations. Am. Compl. at p. 8; Pl.'s Mem. of Law at pp. 4-5. Plaintiff generally alleges that Burge did not remedy the situation with Mahunik after being informed of the law library incident and retaliation claims through the grievance process. Am. Compl. at p. 8; Pl.'s Mem. of Law at pp. 4-5. In regards to the law library claim, Plaintiff cannot sustain a supervisory liability claim as there was no wrong for Burge to remedy since there is no constitutional violation. *See supra* Part II.D.2. However, as Plaintiff's retaliation claims are still viable at this stage, it is possible that Burge may be liable for failing to remedy that wrong. *See supra* Part II.D.3.

**\*12** Therefore, it is recommended that the Motion to Dismiss be **denied** as to the surviving retaliation claims.

### F. Failure to Investigate

Plaintiff claims that Defendant McLaughlin, of the Inspector General's Office, failed to conduct a separate investigation into Plaintiff's complaints regarding Defendant Mahunik, and instead referred them to Defendant Burge. Am. Compl. at pp. 8-9.

A "plaintiff does not have a constitutional right to an investigation [,]" unless the omission or inadequacy of the investigation itself resulted in a deprivation of a constitutional right. *Faison v. Hash,* 2004 WL 944523, at *2 (W.D.N.Y. Apr. 23, 2004) (citing *Malloy v. City of New York,* 1996 WL 648927 at *2 (S.D.N.Y. Nov. 7, 1996) ("holding that warden's alleged failure to investigate assault by correctional officer did not give rise to constitutional violation, where plaintiff failed to show that warden could have anticipated or had other direct involvement in the assault") & *Gomez v. Whitney,* 757 F.2d 1005 (9th Cir.1985) (holding that plaintiff's claim of inadequate investigation that did not cause a deprivation of a constitutional right does not state a claim under § 1983); *see also Scher v. Chief Postal Inspector,* 973 F.2d 682, 683 (8th Cir.1992) (stating that there was no constitutional right to have a plaintiff's complaints regarding mail tampering investigated). This premise also applies to investigation of grievances as there is no federal right to have them properly administered unless some liberty interest is involved. *Faison v. Hash,* 2004 WL 944523, at *3 (citing *Jones v. North Carolina Prisoners Labor Union,* 433 U.S. 119 (1977); *Adams v. Rice,* 40 F.3d 72, 75 (4th Cir.1994); *Ramirez v. Holmes,* 921 F.Supp. at 208; & *Sandin v. Conner,* 515 U.S. 472, 474 (1995)).

In this case, Defendant McLaughlin, although not conducting an investigation himself, still referred that duty to Defendant Burge. Even so, Plaintiff has no constitutional right to an investigation. Additionally, the only way Plaintiff would have that right is if the omission or inadequacy of the investigation itself resulted in a deprivation of a constitutional right. Here, the omission or inadequacy of an investigation would not result in a deprivation of any of Plaintiff's constitutional rights. Plaintiff merely seeks to have some sort of disciplinary action taken against Defendants Mahunik and Burge

through the complaint sent to Defendant McLaughlin .[8] Pl.'s Mem. of Law at p. 5.

[8]    Additionally, Plaintiff does not allege any personal involvement by Defendant McLaughlin nor can he claim supervisory liability as he does not state whom McLaughlin supervises. *See* Am. Compl. Thus, alternatively, dismissal would be recommended on this ground.

Therefore, it is recommended that the Motion to Dismiss be **granted.**

### III. CONCLUSION

For the reasons stated herein, it is hereby

**RECOMMENDED,** that the Motion to Dismiss (Dkt. No. 22) be **GRANTED IN PART** and **DENIED IN PART,** consistent with this opinion in the following manner:

    1. Defendant's request for dismissal pursuant to Federal Rules of Civil Procedure 8 and 10 is **denied.**

    2. All claims against Defendants in their official capacities are **dismissed.**

    **\*13** 3. Plaintiff's First Amendment claim based upon free exercise is **dismissed.**

    4. Plaintiff's First Amendment claim based upon access to the law library is **dismissed.**

5. Plaintiff's First Amendment claims against Defendant Mahunik based on retaliation remain intact.

6. Plaintiff's supervisory liability claim relating to the retaliation claims against Defendant Burge remains intact; Plaintiff's supervisory claim against Defendant Burge for access to the law library is **dismissed.**

7. Plaintiff's failure to investigate claim against McLaughlin is **dismissed;** and it is further **RECOMMENDED,** that should the above be adopted by the District Judge, Defendants Mahunik and Burge shall submit an answer to the Amended Complaint within twenty (20) days of the District Judge's decision on this Report-Recommendation; and it is further

**ORDERED,** that the Clerk of the Court serve a copy of this Report-Recommendation and Order upon the parties to this action.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have ten (10) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. *FAILURE TO OBJECT TO THIS REPORT WITHIN TEN (10) DAYS WILL PRECLUDE APPELLATE REVIEW. Roldan v. Racette, 984 F.2d 85, 89 (2d Cir.1993)* (citing *Small v. Sec'y of Health and Human Servs.,* 892 F.2d 15 (2d Cir.1989)); *see also* 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 72, 6(a), & 6(e).

**All Citations**

Not Reported in F.Supp.2d, 2006 WL 2595200

**End of Document**                    © 2017 Thomson Reuters. No claim to original U.S. Government Works.

Bolanos v. Coughlin, Not Reported in F.Supp. (1993)

1993 WL 762112

1993 WL 762112
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Edgardo BOLANOS, Plaintiff,

v.

Thomas A. COUGHLIN, III, Commissioner,
John P. Keane, Supt., W. Babbie 1st Dept.
Supt.; Charles Greiner, Dept. Supt. Security; T.
Haskell, Captain for Security; John Mahoney,
Hearing Officer; Brant Kehn, Hearing Officer;
J. Fields, Sgt.; M. Stokes, Lieutenant; Donald
Selsky, Dir. S.H.U. & Disciplinary Programs;
E. Bartlett, Lt. Review Officer; McAllister, Lt.
Review Officer; Sheets, Lt. Watch Commander;
Joni Johnson, Correction Counselor; T. Buschel,
Sgt.; John Wendle, C.O.; B. Culpepper, C.O., R.
Dorcean, C.O.; L. Lunsford, C.O.; Defendants.

No. 91 CIV. 5330 (KC).
|
Oct. 15, 1993.

ORDER

CONBOY, District Judge:

 *1 This is a section 1983 action in which the pro se plaintiff claims that his due process rights were violated in two disciplinary proceedings initiated against him by certain officers and officials of the New York State Department of Correctional Services.

The defendants filed a motion for summary judgment on December 23, 1992. On January 6, 1993 the Court granted plaintiff an extension of time, to March 12, 1993 to respond to defendants' motion. The Court by order of March 31, 1993 again granted plaintiff a further extension of time to respond until July 5, 1993. On July 7, 1993 the Court again granted plaintiff's request for a further extension to respond until August 16, 1993. On August 23, 1993 plaintiff sought yet another extension of time, until September 30, 1993 to respond, on the ground that he needed a map allegedly found in his cell and seized by prison authorities. The Court again granted the extension. By letter of August 19, 1993 to the plaintiff, the Attorney General objected to returning the map to plaintiff on

security grounds, but agreed to forward the map to the Court for *in camera* review. By letter dated September 22, 1993 the Attorney General sent the map to chambers and we examined it. It is a standard, commercial road map of the roads and highways of Westchester County and, as the Attorney General observed, the plaintiff is free to argue the legal issues surrounding possession of the map as a basis for discipline, without having physical custody of the map. By order of September 24, 1993 we directed plaintiff to respond to defendants' motion for summary judgment within ten days. The plaintiff has failed to respond and, accordingly, we will decide the motion upon the Attorney General's papers alone.

As we have noted, plaintiff, an inmate currently in the custody of the New York State Department of Correctional Services ("DOCS"), brought this civil rights action pursuant to 42 U.S.C. § 1983. He alleges that his due process rights were violated in two prison disciplinary hearings conducted at Sing Sing Correctional Facility in 1989. The hearings were held to determine plaintiff's guilt of charges contained in several inmate misbehavior reports ("MR"). The charges included possession and use of narcotics based on a white powder found in plaintiff's cell which tested positive for cocaine and a urinalysis which revealed the presence of marijuana, and possession of contraband and escape paraphernalia based on items such as a handcuff key and a map of Westchester County with a route from Ossining, where Sing Sing is located, to the Bronx, marked in red, which were found among plaintiff's property.

Plaintiff alleges that he did not receive due process at the disciplinary hearings because, *inter alia,* he was denied his right to call witnesses and he had no notice that possession of a map of Westchester County was against prison rules. He also claims that all the charges should have been included in one MR and that since the first MR was dismissed because the hearing was not commenced on time, all other MRs should also have been dismissed, although they were written after the first report. Plaintiff names numerous defendants, including Thomas Coughlin, Commissioner of DOCS, John Keane, the Superintendent of Sing Sing, and others in general supervisory positions at Sing Sing, the Hearing Officers who conducted the hearings, the persons who searched his cell, and the individuals who wrote the MRs.

*The Search and Related Disciplinary Charges*

WESTLAW   © 2017 Thomson Reuters. No claim to original U.S. Government Works.   1

1993 WL 762112

**\*2** On or about June 20, 1989, Sgt. Cunningham received a tip from a confidential source that plaintiff had drugs in his cell. He reported this to Lt. Stokes, who directed that plaintiff's cell be searched.

The search was conducted by Sgt. Fields, Corrections Officers Culpepper and Dorcean, and Sgt. Buschel at approximately 10:30 p.m. on June 20, 1989. Numerous unauthorized items were discovered and confiscated, including a handcuff key, DOCS inmate identification cards, a tin box with a picture of a marijuana leaf on the lid containing rolling papers, and a small screw funnel with a small amount of white powder inside (Exhibit A to Mahoney Affidavit). In a MR dated June 20, 1989, signed by C.O. Dorcean, plaintiff was charged with possessing "paraphernalia which gives reasonable grounds to believe escape is planned", possessing authorized articles in unauthorized areas, and possessing contraband items, in violation of prison rules (MR1, Exhibit A to Mahoney Affidavit). Capt. Haskell authorized plaintiff's confinement in the Special Housing Unit ("SHU") as a result of these charges (*Id.,* lines 7–8).

Plaintiff's locker, located in his cell, was searched on June 21, 1989, at approximately 12:25 a.m. During this search a white plastic straw with one end cut on an angle and a small plastic bag containing a white powdery substance were discovered. In a second MR (MR2, Exhibit B to Mahoney Affidavit) written by Sgt. Thomas Buschel [1] plaintiff was charged with possessing an "authorized item that has been altered in any manner so as to change its original intent and/or purpose" and possessing narcotic paraphernalia.

The white powder found in the plastic bag in plaintiff's locker was tested, using the Becton Dickinson "NIK" test, by Officer Culpepper, who had been trained to perform such tests (Exhibit M to Mahoney Affidavit). The test indicated the presence of cocaine, and plaintiff was charged, in another MR, with possession of a narcotic (MR 3, Exhibit C to Mahoney Affidavit).

After plaintiff was confined in SHU his property was gathered up and brought to SHU, where his space was again searched. Additional items—a map of Westchester County with a route from Ossining to New York City clearly marked and an Ossining phone book—were found and confiscated. Based on these items, plaintiff

was charged with possession of contraband ad escape paraphernalia (MR4, Exhibit D to Mahoney Affidavit).

*Hearing and Disposition*
All four MRs were addressed in a hearing conducted by Senior Corrections Counselor John Mahoney at Sing Sing between June 28, 1989 and July 7, 1989.

With respect to MR1, charging plaintiff with possession of contraband and escape paraphernalia, including a handcuff key and DOCS ID cards, plaintiff argued that the hearing had not been commenced on time, since he had been confined to SHU on June 20 and the hearing began on June 28. The hearing therefore did not commence within 7 days after plaintiff was confined, as required by a DOCS regulation, 7 NYCRR § 251–5.1(a). Hearing Officer Mahoney agreed, and dismissed the charges (Mahoney Affidavit, ¶ 12 and Exhibit G).

**\*3** Regarding MR2, charging plaintiff with possession of a straw cut at an angle on one end, plaintiff claimed that straws are not contraband and that he used the straw to feed fish which he kept in his cell (Exhibit E to Mahoney Affidavit, p. 11). He also objected that Lt. Stokes wrote the MR and "forged" Sgt. Buschel's signature (*Id* ).

Plaintiff denied that the white powder found in the plastic bag, which tested positive for cocaine, was in fact cocaine, as alleged in MR3, and requested that it be tested again (*Id.,* p. 61). He claimed that he had some vitamins in the form of a white powder in his cell, although he was not sure if that was the white powder found and seized during the search. Plaintiff claimed that he received the vitamins from a friend, who got them through the prison storeroom or package room. When Hearing Officer Mahoney noted that vitamins could not be mailed to inmates from the outside and received through the package room, plaintiff argued that they could if they were in the form of vitamin fortified wheat germ. Mr. Mahoney then noted that wheat germ was not a white powdery substance (*Id.,* p. 62).

Plaintiff also argued that this, and all other charges, should be dismissed because the hearing was not timely commenced, as Mr. Mahoney had ruled with regard to the charges in MR1 (*Id.,* p. 3, 13). Mr. Mahoney denied this application on the ground that plaintiff had been confined on the basis of MR1, and not on any of the other MRs, and "this ticket had nothing to do with your keeplock status" (*Id* p. 4). The regulation concerning

1993 WL 762112

timely commencement of hearings, 7 NYCRR 251–5.1(a), therefore did not apply to the other MRs. (Mahoney Affidavit, ¶ 17).

Lt. Stokes testified over a speaker phone, with plaintiff present in the room, because he had been transferred from Sing Sing and was currently working at Woodbourne Correctional Facility. He explained that he copied over the MRs because he had spilled coffee on them (Exhibit E to Mahoney Affidavit, p. 17). Because Sgt. Buschel was not on duty that day, Lt. Stokes signed Sgt. Buschel's name on MR 2 and initialed it (Id., p. 18). Although Lt. Stokes had not been present when Officer Wendle searched plaintiff's property, he had spoken to the people who were present (Id., p. 17).

Sgt. Cunningham testified that he received information that plaintiff was dealing drugs and may have contraband in his cell (Id. pp. 69–72). He then passed this information on to his superior (Id., p. 69).

Sgt. Buschel testified that he searched plaintiff's locker. Inside the locker, on the top shelf beneath a pile of underwear, he found a plastic bag containing approximately one teaspoon of white powder, a straw cut on an angle at one end, and a small tin of rolling papers (Id., p. 19). Sgt. Buschel explained that a straw altered in this manner could be used to sniff cocaine (Id., p. 25).

Sgt. Buschel also testified that he spoke with Lt. Stokes about MR2 and told him it was alright for Lt. Stokes to sign his name to the report (Id., p. 28).

*4 Corrections Officer Kessler testified that she was in the room when the white powder was tested by Officer Culpepper. At that time she had not been trained in how to perform the NIK test, although she had been at the time of the hearing (Id., p. 57–58).

Hearing Officer Mahoney refused to allow plaintiff to ask Officer Kessler to describe her training and the NIK testing procedures used in this case, on the ground that such testimony would be "immaterial" because Officer Kessler did not perform the test and had not at that time been trained in the procedure, and because they had literature from the company regarding the testing procedure. (Id., p. 58, 60; Mahoney Affidavit, ¶ 19).

With respect to the charges regarding possession of the map, plaintiff claimed that maps and phone books are available in the prison law library for use by the inmate law clerks, and that no rule prohibits possession of a map (Id., p. 64). Plaintiff argued that he used maps in his legal work so that he could see exactly where other inmates were arrested, and to get directions to courthouses (Id., p. 67–68).

When Hearing Officer Mahoney showed plaintiff a phone book with a map which did not have any routes marked, whereas the map found with plaintiff's property had a route from Ossining to the Bronx marked in red ink (Id., p. 63), plaintiff responded that "however it is that there were marks in there, doesn't mean that I marked this map" (Id., p. 64).

Jeffrey Sinclair, an inmate incarcerated at a different correctional facility, testified via speaker phone in plaintiff's presence. He stated that before his transfer he, like plaintiff, worked as a paralegal in the Sing Sing law Library, and that in that capacity he often used maps to determine where the events concerned in a fellow inmate's case occurred. He claimed that the law library had phone books with maps, "and that map will have all roads leading out of Ossining highlighted. That's the way the publisher prints the books" (Id., p. 34–35). To Sinclair's knowledge, there was no rule prohibiting possession of such a map (Id., p. 35–36).

Sinclair also testified that he had seen plaintiff feed the fish he kept in his cell through a straw with a sliced edge (Id., p. 36), and that he had seen vitamins in the form of a white powder in plaintiff's cell (Id., p. 37–38).

Corrections Officer Campos, who had been the officer in charge of the law library for six months, testified that no phone books were kept in the law library and that the inmate law clerks did not have access to phone books (Id., p. 46–47).

Mr. Mahoney informed plaintiff why certain witnesses were not being called, and provided a written statement of the reasons. (Exhibit K to Mahoney Affidavit). No representative of the Becton Dickerson Co. was called because plaintiff had been provided with written material provided by the company concerning the test, and the testimony would have been redundant (Exhibit E, p. 79, Ex. K).

**\*5** Officer Culpepper did not testify because he was unavailable. He was on vacation from July 3—July 7. Mr. Mahoney was then scheduled to go on vacation, and the next date that both Officer Culpepper and Mr. Mahoney would be available was July 26. (Mahoney Affidavit, ¶ 18). Mr. Mahoney also stated that Officer Culpepper "was to testify on the drug testing procedure and the chain of custody of evidence. Documentation provided to [plaintiff] is sufficient evidence in regard to those points" (Exhibit E, p. 79, Ex. K) (See also Exhibit E, p. 50).

Plaintiff also requested that "every law clerk in the law library be called as a witness" to testify concerning the availability of phone books in the library, including an inmate named Bell. Hearing Officer Mahoney denied that request (Exhibit E, p. 50).

Hearing Officer Mahoney found plaintiff not guilty of the charges in MR2 concerning the altered straw, on the ground that there was insufficient evidence to substantiate the charges. (Mahoney Affidavit, ¶ 13 and Exhibit I).

Mr. Mahoney found plaintiff guilty of the narcotics charge in MR3 (Mahoney Affidavit, ¶ 15 and Exhibit J). He also found plaintiff guilty of possession of contraband and escape paraphernalia in connection with the charges in MR4 (Mahoney Affidavit, ¶ 14 and Exhibit J). Mr. Mahoney noted, in his disposition, that MR1 identified other items which were considered escape paraphernalia and, taken together, led to the conclusion that plaintiff was planning an escape (Exhibit E, p. 82; Exhibit J).

