UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
———————————————————————————

NICHOLAS MARTIN,

                                    Plaintiff,

v.                                                    9:16-CV-0717
                                                      (MAD/TWD)

A.C. WYCKOFF,

                                    Defendant.
———————————————————————————

APPEARANCES:                          OF COUNSEL:

NICHOLAS MARTIN
Plaintiff, *pro se*
644 2nd Avenue, Apt. 4
Troy, New York 12182


BARBARA D. UNDERWOOD                  SHANNAN C. KRASNOKUTSKI, ESQ
Attorney General of the State of New York    Assistant Attorney General
Counsel for Defendant Craig Wyckoff
The Capitol
Albany, New York 12212

**THÉRÈSE WILEY DANCKS**, United States Magistrate Judge

**ORDER AND REPORT-RECOMMENDATION**

## I.    INTRODUCTION

*Pro se* Plaintiff Nicholas Martin, an inmate in the custody of the New York State

Department of Corrections and Community Supervision ("DOCCS"), commenced this action on

June 20, 2016. (Dkt. No. 1)

Following the Court's initial review of the second amended complaint, the only claim

remaining in this action is Plaintiff's Eighth Amendment excessive force claim against

Defendant A.C. Wyckoff ("Wyckoff"), a corrections officer at the Upstate Correctional Facility ("Upstate").  (*See* Dkt. No. 37).

Defendant has now moved for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure on the grounds that Plaintiff has failed to exhaust his administrative remedies with regard to his claim.  (Dkt. No. 52-6 at 1.[1])  Plaintiff has not opposed the motion. For the reasons explained below, the Court recommends that Defendant's motion for summary judgment on failure to exhaust grounds be granted.

## II.    FACTUAL BACKGROUND

### A.    January 23, 2015, Use of Force Incident and Plaintiff's Injuries

On January 23, 2015, Plaintiff was transferred to Upstate.  (Dkt. No. 34 at ¶ 19.[2])  Upon his arrival, he was interviewed by a Sergeant and asked the Sergeant not to place him in any double or with another inmate.  *Id.* at ¶ 19.  Subsequently, Plaintiff was escorted to Housing Unit B, C19T.  *Id.*  Plaintiff was standing under the light over his sink, and was reading the In-House Orientation Manual when Wyckoff walked over to his cell. (Dkt. No. 34 at ¶ 20.)  Wyckoff looked into Plaintiff's cell and yelled "You are trying to kill yourself, huh? You are trying to commit suicide." *Id.* at ¶ 20.  Wyckoff stepped back and activated the alarm on his radio.  (Dkt. No. 34 at ¶ 21.)  As a result, one Sergeant, and approximately ten corrections officers came.  *Id.* The Sergeant who came after Wyckoff activated the alarm, instructed the Plaintiff to put both hands through the feed-up hatch in the door, and Plaintiff complied.  *Id.*  The Sergeant gave the

---

[1] Page references to documents identified by docket number are to the numbers assigned by the CM/ECF docket system maintained by the Clerk's office.

[2] Paragraph references are used where documents identified by CM/ECF docket number contain consecutively numbered paragraphs.

signal to Wyckoff to open Plaintiff's cell. *Id.* When the cell was half-way opened, the ten

corrections officers rushed in, and the corrections officer who had placed the handcuffs on

Plaintiff was still holding onto the cuffs. *Id.* As soon as Plaintiff was further into the cell, the

officer physically slammed Plaintiff into the sink. *Id.* Plaintiff's feet were kicked from under

him and he fell to the floor. *Id.* While Plaintiff was on the floor, the ten corrections officers

commenced to kick, beat and strike Plaintiff on his head, face, arms, legs, and back, and they

stomped on his ankles. *Id.* He was then escorted from his cell to the Medical Holding Cell.

Plaintiff lost consciousness, fell to the floor and was taken to the Hospital Infirmary. (Dkt. No.

34 at ¶ 22.) Plaintiff alleges the handcuffs were extremely tight to the extent that when removed,

the impressions of the handcuffs could be seen on Plaintiff's wrists and left cuts and bruises.

(Dkt. No. 34 at ¶ 23.) The attending nurse on duty did not perform a physical examination on

Plaintiff. (Dkt. No. 24.) Plaintiff was then escorted to Mental Health Observation room. *Id.* On

January 24, 2015, Plaintiff was seen by a nurse and complained to the nurse about the details of

the severe physical beating he had received, and the cuts and bruises on his face, back, neck,

arms, hands, legs, shoulders and back, as well as both swollen ankles. (Dkt. No. 34 at ¶ 27.)

Plaintiff also showed the nurse the cuts and impressions of the handcuffs on both wrists. *Id.*

    **B.**    **Inmate Misbehavior Report and Disciplinary Hearing**

    Defendant Wyckoff wrote and filed a Misbehavior Report ("MR") against Plaintiff,

related to the January 23, 2015, incident regarding his housing arrangements, charging him with

violating Rules 102.10 (Threats) and 109.15 (Double Bunk). (Dkt. No. 34 at ¶ 32.) The MR

alleged that while Wyckoff was interviewing Plaintiff on intake on January 23, 2015, Plaintiff

informed Wyckoff he was not going to double bunk, and that if he was put in a cell with a

bunkie, Plaintiff would not stop beating him until Plaintiff had killed him. (Dkt. No. 34-1.)
Plaintiff claims the MR against him was false, and outright fiction. *Id.*

On February 6, 2015, Plaintiff appeared at a Tier III hearing. *Id.* Plaintiff was found
guilty as charged and the sanctions imposed consisted of sixty days in the special housing unit
and thirty days loss of packages, commissary, and home phone. (Dkt. No. 34 at ¶ 37.) On
February 10, 2015, Plaintiff filed an administrative appeal alleging the hearing officer failed to
adhere to DOCCS rules and regulations regarding Plaintiff's mental condition before
commencing the Tier III hearing. (Dkt. No. 34-1 at 5.) Plaintiff was notified on April 2, 2015,
that the Tier III decision was affirmed. *Id.* Plaintiff thereafter commenced an Article 78
proceeding, which resulted in the hearing result being vacated and remitted for a new hearing
based on the failure of the hearing officer to investigate or receive testimony regarding Plaintiff's
mental state. (Dkt. No. 34-1 at 4-8.)

## III.    APPLICABLE LEGAL STANDARD FOR SUMMARY JUDGEMENT

Summary judgment may be granted only if the submissions of the parties taken together
"show that there is no genuine issue as to any material fact and that the moving party is entitled
to judgment as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986);
Fed. R. Civ. P. 56(c). The party moving for summary judgment bears the initial burden of
showing, through the production of admissible evidence, no genuine issue of material fact exists.
*Salahuddin v. Goord*, 467 F.3d 263, 272-73 (2d Cir. 2006). A dispute of fact is "genuine" if "the
[record] evidence is such that a reasonable jury could return a verdict for the nonmoving party."
*Liberty Lobby*, 477 U.S. at 248.

Only after the moving party has met this burden is the nonmoving party required to
produce evidence demonstrating genuine issues of material fact exist. *Salahuddin*, 467 F.3d at

273 (citations omitted). The nonmoving party must do more than "rest upon the mere allegations . . . of [the plaintiff's] pleading" or "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585-86 (1986). "Conclusory allegations, conjecture and speculation . . . are insufficient to create a genuine issue of fact." *Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir. 1998). A party opposing summary judgment is required to submit admissible evidence. *See Spiegel v. Schulmann*, 604 F.3d 72, 81 (2d Cir. 2010) ("It is well established that in determining the appropriateness of a grant of summary judgment, [the court] . . . may rely only on admissible evidence.") (citation and quotation marks omitted).

In *Jeffreys v. City of New York*, 426 F.3d 549 (2d Cir. 2005), the Second Circuit reminded that on summary judgment motions "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could *reasonably* find for the plaintiff." 426 F.3d at 554 (emphasis in original). To defeat summary judgment, nonmoving parties "may not rely on conclusory allegations or unsubstantiated speculation." *Id.* (citation and internal quotation marks omitted). Rather "[a]t the summary judgment stage, a nonmoving party must offer some hard evidence showing that [his] version of the events is not wholly fanciful." *Id.* (citation and internal quotation marks omitted). Accordingly, statements "that are devoid of any specifics, but replete with conclusions, are insufficient to defeat a properly supported motion for summary judgment." *Bickerstaff v. Vassar Coll.*, 196 F.3d 435, 452 (2d Cir. 1999).

In determining whether a genuine issue of material fact exists, the court must resolve all ambiguities and draw all reasonable inferences against the moving party. *Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 309 (2d Cir. 2008). Where a party is

proceeding *pro se*, the court is obliged to "read [the *pro se* party's] supporting papers liberally,

and . . . interpret them to raise the strongest arguments that they suggest." *Burgos v. Hopkins*, 14

F.3d 787, 790 (2d Cir. 1994). However, "a *pro se* party's 'bald assertion,' unsupported by

evidence, is not sufficient to overcome a motion for summary judgment." *Cole v. Artuz*, No. 93

Civ. 5981 (WHP)(JCF), 1999 WL 983876, at *3 (S.D.N.Y. Oct. 28, 1999)[3] (citing *Carey v.

Crescenzi*, 923 F.2d 18, 21 (2d Cir. 1991)).

When a party fails to respond to a motion for summary judgment, "[t]he fact that there

has been no [such] response . . . does not . . . mean that the motion is to be granted

automatically." *Champion v. Artuz*, 76 F. 3d 483, 486 (2d Cir. 1996). Rather, the Court must (1)

determine what material facts, if any, are undisputed in the record; and (2) assure itself that,

based on the undisputed material facts, the law indeed warrants judgment for the moving party.

*Id.; see also Giannulllo v. City of New York*, 332 F. 3d 139, 143 n.5 (2d Cir. 2003) (holding that

not verifying in the record the assertions in the motion for summary judgment "would derogate

the truth-finding functions of the judicial process by substituting convenience for facts").

## IV.     LEGAL STANDARD FOR THE EXHAUSTION OF ADMINISTRATIVE REMEDIES

Defendant seeks summary judgment on Plaintiff's Eighth Amendment excessive force

claim on the grounds that he failed to exhaust his administrative remedies under the DOCCS

Inmate Grievance Procedure ("IGP") by failing to file a grievance at Upstate regarding the

alleged January 23, 2015, incident of excessive force, and further asserting that even if Plaintiff

had filed a grievance with Upstate's Inmate Grievance Resolution Committee ("IGRC"), he had

---

[3] Copies of all unpublished decisions cited herein will be provided to Plaintiff in accordance with
*Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) (per curiam).

failed to appeal through to the Central Office Review Committee ("CORC"). (Dkt. No. 52-1 ¶12.)

Under the Prison Litigation Reform Act ("PLRA"), "[n]o action shall be brought with respect to prison conditions under section 1983 . . . by a prisoner confined in any jail, prison, or other corrections facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). "[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle*, 534 U.S. 516, 532 (2002). "There is no question that exhaustion is mandatory under the PLRA and that unexhausted claims cannot be brought in court." *Jones v. Bock*, 549 U.S. 199, 211 (2007).

The PLRA requires "proper exhaustions," which means using all steps required by the administrative review process applicable to the institution in which an inmate is confined and doing so properly. *Jones*, 549 U.S. at 218 (citing *Woodford v. Ngo*, 548 U.S. 81, 88 (2006)); *see also Amador v. Andrews*, 655 F.3d 89, 96 (2d Cir. 2011) (exhaustion necessitates "using all steps that the [government] agency holds out, and doing so properly" (internal quotations omitted)). In New York State prisons, DOCCS has a well- stablished three-step Inmate Grievance Procedure ("IGP"). N.Y. Comp. Codes R. & Regs. ("N.Y.C.R.R.") tit. 7, § 701.5.

First, an inmate must file a complaint with the facility IGP clerk within twenty-one day of the alleged occurrence. *Id.* § 701.5(a)(1). A representative of the facility's IGRC has sixteen calendar days from receipt of the grievance to informally resolve the issue. *Id.* § 701.5(b)(1). If there is no such informal resolution, the full IGRC conducts a hearing within sixteen calendar days of receipt of the grievance, *id* § 701.5(b)(2), and issues a written decision within two working days of the conclusion of the hearing. *Id.* § 701.5(b)(3).

Second, a grievant may appeal the IGRC's decision to the facility Superintendent within seven calendar days of receipt of the IGRC's written decision. *Id.* § 701.5(c)(1). If the grievance involves an institutional issue (as opposed to a DOCCS- wide policy issue), the Superintendent must issue a written decision within twenty calendar days of receipt of the grievant's appeal. *Id.* § 701.5(c)(3)(ii). Grievances regarding DOCCS wide policy uses are forwarded directly to CORC for a decision under the process applicable to the third step. *Id.* § 701.5(c)(3)(1).

Third, a grievant may appeal to CORC within seven working days of receipt of the Superintendent's written decision. *Id.* § 701.5(d)(1)(1). CORC is to render a written decision within thirty calendar days of receipt of the appeal. *Id.* § 701.5(d)(3)(ii).

Special procedures are used when the grievance involves a claim of staff misconduct. *Id.* § 701.8. A grievance alleging staff misconduct, once it is recorded and given a number, must be sent directly to the superintendent, and the superintendent must issue a decision within twenty-five days. *Id.* § 701.8(f). If the grievant wishes to appeal a decision by the Superintendent to CORC, he must file a notice of decision to appeal with the inmate grievance clerk at the bottom of the Superintendent's decision within seven days of receipt of the decision. *Id.* § 701.8(h). CORC is required to render a written decision within thirty calendar days of receipt of the appeal. *Id.* § 701.8(i) (incorporating § 701.5).

As set forth above, at each step of the IGP, a decision must be rendered within a specified time period. "Where the IGRC and/or superintendent do not timely respond, an inmate must appeal 'to the next step,'" assuming there is another step in the IGP. *Eleby v. Smith*, No. 9:15-CV- 0281 (TJM/DEP), 2017 WL 986123, at *4 (N.D.N.Y. Jan. 9, 2017) (quoting 7 N.Y.C.R.R. *Id.* § 701.6(g)(2)); *see also Smith v. Kelly*, 985 F. Supp. 2d 275, 281 (N.D.N.Y. 2013) ("[A]ny --

8

failure by the IGRC or the superintendent to timely respond to a grievance . . . can − and must −
be appealed to the next level . . . to complete the grievance process.").

Generally, if a plaintiff fails to follow each of the required steps of the IGP, including
receipt of a decision from CORC, prior to commencing litigation, he has failed to exhaust his
administrative remedies as required under the PLRA.  *See Ruggiero v. Cnty. Of Orange*, 467 F.
3d 170, 176 (2d Cir. 2006).  ("[T]he PLRA requires proper exhaustion, which means using all
steps that the agency holds out, and doing so *properly* (so that the agency addresses the issues on
the merits.")) (quotations and citations omitted) (emphasis in original).

While the PLRA mandates exhaustion of administrative remedies, it also "contains its
own, textual exception to mandatory exhaustion."  *Ross v. Blake*, ___ U.S. ___, 136 S. Ct. 1850,
1858 (2016).  More specifically, Section 1997e(a) provides that only those administrative
remedies that "are available" must first be exhausted.  42 U.S.C. § 1997e(a); *see also Ross*, 136
S. Ct. at 1858 ("[T]he exhaustion requirement hinges on the availability of administrative
remedies [.]") (quotations and citations omitted)).  In the PLRA context, the Supreme Court has
determined that "availability" means that "an inmate is required to exhaust those, but only those,
grievance procedures that are capable of use to obtain some relief for the action complained of."
*Ross*, 136 S. Ct. at 1859 (quotations and internal citations omitted).

The *Ross* Court identified three circumstances in which a court may find that internal
administrative remedies are not available to prisoners under the PLRA.  *Id.* at 1859-60.  First,
"an administrative procedure is unavailable when (despite what regulations or guidance materials
may promise) it operates as a simple dead end − with officers unable or consistently unwilling to
provide any relief to aggrieved inmates."  *Id.* at 1859.  "Next, an administrative scheme might be
so opaque that it becomes, practically speaking, incapable of use."  *Id.*  Finally, an administrative

remedy is not "available" when "prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Id.* at 1860.

In *Williams v. Corr. Officer Priatno,* 829 F. 3d 118, 123 n.2 (2d Cir. 2016), the Second Circuit noted that, "the three circumstances discussed in *Ross* do not appear to be exhaustive[.]" The illustrations of unavailability in *Ross* nonetheless guide the Court's inquiry. *See Mena v. City of New York*, No. 13-CV-2430 (RJS), 2016 WL 3948100, at *4 (S.D.N.Y. July 19, 2016). Because non-exhaustion is an affirmative defense, defendants bear the burden of showing that a prisoner has failed to satisfy the exhaustion requirements. *See Jones*, 549 U.S. at 216; *Johnson v. Testman*, 380 F.3d 691,695 (2d Cir. 2004), *overruled on other grounds in Woodford*, 548 U.S. at 94-95. Plaintiff must then establish that the IGP grievance procedure was unavailable to him. *See Jones,* 549 U.S. at 216.

## V.    ANALYSIS

### A.    Plaintiff's Failure to Exhaust His Administrative Remedies

Plaintiff's remaining claim against Defendant Wyckoff is for excessive use of force at Upstate on January 23, 2015.  (Dkt. Nos. 34 at ¶ 21-23; 37.)  Plaintiff was housed at Upstate from January 23, 2015, through November 6, 2015.  (Dkt. No. 52-4 at ¶ 13.)  Therefore, Plaintiff remained at Upstate during the time permitted for filing a grievance and was required to file any grievance regarding the excessive force incident with the Upstate Inmate Grievance Office.  *Id.* at ¶ 11. There is no evidence in the record that indicates Plaintiff filed a grievance related to the incident.  *Id.* at ¶ 13.

Donna Wilcox ("Wilcox"), IGP Supervisor at Upstate, caused a search to be made of Upstate's records of any grievances filed by Plaintiff during his incarceration at the facility. (Dkt. No. 52-1 at ¶¶ 1, 10.)  Wilcox determined that despite the grievance procedure having been

operational during the relevant time period, Plaintiff had not filed any grievance complaining of the incident involving the alleged use of force on January 23, 2015. *Id*. at ¶¶ 11-12.

According to Rachael Seguin, Assistant Director of the DOCCS IGP and custodian of records maintained by CORC, a review of the CORC database for appeals related to Plaintiff's excessive force claim revealed that Plaintiff had not appealed any grievance with respect to the excessive force claims to CORC. (Dkt. No. 52-1 at ¶¶ 12, 10-13.) Based upon the foregoing, the Court finds that Defendant has satisfied his burden of showing that Plaintiff failed to exhaust his excessive force claim against Wyckoff under the DOCCS IGP.

### B. Plaintiff's Failure to Sustain His Burden On Availability

The Court also finds that Plaintiff has failed to submit nonconclusory evidence of unavailability under *Ross* sufficient to raise a material issue of fact on the question of availability of the DOCCS IGP. The record does not support a contention that the procedures were not available to Plaintiff during the relevant time period, nor has Plaintiff claimed they were unavailable. (*See* Dkt. Nos. 34; 52-1; 52-2.) Furthermore, CORC records indicate Plaintiff filed two grievance appeals to CORC, one in 2008 and another in 2010: Grievance FPT-20243-08 "Wants to See a Dermatologist," and Grievance LKV-8696 "Housed in SHU, but Serving Keeplock," and was therefore apparently aware of the DOCCS inmate grievance procedures. (Dkt. Nos. 52-2 at ¶ 14; 52-3.)

Plaintiff claims that "for all pratical purpose an intent[,"] he complied with the exhaustion requirements of the PLRA by appealing his Tier III finding of guilt to the Superintendent and commencing a State Court Article 78 proceeding following the Superintendent's affirmance. (Dkt. Nos. 34 at ¶ 18; 34-1 at 3-16.) (text unaltered). However, that is not the case.

11

On both his appeal to the Superintendent and in his Article 78 proceeding, the sole issue raised by Plaintiff was the failure of the hearing officer in Plaintiff's Tier III disciplinary hearing to interview or seek testimony from a representative of the Office of Mental Health concerning Plaintiff's mental state at the time of the incident with Wyckoff on January 23, 2015, when Plaintiff allegedly threatened that if he was placed in a cell with a bunkie he would "murder him, I won't stop beating him until I kill the mother fucker."  (Dkt. No. 34-1 at 4-6, 11.)

"Generally, exhaustion of administrative remedies involves utilizing the facility's grievance process, however, when an inmate's federal claims arise directly out of a disciplinary or administrative segregation hearing or confinement, he exhausts his administrative remedies by presenting his objections in the administrative appeals process."  *Harvey v. Harder*, No. 9:09-CV-154 (TJM/ATB), 2012 WL 4093792, at *4 *N.D.N.Y. July 31, 2012) (citing *Sweet v. Wende Corr. Facility*, 514 F. Supp. 2d 411, 413 (W.D.N.Y. 2007); *see also Waters v. Melendez*, No. 15-CV-0805 (TJM/CFH), 2018 WL 3079764, at *7-8 (N.D.N.Y. May 18, 2018) ("[t]hough a disciplinary hearing is sufficient to exhaust a claim that Plaintiff was deprived of due process at a disciplinary hearing, allegations of staff misconduct related to the incidents giving rise to the incident must be grieved") (quoting *Barker v. Smith*, No. 16-CV-76, 2017 WL 3701495, at *3 (S.D.N.Y. Aug. 25, 2017) (quotation marks and additional citation omitted)).

In this case, while Plaintiff alleges a connection between his alleged comments to Wyckoff regarding bringing harm to a bunkie and Wyckoff's subsequent use of excessive force, Plaintiff's excessive force claim against Wyckoff does not arise directly out of the disciplinary hearing.  Therefore, Plaintiff was required to separately exhaust his excessive force claim against Wyckoff through the IGP at Upstate.  (Dkt. No. 34 at ¶¶ 19-20.)  *See Scott v. Gardner*, 287 F. Supp. 2d 477, 489 (N.D.N.Y. 2003) ("Although completion of the disciplinary appeal process

may satisfy the exhaustion requirement with respect to Scott's claims that he was denied due process in the disciplinary proceedings, allegations of staff misconduct related to the incidents giving rise to the discipline must be grieved.").

Based on the foregoing, the Court finds that Plaintiff has failed in his burden of showing unavailability of the IGP, and that his excessive force claim was not exhausted through his Article 78 in connection with the disciplinary proceeding.

## VI.   CONCLUSION

For the reasons set forth above, the Court recommends that Defendant's motion for summary judgment (Dkt. No. 52) be granted.

**ACCORDINGLY**, it is hereby

**RECOMMENDED** that Defendant's motion for summary judgment (Dkt. No. 52) be **GRANTED**; and it is further

**ORDERED** that the Clerk provide Plaintiff with a copy of this Order and Report-Recommendation, along with copies of the unpublished decisions cited herein in accordance with *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2008) (per curiam).

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen days within which to file written objections to the foregoing report.[4]  Such objections shall be filed with the Clerk of the Court.  **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.**  *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing

---

[4]  If you are proceeding *pro se* and are served with this Order and Report-Recommendation by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date the Order and Report-Recommendation was mailed for you to serve and file objections.  Fed.R.Civ.P. 6(d).  If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended to the end of the next day that is not a Saturday, Sunday, or holiday.

*Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15 (2d Cir. 1989) (per curiam)); 28 U.S.C.

§ 636(b)(1) (Supp. 2013); Fed. R. Civ. P. 72, 6(a).


Dated: October 16, 2018
      Syracuse, New York

Therèse Wiley Dancks
United States Magistrate Judge

2017 WL 3701495
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Marc BARKER, Plaintiff,
v.
DSR B. SMITH, Sgt. J. Osinski, Lt.
Limaye, C.O. Ekwerekwu, Defendants.

No. 16-cv-76 (NSR)
|
Signed August 24, 2017
|
Filed 08/25/2017

**Attorneys and Law Firms**

Marc Barker, Dannemora, NY, pro se.

Kristen Rose Vogel, New York Office of the Attorney
General, New York, NY, for Defendants.

OPINION & ORDER

NELSON S. ROMÁN, United States District Judge

**\*1** Plaintiff Marc Barker brings this action *pro
se* against Defendants Deputy Superintendent of
Reception Betsy Smith, Sergeant ("Sgt.") James Osinski,
Lieutenant ("Lt.") Vishnu Limaye, and Correction
Officer ("C.O.") George Ekwerekwu [1] (collectively,
"Defendants"), pursuant to 42 U.S.C. § 1983. Before
this court is Defendants' motion to dismiss. [2] For the
foregoing reasons, Defendants' motion to dismiss is
GRANTED in part and DENIED in part.

BACKGROUND

The following facts are drawn from Plaintiff's Complaint,
ECF No. 2, and are accepted as true for the purpose of
this motion.

The crux of Plaintiff's claim is that he was falsely accused
of an assault that occurred at Downstate Correctional
Facility and wrongfully placed in the SHU on June 9,
2015. (Compl. at 3.)

On June 9, 2015, Sgt. Osinski issued an Inmate
Misbehavior Report ("IMR"), signed by C. O.
Ekwerekwu, charging Plaintiff with violating Department
of Corrections and Community Supervision ("DOCCS")
Rules 100.10 and 104.11, which prohibit assaults upon
inmates and violent conduct, respectively. (*See* Compl.
at 36; Def. Mem. at 1.) Specifically, the IMR indicates
that on the same date, Plaintiff was serving as the housing
unit porter while another inmate was in the shower, that
they were both in the "25-30 tier" and that they were
the only two inmates outside of their cells at this time.
(Compl. at 36.) According to the report, while the other
inmate was showering, the housing unit officer who was
presumably C.O. Ekwerekwu, instructed Plaintiff to pick
up supplies from the east lobby, and observed him leaving
tier 25-30 to do so. (*Id.*) According to C.O. Ekwerekwu,
approximately one minute later, the other inmate came
from tier 25-30 asking where the porter (Plaintiff) went.
(*Id.*) C.O. Ekwerekwu observed a two-and-a-half-inch
laceration on the left side of the inmate victim's face, and
noted that the inmate victim was bleeding. (*Id.* at 36-38.)