Plaintiff appealed the disposition to Superintendent Keane, who instructed First Deputy Superintendent Babbie to forward the appeal to Mr. Donald Selsky, the Director of the Special Housing/Inmate Disciplinary Program, who is DOCS Commissioner Coughlin's designee for handling administrative appeals of Tier III inmate disciplinary dispositions. On September 15, 1989, Mr. Selsky affirmed the dispositions (Selsky Affidavit), but on March 23, 1990, after plaintiff filed an article 78 proceeding in state court, he modified the disposition on MR4 by dismissing the escape paraphernalia charge and restoring the two months of good time which had been taken away as a penalty, because he considered it error that the dismissed charges in MR1 had been considered in rendering the disposition. (Selsky Affidavit, ¶ 21). He

affirmed the finding of guilt on the contraband charge involving the map, however.

However, before Mr. Selsky rendered his determination on the appeal on the narcotics charge, Deputy Superintendent Charles Greiner had reversed the determination based on an analysis of the white powder done by an outside lab which found no controlled substances. (Greiner Affidavit).

*The Urinalysis and Related Charges*
Plaintiff submitted a urine specimen on June 30, 1989. The specimen was tested on July 7, 1989 and again on July 10, 1989, and the tests were positive for marijuana. In a MR dated July 10, 1989, plaintiff was charged with using a controlled substance. (Exhibit A to Kehn Affidavit).

**\*6** A hearing on these charges was held before Hearing Officer Brant Kehn on July 19, 1989.

At the hearing, plaintiff claimed that he was taking a number of medications which could produce a false positive result on the drug test. These medications included tylenol, Robitussin cough syrup, hemorrhoid suppositories, mallox and orinade (Exhibit B to Kehn Affidavit, p. 2).

He was also taking an ear medication which contained benzocaine, which plaintiff asserted was "related to cocaine." Since the urinalysis had been negative for cocaine and positive for marijuana, however, he acknowledged that he was "kinda surprised" (*Id.,* p. 4). Plaintiff requested that his medical records be obtained from the Sing Sing medical department and that Dr. Halko be called as a witness, in order to substantiate his claim (*Id.,* p. 2).

After a recess, Hearing Officer Kehn explained to plaintiff that he had spoken to Dr. Halko, who said that they could get a list of the medications plaintiff was taking, but that he, Dr. Halko, was not a toxicologist and could not state with any expertise whether any of those medications could produce a false positive for marijuana. Mr. Kehn accordingly suggested that he go to the medical department and go over plaintiff's records with the nurse administrator to see what medications plaintiff was on at the time of the test. Plaintiff agreed to this (*Id.,* p. 6).

Corrections Officer Lunsford, who performed one of the drug tests, described the testing procedures. Officer Nelson performed the first test, which was positive for marijuana and negative for cocaine and opiates. Officer Lunsford then performed a second test and obtained the same results (*Id.*, p. 6–9). Officer Lunsford also testified that a memorandum had been put out by the director of the Sing Sing health services department, Dr. Dyett, which stated that no medication dispensed by Sing Sing will affect the result of a drug test (*Id.*, p. 10). [2]

During an adjournment Mr. Kehn went over plaintiff's medical records with the Sing Sing nurse administrator. Upon the advice of the nurse, he considered only those medications which plaintiff was taking from June 1 to June 30, when the urine specimen was taken, because any medications taken before June would no longer have been in plaintiff's system at the time of the test (*Id.*, p. 12). The medical charge indicated that, during June, plaintiff was taking tylenol, mallox, orinade and robitussin. Plaintiff objected to the time period considered, arguing that anything he took after May 1 should be considered (*Id.*, p. 14).

Plaintiff and Mr. Kehn then consulted a list of drugs which can produce false positive results. Plaintiff argued that since Nyquil was on the list, the robitussin he was taking could produce a false positive. Mr. Kehn pointed out, however, that Nyquil was listed as possibly producing a false positive for amphetamines, not marijuana (*Id.*, p. 13).

At plaintiff's request, Mr. Kehn then called a representative of the Syva company, which manufactured the drug testing equipment. He spoke to the individual on a speaker phone in plaintiff's presence. Mr. Kehn asked if any of the four medications plaintiff had been taking in June could produce a false positive test for marijuana, and the Syva representative responded that those medications were not known to produce a false positive for marijuana (*Id.*, p. 20).

**\*7** Mr. Kehn then permitted plaintiff to ask the Syva consultant some questions. Plaintiff asked whether the consultant's information indicated that robitussin could produce a false positive for barbiturates, and the Syva representative responded that it did not (*Id.*, p. 21). Plaintiff wanted to ask additional questions, but Mr. Kehn refused because plaintiff's questions concerned barbiturates or "downers", not marijuana, and no other

medications were listed on plaintiff's medical chart (*Id.*, p. 22; Kehn Affidavit, ¶ 6). Plaintiff also claimed that he had been given additional medications while in SHU in June, and requested that the nurse be called to testify concerning those alleged additional medications. He could not provide the nurse's name, however (*Id.*, p. 22). Mr. Kehn denied plaintiff's request. After asking plaintiff whether he had any additional evidence to present, Mr. Kehn adjourned the hearing to render his disposition (*Id.*, p. 23–24).

Following the adjournment, Mr. Kehn read into the record his written statement of why he did not call the unknown nurse. He said, in part, "no record of this medication appears in the record, and inmate does not know who she is" (*Id.*, p. 24; Ex. D to Kehn Affidavit). Plaintiff then told Mr. Kehn that he now had the name of the nurse. He had obtained it from another nurse whom plaintiff had seen in the area where the hearing was being held while waiting for Mr. Kehn to render his decision. Plaintiff claimed that this nurse was willing to testify that she gave plaintiff medications in SHU (Exhibit B, p. 25). Mr. Kehn declined to re-open the hearing to receive this testimony because the testimony would have been irrelevant, given the memo stating that no medications dispensed by Sing Sing would produce a false positive (Kehn Affidavit, ¶ 7).

Mr. Kehn found plaintiff guilty, citing the result of the urinalysis test, the information received from Syva, and the Sing Sing memo stating that no medications dispensed at Sing Sing would produce a false positive. Mr. Kehn added that in imposing a penalty he considered that use of controlled substances was detrimental to the inmate, other inmates and staff, and noted that plaintiff had a prior hearing involving controlled substances (Exhibit B. 256; Ex. E).

Plaintiff appealed the determination to Donald Selsky, the Commissioner's designee to hand administrative appeals. On September 15, 1992, the disposition was affirmed. (Selsky Affidavit, Exhibit B).

*Plaintiff's State Court Proceeding*

Plaintiff bought a proceeding in New York State Court, pursuant to Article 78 of the New York CPLR, challenging these decisions. In that proceeding he raised many of the same issues he raises herein, including the refusal to call inmates Macon and Bell in the first hearing

1993 WL 762112

and the unidentified nurse in the second hearing, and the curtailment of his questioning of the Syva representative. He also claimed that the prison rules did not give him notice that possessing a map was prohibited, and that Mr. Mahoney was not impartial. (*See* Petition).

 **\*8** The state court dismissed the petition, finding, *inter alia,* that his due process right to call witnesses was not violated and that there was no evidence Mr. Mahoney was not a fair and impartial decisionmaker. (*See* decision of Honorable Francis A. Nicolai, Justice of the Supreme Court, dated January 14, 1991 and made a part of this record.

*Standards Governing This Motion*

Pursuant to Fed.R.Civ.P., Rule 56(c), summary judgment should be granted if the pleadings and affidavits "show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *See, e.g., Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986); *Falls Riverway Realty, Inc. v. City of Niagara Falls,* 754 F.2d 49, 57 (2d Cir.1985). "In considering the motion, the court's responsibility is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried, while resolving ambiguities and drawing reasonable inferences against the moving party." *Knight v. U.S. Fire Ins. Co.,* 804 F.2d 9, 11 (2d Cir.1986), *cert. denied,* 480 U.S. 932 (1987) (citing *Anderson v. Liberty Lobby Inc.,* 477 U.S. 242 (1986); *Eastway Constr. Corp. v. City of New York,* 762 F.2d 243, 249 (2d Cir.1985)., summary judgment is not a "disfavored procedural shortcut" but is an integral part of the Federal Rules' goal of securing the "just, speedy and inexpensive determination of every action." *See Celotex Corp. v. Catrett,* 477 U.S. 317, 327 (1986); *Anderson v. City of New York,* 657 F.Supp. 1571, 1576 (S.D.N.Y.1987).

In determining whether there are factual issues to be tried, the court must determine whether any unresolved issues are material to the outcome of the litigation. *Knight, supra,* 804 F.2d at 11. "[T]he mere existence of factual issues— where those issues are not material to the claims before the court—will not suffice to defeat a motion for summary judgment." *Quarles v. General Motors Corp.,* 758 F.2d 839, 840 (2d Cir.1985). *See also Collins v. Ward,* 652 F.Supp. 500 (S.D.N.Y.1987).

An analysis of the allegations set forth in plaintiff's complaint and the evidence submitted on this motion

reveal that there is no material issue of fact to be tried which could establish that plaintiff's statutory and constitutional rights have been violated. Therefore, summary judgment must be granted in favor of defendants.

## I. PLAINTIFF'S RIGHTS WERE NOT VIOLATED BY THE SEARCH OF HIS CELL

Plaintiff has sued the officers who conducted the search of his cell, and the supervisory personnel who authorized it. It is clear, however, that his constitutional rights were not violated by the search.

Due to the fact that inmates have been lawfully incarcerated for violating the law, and because of the unique nature of the prison setting, which is volatile and potentially dangerous, prisoners have a substantially reduced expectation of privacy. *See generally Turner v. Safley,* 482 U.S. 78 (1987); *Bell v. Wolfish,* 441 U.S. 520 (1970). Accordingly, courts have upheld body cavity searches after contact visits, *Bell v. Wolfish,* 441 U.S. at 558–60, as well as urinalysis and blood samples to detect drug use by inmates, *Spence v. Farrier,* 807 F.2d 753, 755 (8th Cir.1986) (urinalysis): *Storms v. Coughlin,* 600 F.Supp. 1214 (S.D.N.Y.1984) (urinalysis); *Ferguson v. Cardwell,* 392 F.Supp. 750 (D.Ariz.1975) (blood samples); *Hampson v. Satran,* 319 N.W.2d 796 (N.D.1982).

 **\*9** In *Hudson v. Palmer,* 468 U.S. 517 (1984), the Supreme Court upheld "shakedown" searches of an inmate's cell, finding that prisoners have no fourth amendment privacy rights in their individual cells. *See also Bell v. Wolfish,* 441 U.S. at 555–557; *Covino v. Patrissi,* 967 F.2d 73 (2d Cir.1992). Plaintiff has no legitimate expectation of privacy in his cell, and it was certainly reasonable to search his cell after receiving a tip that he may have drugs therein. His rights were not violated by the search. [3]

## II. THE EVIDENCE IS SUFFICIENT TO SUPPORT THE DETERMINATIONS

Plaintiff protests that he is not guilty of the disciplinary charges at issue here. He claims that he had legitimate uses for the map of the area surrounding Sing Sing and was not planning an escape. He also asserts that the white powder was not cocaine and that the urinalysis showing the presence of marijuana in his system was wrong.

1993 WL 762112

The role of the federal court in a civil rights action such as this is not to review the wisdom or accuracy of the decision made by the prison officials. So long as there is some evidence to support the determination, the court should not disturb the decision.

In *Superintendent, Massachusetts Correctional Institution v. Hill,* 472 U.S. 445 (1985) the Court held that as long as there was some evidence to support the decision, constitutional requisites were met. The Court explained that "ascertaining whether this standard is satisfied does not require examination of the entire record, independent assessment of the credibility of witnesses, or weighing of the evidence. Instead, the relevant question is whether there is any evidence in the record that could support the conclusion." *Id.,* at 455–56. Recognizing that "prison disciplinary proceedings take place in a highly charged atmosphere, and prison administrators must often act swiftly on the basis of evidence that might be insufficient in less exigent circumstances", the Court declined to adopt a more stringent evidentiary standard. *Id. See also Freeman v. Rideout,* 808 F.2d 949, 955 (2d Cir.1986), *cert. denied,* 485 U.S. 982 (1988).

Under this deferential standard, the evidence here is amply supported by the evidence. With respect to the drug charges involving the white powder and the urine specimen, well-regarded tests on both indicated the presence of controlled substances.

In *Peranzo v. Coughlin,* 850 F.2d 125 (2d Cir.1988), the Second Circuit held that "use of the [EMIT urinalysis] test results may be relied upon as sufficient evidence to warrant prison discipline ..." Since plaintiff's urine specimen was tested twice, in accordance with the dictates of *Peranzo,* the evidence was sufficient.

The test performed on the white powder also provided sufficient evidence. Although this was only tested once prior to the hearing, and no confirmatory test was performed at that time, this is sufficient. Unlike urinalyses, which can be affected by food or medications ingested by the individual, the risk of a false positive is not as great with a white powder. In any event, it was not clearly established at the time of this hearing that a confirmatory test on a white powder was required, and defendant Mahoney (and any other defendants plaintiff claims were involved in the determination) is entitled to qualified immunity. *See Soto v. Lord,* 693 F.Supp. 8 (S.D.N.Y.1988).

**\*10** Government employees are qualifiedly immune from liability for civil damages "insofar as their conduct does not violate a clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.D. 800, 818 (1982). *See also Anderson v. Creighton,* 483 U.S. 635 (1987); *Krause v. Bennett,* 887 F.2d 362 (2d Cir.1989); *Neu v. Corcoran,* 869 F.2d 662 (2d Cir.), *cert. denied,* 493 U.S. 816 (1989); *Robinson v. Via,* 821 F.2d 913, 920–21 (2d Cir.1987).

Qualified immunity can appropriately be resolved by a motion to dismiss or on a motion for summary judgment. *Gittens v. LeFevre,* 891 F.Supp. 40, 43 (S.D.N.Y.1989). Purely as a matter of law, the defense of qualified immunity "should be sustained if the court finds that it was not clear at the time of the official acts, that the interest asserted by the plaintiff was protected by a federal statute or the Constitution." *Robison v. Via,* 821 F.2d at 920. However, "even if the contours of the plaintiff's federal rights and the official's permission actions were clearly delineated at the time of the acts complained of, the defendant may still enjoy qualified immunity if it was objectively reasonable for him to believe that his acts did not violate those rights." *Id.* at 921.

Qualified immunity is not overcome if defendants' federal rights were established only generally. Officials are not charged "to recognize the significance of a few scattered cases from disparate areas of the law." *Lojuk v. Johnson,* 770 F.2d 619, 628 (7th Cir.1985), *cert. denied,* 474 U.S. 1067 (1986). Instead, a right must be established in a "particularized way." *Jihaad v. OBrien,* 645 F.2d 556, 562–63 (6th Cir.1981); *see also Anderson v. Creighton,* 483 U.S. 635, 107 S.Ct. 3034, 3038 (1987).

Here, since it was not clearly established that a white powdery substance must be tested twice, defendants are entitled to qualified immunity.

Similarly, the determination regarding the map is supported by sufficient evidence. In *Gittens v. Coughlin,* 584 N.Y.S.2d 470 (3d Dept.1992), the state appellate court held that a map constituted contraband. This state court decision establishes that the decision is supported by sufficient evidence—the map which was found in plaintiff's possession. There was also reason to believe that the map constituted escape paraphernalia, given that Ossining was circled and a route to New York City was

Case 9:16-cv-00717-TJM-TWD Document 35 Filed 11/28/17 Page 282 of 310

Bolanos v. Coughlin, Not Reported in F.Supp. (1993)

1993 WL 762112

drawn on it, and that other items which could be used in an escape, such as a handcuff key, were also found among plaintiff's property.

## III. DEFENDANTS DID NOT VIOLATE PLAINTIFF'S RIGHTS BY ISSUING THE MISBEHAVIOR REPORTS

Plaintiff has also sued the individuals who issued the misbehavior reports against him. However, simply causing a misbehavior report to be issued does not implicate federal rights.

To hold otherwise would confuse "the existence of a constitutionally protected right, and the deprivation of that right without procedural safeguards or due process." *Freeman v. Rideout,* 808 F.2d 949, 951 (2d Cir.1986), *reh'g denied,* 826 F.2d 194 (2d Cir.1987), *cert. denied,* 485 U.S. 982 (1988). The due process clause requires that, once an inmate is charged with violating prison rules, he be afforded certain procedural safeguards. The due process clause does not protect an inmate from being charged, even if those charges are false or unfounded. As the Second Circuit held in *Freeman v. Rideout,* a "prison inmate has no constitutionally guaranteed immunity from being falsely or wrongly accused of conduct which may result in the deprivation of a protected liberty interest." 826 F.2d at 951. *See also McCoy v. Coughlin,* 90 Civ. 6657, 1991 WL 130939, slip op. at 305 (S.D.N.Y. July 5, 1991) (copy submitted herewith); *Garrido v. Coughlin,* 716 F.Supp. 98, 101 (S.D.N.Y.1989).

*\*11* Plaintiff's allegations that Lt. Stokes issued MR4 without personal knowledge of the facts also does not state a claim. Writing a MR based on information obtained from another source does not violate federal rights. Such reports may be based on hearsay, even where the source is an unidentified confidential information. *Green v. Bauvi,* 792 F.Supp. 928, 936 (S.D.N.Y.1992); *Russell v. Coughlin,* 774 F.Supp. 189 (S.D.N.Y.1991); *Gittens v. Sullivan,* 720 F.Supp. 40, 42–44 (S.D.N.Y.1989); *see also Foster v. Coughlin,* 76 N.Y.2d 964 (1990).

Contrary to plaintiff's contentions, Lt. Stokes did not violate the state regulation, 7 NYCRR § 251–1.4(b), because he ascertained the facts before writing the report. The regulation does not require that the author personally observe the facts. In any event, violation of this state procedural regulation does not state a federal civil rights claim.

## IV. PLAINTIFF'S CLAIMS ARE PRECLUDED UNDER PRINCIPLES OF COLLATERAL ESTOPPEL

Plaintiff raised many of the same issues pressed herein in an Article 78 proceeding in a New York State Court. Those issues were decided against him. (*See* petition dated January 8, 1990, made part of this record, and the decision of Justice Nicolai, *supra.* Those issues, which are necessary elements to plaintiff's causes of action here, having been litigated and decided, plaintiff's claims are precluded under the doctrine of collateral estoppel or issue preclusion.