Sgt. Osinski was notified, and questioned Plaintiff about
the incident in the east lobby (*see id.* at 8, 37.) Plaintiff
told Sgt. Osinski that he "didn't have a problem with
anyone on the date of 6.9.15." (*Id.* at 8.) Sgt. Osinski also
observed the inmate victim and determined that the injury
sustained was consistent with a "cutting instrument." (*Id.*
at 38.) Both inmates' cells were searched, along with
common areas of their Housing Unit 2-B, and no weapon
or cutting instruments were found. (*Id.*) Nonetheless, it
was determined that Plaintiff was responsible for the
assault, and Lt. Limaye approved Plaintiff's transfer to the
SHU on the same date as the incident (the "Incident").
(*Id.* 8, 38.) Plaintiff contends that Sgt. Osinski wrote a
false misbehavior report to "assist/cover up" for C.O.
Ekwerekwu's failure to properly monitor his assigned
post, the housing unit where the assault occurred. (*Id.* at
4.)

**\*2** From June 25, 2015 through July 13, 2015,
a Superintendent Hearing was held by DSR Smith
regarding the Incident. (*Id.* at 23.) At the conclusion of
the hearing DSR Smith found Plaintiff guilty of violating
DOCCS Sections 100.10 and 104.11. (*Id.*) In her report
on the disposition rendered, DSR Smith indicated that
she relied upon: the misbehavior report, which indicated
Plaintiff was in the housing unit and the relevant tier at

the time of the incident; Plaintiff's own testimony that he was in the tier while the victim inmate was in the shower; C.O. Ekwerekwu's testimony about the timeframe of the incident; testimony from officers and inmates that all other cell doors were locked; and the victim inmate's testimony that he was in the shower in tier 25-30 when he believes he was cut. (*Id.* at 25.) As to the reasons for her disposition, DSR Smith noted she considered Plaintiff's prior institutional history and that prior sanctions and restrictions had failed to deter him. (*Id.*) Plaintiff was sentenced to 270 days in the SHU, beginning on June 9, 2015, loss of various privileges, and loss of "good time" for six months. (*Id.* at 23.) Plaintiff appealed DSR Smith's determination to the Commissioner, and obtained a reversal on September 15, 2015. (*Id.* at 22.) However, Plaintiff was not released from the SHU until October 6, 2015. (*Id.* at 12.)

## STANDARD ON A MOTION TO DISMISS

Under Rule 12(b)(6), the inquiry is whether the complaint "contain[s] sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)); *accord Hayden v. Paterson*, 594 F.3d 150, 160 (2d Cir. 2010). "While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." *Id.* at 679. To survive a motion to dismiss, a complaint must supply "factual allegations sufficient 'to raise a right to relief above the speculative level.' " *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007) (quoting *Twombly*, 550 U.S. at 555). The Court must take all material factual allegations as true and draw reasonable inferences in the non-moving party's favor, but the Court is " 'not bound to accept as true a legal conclusion couched as a factual allegation,' " or to credit "mere conclusory statements" or "[t]hreadbare recitals of the elements of a cause of action." *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555).

In determining whether a complaint states a plausible claim for relief, a district court must consider the context and "draw on its judicial experience and common sense." *Id.* at 662. A claim is facially plausible when the factual content pleaded allows a court "to draw a reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678.

Furthermore, with regard to *pro se* Plaintiffs, the Court must "construe [ ] [the] [Complaint] liberally and interpret[ ] [it] to raise the strongest arguments that [it] suggest[s]." *Martinez*, 164 F. Supp. 3d at 508 (quoting *Sykes v. Bank of Am.*, 723 F.3d 399, 403 (2d Cir. 2013)). Yet, "the liberal treatment afforded to *pro se* litigants does not exempt a *pro se* party from compliance with relevant rules of procedural and substantive law." *Id.* (quoting *Bell v. Jendell*, 980 F. Supp. 2d 555, 559 (S.D.N.Y. 2013), and citing *Caidor v. Onondaga Cty.*, 517 F.3d 601, 605 (2d Cir. 2008)) ("[P]ro se litigants generally are required to inform themselves regarding procedural rules and to comply with them.")).

## DISCUSSION

### I. Allegations as to the Misbehavior Report

Plaintiff asserts that Sgt. Osinski wrote a false misbehavior report to assist or "cover up" for C.O. Ekwerekwu's failure to properly monitor the housing unit where the assault occurred. (Compl. at 4.) Defendant contends that Plaintiff has failed to exhaust his administrative remedies under the Prisoner Litigation Reform Act ("PLRA") prior to bringing this action, and that Plaintiff's claims as to the false misbehavior report must therefore be dismissed.

The PLRA bars prisoners from bringing suit in federal court regarding their confinement "until such administrative remedies as are available are exhausted." *Hicks v. Adams*, 16-509 (PR), 2017 WL 2628874, at *1 (2d Cir. June 19, 2017) (summ. order) (citing 42 U.S.C. § 1997e(a)). "The PLRA's exhaustion requirement 'applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong.' " *Johnson v. Annucci*, 15-CV-3754 (NSR), 2016 WL 3847745, at *3 (S.D.N.Y. July 7, 2016) (citing *Giano v. Goord*, 380 F.3d 670, 675 (2d Cir. 2004) (quoting *Porter v. Nussle*, 534 U.S. 516, 532 (2002))).

**\*3** The PLRA's grievance process requires an inmate of a New York State facility to exhaust his administrative remedies through a three-tiered Inmate Grievance Program ("IGP") pursuant to 7 N.Y.C.R.R. § 701.5. *See Johnson v. Fraizer*, 16-CV-6096 (CJS), 2016 WL 7012961, at *3 (W.D.N.Y. Dec. 1, 2016).

DOC[C]S' Inmate Grievance Program ("IGP") has a regular three-tiered process for adjudicating inmate complaints: (1) the prisoner files a grievance with the Inmate Grievance Resolution Committee ("IGRC"), (2) the prisoner may appeal an adverse decision by the IGRC to the superintendent of the facility, and (3) the prisoner then may appeal an adverse decision by the superintendent to the Central Officer Review Committee ("CORC")

*Id.* (citing *Quezada v. Ercole*, 09-CV-2832 (DLC), 2011 WL 3251811, at \*4 (S.D.N.Y. July 29, 2011) (citing *Espinal v. Goord*, 554 F.3d 216, 224 (2d Cir. 2009))); *see Khalild v. Reda*, 00-CV-7691 (LAK) (GWG), 2003 WL 42145, at \*3 (S.D.N.Y. Jan. 23, 2003) ("An inmate has not exhausted his administrative remedies until he goes through all three levels of the grievance procedure.") (internal quotation marks and citation omitted).

"[F]ailure to exhaust is an affirmative defense under the PLRA" and, as such, "inmates are not required to specially plead or demonstrate exhaustion in their complaints." *Roland v. Smith*, 907 F. Supp. 2d 385, 388 (S.D.N.Y. 2012) (citing *Jones v. Bock*, 549 U.S. 199, 216 (2007)). Instead, defendants bear the burden of demonstrating that the plaintiff's claim is not exhausted. *Key v. Toussaint*, 660 F. Supp. 2d 518, 523 (S.D.N.Y. 2009). However, "a district court ... may dismiss a complaint for failure to exhaust administrative remedies if it is clear on the face of the complaint that the plaintiff did not satisfy the PLRA exhaustion requirement." *Williams v. Correction Officer Priatno*, 829 F.3d 118, 122 (2d Cir. 2016); *see also Lee v. O'Harer*, 13-CV-1022, 2014 WL 7343997 (TJM) (ATB), at \*3 (N.D.N.Y. Dec. 23, 2014) ("Dismissal under Rule 12(b)(6) for failure to exhaust is appropriate if such failure is evidenced on the face of the complaint and incorporated documents.").

According to the Complaint, Plaintiff did utilize the IGP, but did so to challenge the way in which the Superintendent Hearing was conducted, and the ultimate determination. (*See* Compl. at 16.) ("Which claim(s) in this complaint did you grieve?" "The manner in which the tier hearing was being conducted.") Plaintiff was told

that this issue could not be pursued through the grievance process, and later appealed the outcome of the hearing. (*Id.*) Though a disciplinary appeal is sufficient to exhaust a claim that Plaintiff was deprived of due process at a disciplinary hearing, "allegations of staff misconduct related to the incidents giving rise to the discipline must be grieved." *Scott v. Gardner*, 287 F. Supp. 2d 477, 489 (S.D.N.Y. 2003), *on reconsideration in part*, 344 F. Supp. 2d 421 (S.D.N.Y. 2004), *and on reconsideration in part*, 2005 WL 984117 (S.D.N.Y. Apr. 28, 2005); *see Kimbrough v. Fischer*, 13-CV-100 (FJS) (TWD), 2014 WL 12684106, at \*6 (N.D.N.Y. Sept. 29, 2014), *report and recommendation adopted*, 2016 WL 660919 (N.D.N.Y. Feb. 18, 2016) ("An inmate 'cannot satisfy the PLRA's exhaustion requirement as to grievable matters that do not directly relate to the conduct of a hearing simply by alluding to them in his administrative appeal of the hearing decision.' For example, if at the hearing the inmate asserts ... allegations of misconduct by the correction officers involved in the underlying events, the inmate cannot adequately exhaust his remedies for PLRA purposes through his administrative appeal of the hearing decision; he must separately grieve the alleged misconduct of the officers") (citing *Rosales v. Bennett*, 297 F. Supp. 2d 637, 639 (W.D.N.Y. 2004)); *Mateo v. Gundrum*, 10-CV-1103 (GLS) (TWD), 2013 WL 5464722, at \*2, 4, 8 (N.D.N.Y. Sept. 30, 2013) (finding that plaintiff had not exhausted administrative remedies with respect to claim involving false misbehavior report where he had not filed a grievance as to that issue, even though in his disciplinary appeal he indicated he believed Defendant had written false report); *see also Mayo v. Lavis*, 16-1664 (PR), 2017 WL 1493680, at \*2 (2d Cir. Apr. 26, 2017) (claims against defendants for writing false misbehavior report and providing false testimony at disciplinary hearing, even when construed as retaliation claim, barred for failure to exhaust through grievance process).

**\*4** Plaintiff does not attempt to contradict Defendants' contentions, nor did he oppose Defendants' motion to dismiss. As such, the Court cannot assess, for instance, whether Plaintiff contends he attempted to appropriately grieve his claim concerning the allegedly false misbehavior report, and whether his administrative remedies were in fact "unavailable"[3] such that he should be excused from failing to exhaust these claims. As such, because Plaintiff failed to utilize the appropriate grievance process for his claims as to the Misbehavior Report prior to bringing suit, the Court must conclude that he has failed

available administrative remedies. *See Ross v. Blake*, 136 S. Ct. 1850, 1857 (2016) ("mandatory exhaustion statutes like the PLRA establish mandatory exhaustion regimes, foreclosing judicial discretion"). For these reasons, Plaintiff's claims against Osinski and Ekwerekwu concerning the allegedly false misbehavior report are dismissed without prejudice for renewal to the extent it is possible for Plaintiff to exhaust these claims, or alternatively, to the extent he can allege the administrative remedies were "unavailable" as described in footnote three. [4]

## II. Personal Involvement of Lt. Limaye

Similar to the misbehavior report, Plaintiff alleges that the Unusual Incident Report was also created as an attempt to conceal Defendants C.O. Ekwerekwu's and Sgt. Osinski's failure to perform their duties, and that the author concluded that Plaintiff committed the underlying offense without proper evidence, relying only upon C.O. Ekwerekwu's account. (*See* Compl. at 3, 6.) Plaintiff also appears to allege that this report was utilized at his hearing. (*See*, *e.g.*, *id.* at 6.) According to the Unusual Incident Report appended to Plaintiff's Complaint, Limaye appears to be the author. (*Id.* at 37.) Thus, drawing all reasonable inferences in Plaintiff's favor, he appears to allege a claim against Limaye for authoring a false unusual incident report. Defendants do not address any potential claims against Limaye for allegedly authoring a false Unusual Incident Report to protect Ekwerekwu and Osinski.

 **\*5** Plaintiff also alleges that Limaye approved Plaintiff's initial confinement in the SHU "with no reliable evidence." (*Id.* at 8.) Defendants counter that—to the extent Plaintiff asserts a claim against Limaye for the role he played in placing Plaintiff in the SHU—Limaye can only be held responsible for the time period between June 9, 2016, when Plaintiff was first placed in the SHU prior to Plaintiff's Superintendent Hearing, and July 13, 2015, the date DSR Smith issued her determination. (*see* Def. Mem. at 12.) Defendants also assert that Plaintiff has failed to establish personal involvement of Lt. Limaye because he fails to allege that: Limaye authored or endorsed the allegedly false Misbehavior Report; testified at Plaintiff's hearing; contributed in any way to the finding of Plaintiff's guilt, or that Limaye's actions were the "proximate cause" of Plaintiff's injury. (*See* Def. Mem. at 11-12 ("Rather,

Plaintiff's injuries were proximately caused by (1) the IMR; and (2) the disciplinary hearing disposition").)

To the extent Plaintiff does in fact intend to assert a claim against Limaye for authoring a false Unusual Incident Report, the Court need not address the legal sufficiency of this claim. Similar to Plaintiff's allegations with regard to the false Misbehavior Report, Plaintiff must also exhaust his administrative remedies with regard to any claim against Limaye for authoring the Unusual Incident Report prior to filing a claim in federal court. *See McClenton v. Menifee*, 05-CV-2844 (JGK), 2006 WL 2474872, at *8 (S.D.N.Y. Aug. 22, 2006) (indicating claim against author of alleged false incident report must also be exhausted through administrative grievance process). Thus, for the same reasons the Court finds that Plaintiff failed to exhaust his administrative remedies as to his claims regarding the false Misbehavior Report, the Court must also find that Plaintiff has failed to exhaust his administrative remedies against Limaye for drafting the allegedly false Unusual Incident Report. As such, this claim is also dismissed without prejudice.

Assuming Plaintiff does intend to assert a claim against Limaye for placing Plaintiff in the SHU for the 34-day period after the Incident and prior to his Superintendent Hearing, precedent in this Circuit dictates that such a brief period of confinement does not implicate a liberty interest and cannot support a due process claim. *Murray v. Arquitt*, 10-CV-1440 (NAM) (CFH), 2014 WL 4676569, at *14 (N.D.N.Y. Sept. 18, 2014) ("cases in this Circuit typically affirm dismissal of due process claims where the period of time spent in SHU was short- e.g. 30 days-and there was no indication [of] ... unusual conditions"). Nor does Plaintiff appear to allege he experienced any "unusual conditions" during this thirty- four day confinement period. As such, any claims asserted against Limaye for Plaintiff's initial placement in the SHU is also dismissed.

## III. Qualified Immunity

Defendants also assert that they are entitled to qualified immunity: with regard to Plaintiff's claims against Osinski and Ekwerekwu concerning the false misbehavior report, and against Limaye concerning the initial 34 day confinement prior to the Superintendent Hearing. Because the Court finds that Plaintiff's failure to exhaust his administrative remedies is dispositive of his claims regarding the allegedly false reports, the Court need not

address this argument. As to the allegation against Limaye for Plaintiff's initial SHU confinement, because Plaintiff has not plausibly alleged conduct supporting a due process claim, the Court need not address whether Limaye would be entitled to qualified immunity. *See Johnson v. Perry*, 859 F.3d 156, 169 (2d Cir. 2017) ("The doctrine of '[q]ualified immunity shields government officials from civil damages liability unless the official violated a statutory or constitutional right that was clearly established at the time of the challenged conduct.' ") (quoting *Reichle v. Howards*, 566 U.S. 658, 664 (2012)); *McClenton v. Menifee*, 05-CIV-2844 (JGK), 2006 WL 2474872, at *15 (S.D.N.Y. Aug. 22, 2006) ("First, the Court must undertake a threshold inquiry into whether the plaintiff's allegations, if true, establish a constitutional violation ... If the plaintiff's allegations do not state a constitutional claim, 'there is no necessity for further inquiries concerning qualified immunity.' ") (internal quotation marks and citations omitted).

## IV. False Imprisonment

**\*6**  Defendants argue that Plaintiff has failed to state a claim for false imprisonment with regard to his sentence to the SHU. (*See* Def. Mem. at 19-20.) "A prisoner can succeed on a false imprisonment claim only where he has sufficiently pleaded that he had been subjected to punitive segregation for no legitimate reason and without the rudimentary protections of due process." *Jackson v. N.Y. Dep't of Corr'n Servs.*, 994 F.Supp. 219, 224 (S.D.N.Y. 1998).

Plaintiff has adequately alleged that he was subjected to punitive segregation in the form of approximately [5] 120 days of confinement in the SHU. *Banks v. Pinker*, 10-CV-4139 (RMB), 2012 WL 1066799, at *3 (S.D.N.Y. Mar. 22, 2012) (allegation Plaintiff spent 120 days in SHU can suffice to adequately allege punitive segregation); *Koehl v. Bernstein*, 10-CV-3808 (GWG), 2011 WL 2436817, at *7 (S.D.N.Y. June 17, 2011) (that plaintiff "spent 120 days in the SHU [can, under certain circumstances,] constitute[ ] an atypical and significant hardship").

Construing the Complaint liberally, Plaintiff also adequately alleges that he was denied rudimentary protections of due process. [6] These protections include "advance written notice ...; a hearing affording him a reasonable opportunity to call witnesses and present documentary evidence; a fair and impartial hearing

officer; [and] a statement of the disposition including the evidence relied upon and the reasons for the disciplinary actions taken." *Sira v. Morton*, 380 F.3d 57, 69 (2d Cir. 2004). Given Plaintiff alleges that DSR Smith conducted the Superintendent Hearing in an unfair and partial manner, that she ignored documents supporting Plaintiff's contention of his innocence at the hearing along with other inconsistencies in the evidence presented, and found him guilty based upon improper considerations, among other relevant allegations, and considering Defendants make no argument to contrary, the Court finds Plaintiff has plausibly alleged that he was denied the basic protections of due process.

Construing the Complaint liberally, Plaintiff also plausibly alleges that he was subjected to punitive segregation without "legitimate reason." In response, to demonstrate that his SHU confinement was in fact based upon a legitimate reason, Defendants point to Plaintiff's admission that he was serving as unit porter and was thus outside of his cell when another inmate was assaulted, as well as language in DSR Smith's Disposition Report attached to the Complaint, indicating other inmates and officers testified that "the other cell doors were locked." [7] The Court must accept as true Plaintiff's contentions that he was serving as a unit porter at the time of the incident and presumably had permission to be outside of his cell; and that DSR Smith ignored documents and inconsistencies in the evidence presented at the hearing which supported Plaintiff's claims of innocence, stated she was aware of the "officers not being very truthful," and, although noting in her report that there was testimony that other cell doors were locked during the Iincident, did not indicate whether and how she ultimately drew the conclusion that Plaintiff and the victim were the only two inmates outside of their cell, (*see, e.g.*, Compl. at 8-9, 25) (though the Court notes this was indicated in the allegedly false Misbehavior Report). Based upon these allegations, and the fact that Defendants cite no controlling authority indicating a conclusion to the contrary is more appropriate at this time, the Court finds that Plaintiff has plausibly alleged his false imprisonment claim as to his confinement in the SHU as a result of the disciplinary hearing where he was denied the basic protections of due process.

## V. Plaintiff's Claims of Property Loss

**\*7** Defendants also contend that Plaintiff fails to state a plausible claim for loss of personal property when Plaintiff was transferred between facilities. (*See* Def. Mem. at 21 (citing to "SOC ¶ 28" or Compl. at 12.)); *see also* Compl. at 9 (alleging loss of property due to "transfer[s] from SHU to SHU (movement of SHU facility(s) [sic]").)

To the extent Plaintiff alleges a claim for property loss "that claim is subject to ready dismissal since it is well-established that New York provides an adequate post-deprivation remedy for such losses." *Thompson v. LaClair*, 08-CV-0037 (FJS) (DEP), 2009 WL 2762164, at \*8 (N.D.N.Y. Aug. 25, 2009) (citing *Koehl v. Dalsheim*, 85 F.3d 86, 88 (2d Cir. 1996)). This remedy is provided through Section 9 of the New York Court of Claims Act, which permits an inmate such as Plaintiff to pursue his claim for deprivation of property against the State in the Court of Claims. *Key v. Tanoury*, 05-CV-10461 (SHS), 2006 WL 3208548, at \*2 (S.D.N.Y. Nov. 3, 2006) (citing *DeMaio v. Mann*, 877 F. Supp. 89, 95 (N.D.N.Y. 1995), *aff'd mem.*, 122 F.3d 1055 (2d Cir. 1995)).

Although Plaintiff's claim could perhaps survive if he alleged he was denied access to an adequate post-deprivation remedy, he does not do so. *Montanez v. Lee*, No. 14-CV-3205 (NSR), 2016 WL 3866594, at \*7 (S.D.N.Y. July 12, 2016); *Bridgewater v. Taylor*, 698 F. Supp. 2d 351, 361 (S.D.N.Y. 2010) ("Deprivation of an inmate's property by a state actor may constitute a violation of the inmate's due process rights ... but only if a meaningful post-deprivation remedy is not available ... New York State, however, provides inmates with a post-deprivation remedy through the Court of Claims.") (citing *Hudson v. Palmer*, 468 U.S. 517, 533, 104 (1984) (additional citations omitted)). Because adequate state law remedies exist, and Plaintiff does not allege he has been deprived of these remedies, he has not been deprived of property without due process of law and cannot state a claim for relief on these grounds. For these reasons, Plaintiff's allegations regarding the loss of his property do not give rise to a plausible claim for relief, and the Court must dismiss Plaintiff's claims for property loss.

## VI. Plaintiff's State Law Claims

Defendants argue that any claim for damages arising out of state law negligence[8] and false imprisonment claims must also be dismissed as barred by New York Corrections Law § 24. (Def. Mem. at 21.)

Under § 24, a plaintiff cannot assert a civil action against correctional officers and employees of the Department of Correctional Services, in their individual capacities, "for damages arising out of any act done or the failure to perform any act within the scope of the employment and in the discharge of the duties by such officer or employee." N.Y. Correct. L. § 24. New York Corrections Law § 24 precludes " 'the assertion of claims against corrections officers [in their personal capacities] in any court, including the federal courts,' by designating the New York State Court of Claims as the only available venue to bring a claim for damages arising out the acts committed by corrections officers within the scope of their employment." *Rucano v. Koenigsmann*, 12-CV-00035 (MAD), 2014 WL 1292281, at \*15 (N.D.N.Y. Mar. 31, 2014) (citing *Baker v. Coughlin*, 77 F.3d 12, 15 (2d Cir. 1996)); *Ramos v. Artuz*, 00-CV-0149, 2001 WL 840131, at \*6 (S.D.N.Y. July 25, 2001) (concluding that § 24 barred inmate's state law claims for negligence against DOCCS employees in their individual capacities; *Francis v. Fiacco*, 15-CV-00901 (MAD) (ATB), 2016 WL 3448617, at \*4 (N.D.N.Y. June 20, 2016) (barring pendent state claims, including state law false imprisonment claim, as precluded by New York Correction Law § 24).

**\*8** Plaintiff does not appear to allege that Defendants acted outside of the scope of their employment. *See Francis*, 2016 WL 3448617, at \*4. As such, these claims must be pursued in the New York Court of Claims, and the Court dismisses any state law negligence and false imprisonment claims.

## CONCLUSION

For the foregoing reasons, the Defendants' motion to dismiss is GRANTED in part and DENIED in part. Only Plaintiff's procedural due process and federal false imprisonment claims against DSR Smith remain. Defendants' Counsel is directed to submit a completed Scheduling Order to the Court (see attached). The Clerk of Court is directed to mail a copy of this Opinion to *pro se* Plaintiff at the address reflected on the docket, and to amend the caption to reflect that Defendant Elswerekwu's surname is should be spelled "Ekwerekwu." The Clerk of Court is also respectfully directed to terminate the motion at ECF No. 21.

SO ORDERED.

Attachment

## CIVIL CASE DISCOVERY PLAN
## AND SCHEDULING ORDER

This Civil Case Discovery Plan and Scheduling Order is adopted, after consultation with counsel, pursuant to Fed. R. Civ. P. 16 and 26(f):

1. All parties [consent] [do not consent] to conducting all further proceedings before a Magistrate Judge, including motions and trial, pursuant to 28 U.S.C. § 636(c). The parties are free to withhold consent without adverse substantive consequences. (If all parties consent, the remaining paragraphs of this form need not be completed.)

2. This case [is] [is not] to be tried to a jury.

3. Joinder of additional parties must be accomplished by _____.

4. Amended pleadings may be filed until _____. Any party seeking to amend its pleadings after that date must seek leave of court via motion.

5. Interrogatories shall be served no later than _____, and responses thereto shall be served within thirty (30) days thereafter. The provisions of Local Civil Rule 33.3 [shall] [shall not] apply to this case.

6. First request for production of documents, if any, shall be served no later than _____.

7. Non-expert depositions shall be completed by _____.

   a. Unless counsel agree otherwise or the Court so orders, depositions shall not be held until all parties have responded to any first requests for production of documents.

   b. Depositions shall proceed concurrently.

   c. Whenever possible, unless counsel agree otherwise or the Court so orders, non-party depositions shall follow party depositions.