The doctrines of *res judicata* and collateral estoppel serve the "dual purpose [s] of protecting litigants from the burden of relitigating an identical issue with the same party or his privy and of promoting judicial economy by preventing needless litigation. *Parklane Hosiery Co., Inc. v. Shore,* 439 U.S. 322, 326 (1979). Both doctrines are fully applicable to civil rights claims asserted pursuant to 42 U.S.C. § 1983. Under 28 U.S.C. § 1738, federal courts must give the same preclusive effect to state court judgments in section 1983 actions as the judgments would receive in the courts of the rendering state. *Migra v. Warren City School District Board of Education,* 465 U.S. 75, 80–81 (1984); *Kremer v. Chemical Construction Corp.,* 456 U.S. 461, 466–85 (1983); *Allen v. McCurry,* 449 U.S. 90, 96–97 (1980); *Winters v. Lavine,* 574 F.2d 46 (2d Cir.1978). Accordingly, since under New York law plaintiff is precluded from litigating his claims in state court, he cannot pursue them in federal court.

The New York law of collateral estoppel forecloses a second litigation of an issue if (1) the issue sought to be precluded is identical to the issue involved in a prior action; (2) there was a final determination on the merits of that issue in the prior proceeding; (3) the party against whom issue preclusion is sought had a full and fair opportunity to litigate the point. *See e.g., Davis v. Halpern,* 813 F.2d 37, 39 (2d Cir.1987); *Kaufman v. Eli Lilly & Co.,* 65 N.Y.3d 449, 455–56 (1985); *Ryan v. New York Telephone Co.,* 62 N.Y.2d 494, 500–01 (1984); *Gilberg v. Barbieri,* 53 N.Y.2d 285, 291–92 (1981); *Gramatan Home Investors Corp. v. Lopez,* 46 N.Y.2d 481 (1979). These requirements are satisfied in this case.

*\*12* First, the same issues were involved in the Article 78 proceeding. In the petition, plaintiff challenged the same

WESTLAW © 2017 Thomson Reuters. No claim to original U.S. Government Works. 8

Case 9:16-cv-00717-TJM-TWD    Document 35    Filed 11/28/17    Page 283 of 310

Bolanos v. Coughlin, Not Reported in F.Supp. (1993)

1993 WL 762112

determinations. With respect to the Mahoney hearing, he claimed that inmates Macon and Bell and Officer Kessler should have been called as witnesses. He also claimed that he had no prior notice that a map was contraband under DOCS rules, and that the hearing officers was biased and improperly considered charges which had been dismissed. He claimed that his rights were violated in the Kehn hearing because the nurse was not called to testify and his questioning of the Syva representative was curtailed, and because his assistant failed to provide his medical records.

As noted, in its January 14, 1991 decision, the Supreme Court dismissed the petition.

The court found that testimony concerning the use of map in the library was irrelevant to whether he could possess a map in his cell, and that its exclusion did not deprive plaintiff of due process (Decision, p. 2).

With respect to the nurse plaintiff wanted to call at the Kehn hearing, the court found that his due process rights were not violated because plaintiff "was unable to name the nurse and the hearing examiner rightly determined that she would not have called as no record of the medication appeared in the medical record and the petitioner did not know who the nurse was." (Decision, p. 3). The court also found that plaintiff was permitted to question the Syva representative (Decision, p. 3–4). The court also noted that Mr. Kehn's apparent oversight in reviewing the medical records was "immaterial" "in light of the internal memorandum stating that no medications available at the facility would render a false positive" (Decision, p. 4).

Finally, the court rejected the claim that Mr. Mahoney was not impartial because he had also presided over the hearing on the charges in MR1, which were dismissed (Decision, p. 4–5).

Accordingly, it is clear that many, if not all, of the same issues raised herein were decided on their merits by a state court. Since the findings that the excluded witnesses were irrelevant, that plaintiff had an adequate opportunity to question the Syva consultant, and that there was no showing that Mr. Mahoney was not impartial, are entitled to preclusive effect, and would preclude plaintiff from establishing his civil rights claim, summary judgment should be granted on those issues. Even the additional issues raised in the petition but not specifically addressed

in the decision are precluded, because unless the court found that plaintiff's claims lacked merit, it could not have dismissed the petition. By not ruling in plaintiff's favor, it implicitly rejected the claims. Under New York law, such an implicit finding can be the basis for collateral estoppel. *See generally Friarton Estates Corp. v. City of New York,* 681 F.2d 150, 159 (2d Cir.1982); *Chisolm– Ryder Co., Inc. v. Sommer & Sommer,* 78 A.D2d 143 (4th Dept.1980); 5 Weinstein, Korn, Miller *New York Civil Practice,* § 5011.27 (1989).

**\*13** Finally, plaintiff had a full and fair opportunity to litigate these issues. [4] He was represented by attorneys from Prisoners' Legal Services of New York, who are experienced in such cases. The record of the Article 78 proceeding demonstrates that he presented his case fully.

There is no bar to applying issue preclusion in this case, and all the requirements of doing so are met. A plaintiff may not be barred from bringing a § 1983 action due to a prior Article 78 proceeding under principles of claim preclusion or res judicata because full relief (*i.e.* damages) is not available in an Article 78 proceeding. *See Giano v. Flood,* 803 F.2d 769 (2d Cir.1986); *Davidson v. Capuano,* 792 F.2d 275 (2d Cir.1986). There is no similar bar to defendants in a § 1983 action using collateral estoppel defensively, where issues essential to the civil rights claim have been decided against plaintiff in a prior Article 78 proceeding. In both *Davis v. Halpern,* 813 F.2d 37 (2d Cir.1987) and *Fay v. South Colonie Central School District,* 802 F.2d 21 (2d Cir.1986), the court applied the principles of collateral estoppel, although it found that the requisites for issue preclusion were not met because the same issues were not involved or the basis for the state court decision was not clear.

The same is not true here. The same issues were decided on the merits, and plaintiff is precluded from relitigating them.

## V. PLAINTIFF WAS NOT DENIED DUE PROCESS AT THE HEARINGS

### A. The Charges Were Properly Contained In Separate Reports

Plaintiff claims that all of the charges addressed in the Mahoney hearing stemmed from the same incident, and should have been contained in one single misbehavior

Case 9:16-cv-00717-TJM-TWD    Document 35    Filed 11/28/17    Page 284 of 310

Bolanos v. Coughlin, Not Reported in F.Supp. (1993)
1993 WL 762112

report. He asserts that charging him in separate reports violated the double jeopardy clause.

This argument is based on a fundamental misconception concerning the nature of prison disciplinary hearings. These hearings are not criminal prosecutions, and the full panoply of rights due a criminal defendant does not apply. *Wolff v. McDonnell,* 418 U.S. 539, 556 (1974). Since the double jeopardy clause is limited to criminal proceedings. *Breed v. Jones,* 421 U.S. 519 (1975), the double jeopardy clause does not pertain to prison disciplinary hearings. *Gorman v. Moody,* 710 F.Supp. 1256, 1266 (N.D.Ind.1989).

Moreover, it was entirely appropriate to include these charges in separate misbehavior reports. The charges were not the same factually. MRs 1, 2 and 4 concerned different items of contraband found in different places at different times. It was not improper to search plaintiff's locker and the property which was shipped to SHU at different times following the original cell search, and since additional contraband was found in those searches, different reports had to be written. (Mahoney Affidavit, ¶ 16). The logical conclusion of plaintiff's argument is that if additional contraband is discovered when his property in unpacked at SHU, the facility is powerless to act and plaintiff is immune from discipline. This would frustrate the facility's ability to discipline inmates and maintain security and order in the facility. With respect to MR3, concerning the white powder, the report could not be written until the powder was tested. It was therefore proper that that charge be included in a separate report.

 **\*14** At the least, it was not clearly established that it was a violation of plaintiff's federal rights to write separate misbehavior reports, and defendants are entitled to qualified immunity on this claim.

B. The Mahoney Hearing On MRs 2–4 Was Timely
Plaintiff's related claim that MRs 2–4 should have been dismissed because the charges should have been included in MR1, and the hearing on MR1 was not commenced in accordance with a New York State regulation regarding timeliness, must also be rejected.

To repeat, it did not violate plaintiff's rights to put the charges in separate reports. Since MRs 2–4 were written on June 21, and the hearing began on June 28, the hearing was timely. The hearing began within 7 days, as required

by 7 NYCRR § 251–5.1(a). Moreover, this regulation does not apply because plaintiff was not confined on *those* charges pending the hearing. Plaintiff could not possibly be considered confined on those charges until the reports were written. He was confined on MR1. (*See* Mahoney Affidavit, ¶ 17). Plaintiff was not confined on MRs 2–4 until MR1 was dismissed, at which time the hearing had begun. In any event, plaintiff's claim that his rights were violated by the failure to commence his hearing in accordance with a New York State regulation, 7 NYCRR § 2515.1, does not state a claim because 1) he has not alleged a violation of federally protected interests and 2) because any rights he may have concerning the timeliness of his hearings were not clearly established at the time, and defendants are therefore qualifiedly immune.

Because plaintiff's claims regarding the timeliness of his hearings are based solely on a state procedural regulation, he does not state a claim under the civil rights statute. Plaintiff has no federally created right to have his disciplinary hearing commenced within a certain time. While it is true that due process liberty interests may be created by a state law which, using mandatory language, places substantive limits on the authority and discretion of state officials, *see Kentucky Dept. of Corrections v. Thompson,* 490 U.S. 454 (1989); *Hewitt v. Helms,* 459 U.S. 460, 471 (1983); *Deane v. Dunbar,* 777 F.2d 871, 876 (2d Cir.1985); *Dell'Orfano v. Scully,* 692 F.Supp. 226, 233–34 (S.D.N.Y.1988), "no comparable entitlement can derive from a statute that merely establishes procedural requirements," as in this case. *Cofone v. Manson,* 594 F.2d 934, 938 (2d Cir.1979). *See also Olim v. Wakinekona,* 461 U.S. 238, 249–51 (1983); *McDarby v. Dinkins,* 907 F.2d 1334 (2d Cir.1990); *Bolden v. Alston,* 810 F.2d 353, 358 (2d Cir.), *cert. denied,* 484 U.S. 896 (1987); *Afrika v. Sleksy,* 750 F.Supp. 595, 602 (S.D.N.Y.1990); *Smallwood–El v. Coughlin,* 589 F.Supp. 692, 699 (S.D.N.Y.1984). The specific time limitations of 7 NYCRR § 251–5.1 are not a requirement of federal law. *Russell v. Coughlin,* 910 F.2d 75, 78 n. 1 (2d Cir.1990).

Even if plaintiff's claims were not based solely on the state regulation, he has not stated a claim under federal law. Federal courts have recently held that inmates have a protected liberty interest in not being removed from the general population for an "unreasonable" amount of time without an opportunity to be heard on the charges. *Russell v. Coughlin,* 910 F.2d 75; *Gittens v. Lefevre,* 891 F.2d 38 (2d Cir.1989). However, plaintiff has not alleged that any

Bolanos v. Coughlin, Not Reported in F.Supp. (1993)

1993 WL 762112

"delay" in his hearing was unreasonable. He states only that they were in violation of the regulation. Accordingly, he does not state a claim under 42 U.S.C. § 1983.

**\*15** In any event, it is clear that defendants are entitled to qualified immunity, because it was not clearly established at the time of these hearings that untimeliness in commencing or completing a hearing implicated federal rights. Although *Hewitt v. Helms,* 459 U.S. 460 (1983), had established, prior to plaintiff's hearings, that inmates "had a constitutional right to make a statement concerning their administrative confinement within a reasonable time," *Gittens v. LeFevre,* 891 F.2d at 42, the parameters of the requirement were unclear in the summer of 1989, when plaintiff's hearing was conducted.

Certainly, if a defendant complied with the state regulation, as did Hearing Officer Mahoney, and that regulation had never been declared unlawful, it was objectively reasonable for him to believe his conduct did not violate federal rights. *Russell v. Coughlin,* 910 F.2d at 79; *Gittens v. LeFevre,* 891 F.2d at 42; *Garrido v. Coughlin,* 716 F.Supp. 98, 102–103 (S.D.N.Y.1989); *Malik v. Tanner,* 697 F.Supp. 1294, 1303 (S.D.N.Y.1988).

Other cases have held that delays beyond the 7 day regulatory time do not implicate federal constitutional rights. *Russell v. Coughlin,* 910 F.2d 75 (10 day delay); *Abernathy v. Perry,* 869 F.2d 1146 (8th Cir.1989); *Russell v. Coughlin,* 774 F.Supp. 189 (S.D.N.Y.1991) (eleven day delay); *Gains v. Coughlin,* 89 Civ. 0664, slip op. at 6–7 (S.D.N.Y.1990) (eleven day delay) (copy submitted herewith) (even if no legitimate basis for the delay is given an eight day delay is "still by no means long enough to be of constitutional significance.")

In conclusion, since the parameters of the right not to be held for an unreasonable time pending the hearing were not clearly established until *Gittens v. LeFevre* and *Russell v. Coughlin* were decided, after the Mahoney hearing, or even until more recently, *see Santana v. Keane,* 949 F.2d 584 (2d Cir.1991), it was objectively reasonable for defendants to believe that the hearing on MRs 2–4 was not untimely and did not violate plaintiff's federal rights.

It was also certainly not clearly established that it violated plaintiff's right not to include all the charges in one report, which was written on June 20, or that when the MR1 was dismissed as untimely, all the other reports charging

plaintiff with violations based on different facts had to be dismissed also. Since they were legitimately viewed as separate reports, it could not be known by defendants that if MR1 was untimely, all the other reports were untimely. No case had held such. In *Green v. Bauvi,* 88 Civ. 5329, slip op. at 14–17 (S.D.N.Y. Sept. 1, 1992), the court held that defendants were entitled to qualified immunity on a claim that they violated plaintiff's rights by proceeding on a hearing to determine whether plaintiff should be placed in Involuntary Protective Custody ("IPC"), where the IPC recommendation was based on the same facts with which plaintiff had previously been charged in an inmate misbehavior report, and a hearing on those disciplinary charges would have been untimely. Similarly, proceeding on the hearing on these related but different charges, where the original report (MR1) was dismissed on timeliness grounds, did not violate plaintiff's clearly established rights and defendants are entitled to qualified immunity.

C. Plaintiff Had Sufficient Notice That The Map Was Contraband

**\*16** Plaintiff asserts that he had insufficient notice that possessing a map such as that found among his property was prohibited. Defendants are entitled to summary judgment on this claim because the rule under which he was charged, 113.23 [7 NYCRR § 270.2(B)(14)(xiv) ] provided him sufficient notice that this conduct was prohibited.

The rule in question states that inmates "shall not be in possession of any contraband items not listed in Rules 113.10 through 113.22. Contraband is any article that is not authorized by the superintendent or designee." The property which inmates may have is strictly limited (*see* Mahoney Affidavit, ¶ 14), and a map is not specifically authorized. Even assuming, *arguendo,* that plaintiff could legitimately possess a map in the law library (which the hearing officer found, based on sufficient evidence, was not the case), plaintiff was not authorized to have the map in his cell.

In *Gittens v. Coughlin,* 584 N.Y.S.2d 670 (3d Dept.1992), the Appellate Division of the New York State Supreme Court held that Rule 113.23 gave the inmate sufficient notice that a map of the area surrounding the correctional facility where he was incarcerated was contraband. Plaintiff's arguments here must be similarly rejected.

At the least, defendants are entitled to qualified immunity on this claim, since it was not clearly established at the time that Rule 113.23 did not give him sufficient notice. The state appellate decision in *Gittens v. Coughlin* demonstrates that defendants' belief that the rule was adequate was objectively reasonable.

Rule 108.13 also gave plaintiff sufficient notice that the map constituted escape paraphernalia. A map of the surrounding area has an obvious use in an escape, and is encompassed within the escape paraphernalia rule. [5]

### D. Plaintiff Was Not Denied His Right To Call Witnesses

Although inmates subject to a disciplinary hearing have a right to call witnesses in their defense, this right is a limited, qualified one, and prison officials' judgment in this area is entitled to great deference. The Supreme Court, in *Wolff v. McDonnell,* 418 U.S. 539 (1974), recognized that flexibility and discretion in disciplinary hearing procedures were required because "Prison disciplinary proceedings are not part of a criminal prosecution, and the full panoply of rights due a defendant in such proceedings does not apply." *Id.* at 556. The court reasoned that "Prison disciplinary proceedings ... take place in a closed, tightly controlled environment peopled by those who have chosen to violate the criminal law and who have been lawfully incarcerated for doing so." *Id.* at 561. Accordingly, the Court stated that:

> the inmate facing disciplinary proceedings should be allowed to call witnesses and present documentary evidence in his defense when permitting him to do so will not be unduly hazardous to institutional safety or correctional goals. Ordinarily, the right to present evidence is basic to a fair hearing; but the unrestricted right to call witnesses from the prison population carries obvious potential for disruption and for interference with the swift punishment that in individual cases may be essential to carrying out the correctional program of the institution. We should not be too ready to exercise oversight and put aside the judgment

of prison administrators. It may be that an individual threatened with serious sanctions would normally be entitled to present witnesses and relevant documentary evidence; but here we must balance the inmate's interest in avoiding loss of good time against the needs of the prison, and some amount of flexibility and accommodation is required. *Prison officials must have the necessary discretion to keep the hearing within reasonable limits* and to refuse to call witnesses that may create a risk of reprisal or undermine authority, as well as to limit access to other inmates to collect statements or to compile other documentary evidence.

**\*17** 418 U.S. at 566–67 (emphasis added). *See also Scott v. Kelly,* 962 F.2d 145 (2d Cir.1992); *Fox v. Coughlin,* 893 F.2d 475 (2d Cir.1990); *Afrika v. Selsky,* 750 F.Supp. 595, 600 (S.D.N.Y.1990) (constitution does not require that an inmate be permitted to call all of this requested witnesses, and hearing officer does not violate the due process clause by selecting which witnesses to call and denying an irrelevant witness).

Furthermore, it is well established that inmates do not have the absolute right to confront or cross-examine witnesses at disciplinary hearings. *Wolff v. McDonnell,* 418 U.S. at 567–69. *See also Bolden v. Alston,* 810 F.2d 353, 358 (2d Cir.), *cert. denied,* 484 U.S. 896 (1987); ("To the extent that [the hearing officer] took testimony from witnesses out of Bolden's presence, he did not violate any due process requirement."); *Freeman v. Rideout,* 808 F.2d 949, 954 (2d Cir.1986), *cert. denied,* 485 U.S. 982 (1988) (the extent to which prisoners may confront and cross-examine witnesses should be left to the sound discretion of prison officials and administrators ...).

Under these principles and standards, and given the deference due to a hearing officer in determining whether to permit a witness, plaintiff's rights were not violated.