8. Any further interrogatories, including expert interrogatories, shall be served no later than _____.

9. Requests to Admit, if any, shall be served no later than _____.

10. Expert reports shall be served no later than _____.

11. Rebuttal expert reports shall be served no later than _____.

12. Expert depositions shall be completed by _____.

13. Additional provisions agreed upon by counsel are attached hereto and made a part hereof.

14. **ALL DISCOVERY SHALL BE COMPLETED BY** _____.

15. Any motions shall be filed in accordance with the Court's Individual Practices.

**\*9** 16. This Civil Case Discovery Plan and Scheduling Order may not be changed without leave of Court (or the assigned Magistrate Judge acting under a specific order of reference).

17. The Magistrate Judge assigned to this case is the Hon. _____.

18. If, after entry of this Order, the parties consent to trial before a Magistrate Judge, the Magistrate Judge will schedule a date certain for trial and will, if necessary, amend this Order consistent therewith.

19. The next case management conference is scheduled for _____, at _____. (The Court will set this date at the initial conference.)

SO ORDERED.

**All Citations**

Slip Copy, 2017 WL 3701495

Footnotes

1    Although Plaintiff identifies this Defendant as Elswerekwu, according to the Inmate Misbehavior Report appended to Plaintiff's Complaint and Defendants' Memorandum, this individual's last name is actually spelled "Ekwerekwu". (*See* Compl. at 36, 40, ECF No. 1; Def. Mem. in Support of Mot. to Dismiss ("Def. Mem."), at 1, ECF No. 22.) The Court will refer to this Defendant as C.O. Ekwerekwu, and directs the Clerk of Court to amend the case caption accordingly.

2    Defendants' Memorandum indicates they do not move to dismiss with regard to Plaintiff's procedural due process claims against DSR Smith. (*See* Def. Mem. at 1.)

3    To the extent that remedies are available, exhaustion is mandatory. However, where administrative remedies are not "available," failure to comply with the PLRA exhaustion requirement may be excused. *Williams v. Correction Officer Priatno*, 829 F.3d 118, 123-24 (2d Cir. 2016). There are at least three circumstances under which such remedies are considered "unavailable." "First, an administrative remedy may be unavailable when it 'operates as a simple dead end —with officers unable or consistently unwilling to provide any relief to aggrieved inmates.' Second, 'an administrative scheme might be so opaque that it becomes, practically speaking, incapable of use.' In other words, 'some mechanism exists to provide relief, but no ordinary prisoner can discern or navigate it.' Third, 'an administrative remedy may be unavailable 'when prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation.' ' " *Id.* (quoting *Ross v. Blake*, S. Ct. 1850, 1859-60 (2016)); *but see id. at 123* ("special circumstances" exception, permitting plaintiffs to file suit in federal court without first exhausting administrative remedies, abrogated).

4    The Court notes that, as proof of Plaintiff's failure to exhaust, Defendants offer a declaration by Jeffrey Hale, Assistant Director of the Inmate Grievance Program at DOCCS, indicating there is no record that Plaintiff exhausted his claims as to the allegedly false misbehavior report. (*See* Decl. of Jeffrey Hale In Support of Def. Mot to Dismiss, at 2-3, ECF No. 23.) Defendants have also included a notice sent to Plaintiff, who is proceeding *pro se*, apprising him of his obligations in opposing a motion to dismiss, including the possibility that the motion may be converted into one for summary judgment, as is required by Local Civil Rule 12.1. *Roland v. Smith*, 907 F. Supp. 2d 385, 389 (S.D.N.Y. 2012); (*see* ECF No. 25.) Because it is clear from the face of the Complaint that Plaintiff failed to exhaust his claims as to the false misbehavior report, the Court need not considered these documents.

5    (*See* Compl. at 11-12 (indicating Plaintiff was held for 101 days, plus an additional 19 days, from September 17, 2015 through October 6, 2015); *id.* at 13 (indicating Plaintiff held for "121 days").)

6    Defendants presumably concede that Plaintiff's assertions are sufficient to form the basis of a plausible allegation that he was subjected to punitive segregation without the rudimentary elements of due process, as they argue only that Plaintiff fails to allege he was placed in the SHU for "no legitimate reason". (*See* Def. Mem. at 20.)

7    Defendants' Memorandum contends that the Disposition Report, ECF No. 2, at 25, reflects that the officers and inmates testified that "no other inmate was out of their cell." This appears to be an inference based upon testimony of officers and inmates to the effect that "other cell doors were locked" (*see* ECF No. 2 at 25).

8    Defendants also contend that, to the extent Plaintiff asserts a negligence claim under 42 U.S.C. § 1983, presumably for the loss of his property, these claims must also be dismissed. (*See* Def. Mem. at 21 n.5.) This Court agrees. *See New Holland Vill. Condo. v. DeStaso Enterprises Ltd.*, 139 F. Supp. 2d 499, 503 (S.D.N.Y. 2001), *aff'd sub nom.*, 29 Fed.Appx. 760 (2d Cir. 2002) ("negligence—even gross negligence, or negligence that results in grievous injury—cannot be disguised as constitutional claims and brought in a federal court under 42 U.S.C. § 1983. Mere negligence by a state official does not deprive an individual of life, liberty or property without due process of law ... This is true even if the state's negligence results in the loss of life or property.").

---

**End of Document**            © 2018 Thomson Reuters. No claim to original U.S. Government Works.

1999 WL 983876
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Craig COLE, Plaintiff,
v.
Christopher P. ARTUZ, Superintendent, Green
Haven Correctional Facility, R. Pflueger, A.
Glemmon, Sgt. Stevens, Lt. Haubert, Capt.
W.M. Watford, Capt. T. Healey, and John
Doe # 1–5, all as individuals, Defendants.

No. 93 Civ. 5981(WHP) JCF.
|
Oct. 28, 1999.

**Attorneys and Law Firms**

Mr. Craig Cole, Bare Hill Correctional Facility, Malone,
New York, Legal Mail, Plaintiff, pro se.

William Toran, Assistant Attorney General, Office of the
Attorney General of the State of New York, New York,
New York, for Defendant.

*MEMORANDUM & ORDER*

PAULEY, J.

**\*1** The remaining defendant in this action, Correction
Officer Richard Pflueger, having moved for an order,
pursuant to Fed.R.Civ.P. 56, granting him summary
judgment and dismissing the amended complaint, and
United States Magistrate Judge James C. Francis IV
having issued a report and recommendation, dated
August 20, 1999, recommending that the motion
be granted, and upon review of that report and
recommendation together with plaintiff's letter to this
Court, dated August 28, 1999, stating that plaintiff does
"not contest the dismissal of this action", it is

ORDERED that the attached report and
recommendation of United States Magistrate Judge
James C. Francis IV, dated August 20, 1999, is adopted in
its entirety; and it is further

ORDERED that defendant Pflueger's motion for
summary judgment is granted, and the amended
complaint is dismissed; and it is further

ORDERED that the Clerk of the Court shall enter
judgment accordingly and close this case.

*REPORT AND RECOMMENDATION*

FRANCIS, Magistrate J.

The plaintiff, Craig Cole, an inmate at the Green Haven
Correctional Facility, brings this action pursuant to 42
U.S.C. § 1983. Mr. Cole alleges that the defendant
Richard Pflueger, a corrections officer, violated his First
Amendment rights by refusing to allow him to attend
religious services. The defendant now moves for summary
judgment pursuant to Rule 56 of the Federal Rules of Civil
Procedure. For the reasons set forth below, I recommend
that the defendant's motion be granted.

*Background*

During the relevant time period, Mr. Cole was an
inmate in the custody the New York State Department
of Correctional Services ("DOCS"), incarcerated at the
Green Haven Correctional Facility. (First Amended
Complaint ("Am.Compl.") ¶ 3). From June 21, 1993 to
July 15, 1993, the plaintiff was in keeplock because of
an altercation with prison guards. (Am.Compl.¶¶ 17–
25). An inmate in keeplock is confined to his cell for
twenty-three hours a day with one hour for recreation.
(Affidavit of Anthony Annucci dated Dec. 1, 1994 ¶
5). Pursuant to DOCS policy, inmates in keeplock must
apply for written permission to attend regularly scheduled
religious services. (Reply Affidavit of George Schneider
in Further Support of Defendants' Motion for Summary
Judgment dated September 9, 1996 ("Schneider Aff.") ¶
3). Permission is granted unless prison officials determine
that the inmate's presence at the service would create
a threat to the safety of employees or other inmates.
(Schneider Aff. ¶ 3). The standard procedure at Green
Haven is for the captain's office to review all requests
by inmates in keeplock to attend religious services.
(Schneider Aff. ¶ 3). Written approval is provided to the
inmate if authorization is granted. (Affidavit of Richard
Pflueger dated April 26, 1999 ("Pflueger Aff.") ¶ 5). The
inmate must then present the appropriate form to the

gate officer before being released to attend the services. (Pflueger Aff. ¶ 5).

**\*2** On June 28, 1993, the plaintiff submitted a request to attend the Muslim services on July 2, 1993. (Request to Attend Scheduled Religious Services by Keep–Locked Inmate dated June 28, 1993 ("Request to Attend Services"), attached as Exh. B to Schneider Aff.) On June 30, 1993, a supervisor identified as Captain Warford signed the request form, indicating that the plaintiff had received permission to attend the services. (Request to Attend Services). Shortly before 1:00 p.m. on July 2, 1993, the plaintiff requested that Officer Pflueger, who was on duty at the gate, release him so that he could proceed to the Muslim services. (Pflueger Aff. ¶ 3). However, Officer Pflueger refused because Mr. Cole had not presented the required permission form. (Pflueger Aff. ¶ 3). The plaintiff admits that it is likely that he did not receive written approval until some time thereafter. (Deposition of Craig Cole dated February 28, 1999 at 33–35, 38).

On August 25, 1993, the plaintiff filed suit alleging that prison officials had violated his procedural due process rights. On December 4, 1995, the defendants moved for summary judgment. (Notice of Defendants' Motion for Summary Judgment dated December 4, 1995). The Honorable Kimba M. Wood, U.S.D.J., granted the motion and dismissed the complaint on the grounds that the plaintiff failed to show that he had been deprived of a protected liberty interest, but she granted the plaintiff leave to amend. (Order dated April 5, 1997). On May 30, 1997, the plaintiff filed an amended complaint, alleging five claims against several officials at the Green Haven Correctional Facility. (Am.Compl.) On November 16, 1998, Judge Wood dismissed all but one of these claims because the plaintiff had failed to state a cause of action or because the statute of limitations had elapsed. (Order dated Nov. 16, 1998). The plaintiff's sole remaining claim is that Officer Pflueger violated his First Amendment rights by denying him access to religious services on July 2, 1993. The defendant now moves for summary judgment on this issue, arguing that the plaintiff has presented no evidence that his First Amendment rights were violated. In addition, Officer Pflueger contends that he is entitled to qualified immunity. (Defendants' Memorandum of Law in Support of Their Second Motion for Summary Judgment).

A. *Standard for Summary Judgment*

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *see also Tomka v. Seiler Corp.,* 66 F.3d 1295, 1304 (2d Cir.1995); *Richardson v. Selsky,* 5 F.3d 616, 621 (2d Cir.1993). The moving party bears the initial burden of demonstrating "the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). Where the movant meets that burden, the opposing party must come forward with specific evidence demonstrating the existence of a genuine dispute concerning material facts. Fed.R.Civ.P. 56(c); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249 (1986). In assessing the record to determine whether there is a genuine issue of material fact, the court must resolve all ambiguities and draw all factual inferences in favor of the nonmoving party. *Anderson,* 477 U.S. at 255; *Vann v. City of New York,* 72 F.3d 1040, 1048–49 (2d Cir.1995). But the court must inquire whether "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party" and grant summary judgment where the nonmovant's evidence is conclusory, speculative, or not significantly probative. *Anderson,* 477 U.S. at 249–50 (citation omitted). "The litigant opposing summary judgment may not rest upon mere conclusory allegations or denials, but must bring forward some affirmative indication that his version of relevant events is not fanciful." *Podell v. Citicorp Diners Club, Inc.,* 112 F.3d 98, 101 (2d Cir.1997) (citation and internal quotation omitted); *Matsushita Electric Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986) (a non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts"); *Goenaga v. March of Dimes Birth Defects Foundation,* 51 F.3d 14, 18 (2d Cir.1995) (nonmovant "may not rely simply on conclusory statements or on contentions that the affidavits supporting the motion are not credible") ((citations omitted)). In sum, if the court determines that "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.' " *Matsushita Electric Industrial Co.,* 475 U.S. at 587 (quoting *First National Bank of Arizona v. Cities Service Co.,* 391 U.S. 253, 288 (1968)); *Montana v. First Federal Savings & Loan Association,* 869 F.2d 100, 103 (2d Cir.1989).

Cole v. Artuz, Not Reported in F.Supp.2d (1999)
Case 9:16-cv-00717-TJM-TWD    Document 58    Filed 10/16/18    Page 25 of 60
1999 WL 983876

**\*3** Where a litigant is *pro se,* his pleadings should be read liberally and interpreted "to raise the strongest arguments that they suggest." *McPherson v. Coombe,* 174 F.3d 276, 280 (2d Cir.1999) (quoting *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994)). Nevertheless, proceeding *pro se* does not otherwise relieve a litigant from the usual requirements of summary judgment, and a *pro se* party's "bald assertion," unsupported by evidence, is not sufficient to overcome a motion for summary judgment. *See Carey v. Crescenzi,* 923 F.2d 18, 21 (2d Cir.1991); *Gittens v. Garlocks Sealing Technologies,* 19 F.Supp.2d 104, 110 (W.D.N.Y.1998); *Howard Johnson International, Inc. v. HBS Family, Inc.,* No. 96 Civ. 7687, 1998 WL 411334, at \*3 (S.D .N.Y. July 22, 1998); *Kadosh v. TRW, Inc.,* No. 91 Civ. 5080, 1994 WL 681763, at \*5 (S.D.N.Y. Dec. 5, 1994) ("the work product of *pro se* litigants should be generously and liberally construed, but [the *pro se'* s] failure to allege either specific facts or particular laws that have been violated renders this attempt to oppose defendants' motion ineffectual"); *Stinson v. Sheriff's Department,* 499 F.Supp. 259, 262 (S.D.N.Y.1980) (holding that the liberal standard accorded to *pro se* pleadings "is not without limits, and all normal rules of pleading are not absolutely suspended").

## B. *Constitutional Claim*

It is well established that prisoners have a constitutional right to participate in congregate religious services even when confined in keeplock. *Salahuddin v. Coughlin,* 993 F.2d 306, 308 (2d Cir.1993); *Young v. Coughlin,* 866 F.2d 567, 570 (2d Cir1989). However, this right is not absolute. *See Benjamin v. Coughlin,* 905 F.2d 571, 574 (2d Cir.1990) (right to free exercise balanced against interests of prison officials). Prison officials can institute measures that limit the practice of religion under a "reasonableness" test that is less restrictive than that which is ordinarily applied to the alleged infringement of fundamental constitutional rights. *O'Lone v. Estate of Shaabazz,* 482 U.S. 342, 349 (1986). In *O'Lone,* the Court held that "when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." *Id.* at 349 (quoting *Turner v. Safley,* 482 U.S. 78, 89 (1987)). The evaluation of what is an appropriate and reasonable penological objective is left to the discretion of the administrative officers operating the prison. *O'Lone,* 482 U.S. at 349. Prison administrators are "accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." *Bell v. Wolfish,* 441 U.S. 520, 547 (1979).

The policy at issue here satisfies the requirement that a limitation on an inmate's access to religious services be reasonable. The practice at Green Haven was to require inmates in keeplock to present written approval to the prison gate officer before being released to attend religious services. This policy both accommodates an inmate's right to practice religion and allows prison administrators to prevent individuals posing an active threat to security from being released. The procedure is not overbroad since it does not permanently bar any inmate from attending religious services. Rather, each request is decided on a case-by-case basis by a high ranking prison official and denied only for good cause.

**\*4** Furthermore, in order to state a claim under § 1983, the plaintiff must demonstrate that the defendant acted with deliberate or callous indifference toward the plaintiff's fundamental rights. *See Davidson v. Cannon* 474 U.S. 344, 347–48 (1986) (plaintiff must show abusive conduct by government officials rather than mere negligence). Here, there is no evidence that the defendant was reckless or even negligent in his conduct toward the plaintiff or that he intended to violate the plaintiff's rights. Officer Pflueger's responsibility as a prison gate officer was simply to follow a previously instituted policy. His authority was limited to granting access to religious services to those inmates with the required written permission. Since Mr. Cole acknowledges that he did not present the necessary paperwork to Officer Pflueger on July 2, 1993, the defendant did nothing improper in denying him access to the religious services. Although it is unfortunate that the written approval apparently did not reach the plaintiff until after the services were over, his constitutional rights were not violated. [1]

## *Conclusion*

For the reasons set forth above, I recommend that the defendant's motion for summary judgment be granted and judgment be entered dismissing the complaint. Pursuant to 28 U.S.C. § 636(b)(1) and Rules 72, 6(a), and 6(e) of the Federal Rules of Civil Procedure, the parties shall have ten (10) days to file written objections to this report and recommendation. Such objections shall be filed with

the Clerk of the Court, with extra copies delivered to the chambers of the Honorable William H. Pauley III, Room 234, 40 Foley Square, and to the Chambers of the undersigned, Room 1960, 500 Pearl Street, New York, New York 10007. Failure to file timely objections will preclude appellate review.

Respectfully submitted,

**All Citations**

Not Reported in F.Supp.2d, 1999 WL 983876

Footnotes

1       In light of this finding, there is no need to consider the defendant's qualified immunity argument.

**End of Document**                    © 2018 Thomson Reuters. No claim to original U.S. Government Works.

Eleby v. Smith, Not Reported in Fed. Supp. (2017)

2017 WL 986123

Case 9:16-cv-00717-TJM-TWD   Document 58   Filed 10/16/18   Page 27 of 60

2017 WL 986123
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Terrell K. ELEBY, Plaintiff,
v.
G. SMITH and N. Vevone, Defendants.

Civil Action No. 9:15-CV-0281 (TJM/DEP)
|
Signed January 9, 2016
|
Filed 01/09/2017

**Attorneys and Law Firms**

TERRELL K. ELEBY, 86-A-0908, Sing Sing
Correctional Facility, 354 Hunter Street, Ossining, NY
10562, Pro Se.

FOR DEFENDANTS: ERIC T. SCHNEIDERMAN,
New York State Attorney General, OF COUNSEL:
CHRISTOPHER J. HUMMEL, ESQ., Assistant
Attorney General, The Capitol, Albany, NY 12224.

**REPORT AND RECOMMENDATION**

DAVID E. PEEBLES, CHIEF U.S. MAGISTRATE
JUDGE

**\*1** This is a civil rights action brought by *pro se*
plaintiff Terrell Eleby against three individuals employed
by the New York State Department of Corrections and
Community Supervision ("DOCCS"), one of whom has
since been dismissed from the action, pursuant to 42
U.S.C. § 1983. In his complaint, plaintiff alleges that two
of the defendants assaulted him in violation of his Eighth
Amendment rights, and the third defendant violated his
Fourteenth Amendment rights by issuing an allegedly
false misbehavior report against him and confining him in
the special housing unit ("SHU") at the prison facility in
which he was housed.

Currently pending before the court is a motion brought
by the remaining two defendants seeking the entry of
summary judgment in their favor based upon plaintiff's
alleged failure to exhaust available administrative

remedies before filing suit. For the reasons set forth below,
I recommend that the defendants' motion be granted.

I. BACKGROUND [1]

Plaintiff is a prison inmate currently held in the custody
of the DOCCS. *See, e.g.,* Dkt. No. 29-2 at 13. Although
plaintiff is now confined elsewhere, at the times relevant
to this action he was housed in the Auburn Correctional
Facility ("Auburn") located in Auburn, New York. *Id.* at
18.

In his complaint, plaintiff alleges that on January 14, 2015,
he was waiting in one of Auburn's hospital dormitory
rooms to be escorted to an outside facility for a medical
examination. Dkt. No. 1 at 4; Dkt. No. 29-2 at 54. At
approximately 10:00AM, defendants Smith and Vevone,
both of whom are corrections officers, arrived at plaintiff's
room to escort him on the medical trip. Dkt. No. 1 at
4. While plaintiff was attempting to remove his clothes
for a mandatory strip search, defendant Smith "violently
and physically attacked [him]." *Id.*; *see also* Dkt. No. 29-2
at 58. According to plaintiff, both defendants Smith and
Vevone "jumped on [his] back," and defendant Smith
punched him repeatedly in the eye, head, neck, back, and
ribs. Dkt. No. 29-2 at 58, 62-63. After approximately five
minutes Sergeant Cudla, who is not a named defendant
in the action, arrived at plaintiff's dorm, physically
intervened, and ordered defendants Smith and Vevone to
cease the assault and leave the room. Dkt. No. 1 at 4-5;
Dkt. No. 29-2 at 58-59, 64. As a result of the alleged
assault, plaintiff suffered various injuries, including a
bloody and swollen eye, swelling and redness to his neck,
and sore ribs. Dkt. No. 1 at 5; Dkt. No. 29-2 at 62-63, 67.

Following the use-of-force incident, defendants Smith and
Vevone issued plaintiff a misbehavior report accusing
him of violating six prison rules. Dkt. No. 22 at 9; Dkt.
No. 29-2 at 72. Following a superintendent's hearing to
address the charges, plaintiff was found guilty on four
of the six counts. Dkt. No. 22 at 13; Dkt. No. 29-2 at
72. As a result of that finding, plaintiff was sentenced
to serve thirty days of disciplinary SHU confinement,
with a corresponding loss of commissary, package, and
telephone privileges. Dkt. No. 22 at 13; Dkt. No. 29-2 at
73-72.

II. PROCEDURAL HISTORY

Eleby v. Smith, Not Reported in Fed. Supp. (2017)
Case 9:16-cv-00717-TJM-TWD    Document 58    Filed 10/16/18    Page 28 of 60
2017 WL 986123

**\*2** Plaintiff commenced this action on or about March 12, 2015, with the filing of a complaint and accompanied by an application to proceed *in forma pauperis* ("IFP"). Dkt. Nos. 1, 2. On May 12, 2015, Senior District Judge Thomas J. McAvoy issued a decision and order granting plaintiff's IFP application and accepting his complaint for filing, with the exception of one cause of action. [2] Dkt. No. 11. In his third cause of action, plaintiff asserted a Fourteenth Amendment claim against defendant Lieutenant Quinn based on the allegation that defendant Quinn "conspire[d] and aided ... in writing a false [misbehavior] report after ascertaining the facts [sic] that [defendants Smith and Vevone] were in the wrong." Dkt. No. 1 at 6. Judge McAvoy dismissed that cause of action for failure to state a cognizable claim pursuant to 28 U.S.C. §§ 1915(e), 1915A. Dkt. No. 11 at 9-12.

Following the close of discovery, defendants Smith and Vevone filed the currently pending motion for summary judgment seeking dismissal of plaintiff's complaint, arguing that plaintiff failed to fully exhaust available administrative remedies before filing this action. Dkt. No. 29-5. Plaintiff has filed a response in opposition to defendants' motion, which is now fully briefed, and has been referred to me for the issuance of a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and Northern District of New York Local Rule 72.3(c). *See* Fed. R. Civ. P. 72(b).

## III. DISCUSSION

### A. Legal Standard Governing Summary Judgment

Summary judgment motions are governed by Rule 56 of the Federal Rules of Civil Procedure. Under that provision, the entry of summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986); *Sec. Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.*, 391 F.3d 77, 82-83 (2d Cir. 2004). A fact is "material" for purposes of this inquiry if it "might affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248; *see also Jeffreys v. City of N.Y.*, 426 F.3d 549, 553 (2d Cir. 2005). A material fact is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

A party moving for summary judgment bears an initial burden of demonstrating that there is no genuine dispute of material fact to be decided with respect to any essential element of the claim in issue; the failure to meet this burden warrants denial of the motion. *Anderson*, 477 U.S. at 250 n.4; *Sec. Ins. Co.*, 391 F.3d at 83. In the event this initial burden is met, the opposing party must show, through affidavits or otherwise, that there is a material dispute of fact for trial. Fed. R. Civ. P. 56(e); *Celotex*, 477 U.S. at 324; *Anderson*, 477 U.S. at 250.

When deciding a summary judgment motion, a court must resolve any ambiguities, and draw all inferences, in a light most favorable to the non-moving party. *Anderson*, 477 U.S. at 255; *Jeffreys*, 426 F.3d at 553; *Wright v. Coughlin*, 132 F.3d 133, 137-38 (2d Cir. 1998). The entry of summary judgment is justified only in the event of a finding that no reasonable trier of fact could rule in favor of the non-moving party. *Bldg. Trades Employers' Educ. Ass'n v. McGowan*, 311 F.3d 501, 507-08 (2d Cir. 2002); *see also Anderson*, 477 U.S. at 250 (finding summary judgment appropriate only when "there can be but one reasonable conclusion as to the verdict").

### B. Plaintiff's Exhaustion of Administrative Remedies

**\*3** In their motion, defendants contend that plaintiff's complaint is subject to dismissal because plaintiff has failed to exhaust available administrative remedies as required under the Prison Litigation Reform Act of 1996 ("PLRA"), Pub. L. No. 104-134, 110 Stat. 1321 (1996), prior to commencing this action. *See generally* Dkt. No. 29-5 at 2.