With respect to the Mahoney hearing, it did not deprive plaintiff of due process to decline to call additional inmate law clerks to testify as to the use of an availability of phone

Bolanos v. Coughlin, Not Reported in F.Supp. (1993)

1993 WL 762112

books and maps in the prison law library. Such testimony would have been irrelevant, cumulative and redundant. *See* Mahoney Affidavit, ¶ 20). The hearing officer had already heard testimony from Mr. Sinclair, an inmate who had worked as a law clerk in the Sing Sing law library, and from Officer Campos, the law library officer. It was within Mr. Mahoney's discretion to decline to call any further witnesses on this subject, in order to keep the hearing within reasonable limits. [6]

It was also proper for Mr. Mahoney not to call Officer Culpepper, who had performed the test on the white powder, as a witness. Officer Culpepper was unavailable because he was on vacation, and Mr. Mahoney was also going on vacation. Given their vacation schedules, the hearing would have had to be adjourned until July 26 to obtain Officer Culpepper's testimony. Given that the reports had been written on June 21, and the hearing began on June 28, it was within Mr. Mahoney's discretion to determine that a delay of approximately one month to complete the hearing was unwarranted. (Mahoney Affidavit, ¶ 18). There is a significant interest on the part of both the facility and the inmate accused of disciplinary violations to conclude the hearing expeditiously. Moreover, Officer Culpepper's written test results as well as information concerning the testing procedures published by the manufacturer, were available at the hearing. Since plaintiff has no absolute right to confront or cross-examine witnesses, the absence of Officer Culpepper's testimony did not deny plaintiff due process. *See Higgs v. Bland,* 888 F.2d 443, 449 (6th Cir.1989) (failure to call lab technician did not violate consent decree or the due process principles of *Wolff v. McDonnell* ).

 **\*18** Neither did it deny plaintiff due process not to permit Officer Kessler to testify concerning the procedures used to test the white powder. She did not perform the test herself and had not been trained in the proper testing procedures at the time of the test. Mr. Mahoney therefore determined that her testimony on that subject would have been irrelevant. (Mahoney Affidavit, ¶ 19).

Deputy Superintendent Kehn also did not violate plaintiff's due process rights by refusing to let plaintiff ask the Syva consultant irrelevant questions about medications which there was no evidence plaintiff had been taking or about whether medications could produce a false positive for barbiturates, when the urinalysis

at issue had revealed the presence of marijuana, not barbiturates. the evidence plaintiff was seeking to elicit was irrelevant, and the hearing officer properly excluded it. (Kehn Affidavit, ¶ 6). Plaintiff has no absolute right to confront and cross-examine witnesses, and his rights were not violated.

It also did not deny plaintiff due process not to call the nurse whom plaintiff requested. Plaintiff did not provide her name during the hearing, and the hearing officer is under no obligation to call unidentified witnesses. [7] *Nurse v. Duffany,* 1991 WL 24321, 89 Civ. 4373, slip op. at 15–19 (S.D.N.Y. Feb. 12, 1991) (copy submitted herewith).

When plaintiff finally provided a name for this witness or witnesses, the hearing had been concluded and the evidence closed. Plaintiff had indicated that he had no further evidence to present. Mr. Kehn hand written his disposition, and had only to read it into the record. Plaintiff was essentially asking that the hearing be re-opened, a matter that in administrative hearings generally is left to the sound discretion of the officer presiding over the hearing. *See generally Wijeratne v. I.N.S.,* 961 F.2d 1344 (7th Cir.1992); *Cities of Campbell v. F.E.R.C.,* 770 F.2d 1180 (D.C.Cir.1985); *Simmons v. I.C.C.,* 760 F.2d 126 (7th Cir.1985), *cert. denied,* 474 U.S. 1055; *Matter of Morrissey v. Sobol,* 176 A.D.2d 1147 (1991), *appeal denied,* 79 N.Y.2d 754 (1992); *Matter of Edelman v. Sobol,* 174 A.D.2d 896 (3d Dep't), *appeal dismissed,* 78 N.Y.2d 1006 (1991); *Matter of Gagliardi v. Dept. of Motor Vehicles,* 144 A.D.2d 882, 883 (3d Dep't 1988), *appeal denied,* 74 N.Y.2d 606 (1989); *Matter of Columbia Gas of New York, Inc. v. Public Service Commission,* 118 A.D.2d 305, 308–09 (3d Dep't 1986).

Moreover, this evidence would have been immaterial, given the memorandum before Mr. Kehn indicating that no medications dispensed by Sing Sing would produce a false positive. Even if the nurse had testified that she had given certain medications to plaintiff, therefore, this testimony would have been irrelevant. (Kehn Affidavit, ¶ 7).

Accordingly, since plaintiff showed no legitimate reason why he failed to produce the name of the nurse sooner, during the hearing, and because the testimony would have been immaterial, his rights were not violated.

Case 9:16-cv-00717-TJM-TWD   Document 35   Filed 11/28/17   Page 288 of 310

Bolanos v. Coughlin, Not Reported in F.Supp. (1993)

1993 WL 762112

**\*19** On a related matter, Mr. Kehn's mistake in missing an entry in plaintiff's medical charge that he had received an additional medication (Kehn Affidavit, ¶ 8) did not violate plaintiff's rights. First, this was harmless because the evidence would have irrelevant, because the drug, auralgan, does not produce a false positive result (Exhibit F to Kehn Affidavit).

Moreover, even assuming, *arguendo,* that defendant committed an error, this error was due to simple negligence. It is well established that the civil rights statute under which plaintiff brings this action provides no remedy for government actions which is merely negligent. *Daniels v. Williams,* 474 U.S. 327 (1986); *Estell v. Gamble,* 429 U.S. 97, 106 (1976); *Bryant v. Maffucci,* 923 F.2d 979, 983–84 (2d Cir.1991), *cert. denied,* 502 U.S. 849, 112 S.Ct. 152 (1991); *Gertzulin v. Corcoran,* 91 iv. 3428 slip op at 3 S.D.N.Y. October 23, 1991) (copy submitted herewith).

Here, Mr. Kehn's misreading of the medical records can amount to no more than negligence, which does not state a claim under Section 1983. There is no evidence of any malice or wrongful intent on Mr. Kehn's part. Accordingly, he cannot be held to have personally violated plaintiff's civil rights.

In conclusion, plaintiff's right to call witnesses was not violated at either hearing. In the alternative, it was not clearly established that under these circumstances it was error to preclude these witnesses, and defendants are entitled to qualified immunity. [8]

E. Plaintiff Was Not Denied His Right To Assistance
Plaintiff's right to assistance to prepare for his defense was not violated, although plaintiff claims that his assistant failed to provide his medical records to him. However, the assistant conveyed plaintiff's request for his medical records to the hearing officer on the assistance sheet. This was sufficient, particularly since the records are not permitted to leave the medical department.

The hearing officer, Mr. Kehn, went to the medical department to review the records. Any error, therefore, was cured, and plaintiff was not prejudiced. It was also harmless, because any evidence from the medical records would not have resulted in a different disposition, given that none of the medications plaintiff was taking are known to produce a false positive test for marijuana.

F. The Hearing Officers Were Fair And Impartial
Plaintiff claims that both hearing officers prejudged his guilt and improperly considered other charges in rendering their decisions. Although plaintiff has the right to a fair and impartial hearing officer, that right was not violated here. Neither hearing officer had been witness to the incidents or had participated in the investigation *See Bolen v. Alston,* 810 F.2d 353, 358 (2d Cir.1987); *Powell v. Ward,* 392 F.Supp. 628, 633 (S.D.N.Y.1975), *aff'd as modf'd* 542 F.2d 101, 103 (2d Cir.1976). There is no evidence that they were not fair and impartial, and plaintiff's claim that they prejudged his guilt is unsubstantiated. *See Simard v. Board of Education,* 473 F.2d 933 (2d Cir.1973); *Lott v. Slesky,* 747 F.Supp. 226 (S.D.N.Y.1990), *aff'd,* 932 F.2d 957 (2d Cir.1991).

**\*20** There was nothing inherently improper in Mr. Mahoney conducting the hearing on all four misbehavior reports. There is no indication that he could not maintain an open mind on all charges or that he prejudged plaintiff's guilt. In fact, that he dismissed MR2 due to insufficient evidence belies any such claim.

Furthermore, neither hearing officer improperly considered other charges which had been dismissed. It was entirely appropriate for Mr. Kehn to note that plaintiff had a prior disposition related to controlled substances. Like a judge sentencing a criminal defendant, in a prison disciplinary hearing an individual's background and whether he had previously committed similar offenses is highly relevant and is a proper consideration. In determining the proper penalty, therefore, Mr. Kehn did not violate plaintiff's rights by noting the other narcotics charge. And, contrary to plaintiff's contentions, that charge, assuming that it was the disposition on MR3 by Mr. Mahoney, had not been dismissed at the time Mr. Kehn rendered his disposition on July 19, 1989. It was not dismissed until August, 1989. (Greiner Affidavit).

Nor did Mr. Mahoney violate plaintiff's rights. His comment that plaintiff may be dealing in drugs was supported by the evidence—both Sgt. Cunningham's testimony that his source reported that plaintiff was dealing in drugs (Exhibit E to Mahoney Affidavit, p. 71–72) and plaintiff's own denial that he used drugs.

Mr. Mahoney's reference to the other items of escape paraphernalia, such as the handcuff key, in rendering his

1993 WL 762112

disposition on MR4, was also not improper. It was alluded to in the second page of the misbehavior report (Exhibit D to Mahoney Affidavit) and was therefore properly before Mr. Mahoney. It was also highly relevant to plaintiff's intent and to ascertaining how plaintiff intended to use the map and, accordingly, whether the map was escape paraphernalia. Furthermore, plaintiff had brought up the items involved in MR1, and Mr. Mahoney had advised him that would "open the door" to those facts (Exhibit E to Mahoney Affidavit, p. 56). Finally, the other items of possible escape paraphernalia rendered possession of the map a more serious offense and was relevant to the penalty. Mr. Mahoney did not violate plaintiff's rights.

In any event, even if it was error, this error was corrected by Mr. Selsky when he reversed the escape paraphernalia charge (Selsky Affidavit, Exhibit C). When administrative review corrects such an error, due process is satisfied.

In *Young v. Hoffman,* 970 F.2d 1154 (2d Cir.1992), the plaintiff claimed that he was denied due process at a prison disciplinary hearing. The Second Circuit held that an "administrative reversal constituted part of the due process protection [plaintiff] received, and it cured an procedural defect that may have occurred." The Court recognized that "as a policy matter, this possibility of cure through the administrative appeals process will encourage prison administrators to correct errors as an alternative to forcing inmates to seek relief in state or federal courts."

**\*21** In reaching this conclusion, the Second Circuit adopted the reasoning of *Harper v. Lee,* 938 F.2d 104 (8th Cir.1991). There, the Court also found that an inmate received all the process that was due, where an administrative appeal corrected any error.

This result is a logical corollary of the principle that if an adequate state remedy is available, there is no violation of the due process clause. *See McDarby v. Dinkins,* 907 F.2d 1334, 1338 (2d Cir.1990); *Rosa R. v. Connelly,* 889 F.2d 435, 439–440 (2d Cir.1989); *Alfaro Motors, Inc. v. Ward,* 814 F.2d 883, 888 (2d Cir.1987); *Yale Auto Parts, Inc. v. Johnson,* 758 F.2d 54, 58–59 (2 Cir.1985). [9]

Applying the reasoning of *Young* and *Harper,* this claim must be dismissed, since the administrative reversal cured any errors. And, as both the *Young* and *Harper* courts recognized, there are strong public policy reasons favoring such an outcome. It will encourage prison officials to

correct errors through the administrative process, and will obviate the necessity for many plaintiffs to seek redress through state and federal litigation.

Although the plaintiff in *Young* never served any time in segregated confinement, the same principle pertains to this case notwithstanding plaintiff's allegation that he was confined on these charges. In *Harper,* the plaintiff had served 15 days in disciplinary detention. 938 F.2d at 105. Also, in *Williams v. Tavormina,* 89 Civ. 1247T (W.D.N.Y. Aug. 28, 1992), the court adhered to the holding of *Young* despite the fact that the plaintiff spent approximately two months in confinement. The court stated that, "the fact that Williams suffered an interim penalty should not dictate a contrary result." The court recognized that it was within the prison officials' discretion to confine the plaintiff pending the hearing. *See also Anderson v. Sullivan,* 702 F.Supp. 424, 428 (S.D.N.Y.1988); *Malik v. Miller,* 679 F.Supp. 268, 269 (W.D.N.Y.1988) (confinement pending a hearing proper). Here, where plaintiff was charged with serious offenses involving controlled substances and a possible escape, and therefore posed a threat to institutional security, it was well within the prison administrators' discretion to confine plaintiff until the disposition was reversed. [10]

## G. The White Powder Need Not Have Been Tested Twice

It was also not improper to rely on only one test of the white powder. The test used was reliable, and it was not necessary to send it outside the facility to be tested, as plaintiff requested.

In the alternative, defendants are entitled to dualfied immunity on any such claim because it was not clearly established that a suspected controlled substance had to be tested twice.

Finally, any error in this regard, assuming there was error, was corrected when Deputy Superintendent Greiner reversed the disposition after an outside laboratory reported a negative result. Under the reasoning of *Young v. Hoffman,* this cured any error.

## VI. PLAINTIFF'S CLAIMS AGAINST DEFENDANT SELSKY ARE BARRED BY ABSOLUTE QUASI–JUDICIAL IMMUNITY

1993 WL 762112

**\*22** As a general rule, judges are absolutely immune from liability for acts within their judicial discretion. *Pierson v. Ray,* 386 U.S. 547, 553–54 (1967); *Mathis v. Clerk of the First Dep't,* 631 F.Supp. 232, 235 (S.D.N.Y.1986) (district court denies plaintiff leave to amend complaint because Appellate Division justices are immune from suit under 42 U.S.C. section 1983).

The absolute judicial immunity is founded on the public policy that "principled and fearless decision making" will be compromised if a judge "fear [s] that unsatisfied litigants may hound him with litigation charging malice or corruption." *Pierson,* 386 U.S. at 554. As the Supreme Court pointed out long ago, "[l]iability to answer to everyone who might feel himself aggrieved by the action of the judge ... would destroy that independence without which no judiciary can be either respectable or useful." *Bradley v. Fisher,* 80 U.S. (13 Wall.) 335, 347 (1872).

When a judge or legislative body delegates judicial tasks to non-judges, the protection of absolute immunity does not dissipate. Rather, it continues in the form of absolute quasi-judicial immunity, which shields certain judicial functionaries as long as they perform "discretionary acts of a judicial nature." *Oliva v. Heller,* 839 F.2d 37, 39 (2d Cir.1988). Thus, "the Supreme Court follows a 'functional' approach under which [a]bsolute immunity flows not from rank or title or 'location within the Government,' but from the nature of the responsibilities of the individual officials." *Cleavinger v. Saxner,* 474 U.S. 193, 201 (1985).

Absolute quasi-judicial immunity has been extended to a number of judicial functionaries [11] including officials, like defendant Selsky, who preside over administrative appeals that review Tier III hearing dispositions. *See, e.g., Pacheco v. Kihl,* Index No. civ. 90–5495 (W.D.N.Y. Dec. 17, 1991); *Shaddy v. Gunter,* 690 F.Supp. 860, 864–65 (D.Neb.1988) (member of prison appeals board entitled to absolute immunity); *see also Gregoire v. Biddle,* 177 F.2d 579, 580 (2d Cir.1949), *cert. denied,* 339 U.S. 949 (1950) (absolute immunity for quasi-judicial discretionary actions found on public policy); *Arteaga v. State of New York,* 72 N.Y.2d 212, 214 (1988) (DOCS "employees' actions [during disciplinary hearings] constitute discretionary conduct of a quasi-judicial nature for which the State has absolute immunity ..." *Id.*).

The decision in *Pacheco v. Kihl* is particularly relevant here because in it, a federal district court held that defendant Selsky was immune from liability for an administrative appeals decision under circumstances virtually identical to those here. Plaintiff Pacheco, an inmate at Attica Correctional Facility, alleged that he had been denied his constitutional rights because a hearing officer refused to permit the presentation of certain witnesses. The inmate appealed the subsequent Tier III hearing disposition and defendant Selsky affirmed. Whereupon, the inmate used defendant Selsky, *inter alias,* under title 42 U.S.C. section 1983.

**\*23** The *Pacheco* court granted defendant Selsky's motion for summary judgment on a theory of absolute quasi-judicial immunity. It held that his function in conducting administrative appeals was judicial in nature, applying a two-prong test for absolute quasi-judicial immunity. First, the court stated there had to exist a judicial function to be protected. Second, there had to exist adequate safeguards against the improper performance of the judicial function. Because defendant Selsky's judicial function and the safeguards afforded the plaintiff in *Pacheco* are directly parallel to the case at bar, a review of the *Pacheco* court's analysis is instructive.

Initially, the *Pacheco* court noted that defendant Selsky's role in making administrative appeals decisions was clearly adjudicatory. Selsky was required to: (1) exercise his independent discretion in applying legal precedent to factual situations; (2) determine an inmate's guilt or innocence to a given charge; (3) receive documentary evidence; (4) evaluate credibility; and (5) affirm or reverse a final judgment of a hearing officer bearing directly on a prisoner's liberty or property interests or both.

The *Pacheco* court noted further that defendant Selsky was a professional, civilian hearing officer, not a prison rank and file employee temporarily diverted from his usual duties to review Tier III hearing dispositions. He was neither subordinate in rank, the court opined, nor subject to review by facility personnel. Consequently, he was non-collegial with any particular prison's staff and, therefore, under no pressure to resolve disputes in favor of the institution where the prisoner or hearing was held.

The *Pacheco* court then proceeded to analyze the various elements of a Tier III hearing that safeguard an inmate's constitutional rights. Although "[p]rison disciplinary

Case 9:16-cv-00717-TJM-TWD    Document 35    Filed 11/28/17    Page 291 of 310

Bolanos v. Coughlin, Not Reported in F.Supp. (1993)
1993 WL 762112

proceedings are not part of a criminal prosecution," the court noted, and the full panoply of rights due a defendant in such a proceeding does not apply, adequate "safeguards ... [that] tend to reduce the need for private damages actions as a means of controlling unconstitutional conduct" do exist. (Citing *Wolff v. McDonnell,* 418 U.S. 539 (1974)); *Butz v. Economou,* 438 U.S. at 512. These safeguards include: (1) the selection of hearing officers from civil service lists of applicants qualified as administrative law judges; (2) hearing officers; use of federal and state court precedent in administrative review; (3) inmate assistance and the qualified right to call witnesses and listen to testimony; (4) formal notice of charges; (5) the right to be present at the hearing; (6) mandatory recordation of the entire hearing; (7) the right to present evidence; and (8) multiple appeals, including C.P.L.R. Article 78 and habeas relief. *See Pacheco,* slip op. at 7.