### 1. Legal Principles Governing Exhaustion Under the PLRA

The PLRA, which imposes several restrictions on the ability of prisoners to maintain federal civil rights actions, expressly provides that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a); *see also Ross v. Blake*, 136 S. Ct. 1850, 1856 (2016). Section 1997e(a)'s exhaustion provision is "mandatory" and applies to all inmate lawsuits regarding the conditions of their confinement. *Ross*, 136

Eleby v. Smith, Not Reported in Fed. Supp. (2017)

Case 9:16-cv-00717-TJM-TWD  Document 58  Filed 10/16/18  Page 29 of 60

2017 WL 986123

S. Ct. at 1856; *Woodford v. Ngo*, 548 U.S. 81, 84 (2006); *Porter v. Nussle*, 534 U.S. 516, 524, 532 (2002); *Williams v. Corr. Officer Priatno*, 829 F.3d 118, 122 (2d Cir. 2016). In the event a defendant establishes that the inmate-plaintiff failed fully comply with the administrative process prior to commencing an action in federal court, the plaintiff's complaint is subject to dismissal. *See Woodford*, 548 U.S. at 93 ("[W]e are persuaded that the PLRA exhaustion requirement requires proper exhaustion."); *Wilson v. McKenna*, ─── Fed.Appx. ───, No. 15-3496, 2016 WL 5791558, at *1 (2d Cir. Oct. 4, 2016). "Proper exhaustion" requires a plaintiff to procedurally exhaust his claims by "compl[ying] with the system's critical procedural rules." [3] *Woodford*, 548 U.S. at 95; *accord, Macias v. Zenk*, 495 F.3d 37, 43 (2d Cir. 2007).

New York affords state prison inmates the opportunity to seek redress of complaints regarding prison conditions through a grievance procedure that is designated as the Inmate Grievance Program ("IGP"). *Williams*, 829 F.3d at 119. The IGP is comprised of three steps that inmates must satisfy when they have a grievance regarding prison conditions. 7 N.Y.C.R.R. §§ 701.1, 701.5; *Williams*, 829 F.3d at 119. The IGP requires that an inmate first file a grievance with "the clerk" within twenty-one days of the alleged occurrence giving rise to his complaint. 7 N.Y.C.R.R. § 701.5(a)(1). "The complaint may only be filed at the facility where the inmate is housed even if it pertains to another facility." *Id.* Representatives of the inmate grievance resolution committee ("IGRC") [4] have up to sixteen days after the grievance is filed to informally resolve the issue. *Id.* at § 701.5(b)(1). If there is no such informal resolution, then the full IGRC conducts a hearing within sixteen days after receipt of the grievance. *Id.* at § 701.5(b)(2).

A grievant may then appeal the IGRC's decision to the facility's superintendent within seven days after receipt of the IGRC's written decision. 7 N.Y.C.R.R. § 701.5(c). The superintendent must issue a written decision within a certain number of days after receipt of the grievant's appeal. [5] *Id.* at § 701.5(c)(3)(i), (ii).

**\*4** The third and final step of the IGP involves an appeal to the DOCCS Central Office Review Committee ("CORC"), which must be taken within seven days after an inmate receives the superintendent's written decision. 7 N.Y.C.R.R. § 701.5(d)(1)(i). The CORC is required to

render a written decision within thirty days of receipt of an appeal. *Id.* at § 701.5(d)(2)(i).

It is worth noting that, as in this case, where an inmate complains of harassment or other misconduct by corrections officers or prison employees, the IGP provides for an expedited review process. 7 N.Y.C.R.R. § 701.8. In particular, the IGP requires inmates "who wish[ ] to file a grievance complaint that alleges employee harassment [to] follow the procedures set forth in [7 N.Y.C.R.R §] 701.5(a)[.]" *Id.* at § 701.8(a). As was noted above, section 701.5(a)(1) provides that, *inter alia*, the inmate shall submit his grievance to the clerk within twenty-one days of the incident of which he complains. *Id.* at § 701.5(a)(1). On the same day the clerk receives a grievance complaining of employee harassment, he must forward it "to the superintendent by the close of business." *Id.* at § 701.8(b).

As can be seen, at each step of the IGP process, a decision must be rendered within a specified time period. 7 N.Y.C.R.R. § 701.5. Where the IGRC and/ or superintendent do not timely respond, an inmate must appeal "to the next step." *Id.* at § 701.6(g)(2); *Smith v. Kelly*, 985 F. Supp. 2d 275, 281 (N.D.N.Y. 2013) (Suddaby, J.) ("[A]ny failure by the IGRC or the superintendent to timely respond to a grievance ... can— and must—be appealed to the next level ... to complete the grievance process."). Generally, if a plaintiff fails to follow each of the required three steps of the above-described IGP prior to commencing litigation, he has failed to exhaust his administrative remedies as required under the PLRA. *See Ruggerio v. Cnty. of Orange*, 467 F.3d 170, 176 (2d Cir. 2006) ("[T]he PLRA requires proper exhaustion, which means using all steps that the agency holds out, and doing so *properly* (so that the agency addresses the issues on the merits).") (quotation marks omitted)).

While the PLRA mandates exhaustion of available administrative remedies, it also "contains its own, textual exception to mandatory exhaustion." *Ross*, 136 S. Ct. at 1858. More specifically, section 1997e(a) provides that only those administrative remedies that "are available" must first be exhausted. 42 U.S.C. § 1997e(a); *see also Ross*, 136 S. Ct. at 1858 ("[T]he exhaustion requirement hinges on the availability of administrative remedies." (quotation marks omitted)). In the PLRA context, the Supreme Court has determined that "availability" means that "an inmate is required to

Eleby v. Smith, Not Reported in Fed. Supp. (2017)

Case 9:16-cv-00717-TJM-TWD   Document 58   Filed 10/16/18   Page 30 of 60

2017 WL 986123

exhaust those, but only those, grievance procedures that are capable of use to obtain some relief for the action complained of." *Ross*, 136 S. Ct. at 1859 (quotation marks omitted).

In *Ross*, the Supreme Court identified three circumstances in which a court could find that internal administrative remedies are not available to prisoners under the PLRA.[6] *Ross*, 136 S. Ct. at 1859-60. Under the first, "an administrative procedure is unavailable when (despite what regulations or guidance materials may promise) it operates as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates." *Id.* at 1859. In addition, "an administrative scheme might be so opaque that it becomes, practically speaking, incapable of use." *Id.* The Court explained that, "[i]n this situation, some mechanism exists to provide relief, but no ordinary prisoner can discern or navigate it." *Id.* The third scenario in which administrative remedies are deemed unavailable to prisoners is when "prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Id.* at 1860.

### 2. Analysis

**\*5** The record now before the court firmly establishes that plaintiff did not exhaust the available administrative remedies in accordance with the PLRA before commencing this action. According to plaintiff, following the alleged assault, he submitted a (1) grievance,[7] (2) letter to the superintendent at Auburn, (3) memorandum to the IGP supervisor at Auburn, and (4) letter to the New York State Inspector General ("IG") complaining of the alleged assault by defendants Smith and Vevone.[8] Dkt. No. 29-2 at 25-26, 39-40, 46-47, 50, 94-99, 104. Plaintiff did not receive any written response to any of his correspondence. Dkt. No. 29-2 at 40-42, 48-49, 51-53. He claims, however, that an officer stationed at Auburn, Sergeant Cudla, conducted an in-person interview of him on January 22, 2015, in connection with the grievance allegedly filed, and the IG's office conducted an investigation that included an interview of plaintiff in or about April 2015. *Id.* at 40-42, 48-49, 51-53. He also contends that he spoke directly to Deputy Robisson, the Deputy of Superintendent for Security at Auburn, regarding the assault. *Id.* at 31-32, 47-48, 100.

Notwithstanding the fact that he did not receive a written response to any of his correspondence regarding the alleged assault, plaintiff admittedly neglected to appeal the lack of a response to the next level of the IGP. *Id.* at 48-51. Because the IGP has been interpreted by courts in this circuit as requiring inmates to appeal to the next level when they do not receive a timely response to their grievance, plaintiff should have appealed to the superintendent and/or the CORC when he failed to receive a written response to the grievance he allegedly filed. *See* 7 N.Y.C.R.R. § 701.6(g)(2) ("[M]atters not decided within the time limits may be appealed to the next step."); *Dabney v. Pegano*, 604 Fed.Appx. 1, 4-5 (2d Cir. 2015) (citing section 701.6(g) and concluding that, based on that provision, the plaintiff had "an unimpeded path to the CORC, notwithstanding his claims that the Great Meadow grievance clerk failed to process his complaint and that the Clinton superintendent ignored his appeal"); *Hyliger v. Gebler*, 624 Fed.Appx. 780, 782 (2d Cir. 2015) ("Under the regulations ..., if at any step of the grievance process[ ] an inmate did not receive a response within the specified timeframe, he was nonetheless permitted to appeal to the next step. Thus, when [the plaintiff] did not receive a written response from the IGRC, appeal to the superintendent was still an available administrative remedy." (quotation marks, alteration, citation, and footnote omitted)). The record in this case shows, without contradiction, that while plaintiff appealed other grievance denials to the CORC, he did not do so in connection with defendants' alleged assault. Dkt. No. 29-3 at 4. This default constitutes a failure to exhaust available administrative remedies for purposes of the PLRA.

Liberally construing plaintiff's response to defendants' pending motion, he contends that he fully exhausted administrative remedies before commencing this action because his grievance involved allegations of employee harassment and, consequently, by sending his letter directly to the superintendent he satisfied the requirements of the IGP. Dkt. No. 31 at 5. The IGP, however, clearly mandates that even those grievances complaining of employee harassment must be filed with the IGP clerk, who then must forward the grievance to the superintendent on the day of receipt. 7 N.Y.C.R.R. § 701.8(a). Writing and sending a letter directly to a superintendent does not satisfy the IGP. *See Dabney*, 604 Fed.Appx. at 3 ("The IGP also has an expedited

Eleby v. Smith, Not Reported in Fed. Supp. (2017)
Case 9:16-cv-00717-TJM-TWD    Document 58    Filed 10/16/18    Page 31 of 60

2017 WL 986123

process for harassment grievances, which pertains to employee conduct meant to annoy, intimidate, or harm an inmate. These grievances go directly to a superintendent." (quotation marks, citations omitted)); *see also Lopez v. Bushey*, No. 11-CV-0418, 2014 WL 2807532, at \*9 (N.D.N.Y. Apr. 7, 2014) (Dancks, M.J.) ("If the grievance involves a claim of misconduct by staff, harassment or discrimination, it receives a code of 49.... [T]he grievance is handled expeditiously by passing through the IGRC and going directly to the superintendent of the facility.").

**\*6** Plaintiff next argues that he appealed the disciplinary hearing determination related to the misbehavior report he was issued, following the alleged assault by defendants Smith and Vevone, on January 14, 2015. Dkt. No. 31 at 3. Appealing a disciplinary hearing determination, however, is no substitute for filing and pursuing to completion a grievance through the IGP. [9] *See, e.g., McCoy v. Goord*, 255 F. Supp. 2d 233, 256 (S.D.N.Y. 2003).

Plaintiff also "asserts ... that the defendants hinder[ed] [his] complaint from reaching the CORC and from being properly filed with the IGRC." Dkt. No. 31 at 5. While I am mindful of my obligation to draw all inferences in favor of the non-moving party on summary judgment, *Terry*, 336 F.3d at 137, this conclusory allegation is not supported by any record evidence. Indeed, plaintiff sets forth this contention in an unsworn memorandum of law, which is decidedly not evidence. *See Giannullo v. City of N.Y.*, 322 F.3d 139, 142 (2d Cir. 2003) ("In support of the assertion that the police had received complaints of drug activity in the area, the district court cited, not to admissible evidence, but to the defendants' memorandum of law, which is not evidence at all."). In any event, even assuming plaintiff's contention constitutes competent evidence, "a party may not create an issue of fact by submitting an affidavit in opposition to a summary judgment motion that, by omission or addition, contradicts the affiant's previous deposition testimony." *Hayes v. N.Y.C. Dep't of Corrs.*, 84 F.3d 614, 619 (2d Cir. 1996). At his deposition in this matter, plaintiff unequivocally testified that he did not file an appeal of his grievance to the CORC. Dkt. No. 29-2 at 49-51. He now attempts to create a dispute of fact by arguing that defendants thwarted his appeal from reaching the CORC. Dkt. No. 31 at 5. This he cannot do. *Hayes*, 84 F.3d at 619.

Finally, to the extent plaintiff contends that his letter to the IG and any subsequent investigation constitutes exhaustion under the PLRA, plaintiff is incorrect. *See, e.g., Goodson v. Silver*, No. 09-CV-0494, 2012 WL 4449937, at \*9 (N.D.N.Y. Sept. 25, 2012) (Suddaby, C.J.) ("[A]n IG's investigation of a matter and conclusion that it is unsubstantiated does not satisfy the exhaustion requirement[.]" (citing cases)).

In summary, because plaintiff admittedly failed to pursue a grievance filed under the IGP to completion by filing an appeal to the CORC, and because he has failed to set forth any evidence that the IGP was rendered unavailable to him, I recommend that defendants' motion be granted.

## IV. SUMMARY AND RECOMMENDATION
Plaintiff's remaining cause of action alleges that defendants Smith and Vevone applied excessive force against him on January 14, 2015. Although plaintiff alleges that he filed various written documents—including a grievance in accordance with the IGP—complaining of defendants' use of force, he admits that he did not pursue the matter through the IGP by seeking review of his grievance by the CORC, as required under the available grievance program. Accordingly, it is respectfully

**\*7** RECOMMENDED that defendants' motion for summary judgment (Dkt. No. 29) be GRANTED and that plaintiff's complaint in this matter be DISMISSED.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections must be filed with the clerk of the court within FOURTEEN days of service of this report. [10] FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72; *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993).

The clerk of the court is respectfully directed to serve a copy of this report and recommendation upon the parties in accordance with this court's local rules.

## All Citations

Not Reported in Fed. Supp., 2017 WL 986123

Eleby v. Smith, Not Reported in Fed. Supp. (2017)

Case 9:16-cv-00717-TJM-TWD    Document 58    Filed 10/16/18    Page 32 of 60

2017 WL 986123

## Footnotes

1   In light of the procedural posture of the case, the following recitation is derived from the record now before the court, with all inferences drawn and ambiguities resolved in plaintiff's favor. *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003).

2   Plaintiff's first and second IFP applications were denied as incomplete. Dkt. Nos. 4, 7. Following those denials, plaintiff filed a third IFP motion, on or about April 2, 2015, which was then granted by Judge McAvoy. Dkt. Nos. 9, 11.

3   Copies of all unreported decisions cited in this document have been appended for the convenience of the *pro se* plaintiff.

4   The IGRC is comprised of "two voting inmates, two voting staff members, and a non-voting chairperson." 7 N.Y.C.R.R. § 701.4(a).

5   Depending on the type of matter complained of by the inmate, the superintendent has either seven or twenty days after receipt of an appeal to issue a decision. 7 N.Y.C.R.R. § 701.5(c)(3)(i), (ii).

6   According to the Second Circuit, "the three circumstances discussed in *Ross* do not appear to be exhaustive[.]" *Williams*, 829 F.3d at 123 n.2.

7   Aside from plaintiff's testimony at his deposition, there is no record evidence to support his allegation that he filed a grievance in accordance with the IGP. *See, e.g.,* Dkt. No. 29-3 at 4; Dkt. No. 29-4 at 2.

8   In or about 2014 the DOCCS Office of Special Investigations assumed the role previously played by the IG, including investigating complaints regarding prison conditions. *See* DOCCS Directive No. 0700, available at http://www.doccs.ny.gov/Directives/0700.pdf.

9   In any event, plaintiff's appeal of the disciplinary hearing determination does not complain of excessive force used by defendants Smith and Vevone. Dkt. No. 22 at 22-23. Instead, plaintiff argued on appeal that the hearing determination was based on insufficient evidence. *Id.* Accordingly, even assuming the appeal from the disciplinary hearing could act as a substitute for filing and pursuing a grievance through the IGP, plaintiff's appeal did not place prison officials on notice of his complaints of excessive force because he did not raise them in his appeal. *Id.*

10  If you are proceeding *pro se* and are served with this report and recommendation by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date the report and recommendation was mailed to you to serve and file objections. Fed. R. Civ. P. 6(d). If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday. Fed. R. Civ. P. 6(a)(1)(C).

---

**End of Document**                          © 2018 Thomson Reuters. No claim to original U.S. Government Works.

2012 WL 4093792
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Gregory HARVEY, Plaintiff,

v.

David HARDER, et al., Defendants.

No. 9:09−CV−154 (TJM/ATB).
|
July 31, 2012.

**Attorneys and Law Firms**

Gregory Harvey, pro se.

Aaron Marcus, Asst. Broome County Atty., for Defendants.

## ORDER and REPORT–RECOMMENDATION

ANDREW T. BAXTER, United States Magistrtate Judge.

**\*1** This matter has been referred to me for Report and Recommendation pursuant to 28 U.S.C. § 636(b) and LOCAL RULES N.D.N.Y. 72.3(c). In this civil rights amended complaint, plaintiff alleges that defendants violated his rights to due process and equal protection [1] when they kept him in "segregated housing" for approximately one month, without any disciplinary incident or hearing. (Am, Compl .; Dkt. No. 33). Plaintiff also alleges that defendant Shear improperly ordered plaintiff to be put in restraints whenever he left his cell. (*Id.*) Plaintiff seeks substantial monetary relief.

Presently before the court is defendants' motion for summary judgment pursuant to Fed.R.Civ.P. 56. (Dkt. No. 47). Plaintiff has responded in opposition to the motion. (Dkt. No. 50). For the following reasons, this court agrees with defendants and will recommend dismissal of the amended complaint.

## DISCUSSION

**I. *Facts and Procedural History* [2]**

Plaintiff alleges that he was improperly placed in "segregated housing" at Broome County Correctional Facility ("BCCF") from January 12, 2007 until he was transferred out of the facility on February 13, 2007. Plaintiff claims that defendants violated his rights to due process and equal protection because they did not afford him a hearing prior to his confinement in the Special Housing Unit ("SHU"). Plaintiff's original complaint named only the Broome County Sheriff, David Harder. (Dkt. No. 1). In his amended complaint, plaintiff added the names of five more defendants, who plaintiff believes are responsible for his improper confinement: (1) Sergeant Robert E. Buholski; (2) Sergeant Jon C. Gillette; (3) Lieutenant Wesley C. Shear; (4) Corrections Officer ("CO") David B. Thompson; and (5) Lieutenant William Lillie. [3]

Plaintiff claims that on January 12, 2007, when plaintiff was transferred from Herkimer County Correctional Facility ("HCCF"), defendant Harder "ordered his staff to wrongfully imprison and put restraints upon plaintiff by housing him illegally in segragated [sic] housing without any record of a disciplinary incident report or any record of a disciplinary hearing." (Am. Compl. ¶ 6; Facts). Plaintiff also alleges that, beginning on January 17, 2007, "restraints were put on him," and that defendant Harder and his staff violated plaintiff's Eighth Amendment right to be free from cruel and unusual punishment with their "deliberate indifference." (Am. Compl. ¶ 6; CM/ECF pp. 6–7). Plaintiff states that he became paranoid "from the loss of liberty enjoyed by other prisoners. (*Id.* at p. 7) Plaintiff alleges that each of the five new defendants "signed an order" wrongfully housing plaintiff in SHU; defendant Thompson signed two orders; and defendant Shear also signed an order "to place Plaintiff in restraints whenever he left his cell." (Am. Compl. ¶ 7; Causes of Action; CM/ECF pp. 6–7).

There is no dispute in this case that plaintiff was housed in "segregated housing" for the entire time that he was incarcerated in BCCF. Defendants state that plaintiff was in Administrative Segregation ("Ad Seg"), rather than *disciplinary* segregation. In support of the motion for summary judgment, each defendant has submitted an affidavit, explaining the circumstances under which plaintiff was confined to Ad Seg for the period between January 12th and February 13t' of 2007. (Dkt.Nos.47–19–47–26). An affidavit was submitted by Sergeant Edward J. Cermak, who is not a defendant, but states that it was

he, (not defendant Gillette), [4] who reviewed the Order placing plaintiff in Ad Seg in the facility's SHU (D–Pod). (Dkt. No. 47–20; Cermak Aff. ¶ 12; Gillette Aff. ¶ 11). Affidavits were also submitted by CO Franklin Sherman, the Classification Officer at BCCF; and Mark Smolinsky, the Jail Administrator at BCCF. (Dkt.Nos.47–24, 47–25).

 *2  Defendants' affidavits all state that plaintiff was transferred from HCCF to BCCF on January 12, 2007. Prior to the transfer, defendants state that on, January 11, 2007, a " 'Custodial Transfer Information' sheet" was created at HCCF, evidencing plaintiff's transfer. (Buholski Aff. ¶ 2; Cermak Aff. ¶ 2; Gillette Aff. ¶ 2; Shear Aff. ¶ 2; Sherman Aff. ¶ 3; Smolinsky Aff. ¶ 5; Thompson Aff. ¶ 3). [5] This information, prepared by Lieutenant John Coddington at HCCF, indicated that plaintiff had known mental health problems, was on medication, had been assaultive toward staff and inmates at HCCF, and had poor adjustment to confinement. (*Id.* & Ex. F)

Accompanying the custodial transfer information, was a letter from HCCF Lieutenant Coddington, further explaining that plaintiff had an "extensive psychiatric history"; had been assaultive toward staff at HCCF; had very long fingernails, which he refused to cut and had threatened to use as weapons against the staff; had a long history of threat-related activity, including threats to the President of the United States; [6] had been housed in HCCF Ad Seg due to continued outbursts and threats toward staff; had not been housed in general population due to unstable behavior and continued to be housed "alone"; was very paranoid, and was subject to "drastic mood swings." (Smolinsky Aff. ¶ 6 & Ex. G). The court notes that while incarcerated in HCCF, on October 8, 2006, plaintiff was notified that his "classification level" was "Maximum." [7] (Def.s' Ex. D).

Plaintiff arrived at BCCF on Friday, January 12, 2007 at approximately 12:49 p.m. (*Id.* ¶ 7). He was screened by CO Joe Spaziano, who noted that the plaintiff had a "chronic psychiatric history with mental health treatment" and referred him to the forensic unit for evaluation. (*Id.*) Plaintiff was taken to the Ad Seg area of the forensic/ medical unit at 5:29 p.m. on January 12. Until that time, plaintiff had been housed in cell number 5 of the "admissions unit," where all inmates are housed as part of the facility's admission procedures. [8] (*Id.* & Def.s' Ex.H; Housing History Sheet). The forensic referral sheet is

Defendants' Exhibit I. On January 14, 2007, plaintiff was cleared by forensics, medical, and corrections to leave the medical unit, and he was then taken to A– Pod, another housing unit used for classification purposes. (*Id.* ¶ 15 & Def.s' Ex. H). CO Sherman is the facility's Classification Officer, and was charged with completing plaintiff's classification. (Sherman Aff. ¶ 2).

Prior to the completion of plaintiff's classification, on January 17, 2007, there was an incident in A–Pod, in which plaintiff allegedly directed threats toward the President of the United States as well as other individuals. (Smolinsky Aff. ¶ 16; Sherman Aff. ¶ 8). Because of this incident, plaintiff was returned to the medical unit at 2:00 p.m. on January 17th. (*Id.* & Def.s' Ex. H). Another Ad Seg order was drafted by CO Thompson, who noted that plaintiff was being admitted to Ad Seg as part of the facility admission procedure, but also noted that the staff perceived a serious threat to the inmate's safety, although he had not requested protection. (Shear Aff. ¶ 10 & Def.s' Ex. M). Sergeant Cermak reviewed the Order and directed plaintiff's placement in Ad Seg in SHU. (Shear Aff. ¶ 12). At the same time, defendant Shear states that he signed a "Restraint Order" which meant that plaintiff would have a "two officer escort" anytime that he was out of his cell. (Shear Aff. ¶ 13). Defendant Shear states that "[n]o physical restraints, e.g. handcuffs, shackles, etc., were made part of this Order, or placed on the plaintiff." (*Id.*). When plaintiff was released from the medical unit on January 18, 2007 he, was placed in Ad Seg in D–Pod, the SHU of BCCF to finish out his classification period. [9] (*Id.*) Defendant Shear states that he had no control over plaintiff's ultimate classification. (Shear Aff. ¶ 16).

 *3  Plaintiff's classification was completed on Friday, January 19, 2007. He was determined to be a "maximum" security inmate, and his assignment to D–Pod was continued. (*Id.* ¶ 18). CO Sherman states that he conducted the classification pursuant to the facility's "Classification of Inmates" and the "Special Security Classification" policy. (Sherman Aff. ¶ 9). The "Special Security Classification" policy allows the facility to assign inmates to SHU if they have exhibited violent behavior during periods of incarceration. (Sherman Aff. ¶ 10). CO Sherman states that in making his classification determination, he considered the transfer papers sent by HCCF. In addition, he noted that plaintiff's current charges included Rape in the first and second degree, both violent felonies; he had exhibited assaultive behavior at

HCCF; had an extensive psychiatric history; had a history of substance abuse; and had threatened the President of the United States. (Sherman Aff. ¶ 10). CO Sherman used a "Classification Point Scale" and determined that plaintiff was a "maximum" security inmate, not eligible for general population. (*Id.* ¶ 11). CO Sherman states that this classification was not made for punitive reasons, but for the safety and the security of the facility, its staff, and other inmates. (*Id.*) Plaintiff was notified of his classification on Monday, January 22, 2007. (Smolinsky Aff. ¶ 19).

Plaintiff was transferred out of BCCF on February 13, 2007. (Def .s' Ex. H). Defendants do not dispute that plaintiff was confined in "segregated housing" for his entire stay at BCCF.