Upon application of this two-prong test and taking into consideration the many recognized difficulties of administering prisons, many of whose inmates demonstrate "a proclivity for antisocial, criminal, and violent conduct," *Hudson v. Palmer,* 468 U.S. 517, 526 (1984), and a "willingness to harass, ... intimidate, ... and retaliate against prison officials, *Wolff,* 418 U.S. at 562, the *Pacheco* court held that defendant Selsky was entitled to absolute immunity.

**\*24** Here too, both prongs of the *Pacheco* test are satisfied. First, defendant Selsky performed the same function with respect to plaintiff as he did with respect to plaintiff Pacheco. His function in presiding over the administrative appeal at issue here is, therefore, of a judicial nature. Second, as in *Pacheco,* the Tier III hearing here provided more than sufficient constitutional safeguards to plaintiff. Accordingly, plaintiff's claims as to defendant Selsky must fail as a matter of law.

## VII. THE SUPERVISORY DEFENDANTS WERE NOT PERSONALLY INVOLVED IN ALLEGED VIOLATIONS OF PLAINTIFF'S RIGHTS

Plaintiff's claims against defendants Coughlin, Keane, Babbie, Greiner, Haskell, Sheets, McCallister and Bartlett should be dismissed because they were not personally involved in the alleged violations of plaintiff's rights.

Liability of supervisory officials under 42 U.S.C. § 1983 cannot be premised on respondent superior. Rather,

plaintiff must establish fault and causation on the part of the defendant. Consequently, a defendant's personal involvement in the alleged constitutional violation is a prerequisite to the imposition of damages. *See generally Monell v. New York City Department of Social Services,* 436 U.S. 658, 690–95 (1978); *Rizzo v. Goode,* 423 U.S. 362, 370–71, 375–77 (1976); *Al–Jundi v. Estate of Nelson Rockefeller,* 885 F.2d 1060 (2d Cir.1989); *Gill v. Mooney,* 824 F.2d 192, 196 (2d Cir.1987); *Williams v. Smith,* 781 F.2d 319 (2d Cir.1986); *McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir.1977), *cert. denied,* 434 U.S. 2087 (1978); *Respress v. Coughlin,* 585 F.Supp. 854, 859–60 (S.D.N.Y.1984).

In *Williams v. Smith,* the Second Circuit outlined four ways in which a supervisory official may be personally involved in a section 1983 violation: he may (1) have directly participated in the infraction or be directly involved through ordering that the action be taken; (2) fail to remedy a wrong after learning of the violation; (3) have created or allowed a policy to continue under which the violation occurred; or (4) have been grossly negligent in managing the subordinates who caused the violation. 781 F.2d at 323–24.

The fact here cannot support a finding of the supervisory defendants' personal involvement on any of the foregoing theories. Plaintiff has not alleged anything which could be interpreted as their direct participation, a longstanding policy or custom for which any of them is responsible, or grossly negligent training or supervision. His claim is premised primarily on their general supervisory responsibilities and authority over the other defendants. (*See, e.g.,* Complaint, p. 46, ¶ 9). This is insufficient to state a claim.

Although plaintiff claims that he informed some of these defendants of his claims, and that they failed to act, this too does not state a claim. Simply receiving letters or complaints does not render an individual personally liable.

**\*25** To impose liability under such circumstances would be inconsistent with the purpose of § 1983 to hold only those responsible for violations liable. *See generally Rod v. Dellarciprete,* 845 F.2d 1195, 1207–08 (3d Cir.1988) (transmitting a complaint to the Government's office of administration insufficient basis to impose liability); *Crowder v. Lash,* 687 F.2d 996, 1005–06 (7th Cir.1982) (Commissioner's general knowledge of prison

conditions and receipt of letters from plaintiff insufficient to impose liability; *McMillan v. Coughlin,* 716 F.Supp. 98, 100 (S.D.N.Y.1989) (allegations that Coughlin "ignored Garrido's letter of protest and request for an investigation ..." insufficient to hold him liable); *Johnson v. Lane,* 596 F.Supp. 408, 409 (N.D.Ill.1984) ("That [the Director of Illinois Department of Corrections] may have been apprised of the misconduct of subordinates does not ... subject him to personal liability.") The complaint must accordingly be dismissed with respect to the supervisory defendants. [12]

Accordingly, the motion of the defendants is granted, the complaint is dismissed, and the Clerk is directed to enter judgment in favor of the defendants.

SO ORDERED.

[1] Lt. Stokes re-copied this MR, as well as the other MRs, because he spilled coffee on them. He signed Sgt. Buschel's name and initialed the signature (Exhibit E to Mahoney Affidavit, 17–18).

[2] Hearing Officer Kehn also obtained a copy of a memo from Superintendent Keane, dated September 1988, which stated that the Sing Sing pharmacist advised him that no item issued by the Sing Sing Pharmacy would produce a positive result for marijuana in a urinalysis (*Id.,* p. 16).

[3] Although not directly raised in the complaint, it is also clear that subjecting plaintiff to the urinalysis did not violate his rights. *Garcia & Shaffer v. Wilhelm,* 91 Civ. 2248, Report and Recommendation (S.D.N.Y. Aug. 28, 1992), adopted October 14, 1992, 1992 WL 309869.

[4] The burden rests upon plaintiff to show the lack of a full and fair opportunity. *See Ryan v. New York Telephone Co.,* 62 N.Y.2d at 501; *Schwartz v. Public Administrator,* 24 N.Y.2d 65, 73 (1969).

[5] In any event, since this charge was eventually dismissed by Mr. Selsky, we need not reach this issue.

[6] In addition, the record does not reflect that plaintiff specifically requested that inmate Macon testify on this subject.

[7] Plaintiff could have told his assistant that he wanted this nurse to testify, and asked that she locate and identify the nurse. The assistance sheet (Exhibit C to Kehn Affidavit) reflects only that plaintiff requested

Dr. Halko as a witness (a request he withdrew at the hearing), but not a nurse.

[8] Although the record may not reflect that the Hearing Officers gave all of these reasons for precluding witnesses at the hearing, their elaboration of the reasons in their affidavits at this time is proper. *Pone v. Real,* 471 U.S. 491, 497 (1985). Also, plaintiff's claim that he did not receive a written statement of the reason for denial of the witnesses should also be rejected. In most cases, he did receive such a written statement (Exhibit K to Mahoney Affidavit; Exhibit D to Kehn Affidavit). In any event, such a written statement is not required as a matter of *federal* law.

[9] Even if the reversal is seen as a product of plaintiff's having filed an Article 78 proceeding instead of an administrative appeal, this too would negate any due process claim here because the state Article 78 procedure afforded him a remedy.

[10] Furthermore, the fact that plaintiff was confined is not dispositive here because he was confined on other charges at the same time.

[11] These judicial functionaries include but are not limited to: (1) officers of state court in addition to judges, *Glucksman v. Birns,* 398 F.Supp. 1343, 1353 (S.D.N.Y.1975); (2) federal law clerks who assist judges in carrying out judicial functions, *Oliva v. Heller,* 839 F.2d 37, 40 (2d Cir.1988); bankruptcy court clerks who accept and file individual debtors; petitions, *Mullis v. United States Bankruptcy Court,* 828 F.2d 1385, 1390 (9th Cir.1987), *cert. denied,* 486 U.S. 1040 (1988); (3) state court clerks who issue arrest warrants, "a function normally handled by a judge," *Scott v. Dixon,* 720 F.2d 1542, 1546 (11th Cir.1983), *cert. denied,* 469 U.S. 832 (1984); (4) state court clerks who fix bail in misdemeanor cases, *Denman v. Leedy,* 479 F.2d 1097, 1098 (6th Cir.1973); and (5) state court clerks who reject motion papers, *Deferro v. Coco,* 719 F.Supp. 379 (E.D.Pa.1989).

[12] Plaintiff alleges that Commissioner Coughlin violated his rights by affirming the dispositions (Complaint, p. 40, ¶ 14–15, p. 46, ¶ 10–11). However, as Mr. Selsky's affidavit demonstrates, Commissioner Coughlin has delegated the responsibility of ruling on such appeals to Mr. Selsky and is not personally involved in the appeals. In addition, the defendants who were allegedly the review officers who reviewed the misbehavior reports and classified them as a Tier III hearing and/or approved plaintiff's confinement pending the hearing did not violate plaintiff's rights. Like one who simply writes a misbehavior report, one

1993 WL 762112

who reviews the report does not violate an inmate's rights, so long as he receives due process at the hearing.

The claims against defendant McCallister must also be dismissed because the summons and complaint were not served in a timely fashion. Fed.R.Civ.P. 4(j).

**All Citations**

Not Reported in F.Supp., 1993 WL 762112

---

**End of Document**                    © 2017 Thomson Reuters. No claim to original U.S. Government Works.

2002 WL 1997885
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Damar RODRIGUEZ, Plaintiff,

v.

Warden J. MERCADO, et al., Defendants.

No. 00 CIV. 8588 JSRFM.
|
Aug. 28, 2002.

Prisoner brought a § 1983 action against corrections personnel, claiming that they strip-searched him in violation of his Fourth Amendment rights, used excessive force against him, and were deliberately indifferent to his medical needs. On cross-motions for judgment on the pleadings or summary judgment, the District Court, Maas, Magistrate Judge, issued a report and recommendation that: (1) there were issues of fact precluding summary judgment on inmate's Fourth Amendment claim; (2) any injuries inmate allegedly received were not sufficiently serious to support an Eighth Amendment claim of indifference to serious medical needs; (3) in any event, inmate did not show that any of the medical professionals at the jail were deliberately indifferent to his need; (4) there were issues of fact precluding summary judgment on Eighth Amendment excessive use of force claim; (5) inmate failed to show any personal involvement on the part of warden and another supervisory corrections office which could give rise to liability under § 1983; and (6) one corrections officer was entitled to qualified immunity, but two other were not.

Recommendation issued.

West Headnotes (8)

[1]    **Federal Civil Procedure**
           **Civil Rights Cases in General**

There were issues of fact, precluding summary judgment on jail inmate's Fourth Amendment claim, as to whether request that Muslim inmate remove his kufi a second time was reasonable, and as to whether removal of inmate to intake area for a second strip search

was justified, or was intended simply as a form of retribution or humiliation. U.S.C.A. Const.Amend. 4.

Cases that cite this headnote

[2]    **Prisons**
           **Hair, Grooming, and Clothing**

If corrections officer did not know of a prior search of inmate's head during a routine institutional search, his request for removal of the Muslim inmate's kufi was reasonable under the circumstances and could not give rise to a Fourth Amendment violation. U.S.C.A. Const.Amend. 4.

1 Cases that cite this headnote

[3]    **Prisons**
           **Particular Conditions and Treatments**

    **Sentencing and Punishment**
           **Medical Care and Treatment**

Any injuries jail inmate allegedly received when he was allegedly kneed in the back and had his head struck against the wall by corrections officers were not sufficiently serious to support an Eighth Amendment claim of indifference to serious medical needs, where inmate claimed to have sustained only bruises, and the doctor who examined inmate the next day observed no bruises, and noted that inmate had not lost consciousness and was alert and responsive during the examination. U.S.C.A. Const.Amend. 8.

15 Cases that cite this headnote

[4]    **Prisons**
           **Particular Conditions and Treatments**

    **Sentencing and Punishment**
           **Medical Care and Treatment**

Even if jail inmate had demonstrated injuries severe enough to rise to the level of a serious medical need, he did not show that any of the medical professionals at the jail were deliberately indifferent to that need, in violation of the Eighth Amendment, where inmate did not allege that his injuries were

Rodriguez v. Mercado, Not Reported in F.Supp.2d (2002)
Case 9:16-cv-00717-TJM-TWD    Document 35    Filed 11/28/17    Page 295 of 310

2002 WL 1997885

life-threatening or fast-degenerating, or that he was experiencing extreme pain that more rapid treatment would have alleviated, and where inmate was seen within eight or nine hours of the incident by a nurse who prescribed him an analgesic and who put inmate on sick call for the following day, when he was seen by a physician who prescribed additional medication. U.S.C.A. Const.Amend. 8.

35 Cases that cite this headnote

**[5]**    **Federal Civil Procedure**
    👉 **Civil Rights Cases in General**
There were issues of fact, precluding summary judgment on Eighth Amendment excessive use of force claim, as to the degree of force that was used against jail inmate and whether that use of force was justified. U.S.C.A. Const.Amend. 8; 42 U.S.C.A. § 1983.

Cases that cite this headnote

**[6]**    **Civil Rights**
    👉 **Criminal Law Enforcement;Prisons**
Jail inmate failed to show any personal involvement on the part of warden and another supervisory corrections office which could give rise to liability under § 1983 for alleged Fourth and Eighth Amendment violations, where neither personally participated, and it was not shown that they promulgated any unlawful policy or were grossly negligent in the supervision of the officers who engaged in the alleged unlawful activity, or that warden failed to take appropriate action upon the discovery of the incident. U.S.C.A. Const.Amends. 4, 8; 42 U.S.C.A. § 1983.

Cases that cite this headnote

**[7]**    **Civil Rights**
    👉 **Prisons, Jails, and Their Officers;Parole and Probation Officers**
Corrections officer who was not shown to have been involved in alleged misconduct

by another officer was entitled to qualified immunity as to inmate's claims of excessive force and denial of medical treatment. U.S.C.A. Const.Amends. 4, 8; 42 U.S.C.A. § 1983.

Cases that cite this headnote

**[8]**    **Federal Civil Procedure**
    👉 **Civil Rights Cases in General**
Corrections officers who were alleged to have engaged in an unreasonable second search of jail inmate and to have used excessive force against him were not entitled to summary judgment on qualified immunity grounds, where there were factual issues as to what occurred, which had to be resolved in order to determine whether similarly-situated officials would have understood that their actions violated inmate's constitutional rights. U.S.C.A. Const.Amends. 4, 8; 42 U.S.C.A. § 1983.

Cases that cite this headnote

**Attorneys and Law Firms**

Damar Rodriguez, Pro Se, Wyoming Correctional Facility, Attica.

Genevieve Nelson, Esq., Assistant Corporation Counsel, New York City Law Department, New York.

REPORT AND RECOMMENDATION
TO THE HONORABLE JED S. RAKOFF

MAAS, Magistrate J.

I. *Introduction*

**\*1** Plaintiff Damar Rodriguez ("Damar"), [1] who is presently incarcerated at the Wyoming Correctional Facility, instituted this *pro se* action, pursuant to 42 U.S.C. § 1983, by submitting his complaint to the Pro Se Office of this Court on or about September 22, 2000. (Docket No. 2). In his complaint, Damar claims that the Defendants strip-searched him in violation of his Fourth Amendment rights, used excessive force against him, and

2002 WL 1997885

were deliberately indifferent to his medical needs while he was detained at the Bronx House of Detention for Men. (*Id.* at 3-5). He seeks monetary damages in the amount of $5 million from five named defendants and three "John Doe" defendants (collectively, the "Defendants") for these alleged wrongs. (*Id.* at 5).

1    Because both the Plaintiff and one of the Defendants have the same surname, this Report and Recommendation refers to the plaintiff as "Damar" to avoid any confusion.

The Defendants have now moved for judgment on the pleadings pursuant to Fed.R.Civ.P. 12(c), or, in the alternative, for summary judgment pursuant to Fed.R.Civ.P. 56. (Docket No. 28). Damar has cross-moved for the same relief. (Docket No. 30). For the reasons set forth below, the Defendants' motion should be granted in part and denied in part and Damar's cross-motion should be denied.

## II. *Background*

### A. *Relevant Facts*

The factual recitation set forth below is based upon Damar's complaint, the parties' submissions in connection with their motions, including the transcript of Damar's deposition, [2] and matters of public record. Unless otherwise noted, the facts have been set forth in the light most favorable to Damar.

2    Damar's deposition ("Dep.") is attached to the Declaration of Genevieve Nelson, dated Feb. 12, 2002 ("Nelson Decl."), as Ex. C.

Damar has been incarcerated since November 15, 1999, when he was arrested for violating his parole on a 1995 robbery conviction by unlawfully possessing a weapon. (*See* Dep. at 8; http:// nysdocslookup.docs.state.ny.us/ GCA00P00/WIQ1/WINQ000 (last visited Aug. 8, 2002)). On April 26, 2000, he was lodged at the Bronx House of Detention for Men. (*See* Dep. at 29-30). At approximately 7:30 a.m. that day, correction officers at the facility conducted a routine institutional search of Damar's housing area, including both his cell and those of his neighbors. (*See* Compl. at 3; Dep. at 31-33). Damar was awakened in his cell by Officer Virgilio Correa, who directed that Damar remove all of his clothing, including his "religious hat." [3] (*Id.;* Dep. at 32-34). Damar

complied while Officer Correa remained outside the cell and examined Damar visually. (Dep. at 34-36). Officer Correa may also have searched Damar's hair. (*Id.* at 34-35).

3    Damar is a Muslim and was wearing a "kufi," (Dep. at 24-25, 33), headgear commonly associated with members of that faith.

After completing his examination of Damar's person, Officer Correa directed Damar to get dressed and step out of the cell so that he could search the interior. (*Id.* at 36-37). While Officer Correa was conducting that search, Captain Amado Pla approached Damar outside the cell and directed him to remove his hat. (*Id.* at 43; Compl. at 3-4). According to his deposition, Damar told Captain Pla that he was wearing a religious hat and had already been searched by Officer Correa. (Compl. at 4; Dep. at 43, 45). Rather than rescinding his command, however, Captain Pla responded by ordering two or three officers to remove Damar from the housing area. (Compl. at 4; Dep. at 45).

**\*2** Captain Pla tells a markedly different version of these events in his official report. For example, there is nothing in his report which would indicate any awareness on his part that Damar's kufi had previously been removed. Quite to the contrary, his report states that Damar was "disrupting the search by refusing to take off his hat to be [s]earched" and, for this reason, "was ordered cuffed and removed [from] the area." (Nelson Decl. Ex. D at 324). According to a Department of Correction investigator, this version of the incident is corroborated by a videotape, on which Damar is heard stating to Captain Pla, "If you want me to take it off, then you take it off." (*Id.* at 342). Similarly, a Notice of Infraction given to Damar after the incident, which is appended to the investigator's report, states that Damar yelled: "You come here and take my [kufi] off mother fucker, I'll fuck you up mother fucker ." (*Id.* at 355). Damar denies making any of these statements. (Dep. at 72).

Damar testified that he was handcuffed in the vicinity of his cell and dragged down the hall to an elevator, where he was repeatedly kneed "very hard" in the back and his head was deliberately hit against the elevator wall. (Compl. at 4; Dep. at 45, 53-55, 57-59). Damar testified that Captain Pla and Officer Joseph Rodriguez were both in the elevator with him, along with two or three other officers. (Dep. at 56, 57). He was not asked, and his papers

fail to disclose, which of these officers allegedly attacked him in the elevator.