## II. *Summary Judgment*

Summary judgment may be granted when the moving party carries its burden of showing the absence of a genuine issue of material fact. Fed.R.Civ.P. 56; *Thompson v. Gjivoje,* 896 F.2d 716, 720 (2d Cir.1990). "Only disputes over facts that might affect the outcome of the suit under governing law will properly preclude summary judgment." *Salahuddin v. Coughlin,* 674 F.Supp. 1048, 1052 (S.D.N.Y.1987) (citation omitted). A dispute about a genuine issue of material fact exists if the evidence is such that "a reasonable [fact finder] could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).

In meeting its burden, the party moving for summary judgment bears the initial responsibility of informing the court of the basis for the motion and identifying the portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986); Fed.R.Civ.P. 56(c)(1)(A). If the moving party satisfies its burden, the nonmoving party must move forward with specific facts showing that there is a genuine issue for trial. *Salahuddin v. Goord,* 467 F.3d 263, 272–73 (2d Cir.2006). In determining whether there is a genuine issue of material fact, a court must resolve all ambiguities, and draw all inferences, against the movant. *See United States v. Diebold, Inc .,* 369 U.S. 654, 655 (1962). However, when the moving party has met its burden, the nonmoving party must do more than "simply show that there is some metaphysical doubt as to

the material facts." *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 585–86 (1986); *see also Anderson v. Liberty Lobby, Inc.,* 477 U.S. at 247–48.

## III. *Exhaustion of Administrative Remedies*

### A. Legal Standards

**\*4** The Prison Litigation Reform Act, (PLRA), 42 U.S.C. § 1997e(a), requires an inmate to exhaust all available administrative remedies prior to bringing a federal civil rights action. This requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and regardless of the subject matter of the claim. *See Giano v. Goord,* 380 F.3d 670, 675–76 (2d Cir.2004) (citing *Porter v. Nussle,* 534 U.S. 516, 532 (2002) (exhaustion requirement applies, *inter alia,* to excessive force claims). Inmates must exhaust their administrative remedies even if they are seeking only money damages that are not available in prison administrative proceedings. *Id.* at 675.

The failure to exhaust is an affirmative defense that must be raised by the defendants. *Jones v. Bock,* 549 U.S. 199, 216 (2007); *Johnson v. Testman,* 380 F.3d 691, 695 (2d Cir.2004). As an affirmative defense, it is the defendants' burden to establish that plaintiff failed to meet the exhaustion requirements. *See, e.g,* *Key v. Toussaint,* 660 F.Supp.2d 518, 523 (S.D.N.Y.2009) (citations omitted).

In order to properly exhaust an inmate's administrative remedies, he must complete the administrative review process in accordance with the applicable state rules. *Jones v. Bock,* 549 U.S. at 218–19 (citing *Woodford v. Ngo,* 548 U.S. 81 (2006)). In *Woodford,* the Court held that "proper" exhaustion means that the inmate must complete the administrative review process in accordance with the applicable procedural rules, including deadlines, as a prerequisite to bringing suit in federal court. 548 U.S. at 90–103.

Generally, exhaustion of administrative remedies involves utilizing the facility's grievance process, however, when an inmate's federal claims arise directly out of a disciplinary or administrative segregation hearing or confinement, he exhausts his administrative remedies by presenting his objections in the administrative appeals process. *Sweet v. Wende Correctional Facility,* 514 F.Supp.2d 411, 413 (W.D.N.Y.2007) (citing *Rosales v. Bennett,* 297 F.Supp.2d 637, 639 (W.D.N.Y.2004)

(discussing the difference between the grievance process and the administrative appeals process for disciplinary or administrative segregation appeals).

The Second Circuit developed a "three part inquiry" to determine whether an inmate has fulfilled the PLRA exhaustion requirement. *See Brownell v. Krom,* 446 F.3d 305, 311–12 (2d Cir.2006) (citing *Hemphill v. State of New York,* 380 F.3d 680, 686 (2d Cir.2004)). The inquiry asks (1) whether the administrative remedies were available to the inmate; (2) whether defendants' own actions inhibiting exhaustion estops them from raising the defense; and (3) whether "special circumstances" justify the inmate's failure to comply with the exhaustion requirement. *Id.*

**B. Application**

Plaintiff in this case did not challenge his classification or the administrative segregation decision. In his response to the summary judgment motion, plaintiff argues that he asked a corrections officer about challenging the decision. (Pl.'s Br. at 14.) The corrections officer told plaintiff that BCCF did not have a grievance committee, "you write a sergeant if that doesn't work you write a lieutenant." (*Id.*) Plaintiff claims that he wrote to both a sergeant and a lieutenant, who told plaintiff that he "is on administrative segregation and there is nothing anyone can do about it." (*Id.*) In support of his argument, plaintiff cites Jail Administrator Smolinsky's affidavit, which confirms that an administrative segregation decision is not "grievable." (*Id.* & Smolinsky Aff. ¶ 21).

**\*5** Plaintiff may be attempting to claim that the officers prevented him from challenging the decision by "misleading" him about the proper procedural vehicle for the challenge. The corrections officer who told plaintiff that the decision was not grievable was not misleading. While defendants agree that an administrative segregation decision is not subject to the "grievance" process, the defendants assert that the Ad Seg decision is subject to challenge by appealing to the Facility Administrator. (Def.s' Ex. P). Defendants' Exhibit P is a page from the Inmate Handbook, specifically referencing "Administrative Segregation/Protective Custody." The handbook states that "[y]ou have the option to appeal administrative segregation decisions to the Facility Administrator." (*Id.*)

Plaintiff in this case concedes that he did not appeal to the Facility Administrator when he states that he wrote

to a sergeant and a lieutenant. There is no indication, and he does not allege, that he was not given an inmate handbook. The "corrections officer" was correct in telling plaintiff that an administrative segregation determination was not grievable because the proper method of appeal is through the Jail Administrator.

The court understands that plaintiff's incarceration at BCCF was quite short, and one of the exceptions noted above involves whether the administrative remedies were actually "available" to the plaintiff. The administrative segregation decision was ultimately made on January 19, 2007, and plaintiff was transferred to another facility on February 13, 2007. It is unclear how long it would have taken to challenge the classification. There may have been very little time to appeal the decision. It has been held that transfer to other custody does not eliminate the plaintiff's duty to exhaust his administrative remedies, "at least where an inmate has sufficient time to pursue administrative remedies in the facility where the incident complained of took place." *Flowers v. City of New York,* 668 F.Supp.2d 574, 578 (S.D.N.Y.2009). If there were insufficient time to appeal, an exception to the exhaustion requirement might be available to plaintiff. While the court could recommend dismissal for failure to exhaust, because the case may also be dismissed on the merits, and there could be an argument that plaintiff did not have sufficient time to appeal the decision, I will not recommend dismissing the action based solely upon plaintiff's failure to exhaust administrative remedies.

**IV. *Due Process***

**A. Legal Standards**

In order to begin a due process analysis, the court determines whether plaintiff had a protected liberty interest in remaining free from the confinement that he challenges and then determines whether the defendants deprived plaintiff of that liberty interest without due process. *Giano v. Selsky,* 238 F.3d 223, 225 (2d Cir.2001); *Bedoya v. Coughlin,* 91 F.3d 349, 351 (2d Cir.1996). In *Sandin v. Conner,* the Supreme Court held that although states may still create liberty interests protected by due process, "these interests will be generally limited to freedom from restraint which, while not exceeding the sentence in such an unexpected manner as to give rise to protection by the Due Process Clause of its own force ..., nonetheless imposes atypical and significant hardship on

the inmate in relation to the ordinary incidents of prison life." *Sandin v. Conner,* 515 U.S. 472, 483–84 (1995).

**\*6** The Second Circuit has explicitly avoided a bright line rule that a certain period of confinement in a segregated housing unit ("SHU") automatically gives rise to due process protection. *See Sims v. Artuz,* 230 F.3d 14, 23 (2d Cir.2000); *Colon v. Howard,* 215 F.3d 227, 234 (2d Cir.2000). Instead, cases in this circuit have created guidelines for use by district courts in determining whether a prisoner's liberty interest is infringed. *Palmer v. Richards,* 364 F.3d 60, 64–66 (2d Cir.2004). A confinement longer than an intermediate one, and under "normal SHU conditions" is "a sufficient departure from the ordinary incidents of prison life to require procedural due process protections under *Sandin.*" *Colon v. Howard,* 215 F.3d at 231 (finding that a prisoner's liberty interest was infringed by 305–day confinement). Shorter confinements under normal SHU conditions may not implicate a prisoner's liberty interest.

"SHU confinements of fewer than 101 days could constitute atypical and significant hardships if the conditions were more severe than the normal SHU conditions ... or a more fully developed record showed that even relatively brief confinements under normal SHU conditions were, in fact, atypical." *Palmer v. Richards,* 364 F.3d at 65 (citations omitted). In the absence of a detailed factual record, cases in this Circuit typically affirm dismissal of due process claims where the period of time spent in SHU was short–*e.g.,* 30 days–and there was no indication that the plaintiff endured unusual SHU conditions. *Id.* at 65–66 (collecting cases). *See also Arce v. Walker,* 139 F.3d 329, 334–35 (2d Cir.1998) (the *Sandin* analysis is properly applied to determine whether non-punitive, administrative segregation implicates a state-created liberty interest).

**B. Application**
Plaintiff was in Ad Seg at BCCF from January 12, 2007 until February 13, 2007, a total of 32 days. The first eleven days, [10] however, were spent in Ad Seg due to the admissions/classification procedure at the facility. New York regulations governing county jails provide that the chief administrative officer of each facility shall "establish, implement and maintain a formal and objective system for the consistent classification of all inmates." N.Y. COMP. CODES R. & REGS. tit. 9, § 7013.1 (N.Y.CRR)).

The regulations are quite detailed and provide specific requirements for such policies and procedures. *Id.* 9 NYCRR § § 7013.1–7013.9.

In accordance with these regulations, BCCF policy provides that, upon transfer into the facility, all inmates must go through initial screening and classification procedures. (Def.s' Ex. N; Broome County Sheriff's Correction Division Policy Statement). The policy statement provides that "[u]pon completion of the initial screening and risk assessment the inmate will be placed in Ad Seg for classification." (*Id.* ¶ 3). Classification may last up to five business days. [11] (*Id.*) If records are not available, the Jail Administrator may extend the classification time to ten business days.

**\*7** The policy statement also provides detailed factors that the classification officer must consider when determining how to classify an inmate for housing purposes. (*Id.* ¶ 6(a)–6(j)). Those factors include criminal history; propensity for victimization or violence; history of medical or mental illness; history of hostile relationships with other inmates; and any other information that "may affect the safety and welfare of the inmate or facility staff." (*Id.*) After the primary classification interview is completed, the interviewing officer recommends appropriate housing for the inmate. (*Id.* ¶ 10). This paragraph also provides a procedure for challenges to primary housing assignments, and any changes in primary housing relating to custody level will be discussed with the inmate by the classification officer and tour supervisor. (*Id.* ¶ 10(b), 10(c)). The classification officer competes a "Classification Sheet," containing a numerical value assigned to the various factors considered. (Def.s' Ex. O).

"The [Supreme] Court has counseled judicial restraint in the federal courts' review of prison policy and administration, noting that 'courts are ill equipped to deal with the increasingly urgent problems of prison administration and reform.' " *Giano v. Senkowski,* 54 F.3d 1050, 1053 (2d Cir.1995) (quoting *Turner v. Safely,* 482 U.S. 78, 84 (1987)). The overarching consideration is that a prison regulation infringing on an inmate's constitutional rights is valid so long as the regulation is "reasonably related to the legitimate penological interests." *Turner v. Safely,* 482 U.S. at 89. In *Turner,* the Supreme Court held that the court should determine whether the government objective is legitimate and neutral, and then whether there is a valid, rational

connection between the prison regulation or the official action and the legitimate governmental interest that justifies that action. *Id.* Finally, the court determines whether there are alternative means for the inmate to exercise that constitutional right. *Id.* at 90.

In this case, the regulations cited above, together with the policy of allowing temporary segregation of inmates upon transfer into a facility are unquestionably related to the safety and security of the facility. Until an inmate is screened for prior violence; propensity for victimization; possible enemies; behavior; and adjustment, the facility administrators have no way of knowing where the best place to house the inmate will be. Thus, a short classification period in administrative segregation in order to complete this objective is a completely reasonable restriction on an inmate's liberty. The regulations provide for notice to the inmate and for a challenge to the classification. Thus, the regulations are valid under *Turner,* and no due process right is violated. [12]

As shown by the plaintiff's housing history report, he spent part of his classification time in the mental health area of the medical unit. (Def.'s Ex. H). Although he complains that the administrative segregation damaged his mental health and that defendants were deliberately indifferent to his mental condition, it appears that the defendants were very concerned about his mental condition, and according to his housing record, placed him in the medical unit three times prior to his final classification. [13] Defendants could not ignore the transfer papers indicating that plaintiff was a safety risk. [14] They could not ignore plaintiff's unusual behavior and statements to the screening officer, and the progress notes written during his stay in the medical unit show that the concern for his mental health was justified. [15] (Def.s' Ex. L).

**\*8** In addition, plaintiff's relatively brief Ad Seg placement did not implicate a liberty interest under *Sandin.* Plaintiff's classification was completed on Friday January 19, 2007, and he was notified of his classification on Monday January 22, 2007, one business day after the determination was made. [16] He was entitled to a review of this classification, but did not take the opportunity to challenge it. Plaintiff spent the last 21 days of his stay at BCCF in Ad Seg. Based on *Sandin,* a period of 30 days segregation does not create a liberty interest, particularly when plaintiff has not made any assertion that

the conditions of confinement (other than the separation from other inmates) was in any way atypical or significant. Even if the court were to count the entire time that plaintiff was in administrative segregation (32 days), he still would not have had a liberty interest that is protected by due process. [17]

Finally, even if plaintiff had a liberty interest, he received all the process he was due. It is clear that his confinement was administrative, not disciplinary. Plaintiff confuses the two types of confinement. He continues to argue that he was entitled to notice of "charges." There were no "charges" of which to receive notice. Instead, he got notice of the *classification determination* and an opportunity to challenge the determination as required by the regulations involving classification and housing assignments. The fact that he did not challenge the determination does not change the result. Thus, for all of the above procedural and substantive reasons, plaintiff's due process claim may be dismissed.

## V. *Conditions of Confinement*

Plaintiff hints that certain of his conditions of confinement were unconstitutional. Plaintiff states that defendants were deliberately indifferent to his mental health by keeping him in "isolation." Plaintiff also states that defendants issued a "restraint order," and he was placed in restraints whenever he left the cell.

### A. Medical Care

#### 1. Legal Standards

The defendants never actually mention the date of plaintiff's conviction. The reason the court mentions this is simply to clarify the standard under which conditions of confinement are analyzed. Allegations of mistreatment of pretrial detainees in state custody are brought under the Due Process Clause of the Fourteenth Amendment. *See Caiozzo v. Korman,* 581 F.3d 63, 69 (2d Cir.2009). It has been held that because a pretrial detainee has not been "convicted," the proper inquiry is whether the conditions of confinement amount to punishment under the Due Process Clause, not whether the "punishment" is cruel and unusual under the Eighth Amendment. *See Bell v. Wolfish,* 441 U.S. 520, 535 n. 16 (1979) (contrasting sentenced prisoners with pretrial detainees). Sentenced prisoners are protected by the Eighth Amendment prohibition against cruel and unusual punishment. However, the same

2012 WL 4093792

standard applies to claims of deliberate indifference to a serious threat to the health or safety of a person in custody, regardless of whether they are brought under the Eighth Amendment, relating to convicted prisoners, or under the Fourteenth Amendment for pretrial detainees.[18] *See Caiozzo v. Korman,* 581 F.3d 72. Thus, the date of plaintiff's conviction is not relevant to any discussion because the standard would be the same whether plaintiff were still a pretrial detainee or whether he had been convicted of the charges.

**\*9** In order to state a claim based on constitutionally inadequate medical treatment, plaintiffs must allege "acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." *Estelle v. Gamble,* 429 U.S. at 106. There are two elements to the deliberate indifference standard. *Smith v. Carpenter,* 316 F.3d 178, 183–84 (2d Cir.2003). The first element is objective and measures the severity of the deprivation, while the second element is subjective and ensures that the defendant acted with a sufficiently culpable state of mind. *Id.* at 184 (citing *inter alia Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998)).

### 2. Application

Plaintiff in this case claims that the isolation made him depressed and harmed his mental health. However, plaintiff spent several days in the mental health unit, and was examined by Dr. Rahmon, according to the progress notes submitted by both plaintiff and defendants. (Def.s' Ex. L). Plaintiff was monitored and his medications were regulated. There is absolutely no indication that the defendants, none of whom are medical personnel, were deliberately indifferent to plaintiff's medical needs, because it is clear that, when a concern arose regarding plaintiff's mental health, he was transferred to the medical unit for observation. Plaintiff's conclusory allegation that the "isolation" made his mental status worse is baseless.

### B. Restraints

#### 1. Legal Standards

In order to show that conditions of confinement violate the Eighth Amendment, the plaintiff must demonstrate that the conditions result in an "unquestioned and serious deprivation of basic human needs," and that defendants imposed those conditions with deliberate indifference. *Jolly v. Coughlin,* 76 F.3d 468, 480 (2d Cir.1996) (citing

*Wilson v. Seiter,* 501 U.S. 294, 297 (1991); *Whitley v. Albers,* 475 U.S. 312, 319–20 (1986); *Anderson v. Coughlin,* 757 F.2d 33, 35 (2d Cir.1985)). The placement of restraints such as handcuffs on an inmate does not, by itself, amount to excessive force or cruel and unusual punishment. *See Bridgeforth v. County of Rensselaer,* No. 1:08–CV–779, 2012 WL 2873361, at \*6 (N.D.N.Y. July 12, 2012) (absent some allegation beyond forceful cuffing, the claim against defendant was insufficient as a matter of law).

In this case, defendant Shear states that he did sign a "Restraint Order," but the order only called for plaintiff to have a two-officer escort or "double team" anytime that he left his cell. (Shear Aff. ¶ 13). Defendant Shear further states that "[n]o physical restraints" such as handcuffs or shackles were made a part of the order, "or placed on plaintiff." (*Id.*) Plaintiff himself submits the Order in question, and it supports defendant Shear's affirmation. (Pl.'s Ex. C; Dkt. No. 50–1 at 6). The order is signed by defendant Shear. Although the typewritten portion of the order states that, due to plaintiff's involvement in the January 17t' incident, he would be placed in "full restraints" when he left the housing unit for a period of seven days, above the typewritten material, is a handwritten note by defendant Shear that reads: "Double Team only." (*Id.*) The order was reviewed and continued on two occasions: "1/26/07 ... 2/2/07." (*Id.*)

**\*10** Plaintiff's own exhibits support defendant Shear's statement that no physical restraints were placed on plaintiff. (Pl.'s Ex. C, G). The "restraint" only involved assigning two officers to plaintiff when he left the housing unit. This order does not come anywhere near the level of a constitutional violation, particularly given plaintiff's behavior during the time in question. Thus, to the extent that plaintiff's amended complaint can be read as alleging an Eighth Amendment or Substantive Due Process claim regarding his conditions of confinement, it may be dismissed.[19]

**WHEREFORE,** based on the findings above, it is

**RECOMMENDED,** that defendants' motion for summary judgment (Dkt. No. 47) be **GRANTED,** and plaintiff's amended complaint be **DISMISSED IN ITS ENTIRETY AS AGAINST ALL DEFENDANTS,** and it is further

**ORDERED,** that plaintiff's request to amend the amended complaint to remove defendant Gillette and add defendant Cermak (Dkt. No. 50) is **DENIED AS MOOT.**

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have fourteen (14) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir.1989)); 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 6(a), 6(e), 72.

**All Citations**

Not Reported in F.Supp.2d, 2012 WL 4093792

---

**Footnotes**

1    The amended complaint refers only to "due process," however, the plaintiff's response to defendants' summary judgment motion mentions "equal protection." The court will consider both claims in this recommendation.

2    The court must note that plaintiff has filed eight cases in the Northern District of New York, only three of which are currently pending. *Harvey v. Farber, et al.,* 9:09–CV–152 (MAD/TWD); *Harvey v. Corrections Officers 1 through 6, et al.,* 9:09–CV–154 (LEK/TWD); and this case, *Harvey v. Harder,* 9:09–CV–154 (TJM/ATB). The cases that are closed are the following: *Harvey v. Grow, et al.,* 9:09–CV–518 (GTS/RFT); *Harvey v. Sawyer, et al.,* 9:09–CV–598 (FJS/DRH); *Harvey v. Luther, et al.,* 9:09–CV–599 (DNH/GJD); *Harvey v. City of Utica Police Officers, et al.,* 9:09–CV–644 (TJM/GHL); and *Harvey v. Law,* 9:10–CV–1468 (LEK/DEP). The court understands that at the time plaintiff filed his original complaint in this action, many of the above cases had not yet been filed; however, by the time plaintiff filed his amended complaint in March of 2011, *all* of the other cases had been filed, but plaintiff continued to list only one case on the amended complaint form. (Am.Compl.¶ 5).

3    Defendant Lillie has not been served in this case. After the first attempt at service was unsuccessful for various defendants, the court reissued summonses on March 31, 2011. (Dkt. No. 34). Service on four of the five new defendants was successful, and they all join in the motion for summary judgment. Another summons for defendant Lillie was reissued on October 14, 2011, but the summons was returned "unexecuted" on October 26, 2011. (Dkt.Nos.40, 42). The "Process Receipt" states that defendant Lillie is no longer employed at BCCF. Defendant Lillie has not been served in this action, and defense counsel requests dismissal of the case against defendant Lillie for lack of service under Fed.R.Civ.P. 4(m). (Dkt. No. 47–28; Def. s' Br. at 11) (page assigned by defense counsel to his brief, not the CM/ECF page). Because this court is recommending dismissal with prejudice, both procedurally and on the merits of this action, the court need not address lack of service, which would normally result in a dismissal without prejudice.

4    Based on this admission by Sergeant Cermak, plaintiff has requested in his response to the motion for summary judgment, that the court allow plaintiff to amend his amended complaint to remove defendant Gillette as a defendant and replace him with Sergeant Cermak. Generally, the court would allow such an amendment. However, because the court is recommending dismissal on the merits of this case, it would be futile to add Sergeant Cermak at this time. The court would still recommend dismissal notwithstanding the addition of Sergeant Cermak. The court will consider his affidavit.

5    Many of the affidavits contain similar paragraphs regarding the background of this case. The court will cite to the affidavit of Mark Smolinsky, Jail Administrator, for ease of citation, even though the same information is contained in other affidavits. Mr. Smolinsky is *not* a defendant in this case, and his affidavit contains additional information that is relevant to the motion. I will cite to other affidavits as noted for additional information that is not contained in Administrator Smolinsky's statement.

6    Defendants have also filed the June 6, 2006 letter of Timothy M. Kirk, Resident Agent in Charge of the Syracuse office of the United States Secret Service. (Def.s' Ex. B). The letter requests that the Secret Service be notified in the event the plaintiff was released from custody for any reason, due to plaintiff's long history of threat-related activity. (*Id.*) The reason for this request was so that, if plaintiff were released, the Secret Service could assess whether he posed a danger to "any of our protectees." (*Id.*)

7    Plaintiff was incarcerated in HCCF, pending his prosecution for First Degree Rape; Third Degree Assault; Second Degree Unlawful Imprisonment; and Criminal Mischief. (*See* Def. s' Ex. E; Herkimer County Court commitment, dated October 30, 2006—indicating no bail pending trial). Plaintiff was clearly incarcerated in HFFC prior to October 30th because his classification notice is dated October 8, 2006. (Def. s' Ex. D).

8    An Ad Seg Order was drafted on January 12, 2007 by defendant Thompson. (Def. s' Ex. J). There were three reasons marked with an "X" for why plaintiff was being placed in Ad Seg. The first reason was due to "facility admission

procedures." The second and third reasons were that the staff perceived a serious threat to the inmate's safety (although no request for protection had been made) and the inmate was exhibiting unusual behavior and could threaten to, or cause injury to himself or others. (*Id.* & Buholski Aff. ¶ 8). Defendant Buholski reviewed the order and placed plaintiff in Ad Seg within the medical unit. (Buholski Aff. ¶ 10). The order was approved by defendant Lillie. (*Id.* & Def. s' Ex. J).

9    Defendant Shear states that inmates may be placed in D–Pod without a hearing for reasons other than disciplinary. (Shear Aff. ¶ 15).

10   January 12, 2007 until January 22, 2007 (counting the first day that he was brought to BCCF as "one" and the day the he was notified of his classification).

11   Although it appears that the defendants complied with state regulations, providing for particular time limits, the violation of a state law or regulation alone would not necessarily rise to the level of a constitutional violation. *Dixon v. Goord,* 224 F.Supp.2d 739, 744–45 (S.D.N.Y.2002). *See Russell v. Coughlin,* 910 F.2d 75, 78 n. 1 (2d Cir.1990)).

12   The court would also point out that the regulations do not violate equal protection because all inmates are subject to the same regulations governing classification. Plaintiff does not mention equal protection in his amended complaint, however, in his response the motion for summary judgment, he mentions equal protection for the first time. Even assuming that plaintiff could raise a new claim in his response, this claim has no merit. In order to state a claim for an equal protection violation, plaintiff would have to allege that other similarly situated inmates were treated differently that he was. *See Giano v. Senkowski,* 54 F.3d 1050, 1057 (2d Cir.1995) (citing *Cleburne v. Cleburne Living Ctr.,* 473 U.S. 432, 439 (1985) (the Equal Protection Clause provides that the government shall treat all similarly-situated people alike). Plaintiff in this case has not alleged that any other inmates, similarly situated to plaintiff, were treated differently regarding classification.