After Damar was removed from the elevator, he was taken to the prison intake area "search room," where, he alleges, Captain Pla hit his head against the wall and other officers repeatedly punched and/or kneed him in the back. (*Id.* at 60-64; Compl. at 4). Damar then was instructed to remove his clothes for a second strip search, during the course of which he was beaten again. (Dep. at 63). Although he did not know the name of every employee in the search room, Damar testified that Officer Rodriguez was there. (*Id.* at 61).

Damar contends that he sustained bruises on his head, back, and wrists as a result of the illegal actions of the correction officers at the Manhattan House of Detention. (*Id.* at 82). Despite those injuries, however, Damar allegedly was put into a cell in the intake area for approximately two to three hours before he was returned to his housing area. (*Id.* at 68-69). Damar testified that while he was in the intake area cell he asked Officer Rodriguez if he could see a doctor, but Officer Rodriguez responded that he had "nothing to do with that." (*Id.* at 69).

When Damar was returned to the housing area, he asked an unidentified captain there if he could see a doctor because he "was feeling bad and [his] back and head [were] hurting and [his] wrists were sore." (*Id.* at 72-73). Damar testified that he had a "little" red lump on the right side of his head and a "blue and purple mark" resulting from having been handcuffed. (*Id.* at 82-83). Some time after 3:00 p.m., he was examined by a prison nurse who gave him two Tylenol and placed him on "sick call" for the following day. (*Id.* at 73-74).

**\*3** Within forty-eight hours of the incident Damar also was taken to a prison clinic where he was examined by a doctor.[4] (*Id.* at 81). He contends that this occurred only because he had complained to the Legal Aid Society. (*Id.* at 83). At the clinic, the doctor noted that Damar had suffered no loss of consciousness, was alert, and had no acute injuries. (Nelson Decl. Ex. E at 336). Although Damar complained of pain in his right scalp, the doctor also noted that he observed no abrasion or bruise there. (*Id.*). The doctor prescribed Motrin for Damar's pain. (*Id.;* Dep. at 83). For some time thereafter, Damar continued to take Tylenol for recurring migraine

headaches. (Dep. at 83-84). Damar also was prescribed Naprosyn for a preexisting back problem which he contends was exacerbated by the assault. (*Id.* at 83, 85).

[4]     Although Damar contends that the prison doctor did not see him until forty-eight hours after the incident, the doctor's report indicates that the examination took place on April 27, 2000, at 7:30 p.m., approximately thirty-six hours after the incident. (Nelson Decl. Ex. E at 336).

### B. *Exhaustion of Administrative Remedies*

Damar alleges that he filed a written grievance shortly after this incident which was later referred to Warden Mercado. (Compl. at 2). He also annexed to the complaint a May 3, 2002, Department of Correction memorandum which indicates that Damar's grievance is "non-grievable." (*Id.* at 9). In their papers, the Defendants do not dispute that Damar has exhausted his available administrative remedies.

### C. *Complaint*[5]

[5]     The Defendants' motion papers mistakenly refer to an "Amended Complaint" filed by Damar on June 19, 2001. (*See* Nelson Decl. ¶ 3). In fact, only an amended summons was issued that day. (*See id.* Ex. B; Docket No. 18).

Damar's complaint alleges that the Defendants violated his rights under the Fourth, Eighth, and Fourteenth Amendments to the United States Constitution. (Compl. at 5). Specifically, Damar contends that certain of the Defendants violated the Eighth Amendment by using excessive force against him in the elevator and later in the intake area. (*Id.* at 3-4). He also contends that the Defendants provided him with inadequate medical care, in violation of the Eighth Amendment, because he was not examined by a prison doctor until forty-eight hours after the incident. (*Id.* at 4). Finally, Damar's complaint, broadly construed, alleges that the second strip search was conducted in violation of the Fourth Amendment proscription against unreasonable searches and seizures.[6]

[6]     There does not appear to be any factual basis for Damar's claim that the Defendants' also violated his rights under the Fourteenth Amendment.

### D. *Motion*

Rodriguez v. Mercado, Not Reported in F.Supp.2d (2002)

2002 WL 1997885

On or about February 12, 2002, the Defendants filed their motion for judgment on the pleadings, or, in the alternative, for summary judgment. The Defendants contend that the undisputed facts show that no excessive force was used against Damar and that he was given adequate medical care. (Def.'s Mem. at 6-12). Defendants Kerik, Mercado, and Correa also argue that they cannot be held liable under Section 1983 because they were not personally involved in the conduct upon which Damar's claims are based. (*Id.* at 12-16). Additionally, Defendants Pla, Correa, and J. Rodriguez contend that they are entitled to qualified immunity. (*Id.* at 16-20).

On March 12, 2002, Damar responded to the Defendants' motion with a sworn statement pursuant to which he has cross moved for judgment on the pleadings or summary judgment. Damar's papers reiterate his prior claims regarding the use of excessive force and inadequate medical attention. (Pl.'s Mem. at 1-2). Damar also argues that the Defendants abused their authority and, consequently, are not entitled to assert a qualified immunity defense. (*Id.* at 2).

### III. *Discussion*

#### A. *Standard of Review*

**\*4** "Judgment on the pleadings is appropriate where material facts are undisputed *and* where a judgment on the merits is possible merely by considering the contents of the pleadings." *Sellers v. M.C. Floor Crafters, Inc.,* 842 F.2d 639, 642 (2d Cir.1988)(emphasis added). Here, the face of the pleadings is plainly inadequate to resolve the legal issues raised by the parties' cross-motions. In their notice of motion, however, the Defendants also sought summary judgment and, in accordance with Local Civil Rule 56.2, provided the required notice of the procedures that a *pro se* litigant must follow to oppose such a motion. (*See* Docket No. 28). Moreover, Damar responded to the Defendants' motion by filing his own cross-motion for summary judgment.

In these circumstances, it is clear that both sides were on notice that the Court might treat their motions as summary judgment motions and consider matters outside the pleadings. *See In Re Risk Mgmt. Alternatives, Inc.,* ---F.Supp.2d ----, No. 01 Civ. 4441, 208 F.R.D. 493, 2002 WL 1363286, at \*3-\*4 (S.D.N.Y. June 14, 2002)(McMahon, J.)(court may convert motion for judgment on the pleadings to motion for summary

judgment if it is necessary to refer to matters outside the pleadings); *Gill v. Jones,* No. 95 Civ. 9031, 2001 WL 1346012, at \*3 (S.D.N.Y. Nov.1, 2001)(Duffy, J.)(same). Accordingly, I have treated the parties' motions as cross-motions for summary judgment.

Summary judgment is appropriate only when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The moving party has the initial burden of "informing the district court of the basis for its motion" and identifying the matter that "it believes demonstrates the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2253, 91 L.Ed.2d 265 (1986). If the court concludes that "the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial,' 'and summary judgment must be granted. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 569 (1986)(*quoting First Nat'l Bank of Arizona v. Cities Serv. Co.,* 391 U.S. 253, 289, 88 S.Ct. 1575, 1592, 20 L.Ed.2d 569 (1968)).

In deciding a motion for summary judgment, the court must "view the evidence in the light most favorable to the party against whom summary judgment is sought and ... draw all permissible inferences in favor of that party." *Fischl v. Armitage,* 128 F.3d 50, 55 (2d Cir.1997). The Court must accept as true the non-moving party's evidence, if supported by affidavits or other evidentiary material. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 254, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). Thus, "[t]he court's function is not to resolve disputed issues of fact but only to determine whether there is a genuine issue of material fact to be tried." *Fischl,* 128 F.3d at 55. Accord *Anderson,* 477 U.S. at 247-49, 106 S.Ct. at 2510. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510. "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Id.,* 477 U.S. at 249-50, 106 S.Ct. at 2511. *Accord Cities Serv. Co.,* 391 U.S. at 290, 88 S.Ct. at 1593; *Dombrowski v. Eastland,* 387 U.S. 82, 87 S.Ct. 1425, 18 L.Ed.2d 577 (1967).

Case 9:16-cv-00717-TJM-TWD    Document 35    Filed 11/28/17    Page 299 of 310
Rodriguez v. Mercado, Not Reported in F.Supp.2d (2002)

2002 WL 1997885

**\*5** Although the same summary judgment rules apply to a party proceeding pro se, special latitude is appropriate to ensure that a meritorious claim is not foreclosed simply because the papers submitted in opposition to the motion are inartfully worded. *See Morris v. Citibank, N.A.,* No. 97 Civ. 2127, 1998 WL 386175, at \*2 (S.D.N.Y. July 8, 1998)(Koeltl, J.). *See also Estelle v. Gamble,* 429 U.S. 97, 106, 97 S.Ct. 285, 292, 50 L.Ed.2d 251 (1976)(pro se complaint should be held to less stringent standard than formal pleadings drafted by counsel); *McPherson v. Coombe,* 174 F.3d 276, 280 (2d Cir.1999)(pleadings should be read liberally and interpreted to "raise the strongest arguments they suggest")(quoting *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994)). By the same token, however, "a *pro se* party's 'bald assertion,' completely unsupported by evidence, is not sufficient to overcome a motion for summary judgment." *Odom v. Keane,* No. 95 Civ. 9941, 1997 WL 576088, at \*3 (S.D.N.Y. Sept.17, 1997)(Sotomayor, J.)(quoting *Carey v. Crescenzi,* 923 F.2d 18, 21 (2d Cir.1991)). *Accord Jorgensen v. Careers BMG Music Publ'g,* No. 01 Civ. 0357, 2002 WL 1492123, at \*3 (S.D.N.Y. July 11, 2002) (Preska, J.).

#### B. *Section 1983*

Section 1983 provides a procedure for persons alleging a constitutional deprivation to bring a claim, but itself creates no substantive rights. *Sykes v. James,* 13 F.3d 515, 519 (2d Cir.1993). Accordingly, to state a claim under Section 1983, a plaintiff must allege that a defendant acting under color of state law has deprived him of a right, privilege, or immunity guaranteed by the United States Constitution. 42 U.S.C. § 1983; *Barnes v. City of New York,* No. 96 CV 2702, 1998 WL 19485, at \*4 (E.D.N.Y. Jan.20, 1998) (Johnson, J.). Here, there does not seem to be any dispute that each of the Defendants was an employee of the New York City Department of Correction acting under color of state law. The remaining question is whether Damar can establish a violation of any of his constitutional rights.

#### C. *Fourth Amendment Claim*

In his complaint, Damar alleges that the Defendants violated his Fourth Amendment rights in several respects. The Fourth Amendment generally protects against unreasonable searches and seizures, prohibiting unjustifiable government intrusion into areas in which a person has a legitimate expectation of privacy. *See Katz v. United States,* 389 U.S. 347, 361, 88 S.Ct. 507, 516, 19 L.Ed.2d 576 (1967)(Harlan, J. concurring); *Gudema v. Nassau County,* 163 F.3d 717, 722 (2d Cir.1998). However, the protection that the Fourth Amendment affords a sentenced prisoner, such as Damar, is limited. For example, the Supreme Court has held that random "shakedown" searches of prison cells do not violate the Fourth Amendment because a prisoner has no legitimate expectation of privacy in his prison cell. *Hudson v. Palmer,* 468 U.S. 517, 525-26, 104 S.Ct. 3194, 3200, 82 L.Ed.2d 393 (1984). Citing *Palmer,* the Second Circuit has recently has upheld the warrantless search of a convict's cell for evidence of a prior crime. *Willis v. Artuz,* --- F.3d ----, No. 00-176, 2002 WL 1968013 (2d Cir. Aug.26, 2002). Indeed, even regulations authorizing random visual body cavity searches of prisoners have been held to serve legitimate penological interests and, therefore, not to violate the Fourth Amendment. *See Covino v. Patrissi,* 967 F.2d 73, 79-80 (2d Cir.1992). *See also Bell v. Wolfish,* 441 U.S. 520, 558, 99 S.Ct. 1861, 1864, 60 L.Ed.2d 447 (1979)(rejecting Fourth Amendment challenge to visual body cavity searches of inmates and pretrial detainees after contact visits with outsiders).

**\*6** The first search conducted on April 26th occurred in Damar's housing block. As part of that procedure, Damar was asked by Officer Correa to remove his clothing so that Correa could perform a visual inspection for contraband. (Dep. at 32-34). This inspection was apparently conducted largely while Correa remained outside the cell. [7] (*Id.* at 34-36). After it was complete, Damar dressed himself and, at Correa's direction, waited outside his cell so that Correa could search it. (*Id.* at 36-37). There is no basis to conclude, nor does Damar allege, that this type of routine search violated Damar's Fourth Amendment rights in any manner.

[7]    There is some suggestion that Officer Correa may also have searched Damar's hair while they both were inside the cell. (*See* Dep. at 34-35).

After the initial activity in his housing block, Damar was subjected to a second strip search in the intake area of the jail. Unlike random visual body cavity searches, non-random searches-even in prisons-are not presumed to be reasonable. Rather, a court considering the constitutionality of such a search must engage in a balancing test, weighing "the need for the particular search against the invasion of personal rights that the search entails." *Wolfish,* 441 U.S. at 559, 99 S.Ct. at 1884. In the prison context, given the great concern for the

security of the facility, the inmates, and prison personnel, courts accord great deference to prison officials' decisions to conduct a search. *Block v. Rutherford,* 468 U.S. 576, 591, 104 S.Ct. 3227, 3235, 82 L.Ed.2d 438 (1984)("We reaffirm that 'proper deference to the informed discretion of prison authorities demands that they, and not the courts, make the difficult judgments which reconcile conflicting claims affecting the security of the institution, the welfare of the prison staff, and the property rights of the detainees.' ")(quoting *Wolfish,* 441 U.S. at 557 n. 38, 99 S.Ct. at 1885 n. 38).

**[1]** **[2]**    In this case, there is a sharp dispute as to whether the decision to remove Damar to the intake area for a second search was justified. Damar contends that he advised Captain Pla that he had removed his kufi moments earlier and had been subjected to a thorough search of his person. Captain Pla, on the other hand, gives no indication in his report that he was aware of such a prior search, noting only that Damar had refused his request to remove his kufi so that his head could be searched. If Captain Pla did not know of a prior search of Damar's head, his request for removal of the kufi was reasonable under the circumstances and cannot give rise to a Fourth Amendment violation. On the other hand, if Captain Pla knew that the search had taken place, his insistence on a second search would be more troublesome. On the present state of the record, it is impossible to determine what actually transpired and, hence, not possible to grant summary judgment to either side with respect to the legality of the search that Captain Pla sought to conduct outside Damar's cell.

For the same reason, it is impossible to determine at this juncture whether the decision to remove Damar from his housing block to the intake area was reasonable. If it was, ordering a second search of Damar's person may have been reasonable. If, on the other hand, the strip search in the intake area was intended simply as a form of retribution or humiliation, Damar may have a viable Fourth Amendment claim.

**\*7**    In sum, to the extent that Damar challenges the initial search of his cell, the Defendants are entitled to summary judgment. With respect to both the alleged second request that Damar remove his kufi and the strip search of Damar in the intake area, neither side is entitled to summary judgment because there is a dispute as to the material facts.

D. *Eighth Amendment Claims*

The Eighth Amendment protects prison inmates from the infliction of cruel and unusual punishments that "involve the unnecessary and wanton infliction of pain." *Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994)(quoting *Gregg v. Georgia,* 428 U.S. 153, 173, 96 S.Ct. 2909, 2925, 49 L.Ed.2d 859 (1976)). Accordingly, the Eighth Amendment is applicable both to medical care provided by prison officials to inmates, *see Hathaway,* 37 F.3d at 66 (citing *Estelle,* 429 U.S. at 103, 97 S.Ct. 285 at 290, 50 L.Ed.2d 251), and the use of excessive force by prison guards, *see Hudson v. McMillian,* 503 U.S. 1, 9, 112 S.Ct. 995, 1000, 117 L.Ed.2d 156 (1991).

1. *Medical Care*

To prevail on an Eighth Amendment claim alleging a failure to provide sufficient medical attention, an inmate must show that his treatment (or lack thereof) was so defective as to constitute cruel and unusual punishment. This threshold is not met simply by showing that one or more defendants were negligent in diagnosing or treating a medical condition. *Estelle,* 429 U.S. at 103, 105-06, 97 S.Ct. at 291-92. Rather, the inmate must establish "deliberate indifference to [his] *serious* medical needs." *Id.,* 429 U.S. at 104, 97 S.Ct. at 291 (emphasis added).

The deliberate indifference standard incorporates both an objective and subjective test. First, an inmate must show that the alleged deprivation was, in objective terms, "sufficiently serious." *Hathaway,* 37 F.3d at 66 (quoting *Wilson v. Seiter,* 501 U.S. 294, 298, 111 S.Ct. 2321, 2324, 115 L.Ed.2d 271 (1991)). Second, the inmate must establish that the defendant acted with a "sufficiently culpable state of mind." *Hathaway,* 37 F.3d at 66.

a. *Serious Injury*

The Second Circuit, in *Chance v. Armstrong,* 143 F.3d 698 (2d Cir.1998), enumerated several factors that courts may consider to determine whether a prisoner's medical condition is sufficiently serious to give rise to a potential Eighth Amendment violation: "the existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain." *Id.* at 702 (quoting *McGuckin v. Smith,* 974 F.2d 1050, 1059-60 (9th Cir.1992), *overruled on other grounds by*

*WMX Techs., Inc. v. Miller,* 104 F.3d 1133 (9th Cir.1997)). "It is well established that more than minor discomfort or injury is required in order for a plaintiff to demonstrate a serious medical need." *Evering v. Rielly,* No. 98 Civ. 6718, 2001 WL 1150318, at *9 (S.D.N.Y. Sept.28, 2001)(Batts, J.). The standard contemplates "a condition of urgency, one that may produce death, degeneration, or extreme pain." *Hathaway,* 37 F.3d at 66 (quoting *Nance v. Kelly,* 912 F.2d 605, 607 (2d Cir.1990)(Pratt, J., dissenting)).