13   Plaintiff's own exhibits show that on January 19, 2007, plaintiff was brought back to the medical unit for a physical problem, unrelated to his mental status. (Pl.'s Ex. F). The exhibit also shows that the progress note for January 18, 2007 states that the inmate was "seen and cleared by forensics today. [L]eft unit for general population." *Id.* Plaintiff argues that Dr. Rahmon "increased his medication and cleared him for general population on January 14th. (Pl.'s Br. at 7). Plaintiff cites his Exhibit B as support for this, however, Exhibit B only states that Dr. Rahmon increased plaintiff's medication. Exhibit D is the exhibit to which plaintiff may be referring, however, the note only states that plaintiff left the unit for general population on January 18th, not that plaintiff was "cleared" for general population. In any event, plaintiff was still in his classification period on January 14th and could not have gone back to general population because his classification was not completed until January 19.th

14   As part of plaintiff's "equal protection" claim, he argues that the defendants cannot "prove" that they ordered other inmates into Ad Seg, based upon letters from another county. The burden is on plaintiff to show that he was treated differently than other "similarly situated" inmates. He makes absolutely no claim that other inmates who had such a history of violence and threats were treated differently and makes no claim that other inmates were not placed in Ad Seg as part of the admission/classification procedures.

15   On January 14, 2007, the progress notes indicate that Dr. Rahmon was "in to see inmate." (Def.'s Ex. H). The note states that plaintiff's speech was "rushed," his thoughts were racing, he stated that he was a producer from Los Angeles, who spoke to a Fox news reporter about "the CIA issues," and "spoke to himself "most of the day." (*Id.*) On January 17, 2007, plaintiff was involved in an incident whereby plaintiff allegedly threatened the President of the United States, resulting in his second transfer to the mental health unit. Based upon plaintiff's history and behavior, he cannot seriously argue that defendants had no reason to be concerned about the security of the facility.

16   The New York Regulations provide for notice of the classification determination in "one business day" after the determination is made. 9 NYCRR § 7013.8(f).

17   *See, e.g., Brown v. Graham,* 9:07–CV–1353 (FJS/ATB), 2010 WL 6428251, at *9 (N.D.N.Y. Mar. 30, 2010) ("The federal district courts in New York, applying *Sandin,* have been consistent in holding that terms of SITU or "keeplock" of approximately 30 days or less do not implicate a liberty interest protected by the Due Process clause, even in the absence of detailed factual development regarding the conditions of confinement.") (Report–Recommendation), adopted, 2011 WL 1213482 (N.D.N.Y. Mar. 31, 2011); *Rivera v. Goord,* 9:05–CV–1379, 2008 WL 5378372 at *2–*3 (N.D.N.Y. Dec. 22, 2008) (granting summary judgment on the issue that 40 days in room confinement did not constitute a cognizable liberty deprivation under *Sandin* ); *Smith v. Taylor,* 149 F. App'x 12, 2005 WL 2019547 at *1 (2d Cir.2005) (affirming grant of summary judgment dismissing plaintiff's claims of defects in an administrative hearing that resulted in his disciplinary confinement for 45 days in the SITU; plaintiff did not offer evidence that his confinement was more onerous that those generally present in the SITU and thus did not have a protected liberty interest in avoiding the 45–day confinement).

18   Because the due process rights of pretrial detainees are "at least as great as the Eighth Amendment protections available to a convicted prisoner," and the same standard applies, cases cited that refer to the Eighth Amendment are thus

2012 WL 4093792

applicable to the conditions of confinement claims of a pretrial detainee. *Revere v.. Mass Gen. Hosp.,* 463 U.S. 239, 244 (1983).

19   Defendant Harder also argues that he had no contact with plaintiff and bore no personal responsibility for his housing assignment or any other problem that plaintiff might have had at BCCF. (Harder Aff. ¶ 2). Because the court is recommending dismissal on the merits and on procedural grounds, defendant Harder's involvement is not critical to the court's recommendation. The court would just note that personal involvement is required for the assessment of damages in a section 1983 action. *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (citation omitted); *Richardson v. Goord,* 347 F.3d 431, 435 (2d Cir.2003). The same is true for defendant Jon Gillette who was mistakenly named by plaintiff instead of Edward J. Cermak.

---

**End of Document**   © 2018 Thomson Reuters. No claim to original U.S. Government Works.

2016 WL 3948100
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Jonathan Mena, Plaintiff,
v.
City of New York, et al., Defendants.

No. 13-cv-2430 (RJS)
|
Signed 07/19/2016

**Attorneys and Law Firms**

Jonathan Mena, Stormville, NY, pro se.

Omar Javed Siddiqi, Ryan Glenn Shaffer, New York City Law Department, New York, NY, for Defendants.

OPINION AND ORDER

RICHARD J. SULLIVAN, District Judge

**\*1** Plaintiff Jonathan Mena, who is currently incarcerated and proceeding *pro se*, brings this action pursuant to 42 U.S.C. § 1983 ("Section 1983") against Correction Officer Benjamin Eason ("Defendant"), alleging violations of the Eighth Amendment. Now before the Court is Defendant's motion for summary judgment. For the reasons set forth below, the motion is granted.

I. BACKGROUND

A. Facts [1]

On September 9, 2012, while incarcerated at the Otis Bantum Correctional Center ("OBCC") on Rikers Island, Plaintiff was placed in an intake cell in the OBCC's receiving area, which he shared with two other individuals. (56.1 Stmt. ¶¶ 2–3.) Plaintiff alleges that the cell was extremely cold, vermin-infested, and too small to accommodate three men. (*See* Doc. No. 54-1 ("Compl.") 4, 8.) Plaintiff further alleges that these conditions, coupled with the constant noise made by the two other inmates, prevented him from sleeping for the entire 60-

hour period that he was held in the cell. (*See id.* at 4.) Consequently, he asked Defendant, who was on duty, to transfer him to a different cell. (56.1 Stmt. ¶¶ 7–8.) According to Plaintiff, Defendant responded that there was "nothing he could do" about the situation. (*Id.* ¶ 9; *see also* Doc. No. 54-2 ("Mena Dep.") 59:5-8.)

Plaintiff avers that he filed a grievance with the OBCC to complain about his experience in the cell. (*See* Compl. at 7.) The New York City Department of Correction ("DOC") has an administrative grievance procedure, known as the Inmate Grievance and Request Program ("IGRP"), for inmates housed at facilities such as the OBCC. The IGRP, which was available and in effect at all times relevant to this lawsuit, requires that inmates first file a complaint with the Inmate Grievance Resolution Committee ("IGRC") within ten days of the complained-of act. (56.1 Stmt. ¶¶ 11–12; *see also* Doc. No. 54-3 ("IGRP Directive") § IV(D)(1).) The IGRC then attempts to resolve the grievance informally within five days, and if the grievance is not informally resolved, then the inmate may request a formal hearing before the IGRC. (56.1 Stmt. ¶ 12; *see also* IGRP Directive §§ IV(G)-(H).) An inmate may appeal the IGRC's decision to the commanding officer, or her designee, and subsequent appeals may be taken to the Central Office Review Committee ("CORC"). (56.1 Stmt. ¶ 13; *see also* IGRP Directive §§ IV(I)-(J).) The CORC's decision is the final and binding decision of the DOC; if an inmate disputes the decision of the CORC, he may independently appeal to the Board of Correction. (IGRP Directive at 47.) Finally, if an inmate does not receive a timely disposition at any point throughout the grievance process, he has the option of either granting an extension of time to the relevant decisionmaker (i.e., the IGRC, the commanding officer, or the CORC) or appealing and proceeding to the next level of review. (56.1 Stmt. ¶ 14; *see also* IGRP Directive §§ IV(D)(9)(b), (10).)

**\*2** As Plaintiff himself acknowledges, after submitting the grievance and receiving no response, he neither granted the DOC an extension of time nor appealed. (*See* Compl. 7–8; Opp'n 6.) In his Complaint, Plaintiff admits that he is "still waiting" for a disposition of his grievance, but does not indicate any steps he has taken to appeal any decision before the IGRC. (*See* Compl. 7.) In response to a question on the Southern District of New York Prison Complaint form asking a plaintiff to "set forth any additional information that is relevant to the exhaustion of your administrative remedies," Plaintiff repeated a

number of his substantive allegations against the OBCC staff, but did not state any information relevant to the grievance process. (*Id.* at 5.) And in his opposition brief in connection with this motion, Plaintiff again notes that he filed "several grievances about the issues in question," but he does not indicate any specific steps he took to appeal to the IGRC or to pursue any other avenue of appellate review within the IGRP. (Opp'n 6.)

### B. Procedural History

On April 11, 2013, Plaintiff commenced this action by filing a complaint against the City of New York, Correction Officer Jaquon Pickwood ("Pickwood"), Correction Officer Sauda Abdul-Malik ("Abdul-Malik"), and Defendant (collectively, "Defendants"), pursuant to Section 1983, asserting violations of his constitutional rights under the Eighth and Fourteenth Amendments. (*See* Doc. No. 1.) On December 9, 2013, Defendants moved to dismiss the Complaint. (Doc. No. 18.) On September 17, 2014, the Court granted Defendants' motion to dismiss with respect to Plaintiff's claims against the City of New York, Pickwood, and Abdul-Malik, and Plaintiff's Fourteenth Amendment claims against Defendant for failure to state a claim upon which relief can be granted, but denied Defendants' motion to dismiss with respect to Plaintiff's Eighth Amendment claim against Officer Eason. (Doc. No. 29.) On September 11, 2015, following the completion of discovery, Defendant filed the instant motion for summary judgment, along with his brief and his 56.1 Statement, arguing that Plaintiff failed to exhaust administrative remedies, that his Eighth Amendment conditions of confinement claim failed on the merits, and that in any event, Defendant was entitled to qualified immunity. (Doc. Nos. 53–55, 57.) Defendant also filed a notice pursuant to Local Civil Rule 56.2 alerting Plaintiff of his obligation to submit a responsive statement and informing him of the consequences of not doing so. (Doc. No. 56.) In accordance with Local Rule 56.2, this notice included copies of Federal Rule of Civil Procedure 56 and Local Civil Rule 56.1. (*Id.*) On October 14, 2015, Plaintiff filed a brief opposing summary judgment and submitted several exhibits (*see* Doc. No. 58), but he failed to submit a responsive 56.1 Statement. Defendant submitted his reply on October 22, 2015. (Doc. No. 59 ("Reply").)

### II. LEGAL STANDARD

Pursuant to Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). There is "no genuine dispute as to any material fact" where (1) the parties agree on all facts (that is, there are no disputed facts); (2) the parties disagree on some or all facts, but a reasonable fact-finder could never accept the nonmoving party's version of the facts (that is, there are no genuinely disputed facts), *see Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); or (3) the parties disagree on some or all facts, but even on the nonmoving party's version of the facts, the moving party would win as a matter of law (that is, none of the factual disputes are material), *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

In determining whether a fact is genuinely disputed, the court "is not to weigh the evidence but is instead required to view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility assessments." *Weyant v. Okst*, 101 F.3d 845, 854 (2d Cir. 1996). Nevertheless, to show a genuine dispute, the nonmoving party must provide "hard evidence," *D'Amico v. City of N.Y.*, 132 F.3d 145, 149 (2d Cir. 1998), "from which a reasonable inference in [its] favor may be drawn," *Binder & Binder PC v. Barnhart*, 481 F.3d 141, 148 (2d Cir. 2007) (internal quotation marks omitted). "Conclusory allegations, conjecture, and speculation," *Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir. 1998), as well as the existence of a mere "scintilla of evidence in support of the [nonmoving party's] position," *Anderson*, 477 U.S. at 252, are insufficient to create a genuinely disputed fact. A moving party is "entitled to judgment as a matter of law" on an issue if (1) it bears the burden of proof on the issue and the undisputed facts meet that burden; or (2) the nonmoving party bears the burden of proof on the issue and the moving party " 'show[s]'– that is, point[s] out ... – that there is an absence of evidence [in the record] to support the nonmoving party's [position]." *See Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).

**\*3** Typically, a "nonmoving party's failure to respond to a [Local Civil] Rule 56.1 statement permits the court

to conclude that the facts asserted in the statement are uncontested and admissible." *T.Y. v. N.Y.C. Dep't of Educ.*, 584 F.3d 412, 418 (2d Cir. 2009) (citing *Gubitosi v. Kapica*, 154 F.3d 30, 31 n.1 (2d Cir. 1998)). "This general rule applies equally" to cases involving a *pro se* nonmoving party who has been provided adequate notice of the consequences of failing to properly respond to a summary judgment motion. *Pierre-Antoine v. City of N.Y.*, No. 04-cv-6987 (GEL), 2006 WL 1292076, at *3 (S.D.N.Y. May 9, 2006); *see also Gilliam v. Trustees of Sheet Metal Workers' Nat'l Pension Fund*, No. 03-cv-7421 (KMK), 2005 WL 1026330, at *1 n.2 (S.D.N.Y. May 3, 2005). Even so, the Court "may in its discretion opt to conduct an assiduous review of the record even where one of the parties has failed to file such a statement," *Holtz*, 258 F.3d at 73, and the Court is obligated to construe *pro se* litigants' submissions liberally, *see McEachin v. McGuinnis*, 357 F.3d 197, 200 (2d Cir. 2004).

Here, Plaintiff failed to submit a responsive Rule 56.1 statement, even though Defendant, pursuant to Local Civil Rule 56.2, sent Plaintiff notice of his obligations under Local Civil Rule 56.1 and Federal Rule of Civil Procedure 56 and sent copies of both rules. (Doc. No. 56). In light of Plaintiff's *pro se* status, the Court has exercised its discretion to independently review the record, which reveals no controverted facts. *See Holtz*, 258 F.3d at 73. In fact, as discussed below, Plaintiff's own submissions confirm the material facts contained in Defendant's Rule 56.1 Statement.

### III. DISCUSSION

Defendant argues that summary judgment should be granted because Plaintiff has failed to comply with the administrative exhaustion requirement of the Prison Litigation Reform Act of 1995 (the "PLRA"). The Court agrees.

Under the PLRA, inmates bringing claims with respect to prison conditions under Section 1983 must exhaust the administrative remedies that are available at that prison before proceeding in federal court. 42 U.S.C. § 1997e(a). The PLRA's exhaustion requirement is "mandatory," thus "foreclosing judicial discretion." *Ross v. Blake*, 136 S. Ct. 1850, 1857 (2016); *see also Woodford v. Ngo*, 548 U.S. 81, 84 (2006) (describing the "invigorated exhaustion provision" as "[a] centerpiece of the PLRA's

effort to reduce the quantity of prisoner suits" (citations and quotation marks omitted)). Accordingly, "the law is well-settled that the failure to take an available administrative appeal, even when the initial grievance receives no response, constitutes a failure to exhaust available administrative remedies." *Garvin v. Rivera*, No. 13-cv-7054 (RJS), 2015 WL 3999180, at *3 (S.D.N.Y. June 29, 2015); *accord Johnson v. N.Y.C. Dep't of Corr.*, No. 13-cv-6799 (CM), 2014 WL 2800753, at *6 (S.D.N.Y. June 16, 2014) ("Assuming that [p]laintiff filed a timely grievance ... and received no response within five business days [,] ... [p]laintiff ... could have taken the next step and requested a hearing."); *Leacock v. N.Y.C. Health Hosp. Corp.*, No. 03-cv-5440 (RMB) (GWG), 2005 WL 483363, at *7 (S.D.N.Y. Mar. 1, 2005) ("[T]hat [plaintiff] allegedly did not receive a response to her grievance does not excuse her from failing to exhaust the appellate remedies available to her."); *Burns v. Moore*, No. 99-cv-966 (LMM) (THK), 2002 WL 91607, at *8 (S.D.N.Y. Jan. 24, 2002) ("Thus, even if [p]laintiff received no response to his initial grievance, [p]laintiff could have sought the next level of review, in this case, to the prison superintendent.").

*4 At the OBCC, where Plaintiff was incarcerated, an inmate must exhaust several layers of review, even if the inmate does not receive a timely disposition at the initial stages. (56.1 Stmt. ¶ 12–14.) Here, as Plaintiff reveals in his own complaint and brief in opposition to the motion for summary judgment, he did not exhaust the OBCC administrative procedure. (Compl. 7–8; Opp'n 6.) Rather, he indicates that he filed a grievance but otherwise did not appeal or seek further review through the IGRP process. (Compl. 7–8 (noting that he is "still waiting" for disposition of his grievances and did not seek review at the next levels within IGRP); Opp'n 6 (noting that he filed "several grievances about the issues in question," but omitting reference to any specific steps taken to appeal)). Accordingly, Plaintiff failed to satisfy the PLRA exhaustion requirement.

The Court next considers whether there is any basis for excusing Plaintiff's failure to exhaust administrative remedies at the IGRP. Last month, the Supreme Court forcefully disapproved of judge-made exceptions to the PLRA's exhaustion requirement, stressing the mandatory language of the statute. *See Ross*, 136 S. Ct. at 1862 ("Courts may not engraft an unwritten 'special circumstances' exception onto the PLRA's exhaustion requirement.") In doing so, the Supreme Court expressly

rejected the Second Circuit's prior framework under *Giano v. Goord*, 380 F.3d 670 (2d Cir. 2004), and, by extension, *Hemphill v. New York*, 380 F.3d 680, 686 (2d Cir. 2004), which recognized a "special circumstances" exception to the PLRA's exhaustion requirement. *See Williams v. Priatno*, No. 14-4777, ___ F.3d. ___, ___, 2016 WL 3729383, at *4 (2d Cir. July 12, 2016) ("[T]o the extent that our special circumstances exception ... permits plaintiffs to file a lawsuit in federal court without first exhausting administrative remedies that were, *in fact*, available to them, those aspects of *Giano* and *Hemphill* are abrogated by *Ross*.").

Thus, post-*Ross*, the lone surviving exception to the PLRA's exhaustion requirement is that embedded in its text: that an inmate need only exhaust those administrative remedies that are "available" to him. *Ross*, 136 S. Ct. at 1862; *see also* 43 U.S.C. § 1997e(a). An inmate's failure to exhaust may therefore be excused when his prison's grievance mechanisms are literally or constructively "unavailable." *Ross*, 136 S. Ct. at 1858–59. The Supreme Court described three scenarios in which administrative procedures could be "officially on the books," but "not capable of use to obtain relief," and therefore unavailable. *Id.* While not exhaustive, these illustrations nonetheless guide the Court's inquiry. *See Williams*, 2016 WL 3729383, at *4 n.2. First, an administrative procedure is unavailable when "it operates as a simple dead end – with officers unable or consistently unwilling to provide any relief to inmates." *Ross*, 136 S. Ct. at 1859. If prison administrators either lack the necessary authority to provide any relief or possess authority but consistently decline to exercise it, the administrative channels are not "available" within the meaning of the PLRA. *Id.*; *see also Booth v. Churner*, 523 U.S. 731, 736, 738 (2001) ("[T]he modifier 'available' requires the possibility of some relief."). Second, an administrative procedure is unavailable where it is "so opaque that it becomes, practically speaking, incapable of use." *Id.* To meet this high bar, the administrative remedy must be "essentially 'unknowable.' " *Id.* Finally, "a grievance process is rendered unavailable when prison administrators thwart inmates from taking advantage of it through machination, misrepresentation, or intimidation." *Ross*, 136 S. Ct. at 1860.

Here, Plaintiff has not alleged – let alone shown – that the administrative procedures at the OBCC were unavailable to him. Although Plaintiff's initial grievance received no

response, this alone is insufficient to show that the IGRP acted as a mere dead end. As stated earlier, "the law is well-settled" that an inmate's "failure to take an available administrative appeal, even when the initial grievance receives no response, constitutes a failure to exhaust available administrative remedies." *Garvin*, 2015 WL 3999180, at *3 (collecting authorities). In short, the DOC's untimeliness in this case is not enough to demonstrate the unavailability of an administrative remedy. This is especially true in light of the IGRP's built-in appeal mechanism, whereby inmates may directly proceed to the next level of review in the event of the DOC's failure to respond to a grievance. (*See* IGRP Directive § IV(D) (9)(b), (10).) Furthermore, Plaintiff has not introduced any facts to indicate that prison officials at OBCC are "consistently unwilling to provide any relief to aggrieved inmates." *Ross*, 136 S. Ct. at 1859.

**\*5** Nor has Plaintiff pointed to any evidence that the IGRP was "so opaque that it [became], practically speaking, incapable of use" and therefore "essentially unknowable." *Ross*, 136 S. Ct. at 1859. While the Second Circuit recently found that certain administrative grievance procedures at a different New York State facility met this standard, the Second Circuit's decision hinged on the "extraordinary circumstances" specific to the case before it, for which the applicable grievance regulations gave "no guidance whatsoever." *See Williams*, 2016 WL 3729383, at *1, *5. Specifically, the plaintiff in *Williams* was housed in a special housing unit and segregated from the regular prison population; therefore, he gave his grievance complaint to a correction officer to file on his behalf. *Williams*, 2016 WL 3729383, at *2. However, the plaintiff in *Williams* alleged that the correction officer to whom he gave his complaint failed to file it, *id.*, and because the Second Circuit concluded that the applicable grievance regulations gave "no guidance whatsoever to an inmate whose grievance was never filed," *id.* at 5, it reversed the District Court's dismissal for failure to exhaust. Here, by contrast the IGRP expressly guides inmates in Plaintiff's position who have filed a grievance but have not received a timely response and directs them to either grant an extension of time to the relevant decisionmaker or to appeal to the next level of review. (*See* IGRP Directive §§ IV(D)(9)(b), (10).) In light of the IGRP's unambiguous directive, Plaintiff has clearly failed to show that the IGRP was "essentially unknowable." *See Ross*, 136 S. Ct. at 1859.

Finally, the Court turns to the third scenario contemplated by the Supreme Court, in which "prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Id.* at 1859. Plaintiff has not demonstrated, or even suggested, that prison administrators obstructed or interfered with his access to administrative remedies. *See, e.g.*, *Winston v. Woodward*, No. 05-cv-3385 (RJS), 2008 WL 2263191, at *10 (S.D.N.Y. May 30, 2008) (concluding that plaintiff's failure to exhaust administrative remedies was not excused in light of his "failure to put forth any corroborating evidence, either direct or circumstantial, to support his claims that he suffered retaliation in the form of threats, harassment and mail tampering"). Thus, this exception to the exhaustion requirement is also clearly inapplicable.

Therefore, the Court concludes, as a matter of law, that Plaintiff has failed to exhaust administrative remedies available to him through the IGRP and has failed to offer any facts to prove that administrative remedies were not available to him. Because Plaintiff's claims are barred for failure to comply with the administrative exhaustion requirement of the PLRA, Defendant's motion for summary judgment is granted. [2]

## IV. CONCLUSION

For the reasons stated above, IT IS HEREBY ORDERED that Defendant's motion for summary judgment is GRANTED.

Although Plaintiff has paid the filing fee in this action and has not applied to proceed *in forma pauperis*, the Court nevertheless certifies pursuant to 28 U.S.C. § 1915(a)(3) that, in the event Plaintiff seeks to appeal this Order *in forma pauperis*, any appeal would not be taken in good faith.

The Clerk is respectfully directed to terminate the motion pending at docket number 53, to mail a copy of this order to Plaintiff, and to close this case.

SO ORDERED.

**All Citations**

Not Reported in F.Supp.3d, 2016 WL 3948100

Footnotes

1    The following facts are drawn from Defendant's unopposed Local Civil Rule 56.1 Statement. (Doc. No. 55 ("56.1 Statement" or "56.1 Stmt.").) In deciding Defendant's motion for summary judgment, the Court has also considered Plaintiff's submission in opposition to summary judgment (Doc. No. 58 ("Opp'n")), and has conducted an independent review of the record, notwithstanding Plaintiff's failure to submit a statement compliant with Local Civil Rule 56.1. *See Holtz v. Rockefeller & Co.*, 258 F.3d 62, 73 (2d. Cir. 2001) (noting that district court "may in its discretion opt to conduct an assiduous review of the record even when" a party has failed to comply with Local Civil Rule 56.1 (citations and quotation marks omitted)).

2    Although Defendant has raised other grounds for summary judgment, including that Plaintiff has failed to establish an Eighth Amendment conditions of confinement claim, and that Defendant is entitled to qualified immunity, the Court finds it unnecessary to address these other arguments because of Plaintiff's failure to exhaust remedies.

**End of Document**                                  © 2018 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW    © 2018 Thomson Reuters. No claim to original U.S. Government Works.    5

2018 WL 3079764
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Keith WATERS, Plaintiff,
v.
Sgt. A. MELENDEZ and C.O. Muschett, Defendants.

No. 15-CV-0805 (TJM/CFH)
|
Signed 05/18/2018

**Attorneys and Law Firms**

Keith Waters, 06-A-2999, Wallkill Correctional Facility,
Box G, Wallkill, NY 12589, pro se.

HON. ERIC T. SCHNEIDERMAN, OF COUNSEL:
NICOLE E. HAIMSON, ESQ., Assistant Attorney
General, Attorney General for the State of New York,
The Capitol, Albany, New York 12224-0341, Attorney for
Defendants.

**REPORT-RECOMMENDATION AND ORDER** [1]

CHRISTIAN F. HUMMEL, U.S. MAGISTRATE
JUDGE

**\*1** Plaintiff pro se Keith Waters ("Waters"), an inmate
who was, at all relevant times, in the custody of the
New York Department of Corrections and Community
Supervision ("DOCCS"), brings this action pursuant
to 42 U.S.C. § 1983 alleging that Defendants Sgt.
A. Melendez ("Defendant" or "Melendez") and C.O.
Muschett ("Defendant" or "Muschett")—who, at all
relevant times, were employed at Coxsackie Correctional
Facility ("Coxsackie")—violated his rights under the First
Amendment. Dkt. No. 23 ("Sec. Am. Compl."). Presently
pending before the Court is Defendants' motion for
summary judgment pursuant to Rule 56 of the Federal
Rules of Civil Procedure ("Fed. R. Civ. P."). Dkt. No. 81.
Waters opposed the motion, and Defendants submitted
a reply. Dkt. Nos. 83, 84, 85. For the following reasons,
it is recommended that Defendants' motion for summary
judgment be granted on the basis of plaintiff's failure
to exhaust. Alternatively, if the District Court Judge
should not agree with the undersigned's recommendation,

it is recommended that Defendants' motion for summary
judgment be granted in part and denied in part.