**\*8** **[3]** Judged by this standard, Damar has not demonstrated that any of the injuries he allegedly received during the April 26th incident were "sufficiently serious." Despite the suggestion that he was kneed in the back and had his head struck against the wall, Damar claims to have sustained only bruises to his head, back, and wrists. (Dep. at 82). Moreover, the doctor who examined Damar the day after the incident observed no bruises on Damar's body, and noted that Damar had not loss consciousness and was alert and responsive during the examination. (Nelson Decl. Ex. E at 336). In addition, Damar has not adduced any evidence to suggest that any of his injuries after the April 26th incident were so urgent or life-threatening that they required immediate care. Courts in this circuit often have found no serious medical need in cases in which the injury complained of was similar to-or even more serious than-the injuries alleged by Damar. *See, e.g., Sonds v. St. Barnabas Hosp. Corr. Health Servs.,* 151 F.Supp.2d 303, 311 (S.D.N.Y.2001)(McMahon, J.) (bleeding finger not a severe injury); *Henderson v. Doe,* No. 98 Civ. 5011, 1999 WL 378333, at *2 (S.D.N.Y. June 10, 1999)(Pauley, J.) (broken finger not a severe injury)(quoting *Rivera v. Johnson,* No. 95 Civ. 0845, 1996 WL 549336, at *2 (W.D.N.Y. Sept.20, 1996)(Elfvin, J.)); *Veloz v. New York,* 35 F.Supp.2d 305, 312 (S.D.N.Y.1999)(Sweet, J.)(pain from foot fracture, bone cyst, and degenerative arthritis not sufficiently serious). *But see Linden v. Westchester County,* No. 93 Civ. 8373, 1995 WL 686742, at *3 (S.D.N.Y. Nov.20, 1995)(Mukasey, J.)(prisoner who was beaten and sustained "cuts, bruises, and pain" alleged a serious medical need).[8]

[8]   Damar complains that he suffers from back pain and migraines as a result of the incident. (Compl. at 4; Dep. at 19-21, 84-85). However, he has not produced any evidence demonstrating that these problems are causally related to the alleged assault or that they significantly interfere with his everyday life. In fact,

he admits that he has always had a "weak back" and that he suffered from back pain prior to the April 26th incident. (Dep. at 85).

**b.** *Deliberate Indifference*

**[4]** Even if Damar had demonstrated injuries severe enough to rise to the level of a serious medical need, he still has not shown that any of the medical professionals at the Bronx House of Detention were deliberately indifferent to that need.

To satisfy the subjective element of the deliberate indifference standard, an inmate must demonstrate that the prison official's conduct was more than negligent, but he need not show that it was "undertaken for the very purpose of causing harm." *Hathaway,* 37 F.3d at 66. Rather, it must be established that the prison official "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* (quoting *Farmer v. Brennan,* 511 U.S. 825, 837, 114 S.Ct. 1970, 1979, 128 L.Ed.2d 811 (1994)). Stated somewhat differently, "the plaintiff must demonstrate that the defendant actually wish[ed] him harm or at least [was] totally unconcerned with his welfare." *LaBounty v. Gomez,* No. 94 Civ. 3360, 1997 WL 104959, at *5 (S.D.N.Y. Mar.10, 1997)(Cote, J.) (quoting *Hathaway,* 37 F.3d at 69)(internal quotations and citations omitted); *Duane v. Lane,* 959 F.2d 673, 677 (7th Cir.1992)(same).

**\*9** A delay in treatment does not automatically indicate a violation of a prisoner's Eighth Amendment rights, "unless the delay reflects deliberate indifference to a serious risk of health or safety, to a life-threatening or fast-degenerating condition or to some other condition of extreme pain that might be alleviated through reasonably prompt treatment." *Amaker v. Coombe,* No. 96 Civ. 1622, 2002 WL 523388, at *8 (S.D.N.Y. Mar. 29, 2002)(Koelti, J.). *Accord Espinal v. Coughlin,* No. 98 Civ. 2579, 2002 WL 10450, at *3 (S.D.N.Y. Jan.3, 2002)(Patterson, J.)(quoting *Demata v. N.Y.S. Corr. Dep't of Health Servs.,* 198 F.3d 233, 1999 WL 753142, at *2 (2d Cir. Sept.17, 1999)). Indeed, given the triage system utilized by most emergency medical treatment facilities, anyone seeking care for a non-life-threatening injury generally experiences some delay in receiving treatment. *See Sonds,* 151 F.Supp.2d at 312 ("patients are frequently faced with delays in receiving medical care, particularly when, [as in this case], their

2002 WL 1997885

medical condition is not grave") (quoting *Davidson v. Harris,* 960 F.Supp. 644, 648 (W.D.N.Y.1997))(internal quotations omitted).

Damar has not alleged that his injuries were "life-threatening" or "fast-degenerating," or that he was experiencing extreme pain that more rapid treatment would have alleviated. Also, by his own admission, Damar was seen within eight or nine hours of the incident by a nurse who prescribed him Tylenol. (Dep. at 73-74). The nurse also put Damar on sick call for the following day, when he was seen by a physician who prescribed additional medication. In these circumstances, any delay in treatment that Damar may have experienced upon his return to the housing area was, at most, mere negligence, which is not sufficient to state an Eighth Amendment claim. *See Estelle,* 429 U.S. at 105-06, 97 S.Ct. at 291-92; *Linden,* 1995 WL 686742, at *3 (prisoner who was denied a visit to infirmary for eight hours did not state an Eighth Amendment claim).

In sum, to the extent that Damar contends that the treatment actually provided by the prison medical facility was inadequate, his complaint amounts to nothing more than a challenge to the judgment of the medical professionals concerned, which is not enough to implicate the Eighth Amendment's proscription against cruel and unusual punishment. *See Estelle,* 429 U.S. at 106-07, 97 S.Ct. at 292 ("a complaint that a physician has been negligent in ... treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment"); *Arroyo v. Schaeffer,* 542 F.2d 47, 49-50 (2d Cir.1977)("Medical malpractice does not become a constitutional violation merely because the victim is a prisoner."); *Espinal v. Goord,* No. 00 Civ. 2242, 2001 WL 476070, at *9 (S.D.N.Y. May 7, 2001)(Peck, Mag. J.)(citing *Estelle,* 429 U.S. at 106, 97 S.Ct. at 292); *Troy v. Kuhlmann,* No. 96 Civ. 7190, 1999 WL 825622, at *6 (S.D.N.Y. Oct.15, 1999)(Jones, J.)("prisoner's disagreement with ... forms of treatment employed by medical personnel does not itself give rise to an Eighth Amendment claim").

**\*10** Damar's papers can also be read to allege that Officer Rodriguez displayed a lack of concern for Damar's welfare when Damar asked Officer Rodriguez to secure medical attention for him while he was in the intake area. Inasmuch as Officer Rodriguez allegedly was present when Damar was assaulted in the elevator

and intake area, a reasonable finder of fact could conclude that Officer Rodriguez was "totally unconcerned with [Damar's] welfare," *LaBounty,* 1997 WL 104959, at *5 (citing *Hathaway,* 37 F.3d at 69), and therefore exhibited a state of mind which might potentially expose him to liability for deliberate indifference to Damar's medical needs. Nonetheless, because Damar's alleged injuries were not sufficiently serious to meet the objective component of such a claim, Officer Rodriguez is entitled to summary judgment to the extent that Damar seeks to recover damages under the Eighth Amendment for alleged indifference to his medical needs. As set forth below, however, Officer Rodriguez fares less well insofar as Damar alleges that Officer Rodriguez also violated the Eighth Amendment through the use of excessive force after Damar was removed from the housing area.

*2. Excessive Force*

To establish an excessive force claim under the Eighth Amendment, a prisoner again must satisfy both an objective and a subjective component. *McMillian,* 503 U.S. at 8-9, 112 S.Ct. at 999-1000; *Griffen v. Crippen,* 193 F.3d 89, 91 (2d Cir.1999). The objective component typically requires a prisoner to demonstrate that he endured an injury "sufficiently serious to warrant Eighth Amendment protection." *Evering,* 2001 WL 1150318, at *6 (citing *Wilson,* 501 U.S. at 298, 111 S.Ct. at 2324). However, a prisoner who has not sustained a significant injury may nevertheless prevail on an excessive force claim if he is able to show that "prison officials maliciously and sadistically use[d] force to cause harm." *McMillian,* 503 U.S. at 9, 112 S.Ct. at 1000.

To satisfy the subjective component of an excessive force claim, a prisoner must show that the defendants "had a 'wanton' state of mind when they were engaging in the alleged misconduct." *Davidson v. Flynn,* 32 F.3d 27, 30 (2d Cir.1994). This must be judged in light of the circumstances facing the prison officials at the time of the incident. *See McMillian,* 503 U.S. at 6, 112 S.Ct. at 998 ("the question whether the measure taken inflicted unnecessary and wanton pain and suffering ultimately turns on whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm") (quoting *Whitley v. Albers,* 475 U.S. 312, 320-21, 106 S.Ct. 1078, 1085, 89 L.Ed.2d 251 (1986)(internal quotations omitted)); *Blyden v. Mancusi,* 186 F.3d 252, 262-63 (2d Cir.1999)(quoting *McMillian,* 503 U.S. at 7, 112 S.Ct.

Case 9:16-cv-00717-TJM-TWD    Document 35    Filed 11/28/17    Page 303 of 310
Rodriguez v. Mercado, Not Reported in F.Supp.2d (2002)

2002 WL 1997885

at 999); *Byas v. New York,* No. 99 Civ. 1673, 2001 WL 1579552, at *4 (S.D.N.Y. Dec.11, 2001)(Buchwald, J.) ("Because on summary judgment we are required to take all facts in plaintiff's supporting documentation to be true, we must deny defendants' summary judgment on [the] excessive force count.").

**\*11**  **[5]**  As noted previously, Damar has not adduced any evidence demonstrating that his alleged injuries were serious. Nevertheless, issues of fact clearly remain as to the degree of force that was used against him in the elevator and intake area and whether that use of force was justified. Damar alleges that he was removed from his housing area without justification, (Dep. at 72), and thereafter was assaulted in the elevator and in the intake area while handcuffed. (Compl. at 3-4; Dep. at 53-55, 57-59, 60-63, 82). The Defendants dispute these allegations, contending that Damar disobeyed a proper order to remove his hat and that they did not use any unnecessary force. (*See* Nelson Decl. Ex. D at 324-35, 342, 355). Because this disagreement cannot be resolved prior to trial, neither the Defendants nor Damar are entitled to summary judgment with respect to the Eighth Amendment excessive use of force claim.

### E. *Personal Involvement*
Defendants Kerik, Mercado, and Correa contend that they are entitled to summary judgment because they were not personally involved in any alleged unlawful conduct. (Def.'s Mem. at 12).

"In this Circuit ... personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Johnson v. Newburgh Enlarged Sch. Dist.,* 239 F.3d 246, 254 (2d Cir.2001) (quoting *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995)). *Accord Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994). The doctrine of respondeat superior does not suffice to establish liability. *Monell v. Dep't of Soc. Servs.,* 436 U.S. 658, 692-94, 98 S.Ct. 2018, 2036-37, 56 L.Ed.2d 611 (1978); *Blyden,* 186 F.3d at 264; *Johnson v. Glick,* 481 F.2d 1028, 1034 (2d Cir.1973). Rather, to recover damages from a supervisor based upon an alleged constitutional violation, a plaintiff must show that the supervisor (1) directly participated in the violation, (2) learned of it through a report or appeal but failed to take action, (3) created or maintained the policy or custom which gave rise to it, or (4) was grossly negligent in the

supervision of subordinates who caused the violation to occur. *See Newburgh Enlarged Sch. Dist.,* 239 F.3d at 254.

**[6]**  In this case, Damar has not shown-nor, obviously, is there any reason to believe-that Defendants Kerik and Mercado personally participated in Damar's removal from the housing area, or that they were present in the elevator or intake area during the alleged incident. Damar also has adduced no evidence to suggest that these Defendants were in any way personally involved in providing medical treatment to him. Finally, he has not shown that they promulgated any unlawful policy or were grossly negligent in the supervision of the officers who engaged in the alleged unlawful activity.

Damar does contend that on the day after the alleged incident he spoke to Mercado who promised to conduct an investigation. If so, Mercado plainly was aware of Damar's allegations. (*See* Compl. Ex. 3 (letter dated May 11, 2000, from Damar to Department of Correction Appeals Attorney,) at 3-4; Pl.'s Mem. at 1). Although Damar contends that Mercado thereafter failed to take any action, the Defendants have proooduced records which establish that the Investigation Division of the Department of Correction did conduct an extensive review of the incident. (*See generally* Nelson Decl. Ex. D). In light of that investigation, Damar plainly cannot demonstrate that Mercado failed to take appropriate action upon the discovery of the incident. *Cf. Sealey v. Giltner,* 116 F.3d 47, 51 (2d Cir.1997)(warden who referred letter to subordinate not personally involved); *Woods v. Goord,* No. 01 Civ. 3255, 2002 WL 731691, at *7 (S.D.N.Y. Apr.23, 2002)(Scheindlin, J.)(warden who referred inmate's complaint of medical mistreatment to lower-level supervisors not personally involved); *Woods v. Goord,* No. 97 Civ. 5143, 1998 WL 740782, at *6 (S.D.N.Y. Oct.23, 1998)(Sweet, J.)(receipt of letter or complaint from inmate does not render a defendant personally liable).

**\*12**  In sum, because Damar has failed to show any personal involvement on the part of Defendants Kerik and Mercado which could give rise to liability under Section 1983, they are entitled to summary judgment dismissing the complaint as against them.

Damar has also failed to show any personal involvement on the part of Defendant Correa in any unlawful activity. Although Correa was involved in the initial shakedown

search, Damar has not suggested that any aspect of this routine procedure violated the Fourth Amendment. Moreover, Damar has admitted that he is uncertain whether Correa was involved in his removal from the housing area, accompanied Damar in the elevator, or was present when Damar was allegedly beaten and strip-searched again in the intake area. (Dep. at 56, 61). Damar also has failed to provide any independent evidence to suggest that Correa was involved at any of these stages. In the absence of any proof that Correa engaged in any constitutionally-prohibited conduct, the complaint must also be dismissed as against him.

### F. *Qualified Immunity*

Defendants Pla, Correa, and Rodriguez claim that they are entitled to qualified immunity as to Damar's excessive force and medical treatment claims. (Def.'s Mem. at 16). "Qualified immunity is an entitlement not to stand trial or face the other burdens of litigation." *Caldarola v. Calabrese,* ---F.3d ----, No. 01-9053, 298 F.3d 156, 2002 WL 1759778, at *3 (2d Cir. July 31, 2002)(quoting *Saucier v. Katz,* 533 U.S. 194, 200, 121 S.Ct. 2151, 2156, 150 L.Ed.2d 272 (2001))(internal quotations omitted). The doctrine of qualified immunity "shields public officials from liability for civil damages if their actions were objectively reasonable, as evaluated in the context of legal rules that were 'clearly established' at the time." *Poe v. Leonard,* 282 F.3d 123, 132 (2d Cir.2002). *Accord African Trade & Info. Ctr., Inc. v. Abromaitis,* 294 F.3d 355, 359 (2d Cir.2002)(quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982)).

In evaluating a motion for summary judgment based on qualified immunity, a court must engage in a two-part analysis. As a threshold matter, the court must determine whether the facts taken in the light most favorable to the plaintiff indicate that the defendants' conduct violated a constitutional right. *Saucier,* 533 U.S. at 201, 121 S.Ct. at 2156. If the court determines that a violation occurred, it must consider whether the right in question was clearly established at the time of the violation. This requires that "[t]he contours of the right ... be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Id.,* 533 U.S. at 202, 121 S.Ct. at 2156.

As Justice Ginsberg noted in her *Saucier* concurrence, when a defendant seeks qualified immunity in response to an excessive force claim, the determination of both the substantive claim and the qualified immunity issue requires consideration of whether, in light of the particular circumstances, "a reasonable officer, identically situated, [would] have believed the force employed was lawful." *Id.,* 533 U.S. at 210, 121 S.Ct. at 2161 (Ginsberg, J., concurring). Although summary judgment as to this issue need not always be denied when the facts giving rise to an excessive force claim are disputed, *id., 533 U.S. at 202, 121 S.Ct. at 2156,* as Justice Ginsberg cautioned, if the claim "turns on which of two conflicting stories best captures what happened," the defendant is not entitled to summary judgment on qualified immunity grounds. *Id ., 533 U.S. at 216, 121 S.Ct. at 2164* (Ginsberg, J., concurring).

**\*13** **[7]** Turning first to Officer Correa, Damar could only be certain that Officer Correa was present during a routine inspection of Damar's person and cell. Moreover, there is no independent evidence which would suggest that Officer Correa was involved in any of the later misconduct alleged by Damar. Consequently, because there has been no showing that Officer Correa committed any constitutional violation, he is plainly entitled to qualified immunity.

**[8]** Officer Rodriguez and Captain Pla are both alleged to have engaged in an unreasonable second search of Damar and to have used excessive force against him. With respect to these claims, the Defendants and Damar tell wholly contradictory stories. For example, although Damar alleges that he was beaten without provocation in the elevator, the Defendants deny that any unnecessary force was used. A similar dispute exists with regard to the Defendants' actions in the intake area. Accordingly, because there are factual issues which must be resolved in order to determine whether similarly-situated officials would have understood that their actions violated Damar's constitutional rights, neither Captain Pla nor Officer Rodriguez is entitled to summary judgment on qualified immunity grounds.

### G. *Failure to Serve "John Doe" Defendants*

Damar's complaint was received by the Pro Se Office on September 22, 1990. Thereafter, it was filed with the Clerk of the Court on November 9, 2000. Pursuant to Fed R. Civ. P. 4(m), service of the summons and complaint on the Defendants had to be completed within 120 days after the complaint was filed. Since considerably more than 120 days have passed without any attempt to serve additional defendants, the complaint should also be dismissed as

2002 WL 1997885

against the "John Doe" defendants, none of whom has been identified.

#### IV. *Conclusion*

For the reasons set forth above, the Defendants' motion for summary judgment should be granted except insofar as Damar claims that Defendants Rodriguez, and Pla violated his Fourth Amendment rights and used excessive force against him in violation of the Eighth Amendment. Additionally, Damar's cross-motion for summary judgment should be denied in its entirety.

#### V. Notice of Procedure for Filing of *Objections to this Report and Recommendation*

The parties are hereby directed that if they have objections to this Report and Recommendation, they must, within ten days from today, make them in writing, file them with the Clerk of the Court, and send copies to the chambers of the Honorable Jed S. Rakoff and to the chambers of the undersigned, at the Daniel Patrick Moynihan United States Courthouse, 500 Pearl Street, New York, New York 10007, and to any opposing parties. *See* 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(e), 72(b). Any requests for an extension of time for filing objections must be directed to Judge Rakoff. The failure to file timely objections will result in a waiver of those objections for purposes of appeal. *See Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *Frank v. Johnson,* 968 F.2d 298, 300 (2d Cir.1992); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(e), 72(b).

**All Citations**

Not Reported in F.Supp.2d, 2002 WL 1997885

---

**End of Document**                    © 2017 Thomson Reuters. No claim to original U.S. Government Works.

2001 WL 262665
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

William HYMAN, Plaintiff,
v.
C. HOLDER, et al., Defendants.