**I. Background**

**A. Procedural History**

On July 1, 2015, plaintiff filed his complaint in the pending
action. Dkt. No. 1 ("Compl."). On July 25, 2015, Plaintiff
filed a motion to amend with a proposed amended
pleading asserting that Sgt. Melendez, Lt. Sheridan
("Sheridan"), Hearing Officer ("H.O.") Eric Gutwein
("Gutwein"), and Director of SHU/Inmate Disciplinary
Program Albert Prack ("Prack") retaliated against him,
and disciplined him in violation of his due process
rights. Dkt. No. 5-2. The Court accepted the Amended
Complaint and, upon review, directed Defendants to
respond. Dkt. Nos. 10 and 11 ("Am. Compl."). On
October 7, 2015, Waters filed a motion to amend, and
added Muschett and John/Jane Doe defendants. Dkt.
Nos. 13-2, 13-3 at 2. The Court accepted the Second
Amended Complaint and directed Defendants to respond.
Dkt. Nos. 22; Sec. Am. Compl. On February 11, 2016,
Defendants filed an Answer to the Second Amended
Complaint. Dkt. No. 33. On March 10, 2016, after defense
counsel identified the John/Jane Doe defendants, the
Second Amended Complaint was amended to include
Scott Lamphere ("Lamphere"), Opal Rivera ("Rivera"),
and Corey Bedard ("Bedard") as Defendants. Dkt. No.
36. Additionally, Lt. Sheridan was terminated as a
defendant. [2] Dkt. No. 37.

On June 21, 2016, Defendants filed a motion to dismiss
the Second Amended Complaint as duplicative of Waters
v. Prack, No. 9:13-CV-1437 (LEK/DEP) (N.D.N.Y. Nov.
20, 2013) ("Waters I"), a concurrent action pending in
this District. [3] Dkt. No. 53. Alternatively, defendants
Bedard, Lamphere, and Rivera moved for dismissal of
the Second Amended Complaint for failure to state
a claim. Id. In a Report-Recommendation and Order
filed on January 31, 2017 (the "January Order"), the
undersigned recommended the dismissal of the claims
against Gutwein and Prack as duplicative, holding that:
"[t]he claims alleged against Gutwein and Prack in each
suit arise from the same MBR and subsequent disciplinary
proceedings. In both suits, plaintiff has asserted First
Amendment retaliation and Fourteenth Amendment due

process claims against Gutwein and Prack." Dkt. No. 63 at 7. [4] The Court also recommended dismissal of Waters' claims against Bedard, Lamphere, and Rivera as conclusory and insufficient to state a claim. [5] Dkt. No. 63. On March 13, 2017, the District Court Judge Thomas J. McAvoy adopted the undersigned's Report-Recommendation and Order. Dkt. No. 68. Thus, the only claims surviving dismissal are First Amendment claims against Sgt. Melendez and C.O. Muschett based upon an alleged January 2013 false misbehavior report issued in retaliation for Waters filing a sexual harassment claim against a non-party officer, and providing legal assistance to other inmates. Id.

## B. Record and Judicial Notice [6]

**\*2** In support of their motion, Defendants filed a Statement of Material Facts. Dkt. No. 81-1. [7] Pursuant to N.D.N.Y. Local Rule 7.1(a)(3), Waters responded, and admitted facts contained in certain paragraphs of Defendants' Statement of Material Facts. Dkt. No. 83-2. Both parties annexed exhibits to their submissions, without objection, related to the authenticity of documents. See generally Dkt. Nos. 81, 83. Therefore, to the extent that the "facts" asserted by the parties are supported by the record, the undersigned will consider the facts and relevant exhibits and/or documents in the context of the pending motion. See U.S. v. Painting known as Hannibal, No. 07-CV-1511, 2010 WL 2102484, at \*1, n.2 (S.D.N.Y. May 18, 2010) (citing Daniel v. Unum Provident Corp., 261 Fed.Appx. 316, 319 (2d Cir. 2008) (summary order) ("[A] party is not required to authenticate documents on a summary judgment motion where, as here, authenticity is not challenged by the other party.") ).

Additionally, the undersigned will consider relevant exhibits and documents filed with the Court under Docket No. 84. On October 2, 2017, the same date that Waters filed his response to Defendants' motion, Waters filed documents obtained during the course of discovery. Dkt. No. 84. In his opposition to the motion for summary judgment, Waters cites to these documents and incorporates them by reference. See generally Dkt. No. 83. Because defendants did not object to the filing of these documents, and do not object to the authenticity of these documents, the undersigned will also consider the

relevant exhibits and/or documents in the context of the within motion.

Finally, the undersigned will consider documentation and exhibits filed in Waters I. During the course of litigation in Waters I, Waters and defendants filed motions for summary judgment and memorandums in opposition to those motions. Waters I, Dkt. Nos. 24, 47, 48, 110, 116, 120. In support and in opposition to the motions for summary judgment, the parties submitted documents and exhibits including: (1) the transcript from Waters' January/March 2013 disciplinary hearing; (2) the Decision and Order on Waters' Article 78 petition; (3) Waters' Disciplinary History; and (4) records related to Waters' appeal of the disciplinary determination. Waters I, Dkt. No. 110-4 at 21-33; Dkt. No. 116-2 at 15-18; Dkt. No. 116-3 at 2; Dkt. No. 110-5 at 14. The parties did not dispute the authenticity of these public records. When deciding a motion for summary judgment, a Court may take judicial notice of its own records of prior litigation, particularly when the records of prior litigation "closely relate" to the case before it. See In re Brooklyn Navy Yard Asbestos Litig., 971 F.2d 831, 839 (2d Cir. 1992) (citing, inter alia, St. Louis Baptist Temple, Inc. v. FDIC, 605 F.2d 1169, 1171-72 (10th Cir. 1979) ) ("[A] court may: consider stipulations, concessions of counsel, transcripts, exhibits and other papers[.]"); see also Graham v. City of New York, 869 F.Supp.2d 337, 343 (E.D.N.Y. 2012) (incorporating by reference a petition that the plaintiff referred to in the complaint, was in the plaintiff's possession, and was relied on by him in pleading); Bernier v. Koenigsmann, No. 9:17-CV-254 (DNH/ATB), 2017 WL 8230891, at \*5 (N.D.N.Y. Nov. 22, 2017) ("[T]he court may consider matters of which judicial notice may be taken, such as public filings and administrative decisions.") (citations omitted). Accordingly, the court will, sua sponte, take judicial notice of certain relevant records in Waters I. [8]

## C. Facts

**\*3** The facts are reviewed in the light most favorable to Waters as the non-moving party. See subsection II(A) infra. At the time of the incident described in the Second Amended Complaint, Waters was confined at Coxsackie and Greene Correctional Facility ("Greene"). See Sec. Am. Compl.

From June 2006 until January 17, 2013, Waters was confined at Coxsackie C.F. Dkt. No. 81-5 at 13. From December 2006 until August 2011 and from October 2011 until January 2013, Waters worked as a clerk in the law library. Id. at 17. As a law library clerk, Waters was not permitted to accept compensation in exchange for legal services provided to other inmates. Id. at 65.

In June 2010, Waters filed a Prison Rape Elimination Act ("PREA") sexual assault complaint against non-party Corrections Officer Jody Slater ("Slater"), a Cocksackie law library supervisor. Dkt. No. 81-5 at 20-22. A copy of his complaint was filed with the Eastern District of New York in support of Waters' habeas corpus petition.[9] Id. at 51.

Waters alleges that his PREA complaint was "common knowledge" within the facility. Dkt. No. 81-5 at 24. From September 2012 until November 2012, Sgt. Melendez threatened Waters with disciplinary action for providing legal assistance to certain inmates, and specifically mentioned Slater and the PREA complaint. Dkt. No. 81-5 at 19, 27-30. Waters also claims that Sgt. Melendez referred to him as "Johnnie Cochran" and asked Waters to provide legal assistance for his nephew. Id. at 30-37. Sgt. Melendez asked Waters how much it would cost for Waters to assist his nephew, who "might come up north" to Coxsackie. Id. Waters assumed that Sgt. Melendez was attempting to "set him up," and he informed Sgt. Melendez that he did not charge for legal assistance. Id. at 37.

On January 17, 2013, Waters was transferred to Greene C.F. Dkt. No. 81-6 at 2. On January 18, 2013, Sgt. Melendez, who was assigned to the Coxsackie Special Housing Unit issued plaintiff an Inmate Misbehavior Report (the "misbehavior report"), charging him with disobeying a direct order (106.10) and receiving compensation for legal services (180.17). Dkt. No. 81-11 ¶ 20; Dkt. No. 81-13. Waters received the misbehavior report the next day. Dkt. No. 81-5 at 85. On January 18, 2013, Sgt. Melendez, who was assigned to the Special Housing Unit ("SHU"), issued the misbehavior report and charged Waters with disobeying a direct order and receiving compensation for legal services. Dkt. No. 81-11 at ¶ 20; Dkt. No. 81-13. In that misbehavior report, Sgt. Melendez alleged that:

**\*4** On the above date and approx 2:00 p.m., while retrieving a hearing tape that was illegally sent to the law library by Inmate Burroughs.[10] A letter was found in an envelope that was addressed to inmate Waters 06A2999, who used to work in the law library. In this letter, Burroughs insinuates that he was in and in the past has paid for legal services from inmate Waters. A copy of the letter is attached but states as follow: "We will do the same agreement as the first time, that will get to you in about 2 weeks. You know I am a man of my word." I confronted Burroughs with the letter, he immediately admitted to paying inmate Waters for the legal services he had provide to him in the past and of his willingness to pay for it this time again. Officer Muschett, the law library officer, informed me that he has advised inmate Waters in the past that he is not allowed to receive compensation for legal services provided to other inmates.

Dkt. No. 81-13 at 2.

The misbehavior report did not include the date, time, or place that Burroughs allegedly paid Waters for legal services. See Dkt. No. 81-11 ("Melendez Decl.") ¶ 24; Dkt. No. 81-13 at 2. The "Incident Date" reflects the date that the letter arrived in the law library. Melendez Decl. ¶ 24. Sgt. Melendez did not preserve the envelope or cassette tape seized from Burroughs. Dkt. No. 83 ¶¶ 6, 7.

Sgt. Melendez investigated the incident, and interviewed Burroughs and C.O. Muschett. Melendez Decl. ¶¶ 16, 18, 19. C.O. Muschett advised Sgt. Melendez that when he became the Law Library Officer in 2009, he re-instructed Waters that he could not accept compensation. Melendez Decl. ¶¶ 18, 19. Sgt. Melendez also claims that Burroughs admitted that he previously paid Waters for legal services and was attempting to do so again. Id. ¶¶ 2, 3, 16.

Waters asserts that Sgt. Melendez's report is "fictitious." Dkt. No. 81-5 at 46. Waters claims that all outgoing communication from the SHU would have been searched, confiscated as contraband, photographed as evidence, and preserved for a disciplinary hearing. Dkt. No. 83 at ¶¶ 3, 4. Waters maintains that although he previously provided legal services for Burroughs, he never accepted favors, commissary, money, cigarettes, or any items in exchange for the services. See Dkt. No. 81-5 at 55-60. Waters testified that he never traded for legal services with any inmate. Id. Waters also asserts that when C.O. Muschett

assumed the role of library supervisor, he did not direct Waters not to accept compensation or reiterate the rules. Id. at 70-71.

On January 22, 2013, H.O. Gutwein presided over a Tier III disciplinary hearing related to the misbehavior report. Dkt. No. 84 at 7; Waters I, Dkt. No. 110-4 at 21-32. During the disciplinary hearing, C.O. Muschett testified that he was not aware of Waters charging Burroughs, or any other inmate, for legal services. Dkt. No. 84 at 9-10. Sgt. Melendez testified that his investigation did not reveal the type of assistance Waters provided Burroughs or the form of compensation that Waters received. Waters I, Dkt. No. 110-4 at 27-28.

At the conclusion of the hearing, H.O. Gutwein found Waters not guilty of refusing a direct order, but guilty of providing unauthorized legal assistance. Dkt. No. 84 at 7. H.O. Gutwein sentenced three months of SHU confinement, with a loss of packages, commissary, and telephone privileges for a corresponding period, and recommended that Waters forfeit three months of good time credits. Dkt. No. 84 at 7.

In March 2013, Plaintiff appealed the disciplinary determination to Prack. Dkt. No. 81-7. On May 8, 2013, Prack affirmed the decision. Waters I, Dkt. No. 110-5 at 14. In May 2013, Waters commenced a proceeding pursuant to Article 78 of the New York Civil Practice Law and Rules challenging the Tier III determination. Dkt No. 84 at 12-14. Plaintiff's Article 78 petition was granted and, the Albany County Supreme Court concluded that the misbehavior report failed to comply with the notice requirements under 7 N.Y.C.R.R. § 251-3.1. Id. The Court ordered that H.O. Gutwein's determination be annulled and all references to it be expunged from Waters' records. Id.; Dkt. No. 81-5 at 80. By the time the Article 78 determination was issued and implemented, Waters had already served seventy days of his sentence. Waters I, Dkt. No. 42 at 13.

**\*5** During his confinement with DOCCS, Waters was familiar with the grievance process and, specifically, DOCCS' Directive 4040. Dkt. No. 81-5 at 75-76. Waters previously advised other inmates on the grievance process and filed a grievance on his own behalf, unrelated to Sgt. Melendez, C.O. Muschett, or retaliation. Dkt. No. 81-5 at 76; Dkt. No. 81-8 ("Seguin Decl.") ¶ 13. While Waters was confined at Greene, the inmate grievance process was

available, and he successfully received and sent mail. [11] Dkt. No. 81-5 at 80, 84-85. Waters did not file any grievance against Defendants for alleged retaliation. Id. at 74, 76, 88. In 2014 and 2015, Waters filed two grievance appeals unrelated to Sgt. Melendez, C.O. Muschett, or retaliation. Seguin Decl. ¶ 14.

### II. Motion for Summary Judgment

Waters contends that Defendants retaliated against him in violation of the First Amendment. See generally Sec. Am. Compl. Defendants move for summary judgment on the grounds that: (1) Waters cannot establish a retaliation claim against Defendants; and (2) Waters failed to exhaust his administrative remedies. See generally Dkt. No. 81.

### A. Legal Standard

"A court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). The moving party has the burden of showing the absence of disputed material facts by providing the Court with portions of "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which support the motion. FED. R. CIV. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). A fact is material if it may affect the outcome of the case as determined by substantive law, such that "a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). "In determining whether summary judgment is appropriate, [the Court will] resolve all ambiguities and draw all reasonable inferences against the moving party." Skubel v. Fuoroli, 113 F.3d 330, 334 (2d Cir. 1997).

To avoid summary judgment, a non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." Carey v. Crescenzi, 923 F.2d 18, 19 (2d Cir. 1991) (quoting Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) ) (internal quotation marks omitted). A non-moving party must support such assertions by evidence showing the existence of a genuine issue of material fact. Id. "When no rational jury could

find in favor of the non-moving party because the evidence to support is so slight, there is no genuine issue of material fact and a grant of summary judgment is proper." Gallo v. Prudential Services, Ltd. P'ship, 22 F.3d 1219, 1224 (2d Cir. 1994).

Where, as here, a party seeks judgment against a pro se litigant, a court must afford the non-movant special solicitude. See Triestman v. Fed. Bureau of Prisons, 470 F.3d 471, 477 (2d Cir. 2006). As the Second Circuit has stated,

> [t]here are many cases in which we have said that a pro se litigant is entitled to "special solicitude," ... that a pro se litigant's submissions must be construed "liberally," ... and that such submissions must be read to raise the strongest arguments that they "suggest," .... At the same time, our cases have also indicated that we cannot read into pro se submissions claims that are not "consistent" with the pro se litigant's allegations, ... or arguments that the submissions themselves do not "suggest," ... that we should not "excuse frivolous or vexatious filings by pro se litigants," ... and that pro se status "does not exempt a party from compliance with relevant rules of procedural and substantive law....

*6 Id. (citations and footnote omitted); see also Sealed Plaintiff v. Sealed Defendant, 537 F.3d 185, 191-92 (2d Cir. 2008).

### B. Exhaustion

Sgt. Melendez contends that the motion for summary judgment must be granted because Waters failed to exhaust his administrative remedies through available grievance procedures. See Dkt. No. 81-2 at 9-14. The Prison Litigation Reform Act ("PLRA") requires that a prisoner exhaust any administrative remedies available to him or her before bringing an action for claims arising out of his or her incarceration. See Porter v. Nussle, 534 U.S. 516, 524, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002); see also Woodford v. Ngo, 548 U.S. 81, 82, 126 S.Ct. 2378, 165 L.Ed.2d 368 (2006). The exhaustion requirement applies "to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." Porter, 534 U.S. at 532, 122 S.Ct. 983. Further, the exhaustion requirement applies even where the prisoner seeks relief not available in the administrative grievance

process, such as monetary damages. Id. at 524, 122 S.Ct. 983. To exhaust administrative remedies, the inmate must complete the full administrative review process set forth in the rules applicable to the correctional facility in which he or she is incarcerated. See Jones v. Bock, 549 U.S. 199, 218, 127 S.Ct. 910, 166 L.Ed.2d 798 (2007) (internal citation omitted).

Although the Supreme Court has deemed exhaustion mandatory, the Second Circuit has recognized that "certain caveats apply." Ruggiero v. Cty. of Orange, 467 F.3d 170, 175 (2d Cir. 2006) (citation omitted). The Supreme Court recently held that "[c]ourts may not engraft an unwritten 'special circumstances' exception onto the PLRA's exhaustion requirement." Ross v. Blake, ––– U.S. ––––, 136 S.Ct. 1850, 1862, 195 L.Ed.2d 117 (2016). Thus, the "special circumstances" exception in Hemphill v. New York, 680 F.3d 680, 686 (2d Cir. 2004) is no longer consistent with the statutory requirements of the PLRA. Williams v. Priatno, 829 F.3d 118, 123 (2d Cir. 2016). [12]

Although Ross eliminates the "special circumstances" exception, courts must still consider the PLRA's "textual exception to mandatory exhaustion." Ross, 136 S.Ct. at 1858. Under this exception, courts must determine whether administrative remedies were "available" to a prisoner. Id. The Supreme Court identified three circumstances where administrative remedies may be unavailable to a prisoner. First, "an administrative procedure is unavailable when (despite what regulations or guidance materials may promise) it operates as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates." Id. at 1859 (citing Booth v. Churner, 532 U.S. 731, 736, 738, 121 S.Ct. 1819, 149 L.Ed.2d 958 (2001) ). "Next, an administrative scheme might be so opaque that it becomes, practically speaking, incapable of use." Id. Lastly, administrative remedies are unavailable where "prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." Id. at 1860.

### 1. Application [13]

*7 In support of the motion for summary judgment, defendants proffer the declarations of Assistant Director of the Inmate Grievance Program ("IGP") Rachel Seguin

and Greene IGP Supervisor Thomas Mauro. See Seguin Decl.; Dkt. No. 81-10 ("Mauro Decl."). Both Ms. Seguin and Mr. Mauro aver that a claim of retaliation is the proper subject for a grievance. Seguin Decl. ¶ 9; Mauro Decl. ¶ 9. A review of DOCCS records establishes that Waters did not file any grievances while housed at Greene in 2013, nor did he appeal any grievances to CORC during that year. Seguin Decl. ¶¶ 10, 12; Mauro Decl. ¶ 12. Waters concedes that he did not file a grievance related to the alleged retaliation. Dkt. No. 81-5 at 74. As there is no dispute that Waters failed to exhaust his administrative remedies, the undersigned must only assess whether administrative remedies were available to Waters. In that regard, Waters sets forth three arguments to establish that administrative remedies were not available to him.

### a. Transfer to Greene C.F.

First, Waters alleges that he was unable to file a grievance related to incidents that occurred at Coxsackie because he was housed at Greene. Dkt. No. 83-3 at 10. While the incident that was the subject of the misbehavior report allegedly occurred at Coxsackie, Waters received the misbehavior report when he was housed at Greene. Dkt. No. 81-8 at 85; Dkt. No. 81-13 at 2. Waters does not assert that the grievance process was unavailable to him at Greene, concedes that he was familiar with the grievance process, and testified that he had no issues with his mail while housed at Greene. Dkt. No. 81-5 at 75, 85. Accordingly, this argument lacks merit. See Rodriguez v. Senkowski, 103 F.Supp.2d 131, 134 (N.D.N.Y. 2000) ("[T]he mere fact that Plaintiff has been transferred to another prison facility does not necessarily render the exhaustion requirement moot. It is not clear to the Court why the Plaintiff cannot initiate a grievance against Defendants from his current facility, thereby instigating a review of these individuals' behavior that could lead to sanctions, discipline, and/or a change in the administration of medical care."); see also Rodriguez v. Westchester Cty. Jail Corr. Dep't, Assoc., No. 98 Civ. 2743, 2002 WL 1933953, at *3 (S.D.N.Y. Aug. 21, 2002) (finding that the inmate had ample time to file a grievance, notwithstanding his subsequent transfer.)

### b. Untimely

Waters claims that he did not file a grievance because he was not subjected to a "final adverse action" until sixty-three days after the misbehavior report was issued, and, thus, unable to file a grievance within the twenty-one day period. Dkt. No. 83-3 at 10. Waters further asserts that he was not eligible for an exception to the time limit. Id. As discussed supra, an inmate must submit a grievance within twenty-one calendar days of the alleged occurrence. See N.Y. Comp. Codes R. & Regs. tit. 7, § 701.5(a). "An inmate may request an exception to the time limit for filing a grievance, ... and the IGP supervisor may grant an exception to the time limit for filing a grievance based on mitigating circumstances[.]" Id. at § 701.6(g). Here, Waters concedes that he never filed a grievance nor did he file a request for an extension of time. Thus, because "Plaintiff's failure to exhaust his administrative remedies cannot be excused based upon [his] mere speculation that his grievance would have been denied," this argument does not suffice to excuse his failure to exhaust. Tomony v. Cnty. of Suffolk, No. 10-CV-5726, 2013 WL 55821, at *4 (E.D.N.Y. Jan. 3, 2013) (citation omitted).

### c. Non-Grievable Issue

Waters also claims that the language of § 701.3(e) [14] is "opaque and confusing," and that he decided not to file a grievance for retaliation because he considered it a "non grievable" issue related to the disciplinary process. Dkt. No. 83-3 at 8-11. Waters asserts that the facility provided "mixed messages" with respect to the proper process to grieve retaliation arising from a misbehavior report. Dkt. No. 81-5 at 87. Based upon his interpretation of DOCCS' regulations and procedures, inmates are required to raise retaliation claims, related to disciplinary hearings, during the disciplinary process. Id. at 76-78. Although Waters admits that he did not file a grievance against Sgt. Melendez, Waters claims that he exhausted his administrative remedies when he filed an appeal of the disciplinary determination and an Article 78 petition. Id. at 80. Waters could not recall whether he addressed retaliation in the disciplinary hearing or in any appeal. Id.

**\*8** Waters' argument is misplaced. Courts in this District have held that "[t]hough a disciplinary appeal is sufficient to exhaust a claim that Plaintiff was deprived of due process at a disciplinary hearing, 'allegations of staff misconduct related to the incidents giving rise to the discipline must be grieved.' " Barker v. Smith, No. 16-

CV-76, 2017 WL 3701495, at *3 (S.D.N.Y. Aug. 25, 2017) (quoting Scott v. Gardner, 287 F.Supp.2d 477, 489 (S.D.N.Y. 2003), on reconsideration in part, 344 F.Supp.2d 421 (S.D.N.Y. 2004), and on reconsideration in part, 2005 WL 984117 (S.D.N.Y. Apr. 28, 2005) ); see also Labounty v. Johnson, 253 F.Supp.2d 496, 501 (W.D.N.Y. 2003) ("An appeal from a disciplinary hearing does not satisfy the grievance exhaustion requirement for a [constitutional] claim, even if the hearing is based on the same set of facts underlying the grievance."). "Where the inmate is asserting both retaliation claims and procedural due process claims, he must separately exhaust both types of claim, using the procedure appropriate to each type of claim." Johnson v. Fraizer, No. 16-CV-6096, 2016 WL 7012961, at *4 (W.D.N.Y. Dec. 1, 2016) (citing, inter alia, Washington v. Chaboty, No. 09 CIV. 9199, 2015 WL 1439348, at *7 (S.D.N.Y. Mar. 30, 2015) ("In certain circumstances, however, courts have deemed a disciplinary appeal inadequate to exhaust a claim under the PLRA. Inmate Grievance Program exhaustion has been required, for example, where an inmate alleges retaliation, including retaliation based on the filing of an allegedly false misbehavior report.") (citation omitted) ).