No. 96 Civ. 7748(RCC).
|
March 15, 2001.

Opinion and Order

CASEY, J.

 **\*1**  Plaintiff William Hyman ("Hyman"), an inmate
at the Sing–Sing Correctional Facility, brings this
action against Correction Officer Christopher Holder,
Correction Officer J. McCarthy, Lieutenant Robert
Patterson, Lieutenant Thomas Lucas, First Deputy
Superintendent Charles Greiner and Superintendent
John P. Keane (collectively, "defendants"), alleging that
defendants conspired to violate his civil rights by filing
a false inmate misbehavior report against him and by failing
to conduct an adequate hearing before imposing certain
disciplinary sanctions. Defendants now seek summary
judgment on the grounds that no genuine issue of material
fact is in dispute and that defendants are entitled to
judgment in their favor as a matter of law. For the reasons
set forth below, defendants' motion is granted.

I. BACKGROUND

On December 9, 1995, Hyman heard the sounds of
a disturbance coming from the Southgate section of
the Sing–Sing Correctional Facility. Hyman proceeded
to that area where certain officers were engaged in a
confrontation with a prisoner, inmate Delacruz. Roughly
40 other prisoners were in the vicinity and had begun
shouting at the officers.

Hyman observed Officer Holder force inmate Delacruz
to the ground. According to Hyman, Delacruz began
thrashing on the floor in what Hyman assumed was an
epileptic seizure. A principal dispute between the parties
concerns Hyman's response to Officer Holder's actions.
Hyman claims that he then raised his voice in order to
alert the officers of his concern for Delacruz's presumed
medical condition. In contrast, defendants contend that
Hyman shouted obscenities and other loud and boisterous
remarks, inciting other inmates to do the same.

The officers transported Delacruz to the Emergency
Room. After Delacruz was removed, the prisoners moved
on to their assigned activities. Hyman continued to follow
his daily routine until the next morning, when Hyman
was advised that he was in keeplock status and would
be fed in his cell. That afternoon, Hyman received an
inmate misbehavior report prepared by Officers Holder
and McCarthy, which charged him with violations of
Institutional Rules 104.10 (Rioting), 104.13 (Creating a
Disturbance) and 102.10 (Threats). The reviewing officer,
Lieutenant Patterson, designated the subsequent hearing
as "Tier III," the most serious in the New York prison
system.

Hyman met with his assigned assistant, Ms. Ibrahim,
on December 11, 1995, in order to prepare his defense.
Hyman again met with Ms. Ibrahim on the day of the
hearing, December 15, 1995. During the proceeding before
Lieutenant Lucas, Hyman pled guilty to the charge of
creating a disturbance. Hyman withdrew his request to
call witnesses and did not proffer any witness testimony.
Hyman was found guilty of rioting and threats and was
sentenced to 270 days in keeplock, loss of 9 months good-
time credits and loss of phone, commissary and package
privileges.

Hyman wrote to Superintendent Keane by letter dated
December 22, 1995, to request a discretionary review
of the disciplinary hearing. The letter was forwarded to
First Deputy Superintendent Greiner, who affirmed the
underlying determination on January 8, 1996. Hyman
appealed defendant Greiner's decision to the Director of
Special Housing Donald Selsky. Selsky reduced Hyman's
loss of good-time credits to 6 months and the keeplock
sentence to 150 days, and dismissed the charge of rioting.

 **\*2**  Hyman brings the instant suit pursuant to 42
U.S.C. §§ 1983, 1985(3), 1986 and 1988 on the basis
that defendants conspired to violate his civil rights by
filing a false inmate misbehavior report and conducting
a procedurally improper hearing.[1] In addition, Hyman
alleges that his equal protection rights were violated

because he alone was singled out for discipline and that his confinement to segregated housing was contrary to the Eight Amendment. Finally, Hyman contends that defendants violated a number of prison regulations and directives.

<sub>1</sub>    The Complaint also refers to 18 U.S.C. §§ 241–42. However, those criminal statutes do not provide a private right of action. *See Robinson v. Overseas Military Sales Corp.,* 21 F.3d 502, 511 (2d Cir.1994).

Defendants make the following arguments in support of summary judgment: (1) Hyman's due process claims are barred under *Edwards v. Balisok,* 520 U.S. 641 (1997); (2) the allegations as to the inmate misbehavior report fail to state a constitutional claim because the Tier III hearing comported with due process; (3) Hyman has not established a viable equal protection violation on the basis of selective enforcement; (4) there is no evidence of conspiracy; (5) the Eighth Amendment claim is not cognizable; (6) the Court lacks jurisdiction over any allegations of state law violations; (7) defendant Keane was not personally involved with any alleged constitutional deprivations; and (8) defendants are entitled to qualified immunity. These arguments are addressed below.

## II. DISCUSSION

Summary judgment is appropriate only where no genuine issues of material fact remain for trial, and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247 (1986). The moving party bears the initial burden of proof on such a motion. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). Facts, and all inferences therefrom, must be viewed in a light most favorable to the non-movant. *Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986); *American Cas. Co. v. Nordic Leasing, Inc.,* 42 F.3d 725, 728 (2d Cir.1994). If the moving party meets its burden, then the non-movant must set forth specific facts showing that there is a genuine issue for trial. *Anderson,* 477 U.S. at 250. Mere "metaphysical doubt" is inadequate; sufficient evidence must exist upon which a reasonable jury could return a verdict for the non-movant. *Matsushita,* 475 U.S. at 587. A grant of summary judgment is appropriate when no rational jury could find in favor of the non-moving party because there is no genuine issue of material fact based on

the evidence in the record or the substantive law. *Gallo v. Prudential Residential Services, Ltd.,* 22 F.3d 1219, 1224 (2d Cir.1994).

### A. *Edwards v. Balisok*

Defendants first argue that Hyman's due process claims are not cognizable under § 1983 because the sanctions imposed on Hyman include the loss of good-time credits. *See Edwards v. Balisok,* 520 U.S. 641 (1997). In *Edwards,* which involved similar penalties to those here, the petitioner alleged that his prison disciplinary hearing, which led to the revocation of his good-time credits as well as a term of segregated confinement, violated his Fourteenth Amendment rights. Although the petitioner did not request restoration of the credits and framed his case solely as a challenge to the prison's procedures, the Supreme Court nevertheless determined that the § 1983 suit was barred. The Court held that the petitioner's case implicitly presented a challenge to the length of his sentence, and as such was not cognizable until the prison's determination was overturned administratively or judicially by the state courts, or through federal habeas review. *See also Heck v. Humphrey,* 512 U.S. 477 (1994); *Preiser v. Rodriguez,* 411 U.S. 475 (1973).

**\*3** Hyman argues that *Edwards* is inapplicable and that his suit should be allowed to proceed because his loss of good-time credits does not in and of itself affect his term of imprisonment. Although Hyman does not cite any case law, Hyman appears to rely on *Jenkins v. Haubert,* 179 F.3d 19, 27 (2d Cir.1999), in which the Second Circuit held that *Edwards* does not bar suits that do not affect the overall length of confinement. Hyman argues that the length of his confinement is not affected by the prison sanctions because under New York regulations the hearing disposition is merely tentative until a final decision is made by the Time Allowance Committee. *See* 7 N.Y.C.C.R. § 260.4. Hyman notes that the Committee may restore all or part of the lost allowance. *See* 7 N .Y.C.C.R. § 261.3. However, the possibility that the credits may be restored does not alter the Superintendent's decision. As another court in this District noted in rejecting the same argument:

> None of the cases evaluating § 1983 claims attacking a disciplinary decision involving a loss of good-time credits suggests that the fact or length of confinement is not

implicated unless the inmate has already been considered for parole or conditional release. If Plaintiff were correct, if the deprivation of good-time does not implicate the fact or length of a prisoner's confinement unless and until the time allowance committee actually implements the superintendent's decision, a prisoner could not attack the deprivation in a state court CPLR article 78 proceeding or via habeas, which the law clearly allows him to do.... Although the prisoner has available to him ways by which he may recoup time lost, potentially cancelling out the effect of part or all of the deprivation, whether he will earn all of the lost time back is what is speculative. Unless and until he does, the deprivation of good-time most certainly does affect the length of the prisoner's sentence.

*Gomez v. Kaplan,* No. 94 Civ. 3292, 2000 WL 1458804, at *7 n. 7 (S.D.N.Y. Sept. 29, 2000). Therefore, because any ruling by this Court in Hyman's favor on his procedural claims would invalidate his sentence under *Edwards,* Hyman's due process claims are not cognizable until the prison's determination is overturned through administrative channels or through habeas corpus review. [2]

[2]    Hyman also appears to suggest that the length of his confinement was unaffected because he was held past his earliest release date of May 19, 1999. However, Hyman does not indicate whether the Parole Board thereby affirmed the loss of the good-time credits or whether the issue of good-time credits may be reviewed again in the future with respect to another release date. In either event, Hyman's loss of good time credits affects the overall length of his confinement.

B. *Due Process*

Even if *Edwards* was not dispositive, Hyman's due process claims nonetheless must be dismissed as a matter of law. First, as a preliminary matter, Hyman's allegation that defendants conspired to file a false inmate misbehavior report does not in and of itself state a constitutional claim. The Constitution requires only that prison officials conduct a proper hearing before sanctioning an inmate based upon such a report. *See Greaves v. State of New York,* 958 F.Supp. 142, 144 (S.D.N.Y.1997) ("In other words, the failure to conduct an adequate disciplinary hearing may give rise to a Section 1983 action, but the mere filing of a false misbehavior report does not."); *see also Freeman v. Rideout,* 808 F.2d 949, 951 (2d Cir.1986), *cert. denied,* 485 U.S. 982 (1988) ("a prison inmate has no constitutionally guaranteed immunity from being falsely or wrongly accused of conduct which may result in the deprivation of a protected liberty interest").

**\*4**    Similarly, Hyman's assertion that a prison disciplinary determination must be supported by substantial evidence also does not comport with the case law. In *Superintendent v. Hill,* 472 U.S. 445, 453 (1985), the Supreme Court made clear that due process is satisfied if "some" evidence supports the prison's determination. In spite of "meager" evidence, including the lack of any direct evidence identifying the violator, the Supreme Court nonetheless found that the record in *Hill* was not "so devoid of evidence that the findings of the disciplinary board were without support or otherwise arbitrary." *Id.* at 457. Here, it is undisputed that Hyman raised his voice either during or directly following a violent situation. Moreover, Hyman pled guilty to the charge of creating a disturbance. Therefore, there is sufficient evidence to support the determination at Hyman's disciplinary hearing.

Furthermore, Hyman has presented no other facts which would suggest that his Tier III hearing was in any way contrary to due process. Hyman suggests that his rights were violated because (1) the hearing was held less than 24 hours after he met with his assistant; (2) he was not provided with a to-from memorandum or an unusual incident report, as allegedly required by New York regulations; and (3) he was not permitted to call witnesses at the hearing.

In *Wolff v. Macdonnell,* 418 U.S. 539, 563 (1974), the Supreme Court elucidated the requirements of due process with respect to prison hearings, holding that an inmate is entitled to no less than 24 hours "advance written notice of the claimed violation and a written statement of the fact finders as to the evidence relied upon and the reasons for the disciplinary actions taken." However,

2001 WL 262665

*Wolff* does not require that the inmate meet with his assistant 24 hours in advance of the proceeding as well; indeed, *Wolff* necessarily presumes that assistance will be provided during the 24 hour period. Furthermore, the undisputed evidence indicates that Hyman met with Ms. Ibrahim on December 11, 1995, approximately 4 days prior to the hearing. The fact that Hyman met with her again on the day of the hearing does not vitiate the prior meeting, and indeed suggests that Hyman was provided with ample assistance.

Hyman next points out that defendants did not provide him with a to-from memorandum or an unusual incident report, which Hyman contends is required under New York regulations. First, even if New York law does indeed require that an unusual incident report be filed in Hyman's situation, [3] the failure to do so does not give rise to a constitutional violation. In a similar case from this district also involving the failure to provide an unusual incident report, the court granted summary judgment to defendants, holding that:

[3]    Defendants contend that the incident at issue here did not rise to the level of an unusual incident because no force was used by or against Hyman, and no disruption of normal facility operations resulted. *See* Holder Reply Aff. ¶ 5.

Although DOCS Directives 4933 and 4004 do require that special SHU logs and unusual incident reports should have been filed following the January 7, 1990 incidents, the failure of defendants to make such reports is a violation of a state directive, not a violation of a federal constitutional right.

**\*5** *Woods v. Robertson,* No. 90 Civ. 1672(JFK), 1990 WL 115717, at \*4 (S.D.N.Y. Aug. 6, 1990); *see also infra* Section F.

Second, Hyman was not provided with a copy of the to-from memorandum because defendant Lucas believed that no such document had been issued, as to-from memoranda generally accompany only unusual incident reports, not inmate misbehavior reports. *See* Lucas Aff. ¶ 7. Hyman proffers no evidence that Lucas knowingly withheld the memorandum. The negligent failure to turn over materials cannot support a § 1983 claim. *See Daniels v. Williams,* 474 U.S. 327 (1986). Moreover, as the to-from memorandum was identical to the inmate misbehavior report, Hyman was not deprived of any relevant information prior to his hearing.

Finally, Hyman's claim that he was denied the right to call witnesses is wholly unsupported by the record. It is undisputed that Hyman withdrew his request to proffer witness testimony at the hearing. Indeed, defendant Lucas specifically asked Hyman if he would like to call witnesses, and Hyman declined. Lucas Aff. ¶ 7.

## C. *Equal Protection*

Hyman also fails to state a viable claim for selective enforcement in violation of the Equal Protection Clause of the Fourteenth Amendment. In order to prevail, Hyman must show that (1) he was selectively treated as compared with others similarly situated, and (2) his selective treatment was prompted by an impermissible consideration, such as membership in a suspect class, intent to inhibit or punish the exercise of a constitutional right or malicious or bad faith intent to injure. *Birmingham v. Ogden,* 70 F.Supp.2d 353, 371 (S.D.N.Y.1999).

Hyman claims that he was singled out for discipline because he exercised his First Amendment right to report a medical emergency. However, it is undisputed that Hyman expressed his opinion by yelling during or immediately after a violent situation. Hyman acknowledges that he created a disturbance to get the officer's attention. Hyman Aff. ¶ 4. Such behavior is not constitutionally protected activity. *See Butler v. Westchester Cty.,* 94 Civ. 8216, 2000 WL 335539, at \*7 (S.D.N.Y. Mar. 30, 2000) ("[t]here is no constitutional right to behave problematically"). Although no other prisoners were subject to disciplinary proceedings, Officer Holder has sworn that he charged Hyman because Hyman was the loudest, most threatening and most repetitive. Holder Reply Aff. ¶ 3. Moreover, Holder denies the allegation that he issued the report in order to retaliate against Hyman for calling attention to another inmate's illness. *Id.* Hyman points to no evidence beyond mere speculation which would cast doubt upon defendant Holder's stated motive.

## D. *Conspiracy*

Similarly, Hyman's conspiracy allegations also are unsupported. Hyman claims that defendants conspired to assist Officers Holder and McCarthy in the filing of the inmate misbehavior report, for the purpose of covering up the assault on Delacruz. It is well settled that plaintiff must proffer more than mere conclusory allegations in

order to support a civil rights conspiracy complaint. *See Salahaddin v. Cuomo,* 861 F.2d 40, 43 (2d Cir.1988). Plaintiff must put forth facts demonstrating an agreement among two or more persons. *See Whitfield v. Forest Elec. Corp.,* 772 F.Supp. 1350, 1353 (S.D.N.Y.1991). Hyman claims that each defendant took actions that resulted in Hyman's keeplock sentence. However, Hyman points only to tasks that defendants are required to perform under state law, such as defendant Patterson's review of the report, defendant Lucas' hearing determination and defendant Greiner's appellate review after receiving the file from defendant Keane. These actions cannot constitute a "meeting of the minds;" otherwise, prison officials would be liable for conspiracy each time they performed their assigned duties.

E. *Eighth Amendment*

**\*6** Hyman claims that his confinement to a special housing unit constitutes cruel and unusual punishment. To prevail on an Eight Amendment claim, Holder must show that the conditions of his confinement involved "unquestioned and serious deprivations of human needs" and that prison officials imposed those conditions with deliberate indifference. *Jackson v. New York Dep't of Correctional Servs.,* 994 F.Supp. 219, 223 (S.D.N.Y.1998). Hyman does not point to any specific way in which his human needs went unmet. The Second Circuit has held that the conditions of special housing units do not per se violate the Eight Amendment. *See Anderson v. Coughlin,* 757 F.2d 33 (2d Cir.1985). Thus summary judgment is warranted on this claim as well.

F. *State Law Violations*

To the extent that Hyman claims defendants failed to follow prison regulations, such as directives concerning the implementation of disturbance control plans or the failure to include the specific roles of other prisoners in the inmate misbehavior report, these state law violations are not cognizable under § 1983. Section 1983 imposes liability for violations of rights protected by the Constitution and laws of the United States, not for violations arising solely out of state or common-law principles. *Fluent v.*

*Salamanca Indian Lease Auth.,* 847 F.Supp. 1046, 1056 (W.D.N.Y.1994); *see also Doe v. Connecticut Dept. of Child & Youth Servs.,* 911 F.Supp. 868, 869 (2d Cir.1990) ( "[A] violation of state law neither gives [plaintiff] a § 1983 claim nor deprives defendants of the defense of qualified immunity to a proper § 1983 claim.") (citations omitted). Because Hyman fails to allege the violation of any underlying federal law, his state law claims must be dismissed.

G. *Defendant Keane*

Hyman seeks to impose liability on defendant Keane on the grounds that Keane was notified of Hyman's appeal by letter and failed to remedy the alleged wrong. Courts consistently have held that mere receipt of a letter does not render the supervisor personally liable. *See Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995); *Richardson v. Coughlin,* No. 93–CV–6254, 2000 WL 815117, at \*4–5 (W.D.N.Y. June 19, 2000). Nor can Hyman assert a viable claim based upon mere conclusory allegations that defendant Keane failed to supervise defendant Greiner. Hyman has provided no evidence which shows that Keane's supervision was grossly negligent as required in this Circuit. *See Williams v. Smith,* 781 F.2d 319, 323–24 (2d Cir.1986).

H. *Qualified Immunity*

Because Hyman fails to establish any constitutional violations on the merits, this Court need not address defendants' qualified immunity claims.

III. CONCLUSION

For the foregoing reasons, defendants' motion for summary judgment is granted. The Clerk of the Court is directed to close this case.

All Citations

Not Reported in F.Supp.2d, 2001 WL 262665

                          © 2017 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW  © 2017 Thomson Reuters. No claim to original U.S. Government Works.