Even if the undersigned accepts Waters' claim that DOCCS' regulations regarding the proper grievance procedures for retaliation are confusing and irreconcilable, Waters' excuse nonetheless lacks merit. During the disciplinary hearing, Waters stated that the misbehavior report failed to provide him with adequate notice of the charges, but did not make any reference to retaliation. Waters I, Dkt. No. 110-4 at 21-32. Waters was given the opportunity to question Sgt. Melendez, but did not pose any questions related to retaliation or non-party officer Slater. Id. at 27-28. Similarly, while Waters appealed the disciplinary determination, his objections involved issues related to the process afforded at the hearing, including the sufficiency of the evidence presented. See Dkt. No. 81-7. Specifically, Waters referred to H.O. Gutwein's refusal to provide documents and the absence of "some evidence" supporting the charge. Id. at 2. Waters also claimed that "[t]he hearing was in retaliation of complaints and legal action challenging Greene's procedure of imposing dorm sanction in violation of due process and First Amendment filed by petitioner in the Northern District Court of New York"— a retaliation claim entirely unrelated to Sgt. Melendez and the misbehavior report. Id. With respect to the misbehavior report, Waters claimed that it lacked "the

date, time, place or special acts of petitioner to support the charge." Id. Finally, in the Decision and Order granting the Article 78 petition, the Albany County Supreme Court noted that Waters challenged the insufficiency of the misbehavior report because it failed to comply with the regulatory particularity requirements. Dkt. No. 84 at 12-14. Notably absent from the disciplinary transcript or Waters' appeals, is any claim that Sgt. Melendez retaliated against Waters when he issued the misbehavior report.

Waters' argument that the facility was "on notice" of his retaliation claim through the appellate procedure is unsupported by the record. Indeed, the only reference to retaliation in the record is contained in Waters' pleadings and deposition. See Dkt. Nos. 23, 81-5, 83. In cases in this District with similar factual scenarios, Courts have concluded that an appeal of a misbehavior report does not suffice to exhaust retaliation claims, "even if that misconduct formed the basis of the disciplinary proceeding." Smith v. Ashley, No. 9:15-CV-496 (BKS/ ATB), 2016 WL 8732642, at *8 (N.D.N.Y. April 1, 2016); see Crosby v. LaValley, No. 9:15-CV-1125 (BKS/ ATB), 2017 WL 7050647, at *6 (N.D.N.Y. Dec. 15, 2017) (finding that retaliation claims related to misbehavior report were not properly exhausted due to the absence of any reference to retaliation in disciplinary hearing transcript, grievances, and use of force report). Therefore, defendants have met their burden of showing that Waters has failed to exhaust his administrative remedies. Accordingly, as exhaustion is a prerequisite to filing an action in federal court (Woodford, 548 U.S. at 85, 126 S.Ct. 2378), it is recommended that Sgt. Melendez's motion for summary judgment be granted.

*9 Traditionally, if it is found that the plaintiff has not exhausted all available administrative remedies, his or her case should be dismissed without prejudice. See Standard Inv. Chartered, Inc. v. Nat'l Ass'n of Sec's. Dealers, Inc., 560 F.3d 118, 124 (2d Cir. 2009) (citation omitted). "[F]ailure to exhaust administrative remedies is often a temporary, curable procedural flaw," and "[i]f the time permitted for pursuing administrative remedies has not expired, a prisoner ... can cure the defect by exhausting [the available remedies] and reinstating his suit." Berry v. Kerik, 366 F.3d 85, 87 (2d Cir. 2003) (amended 2004) (quoting Snider v. Melindez, 199 F.3d 108, 111-12 (2d Cir. 1999) (internal quotation marks omitted) ). In this instance however, because the events that gave rise to Waters' claims occurred in January 2013 and the time to

cure the defect has expired, the undersigned recommends that the dismissal be with prejudice. See Bridgeforth v. Bartlett, 686 F.Supp.2d 238, 240 (W.D.N.Y. 2010) ("Since the time limits for plaintiff to file an administrative appeal have long since passed, administrative remedies are no longer available to him, as a result of his own inaction. This case, then, is precisely the kind of case that the PLRA was intended to foreclose. It is therefore dismissed with prejudice."); Martin v. Howard, No. 9:03-CV-0712 (LEK/DEP), 2008 WL 323835, at *9 (N.D.N.Y. Feb. 5, 2008) (granting summary judgment, with prejudice, because the plaintiff had "well over one year to exhaust the administrative remedies available to him.").

### C. First Amendment

Alternatively, if the District Judge were not to adopt or confirm the undersigned's recommendation for dismissal with prejudice on the basis of exhaustion, the undersigned addresses the merits of plaintiff's claim.

### 1. C.O. Muschett

During Waters' deposition, he testified that C.O. Muschett should be dismissed as a defendant in this action. Dkt. No. 81-5 at 18 ("Muschet [sic], I don't want to say that he retaliated against me because I've never had a problem with Officer Muschet [sic]. So if anything, I think Muschet [sic] actually would more than likely probably need to be dismissed from this action."), 90 ("Again, with Muschet [sic], I'm really not claiming anything against him because I really don't see how any issue against Muschet [sic] can survive."). In opposition to the motion for summary judgment, Waters presented arguments pertaining only to Sgt. Melendez. See generally Dkt. No. 83-3. In light of Waters' assertions at his deposition, and his failure to present any argument in opposition to C.O. Muschett's motion, the undersigned recommends that the motion for summary judgment, as it pertains to C.O. Muschett, be granted. See Feacher v. Intercontinental Hotels Grp., 563 F.Supp.2d 389, 399 (N.D.N.Y. 2008) ("The failure to oppose a motion for summary judgment on a certain claim is deemed abandonment of the claim, and, in the Northern District of New York, is deemed consent to granting that portion of the motion.") (internal citation omitted) (citing N.D.N.Y. L.R. 7.1(b)(3) ("Where a properly filed motion is unopposed and the Court

determines that the moving party has met its burden to demonstrate entitlement to the relief requested therein, the non-moving party's failure to file or serve any papers as this Rule requires shall be deemed as consent to the granting or denial of the motion, as the case may be, unless good cause is shown.") ).

### 2. Sgt. Melendez

Waters claims that Sgt. Melendez subjected him to a false misbehavior report in retaliation for filing a PREA complaint against Slater, and providing legal assistance to inmates. Dkt. No. 83-3 at 11-23. Sgt. Melendez argues that Waters has failed to establish a causal connection between the misbehavior report and protected speech. Dkt. No. 81-2 at 15-18.

Courts are to "approach [First Amendment] retaliation claims by prisoners 'with skepticism and particular care[.]' " See, e.g., Davis v. Goord, 320 F.3d 346, 352 (2d Cir. 2003) (quoting Dawes v. Walker, 239 F.3d 489, 491 (2d Cir. 2001), overruled on other grounds by Swierkiewicz v. Sorema, N. A., 534 U.S. 506, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002) ). A retaliation claim under Section 1983 may not be conclusory and must have some basis in specific facts that are not inherently implausible on their face. See Ashcroft v. Iqbal, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009); South Cherry St., LLC v. Hennesse Grp. LLC, 573 F.3d 98, 110 (2d Cir. 2009). "To prove a First Amendment retaliation claim under Section 1983, a prisoner must show that '(1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected speech and the adverse action.' " Espinal v. Goord, 558 F.3d 119, 128 (2d Cir. 2009) (quoting Gill v. Pidlypchak, 389 F.3d 379, 380 (2d Cir. 2004), overruled on other grounds by Swierkiewicz, 534 U.S. at 560, 122 S.Ct. 999). If the plaintiff establishes these elements, the burden shifts to the defendants to show by a preponderance of the evidence that they would have taken the same action against the plaintiff absent his exercising of the protected conduct. See Graham v. Henderson, 89 F.3d 75, 81 (2d Cir. 1996).

### a. Protected Speech or Conduct

**\*10** To satisfy the first element of a retaliation claim, a plaintiff must show that he engaged in a protected activity. See Espinal, 558 F.3d at 128. The Second Circuit has concluded that use of the prison grievance system constitutes a protected activity. See Gill, 389 F.3d at 384; Franco v. Kelly, 854 F.2d 584, 589 (2d Cir. 1988) ("Moreover, intentional obstruction of a prisoner's right to seek redress of grievances is precisely the sort of oppression that section 1983 is intended to remedy.") (alteration and internal quotation marks omitted); see also Roseboro v. Gillespie, 791 F.Supp.2d 353, 367 (S.D.N.Y. 2011) (finding that the filing of a grievance is a protected activity); Mateo v. Fischer, 682 F.Supp.2d 423, 433 (S.D.N.Y. 2010) (same). Moreover, providing authorized legal assistance to other inmates is constitutionally protected conduct. See Auleta v. LaFrance, 233 F.Supp.2d 396, 401 (N.D.N.Y. 2002) (acknowledging that "[t]he Supreme Court found that the prison regulation that prohibited inmates from providing legal assistance to other inmates was unconstitutional unless inmates had alternatives to inmate assistance.") (citing Johnson v. Avery, 393 U.S. 483, 490, 89 S.Ct. 747, 21 L.Ed.2d 718 (1969) ). Plaintiff contends that he was disciplined due to a PREA complaint filed against a non-party officer, as well as his past legal assistance to other inmates. See Dkt. No 83-3 at 12. Thus, Waters satisfies the first prong of the test as he has engaged in a protected activity. See id.; Gill, 389 F.3d at 384.

### b. Adverse Action

In the prison context, "adverse action" is objectively defined as conduct "that would deter a similarly situated individual of ordinary firmness from exercising ... constitutional rights." Davis, 320 F.3d at 353. "[A]dverse action taken for both proper and improper reasons may be upheld if the action would have been taken based on the proper reasons alone." Jackson, 549 F.Supp.2d at 215. A defendant's retaliatory filing of a falsified misbehavior report that results in disciplinary segregated confinement constitutes adverse action. See Gill, 389 F.3d at 384 (finding that a false misbehavior report that resulted in the plaintiff's placement in keeplock constituted adverse action); Gayle v. Gonyea, 313 F.3d 677, 682 (2d Cir. 2002) (emphasis added) ("An allegation that a prison official filed false disciplinary charges in retaliation for the exercise of a constitutionally protected right, such as the filing of a grievance, states a claim under § 1983.").

At the conclusion of the January 2013 disciplinary hearing, H.O. Gutwein sentenced Waters to three months of confinement in the SHU with a loss of packages, commissary, and telephone privileges and recommended that Waters forfeit three months of good time credits. Dkt. No. 84 at 7. When Waters' Article 78 petition was ultimately granted in September 2013, he had already served seventy days of the three-month SHU confinement ordered by H.O. Gutwein. Waters I, Dkt. No. 42 at 13. Because Waters has established that Sgt. Melendez's misbehavior report resulted in a period of segregated confinement, the undersigned finds that Waters has satisfied the second prong of the test. See Gill, 389 F.3d at 384

### c. Causal Connection

The plaintiff bears the burden of establishing that "the protected conduct was a substantial or motivating factor in the prison officials' decision to discipline the plaintiff." Gayle, 313 F.3d at 682. A plaintiff "may do so with circumstantial evidence if it is 'sufficiently compelling[.]' " Kotler v. Donelli, 382 Fed.Appx. 56, 57-58 (2d Cir. 2010) (summary order) (quoting Bennett v. Goord, 343 F.3d 133, 137 (2d Cir. 2003) ).

> In determining whether a causal connection exists between the plaintiff's protected activity and a prison official's actions, a number of factors may be considered, including: (i) the temporal proximity between the protected activity and the alleged retaliatory act; (ii) the inmate's prior good disciplinary record; (iii) vindication at a hearing on the matter; and (iv) statements by the defendant concerning his motivation.

Baskerville v. Blot, 224 F.Supp.2d 723, 732 (S.D.N.Y. 2002). In assessing temporal proximity,

> **\*11** [t]here is no bright line to define the outer limits beyond which a temporal relationship is too attenuated to establish a causal relationship, so courts judge the

permissible inferences that can be drawn from temporal proximity in the context of particular cases. However, courts have found that six and eight month gaps between the protected conduct and adverse action were sufficient, while in other circumstances three months was considered too long.

Burton v. Lynch, 664 F.Supp.2d 349, 367 (S.D.N.Y. 2009) (internal quotation marks and citations omitted).

Waters alleges that he filed his PREA complaint against the non-party officer Slater in 2010. Dkt. No. 81-5 at 21. In or about September 2012, Sgt. Melendez began threatening Waters, stating that Slater still worked at the facility, and that Waters "didn't get that much ... accomplished with him, so ... [you won't] get much accomplished against any of us." Id. at 27. Sgt. Melendez referred to Waters as "Johnnie Cochran," stated that he was going to "get rid of [his] black ass," and requested that he assist his nephew with legal matters if he became incarcerated. Id. at 30, 35, 38. In January 2013, Sgt. Melendez issued plaintiff the misbehavior report. Dkt. No. 81-13 at 2. Two years between Waters' PREA complaint and the alleged false misbehavior report is too attenuated to support an inference of a causal connection. See Moore v. Kwan, No. 12-CV-4120, 2016 WL 9022575, at *15 (S.D.N.Y. Mar. 30, 2016), aff'd, 683 Fed.Appx. 24 (2d Cir. 2017) ("Courts have found causation based upon temporal proximity where the lapse between the protected act and the adverse action consisted of a few months, not years."); see also Espinal, 558 F.3d at 129; Kasiem v. Rivera, No. 09 Civ. 9665(DLC), 2011 WL 166929, at *7 (S.D.N.Y. Jan. 18, 2011) (dismissing the plaintiff's retaliation claim where the adverse action occurred nearly two years after the protected conduct as "twenty months is too long a gap in time to support [an inference of causation]."); cf. Jordan v. Garvin, No. 01CIV4393LTS/GWG, 2004 WL 302361, at *6 (S.D.N.Y. Feb. 17, 2004) ("[T]he existence of a temporal connection as close as the one present here—just two days—is sufficient by itself to establish the requisite inference of a causal connection."). However, even assuming plaintiff could establish retaliatory motive via temporal proximity, "without more, such temporal proximity is insufficient to satisfy [the plaintiff's] burden to bring forward some evidence of pretext." Simpson v. N.Y.S. Dep't of Civil

Servs., 166 Fed.Appx. 499, 502 (2d Cir. 2006) (summary order).

Despite this gap, the undersigned finds that the record includes circumstantial evidence that creates a genuine issue of material fact regarding the motivation behind Sgt. Melendez's decision to issue the misbehavior report. In support of the motion for summary judgment, Sgt. Melendez avers that he was not assigned to the law library in 2013 and that he was not aware of any legal assistance that Waters provided to other inmates. Melendez Decl. ¶¶ 32, 33. Sgt. Melendez states that he did not speak to Waters or non-party officer Slater about any grievance or lawsuit filed against non-party officer Slater, and had no knowledge of any lawsuit. Id. ¶¶ 30, 31.

However, in further support of his claim of retaliatory intent, Waters testified his PREA complaint against non-party officer Slater was "common knowledge," and that Sgt. Melendez made numerous references to the PREA complaint when he harassed and threatened him in September 2012. Dkt. No. 81-5 at 24, 27. Specifically, Sgt. Melendez told Waters, "... you know, Slater's still here" and "you really didn't get that much done —accomplished with him[.]" Id. at 27. Waters also contends that Sgt. Melendez told him not to provide certain inmates with legal assistance because they "create problems." Id. at 29-30. Waters identified these inmates, by name, during his deposition. Id. As to his prior good disciplinary record, Waters testified that he served as a law library clerk for seven years and was never accused or charged with accepting compensation for legal services. Id. at 17, 37. Indeed, the record establishes that from 2007 until January 2013, Waters received only three misbehavior reports resulting in two Tier II hearings and one Tier III hearing. [15] Waters I, Dkt. No. 116-3 at 2. Finally, as to whether plaintiff was vindicated, the record establishes that Waters' Article 78 petition was granted resulting in H.O. Gutwein's determination being overturned and expunged from Waters' records. Dkt. No. 84 at 12-14. However, the undersigned notes that the Article 78 proceeding challenged only Waters' Fourteenth Amendment due process rights, and did not discuss whether Sgt. Melendez retaliated against him. See id.

**\*12** Even disregarding Waters' disciplinary hearing vindication, a determination of whether Sgt. Melendez was aware of the PREA complaint or threatened

Waters for providing legal assistance to certain inmates involves an issue of credibility that is inappropriate to be decided for purposes of this motion. Taking the lack of disciplinary history, coupled with the statements attributed to Sgt. Melendez, which, if true, strongly suggest that he was motivated by retaliatory intent, these circumstances present genuine issues of material fact concerning the nexus element of the retaliation test, which preclude the entry of summary judgment in connection with the retaliation claim. See Roland v. McMonagle, No. 12-CV-6331, 2015 WL 5918179, at *6 (S.D.N.Y. Oct. 9, 2015) (finding an issue of fact as to retaliation despite the gap in time between the protected conduct and alleged attack as the plaintiff presented evidence that the defendants were aware of the complaints and mocked him for filing grievances during the attack).

**d. Discipline Absent Protected Conduct**

Sgt. Melendez argues that, even assuming the evidence creates a material question of fact as to whether he had retaliatory intent, he would have issued the misbehavior report even in the absence of the protected conduct. Dkt. No. 81-2 at 16-18. "[T]he conclusion that the state action would have been taken in the absence of improper motives is readily drawn in the context of prison administration where we have been cautioned to recognize that prison officials have broad administrative and discretionary authority over the institutions they manage." Hynes, 143 F.3d at 657 (quoting Lowrance v. Achtyl, 20 F.3d 529, 535 (2d Cir. 1994). "Defendants [may meet] their burden of showing that they would have disciplined the plaintiff even in the absence of the protected conduct if 'it was undisputed that [the inmate plaintiff] had in fact committed the prohibited conduct' for which he had been cited in a misbehavior report." Id.

Here, Waters did not concede to the charges, and has denied accepting compensation for legal assistance from any inmate. See Dkt. No. 81-5 at 67. The record does not contain any evidence that Waters was previously disciplined for accepting compensation for legal services. Indeed, C.O. Muschett testified that he was not aware of Waters accepting compensation for legal services. See Dkt. No. 84 at 4. Thus, affording Waters special solicitude, there is a genuine issue of material fact related to whether Waters attempted to trade compensation for legal services. See Gayle, 313 F.3d at 684 (denying

summary judgment where it is disputed whether the plaintiff committed the prohibited conduct); see Rivera v. Lawrence, No. 9:05-CV-0967 (TJM/GHL), 2009 WL 1734735, at *6 (N.D.N.Y. June 18, 2009) (finding an issue of fact where the plaintiff denied the charge and the documentary evidence and testimony at the disciplinary hearing did not support the charge). As Sgt. Melendez has not met his burden of establishing that he would have filed the misbehavior report even in the absence of the protected conduct, it is recommended that his motion for summary judgment on this ground be denied.

### III. Conclusion

**WHEREFORE**, based on the findings set forth above, it is hereby:

**RECOMMENDED**, that Defendants' motion for summary judgment (Dkt. No. 81) be **GRANTED** with prejudice on the grounds that plaintiff failed to exhaust his administrative remedies. Alternatively, if reached, Defendants' motion for summary judgment should be **GRANTED** as to plaintiff's First Amendment retaliation claims against C.O. Muschett, and **DENIED** as his plaintiff's First Amendment retaliation claims against Sgt. Melendez; and it is

**ORDERED**, that the Clerk of the Court serve a copy of this Report-Recommendation and Order on all parties in accordance with the Local Rules.

**IT IS SO ORDERED**.

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have fourteen days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN (14) DAYS WILL PRECLUDE APPELLATE REVIEW**. Roldan v. Racette, 984 F.2d 85, 89 (2d Cir. 1993) (citing Small v. Secretary of Health and Human Servs., 892 F.2d 15 (2d Cir. 1989) ); 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 6(a), 6(e), 72. [16]

**All Citations**

Slip Copy, 2018 WL 3079764

Footnotes

1  This matter was referred to the undersigned for report and recommendation pursuant to 28 U.S.C. § 636(b) and N.D.N.Y.L.R. 72.3(c).

2  Defense counsel advised that Sheridan was deceased.

3  The complaint in Waters I, filed in November 2013, included procedural due process and retaliation claims against Gutwein and Prack. Waters I, Dkt. No. 42.

4  Throughout this Report-Recommendation, references to page numbers in items that appear on the docket refer to the pagination of the header numbers generated by CM/ECF, not to the page numbers used by the parties in the individual documents.

5  On March 13, 2017, the Court issued a Decision and Order adopting the Report-Recommendation and Order. Dkt. No. 68.

6  All unpublished decisions cited herein, unless otherwise indicated, are attached to this Report-Recommendation.

7  Local Rule 7.1(a)(3) states:
   Summary Judgment Motions
   Any motion for summary judgment shall contain a Statement of Material Facts. The Statement of Material Facts shall set forth, in numbered paragraphs, each material fact about which the moving party contends there exists no genuine issue. Each fact listed shall set forth a specific citation to the record where the fact is established.
   The opposing party shall file a response to the Statement of Material Facts. The non-movant's response shall mirror the movant's Statement of Material Facts by admitting and/or denying each of the movant's assertions in matching numbered paragraphs. Each denial shall set forth a specific citation to the record where the factual issue arises. The non-movant's response may also set forth any additional material facts that the non-movant contends are in dispute. *Any facts set forth in the Statement of Material Facts shall be deemed admitted unless specifically controverted by the opposing party.*
   Local Rule 7. 1(a)(3) (emphasis in original).

8  In opposition to the within motion, Waters provided excerpts of the transcript from his disciplinary hearing and a portion of the Decision and Order granting his Article 78 petition. Dkt. No. 84. The complete transcript from the disciplinary hearing and complete Decision on the Article 78 petition were annexed as exhibits to defendants' motion for summary judgment in Waters I.

9  Waters filed a Habeas Corpus Petition pursuant to 28 U.S.C. § 2254 in the United States District Court for the Eastern District of New York. See Waters v. Martuscello, No. 1:10-CV-5700, Dkt. No. 1 (E.D.N.Y. Nov. 24, 2010) ("Waters II"). During the course of the litigation, Waters filed a letter addressed to the presiding Judge and dated June 13, 2010, but received by the Court on June 22, 2011. Waters II, Dkt. No. 21. In that letter, Waters advised that Slater intimidated and threatened him with "special confinement." Id. at 2. On June 22, 2011, the Court received a letter, dated June 15, 2011, from Waters accusing Slater of forcing him to perform a sexual act. Waters II, Dkt. No. 22. The second letter was filed, under seal.

10  Inmate Burroughs' name was redacted from the misbehavior report. Dkt. No. 81-13 at 2.

11  Plaintiff remained at Greene C.F. until March 29, 2013. Dkt. No. 81-6 at 3.

12  In Williams v. Priatno, the Second Circuit debated Ross's effect on Hemphill's estoppel exception. See Williams, 829 F.3d at 123. The Williams Court stated that "Ross largely supplants Hemphill inquiry by framing the exception issue entirely within the context of whether administrative remedies were actually available to the aggrieved inmate." Id. (citing Ross, 136 S.Ct. at 1858-59).

13  First, the inmate must file a complaint with an inmate grievance program ("IGP") clerk within twenty-one days of the alleged incident. N.Y. COMP. CODES R. & REGS. tit. 7, § 701.5(a)(1). An IGP representative has sixteen calendar days to informally resolve the issue. Id. § 701.5(b)(1). If no informal resolution occurs, the IGRC must hold a hearing within sixteen days of receipt of the grievance and must issue a written decision within two working days after the conclusion of the hearing. Id. §§ 701.5(b)(2)(i)-(ii). If the determination is unfavorable to the inmate, the inmate may appeal the IGRC's determination to the facility superintendent within seven calendar days of receipt of the determination. Id. § 701.5(c)(1). If the superintendent's determination is unfavorable, the inmate may appeal to CORC within seven days after receipt of the superintendent's determination. Id. §§ 701.5(d)(i)-(ii). CORC must "review each appeal, render a decision on the grievance, and transmit its decision to the facility, with reasons stated, for the [inmate], the grievance clerk, the superintendent, and any direct parties within thirty (30) calendar days from the time the appeal was received." Id. § 701.5(d)(3)(ii). Parties do not dispute that at all relevant times, DOCCS had in place a three-step inmate grievance program. N.Y. COMP. CODES R. & REGS. tit. 7, § 701.5.

14  A list of "non grievable" issues is set forth in Section 701.3(e) and DOCCS' Directive # 4040:

e) Non-grievable issues.

(1) An individual decision or disposition of any current or subsequent program or procedure having a written appeal mechanism which extends review to outside the facility shall be considered non-grievable.

(2) An individual decision or disposition of the temporary release committee, time allowance committee, family reunion program or media review committee is not grievable. Likewise, an individual decision or disposition resulting from a disciplinary proceeding, inmate property claim (of any amount), central monitoring case review or records review (freedom of information request, expunction) is not grievable. In addition, an individual decision or disposition of the Commissioner, or his designee, on a foreign national prisoner application for international transfer is not grievable.

(3) The policies, rules, and procedures of any program or procedure, including those above, are grievable.

Note: If an inmate is unsure whether an issue is grievable, he/she should file a grievance and the question will be decided through the grievance process in accordance with section 701.5 of this Part.

N.Y. Comp. Codes R. & Regs. tit. 7, § 701.3.

15    DOCCS conducts three types of inmate disciplinary hearings. See 7 N.Y.C.R.R. § 270.3; see also Hynes v. Squillace, 143 F.3d 653, 655 n.1 (2d Cir. 1998). Tier I hearings address the least serious infractions and can result in minor punishments such as the loss of recreation privileges. Hynes, 143 F.3d at 655 n.1. Tier II hearings involve more serious infractions, and can result in penalties which include confinement for a period of time in the SHU. Id. Tier III hearings address the most serious violationsand can result in unlimited SHU confinement and the loss of "good time" credits. Id.

16    If you are proceeding pro se and are served with this Order by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date the Order was mailed to you to serve and file objections. FED. R. CIV. P. 6(d). If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday. Id. § 6(a)(1)(C).

---

**End of Document**                                    © 2018 Thomson Reuters. No claim to original U.S. Government Works.